George M. Lee (SBN 172982)
Douglas A. Applegate (SBN 142000)
**Seiler Epstein Ziegler & Applegate LLP**
601 Montgomery Street, Suite 2000
San Francisco, California 94111
Phone:  (415) 979-0500
Fax:      (415) 979-0511

Raymond M. DiGuiseppe (SBN  228457)
**LAW OFFICES OF RAYMOND MARK DIGUISEPPE, PLLC**
4002 Executive Park Blvd., Suite 600
Southport, NC 28461
Phone: (910) 713-8804
Fax:     (910) 672-7705

Attorneys for Plaintiffs
WILLIAM WIESE, JEREMIAH MORRIS,
LANCE COWLEY, SHERMAN MACASTON,
ADAM RICHARDS, CLIFFORD FLORES,
L.Q. DANG, FRANK FEDEREAU, ALAN NORMANDY,
TODD NIELSEN, THE CALGUNS FOUNDATION,
FIREARMS POLICY COALITION,
FIREARMS POLICY FOUNDATION,
and SECOND AMENDMENT FOUNDATION

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM WIESE, et al., <br><br> Plaintiffs, <br><br> vs. <br><br> XAVIER BECERRA, in his official capacity as Attorney General of California, et al., <br><br> Defendants. | Case No. 2:17-cv-00903-WBS-KJN <br><br> **Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Temporary Restraining Order, and Issuance of Preliminary Injunction** <br><br> **[FRCP 65; E.D. L.R. 231]** <br><br> Date:      TBD <br> Time:      TBD <br> Courtroom 5 <br> Judge:     Hon.  William B. Shubb |

**Seiler Epstein Ziegler & Applegate LLP**
Attorneys at Law

– i –

## TABLE OF CONTENTS

I.   INTRODUCTION ......................................................................................................1

II.  STATEMENT OF FACTS .........................................................................................2

    A.  AMMUNITION MAGAZINES AND THE ORIGINAL CALIFORNIA MAGAZINE BAN ..................2

    B.  SENATE BILL 1446 AND PROPOSITION 63 ............................................4

    C.  THE INSTANT ACTION ...............................................................................7

III. ARGUMENT IN SUPPORT OF TRO/PRELIMINARY INJUNCTION .................................7

    A.  PRELIMINARY INJUNCTION AND TRO STANDARDS ...........................................7

    B.  PLAINTIFFS ARE ENTITLED TO A TRO/PRELIMINARY INJUNCTION ON THE
        GROUNDS THAT PEN. CODE §§ 32310(C) AND (D), AS AMENDED, WOULD
        VIOLATE THE SECOND AMENDMENT RIGHTS OF PLAINTIFFS AND
        SIMILARLY-SITUATED INDIVIDUALS ...............................................................9

      1.  The Standards for Facial and As-Applied Constitutional Challenges ......................9

      2.  The Nature of the Right at Stake ........................................................9

      3.  The Substantial  Burden This Ban Would Impose Upon Core
         Second Amendment Rights ...............................................................10

      4.  The Law is Subject to Strict Scrutiny, Which It Cannot Survive. ...........................14

      5.  The Law Resoundingly Fails Even Under the Less Exacting,
         Though Still Demanding Standards of Intermediate Scrutiny. .................................16

      6.  The Irreparable Harm and the Interests of the Public Palpably Favor
         a Preliminary Stay Pending Determination of These Important Claims. .................19

      7.  Serious Questions Going to the Merits Undeniably Exist and the
         Balance of Equities Weighs Heavily in Favor of the Stay. ....................................20

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

C.  THE COURT SHOULD ENJOIN ENFORCEMENT OF PEN. CODE §§ 32310(C) AND (D), AS AMENDED, TO PREVENT AN UNCONSTITUTIONAL TAKING OF PLAINTIFFS' LAWFULLY-HELD PERSONAL PROPERTY WITHOUT PROVIDING FOR COMPENSATION. ...................................................22

    1.  The Retroactive Magazine Possession Ban Constitutes a Per Se Taking. ................23

        a.  Section 32310(d) is a Taking Because it Compels the Physical Appropriation of Property. ................................................24

        b.  Section 32310(c) and (d) Constitutes a Taking Because it Completely Deprives the Owners All Economically Beneficial Use of Their Property. .....28

        c.  The Statute is Not a Valid Exercise of Police Power. ....................................31

    2.  The Retroactive Magazine Possession Ban Constitutes a Burdensome Regulatory Taking. .........................................................36

D.  THE COURT SHOULD ENJOIN ENFORCEMENT OF PEN. CODE §§ 32310(C) AND (D), AS AMENDED, ON THE GROUNDS THAT IT IS UNCONSTITUTIONALLY VAGUE, AND OVERBROAD. ....................................................40

    1.  The Statute is Void for Vagueness ...............................................40

    2.  The Statute is Constitutionally Overbroad ............................................43

IV.  CONCLUSION ..........................................................................45

## TABLE OF AUTHORITIES

**Cases**

*4805 Convoy, Inc. v. City of San Diego*, 183 F.3d 1108 (9th Cir. 1999)..........................9

*Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) ............................ passim

*Anderson v. United States*, 612 F.2d 1112 (9th Cir. 1980)..........................................8

*Andrus v. Allard*, 44 U.S. 51, 100 S.Ct. 318 (1979) .........................................29, 30

*Bauer v. Becerra*, __ F.3d __, 2017 U.S. App. LEXIS 9658 (9th Cir. 2017) ........................10, 14

*Caetano v. Mass.*, __ U.S. __, 136 S.Ct. 1027 (2016)....................................9, 11, 13, 18

*Centro Tepeyac v. Montgomery County*, 722 F.3d 184 (4th Cir. 2013) .......................................21

*Chalk v. U.S. Dist. Court*, 840 F.2d 701 (9th Cir. 1988) ...................................................8

*Chicago, R. I. & P. R. Co. v. United States*, 284 U.S. 80, 52 S.Ct. 87 (1931) ...........................28

*Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund, Ltd.*,
598 F.3d 30 (2d Cir. 2010) ........................................................19, 21, 44

*Clear Channel Outdoor, Inc. v. City of Los Angeles*, 340 F.3d 810 (9th Cir. 2003)..............21, 44

*Colorado Outfitters Ass'n v. Hickenlooper*, 24 F.Supp.3d 1050 (D. Colo. 2014) ......................12

*County of Santa Clara v. Trump*, __ F.Supp.3d __,
2017 U.S. Dist. LEXIS 62871 (N.D. Cal. 2017) .........................................8, 19, 37

*Credit Bureau Connection, Inc. v. Pardini*, 726 F.Supp.2d 1107 (E.D. Cal. 2010)...................7, 8

*Davis v. Abercrombie*, 903 F.Supp.2d 975 (D. Haw. 2012)...........................................7

*District of Columbia v. Heller*, 554 U.S 570, 128 S.Ct. 2783 (2008) .................................. passim

*Dore v. United States*, 97 F. Supp. 239 (Ct. Cl. 1951) ...............................................27

*Edward P. Stahel & Co. v. United States*, 78 F. Supp. 800 (Ct. Cl. 1948).............................27

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ..............................................10

*Felton Water Co. v. Superior Court*, 82 Cal.App. 382 (1927) .......................................22

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

*Fesjian v. Jefferson*, 399 A.2d 861 (D.C. Ct. App. 1979) ..........................................32, 33

*Foti v. City of Menlo Park*, 146 F.3d 629 (9th Cir. 1998) ...............................................9

*Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015) ..............................12

*Fyock v. City of Sunnyvale*, 25 F.Supp.3d 1267 (N.D. Cal. 2014) ..............................13

*Fyock v. City of Sunnyvale*, 779 F.3d 991 (9th Cir. 2015) ............................12, 15, 38

*Golden Gate Hotel Assn. v. City & County of San Francisco*,
    836 F.Supp. 707 (N.D. Cal. 1993) ....................................................................22

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ......................................................40

*Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244 (D.C. Cir. 2011) ...............12

*Hoosier Energy Rural Elec. Co-op., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721 (7th Cir. 2009) ................................................................................................................21

*Horne v. Department of Agriculture*, ___ U.S. ___, 135 S.Ct. 2419 (2015)....................29, 30, 36

*Hotel & Motel Assn. of Oakland v. City of Oakland*, 344 F.3d 959 (9th Cir. 2003) ...................40

*Hoye v. City of Oakland*, 653 F.3d 835 (9th Cir. 2011) ...........................................9, 43

*Int'l Refugee Assistance Project v. Trump*, 2017 U.S. App. LEXIS 9109 (4th Cir. 2017) .....19, 21

*Jefferson Street Industries, LLC v. City of Indio*, 236 Cal.App.4th 1175 (2015) .........................22

*Kaiser Aetna v. United States*, 444 U.S. 164, 100 S. Ct. 383 (1979) .......................24, 28

*Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 104 S.Ct. 2187 (1984)...........................27

*Kolender v. Lawson*, 461 U.S. 352 (1983) ....................................................................40

*Lair v. Bullock*, 697 F.3d 1200 (9th Cir. 2012) ............................................................8

*Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 125 S. Ct. 2074 (2005) ................................ passim

*Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S.Ct. 3164 (1982).23, 24, 31

*Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 112 S.Ct. 2886 (1992).............. passim

*McDonald v. Chicago*, 561 U.S. 742 (2010) ...................................................................9

*Meghrig v. KFC Western*, 516 U.S. 479 (1996) ........................................................................8

*Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012) ............................................................19

*Mugler v. Kansas*, 123 U.S. 623 (1887) ........................................................................34, 35

*Munaf v. Geren*, 553 U.S. 674 (2008) .................................................................................8

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2d Cir. 2015) .....................12

*Nat'l Inst. of Family & Life Advocates v. Harris*, 839 F.3d 823 (9th Cir. 2016) ...................18

*Nat'l Wildlife Fed'n v. I.C.C.*, 850 F.2d 694 (D.C. Cir. 1988) ..............................................24

*Nixon v. United States*, 978 F.2d 1269 (D.C. Cir. 1992) ....................................................26

*Nunez v. City of San Diego*, 114 F.3d 935 (9th Cir. 1997) ..................................................40

*Oracle USA, Inc. v. Rimini St., Inc.*, 191 F.Supp.3d 1134 (D.Nev. 2016) ......................40, 42

*Palazzolo v. Rhode Island*, 533 U.S. 606, 121 S.Ct. 2448 (2001) .......................................36

*Penn Central Transportation Co. v. City of New York*,
    438 U.S. 104, 98 S.Ct. 2646 (1978) .......................................................................35, 36

*Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 43 S.Ct. 158 (1922) .................................36

*PEST Comm. v. Miller*, 626 F.3d 1097 (9th Cir. 2010) .......................................................40

*Powell's Books, Inc. v. Kroger*, 622 F.3d 1202 (9th Cir. 2010) .....................................43, 44

*Quilici v. Vill. of Morton Grove*, 532 F.Supp. 1169 (N.D. Ill. 1981) ...........................32, 33, 38

*Residents of Beverly Glen, Inc. v. City of Los Angeles*, 34 Cal.App.3d 117 (1973) ...............7, 23

*Richmond Elks Hall Ass'n v. Richmond Redevelopment Agency*,
    561 F.2d 1327 (9th Cir. 1977) ....................................................................................28

*Sammartano v. First Jud. Dist. Ct.*, 303 F.3d 959 (9th Cir. 2002) .......................................20

*San Remo Hotel L.P. v. City and County of San Francisco*, 27 Cal.4th 643 (2002) ..................22

*Silvester v. Harris*, 843 F.3d 816 (9th Cir. 2016) ..................................................... passim

*Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*,
    535 U.S. 302, 122 S.Ct. 1465 (2002)..........................................................................23

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

*Tenants Assn. of Park Santa Anita v. Southers*, 222 Cal.App.3d 1293 (1990)...............................7

*United States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013).......................................10, 16

*United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803 (2000)................................16

*Video Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950 (9th Cir. 2009).....................16

*Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383 (1998)......................................43, 44

*Washington v. Trump*, 847 F.3d 1151 (9th Cir. 2017)...........................................8

**Statutes**

Cal. Pen. Code § 16740 .....................................................................4

Cal. Pen. Code § 16900 ....................................................................11

Cal. Pen. Code § 26700 ....................................................................15

Cal. Pen. Code § 30915 ....................................................................15

Cal. Pen. Code § 30920 ....................................................................15

Cal. Pen. Code § 30960 ....................................................................15

Cal. Pen. Code § 31910 ....................................................................11

Cal. Pen. Code § 32000 ....................................................................11

Cal. Pen. Code § 32310 ................................................................. passim

Cal. Pen. Code § 32315 ....................................................................15

Cal. Pen. Code § 32400 ...................................................................5, 14

Cal. Pen. Code § 32405 .....................................................................5

Cal. Pen. Code § 32406 ...........................................................5, 41, 42, 43

Cal. Pen. Code § 32410 ...................................................................5, 15

Cal. Pen. Code § 32425 .....................................................................5

Cal. Pen. Code § 32430 ....................................................................15

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

Cal. Pen. Code § 32435 ....................................................................................5

Cal. Pen. Code § 32450 ...............................................................................5, 26

Colo. Rev. Stat. § 18–12–301 ........................................................................4

Colo. Rev. Stat. § 18-12-302 ........................................................................15

D.C. Code Ann. § 7-2506.01 ........................................................................16

Mass. Gen. Laws Ann., ch. 140, § 131M ......................................................15

N.J. Stat. Ann. § 2C:39-9 ..............................................................................15

N.Y. Penal Law § 265.02 ...............................................................................15

**Other Authorities**

David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849 (2015)...........................................................................................11, 17

**Constitutional Provisions**

Cal. Const., Art. II, § 10 .................................................................................5

U.S. Const., 14th Amend., § 1 .......................................................................22

U.S. Const., 5th Amend.................................................................................22

## I.    INTRODUCTION

California has generally banned the importation, manufacture, sale or receipt of large-capacity firearm magazines since 2000.  And thus, for 17 years, California gun owners have been forced to live with a Constitutionally unacceptable, but politically negotiated compromise: that the further acquisition, importation or manufacture of large-capacity magazines would be prohibited, but that gun owners – including the individual Plaintiffs herein – would be permitted to keep their existing property as "grandfathered" items.

In 2016, the Legislature and the drafters of Proposition 63 reneged on that deal. Seventeen years after the fact, they are now requiring, retroactively, that these large-capacity magazine holders either remove them from the state, sell them to a licensed firearms dealer, or "surrender" them to the state.  Neither of these options allows a grandfathered magazine holder to keep his or her property, and therefore, they are being forcibly dispossessed of them.

By and through this motion, Plaintiffs here are seeking temporary and preliminary injunctive relief on a specific and limited issue, that is: to maintain the *status quo*, which for 17 years has represented that constitutionally unpalatable but compulsory balance which permitted Plaintiffs to keep these magazines, until all claims are adjudicated at trial.  By enacting these provisions last year, the State has upset this balance, and Plaintiffs are forced to bring this motion to prevent further permanent, irreparable injury to their Second Amendment and property rights. We do so here on three grounds:

First, the provisions at issue – which are in effect a retroactive prohibition on lawfully-acquired parts of firearms, and intrinsic to them, constitute a retroactive ban that violates the Second Amendment to the United States Constitution.  The magazines themselves are firearms parts, which cannot be so readily and easily banned today.  Plaintiffs will be able to show that they are arms, and/or parts of arms, that are in widespread common use, for lawful purposes, including self-defense.  Therefore, they are protected from a categorical ban under the Supreme Court's mandate in *District of Columbia v. Heller*.  The scope and scale of the numbers that will be affected in California, Plaintiffs will show, are substantial.

– 1 –

Second, this retroactive ban on lawfully-possessed private property completely dispossesses Plaintiffs of important (and now Constitutionally-protected) property.  Therefore, the retroactive magazine ban amounts to a violation of the Takings and Due Process Clauses of the Constitution, as the State in no way provides or allows for just compensation to be paid to "grandfathered" magazine holders who will soon lose, in many instances, their right to keep and maintain valuable property.

Finally, the retroactive ban suffers from Constitutionally unacceptable problems in vagueness and overbreadth.

For these reasons, discussed at length below, these provisions of the magazine ban that imminently would dispossess Plaintiffs of these items – useful force multipliers in defense of hearth and home, treasured and valued family property, and items which conscientious, law-abiding citizens otherwise should be able to keep – must be enjoined.


## II.    STATEMENT OF FACTS

### A.    AMMUNITION MAGAZINES AND THE ORIGINAL CALIFORNIA MAGAZINE BAN

Ammunition magazines and feeding devices are intrinsic parts of all semi-automatic firearms, which were designed, developed, produced and sold in large quantities starting in the early 20th Century.  Today, a vast majority of firearms, including handguns ("the quintessential self-defense weapon," *District of Columbia v. Heller*, 554 U.S. 570, 629, 128 S. Ct. 2783, 2818, (2008)), are self-loading semi-automatic firearms that require a magazine to feed each successive round of ammunition.

A magazine is simply "a receptacle for a firearm that holds a plurality of cartridges or shells under spring pressure preparatory for feeding into the chamber.  Magazines take many forms, such as box, drum, rotary, tubular, etc. and may be fixed or removable." (http://saami.org/glossary/.)  A vast majority of the firearms sold at retail to law enforcement and to the civilian markets today are semi-automatic, particularly handguns, and which contain removable magazines.  (Youngman Decl., ¶ 6.)  A magazine is therefore an inherent operating

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

– 2 –

part of, and inseparable from, a functioning firearm.  (Id., ¶ 7.)  All semi-automatic firearms are basically inoperable without them.  (Id.)  Modern semi-automatic firearms of the kind in use for lawful purposes (including self-defense) sold at retail in the civilian and law enforcement markets include at least one magazine intended to be used as a part of that firearm.  (Id.)

Although an exact number may never be known, over the past century, many millions of magazines certainly have existed, lawfully within the United States, as these inherent parts of semi-automatic firearms commonly held and used by Americans for lawful purposes such as self-defense, competition, training, and sport.  According to James Curcuruto, the National Shooting Sports Foundation's Director of Industry Research and Analysis – and most likely the leading source for this figure – there were an estimated 230 million pistol and rifle magazines in the possession of United States consumers between 1990 and 2015.  (Curcuruto Decl., ¶ 9.)  The data supporting the NSSF's study further show that magazines capable of holding more than 10 rounds of ammunition accounted for approximately 115 million, or approximately half of all magazines owned in the United States.  (Id.)  It can also be safely assumed that many more such magazines were manufactured within or imported into the United States for sale, both prior to 1990 as well as after 2015.  (Id., ¶ 13.)  Whatever the actual figure is or would be, it is safe to say that there are at least tens of millions of magazines holding more than 10 rounds being held in the U.S.  (Id., ¶ 14; Youngman Decl., ¶ 9.)

Contrary to conventional stereotypes, and national perceptions, California has long had an active and thriving culture and tradition of gun ownership, for recreational target shooting, competition, hunting, and training for self-defense.  But over the past few years, and even after *Heller*, many have been forced to become active and vocal in the defense of their gun rights, as the Legislature continues to pile a steady drumbeat of indignities and injuries to their rights to keep and bear arms.

Along with the rest of the nation, and up through 1999, millions of California citizens, including Plaintiffs herein, lawfully acquired and possessed semi-automatic firearms – many of which contained magazines capable of holding more than ten rounds of ammunition.  However,

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

– 3 –

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

in 1999, through passage of Senate Bill 23, California enacted legislation generally banning methods of *acquiring* magazines that could hold more than ten rounds, legislatively branding them "large-capacity magazines" as currently defined in Penal Code § 16740.[1]  And since that time, the Code has generally forbidden the manufacture, importation, sale or receipt of any large-capacity magazine.  *See* Cal. Pen. Code § 32310(a) (formerly § 12020(a)(2)).

However, and as a part of the legislative compromise in connection with Sen. Bill 23, as enacted, the continued possession of lawfully-acquired "large capacity magazines" up to that point (i.e., "grandfathered" magazines) was not prohibited and would still be lawful.  Individual Plaintiffs Wiese, Morris, Cowley, Macaston, Flores, and Dang, and the members of the class of persons on whose behalf this action is brought, are law-abiding citizens, who are neither prohibited nor exempt, and who have lawfully possessed such large-capacity magazines through December 31, 1999.

### B.     SENATE BILL 1446 AND PROPOSITION 63

In 2016, gun control measures in California moved forward at a steady, and unprecedented pace.  Among these measures included additional laws pertaining to large-capacity magazines, which provisions appeared in Senate Bill 1446, and certain parts of Proposition 63.

Apparently concerned about the prevalence of mass shootings, and most recently the terrorist attacks in San Bernardino, California on December 2, 2015 (*See* Req. for Jud. Notice, Exhibit B, p. 4), the Legislature passed Senate Bill 1446 ("SB 1446") which amended Penal

---

[1]To be sure, the very term "large-capacity magazine" is irksome to use, and is controversial.  To the rest of the country, at least in states where there are no limits on magazine capacity, the term "large capacity magazine" is not generally used.  In most other states, firearms are sold with "standard capacity magazines" holding more than 10 rounds. (Youngman Decl., ¶ 8.)  Many of the most popular and common pistols sold in the United States, for example, were designed to hold more than 10 rounds.  (Id.)  We use the term "large-capacity magazine" in this memorandum, as we must, solely because that is the codified definition at issue. In other states, the term "large capacity magazine" may mean something else.  *See, e.g.*, Colo. Rev. Stat. § 18–12–301(2)(a)(I) (defining "large capacity magazine" as those having capacity to accept more than 15 rounds).

– 4 –

Code § 32310(b), to make it a criminal offense to possess large-capacity magazines starting on July 1, 2017, "regardless of the date the magazine was acquired[.]"  The law as signed would also require a person in lawful possession of any large-capacity magazines prior to July 1, 2017, to dispose of such magazine(s) only as provided by the statute.  The provisions of SB 1446 were signed into law by Gov. Brown on July 1, 2016, and became effective on January 1, 2017.

We note that the author and proponents of SB 1446 never conducted any report about either the costs associated with the payment of "just compensation" to the owners of previously grandfathered magazines who would turn them in to law enforcement, or the existence of any type of market that would be available to such owners under a "forced sale" to licensed firearm dealers.  The bill's author and sponsors simply assumed that the state, via local law enforcement agencies, had the power to confiscate the magazines under the "police powers" of the State, and without providing the owners any compensation.  (*See* Req. for Jud. Notice, Exhibit B, pp. 4-6.)

And then, on November 8, 2016, California voters enacted Proposition 63 (entitled the "Safety for All Act"), a measure that was sponsored and heavily promoted as a "gun safety" measure by Lt. Gov. Gavin Newsom.  (*See* Req. for Jud. Notice, Exhibit E.)  Proposition 63 amended Penal Code §§ 32310, 32400, 32405, 32410, 32425, 32435, 32450, added section 32406, and repealed section 32420 by initiative statute, which changed the law to totally prohibit and criminalize the possession of large-capacity magazines as of July 1, 2017.  Proposition 63 took effect on the day after the election.  *See*, Cal. Const., Art. II, § 10(a) ("An initiative statute or referendum approved by a majority of votes thereon takes effect the day after the election unless the measure provides otherwise.")

With regard to those provisions of Prop. 63 dealing with large-capacity magazines, the proponents and drafters likewise clearly had mass shootings in mind, a type of crime that has dominated our news within the past decade.  Specifically, contained within the "Findings and Declarations" (section 2) of Proposition 63, the measure stated:

11. Military–style large-capacity ammunition magazines—some capable of holding more than 100 rounds of ammunition—significantly increase a shooter's ability to kill a lot of people in a short amount of time. That is why these large capacity ammunition magazines

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

are common in many of America's most horrific mass shootings, from the killings at 101 California Street in San Francisco in 1993 to Columbine High School in 1999 to the massacre at Sandy Hook Elementary School in Newtown, Connecticut in 2012.

12. Today, California law prohibits the manufacture, importation and sale of military-style, large capacity ammunition magazines, but does not prohibit the general public from possessing them. We should close that loophole. No one except trained law enforcement should be able to possess these dangerous ammunition magazines.

(Prop. 63, § 2; *see* Req. for Jud. Notice, Exhibit E.)

With mass shootings being the stated *raison d'être* justifying these new magazine restrictions, we undertook a study of the reported mass shootings that occurred within California, since 2000. We specifically looked at three separate sources which tracked and reported either "mass shooting" incidents, or "active shooter" incidents, using three of the most well-known sources for this type of data. (Moody Decl., ¶¶ 10.) Among these three data sets, we are presented with a reasonably accurate picture of post-2000 California incidents. Professor Carl Moody, Professor of Economics at the College of William and Mary, diving into the unpleasant task of examining the circumstances regarding the reported, and some of the most widely-known incidents in California, concludes that pre-ban (lawfully-held, since before 2000) large-capacity magazines have simply not been used in mass shootings. To be sure, in some of the incidents, large-capacity magazines were used, as in the San Bernardino terrorist attack of Dec. 2, 2015, which the Legislature specifically cited as a catalyst justifying passage of SB 1446. (See Req. for Jud. Notice, Exh B at p. 4.) But in that event, given the ages of the shooters and their recent history in preparing for the attack (i.e., obtaining weapons through straw purchases in recent proximity to the attacks), "it is a reasonable inference that the large-capacity magazines were either imported from out of state, or manufactured here illegally." (Moody Decl., ¶ 11.) Many more such examples appear in this study. (Id., ¶¶ 11-13.) In short, there is no current evidence that legally-possessed large-capacity magazines were involved in mass shooting incidents in California since 2000. (Id., ¶ 16.) Certainly as time progresses, the chances that such items are used in future attacks is lowered. (Id., ¶ 17.)

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

– 6 –

**SEILER EPSTEIN ZIEGLER & APPLEGATE LLP**
Attorneys at Law

**C.      THE INSTANT ACTION**

Plaintiffs filed the instant action on April 28, 2017, and filed a First Amended Complaint on June 6, 2017.  (Docket No. 7.)  Plaintiffs Wiese, Morris, Cowley, Macaston, Flores and Dang are individual and law-abiding California residents, who acquired, prior to 2000, large-capacity magazines, as parts of legally-possessed firearms.  (Wiese Decl., ¶ 3; Morris Decl., ¶ 4; Cowley Decl., ¶ 4; Macaston Decl., ¶ 5; Flores Decl., ¶ 4; Dang Decl., ¶ 4.)  Each of these individual plaintiffs wishes to keep these magazines in the State of California, and are unwilling to destroy or "surrender" their property to the State.  Some of the Plaintiffs have "pre-ban" magazines that are worth substantial amounts, either intrinsically or because they have historical value.  (Wiese Decl., ¶ 5; Flores Decl., ¶¶ 4-5; Dang Decl., ¶ 8.)  Some of these magazines are the only magazines that the Plaintiffs may have for that particular firearm.  (Wiese Decl., ¶ 6; Dang Decl., ¶ 5; Macaston Decl., ¶ 6.)  Some of the magazines were the only magazines that were ever made for that particular firearm.  (Dang Decl., ¶ 5.)

Plaintiffs, including the organizational plaintiffs, are bringing this matter individually, and as representatives on behalf of the class of individuals who are or would be affected by the ban, that is, those law-abiding California residents, who are not otherwise exempt, who lawfully and have legally possessed large-capacity magazines in this state before December 31, 1999.  (FAC, ¶ 7.)  *Residents of Beverly Glen, Inc. v. City of Los Angeles*, 34 Cal.App.3d 117 (1973); *Tenants Assn. of Park Santa Anita v. Southers*, 222 Cal.App.3d 1293, 1299-1300 (1990) (a right to sue in a representative capacity may be recognized where the question is one of public interest.)

**III.      ARGUMENT IN SUPPORT OF TRO/Preliminary Injunction**

**A.      PRELIMINARY INJUNCTION AND TRO STANDARDS**

"The same standards generally apply to temporary restraining orders and preliminary injunctions." *Credit Bureau Connection, Inc. v. Pardini*, 726 F.Supp.2d 1107, 1132 (E.D. Cal. 2010); *Davis v. Abercrombie*, 903 F.Supp.2d 975, 994 (D. Haw. 2012) ("The standard for

granting a preliminary injunction and the standard for granting a temporary restraining order are identical."). The determination of whether a party is entitled to relief "is guided by four questions: '(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.'" *Washington v. Trump*, 847 F.3d 1151, 1164 (9th Cir. 2017) (quoting *Lair v. Bullock*, 697 F.3d 1200, 1203 (9th Cir. 2012)).  The movants must show "they are likely to face immediate irreparable harm absent an injunction, that they are likely to succeed on the merits, and that the balance of harms and public interest weighs in their favor." *County of Santa Clara v. Trump*, __ F.Supp.3d __, 2017 U.S. Dist. LEXIS 62871, *15 (N.D. Cal. 2017).

However, even if the movant's showing does not rise to the level of demonstrating a strong likelihood of success at this preliminary stage, an injunction or restraining order may still properly issue so long as the movant demonstrates "'serious questions going to the merits,'" and "that the balance of hardships 'tips sharply' in his favor,' along with a showing that 'he is likely to suffer irreparable harm, and that an injunction is in the public interest.'" *County of Santa Clara v. Trump*, 2017 U.S. Dist. LEXIS 62871 at *28-29 (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-35 (9th Cir. 2011) (*Cottrell*)). While this is generally considered an "extraordinary and drastic remedy," *Munaf v. Geren*, 553 U.S. 674, 689-690 (2008), "[a] 'prohibitory injunction,' the form of preliminary injunction plaintiffs request here, seeks only to 'prohibit[] a party from taking action' and 'pre-serve[] the status quo pending a determination of the action on the merits,'" *Pardini*, 726 F.Supp.2d at 1133 (quoting *Chalk v. U.S. Dist. Court*, 840 F.2d 701, 704 (9th Cir. 1988)), "unlike the 'particularly disfavored' 'mandatory' form of injunction which 'goes well beyond simply maintaining the status quo,'" *Pardini*, at 1133 (quoting *Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir. 1980)), and forces "'a responsible party to take action,'" *Pardini*, at 1133 (quoting *Meghrig v. KFC Western*, 516 U.S. 479, 484 (1996)).

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

**SEILER EPSTEIN ZIEGLER & APPLEGATE LLP**
Attorneys at Law

1

2

**B.** **PLAINTIFFS ARE ENTITLED TO A TRO/PRELIMINARY INJUNCTION ON THE GROUNDS THAT PEN. CODE §§ 32310(C) AND (D), AS AMENDED, WOULD VIOLATE THE SECOND AMENDMENT RIGHTS OF PLAINTIFFS AND SIMILARLY-SITUATED INDIVIDUALS.**

3

4

### 1. The Standards for Facial and As-Applied Constitutional Challenges

5

This both is a facial and as-applied challenge to the retroactive large-capacity magazine ban under the Second Amendment. "'A successful challenge to the facial constitutionality of a law invalidates the law itself.'" *4805 Convoy, Inc. v. City of San Diego*, 183 F.3d 1108, 1111 (9th Cir. 1999) (quoting *Foti v. City of Menlo Park*, 146 F.3d 629, 635 (9th Cir. 1998)). "[A] statute is facially unconstitutional if 'it is unconstitutional in every conceivable application, or it seeks to prohibit such a broad range of protected conduct that it is unconstitutionally overbroad.'" *Hoye v. City of Oakland*, 653 F.3d 835, 857 (9th Cir. 2011) (quoting *Foti*, at 635). "A paradigmatic as-applied attack, by contrast, challenges only one of the rules in a statute, a subset of the statute's applications, or the application of the statute to a specific factual circumstance, under the assumption that a court can separate valid from invalid subrules or applications." *Hoye*, at 857 (internal citations omitted).

6

7

8

9

10

11

12

13

14

15

16

17

### 2. The Nature of the Right at Stake

18

"The core of the *Heller* analysis is its conclusion that the Second Amendment protects the right to self defense in the home. The Court said that the home is 'where the need for defense of self, family, and property is most acute,' and thus, the Second Amendment must protect private firearms ownership." *Silvester v. Harris*, 843 F.3d 816, 820 (9th Cir. 2016) (*Silvester*) (quoting *District of Columbia v. Heller*, 554 U.S 570, 628, 128 S.Ct. 2783 (2008) (*Heller*)). This is why the Second Amendment protects "arms . . . of the kind in common use . . . for lawful purposes like self-defense," *Heller*, 554 U.S. at 624, and "elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home," *id.* at 624; *Caetano v. Mass.*, __ U.S. __, 136 S.Ct. 1027, 1028 (2016) (*per curiam*) (*Caetano*) (quoting *McDonald v. Chicago*, 561 U.S. 742, 767 (2010) ("That right vindicates the 'basic right' of 'individual self-defense.'")).

19

20

21

22

23

24

25

26

27

28

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

The Ninth Circuit employs a two-step inquiry in resolving challenges to laws under the Second Amendment: "first, the court asks whether the challenged law burdens conduct protected by the Second Amendment . . . based on a 'historical understanding of the scope of the right.'" *Silvester*, 843 F.3d at 820-821 (quoting *Heller*, 554 U.S. at 625). "[A]nd if so, the court must then apply the appropriate level of scrutiny." *Id.* at 821. "[T]he [*Heller*] Court expressly left for future evaluation the precise level of scrutiny to be applied to laws relating to Second Amendment rights." *Id.* at 820. "The Court did, however, reject a rational basis standard of review, thus signaling that courts must at least apply intermediate scrutiny." *Id.* (italics added). Generally, "just as in the First Amendment context, the level of scrutiny in the Second Amendment context should depend on 'the nature of the conduct being regulated and the degree to which the challenged law burdens the right.'" *United States v. Chovan*, 735 F.3d 1127, 1137 (9th Cir. 2013). "More specifically, the level of scrutiny should depend on (1) 'how close the law comes to the core of the Second Amendment right,' and (2) 'the severity of the law's burden on the right.'" *Id.*, at 1137 (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 703 (7th Cir. 2011)). "Guided by this understanding, our test for the appropriate level of scrutiny amounts to 'a sliding scale.'" *Bauer v. Becerra*, __ F.3d __, 2017 U.S. App. LEXIS 9658, *11 (9th Cir. 2017) (quoting *Silvester*, 843 F.3d at 821). "'A law that imposes such a severe restriction on the fundamental right of self defense of the home that it amounts to a destruction of the Second Amendment right is unconstitutional under any level of scrutiny.'" *Bauer*, at *11 (quoting *Silvester*, at 821). "Further down the scale, a 'law that implicates the core of the Second Amendment right and severely burdens that right warrants strict scrutiny. Otherwise, intermediate scrutiny is appropriate.'" *Id.*

### 3.    This Ban Would Impose Substantial Burdens Upon Core Second Amendment Rights

The Large-Capacity Magazine Ban Law unquestionably places a burden upon Second Amendment rights – and a substantial one at that. Firearm magazines are integral operating parts

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

of the modern day semi-automatic firearms for which they are routinely produced, such that many, if not most, firearms are essentially inoperable without them.[2] (Youngman Decl., ¶ 7.)

And this is not a recent development.  Magazines with a capacity of more than ten rounds have been prevalent and commonly used since long before California and some other states targeted them with special forms of regulation.  They have been manufactured and used in connection with firearms as early as the 15th Century, and they have been popular throughout the country and California since the 1930s.  *See* David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849 (2015) (Lee Decl., Ex. A).  By the time California legislatively branded them "large-capacity magazines" at the end of 1999 (SB 23, 1999-2000 Reg. Sess. (Cal. 1999); former § 32310), millions of such magazines had been manufactured and sold into circulation here and around the county as integral operating parts of semi-automatic firearms.  (Curcuruto Decl., ¶¶ 8-13; Youngman Decl., ¶ 7; Kopel, *supra*, at 862 ("Long before 1979, magazines of more than ten rounds had been well established in the mainstream of American gun ownership."))  *See also*, *Caetano*, 136 S.Ct. at 1032-33 (the "[h]undreds of thousands" of stun guns, which are "less popular than handguns," makes them "a legitimate means of self-defense across the country").  With many of the most popular semi-automatic firearms, magazines of this capacity or greater are the most prevalent type of magazine employed or the only type manufactured for those firearms; magazines of this capacity or greater are now "standard" in semi-automatic firearms.  (Youngman Decl., ¶ 7-8.)  And virtually all such firearms are sold at retail with at least one or more magazines, usually of "standard capacity." (Youngman Decl., ¶¶ 7-8.)

While California's 2000 legislative action generally banned most forms of future

---

[2]In fact, California law requires many models of new pistols sold at retail to have "magazine disconnect mechanisms," which means that these firearms are literally incapable of being fired without a magazine.  (Youngman Decl., ¶ 7).  *See*, Pen. Code §§ 31910(b)(4)-(6), 32000, and 16900 (defining "magazine disconnect mechanism" as "a mechanism that prevents a semiautomatic pistol that has a detachable magazine from operating to strike the primer of ammunition in the firing chamber when a detachable magazine is not inserted in the semiautomatic pistol.")

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

1   acquisition and transfer of these magazines, it did not ban mere possession, and thus countless

2   law-abiding citizens of this state have continued to use and possess them for many recognized

3   lawful purposes, including self-defense, competition, training, and sport. (Youngman Decl., ¶ 9.)

4   The large-capacity magazines in California today at least number into the "hundreds of

5   thousands," as the California Department of Justice's own recent findings indicate. (Req. for Jud

6   Notice, Ex. A).  And they likely number into the millions nationwide. (Curcuruto Decl., ¶¶ 11-

7   13.)  Courts have found likewise.  *See, Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244,

8   1261 (D.C. Cir. 2011) ("We think it clear enough in the record that semi-automatic rifles and

9   magazines holding more than ten rounds are indeed in 'common use,' as the plaintiffs

10  contend."); *Colorado Outfitters Ass'n v. Hickenlooper*, 24 F.Supp.3d 1050, 1068 (D. Colo. 2014)

11  (magazines with capacities of greater than 15 rounds "number in the tens of millions").

12          Should this new ban take effect in California, as of July 1, 2017 – subject to very limited

13  exceptions almost invariably beyond the reach of any average citizen – not only would the mere

14  possession of such magazines become unlawful, but all those currently in possession of the

15  magazines would be forced to dispose of them through certain specified means.  Moreover, as

16  discussed in section III.C, *infra* at pp. 22-39, this is essentially a forced dispossession of

17  property, because none of the specified means of mandated disposal provides even a realistic

18  chance of obtaining just compensation, or any compensation at all, for that matter.  Based upon

19  this clear prevalence, popularity, and common use of magazines capable of holding more than

20  ten rounds, the courts, including the Ninth Circuit, have recognized that possession of such

21  magazines is protected by the Second Amendment, have rejected any notion that they are

22  uncommon, dangerous, or unusual, and have thus held that bans of this sort indeed burden a

23  constitutionally-protected right. *See e.g.*, *Fyock v. City of Sunnyvale*, 779 F.3d 991, 999 (9th Cir.

24  2015); *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015);

25  *Friedman v. City of Highland Park*, 784 F.3d 406, 415 (7th Cir. 2015); *Heller II*, 670 F.3d at

26  1261.

27          This ban will necessarily impair "the right of law-abiding, responsible citizens to use

28

arms in defense of hearth and home," *Heller*, 554 U.S. at 624, which is "the core of the Second Amendment right," *Silvester*, 843 F.3d. at 821. The countless Californians who have reasonably relied upon the continuing ability to possess these magazines for self-defense will be forced to acquire substitute magazines, and perhaps even substitute firearms if their current firearms only accommodate magazines holding more than ten rounds, in order to salvage some form of their constitutionally-protected right to possess and use firearms for defensive means. The expense of replacing these magazines with substitute magazines or firearms could be substantial in many cases, entirely cost-prohibitive in others, or even render the firearms completely useless in still others, such as where the person has multiple such magazines or simply cannot afford to make the new purchases necessary to replace their existing ammunition or firearms subject to the ban. And some such magazines are simply irreplaceable. (*See, e.g.*, Flores Decl., ¶ 4, 10; Dang Decl., ¶ 5, 8.) At best, some of these individuals would be left with a lesser level of firearm protection; at worst, some would be left with no firearm protection at all.

Second, the magazine size very well may make a difference. Whether or not the documented instances of firearm self-defense, where the number of shots fired has actually been recorded, have or have not involved more ten rounds of fire is beside the point. The fact that few people may actually require large-capacity magazine for self-defense "should be celebrated, and not seen as a reason to except magazines having a capacity to accept more than ten rounds from Second Amendment protection." *Fyock v. City of Sunnyvale*, 25 F.Supp.3d 1267, 1276 (N.D. Cal. 2014). "[T]he court will not judge whether the public's firearm choices are often used for self-defense, or even whether they are effective for self-defense – the firearms must merely be preferred." *Id.* at 1278; *see Caetano*, 136 S.Ct. at 1028-29 (Caetano's mere possession of a stun gun in an encounter with her violent ex-boyfriend "may have saved her life," even though she never deployed it[.]") Unquestionably, having a large-capacity magazine at one's disposal certainly *could*, and likely *would*, provide a greater level of protection in a self-defense situation given the simple, yet significant fact that one has a greater number of rounds available to fire. (Ayoob Decl., ¶ 6.) This is particularly true for average citizens who, unlike some trained law

enforcement personnel, are generally not readily prepared, mentally or physically, for combat with an armed criminal. They are likely to have a single firearm and a single magazine at their disposal, and to be more susceptible to the psychological effects of fear, anxiety, and stress that naturally occur when faced with the threat of deadly violence and tend to deprive one of the focus and clarity of mind necessary to make accurate shots at the attacker.  (Id., ¶ 5.) In a home invasion, the average citizen may be able to retrieve the loaded firearm but likely will be unable to properly equip himself or herself with any additional ammunition; in such desperate moments, it will likely be all they can do to hold the gun in one hand and dial 9-1-1 with the other. Uniformed police are armed against the very same criminals with a loaded gun and, traditionally, two spare magazines each containing seventeen rounds of 9mm, or fifteen rounds of .40 caliber cartridges. Collective law enforcement experience has determined this to be critical to officer survival in confrontations with armed criminals. (Id.)

California undoubtedly recognizes the value of – and need for – large-capacity magazines even for those who are trained and generally prepared to meet gun violence and who often have back-up resources readily available, in light of the numerous Penal Code exceptions for those in law enforcement and quasi-law enforcement capacities by ensuring they have, and will continue to have even after the effective date of this new ban, the ability to employ such magazines for defensive purposes. *See e.g.*, §§ 32400, et seq.

**4.     The Law is Subject to Strict Scrutiny, Which It Cannot Survive.**

Especially when coupled with the reality that this ban would effect a government-forced extraction of valuable personal property intrinsic to countless protected firearms, '"it amounts to a destruction of the Second Amendment right . . . unconstitutional under any level of scrutiny.'" *Bauer v. Becerra*, 2017 U.S. App. LEXIS 9658, at *11 (quoting *Silvester*, 843 F.3d at 821). At the least, the ban '"implicates the core of the Second Amendment right and severely burdens that right.'" *Id.*

That the Ninth Circuit applied intermediate scrutiny in upholding Sunnyvale's ban of

large-capacity magazines in *Fyock* does not compel or warrant application of anything less than strict scrutiny here. While the *Fyock* court found the burden of that ban was not substantial enough to invoke strict scrutiny, *Fyock*, 779 F.3d at 999-1000, the burden to be imposed by this ban is notably more significant. That ban is merely a *citywide* restriction on the possession of large-capacity magazines: one need only step across the border of Sunnyvale City limits to be entirely free of its proscription. The ban here applies across California entirely; there is no escaping its proscription anywhere within this state.  Additionally, the Sunnyvale ban contained exemptions for all those issued licenses or permits pursuant to *both* Penal Code sections 26700 et seq. and 32650, among others.  Sunnyvale, Cal. Muni. Code, § 9.44.050 (a) – (c). Licenses pursuant to section 32650 were available to anyone at least 18 years old, not otherwise prohibited from firearm possession, upon a showing of "good cause." *See* Pen. Code, §§ 30915, 30920, 30960. By contrast, the license and permit exceptions for large-capacity magazines are limited to the regulatory scheme under section 26700 et seq. *See* §§ 32315, 32410, 32430. That scheme imposes eligibility criteria beyond reach of the average citizen, including the requirement of "a valid federal firearms license," a "regulatory or business license, or licenses, as required by local government," and a "valid seller's permit issued by the State Board of Equalization." *Id.* Essentially, licenses under this scheme are reserved for firearms dealers; so this exception to the ban offers no real recourse for the average law-abiding citizen, who might otherwise be able to qualify for the broader license exceptions under the Sunnyvale ban.

The burden of California's would-be ban also stands out among the handful of other states' "large-capacity magazine" bans. It is more severe than the laws of New Jersey, which prohibit only manufacturing, transporting, shipping, selling, or disposing – not mere possession, N.J. Stat. Ann. § 2C:39-9(h); Colorado, which apply only to magazines holding 15 rounds or more and except from the prohibition all such magazines owned on or before July 1, 2013, Colo. Rev. Stat. § 18-12-302(2)(a); Massachusetts and New York, which do not apply to large-capacity magazines manufactured or possessed on or before September 1994, Mass. Gen. Laws Ann., ch. 140, § 131M; N.Y. Penal Law § 265.02(8)); and the District of Columbia, which except from

1    their prohibition essentially anyone who is of a responsible age, has no history of weapons or

2    violence offenses, is mentally and physically capable of safely handling firearms, and has

3    received sufficient firearms training, D.C. Code Ann. §§ 7-2506.01(a)(3), 7-2502.03(a)-(b).

4         The tremendous sweep of this statewide forced extraction of constitutionally protected

5    personal property – essentially applying to all large-capacity magazines owned and possessed by

6    everyone in the state except the select credentialed few – sets it quite apart from the localized,

7    less onerous regulations at issue in the other cases, and compels a determination that the ban is

8    subject to strict-scrutiny review, if not presumptively unconstitutional. The law surely cannot

9    survive such scrutiny because it requires the government demonstrate the ban is narrowly

10   tailored to achieve a compelling state interest and that no less restrictive alternative exists to

11   achieve the same end.  *Video Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950, 958 (9th

12   Cir. 2009) (quoting *United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 813 (2000)

13   (under strict scrutiny, '"[i]f a less restrictive alternative would serve the Government's purpose,

14   the legislature must use that alternative"'). This the State cannot do given the breadth of the

15   prohibition and the plethora of existing regulations that mandate background checks and waiting

16   periods and effectively ban the use or possession of such weapons by essentially anyone known

17   or believed to have a propensity toward felonious or violent behavior. *See e.g.*, Pen. Code, §§

18   26500 – 26588, 29800 – 29850, 29860 – 29905, 30000 – 30020, 30370 – 30371, 30385 – 30395,

19   32311. Indeed, a look at the primary justification for the ban and its actual effectiveness in

20   achieving the stated end readily reveals that it cannot even survive intermediate scrutiny.

21

22

23        **5.    The Law Resoundingly Fails Even Under the Less Exacting, Though Still
               Demanding Standards of Intermediate Scrutiny.**

24

25        "Although courts have used various terminology to describe the intermediate scrutiny

26   standard, all forms of the standard require (1) the government's stated objective to be significant,

27   substantial, or important; and (2) a reasonable fit between the challenged regulation and the

28   asserted objective." *Chovan*, 628 F.3d at 1139; *Silvester*, 843 F.3d at 823 ("Critical to the

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

analysis is identifying an important legislative objective and determining whether the regulation reasonably fits with the objective.").

The primary stated objective of the government for this ban is to reduce the incidence of mass shootings and the extent of harm inflicted during such incidents.  (SB 1446, Senate Appropriations Committee Analysis (Req. for Jud. Notice, Ex. B at pp. 5, 7-8); Prop. 63, § 2, ¶¶ 11-12 (Req. for Jud. Notice, Ex. E.)  However, as will be demonstrated at trial, there is no evidence of any such casual connection between the grandfathered, pre-ban large-capacity magazines and mass shootings, or even between all large capacity magazines in general and gun violence in general, either in California or elsewhere.  Firearm-related crimes have rarely involved large-capacity magazines and, with the exception of mass shootings, have rarely involved the firing of more than ten rounds. (Moody Decl., ¶¶ 9-10, 18-25.)  And the thankfully rare instances of mass shootings comprise a small percentage of all firearm-related crimes. (Moody Decl., ¶¶ 9-10.)  Mass shooters have often used multiple smaller capacity magazines, multiple guns, or have just reloaded during their shootings, instead of using large-capacity magazines, because their advantages of planning, surprise, and victim-vulnerability render such magazines unnecessary to execute their plots.  (Ayoob Decl., ¶ 9; Moody Decl., ¶¶ 10-15.)  Indeed, with these advantages, even when mass shooters have used large-capacity magazines, they have not actually needed them because they would have been able to inflict the same degree of harm without such magazines. (Ayoob Decl., ¶ 9.)  In fact, the documented evidence of such instances shows that the rate of firing (the period between each shot) has generally been as long as it would take to reload a gun.[3] (Id.)  Notably, there had been a federal ban on the possession of large-capacity magazines between 1994 and 2004, but Congress let the ban expire after a Department of Justice study of its potential effects showed it had no discernable impact on gun violence in the United States.  Kopel, *supra*, at 866 (Lee Decl., Ex. A).  And, in any event, there

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

[3] A video produced in 2013, which demonstrates these principles, and also dispels the oft-repeated myth that requiring more reloads allows a "break in the action" to tackle an assailant, can be found here: https://youtu.be/8YmF2ULnlhA

1    is certainly no indication that the pre-2000 large-capacity magazines the state seeks to largely

2    banish with this law have been at all involved with such incidents, much less to any substantial

3    degree.  (Moody Decl., ¶¶ 10-25.)

4         This indicates the lethal intent – the desire to kill – and calculated effort to carry out that

5    intent are the real causal factors in bringing about these tragic events, not large-capacity

6    magazines. (Moody Decl., ¶¶ 6, 9: "a retroactive large-capacity magazine ban prohibiting the

7    continued possession of pre-ban magazines would have no discernable effect on the incidence or

8    effectiveness of mass shootings, or violent crime rates in general"; Ayoob Decl., ¶12.)  Many

9    forms of weaponry and even devices not designed as weapons *could* be used to inflict mass

10   casualties, if a person sets about to inflict such harm. That, however, is not a legitimate

11   justification for this statewide ban of all large-capacity magazines – much less a "significant,

12   substantial, or important" one that "reasonab[ly] fit[s]" with the stated aim of reducing the

13   prevalence of or harm from mass shootings. *Chovan*, 628 F.3d at 1139. Indeed, at bottom, the

14   government's stated objective rests on the mere assumption that the ban *might* theoretically

15   reduce the prevalence of or harm from mass shootings. The same could be said of a ban on the

16   myriad other devices or implements that could be employed to inflict mass casualties – including

17   the very handguns protected under *Heller*.  But such speculation is no reason to bar all average

18   law-abiding citizens from possessing such property for entirely lawful purposes. *See Caetano*,

19   136 S.Ct. at 1031 ("the relative dangerousness of a weapon is irrelevant when the weapon

20   belongs to a class of arms commonly used for lawful purposes"). Although the test demands less

21   than strict scrutiny, intermediate scrutiny is still a "'demanding'" test, as the "'[s]tate must show

22   . . . that the statute directly advances a substantial governmental interest,'" by "a means narrowly

23   tailored to achieve the desired objective,'" *Nat'l Inst. of Family & Life Advocates v. Harris*, 839

24   F.3d 823, 841 (9th Cir. 2016).  Holding the state to this burden is particularly important when, as

25   in this case, the possession of such property is a constitutionally-protected right and the ban

26   would have a severely disproportionate and egregious effect upon the countless law-abiding

27   citizens, including the individual Plaintiffs and many members of the institutional plaintiffs

28

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

– 18 –

herein, who would be forced to dispose of the magazines they have now lawfully possessed for years and without any fair or just compensation. The regulation reduces to merely a hollow "policy choice" about how certain constitutionally-protected ammunition should be treated, which is untenable under the Second Amendment. *Heller*, 554 U.S. at 636 ("the enshrinement of constitutional rights necessarily takes certain policy choices off the table"). It fails to survive intermediate scrutiny, as being unconstitutional on its face and as applied to Plaintiffs under the Second Amendment.

At the least, Plaintiffs are "*more likely than not* to prevail on the merits of the underlying claims'" – which is all that is necessary to demonstrate a likelihood of success on the merits in seeking to stay implementation of the law. *Cottrell*, 632 F.3d at 1133 (quoting *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund, Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010) (italics added).

**6.      The Irreparable Harm and the Interests of the Public Palpably Favor a Preliminary Stay Pending Determination of These Important Claims.**

The foregoing analysis also demonstrates that the remaining two factors are met for the issuance of a restraining order or injunction: that Plaintiffs stand to suffer irreparable harm should this ban become effective on July 1, and that staying its implementation is in the best interest of the public. *See Cottrell*, 632 F.3d at 1135. "A plaintiff can suffer a constitutional injury by being forced to comply with an unconstitutional law or else face financial injury or enforcement action." *County of Santa Clara v. Trump*, 2017 U.S. Dist. LEXIS 62871, *93. And "[t]he Ninth Circuit has repeatedly held that 'the deprivation of constitutional rights unquestionably constitutes irreparable injury.'" *Id.* at *92-93 (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012). Indeed, "a plaintiff's claimed irreparable harm is inseparably linked to the likelihood of success on the merits." *Int'l Refugee Assistance Project v. Trump*, 2017 U.S. App. LEXIS 9109, at *90 (4th Cir. 2017) (internal quotations omitted). "Accordingly, [a] finding that Plaintiffs are likely to succeed on the merits of their constitutional claim counsels

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

1    in favor of finding that in the absence of an injunction, they will suffer irreparable harm." *Id.* at

2    *90-91. In a similar vein, "upholding the Constitution undeniably promotes the public interest,"

3    and thus "'it is always in the public interest to prevent the violation of a party's constitutional

4    rights.'" *Id.* at 95 (quoting *Sammartano v. First Jud. Dist. Ct.*, 303 F.3d 959, 974 (9th Cir.

5    2002)). Given the clear deprivation of the constitutional rights of the individual plaintiffs and

6    many members of the institutional plaintiffs who stand to lose their constitutionally-protected

7    magazines along with the countless other such people whose interests the institutional plaintiffs

8    represent, the irreparable injury of allowing this ban to take effect and the public interest in

9    staying it are both palpable.

10       Those innumerable Californians who have lawfully owned and possessed these

11    magazines for at least 17 years now would be forced to surrender them under threat of criminal

12    sanction and with no assurance that they could find or afford adequate substitutes – all because

13    of a legislative policy choice based on nothing more than the theoretical possibility that some

14    small percentage of people might choose to employ these magazines in carrying out their

15    (fortunately) rare lethal intents. The irreparable injury that would flow from the significant

16    constitutional burden this ban would impose upon Plaintiffs and so many other Californians can

17    only be forestalled, and the public interest can only be served, by preventing the effectiveness of

18    the ban at least until the merits of the important underlying claims are adjudicated.

19

20       **7.      Serious Questions Going to the Merits Undeniably Exist and the Balance of
21              Equities Weighs Heavily in Favor of the Stay.**

22       To the extent there may remain any doubt about whether Plaintiffs' showing at this

23    preliminary stage satisfies the general standards for likelihood of success on the merits, a stay of

24    this ban is still warranted, and necessary, based on the degree of irreparable harm and balance of

25    the relative equities. "'How strong a claim on the merits is enough depends on the balance of

26    harms: the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits

27    can be while still supporting some preliminary relief.'" *Cottrell*, 633 F.3d at 1133 (quoting

28

*Hoosier Energy Rural Elec. Co-op., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009)). Thus, preliminary relief is proper "where the likelihood of success is such that 'serious questions going to the merits were raised and the balance of hardships tips sharply in [plaintiff's] favor.'" *Cottrell*, at 1131-1132 (quoting *Clear Channel Outdoor, Inc. v. City of Los Angeles*, 340 F.3d 810, 813 (9th Cir. 2003); that is, where the court "cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction.'" *Cottrell*, at 1133 (quoting *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d at 35).

While Plaintiffs, and all those similarly situated Californians, stand to suffer an immediate and irreversible loss of valuable, constitutionally-protected property should this ban go into effect July 1, Defendants stand to lose nothing should the status quo merely be preserved for now. Indeed, "the Government is 'in no way harmed by issuance of a preliminary injunction which prevents [it] from enforcing restrictions likely to be found unconstitutional.'" *Int'l Refugee Assistance Project v. Trump*, 2017 U.S. App. LEXIS 9109, at *94 (quoting *Centro Tepeyac v. Montgomery County*, 722 F.3d 184, 191 (4th Cir. 2013). "If anything," "the system is improved by such an injunction." *Id.* at *94 (internal quotations omitted). It would be particularly inequitable to permit the state to proceed with this forced extraction of property valuable and important to the exercise of Second Amendment rights by so many Californians who have lawfully owned, possessed, and used these magazines for years, given the absence of any evidence that their continued possession of such devices is in any way related to – much less responsible for – the rare tragedies of mass shootings. So the balance of equities indeed "tips sharply" in Plaintiffs' favor, compelling the issuance of this preliminary relief pending adjudication of the underlying claims important to them and innumerable other Californians.

**SEILER EPSTEIN ZIEGLER & APPLEGATE LLP**
Attorneys at Law

**C.**     **THE COURT SHOULD ENJOIN ENFORCEMENT OF PEN. CODE §§ 32310(C) AND (D), AS AMENDED, TO PREVENT AN UNCONSTITUTIONAL TAKING OF PLAINTIFFS' LAWFULLY-HELD PERSONAL PROPERTY WITHOUT PROVIDING FOR COMPENSATION.**

Penal Code § 32310, subdivs. (c) and (d), which as of July 1, 2017 would require plaintiffs Wiese, Morris, Cowley, Macaston, Flores and Dang, and a class of similarly-affected individuals to dispose of, destroy, or "surrender" their constitutionally-protected personal property, would constitute a taking of such property, for which no compensation has been or would be provided, and therefore, would violate both the Takings and Due Process Clauses of the United States Constitution.

The Takings Clause of the Constitution guarantees property owners "just compensation" when their property is "taken for public use." U.S. Const., 5th Amend.  The Due Process Clause likewise guarantees property owners due process of law when the state "deprive[s] [them] of ... property."  U.S. Const., 14th Amend., § 1.

As in this case, a plaintiff suffering an unconstitutional taking without compensation may seek declaratory and injunctive relief as a remedy.  *See, e.g.*, *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 528, 125 S. Ct. 2074, 2075 (2005) (plaintiffs brought suit seeking a declaration that a rent cap effected an unconstitutional taking of its property, sought injunctive relief against application of the cap); *San Remo Hotel L.P. v. City and County of San Francisco*, 27 Cal.4th 643, 649 (2002) (plaintiffs challenged ordinance under California constitution by petition for writ of mandate); *Jefferson Street Industries, LLC v. City of Indio*, 236 Cal.App.4th 1175, 1195 (2015) (a facial challenge to an ordinance alleged to effect a regulatory taking may be brought through an action for declaratory relief); *Golden Gate Hotel Assn. v. City & County of San Francisco*, 836 F.Supp. 707, 709 (N.D. Cal. 1993) (granting injunction enjoining city from enforcing city hotel conversion ordinance constituting a taking) (reversed on other grounds, 18 F.3d 1482 (9th Cir. 1994).  A court also has jurisdiction to enjoin the taking of private property before the amount of compensation has been determined.  *Felton Water Co. v. Superior Court*, 82 Cal.App. 382, 388 (1927).

This action is being brought by individual plaintiffs named above, all of whom are law-

abiding owners of pre-ban (grandfathered) magazines, for themselves and on behalf of those in a class who are similarly situated, in a representative capacity pursuant to state law.  *See, e.g.*, *Residents of Beverly Glen, Inc. v. City of Los Angeles*, 34 Cal.App.3d 117 (1973) (plaintiffs had standing to bring takings-type challenge to ordinance, in a representative capacity under state law.)  None of these individual plaintiffs are willing to destroy or surrender their property, and none of them wish to surrender any working part of a valued firearm.  (Wiese Decl., ¶ 4; Morris Decl., ¶ 6; Cowley Decl., ¶ 6; Macaston Decl., ¶ 8; Flores Decl., ¶ 9; Dang Decl., ¶ 7.)

### 1.   THE RETROACTIVE MAGAZINE POSSESSION BAN CONSTITUTES A *PER SE* TAKING.

A "classic taking" is well understood to be one in which "the government directly appropriates private property for its own use." *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302, 324, 122 S.Ct. 1465 (2002).  And likewise, a "paradigmatic taking," has also been equally well understood to be "a direct government appropriation or physical invasion of private property." *Lingle*, 544 U.S. at 537, 125 S. Ct. at 2081.  Such takings – where the government directly appropriates the property itself – is a *per se* taking for which just compensation must be provided, without regard to factors regarding the economic impact of the regulation, or the nature or character of the government action.  *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426, 102 S.Ct. 3164, 3171 (1982) ("a permanent physical occupation authorized by government is a taking without regard to the public interests that it may serve.")

The law has further developed to recognize another type of *per se* taking, one in which government regulation of private property may be so onerous that its effect *is tantamount* to a direct appropriation or ouster.  These regulations are also compensable takings under the Fifth Amendment, and occur when such regulations "completely deprive an owner of '*all* economically beneficial us[e]' of her property." *Lingle*, 544 U.S. at 538, 125 S.Ct. at 2081 (citing *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1019, 112 S.Ct. 2886, 2895

1   (1992) (*Lucas*) (emphasis original)).

2   Where there has been a *per se* taking, under either theory, compensation *must* be paid to

3   the property owner, *irrespective* of the perceived public good.  *See, e.g.*, *Loretto*, 458 U.S. at

4   426, 102 S.Ct. at 3171; *Kaiser Aetna v. United States*, 444 U.S. 164, 174, 100 S. Ct. 383, 390

5   (1979) ("[T]here is no question but that Congress could assure the public a free right of access

6   […] if it so chose. Whether a statute or regulation that went so far amounted to a 'taking,'

7   however, is an entirely separate question."); *Nat'l Wildlife Fed'n v. I.C.C.*, 850 F.2d 694, 706

8   (D.C. Cir. 1988) ("government action that causes a permanent physical occupation of real

9   property amounts to a taking 'without regard to whether the action achieves an important public

10  benefit or has only minimal economic impact on the owner.'")

11  Here, section 32310(c) and (d) as amended is a statutory scheme that is both a direct

12  physical appropriation of Plaintiffs' personal property, as well as a scheme so onerous that it

13  deprives the Plaintiffs of all economically beneficial use of their property.  It therefore amounts

14  to a *per se* taking, for which compensation *must* be provided.

### a.   Section 32310(d) is a Taking Because it Compels the Physical Appropriation of Property.

17  In the first instance, there can be no question that the statute itself *provides* for the direct

18  physical appropriation of tangible property by the government by its forced physical surrender.

19  The question is whether that is the only practical, viable (and intended) result.  Pen. Code §

20  32310(d) as enacted, states:

Any person who may not lawfully possess a large-capacity magazine commencing July 1,
2017 shall, prior to July 1, 2017:

(1) Remove the large-capacity magazine from the state;
(2) Sell the large-capacity magazine to a licensed firearms dealer; or
(3) Surrender the large-capacity magazine to a law enforcement agency for destruction.

25  Of these three purported "options," the third option ("surrender") we contend, is the true option

26  which the state intends to compel, and to which it will relegate most owners of pre-ban

27  magazines who wish to comply with the law.  And as Plaintiffs will show, it is the only

28

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

– 24 –

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

1  economically viable option for a vast majority of California pre-ban magazine holders to remain

2  within the law.

3      The first purported "option" under sudiv. (d), which is to "remove the large-capacity

4  magazine from the state," is simply not viable for a vast majority of the class, i.e., lawful pre-ban

5  magazine holders.  In the first place, the State has taken great pains to prevent or prohibit the sale

6  of such items to others, while still within the confines of this state.  Section 32310, subdiv. (a)

7  specifically states: "[A]ny person in this state who […] *offers or exposes for sale*, […] any large-

8  capacity magazine is punishable by imprisonment in a county jail not exceeding one year or

9  imprisonment pursuant to subdivision (h) of Section 1170."  (Emphasis added.)  Therefore, a

10 conscientious California pre-ban large capacity magazine holder who wishes to dispose of his or

11 her property using the first "option" apparently may not go on the Internet, offer it for sale, or

12 even call a prospective purchaser in another state to arrange for the sale.[4]  They must, by statute,

13 physically drive to a border state before they may even begin to offer or expose it for sale, or

14 look for a willing buyer or receiver.  This is simply, economically and practically, untenable.

15 Moreover, the Legislature and drafters of Prop. 63 simply and callously assumed (or were simply

16 indifferent to the fact) that any lawful pre-ban large-capacity magazine holder wishing to take the

17 magazine out of state to preserve his or her constitutionally-protected right to *keep* and bear arms

18 has either a willing friend, relative or other recipient willing to take firearms, firearms parts, or

19 would otherwise have to bear the costs of storage for this item alone.  This is simply unrealistic –

20 but of no apparent concern to the Legislature and drafters of Prop. 63.  Yet, this is the only

21 option that is available to the class of pre-ban magazine holders who actually wish to *keep* their

22 firearms, intact or otherwise.[5]  If such owners wish to keep their firearms intact, they essentially

23 lose access to them.  "The retention of some access rights by the former owner of property does

24

25 ─────────────────

26 [4] This also presupposes that there is an actual market for such 17+ year old firearms parts, a
   prospect which is untenable, as we discuss next.

27 [5] Again, and as we have maintained throughout, ammunition magazines are not separate artifacts,
   but are considered to be inherent operating parts of functioning firearms.  (Youngman Decl., ¶

28 7.)  Semi-automatic firearms are basically inoperable without them.  (Id.)

**SEILER EPSTEIN ZIEGLER & APPLEGATE LLP**
Attorneys at Law

1   not preclude the finding of a *per se* taking." *Nixon v. United States*, 978 F.2d 1269, 1285 (D.C.

2   Cir. 1992).

3        The second purported "option" under § 32310(d), i.e., to sell to a "licensed firearms

4   dealer," is equally illusory and (from a takings perspective) suffers from the same defect as the

5   first option, i.e., it simply presupposes that there is an actual market for such items.  That is not

6   only a callous assumption, but it is a false one.  For in the first instance, there is no guarantee that

7   any licensed firearms dealers are even willing to participate in this state-endorsed confiscation

8   scheme, forcing upon California gun owners the gross indignity of disassembling and selling

9   away valuable firearms parts they have lawfully held for years.  And moreover, from a purely

10  economic point of view, there is no guarantee that any licensed firearms dealer would be willing

11  to buy such items, even at cost, or even at all.  For there are very few people within the state to

12  which licensed firearms dealers could then resell such items, except for exempt people such as

13  law enforcement officers.  *See* Pen. Code § 32450(c).

14       But let us pause to examine this for a moment: You are a peace officer, and your

15  department is willing to buy you brand-new, replacement firearm magazines, directly from the

16  manufacturer.  Would you be willing to stake your life on used magazines that would now be at

17  least 17 years old, and in many cases, much older?  The very question, of course, provides the

18  answer.  And thus, plaintiffs will easily demonstrate at trial that there is no market, or would be

19  no market, for the purchase and resale of most used ammunition magazines that are 17 years old

20  or older, to law enforcement officers, or anyone else for that matter.  (Youngman Decl., ¶ 10.)

21  "Used magazines, from unknown sources, may suffer from defects such as worn springs,

22  followers and feed lips, which may greatly impair their reliability.  For these reasons, there is or

23  would be very little demand for magazines sold by retailers, re-selling 17+ year old magazines,

24  especially much older ones, within the United States generally."  (Id.)

25       But in the bigger picture, of course, the government's forced dispossession of personal

26  property, by *forcing* its sale to third parties, must itself be considered no less than a taking in the

27  first place.  It may be recalled that at one time, during a *bona fide* national emergency/World

28

War, the government routinely did just this, forcing property owners to relinquish valuable materiel in forcing its sale to third parties for wartime use.  And in such instances, the courts routinely held these commandments to be takings, whether the property was directly appropriated by the government or not.  *See*, *Dore v. United States*, 97 F. Supp. 239, 242 (Ct. Cl. 1951) ("When, as here, the United States exercises its authority to order delivery and in its sovereign capacity forces the 'sale' of property to it for public use there is, in our opinion, a 'taking' and just compensation must be made."); *Edward P. Stahel & Co. v. United States*, 78 F. Supp. 800, 804 (Ct. Cl. 1948) ("But to say that when the Government forbids an owner of property to make any other use of it, and requires him to sell it, upon request, to the Government, or its designee who will use it for a Government purpose, is not a taking of the property for public use, would be to make the constitutional right contingent upon the form by which the Government chose to acquire the use of the property.")

And therefore, the State cannot simply defer, deflect or "outsource" its duty to provide just compensation under the Takings Clause, simply by *assuming* that a market for such forced sales exist.  For this would in no way be a "voluntary" option.  "A 'sale' implies willing consent to the bargain.  A transaction although in the form of a sale, but under compulsion or duress, is not a sale."  *Dore*, 97 F. Supp. at 242.  "'Just compensation,'" we have held, means in most cases the fair market value of the property on the date it is appropriated. […] 'Under this standard, the owner is entitled to receive 'what a willing buyer would pay in cash to a willing seller' at the time of the taking.'" *Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 10, 104 S.Ct. 2187, 2194 (1984) (citation omitted).  A true market for these old pre-ban magazines – comprised of *voluntary* buyers and sellers – therefore simply does not exist.

There being no viable, true market for these pre-ban magazines, (again, which essentially cannot be offered for sale while within this state), that leaves only one plausible, practical option for a conscientious pre-ban magazine holder to comply with the law: to "surrender" it to a law enforcement agency for destruction.  And let us make no mistake: this is the option which the State wants, for (a) it is the only viable option as discussed above, and (b) it is hard to imagine

– 27 –

that such large-capacity magazines which the state believes "are disproportionately used in crime, and feature prominently in some of the most serious crime, including homicides, mass shootings, and killings of law enforcement officers" as claimed in the State's briefing in similar litigation, is somehow acceptable to export to other parts of the country.  And the destruction option is, for purposes of this discussion, direct physical appropriation of previously lawfully-held property, whether the government takes title to it or not.  It is therefore a taking, for which compensation has not even been considered, or would be provided.[6]

Therefore, by enactment of this confiscatory statutory scheme, the state has or will have engaged in a taking.  "[T]o constitute a taking under the Fifth Amendment it is not necessary that property be absolutely 'taken' in the narrow sense of that word to come within the protection of this constitutional provision; it is sufficient if the action by the government involves a direct interference with or disturbance of property rights.  […]  Nor need the government directly appropriate the title, possession or use of the properties[.]"  *Richmond Elks Hall Ass'n v. Richmond Redevelopment Agency*, 561 F.2d 1327, 1330 (9th Cir. 1977) (citations omitted); *Kaiser Aetna*, 444 U.S. at 175 ("[T]his Court has observed that '[c]onfiscation may result from a taking of the use of property without compensation quite as well as from the taking of the title[.]") (quoting *Chicago, R. I. & P. R. Co. v. United States*, 284 U.S. 80, 96, 52 S.Ct. 87, 92 (1931)).

### b. Section 32310(c) and (d) Constitutes a Taking Because it Completely Deprives the Owners All Economically Beneficial Use of Their Property.

Irrespective of whether the statute as amended will substantially result in direct physical

---

[6] The Legislature, in enacting SB 1446, never even considered the question of compensation at all, nor did it consider the question of a viable market for the forced sale of these items.  We know this because the Legislative analysis simply assumed, as discussed below, that the retroactive pre-ban magazine ban was not a taking in the first place, but was a valid exercise of its police power.  (*See* Senate Rules Committee Analysis dated 5/19/16 regarding SB 1446, at pp. 4-5, Plaintiffs' Req. for Jud. Notice, Exhibit B.)  Moreover, there is nothing in the legislative history of SB 1446, or Prop. 63, that indicates that the drafters/proponents ever even considered a study of compensation, or a viable market for the forced sale of these items.

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

appropriation of the pre-ban magazines, one thing is clear: it is, in any event, compelling *dispossession* of this property.  And thus, it amounts to a compensable taking because the law will have completely deprived the owners of *all* economically beneficial use of their property. *Lucas*, 505 U.S. at 1019; *Lingle*, 544 U.S. at 538.  In doing so, the State has deprived plaintiffs and those similarly situated of "the entire 'bundle' of property rights," i.e., their rights to possess, use and dispose of these items as they see fit.  *Horne v. Department of Agriculture*, ___ U.S. ___, 135 S.Ct. 2419, 2428 (2015).

In *Horne*, the Supreme Court confirmed that the Takings Clause applies to direct appropriations of personal property, included within its description of a "paradigmatic" taking. That this was the first time that the Supreme Court squarely addressed the issue of whether personal property was subject to the Takings Clause is somewhat remarkable because it is self-evident.  However, it has long been established that laws or regulations which essentially destroy the value of personal property, or require its surrender, may properly constitute a taking, thereby entitling the property owner to compensation or other relief.

In fact, it was close to 40 years ago, in *Andrus v. Allard*, 44 U.S. 51, 100 S.Ct. 318 (1979) (*Allard*), when the Supreme Court considered the question of whether a law that affected the value of personal property could be challenged, among other grounds, for the reason that it constituted a taking without compensation – or more precisely, whether it violated the plaintiffs' property rights under the Fifth Amendment.[7]  The specific question presented to the Court was whether federal conservation statutes designed to protect the destruction of certain species of birds violated the Fifth Amendment rights of the plaintiffs.  The conservation statutes in question prohibited generally the sale of protected bird parts, but not the possession thereof.  The plaintiffs were engaged in the trade of Indian artifacts, and in fact, had been prosecuted and fined for *selling* such artifacts which contained the feathers of protected birds.  444 U.S. at 54-55.

_____

[7] The Court noted that although the argument was cast in terms of "economic substantive due process," the language used by the district court was consistent with the terminology of the Takings Clause.  444 U.S. at 64 fn. 21.

1    Ultimately, the Court, considering the merits of the claim, concluded that the conservation

2    statutes did not amount to a taking, the primary reasons for which had to do with the enduring

3    economic value of the property, and that the laws did not completely destroy that bundle of

4    property rights to deprive the owners of any use whatsoever.  But in this regard, the Court stated:

5           The regulations challenged here do not compel the surrender of the artifacts, and
            there is no physical invasion or restraint upon them. Rather, a significant
6           restriction has been imposed on one means of disposing of the artifacts. But the
            denial of one traditional property right does not always amount to a taking. At
7           least where an owner possesses a full "bundle" of property rights, the destruction
            of one "strand" of the bundle is not a taking, because the aggregate must be
8           viewed in its entirety. [. . .]  In this case, it is crucial that appellees retain the
            rights to possess and transport their property, and to donate or devise the protected
9           birds.

10   444 U.S. at 65–66, 100 S. Ct. at 327 (internal citations omitted.)

11

12          Obviously, such is not the case here. Unlike the regulations in *Allard*, the relevant

13   portions of the Large Capacity Magazine Ban, specifically section 32310 subdivs. (c) and (d) as

14   amended, *do indeed* compel the surrender of lawfully-held personal property, as argued above.

15   But more to this point, unlike the regulations at issue in *Allard*, the magazine ban as enacted is a

16   complete and retroactive ban on the *possession* of previously lawfully-held, and constitutionally-

17   protected, personal property.  Unlike the plaintiffs in *Allard*, but like the plaintiffs in *Horne*, the

18   retroactive ban on the possession of pre-ban magazines indeed causes the plaintiffs here to "lose

19   the entire 'bundle' of property rights in these items.  Chief Justice Roberts emphasized this very

20   point in *Horne*, when he wrote for the majority: "*Allard* is a very different case.  […] [T]he

21   owners in that case retained the rights to possess, donate, and devise their property.  In finding no

22   taking, the Court emphasized that the Government did not 'compel the surrender of the artifacts,

23   and there [was] no physical invasion or restraint upon them.' […]  Here of course the raisin

24   program requires physical surrender of the raisins and transfer of title, and the growers lose any

25   right to control their disposition."  *Horne*, 135 S.Ct. at 2429 (citing *Allard*, 444 U.S. at 65-66.)

26          Again, that the Legislature blithely assumed that every pre-ban large-capacity magazine

27   holder in this state simply had the means and the ability to store their personal property out of

28

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

– 30 –

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

1   state, or simply sell the magazine to a licensed firearm dealer – without doing any type of

2   analysis as to the likely burdens and costs for such out-of-state storage, or the market for such

3   forced sales (see footnote 6 above) – shows the State's true motive here: to force law-abiding

4   gun owners to surrender valuable – and in some instances, very valuable – firearm parts.[8]  In

5   other words, the State's ultimate goal is simply confiscation and destruction of the Plaintiffs'

6   lawfully-held personal property.

7        Because the newly-enacted provision of the magazine ban at issue, Pen. Code §§

8   32310(c) and (d) amounts to a complete dispossession of long-established rights to hold

9   constitutionally-protected personal property held for 17+ years, it constitutes a taking and its

10  enforcement which does not provide for any compensation whatsoever must be enjoined.

11              **c.      The Statute is Not a Valid Exercise of Police Power.**

12       We well understand that the State will ultimately argue that the ban on possession of

13  ammunition magazines is not a taking in character, but is a valid exercise of its police power, "to

14  protect the safety, health and general welfare of the public," as it has argued in other matters.

15  This is quite likely the heart of this matter.  In anticipation of this argument, we would point out

16  two things: First, the authority upon which the State has relied upon (and will rely upon here)

17  pre-dates both *Heller*, and *Lucas*, and therefore, a completely different analysis is called for.

18  And moreover, following *Lucas*, the State's call to "police power" is largely irrelevant if the

19  court finds this statute to be a *per se* taking.  Again, *per se* takings require compensation –

20  irrespective of any "public good" that is allegedly asserted.  *See*, *Loretto*, 458 U.S. at 425, 102

21  S.Ct. at 3170. (Assuming a valid exercise of the state's police power, the Court stated: "It is a

22  separate question, however, whether an otherwise valid regulation so frustrates property rights

23  that compensation must be paid.")

24       On the first point, regarding the police power to regulate "dangerous weapons," the case

25

26  _____

27  [8]The Attorney General admits as much in his opposing memorandum in a similar case, where he
    states that "the purpose of the statute is to remove LCMs from circulation, not to transfer title to
28  the government or an agent of the government for use in service of the public good."

1  upon which the Legislature primarily relied in determining that it had the unilateral authority to

2  enact this ban without running afoul of the Takings Clause, is *Fesjian v. Jefferson*, 399 A.2d 861

3  (D.C. Ct. App. 1979).  (*See* Plaintiffs' Req. for Jud. Notice, Exhibit B, at p. 6.)  We also

4  reasonably anticipate that the State will cite *Fesjian* in support of its opposition here.  In

5  anticipation of this argument, we would here make two points regarding this case.  First, *Fesjian*

6  pre-dated the Supreme Court's decision in *Heller*, and applied a simple rational basis test to an

7  important fundamental right, albeit on equal protection grounds.  399 A.2d at 864.  Under a new,

8  modern analysis, we think the result would be different, when the inquiry would be whether the

9  firearms themselves are in common use, for lawful purposes, and are not dangerous and unusual.

10 *Heller*, 554 U.S. at 627.  And as to the specific takings argument, it could fairly be said that the

11 D.C. Court of Appeals, assuming that *all* firearms could be summarily banned in a pre-*Heller*

12 District of Columbia, simply gave short shrift to the takings argument.  In one paragraph,

13 assuming arguendo that the D.C. statute prohibiting the plaintiffs (who were representing

14 themselves in pro per) from registering their weapons was a taking, the court simply concluded

15 that "a taking for the public benefit under a power of eminent domain is, however, to be

16 distinguished from a proper exercise of police power to prevent a perceived public harm, which

17 does not require compensation. […]  That the statute in question is an exercise of legislative

18 police power and not of eminent domain is beyond dispute."  *Fesjian*, 399 A.2d at 866.  There

19 was no discussion or analysis whatsoever as to whether the D.C. statute amounted to forced

20 dispossession, or deprived plaintiffs of the economically beneficial use of their property,

21 constituting a *per se* taking.  Those Supreme Court takings cases, of course, came later.

22        Indeed, *Heller* completely changes the landscape as to takings cases involving firearms,

23 particularly where, as in *Fesjian*, a court could simply assume that *all* firearms could be banned

24 within any given jurisdiction.  For example in *Quilici v. Vill. of Morton Grove*, 532 F.Supp. 1169

25 (N.D. Ill. 1981), the district court ruled that a village ordinance which completely banned

26 possession of handguns except by peace officers, members of armed forces, and licensed gun

27 collectors but which allowed continued recreational use of handguns at licensed gun clubs was a

28

reasonable exercise of police power.  As in *Fesjian* (and in fact, citing to it), the district court made short work of the takings argument, stating in summary fashion: "It is well established that a Fifth Amendment taking can occur through the exercise of the police power regulating property rights. In order for a regulatory taking to require compensation, however, the exercise of the police power must result in the destruction of the use and enjoyment of a legitimate private property right." *Quilici*, 532 F.Supp. at 1183-84, aff'd, 695 F.2d 261 (7th Cir. 1982).  If a court believes it can simply uphold a ban *all* firearms, without regard to the Second Amendment, it is a short step for that same court to dismiss a related takings claim, as being a valid exercise of police power.  We therefore conclude that all pre-*Heller* takings cases involving firearms, including *Fesjian*, are inherently suspect for this very reason alone.

But returning to our primary point here: *it simply does not matter* whether the retroactive magazine ban today presents a purported exercise of "police power," however loosely that term may be used, and a point which we do not concede.  Reliance upon older, pre-*Lucas* cases in adopting some type of bright-line rule regarding the payment of compensation is, today, a fools' errand.  And reliance upon hoary cases that attempted to draw such distinctions is insufficient to the analysis.

It should be recalled, in fact, that *Lucas*, the very case that gives us its eponymous test regarding deprivation of all economically beneficial use of a claimant's property, started its life as a case involving the alleged exercise of a state's "police power" as well.  In *Lucas*, the owner of two beachfront lots intended to build houses there, but was prohibited by a statute prohibiting any permanent inhabitable structure on the land in question.  505 U.S. at 1008.  The plaintiff sued in state court, and the South Carolina Supreme Court ultimately rejected his challenge under the Takings Clause, holding that in the legitimate exercise of its police power, the state could restrict his ability to use the land in order "to mitigate the harm to the public interest that [such a] use of his land might occasion." *Id.*, at 1020–21.  The *Lucas* Court disagreed.  There, it held that, when "the State seeks to sustain regulation that deprives land of all economically beneficial use, ... it may resist compensation only if the logically antecedent inquiry into the

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

nature of the owner's estate shows that the proscribed use interests were not part of his title to begin with." *Id.*, at 1027.  And thus, the Court remanded the case for the state courts to determine, under state law, whether "background principles of ... property law" prohibited the future uses that the property owner intended.  *Id.*, at 1031.

The rule post-*Lucas* now and simply boils down to this: Does the regulation result in the complete elimination of the property's value or beneficial use?  If so, it amounts to the equivalent of a physical appropriation, *see Lucas*, 505 U.S. at 1017; *Lingle*, 544 U.S. at 539–40, and compensation must be paid.  In *Lucas*, the Court itself strongly implied that "many of [its] prior opinions" which wrestled with the concept of "'harmful or noxious uses' of property" were simply "early attempt[s] to describe in theoretical terms why government may, consistent with the Takings Clause, affect property values by regulation without incurring an obligation to compensate—a reality we nowadays acknowledge explicitly with respect to the full scope of the State's police power." *Lucas*, 505 U.S. at 1022–23, 112 S.Ct. at 2897.  With regard to these early cases, the Court stated:

> When it is understood that "prevention of harmful use" was merely our early formulation of the police power justification necessary to sustain (without compensation) any regulatory diminution in value; and that the distinction between regulation that "prevents harmful use" and that which "confers benefits" is difficult, if not impossible, to discern on an objective, value-free basis; *it becomes self-evident that noxious-use logic cannot serve as a touchstone to distinguish regulatory "takings"—which require compensation—from regulatory deprivations that do not require compensation*.

505 U.S. at 1026, 112 S.Ct. at 2898–99 (emphasis added.)  Accordingly, the older line of cases, starting with *Mugler v. Kansas*, 123 U.S. 623 (1887), which attempted to distinguish between valid exercises of "police powers" and takings, simply does not result in a bright-line rule today. In fact, it is quite likely that *Mugler* – decided under today's standards – would have a different result, and it certainly would be subject to a different analysis.  For in the first instance, the dispositive fact upon which the Court relied in *Mugler* was that the plaintiff had not been deprived of his property.  "He still has possession of it. He still has the right to sell it. Nor is it claimed that he is deprived of its use generally. The only claim is that he is deprived of the

1   privilege to use it for the manufacture of liquors for sale as a beverage." *Mugler*, 123 U.S. 623, 8

2   S.Ct. at 285–86.  Accordingly, it was easy for the Court simply to conclude, as a binary matter,

3   that "[t]he law was within the police power of the state." *Id.*, at 286.  Today, of course, the

4   analysis would hinge not upon physical possession, but whether the plaintiff was deprived of all

5   economically beneficial use thereof.  *Lucas*, 505 U.S. at 1019, 112 S.Ct. at 2895.[9]

6         Returning to the present case, there is no question – and the State cannot legitimately

7   dispute – that Plaintiffs and similarly-situated, pre-ban magazine holders (of which there may be

8   hundreds of thousands – *see* Req. for Jud. Notice Exhibit A), have and have had – for at least 17

9   years and more – a valid possessory interest in their personal property.  This is personal property

10   which they have lawfully and legally held, without controversy, for many years.  *Their* property

11   was not a nuisance 17 years ago, and it is not today.  There is no evidence that they (Plaintiffs,

12   and those similarly-situated legal pre-ban magazine holders) themselves are using the property in

13   noxious or dangerous ways.  (*See* Moody Decl., ¶¶ 7-17.)  Instead, the statute is a categorical ban

14   on possession itself, designed to punish Plaintiffs and others similarly situated, as a perceived

15   remedy to the tragedies of mass shootings and other gun violence – in which pre-ban magazines

16   are not even used (*id.*), and certainly not used in this manner by Plaintiffs themselves.  As

17   discussed above, Plaintiffs are being completely dispossessed of this lawfully-held, and

18   Constitutionally-protected property, either as a physical surrender or its equivalent by the

19   destruction of all beneficial use thereof.  It is, quite simply, a *per se* taking for which

20   compensation must be provided, irrespective of the purported public good or the police power of

21   the State.

22   //

23   //

24   //

25

26   _____

27   [9]And even if the prohibitionary liquor law were found not to deprive the plaintiff of *all*
economically beneficial use of the distillery, that would not end the story either.  The law's effect

28   would still be subject to the regulatory takings analysis required by *Penn Central Transportation
Co. v. City of New York*, 438 U.S. 104, 98 S.Ct. 2646 (1978), as discussed below.

**SEILER EPSTEIN ZIEGLER & APPLEGATE LLP**
Attorneys at Law

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

**2.** **THE RETROACTIVE MAGAZINE POSSESSION BAN CONSTITUTES A BURDENSOME REGULATORY TAKING.**

The same factors discussed to this point alternatively support a conclusion that the retroactive ban on the prohibition of these grandfathered, pre-ban magazines constitutes an unreasonably burdensome regulatory taking, which also requires compensation.  Aside from the direct appropriations of and interference with property constituting *per se* takings, discussed above, the Court has established a line of cases, starting with *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 43 S.Ct. 158 (1922), which held that compensation was also required for a "regulatory taking" – a restriction on the use of property that went "too far."  260 U.S. at 415; *Horne*, 135 S.Ct. at 2427.  "And in *Penn Central Transp. Co. v. New York City*,  […], the Court clarified that the test for how far was 'too far' required an 'ad hoc' factual inquiry."  *Horne*, 135 S.Ct. at 2427.

In *Lingle*, the Court acknowledged that the *Penn Central* factors were, at times, difficult to determine with certainty.  Nevertheless, "[t]he *Penn Central* factors – though each has given rise to vexing subsidiary questions – have served as the principal guidelines for resolving regulatory takings claims that do not fall within the physical takings or Lucas rules."  *Lingle*, 544 U.S. at 539, 125 S.Ct. at 2082.  "Primary among those factors are '[t]he economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations.' […]  In addition, the 'character of the governmental action – for instance whether it amounts to a physical invasion or instead merely affects property interests through 'some public program adjusting the benefits and burdens of economic life to promote the common good' – may be relevant in discerning whether a taking has occurred.'"  *Id.*; *Palazzolo v. Rhode Island*, 533 U.S. 606, 617, 121 S.Ct. 2448 (2001).

We needn't discuss these in great detail here. In essence, the "principal guidelines" under *Penn Central* are the economic impact on the regulation, and the character of the government action.  Each test focuses on the severity of the burden that the government imposes upon these private property rights.  These have already been discussed at length, above.

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

1   The economic burden on the Plaintiffs, and the class of similarly-situated individuals they

2   represent, is substantial.  In the first place, as discussed above, to the extent that the forced

3   dispossession of the magazines is not a taking *per se*, the State has insured that there is no market

4   for the "forced sale" of these items.  In some cases, the value of these pre-ban, "grandfathered"

5   magazines is substantial.  (*See* Wiese Decl., ¶ 5; Flores Decl., ¶ 4-5.)  Some of these magazines

6   are substantial in value because they are the only type of magazine that was ever made for that

7   particular firearm (Dang Decl., ¶ 5), or the manufacturer never made original ten-round or fewer

8   magazines for that firearm.  (Macaston Decl., ¶ 6.)  In an ironic way, the very thing that makes

9   all of these magazines so valuable is the fact that their further acquisition and importation into

10  the state is illegal under § 32310(a)[10] which makes them irreplaceable.  *See, e.g.*, Wiese Decl., ¶

11  4 ("[…] they are literally irreplaceable, given the prohibition on further purchase, acquisition or

12  manufacture of such items under California law.")  In sharp contrast to these values, the State has

13  essentially insured that there is no actual market for these firearm parts, as discussed above.  The

14  balancing of hardships, and that a balancing of the equities tipping sharply in Plaintiffs' favor has

15  already been discussed above, in connection with Plaintiffs' Second Amendment claims.  We

16  simply reiterate that the potential loss of a constitutional right is irreparable injury, particularly

17  where the loss of the right will be permanent – even if Plaintiffs are ultimately vindicated.

18  *County of Santa Clara v. Trump*, 2017 U.S. Dist. LEXIS 62871 at *92-93.

19      Moreover, and as a matter of scale, we are talking about the forced extraction of a

20  substantial number of magazines, being lawfully held for at least 17 years, by many thousands of

21  gun owners in this state.  The Attorney General acknowledges that "[t]here are likely hundreds of

22  thousands of large-capacity magazines in California at this time. [...]  The Department therefore

23  expects many gun owners to be affected by the new ban."  (Plaintiffs' Req. for Jud. Notice,

24  Exhibit A.)  And we think that the Attorney General vastly understates the problem.  Plaintiffs

25  have established that even under the most conservative estimates, some "tens of millions" of

27  ───────────────

28  [10] Plaintiffs are not requesting preliminary injunctive relief as to enjoin the continuing
enforcement of this particular provision at this time.

large-capacity magazines have been sold and are in the hands of United States consumers nationwide.  (Curcuruto Decl., ¶ 13.)  California being such a large and populous state, with many hundreds of thousands of law-abiding gun owners, many of whom have been for many years, it is not unreasonable to assume that at the very least, tens of thousands of people – knowingly or unknowingly – have large-capacity magazines in their possession.  The conscientious ones who are staying abreast of the law, will attempt to comply, but with substantial burdens.

For again, even generously assuming that some market exists, the law does not permit the offering for sale of these items while within the confines of this state. Pen. Code § 32310(a). And unlike the plaintiffs in *Fyock*, this is not simply a matter of taking items of personal property to a neighboring township.  The statewide scale, combined with a restrictive law preventing the interstate or extra-state sale of these items, makes the burden of compliance far more substantial. This is not an unimportant point.  In *Quilici v. Vill. of Morton Grove*, 532 F. Supp. 1169 (N.D. Ill. 1981), the district court specifically upheld a village-wide ban on handguns, among other reasons, rejecting the plaintiffs' takings challenge.  On this point, the district court concluded: "The Morton Grove ordinance does not go that far. The geographic reach of the ordinance is limited; gun owners who wish to may sell or otherwise dispose of their handguns outside of Morton Grove." 532 F.Supp at 1184.  Such is clearly not the case here.

We measure these severe burdens upon the Plaintiffs, of course, against the character of the government's action.  Here, there can be no substantial or legitimate justification for the retroactive confiscation of large-capacity magazines that are now at least 17 years old, and in most cases, much older.  For the stated, express justification for this massive retroactive ban is to prevent the incidence of horrific mass shootings that have occurred over the past few years, most notably culminating in the terrorist attacks in San Bernardino in 2015.

But an objective and careful examination of the data show that if mass shootings occur in California, pre-ban, large-capacity magazines that have been lawfully held in California since well before 2000 are not used in these events.  Again, Professor Moody undertook an

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

examination of post-2000 California mass shootings, and found that there is little or no data that supports any conclusion that pre-SB 23 "grandfathered" large-capacity magazines were used in a California mass shooting from 2013 to the present.  (Moody Decl., ¶ 15.)  Further looking at the data that is relied upon by defendant's experts, i.e., the *Mother Jones* and FBI data, Prof. Moody further opines that "the high-profile California mass shootings that occurred since 2000 were unlikely to have used such pre-ban magazines as well."  (Id.)  Again, it should be emphasized that to the extent that large-capacity magazines were used at all in conjunction with any of these attacks, e.g., San Bernardino, given the demographics and ages of the shooters, it is equally unlikely that they were acquired and held lawfully, i.e., before 2000.  (Id.)

Therefore, there is little or no evidence that legally-possessed pre-ban large-capacity magazines were involved in any mass shooting incident in California since 2000.  (Id., ¶ 16.) And an examination of California mass shooting incidents since 2000 in which large capacity magazines were, in fact, used indicates that the probability that any of them were grandfathered magazines is extremely low.  (Id.)  Thus, there is virtually no benefit to be gained to ban possession of large-capacity magazines that have been legally and peaceably owned since 2000. (Id.)  Furthermore, there is no evidence that large-capacity magazine bans in general have anything to do with reducing murder rates, or gun homicides in particular.  (Id. ¶¶ 18-25.)

In sum, whether the retroactive ban on the continued possession of personal property, legally held for at least 17 years and more, constitutes direct appropriation, completely eliminates their value, or substantially interferes with Plaintiffs' property rights to rise to the level of a regulatory taking, compensation must be provided.  In this case, the State never even considered that it might need to provide compensation as a taking, instead presumptively assuming that it could simply dispossess Plaintiffs of long-held, lawfully-owned and intrinsic parts of firearms under the "police powers" of the State.  It was wrong in so assuming, and should therefore be enjoined in enforcing this retroactive ban, unless and until it provides for such compensation, or amends the law to keep grandfathered magazines legal within this state.

**D.      THE COURT SHOULD ENJOIN ENFORCEMENT OF PEN. CODE §§ 32310(C) AND (D), AS AMENDED, ON THE GROUNDS THAT IT IS UNCONSTITUTIONALLY VAGUE, AND OVERBROAD.**

**1.      The Statute is Void for Vagueness**

Plaintiffs further seek preliminary relief on the independent ground that the newly-enacted large-capacity magazine ban is unconstitutionally vague in significant ways, both facially and applied to the Plaintiffs, as well as unconstitutionally overbroad. "'The void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.'" *Oracle USA, Inc. v. Rimini St., Inc.*, 191 F.Supp.3d 1134, 1147 (D.Nev. 2016) (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)). To overcome a facial vagueness challenge, law or ordinance: "'must (1) define the offense with sufficient definiteness that ordinary people can understand what conduct is prohibited; and (2) establish standards to permit police to enforce the law in a non-arbitrary, non-discriminatory manner.'" *Hotel & Motel Assn. of Oakland v. City of Oakland*, 344 F.3d 959, 971 (9th Cir. 2003) (quoting *Nunez v. City of San Diego*, 114 F.3d 935, 940 (9th Cir. 1997); *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972) ("A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application.") Similarly, "'[t]o determine whether a statute is unconstitutionally vague as applied, a two-part test is used: a court must first determine whether the statute gives a person of ordinary intelligence a reasonable opportunity to know what is prohibited and then consider whether the law provides explicit standards for those who apply it.'" *PEST Comm. v. Miller*, 626 F.3d 1097, 1111 (9th Cir. 2010). Where, as here, "a statute imposes criminal penalties, the standard of certainty is higher." *Id.,* at 1111 (quoting *Kolender*, 461 U.S. at 358 n. 8).

This impending ban is unconstitutionally vague to the point of being downright confusing and nonsensical. The vagueness is structurally embedded into the statutory scheme through its confoundingly bizarre feature of two parallel, yet distinctly different chaptered versions of the

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

1   same statutory provisions under Penal Code § 32406 – *both* the one drafted as part of SB 1446

2   and the one drafted as part of Proposition 63.  Section 32406 deals with the crucial subject of

3   exemptions from the ban's prohibitions, and thus the scheme effectively establishes two sets of

4   conflicting laws as to what conduct is and is not exempt from the ban. The result is a legal

5   quagmire that no person of ordinary intelligence faced with deciphering the effect of the two

6   statutes could hope to reliably resolve.

7        The most glaring of these conflicts between the two parallel versions of section 32406 is

8   that the Proposition 63 version contains only a single exemption – for "honorably retired" law

9   enforcement officers – whereas the SB 1446 version contains that exemption plus *five*

10  *more* exemption categories.  Specifically, the law under SB 1446 extends protection to: historical

11  societies that keep large-capacities magazines "unloaded, properly housed within secured

12  premises, and secured from authorized handling," § 32406(b); one who "finds a large-capacity

13  magazine, if the person is not prohibited from possessing firearms or ammunition, and possessed

14  it no longer than necessary to deliver or transport it to the nearest law enforcement agency," §

15  32406(c); forensic laboratories, and their agents or employees, "in the course and scope of [their]

16  authorized activities," § 32406(d); "[t]he receipt or disposition of a large-capacity magazine by a

17  trustee of a trust, or an executor or administrator of an estate, including an estate that is subject to

18  probate, that includes a large-capacity magazine," § 32406(e); and "[a] person lawfully in

19  possession of a firearm that the person obtained prior to January 1, 2000, if no magazine that

20  holds 10 or fewer rounds of ammunition is compatible with that firearm and the person possesses

21  the large-capacity magazine solely for use with that firearm," § 32406(f).

22       Because these five exemption categories are entirely absent from the parallel operative

23  version of section 32406 under Proposition 63, the law necessarily authorizes or encourages

24  arbitrary and discriminatory enforcement, and ordinary people cannot rely upon it as being

25  "sufficiently definite" one way or another, since law enforcement agencies presumably could

26  enforce either version in any given case. Either of these problems alone renders the scheme

27  unconstitutionally vague because the statute fails to satisfy the requirements of due process

28

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

– 41 –

1  unless it *both* "define[s] the criminal offense with sufficient definiteness" and does not permit

2  arbitrary or discriminatory enforcement. *Oracle USA, Inc. v. Rimini St., Inc.*, 191 F.Supp.3d at

3  1147. Short of a legislative rewrite, the only potential means of avoiding this particular

4  constitutional infirmity would be a judicial declaration that the two statutes should be read

5  coextensively, as though the expansive set of exemptions under SB 1446 represents a

6  comprehensive list of exemptions that include the retired law enforcement exemption both

7  versions share in common – assuming there is evidence of legislative intent to support such an

8  interpretation. But this still would not save the statutory scheme from ultimate peril because the

9  vagueness runs even deeper, subsisting in the design of the specific exemptions themselves.

10       First, under both the SB 1446 and Proposition 63 versions of section 32406, the retired

11  law enforcement exemption only carves out *possession* from among the types of conduct

12  prohibited under section 32310's general ban, leaving these individuals subject to prosecution for

13  all the other incidents of dominion and control an owner would normally be able to exercise over

14  property: manufacturing, importing into the state, keeping for sale, offering or exposing for sale,

15  giving, lending, buying, or receiving the magazines. § 32406, subdivision (a), SB 1446 version

16  (provides that these individuals are only exempt from subdivisions (b) and (c) of section 32310

17  (as drafted under SB 1446), which respectively prohibit possession and mandate disposal of

18  large-capacity magazines); §32406, Prop. 63 version (provides the same limited exemption under

19  its own version of section 32310). Thus, the face of these statutes results in the paradoxical

20  situation that retired law enforcement officers are supposedly entrusted with the right to possess

21  large-capacity magazines, but are simultaneously prohibited from exercising any other form of

22  dominion and control normally intertwined with such possession; they cannot bring into the

23  state, nor even "receive" these magazines that they are supposedly permitted to "possess." No

24  retired law enforcement officer could "possess" a large-capacity magazine under these

25  circumstances with any reasonable assurance that the exemption protects him or her from

26  arbitrary enforcement.

27

28

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

Second, the exemption designed to protect trustees of a trust or administrators of estates (unique to the SB 1446 version under that version's section 32406(e)) similarly fails to provide sufficient definiteness and protection against arbitrary enforcement.  It too protects against liability for possession only, leaving these individuals subject to prosecution for every other form of prohibited conduct. This includes the acts of giving and receiving under section 32310(a), conduct inherent in the handling of any property as a trustee or estate administrator.  So, while those like Plaintiff Adam Richards (Trustee of the Magazine Ban Lawsuit Trust) and Clifford Flores (Trustee of the Flores Family Trust) may be able to rely upon the chaptered provisions under the SB 1446 version of section 32406 to lawfully preserve their property, given the inherent vagueness as to what conduct is and is not exempted or prohibited and the existence of a parallel chaptered version that contains no such exemption at all, the statute is void for vagueness in its meaning and the manner of its potential enforcement.

For these reasons, the Large-Capacity Magazine Ban is unconstitutionally vague on its face and as applied to Plaintiffs, who are subject to its proscriptions as owners of such magazines, and yet all of whom stand to be deprived of their right to adequate notice of what the scheme prohibits or allows and their right to remain free of arbitrary or discriminatory enforcement.

### 2.     The Statute is Constitutionally Overbroad

Beyond being unconstitutional as applied, and in every "other conceivable application," under general vagueness principles, this ban suffers the related though independent infirmity of being "unconstitutionally overbroad." *Hoye*, 653 F.3d at 857. A statute is unconstitutionally overbroad when it captures "a substantial amount of constitutionally protected conduct," "[t]he legislative goal does not match the text of the statutes," and it is not "'readily susceptible' to a limiting construction that would render it constitutional.'" *Powell's Books, Inc. v. Kroger*, 622 F.3d 1202, 1207 (9th Cir. 2010) (quoting *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 397 (1998)). This statutory scheme falls squarely with the overbreadth doctrine.

As written, the ban requires that all current owners of large-capacity magazines in California dispose of their magazines by July 1, 2017. Assuming *arguendo*, without in any way conceding, that a *prospective* application of the ban is constitutional, there can be no legitimate claim its *retroactive* application to current owners of the magazines in any way advances the stated objective of the law – to reduce the prevalence of mass shootings or the extent of harm inflicted during those (fortunately) rare tragic incidents. There is simply no evidence any of *these* magazines or any of their owners have ever been involved in mass shootings, gun crimes, or in anything other than purely lawful activities. And yet, as discussed at length already, it is these individuals who stand to suffer the most immediate and tangible deprivation of rights through the forced extraction of all their large-capacity magazines by July 1, 2017.

This sweeping prohibition that would deprive countless responsible owners of their constitutionally-protected rights is entirely unjustified by the state's mismatched legislative goal. And because the law is designed around this forced extraction of property, it is not "'readily susceptible' to a limiting construction that would render it constitutional." *Powell's Books, Inc.*, 622 F.3d at 1207 (quoting *Virginia v. Am. Booksellers Ass'n*, 484 U.S. at 397). The constitutional infirmity infects the entire statutory scheme, rendering it hopelessly overbroad. *Id.* at 1215 (quoting *Virginia Am. Booksellers Ass'n*, at 397) ("We may not 'rewrite a state law to conform it to constitutional requirements.'")

Based on the foregoing, plaintiffs have demonstrated they are "more likely than not" to prevail on the merits of the vagueness and overbreadth claims in addition to the other claims. *Cottrell*, 633 F.3d at 1133. At the least, "serious questions" about the merits exist and "'the balance of hardships tips sharply in [plaintiff's] favor,'" *Cottrell*, at 1131-1132 (quoting *Clear Channel Outdoor, Inc. v. City of Los Angeles*, 340 F.3d at 813), such that "'the costs outweigh the benefits of not granting the injunction,'" *Cottrell*, at 1133 (quoting *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d at 35).

## IV.   CONCLUSION

Unless and until the State is enjoined, through the pendency of this lawsuit and thereafter, Plaintiffs and each of them, individually and on behalf of the class of persons they represent, would suffer irreparable injury arising from the permanent loss of constitutionally-protected liberty interests and loss of irreplaceable personal property.  For the reasons stated in this memorandum, the court should maintain the *status quo* and issue a TRO/Preliminary Injunction to Prevent irreparable injury to such liberty interests, at least through the pendency of this action.

Dated: June 12, 2017                    **SEILER EPSTEIN ZIEGLER & APPLEGATE LLP**


/s/ George M. Lee
George M. Lee

**LAW OFFICES OF RAYMOND MARK DIGUISEPPE, PLLC**

/s/ Raymond M. DiGuiseppe
Raymond M. DiGuiseppe