1   XAVIER BECERRA, State Bar No. 118517
    Attorney General of California
2   TAMAR PACHTER, State Bar No. 146083
    Supervising Deputy Attorney General
3   ALEXANDRA ROBERT GORDON, State Bar No. 207650
    JOHN D. ECHEVERRIA, State Bar No. 268843
4   Deputy Attorneys General
      455 Golden Gate Avenue, Suite 11000
5     San Francisco, CA  94102-7004
      Telephone:  (415) 703-5509
6     Fax:  (415) 703-5480
      E-mail:  Alexandra.RobertGordon@doj.ca.gov
7   *Attorneys for Defendants*

8                   IN THE UNITED STATES DISTRICT COURT

9                 FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11

12

13  **WILLIAM WIESE, et al.,**                  2:17-cv-00903-WBS-KJN

14                          Plaintiff,          **EXHIBITS 55 THROUGH 64 TO THE**
                                                **DECLARATION OF ALEXANDRA**
15  **v.**                                      **ROBERT GORDON IN SUPPORT OF**
                                                **PLAINTIFF'S MOTION FOR**
16  **XAVIER BECERRA, et al.,**                 **TEMPORARY RESTRAINING ORDER**
                                                **AND PRELIMINARY INJUNCTION**
17                          Defendant.
                                                Date: June 16, 2017
18                                              Time:  10:00 a.m.
                                                Courtroom:  5
19                                              Judge:  The Honorable William B. Shubb
                                                Action Filed:  April 28, 2017
20

21

22

23

24

25

26

27

28

                                    Decl. of Alexandra Robert Gordon  (2:17-cv-00903-WBS-KJN)

# Exhibit 55

Gordon Declaration 01879

Written Testimony for Chief Jim Bueermann (Ret.)
President, Police Foundation, Washington, D.C.
Senate Judiciary Committee Hearing
on Gun-related Violence
Wednesday, January 30, 2013

I write to you in my capacity as both President of the Police Foundation and the former Chief of Police of the Redlands, CA Police Department. The Police Foundation, established in 1970 by the Ford Foundation, is a non-partisan, non-constituency research organization. Our mission is to advance policing through innovation and scientific research. The Foundation is committed to disseminating science and evidence-based practices to the field. My written testimony reflects these principles and my personal experience after 33 years as a police officer during which time I witnessed countless acts of violence. I urge the passage of the Assault Weapons Ban Act of 2013 and ask Congress to consider funding additional scientific research to help this country implement evidence-based approaches to reducing gun violence in our communities and schools.

The most recent available data reveal this alarming picture of America's experience with gun-related violence: in 2011, of the 32,163 deaths from firearms, 19,766 were suicides and 11,101 were homicides.[1] Additionally, there were 467,321 non-fatal violent crimes committed with a firearm.[2] These numbers all reflect the unique position of the United States in relation to other high-income nations: our homicide rate is 6.9 times higher than the combined homicide rate of 22 other high-income countries.[3] We all know that gun violence must be stemmed. The Police Foundation supports a comprehensive and holistic approach to preventing and reducing gun violence that includes:

- Legislation that bans assault weapons, requires universal background checks for all firearm purchases and limits high capacity ammunition feeding devices to ten rounds;
- Enhanced funding for research on the availability of firearms, the causes and prevention of gun violence and the connection between mental health and gun violence;
- Specific funding to replicate the 1996 US DOJ, National Institute of Justice study *Guns in America* that provided a comprehensive view of guns in our society;
- Increased funding to states for community-based mental health treatment; and,
- Sustained funding and support of the Justice and Mental Health Collaboration Program Act, which allows for collaborative efforts between law enforcement, criminal justice and mental health professionals.

Gun violence, especially violence that is mental health-related, is a complex social, cultural, health and safety issue. It is one that we do not know enough about. As the leader of a research organization that focuses on policing crime and disorder, I stress the need for scientific research and an evidence-based approach to understanding important societal issues. As a country, we

---

[1] Ibid.

[2] Bureau of Justice Statistics. Number of violent victimizations by weapons category. Generated using the NCVS Victimization Analysis Tool at www.bjs.gov. 29-Jan-13.

[3] Richardson EG, Hemenway D. Homicide, suicide, and unintentional firearm mortality: comparing the United States with other high-income countries, 2003. Journal of Trauma 2011; 70:238-243.

need a robust and rigorous agenda on the causes of gun violence, effective, community-based prevention and intervention strategies and the link between mental illness and gun violence. Lifting the freeze on gun violence research at the Centers for Disease Control is heartening, and I hope Congress will support additional funding for interdisciplinary, scientific research and collaboration across government agencies, including the Department of Justice and the Department of Health and Human Services.

Mental health-related gun violence has been brought to the fore with the shootings in Newtown, CT, Aurora, CO and Tucson, AZ. While these tragic incidents are statistically rare, when combined with the number of gun-related suicides each year, the necessity of addressing the mental health needs of individuals, and the availability of firearms in our communities, is paramount.

We do not want to stigmatize individuals with mental illness nor solely focus the current dialogue on gun violence on the role of mental illness. The best available data on violence attributable to mental illness shows that 3-5% of violent acts are committed by individuals with mental illness[4] and most of these acts do not involve guns.[5] Yet, we cannot ignore the number of gun-involved suicides each year and the connection between mass shootings and mental illness. Increased scientific research across the fields of medicine, public health, criminal justice and law will help us understand how to prevent mental health-related gun violence. This requires both robust funding and time.

As a former chief of police, I recognize that local law enforcement agencies require immediate strategies to prevent another incident of mass violence. Earlier this month, the Police Foundation convened a roundtable meeting of expert researchers and practitioners from the fields of law enforcement, mental health, public health, criminal justice and policy. The group discussed how available interdisciplinary research might be used to develop practical strategies for law enforcement that prevent mental health-related gun violence. Existing research establishes the difficulty in predicting a violent act,[6] but the group committed to three strategies that law enforcement can adopt now. Based on innovative practices defined in the literature, the group proposed that law enforcement executives:

- Create local partnerships with mental health service providers, school officials and appropriate community groups to develop a mental health crisis response capacity;
- Advocate for increased mental health services in their communities. Law enforcement executives should convene local service providers and community members to assess local mental health services and community needs and increase community members' knowledge of the exiting science on mental health and gun violence;

---

[4] Swanson JW: Mental disorder, substance abuse, and community violence: an epidemiological approach; in Violence and Mental Disorder. Edited by Monahan J, Steadman H. Chicago, University of Chicago Press,1994. Cited in Appelbaum, PS and JW Swanson. Gun laws and mental illness: How sensible are current restrictions? Psychiatric Services 2010, 61: 652-654.
[5] Monahan J, Steadman H, Silver E, et al: Rethinking Risk Assessment: The MacArthur Study of Mental Disorder and Violence. New York, Oxford University Press, 2001. Cited in Appelbaum, PS and JW Swanson. Gun laws and mental illness: How sensible are current restrictions? Psychiatric Services 2010, 61: 652-654.
[6]

- Adopt specific policies and practices that reduce the availability of guns to people in mental health crisis, institutionalize mental health training for their officers and facilitate community-wide "mental health first aid" training for all community members.

Clearly, more work needs to be done in this area so police departments can effectively operationalize these ideas. With additional Congressional support, strategies like these can be supported by legislation such as the Justice and Mental Health Collaboration Act or through an enhancement of programs at the Department of Justice and the Departments of Health and Human Services and Education. The JMHC Act has bipartisan support across the House of Representatives and Senate, and I ask that Congress sustain funding for these important ideas as part of a targeted approach to specifically reducing gun violence.

Charting a path to respond to gun violence will not be easy, but I encourage Congress to rely on the police, community leaders and science to guide that path. The Police Foundation, along with law enforcement leaders across the country, support reducing the availability of assault weapons and high capacity ammunition feeding device as a first step to reducing gun violence. However, to effectively reduce gun violence, there must be more comprehensive action. Congress should prioritize funding to better understand guns in America, research on the causes and prevention of gun violence and the connection between mental illness and gun violence. It should also enhance the funding and availability of mental health services in communities, and support programs that increase local collaboration between law enforcement, criminal justice and mental health professionals.

Thank you for your consideration of this written testimony.

Gordon Declaration 01882

Written Testimony

Submitted for the record by

**Sheldon Greenberg, Ph.D.**
**Associate Dean**
**Johns Hopkins University, School of Education, Division of Public Safety Leadership**
**Former Associate Director, Police Executive Research Forum**
**Former Officer, Supervisor, and Bureau Commander, Howard County (MD) Police Department**
**Past President, Maryland Crime Prevention Association**

For the hearing before the
Senate Committee on the Judiciary

on

"What Should American Do About Gun Violence?"

Wednesday, January 30, 2013

Two months ago, Johns Hopkins University co-sponsored the National Summit on Multiple Casualty Shootings, in partnership with the Department of Justice, Office of Community Oriented Policing Services (COPS), and the Department of Homeland Security, Federal Law Enforcement Training Center (FLETC).  While much attention is being given to multiple casualty shootings, the nation's public safety personnel are equally concerned about the violence and trauma resulting from gun-related acts of domestic violence, street crime, and suicide that occur every day.  These incidents devastating and disrupt neighborhood and community well-being.

We can do more to tend to the public's safety and provide people with a greater sense of peace and safety where they live, work, shop, and recreate.  We believe, and evidence supports, that much of the gun-related violence and subsequent suffering that occurs in our nation's homes, neighborhoods, small businesses, and schools can be prevented.  One of the most effective ways to prevent tragic events from occurring is to do more to control access to guns.

In seeking new and better ways to prevent gun violence, the Division of Public Safety Leadership embraces the principles established by the National Law Enforcement Partnership to Prevent Gun Violence and with Mayors Against Illegal Guns.  These principles were embraced by the Ad Hoc Committee of the Maryland Chiefs of Police Association last week. They are:

- The level of gun violence in the United States, specifically firearm-related injuries and deaths including homicides, suicides, and accidental shootings, is unacceptable and demands immediate attention.

- The level and lethality of gun violence directed at police officers requires an organized and aggressive response from policy makers at the federal, state, and local levels.

- Elected officials must close the gaps in the current regulatory system, including those that enable felons, minors, persons with mental illness, and other prohibited persons to access firearms, and those that allow the trafficking of illegal guns.

1

Gordon Declaration 01883

- Law enforcement plays a critical role in preventing gun violence and solving crime.

- Effective strategies for the strict enforcement of laws concerning the illegal possession, trafficking, and criminal use of firearms are vital, and need to be supported by data, research, technology, training, and best practices.

- Because the public's health and safety depends on the efforts of law enforcement, agencies must have resources sufficient to prioritize the protection of officers and communities against illegal guns and firearm violence.

- The crisis of gun violence in our nation necessitates a sustained, coordinated, and collaborative effort involving citizens, elected officials, law enforcement, and the entire criminal justice system.

In response, we join the above cited organizations in calling upon the President of the United States and members of Congress to:

1. Require background checks for all firearm purchasers.
2. Improve background checks by ensuring that the National Instant Criminal Background Check System (NICS), which maintains records of those who are legally prohibited from purchasing guns, be complete and accurate.
3. Ban new semi-automatic assault weapons.
4. Limit high-capacity ammunition magazines to ten rounds.
5. Oppose federal preemption of state laws governing the carrying of concealed weapons.

In January, the Johns Hopkins University, School of Education, Division of Public Safety Leadership hosted the second national Summit on Campus Public Safety for the Department of Justice, Bureau of Justice Assistance and facilitated the meeting of the Maryland Chiefs of Police Association Ad Hoc Committee on Gun Violence. We have a legacy of scholarship and leadership in this area and welcome the opportunity to support all reasonable efforts to prevent gun violence.

*The Johns Hopkins University, School of Education, Division of Public Safety Leadership (DPSL) provides education, research, and technical assistance to the fields of law enforcement, fire/EMS, intelligence analysis, emergency management, public health, security, corrections, and the military. DPSL cultivates viable communities by developing and disseminating educational and technical assistance programs that foster the ethical, social, operational and intellectual development of professionals who serve public safety and related fields.  The Division provides graduate, undergraduate, certificate, and noncredit education designed to advance and sustain the well-being of people and their neighborhoods and communities. All students in PSL are active public safety practitioners. Over 1,000 PSL graduates hold leadership positions nationwide in federal, state, and local agencies and play a significant role in shaping the future of American public safety.  PSL graduates currently serve as chiefs of police in Denver, San Antonio, Washington, D.C., and Prince George's Counties in Maryland.  They also serve as senior executives in federal agencies, such as the U.S. Secret Service, U.S. Bureau of Alcohol, Tobacco, Firearms, and Explosives, and Immigration and Customs Enforcement.*

2



Written Testimony

Submitted for the record by

**Daniel W. Webster, ScD, MPH**<br>**Professor and Director**<br>**Johns Hopkins Center for Gun Policy and Research**

For the hearing before the<br>Senate Committee on the Judiciary

on

"What Should American Do About Gun Violence?"

Wednesday, January 30, 2013

On January 14-15, 2013, more than twenty of the top researchers and gun policy experts gathered to participate in a Summit on Reducing Gun Violence in America at Johns Hopkins, and presented findings and analyses that were just published in a book.[1]  These leading scholars identified numerous weaknesses in current federal firearms policy which enable criminals, those with severe mental illness, perpetrators of domestic violence, and underage youth to obtain firearms.  These weaknesses in our firearms policies play an important role in explaining why the United States' homicide rate is seven times higher than the average rate among other high-income countries.[2]

A recent national survey we conducted found very broad support – among gun owners and non-gun-owners and across political party affiliation – for laws prohibiting these and other high-risk groups from possessing firearms.  There was similarly broad support for measures to keep guns from these groups, such as requiring background checks for all gun sales and stronger laws governing licensed gun dealers.[3]  Importantly, research shows that prohibiting high-risk groups from possessing firearms reduces violence and saves lives,[4,5] especially if necessary records are available for law enforcement to deny prohibited individuals.[6]

Opponents of stronger gun laws often claim that we simply need to do a better job of enforcing current gun laws. But current federal laws are written in ways that make it very difficult to hold firearm sellers, whether licensed dealers or private sellers, accountable if they sell firearms to criminals or traffickers.[7,8]  Non-licensed sellers of firearms have no obligation to ensure that the prospective purchasers have passed a background check and can legally possess firearms.

Such a policy is indefensible and is commonly exploited by criminals and traffickers. It is not surprising that nearly eighty percent of handguns used by offenders incarcerated in state prisons report that they acquired their handguns from non-licensed sellers – friends, family, and sellers in the underground market.[9]  Nor is it surprising that states that fail to regulate private handgun transactions export guns to criminals in states that do regulate private handgun sales.  If you follow the logic of arguments that requiring background checks for private gun sales is pointless because criminals won't obey the law, then laws against drunk driving are pointless because drunks will always disobey those laws.  Just as drunk

driving laws provide law enforcement with the tools to arrest individuals who break those laws and deter others from driving drunk, requiring background checks for all sales will provide law enforcement with the tools it needs to combat illegal gun trafficking and keep guns from prohibited individuals. Unfortunately, Congress has enacted several laws that shield scofflaw gun dealers from scrutiny, civil penalties, and criminal prosecution. The 1986 Firearm owners Protection Act weakened penalties for gun sales violations, increased standards of proof for prosecutions and actions against licensed gun dealers, and limited ATF law compliance inspections. The Protection of Lawful Commerce in Arms Act provided special immunity from lawsuits for negligent practices which enable criminals and other prohibited individuals to obtain guns. The Tiahrt amendments provided further protections to licensed gun dealers who sell many guns that subsequently are recovered from criminals.[8]

There is a growing body of research that has consistently demonstrated that laws which increase gun seller accountability and increase the risk to those involved in illegal gun transactions significantly reduce the number of guns diverted for criminal use. Whereas the federal Tiahrt amendments have been shown to increase the diversion of guns to criminals from suspect gun dealers,[10] strong regulation and oversight of gun dealers reduces guns diverted to criminals,[11] as does being vulnerable to lawsuits for making illegal sales.[12,13]  Research has also shown that regulation of private sales of handguns,[8] mandatory reporting of loss or theft of firearms from private owners, and permit-to-purchase licensing for handguns reduces the diversion of guns to criminals.[9]

By adopting many laws shown to be effective at that the state level, Congress could significantly reduce the availability of guns to dangerous individuals, which would translate into fewer lives lost, safer streets and homes, increased quality of life, and reduced government expenditures on health care, disability payments, criminal justice, and corrections.

---

## Research Cited

[1] Webster, Daniel W. and Jon S. Vernick. *Reducing Gun Violence in America: Informing Policy with Evidence and Analysis.* Baltimore, MD: Johns Hopkins University Press, 2013.

[2] Richardson EG, Hemenway D.  Homicide, suicide, and unintentional firearm fatality: comparing the United States with other high-income countries, 2003. *Journal of Trauma Injury, Infection and Critical Care* 2011;70:238-243.

[3] Barry CL, McGinty EE, Vernick JS, Webster DW.  After Newtown – public opinion on gun policy and mental illness. *New England Journal of Medicine* Jan. 28, 2013; DOI: 10.1056/NEJMp1300512

[4] Wintemute GJ.  "Broadening denial criteria for the purchase and possession of firearms: Need, feasibility, and effectiveness." Pages 77-94 in *Reducing Gun Violence in America: Informing Policy with Evidence and Analysis,* Daniel W. Webster and Jon S. Vernick, Eds., Baltimore, MD: Johns Hopkins University Press, 2013.

[5] Zeoli AM, Frattaroli S.  "Evidence for optimism: policies to limit batters' access to firearms. Pages 53-64 in *Reducing Gun Violence in America: Informing Policy with Evidence and Analysis,* Daniel W. Webster and Jon S. Vernick, Eds., Baltimore, MD: Johns Hopkins University Press, 2013.

[6] Swanson JW, Robertson AG, Frisman LK, Norko MA, Lin HJ, Swartz MS, Cook PJ.  "Preventing gun violence involving people with severe mental illness. Pages 33-52 in *Reducing Gun Violence in America: Informing Policy with Evidence and Analysis,* Daniel W. Webster and Jon S. Vernick, Eds., Baltimore, MD: Johns Hopkins University Press, 2013.

[7] Braga AA, PL Gagliardi. "Enforcing federal firearms laws against firearms traffickers: Raising operational effectiveness by lowering enforcement obstacles." Pages 143-156 in *Reducing Gun Violence in America: Informing Policy with Evidence and Analysis,* Daniel W. Webster and Jon S. Vernick, Eds., Baltimore, MD: Johns Hopkins University Press, 2013.

[8] Vernick JS, Webster DW.  "Curtailing dangerous sales practices by licensed firearms dealers: legal opportunities and obstacles". Pages 133-142 in *Reducing Gun Violence in America: Informing Policy with Evidence and Analysis,* Daniel W. Webster and Jon S. Vernick, Eds., Baltimore, MD: Johns Hopkins University Press, 2013.

[9] Webster DW, Vernick JS, McGinty EE, Alcorn T.  "Preventing the diversion of guns to criminals through effective firearm sales laws." Pages 109-122 in *Reducing Gun Violence in America: Informing Policy with Evidence and Analysis.*  Daniel W. Webster and Jon S. Vernick, Eds.  Baltimore, MD: Johns Hopkins University Press, 2013.

[10] Webster DW, Vernick JS, Bulzacchelli MT, Vittes KA.  Recent federal gun laws, gun dealer accountability and the diversion of guns to criminals in Milwaukee.  *J Urban Health* 2012;89:87-97.

[11] Webster DW, Vernick JS, Bulzacchelli MT.  Effects of state-level firearm seller accountability policies on firearms trafficking.  *Journal of Urban Health* 2009;86:525-537.

[12] Webster DW**,** Zeoli AM, Bulzacchelli MT, Vernick JS.  Effects of police stings of gun dealers on the supply of new guns to criminals.  *Injury Prevention* 2006;12:225-230.

[13] Webster DW, Vernick JS.  "Spurring responsible firearms sales practices through litigation: the impact of New York City's lawsuits against gun dealers on interstate gun trafficking." Pages 123-132 in *Reducing Gun Violence in America: Informing Policy with Evidence and Analysis.*  Daniel W. Webster and Jon S. Vernick, Eds.  Baltimore, MD: Johns Hopkins University Press, 2013.

Gordon Declaration 01887

# Exhibit 56

Gordon Declaration 01888

The Washington Post

**Politics**

# Senate Judiciary Committee hearing on gun violence on Jan. 30, 2013 (Transcript)

January 30, 2013

*Here's a complete transcript of testimony from the Senate Judiciary Committee hearing on gun-related violence on Jan. 30, 2013.*

SEN. PATRICK LEAHY: We have more than 200 people here today and hundreds more watching on our committee web cast. I expect everybody in this room to be respectful of the senators and the witnesses speaking about this very serious subject.

That means I do not want applause for or against any position I might take or anybody else takes. The Capitol Police have been notified to remove any audience member who interferes with the orderly conduct of this important hearing.

This incidentally, is a warning I give at many hearings.

We're going to hear a lot of different perspectives on gun violence.

And both Senator Grassley and I will give opening statements . But we have a former member of Congress here, Gabby Giffords, who's going to give a brief message and -- and leave.

And Captain Kelly, thank you for your help in bringing your wife here.

Ms. Giffords?

GIFFORDS: OK . Thank you for inviting me here today. This is an important conversation for our children, for our communities, for Democrats and Republicans.

Gordon Declaration 01889

Case 2:17-cv-00903-WBS-KJN   Document 40-6   Filed 06/15/17   Page 13 of 175

Speaking is difficult. But I need to say something important. Violence is a big problem. Too many children are dying. Too many children. We must do something.

It will be hard, but the time is now. You must act. Be bold, be courageous, Americans are counting on you.

Thank you.

LEAHY: Captain Kelly, do you want to help Ms. Giffords out? And we'll give you a few moments and then...

(RECESS)

LEAHY: We return to the hearing.

LEAHY: And I -- I thank former Congressman (sic) Giffords and -- and her husband. We will be calling up the witnesses shortly. And Senator Grassley and I will give our opening statements.

You know, on December 14th, America's heart was broken when 20 young children and six dedicated educators were murdered. This is the first Judiciary Committee hearing of the 113th Congress. And I want everybody here to join the discussion as part of a collective effort to find solutions, to help ensure that no family, no school, no community ever has to endure such a grievous tragedy again.

We have to come together today as Americans seeking common cause. I hope we can forego sloganeering and demagoguery and partisan recrimination. It's too important for that. We should all be here as Americans. Every American abhors the recent tragedies. In just the last two years, an elementary school in Connecticut; a movie theater in Colorado; in a sacred place of worship in Wisconsin; in front of a shopping mall in Arizona. And Americans are looking to us for solutions and for action. This committee is a focal point for that process.

I've introduced a measure to provide law enforcement agencies with stronger tools against illegal gun trafficking. Others have proposed restrictions on military-style weapons and the size of ammunition clips. Others have proposed modifications to the background check system to keep guns out of the wrong hands while not unnecessarily burdening law-abiding citizens.

I'm a lifelong Vermonter. I know gun store owners in Vermont. They follow the law. They conduct background checks to block the conveyance of guns to those who should not have them. And they wonder why others who sell guns do not have to follow these same protective rules. And I agree with these responsible business owners.

If we could all agree that criminals and those adjudicated as mentally ill should not buy firearms, why should we not try to plug the loopholes in the law that allows them to buy guns without background checks? It's a simple matter of common sense. And if we agree that the background check system is worthwhile, shouldn't we try to improve its content and use it so it could be more effective? What responsible gun owner objects to improving the background check system? When I buy firearms in Vermont, I go through the background check. I would expect everybody else to.

Gordon Declaration 01890

Case 2:17-cv-00903-WBS-KJN   Document 46-6   Filed 06/15/17   Page 14 of 175

Now, at the outset of this hearing, I note that the Second Amendment is secure and will remain secure and protected. In two recent cases, the Supreme Court has confirmed that the Second Amendment, like the other aspects of our Bill of Rights, secures a fundamental individual right. Americans have the right to self- defense; as the court has said, to have guns in their homes to protect their families. No one can take away those rights or their guns.

Second Amendment rights are the foundation on which our discussion rests. They're not at risk. What is at risk are lives. Lives are at risk when responsible people fail to stand up for laws that will keep guns out of the hands of those who use them to commit murder, especially mass murders. I ask that we focus our discussion on additional statutory measures to better protect our children and all Americans. I say this as a parent and as a grandparent.

Ours is a free society, an open society. We come together today to consider how to become a safer and more secure society. No one begrudges the government assistance provided to victims of mass tragedies made possible by the law we passed after the bombing in Oklahoma City. The bill introduced last week against gun trafficking will similarly prove helpful, and I believe will become an accepted part of our crime control framework.

LEAHY: It, too, is common-sense reform. It fills a hole in our law enforcement arsenal so that straw purchasers who acquire weapons for criminals can be prosecuted more effectively. Last Thursday, the president nominated the U.S. attorney for Minnesota -- and we have two from his state here on this committee -- nominated the U.S. attorney to direct the Federal Bureau of Alcohol, Tobacco, Firearms and Explosives. And I trust that all the senators will cooperate in a prompt hearing in action on that nomination. We will join (ph) good faith to strengthen our law enforcement efforts against gun violence and to protect public safety.

As a responsible governor and someone who cherishes all of our constitutional rights, as a senator who has sworn an oath to uphold those rights, as a father and a grandfather, and as a former prosecutor who has seen the results of gun violence firsthand in graphic detail, I undertake these efforts with the hope that this hearing can build consensus around common sense solutions.

Previous measures to close the gun show loophole or to improve the background check system have been bipartisan. And I hope in this new Congress, further improvements will also become bipartisan. We could act together as Americans. I have said what kind of measures I can support. Now I ask other senators to come forward and do, as well. I will ask our witnesses what legislative proposals they support to make America safer, and I thank everybody here for joining in today's discussion.

Senator Grassley?

GRASSLEY: Mr. Chairman, and thank you, as well, for this hearing. And thanks to everybody who is here, and, particularly, our witnesses.

What happened at Newtown shocks our nation. We will never forget where we were or how we reacted when we learned that 20 very young children and six adults were killed that day, or if we forgot about that specific incident, you don't forget about all the tragedies that have happened recently.

Gordon Declaration 01891

Case 2:17-cv-00903-WBS-KJN   Document 40-6   Filed 06/15/17   Page 15 of 175

As a grandfather and great-grandfather, I cannot imagine how anyone would commit an evil act like that. And I cannot ever begin to know what it would be like to be a relative of one of those slain children. We pray for the families who continue to mourn the loss of loved ones. We pay for -- pray for all victims of violence and guns, by guns and otherwise. Clearly, violent crimes and those who commit them are a plague on our society, one that has been with us for far too long. We have looked at these issues before, but I welcome this renewed discussion. I think the need for the judiciary committee to hold hearings after Newtown is very clear. All over America, people were appalled by what happened to those vulnerable and precious victims. And we all want to exam (ph) sensible actions that could reduce the likelihood of future crimes.

And we've extended a special welcome to former Congresswoman Giffords. She was doing what a conscientious representative should do, but I hope all of us do, taking the pulse of constituents to represent them in Congress. She was representing the people of her congressional district when a gunman opened fire. The shooting was a horrible tragedy, but her determination to overcome her injuries, progress through rehabilitation, and continued contribution to society are an inspiration, or at least should be an inspiration to all of us. I thank her for being here today and with her husband, Captain Kelly.

Although Newtown and Tucson are terrible tragedies, the deaths in Newtown should not be used to put forward every gun control measure that's been floating around for years. Because the problem is greater than just guns alone, and I think the chairman's speech indicates that, as well. Any serious discussion of the causes of gun violence must include a complex re-examination of mental health as it relates to mass shootings. Society, as a whole, has changed as well, and that statement's made. It's difficult for remeasure, (ph) but I think you see a lack of civility in American society has grown considerably in the last couple decades.

GRASSLEY: You see it here on the -- in the Congress, as well, when we are partisan and don't treat each other with the respect that we ought to. There are too many video games that celebrate the mass killing of innocent people, games that, despite attempts at industry's self-regulation, find their way into the hands of children.

An example: One video game released November 2009, which has sold over 22 million copies in the U.S. and U.K., was for foreign distribution because the opening level depicted shooting innocent civilians in an airport security line.

This game was specifically cited in a manifesto of the Norway mass shooter as, quote, "part of my training simulation," end of quote, for carrying out his attacks.

Where is the artistic value of shooting innocent victims? I share of vice president Joe Biden's disbelief of manufacturer denial that these games have no affect on real-world violence.

Above all, we should not rush to pass legislation that will not reduce mass killings. Banning guns based on their appearance does not make sense. The 1994 assault weapon ban did not stop Columbine. The Justice Department found the ban ineffective. Scholars have indicated that refining or expanding such legislation will not cut gun violence.

I also question the limitation on magazine capacities. Those can be circumvented by carrying multiple guns, as many killers have done.

Gordon Declaration 01892

Case 2:17-cv-00903-WBS-KJN   Document 40-6   Filed 06/15/17   Page 16 of 175

We hear that no one needs to carry larger magazines than those that hunters used to shoot deers (sic) but an attacking criminal, unlike a deer, shoots back.

I do not think that we may be able -- I do think that we may be able to work together to prevent straw purchasers from trafficking in guns.

The oversight work I conducted on illegal Operation Fast and Furious shows that there are some gaps in this area of law that should be closed.

Besides legislative proposals, the presently -- president recently took 23 executive actions on guns. And without knowing exactly how they're worded, we don't -- can't find fault with them. And probably should not find fault with a lot of his actions.

Despite this administration's claim to be the most transparent in history, the text of these actions is still not posted on the White House website, only very brief statements about what they do.

But all of those executive actions could have been issued years ago or after the Tucson shooting or after Aurora. Why only now?

One order directs the Center for Disease Control to research causes of gun violence. Contrary to what you may have heard, Congress has never prohibited CDC from researching gun violence rather.

Rather, Congress prevented federal research to, quote, "advocate or promote gun control," which some government researchers had been doing under the guise of taxpayer-supported science.

Had Congress actually prohibited gun violence research, the president could not legally have directed CDC to conduct that research.

I was taken aback when the president cited the Declaration of Independence and the Constitution as sources of government power to restrict gun ownership rights.

The Constitution, in fact, creates a limited federal government. It separates powers among branches of the federal government and preserves state power against federal power.

The framers believed that these structures would adequately control the government so as to protect individual liberty. But the American people disagreed. They feared that the Constitution gave the federal government so much power that it could be tyrannical and violate individual rights. So the Bill of Rights was added.

Each of those rights, including the Second Amendment, was adopted to further limit government power and protect individual rights.

Gordon Declaration 01893

Case 2:17-cv-00903-WBS-KJN   Document 40-6   Filed 08/15/17   Page 17 of 175

President Obama's remarks turned the Constitution on its head. He said, quote, "The right to worship freely and safely, that right was denied to Sikhs in Oak Creek, Wisconsin."

Quote, "the right to assemble peacefully, that right was denied shoppers in Clackmas, Oregon, and moviegoers in Aurora, Colorado. That most fundamental set of rights to life, liberty, and the pursuit of happiness are fundamental rights that were denied to college students at Virginia Tech and high school students at Columbine and elementary school students in Newtown," end of quote.

But this is not so. Except for its prohibition on slavery, the Constitution limits only actions of government, not individuals.

So, for instance, the right to peacefully assemble protects individual rights to organize, to protest, and seek to change to government action. That right is trivialized and mischaracterized as protecting shopping and watching movies.

GRASSLEY: And those constitutional rights are not the source of governmental power to enact legislation, as the president suggested. In fact, just the opposite: They were included in the Bill of Rights because throughout history, governments have wanted to shut up those who would criticize government, to suppress unpopular religions, or to disarm people.

The president's citing of constitutional protections of individual rights is the basis for expanding federal power over the lives of private individuals. This is the same president who exceeded his power under the Constitution to appoint recess appointments. So, no wonder millions of Americans fear that the president might take executive action and Congress may enact legislation that could lead to tyrannical federal government.

So, I cannot accept the president's claim that, quote, "There will be politicians and special interest lobbyists publicly warning of tyrannical all-out assault on liberty, not because that's true, but because they want to gin up fear," end of quote. This necessarily and understandably leads many citizens to fear that their individual rights will be violated. And that extends well beyond the Second Amendment. It should be a matter of deep concern to all of us. The Constitution for 225 years has established a government that is the servant of the people, not the master.

So, Mr. Chairman, as we consider and debate legislation arising from these tragedies, I hope that we will proceed with proper understanding of the relationship that the Constitution establishes between government power and individual liberty, and I hope we will pass those bills that would actually be effective in reducing gun violence.

I welcome the witnesses and look forward to this hearing. Thank you very much.

LEAHY: Thank you.

I'd ask that Captain Mark Kelly, Professor David Kopel, Chief James Johnson, Ms. Gayle Trotter and Mr. Wayne LaPierre step forward. Just stand behind your chairs for the moment and I can swear in the panel at one time.

Please raise your right hand. Do you solemnly swear that the testimony you're giving us is the truth, the whole truth and

Gordon Declaration 01894

nothing but the truth, so help you God?

Let the record show that all witnesses have been sworn in.

Please take your -- take your seat. What I'm going to suggest we do, I'm going to call on each witness. We're going to try to keep to fairly strict time and call on each one to give their testimony. Then, we'll open it to questions in the usual way, alternating on both sides.

Our first witness is Mark Kelly. He's -- our first witness is Mark Kelly. He's a retired astronaut and U.S. Navy captain. Captain Kelly recently co-founded Americans for Responsible Solutions. This is an advocacy group that promotes solutions to prevent gun violence and protect responsible gun ownership. He is with his wife, former Congresswoman Gabrielle Giffords.

So Captain Kelly, please go ahead, sir.

KELLY: Thank you, Chairman Leahy and Ranking Member Grassley for inviting me here today. I look forward to a constructive dialogue with your committee.

I also want to take the opportunity to congratulate Gabby's friend and much-respected former colleague, Jeff Flake, on his new role as Arizona's junior senator.

As you know, our family has been immeasurably affected by gun violence. Gabby's gift for speech is a distant memory. She struggles to walk and she is partially blind. And a year ago, she left a job she loves, serving the people of Arizona.

But in the past two years, we have watched Gabby's determination, spirit and intellect conquer her disabilities. We aren't here as victims. We're speaking to you today as Americans. We're a lot like many of our fellow citizens following this debate about gun violence. We're moderates. Gabby was a Republican long before she was a Democrat.

We're both gun owners and we take that right and the responsibilities that come with it very seriously. And we watch with horror when the news breaks to yet another tragic shooting. After 20 kids and six of their teachers were gunned down in their classrooms at Sandy Hook Elementary, we said: "This time must be different; something needs to be done." We are simply two reasonable Americans who have said "enough."

On January 8th of 2011, a young men walked up to Gabby at her constituent event in Tucson, leveled his gun and shot her through the head. He then turned down the line and continued firing. In 15 seconds, he emptied his magazine. It contained 33 bullets and there were 33 wounds.

KELLY: As the shooter attempted to reload, he fumbled. A woman grabbed the next magazine and others restrained him.

Gabby was the first victim. Christina Taylor Green, nine years old, born on 9/11 of 2001, was shot with the 13th bullet or after. And others followed.

Gordon Declaration 01895

Case 2:17-cv-00903-WBS-KJN   Document 40-6   Filed 06/15/17   Page 19 of 175

The killer in the Tucson shooting suffered from severe mental illness, but even after being -- even after being deemed unqualified for service in the Army and expulsion from Pima (ph) Community College, he was never reported to mental health authorities.

On November 30, 2010, he walked into a sporting goods store, passed the background check, and walked out with a semiautomatic handgun. He had never been legally adjudicated as mentally ill, and even if he had, Arizona, at the time, had over 121,000 records of disqualifying mental illness that it had not submitted into the system.

Looking back, we can't say with certainly -- with certainty, "Only if we had done this, this would never have happened." There is not just one thing that would have prevented the Tucson shooting from being written into the history books. Gabby is one of roughly 100,000 victims of gun violence in America each and every year. Behind every victim lays a matrix of failure and inadequacy in our families, in our communities, in our values, in our society's approach to poverty, violence, and mental illness and yes, also in our politics and in our gun laws.

One of our messages is simple, the breadth and complexity of gun violence is great, but it is not an excuse for inaction. There's another side to our story, Gabby is a gun owner and I am a gun owner. We have our firearms for the same reasons that millions of Americans just like us have guns, to defend ourselves, to defend our families, for hunting, and for target shooting.

We believe wholly and completely in the second amendment and that it confers upon all Americans the right to own a firearm for protection, collection, and recreation. We take that right very seriously and we would never, ever give it up, just like Gabby with never relinquish her gun and I would never relinquish mine. But rights demand responsibility and this right does not extend to terrorists, it does not extend to criminals, and it does not extend to the mentally ill.

When dangerous people get guns, we are all vulnerable at the movies, at church, conducting our everyday business, meeting with a government official. And time after time after time, at school, on our campuses, and in our children's classrooms. When dangerous people get dangerous guns, we are all the more vulnerable. Dangerous people with weapons specifically designed to inflict maximum lethality upon others have turned every single corner of our society into places of carnage and gross human loss. Our rights are paramount, but our responsibilities are serious. And as a nation, we're not take responsibility for the gun rights that our founding fathers have conferred upon us.

Now we have some ideas on how we can take responsibility. First, fixed on background checks. The holes and our laws make a mockery of the background check system. Congress should close the private sales loophole, and the dangers people entered into that system. Second, remove the limitations on collecting data and conducting scientific research on gun violence. Enact -- enact a tough federal gun trafficking statute, this is really important . And finally, let's have a careful and civil conversation about the lethality of fire arms we permit to be legally bought and sold in this country.

Gabby and I are pro-gun ownership. We are also anti-gun violence, and we believe that in this debate, Congress should look not toward special interests and ideology, which push us apart, but towards compromise which brings us together. We believe whether you call yourself protest gun, or anti-gun violence, or both, that you can work together to pass laws that save lives.

Gordon Declaration 01896

Case 2:17-cv-00903-WBS-KJN    Document 40-6    Filed 06/15/17    Page 20 of 175

KELLY: Thank you.

LEAHY: Thank you.

Next witness, David Kopel is the research director for the Independence Institute as well an associate policy analyst with the Cato Institute, an adjunct professor of advance constitutional law at Denver University's Sturm College of Law. Did I get that all correct?

(OFF-MIKE)

LEAHY: Thank you. Go ahead, please.

KOPEL: Thank you, Chairman Leahy and then Senator Grassley.

I think, to -- to continue the themes that the Captain Kelly so eloquently spoken about, gun rights and gun control don't have to be culture-war enemies. Properly conceived, they can work together and reinforce each other. It's important to recognize that the Second Amendment is not absolute any more than the First Amendment is. It certainly has an absolute core that can't be violated under any circumstances, but that doesn't prohibit all firearms controls.

LEAHY: Excuse me, and this won't come out of your time.

KOPEL: OK.

LEAHY: All of the statements will be put in the record in full so we can keep close to the time.

Go ahead.

KOPEL: Thank you, I will keep very close to the time.

And, likewise, gun controls don't violate the Second Amendment if they are constructed so they don't violate the rights of law-abiding citizens, and they actually do something constructive, significant, and effective to protect law-abiding citizens.

Captain Kelly talked about the matrix of failure. 20 years ago, I testified before this committee -- some of the senators are still here -- about one thing that turned out to be part of that matrix of failure. And that was the ban on so-called assault weapons. I warned during that testimony then that it was based, not on the function of guns, or how fast they fired, or how powerful they were, but on superficial, cosmetic characteristics and accessories. As part of the compromise that eventually led to that bill being mistakenly passed by Congress, the bill had a 10-year sunset in it and a requirement that the Department of Justice supervise a study of the effectiveness of that law. That study was -- the people to carry out that study were chosen by Attorney General Reno at the Department of Justice. They did several interim studies, and then a final study. And they concluded that the law had done nothing. It had not save lives. It had did not reduced the number of bullets that were fired in crimes. It had

Gordon Declaration 01897

Case 2:17-cv-00903-WBS-KJN   Document 40-6   Filed 06/15/17   Page 21 of 175

been a failure. It had -- to some minor degree, switched the types of guns that were used in crimes, so you had a gun with one name instead of another name, but it didn't -- it didn't reduce crime overall.

And indeed, it was a dangerous bill in the sense that so much political attention was distracted by the focus on this that it took public attention away from debate on measures that might have been more constructive and life-saving.

Today, police and law-abiding citizens choose semi-automatic handguns and rifles such as the AR-15 for the same reason. They are often the best choice for the lawful defense of self and others. To assert that such firearms, and their standard capacity factory magazines, are only meant for mass murder, is truly to libel law- abiding citizens and the many law-enforcement officers who choose these guns, not for hunting, not for collecting, but for the purpose for which police officers always carry firearms, for the lawful defense of self and others.

Great Britain shows the perils of mass gun -- gun confiscation that some people have proposed. It has a hire violent crime rate than the United States, and especially high rate of home invasion burglaries. Congress has repeatedly outlawed gun registration because of the accurate recognition that another country's, and in the United States -- in New York city, gun registration has been used as a tool for confiscation. These 1941, 1986, and 1993 congressional statutes are one way that gun rights can be protected against future abuses.

Unfortunately, the bill's that -- about universal background checks that have been proposed in recent Congresses, with the support of mayor -- New York City Michael Bloomberg, have often been -- had provisions in them for gun registration and for many other violations of the civil liberties of law-abiding persons, such as allowing gun bans for people accused but acquitted of drug crimes.

KOPEL: Universal background checks should be available. It was a wise move by President Obama in his January 16th press conference to begin changes in federal regulations and their interpretation to allow private sellers to access the background check system via federally licensed firearms dealer. Many people will choose to take advantage of that, and I commend them. But mandating universal checks can only be enforceable if there is universal gun registration, and we know that universal gun registration, in every country in the world where it's existed, has been a serious peril to gun ownership.

Universal gun registration was imposed by Canada in 1995 and was later repealed in 2012 by the Canadian Parliament because it was such a fiasco.

If we want to save lives right now, not with constructive reforms that might do some good in the future, there is only one thing that will stop the next copycat killer and that is lawful armed self- defense in the schools not only by armed guards, but also by teachers.

Utah provides the successful model. There, a teacher who has a permit to carry after a background check and a safety training class everywhere else in the state is not prohibited from carrying at the schools.

Gun prohibition lobbies come up with all kinds of fantastic scenarios about what -- the harms that these would cause -- and

Gordon Declaration 01898

teachers will shoot each other or threaten students, or the students will steal the guns.

But we've had this policy in practice in Utah for many years, and we've never had been a single problem. And, quite notably, we've never had an attack on a Utah school.

If we want to save lives, armed defense in schools is the immediate and best choice, while other constructive solutions may take longer to have an effect.

Thank you.

LEAHY: Thank you very much. As I said, the full statement will be placed in the record.

Chief James Johnson is the police chief of the Baltimore County Police Department. He started his career as a police cadet at the age of 18. He has more than 30 years of experience with the department. He's also the chair of the National Law Enforcement Partnership to Prevent Gun Violence and represents nine national law enforcement organizations.

Chief, thank you for taking the time to be here. Please go ahead, sir.

J. JOHNSON: Thank you.

Mr. Chairman, Ranking Member and members of the committee, thank you for the opportunity to testify. I am here on behalf of the National Law Enforcement Partnership to Prevent Gun Violence .

Yes, sir, it is.

I'm here on behalf of the National Law Enforcement Partnership to Prevent Gun Violence. It aligns to the nation's law enforcement leadership organizations concerned about the unacceptable level of gun violence in the United States.

We mourn the loss of gun violence victims including the 20 children and six adults in Newtown whose lives were cut short by an individual armed with firepower originally designed for combat.

More than 30 homicides occur in America each day, 2,000 children and six adults, certainly, in Newtown are amongst those individuals. Folks 18 and under die from fire-related (ph) violence and deaths every year.

In 2011, for the first time in 14 years, firearms was the leading cause of death for police officers killed in the line of duty. In a one-week period in 2011, the Police Executive Research Forum found that gun crime in six cities had cost more than $38 million. And in the year 2010, the cost in the entire country was more than $57 billion.

We urgently need Congress to address the rising epidemic of gun violence in this nation.

Gordon Declaration 01899

Case 2.17-cv-00903-WBS-KJN   Document 40-6   Filed 08/15/17   Page 23 of 175

Law enforcement leaders support the president's comprehensive approach which includes enhancing safety in educational institutions and addressing mental health issues.

On behalf of my colleagues across the nation, I'm here today to tell you that we are long overdue in strengthening our nation's gun laws. Doing so must be a priority for Congress.

The organizations in the National Law Enforcement Partnership to Prevent Gun Violence urgently call on you to require background checks for all firearms purchases, ensure that prohibited purchasers' records in a National Instant Criminal Background Check System, NICS, are complete, and limit high-capacity-ammunition-feeding devices to 10 rounds.

Seven of our nine groups, including the largest among us, also support Senator Feinstein's assault weapons ban legislation.

Federal law prohibits dangerous individuals, such as convicted felons and those with mental health disqualifiers from possessing firearms. While background checks are required for purchases through licensed gun dealers, no check is required for private sales, such as those through online or print ads or gun shows. It's a major problem.

J. JOHNSON: From November 2011 to November 2012, an estimated 6.6 million gun transactions occurred without a background check. Up to 40 percent of firearm transactions occur through private individuals rather than licensed gun dealers. Allowing 40 percent of those acquiring to bypass checks is like allowing 40 percent of passengers to board a plane without going through security. Would we do this? Last October in Brookfield, Wisconsin, seven women were shot by a prohibited purchaser who as under a domestic violence restraining order.

The shooter answered an online ad, was able to buy a gun without a check very quickly. He had -- had the sale been -- or sale required to have a check, this tragedy could have been prevented. Background checks work. They stopped nearly 2 million prohibited purchasers between 1994, and 2009. We already have a national background check system in place. Therefore, extending a background check to all firearms purchases can easily be implemented, and it should be without delay.

States can't do it alone. Interstate firearms trafficking is a -- a rampant problem, and it must be addressed federally. According to ATF, in 2009, 30 percent of guns recovered at crime scenes crossed state lines. Maryland recovered nearly 2,000 last year from outside the state. Submissions to NICS must be approved, especially mental health and drug abuse records. The 2009 -- a 2007 massacre at Virginia Tech is a great example of a prohibited purchaser slipping through the cracks due to incomplete NICS background check.

The ban on assault weapons, and high-capacity ammunition must be reinstated. Like assault weapons, high-capacity magazines are not used for hunting, and they do not belong in our homes. And they reek havoc on our communities. Banning these magazines will limit the number of rounds a shooter can discharge before he has to reload. Reloading can provide a window to escape, to seek cover, or concealment, or attack the adversary to take down the shooter, as we have heard in Tuscon.

In 1998, four years after the assault weapons and high-capacity magazine ban was enacted, the percentage of firearms with

Case 2:17-cv-00903-WBS-KJN   Document 40-6   Filed 08/15/17   Page 24 of 175

large capacity magazines recovered by Virginia police decreased, and continued to drop until it hit a low of 9 percent of the weapons recovered in 2004. The year the ban expired, it hit a high of 20 percent in 2010. I've been in law enforcement for nearly 35 years, and I've seen an explosion of fire power since the assault weapons ban expired. It is common to find many shell casings at crime scenes when you go out, and you investigate these days. Victims are being riddled with multiple gunshots. The common-sense measures we call for will not infringe on the Second Amendment rights, but will keep guns out of the dangerous hands of -- of people who are out there to commit danger in our society, and excessive firepower out of our communities.

Generations of Americans, including our youngest ones are depending on you to ensure that they will grow up, and fill their roles in the great human experience. None of us can fail them and I urge you to follow the will of the American people on this issue, and stand with law enforcement on these common-sense public safety measures. Thank you.

LEAHY: Thank you, Chief. Our next witnesses is Gayle Trotter. She was in the co-founder, Shaffer and Trotter, PLC. It's a law firm here in Washington. She's also a senior fellow with the Independent Women's Forum. Attorney Trotter,, good to have you here. Go ahead, please?

TROTTER: Chairman Leahy, Ranking Member Grassley, and members of this committee, thank you for inviting me to appear before you today.

We all want a safer society. We differ on how to make our society safer, and we differ whether some proposals will actually increase public safety. I urge you to reject any actions that will fail to make American's safer, and in particular, harm women the most. I would like to begin with the compelling story of Sara McKinley.

Home alone with her baby, she called 911 when two violent intruders began to break down her front door. These men were forcing their way into her home to steal the prescription medication of her recently deceased husband. Before police could arrive, while Ms. McKinley was still on the phone with 911, these violent intruders broke down her door. One of the men had a foot-long hunting knife.

TROTTER: As the intruders forced their way into their home, Ms. McKinley fired her weapon, fatally wounding one of the violent attackers. The other fled. Later Ms McKinley explained; "It was either going to be him, or my son. And it wasn't going to be my son." Guns make women safer. Over 90 percent of violent crimes occur without a firearm which makes guns the great equalizer for women. The vast majority of violent criminals use their size and their physical strength to prey on women who are at a severe disadvantage. In a violent confrontation guns reverse the balance of power. An armed woman does not need superior strength or the proximity of a hand-to- hand struggle.

Concealed carry laws reverse that balance of power even before a violent confrontation occurs. For a would-be criminal concealed carry laws dramatically increase the risk of committing a crime. This indirectly benefits even those who do not carry. Research shows that in jurisdictions with concealed carry laws, women are less likely to be raped or murdered than they are in states with more restrictions on gun ownership. Armed security works.

Gordon Declaration 01901

Case 2:17-cv-00903-WBS-KJN   Document 40-6   Filed 06/15/17   Page 25 of 175

Brave men and women stand guard over Capitol Hill, including this building where we are now. Armed guards protect high-profile individuals including prominent gun-control advocates, some of whom also rely on personal gun permits.

While armed security works, gun bans do not. Anti-gun legislation keep guns away from the sane and the law-abiding but not criminals. No sober minded person would advocate a gun ban instead of armed security to protect banks, airports, or government buildings. We need sensible enforcement of laws that are already on the books.

Currently, we have thousands, thousands of under-enforced or selectively enforce gun laws, and we fail to prosecute serious gun violations and impose meaningful, consistent penalties for violent felonies involving firearms.

Instead of self-defeating gestures, we should address the gun violence based on what works. Guns make women safer. The Supreme Court has recognized that lawful self-defense is a central component of the Second Amendment's guarantee of the right to keep and bear arms. For women, the ability to arm ourselves for our protection is even more consequential than for men. Because guns are the great equalizer in a violent confrontation. As a result, we protect women by safeguarding our Second Amendment rights. Every woman deserves a fighting chance.

Thank you.

LEAHY (?): Excuse me, thank you very much, Ms. Trotter.

Our last witness, then we'll go to questions.

Wayne La Pierre the executive vice president CEO of the National Rifle Association. I believe, Mr. La Pierre you have been there since 1970?

Is that correct?

LAPIERRE: That is correct.

LEAHY (?): Please go ahead.

LAPIERRE: Thank you, Mr. Chairman and members of the committee. It's an honor to here today on behalf of the more than 4.5 million moms and dads and sons and daughters...

(UNKNOWN): Press that white button.

LAPIERRE: Thank you.

It is an honor to be here today on behalf of the more than 4.5 million moms and dads, sons and daughters in every state across our nation who make up the National Rifle Association of America. There are 4.5 million active members of the NRA, and

Gordon Declaration 01902

Case 2:17-cv-00903-WBS-RJN   Document 40-6   Filed 06/15/17   Page 26 of 175

they're joined by tens of millions of supporters throughout the country. It's on behalf of these millions of decent, hard-working, law-abiding citizens that I am here today to give voice to their concerns.

The title of today's hearing is "What Should America Do About Gun Violence?" We believe the answer is to be honest about what works and honest about what doesn't work.

Teaching safe and responsible gun ownership works, and the NRA has a long and proud history of doing exactly that. Our Eddy Eagle Child Safety Program has taught 25 million young people that if they see a gun, they should do four things: stop, don't touch it, leave the area, and call an adult. As a result of this and other private- sector programs, fatal fire arms accidents are at the lowest level in 100 years.

LAPIERRE: The NRA has over 80,000 certified instructors to teach our military personnel, law enforcement officers, and hundreds of thousands of other American men and women how to safely use firearms.

We do more and spend more than anyone else on teaching safe and responsible gun ownership. We join the nation in sorrow over the tragedy that occurred in Newtown, Connecticut. There is nothing more precious than our children and we have no more sacred duty than to protect our children and to keep them safe.

That's why we asked former congressman and under secretary of homeland security, Asa Hutchinson, to bring in every available expert to develop a model school shield program, one that can be individually tailored to make our schools as safe as possible.

It's time to throw an immediate blanket of security around our children. About a third of our schools right now have armed security already because it works, and that number if growing every day. Right now, state officials, local authorities and school districts in 50 states are considering their own plans to protect children in schools.

In addition, we need to enforce the thousands of gun laws already on the books. Prosecuting criminals who misuse firearms works. Unfortunately, we've seen a dramatic collapse in federal gun prosecutions in recent years. Overall in 2011, federal firearms prosecutions per capita were down 35 percent from their peak in the previous administration. That means violent felons, violent gangmembers and drug dealers with guns, and the mentally ill who possess firearms are not being prosecuted. And that is completely and totally unacceptable.

And out of more than 76,000 firearms purchases supposedly denied by the federal instant check system, only 62 were referred for prosecution and only 44 were actually prosecuted. Proposing more gun laws while failing to enforce the thousands we already have, it's not a serious solution for reducing crime.

I think we can also agree that our mental health system is broken. We need to look at the full range of mental health issues from early detection to treatment to civil commitment laws to privacy laws that needlessly prevent mental health records from being included in the national instant check system.

Gordon Declaration 01903

Case 2:17-cv-00903-WBS-KJN   Document 46-6   Filed 06/15/17   Page 27 of 175

While we're ready to participate in a meaningful effort to solve these pressing problems, we must respectively (sic), but honestly and firmly disagree with some members of the committee and many in the media, and all the gun control groups, on what will keep our kids and keep our streets safe. Law-abiding gun owners will not accept blame for the acts of violent or deranged criminals, nor do we believe that government should dictate what we can lawfully own and use to protect our families.

As I said earlier, we need to be honest about what works and what does not work. Proposals that would only serve to burden the law-abiding have failed in the past and they'll fail again in the future. Semi-automatic firearms technology has been around for 100 years. They're the most popular guns for hunting, target-shooting, self-defense.

Despite this fact, Congress banned the manufacture and sale of hundreds of semi-automatic firearms and magazines from '94 to 2004. And independent studies, including one from the Clinton Justice Department, proved that it had no impact on lowering crime. And when it comes to background checks, let's be honest. Background checks will never be universal because criminals will never submit to them.

There are a lot of things that can be done and we ask you to join with us. The NRA is made up of millions of Americans who support what works. The immediate protection for all, not just some of our school children is what's needed, and swift, certain punishment of criminals who misuse guns, and fixing our mental health system.

We love our families. We love our country. We believe in freedom. And we're the millions from all walks of life who take responsibility for our safety and protection as a God-given fundamental American right.

Thank you, Mr. Chairman.

LEAHY: Thank you.

Now, Chief Johnson, let me begin with you, sir, if I could. I've found in my experience that many criminals are able to get guns illegally because they use straw purchasers. In other words, the person who has no criminal record can easily pass background check, goes in and buys the guns, and turns around and gives them to criminals.

LEAHY: There's no federal law that makes it illegal to act as a straw purchaser of firearms. So last week I -- I introduced a bill that will strengthen federal law to combat firearms trafficking. It would specifically target straw purchasers.

Do you think there should be such a law?

J. JOHNSON: The background procedures in this nation are seriously in need of -- of modification. Again, 40 percent of those acquiring firearms tried to do it outside that background procedure.

Senator, you are absolutely correct, many will use a straw purchaser to go in and acquire these firearms. It happens each and every day across America. It is a serious problem. And the National Law Enforcement Partnership To Prevent Gun Violence

Gordon Declaration 01904

supports your initiative to address that issue.

LEAHY: Thank you, chief. We also heard testimony about the safety of women and gun violence. Now I'm seeking immediate consideration of the Leahy-Crapo Violence Against Women Reauthorization Act. I was told yesterday that sometime in the next couple weeks we'll have it on the floor of the Senate for a vote.

I do this out of concern for domestic violence victims. We -- we have statistics that show women in this country are killed at alarming rates by domestic abusers with guns. Fortunately if a woman has a protective order against her abuser, if he is able to get a gun with a straw purchaser, of course, he still gets it, but he is not going to be able to purchase a gun and a background check is conducted. And we have at least one side that says in states that require a background check for every handgun sale, 38 percent fewer women are shot by their partners (inaudible).

Do you agree that if we want to keep firearms away from domestic abusers, who are not supposed to have them anyway, we have to have to improve the background check system and require a background check for every firearm purchasers?

J. JOHNSON: Absolutely.

I'd like to stand before this group today and say, I've spent my years of chasing down violent armed robbers each and every day. The fact of the matter is, as a young patrol officer, most of my day was one domestic to another it was the post that I had. Statistics show that when females are killed, it's more likely -- over 50 percent of the time to be by a spouse or household member. A gun and a home where there is a history of domestic violence, statistics show that there is a 500 percent increase of chance that, that person will be victimized by gun violence.

The state of Maryland in the last several years enacted legislation to address this domestic violence issue to allow us to go out and seize the guns of domestic violence abusers where the spouse has won and obtained a protective order. This has been very effective. And in my jurisdiction, which averages generally about 35 homicides a year, unfortunately most being domestic violence related, this has had a significant impact in reducing the amount of those domestics.

Two of the last three years, the statistic was below the 41 year homicide rate. And I credit, in this case, lieutenant governor state of Maryland, Lieutenant Governor Brown for this initiative, and it's helped us tremendously.

LEAHY:

Thank you.

Captain Kelly Mr. La Pierre has testified that universal background checks won't work because criminals would never submit to them. And I understand that, but under current law, criminals don't have to go through background checks because there are so many loopholes, gun show loophole, no real punishment for straw purchasers.

Do you agree that there is nothing that we can do to strengthen our background checks? Gordon Declaration 01905

Case 2:17-cv-00903-WBS-KJN   Document 40-6   Filed 06/15/17   Page 29 of 175

KELLY: Chairman Leahy, I disagree. There is a lot we can do.

The situation that I know best is what happened in Tucson, January 8th, 2011. Jared Loughner (ph), the shooter in this case, when he purchased a gun, he did purchased it through a background check. But there was a lot of evidence that could possibly been in the national instant criminal background check system about him that would have prevented him from buying a gun through a background check. So that's part of the solution.

KELLY: Now, the other problem is, let's say, he was denied, denied the purchase of the gun which he purchased in November of 2010. It would have been very easy for him to go to a gun show and purchase a gun without a background check.

So, you know, there are several things that need to be done. And in my opinion, and in Gabby's opinion, this is one of the most important things that we must do to prevent criminals, terrorists and the mentally ill from having easy access to guns, I mean, closing the gun-show loopholes and requiring private sellers to require a background check before they transfer a gun is -- I mean -- I mean, for us, I mean, I can't think of something that would make our country safer than doing just that .

LEAHY: Thank you.

And, Mr. LaPierre, in 1999, you testified before the House Judiciary Committee. And you testified, quote, "Nobody is more committed than we are to keeping guns out of criminals' hands. That's obviously in our best interest," close quote.

I assume you are still just as committed to keeping guns out of the hands of criminals. Is that correct?

LAPIERRE: Yes, sir.

LEAHY: And would you agree that we should prosecute and punish those who help criminals get guns?

LAPIERRE: If you're talking about strawman sales, we've said strawman sales should be prosecuted for years. There are about six to eight statutes on the books right now...

LEAHY: So you agree that we should prosecute and punish those who help criminals get guns?

LAPIERRE: Absolutely. If someone is doing a strawman sale, they should be prosecuted. Absolutely.

LEAHY: And in your testimony in '99, you supported mandatory instant criminal background checks for every sale and every gun show. You said, quote, "No loopholes anywhere, for anyone."

Now, today, of course, you say criminals would never submit to background checks. Statistics show that plenty of them do. Nearly 2 million convicted criminals and other dangerous people have tried to buy firearms and (inaudible), as Chief Johnson said, were prevented.

Gordon Declaration 01906

Case 2:17-cv-00903-WBS-KJN   Document 40-6   Filed 06/15/17   Page 30 of 175

So let me ask you this: Do you still, as you did in 1999, still support mandatory background checks at gun shows? Yes or no?

LAPIERRE: We supported the National Instant Check System on dealers. I -- we were here when Senator Birch Bayh, one of your colleagues, held the hearings in terms of who would be a dealer and who would be required to have a license. If you did it for livelihood and profit, yes. If you were a hobbyist, then no.

LEAHY: Let's make -- let's make it easier, though. I'm talking about gun shows. Should we have mandatory background checks at gun shows for sales of weapons?

LAPIERRE: If you're a dealer, that's already the law. If you're talking...

LEAHY: That's not my question. Please, Mr. LaPierre, I'm not trying to play games here. But, if you could, (inaudible) just answer my question.

LAPIERRE: Senator, I do not believe the way the law is working now, unfortunately, that it does any good to extend the law to private sales between hobbyists and collectors.

LEAHY: OK, so you do not support...

(CROSSTALK)

LEAHY: ... mandatory background checks in all instances at gun shows?

LAPIERRE: We do not, because the fact is, the law right now is a failure the way it's working. The fact is, you have 76,000-some people that have been denied under the present law. Only 44 were prosecuted. You're letting them go. They're walking the streets...

(CROSSTALK)

LEAHY: And do you -- then, I understand, back in 1999, you said no loopholes anywhere for anyone. But now you do not support background checks for all buyers of firearms?

LAPIERRE: I think the National Instant Check System, the way it's working now, is a failure. Because this administration is not prosecuting the people that they catch.

They're not -- 23 states are not even putting the mental records of those adjudicated mentally incompetent into the system. Now, assume that if you don't prosecute and they try to buy a gun, even if you catch 'em, and you let 'em walk away, to assume they're not going to get a gun -- they're criminals, they're homicidal maniacs, and they're mentally ill.

I mean, we all know that homicidal maniacs, criminals and the insane don't -- don't -- don't -- don't... LEAHY: Mr. LaPierre...

Gordon Declaration 01907

LAPIERRE: ... don't abide by the law.

LEAHY: Mr. LaPierre, my time is up. With all due respect, that was not the question I asked. Nor did you answer it.

LAPIERRE: But I think it is the answer. I honestly do. I -- the fact...

LEAHY: All right. It's your testimony.

Senator Grassley?

GRASSLEY: Yes.

Before I ask questions, Senator Hatch asked if I would explain to everybody here why he left. He's ranking member Finance Committee, and Senator Baucus has scheduled a hearing for 10:45 and he has to be there for that.

Professor -- Professor Kopel, was the 1994 assault weapons ban a sensible and effective means of reducing gun violence?

And, secondly, is there any reason to re-enact a more extensive assault weapons ban?

KOPEL: (OFF-MIKE)

GRASSLEY: Turn it up. Turn...

KOPEL: Sorry.

Based on the Department of Justice study, the answer was no, that it was something that was tried with great sincerity. A lot of people thought it would be a good idea, but it didn't seem to save any lives -- that the researchers could -- could find.

The revised law is just more of the same, but it suffers from the same fundamental problem. You can have a 1994 law that lists some guns by name and a 2013 law that lists more guns by name. But the very fact that you're banning guns by name, what's -- that's just an example of how the law doesn't address the guns firepower or their rate of fire. It simply -- if there's something that makes these guns more dangerous then legislation ought to be able to describe it in neutral terms. So all these -- these names, I think, are a sign of exactly what's wrong with the bill.

Now, the -- the present bill, like its 1994 predecessor, also has outlaws that is based on various features. But, again, these are -- there aren't things that have to do with internal mechanics of the gun, how fast it fires or how powerful the bullets are. There're things like whether a rifle has a forward grip. Well, a forward grip on a rifle helps the user stabilize it and make the gun more accurate. So that if you're deer hunting the second shot is almost as accurate as the first, or if you're target shooting, or more importantly -- most importantly, if you're engaged in lawful self- defense.

Gordon Declaration 01908

Case 2:17-cv-00903-WBS-KJN   Document 40-6   Filed 06/15/17   Page 32 of 175

And that's why you see guns like the AR-15 with their standard, factory-issued 30-round magazines in police cars all over the country, is because they make the gun more accurate for the core purpose of the Second Amendment, which is lawful self-defense.

GRASSLEY: OK.

Chief Johnson and Professor Kopel, listen while I read, and I'll ask each of you a question. Recently, Iowa law enforcement officials were quoted in an article -- that I ask consent to include in the record -- entitled, "Law Officers Tell Congressmen Mental Health Issues More Important than Gun Ban," end of quote.

In it, a bipartisan group of elected sheriffs and police chiefs offered candid assessments of current legislative proposals. One chief of police stated, quote, "I think banning assault weapons and high-capacity magazines is strictly a feel-good measure. It's not going to accomplish anything," end of quote.

Instead, they asked for options for getting mentally ill individuals treatment. Chief Jim Clark, Ottumwa, Iowa, added, quote, "We identify some that are mentally ill. They need treatment. But we can't access the system."

So Chief Johnson, what options do your officers have, from your experience -- because I quoted in Iowa -- (inaudible) currently have in dealing with individuals they believe to have untreated mental illness?

J. JOHNSON: It is a major problem in America today, in my jurisdiction. I'm here today to talk about guns and ways to stop gun violence. We know a comprehensive background check that picks up these mental health issue disqualifiers will make our nation a safer place.

We know that banning high-capacity magazines will make our police officers safer. We've lost dozens of police officers in America due to assault weapons. And we've seen tragedies all across this great nation (inaudible) Newtown, in Webster, New York -- an off-duty police officer -- we're never off duty, he's a police officer -- shot down by an assault weapon. It's a serious problem, and it must be addressed.

GRASSLEY: Professor Kopel, you authored an article, Wall Street Journal, last month entitled, "Guns, Mental Illness, Newtown." And I would also like to have that included in the record.

Is there evidence that mental illness and changes to civil commitment laws that play a part in mass shootings? And what can we do to keep guns away from mentally ill consistent with our Second Amendment?

KOPEL: Well, certainly, they play quite a major role in -- in homicides in general, probably about -- according to the Department of Justice research, about one-sixth of the people in state prisons for homicide are mentally ill. If you look at the -- these mass murders where suicidal people try to end their lives in the most infamous way possible -- in -- in Tucson, Virginia Tech, Newtown, Aurora, you have a very strong threat of mental illness running through that.

Gordon Declaration 01909

Case 2:17-cv-00903-WBS-KJN   Document 40-6   Filed 06/15/17   Page 33 of 175

And certainly, improving the background -- the data about mental health adjudications, not just a psychiatrist recommendation or something like that, but what due process and the Constitution require, which is an adjudication, a fair decision by a neutral decision-maker. Getting those into the background check system is something that Congress started working on after Virginia Tech, and there's -- there's more progress to be made.

But that's -- it's not just a matter of checks. It's -- even if you have the most ideal check system in the world, at the least -- and imagine these criminals, violently insane criminals could never get a gun anywhere else. You know, Adam Lanza at Newtown didn't have background checks. He stole the guns after murdering his mother.

So, the long-term solution is not just about background checks. It's about why are these people on the streets in the first place. All of these killers I've just mentioned could have been civilly committed under the civil commitment laws we had several decades ago. Those laws were changed. Sometimes -- because they were sometimes abused, but I think we can move back to a more sensible position that strongly protects the due process rights of people against involuntary commitment, but also gets dangerous people off the streets. And that will cost money at the state level, but it's money that will be greatly saved in the long term through reduced incarceration costs for crimes.

GRASSLEY: OK.

Ms. Trotter, your testimony discussed the need for women to be able to use firearms to defend themselves and their families. The law currently permits the lawful possession of semi-automatic rifles such as AR-15s. Can you tell us why you believe a semi-automatic rifle such as AR-15 has value as a weapon of self-defense? And does banning weapons -- banning guns which feature designed to improve accuracy disproportionately burden women?

TROTTER: I believe it does. Young women are speaking out as to why AR-15 weapons are their weapon of choice. The guns are accurate. They have good handling. They're light. They're easy for women to whole. And most importantly, their appearance. An assault weapon in the hands of a young woman defending her babies in her home becomes a defense weapon. And the peace of mind that a woman has as she's facing three, four, five violent attackers, intruders in her home with her children screaming in the background -- the peace of mind that she has knowing that she has a scary-looking gun gives her more courage when she's fighting hardened violent criminals.

And if we ban these types of assault weapons, you are putting women at a great disadvantage, more so than men, because they do not have the same type of physical strength and opportunity to defend themselves in a hand-to-hand struggle. And they're -- they're not criminals. They're moms. They're young women. And they're not used to violent confrontations.

So, I absolutely urge -- I -- I speak on behalf of millions of American women across the country who urge you to defend our Second Amendment right to choose to defend ourself.

GRASSLEY: Thank you.

LEAHY: Thank you.

Gordon Declaration 01910

Senator Feinstein?

FEINSTEIN: Thank you very much, Mr. Chairman, for holding this hearing. And I want to thank everybody for being here, particularly our witnesses. Even you, Mr. LaPierre -- it's good to see you again.

(LAUGHTER)

I guess we tangled...

LAPIERRE: We have.

FEINSTEIN: ... we tangled, what was it? Eighteen years ago. You look pretty good, actually.

(LAUGHTER)

LEAHY: I will give a little prerogative to the laughter.

(CROSSTALK)

FEINSTEIN: I'd like to add something to the record, Mr. Chairman -- page 44 of the Department of Justice report, "Assault Weapons As A Percentage of Gun -- of Gun Traces," which shows a 70 percent decline from '92-'93 to 2001-2002.

LEAHY: Without objection, so ordered.

FEINSTEIN: Thank you. Thank you very much.

Chief Johnson, I'd like to talk with you. First of all, I am very grateful for the support of your organization, of the major chiefs, and the International Association of Chiefs of Police, as well as trauma surgeons who see what these guns do in tearing apart bodies.

FEINSTEIN: I have become very concerned as I looked at the bill before, in '93, at the technological improvement in these weapons over this -- these years. And one of the things that we've tried to do in this new bill is prevent that from happening in the future. In looking at the AR-15 magazine on a device, which is legal, called a slide fire, I note that with practice, a shooter may control his rate of fire from 400 to 800 rounds per minute, or shoot two, three, or four rounds at a time, and just as easily fire single shots. So this is a weapon, and I think Ms. Trotter's right, it apparently is versatile. It apparently is rather easy to use, but it has tremendous philosophy -- velocity, and tremendous killing power,and I suspect tears young bodies apart.

Additionally, it's my understanding that Mrs. Lanza actually gave this gun to her son. Is that correct?

J. JOHNSON: These guns used in Newtown were not stolen, Professor. They were in the home, accessible to the shooter.

Gordon Declaration 01911

FEINSTEIN: Thank you.

Case 2:17-cv-00903-WBS-KJN    Document 40-6    Filed 06/15/17    Page 35 of 175

J. JOHNSON: It's a major problem, safety and security of weapons. In my jurisdiction, two school shootings, safety and security of weapons would have made a difference in that case. And Senator, you bill, I salute, and applaud you for including a safety and security measure.

FEINSTEIN: Well, thank you very much, Chief. This is such a hard debate because people have such fixed positions. Police, I think see killings as they are. Many people do not. So in a sense, the streets speak about this issue. The more you add highly technologically efficient weapons, which are originally designed to kill people in close combat, and they fall in the hands of the wrong people.

It's my understanding that Mrs. Lanza's son, the shooter in this case, had no mental health record. Is that correct?

J. JOHNSON: It is my understanding that no record exists. It is my understanding that there was ample evidence though, amongst those close to him, that there was a serious problem.

FEINSTEIN: Which is really something that I think we need to tackle today. Mental health laws are usually the preserve of the state, and the local governments. They provide the facilities. Do you have any suggestions there with respect to anything that we might be able to do, to improve mental health laws nationally, which might catch people who are a danger to themselves, or others in this area?

J. JOHNSON: It's a -- a major problem for law enforcement. Citizens, police officers, doctors, parents, can petition for an emergency evaluation when they see behavior that presents an individual as being a danger to themselves, or others. It's really important that we all do this. It's a tough decision, but sometimes you have to make it against your own son. Very, very hard. It could affect their entire life, but it has to be done.

The improvement that needs to be made is, we need to have this information entered instantly into a data system in the event that the -- the individual tries to go out within 24 hours to get a gun. The fellow in Wisconsin who went into the salon to shoot his wife, he wanted a gun fast. He wanted it fast. He as hot, he was emotional, he was out of control. And he wanted to get a gun fast.

And the way you do that, is you reach outside the established background check system and acquire it. If that record would have been entered into the system's domestic violence order, it would have been entered instantly, like we can do today all right? In many areas. That gun could have been -- a gun could have been prevented from getting in the hands of a person who is going to carry it out when they're in a high emotional stage. This is really, really important.

FEINSTEIN: We have millions and millions of big clips. The Aurora shooter used a 100 round drum. Fortunately it jammed. Otherwise he would have killed more people. I think most people believe that, sure we can have guards at schools. I'm well aware that at Columbine there was a deputy sheriff who was armed, who actually took a shot, but couldn't hit the shooter there.

Gordon Declaration 01912

Case 2:17-cv-00903-WBS-KJN   Document 40-6   Filed 06/15/17   Page 36 of 175

FEINSTEIN: The question comes, what do you do about the malls then? What do you do about our movie theaters? What do you do about businesses? We can't have a totally armed society. And that's my feeling in terms of the need to say that there are certain categories of guns. We actually exempt over 2,000 specific weapons by make and model name to create and then ban about 158 assault weapons, and then go to a one-characteristic test.

You have looked at this bill. Do you believe it will be effective?

J. JOHNSON: Yes, ma'am, I do. I believe that holistically addressing all of the issues in the president's plan, as well as a comprehensive, universal background check procedure, banning high- capacity magazines, and banning the sale of assault weapons, frankly, collectively all these together will create a system. The best way to stop a bad guy from getting a gun in the first place is a good background check.

FEINSTEIN: Thank you, very much.

Thank you, Mr. Chairman.

LEAHY: Thank -- thank you.

As Senator Grassley noted, Senator Hatch has to be at other thing. Recognize him when he comes back. I'm gonna go back and forth, go in seniority. We'll go to Senator Sessions. But I'll talk -- announce that all members can put statements in the record by the close of business today as -- as (inaudible) read (ph).

Senator Sessions?

SESSIONS: Thank you, Mr. Chairman.

I've spent the better part of our career, I guess, prosecuting cases, 12 years as a United States attorney, and during that time I gave a high emphasis to prosecutions of gun violations. We were one of the top prosecuting districts in the country. I note, in the latest University of Syracuse report, they list my district, the southern district of Alabama as number one in the nation still today in prosecutions of gun violations.

This is what the University of Syracuse study said, however, in its lead comment, "Weapons prosecution's declined to the lowest level in a decade," quote, "The latest available data from the Justice Department shows that during January of 2011, the government reported 484 new weapons prosecutions. This is the lowest level to which prosecutions federally have fallen since January of 2001, when 445 at the time that President Bush assumed office," close quote.

They go on to note some of the declines in various categories. And so first and foremost, I would say to you, as someone who has personally tried a lot of these cases before a jury, written appellate briefs on these cases, that these -- the bread and butter criminal cases are felons in possession of a firearm, and carrying a firearm during a crime, both of which are serious offenses. Carrying a firearm during a crime, drug crime, or crime of violence, or other serious crimes is a mandatory five-year sentence

Gordon Declaration 01913

without parole.

Those prosecutions have declined, unfortunately, substantially, under President Obama's presidency. Chief, does it concern you that in -- comparing total prosecutions per month for guns in federal court with those for a month in , with those for the same period in 2010, the number of filings went down 7.9 percent and were down 28.8 percent from 2006 in federal court.

Does that concern you?

J. JOHNSON: Senator, I can tell you that in the Baltimore County Police Department...

SESSIONS: I'm asking if those are the numbers, did that concern you?

J. JOHNSON: No, because you don't -- sir, you're...

SESSIONS: It doesn't concern you?

J. JOHNSON: ... not including local prosecutions. I can't stand before you today and tell you of a single case in Baltimore County of an illegal possessed gun that was not prosecuted...

SESSIONS: Are we trying to pass a state or federal law today?

J. JOHNSON: Certainly, background checks...

SESSIONS: That's what you guys call a federal law. We'd like to see the federal laws that are on the books enforced. I suggest and with with regard to the crimes of -- of carrying a firearm during the furtherance of a violence or drug trafficking offense, those prosecutions declined 28.5 percent between 2007 and 2011.

SESSIONS: So I would say that, first of all, we need to make sure we are doing our job there. I would also note that although crime is a very, very important matter, we should never lose our emphasis on bringing down crime -- the murder rate in America today is half what it was in 1993. We have made progress on that. And -- and we can continue to drive those numbers down. It's not as if we have an unusual surge in violent crime in America.

Now, with regard to the background checks and straw purchases, let's -- let's be frank: Straw purchases are a problem and should be prosecuted. I have prosecuted those cases before on a number of occasions. I've prosecuted gun dealers who fail to keep records as required by the law.

But the number of defendants charged under 18 USC 922(a)(6), making material misrepresentations under the federal firearms law regarding the lawfulness of a transfer, have declined from 459 in 2004 to 218 in 2010. That's -- that's about half, 52 percent decline under this administration's leadership.

Gordon Declaration 01914

Case 2:17-cv-00903-WBS-KJN   Document 40-6   Filed 06/15/17   Page 38 of 175

And I -- I would just say to you, mathematically speaking, violence in America is impacted mostly when you're enforcing these bread-and-butter violations that are effective, they're proven and they work. They have support of Mr. LaPierre, I think -- I know that group (inaudible) support 'em. I think everybody supports these strong laws. And that's where the rubber meets the road. That's where you really begin to impact crime.

If you can intimidate -- and I believe the word is getting out -- it did in our district -- that if you carry a gun in a crime, a drug dealing offense, you could be prosecuted in federal court, given five years in jail without parole. And I believe we saw a decline in the violent rate -- violence rate and the number of drug dealers and criminals carrying guns. But you have to prosecute those cases.

Mr. LaPierre, it does appear that the straw purchase prohibition that's out there, that prohibition seems to me to be legitimate. And I support -- and you said you support the prosecutions of it. But if we expand the number of people covered (inaudible) we don't have any prosecutions -- I believe you used the number 44, was all. There're 90 United States attorneys in America. Only 44, only one out of every two, apparently, is prosecuting a single case in a single year. That's the weakness in the system.

LAPIERRE: Senator, there needs to be a change in the culture of prosecution at the entire federal level. It's a national disgrace. The fact is, we could dramatically cut crime in this country with guns and save lives all over this country if we would start enforcing the 9,000 federal laws we have on the books.

I'm talking about drug dealers with guns, gangs with guns and felons with guns. There're simply not being enforced. The numbers are shocking. I mean, in Chicago, one of the worst areas in the country in gun violence by criminals, it is 89 of 90 in terms of federal prosecutions in the entire United States; 62 people prosecuted under all of the federal gun laws.

I mean (inaudible) Dave Schiller and Project Exile cleaned up Richmond years ago, they did 350 cases in Richmond. I mean, if you want to stop crime, interdict violent criminals, incarcerate 'em and get 'em off the street before they get to the next crime...

(CROSSTALK)

SESSIONS: Well, I -- I agree. My time is up.

LAPIERRE: ... or worse.

SESSIONS. And I -- Richmond was a great model. And I would just say, I would call on President Obama to call in Attorney General Eric Holder and ask him why the prosecutions have dropped dramatically across all categories of federal gun laws. And he should call in his U.S. attorneys and tell them, you need to look at your numbers and get them up and emphasize these prosecutions.

Thank you, Mr. Chairman.

LEAHY: Senator Schumer?

Gordon Declaration 01915

SCHUMER: Well, thank you.

First, let me apologize to the witnesses. At the end -- we have a Finance Committee meeting on reconciliation, which probably affects our police chief anyway. And so I had to be there.

And I want to thank you, Chairman Leahy, for organizing this important hearing.

Thank all the witnesses for being here, particularly Congresswoman Giffords and Captain Kelly for your testimony. We've been moved by your strength, your courage that your family has demonstrated in this face of unspeakable tragedy.

By being here instead of cursing the darkness you're lighting a candle. Thank you.

Now, I do believe today we have a chance to do something reasonable in the aftermath of the Sandy Hook tragedy. But when we discuss ways to stop violence, guns must be included in that discussion.

SCHUMER: I heard Ranking Member Grassley say that we must go beyond guns. That's true. But we must include guns as well. Not including guns when discussing mass killings is like not including cigarettes when discussing lung cancer.

But at the same time, I agree. We can't simply replay the usual sum zero political game on guns, or the moment'll pass us by.

The Supreme Court ruling in Heller, which struck down the District of Columbia's ban on handguns laid out a good framework. It said an individual right to bear arms does exist, but it comes with limitations, like very amendment.

In other words, it is now settled law that the government is never going to take away America's guns -- Americans' guns.

Progressives need not to accept this decision, but to endorse it. We've got to follow it, not just de jure, but de facto. And it makes sense. You can't argue for an expansive reading of amendments like the First, Fourth and Fifth, but see the Second Amendment through the pinhole of saying it only affects militias.

At the same time, those on the pro-gun side must recognize no amendment is absolute. The First Amendment protects freedom of speech. It's hallowed. But you still can't falsely shouts fire in a crowded theater or traffic in child pornography. Those are reasonable limits on the First Amendment.

The Second Amendment has sensible limits, too. My colleagues have offered a range of impressive and thoughtful proposals on the topic of gun violence.

For example, Chairman Leahy has introduced a bill on trafficking. Senator Feinstein has introduced one of assault weapons. Senator Blumenthal on ammunition.

But for the last several years, my particular focus in the area of gun safety has been on responsible gun ownership and

background checks. Universal background checks is a proven, effective step we can take to reduce gun violence. And I believe it has a good chance of passing.

Case 2:17-cv-00903-WBS-KJN   Document 40-6   Filed 06/15/17   Page 40 of 175

Federally licensed firearm dealers have been required to conduct background checks on prospective gun purchasers since we passed the Brady bill. And we've that they work. Since 1999, the federal background check system has blocked 1.7 million prohibited purchasers from buying firearms at federally licensed dealers.

Yes, we should prosecute them. But the number one goal is to prevent a felon from getting a gun in the first place. That's what this did 1.7 million times.

The current system works well. But there are some glaring holes.

First of all, not all gun sales are covered by a background check. The problem, sometimes referred to as the gun-show loophole, means that a private seller could set up a tent at a gun show or somewhere else and not have to conduct background check on his purchasers.

Current estimates show because of these loopholes 48 percent of gun sales are made without a background check. If you're a felon, if you're a gun trafficker, if you're a -- a mentally ill person, you know that you can go to a gun show and not have any check. So, of course, that's what they do.

This isn't fair, also, to dealers who follow the rules and conduct checks. The registered dealers at their gun stores have to obey the rules. Why should someone going to a gun show have a different rule? There's no logic to it. None.

I was there. I was the author of the Brady bill, and that was something that we were forced to put in the bill, those of us who weren't for it, as a way to get the bill passed. But the last 15 years has proven it doesn't make sense.

The second problem with the current system is that not all records are fed into the system. This is especially true with mental health records. Nineteen states have submitted fewer than 100 mental health records to NICS.

I think we can get bipartisan agreement on a bill that solves these problems by doing two things. One, it'll prevent felons and mentally ill from getting guns by requiring a background check before all purchases. And, two, it will get relevant records into the system.

Now, at the moment, right now, as we meet here today, I am having productive conversations with colleagues on both sides of the aisle, including a good number with high NRA ratings. And I'm hopeful that we are close to having legislation we can introduce.

And I would urge the NRA, Mr. LaPierre, and other gun advocacy groups to work with us on this proposal. The NRA supported our 2007 legislation that improved the NICS background check system. And I hope they'll reconsider and try to do that again.

Gordon Declaration 01917

Case 2:17-cv-00903-WBS-KJN   Document 40-8   Filed 06/15/17   Page 41 of 175

It's a simple, straightforward solution. It's one the American people support. A recent survey by the New England Journal of Medicine found 90 percent of Republicans, 74 percent of NRA members support requiring background checks for all gun sales.

SCHUMER: I understand, because we haven't introduced it, I can't ask the witnesses about it, but I want to tell you what it won't do.

It won't create any gun registry. That is already illegal and it will be repeated as illegal in our law. That's particularly for Mr. Kopel. And it will not limit your ability to borrow your Uncle Willy's hunting rifle or share a gun with your friend at a shooting range.

It will include reasonable exceptions to make sure we're only requiring background checks for bona fide sales and transfers. So specious claims about background checks are a tactic made by those who can't argue with the facts.

Now, I'd like to ask Chief Johnson a question or two about those checks. Do you agree with the logic that even -- you know, that we should prosecute people who illegally try to buy guns, but even without that, the law has done a whole lot of good because people who are felons or adjudicated mentally ill, millions have been stopped from buying guns and getting guns?

J. JOHNSON: Yes, since 1994 to 2009, the record is very clear. It is a fact that nearly 2 million prohibited purchases were stopped. God only knows what they would have done with those weapons had it not been for that particular law.

SCHUMER: And from a law enforcement point of view, wouldn't we rather -- we want to do both, but wouldn't we rather stop them from having a gun than after they shoot somebody or buy a gun illegally, then arrest them and put them in jail for that crime?

J. JOHNSON: Yes, sir. You have to address the pathology -- how you get the gun in the first place. And that is what we're trying to achieve here by a universal background check. And I'm very proud to stand before you this morning and let you know that the entire national law enforcement partnership to prevent gun violence, every member of our organization supports background checks.

SCHUMER: Right. And does it make any sense to exclude the same people who sell them in a gun shop or others, to go to a gun show, and now have any background check at all?

J. JOHNSON: It's absolutely insane. Again, it's like letting 40 percent of people just pass a TSA checkpoint at an airport. It's not an inconvenience. The record shows that nearly 92 percent of the individuals that go in to try to do a background check at a gun shop, in minute-and-a-half, they're done. I can't write a ticket, a citation in a minute-and-a-half. Even with e-tick technology, I can't do it that fast.

It's not inconvenient. And it's fair to the gun owner and the shop owner, too. Why impose on a shop owner, a gun dealer, a federally licensed dealer, more restrictions than you do on anyone else? And if you think for a minute you can sell your gun to

Gordon Declaration 01918

Case 2:17-cv-00903-WBS-KJN   Document 40-6   Filed 06/15/17   Page 42 of 175

your neighbor that you've known for 10 years, you don't know your neighbor. You do not know your neighbor. And the only way to make sure that you're safe in what you're doing is a comprehensive background check.

SCHUMER: One final quick question. Many police officers are avid sportsmen. They, you know, enjoy shooting, not in their official professional duties. The surveys show the overwhelming majority of gun owners are for background checks. Does your personal experience corroborate that?

J. JOHNSON: It's my understanding that 74 percent of NRA members support a background check. I am a hunter. I love to hunt. I own several guns. I love going to the range with my son who is a police officer today. It's enjoyable. I've met many great people.

SCHUMER: Thank you, Mr. Chairman.

LEAHY: Thank you.

I understand (inaudible) quite the order we'd said before, but Senator Graham has graciously said for Senator Cornyn to go. So please, Senator Cornyn?

CORNYN: Well, thank you, Mr. Chairman. And thanks to all of the witnesses for being here today and sharing your observations and testimony. I'm particularly gratified to see Congresswoman Giffords here doing so well and speaking so forcefully.

I hope this hearing serves as a starting point for us to consider a range of ideas on this topic. Anything that falls short of serious examination and discussion is just window dressing, just symbolism over substance. I have a hard time telling my constituents in Texas that Congress is looking at passing a whole raft of new laws, when the laws that we currently have on the books are so woefully unenforced.

I think we can and we should come together to address shortcomings in mental health care, both in the general response to mental illness and also in the background checks mechanisms we use to screen out prohibited gun buyers.

CORNYN: We need to ask whether years of de-institutionalization of the mental health population have left America more vulnerable. Perhaps it's time to consider our background checks laws to see if they need to be updated to screen out the growing number of people who are subjected to court-ordered outpatient mental health treatment.

It's unclear whether the tens of thousands of committed outpatients in this country are falling through the cracks, and surely, we can agree that more needs to be done to enforce existing gun laws as I said a moment ago.

Gun crime prosecutions are down across the board, including enforcement of laws against lying on background checks. And Mr. Chairman, I hope -- I hope you -- we will have a follow-on hearing where we'll ask administration witnesses to come before the panel and to testify why the Department of Justice and other law enforcement agencies of the federal government

Gordon Declaration 01919

are not enforcing laws that Congress has already passed.

It's worth noting that five years ago, Congress was asking the same questions we are asking right now. In 2008, there was an attempt made to strengthen the background check laws following the murders at Virginia Tech. Looking back, we have to ask ourself, did those laws work. Well, the department -- the Government Accountability Office just last July gave it mixed reviews.

The GAO reports that only a handful of states have taken seriously the responsibility to share mental health records. And I'm pleased that Texas is highlighted by the GAO as outperforming other states in this area, but we have a lot -- we have a long way to go.

So I think there are areas where Congress can come together right now, examine the nexus between gun crime, violence, and mental health care. and I'm willing to listen to serious ideas, not just window dressing, to try to come up with solutions.

Captain Kelly, I noticed in your testimony you alluded to the -- part of what I talked about, which is the fact that at the time in Arizona there were 121,000 records of disqualifying mental illness for people in Arizona that had not been subjected to background checks, because the state hadn't send that information to the federal government.

Could you expand on the significance of that?

KELLY: Yes sir. So, in the case of Jared Loughner, the person who shot my wife and murdered six of her constituents, he was clearly mentally ill. He was expelled from Pima -- Pima Community College because of that. There was nowhere for -- or his parents and the school did not send him anywhere to be adjudicated or evaluated with regards to his mental illness.

Now Mr. LaPierre earlier tried to make the point that criminals do not submit to the background checks. Well, Mr. -- Jared Loughner, the guy -- the Tucson shooter, was -- was an admitted drug user. He was rejected from the U.S. Army because of his drug use. He was clearly mentally ill. And when he purchased the gun in November, his plan was to assassinate my wife and commit mass murder at that Safeway in Tucson. He was a criminal. Because of his drug use and because of what he was planning on doing.

But he -- because of these gaps in the mental health system -- now, in this case, those 121,000 records, I admit, did not include a record on him. But it could have. And if it did, he would have failed that background check.

Now, obviously, in this case, he would have likely have gone to a gun show or a private seller and avoided a background check. But if we close the gun show loophole, if we require private sellers to complete a background check, and we get those 121,000 records and others into the systems, we will prevent gun crimes. That is an absolute truth. It would have happened in Tucson . My wife would not be sitting in this seat. She would not have been sitting here today if we had a strong background checks.

CORNYN: Mr. LaPierre, you talk about a laws already on the books and the fact that the federal government has a poor record of enforcing current laws. And I fail to see out that the Department of Justice will not in force will is gonna make America any

Gordon Declaration 01920

safer.

But let me just ask you to react briefly to these statistics. From 2007-2011, the Department of Justice charged 13 percent fewer total firearms cases. In each of the years during that span, the current administration's brought fewer firearms prosecution's than the year before.

CORNYN: In January, 2011, only 484 new firearm prosecutions were initiated by the Department of Justice, the fewest number of prosecutions in 10 years. As far as background check prosecutions 2006-2010, the number of investigations for unlawful possession decreased 26 percent. During the same period, 77 percent fewer NICS denials were referred by the Bureau of Alcohol, Tobacco and Firearms for prosecution. Federal prosecutors declined 82 percent more cases over the same period. In 2010, out of the 76,125 denied background checks, the FBI referred to the ATF, a verdict or plea was reached in just 13 cases.

Would you give us your reaction to that -- that record?

LAPIERRE: I think -- I think it's tragic, Senator.

I mean, the fact is, in the shadow of this Capitol, right under everyone's noses, in this building, right now there are drug dealers out in the street with guns, violating federal law, illegal. There's all kinds of drugs and cocaine being sold. By God, gangs are trafficking 13-year-old girls. And it goes on day, after day, after day.

What we've got to do is interdict these people. Get them off the street before they get to the next crime scene. I mean -- and get in the real world in terms of checks. I mean the fact is, the NRA has been trying for 20-some years -- Senator Schumer and I went back and forth on "Face the Nation" where I asked him if he'd help get those adjudicated mentally incompetent into the system 20 years ago. He said yes, and they're still not in the system. And my point is, even if you turn up someone on an instant check that's a mentally ill person, or a felon, as long as you let them go, you're not keeping them from getting a gun.

And you're not preventing them from getting to the next crime scene. I mean we've got to get in the real world of this discussion. The problem with gun laws is, criminals don't cooperate with them. The -- the mentally ill don't cooperate with them. So you've got to interdict, incarcerate, interdict, get in treatment, and do things that matter. And then you've got to put police officers in schools, armed security in schools. But let's do the things that work. Let's get serious about this.

I mean this discussion -- I mean I sit here and listen to it and my reaction is, how little it has to do with making the country and our kids safe. And how much it has to do with this decade long, or two decade long gun ban agenda that -- that we don't enforce the laws even when they're on the books. The attorney general of the United States -- Attorney General Eric Holder during the Richmond Program, called it a cookie-cutter approach to solving crime that, you know he really didn't have a lot of enthusiasm about.

I remember Senator Sessions held a hearing and they -- the Department of Justice testified, well a drug dealer with a gun is a guppy, and we can't really concentrate on guppies. Those guppies are what is ruining neighborhoods, destroying lives, and

Gordon Declaration 01921

Case 2:17-cv-00903-WBS-KJN   Document 40-6   Filed 06/15/17   Page 45 of 175

killing people. And we've got to confront their behavior, take them off the street because they don't obey by all the laws we have right now. We've got to get in the real world on what works, and what doesn't work.

My problem with back -- background checks is, you're never going to get criminals to go through universal background checks. I mean they're -- all the law abiding people, you'll create an enormous federal bureaucracy, unfunded, hitting -- all of the little people in the country will have to go through it, pay the fees, pay the taxes. We don't even prosecute anybody right now who goes through the system we have.

So, we're going to make all those law abiding people go through the system, and then we aren't going to prosecute any of the bad guys if they do catch one. And it -- none of it makes any sense in the real world. We have 80,000 police families in the NRA. We care about safety. We'll support what works.

LEAHY: I'm trying to be fair to everybody here, and certainly you're going to have a lot more chance to speak. Senator Durbin?

DURBIN: Mr. LaPierre, that's the point. The criminals won't go to purchase the guns because there will be a background check. We'll stop them from the original purchase. You miss that point completely.

LAPIERRE: Senator...

DURBIN: I think it's -- it's basic.

LAPIERRE: Senator, I think you missed...

(CROSSTALK)

LEAHY: Let there be order.

LAPIERRE: I think you're missing...

(CROSSTALK)

LEAHY: Let there be order.

(CROSSTALK)

LAPIERRE: If you don't prosecute them, you're not stopping them.

(CROSSTALK)

LEAHY: Please wait -- everybody for a moment. (CROSSTALK)

Gordon Declaration 01922

Case 2:17-cv-00903-WBS-KJN   Document 40-6   Filed 06/15/17   Page 46 of 175

LEAHY: I said earlier, there will be order in the committee room. Senator Durbin, and then...

DURBIN: I -- I'm going to give you a chance, but let me just say at the outset, Captain Kelly thank you. Thank you for bringing that wonderful, brave wife of yours today to remind us what victims suffer from gun violence. What a heroic figure she is, and what a great pillar of strength you are, to stand by her during this entire ordeal, and her rehabilitation. We're so proud of her, and of you.

KELLY: Thank you.

DURBIN: And I say with some regret, there should have been a hearing just like this right after your wife, one of our own, a member of Congress, was shot point-blank in the face at a town meeting in Tuscon, Arizona.

I'm sorry it's taken two years for us to convene this hearing, but it took Newtown, Connecticut to finally bring us to our senses and to open this national conversation. But I hope that you will extend to her our best wishes, our love and our support for what she is doing today and what she has meant to all of us for this long period of time.

I also want to say a word about an incident. There was a young lady from Chicago, Illinois, 15 years old. She attended the University Prep School in Chicago. She was an honor student and a majorette. And she marched in the inaugural parade last week here in Chicago. It was the highlight of her young 15-year-old life.

Yesterday, in a rainstorm after school she raced to a shelter. A gunman came in and shot her dead. Just a matter of days after the happiest day of her life she's gone.

A lot has been said about the city of Chicago, and I want to say a few words too. The biggest problem in Chicago, according to Superintendent McCarthy, who came to Chicago from New York, we are awash in guns.

The confiscation of guns per capita in Chicago is six times the number of New York City. We have guns everywhere. And some believe the solution to this is more guns. I disagree.

When you take a look at where these guns come from, 25 percent plus are sold in the surrounding towns around the city of Chicago, not in the city.

And you look over the last 10 or 12 years, of the 50,000 guns confiscated in crimes, almost one out of 10 crime guns in Chicago came to that city from Mississippi -- Mississippi. Why? Because the background checks there, the gun dealers there are a lot easier than they are in other places. And they end up selling these guns in volume and they come up the interstate and kill wantonly on the way.

Here's the basics. I think we all agree -- I hope we all agree that the Supreme Court decision in Heller said we can have reasonable limitations on a Second Amendment right in terms of the type of weapon and the people who own them and the background checks on those people.

Gordon Declaration 01923

It's something we desperately need to do.

Case 2:17-cv-00903-WBS-KJN    Document 40-6    Filed 06/15/17    Page 47 of 175

But we know now that 40 percent of the sales are not going through the background checks. That's a huge problem. It's created this abundance of weapons that are available.

And the straw purchasers -- I salute the chairman for addressing this issue on straw purchasers. It's one of the worst situations in our state and in the city of Chicago.

I can point to one gun store -- one gun store in Riverdale, Illinois, that accounts for more than 20 percent of the crime guns in Chicago. Straw purchasers buy the guns there and they end up in the hands of criminals in the city of Chicago. We got to put an end to this.

Chairman, thank you for your bill.

And let me ask -- I'm gonna ask a question here of some of the panelists.

Mr. LaPierre, I run into some of your members in Illinois and here's what they tell me, "Senator, you don't get the Second Amendment." Your NRA members say, "You just don't get it. It's not just about hunting. It's not just about sports. It's not just about shooting targets. It's not just about defending ourselves from criminals," as Ms. Trotter testified. "We need the firepower and the ability to protect ourselves from our government" -- from our government, from the police -- "if they knock on our doors and we need to fight back."

Do you agree with that point of view?

LAPIERRE: Senator, I think without any doubt, if you look at why our founding fathers put it there, they had lived under the tyranny of King George and they wanted to make sure that these free people in this new country would never be subjugated again and have to live under tyranny.

I also think, though, that what people all over the country fear today is being abandoned by their government. If a tornado hits, if a hurricane hits, if a riot occurs that they're gonna be out there alone. And the only way they're gonna protect themself (ph) in the cold and the dark, when they're vulnerable is with a fire arm. And I think that indicates how relevant and essential the Second Amendment is in today's society to fundamental human survival.

DURBIN: Well, Chief Johnson, you've heard it.

The belief of NRA is the Second Amendment has to give American citizens the firepower to fight back against you, against our government.

LAPIERRE: That's not (OFF-MIKE)

Gordon Declaration 01924

Case 2:17-cv-00903-WBS-KJN   Document 40-6   Filed 08/15/17   Page 48 of 175

DURBIN: So how do you conduct your business in enforcing the law and not knowing what is behind that door?

J. JOHNSON: I find it to be scary, creepy. And it's simply just not based on logic. Certainly, law enforcement across this nation is well-prepared to deal with any natural or man-made disaster that will occur. And, frankly, I just -- I can't relate to that kind of thinking.

DURBIN: I can't either. I can't relate to the need of that man in Aurora. Colorado, to have a 100-round drum, 100 cartridges.

Professor Kopel, do you think that's necessary for hunting, sports, target practice, even self defense?

KOPEL: I -- it would be not legal for hunting in most states, where there are limits on how many rounds you can have in a magazine.

But, as I think you've recognized, the Second Amendment is not primarily about hunting. What I've been talking about is what the Supreme Court said in District of Columbia v. Heller, which is what is core of the Second Amendment, which is the firearms and their accessories which are commonly owned by law-abiding people for legitimate purposes.

DURBIN: But, let me tell you -- let me ask...

(CROSSTALK)

KOPEL: And -- and -- and those are not, I'm not talking about 100-round magazines. I'm talking about what police officers carry, what citizens carry, semi-automatic handguns, typically with magazines of below 19 rounds...

DURBIN: But those are police officers.

KOPEL: ... and rifles.

DURBIN: But those are police officers. Those are members of our military.

(CROSSTALK)

KOPEL: No, they're not -- they're not military men. They're not coming to attack people, They're coming to protect people. And they want to protect -- and citizens protect themselves the same way that police officers do.

DURBIN: What I'm trying to get to is this, if you can rationalize a 100-round drum that someone can strap onto an automatic -- semi-automatic weapon, as did in Aurora, Colorado, and turn it loose, killing dozens of people there, and saving lives only because it jammed, then you certainly ought to object to the laws that have been on the books for 80 years about machine guns. Why aren't they allowed under the Second Amendment?

Gordon Declaration 01925

Case 2:17-cv-00903-WBS-KJN Document 40-6 Filed 06/15/17 Page 49 of 175

KOPEL: Because, as the... because, according to Heller, because they are not commonly used by law-abiding citizens for legitimate purposes.

DURBIN: But 100-round magazines are?

KOPEL: You're the one who wants to talk about 100-round magazines.

DURBIN: I sure do.

KOPEL: And thank goodness -- thank goodness he had a piece of junk like that that jammed, instead of something better made, where he could have killed more people with it.

(CROSSTALK)

DURBIN: Well, we -- that's what it's all about, then?

KOPEL: It's about saving...

DURBIN: We're playing God here?

KOPEL: It's about saving lives -- it's about saving lives with ordinary magazines. Hundred magazines are novelties that are not used by police officers or hunters or most other people.

(CROSSTALK)

KOPEL: But what you're talking about banning, Senator, is normal magazines.

DURBIN: Tell us about -- tell us about the lives that were saved in Tucson and what it had to do with magazines.

KELLY: The shooter in Tucson showed up with two 33-round magazines, one of which was in his 9 millimeter. He unloaded the contents of that magazine in 15 seconds. Very quickly. It all happened very, very fast.

The first bullet went into Gabby's head. Bullet number 13 went into a nine-year old girl named Christina Taylor Green, who was very interested in democracy and our government, and really deserved a full life committed to advancing those ideas.

If he had a 10-round magazine -- well, let me back up. When he tried to reload one 33-round magazine with another 33-round magazine, he dropped it. And a woman named Patricia Maisch grabbed it, and it gave bystanders a time to tackle him. I contend if that same thing happened when he was trying to reload one 10-round magazine with another 10-round magazine, meaning he did not have access to a high-capacity magazine, and the same thing happened, Christina Taylor Green would be alive today.

Gordon Declaration 01926

Case 2:17-cv-00903-WBS-KJN   Document 40-6   Filed 06/15/17   Page 50 of 175

I certainly am willing to give up my right to own a high-capacity magazine to bring that young woman back, that young girl.

Now, let me -- let me -- let me continue with what happened that day. In that 15 seconds -- or, actually, with the first shot, a man ran out of Walgreen's, a good guy with a gun, with the intent to do the right thing, An armed citizen.

He came within -- he admits that he came within about a half a second of shooting the man who tackled during Jared Loughner and nearly killing him.

I mean, we almost had this horrific mass murder followed up with a horrific accident. The horrific mass murder because of the high- capacity magazine and the horrific accident because of the -- the armed person there who, with good intention, wanted to end the something that was -- that was going really bad.

DURBIN: Thank you.

Thank you, Mr. Chairman.

LEAHY: Senator Graham?

GRAHAM: Thank you, Mr. Chairman.

I think I'm speaking for a lot of people when they say we're heartbroken when a family member is taken through an act of gun violence, whether it be a child or anyone else, but particularly children. That's just a heartbreaking episode in society. And I think most people would -- would appreciate the fact that there are thousands, it not millions of Americans who saved their families from home invasions or violent assault because they had a gun to protect themselves. And most of us are glad it ended well for you.

So, those are the two bookends. And you mentioned, Captain Kelly, and I very much appreciate your being here and your service to the country, about you and your wife are reasonable Americans. I don't doubt that one bit. I'm sure you are. The question is, am I a reasonable American if I oppose this bill? Am I a reasonable American believing that the Constitution says guns commonly used by the population (inaudible) for legitimate purposes?

(inaudible) the Second Amendment, I don't want to own a gun to attack my government. That's just not what I think a legitimate purpose is.

Let's talk about a real-world incident that happened in Loganville, Georgia on January 4th, 2013. My basic premise is that one bullet in the hand of a mentally unstable person or a convicted felon is one too many. Six bullets in the hands of a mother protecting her twin 9-year-olds may not be enough. So, I've got a chart here. At the very top is a .38 revolver and on the right is a 9-millimeter pistol that holds 15 rounds.

Does everybody on the panel agree that a convicted felon should not have either one of those guns? Does everybody agree that

Gordon Declaration 01927

a mentally unstable person shouldn't have either one of those pistols? OK, common ground there.

Put yourself in the shoes of the mother. The guy broke into the home. She ran upstairs. She hid in a closet. She got on the phone to the police. And she was talking to her husband in real time. The intruder broke into the home, had a crowbar, and he found them in the closet. And they were confronted -- confronted face to face. According to media report, her husband said, "shoot, shoot." She emptied the gun, a six-shot revolver. The guy was hit five of the six times. He was able still to get up and drive away. My question is: Put your family member in that situation. Would I be a reasonable American to want my family to have the 15-round magazine in a semi-automatic weapon to make sure that if there's two intruders, she doesn't run out of bullets? Am I an unreasonable person for saying that in that situation, the 15-round magazine makes sense?

Well, I'll say I don't believe I am. So I can give you an example of where a 15-round magazine could make the difference between protecting a family if there's more than one attacker.

Now, back to your point, Captain Kelly. In the situation you described, I don't want that person to have one bullet or one gun. And the point of regulating magazines is to interrupt the shooter. That's the point of all this.

And I guess what I'm saying is that we live in a world where there are 4 million high-capacity magazines out there or more. I think the best way to interrupt the shooter if they come to a schoolhouse is not to try to deny the woman in Atlanta the ability to have more than 10 rounds, but to have somebody like you, Chief Johnson, meet them when they come into the door. I think that's the best way to do it.

Now, my good friend Joe Biden, who we have very spirited conversations about a lot of things, was online recently talking to someone in California who mentioned the fact, what is there's an earthquake out here -- out here and there's a lawless situation? In 1992, you had the riots in Los Angeles. I think it was the King event. But you could find yourself in this country in a lawless environment through a natural disaster or a riot, and the story was about a place called Koreatown. There were marauding gangs going throughout the area burning stores, looting and robbing and raping. And the vice president said in response to "that's why I want my AR- 15," he said, "No, you would be better off with a 12-gauge shotgun."

GRAHAM: Well, that's his opinion and I respect it. I have an AR-15 at home and I haven't hurt anybody and I don't intend to do it. But I think I would be better off protecting my business or my family if there was law-and-order breakdown in my community, people roaming around my neighborhood to have the AR-15, and I don't think that makes me and on reasonable person.

Now, Ms. Trotter when you mention that you're speaking on behalf of millions of women out there who believe an AR-15 makes them safer, there were a lot of giggles and the room, and I think that explains the dilemma we have.

The people who were giggling were saying to you, that is crazy. Nobody I know thinks that way. Which reminds me of the Harvard professor who said, "I cannot believe Mcgovern lost. Everyone I know voted for him." And I bet there are people on our side that can't believe Obama won, because everyone they know voted against him.

Gordon Declaration 01928

The point is that we have different perspectives on this. And the reason I'm going to oppose the legislation, Chief Johnston, is because I respect what your do as a law enforcement officer.

Case 2:17-cv-00903-WBS-RJN   Document 40-6   Filed 06/15/17   Page 52 of 175

Has your budget been cut?

J. JOHNSON: Yes.

GRAHAM: Will it be cut in the future?

J. JOHNSON: I am optimistic that it is not.

GRAHAM: Well I hope you're right, but I can tell people, throughout this land, because of the fiscal state of affairs we have, there will be less police officers, not more, over the next decade. Response time are gonna be less, not more.

So, Captain Kelly I really do want to get guns out of the hands of the wrong people. I honest to God believe that if we arbitrarily say nobody in this country can own a 10-round magazine in the future, the people who own them are the people we're trying to combat to begin with, and they (sic) could be a situation where a mother runs out of bullets because of something we do here.

I can't prevent every bad outcome, but I do know and I do believe in the bottom of my heart I am not an unreasonable person for saying that in some circumstances the 15-round magazine makes perfect sense and in some circumstances the AR-15 makes perfect sense. And I think our efforts to solve a problem that exists in the real world out there from Washington by having more gun laws that really do not hit the mark so to speak, politically, or situationally, that we're all face, but this is why we have these hearings. And I really do appreciate the fact that we have these hearings.

Professor Kopel -- Kopel, Kopel?

KOPEL: Either one.

GRAHAM: OK.

Some people on our side say -- and I'll wrap this up, Mr. Chairman -- that it is unconstitutional to put a limit on magazine size.

Do you agree with that?

KOPEL: I think if we follow Senator Schumer's approach and say we're gonna follow what the District of Columbia v. Heller Supreme Court decision says, what that tells you is the core of the Second Amendment is the firearms and accessories that are commonly owned by law abiding people for legitimate purposes.

GRAHAM: Is it constitutional to say 10 rounds versus 15?

Gordon Declaration 01929

Case 2:17-cv-00903-WBS-KJN   Document 40-6   Filed 06/15/17   Page 53 of 175

KOPEL: Ten is plainly unconstitutional because, as I was trying to explain to Senator Durbin, magazines of up to 19 are common on semiautomatic handguns.

GRAHAM: (inaudible) I do not know if 10 versus 19 is common or uncommon. I do know that 10 versus 19 in the hands of the wrong person is a complete disaster. I do know that six bullets in that hands of a woman trying to defend her children may not be enough. So I don't look at it from some academic debate.

Let's agree on one thing. One bullet in the hands of the wrong person we should all try to prevent. But when you start telling me that I am unreasonable for wanting that woman to have more than six bullets, or to have an AR-15 if people roaming around my neighborhood, I reject the concept.

LEAHY: Thank you, Senator.

Senator Whitehouse? And then after Senator Whitehouse, Senator Lee.

Senator Whitehouse?

WHITEHOUSE: Thank you, Mr. Chairman.

Mr. Chairman, I've heard testimony in this hearing that the federal gun crime prosecutions number 62 per year, and that, "We don't prosecute any." And I was surprised to hear that testimony because I was a United States attorney. And in my time that I was United States attorney it became an absolute priority of the Department of Justice to prosecute firearms.

WHITEHOUSE: So I went to every police department in my state to talk up what we could do with gun criminals. We set up a special procedure where the attorney general's office, which has criminal jurisdiction in Rhode Island, and our office viewed gun crimes together to make sure they were sent to the place where they could get the most effective treatment. And I believe that, that continues, although I'm no longer a U.S. attorney. So I hold up some quick statistics, and according to the executive office at United States attorneys, in 2012 more than 11,700 defendants were charged with federal gun crimes, which is a lot more than not doing it, and a lot more than 62.

And the numbers are up at the Department of Justice since 2000 and 2001 by more than 3,000 prosecutions. So, we may have a debate about whether more should be done, and who at the witness table actually wants more to be done in the way of gun prosecutions, but I think to pretend that the number is in double digits, or the number is zero, is flagrantly wrong, and I think inconsistent with the type of testimony that Senators should rely on in a situation like this.

I'd also add that there's been repeated testimony, also mentioned by Senator Durbin that criminals won't subject themselves to a background check. And my response to that is, that's exactly the point. Criminals won't subject themselves to a background check, so they won't go into the gun shops. And if they do, they get prevented from buying a gun. So instead, they go to illegal means. They go primarily to the way we distribute guns without a gun check -- a background check, which is to the gun shows.

Gordon Declaration 01930

Case 2:17-cv-00903-WBS-KJN   Document 40-6   Filed 06/15/17   Page 54 of 175

And so I think to the extent we can expand the background check, the very fact that the criminals won't subject themselves to a background check provides the kind of prevention that Senator Graham was talking about, to keep the guns out of the hands of criminals in the very first case. Chief Johnson, tell me a little bit about the men and women with whom you serve in law enforcement, and the type of training, and screening that is important both in gun use, in gun safety, in situational awareness, before they are put in a position where they are expected to defend the public with firearms?

Is that just something you just give somebody a gun and say, get in there, and go defend the -- the community? Or how -- how rigorous, and how cautious are you about the training required?

J. JOHNSON: The process starts well before we even offer you a badge. And it is a very robust, in depth, psychological review of whether or not we're even going to allow you to enter the force itself. All departments are universal in this issue. It includes psychological, polygraph, and other means to determine whether or not you have the fiber to have that awesome responsibility to carry a gun. The training is exhaustive. Weeks and weeks of training on how to use the weapon, and tactically how to deal with it, how to care for it, and how to safeguard that weapon.

But it doesn't stop there. Once you're out in the field, a very robust psychological services section, yearly training and other safety equipment that must be carried. This talk about teachers having guns...

WHITEHOUSE: That's actually where I was going to go. But before we get to teachers, to your knowledge, does the military have the -- similar types of concerns and programs with respect to arming men and women who serve in our armed forces?

J. JOHNSON: It is my understanding talking with my associates in the military, that public policing mirrors much of what the military does.

WHITEHOUSE: So against that background, tell me how much sense you think it makes to have our line of defense be armed teachers?

J. JOHNSON: Certainly when we have this discussion, you have to -- does a teacher have the -- the -- the inner fiber to carry that weapon? The awesome responsibility? You're a teacher in a classroom. You're an educator. You dedicated your entire life to that pursuit, but you've got a sidearm strapped to yourself? You'd better have it all the time. Because if you put it in your desk drawer, your purse, or your briefcase -- and where you gonna leave it?

J. JOHNSON: Let me tell you something, carrying this weapon on my side has been a pain all these years. I'm glad I have it if I need it, but let me tell you, it's an awesome responsibility. And what do you do in the summertime when you dress down? How are you going to safeguard that weapon from a classroom full of 16-year-old boys that want to touch it? How are you gonna do that?

And certainly -- the holsters. I'm spending $200 a piece just for the holsters. You can't rip it from my side.

So these are all the factors that in a robust, psychological service section we all face catastrophic changes in our lives as we go

Gordon Declaration 01931

Case 2:17-cv-00903-WBS-KJN   Document 40-6   Filed 08/15/17   Page 55 of 175

through divorce and other things that bring us down. But you need people to step in, like we have in policing, that notice those things and deal with them. This is a major issue.

WHITEHOUSE: We've had cases, including a case in Rhode Island, in which trained police officers who were off duty responded to a situation, because they hadn't been adequately trained in how to respond off duty and because they were out of uniform, it lead to tragic blue-on-blue events.

Presumably, that would have some bearing on armed police officers responding to an event in which a lot of armed and untrained teachers are trying to defend students in a school.

J. JOHNSON: Well, it's a very important point. Two years ago in Baltimore City an on-duty officer in plain clothes was shot by uniformed on-duty personnel, and they work the same shift. It's just in the darkness of the night they couldn't tell.

And as Captain Kelly has pointed out, that's a major issue in the Tucson shooting.

WHITEHOUSE: And Ms. Trotter, a quick question. Sarah McKinley, in defending her home, used a Remington 870 Express 12-gauge shotgun that would not be banned under this statute, correct -- under the proposed statute?

TROTTER: I don't -- I don't remember what type of weapon she used.

WHITEHOUSE: Well, trust me, that's what it was. And it would not be banned under the statute.

So it doesn't -- I think it proves the point that with ordinary firearms not 100-magazine, peculiar types of artifacts people are quite capable of defending themselves. In fact, that was your example.

TROTTER: I respectfully disagree. I understand that you are also a graduate from the University of Virginia School of Law, and you were close to Monticello where Thomas Jefferson penned our Declaration of Independence and close to Montpelier where James Madison was instrumental in drafting the Bill of Rights. And I think you can understand that as a woman I think it's very important not to place undue burdens on our Second Amendment right to choose to defend ourselves.

WHITEHOUSE: Oh, I have...

(CROSSTALK)

TROTTER: I don't know what -- I don't know what weapon she used...

WHITEHOUSE: ... the point. My point is that the example you used is one that would not bear (ph) an argument against the proposal that is before us, because that Remington 870 Express is a weapon that would be perfectly allowed.

TROTTER: So would it have been unreasonable for her to use a different gun to protect her child?

Gordon Declaration 01932

Case 2:17-cv-00903-WBS-KJN   Document 40-6   Filed 06/15/17   Page 56 of 175

WHITEHOUSE: I think that if she was using a 100 weapon -- let me put it another way. She would clearly have an adequate ability to protect her family without the need for a 100-round piece.

TROTTER: How can you say that?

You -- you are a large man, and you are not a teenage...

(CROSSTALK)

TROTTER: a tall -- tall man. You are not a young mother who has a young child with her. And I am passionate about this position. Because you cannot understand. You are not a woman stuck in her house having to defend her children, not able to leave her child, not able to seek safety, on the phone with 911. And she cannot get the police there fast enough to protect her child...

(CROSSTALK)

TROTTER: ... and she's not used to being in a firefight.

WHITEHOUSE: And my point simply is that she did it adequately and safely with lawful firearms and without the kind of firepower that was brought to bear so that the 12th, 13th, 14th shots could be fired by the man who shot...

(CROSSTALK)

LEAHY: I'm gonna have to acknowledge and (inaudible) another round.

There are a number of things that I could say as a gun owner, but I won't. Pass up on the opportunity, and go to Senator Lee.

LEE: Thank you, Mr. Chairman.

And I -- I'd like to thank each of the distinguished members of our panel today for enduring now over two hours of this hearing.

As -- as a more junior member of the committee who sometimes gets to ask questions last or second to last, I'm especially appreciative of your willingness to stay this long.

LEE: I think every one of us, both here in this room and everyone watching on television, has been horrified by the incidents that occurred in Newtown, in -- in Tucson and elsewhere. And I don't think there is one of us that wouldn't like us to find a way as a society to put an end to events like this.

It would be my preference, if we could find a way to put an end to events like this, without doing violence to the Constitution

Gordon Declaration 01933

Case 2:17-cv-00903-WBS-RJN    Document 40-6    Filed 06/15/17    Page 57 of 175

and also without leaving law-abiding citizens more vulnerable to crime.

There are a number of statistics on this, but one statistic I've read has indicated that about 2.5 million times a year in America, a gun is used to protect its owner, its possessor, from a crime. That's -- that's quite significant and that's a fact that we need to take into account.

There's been a lot of reference today to the fact that the protections of the Constitution -- the protections of the Second Amendment right to bear arms -- are not unlimited. And I agree that they are not unlimited. There are limits. I think it's important for us from time to time to focus on what those limits are.

The Supreme Court in District of Columbia v. Heller held that the guns that are within the zone of protection of the Second Amendment are those that are typically possessed by law-abiding citizens for lawful purposes.

Why don't we start with you, Professor Kopel. Can you tell me, is a gun -- a semi-automatic weapon, whether a rifle or a hand gun, that holds more than 10 rounds in its ammunition magazine, one that could fairly be characterized as one that's typically possessed by law-abiding citizens for lawful purposes?

KOPEL: In hand guns, semi-automatics are 81 percent of new hand guns sold. A very large percentage of those have as standard, not as high-capacity, but as standard factory magazines -- magazines between 11 and 19 rounds. Another thing that is very common, to get back to Senator Whitehouse's issue about the Remington 870 shotgun, is Senator Feinstein's bill would outlaw that shotgun if it has a seven-round magazine on it. It comes with a five-round magazine. You can extend it buy two rounds. And the Feinstein bill would outlaw that very standard home defense shotgun if it simply has a seven-round magazine.

So, it's all fine to talk about novelty items on the fringe, like a 100-round drum, but in practice what is at threat of being outlawed, that people are actually using, is their standard capacity hand gun magazines and standard capacity magazines for rifles and shotguns.

LEE: And what are the law -- what are the law-abiding citizens doing with these? In other words, what are the lawful purposes to which law-abiding citizens are putting these guns, who own them?

KOPEL: Self-defense, target shooting -- all the purposes which is lawful to possess a firearm. And I would -- regarding what the chief was talking about about all this extra training that police officers have. Well, since I represented the two leading police training organizations in the U.S. Supreme Court, I would certainly agree that the police have more training for all kinds of reasons, including they have the power to effectuate arrests, which ordinary citizens don't.

But the training -- in the view of the police training organizations, the International Law Enforcement Educators and Trainers Association, the International Association of Law Enforcement Firearms Instructors, they believe that the training that is required in most states to obtain a permit to carry a hand gun for lawful protection of self -- only nine states currently violate that by not letting trained citizens carry -- that that is appropriate, sufficient for people to be able to protect themselves, not necessarily to go out and do arrests, but to defend themselves. And that includes defending themselves in their place of

Gordon Declaration 01934

Case 2:17-cv-00903-WBS-KJN    Document 40-6    Filed 06/15/17    Page 58 of 175

employment, including if that place of employment happens to be a school.

LEE: Well, one of the arguments that I've frequently heard for making this type of weapon illegal or making any weapon illegal if you're using an ammunition magazine containing more than 10 rounds is that weapons like these are available on a widespread basis; that -- that it's relatively easy to buy them in the sense that, you know, most people may lawfully buy them and own them. And that's used as an argument in favor of restricting access to these weapons.

In your opinion, does that make it more or less constitutionally permissible to restrict their sale?

KOPEL: Well, I think you've hit exactly what District of Columbia v. Heller was all about, which, you know, you talk about how often are 100-round magazines used in crimes. Pretty rarely. How often are they used in self-defense? Pretty rarely, too.

Hand guns are used -- they're 70 percent of gun homicides are perpetrated with hand guns. And the Supreme Court said the fact that these are very frequently used in crimes does not mean that under the Constitution, you can prohibit them.

KOPEL: So the point -- the fact that you can point to any particular crime where a gun was misused and say, "Oh, that proves we have to ban this gun or this accessory," is the opposite of what the Supreme Court is saying. The Supreme Court is saying, "You don't look only at the misuse of an arm or an accessory, you look at its lawful use. Does it have common, lawful use?"

Yes, handguns have common, lawful use. Yes, handgun magazines in the standard size of 11 to 19 rounds have common, lawful use. And yes, the AR-15 rifle, the most popular, best-selling rifle in this country for years, has pervasive lawful use.

LEE: So, if we restrict access to these guns, we're -- we're limiting the ability of individual Americans, law-abiding Americans, to use them for lawful purposes?

KOPEL: Yes, and the -- and the teaching of Heller is the fact that Criminals may misuse something, but that does not constitute sufficient reason to prohibit law-abiding citizens from using a commonly used firearm.

LEE: Ms. Trotter, do most of the gun-owning women that you know have an inclination to abide by the law in connection with a gun ownership?

TROTTER: Yes, definitely.

LEE: If we were to ban all weapons that contained an ammunition magazine capable of accommodating more than 10 rounds, would most female gun owners abide by that law?

TROTTER: Of course.

LEE: What about criminals, those who use weapons like these in connection with crimes? Do you think they are as likely to abide by that law?

Gordon Declaration 01935

TROTTER: By definition, criminal are not abiding by the law.

LEE: Where does that then put women like those that you described -- women like those that you represent, what kind of position does this put them in relative to their -- their current position, as their ability to defend themselves?

TROTTER: It disarms the women, it puts them at a severe disadvantage and it not only affects them, but it affects anybody they are responsible for, their children, elderly relatives, incapacitated family members.

LEE: Mr. Chairman, I see my time's expired. I have one question for Mr. Johnson, if I could have -- Mr. Johnson, according to FBI statistics, about 72 percent of the gun homicides that are committed each year in America are committed with handguns, 4 percent with rifles, 4 percent with shotguns, 1 percent with other types of -- of firearms, and then 18 percent that fit into the category of unknown, but 72 percent classified as -- as handguns.

If 72 percent of gun homicides are being committed with handguns, would that suggest that you prefer banning handguns as well?

J. JOHNSON: Our partnership -- and frankly I've been party to no discussion of banning handguns or restricting handguns from women or any other group.

I don't want to give up my hand guns. We are here today to talk about a universal background check that would help make our nation safer and limit high-capacity magazines. They are used in crimes and violence across America.

LEE: Even though far more people die each year from handgun- inflicted injury is an assault weapon-inflicted injuries.

J. JOHNSON: We believe the limit on high-capacity magazines, even in handguns is necessary. No more than 10.

LEE: Thank you.

LEAHY: Senator Klobuchar.

KLOBUCHAR: Thank you very much, Mr. Chairman.

Thank you, I first wanted to just acknowledge all of the family out here who have lost loved ones in shootings. And I especially wanted to acknowledge Maya Ramin (ph) who's here from Minnesota, who lost their dad, (inaudible), in a horrible shooting at the company that he built and loved, a small business in which he was killed along with four other employees and a UPS guy who just happened to be there by a coworker who was mentally unstable. And this just happened this fall.

So thank you.

I also was listening to all the statistics here, which are very important. I am a former prosecutor, I believe in evidence. But the

Gordon Declaration 01936

Case 2:17-cv-00903-WBS-KJN   Document 46-8   Filed 06/15/17   Page 60 of 175

statistic that I will never forget is the one from Newtown, Connecticut, shared with me by a relative of one of the young victims in that tragedy.

And that is that little Charlotte Bacon loved her Girl Scout troop. And her Girl Scout troop once had 10 girls, and now there are only five left.

We have to remember what this is all about as we look at solutions.

KLOBUCHAR: For me, as a former prosecutor, I've always believed in enforcing the laws on the books. And, Mr. LaPierre, I made it a major, major focus of our office to prosecute the (inaudible) and possession of guns. I think that is clearly part of the solution. You cannot lessen the importance of that as we go forward.

But there are other things as well, including the recommendations that have been made by Vice President Biden and that task force. And I think it's very important that we explore those in addition to enforcing the laws on the books.

I have heard from my sheriffs -- Republican sheriffs from all over my state, that there are major issues with background checks.

And so, I think I would turn to that first, Chief Johnson. We have had -- we had a guy in Minnesota that just came our paper, the Minneapolis paper, who had killed his parents as a juvenile. Got out. Somehow got a permit, and was able to obtain guns.

In fact, when they found him, he had 13 guns in his house. And he had a note that he had written to the gunman in Newtown. And he also said in the note, "I am so homicide, I think about killing all the time."

He was able to get a permit and get those guns. This just came out in our local paper.

And I wondered what you see as some of the biggest loopholes. We've talked about gun shows, Internet, private sales, and -- and how you think that could help?

And then I want to get to the thing you talked about, about how you can get those background checks done quickly, because I come from a hunting state. The last thing I want to do is hurt my Uncle Dick in his deer stand. And I want to make sure that what we do works.

And so, if you could address that.

J. JOHNSON: There's been great improvement in the nation. Some statistics show nearly 800 percent increase in data entered into the National Instant Criminal Background Check System. That's good, but it's not good enough. And we're really failing miserably, nationally, entering that data.

Statistics I've read indicate that nearly 18 states across the nation submit less than 100 records to the NICS system on a -- on a

Gordon Declaration 01937

Case 2:17-cv-00903-WBS-KJN   Document 40-6   Filed 06/15/17   Page 81 of 175

regular basis. We've to improve that. Maryland has to improve that, in fact. We're not doing enough in Maryland.

KLOBUCHAR: And is it true that about 40 percent of gun sales take place at the gun shows?

J. JOHNSON: Statistics reveal that 40 percent of gun sales take place at gun shows and other non-licensed dealer sales arrangements. Nearly 6.6 million guns through that process a year.

KLOBUCHAR: And are more and more people now using the Internet to buy guns, as we see in other areas?

J. JOHNSON: I sat with my detectives in the gun squad for weeks before I had a chance to come -- the honor to come here today. And they regularly used Internet, PennySaver classified ads. They'll go outside the state in many cases. A variety of methods, including straw purchasers.

KLOBUCHAR: And you talked a little bit earlier about how quickly these background checks can get done. You compared it to issuing a ticket. If you could answer that.

J. JOHNSON: The analysis that we've conducted, the information I have, I believe it's 92 percent of NICS background checks come back in less than a minute and half when you go to a licensed federal dealer.

And, certainly, that's much quicker than I can write a citation. And I think that should be universal. That's what we're calling for. That's that's gonna make our nation safer.

KLOBUCHAR: Mr. LaPierre, do you want to respond about the -- the timing on the checks?

LAPIERRE: Sure, I'll respond to -- yes, Senator, a couple points. One, the chief's talking about using the Internet to do interstate sales. That is a federal crime and should be prosecuted. The only way you can do a sale, it would have to go through a dealer and it would have to be cleared through a check.

The senator from Rhode Island talked about the prosecution data. I get all that from the Syracuse University track data, which is who tracks the initial -- the prosecution of the federal gun laws where that's the initial charge.

And why Project Exile worked in Richmond, Virginia, is what they started to is they caught a drug dealer with a gun. They put signs up all over the city saying if you have an illegal gun in Richmond under federal law, you're going to be prosecuted 100 percent of the time. Drug dealers, gangs and felons stopped carrying guns.

So those -- the '62 (ph), Senator, statistic, was for Chicago alone, not for the entire country.

KLOBUCHAR: Mr. LaPierre, if you could...

LAPIERRE: Yeah. KLOBUCHAR: ... and I know you want to discuss this with Senator Whitehouse, but I have question about

Gordon Declaration 01938

the timing. Could -- do you agree with the chief here that we could do this quickly? And all we're trying to do here is close some of these loophole so we expand some of the background checks, but that it still could be done in a way that won't interfere with law-abiding gun owners.

LAPIERRE: Well, gun shows, right now are -- according to all the surveys, are not a source of crime guns, anyway. It's 1.7 percent. Where criminals are guns, they're -- the black market. They're stealing them, They're not getting them through gun shows.

But if you're talking about expanding a system that is already overloaded, where they're not doing any prosecutions, basically. Even if they catch somebody, they're saying -- it's like Bonnie and Clyde. They catch Clyde, and he goes home and says, "Bonnie, they didn't do anything to me, so let's go commit our crime and get a gun."

LAPIERRE: I mean, if -- if you're talking about expanding that system to every hunter, to every family member, every relative all over the United States, when the system already can't handle what it has, you're creating an enormous federal bureaucracy. It's only going to hit the law-abiding people, not criminals.

Honest people are going to be entrapped into committing crimes they had no intention to commit and it's going to -- it's an unworkable universal federal nightmare bureaucracy being imposed under the federal government.

I just don't think that law-abiding people want every gun sale in the country to be under the thumb of the federal government.

KLOBUCHAR: But it's my understanding that when people buy guns, they do undergo a background check. We know that and we're just simply trying to close some of these loopholes.

Chief? Do you want to respond to this?

J. JOHNSON: Well, certainly when a weapon is purchased through a licensed federal dealer, they undergo a background check. But, as we've said many times here today 40 percent of these guns are being sold outside that process. This is not unreasonable. And certainly I don't consider it a restriction. If I buy a gun next year, you know through a private seller, I'll go to a licensed dealer to do it. This is not unreasonable.

KLOBUCHAR: And Captain Kelly, I think you really said it best at the very beginning of this lengthy hearing when you talked about your belief in the Second Amendment, and in those rights. But with those rights comes responsibility. And you talked about the responsibility to make sure that these guns do not get into the hands of criminals and terrorists, and those with mental illness. And do you see this, the background check, as a way to get at this problem?

KELLY: Gabby and I are both responsible gun owners. I bought a hunting rifle from Walmart a few months ago, and I went through a background check. It didn't take very long. And they -- you know they were able to very clearly determine that, you know I was a responsible person. You know in -- in Tuscon, and in many of these cases there are people that either would have failed a background check if the right data was in the system, like in the case of Jared Loughner, and certainly in that case he

Gordon Declaration 01939

Case 2:17-cv-00903-WBS-RJN   Document 40-6   Filed 06/15/17   Page 63 of 175

would have the option to go to a gun show, or a private seller, and I imagine he would have gotten a weapon. You know he was a pretty marginalized person. I would imagine, and -- and quite mentally ill and didn't have much of a community around him. I imagine in that case, if he would have not been able to get -- not pass a background check, and -- if there was a universal background check, I actually don't see him going on the black market to get a gun. And maybe if he did, maybe it would have taken him a long time to do that. To find the right place to go.

And maybe in that period of time, just maybe his parents would have gotten him some treatment, got him on medication. And if they did, from what his attorney and the prosecutors have told me, on medication he would have never done what he did on that day. I mean, so you might not be able to prevent every single criminal from getting a weapon, but a universal background check is a common-sense thing to do.

I mean if we do them for federal licensed dealers, why can't we just do it at the gun show, and for a private sale?

KLOBUCHAR: Thank you very much. And I was thinking as I listened to you, about all the people in this room that have thought those maybes too. Maybe if this had been in place, maybe if that had been in place. And I think your acknowledgment that it's not one solution for every person, for every case. That we have to enforce the laws, but we have to do better with background checks and the number of the proposals that recommended out there by Vice President Biden's commission that we can do better. Thank you.

LEAHY: Thank you.

I want to welcome one of our three new members to the committee, Senator Cruz of Texas. And Senator Cruz, you have the floor. I apologize that the allergies cause my voice to be so bad.

CRUZ: I thank you Mr. Chairman and it is a pleasure to serve with you, and all the members of this committee. I want to begin by thanking each of the distinguished witnesses who have come here today. Thank you for taking your time. In particular, I want to thank you Captain Kelly for your service to this country, and for your wife's extraordinary journey, for her coming here.

CRUZ: Congresswoman Giffords has been lifted up in prayer by millions of Americans, and her heroic recovery is inspirational. And please know that you, and your family will continue in our prayers in the years to come.

My wife and I have two little girls. They are 4 and 2. I think no parent, and in particular no parent of young children could -- could watch what happened in Newtown without being utterly horrified -- utterly horrified at the depravity of a deranged criminal who -- who -- who would senselessly murder 20 young children at an elementary school.

Unfortunately in Washington, emotion often leads to bad policies. When a tragedy occurs, often this body rushes to act. And at times it seems the considerations of this body operate in a fact-free zone. I will suggest a philosophy that I think should guide this body in assessing gun violence, and then I would like to highlight and ask a few questions on a couple of points that I think are particularly salient to addressing this issue.

Gordon Declaration 01940

Case 2:17-cv-00903-WBS-KJN   Document 40-6   Filed 08/15/17   Page 64 of 175

The philosophy I would suggest makes sense is that we should be vigorous and unrelenting in working to prevent, to deter and to punish violent criminals. I have spent a substantial portion of my professional life working in law enforcement. And the tragedies that are inflicted on innocent Americans every day by criminals are heartbreaking, and we need to do more to prevent them.

At the same time, I think we should remain vigilant in protecting the constitutional rights of law-abiding citizens. And I think far too often, the approaches that have been suggested by this Congress to the issue of gun violence restricts the liberties of law-abiding citizens rather than targeting the violent criminals that we should be targeting.

And I would point out that I hope some of the passion we have seen from members of this committee with respect to the need to prevent violent crime will be reflected equally should we find ourselves in a judicial confirmation hearing with a judicial nominee who has a record of abusing the exclusionary rule to exclude evidence that results in a violent criminal walking free and being able to commit yet another crime. I hope we see exactly the same passion devoted to assessing whether judicial nominees will enforce our criminal laws and not frustrate the administration of justice.

Three points I think are particularly salient. The first is, in my judgment, the proposed assault weapons ban is a singularly ineffective piece of legislation.

I was having a conversation recently with a loved one in my family who asked a very reasonable question. She said, why do regular people need machine guns? And, you know, one of the things that happens in this debate is the phrase "assault weapons ban" gets a lot of people really concerned, and they assume, much like the phrase "military-style weapons" that we're talking about ordinary citizens walking around with M-16s and Uzis that are fully automatic.

Fully automatic machine guns are already functionally illegal. Ordinary citizens cannot own them, absent very, very heavy regulation. This entire discussion does not concern machine guns, and yet I would venture to say, a large percentage of Americans do not understand that.

I want to begin by talking about the assault weapons ban as it was enforced before. And I would ask for slide number 1.

The assault weapons ban that used to be in effect, according to the Department of Justice, quote, "failed to reduce the average number of victims per gun murder incident or multiple gunshot wound victims." Now, that is the assessment of the United States Department of Justice, and that is in 1994. That was the Janet Reno Department of Justice under President Clinton that said the assault weapons ban was singularly ineffective.

If we can move to the second slide.

The Department of Justice, likewise, concluded that the assault weapons ban, quote, "under it there has been no discernible reduction in the lethality and injuriousness of gun violence."

So the reaction to this tragedy in Newtown is for a lot of elected officials in Washington to rush to re-enact a law that according

Gordon Declaration 01941

to the Department of Justice did absolutely nothing to reduce gun violence.

Now, why is that? That's not accidental. Because the assault weapons ban, if it doesn't ban machine guns, what does it ban? And what it bans, I would suggest to you, are scary-looking guns.

If we can move to slide 3.

This is a photograph of a Remington 750. It is one of the most popular hunting rifles in America. This rifle would be entirely legal under this so-called assault weapons ban.

CRUZ: Now, I have a question for you, Mr. LaPierre. Functionally, in terms of the operation of this firearm -- this is a semi-automatic firearm. You pull the trigger once, one bullet comes out. Is the operational firing mechanism in this firearm materially different from the so-called assault weapons ban that this -- this bill is targeted at?

LAPIERRE: No, it's not.

CRUZ: Now, what the assault weapons ban instead targets are cosmetic features. So, for example, I am holding in my hand a pistol grip. Under this proposed legislation, if this piece of plastic, this pistol grip were attached to this rifle, it would suddenly become a banned assault weapon.

Now, I would ask you, Mr. LaPierre, are you aware of any evidence to suggest that attaching a piece of plastic to this rifle would make it in any way whatsoever even slightly more dangerous?

LAPIERRE: No, that -- that -- the problem with the whole bill that Senator Feinstein introduced is it's based on falsehoods to people that do not understand firearms, to convince them that the performance characteristics of guns that they are trying to ban through that bill are different than the performance characteristics that they're not trying to ban.

They make bigger holes. They're rapid-fire. They spray bullets. They're more powerful. They're heavy armor. All of that is simply not true. I mean, the -- AR-15 that people -- uses a .223s, and then I hear in the media all the time and people say, "Well, no deer hunter would use something that powerful." I mean, .243s, .270s, 25.06, 30.06, .308s -- dozens of other calibers used in hunting are more powerful.

I mean...

CRUZ: So let me make sure I understand that right. This deer rifle which is entirely legal and is used by millions of Americans, is the -- is sold in the identical caliber as the so-called assault weapons ban, although those look scarier because they have a piece of plastic attached to them.

LAPIERRE: And the Ruger Mini-14, which Senator Feinstein exempts in her bill, uses .223. The AR-15, which has the handle on the bottom, which she prohibits, also uses the exact same. CRUZ: I'm -- I'm out of time. I want to make one final point if I

Gordon Declaration 01942

Case 2:17-cv-00903-WBS-KJN   Document 40-6   Filed 06/15/17   Page 66 of 175

may, which is there has been much attention drawn to gun shows. And indeed, the statistic of 40 percent has been bandied about. Now, that statistic is unfortunately based on a study that occurred before the background check went into effect. And so it is a highly dubious figure.

But I do want to point to what the Department of Justice has said, which is in slide five. The Department of Justice has said that firearms used in crimes, 1.9 percent of those firearms come from gun shows. So again, in response to this crime, this body does not act to enact anti-crime legislation to prevent violent crimes. Instead, it targets 1.9 percent of the guns, and a substantial portion of those guns were sold by licensed firearms dealers who already conducted a background check. So even that 1.9 percent, a substantial portion area already subject to a background check.

I would ask, Mr. Chairman, if we have a second round, I would like to additionally get into the effectiveness or lack thereof of gun controls.

LEAHY: I'm -- I'm going to leave the record open for questions. I think, because of the Senate's schedule this afternoon we probably will not have a second round. So, we will leave the record open so the senator -- and I have further questions. I won't have time either, so I can submit my questions.

Senator Franken?

FRANKEN: Thank you, Mr. Chairman.

Thank you to all the witnesses, especially you, Captain Kelly, and thanks to your beautiful wife -- and beautiful in every, every way.

My wife Frannie and I were heartbroken for the families in Sandy Hook. We're heartbroken for the families in Tucson. For those of you who are listening or watching this hearing in Newtown, I want you to know that Minnesotans have you in our -- our thoughts and our prayers, and that we shared in your grief. We shared it when we lost lives at a sign factory -- Maya (ph) is here, lost her father. This was in Minneapolis in September.

FRANKEN: We share it every time we hear gun shots and ambulance sirens interrupting an otherwise quiet school night. We share it every time we bury one of our sons or daughters. I know that a group of students from Redlake Reservation in Minnesota, students who lost their classmates to gun violence, made 1,500-mile trip -- drive to Newtown just a few days before Christmas just to let the people in Newtown know that they are not alone, we're all in this together.

Over the past month or so, I've been talking to my constituents about their ideas on how to make our communities safer. I traveled safely with hunters and school officials, with law enforcement officers , with mental health experts. I have convened round table discussions and I have had many, many conversations. And what I've learned is that there is a balance to be struck here. We can honor the Second Amendment, and we can honor the Minnesota's culture of responsible gun ownership while taking basic measures that will make our kids and our communities safer.

Gordon Declaration 01943

Case 2:17-cv-00903-WBS-KJN   Document 40-6   Filed 06/15/17   Page 67 of 175

So I have co-sponsored a bill to limit the number of rounds in a magazine. I have co-sponsored a bill to require background checks at gun shows. I have co-sponsored Senator Feinstein's bill to ban assault weapons. I am reviewing legislation to address gun trafficking. I have supported funding for law enforcement programs and I work every day to carry out the work Paul Wellstone -- his unfinished work to improve our nation's mental health system.

Tomorrow I will introduce the Mental Health In School Act which will improve access to mental health care for kids, because catching these issues at an early age is really important. And I want to be careful here that we don't stigmatize mental illness.

The vast majority of people with mental illness are no more violent than the rest of the population. In fact, they are more likely to be the victims of violence. But these recent events have caused us as a nation to scrutinize our failed mental health and system, and I'm glad we're talking about this and a serious way.

Police Chief Johnson, I -- I met with some mothers from the Mountain's View school district in Minnesota whose children's lives and their own lives were changed for the better, because their kids got access to mental health care that they needed at an early age. They got treatment. Their lives are improving, and their moms lives were improved.

As a community leader and law enforcement official, do you think it will benefit our communities if we are able to use schools to improve access to mental health care?

J. JOHNSON: I applaud your -- your initiatives and your work Senator. And the answer is, absolutely. As a father with a child that has mental health issues I think this is absolutely essential. And if my child has access to medical care that she needs, but the record shows and reflect that nearly half the children and adults in this nation who are diagnosed with mental health issues do not have access to the care they need, and it gets even worse after the aged 18.

And we're seeing this in crimes of violence, and we're seeing this in crimes across our nation and in my jurisdiction. It's a major problem and I do recognize that most people with mental health issues do not go on to commit violent crimes. However, we have seen over and over again, it seems to be a common thread or theme or issue that we must deal with.

FRANKEN: Again, Police Chief Johnson, I've heard from some gun owners who are worried that Congress is gonna outlaw features that they really like in guns, things like pistol grips and barrel shrouds and threaded barrels. Some say that these features are merely cosmetic, but it seems to me that a lot of these features are not just cosmetic, they are functional.

Can you explain why a pistol grip in the right place makes a functional difference, why it isn't just a piece of plastic? Why collapsible stocks present a danger; bullet buttons and some of the other features are dangerous?

I think this is a crucial point.

J. JOHNSON: I -- I agree completely. It's not just about the capacity of the weapon to handle numerous rounds, which obviously is absolutely critical in this discussion. And, again, we believe no more than 10.

Gordon Declaration 01944

We use that weapon in (ph) police because of its technical capability, it's ability to cool down and handle round after round after round; it's ability -- it's rugged, it's ruggedized, it's meant for a combat or environment that one would be placed in facing adversaries, human beings, people. That weapon can be retrofitted with other devices to enhance your offensive capability.

The weapon itself has features to adjust it; optics sights, for example, that can cost hundreds of dollars -- and I've shot this weapon many times -- that would enhance our capability in various tactical maneuvers, whether it's from the shoulder or the hip or whether you choose to spray fire that weapon or individually shoot from the shoulder. The optic sights are amazing, the technology advances that weapon has.

That weapon is the weapon of our time. It's the place that we find ourselves in today. And, certainly, I believe it's meant for the battlefield and in a public safety environment only.

FRANKEN: Thank you.

Mr. Chairman, before I yield my time, I just would like to submit testimony of Miya Rahamim (ph) who is here today. She lost her father in a shooting in September in Minneapolis. And I'd just like unanimous consent to submit her testimony for the record.

LEAHY: It will be. As Senator Grassley and I indicated earlier, each -- there will be other statements for the record, as there will be. The record kept open for questions.

As I indicated also earlier, Senator Hatch, a very senior member of this committee, had to be at two different committees. And I yield now to his time, and then we'll go to the next Republican. After we go back (inaudible) Senator Flake.

Senator Hatch?

HATCH: Well, thank you so much, Mr. Chairman.

And I thank all of you for being here today.

Captain Kelly, I appreciate you and your wife and your testimony and your feelings very much. And I appreciated much of your testimony. And I'm grateful that you would take the time to be with us, and that was wonderful to see your wife again.

Let me go to you, Mr. LaPierre. President Obama's issued 23 executive actions on gun violence. Can you please discuss the commonalities between your organization, the NRA, and the Obama administration when it comes to finding ways to reduce gun violence?

LAPIERRE: Well, I mean, what we think works -- and we support what works, is what NRA's done historically. I've talked about our Ready Eagle child safety program, which we put more money into than anybody in the country; that's cut accident to the lowest level ever.

Gordon Declaration 01945

Case 2:17-cv-00903-WBS-KJN   Document 40-6   Filed 06/15/17   Page 69 of 175

We support enforcing the federal gun laws on the books 100 percent of the time against drug dealers with the guns, gangs with guns, felons with guns. That -- that works.

We've supported prison building. You've got states like California where they (inaudible) more than any other state in the country they send more inmates back to the street and have to put more back in jail for new crimes committed against their citizens than any other country in the nation. New York state is too. I mean, the collapse of the fiscal situation in those states has also collapsed the criminal justice system in those states.

It -- I mean, NRA has always supported what works. We have 11,000 police instructors. And we represent honest people all over this country.

There are 25,000 violent crimes a week in this country. The innocent are being preyed upon. The statistics are numbing. Those 911 calls are horrible.

LAPIERRE: But at the scene of the crime, it's the criminal and the victim. And victims all over the country want to be able to protect themselves.

I mean, you know, this whole debate almost puts it into two different categories. If you're in the elite, you get bodyguards, you get right here and you get high-cap mags with semi-automatics protecting this whole Capitol. The -- the titans of industry get the bodyguards whenever they want. Criminals don't obey the law at any -- anyway, they get what they want. And in the middle is the hardworking, law abiding, taxpaying American that we're going to make the least capable of defending themselves.

We're going to say, you can have a bolt action rifle, but boy you can't have an AR-15. Or you can -- you can have a six shot revolver, but you can't have a semi-automatic handgun. You can have a four, or five, or six rounds in your magazine, but if three intruders are breaking down your door, you can't have 15 rounds because somebody thinks that's reasonable in their opinion. I mean...

HATCH: Understood.

LAPIERRE: People want to be able to protect themselves, that's why people support the Second Amendment, and that's why these bills are so troubling. They hit the -- they don't hit the elites. They don't hit the criminal, they hit the average, hardworking, taxpaying American that gets stuck with all the laws and regulations.

HATCH: I understand that one of the bills will ban well over 2,000 guns? I mean talking about individual guns?

LAPIERRE: Senator Feinstein's bill ban -- bans all kinds of guns, but the -- that are used for target shooting, hunting, personal protection. And yet on the other hand, she exempts guns that have the exact same performance characteristics as the guns she doesn't ban. I mean -- and -- and gun owners know the truth, I mean that's why gun owners in this country, the 100 million gun owners get upset about this stuff.

Gordon Declaration 01946

They may be the victim of these lies. About taking the term, assault, and applying it to the civilian firearms, that military term, assault. But they know the truth inherently. They look at their hands, and they shake their head, and they go, none of this makes any sense.

HATCH: Well, I appreciate that. Ms. Trotter, let me just ask you this, in your testimony you state that all women in jurisdictions that have conceal-carry laws reap the benefits of increased safety, even if they choose not to carry a weapon themselves. Can you -- can you please explain why?

TROTTER: Yes. Mr. LaPierre mentioned that gun owners are very concerned about all these burdens that could be possibly put on law abiding citizens. And I will tell you that non-gun owners are concerned about this too. Because you don't have to choose to carry to be the beneficiary of laws that allow people to carry. And for women, you reap the benefit of fewer murders, fewer rapes, fewer possibilities of being a victim of violence if your -- if the state that you live in does not ban anybody, particularly women from carrying weapons.

So it's a matter of choice. We're not saying that all women should, or need to carry weapons. But we need to protect the Second Amendment right to choose to defend yourself.

HATCH: Well, thank you, Mr. Kopel? Professor, you wrote an article that appears in the Wall Street Journal in December -- appeared in the Wall Street Journal on December 18, 2012. In the article, you point out that -- that firearms are the most heavily regulated consumer product in the United States. Gun control laws are more prevalent now than in the mid 1960's, when you could walk into any store and buy a semi-automatic weapon with no questions asked.

Now in your opinion, the lack of firearms regulations is not a contributing factor to the recent rise in the random mass shootings? So what factors have contributed to the rise in these random shootings? You may have answered this already but I -- I would like to hear it again if you haven't?

KOPEL: No.

HATCH: OK.

(OFF-MIKE)

KOPEL: For one thing there's a copycat effect.

HATCH: Could you put your mike on?

KOPEL: Certainly. There's a copycat effect, and lots of studies of the scholars of these -- of all kinds of criminals, but especially of these people seeking notoriety, show strong copycat effect. And that is something that makes me think we need immediate protection for schools because of the -- the copycat danger right now. In addition, there's been a -- there was a mass de-institutionalization of the mentally ill starting in the 1960s and going through the 1980s.

Gordon Declaration 01947

Case 2:17-cv-00903-WBS-KJN   Document 40-6   Filed 06/15/17   Page 71 of 175

KOPEL: Some of that was because of budgetary issues, and a lot of the times the promise was, well we'll put these people in halfway houses so they can be partially in the community, which is a great idea. But then there was never the funding for the halfway houses, and people walk away. Nothing -- nothing is done to follow up. The Jared Loughner, Adam Lanza, so many -- James Holmes -- so many of these perpetrators absolutely would have been civilly committed under the system we had 50 years ago.

We need a -- we need to move back toward greater possibility for civil commitment for the dangerously violently mentally ill. It's certainly right, as Ms. -- I think both senators from Minnesota were saying that mentally ill people, per se, are not any more dangerous or violent than -- than anyone else. In fact, sometimes less so.

But there is a subset of them that are dangerously violently mentally ill. and we -- we need to have them off the streets before so that -- before they -- so that they can't endanger themselves or others.

HATCH: Well, thank you so much.

Mr. Chairman, I would like to have a statement put into the record at the -- following yours and Senator...

LEAHY: Without objection.

HATCH: Thank you so much.

I want to thank all of you for being here. I think it's been an enlightened hearing.

And this isn't a simple thing. And I've got to say there are some freedoms among the mentally ill that have to be considered, too. And this is -- this is complex. It's not -- not easy.

But I can say this that -- that I think this has been a particularly good panel, and I just appreciate all of you for testifying.

LEAHY: I thank -- I thank you for that, Senator Hatch.

And I yield now to Senator Coons.

COONS: Thank you, Chairman Leahy. And thank you for convening this important hearing. To the panel, thank you for your testimony.

And to Captain Kelly and to your wonderful wife, Congresswoman Giffords, thank you for everything you're doing to bring I think an important message.

We, as a committee, are wrestling here today and we as a country are wrestling with how to respond appropriately and effectively to a whole string of horrific shootings, whether in Newtown or in Tucson, whether in a Sikh temple or at a state

university like Virginia Tech, there are just too many of these incidents piled year upon year.

Case 2:17-cv-00903-WBS-KJN    Document 40-6    Filed 08/15/17    Page 72 of 175

And I'm grateful for all my colleagues who've engaged in this thorough discussion today about how do we balance things.

One of the most important things, I think, is for us to get our facts right. A number of my colleagues have made a great deal of the number of cases of federal gun prosecutions going down.

But my staff's pulled the most recent report from the Executive Office of the United States Attorneys, and it turns out that the number of defendants charged with federal gun violations is actually steady.

In fact, in 2011, it was 46 percent higher than in 2000.

So I just encourage all who are paying attention to scoring at home the numbers, what matters is the number of defendants actually prosecuted with federal gun violations.

I've got lots of things I'd like to touch on. And I did want to say at the outset, I'm grateful that our vice-president, Joe Biden, has led, I think, a very broad and searching conversation, where he's listened. as I have, to folks across the country and, in my masse, across my state of Delaware.

And I've heard from parents whose children suffer from mental illness and who are really struggling to provide the care that they deserve and need. Law-enforcement officials, educators, community leaders, gun owners, sportsmen, people who are really concerned about how we strike the right balance and how we make our country safer.

If I could, to Captain Kelly, first, thank you for leading Americans for Responsible Solution.

One of the main ideas you and your wife have advanced is expanded background checks. Could you just explain for me, again, how it is today that convicted felons are able to get their hands on weapons despite our current background check laws and how we might fix that?

KELLY: Well, currently, certainly Senator Cruz mentioned earlier the statistic of, I think he said 1.9 percent of criminals that committed a crime with a gun...

(CROSSTALK)

KELLY: Of prisoners. Well, I want to just look at that for a second.

There's also a statistic that says 80 percent -- on a survey done of criminals, 80 percent of criminals got their guns from a private sale or a transfer.

So by closing that part of the existing loophole, which is the fact that with a private sale or transfer, there is no requirement to

Gordon Declaration 01949

Case 2:17-cv-00903-WBS-KJN   Document 40-6   Filed 06/15/17   Page 73 of 175

get a background check, you could effectively reduce the number of guns in the hands of criminals.

And we know from what happened in Tucson that if there was an effective background check, which includes having the mental health data and the person's drug use, in the case of the Tucson shooter, into the system, and if, in fact, there was no gun show loophole, I would contend that he would have had a very difficult time getting a gun.

KELLY: So the first thing that needs to be done is we certainly need to have a universal background check. If background checks are good enough for somebody who's a federal firearms licensed dealer, like Wal-Mart, for instance, where I just purchased a gun a couple months ago, a hunting rifle, and I had to go through a background check, why isn't that good for other sales, sales from a private individual, or sales from somebody who is really kind of in business at a gun show?

COONS: Captain Kelly, as a gun owner yourself, how do you feel that a thorough universe a background checks of the types that you describe either for purchase of weapons or large capacity magazines, how would that affect or infringe your Second Amendment rights?

KELLY: I don't think it would infringe my Second Amendment rights at all. You know, I am -- I think I'm as -- a strong a supporter of the Second Amendment as anybody on this panel. You know, I've flown 38 combat missions over Iraq and Kuwait defending what I believe is our -- defending our Constitution.

You know, I've flown in combat -- I've been shot at dozens of times. You know, I find it interesting that often, we talk about putting a security guard to school. That's been brought up a lot. And, I -- I actually think, you know, that's better than no security guard in the school, but from my experience of being shot at and what that actually feels like and how chaotic it is, and with the exception of -- of Chief Johnson, I would suspect that not many members of this panel, or even in this room, for that matter, have been in any kind of a fire fight.

It is -- it is chaos. I think there are really some very effective things we can do. And one is, Senator, the background check. Let's make it difficult for the criminals, the terrorists, and the mentally ill to get a gun.

COONS: I agree with you, and I have agreed to co-sponsor legislation to this affect.

But let me ask Mr. LaPierre. I, just at the outset, want to say I', grateful for the work the NRA in providing training and safe gun ownership to millions of Americans. And I hope you'll take into account the data I have offered gone prosecutions.

But I -- I disagree with a point you made your testimony. You said -- and I think I quote, that, "Background checks will never be universal, because criminals will never submit to them. " And while that may be true, I think the point that Captain Kelly makes is telling. And if we in combination put in place tougher restrictions on straw purchases and tougher enforcement on those who buy guns legally, but then sell them to those who shouldn't have them, and we put in place universal background checks and impose some responsibility on responsible gun owners to report lost or stolen weapons in combination, wouldn't all of these things effectively move us towards a country where the number of those who should not have weapons cannot get access?

Gordon Declaration 01950

Case 2:17-cv-00903-WBS-KJN   Document 40-6   Filed 06/15/17   Page 74 of 175

LAPIERRE: I think you will end up with a huge bureaucracy with a honestly a huge waste of police resources and money that could go into doing things in the police criminal justice area that would actually save lives.

You know, that study that you were talking about actually says where criminals get their guns, 39.5 percent from friends and family, 37 percent from street or black market, 11 percent from licensed dealers, 10 percent by theft, 1.7 percent at gun shows. I just think that you're gonna -- if you try to do this universal background check which sounds -- sounds -- whatever, it ends up being a universal federal nightmare imposed upon law-abiding people all over this country.

Criminals will ignore it. We -- the federal government won't -- we already won't prosecute. The senator -- the -- the vice president told at the meeting with our people said they didn't have time to prosecute those types of cases. So what's the point of the whole thing?

COONS: Mr. -- Mr. LaPierre, I'm almost out of time, forgive me for the brief cycle.

Just to take at face value, the -- the data you just suggested is not just closing the gun show loophole. It is also thoroughly enforcing those who transfer weapons bought legally to those who shouldn't have them. And -- and awful lot of the folks you cited are getting their hands on weapons inappropriately through your so called straw purchases, or through illegal transfers.

I just want to ask a question of Chief Johnson, if I might, because I see Mr. Chairman, my time is almost up.

I think it's valuable to have the input of law enforcement professionals. In your view, with this sort of a universal background check combined with aggressive enforcement of the transfers to those who shouldn't have them, would that be a waste of police resources, or might it make a difference on the street for those of you who put your lives on the line for us every day?

J. JOHNSON: I have to respectfully disagree with Wayne on this issue. Public safety, police we -- we are ready. We are unified on this issue that a universal background check will make our society a safer place, will make my police officer is safer. It's absolutely essential.

COONS: Well, thank you, Chief. Thank you to the panel. I'll submit some more questions for the record. I see I'm out of time.

LEAHY: Thank you.

And again, another new member of this committee, Senator Flake of Arizona. I appreciate you being here, and your patience in waiting. If it's any consolation, I had that seat years ago.

(LAUGHTER)

FLAKE: It's good to know.

Thank you, Chairman, for convening this. And thank you to the panel for being here offering such excellent testimony and for

Gordon Declaration 01951

staying so long. I'll try not to take my full seven minutes. But I especially want to thank Mark for being here. I know that Gabby is watching the proceedings in a room in the back. I just visited here a while ago. And I -- I just want you to know, Mark, and I want Gabby to know how much we miss her here.

I was on a call this morning with a few dozen ranchers -- border ranchers in Arizona, and was reminded that this is a practice that she began years ago, to talk about immigration issues and to keep them up to speed and to seek their input. And I've continued that -- that practice. And I can tell you, she offered wonderful representation to the people of southern Arizona and she is missed. And I am so grateful to you and to her for the public service that you've offered in the last year under difficult circumstances, and for taking up this new cause.

So, thank you.

With regard to the Tucson shooting, you mentioned that Jared Loughner had had drug use in the past that might have triggered some kind of entry into a system that -- that he may have been checked, but also the mental health aspect. And that seems to be the -- the difficult problem to solve here, listening to the testimony, is the nexus between mental illness and some kind of entry into a background system.

In Maryland, I believe it is, there have only been like 56 mental health records provided to the NICS system. Arizona has 120,000 entries, but not interfaced with the system here. What are the major problems there? And I'll take anybody who can comment on this. Perhaps Chief Johnson, you know? Or Mark, if you have any ideas? Is it solely privacy issues? Many of those have a federal nexus, and that's something that we can deal with here. So I'm interested in -- in why it is that it's so difficult to have some of the mental health records entered into the system?

Chief, first? Do you want to take this?

J. JOHNSON: Well, Governor O'Malley in the state of Maryland last week introduced his plans to increase significantly data into the national instant criminal background check system. Senator, you are right. Maryland could do much better in this area, no question about it.

FLAKE: Is -- is this an issue with Maryland or any other state? And I'm not trying to pick on Maryland at all. I -- I assume it's similar with every state out there. I just had the figures for Maryland. But is that an issue of just resources? Or are there privacy concerns that prevent them from offering this information?

J. JOHNSON: I think there's confusion. Data that I've seen indicates some 18 states submit less than 100 records to -- to the system. I think there's confusion amongst -- amongst the medical community and even fear. Well, how does HIPPA affect the release of this information and this data system? And I do believe, as the president's plan has called for, incentive -- incentivize states to participate would drastically help this -- this problem.

FLAKE: Mark, do you want to comment on that?

Gordon Declaration 01952

KELLY: Yes, Senator. Thank you for your kind words. Gabby misses being here as well.

Case 2:17-cv-00903-WBS-KJN   Document 40-6   Filed 06/15/17   Page 76 of 175

Of those 121,800 records that Arizona has not submitted to the background check system, I -- I don't know why. I imagine it could be something. It might be a matter of resources. You know, maybe the funding isn't there to have the manpower to do that. Possibly -- maybe there isn't the will. Maybe for some reason in the state of Arizona, maybe they don't have a desire to share that information.

I don't know, but I can guarantee you after this hearing I'm going to try to find out.

FLAKE: All right.

KELLY: I'll get back to you.

FLAKE: And so will I. I think that that's an area from the testimony today and what we know of this situation where we have I think a real impact here. And so I thank you all for your testimony, especially Mark and Gabby for being here.

KELLY: Thank you.

LEAHY: Thank you, Senator Flake.

And Senator Blumenthal, I'll recognize you next. And I would just note, as everybody probably assumes, you and I have had a number of discussions since the tragedy in Connecticut, including one phone call I recall when you were just about to meet with some of the families.

And I have relied a great deal on your -- both your expertise, your law enforcement background but also the fact that you are from Connecticut.

Senator Blumenthal?

BLUMENTHAL: Thank you. Thank you, Mr. Chairman.

I want to express my appreciation to you for your sensitivity and your condolences, and so many of my colleagues for theirs as well and the expressions that we've had this morning and also, obviously, for convening this hearing, which is a beginning -- hardly an end -- just a first step in what I hope will be a call to action that Newtown has begun and action that is really bipartisan.

Whatever the impressions that may be left by this morning's proceedings, I think there is a real potential for bipartisan common ground on this issue, because we certainly have more in common than we have in conflict on this issue.

And I speak as a former prosecutor, having served as attorney general in the state of Connecticut for 20 years, but also as a

Gordon Declaration 01953

United States attorney, a federal prosecutor for four and a half years.

And I want to thank all of the members of the panel for your patience and your staying power today. It has been a very informative and worthwhile hearing.

But I want to say a particular thanks, as others have, to Captain Kelly and to Gabby Giffords for your courage and strength in being here today; and to all of the victims and their families -- Steve Barton, who is here from Connecticut, who was a victim in Aurora; many of the Sandy Hook families who are not here today, I know who are here in spirit.

Mark and Jackie Barden, who lost their wonderful son Daniel at Sandy Hook, wrote a profoundly moving and inspiring piece in today's Washington Post.

And Mr. Chairman, if there's no objection, I'd like to submit it for the record. It's entitled, "Make the Debate Over Guns Worthy of Our Son."

LEAHY: Without objection.

BLUMENTHAL: To Chief Johnson, you are here not only in a personal capacity but, in my view, as representing and reflecting the courage and heroism of the tens of thousands of law enforcement community, police and firefighters and first responders across the country who every day brave the threat of gunfire and are often outmanned or outgunned by criminals.

And I want to thank you for your service to our nation, as I do Captain Kelly for his in our military.

And just to say, you know, I was in Sandy Hook within hours of the shooting at the fire house where parents went to find out whether their children were alive. And I will never forget the sights and sounds of that day when the grief and pain was expressed in the voices and faces of those parents.

As much evil as there was on that day in Newtown, there was also a tremendous heroism and goodness: The heroism and goodness of the educators who perished literally trying to save those children by putting themselves between the bullets and their children. And the heroism of those first responders and police who ran into that building to stop the shooter not knowing that he was dead when they did. And their being there in fact stopped the tragedy.

So I want to thank also the community of Sandy Hook. I've spent countless hours there, the better part of three weeks after the shooting and most recently this past weekend, the dedication of a memorial and then time with one of the families.

And their strength and courage, I think, has been an inspiration to the country and very, very important to advancing an agenda of making our nation safer.

And one way they've done it -- one way, not the exclusive or only way, has been through a pledge called the Sandy Hook Promise. This promise I would like to read. Have it on a chart here.

Gordon Declaration 01954

BLUMENTHAL: It is "I promise to honor the 26 lives lost at Sandy Hook Elementary School. I promise to do everything I can to encourage and support common-sense solutions that make my community and our country safer from similar acts of violence.

Case 2:17-cv-00903-WBS-RJN   Document 40-6   Filed 06/15/17   Page 78 of 175

I promise this time there will be change. I'm proud to say Steve Barton, Gabby Giffords and Mark Kelly have made the Sandy Hook promise. Tens of thousands of Americans in Connecticut and across the country have made that promise, as have I.

So I want to ask Mr. LaPierre, will you make the Sandy Hook promise?

LAPIERRE: Senator, our Sandy Hook promise is -- is always to make this country safer, which is why we've advocated immediately putting police, armed security in schools, fixing the mental health system, computerizing the records of those mentally adjudicated. I would hope we could convince some of these companies that are just -- I'm not talking about First Amendment, I know they have a right to do it, to stop putting out such incredibly violent video games that desensitize.

And -- and finally we need to enforce the reasonable gun laws on the books and NRA support that -- that we do not do.

(CROSSTALK)

BLUMENTHAL: I'll take that as a yes?

(CROSSTALK)

LAPIERRE: That will make the country safer.

BLUMENTHAL: Can I take that as a yes?

LAPIERRE: Yes. That's a yes.

BLUMENTHAL: Thank you.

LAPIERRE: We're -- we have 11,000 police...

(CROSSTALK)

BLUMENTHAL: And can I -- can I invite and urge you to advocate that your members, responsible gun owners, and I thank them for being responsible gun owners, also join in the Sandy Hook promise? LAPIERRE: Senator there is not a -- a law-abiding firearms owner across this United States that wasn't torn to pieces by what happened in Sandy Hook. They just don't believe that their constitutional right to own a firearm, and the fact that they can protect their family with a firearm is -- is -- resulted in the problem.

Gordon Declaration 01955

(CROSSTALK)

BLUMENTHAL: Let me ask you this, Mr. LaPierre. You and I agree there ought to be more prosecutions of illegal gun possession, and illegal gun ownership.

LAPIERRE: You know the problem, Senator is I've been up here on this Hill for 20-some years agreeing to that, and nobody does it. And that's the problem. Every time we say we're going to do it -- I -- I make you this bet right now, when President Obama leaves office four years from now, his prosecutions will not be much different than they are now. If each U.S. attorney did ten a month, they'd have 12,000. If they did 20 a month, they'd have 24,000. Let's see if we get there.

BLUMENTHAL: Chief Johnson, you've -- you've testified very persuasively on the need for better background checks. Do you believe those background checks ought to be applied to ammunition purchases, as well as firearms purchases?

J. JOHNSON: Our organization supports background checks on ammunition sales.

BLUMENTHAL: Thank you. And Captain Kelly, I am just about out of time, but I -- I would like to ask you if you may, you supported better background checks, as a -- an advocate of the Second Amendment, and I join you in believing that Americans have a strong and robust right to possess firearms, it's the law of the land. Do you also believe that better background checks on firearms purchases would help make both Arizona, and our nation safer?

KELLY: Absolutely, Senator. While we were having this hearing, and we certainly don't know the details, but in Phoenix, Arizona there is another, what seems to be possibly a -- a shooting with multiple victims. And it doesn't seem like anybody has been killed, but the initial reports are three people injured in Phoenix, Arizona with multiple shots fired. There's 50 or so police cars on the scene. And I certainly agree with you, Sir that, you know a universal background check that's effective, that has the mental health records in it, that has the criminal records in it, will go a long way to saving and -- saving people's lives.

BLUMENTHAL: And improving the quality of information in the...

KELLY: Absolutely.

BLUMENTHAL: ... checks would make a difference. Let me just again thank the panel. My hope is that Newtown will be remembered, not just as a place, but as a promise. And that we use this tragedy as a means of transforming the debate, the discussion, the action that we need to make America safer. Thank you, Mr. Chairman.

LEAHY: Thank you.

Just so everybody understands, we are coming to a close. I'll make an exception to the normal rules. Senator Cruz said he had one more question, let him do that then we will -- then I'll yield to Senator Hirono, the newest member of this committee, and she will have the final word. Senator Cruz?

Gordon Declaration 01956

CRUZ: Thank you, Mr. Chairman. I very much appreciate your -- your allowing me to ask an additional question.

Case 2:17-cv-00903-WBS-KJN   Document 40-8   Filed 06/15/17   Page 80 of 175

I wanted to ask a question of Chief Johnson. Your -- your testimony today was in -- in tension with what I have heard from -- from police officer serving on the ground in the state of Texas, namely that your testimony, as I understand it, was, that in your judgment, stricter gun control laws would -- would prove effective in -- in limiting crime. And the data I have seen suggests that -- that the evidence doesn't support it.

If one looks in the District of Columbia which had district is gun-control laws in this country and banned firearms, we saw that when the ban was implemented in 1976, there were fewer than 200 and homicides that rose to over 350 in 1988, and two over 450 in 1993. That pattern is reflected across major urban centers. Those urban centers that have the strictest gun bans, for example, the city of Chicago unfortunately, suffers from according to the latest statistics 15.9 murders per hundred thousand citizens.

Your city, the city of Baltimore, has 31.3 murders per 100,000 citizens. That contrasts with other major urban areas such as my home town of Houston which does not have strict gun-control laws like the -- the jurisdictions I was talking about, that has a murder rate of 9.2 percent per 100,000, 1/3 of Baltimore's. And in fact, the city of Austin, our capital, has a murder rate of 3.5 per 100,000, 1/10 that of Baltimore.

So, my question to you is, in light of the evidence, what -- what empirical data supports your contention that -- that restricting the rights of law-abiding citizens to possess firearms would -- would decrease crime rather than making people more vulnerable to violent criminals, which is what I would suggest the data indicates has happened when it's been done?

J. JOHNSON: We know that nearly 2 million prohibited purchases were stopped from obtaining their firearms since 1994-2009. Senator, I would tell that your homicide statistics would be much greater and often missed from this conversation is the medical intervention and takes place to day at the EMT in the field to the shock trauma facilities that are very robust in our nation today, these -- this data would be much higher.

I'm here today representing nine major police executive leadership organizations. For the sake of time, I'm not gonna read all of those. I think they're a matter of record.

The problem in areas like Baltimore, and New York, and Chicago with some of the toughest gun regulations and laws in the nation is outside weapons coming in. It's about the background check problem. It is about acquisition of these firearms outside of the normal firearms licensed dealer process. And that's what we have to fix.

In addition, high-capacity magazines or a problem, and certainly we are seeing assault weapons used each and every day in crimes and police are seizing these weapons each and every day. And the -- holistically with the plan that the president's laid out and, frankly (ph), some of the bills that have been put forth, we can make our nation and much safer place.

LEAHY: Thank you.

Gordon Declaration 01957

We've been fortunate to have three new members of this committee, Senator Cruz, Senator Flake and Senator Hirono. And you, Senator, have the last word.

Case 2:17-cv-00903-WBS-KJN   Document 40-8   Filed 06/15/17   Page 81 of 175

HIRONO: Are you saving the best for last, is that it?

LEAHY: Well, I was just saying you get the last word.

You're gonna have to prove whether it's the best, but I -- I would note that both you and Senator Flake -- I occupied the bad seed so you are very patient in waiting. So I thank Senator Blumenthal for bringing the -- representing so well the feelings of the people in Connecticut.

Senator Hirono?

HIRONO: Thank you so much, Mr. Chairman.

I would like to thank the panel for this very lively discussion on what is a highly emotional subject.

HIRONO: And, Captain Kelly, I would like to thank you for being here because Gabby and I were elected to the House of Representatives in the same year and her courage continues to inspire us. And I certainly take to heart her testimony today asking us to do something now to reduce gun violence in our country.

And, Chief Johnson, you are, literally, in the trenches. You're on the firing line and I -- and I certainly give much credence to your testimony.

We have a lot of hunters in Hawaii, so I certainly understand their perspective. And this -- to me, this issue is not about abrogating Second Amendment rights. It is about reasonable limits on those rights.

And one of those areas that has already been deemed reasonable is the requirement for background checks.

And so, what many of us are saying is what has already been deemed reasonable should be a reasonable requirement when guns are sold regardless of how or where they are sold.

So I -- I hope that we can reach bipartisan agreement on the reasonable limit of requiring background checks when guns are sold.

And, Captain Kelly, I do appreciate your starting your testimony today by saying that there is no perfect solution. I know there are all kinds of antecedent environmental issues and -- and community issues that lead to gun violence, but I believe we should do that which is reasonable. so nothing is perfect.

I believe that one of the areas of focus for your organization, Americans for Responsible Solutions, is the mental health part of

Case 2:17-cv-00903-WBS-KJN   Document 40-6   Filed 06/15/17   Page 82 of 175

what we ought to be addressing that leads to gun violence.

Do you have some key suggestions that Congress can take to help address the mental illness problem?

KELLY: Well, thank you, Senator.

Well, you know, first of all, compelling states to share with the federal government the records, the appropriate records, of adjudicated mental illness and criminal records as well, also within the federal government.

I had a conversation with the vice president, who talked specifically about, you know, intergovernment agencies and why -- that there has also been, you know, some issues in certain federal government agencies at times getting the records into the background check system.

So if we could improve the system, close the gun-show loophole, require background checks for private sellers, I think we will go a long way to preventing many of these murders and mass shootings in this country.

We're not going to stop all of them, but there is certainly a reason that we have 20 times the murder rate -- 20 times the murder rate -- of other developed countries. And I think that's unacceptable.

But like -- you know, like you said, we -- you know, as an organization, I certainly think Congress can come together on this issue. We realize there's a problem, and it certainly can be solved.

HIRONO: Captain Kelly, it's one thing when someone has already been deemed to show signs of mental illness, and certainly if there's been any kind of an adjudication, that -- that identification is much easier and therefore that information should get into our system.

It becomes a lot harder when you're trying to determine whether someone is suffering from mental illness and needs help. And often these kinds of signs manifest themselves certainly in the home, but in the schools. And we don't have a lot of psychologists, therapists in our schools.

Would you also support more of those kinds of personnel in our schools so we can help these individuals?

KELLY: You know, absolutely. In the case of Jared Loughner in Tucson, Pima Community College was well aware of -- you know, that he had some form of mental illness. They expelled him over it. Multiple cases of very erratic and disruptive behavior in the classroom and outside the classroom.

But, for some reason, he was not referred, as far as I know, to an appropriate mental health authority for an evaluation. And I know often those need to be voluntary, but his parents, as well.

KELLY: I mean, there seems, in this case, that there was a lack of education within the community to get him some effective

Case 2:17-cv-00903-WBS-KJN   Document 40-6   Filed 06/15/17   Page 83 of 175

treatment. And it's really -- it's actually really sad. Because in his case, as I know in many other cases, often you'll see a man who is paranoid schizophrenic that commits some of these horrific crimes.

But with treatment, they would never have done these things. So, absolutely. I mean, we are going to work -- at Americans For Responsible Solutions, we're going to work to help fix the mental health aspect of this, too.

It is a big part of it. I agree with Mr. LaPierre on that matter. I mean, that is a major issue, but so is a comprehensive, universal, a good background check without a loophole, without holes in it, and getting the data into the system. Those are critical things that can make our communities much safer.

HIRONO: Thank you.

I -- I do have one question for Chief Johnson. This is an area that has not been raised today so far. It has to do with an environment that allows bullying to occur in our schools. And sometimes bullying can lead to violent situations. I'm sure it's happened in Baltimore and just recently in Hawaii, we had a situation in our -- in our schools where bullying led to fights and the school had to be closed.

So, I think that one of the ways that we prevent escalation of violent behavior is to put in place programs that will address the issue of bullying, which takes place in just about -- in every state. Would you -- do you have any thoughts on -- on that?

J. JOHNSON: Yes. The president's plan calls for not only funding and an announcement for additional police officers. And I believe Congress should support these plans. They also call for funding to support additional counselors and psychological service providers as well in the schools.

Certainly, in my particular case and in many jurisdictions across America, we have police officers in all the high schools, and frankly, the middle schools, costing my jurisdiction nearly $8 million a year. And they have a place, but certainly we believe that more needs to be done in this area. In my two school shootings, in both shootings, bullying was alleged to be a factor.

HIRONO: Thank you. Thank you, Mr. Chairman.

LEAHY: Thank you very much.

I want to thank all the witnesses who came here. This was a lengthy hearing. It's the first of others we will have. I think what we're trying to do, and I hope people realize, on this committee we're trying to write laws to protect the public. And I cherish and exercise my Second Amendment rights as I do all my rights under the Constitution.

But I don't think individual rights include weapons of war like landmines or tanks or machine guns or rocket-propelled grenades. And where do we go as we step back from those levels? I came here to have a discussion, hope to build consensus. Obviously, there's more work that needs to be done.

Gordon Declaration 01960

Case 2:17-cv-00903-WBS-KJN   Document 40-6   Filed 06/15/17   Page 84 of 175

I think there is one consensus. We all want to do what we can to prevent future tragedies and put an end to the violence that breaks all our hearts. You know, I live an hour's drive from another country, Canada. I don't see the same kind of problem there. I want to find out how we can stop what is happening. I believe there should be some areas of agreement, and I hope the committee can get together to mark up legislation next month -- this month is virtually over -- and then take it to the floor.

We will respect the diversity of viewpoints represented today. We will have hearings that have other viewpoints. We have to listen to one another. If we start with a basic thing that we abhor the kind of violence we see and the violence I saw years ago as a prosecutor, then let's find which steps (inaudible) for it.

So thank you all -- all five of you -- very, very much.

We stand in recess.

END

Gordon Declaration 01961

# Exhibit 57

Gordon Declaration 01962



**B r a d y   C e n t e r**

**To Prevent Gun Violence**

**Testimony of Brian J. Siebel**
**Senior Attorney**
**Brady Center to Prevent Gun Violence**
**Before the Council of the District of Columbia**
**October 1, 2008**

Thank you, Chairman Mendelson and other members of the Council, for inviting the Brady Center to Prevent Gun Violence to speak at this important committee hearing.

The Brady Center to Prevent Gun Violence and the Brady Campaign to Prevent Gun Violence are the nation's largest organizations working for sensible gun policies. The Legal Action Project of the Brady Center represents victims of gun violence and defends gun laws in the courts.

In addition to the other measures being suggested here today, which we support, the Brady Center and Brady Campaign strongly urge the Council to pass an assault weapons ban, a ban on .50 caliber sniper rifles, and retain its recently-passed ban on high-capacity ammunition magazines, as part of its process of strengthening the District's gun laws in light of the *Heller* decision.

### The Need for An Assault Weapons Ban

Assault weapons had been banned for more than 30 years under the broader D.C. ban on all semiautomatic weapons. However, now that that ban has been repealed, an assault weapon ban is needed to protect the people of the District, visitors, and law enforcement from these particularly dangerous weapons. An assault weapons ban would continue to allow law-abiding citizens to have common pistols in their homes for self-defense, and would remain in compliance with the *Heller* decision. We believe it is imperative for the Council, now that it has legalized common semiautomatic pistols, to restore a ban on military-style assault weapons.

### Assault Weapons Are "Mass Produced Mayhem"

Assault weapons are semiautomatic versions of fully automatic guns designed for military use. Even semiautomatic assault weapons unleash extraordinary firepower. When San Jose, California, police test-fired an UZI, a 30-round magazine was emptied in slightly less than two seconds on full automatic, while the same magazine was emptied in just five seconds on semiautomatic.

The Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") has described assault weapons in stark terms.

Gordon Declaration 01963

Assault weapons were designed for rapid fire, close quarter shooting at human beings. That is why they were put together the way they were. You will not find these guns in a duck blind or at the Olympics. **They are mass produced mayhem.**[1]

Assault weapons have distinct features that separate them from sporting firearms.[2] While hunting rifles are designed to be fired from the shoulder and depend upon the accuracy of a precisely aimed projectile, the military features of semiautomatic assault weapons are designed to enhance their capacity to shoot multiple human targets very rapidly. Assault weapons are generally equipped with large-capacity ammunition magazines that allow the shooter to fire 20, 50, or even more than 100 rounds without having to reload. Pistol grips on assault rifles and shotguns help stabilize the weapon during rapid fire and allow the shooter to spray-fire from the hip position. Barrel shrouds on assault pistols protect the shooter's hands from the heat generated by firing many rounds in rapid succession. Far from being simply "cosmetic," these features all contribute to the unique function of any assault weapon to deliver extraordinary firepower. They are uniquely military features, with no sporting purpose whatsoever.

Accordingly, ATF has concluded that assault weapons "are not generally recognized as particularly suitable for or readily adaptable to sporting purposes" and instead "are attractive to certain criminals."[3] ATF's analysis of guns traced to crime showed that assault weapons "are preferred by criminals over law abiding citizens eight to one.... Access to them shifts the balance of power to the lawless."[4]

It is no accident that when a madman, Gian Luigi Ferri, decided to assault the law offices at 101 California Street in San Francisco, he armed himself with two TEC-9 assault weapons with 50 round magazines, which enabled him to kill eight people and wound six others.[5] Or that the Columbine high school shooters who killed 12 students and a teacher included a TEC-9 assault weapon in their arsenal. Or that James Huberty used an UZI assault pistol and a shotgun to kill 21 people and wound 19 others at a McDonald's in San Ysidro, California.[6] Or that Patrick Purdy used an AK-47 assault rifle to kill five children and wound 29 others and a teacher at an elementary School in Stockton, California. Equipped with a 75-round "drum" magazine, Purdy was able to shoot 106 rounds in less than two minutes.[7] The list goes on.

---

[1] ATF, *Assault Weapons Profile* 19 (1994) (emphasis added).

[2] *Id.* at 20.

[3] DEP'T OF TREASURY, *Study on the Sporting Suitability of Modified Semiautomatic Assault Rifles* 38 (1998).

[4] ATF, *Assault Weapons Profile, supra* note 1, at 19-20.

[5] *Ferri Used Guns That California Ban Does Not Forbid*, SAN FRANCISCO EXAMINER, July 4, 1993.

[6] *Satellite College Campus Helps to Heal the Scars at San Ysidro Massacre*, LOS ANGELES TIMES, Mar. 30, 1989; *A 77-Minute Moment in History That Will Never Be Forgotten*, LOS ANGELES TIMES, July 16, 1989.

[7] *The Kinds of Guns School Killer Used*, SAN FRANCISCO CHRONICLE, Jan. 19, 1989; Michael Taylor & Leslie Guevarra, *Mysterious Scrawlings and Slogans, School Killer's Last Days, Toy Army in his Room*, SAN FRANCISCO CHRONICLE, Jan. 19, 1989.

Gordon Declaration 01964

### Assault Weapons Threaten Law Enforcement

Law enforcement officers are at particular risk from these weapons because of their high firepower, which often leaves them outgunned by criminals. A researcher for the Department of Justice found that

> assault weapons account for a larger share of guns used in mass murders and murders of police, crimes for which weapons with greater firepower would seem particularly useful.[8]

Assault weapons have even been used in a brazen attack at D.C. Police Headquarters. On November 22, 1994, a man armed with a MAC-11 assault pistol walked into Metropolitan Police headquarters and shot and killed Sergeant Henry Daly and FBI Agents Mike Miller and Martha Martinez. The shooter seriously wounded FBI Agent John Kuchta and shot at couches, walls, computers, and desks before shooting and killing himself with Agent Martinez's gun.[9]

In addition, numerous law enforcement officers have been killed with high-firepower assault weapons. Here are a few recent examples:

- **Philadelphia, PA. May 3, 2008.** Officer Stephen Liczbinski was shot and killed by an assault rifle as he was responding to a robbery at a Bank of America branch. Three men robbed the bank and were fleeing when Officer Liczbinski stopped their car and exited his patrol car. At that time, one of the bank robbers opened fire with an SKS assault rifle, striking Liczbinski numerous times. One suspect was eventually shot and killed by police and the other two suspects were arrested and charged with murder.[10]

- **Miami, Florida. September 13, 2007.** Police spotted a vehicle driving erratically and followed it until it stopped in a residential complex. The suspect got out and hopped a fence to the rear of the home; the officers exited their patrol car and went to the front of the home and were granted permission to search by a female resident. The suspect grabbed a high-powered, military-grade rifle and fired at the police officers through a window, killing Officer Jose Somohano. The suspect then exited the house and shot three other officers as he escaped. The shooter was caught later that day but would not relinquish his assault rifle so he was shot and killed by police officers.[11]

---

[8] Christopher S. Koper, *Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003*, U. Penn. Jerry Lee Center of Criminology 87 (June 2004).

[9] Brian Reilly, *Cop killers' guns similar; handgun converted to fiercer weapon*, THE WASHINGTON TIMES, May 1, 1995.

[10] Joseph A. Gambardello, *Liczbinski suspect's girlfriend to stand trial*, PHILADELPHIA INQUIRER, July 17, 2008; *Officer shot, killed after bank robbery*, NBC 10.COM, May 3, 2008; Sergeant Stephen Liczbinski, www.odmp.org, *available at*: http://www.odmp.org/officer/19359-sergeant-stephen-liczbinski (last visited Sept. 30, 2008).

[11] David Ovalle et. al., *The murder and the manhunt started in a South Miami-Dade townhouse, zigzagged...*, MIAMI HERALD, Sept. 15, 2007.

Gordon Declaration 01965

- **Chantilly, Virginia. May 8, 2006.** A teenager with an AK-47 and 5 handguns engaged in a firefight at a police station in suburban Virginia, killing Detective Vicky Armel immediately and wounding two other officers, one of whom, Officer Michael Garbarino, died nine days later from his injuries.[12]

The threat posed to law enforcement is one reason why major law enforcement organizations are united in supporting bans on assault weapons.

### Assault Weapons Threaten Civilians

Assault weapons have also been used to massacre and terrorize civilians. Who can forget the nightmare we lived through in the District of Columbia and surrounding communities during the attacks committed by the D.C. snipers. Their weapon of choice? A Bushmaster XM-15 assault rifle.

There have been hundreds of other shootings committed with semiautomatic assault weapons. Here, we list just a few recent examples:

- **Arvada & Colorado Springs, Colorado. December 9, 2007.** One man with an assault rifle attacked a missionary training center in Arvada and a church in Colorado Springs. He killed two people and injured two others in Arvada, and killed two and injured three others, including two teenage sisters, in Colorado Springs. He died after being shot by a security guard and then shooting himself.[13]

- **Omaha, Nebraska. December 5, 2007.** Nine people were shot to death and five others were injured after a 20-year-old shooter, armed with a military-style assault rifle, attacked shoppers in a department store in a Nebraska mall.[14]

- **Indianapolis, Indiana. June 2, 2006.** Seven family members, four adults and three children, were shot and killed in their home by a robber armed with an assault rifle. Nearly 30 shell casings were found.[15]

- **Tyler, Texas. February 25, 2005.** A gunman with a history of domestic violence and a felony conviction, who was reportedly fighting with his ex-wife over child support for their two youngest children, shot over 50 rounds from an SKS assault rifle on the steps of his local courthouse when his ex-wife exited the building. His ex-wife was killed along with a bystander who tried to shoot the gunman. The shooter's 23-year-old son and three law enforcement officers were wounded during the shooting, including a 28-year-old deputy who

---

[12] Ian Urbina, *Fatal police station attach shocks tranquil community*, NEW YORK TIMES, May 10, 2006; *Officer Killed*, BOSTON GLOBE, May 18, 2006.

[13] Erin Emery, *Report details church shooting, the document chronicles the days leading up to the Dec. 9 deaths of four young people*, DENVER POST, Mar. 13, 2008.

[14] *The American Way*, REGISTER-GUARD, Dec. 17, 2007.

[15] Ashley M. Heher, *Suspect in slaying of 7 family members surrenders / Indianapolis police say he had nowhere else to go*, HOUSTON CHRONICLE, June 4, 2006.

4

Gordon Declaration 01966

was in grave condition. The gunman fled the scene but was pursued and shot by police when he exited his car and shot toward officers.[16]

- **Akron, Ohio. February 24, 2005.** A man shot and killed his girlfriend and her seven-year old son using an AR-15 assault weapon, then fired more than one hundred rounds at a dozen law enforcement officers as he fled the murder scene. The gunman was arrested the next morning inside the apartment of a Kent State University student, who he also murdered with the AR-15 assault weapon. Police subsequently seized 21 weapons kept by the suspect, including an Uzi and an AK-47.[17]

### Assault Weapons Threaten Homeland Security

These weapons pose particular and severe risks for homeland security here in the Nation's Capital. The extraordinary firepower of these weapons could wreak havoc at any number of high-profile sites or events that occur in Washington, or victimize any number of high-profile targets, from government officials to foreign dignitaries.

And make no mistake: these weapons have great appeal for terrorists. The oft-seen file footage of Osama Bin Laden, aiming his AK-47 at an unknown target, is now a familiar reminder of the incontrovertible connection between terrorism and assault weapons.

The *Chicago Tribune* has reported that, found among the mounds of rubble at a training facility in Kabul for a radical Pakistan-based Islamic terrorist organization, was a manual entitled "How Can I Train Myself for Jihad" containing an entire section on "Firearms Training."[18] Tellingly, the manual singles out the United States for its easy availability of firearms and stipulates that al-Qaeda members living in the United States "obtain an assault weapon legally, preferably AK-47 or variations."

Terrorists have used assault weapons in numerous attacks. I am going to mention just one that is close to home.

- **Langley, Virginia, January 25, 1993.** Pakistani national Mir Aimal Kasi killed two CIA employees and wounded three others outside the entrance to CIA headquarters in Langley, Virginia. Kasi used a Chinese-made semiautomatic AK-47 assault rifle equipped with a 30-round magazine purchased from a Northern Virginia gun store.[19] After fleeing the country, he was arrested in Pakistan in 1997.[20]

---

[16] Bill Hanna & Jack Douglas Jr., *Rampage in Tyler leaves three dead, four wounded*, FORT WORTH STAR-TELEGRAM, Feb. 25, 2005; Jack Douglas Jr. & Bill Hanna, *Police order emergency trace on weapon used in shootings*, FORT WORTH STAR-TELEGRAM, FEB. 26, 2005.

[17] Ed Meyer, *Police eye semiautomatic rifles, Brimfield officials want to be prepared after recent shooting rampage that killed 3 people*, AKRON BEACON JOURNAL, Feb. 24, 2005.

[18] Paul Salopek, *A Chilling Look into Terror's Lair*, CHICAGO TRIBUNE, Nov. 18, 2001.

[19] *CIA Killings Prompt Scrutiny on 2 Fronts: Fairfax Loophole Expedited Gun Purchase*, WASHINGTON POST, Feb. 11, 1993.

[20] Robert O'Harrow, Jr., *Kansi's Shadowy Stay in U.S. Leaves a Hazy Portrait*, WASHINGTON POST, Mar. 3, 1993.

5

Gordon Declaration 01967

## .50 Caliber Sniper Rifles Pose Serious Dangers

Fifty caliber sniper rifles also pose an extraordinary risk in the District. In 1987, Barrett Firearms Manufacturing Inc., patented its self-described "armor-penetrating" .50 caliber BMG sniper rifle.[21] Capable of destroying armored personnel carriers, aircraft and bulk fuel and ammunition sites, the .50 caliber sniper rifle is now proliferating in the civilian market.[22] Accurate at up to 2,000 yards, it can inflict effective damage to targets over four miles away.[23] With more power on impact then any other semi-automatic rifle legally available on the civilian market,[24] the .50 caliber represents a serious threat to local law enforcement and national security. A 2004 report on airport security at Los Angeles International Airport warned that terrorists could use .50-caliber sniper rifles to target parked and taxiing airplanes "firing over 50 shots in five minutes."[25] The Council should take action to prohibit the possession of these weapons in civilian hands.

## High-Capacity Magazines Increase Firepower

The threat posed by military-style assault weapons is increased significantly if they can be equipped with high-capacity ammunition magazines, defined as those accepting more than ten rounds. The 1994-2004 federal ban on assault weapons also banned these magazines. By permitting a shooter to fire more than ten rounds without reloading, they greatly increase the firepower of mass shooters. For example, the shooter at Virginia Tech equipped himself with numerous high-capacity magazines of up to 30 rounds, which enabled him to get off nearly 200 rounds in his attack. In self-defense situations, too much firepower is a hazard, because the tendency is for defenders to keep firing until all bullets have been expended, which poses grave risks to others in the household, passersby, and bystanders.

## Assault Weapons Bans Already In Place

Six states currently ban assault weapons. Those include California, which passed the nation's first statewide ban in May 1989, as well as New Jersey (1990), Hawaii (1991), Connecticut (1993), Maryland (1994), Massachusetts (1998), and New York (2000). California expanded its ban in 2000 to include all semiautomatic rifles or pistols that have the ability to accept a detachable magazine and contain any one of a series of military-style features. We strongly support that legislation as a model for the District of Columbia.

---

[21] Carolyn Marshall, *California Bans Large Caliber Guns, and the Battle is on*, NEW YORK TIMES, Jan. 4, 2005.

[22] *See*, Government Accounting Office for U.S. House of Representatives, Committee on Government Reform, *Long Range 50 Caliber Sniper Weapons* 4 (May 3, 1999).

[23] *Id.*

[24] *Id.* at 3.

[25] Donald Stevens, *Near Term Options for Improving Security at Los Angeles International Airport*, RAND (2004).

Gordon Declaration 01968

In addition, from 1994-2004, there was a federal ban on assault weapons. Plus, as mentioned above, ATF currently bans assault weapons from being imported into this country because they are not weapons suitable for sporting purposes.

### Banning Assault Weapons and Sniper Rifles Is Consistent with *Heller*

A ban on assault weapons and .50 caliber sniper rifles would be constitutional and consistent with the Supreme Court's decision in *District of Columbia v. Heller*. In *D.C. v. Heller*, the Supreme Court narrowly defined the Second Amendment as protecting the right of law-abiding citizens to keep and use guns in the home for self-defense. At the same time, the Court indicated that the right to keep and bear arms is limited in a number of ways. The Court made clear that the Second Amendment does not entitle citizens to any and all guns. Certainly, military-style assault weapons and .50 caliber sniper rifles are not a part of this right. The Court held that not all "arms" are protected.

> We also recognize another important limitation on the right to keep and carry arms. [*U.S. v.*] *Miller* said, as we have explained, that the sorts of weapons protected were those **"in common use at the time."** We think that limitation is fairly supported by the historical tradition of prohibiting carrying of **"dangerous and unusual weapons."**[26]

Assault weapons and .50 caliber sniper rifles are certainly "dangerous and unusual weapons" according to any reasonable analysis of that phrase. They are military-style offensive weapons designed to slaughter human beings. This differentiates them from all hunting rifles and shotguns, as well as common handguns, which are often used in crime but have also been used in self-defense.

Moreover, assault weapons and .50 caliber sniper rifles are not "in common use." As semiautomatic versions of machine guns developed for use during the World Wars of the 20th Century, assault weapons are a relatively recent invention. Plus, ATF has twice concluded, after thorough analyses in 1989 and 1998, that assault weapons have no sporting purpose. And the Barrett .50 caliber sniper rifles was patented a mere twenty-one years ago, and was made for military, not civilian use.

Finally, assault weapon bans have been challenged in court, but have never been struck down as unconstitutional under the Second Amendment or under right to bear arms provisions in state constitutions.[27]

### Conclusion

Outside of the military or law enforcement, assault weapons and .50 caliber sniper rifles have no place in civilized society. We would urge the D.C. Council to adopt a ban on these weapons. Thank you.

---

[26] *District of Columbia v. Heller*, 128 S.Ct. 2783 (2008).

[27] *See, e.g., Benjamin v. Bailey*, 662 A.2d 1226 (Conn. 1995); *Robertson v. Denver*, 874 P.2d 325 (Colo. 1994); *Arnold v. City of Cleveland*, 616 N.E.2d (Ohio 1993).

7

Gordon Declaration 01969

# Exhibit 58

Gordon Declaration 01970

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **JUNE SHEW, et al.** | : | **No. 3:13-CV-0739 (AVC)** |
| *Plaintiffs*, | : | |
| | : | |
| **v.** | : | |
| | : | |
| **DANNEL P. MALLOY, et al.** | : | |
| *Defendants*. | : | **SEPTEMBER 30, 2013** |

## AFFIDAVIT OF CHRISTOPHER S. KOPER

1. My name is Christopher S. Koper.  I am over eighteen years of age and I believe in the obligations of an oath.

2. I have read the Plaintiffs' First Amended Complaint in the above captioned matter, and am familiar with the claims set forth therein.

3. I am an Associate Professor for the Department of Criminology, Law and Society at George Mason University, in Fairfax, Virginia, and a senior fellow at George Mason's Center for Evidence-Based Crime Policy.  A copy of my curriculum vitae is attached to the Defendants' motion as Exhibit 27.

4. I have been studying firearms issues since 1994.  My primary areas of focus are firearms policy and policing issues.

5. In 1997, my colleague Jeffrey Roth and I conducted a study on the impact of Title XI, Subtitle A of the Violent Crime Control and Law Enforcement Act of 1994 (hereinafter the "federal assault weapons ban" or the "federal ban"), for the United States Department of Justice and the United States Congress.[1]  I updated our original 1997 study in 2004,[2] and briefly revisited the issue again by re-examining my 2004 report in 2013.[3]  My 2004

---

[1]     Jeffrey A. Roth & Christopher S. Koper, *Impact Evaluation of the Public Safety and Recreational Firearms Use Protection Act of 1994: Final Report* (1997), attached to Defendants' motion as Exhibit 28 (hereinafter, "*Koper 1997*").

[2]     Christopher S. Koper, *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003* (2004), attached to Defendants' motion as Exhibit 29 (hereinafter, "*Koper 2004*").

[3]     Christopher S. Koper, *America's Experience with the Federal Assault Weapons Ban, 1994-2004: Key Findings and Implications,* ch. 12, pp. 157-71 in Reducing Gun Violence in America: Informing Policy with Evidence and Analysis (Daniel S. Webster & Jon S. Vernick eds. 2013), attached to Defendants' motion as Exhibit 30 (hereinafter "*Koper 2013*").

1

and 2013 reports are the best resources for understanding my analysis of the impact of the federal ban.  My 1997 report was based on limited data, especially with regard to the criminal use of large capacity magazines.  As a result, my conclusions on the impact of the federal ban are most accurately and completely set forth in my 2004 and 2013 reports.

6. To my knowledge, the reports I authored are the only published academic studies to have examined the impacts of the federal bans on assault weapons and ammunition feeding devices holding more than ten rounds of ammunition (hereinafter referred to as "large-capacity magazines" or "LCMs").[4]

## SUMMARY OF FINDINGS

7. Based on my research, I found, among other things, that assault pistols are used disproportionately in crime in general, and that assault weapons more broadly were disproportionately used in murder and other serious crimes in some jurisdictions for which there was data.  I also found that assault weapons and other firearms with large capacity magazines are used in a higher share of mass public shootings and killings of law enforcement officers.

8. The evidence also suggests that gun attacks with semiautomatics—especially assault weapons and other guns equipped with large capacity magazines—tend to result in more shots fired, more persons wounded, and more wounds per victim, than do gun attacks with other firearms.  There is evidence that victims who receive more than one gunshot wound are substantially more likely to die than victims who receive only one wound.  Thus, it appears that crimes committed with these weapons are likely to result in more injuries, and more lethal injuries, than crimes committed with other firearms.

9. In addition, there is some evidence to suggest that assault weapons are more attractive to criminals, due to the weapons' military-style features and particularly large magazines.

10. Based on these and other findings in my studies discussed below, it is my considered opinion that Connecticut's recently strengthened ban on assault weapons and newly enacted ban on large capacity magazines,[5] and in particular its ban on LCMs which is in some ways stronger than the federal ban that I studied, is likely to advance Connecticut's

---

[4]     As discussed below, there have been some additional studies about the impact and efficacy of the federal assault weapons ban conducted by non-academic institutions.  In 2011, for example, the *Washington Post* published the results of its own investigation into the federal ban's impact on the criminal use of LCMs in Virginia.  *See* ¶¶57, 74, 81, *infra*.  I also am aware of gun tracing analyses conducted by the federal Bureau of Alcohol Tobacco and Firearms (2003 Congressional Q&A memo provided to the author) and the Brady Center to Prevent Gun Violence (2004).  These analyses are consistent with the findings of my studies regarding the decline in assault weapons as a percentage of crime gun traces between the pre-ban and post-ban periods.

[5]     *See generally* Public Act 13-3, An Act Concerning Gun Violence Prevention And Children's Safety (hereinafter, "the Act").

Gordon Declaration 01972

interest in protecting public safety. Specifically, it has the potential to: (1) reduce the number of crimes committed with assault weapons and other firearms with large capacity magazines; (2) reduce the number of shots fired in gun crimes; (3) reduce the number of gunshot victims in such crimes; (4) reduce the number of wounds per gunshot victim; (5) reduce the lethality of gunshot injuries when they do occur; and (6) reduce the substantial societal costs that flow from shootings.

## I.   Criminal Uses and Dangers of Assault Weapons and LCMs

11. The precise definition of "assault weapon" varies among the different federal, state, and local jurisdictions that have adopted bans on such weapons, although there is substantial overlap. Assault weapons are usually defined as a subset of semiautomatic weapons,[6] and generally include semiautomatic pistols, rifles, and shotguns with military features that are conducive to military and potential criminal applications, but that are unnecessary in shooting sports or for self-defense.

12. The ability to accept a detachable magazine, including large capacity magazines, is a common feature in most assault weapon definitions, including Connecticut's. However, LCMs can be and frequently are used with guns that fall outside of the definition of assault weapon.

13. One of the core rationales for banning or otherwise limiting the availability of both assault weapons and LCMs is that they are particularly dangerous, insofar as they are capable of and facilitate the wounding and killing of larger numbers of people because of their capacity for rapid firing of high numbers of rounds in a short period of time. The evidence supports this rationale. As discussed more fully below, attacks with semiautomatics—especially assault weapons and other guns with LCMs—generally result in more shots fired, persons wounded, and wounds per victim than do other gun attacks. *See Koper 2004,* p. 97. The rapid fire capability of these weapons thus increases the number and lethality of injuries from gun violence in which they are used.

14. Likely due to these characteristics, assault weapons and LCMs have been frequently and disproportionately used in mass public shootings and murders of law enforcement officers, crimes for which firearms with greater firepower would seem to be particularly desirable and effective. *See Koper 2004,* pp. 14-19, 87.

15. During the 1980s and early 1990s, for example, assault weapons and other semiautomatic firearms equipped with LCMs were involved in a number of highly publicized mass

---

[6] A semiautomatic weapon is a gun that fires one bullet for each pull of the trigger and, after each round of ammunition is fired, automatically loads the next round and cocks itself for the next shot. This semiautomatic firing action permits a faster rate of fire relative to non-semiautomatic firearms. Semiautomatics, however, are not to be confused with fully automatic weapons (*i.e.*, machine guns), which fire continuously so long as the trigger is depressed. Fully automatic weapons have been illegal to own in the United States without a federal permit since 1934. *See Koper 2004*, p. 4 n.l.

Gordon Declaration 01973

shootings.  These incidents heightened public concern about the accessibility of high powered, military-style weaponry, and other guns capable of discharging high numbers of rounds in a short period of time.  Such incidents include:

- On July 18, 1984, James Huberty killed 21 persons and wounded nineteen others in a San Ysidro, California McDonald's restaurant, using an Uzi carbine, a shotgun, and another semiautomatic handgun equipped with a 25-round LCM;
- On January 17, 1989, Patrick Purdy used a civilian version of the AK-47 military rifle and a 75-round LCM to open fire in a schoolyard in Stockton, California, killing five children and wounding twenty nine other persons;
- On September 14, 1989, Joseph Wesbecker, armed with an AK-47 rifle, two MAC-11 handguns, a number of other firearms, and multiple 30-round magazines, killed seven and wounded fifteen people at his former workplace in Louisville, Kentucky;
- On October 16, 1991, George Hennard, armed with two semiautomatic handguns with LCMs (and reportedly a supply of extra LCMs), killed twenty two people and wounded another twenty three in Killgren, Texas; and
- On December 7, 1993, Colin Ferguson, armed with a handgun and multiple LCMs, opened fire on commuters on a Long Island Rail Road train, killing six and wounding nineteen.

*See Koper 2004,* p. 14.[7]

16. More recently, in the years since the expiration of the federal ban in 2004, there have been numerous other mass shooting incidents involving previously banned assault weapons and/or LCMs.  Since 2007, for example, there have been at least fifteen incidents in which offenders using assault-type weapons or other semiautomatics with LCMs have wounded and/or killed eight or more people.[8]  Some of the more notorious of these incidents, both nationally and in Connecticut, include:

---

[7]     Additional details regarding these incidents were obtained from: Violence Policy Center, *Mass Shootings in the United States Involving High-Capacity Ammunition Magazines* (Washington, D.C. 2012) (hereinafter, "Violence Policy Center 2012"); Mark Follman, Gavin Aronsen & Deanna Pan, *US Mass Shootings, 1982-2012: Data from Mother Jones' Investigation* (updated Feb. 27, 2013), *available at* http://www.motherjones.com/politics/2012/12/mass-shootings-mother-jones-full-data (hereinafter, "Follman, Aronsen & Pan 2013"); and Mark Follman, Gavin Aronsen & Jaeah Lee, *More Than Half of Mass Shooters Used Assault Weapons and High-Capacity Magazines* (Feb. 27, 2013), *available at* http://www.motherjones.com/politics/2013/02/assault-weapons-high-capacity-magazines-mass-shootings-feinstein (hereinafter, "Follman, Aronsen & Lee 2013").

[8]     *See* Violence Policy Center 2012; Follman, Aronsen & Pan 2013; Follman, Aronsen & Lee 2013.  The reference above to 15 cases is based on a tabulation from these sources.

Gordon Declaration 01974

- Blacksburg, Virginia, April 16, 2007: Student Seung-Hui Cho killed thirty three (including himself) and wounded seventeen on the campus of Virginia Tech., armed with a handgun and multiple LCMs;
- Binghamton, New York, April 3, 2009: Jiverly Wong killed fourteen (including himself) and wounded four at the American Civic Association immigration center, armed with two handguns and a 30-round LCM;
- Tucson, Arizona, January 8, 2011: Jared Loughner, armed with a handgun and multiple LCMs, killed six and wounded thirteen, including Congresswoman Gabrielle Giffords and a federal judge;
- Aurora, Colorado, July 20, 2012: James Holmes killed twelve and wounded fifty eight in a movie theater, armed with a Smith & Wesson M&P15 assault rifle, 100-round LCMs, and other firearms; and
- Newtown, Connecticut, December 14, 2012: Adam Lanza killed twenty six (twenty of whom were young children) and wounded two at Sandy Hook Elementary School, armed with a Bushmaster AR-15-style assault rifle, two handguns, and multiple LCMs.[9]

*See Koper 2013,* p. 157-58.

## A. Assault Weapons

17. Though estimates are imprecise, assault weapons represented only a small percentage of the gun stock in this country when the federal ban was enacted, accounting for less than 1% of the gun stock around 1990 and about 2.5% of guns produced domestically between 1989 and 1993. This suggests that they likely accounted for 1% or less of the civilian gun stock at the time of the ban.  Numerous studies suggest, however, that assault weapons accounted for up to 8% of guns used in crime overall before the federal ban, with most studies suggesting they accounted for about 2%.  Further, evidence from studies of gun buyers suggests that assault pistols are at higher risk of being used in crime than other types of handguns.

18. In addition, there is some evidence that assault weapons are used more disproportionately in certain kinds of serious crime—in particular mass public shootings and killing of law enforcement officers—relative to their market presence.

19. Several local and national police data sources that my colleagues and I analyzed indicate that, before the ban went into effect, the most common assault weapons prohibited by the federal ban accounted for up to 6% of murders, up to 9% of murders of law enforcement officers, up to 13% of all mass shootings in which four or more people died (figures discussed below show that assault weapons are more heavily represented in mass public shootings and mass shootings involving particularly high numbers of victims), and up to 4% of other serious crimes.  *See Koper 2004,* p. 15.

---

[9]     Additional details regarding these incidents were obtained from: Violence Policy Center 2012; Follman, Aronsen & Pan 2013; and Follman, Aronsen & Lee 2013.

Gordon Declaration 01975

20. While the evidence suggests that assault weapons are used in a small share of gun crimes overall, these weapons pose particular dangers in connection with two very visible and destructive aspects of crime and violence: mass shootings and murders of police. *See Koper 2004,* pp. 14-19, 87.

21. For example, evidence from before the federal ban indicates that assault weapons and other semiautomatics with LCMs were involved in 40% of mass shooting incidents that occurred between 1984 and 1993 in which six or more persons were killed or a total of 12 or more were wounded. *See Koper 2004,* p. 14.[10]

22. More recently, a media investigation by *Mother Jones* magazine analyzed and compiled data on sixty two public mass shooting incidents that involved the death of four or more people between 1982 and 2012.[11]  That study indicates that 42% of the incidents involved an assault weapon, and more than half of the perpetrators possessed assault weapons, LCMs, or both.

23. Working under my direction, a graduate student at George Mason University recently analyzed the *Mother Jones* data for his Master's thesis, and compared the number of deaths and fatalities across cases that involved assault weapons and large capacity magazines, and those that did not.  With regard to assault weapons, although he found no difference in the average number of fatalities, he did find an increase in gunshot victimization.  Specifically, he found that an average of 11.04 people were shot in public mass shootings involving assault weapons, compared to 5.75 people shot in non-assault weapon cases.  This is a statistically significant finding, meaning that it was not likely due to chance.  As a result, the total average number of people killed and injured in assault weapon cases was 19.27, compared to 14.06 in non-assault weapon cases.[12]

24. Assault weapons also appear to be used in a disproportionately high number of shootings of law enforcement officers.   Specifically, although prior to the federal ban they represented less than 5% of crime guns in most data sources my colleagues and I analyzed, they were involved in 7% to 9% of gun murders of police from 1992 to 1994, and as many as 16% of gun murders of police in 1994 (the same year that the ban went into effect).  *See Koper 2004,* p. 15 & n.l2; *Koper 1997,* pp. 98-100.

25. This disproportionate use of assault weapons in these crimes is consistent with other data suggesting that the military features and large ammunition capacity of assault weapons

---

[10]      These figures are based on tabulations that I and my research team did using data reported in Gary Kleck, *Targeting Guns: Firearms and Their Control* (1997), pp. 124-26, 144.

[11]      This investigation and compilation of data on mass shootings was done by reporters at *Mother Jones* magazine. *See* Follman, Aronsen & Pan 2013; Follman Aronsen & Lee 2013; Mark Follman, Gavin Aronsen & Deanna Pan, *A Guide to Mass Shootings in America* (updated Feb. 27, 2013), *available at* http://www.motherjones.com/politics/2012/07/mass-shootings-map.

[12]      *See* Dillon, Luke. (2013). *Mass Shootings in the United States: An Exploratory Study of the Trends from 1982 to 2012*. Master's thesis. Fairfax, VA: Department of Criminology, Law and Society, George Mason University.

Gordon Declaration 01976

make them more attractive to criminals overall, and in particular to offenders with serious criminal histories, than to non-criminal gun owners. Perhaps the best evidence of this comes from a study of young adult handgun buyers in California that found buyers with minor criminal histories (*i.e.*, arrests or misdemeanor convictions that did not disqualify them from purchasing firearms) were more than twice as likely to purchase assault pistols than were buyers with no criminal history (4.6% to 2%, respectively). Those with more serious criminal histories were even more likely to purchase assault pistols: 6.6% of those who had been charged with a gun offense bought assault pistols, as did 10% of those who had been charged with two or more serious violent offenses. The study also found that assault pistol purchasers were more likely to be arrested subsequent to their purchases than were other gun purchasers. Among handgun purchasers with prior histories of violence, those who purchased assault-type pistols were three times as likely as other handgun purchasers to be subsequently charged with a new offense involving guns or violence. *See Koper 2004,* pp. 17-18.

26. Although less reliable, some survey studies have indicated even higher ownership of assault weapons among criminals and other high-risk individuals, particularly urban gang members. *See Koper 2004,* p. 16.

**B.  LCMs**

27. LCMs appear to present even greater dangers to crime and violence than assault weapons alone, in part because they are more prevalent and can be and are used as ammunition feeding devices in both assault weapons and non-assault weapons.

28. Prior to the federal assault weapon and LCM bans, for example, guns with LCMs were used in roughly 13-26% of gun crimes. *See Koper 2004,* pp. 15, 18-19; *Koper 2013,* pp. 161-62.

29. And, in New York City, the New York State Division of Criminal Justice Services reported that, in 1993, at least 16%, and as many as 25%, of guns recovered in murder investigations were equipped with LCMs. *See Koper 2004,* p. 18.[13]

30. Like assault weapons, it also appears that firearms (assault and non-assault) with LCMs have been used disproportionately in killings of law enforcement officers. The available data indicates that LCMs were used in somewhere between 31% and 41% of gun murders of police before enactment of the federal ban. *See Koper 2004,* p. 18; *Koper 2013,* p. 162.

31. The evidence of public safety threat posed by LCMs is even stronger in the context of public mass shootings. Prior to the federal ban semiautomatics with LCMs (including assault weapons) were involved in 40% of the mass shooting incidents that occurred

---

[13]  The minimum estimate is based on cases in which discharged firearms were recovered, while the maximum estimate is based on cases in which recovered firearms were positively linked to the case with ballistics evidence. *See Koper 2004,* p. 18 n.15.

Gordon Declaration 01977

between 1984 and 1993 in which six or more persons were killed or a total of 12 or more were wounded.  *See Koper 2004,* p. 14; *Koper 2013,* p. 161.  And the recent *Mother Jones* investigative report shows that, since 1982, half of all public mass shooters who killed four or more persons possessed LCMs when carrying out their attacks.[14]

32. Firearms with LCMs, both assault-type and non-assault-type, also are more destructive and cause more death and injury in gun crime.

33. As discussed above, for example, a graduate student at George Mason University, working at my direction, recently analyzed the *Mother Jones* data as part of his Master's thesis.  He compared cases where an LCM was known to have been used (or at least possessed by the shooter) against cases where either an LCM was not used or known to have been used.  He found that the LCM cases (which included assault weapons) had significantly higher numbers of fatalities and casualties; an average of 10.19 fatalities in LCM cases compared to 6.35 fatalities in non-LCM/unknown cases.  He found an average of 12.39 people were shot but not killed in public mass shooting involving LCMs, compared to just 3.55 people shot in the non-LCM/unknown LCM shootings.  These findings reflect a total victim differential of 22.58 killed or wounded in the LCM cases compared to 9.9 in the non-LCM/unknown LCM cases.[15]  All of these differences were statistically significant and not a result of mere chance.

34. In my own studies, I similarly found that from 1984 through 1993, offenders who clearly possessed assault weapons or other semiautomatics with LCMs on average wounded or killed more than twice as many victims compared to offenders who used other kinds of weapons (an average of twenty nine victims compared to thirteen) in mass shooting incidents that resulted in at least six deaths or at least twelve total gunshot victims.  *See Koper 2004,* pp. 85-86; *Koper 2013,* p. 167.

35. Localized studies of gunshot victimizations also corroborate this conclusion.  Between 1992 and 1995, gun homicide victims in Milwaukee who were killed by guns with LCMs had 55% more wounds than those victims killed by non-LCM firearms.  *See Koper 2004,* p. 86.

36. In Jersey City in the 1990s, criminals who used semiautomatic pistols fired roughly 23% to 61% more shots and wounded 15% more people than did those who used revolvers.  Although only 2.5% of those attackers fired more than ten shots, those incidents had a 100% injury rate and accounted for nearly 5% of all gunshot victims. *Koper 2004,* p. 84-85, 90-91; *Koper 2013,* p. 167.

---

[14]     *See* Follman, Aronsen & Lee 2013.

[15]     *See* Dillon, Luke. (2013). *Mass Shootings in the United States: An Exploratory Study of the Trends from 1982 to 2012.* Master's thesis. Fairfax, VA: Department of Criminology, Law and Society, George Mason University.  The patterns were also very similar when comparing the LCM cases against just those cases in which it was clear that an LCM was not used (though this was a very small number).

Gordon Declaration 01978

37. The trend in more lethal and injurious outcomes of crimes committed with LCMs repeated itself in Baltimore.  In an analysis I conducted of guns recovered by police in that city, I found, among other things, that guns used in incidents where a victim was shot were 17% to 26% more likely to have LCMs than guns used in gunfire cases with no wounded victims.  Similarly, guns linked to murders were 8% to 17% more likely to have LCMs than guns linked to non-fatal gunshot victimizations. *See Koper 2004,* p. 87.

38. In short, while tentative, the available evidence suggests that, more often than not, attacks with semiautomatics—particularly those equipped with LCMs—result in more shots fired, more victims, and more wounds per victim.  Increased numbers of shots fired in a gunfire incident is significant because it increases the number of gunshot victims, and because gunshot victims who are shot more than once are 63% more likely to die than victims who receive only one wound.  *See Koper 2004,* p. 87.

## II.  The 1994 Federal Assault Weapons Ban

### A.  Provisions of the Federal Assault Weapons Ban

39. The federal assault weapons ban, which was enacted on September 13, 1994, prohibited and restricted the manufacture, transfer, and possession of certain semiautomatic firearms designated as assault weapons and certain LCMs.  Pub. L. No. 103-322, tit. XI, subtit. A, 108 Stat. 1796, 1996-2010 (1994).

40. The federal assault weapons ban expired on September 13, 2004 by operation of the statute, and was not renewed by Congress.  *Id.* § 1101 05(2).

*Banned assault weapons and features*

41. The federal ban was not a prohibition on all semiautomatic firearms; rather, it was directed against those semiautomatics firearms having features that are useful in military and criminal applications, but that are unnecessary or unsuitable in shooting sports or for self-defense.

42. Banned firearms were identified under the federal law in two ways.  First, the federal ban specifically prohibited eighteen models and variations of semiautomatic weapons by name (*e.g.,* the Intratec TEC-9 pistol and the Colt AR-15 rifle), as well as revolving cylinder shotguns.  The list also included a number of foreign rifles that the federal government had banned from importation into the country beginning in 1989 (*e.g.,* the Avtomat Kalashnikov models).  Several of the weapons banned by name were civilian copies of military weapons that accepted ammunition magazines made for those military weapons.[16]

---

[16]     A list of the weapons banned by name in the 1994 law is set forth in Table 2-1 of *Koper 2004,* p. 5.

Gordon Declaration 01979

43. Second, the federal ban contained a "features test" provision that generally prohibited other semiautomatic weapons having two or more military-style features. Examples of such features include pistol grips on rifles, flash suppressors, folding rifle stocks, threaded barrels for attaching silencers, and the ability to accept detachable magazines.[17]

### Banned LCMs

44. The federal ban also prohibited most ammunition feeding devices that could hold more than ten rounds of ammunition, which I have referred to herein as "large capacity magazines" or "LCMs." The federal ban extended to LCMs or similar devices that had the capacity to accept more than ten rounds of ammunition, or that could be "readily restored or converted or to accept" more than ten rounds of ammunition.[18]

### Exemptions and limitations to the federal ban

45. The federal ban contained several broad exemptions that delayed its impact. *See Koper 2004,* pp. 10-11. First, assault weapons and LCMs manufactured before the effective date of the ban were "grandfathered" in, and thus remained legal to not only own but also to transfer. Estimates suggest that there may have been upward of 1.5 million assault weapons and 25 to 50 million LCMs exempted from the federal ban. The statute also allowed the importation of an additional 4.8 million pre-ban LCMs into the country from 1994 through 2000, and an additional 42 million pre-ban LCMs from 2000-2004. *See Koper 2004,* p. 10; *Koper 2013,* pp. 160-61.

46. Furthermore, although the federal ban prohibited "copies or duplicates" of the assault weapons enumerated in the act, federal authorities applied this prohibition only to exact copies in enforcing this provision. The federal ban also did not apply to a semiautomatic weapon possessing only one military-style feature.[19] Thus, many civilian rifles patterned after military weapons were legal under the ban with only slight modifications. *See Koper 2004,* pp. 10-11.[20]

---

[17] The "features test" of the federal assault weapon ban is described more fully in Table 2-2 of *Koper 2004,* p. 6, and in Table 12-1 of *Koper 2013,* p. 160.

[18] The federal ban exempted attached tubular devices capable of operating only with .22 caliber rimfire ammunition.

[19] Notwithstanding these "grandfathering" exemptions, any firearms imported into the country still must meet the "sporting purposes test" established under the federal Gun Control Act of 1968. In 1989, ATF determined that foreign semiautomatic rifles having any one of a number of named military features (including those listed in the features test of the federal ban) fail the sporting purposes test and cannot be imported into the country. In 1998, ATF added the ability to accept a LCM made for a military rifle to the list of disqualifying features. Consequently, it was possible for foreign rifles to pass the features test of the federal assault weapons ban but not meet the sporting purposes test for imports. *See Koper 2004,* p. 10 n.7.

[20] Examples of some of these modified, legal versions of banned guns are listed in Table 2-1 of *Koper 2004,* p. 5.

10

**B. Impact of the Federal Assault Weapons Ban**

*Assault weapons*

47. Prior to the federal ban, the best estimates suggest that there were approximately 1.5 million privately owned assault weapons in the United States as of 1993, and they likely accounted for 1% or less of the total civilian gun stock. *See Koper 2013,* pp. 160-61; *Koper 2004,* p. 10.

48. Manufacturers increased production and sale of assault weapons during the Congressional debate about the federal ban that was ultimately enacted in 1994. This surge in demand helped drive up the prices for many assault weapons (notably assault pistols) and appeared to make them less accessible and affordable to criminal users. *See Koper 2013,* pp. 162-63; *Koper 2004,* pp. 25-38.

49. After the federal assault weapons ban was enacted in 1994, crimes with assault weapons declined. In particular, across six major cities (Baltimore, Miami, Milwaukee, Boston, St. Louis, and Anchorage), the share of gun crimes involving assault weapons declined by 17% to 72%, based on data covering all or portions of the 1995-2003 post-ban period. *See Koper 2004,* pp. 2, 46-60; *Koper 2013,* p. 163.

50. The pattern from these six major cities is consistent with that found in the national data on guns recovered by law enforcement and reported to the federal Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") for investigative gun tracing.[21] Specifically, although the interpretation is complicated by changes in tracing practices that occurred during this time, the national gun tracing data suggests that use of assault weapons in crime declined after 1994 because the percentage of gun trace requests submitted to ATF involving assault weapons fell 70% between 1992/93 and 2001/02 (from 5.4% to 1.6%). And, notably, this downward trend did not begin until 1994, the year the federal ban became effective. *See Koper 2004,* pp. 2, 39-46, 51-52; *Koper 2013,* p. 163.[22]

51. In short, my research and analysis indicates that the criminal use of assault weapons declined after the federal assault weapons ban was implemented in 1994, independently of trends in gun crime. *See Koper 2004,* pp. 51-52; *Koper 2013,* p. 163.

52. The reduction in the use of assault pistols in crime was the biggest factor in criminal use of assault weapons. Assessment of trends in the use of assault rifles was complicated by

---

[21]   A gun trace is an investigation that typically tracks a gun from its manufacture to its first point of sale by a licensed dealer. It is undertaken by the ATF, upon request by a law enforcement agency. The trace is generally initiated when the requesting law enforcement agency provides ATF with a trace request including identifying information about the firearm, such as make, model and serial number. For the full discussion of the use of ATF gun tracing data, *see* section 6.2 of *Koper 2004,* pp. 40-46.

[22]   These findings are consistent with other tracing analyses conducted by ATF and the Brady Center to Prevent Gun Violence. *See Koper 2004,* p. 44 n.43.

11

the rarity of crimes with such rifles and by the substitution in some cases of post-ban rifles that were very similar to the banned models, but remained legal with slight modification. *See* ¶46, *supra*. The decline in assault weapon use was not completely offset by use of substitution assault weapon-type models. Even counting these substitute models, the share of crime guns that were assault weapons fell 24% to 60% across most of the local jurisdictions studied. Patterns in the local data sources also suggested that crimes with assault weapons were becoming increasingly rare as the years passed. *See Koper 2004,* pp. 46-52; *Koper 2013,* pp. 163-64.

53. Arriving at a nationwide estimate of the number of assault weapons crimes prevented due to the federal ban is made more complicated by the range of estimates of assault weapon use and changes therein derived from different data sources. Notwithstanding these complexities, it is my opinion based on my review of multiple data sources that the federal ban prevented a few thousand crimes with assault weapons annually. For example, using 2% as the best estimate of the percentage of gun crimes involving assault weapons prior to the ban, and 40% as a reasonable estimate of the post-ban drop in this figure, implies that almost 2,900 murders, robberies, and assaults with assault weapons were prevented in 2002 as a result of the federal ban. *See Koper 2004,* p. 52 n.61.[23]

   *LCMs*

54. Assessing trends in LCM use is much more difficult because there was, and is, no national data source on crimes with LCMs, and few local jurisdictions maintain this sort of information. Also LCMs, unlike firearms, do not have serial numbers and therefore are not always uniquely identifiable.

55. It was nevertheless possible to examine trends in the use of guns with LCMs in four jurisdictions: Baltimore, Milwaukee, Anchorage, and Louisville. In all four jurisdictions, the overall share of crime guns equipped with LCMs rose or remained steady through at least the late 1990s. This failure to reduce overall LCM use for at least several years after the federal ban was likely attributable to the immense stock of exempted pre-ban LCMs, which, as noted, was enhanced by post-ban imports. *See Koper 2004,* pp. 68-79; *Koper 2013,* p. 164.

56. Notwithstanding that initial increase, the criminal use of LCMs may have been starting to drop by the early 2000s. *See Koper 2013,* p. 164; *Koper 2004,* pp. 68-79. Although the data in the four cities I investigated were too limited and inconsistent to draw any clear overall conclusions in this regard, such a deferred decline in LCM use would make sense because of the grandfathering provision in the federal law, which delayed the

---

[23]   It is likely that many of these crimes still were committed with other guns that the perpetrator substituted for the banned assault weapon. Even if that is the case, however, for the reasons discussed it is likely that the number of victims per shooting incident, and the number of wounds inflicted per victim, was diminished in some of those instances in which an assault weapon or LCM was no longer available to the assailant.

12

effectiveness of the ban by requiring more time for grandfathered LCMs to be taken out of circulation.

57. A later investigative study by the *Washington Post* in January 2011 provides some additional evidence that the ban may have reduced crimes with LCMs by the time it expired in 2004. In its study, the *Washington Post* analyzed data maintained by the Virginia State Police about guns recovered in crimes by local law enforcement officers across the state. Those data indicated that between 1994 and 2004, the period the federal ban was in effect, the share of crime guns with LCMs declined by roughly 31% to 44%, and then rebounded after the ban was allowed to expire. Specifically, although the percentage of recovered crime guns with LCMs generally ranged between 13% and 16% from 1994 through 2000, by the time the ban had a chance to run its full course through 2004 that percentage fell to 9% of crime guns recovered. Following expiration of the federal ban in 2004, the share of Virginia crime guns with an LCM rose again to 20% of recovered crime guns by 2010. *See Koper 2013,* p. 165.[24]

58. Although it is difficult to extrapolate the Virginia data to the nation as a whole, these data do suggest that the federal ban may have been reducing the use of LCMs in gun crime by the time it expired in 2004, and that it could have had an even stronger impact had it remained in effect.

### *Results of the Federal Assault Weapons Ban*

59. The federal ban's exemption of millions of pre-ban assault weapons and LCMs meant that the effects of the law would occur only gradually, and that those effects were growing when the ban expired in 2004. Nevertheless, while the ban did not appear to have a measurable effect on overall gun crime in terms of crimes committed (due to criminals' ability to substitute other guns in their crimes), the evidence does suggest a significant impact on the number of gun crimes involving assault weapons. Had it remained in effect over the long-term, moreover, it could have had a potentially significant impact on the number of crimes involving LCMs.

---

[24]   The results of the *Washington Post's* original investigation (which are conveyed in *Koper 2013,* p. 165) are reported in David S. Fallis & James V. Grimaldi, *Va. Data Show Drop in Criminal Firepower During Assault Gun Ban*, Wash. Post, Jan. 23, 2011, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2011/01/22/AR2011012203452.html. Earlier this year, the *Post* updated this analysis and slightly revised the figures it reported by identifying and excluding from its counts more than one thousand .22-caliber rifles with large-capacity tubular magazines, which were not subject to the federal ban (and which are similarly not subject to Connecticut's ban). *See* David S. Fallis, *Data Indicate Drop in High-Capacity Magazines During Federal Gun Ban,* Wash. Post, Jan. 10, 2013, *available at* http://www.washingtonpost.com/investigations/data-point-to-drop-in-highcapacity-magazines-during-federal-gun-ban/2013/01/l0/d56d3bb6-4b91-11e2-a6a6-aabac85e8036_story.html.   This updated data, is reported above.

Gordon Declaration 01983

60. These implications are important.  By reducing the number of crimes in which assault weapons and LCMs are used and forcing criminals to use less lethal weapons and magazines, the federal ban could have potentially prevented hundreds of gunshot victimizations annually.  It also could have reduced the lethality and injuriousness of those gunshot victimizations that do occur by reducing the number of wounds per victim. *See Koper 2004*, p. 87.

61. Using the Jersey City data as a tentative guide, it is possible that the federal ban eventually could have reduced gunshot victimizations by up to 5% if it had remained in effect long enough to meaningfully reduce the number of LCMs in circulation.  *See Koper 2013*, p. 167.  Although that may be a small percentage, based on 2010 statistics from the Center for Disease Control and Prevention it would correlate to 3,241 fewer people being wounded or killed as a result of gun crime on an annual basis.  *See id.*  Even if the federal ban's effect would not have been that substantial, however, a smaller reduction in the number and lethality of gunshot victimizations could still have yielded significant societal benefits.

62. In addition to the inherent benefits of such reductions, the federal ban also potentially could have produced millions of dollars of cost savings per year in medical care alone.  Some studies have shown, for example, that the lifetime medical costs for gunshot injuries are about $28,894 (adjusted for inflation).  Even if the federal ban would have been able to reduce gunshot victimizations by only 1%, that would result in roughly $18,781,100 in lifetime medical cost savings from the shootings prevented each year.[25] *See Koper 2013,* pp. 166-67; *see also Koper 2004,* p. 100 n.118.

63. The cost savings potentially could have been substantially higher if one looks beyond just medical costs.  For example, some estimates suggest that the full societal costs of gun violence—including medical, criminal justice, and other government and private costs (both tangible and intangible)—could be as high as $1 million per shooting.  Based on those estimates, even a 1% decrease in shootings could result in roughly $650 million in cost savings to society from shootings prevented each year.  *See Koper 2013,* pp. 166-67.

## III.   The Act Concerning Gun Violence Prevention And Children's Safety

64. As noted above, the State of Connecticut recently enacted the Act Concerning Gun Violence Prevention And Children's Safety ("the Act").  Among other things, the Act strengthened Connecticut's existing ban on assault weapons, which was similar to the standards set forth in the 1994 federal assault weapons ban.  It also imposed a new ban on LCMs.  I examine these prohibitions and restrictions on assault weapons and large-capacity magazines, and opine as to their potential impact and likely efficacy, below.[26]

---

[25]   These savings calculations are based on a report by the federal Centers for Disease Control and Prevention which indicated that there were 64,816 gun homicides and other non-fatal assault-related shootings in the United States in 2010.  *See Koper 2013,* pp. 166-67.

[26]   The Act is a comprehensive law that contains many other provisions, including new regulations on long guns, ammunition, firearm storage, mental health, and school safety.  It also

## A.  Connecticut's Assault Weapons Ban

65. In the Act, Connecticut strengthened its existing assault weapons ban by updating the list of enumerated weapons and the military features test to make it more stringent, and more consistent with modern assault weapon features.   Like the 1994 federal ban, Connecticut's previous ban consisted of both a list of specifically prohibited firearms, and a "features test" that generally prohibited semiautomatic weapons having two or more military-style features and, for rifles, that also had a detachable magazine.

66. The Act broadens the assault weapon ban by including a number of additional specifically identified semiautomatic centerfire rifles, semiautomatic pistols, and semiautomatic shotguns.   It also prohibits any semiautomatic centerfire rifle or semiautomatic pistol that has a fixed magazine with the ability to accept more than ten rounds of ammunition, and any semiautomatic shotgun that has the ability to accept a detachable magazine or a revolving cylinder.   P.A. 13-3, § 25(1)(B)-(D); *id.*, § 25(1)(E)(ii), (v), (vii), (viii).

67. It also provides that any semiautomatic centerfire rifle or semiautomatic pistol that has an ability to accept a detachable magazine need only have one of the listed enumerated military-style features to qualify as an assault weapon (instead of the two feature requirement that existed previously).   It also amended the number and type of those prohibited features.  *Id.*, § 25(1)(E)(i), (iv).

68. The Act does not ban any weapons that were lawfully possessed prior to its effective date.   Thus, those who lawfully possessed assault weapons at that time may continue to do so as long as they obtain a certificate of possession for it and possess it in compliance with all applicable state laws and regulations.  *Id.*, § 28(a), (f)

## B.  Connecticut's LCM Ban

69. The Act also imposed a ban on LCMs which, as noted, largely mirrors the 1994 federal ban.  P.A. 13-3, § 23.   As with assault weapons, the Act does not ban any LCMs that were lawfully possessed prior to its effective date.   Those who lawfully possessed an LCM at that time may continue to do so as long as they declare it to the Department of Emergency Services and Public Protection, and possess it in compliance with all applicable state laws and regulations.  *Id.*, § 23(e)(3), § 24(a), (f).

70. One important difference between the Connecticut and federal LCM ban is that, unlike the federal ban, the Act prohibits any individual who possesses a grandfathered LCM from selling or transferring it to another individual.   Importantly, moreover, LCMs

---

establishes a deadly weapon offender registry, and increases the penalties for certain gun-related offenses.  I limit my analysis here to Connecticut's bans on assault weapons and large-capacity magazines.

Gordon Declaration 01985

generally may not be imported into the state after the Act's effective date, including those produced before the effective date of the Act.  *Id.*, § 23(b), (d), (f).

## C.  The Potential Impact and Efficacy of Connecticut's Bans

71. The Act was only recently passed and not all of its provisions have gone into effect, and I have not undertaken any study or analysis of its effects.  Nevertheless, it is my considered opinion that, based on the similarities of the Act to the federal ban, the impacts of the federal ban and the ways in which the Act address some of the weaknesses of the federal ban, the Act is likely to advance Connecticut's interest in protecting public safety.

72. First, the Act strengthens the assault weapons ban by moving it to a "one-feature" test rather than the "two-feature" test that existed under the federal ban and Connecticut's original ban.  This change is likely to substantially limit—if not eliminate—the ability of gun manufacturers to quickly adopt minor cosmetic changes to their firearms that make them technically legal but that circumvent the purpose and effect of the law to remove military style assault weapons from civilian use.  In doing so, the Act is likely to meaningfully limit the number of weapons with military-style characteristics considered conducive to criminal applications in Connecticut, and to further reduce the use of such weapons in crime.

73. Second, Connecticut's LCM ban is more robust than the expired federal ban, and may be more effective more quickly.  Unlike the grandfather provision in the federal ban, the grandfathered LCMs in Connecticut may not be sold or transferred after the effective date of the Act.  Unlike the experience under the federal ban, moreover, banned LCMs in Connecticut may not be imported into the state after the Act's effective date.  Although these changes will not eliminate the lag in effectiveness created by the grandfather provision, they likely will minimize it and thereby reduce the time it otherwise would take for the benefits of the LCM ban to take hold.

74. Even with the grandfather provision, it is my opinion that Connecticut's LCM ban is likely to have a meaningful impact on gun crime if allowed to operate over the long-run.  As discussed, the analogous grandfather provision in the federal ban and the immense stock of pre-ban LCMs that existed in this country delayed any impact that the federal LCM ban could have had on the use of such weapons in crime.  The *Washington Post* study found, however, that the number of recovered crime guns with LCMs in Virginia nevertheless was beginning to substantially decline just as the ban expired.  This suggests that, had the federal ban been renewed by Congress in 2004 and not allowed to expire, it could have had a meaningful impact on the use of such weapons in crime.  That impact likely would have increased the longer the ban remained in effect.  Thus, although Connecticut's LCM ban contains an analogous grandfather provision, it is reasonable to assume that it likewise would have a meaningful impact on the use of LCMs in crime if allowed to operate over the long-term.

75. If that is the case, it is likely that the Act could have a meaningful impact on public safety.  As discussed above, *see* ¶¶8, 32-38, *supra*, the available evidence suggests that

16

attacks with semiautomatics, particularly assault weapons and other semiautomatics equipped with LCMs, result in more shots being fired, leading to both more injuries and injuries of greater severity.  If the Act is allowed to operate over the long-term, it should reduce the number of LCMs in circulation and thereby reduce the number and lethality of gunshot victimizations.  The potential benefits to victims and their families is obvious, and may well reduce the associated medical costs and overall costs to society.  *See Koper 2004,* pp. 83-91, 100 n.118.

76. While the Act's provisions prohibiting and restricting assault weapons and large-capacity magazines certainly will not be a panacea for the gun violence epidemic in Connecticut or the United States more broadly, they appear to be reasonable and well-constructed measures that, like federal restrictions on fully automatic weapons and armor-piercing ammunition, will help prevent the spread of particularly dangerous weaponry.

77. In sum, therefore, it is my considered opinion, based on my nineteen years as a criminologist studying firearms generally and my detailed study of the federal assault weapon ban in particular, that Connecticut's bans on assault weapons and large-capacity magazines, and particularly its ban on LCMs, have the potential to prevent and limit shootings in the state over the long-run.  In doing so, the Act is likely to advance Connecticut's interest in reducing the harms caused by gun violence.

## IV.  Plaintiffs' and *Amici's* Reliance On My Reports

78. I have read the Plaintiffs' brief in support of their motion for preliminary injunction (Document No. 15), their brief submitted in support of their motion for summary judgment (Document No. 62), and their Local Rule 56(a)(1) statement (Document No, 61).  I also have read the briefs submitted by the *amici* in support of the Plaintiffs' motion (Document Nos. 33, 34, and 36).  I hereby respond to those parties' reliance on, and characterizations of, the findings and conclusions in my reports.

79. As a general matter, the Plaintiffs and *amici* frequently cherry pick isolated statements from my studies and take them out of context.  While the majority of their references to my works accurately quote from my reports, in most instances they do not reflect the totality of my discussion or the conclusions that I actually reached.  The Plaintiffs and *amici* also rely heavily on my 1997 report which, as discussed above, was for the most part superseded by the more complete and up to date evidence contained in my 2004 and 2013 reports.  I respond to some specific representations made by the Plaintiffs and *amici* below.

80. First, in the *amicus* brief filed by Pink Pistols, that group states that my reports support the conclusion that "this kind of legislation has no discernible impact on firearms violence."  (Doc. 36 at 27).  Specifically, they quote a variety of statements in my 1997 and 2004 reports to the effect that there is little evidence that such bans will have an impact on the lethality and injuriousness of gun violence based on indicators such as the number of victims per gun homicide incident, the number of gunshot wounds per victim,

or the proportion of gunshot victims with multiple wounds.  (*Id.* at 27-28 and n.71).  In doing so, Pink Pistols does not fully convey the conclusions in my reports.

81.   My research revealed that gun crimes involving assault weapons and other guns with LCMs do result in more shots fired, more victims shot, more gunshots per victim, and more lethal injuries.  Although it is true that my research team and I cannot clearly credit the federal ban with decreasing gunshot victimizations during the time it was in effect, as explained in my report, that is due in large part to the delay in the ban's effectiveness caused by its grandfather provision and the large stock of pre-ban LCMs that remained in circulation.[27]   In other words, had the federal ban remained in effect long enough to reduce the stock of those pre-ban LCMs—which the *Washington Post* study suggests it may have begun to do just as it expired in 2004—it is more likely that we would have seen a corresponding drop in the gun violence lethality indicators discussed above.[28]

82.   Pink Pistols also quotes my 2004 report for the proposition that, "[s]hould it be renewed, the ban's effects on gun violence are likely to be small at best and perhaps too small for reliable measurement", that "the evidence is not strong enough for us to conclude that there was any meaningful effect [on gun violence] (i.e., that the effect was different from zero)", and that "there is not a clear rationale for expecting the ban to reduce assaults and

---

[27]   Pink Pistols cites my 1997 report for the proposition that "in fact, both 'victims per incident' and 'the average number of gunshot wounds per victim' *actually increased* under the Ban—although not by a statistically significant margin."  (Document 36 at 28 n.71, citing *Koper 1997* at 85-86, 88, 91).  Notably, the increase to which I referred in my 1997 report occurred during a period in which we also saw an increase in the use of LCMs in gun crime due to the federal ban's grandfathering provision and the large numbers of LCMs being imported into the country.  *See* ¶¶55-58, *supra*.  If anything, therefore, that finding corroborates the link between LCMs and increased lethality of gunshot victimizations.

[28]   Pink Pistols contends that I concluded in my 2013 report that the *Washington Post* study nevertheless "showed no discernible reduction in the lethality or injuriousness of gun violence during the post-ban years."  (Doc. 36 at 29 n.75, quoting *Koper 2013,* p. 165).  That is incorrect.  My research team and I did not examine the *Washington Post* data to determine whether the drop in LCM use in Virginia during the last years of the federal ban correlated to a drop in the lethality or injuriousness of gun crime in that jurisdiction.  Rather, our examination of the lethality of gun crime in the 2004 report was based on national data and data from a selected number of localities outside of Virginia.  Further, the analyses in the 2004 report were limited to the first several years of the federal ban (they covered different portions of the 1995-2002 period, and most extended only through the late 1990s or through 2001), during which time we had not yet observed a reduction in the use of LCMs in crime.  The *Washington Post* data suggests that LCM use may have declined more appreciably by 2004, but this was beyond the period I had studied for the 2004 report to the U.S. Department of Justice.  Consequently, my conclusion that there was "no discernible reduction in the lethality or injuriousness of gun violence" during earlier portions of the ban when we had not seen a drop in LCM use in gun crime has no bearing on whether there would be such a reduction once the number of LCMs used in crime began to drop.

Gordon Declaration 01988

robberies with guns."  (Doc. 36 at 27-29).  While those are accurate quotes, they do not fully reflect the conclusions in my report on the efficacy of this kind of legislation.

83. Because criminals and mass shooters will be able to substitute legal firearms for the banned assault weapons and LCMs, it is true that this kind of legislation is unlikely to substantially reduce overall gun violence in terms of the number or rate of crimes committed.  One should not conclude from that, however, that such bans will have no effect on public safety.  As discussed above, if allowed to operate over the long-run, such bans can potentially reduce the number and lethality of gunshot victimizations by forcing criminals to substitute assault weapons and other weapons with LCMs with less destructive firearms.  The effects on gun deaths and injuries overall would likely be small in percentage terms (and thus they could be difficult to measure reliably), but, as discussed above, even small reductions in gunshot victimizations could produce significant societal benefits.

84. Pink Pistols similarly cites my 2004 report for the proposition that "[s]tudies of state-law bans on AWs and LCMs likewise found that such bans 'have not reduced crime.'" (Document 36 at 28 and n.73, quoting *Koper 2004*, p. 81 n.95).  That, again, does not accurately reflect my conclusions in the 2004 report.  In discussing the effect of state assault weapons bans, I noted that there are a few studies that have suggested that such bans have not reduced crime.  I specifically noted, however, that it is hard to draw definitive conclusions from these studies for the following reasons: (1) there is little evidence on how state assault weapon bans affect the availability and use of assault weapons; (2) studies have not always examined the effects of these laws on gun homicides and shootings, the crimes that are arguably most likely to be affected by assault weapon bans; and (3) the state assault weapon bans that were passed prior to the federal ban (those in California, New Jersey, Hawaii, Connecticut, and Maryland) were in effect for only three months to five years (two years or less in most cases) before the imposition of the federal ban, after which they became largely redundant with the federal legislation and their effects more difficult to predict and estimate.  Perhaps more importantly, most of these state laws either lacked LCM bans or had LCM bans that were less restrictive than that of the federal ban or Connecticut's ban.  Pink Pistols ignores these important qualifications that undermine the usefulness of the cited studies.

85. Second, both the National Rifle Association ("NRA") and the Law Enforcement Legal Defense Fund ("LELDF") argue that banning large capacity magazines will not advance public safety.  In support of that conclusion they cite the findings in my reports that assailants fire an average of less than four shots in gun crimes, and rarely fire more than ten shots.  (Doc. 33 at 19; Doc. 34 at 9-10).  While those references to my studies are correct, they also do not fully reflect my conclusions.

86. Based on my study with Darin Reedy of handgun attacks in Jersey City, NJ, I found that assailants fired more than ten shots in 2.5% to 3% of gunfire incidents.  As discussed above, however, my report specifically explains that those incidents had a 100% injury rate, and were responsible for 4.7% of the gunshot victimizations in our sample.  The *amici* ignore this crucial piece of data, which was the whole point of that aspect of my

19

discussion in the report. It shows that, while rare, incidents in which more than ten shots are fired are especially lethal and injurious. They produce a disproportionate share of gunshot victimizations and are more likely to result in gunshot injuries or deaths. *See Koper 2004,* pp. 3, 90-91.

87. In addition to taking that data out of context, the *amici* completely ignore one of my central conclusions: gun crimes involving assault weapons and other weapons with LCMs tend to result in more victims wounded, more wounds per victim, and more lethal injuries than do gun crimes committed with other weapons. They likewise ignore the evidence that both assault weapons and other guns with LCMs are used disproportionately in mass killings and murders of law enforcement officers.

88. Third, the *amici* argue that assault weapons bans are not likely to reduce overall gun violence based on the finding in my reports that such weapons are only used in between 2% and 8% of gun crimes. (Doc. 33 at 14; Doc. 34 at 9; Doc. 36 at 27 and n. 69, 70). While these selective references to my studies technically are correct, they are again misleading. It ignores the fact that assault weapons were used more frequently and disproportionately in mass murders and killings of law enforcement officers. It also ignores the fact that gun crimes involving semiautomatics—including assault weapons and other firearms with LCMs—generally result in more shots fired, more victims, and more wounds per victim. Thus, although reducing the number of such weapons may not reduce the overall number of gun crimes due to the weapon substitution effect, it could reduce the number and lethality of gunshot victimizations in crimes in which such weapons otherwise would have been used. Any such reduction in gun crime or gun crime lethality—even if difficult to measure precisely relative to the overall level of gun violence in the nation—would have a meaningful impact for the victims of such crimes, and for society more broadly.

20

The foregoing is true and accurate to the best of my knowledge and belief.


FURTHER AFFIANT SAYETH NOT.


Christopher S. Koper


STATE OF VIRGINIA                    )
                                     )ss:  _Brambleton_____, Virginia
COUNTY OF _Loudoun_____            )


Subscribed and sworn to before me, this _30_ day of September, 2013.


Notary Public
Commissioner of the Superior Court


SARAH YORK CONRAD
NOTARY PUBLIC
Commonwealth of Virginia
Reg. #7365612
My Commission Expires Nov. 30, 2014


21

## **CERTIFICATION**

     I hereby certify that on this 11th day of October, 2013, a copy of the foregoing Affidavit of Christopher S. Koper was filed electronically.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

 

                                                *_/s/ Maura Murphy Osborne_____*
                                                Assistant Attorney General

Gordon Declaration 01992

# Exhibit 59

Gordon Declaration 01993

# CITY ATTORNEY OF SAN FRANCISCO

DENNIS J. HERRERA, CITY ATTORNEY

HOME    ABOUT ⌄    NEWS    CASES ⌄    FILE A CLAIM    OPINIONS

GOOD GOVERNMENT ⌄                                                    🔍

## Connect







# Herrera secures court order to make California communities safer; gun suppliers must halt sale of high-capacity ammo 'repair kits' into state

May 16, 2017

*Settlement agreement includes a 10-year injunction with additional restrictions*

## Subscribe

Sign-up here to get news releases by email.

[ Email (required ]

[ First name (opt ]

Gordon Declaration 01994

SAN FRANCISCO (May 16, 2017) — City Attorney Dennis Herrera today announced that five online gun equipment suppliers have agreed to a stringent 10-year, court-imposed injunction prohibiting them from selling or advertising large-capacity firearm magazines or





"Californians have spoken clearly. We don't want these weapons in our communities," said City Attorney Dennis Herrera on securing a court order prohibiting five online gun equipment suppliers from selling high-capacity ammo 'repair kits' into state.

magazine repair kits to customers in California. The agreement is part of a settlement where the defendants will also face a number of other court-ordered restrictions on their business practices to help ensure that their products do not enter the state.

Herrera sued the suppliers on Feb. 9, 2017 for violating California's prohibition on the sale and advertisement of large-capacity magazines — military-style ammunition holders that can allow shooters to fire dozens of bullets without reloading. Some magazines hold more than 100 rounds of ammunition. According to the lawsuit, the suppliers had been flouting both state and San Francisco law by selling complete but disassembled large-capacity magazines as "repair" or "rebuild" kits to customers in California and San Francisco. The lawsuit was brought on

Last name (opt

Organization (c

Submit

## News Topics

Select Category

**Office of the City Attorney**

City Hall, Room 234

1 Dr. Carlton B. Goodlett Pl.

San Francisco, CA 94102

Hours: M–F, 8 a.m.–5 p.m.

(415) 554-4700 Phone

(415) 554-6770 TTY

info@sfcityattorney.org

Large-capacity magazines make guns significantly more lethal and have been used in high-profile mass shootings across the country, including the 2016 Orlando nightclub massacre, which killed 49 people, and the 2015 San Bernardino attack, which killed 14. California has prohibited their sale, manufacture or import since Jan. 1, 2000 to limit the danger they pose to public safety. State law defines large-capacity magazines as those holding more than 10 rounds of ammunition.

"Californians have spoken clearly. We don't want these weapons in our communities," Herrera said. "I have zero tolerance for gun sellers who try to skirt the law, and we will bring statewide enforcement action when needed. I'm glad we were able to get a tough, enforceable court order against these companies that were flouting the law. "

The settlement agreements were finalized earlier this month, and the court is expected to endorse them in a final judgment today. The defendants have agreed to submit to a stringent, statewide, 10-year injunction that requires them to stop violating the law and to notify California residents that large-capacity magazines may not legally be sold into California. Among other things, defendants have agreed to:

- cease selling large-capacity magazines or repair kits into California;

- notify customers on their websites that these products may not be purchased in California;

- remove California as a billing or shipping option for these items on their websites;

- permanently delete from their sites any suggestion that

these magazines or kits may legally be shipped to California; and

- produce affidavits to the San Francisco City Attorney's Office annually certifying that they have complied with the injunction, and with San Francisco and California law.

The defendants will also collectively pay $22,500 to cover the City Attorney's investigative costs.

"I would like to thank the San Francisco Police Department for their support and cooperation on this case, particularly Officer Joseph Emanuel, who provided compelling expert testimony regarding large-capacity firearms," Herrera said.

The settlement was reached with all of the online retailers that Herrera had sued in February: Badger Mountain Supply, located in Washington; 7.62 Precision in Alaska; Shooters Plus, located in Mississippi; LAK Supply of Wyoming; and Buymilsurp.com, located in Florida.

The companies had falsely represented that California and San Francisco consumers may lawfully purchase disassembled large-capacity magazines as "repair kits." 7.62 Precision, for example, marketed a disassembled magazine as a "California Magazine Rebuild Kit," saying "these parts kits are intended for California customers only." Badger Mountain Supply falsely represented to customers on its website that shipping disassembled magazines in two separate packages was permissible under California law. Shooters Plus' website referenced "ban States such as California" and instructed consumers to "simply click on the magazine/s you need, then click on the checkbox under each magazine that reads 'Convert to Rebuild Kit," which

enabled a customer to purchase a 30-round magazine and convert it to a rebuild kit for $2, for example.

After California's 2000 statewide ban, a number of companies tried to skirt the law by selling these so-called magazine repair kits to California residents. In 2013, Herrera sued four companies over the practice, and the state Legislature strengthened the existing law to specifically outlaw the sale or purchase of such "kits." San Francisco took further action in 2014, enacting a ban on possessing large-capacity magazines, not just buying or selling them. Similarly, state voters in November overwhelmingly approved Prop. 63, which, among other safety steps, will outlaw the possession of large-capacity magazines statewide starting July 1, 2017, with very narrow exceptions.

The case is: *The People of the State of California v. Badger Mountain Supply, Inc., et al*, San Francisco Superior Court, Case No. CGC 17-557010, filed Feb. 9, 2017.  Complete documentation on the case is available on the City Attorney's website at www.sfcityattorney.org

# # #

R E L A T E D

| 🏠 Start | | 🔍 ⚙ 🔁 |
|---|---|---|
| Name | Date modified | Size |
| 📄 7.62 Precisi… | May 16, 2017 17:42 | 216.8 KB |
| 📄 Badger Stip… | May 16, 2017 17:43 | 200.4 KB |
| 📄 Buymilsurp … | May 16, 2017 17:43 | 225.4 KB |
| 📄 Complaint.… | May 16, 2017 19:30 | 13.1 MB |





Shooters Sti... May 16, 2017 17:52        234.1 KB

📁 GUN SAFETY, NEWS

‹ Herrera takes Uber to court to comply with Treasurer's subpoena

› The Facts About Immigration Law

Copyright © 2017 City Attorney of San Francisco • Go to SFGov.org

Gordon Declaration 01999

# Exhibit 60

Gordon Declaration 02000

# LOUIS KLAREVAS

# RAMPAGE NATION

## SECURING AMERICA FROM
## MASS SHOOTINGS



Gordon Declaration 02001

teaches in the Department of Global Affairs at the University of Massachusetts–Boston. He also regularly serves as a consultant to the federal government on national-security matters. A frequent commentator on homeland security and foreign policy, he has appeared on numerous news programs, including CNN, ABC, NPR, and the BBC. In the past, he has taught at American University, George Washington University, City University of New York, and New York University. In addition, he has served as the Defense Analysis Research Fellow at the London School of Economics and a Senior Fulbright Scholar in Security Studies.

# CONTENTS

Preface                                                              9

Acknowledgments                                                     13

## PART 1: PROBLEM

Chapter One: Sandy Hook                                             17

Chapter Two: The Beginning of Wisdom                               31

Chapter Three: A Growing Threat                                     49

## PART 2: PROBE

Chapter Four: Unstable, Angry, Armed Men                           89

Chapter Five: No Place Is Safe                                    131

Chapter Six: Guns Kill, Some More Than Others                     183

## PART 3: PRESCRIPTION

Chapter Seven: Breaking the Trinity                               229

Chapter Eight: The Bad Man's Awe                                  249

Chapter Nine: The New Normal                                      267

7

# THE REAL NUMBERS

It's easy to be dismissive of pundits and partisans, even ones with PhD after their names like John Lott. After all, they often take to the airwaves, the print media, and the blogosphere to impart a variety of assertions about rampage violence, usually with little consequence for being erroneous, biased, or intentionally deceptive. But there's one place where claims don't get a free pass: the courts. Under oath and subject to cross-examination, "experts" aren't afforded an escape from scrutiny during litigation. Case in point: the legal battle over the constitutionality of Colorado's recent ban on large-capacity magazines.

After a mentally disturbed man wielding an assault weapon armed with a 100-round magazine killed twelve and wounded an additional fifty-eight cinema patrons in Aurora, Colorado, the state legislature enacted tight restrictions on the safe, possession, and transfer of any magazines that held more than fifteen rounds of ammunition. The objective of the statute was to reduce the carnage of shooting sprees by limiting the number of bullets a semiautomatic weapon can fire in a single feed. In 2013, this law came under attack when a group of thirty plaintiffs—a combination of gun-rights organizations, firearms dealers, and individual gun owners—asked a federal court to strike it down, arguing that it violated the Second Amendment. At the crux of their case, the plaintiffs asserted that mass shootings are rare to begin with, no magazine restrictions are likely to have little to no positive impact on the casualty tolls of gun attacks. Believing that the ban would have negligible impact on gun violence, they insisted that it unnecessarily infringed on their rights to lawfully own large-capacity magazines.[7]

To help establish their claim, the plaintiffs in Colorado Outfitters Association et al. v. Hickenlooper put criminologist Gary Kleck on the stand to make a key point: "Mass shootings are extremely rare."[72] Perhaps you'll recall the name from the previous chapter. Kleck was the first scholar to define and study mass shootings as a unique subset of gun violence. In the past decade, he has become one of the go-to scholars for the gun-rights movement, earning $350 an hour as an expert witness who testifies against certain gun-control measures.[73] When Kleck conducted his initial study of mass shootings in 1997, he defined them as "incident[s] in which six or more victims

were shot dead with a gun, or twelve or more total were wounded."[74] He has since broadened his definition to "shooting[s] in which more than six people were shot, fatally or nonfatally, in a single incident."[75] While Kleck's conceptualization still maintains a fairly high casualty threshold—remember the emerging consensus is that mass shootings are acts of violence where four or more people are shot—he testified that in the nearly two decades between January 1994 and July 2013, there were only fifty-seven mass shootings in the United States. With fewer than three mass shootings per year, on average, Kleck concluded that any such attack was a "rare event."[76]

On cross-examination, Assistant Attorney General for Colorado Matthew Grove began with a simple question: "So if you missed a quarter of the data, that might be a problem, right?"[77] Kleck admitted it would. When the time came to discuss Kleck's analysis, Grove asked: "You testified earlier that you considered all mass shooting incidents that met your criteria of seven or more killed or wounded, correct?" Again, Kleck confirmed Grove's leading question, acknowledging that there were only fifty-seven such attacks in the twenty-year period he examined.[78] Grove then turned to the data set. Handing Kleck a binder full of exhibits, Grove had Kleck read through each document. Here's a sampling from the transcripts of how this played out:

Q. Please take a moment to read Exhibit 101.... This article is entitled, "Tech worker charged in seven deaths at Massachusetts firm." Correct?

A. That's correct.

Q. And in the second paragraph, it says, "Prosecutors accuse McDermott of acting with premeditation and without mercy when colleagues were shot repeatedly with a 12-gauge shotgun and an assault rifle fed with a 60-round magazine," correct?

A. Yes.

Q. And the next paragraph says, "The seven Edgewater Technology employees were shot a combined 90 times," correct?

A. Correct.

Q. This meets your criteria for inclusion in your report, correct?

A. It does.

Q. And it was not included in [your expert report], right?

A. Correct....

Q. Let's turn to Exhibit 102. . . . Title of this is, "Factory feud is cited in shooting in Indiana." Do you need a moment to read this?

A. Yes, please. Okay.

Q. So the very first sentence of this says, "The factory worker who killed a co-owner of the factory and wounded six others before fatally shooting himself was apparently angered over a dispute." So that's one dead, six wounded, correct?

A. That's correct.

Q. That meets your criteria?

A. Yes, it does.

Q. And you didn't include this in your report, did you?

A. No.[79]

This painful cross-examination continued for approximately forty-five minutes; each time, Kleck confirmed that he had omitted the specific mass shooting from his inquiry.[80] When Grove was finished, he had successfully pointed out that, even under Kleck's high casualty threshold, there were at least twenty-nine mass shootings that the plaintiff's expert failed to report. As Kleck admitted on the stand, "Yes, it's about 50 percent of the ones I analyzed."[81] Earlier, Kleck had testified that investigations that overlooked a quarter of these cases were problematic. Grove had just established that Kleck's analysis—which disregarded at least a third of the data (twenty-nine out of eighty-six cases)—was flawed by his own standards.

Grove followed up by reminding Kleck that, in his official expert report submitted to the court, he asserted "all [mass] shooting incidents were examined."

Kleck backtracked on his claim: "Yes, I did say all. Had I been more precise, I would have said, all that I knew of, or all that I could discover, or words to that effect."

"All would suggest every one, though, right?"

"Well, to me, it suggested all that I knew about," Kleck replied in one final attempt to salvage his testimony. But it was too late.[82]

On June 26, 2014, the judge in the case issued a fifty-page ruling upholding Colorado's restrictions on large-capacity magazines. Kleck's name, let alone his claims, never appeared in the decision. Not even in passing. Meanwhile, the court expressly stated that it accepted the views of the state's expert witness, Jeffrey Zax, who offered testimony

that at times directly contradicted Kleck. It was a signal. Like the pro-gun-rights lawsuit itself, the argument that mass shootings occur too infrequently to merit legislative action was dismissed.[83]

\* \* \*

Testifying under oath, Gary Kleck was forced to acknowledge that mass shootings occur with greater frequency than his research confirmed. In fact, they take place more often than most Americans probably realize—at a higher rate of incidence than even many in the gun-control camp claim. The real numbers are actually quite disturbing.

When I started conducting research for this book, I decided to collect information on every known gun massacre that took place in the United States over the past fifty years. While it was a labor-intensive process that required a full year of searching through a variety of data sets and news banks, I came up with 111 attacks that resulted in six or more people—not including the perpetrator(s)—dying as a result of gunshot wounds (see table 3.2).[84] As these are the deadliest gun attacks of the past five decades, they are the most disconcerting, deserving special attention.

The statistics paint a troubling picture. Since 1966, gun massacres have claimed 904 lives (see figure 3.1). What's most alarming about these extreme acts of violence is that they're taking place with greater frequency, with the sharpest increase in deaths occurring in the past decade (see figure 3.2).[85] Specifically, over one-third (39 out of 111) of gun massacres during the past fifty years occurred in the past decade (2006–2015). That's a 160 percent increase from the previous decade, which only experienced fifteen high-fatality mass shootings (see figure 3.3). Equally disturbing, the total number of people killed in gun massacres in the past decade (349 out of 904) accounts for nearly 40 percent of all murders in such acts of violence during the same fifty-year span (see figure 3.4). This is a massive increase from the previous decade, when only 111 people died in such shootings. The past decade has clearly been the worst, exceeding the second worst (1976–1985) by way more than a third in terms of number of incidents and by more than double in terms of total deaths.[86] It's also the only decade to average roughly nine deaths per attack (see table 3.3).

## Table 3.2. Gun Massacres in the United States, 1966–2015.

| | Date | City | State | Perpetrator(s) | Deaths |
|---|---|---|---|---|---|
| 1 | 8/1/1966 | Austin | TX | Charles Whitman | 14 |
| 2 | 8/26/1966 | New Haven | CT | Arthur Jones | 6 |
| 3 | 9/20/1966 | Lock Haven | PA | Leo Held | 6 |
| 4 | 6/12/1968 | Inwood | NH | Eric Pearson | 6 |
| 5 | 6/25/1968 | Good Hart | MI | Undetermined | 6 |
| 6 | 7/19/1968 | Napa | CA | Charles Boney | 6 |
| 7 | 9/5/1971 | Phoenix | AZ | John Freeman | 6 |
| 8 | 1/7/1972 | Cherry Hill | NJ | Edwin Grace | 6 |
| 9 | 1/7/1973 | New Orleans | LA | Mark Essex | 9 |
| 10 | 6/21/1973 | Pebec Hills | PA | William Workman | 6 |
| 11 | 1/4/1973 | Los Angeles | CA | William Bonner | 7 |
| 12 | 6/9/1973 | Boston | MA | George O'Leary | 6 |
| 13 | 1/14/1973 | Cleveland | OH | Cyril Rowentosk | 7 |
| 14 | 6/9/1973 | Fryette | PA | Ronald DeFeo | 6 |
| 15 | 3/18/1974 | Amityville | NY | James Ruppert | 11 |
| 16 | 8/20/1975 | Scarsdale | NE | Erwin Simants | 6 |
| 17 | 7/12/1976 | Fullerton | PA | George Geschwend | 7 |
| 18 | 1/23/1977 | Oklahoma City | OR | DeWitt Henry | 6 |
| 19 | 7/12/1976 | Kamaili Falls | IN | Edward Allaway | 6 |
| 20 | 7/23/1977 | Hackettstown | NJ | Emile Benoist | 6 |
| 21 | 7/17/1981 | Forward | VA | Gene Gilbert | 7 |
| 22 | 1/14/1982 | Grand Prairie | TX | John Pietri | 6 |
| 23 | 8/20/1982 | Miami | FL | Carl Brown | 8 |
| 24 | 5/21/1981 | Detroit | IN | King Bell | 6 |
| 25 | 7/16/1982 | Richmond | VA | Robert Haggart | 7 |
| 26 | 3/25/1982 | Seattle | WA | Kwan Fai Mak and Benjamin Ng | 13 |
| 27 | 1/7/1983 | College Station and Hempstead | TX | Louis Hastings | 6 |
| 28 | 3/5/1983 | Brooklyn | AK | Mark McCarthy | 10 |
| 29 | 4/15/1984 | Dallas | NY | Christopher Thomas | 10 |
| 30 | 7/18/1984 | San Ysidro | CA | James Huberty | 21 |
| 31 | 7/19/1984 | Evansville | IN | Abdelkrim Boradaheb | 6 |
| 32 | 8/20/1986 | Edmond | OK | Patrick Sherrill | 14 |
| 33 | 12/5/1987 | Oakland | CA | Rico Lewis and David Welch | 6 |
| 34 | 2/5/1987 | Perth Roy | AI | Terry Morris | 7 |
| 35 | 4/23/1987 | Palm Bay | FL | William Cruse | 6 |
| 36 | 5/25/1987 | Elkland | MO | Daniel Lynam | 7 |
| 37 | 7/25/1987 | Dexter | IA | Robert Dreesman | 6 |
| 38 | 7/16/1988 | Somerville | KY | Richard Farley | 7 |
| 39 | 9/14/1989 | Louisville | FL | Joseph Wesbecker | 8 |
| 40 | 6/18/1990 | Jacksonville | FL | James Pough | 9 |
| 41 | 9/26/1991 | Watkia | MA | Ricky Alberta | 6 |
| 42 | 7/5/1992 | Chimayo | HI | Jonathan Doody and Alessandro Garcia | 9 |
| 43 | 10/16/1991 | Woodland | WA | George Hansward | 9 |
| 44 | 11/7/1992 | Paso Robles | CA | Lynwood Drake | 6 |
| 54 | 1/8/1993 | Palatine | IL | James Bogoski and Juan Luna | 7 |

| | Date | City | State | Perpetrator(s) | Deaths |
|---|---|---|---|---|---|
| 55 | 5/16/1993 | Fresno | CA | Allen Helfrit and Johnnie Mobakley | 7 |
| 56 | 7/1/1993 | San Francisco | CA | Gian Luigi Ferri | 9 |
| 57 | 7/1/1993 | Garden City | NY | Colin Ferguson | 6 |
| 58 | 4/20/1999 | Littleton | CO | Eric Harris and Dylan Klebold | 13 |
| 59 | 9/15/1999 | Atlanta | GA | Mark Barton | 9 |
| 60 | 7/29/1999 | Fort Worth | TX | Byron Kidd Lynequi | 7 |
| 61 | 11/2/1999 | Honolulu | HI | Bryan Kidd Lynequi | 7 |
| 62 | 7/8/2003 | Meridian | MS | Douglas Williams | 6 |
| 63 | 12/26/2000 | Wakefield | MA | Michael McDermott | 7 |
| 64 | 12/28/2000 | Philadelphia | PA | Shawn Black, Dawud Faruq, Khalid Faruqi, and Bruce Veney | 7 |
| 65 | 8/24/2002 | Rutledge | AL | Humberto Garza, Robert Garza, Rodolfo Medrano, and Juan Ramirez | 6 |
| 66 | 7/15/2003 | Edinburg | TX | Wesley Harris | 6 |
| 67 | 7/8/2003 | Meridian | MS | Douglas Williams | 6 |
| 68 | 8/27/2003 | Chicago | IL | Salvador Tapia | 6 |
| 69 | 3/12/2004 | Fresno | CA | Marcus Wesson | 9 |
| 70 | 11/21/2004 | Birchwood | WI | Chai Soua Vang | 6 |
| 71 | 3/12/2005 | Brookfield | WI | Terry Ratzmann | 7 |
| 72 | 3/21/2005 | Red Lake | MN | Jeffrey Weise | 9 |
| 73 | 3/30/2006 | Seattle | WA | Kyle Huff | 6 |
| 74 | 12/24/2007 | Crandon | WI | Tyler Peterson | 6 |
| 75 | 6/7/2006 | Indianapolis | IN | James Stewart and Desmond Turner | 7 |
| 76 | 4/16/2007 | Blacksburg | VA | Seung-Hui Cho | 32 |
| 77 | 12/24/2007 | Kansas City | KS | Hessel Souleim | 6 |
| 78 | 10/7/2007 | Crandon | WI | Tyler Peterson | 6 |
| 79 | 12/16/2006 | Kansas City | MO | Robert Hawkins | 9 |
| 80 | 12/24/2007 | Omaha | NE | Robert Hawkins | 8 |
| 81 | 3/25/2006 | San Antonio | TX | Kyle Huff | 6 |
| 82 | 2/7/2008 | Kirkwood | MO | Charles Lee Thornton | 6 |
| 83 | 9/2/2008 | Alger | WA | Isaac Zamora | 6 |
| 84 | 1/27/2008 | Covina | CA | Bruce Pardo | 9 |
| 85 | 3/29/2009 | Los Angeles | CA | Ervin Lupoe | 6 |
| 86 | 3/29/2009 | Carthage | NC | Robert Stewart | 8 |
| 87 | 4/3/2009 | Binghamton | NY | Michael McLendon | 13 |
| 88 | 11/5/2009 | Fort Hood | TX | Nidal Malik Hasan | 13 |
| 89 | 1/19/2010 | Appomattox | VA | Christopher Speight | 8 |
| 90 | 8/3/2010 | Manchester | CT | Omar Thornton | 9 |
| 91 | 1/8/2011 | Tucson | AZ | Jared Loughner | 6 |
| 92 | 7/7/2011 | Grand Rapids | MI | Rodrick Dantzler | 8 |
| 93 | 10/12/2011 | Copley Township | OH | Michael Hance | 8 |
| 94 | 9/25/2011 | Seal Beach | CA | Scott Dekraai | 8 |
| 95 | 7/20/2012 | Aurora | CO | James Holmes | 12 |
| 96 | 10/12/2012 | Azana Yoahiniapudi | ... | ... | 6 |
| 97 | 8/5/2012 | Oak Creek | WI | Wade Page | 7 |
| 98 | 8/5/2012 | Oak Creek | WI | Wade Page | 7 |
| 99 | 9/27/2012 | Minneapolis | MN | Andrew Engeldinger | 7 |
| 100 | 11/26/2013 | Hialeah | FL | Pedro Vargas | 7 |
| 101 | 7/26/2013 | Newtown | CT | Adam Lanza | 27 |
| 102 | 9/15/2013 | Washington | DC | Aaron Alexis | 13 |
| 103 | 7/9/2014 | Spring | TX | Ronald Lee Haskell | 6 |
| 104 | 9/18/2014 | Bell | FL | Don Spirit | 7 |
| 105 | 5/17/2015 | Waco | TX | Tyrone | 9 |
| 106 | 6/17/2015 | Charleston | SC | Dylann Roof | 9 |
| 107 | 8/8/2015 | Houston | TX | David Conley | 8 |
| 108 | 10/1/2015 | Roseburg | OR | Christopher Harper-Mercer | 9 |
| 109 | 11/15/2015 | Palatine | IL | Wilson Hudson | 6 |
| 110 | 12/2/2015 | San Bernardino | CA | Syed Rizwan Farook and Tashfeen Malik | 14 |

Case 2:17-cv-00903-WBS-KJN   Document 40-6   Filed 06/15/17   Page 129 of 175

Gordon Declaration 02006



Fig. 3.1. Cumulative Death Toll of Gun Massacres in the United States, 1966–2015. Source: Table 3.2.



| | 1966-1975 | 1976-1985 | 1986-1995 | 1996-2005 | 2006-2015 |
|---|---|---|---|---|---|
| ▪ Shootings | 17 | 22 | 18 | 15 | 39 |
| ▫ Deaths | 122 | 173 | 149 | 111 | 349 |

Fig. 3.2. Gun Massacres in the United States by Decade, 1966–2015. Source: Table 3.2.

Gordon Declaration 02007



Fig. 3.3. Annual Number of Gun Massacres in the United States, 1966–2015. Source: Table 3.2.



Fig. 3.4. Annual Death Toll of Gun Massacres in the United States, 1966–2015. Source: Table 3.2.

**Table 3.3. Average Death Tolls of Gun Massacres in the United States by Ten-Year Period, 1966–2015.**

| Ten-Year Period | Average Death Toll Per Gun Massacre |
| --- | --- |
| 1966–1975 | 7.2 |
| 1976–1985 | 7.9 |
| 1986–1995 | 8.3 |
| 1996–2005 | 7.4 |
| 2006–2015 | 8.9 |

A breakdown of the data shows how this disturbing pattern came to be. Until 2015, there has never been a year with more than five gun massacres. In 2015, there were seven gun massacres. Moreover, the past decade has experienced more "five-plus-shooting-years"[87] than any other decade (see figure 3.3). It's also the only decade with consecutive five-plus-shooting-years (2011 and 2012). When expanded to track four-plus-shooting-years, the past decade qualifies as the most disturbing ten-year-period, surpassing the next closest ten-year-period (1976–1985) by three additional years of four-plus gun massacres.

The past decade is also the only decade not to have had a year without a gun massacre. Every other decade under study had at least two years of reprieve from such heinous acts of gun violence—and the five-year period from 1994 to 1998 experienced no such shootings at all. In terms of lethality, the past decade again stands apart from the others. For instance, while there have been only five years that experienced fifty or more deaths as a result of gun massacres, four of those years were in the past decade (see figure 3.4). Indeed, 2015, the deadliest year on record for murders resulting from gun massacres, with sixty-two combined fatalities. Furthermore, a comparison of the last two decades reveals an eightfold increase in the number of double-digit fatality shootings (see table 3.4).

Between 1966 and 2015, the population of the United States has increased nearly 65 percent, from approximately 195 million people to over 320 million people. Yet even this demographic shift has failed to reverse the troubling trend in rampage violence, as evidenced by incidence rates, which assess the occurrence of attacks and fatalities

relative to the population in a given time. Over the past ten years, gun massacres have taken place at an unprecedented rate of one for roughly every eight million residents and deaths have been incurred at a rate that exceeds one fatality for every one million residents (see table 3.5). Even when accounting for population growth, the past decade still stands out as the worst ten-year period of the last fifty years, marked by a rising trajectory that doesn't bode well for the coming decade (see figure 3.5).

**Table 3.4. The Deadliest Mass Shootings in the United States, 1966–2015.**

| Death Toll | Date | Perpetrator(s) | City | State |
| --- | --- | --- | --- | --- |
| 32 | 4/16/2007 | Seung-Hui Cho | Blacksburg | VA |
| 27 | 12/14/2014 | Adam Lanza | Newtown | CT |
| 23 | 10/16/1991 | George Hennard | Killeen | TX |
| 21 | 7/18/1984 | James Huberty | San Ysidro | CA |
| 14 | 8/1/1986 | Charles Whitman | Austin | TX |
| 14 | 8/20/1986 | Patrick Sherrill | Edmond | OK |
| 14 | 12/2/2015 | Syed Rizwan Farook and Tashfeen Malik | San Bernardino | CA |
| 13 | 9/25/1982 | George Banks | Wilkes-Barre | PA |
| 13 | 2/18/1983 | Kwan Fai Mak and Benjamin Ng | Seattle | WA |
| 13 | 4/20/1999 | Eric Harris and Dylan Klebold | Littleton | CO |
| 13 | 4/3/2009 | Jiverly Wong | Binghamton | NY |
| 13 | 11/5/2009 | Nidal Hasan | Fort Hood | TX |
| 12 | 7/20/2012 | James Holmes | Aurora | CO |
| 12 | 9/16/2013 | Aaron Alexis | Washington | DC |
| 11 | 3/30/1975 | James Ruppert | Hamilton | OH |
| 10 | 4/15/1984 | Christopher Thomas | Brooklyn | NY |
| 10 | 3/10/2009 | Michael McLendon | Kinston, Samson, and Geneva | AL |

At a time when modern emergency medicine can save the lives of most gunshot victims if they reach the hospital alive within the "golden hour," the death rate of mass casualty gun attacks should've gone down significantly in the past decade.[88] That this hasn't happened speaks to the danger mass shootings pose.

## Table 3.5. Ten-Year Incidence Rates for Gun-Massacre Attacks and Deaths, 1966–2015.

| Decade | Attack Rate | Death Rate |
|---|---|---|
| 1966–1975 | 0.08 | 0.59 |
| 1976–1985 | 0.10 | 0.26 |
| 1986–1995 | 0.07 | 0.59 |
| 1996–2005 | 0.05 | 0.39 |
| 2006–2015 | 0.13 | 1.12 |

Note: Rates are calculated using the mean population estimates for the United States (in millions) over the applicable ten-year periods.

Source: Attack and death tolls are drawn from table 3.2. Population data are drawn from United States Census Bureau, "Population Estimates," www.census.gov/popest/index.html (accessed May 3, 2016).

Above, I argued that high-fatality mass shootings are now in a distinct class. This becomes abundantly clear when gun massacres are compared to other common forms of homicide. The most recent decade of available data illustrates that, while most forms of homicide continue to decline, gun-massacre deaths are heading in the opposite trajectory (see figure 3.6). This presents a troubling mystery: Why are such deadly shooting sprees on the rise when most other homicides are on the wane? Equally baffling, this increase is occurring despite a steady decrease in gun-ownership rates (see figures 3.7 and 3.8).[89] Even if we allow for the fact that the absolute number of households with firearms has consistently held at around forty million over the last forty years, it still fails to correlate with the upsurge in gun massacres.[90]

My data set, while unique, is limited by the exclusion of mass shootings that didn't result in at least six victims being murdered. Indications are that if the bar is lowered below a minimum of six deaths, the rate of occurrence is even more disturbing. Unfortunately, due in part to a funding prohibition enacted by Congress—at the urging of the National Rifle Association (NRA)—government agencies eschew research that would compile such data.[91] Frustrated by these restrictions, a group of social-media-savvy individuals launched a crowdsourcing experiment on Reddit to track every gun assault in the United States that resulted in four or more people being shot.[92]



Fig. 3.5. Ten-Year Incidence Rates for Gun-Massacre Attacks and Deaths, 1966–2015. Source: Table 3.5.









Fig. 3.6. Trends in Common Forms of Homicide, 2003–2012.

Note: The data represent the most recent decade of available data and indicate the cumulative number of such homicides per year. All data except for gun-massacre homicides are drawn from the Center for Disease Control WONDER Database (available at wonder.cdc.gov). Gun-massacre homicides are drawn from table 3.2.



Fig. 3.7. Comparison of Trends in Gun Massacres and Gun-Ownership Rates, 1966–2015.
Source: Table 3.2 and General Social Survey Data (1973–2014).

Gordon Declaration 02011



Fig. 3.8. Comparison of Trends in Gun-Massacre Deaths and Gun-Ownership Rates, 1966–2015.
Source: Table 3.2 and General Social Survey Data (1973–2014).

-○- Percentage of Households with Guns   -●- Annual Deaths from High-Fatality Mass Shootings

## Table 3.6. Mass Shootings in the United States, 2013–2015.

| Number of Mass Shootings Resulting in | 2013 | 2014 | 2015 | Combined |
|---|---|---|---|---|
| 0 Deaths | 130 | 145 | 159 | 434 |
| 1 Death | 93 | 95 | 108 | 296 |
| 2 Deaths | 47 | 30 | 38 | 115 |
| 3 Deaths | 22 | 26 | 26 | 74 |
| 4 Deaths | 34 | 19 | 26 | 79 |
| 5 Deaths | 8 | 7 | 5 | 20 |
| 6 Deaths | 3 | 2 | 3 | 8 |
| 7 Deaths | 1 | 0 | 1 | ... |
| 8 Deaths | 0 | 1 | 2 | 3 |
| 9 Deaths | 0 | 0 | 2 | 2 |
| 10 Deaths | 0 | 0 | 1 | 1 |
| 13 Deaths | 1 | 0 | 1 | ... |
| 16 Deaths | 0 | 0 | 1 | ... |
| Total Shootings | 339 | 325 | 371 | 1,035 |
| Total Deaths | 467 | 364 | 469 | 1,300 |

Note: The Mass Shooting Tracker defines mass shootings as any gun attack where four or more people, including the shooter(s), are shot. As a result, the death tolls in this table include gunmen, if they died during the perpetration of their crimes.

Source: www.massshootingtracker.org.

In its first year (2013), the Mass Shooting Tracker logged a total of 339 multiple-victim shootings (see table 3.6). This dropped by fourteen, to 325 incidents, the following year. By 2015, however, the total number of mass shootings had jumped to 371, surpassing the rate of one per day. A review of the three-year period indicates that 1,300 people lost their lives during the commission of these 1,035 gun attacks. That's an annual average of 433 fatalities—a far cry from the "18 lives a year" gun-rights activist Emily Miller tells us die on average in mass shootings in the United States. What's arguably most alarming is that, in all three years, the number of lethal incidents in the Mass Shooting Tracker's data set exceeds the number of nonlethal inci-

Gordon Declaration 02012

dents. Indeed, on an annual average, six in ten mass shootings result in at least one death, and three in ten result in multiple deaths.

\* \* \*

Remember John Fund? He's the conservative columnist who claimed that, for Americans, the odds of dying in a mass shooting are equal to those of being struck by lightning. Well, not so. According to the National Weather Service, an average of 267 people are struck by lightning in the United States every year.[93] That's far less than the 433 individuals who lose their lives annually in a mass shooting. In fact, in any given year, the odds of being struck by lightning are about one in 1.2 million, whereas the odds of dying in a multiple-victim gun attack are about one in 700,000. And those are the chances of dying in a mass shooting. If we expand this calculation to the number of people who are shot in a mass shooting every year—so as to make a true apples-to-apples comparison—the odds increase significantly.

Since we're putting mass shootings in a proper perspective, let's add one final comparison to what most Americans consider to be the gravest threat to their security: terrorism.[94] Certainly, given the way politicians in Washington are always carrying on about groups like al Qaeda and ISIS, you might think that you're more likely to be killed by a terrorist than by a rampage gunman. But the opposite is true. In the ten years immediately following 9/11, terrorists killed twenty-seven individuals in the United States.[95] That's the same number of people Adam Lanza killed in Newtown. In other words, what terrorists took a decade to accomplish, a single, well-armed individual on a gun rampage pulled off in one morning.[96]

The bottom line is that, no matter how you crunch the numbers, the outcome is consistently the same: in the past decade, no single incident of violence has killed more people in the United States than the mass shooting. Quite simply, the most credible violent threat to American society currently comes out of the barrel of a gun—and, unfortunately, the threat is growing.

PART 2

PROBE

## Table 6.1. Comparison of Firearm Capabilities.

### Average Shooter

| Firearm | Six-Shot Revolver | Semi-Auto Handgun (Ten-Round Magazines) | Semi-Auto Handgun (Thirty-Round Magazines) | Assault Rifle (One-Hundred-Round Drums) |
|---|---|---|---|---|
| Firing Rate | 1 Shot per Second | 2 Shots per Second | 2 Shots per Second | 2 Shots per Second |
| Reload Rate | 20 Seconds | 10 Seconds | 10 Seconds | 15 Seconds |
| Time Shooting | 18 Seconds | 20 Seconds | 20 Seconds | 50 Seconds |
| Time Not Shooting | 42 Seconds | 40 Seconds | 40 Seconds | 10 Seconds |
| Bullets Fired | 18 Rounds | 40 Rounds | 40 Rounds | 100 Rounds |

### Expert Shooter

| Firearm | Six-Shot Revolver | Semi-Auto Handgun (Ten-Round Magazines) | Semi-Auto Handgun (Thirty-Round Magazines) | Assault Rifle (One-Hundred-Round Drums) |
|---|---|---|---|---|
| Firing Rate | 1.5 Shots per Second | 5 Shots per Second | 3 Shots per Second | 3 Shots per Second |
| Reload Rate | 10 Seconds | 5 Seconds | 5 Seconds | 10 Seconds |
| Time Shooting | 20 Seconds | 25 Seconds | 40 Seconds | 50 Seconds |
| Time Not Shooting | 40 Seconds | 35 Seconds | 20 Seconds | 10 Seconds |
| Bullets Fired | 24 Rounds | 75 Rounds | 120 Rounds | 150 Rounds |

## THE AURORA THEATER MASSACRE ARSENAL

Following the Aurora theater massacre, the Colorado legislature enacted three sweeping gun-control bills that, among other things, banned the sale of ammunition magazines with a capacity larger than fifteen bullets. Avid Second Amendment advocates revolted against these laws. In a blunt attempt to punish two major proponents of these public-safety measures, the gun-rights movement organized a recall campaign. On September 10, 2013, State Senate President John Morse and State Senator Angela Giron—both Democrats—were removed from office and replaced by pro-gun Republicans.[106] State Senator Bernie Herpin was one of those who ascended to office in the wake of the recall, replacing Morse. In February 2014,

during a Senate committee hearing on a bill Herpin sponsored to repeal the ban on extended-capacity magazines, one of his Democratic colleagues questioned the utility of his proposal: "My understanding is that James Holmes bought his 100-round capacity magazine [the 2013 high-capacity magazine ban] would have stopped James Holmes from purchasing a 100-round magazine. I was wondering if you agree with me."[107] Herpin, in what was clearly a poorly thought-out response, replied: "As it turned out, that was maybe a good thing that he had a 100-round magazine, because it jammed. If he had four, five, six 15-round magazines, there's no telling how much damage he could have done until a good guy with a gun showed up." Herpin was trying to suggest that the larger the capacity of the magazine, the more likely it is that the magazine might jam. But to the families of the victims, Herpin's suggestion that the public should put its faith in product defects as a means to ensure its safety came across as stupid and insensitive.

The AR-15 that James Holmes fired at the Century 16 multiplex did, in fact, jam. But not before it discharged sixty-five rounds. As we have already seen, one-hundred-round drums provide greater kill potential than smaller-capacity magazines. Had Holmes—at best, an average shooter by his own admission—been using thirty-round magazines, it would have provided theater patrons with approximately two additional ten-second windows to escape or to confront Holmes before he could have gotten off sixty-five shots.[108] And had he been using ten-second magazines, the shooting downtime would have increased to six ten-second windows—a full minute.

Contrary to the suggestion floated by Herpin, the one-hundred-round drum used by James Holmes played a critical role in making the Aurora theater massacre one of the highest-casualty mass shootings in American history.[109]

* * *

James Holmes's arsenal—particularly his polymer AR-15 assault rifle armed with a one-hundred-round drum—lends credence to the proposition that, as firearms become lighter and their ammunition capacities become larger, they become more lethal. But that's the

214   PART 2: PROBE

anecdotal takeaway from one gun massacre (albeit one that registered an extremely high casualty toll). What about the weapons used in other gun massacres?

If all firearms were equal, we would find that, on average, they produced similar outcomes, especially similar fatality tolls. In practice, however, that's not the case. After examining the firearms used in the 111 gun massacres in my data set, it's clear that there is a significant difference between attacks that involve semiautomatic weapons and those that do not. Those massacres where there was no evidence that the weapons used were semiautomatic firearms resulted, on average, in fewer deaths per attack. In fact, those high-fatality mass shootings accounted for 27 percent of the 111 incidents in my data set, but for only 23 percent of the 904 cumulative deaths resulting from those incidents (see table 6.2). On the other hand, gun massacres involving semiautomatic firearms produced, on average, higher death tolls. Semiautomatic firearm attacks accounted for 73 percent of all the incidents in my data set, but 77 percent of the fatalities resulting from those incidents. The conclusion is unambiguous: semiautomatic firearms, when used in mass shootings, increase the lethality of such attacks.[110]

Table 6.2. Percentage of Gun-Massacre Incidents and Cumulative Fatalities by Firearm Type.

| Gun Massacres between 1966 and 2015... | Percentage of All Incidents (N = 111) | Percentage of All Deaths (N = 904) | Difference (in Percentage) |
|---|---|---|---|
| ...Not Involving Semiautos | 27 | 23 | -4 |
| ...Involving Semiautos | 73 | 77 | +4 |
| ...Involving Assault Weapons | 25 | 29 | +4 |
| ...Involving ECMs | 47 | 55 | +8 |
| ...Involving Polymer Guns | 34 | 42 | +8 |
| ...Involving Assault Weapons + ECMs | 22 | 27 | +5 |
| ...Involving ECMs + Polymer Guns | 30 | 38 | +8 |
| ...Involving Polymer Assault Weapons + ECMs | 12 | 15 | +3 |

Note: There is no separate category for polymer assault weapons without extended-capacity magazines (ECMs) as every gun massacre involving polymer assault weapons also involved ECMs.

GUNS KILL, SOME MORE THAN OTHERS   215

This finding is particularly troubling because, over the course of the past fifty years, semiautomatic firearms have become more prevalent in high-fatality mass shootings (see figure 6.1). Their use in gun massacres has consistently increased decade after decade. The shift is particularly drastic when the first ten-year period of the past fifty years is compared to the most recent ten-year period. During the period 1966–1975, semiautomatic firearms were involved in 47 percent of all gun massacres. Jump forward to the present and you'll see that they have been involved in 92 percent of all gun massacres that have occurred in the past ten years. A similar pattern exists in terms of deaths resulting from semiautomatic firearm use in high-fatality mass shootings (see figure 6.2). During the period 1966–1975, semiautomatic firearm massacres accounted for 48 percent of all gun-massacre fatalities. In the past ten years, they have accounted for 95 percent of fatalities. It's also worth noting that, forty to fifty years ago, the range in the average number of deaths per gun massacre between those not involving semiautomatic weapons and those involving such weapons was relatively close: 7.1–7.3 (see figure 6.3). In the past decade, however, that difference has grown to its widest margin, with the former producing, on average, six fatalities per attack and the latter over nine deaths. In fact, in the past twenty years, the average death toll for incidents not involving semiautomatic firearms has bottomed out at six deaths—the minimum number of fatalities required for a shooting to meet the definition of a gun massacre.[111]

As discussed in chapter 3, gun massacres escalated extensively between the time periods 1966–1975 and 1976–1985. Afterward, they waned in both occurrence and lethality, reaching new lows in the 1990s, before spiking to unprecedented levels in the past ten years (see table 6.3). The use of semiautomatic firearms in such incidents has also grown to unprecedented levels of late.

Following the Aurora massacre, assault weapons seemed to bear the brunt of the blame. But, as I argued earlier in this chapter, polymer firearms and extended-capacity magazines are also considerably responsible for the increased bloodshed. A review of the data supports this assessment. In fact, the two factors that have correlated with the highest differential in death tolls are polymer guns and large-capacity magazines (see table 6.2). Assault weapons, on their own, were involved



Fig. 6.1. Number of Gun Massacres per Decade (Massacres Involving Semiautomatic Firearms versus Massacres Not Involving Semiautomatic Firearms).



Fig. 6.2. Number of Deaths Resulting From Gun Massacres per Decade (Massacres Involving Semiautomatic Firearms versus Massacres Not Involving Semiautomatic Firearms).

Gordon Declaration 02016

218                                                                    PART 2: PROBE



| | 1966-1975 | 1976-1985 | 1986-1995 | 1996-2005 | 2006-2015 |
|---|---|---|---|---|---|
| ■ Non-Semiautomatic Firearms | 7.1 | 7.2 | 6.6 | 6 | 6 |
| ▨ Semiautomatic Firearms | 7.3 | 8.3 | 9.4 | 7.6 | 9.2 |

Fig. 6.3. Average Number of Deaths per Gun Massacre by Decade
(Massacres Involving Semiautomatic Firearms versus Massacres Not Involving Semiautomatic Firearms).

GUNS KILL, SOME MORE THAN OTHERS                                                  219

Table 6.3. Gun-Massacre Incidents and Fatalities by Firearm Type.

| | | 1966–1975 | 1976–1985 | 1986–1995 | 1996–2005 | 2006–2015 | Total |
|---|---|---|---|---|---|---|---|
| All Gun Massacres | Incidents | 17 | 22 | 18 | 15 | 39 | 111 |
| | Deaths | 122 | 173 | 149 | 111 | 349 | 904 |
| | Average Death Toll | 7.2 | 7.9 | 8.3 | 7.4 | 8.9 | 8.1 |
| Gun Massacres Not Involving Semiautomatics | Incidents | 9 | 9 | 7 | 2 | 3 | 30 |
| | Deaths | 64 | 65 | 46 | 12 | 18 | 205 |
| | Average Death Toll | 7.1 | 7.2 | 6.6 | 6.0 | 6.0 | 6.8 |
| Gun Massacres Involving Semiautomatics | Incidents | 8 | 13 | 11 | 13 | 36 | 81 |
| | Deaths | 58 | 108 | 103 | 99 | 331 | 699 |
| | Average Death Toll | 7.3 | 8.3 | 9.4 | 7.6 | 9.2 | 8.6 |
| Gun Massacres Involving Assault Weapons | Incidents | 3 | 6 | 9 | 3 | 10 | 28 |
| | Deaths | 26 | 58 | 82 | 26 | 110 | 264 |
| | Average Death Toll | 8.7 | 9.7 | 9.1 | 8.7 | 11.0 | 9.4 |
| Gun Massacres Involving Polymer Guns | Incidents | – | 2 | 9 | 7 | 26 | 52 |
| | Deaths | – | 19 | 82 | 61 | 261 | 494 |
| | Average Death Toll | – | 9.5 | 9.1 | 8.0 | 10.0 | 9.5 |
| Gun Massacres Involving ECMs | Incidents | 1 | 2 | 3 | 2 | 25 | 38 |
| | Deaths | 6 | 19 | 38 | 15 | 253 | 377 |
| | Average Death Toll | 6.0 | 9.5 | 12.7 | 8.7 | 10.1 | 9.9 |
| Gun Massacres Involving ECMs + Polymer Guns | Incidents | 1 | 2 | 3 | 2 | 10 | 24 |
| | Deaths | 6 | 19 | 38 | 15 | 110 | 240 |
| | Average Death Toll | 6.0 | 9.5 | 12.7 | 8.7 | 11.0 | 10.0 |
| Gun Massacres Involving Assault Weapons + ECMs | Incidents | – | – | 3 | 3 | 27 | 33 |
| | Deaths | – | – | 25 | 13 | 226 | 341 |
| | Average Death Toll | – | – | 8.7 | 8.7 | 10.8 | 10.3 |
| Gun Massacres Involving Polymer Assault Weapons + ECMs | Incidents | – | – | 1 | 1 | 7 | 13 |
| | Deaths | – | – | 6 | 6 | 87 | 140 |
| | Average Death Toll | – | – | 6.0 | 6.0 | 12.4 | 10.8 |

Note: There is no separate category for polymer assault weapons without extended-capacity magazines (ECMs) as every gun massacre involving polymer assault weapons also involved ECMs.

Gordon Declaration 02017

in only 25 percent of all gun massacres from the past fifty years, and those incidents accounted for 29 percent of all gun-massacre fatalities. The bigger impact results from using polymer guns and high-capacity magazines. The former were employed in 94 percent of all gun massacres, yet those attacks accounted for 42 percent of all gun-massacre fatalities. That's an 8 percent differential. The latter resulted in an identical percentage differential (47 percent of all massacres and 55 percent of all fatalities), although the larger overall tallies provide reason to find the use of extended-capacity magazines even more disconcerting than the use of polymer firearms.

One of the impressions that someone might form after hearing critics fault assault weapons like the AR-15 is that these potent firearms are used fairly often to perpetrate gun massacres. The data, however, do not support such a conclusion. On the contrary, assault weapons were used in only a quarter of the gun massacres from the past fifty years (see tables 6.2 and 6.3). Even in the past ten years, they were used in only ten attacks (again roughly 25 percent of all attacks in the past decade).

The same can be said for polymer guns and extended-capacity magazines. They, too, were involved in less than half of all gun massacres from the past fifty years (see tables 6.2 and 6.3). Nonetheless, unlike assault weapons, high-capacity magazines and polymer guns stand apart in their prevalence of late. Assault weapons have only been used in roughly one-fourth of all gun massacres since 2006. Extended-capacity magazines and polymer guns, on the other hand, have been used in about two-thirds of all such gun massacres. Indeed, a comparison with the earliest and most recent ten-year periods of my data set shows that, while the use of assault weapons increased by a factor of nearly three, the use of large-capacity magazines has increased by a factor of nearly nine, and the use of polymer firearms has increased by a factor of twenty-five.

Another relationship worth investigating is the frequency and lethality of these three elements—assault weapons, extended-capacity magazines, and polymer firearms—when employed in combination. Again, across the entire fifty-year time frame, their use remains limited, but their impact lethal (see tables 6.2 and 6.3). This becomes indisputable when the different firearms are assessed by

the average number of fatalities that result when they are involved in gun massacres (see figure 6.4). In general, the average death toll since 1966 has been 8.1. When gunmen don't shoot their victims with semiautomatic firearms, this average falls 17 percent to 6.8 deaths per incident.[18] The employment of semiautomatic firearms makes the average death toll per incident rise 5 percent to 8.6. The jumps are more profound when the shootings are broken down into those involving assault weapons, extended-capacity magazines, and polymer guns. Each of these elements result in, respectively, 16 percent, 17 percent, and 22 percent increases. The largest growth in average death toll, however, results when mass shooters attack with polymer assault weapons armed with extended-capacity magazines—all three elements in one. Those instances result in an average of 10.8 deaths per attack—a 33 percent increase from the 8.1 baseline.

When the comparisons are limited to just the past decade—when gun massacres almost always involved semiautomatic firearms—the most lethal outcome again results from attacks involving all three elements: polymer assault weapons armed with extended-capacity magazines. In the past ten years, the increase from the baseline average of number deaths per incident soars from 8.9 to 12.8 (see figure 6.4). That's an enormous 39 percent upsurge in the average number of fatalities when all three elements are involved in a gun massacre—and at a time when modern medicine has drastically reduced the likelihood of dying from gunshot wounds, no less.

One final question worth addressing: Do gun massacres employing more than one firearm or involving more than one perpetrator result in higher death tolls? It makes sense that if you have more weapons, you can produce more bloodshed. And the data support such a conclusion as it pertains to high-fatality mass shootings (see table 6.4). The average death toll when a perpetrator is armed with only a single weapon is 6.9 fatalities per incident (see table 6.5). That number jumps to 9.2 fatalities per incident when a gunman is armed with multiple firearms. That's higher than the average death toll for all 111 incidents in the data set but less than the average death toll resulting from incidents involving assault weapons, extended-capacity magazines, or polymer firearms (compare tables 6.3 and 6.5). A breakdown of the data clearly establishes that, while mass shootings involving two or more guns often



Fig. 6.4. Average Number of Fatalities per Gun Massacre by Firearm Type (1966–2015 Compared to 2006–2015).
Note: There is no separate category for polymer assault weapons without extended-capacity magazines (ECMs)
as every gun massacre involving polymer assault weapons also involved ECMs.

result in increased carnage, the impact is driven more by the use of enhanced weapons (especially polymer guns equipped with extended-capacity magazines) than by the use of multiple firearms.

## Table 6.4. Percentage of Gun-Massacre Incidents and Cumulative Fatalities by Number of Firearms and Shooters.

| Gun Massacres between 1966 and 2015 . . . | Percentage of All Incidents (N = 111) | Percentage of All Deaths (N = 904) | Difference (in Percentage) |
|---|---|---|---|
| . . . Involving Only One Gun | 47 | 40 | −7 |
| . . . Involving Multiple Guns | 53 | 60 | +7 |
| . . . Involving Only One Shooter | 86 | 86 | 0 |
| . . . Involving Multiple Shooters | 14 | 14 | 0 |

Unlike the sizeable difference that results from using multiple weapons, gun massacres involving more than one shooter don't result in significantly more fatalities (see table 6.4). When gun massacres are perpetrated by more than one gunman, the increase in fatalities per incident increases only 2 percent—from 8.1 to 8.3 fatalities per incident (see table 6.6).[115] Even more surprising, massacres involving two gunmen have produced higher average death tolls than those involving three or more gunmen. The former have claimed an average of 9.1 lives per attack, whereas the latter have claimed 6.3 lives per attack. This suggests that the number of perpetrators, per se, doesn't significantly impact the extent of the bloodshed.

★ ★ ★

For those of you who are not data wonks, all of the statistics in the previous subsection might have left you a bit overwhelmed. The picture they paint is, nevertheless, pretty simple and straightforward. Most gun massacres involve semiautomatic firearms. The perpetrators of these murder sprees have not historically relied on assault rifles to pull off their attacks. Nor have they turned to polymer guns and large-capacity

**Table 6.5. Gun-Massacre Incidents and Fatalities by Number of Firearms.**

| | Total |
|---|---|
| **All Gun Massacres** | |
| Incidents | 111 |
| Deaths | 904 |
| Average Death Toll | 8.1 |
| **Gun Massacres Involving Only One Gun** | |
| Incidents | 52 |
| Deaths | 359 |
| Average Death Toll | 6.9 |
| **Gun Massacres Involving Multiple Guns** | |
| Incidents | 59 |
| Deaths | 545 |
| Average Death Toll | 9.2 |
| **Gun Massacres Involving Multiple Guns But Not Involving Semi-Autos** | |
| Incidents | 13 |
| Deaths | 92 |
| Average Death Toll | 7.1 |
| **Gun Massacres Involving Multiple Guns and Semi-Autos** | |
| Incidents | 46 |
| Deaths | 453 |
| Average Death Toll | 9.8 |
| **Gun Massacres Involving Multiple Guns and Assault Weapons** | |
| Incidents | 20 |
| Deaths | 204 |
| Average Death Toll | 10.2 |
| **Gun Massacres Involving Multiple Guns and ECMs** | |
| Incidents | 30 |
| Deaths | 336 |
| Average Death Toll | 11.2 |
| **Gun Massacres Involving Multiple Guns and Polymer Guns** | |
| Incidents | 22 |
| Deaths | 257 |
| Average Death Toll | 11.7 |
| **Gun Massacres Involving Multiple Guns and Assault Weapons + ECMs** | |
| Incidents | 16 |
| Deaths | 180 |
| Average Death Toll | 11.3 |
| **Gun Massacres Involving Multiple Guns and ECMs + Polymer Guns** | |
| Incidents | 19 |
| Deaths | 236 |
| Average Death Toll | 12.4 |
| **Gun Massacres Involving Multiple Guns and Polymer Assault Weapons + ECMs** | |
| Incidents | 9 |
| Deaths | 108 |
| Average Death Toll | 12.0 |

Note: There is no separate category for polymer assault weapons without extended-capacity magazines (ECMs) as every gun massacre involving polymer assault weapons also involved ECMs.

magazines. But—and this is a huge *but*—when they have utilized these types of guns, they have generated far greater bloodshed. The critical elements that seem to compound the carnage are, in particular, plastic weapons and large-scale ammunition-feeding devices. Assault weapons certainly contribute to the escalation of death tolls, but not quite as much as polymer guns and extended-capacity magazines do. That said, the most lethal outcomes tend to result, on average, when rampage gunmen use polymer assault weapons loaded with extended-capacity magazines. No doubt, James Holmes's decision to rely predominantly on a lightweight, ergonomically designed, high-capacity weapon made it extremely easy for him to achieve his self-professed goal of shooting "as many people as possible."[14] As it turned out, this amounted to upwards of seventy people in under three minutes.

**Table 6.6. Gun-Massacre Incidents and Fatalities by Number of Shooters.**

| | Total |
|---|---|
| **All Gun Massacres** | |
| Incidents | 111 |
| Deaths | 904 |
| Average Death Toll | 8.1 |
| **Gun Massacres Involving Only One Shooter** | |
| Incidents | 96 |
| Deaths | 779 |
| Average Death Toll | 8.1 |
| **Gun Massacres Involving Multiple Shooters (Two or More Shooters)** | |
| Incidents | 15 |
| Deaths | 125 |
| Average Death Toll | 8.3 |
| **Gun Massacres Involving Exactly Two Shooters** | |
| Incidents | 10 |
| Deaths | 91 |
| Average Death Toll | 9.1 |
| **Gun Massacres Involving More Than Two Shooters** | |
| Incidents | 5 |
| Deaths | 34 |
| Average Death Toll | 6.8 |

The above vignettes illustrate that there is a preferred way of reducing threats to public safety: denying weapons to potential perpetrators. By preventing high-risk individuals from acquiring dangerous weapons or by hindering them from employing such weapons, government can keep its citizens safe.

\* \* \*

In a way, homeland security is akin to George Orwell's *Animal Farm*. All strategies proposed by the trinity of violence are equal, but some are more equal than others. It's not that dissuasion and defense aren't valuable. They are. After all, we still criminalize bombings and erect barricades in front of important structures. But laws, on their own, often fail to dissuade homicidal and suicidal individuals. And blast barriers can't be erected everywhere. There are just too many potential perpetrators and targets for these strategies to be effective on their own. In open societies where resources are limited, securing public safety depends primarily on a strategy of denial to break the trinity of violence.

\* \* \*

The success of the United States in countering aviation attacks and bombings by restricting access to, and use of, weapons raises an important question: If the deprivation of weapons works in these areas, couldn't it also serve as an effective strategy in reducing gun violence?

## THE AMERICAN EXPERIENCE

The United States has been exemplary in safeguarding its citizenry from a host of deadly threats: accidents, environmental hazards, pandemics, hijackings, bombings, even weapons of mass destruction. Through successful regulation of hazardous products—almost all work hand in hand to keep us safe from a plethora of dangers.[26] But when it comes to protecting us from gun violence, the government's record has been abysmal.[27] In fact, the United States is

in a class all by itself. No other advanced, Western democracy experiences the magnitude of gun violence that presently afflicts American society.[28] This is particularly true when it comes to mass shootings.[29]

\* \* \*

The United States does little to regulate firearms, especially at the federal level.[30] While it goes to great lengths to restrict access to WMDs and IEDs, the same can't be said for its efforts to keep firearms out of the hands of high-risk individuals. Indeed, the American experience with gun control nationwide is so limited that it can actually be chronicled in a few bullet points:

- The National Firearms Act of 1934: Heavily regulated machine guns, short-barrel rifles and shotguns, and silencers.
- The Federal Firearms Act of 1938: Established a federal licensing system to regulate manufacturers, importers, and dealers of firearms.
- The Omnibus Crime Control and Safe Streets Act of 1968: Prohibited anyone under twenty-one years of age from purchasing a handgun.
- The Gun Control Act of 1968: Required that all interstate firearms transfers or sales be made through a federally licensed firearms dealer and prohibited certain categories of people—felons (indicted or convicted), fugitives, drug abusers, mentally ill persons (as determined by adjudication), illegal aliens, dishonorably discharged servicemen, US-citizenship renouncers, and domestic abusers—from possessing firearms.[31]
- The Firearm Owners Protection Act of 1986: Barred the purchase or transfer of automatic weapons without government approval.
- The Undetectable Firearms Act of 1988: Required that all firearms have at least 3.7 oz. of metal that can be detected by a metal detector.
- The Gun-Free School Zones Act of 1990: Criminalized possession or discharge of a firearm in a school zone.
- The Brady Handgun Violence Prevention Act of 1993: Required

that anyone attempting to purchase a firearm from a federally licensed dealer pass a background check.[32]

- The Federal Assault Weapons Ban of 1994: Banned the sale and possession of semiautomatic assault weapons and extended-capacity magazines not grandfathered prior to the enactment of the law.[33]

Of all of these measures, the National Firearms Act of 1934 and the Assault Weapons Ban of 1994 (AWB) were the only ones instituted primarily in an effort to reduce the carnage of mass shootings. The former was passed in response to a series of bloody gangland executions, including the infamous 1929 St. Valentine's Day massacre in Chicago.[34] While there are still machine guns in circulation, the National Firearms Act, in conjunction with the Firearm Owners Protection Act of 1986, sharply cut the availability of machine guns, which likely explains the complete elimination of massacres perpetrated with such automatic-fire weapons.

Like the National Firearms Act, the AWB was introduced following several high-profile mass shootings in the early 1990s: the Luby's restaurant, 101 California Street office complex, and Long Island Railroad train car massacres.[35] Signed into law by President Bill Clinton, the AWB went into effect on September 13, 1994. At the insistence of the gun-rights lobby, however, the bill contained a ten-year sunset provision. As Congress never renewed the ban, it automatically expired on September 13, 2004.

The decade the law was in effect nonetheless resulted in a unique experiment, allowing us to discern what impact, if any, the ban had on gun violence in general and mass shootings in particular. As to the former, the academic consensus seems to be that the AWB had minimal impact on reducing violent crime.[36] This hardly comes as a surprise. After all, most crimes don't involve assault weapons. The real test should be: Did it succeed in its intended purpose of reducing rampage violence? The answer is a resounding yes.

Let's take a closer look.

The best way to assess the impact of something is to conduct what, in social science, we commonly refer to as a time-series analysis. Basically, that's a fancy name for a before-and-after test. Figures 7.1



Fig. 7.1. Gun Massacres Before, During, and After the Assault Weapons Ban of 1994.

Note: The lines in the graph demarcate the start and end points of the Assault Weapons Ban, which was in effect from September 13, 1994, through September 12, 2004. The data are drawn from Table 3.2.

| Period | # Incidents | # Deaths |
|---|---|---|
| Pre -10 | 1 | 6 |
| Pre -9 | 1 | 14 |
| Pre -8 | 4 | 25 |
| Pre -7 | 3 | 20 |
| Pre -6 | 0 | 0 |
| Pre -5 | 2 | 17 |
| Pre -4 | 1 | 16 |
| Pre -3 | 1 | 23 |
| Pre -2 | 4 | 28 |
| Pre -1 | 1 | 6 |
| Ban 1 | 0 | 0 |
| Ban 2 | 0 | 0 |
| Ban 3 | 0 | 0 |
| Ban 4 | 3 | 24 |
| Ban 5 | 1 | 14 |
| Ban 6 | 2 | 14 |
| Ban 7 | 1 | 6 |
| Ban 8 | 1 | 18 |
| Ban 9 | 3 | 9 |
| Ban 10 | 2 | 22 |
| Post +1 | 1 | 20 |
| Post +2 | 2 | 38 |
| Post +3 | 4 | 32 |
| Post +4 | 3 | 45 |
| Post +5 | 2 | 20 |
| Post +6 | 3 | 39 |
| Post +7 | 1 | 39 |
| Post +8 | 3 | 18 |

Gordon Declaration 02022



Fig. 7.2. Gun Massacres by Decade Before, During, and After the Assault Weapons Ban of 1994.
Note: The Assault Weapons Ban was in effect from September 13, 1994, through September 12, 2004.
The data are drawn from Table 3.2.

| | Decade Before AWB | Decade During AWB | Decade After AWB |
|---|---|---|---|
| ■ Incidents | 19 | 12 | 34 |
| ■ Deaths | 155 | 89 | 302 |

and 7.2 provide a look at the before-and-after pictures. In the decade prior to the enactment of the AWB, the United States experienced nineteen gun massacres that resulted in 155 cumulative deaths, for an average death roll of 8.2 fatalities per incident. During the ten-year period that the AWB was in effect, the numbers declined substantially, with only twelve gun massacres, resulting in eighty-nine deaths, for an average of 7.4 fatalities per incident.[37] What's particularly astounding about this time period is that during the first four and a half years of the ban, there wasn't a single gun massacre in the United States. Not one. This is unprecedented in modern American history.[38] Since 1966, the longest streaks without a gun massacre prior to era of the AWB were two instances of consecutive years (1969–1970 and 1979–1980).[39] Then, all of a sudden, from September 1994 to April 1999, the country experienced a long calm. As further evidence of the AWB's effectiveness, once it expired, rampages returned with a vengeance. In the ten years after the ban, the number of gun massacres nearly tripled to thirty-four incidents, sending the total number of deaths skyrocketing to 302, for an average of 8.9 fatalities per incident.[40] These numbers paint a clear picture: America's experiment, while short-lived, was also extremely successful.[41]

## ZEROING OUT GUN MASSACRES

The biggest takeaway from America's experience with a ban on assault weapons and extended-capacity magazines is that gun-control legislation can save lives. But is there a way to get to zero? Is there a way to eliminate gun massacres once and for all? For that, we have to look overseas for insights.

One of the biggest obstacles to successful gun control is the ability to transport firearms across open, contiguous borders. In the United States, it's a problem that allows guns to flow freely from states with lax laws into states with strict laws. A common complaint frequently leveled by elected officials in places like California, Illinois, Maryland, New York, and Massachusetts is that people just need to drive across a state line and they can readily obtain firearms that they can then easily—if perhaps illegally—bring back into their jurisdictions.[42] That

If history is a guide, then it seems likely that the attack on Sandy Hook is the start of the next major reform in gun safety. What is argu-ably the most disturbing shooting in American history kick-started a national dialogue on firearms and it prompted President Obama's Now Is the Time initiative for reducing the carnage of rampage vio-lence. What we don't know is what will be the subsequent tragedy that jolts Congress out of its complacency. But sadly it will likely take another gun massacre on par with Newtown before change is enacted.

As those who fought for automobile and gun safety in the past can attest, now might not be the time, but soon it will be.

## THE WAY FORWARD

One of the criticisms that President Obama's Now Is the Time agenda continues to face is that, considering it was a plan occasioned by the Newtown massacre, its implementation would likely have not stopped Adam Lanza's attack.[35] Recalling the three main com-ponents of the initiative—universal background checks, an assault weapons ban, and a crackdown on illegal gun trafficking and straw purchases—opponents note that none of these would've kept Lanza from getting his hands on firearms. For starters, the guns used in the attack were all legally acquired by his mother after she passed a background check. Moreover, while an assault weapons ban might stem the manufacture of certain military-style rifles in the future, the president's current proposal (like the 1994 ban) would grandfather older models already in circulation, meaning that the AR-15 used by Lanza would have been legal. And, as the AR-15 was not straw-purchased for him, tighter enforcement of gun-trafficking laws also would have not prevented the Sandy Hook slayings.

The Obama administration's plan is a good starting point—espe-cially for purposes of curbing gun violence in general. There are obviously scores of firearms that are employed by criminals that have been obtained without background checks or through illegal trans-actions.[36] In addition, while closing the gun-show loophole wouldn't have kept firearms out of Adam Lanza's hands, other rampage

gunmen like the Columbine killers, who exploited this loophole, would have been prevented from acquiring weapons.[37] Wanting to prevent another circumvention of the Brady Act is certainly a wise policy position. Furthermore, going forward, a ban on assault weapons—even one with gaping loopholes—is still likely to stem some of the bloodshed of rampage violence, as the 1994 AWB did. So, no matter how you see it, the president's proposals are, overall, solid ideas.

However, if the federal government is serious about addressing mass shootings, it must do more. That means instituting gun-safety measures that will go well beyond those that form the centerpiece of the Now Is the Time initiative. Toward this end, there are eight reforms that can be powerful forces in breaking the trinity of rampage violence through weapons deprivation.

1. *Banning and buying back all extended-capacity magazines.* Some gun-control advocates might envision an America where all assault weapons—and perhaps all polymer guns—are banned. Given that there's currently at least one gun in circulation for every American in the population, this is a pipe dream.[38] But there is one measure—controversial as it may be—that if it were to be implemented, would sharply curtail rampage vio-lence: a ban on extended-capacity magazines. Recall from chapter 6, the factor most associated with high death tolls in gun massacres is the use of a magazine holding more than ten bullets. If such magazines were completely removed from cir-culation, the bloodshed would be drastically reduced. Nothing facilitates a shooter's ability to spray people with bullets more than being armed with a firearm equipped with twenty, thirty, and, in the case of James Holmes, one hundred bullets. No one needs that kind of capability. Not even for self-defense.[39]

   To do this, however, would entail more than just a ban on extended-capacity magazines. It would require a mandatory buy-back program, like Australia's, that would recoup maga-zines that were not retrofitted to a ten-round cap. Bans are sub-optimal if prohibited items are grandfathered, allowing those already possessed by lawful owners to remain in circulation. At

Case 2:17-cv-00903-WBS-KJN   Document 40-6   Filed 06/15/17   Page 148 of 175

usatoday.com/story/news/nation/2013/12/05/fbi-mass-killing-data-inaccurate/3666953 (accessed December 16, 2014).

62. Jason Kissner, "The Sandy Hook School Massacre and FBI Data Anomalies," *Global Research Newsletter*, September 27, 2014, http://www.globalresearch.ca/the-sandy-hook-school-massacre-and-fbi-data-anomalies/5404658 (accessed April 30, 2015).

63. From 1976 to 2011, eighty-seven gun massacres resulting in the murder of six gun massacre victims were cataloged in the SHR data. Of those, twenty-three were erroneous. That means only sixty-four of the high-fatality mass shootings in the SHR data sets were verifiable. That's an error rate of 26 percent. But that speaks only to erroneous incidents entered into the system. There were also nineteen gun massacres I documented in table 3.2 that were omitted from the SHR data sets. When those missing incidents are accounted for, the error rate jumps 40 percent. In other words, the accuracy rate for gun massacres in the SHR data sets is only 60 percent. Similarly, *USA Today*, in its own examination of mass killings since 2006, found that the SHR data sets had an accuracy rate of only 57 percent. Meghan Hoyer, "In FBI Murder Data, Mass Killings Often Go Missing," *USA Today*, September 10, 2014, http://www.usatoday.com/story/news/nation/2014/09/10/mass-killings-missing-data/12990815 (accessed December 16, 2014).

64. In all fairness, Fox has acknowledged the limitations of working with SHR data. He has introduced a few statistical corrections to the overall data set, but none are the techniques that he recommends for filling in the gaps that can generate accurate numbers pertaining to gun massacres. James Alan Fox, "Missing Data Problems in the SHR: Imputing Offender and Relationship Characteristics," *Homicide Studies* 8 (August 2004): 214–54.

65. John Lott is certainly a polemic figure in the gun debate, often referred to as a "discredited scholar" and even accused of unethical conduct. For more on the controversies surrounding Lott, see chapter 5. Also, see Evan DeFilippis and Devin Hughes, "Shooting Down the Gun Lobby's Favorite 'Academic': A Lot of Lies," *Armed with Reason*, December 1, 2014, http://www.armedwithreason.com/shooting-down-the-gun-lobbys-favorite-academic-a-lot-of-lies (accessed December 16, 2014).

66. The argument that an increase in gun ownership results in less crime is based predominantly on John Lott, *More Guns, Less Crime: Understanding Crime and Gun Control Laws*, 3rd ed. (Chicago: University of Chicago Press, 2000).

67. Lott's report utilized the same fatality threshold as the Everytown report: a minimum of four victims shot to death. John R. Lott Jr., *The Myths about Mass Public Shootings: Analysis*, Report of the Crime Prevention Research Center,

October 9, 2014, p. 4, http://crimepreventionresearchcenter.org/wp-content/uploads/2014/10/CPRC-Mass-Shooting-Analysis-Bloomberg2.pdf (accessed October 27, 2014).

68. Ibid., p. 5.

69. Ibid., p. 19.

70. Beck also cites the research of criminologist Grant Duwe, who suggests that mass shootings might have actually decreased in the recent past. As the *Los Angeles Times* noted, "The 26 public shooting massacres [Duwe] tallied between 2000 and 2009 were significantly down from the 43 cases he counted in the 1990s." Matt Pearce, "2012 Is Tragic, but Mass Shootings Not Increasing, Experts Say," *Los Angeles Times*, December 18, 2012, http://articles.latimes.com/2012/dec/18/nation/la-na-nn-mass-shootings-common-20121218 (accessed October 27, 2014). Unlike Fox, Duwe excludes certain mass shootings that were motivated by criminal enterprise or occurred in private, making his conclusions subject to some of the same limitations associated with the *Mother Jones* analysis.

71. "Findings of Fact, Conclusions of Law and Order," *Colorado Outfitters Association et al. v. Hickenlooper*, Civil Action No. 13-cv-01300-MSK-MJW, US District Court for the District of Colorado, June 26, 2014, http://michellawyers.com/wp-content/uploads/2013/05/Cooke-v-Hickenlooper_Findings-of-Fact-Conclusions-of-Law-and-Order.pdf (accessed November 23, 2014).

72. "Reporter's Transcript: Trial to Court—Day Three," *Colorado Outfitters Association et al. v. Hickenlooper*, Civil Action No. 13-cv-01300-MSK-MJW, US District Court for the District of Colorado, April 2, 2014, p. 529, http://michellawyers.com/wp-content/uploads/2013/05/Cooke-v-Hickenlooper_Reporters-Transcript-Trial-to-Court-Day-Three.pdf (accessed November 23, 2014). Kleck elaborated on his reasoning for opposing a ban on magazine capacity in a *Wall Street Journal* op-ed:

The availability of large-capacity magazines is certainly irrelevant to ordinary gun violence, which usually involves few or no shots fired, but it is even irrelevant to virtually all mass shootings, because the shooters either have multiple guns, making it easy to fire many rounds without reloading, or they have ample time and opportunity to reload because there is no one present willing to stop them while they reload. . . .

When there are willing interveners, it limits how much death and injury a shooter can inflict with the initial magazine; the smaller the magazine, the fewer the victims. Unfortunately, these conditions almost never prevail in mass shootings. . . .

Any restrictions that limit the availability of guns for criminal purposes

Gordon Declaration 02025

Case 1:17-cv-00903-WBS-KJN Document 106 Filed 06/15/17 Page 149 of 175

also limit their availability for self-protection. . . . Making guns unavailable for self-defense can therefore cost lives, and this cost must be taken into account when considering the possible slight benefit of measures that would prevent only the rarest of crimes.

Gary Kleck, "Mass Shootings Aren't the Real Gun Problem," *Wall Street Journal*, January 15, 2011, http://www.wsj.com/articles/SB10001424052748709959105760 819107521808064 (accessed November 23, 2014).

73. Kleck has served as an expert witness in at least five other gun rights cases: *Heller v. District of Columbia, Fyock v. Sunnyvale, San Francisco Veterans Police Officers Association v. San Francisco; Tardy v. O'Malley,* and *Shew v. Malloy.* See "Reporter's Transcript: Trial to Court—Day Three," pp. 582–83.

74. Gary Kleck, *Targeting Guns: Firearms and Their Control* (Hawthorne, NY: Aldine de Gruyter, 1997), pp. 194–25.

75. "Reporter's Transcript: Trial to Court—Day Three," p. 559.

76. Ibid.

77. Ibid., p. 580.

78. "Reporter's Transcript: Trial to Court—Day Five," *Colorado Outfitters Association et al. v. Hickenlooper,* Civil Action No. 13–cv–01300–MSK–MJW, US District Court for the District of Colorado, April 4, 2014, p. 975 (emphasis added), http://michellawyers.com/wp-content/uploads/2013/05/Cooke-v-Hickenlooper-Reporters-Transcript-Trial-to-Court-Day-Five.pdf (accessed November 23, 2014).

79. Ibid., pp. 977–78.

80. The forty-five-minute time frame was reported in Megan Gallegos, "Data Questioned in Gun Control Trial," *Courthouse News Service,* April 6, 2014, http://www.courthousenews.com/2014/04/06/66817.htm (accessed November 23, 2014).

81. "Reporter's Transcript: Trial to Court—Day Five," p. 993.

82. Ibid., p. 995.

83. "Findings of Fact, Conclusions of Law, and Order," p. 35. In fact, the judge's opinion upholding Colorado's law noted, "The General Assembly considered evidence that mass shootings occur with alarming frequency and often involve . . . of large-capacity magazines." Ibid., p. 82. In March 2016, the US Court of Appeals for the Tenth Circuit vacated the district court's ruling on the grounds that the plaintiffs lacked standing to bring their legal action. The result was that the lawsuit was dismissed. *Colorado Outfitters Association et al. v. Hickenlooper,* Nos. 14-1290 and 14-1292, March 22, 2016, https://www.ca10.uscourts.gov/opinion14/14-1290.pdf (accessed April 17, 2016).

84. Because research funding was not available to me, I didn't have the sources to search out and catalog every mass shooting—at least four people shot in

a single incident—that occurred in the United States since 1966. Just tracking down the mass shootings where five people were shot to death would have likely more than doubled my data set. *USA Today* found a similar pattern. Between January 1, 2006, and June 30, 2015, the newspaper identified 39 mass shootings resulting in six or more deaths. Shifting the baseline to five or more deaths increased the data set by more than double (42 additional incidents), to 81 such mass shootings. When the newspaper included shootings resulting in four or more deaths, the tally jumped by 130 incidents to 211 total mass shootings. The *USA Today* mass murder data set can be accessed at http://www.usatoday.com/story/news/nation/2013/09/16/mass-killings-data-map/2820423 (accessed December 13, 2015).

85. As figure 8.1 illustrates, there were three quasi-fatline periods when total deaths in gun massacres were accumulating at a rate of zero or close to zero (1968–1972, 1977–1980, and 1993–1998). The past decade, however, has exhibited no such pattern.

86. The ten-year period 1996–2005 was the decade with the least number of gun massacres as well as the least number of cumulative deaths resulting from such attacks. A possible explanation for this decline is offered in chapter 7.

87. By "five-plus-shooting-year," I mean a calendar year with five or more gun massacres. Similarly, by "four-plus-shooting-year," I mean a calendar year with four or more gun massacres.

88. Gary Fields and Cameron McWhirter, "In Medical Triumph, Homicides Fall Despite Soaring Gun Violence," *Wall Street Journal,* December 8, 2012, http://www.wsj.com/articles/SB10001424127887324171250457818136068427812 (accessed February 10, 2015).

89. Since 1973, the National Opinion Research Center at the University of Chicago has been surveying how many households have firearms. These gun-ownership rates are compiled roughly every two years by the General Social Survey. The data from 1973 to 2012 are available in Tom W. Smith, Faith Laken, and Jaeszk Son, *Gun Ownership in the United States: Measurement Issues and Trends,* General Social Survey Methodological Report No. 123 (Chicago: National Opinion Research Center, 2014), http://publicdata.norc.org/41000/gss/documents/MTRT/MR123%20Gun%20Ownership.pdf (accessed March 17, 2015). The data for 2014 are reported in "Gun Ownership among Americans at a Record Low, Survey Finds," *Chicago Tribune,* March 10, 2015, http://www.chicagotribune.com/news/local/breaking/chi-gun-ownership-record-low-20150310-story.html (accessed March 17, 2015).

90. Since 1973, when the General Social Survey began probing household gun-ownership rates, the number of households in the United States has nearly doubled from 68 million to 124 million. Yet the absolute number of armed

Gordon Declaration 02026

Case 2:17-cv-00903-WBS-KJN Document 40-6 Filed 08/15/17 Page 150 of 175

households has remained fairly constant at an average of 40 million. The lowest number of households with guns was recorded in 1973 (approximately 33 million) and the highest number was recorded in 1989 (approximately 46 million). In 2014, the number of households in the United States with firearms is again roughly 40 million. Annual data on the number of households in the United States is drawn from "Number of Households in the U.S. from 1960 to 2013," *Statista*, http://www.statista.com/statistics/183635/number-of-households-in-the-us (accessed March 17, 2015). As the data only extends to 2013, the number of households in the United States in 2014 has been estimated to be 124 million, based on a projection from previous years. The absolute number of armed households was calculated by multiplying the number of households by the percentage of households that the General Social Survey found had guns at home.

91. Todd C. Frankel, "Why the CDC Still Isn't Researching Gun Violence, Despite the Ban Being Lifted Two Years Ago," *Washington Post*, January 14, 2015, http://www.washingtonpost.com/news/storyline/wp/2015/01/14/why-the-cdc-isnt-researching-gun-violence-despite-the-ban-being-lifted-two-years-ago (accessed February 10, 2015).

92. The list of incidents is available online at massshootingtracker.org as well at the sub-Reddit /r/GunsAreCool. Every incident listed in the Mass Shooting Tracker contains a link to a news media account that allows for verification of the perpetrator, for a total of four killed or wounded by gunfire. The incidents—attacks involving four or more victims shot—include the gunmen in the number of people shot. Therefore, an unknown portion of these incidents actually involved three innocent people being shot alongside the shooter.

93. National Weather Service, "How Dangerous Is Lightning?" http://www.lightningsafety.noaa.gov/odds.htm (accessed February 18, 2015).

94. In a December 2015 CBS News / *New York Times* poll conducted in the immediate aftermath of the terrorist attack in San Bernardino, respondents identified terrorism as the most important problem facing the United States. In addition, 79 percent of respondents indicated that they felt there would likely be another terrorist attack on American soil within the next few months. Anthony Salvanto et al., "Poll: After San Bernardino Attacks, American Concern about Terror Threat Rises," CBS News, December 10, 2015, http://www.cbsnews.com/news/poll-after-san-bernardino-attacks-american-concern-about-terror-threat-rises (accessed December 13, 2015).

95. Klarevas, "Trends in Terrorism," p. 80.

96. In the past decade, there have been seven lethal terrorist attacks perpetrated by jihadists on American soil. These seven attacks resulted in a total of forty-two fatalities. Louis Klarevas, "Almost Every Fatal Terrorist Attack in America

Since 9/11 Has Involved Guns," *Vice*, December 4, 2015, http://www.vice.com/read/almost-every-fatal-terrorist-attack-in-america-since-911-has-involved-guns-123 (accessed December 13, 2015). At a time when Americans are particularly concerned about becoming the victim of an ISIS-inspired act of terrorism, it's valuable to identify the odds of that happening. Basically, in any given year, the odds of being killed in an act of jihadist terrorism on American soil are around one in eighty million, an astronomically lesser chance than being killed in a mass shooting on American soil, which has a likelihood of about one in 700,000. These odds were calculated by dividing the current estimated population of the United States ($320 million people) by the average number of people killed in the United States annually in jihadist terrorist attacks (four people) and mass shootings (458 people).

## CHAPTER FOUR: UNSTABLE, ANGRY, ARMED MEN

1. Unless otherwise noted, all the information on the Virginia Tech massacre is drawn from Virginia Tech Review Panel, *Mass Shootings at Virginia Tech, April 16, 2007: Report of the Review Panel*, August 2007, http://www.washingtonpost.com/wp-srv/metro/documents/vatechreport.pdf (accessed May 2, 2015).

2. Ibid., p. 94.

3. Quoted in ibid., p. 35.

4. Quoted in ibid., p. 37.

5. Quoted in ibid., p. 42.

6. Quoted in ibid., p. 50.

7. Quoted in ibid., p. 50.

8. Quoted in ibid., p. 47.

9. Quoted in ibid., p. 48.

10. 18 USC § 922(g)(4).

11. Of the sixty-two occupants in the four classrooms Cho breached, only thirteen avoided being shot; ten of them as a result of jumping from the second-floor window and the other three presumably by playing dead.

12. Six more students were hurt as a result of jumping out of the windows in Professor's Librescu's classroom.

13. "Killer's Manifesto: You Forced Me into a Corner," CNN, April 18, 2007, http://edition.cnn.com/2007/US/04/18/vtech.shooting/index.html (accessed May 2, 2015).

14. Ibid. See also M. Alex Johnson, "Gunman Sent Package to NBC News," NBC News, April 19, 2007, http://www.nbcnews.com/id/18195423#.VdC-Mvmqlp (accessed May 2, 2015).

86. Ibid., p. 11. See also Paul Scarlata, "Shootout Polymer Police Pistols," Guns & Ammo Handguns, September 24, 2010, http://www.handgunsmag.com/reviews/shared_handguns_polysh_032707 (accessed July 26, 2015).

87. Barrett, Glock, p. 86.

88. Ibid., p. 14.

89. Ibid., p. 263.

90. Scarlata, "Shootout"

91. Barrett, Glock, p. 32.

92. Ibid., pp. 56, 142–43.

93. Ibid., p. 192.

94. Ibid., p. 56.

95. Ibid., p. 56.

96. Polymer has brought such distinct advantages to firearms that gun makers have begun manufacturing polymer revolvers. See Dick Metcalf, "Polymer evolution," Shooting Times, January 3, 2011, http://www.shootingtimes.com/handgun_st_polymerevo_201005 (accessed July 26, 2015). Typically, .38-caliber revolvers hold five or six bullets in the cylinder.

97. Massad Ayoob, "Maximizing Semi-Auto Handgun Performance," Daily Caller, September 23, 2014, http://dailycaller.com/2014/09/23/massad-ayoob-maximizing-semi-auto-handgun-performance/ (accessed July 29, 2015). Ayoob makes an important point that, when calculating firing rates and reload times, we should not use best-case scenario and world-record times. We should use reasonable, average times. As he notes, "World Champion Jerry Miculek is on record doing six aimed shots from his .45 revolver, reloading with a moon clip, and firing six more in an incredible 2.99 seconds overall. There is only one Jerry Miculek. Most folks take longer to recharge a wheel gun." Ibid.

98. Brookes, "AR-15 Is More Than a Gun."

99. This subsection has benefitted from the thoughts of Kevin J. Ashton, including correspondence between us on his now-defunct blog. See Kevin Ashton, The Politics of Mass Killing," January 24, 2013, archived at http://web.archive.org/web/20150110031240/http://kevinjashton.com/2013/01/24/the-physics-of-mass-killing (accessed July 29, 2015).

100. The details of the Tucson massacre are drawn from Gabrielle Giffords and Mark Kelly, Enough: Our Fight to Keep America Safe from Gun Violence (New York: Scribner, 2014), pp. 47–74.

101. Ibid.

102. Mark Kelly Makes Case against High-Capacity Gun Magazines," ABC News, January 30, 2013, http://abcnews.go.com/Politics/video/mark-kelly-makes-case-high-capacity-gun-magazines-18356282 (accessed July 29, 2015).

103. Giffords and Kelly, Enough, p. 68.

104. Reload time is calculated as beginning the moment the final bullet is fired and ending the moment the first reload bullet is chambered and fired.

105. The calculations in this section are informed by Ayoob, "Maximizing Semi-Auto Handgun Performance." See also Jim Wilson, "The Revolver Speed Load," American Rifleman, February 10, 2012, http://www.americanrifleman.org/articles/2012/2/10/the-revolver-speed-load (accessed July 29, 2015); and Kenan Flasowski, "Semi-Automatic Handgun Reloading," Shooting Illustrated, October 25, 2012, http://www.shootingillustrated.com/articles/2012/10/25/semi-automatic-handgun-reloading (accessed July 29, 2015). For an article that suggests faster rates of fire than most firearms experts seem to endorse, see Brian Palmer, "How Many Times Can You Shoot a Handgun in Seven Minutes? More Than a Thousand," Slate, November 9, 2009, http://www.slate.com/articles/news_and_politics/explainer/2009/11/how_many_times_can_you_shoot_a_handgun_in_seven_minutes.html (accessed July 29, 2015).

106. Lynn Bartels, Kurtis Lee, and Joey Bunch, "Colorado Senate President John Morse, State Sen. Angela Giron Ousted," Denver Post, September 10, 2013, http://www.denverpost.com/breakingnews/ci_24066108/colorado-senate-president-john-morse-recalled-angela-giron (accessed July 31, 2015).

107. Eli Stokols, "Herpin Explains Why It Was a 'Good Thing' Holmes Had Large Ammo Magazine," KDVR, February 14, 2014, http://kdvr.com/2014/02/12/herpin-a-good-thing-that-james-holmes-had-100-round-magazine (accessed July 31, 2015). See also Kurtis Lee, "Sen. Bernie Herpin Says 'Maybe a Good Thing' Aurora Theater Gunman Had 100-Round Magazine," Denver Post, February 12, 2014, http://blogs.denverpost.com/thespot/2014/02/12/sen-bernie-herpin-says-maybe-a-good-thing-aurora-theater-gunman-100-round-magazine/105925 (accessed July 31, 2015). Herpin's repeal was defeated by the committee. Marc Stewart and Phil Tenser, "State Sen. Herpin That 'Maybe a Good Thing That James Holmes Had a 100-Round Magazine," KMGH, February 12, 2014, http://www.thedenverchannel.com/news/politics/state-sen-herpin-suggests-it-was-maybe-a-good-thing-that-james-holmes-had-a-100-round-magazine (accessed July 31, 2015).

108. James Holmes discussed his shooting abilities in an interview with court-appointed psychiatrist Dr. William Reid. That conversation, which was videotaped, was played for the jury during Holmes's trial. See Jordan Steffan, "Aurora Theater Shooting Trial, the Latest from Day 22," Denver Post, June 1, 2015 http://www.denverpost.com/theater-shooting-trial/ci_28227922/aurora-theater-shooting-trial-latest-from-day-22 (accessed July 31, 2015).

109. Shortly after his gaffe, Herpin apologized to the victims' families: "There's nothing I can say to relieve their pain; I certainly didn't intend to add to their pain." Megan Schrader, "Republican Sen. Bernie Herpin Apologizes for

'Insensitive' Gun Remark," *Gazette*, February 14, 2014, http://gazette.com/republican-sen-bernie-herpia-apologizes-for-insensitive-gun-remark/article/1514605 (accessed July 31, 2015).

110. The use of the term *average* in this section is a reference to the mean average.

111. To the best of my knowledge, the impact of different types of firearms is rarely a topic of study. One notable exception is D. C. Reedy and C. S. Koper, "Impact of Handgun Types on Gun Assault Outcomes: A Comparison of Gun Assaults Involving Semiautomatic Pistols and Revolvers," *Injury Prevention* 9 (June 2003): 151–55. The Reedy and Koper article, while insightful, examines all types of criminal gun attacks that took place in one municipality; Jersey City, New Jersey; As such, its findings do not really apply to mass shootings.

112. The use of only revolvers produces an identical average. The use of only rifles results in an average seven deaths per incident. And the use of only shotguns results in the lowest recorded average of 6.7 deaths per incident.

113. Out of the 111 gun massacres since 1966, ninety-six were perpetrated by only one gunman and fifteen were perpetrated by multiple gunmen. Of those fifteen incidents, ten involved two shooters, one involved three shooters, three involved four shooters, and one involved more than four shooters.

114. Quoted in Steffan, "Aurora Theater Shooting Trial, the Latest from Day 22."

## CHAPTER SEVEN: BREAKING THE TRINITY

1. The audio of Pacific Air Lines Flight 773's final transmission to Oakland Air Traffic Control is available at "Pacific Air Lines Flight 773 ATC Recording May 7, 1964," YouTube video, 0:35, posted by "starwarsfandude," March 29, 2013, https://www.youtube.com/watch?v=L1WYIAeuq4w (accessed December 11, 2015).

2. Civil Aeronautics Board, *Aircraft Accident Report: Pacific Air Lines, Inc., Fairchild F27, N2770R, Near San Ramon, California, May 7, 1964*, November 2, 1964, http://dotlibrary.specialcollection.net/Document/db=DOT-AIRPLANE ACCIDENTS&query=(select+773) (accessed December 11, 2015).

3. Ibid.

4. One of the principal investigators of the crash of Pacific Air Lines Flight 773, Darrol Davison, in a KTVU "Second Look" news segment discussed how, in 1964, security provisions didn't exist to prohibit guns from being brought aboard airplanes. The news segment is available at "Pacific Air Lines Flight 773," YouTube video, 7:07, posted by "Tom Bailey," September 20, 2012, https://www.youtube.com/watch?v=fpQu4TJh-8Q (accessed December 11, 2015).

5. Jane Engle, "U.S. Aviation Security Timeline," *Los Angeles Times*, June 12, 2011, http://articles.latimes.com/2011/jun/12/travel/la-tr-airline-safety-timeline-20110612 (accessed December 11, 2015); See also Bryan Gardiner, "Off with Your Shoes: A Brief History of Airport Security," *Wired*, June 14, 2013, http://www.wired.com/2013/06/fa_planehijackings (accessed December 11, 2015).

6. Gun owners recall that in 1968 regulations were changed to prohibit carrying a firearm aboard an airplane, requiring that the weapon be checked in cargo-hold luggage. See, for example, "When Did Carrying Become Forbidden on Airplanes?" *High Road*, September 7, 2010, http://www.thehighroad.org/archive/index.php/t-540773.html (accessed December 11, 2015).

7. Civil Aeronautics Board, *Aircraft Accident Report*.

8. "Investigations: Death Wish," *Time*, November 6, 1964, http://content.time.com/time/magazine/article/0,9171,876874,00.html (accessed December 11, 2015)

9. Ibid.

10. Wallace Turner, "Pilot Reported Calling, 'I've Been Shot,' Before Crash that Killed 44 on Coast," *New York Times*, May 6, 1964, http://www.nytimes.com/1964/05/09/pilot-reported-calling-ive-been-shot-before-crash-that-killed-44-on-coast.html (accessed December 11, 2015).

11. Civil Aeronautics Board, *Aircraft Accident Report*.

12. "Investigations: Death Wish."

13. Civil Aeronautics Board, *Aircraft Accident Report*.

14. For an excellent introduction to strategy, including a review of how discussion, defense, and disarmament relate to each other, see Thomas C. Schelling, *Arms and Influence*, rev. ed. (New Haven, CT: Yale University Press, 2008).

15. Keith B. Payne, *Deterrence in the Second Nuclear Age* (Lexington: University of Kentucky Press, 1996), p. 86. See also Michael Howard, "Lessons of the Cold War," *Survival* 36 (Winter 1994-95): 166.

16. Tom Walsh, "How's the Air up There?" *Barre Montpelier Times Argus*, October 14, 2015, http://www.timesargus.com/article/20151014/OPINION02/151019749 (accessed December 11, 2015).

17. Larry Pratt, "Strange Priorities," Gun Owners of America, October 2001, http://www.gunowners.org/op0136.htm (accessed December 11, 2015).

18. "Packing Heat on Planes," Fox News, February 8, 2007, http://www.foxnews.com/story/2007/02/08/packing-heat-on-planes.html (accessed December 11, 2015); Joe Sharkey, "Owners Argue Merits of Firearms on Airplanes," *New York Times*, January 2, 2012, http://www.nytimes.com/2012/01/03/business/arguing-the-merits-of-guns-on-airplanes.html (accessed December 11, 2015); Robert Farago, "As a Pilot, I Don't Understand the Reason Why We Can't Have

Case 2:17-cv-00903-WBS-KJN   Document 40-6   Filed 06/24/17   Page 153 of 175

19. Google, "U.S. Aviation Security Timeline."

20. Paul Michel and Dan Herbeck, *American Terrorist: Timothy McVeigh and the Oklahoma City Bombing* (New York: Harper, 2001).

21. John Mueller and Mark G. Stewart, *Chasing Ghosts: The Policing of Terrorism* (New York: Oxford University Press, 2016), pp. 98–100.

22. National Forensic Science Technology Center, "A Simplified Guide to Explosives Analysis: Principles of Explosives Analysis," A Simplified Guide to Forensic Science, 2013, http://www.forensicsciencesimplified.org/explosives/principles.html (accessed December 11, 2015).

23. Louis Klarevas, "The Idiot Jihadist Next Door," *Foreign Policy*, December 1, 2011, http://foreignpolicy.com/2011/12/01/the-idiot-jihadist-next-door (accessed December 11, 2015).

24. Jana Winter, "Anatomy of a Bomb: An Inexpensive and Deadly Mishmash of Ingredients," Fox News, May 3, 2010, http://www.foxnews.com/us/2010/05/03/anatomy-bomb.html (accessed December 11, 2015); "Timeline—From Parking Car Bomb to Catching a Plane," *Reuters*, May 4, 2010, http://www.reuters.com/article/timessquare-investigation-idUSN0411707T20100504 (accessed December 11, 2015); and Peter Grier, "Times Square Bomb: Did Pakistan Taliban Lend Its 'Team'?" *Christian Science Monitor*, May 10, 2010, http://www.csmonitor.com/USA/2010/0510/Times-Square-bomb-Did-Pakistan-Taliban-send-its-Cream (accessed December 11, 2015).

25. Louis Klarevas, "Bombing on the Analysis of the Times Square Bomb Plot," *Huffington Post*, May 25, 2011, http://www.huffingtonpost.com/louis-klarevas/bombing-on-the-analysis-o_b_565428.html (accessed December 11, 2015).

26. David Hemenway, *While We Were Sleeping: Success Stories in Injury and Violence Prevention* (Berkeley: University of California Press, 2009).

27. Daniel W. Webster and Jon S. Vernick, eds., *Reducing Gun Violence in America: Informing Policy with Evidence and Analysis* (Baltimore, MD: Johns Hopkins University Press, 2013), http://home.uchicago.edu/ludwigj/papers/Impact%20Body%20Act%202013.pdf (accessed December 11, 2015).

28. Erin G. Richardson and David Hemenway, "Homicide, Suicide, and Unintentional Firearm Fatality: Comparing the United States with Other High-Income Countries, 2003," *Journal of Trauma* 70 (January 2011): 238–43.

29. Sarah Kaplan, "American Exceptionalism and the 'Exceptionally American' Problem of Mass Shootings," *Washington Post*, August 27, 2015, https://www.washingtonpost.com/news/morning-mix/wp/2015/08/27/american-exceptionalism-and-the-exceptionally-american-problem-of-mass-shootings (accessed December 11, 2015).

30. David Hemenway, *Private Guns, Public Health* (Ann Arbor: University of Michigan Press, 2006).

31. The Gun Control Act of 1968 does not apply to "antique firearms" manufactured prior to 1899. For the statutory definition of "antique firearm," see 18 USC § 921(a)(16).

32. The Brady Handgun Violence Prevention Act of 1993 does not apply to "antique firearms" manufactured prior to 1899. For the statutory definition of "antique firearm," see 18 USC § 921(a)(16).

33. Hemenway, *Private Guns, Public Health*, pp. 209–12.

34. Bureau of Alcohol, Tobacco, Firearms, and Explosives, "National Firearms Act," ATF, November 9, 2015, https://www.atf.gov/rules-and-regulations/national-firearms-act (accessed December 11, 2015).

35. Bruce H. Kobayashi and Joseph E. Olson, "In Re: 101 California Street: A Legal and Economic Analysis of Strict Liability for the Manufacture and Sale of 'Assault Weapons,'" *Stanford Law and Policy Review* 8 (Winter 1997): 41–51.

36. Christopher S. Koper, "America's Experience with the Federal Assault Weapons Ban, 1994–2004: Key Findings and Implications," in *Reducing Gun Violence in America: Informing Policy with Evidence and Analysis*, ed. Daniel W. Webster and Jon S. Vernick (Baltimore, MD: Johns Hopkins University Press, 2013), pp. 157–71, http://home.uchicago.edu/ludwigj/papers/Impact%20of%20Brady%20Act%202013.pdf (accessed December 11, 2015).

37. Out of the twelve gun massacres that occurred while the AWB was in effect, three involved assault weapons and six involved extended-capacity magazines. I have been unable to uncover any evidence that any of these instruments were illegal under the AWB. In fact, most were grandfathered, meaning that they were exempted by the ban because they were legally in circulation prior to the AWB's enactment.

38. When viewed in terms of full calendar years, the massacre-free period ran five consecutive years, from 1994 to 1998, although it must be noted that the AWB was not in effect for most of 1994. There were also no gun massacres in 2001. When 2001 is combined with the four-and-a-half-year period without a high-fatality mass shooting from September 13, 1994, through April 20, 1999, we see that over half of the decade that the AWB was in effect was massacre-free.

Gordon Declaration 02030

# Exhibit 61

Gordon Declaration 02031

BILL ANALYSIS

```
-----------------------------------------------------------------
|SENATE RULES COMMITTEE        |                         SB 396|
|Office of Senate Floor Analyses |                             |
|1020 N Street, Suite 524        |                             |
|(916) 651-1520        Fax: (916) |                             |
|327-4478                        |                             |
-----------------------------------------------------------------
```

THIRD READING

Bill No:  SB 396
Author:   Hancock (D) and Steinberg (D), et al.
Amended:  5/15/13
Vote:     21

 SENATE PUBLIC SAFETY COMMITTEE  : 5-2, 4/16/13
AYES:  Hancock, Block, De León, Liu, Steinberg
NOES:  Anderson, Knight

 SENATE APPROPRIATIONS COMMITTEE  : 5-2, 05/23/13
AYES: De León, Hill, Lara, Padilla, Steinberg
NOES: Walters, Gaines


 SUBJECT  :   Firearms:  magazine capacity

 SOURCE  :   Author

 DIGEST  :   This bill prohibits, beginning July 1, 2014,
possession of any ammunition magazine that is capable of holding
more than 10 rounds of ammunition, except as specified, and
amends the definition of large-capacity magazine.

 ANALYSIS  :

Existing law:

1. Defines a "large-capacity magazine" as "any ammunition
   feeding device with the capacity to accept more than 10
   rounds, but shall not be construed to include any of the
   following:

                                          CONTINUED


                                    SB 396
                                    Page
2

    A.    A feeding device that has been permanently altered so
          that it cannot accommodate more than 10 rounds.

    B.    A .22 caliber tube ammunition feeding device.

    C.    A tubular magazine that is contained in a lever-action
          firearm.

2. Provides that, except as specified, commencing January 1,
   2000, any person in this state who manufactures or causes to
   be manufactured, imports into the state, keeps for sale, or
   offers or exposes for sale, or who gives, or lends, any
   large-capacity magazine is punishable by imprisonment in a
   county jail not exceeding one year or imprisonment for 16
   months, two or three years.

3. Provides that, upon a showing that good cause exists, the
   Department of Justice may issue permits for the possession,
   transportation, or sale between a licensed firearms dealer
   and an out-of-state client, of large-capacity magazines.

4. Provides that, except as specified, any large-capacity
   magazine is a nuisance and is subject to an injunction
   against its possession, manufacture or sale, and is subject
   to confiscation and summary destruction.

This bill:

1. Prohibits, beginning July 1, 2014, possession of any
   ammunition magazine that is capable of holding more than 10
   rounds of ammunition, except as specified.

2. Amends the definition of large-capacity magazine to include a
   feeding device that had a capacity of more than 10 rounds but
   has been permanently modified to hold no more than 10 rounds
   of ammunition.

Gordon Declaration 02032

3. Requires that any person who, prior to July 1, 2014, legally
   possesses a large-capacity magazine dispose of that magazine
   by removing it from the state, selling the large-capacity
   magazine to a licensed firearms dealer before July 1, 2014,
   destroying it, or surrendering it to a law enforcement agency
   for destruction.

                                              CONTINUED


                                              SB 396
                                              Page
   3

   FISCAL EFFECT :   Appropriation: No   Fiscal Com.: Yes
Local: Yes


According to the Senate Appropriations Committee:


   Unknown, potential increase in annual state incarceration
   costs (General Fund) to the extent additional felony
   convictions for unlawful possession of a large-capacity
   magazine to individuals with a prior serious or violent
   offense are sentenced to state prison.  For every 50
   additional felony convictions, increased annual incarceration
   costs of $1.4 million to $3 million (General Fund),
   compounding to $2.8 to $6 million for overlapping sentences
   assuming the middle term of the sentencing triad.


   Increased annual local incarceration costs (Local) for
   unlawful possession of a large-capacity magazine as either a
   misdemeanor offense or a felony offense with no serious or
   violent prior conviction.

   Potentially significant costs to local law enforcement
   agencies to destroy large-capacity magazines that are
   surrendered, as authorized under the provisions of this bill.

   SUPPORT  :   (Verified  5/23/13)

AAUW of California
ADL - Anti-Defamation League
Alameda County District Attorney Nancy E. O'Malley
Alameda Police Department
American Academy of Pediatrics
Auburn Area Democratic Club
Bend the Arc: Jewish Partnership for Justice
California American College of Emergency Physicians
California Chapters of the Brady Campaign to Prevent Gun
Violence
   (Individual Chapters of the Brady Campaign from the following
   Counties and regions: Antelope Valley, Contra Costa, Long
   Beach, Los Angeles, Marin, Napa, Nevada, Oakland, Orange
   County, Pomona, San Joaquin, Sacramento Valley, San Diego, San

                                              CONTINUED


                                              SB 396
                                              Page
   4

   Fernando Valley, San Francisco, San Mateo, Santa Barbara,
   Santa Clara, Santa Cruz, Solano, Sonoma, South Bay LA, Tri
   City Alameda County, Ventura and Yolo)
California Church Impact
California Federation of Teachers
California Partnership to End Domestic Violence
California State Parent Teachers Association
Chula Vista Police Department
Christy Lynn Foundation of Orange County
City of Chula Vista
City of Oakland
City of San Leandro Police Department
CLUE California
Coalition Against Gun Violence
Contra Costa County Supervisor John Gioia
County of Los Angeles Sheriff Lee Baca
County of Santa Barbara District Attorney Joyce E. Dudley
Courage Campaign
Credo Action
Democratic Women of Santa Barbara County
Doctors for America
El Cerrito Police Department
Emeryville Police Department
Friends Committee on Legislation of California
Hercules City Council Member Sherry McCoy
Laguna Woods Democratic Club, Orange County
Law Center to Prevent Gun Violence

                                              Gordon Declaration 02033

```
Livermore Police Department
Los Angeles Mayor Antonio Villaraigosa
Los Angeles Police Chief Charlie Beck
Moms Demand Action for Gun Sense in America, San Francisco
    Bay Area Chapter
National Council of Jewish Women
Neighbors United to Protect Our Communities
Oakland Police Department
PICO California
Piedmont Police Department
South County Citizens against Gun Violence of Orange County
St. Stephens Church
Tri-Cities Democratic Forum
City of Hercules, Vice-Mayor Myrna de Vera
Violence Prevention Coalition of Orange County
Women for: Orange County
Youth Alive!
```

                                                CONTINUED


                                                          SB 396
                                                          Page
—————————
5


  OPPOSITION :  (Verified 5/23/13)

```
Calguns Foundation
California Association of Federal Firearms Licensees
California Public Defenders Association
California Right to Carry
California Rifle and Pistol Association, Inc.
California Sportsman's Lobby, Inc.
California State Sheriffs' Association
National Rifle Association
Outdoor Sportsmen's Coalition of California
Safari Club International
Sheriff of Shasta County, Tom Bosenko
Sheriff of San Bernardino County, John McMahon
```

  ARGUMENTS IN SUPPORT :  The California Chapters of the Brady
Campaign to Prevent Gun Violence states:

    Since January 2000, California law has prohibited the
    manufacture, importation, sale, gift, or loan of any large
    capacity ammunition magazine capable of holding more than
    ten rounds. SB 396 would add a prohibition on possessing
    large capacity magazines, regardless of the date the
    magazine was acquired.

    Recent mass shootings involving large capacity magazines
    have demonstrated the tragic carnage caused by these
    magazines.  The shooters in Fort Hood, Tucson, Aurora, and
    Newtown were able to injure or kill large numbers of
    people very quickly because of their ability to shoot a
    large number of bullets in a very short period of time.
    Jared Loughner, who was able to rapidly fire 31 bullets in
    15 seconds without reloading, killed six people and
    wounded thirteen others in Tucson.  The shooting ended
    when bystanders tackled the gunman while he was reloading.
     Nine year old Christina-Taylor Green was shot by the
    thirteenth bullet - had there been a magazine limit of ten
    rounds, she might be alive today.

    With average use, magazines typically last about twelve
    years.  It is now time to end the grandfathering of large
    capacity magazines and exploitation of the law by
    prohibiting the possession of these magazines.   Serious

                                                CONTINUED


                                                          SB 396
                                                          Page
—————————
6

    hunters do not use large capacity magazines.  A
    prohibition on the sale, transfer, and possession of large
    capacity magazines clearly furthers public safety.

  ARGUMENTS IN OPPOSITION :  The Shasta County Sheriff states:

    I am strongly opposed to Senate Bill 396.  Existing law
    defines firearm magazine capacity.  This bill would add
    that the magazine be only of a sufficient length to
    accommodate 10 rounds.  This bill would also prohibit the
    possession, sale, lending, offering, giving, etc. of any
    current or existing large capacity magazine.  This bill
    not only restricts magazines but would render certain
    firearms such as semi-automatic handguns inoperable due to
    grip and magazine design.

    Currently, there are literally millions of magazines with

                                             Gordon Declaration 02034

capacity greater than 10 rounds.  Existing law exempts or
grandfathers in such magazines.  This law would make
current law abiding citizens who possess such magazines
into criminals.  If citizens would be required to turn in
high capacity magazines, they would need to be compensated
for them at fair market value.  This would cost the state
hundreds of millions to reimburse citizens, all at a time
when the state should be saving money.

This bill improperly and unreasonably places unfounded
mandates on local agencies, such mandates need to be
properly funded.  This bill does nothing to address the
causes of gun violence, such as criminal behavior, mental
illness, or substance abuse.  There are plenty of gun
related laws, enforce them.  Strict enforcement, vigorous
prosecution, and harsh sentences will address criminals,
reduce violence, and save lives.


JG:d  5/24/13   Senate Floor Analyses

                SUPPORT/OPPOSITION:  SEE ABOVE

                    ****  END  ****



                                     CONTINUED




                                 SB 396
                                 Page
  _____
            7

                                     CONTINUED

Gordon Declaration 02035

# Exhibit 62

Gordon Declaration 02036

BILL ANALYSIS

|                                                                    | SB 396 |
|--------------------------------------------------------------------|--------|
|                                                                    | Page 1 |

Date of Hearing:  August 13, 2013
Counsel:       Stella Choe

ASSEMBLY COMMITTEE ON PUBLIC SAFETY
Tom Ammiano, Chair

SB 396 (Hancock) - As Amended:  May 15, 2013

 SUMMARY  :  Prohibits the possession of any large-capacity
magazine with specified exemptions.  Specifically,  this bill  :

1) Amends the current definition of "capacity to accept more than
   10 rounds" to mean capable of holding more than 10 rounds, and
   specifies that the term does not apply to a feeding device
   that has been permanently altered so that it cannot hold more
   than 10 rounds.

2) Includes within the definition of a "large-capacity magazine"
   a feeding device that had a capacity of more than 10 rounds
   but has been permanently modified to hold no more than 10
   rounds of ammunition.

3) States that a "large-capacity magazine" does not include a
   magazine that is only of sufficient length to hold no more
   than 10 rounds of ammunition.

4) Makes it a crime, commencing July 1, 2014, for any person in
   California to possess any large-capacity magazine, regardless
   of the date the magazine was acquired, punishable by
   imprisonment in a county jail not exceeding one year or
   imprisonment pursuant to realignment.

5) Provides that any person who, prior to July 1, 2014, legally
   possesses a large-capacity magazine shall dispose of that
   magazine by any of the following means:

   a)   Remove the large-capacity magazine from California;

   b)   Prior to July 1, 2014, sell the large-capacity magazine
        to a licensed firearms dealer;

   c)   Destroy the large-capacity magazine; or,

|                                                                    | SB 396 |
|--------------------------------------------------------------------|--------|
|                                                                    | Page 2 |

   d)   Surrender the large-capacity magazine to a law
        enforcement agency for destruction.

6) Exempts the possession of a large-capacity magazine by:

   a)   Any federal, state, county, city and county, or city
        agency that is charged with the enforcement of any law, for
        use by agency employees in the discharge of their official
        duties, whether on or off duty, and where the use is
        authorized by the agency and is within the course and scope
        of their duties;

   b)   A sworn peace officer, as defined, who is authorized to
        carry a firearm in the course and scope of that officer's
        duties;

   c)   Any entity that operates an armored vehicle business
        pursuant to the laws of California;

   d)   Authorized employees, while in the course and scope of
        employment for purposes that pertain to the entity's
        armored vehicle business; and,

   e)   The holder of a special weapons permit for use as a prop
        for a motion picture for specified purposes.

 EXISTING LAW  :

1) Defines a "large-capacity magazine" as any ammunition feeding
   device with the capacity to accept more than 10 rounds, but
   shall not be construed to include any of the following:

   a)   A feeding device that has been permanently altered so
        that it cannot accommodate more than 10 rounds;

   b)   A .22 caliber tube ammunition feeding device; or,

Gordon Declaration 02037

c)   A tubular magazine that is contained in a lever-action
   firearm.  (Penal Code Section 16740.)

2) States, except as provided, commencing January 1, 2000, any
   person in California who manufactures or causes to be
   manufactured, imports into the state, keeps for sale, or
   offers or exposes for sale, or who gives, or lends, any
   large-capacity magazine is punishable by imprisonment in a

SB 396
Page   3

county jail not exceeding one year or imprisonment pursuant to
realignment.  (Penal Code Section 32310.)

3) Allows a person who lawfully possessed a large-capacity
   magazine in California prior to January 1, 2000, and lawfully
   took it out of the state, to return to the state with the same
   large-capacity magazine without violating the prohibition
   against importing a large-capacity magazine into California.
   (Penal Code Section 32420.)

4) Provides the following exceptions to the prohibition against
   manufacturing or causing to be manufactured, importing into
   the state, keeping for sale, or offering or exposing for sale,
   or giving, or lending, any large-capacity magazine:

   a)   Government agency charged with law enforcement (Penal
      Code Section 32400);

   b)   Sworn peace officer (Penal Code Section 32405);

   c)   Sale or purchase by licensed person (Penal Code Section
      32410);

   d)   Loan under specified circumstances (Penal Code Section
      32415);

   e)   Importation by person in legal possessions prior to
      January 1, 2000 (Penal Code Section 32420);

   f)   Delivery to gun smith (Penal Code Section 32425);

   g)   Person with permit and registration (Penal Code Section
      32430);

   h)   Entity that operates armored vehicle business (Penal
      Code Section 32435);

   i)   Manufacture for government agency (Penal Code Section
      32440);

   j)   Use as prop (Penal Code Section 32445); or,

   aa)  Purchase for use as prop (Penal Code Section 32450).

5) Provides that the Attorney General, district attorney, or city

SB 396
Page   4

attorney may bring an action to enjoin the manufacture of,
importation of, keeping for sale of, offering or exposing for
sale, giving, lending, or possession of, any item that
constitutes a nuisance under any of the specified code
sections, including the code section relating to
large-capacity magazines.  [Penal Code Section 18010(a).]

6) States that the weapons listed in the specified code sections
   constituting a nuisance shall be subject to confiscation and
   summary destruction whenever found within California.  [Penal
   Code Section 18010(b).]

   FEDERAL LAW  : The federal assault weapons law (Violent Crime
Control and Law Enforcement Act, H.R. 3355, Pub.L. 103-322),
became effective on September 13, 1994, and banned the
possession of "assault weapons" and "large-capacity ammunition
feeding devices," defined as a magazine capable of holding more
than 10 rounds of ammunition, manufactured after that date.  The
federal assault ban contained a grandfather clause which stated
that the ban shall not apply to the possession of a large
capacity ammunition feeding device otherwise lawfully possessed
within the United States on or before the date of the enactment
of the law.  The federal assault weapons law expired in 2004 and
has not been reenacted.

FISCAL EFFECT  :  Unknown

COMMENTS  :

1)Author's Statement_  :  According to the author, "In 1999, the
  Legislature passed SB 23 (Perata) which prohibited the
  possession of assault weapons, such as the AK-47 and created a
  generic definition of an assault weapon.  As part of that
  legislation, the importation, manufacture and sale of large
  capacity ammunition magazines was strictly prohibited.
  However, the possession of high capacity magazines was not
  prohibited.

  "Federal law also outlawed possession of high capacity magazines
  as part of the 1994 federal assault weapons ban but allowed
  current owners to keep them under a 'grandfathering'
  provision.  The federal assault weapons ban was allowed to
  expire in 2004.  Research has shown that, prior to the
  implementation of the federal assault weapons ban, these high
  capacity magazines were used in between 14 and 26% of guns

                                              SB 396
                                              Page  5

  used in crime.

  "High capacity magazines are ammunition feeding devices that
  hold more than ten rounds of ammunition.  These mega-magazines
  can hold upwards of 100 rounds of ammunition and allow a
  shooter to rapidly fire without reloading.

  "High capacity magazines are not designed for hunting or target
  shooting.  High capacity magazines are military designed
  devices.  They are designed for one purpose only - to allow a
  shooter to fire a large number of bullets in a short period of
  time.

  "This bill will make clear that possession of these
  'mega-magazines' is also prohibited.  Law enforcement officers
  have told us that, because the Penal Code currently fails to
  specifically prohibit possession, the law is very difficult to
  enforce.  This needs to be fixed and this measure addresses
  that by prohibiting the possession.

  "Prohibiting possession of these high capacity magazines is just
  one important part of the comprehensive strategy being
  proposed today to reduce gun violence in California."

2)Background_  :  Many rifles and handguns that use a detachable
  ammunition magazine can accept a large-capacity magazine,
  meaning a magazine that can hold more than 10 rounds of
  ammunition.  On a semiautomatic handgun or rifle, one bullet
  is fired per trigger-pull. The effect of attaching a
  large-capacity magazine is to allow the shooter to rapidly
  fire as many rounds as the magazine holds, as fast as they can
  pull the trigger.  A large-capacity magazine typically holds
  30 rounds but some have been designed to hold as many as 100
  rounds.  Since January 1, 2000, California has banned the
  importation, manufacture or sale of high capacity magazines.
  (Penal Code Sections 32310 and 32390.)  These magazines have
  also been deemed a public nuisance and are, therefore, subject
  to confiscation and destruction, although this requires a
  prosecutor to obtain a civil injunction.  (Penal Code Section
  18010.)  The Department of Justice states that sellers are
  currently circumventing the ban on sale of these magazines in
  California by selling all the parts necessary to construct
  them as "repair kits," which are then easily assembled in a
  matter of minutes.  Once the magazine is assembled, law
  enforcement is unable to take action on the mere possession of

                                              SB 396
                                              Page  6

  the large capacity magazine.

3)Current Law on Large-Capacity Magazines_  :  Current law
  prohibits the manufacture, importation, keeping for sale,
  offering or exposing for sale, giving or lending any
  ammunition magazine with a capacity greater than 10 rounds.
  (Penal Code Section 32310.)  The criminal penalty for
  violating these prohibitions is an alternate
  misdemeanor/felony.  Exemptions are given to law enforcement
  agencies, permit holders, peace officers, and other specified
  persons or entities from the purchase prohibitions on
  large-capacity magazines.  (Penal Code Sections 32315,
  32400-32450.)  This bill expands the large-capacity magazine

Gordon Declaration 02039

prohibitions to include the possession of large-capacity
magazines, regardless of when the magazine was acquired, and
imposes the same criminal penalties for possession of
high-capacity magazines as currently exist for their
importation, manufacture or sale in California.

4) Second Amendment  :  The Second Amendment to the federal
Constitution provides, "A well regulated militia being
necessary to the security of a free state, the right of the
people to keep and bear arms shall not be infringed." In
District of Columbia v. Heller (2008) 554 U.S. 570, the United
States Supreme Court held that the Second Amendment protects
an individual's right to possess and carry weapons in case of
confrontation.  The Court struck down a law banning possession
of handguns in the home.

Subsequently, in McDonald v. City of Chicago (2010) 561 U.S.
3025, 130 S.Ct. 3020, the Court held that Second Amendment
rights are applicable to the states.  The majority found the
individual right to bear arms, particularly for self-defense
was fundamental.

However, the Second Amendment does not afford an unlimited
right to own a weapon.  "It is not a right to keep and carry
any weapon whatsoever in any manner whatsoever and for
whatever purpose. . . ."  (Heller, supra, 554 U.S. at p. 646.)
  As the Court explained in Heller, the right "to keep and
carry arms" is limited to weapons "in common use."  (Id. at p.
627.)  Moreover, in Heller, the United States Supreme Court
did not strike down neutral licensing and registration as a
condition of possession and the Court also enumerated examples
of presumptively valid government regulation of firearms.

While it can be argued that a ban on large-capacity magazines
could infringe on a person's right to bear arms as protected
by the Second Amendment, this argument would likely be
unsuccessful because the ban, unlike the one challenged in
Heller, does not ban handgun possession outright.  Rather, a
ban on large-capacity magazines regulates the type of firearm
that can be possessed, which under the Heller ruling, is
constitutionally permissible.

5) Fifth Amendment Takings Issues  :  Both the Federal Government
and the states have the authority to take private property
when necessary for government activities.  But there is a
limitation on this power.  The Fifth Amendment to the federal
constitution states "nor shall private property be taken for
public use without just compensation."  For a legal analysis
under the takings clause one must consider the following:  Is
there a taking of property; if so, is it for public use; if
so, is "just compensation" paid?

A possessory taking occurs when the government confiscates,
physically occupies property or deprives a property owner of
all beneficial use of the property.  While the takings clause
is often discussed in the context of land and real estate, it
also applies to personal property.

In Silveira v. Lockyer (9th Cir. 2002), 312 F.3d 1052, the
plaintiffs challenged the constitutionality of the California
Assault Weapons Control Act (AWCA) which banned the possession
of assault weapons by individuals but contained a grandfather
clause allowing the retention of previously owned assault
weapons by the owners, provided that the owners register them
with the state.  The court rejected the plaintiffs' claim that
the AWCA violates the takings clause of the Fifth Amendment
based on the reasoning that "a government may enact
regulations pursuant to its broad powers to promote the
general welfare that diminish the value of private property,
yet do not constitute a taking requiring compensation, so long
as a reasonable use of the regulated property exists. . . .
Here, plaintiffs who owned assault weapons prior to the
enactment of the AWCA are protected by a grandfather clause
that permits them to use the weapons in a number of reasonable
ways so long as they register them with the state."  (Id. at
pg. 1092; citations omitted.)  Unlike the AWCA, this bill
creates a ban on large-capacity magazines that does not

contain a grandfather clause for those who legally possessed

the large-capacity magazines prior to the ban.  Under the
rationale used by Silveira, this bill would constitute a
taking because it is total ban that deprives the owner of any
reasonable use of the property.

The next question to consider is whether the taking is for
public use.  The Supreme Court has expansively defined "public
use" so that almost any taking will meet this requirement.
The "government does not itself have to use property to
legitimate the taking; it is only the taking's purpose, and
not its mechanics, that must pass scrutiny under the Public
Use Clause."  [Hawaii Housing Authority v. Midkiff (1984) 467
U.S. 229, 244.]  Thus, a taking is for public use so long as
the government is taking property to achieve a legitimate
government purpose and the taking is a reasonable way to
achieve this goal.  The intent to stop the use of
large-capacity magazines in mass shootings in order to reduce
the potential number of victims would appear to be a
legitimate government purpose, and restrictions on possession
of those magazines may be a reasonable means of achieving this
goal.

If it is determined that a taking has occurred, and the taking
is for public use, one must consider the issue of just
compensation.  This bill does not include a provision
requiring compensation for owners who must dispose of their
large-capacity magazines.  Thus, some potential takings issues
presented by this bill may be alleviated by providing that
individuals must be compensated or by adding a grandfather
clause.

If the takings issue were to be litigated, the state may argue
that the prohibitions in this bill do not require just
compensation because it is a valid exercise of police powers.
One district court has found that a ban on dangerous weapons
is a valid exercise of police powers.  In Fesjian v. Jefferson
(D.C. 1979) 399 A.2d 861, plaintiffs challenged a District of
Columbia statute that banned the registration of new handguns
and machine guns, with a grandfather clause for handguns
possessed prior to the ban.  Any handguns or machine guns that
could not be registered would have to be surrendered to the
chief of police, lawfully removed from the District, or
lawfully disposed.  (Id. at pg. 865.)  With regard to the
takings clause issue, the court held that, assuming that the

                                                          SB 396
                                                          Page  9

statute authorized a taking, such a taking was an exercise of
legislative police power to prevent a perceived harm, rather
than an exercise eminent domain for public use.  Accordingly,
the government did not have to provide just compensation.
(Id. at pg. 866.)

However, Fesjian is not binding on California.  At least one
court in California has analyzed the issue of police powers
differently from Fesjian.  In American Sav. & Loan Asso. v.
County of Marin (9th Cir. 1981) 653 F.2d 364, 368, the court
held "if the regulation is a valid exercise of the police
power, it is not a taking if a reasonable use of the property
remains."  Unlike Fesjian, the American Sav. & Loan case did
not find that a valid exercise of police power preempts the
need for compensation.  Instead, the court looked at whether a
reasonable use of the property remained to determine whether
the action was a taking requiring compensation.  If the court
applies the reasonable use test, this bill would constitute a
taking requiring just compensation regardless of whether it is
an exercise of police powers because no reasonable use of the
large capacity magazine would remain.  If the court applies
the reasoning used in Fesjian, and assuming the banning of
large-capacity magazines is a valid exercise of police powers,
compensation would not be required.

 6)Arguments in Support  :

    a)    According to the  Friends Committee on Legislation of
       California (FCLCA)  , "The U.S. Supreme Court has repeatedly
       held that the right to bear arms is not an absolute right
       that cannot be regulated under the Second Amendment to the
       U.S. Constitution.  For example, citizens are prohibited
       from owning machine guns and other military weapons, and
       FCLCA supports the reasonable regulation of firearms.

    "FCLCA is fully aware that regulating firearms in and of
    itself does not take the place of other constructive
    measures to reduce crime and social disorganization, but
    the use of military-style large capacity magazines are
    capable of devastating lethality.  These devices in the
    hands of civilians serves no legitimate purpose - to the
    contrary, they are a means to violent ends.  Prohibiting
    their possession is an important step towards reducing gun
    violence."

                                                  Gordon Declaration 02041

SB 396
Page 10

b)   The  Los Angeles County Sheriff's Department  states, "High capacity ammunition magazines can hold upwards of 100 rounds of ammunition and allow a shooter to rapidly fire without reloading.  The ability to fire a large number of bullets in a short period of time escalates the number of victims and lethality in any shooting incident.  As demonstrated in 2011 when Jared Lee Loughner killed six people and wounded 13 others, including U.S. representative Gabrielle Giffords in Arizona, bystanders were able to intervene when the gunman stopped to reload.  Likewise, eleven children were able to escape from one of the classrooms at Sandy Hook Elementary last December when the shooter stopped to reload.

"California has prohibited the importation, manufacture and sale of large capacity ammunition magazines since the year 2000.  This law is difficult to enforce since the date of acquisition is nearly impossible to prove.  Magazines acquired before the ban, or illegally purchased in other states since the ban, are usually indistinguishable.  A ban on the possession of high capacity magazines will help address this issue."

7)Arguments in Opposition  :

a)   The  National Rifle Association  writes, "The provisions of SB 396 would ban the simple possession of ammunition feeding devices/magazines that are capable of holding more than 10 cartridges.  There are hundreds of thousands of Californians that possess millions of these ammunition feeding devices/magazines, the possession of which was 'grandfathered' in the various versions of this legislation that sought to regulate so called 'assault weapons.'

"The requirements of Senate Bill 396 would require that

Californians surrender the ammunition feeding

devices/magazines or face criminal penalties and confiscation of their property.  Many Californians will not be aware of the passage of the new law and be unaware that the ammunition feeding devices/magazines that have been owned for generations have now become contraband. "

b)   The  California State Sheriffs Association  argues, "California has some of the strictest gun laws in the nation, yet incidents of gun violence continue to plague

SB 396
Page 11

our state.  We must continue to take steps to keep guns out of the hands of criminals and other prohibited persons. Unfortunately, this measure would have little impact on the ability of criminals or other prohibited persons from obtaining large-capacity magazines.  On January 1, 2000, California banned the manufacturing, importation, sale, giving, and lending of any large-capacity magazine, but allowed the continued possession of existing magazines.  We are concerned that by expanding existing law this measure would unintentionally turn many law abiding citizens into criminals, subject to felony prosecution, for failing to sell or destroy their lawfully obtained property.  If someone has lawfully possessed a large-capacity magazine for over 13 years without incident, it is troubling that the state would mandate its destruction now without compensation.  For handguns that are designed to use larger magazines, it is equally troubling that this measure would render such firearms inoperable.  Finally, we are concerned about the unfunded mandate this measure would create by requiring law enforcement agencies to destroy any magazines obtained."

8)Related Legislation  :

a)   AB 48 (Skinner) expands provisions limiting large-capacity magazines by revising the definition of "large-capacity magazine."  AB 48 is pending hearing by the Senate Appropriations Committee.

b)   SB 47 (Yee) amends the definition of an "assault weapon" to include those weapons that do not have a detachable magazine and one of specified features, and requires registration of weapons which now fall under the new

Gordon Declaration 02042

definition but which previously did not require
registration.  SB 47 will be heard by this Committee today.

c)  SB 374 (Steinberg) redefines an assault weapon by
creating a new test to determine if a semi-automatic pistol
or centerfire rifle is an assault weapon.  SB 374 also
defines "fixed magazine" and "detachable magazine" in
statute.  SB 374 will be heard by this Committee today.

d)  SB 396 (Hancock) prohibits the possession of
large-capacity magazines.  SB 396 will be heard by this
Committee today.

                                                    SB 396
                                                    Page  12

e)  SB 567 (Jackson) redefines an assault shotgun to include
a shotgun with a rifled bore and a rotating ammunition
cylinder.  SB 567 will be heard by this Committee today.

9)Prior Legislation :

a)  SB 249 (Yee), of the 2011-12 Legislative Session, would
have prohibited any person from importing, making, selling,
loaning, transferring or possessing any conversion kit
designed to convert certain firearms with a fixed magazine
into firearms with a detachable magazine.  SB 249 was held
on the Appropriations Committee's Suspense File.

b)  SB 776 (Hancock), of the 2009-10 Legislative Session,
among other provisions, would have prohibited the
possession of large-capacity magazines commencing January
1, 2011, with specified exceptions, and would have required
registration for large-capacity magazines that are subject
to those exceptions.  SB 776 was never heard by the Senate
Committee on Public Safety.

c)  AB 2728 (Klehs), Chapter 793, Statutes of 2006, made the
possession of unregistered assault weapons and .50 BMG
rifles in violation of the Penal Code a nuisance, allowing
for their destruction.

d)  SB 626 (Perata), Chapter 937, Statutes of 2001, exempts
the manufacture of a large-capacity magazine for certain
law enforcement agents, peace officers, government
agencies, the military, or for export, and specifies
additional magazines that are not included within the
definition of "large-capacity magazine."

e)  SB 23 (Perata), Chapter 129, Statutes of 1999, made it
an alternate felony/misdemeanor, commencing January 1,
2000, for any person to manufacture or cause to be
manufactured, import into California, keep for sale, offer
or expose for sale, give away, or lend any large-capacity
magazine with specified exceptions.

f)  SB 1483 (Perata), of the 1999-2000 Legislative Session,
would have exempted tubular magazines contained in
lever-action firearms from the "large-capacity magazine"
restrictions, and exempts the manufacture of

                                                    SB 396
                                                    Page  13

"large-capacity magazines" for use by specific law
enforcement agencies, peace officers, and firearm
licensees.  SB 1483 passed this Committee, but was later
amended and became a vehicle for an unrelated matter.

g)  AB 357 (Roos), Chapter 19, Statutes of 1989, established
the Roberti-Roos Assault Weapons Control Act of 1989 which
prohibited the manufacture in California of any of the
semi-automatic weapons specified in the statute, or the
possession, sale, transfer, or importation into the state
of such weapons without a permit.  AB 357 contained a
grandfather clause that permits the ownership of assault
weapons by individuals who lawfully purchased them before
its enactment, so long as the owners register the weapons
with the Department of Justice.

REGISTERED SUPPORT / OPPOSITION :

Support

California Chapters of the Brady Campaign (Co-Sponsor)

Gordon Declaration 02043

Courage Campaign (Co-Sponsor)
Alameda County District Attorney's Office
Alameda Police Department
American Academy of Pediatrics, California
American Association of University Women, Santa Barbara-Goleta
Valley Branch
American Association of University Women, Santa Maria Branch
Antelope Valley Chapter of the Brady Campaign to Prevent Gun
Violence
Anti-Defamation League
Antonio R. Villaraigosa, former Los Angeles Mayor
Auburn Area Democratic Club
Bend the Arc, Jewish Partnership for Justice
Burbank Police Department
California Chapter on the American College of Emergency
Physicians
California Church Impact
California Federation of Teachers
California Medical Association
California State PTA
Chief of Police, Chula Vista Police Department
City of San Leandro
City of Santa Monica
CLUE California

SB 396
Page  14

Coalition Against Gun Violence, Santa Barbara Coalition
Coalition to Stop Gun Violence
Contra Costa County Chapter of the Brady Campaign to Prevent Gun
Violence
CREDO Action
Diablo Valley Democratic Club
Doctors for America
El Cerrito Police Department
Friends Committee on Legislation of California
Jean Quan, Oakland Mayor
Laguna Woods Democratic Club
Law Center to Prevent Gun Violence
League of Women Voters of California
Livermore Police Department
Long Beach Chapter of the Brady Campaign to Prevent Gun Violence
Los Angeles Chapter of the Brady Campaign to Prevent Gun
Violence
Los Angeles County Sheriff's Department
Marin County Chapter of the Brady Campaign to Prevent Gun
Violence
Moms Demand Action for Gun Sense in America
Moms Demand Action for Gun Violence in America, Orange County
Chapter
Myrna De Vera, Vice-Mayor, City of Hercules
Napa Chapter of the Brady Campaign to Prevent Gun Violence
Neighbors United to Protect Our Communities
Nevada County Chapter of the Brady Campaign to Prevent Gun
Violence
Nevada County Democratic Women's Club
Oakland/Alameda County Chapter of the Brady Campaign to Prevent
Gun Violence
Orange County Chapter of the Brady Campaign to Prevent Gun
Violence
Orange County Democrats
Pam O'Connor, Mayor , City of Santa Monica
PICO California
Piedmont Police Department
Pomona Valley Chapter of the Brady Campaign to Prevent Gun
Violence
Sacramento Valley Chapter of the Brady Campaign to Prevent Gun
Violence
San Diego County Chapter of the Brady Campaign to Prevent Gun
Violence
San Fernando Valley Chapter of the Brady Campaign to Prevent Gun
Violence

SB 396
Page  15

San Francisco Chapter of the Brady Campaign to Prevent Gun
Violence
San Joaquin Valley Chapter of the Brady Campaign to Prevent Gun
Violence
San Mateo County Chapter of the Brady Campaign to Prevent Gun
Violence
Santa Barbara County Chapter of the Brady Campaign to Prevent
Gun Violence
Santa Barbara County District Attorney's Office

Gordon Declaration 02044

Santa Barbara Police Department
Santa Barbara Rape Crisis Center
Santa Clara County Chapter of the Brady Campaign to Prevent Gun
Violence
Santa Cruz Chapter of the Brady Campaign to Prevent Gun Violence
Sisters of St. Joseph of Orange
Solano County Chapter of the Brady Campaign to Prevent Gun
Violence
Sonoma County Chapter of the Brady Campaign to Prevent Gun
Violence
South Bay LA Chapter of the Brady Campaign to Prevent Gun
Violence
South County Citizens Against Gun Violence
St. Stephens Church
Tri-Cities Democratic Forum
Tri-City Alameda County Chapter of the Brady Campaign to Prevent
Gun Violence
Tri-City Interfaith Council
Ventura County Chapter of the Brady Campaign to Prevent Gun
Violence
Violence Policy Center
Violence Prevention Coalition of Greater Los Angeles
Violence Prevention Coalition of Orange County
Women Against Gun Violence
Women For: Orange County
Yolo County Chapter of the Brady Campaign to Prevent Gun
Violence
Youth ALIVE!
52 private individual

 Opposition 

Association for Los Angeles Deputy Sheriffs
CalGuns Foundation
California Association of Federal Firearms Licensees
California Chapters of Safari Club International

                                              SB 396
                                              Page  16

California Coalition of Law Enforcement Associations
California Public Defenders Association
California Rifle and Pistol Association, Inc.
California Sportsman's Lobby
California State Sheriffs' Association
Gun Owners of California
L.A. County Probation Officers Union
Lassen County Sheriff's Office
Long Beach Police Officers Association
National Rifle Association of America
Outdoor Sportsmen's Coalition of California
Riverside County Sheriff's Office
Riverside Sheriffs' Association
Safari Club International
San Bernardino County Sheriff's Department
Shasta County Sheriff's Office
14 private individuals

 Analysis Prepared by  :   Stella Choe / PUB. S. / (916) 319-3744

Gordon Declaration 02045

# Exhibit 63

Gordon Declaration 02046

# CITIZENS CRIME COMMISSION
OF NEW YORK CITY

### RICHARD M. ABORN, PRESIDENT

**For Immediate Release:** March 2, 2011
**Contact:** Ashley Cannon, 212.608.4700

## NYC & LA CITY COUNCILS
## INTRODUCE REZO FOR FEDERAL BAN ON
## LARGE CAPACITY AMMUNITION MAGAZINES

*LAPD Chief calls on congress to pass the ban, Villaraigosa signs Council resolution*

*1,808% increase in large capacity ammunition magazines
recovered in LA after ban's lapse*

NEW YORK –City Councils in New York and Los Angeles introduced simultaneous resolutions in support of federal legislation to ban large capacity ammunition magazines (HR308/S32), such as the type used in the tragic shooting in Tucson, AZ, that left 6 dead and 13 wounded.

"This is common sense legislation which aims to protect innocent people from violence. There is no need for the average citizen to possess a weapon which can hold more than ten rounds of ammunition. Large capacity ammunition magazines are a serious threat to American citizens, and a federal ban is the only way to ensure that these dangerous weapons stay off of our streets. I urge Congress to support this legislation before we experience yet another tragedy, such as those witnessed in Arizona and Virginia Tech," said New York City Council Member Gale A. Brewer who authored Resolution 686.

In LA, City Council President Eric Garcetti, City Councilmember Paul Koretz, and City Attorney Carmen Trutanich joined with LAPD Chief Charlie Beck, to call on Congress to pass the ban:

"As the third largest police department in the nation, the LAPD is responsible for patrolling 470 square miles and protecting a population of nearly 4 million people," said LAPD Chief Charlie Beck. "Even as crime has declined significantly in the city over the past several years, large capacity ammunition magazines are still being used by violent street gangs. Common sense restrictions on these magazines would help LAPD officers better protect the public and themselves."

Large capacity ammunition magazines (defined as 10 or more rounds of ammunition) were made illegal as part of the Violent Crime Control and Law Enforcement Act of

Citizens Crime Commission of New York City, Inc., 335 Madison Avenue, 9th Floor, New York, NY 10017
p: 212.608.4700 • f: 212.350.2701 • e: info@nycrimecommission.org
www.nycrimecommission.org

*Page 1 of 3*

Gordon Declaration 02047

1994, commonly known as the federal assault weapons ban, but Congress failed to renew the ban when it expired in 2004.  A large capacity ammunition magazine was used to carry out the recent shooting in Tucson, allowing the gunman to fire more than 30 bullets in 15 seconds.

 "Large capacity ammunition magazines carry far more bullets than any civilian could possibly ever use.  Common sense restrictions provide law enforcement with a tactical advantage over criminals, making us *all* safer," said Richard M. Aborn, President of the Citizens Crime Commission of New York City.  As the former President of the Brady Campaign, Aborn is credited as the principal strategist behind the original ban on large capacity ammunition magazines.

"There is no reason for anyone to have more firepower than our law enforcement officials who have pledged to protect our communities.  Banning large capacity ammunition magazines is a sensible step to take in order to reduce gun violence and save lives" said Colin Weaver, Deputy Director of New Yorkers Against Gun Violence.

"Large capacity ammunition magazines have no business being on our streets," Mayor Antonio Villaraigosa said. "H.R. 308 is a step forward in our efforts to curb gun violence and keep dangerous weapons out of the hands of criminals."

"As law enforcement officials, it is our duty to be thoughtful and take a big picture approach in our shared desire to protect the public from criminals using these large capacity killing machines," said City Attorney Carmen Trutanich. "I believe that only a comprehensive, nation-wide federal restriction on these potentially dangerous weapons will ultimately aid our law enforcement partners in maintaining peace on our streets."

Since the ban's sunset in 2004, the Los Angeles Police Department's Gun Unit has seen a significant increase in the number of large capacity ammunition magazines recovered. In 2004, the City recovered 725 large capacity ammunition magazines compared to 38 in 2003, a 1,808% increase.

| Year | Magazines Recovered | % Change |
|------|---------------------|----------|
| 2003 | 38 | N/A |
| 2004 | 725 | 1,808 |
| 2005 | 940 | 30 |
| 2006 | 151 | -84 |
| 2007 | 398 | 164 |
| 2008 | 870 | 119 |
| 2009 | 156 | -82 |
| 2010 | 326 | 109 |

"We all pay a high price for the toll that gun violence takes on our communities.  We

Citizens Crime Commission of New York City, Inc., 335 Madison Avenue, 9th Floor, New York, NY 10017
p: 212.608.4700  •  f: 212.350.2701  •  e: info@nycrimecommission.org
www.nycrimecommission.org

*Page 2 of 3*

Gordon Declaration 02048

want to make it as difficult as possible for criminals to have access to large capacity firepower, and we definitely don't want to see our law enforcement officers outgunned by criminals," said Council President Garcetti, who authored the Council resolution that established the city's official support of H.R. 308.

Since 2004, lethal large capacity ammunition magazines have been used in several mass shootings in the United States.  Examples include:

- 2007 Virginia Tech:  32 dead, 17 wounded, 15-round magazines, hundreds of shots fired
- 2008 Northern Illinois University:  6 dead, 21 wounded, 33- and 15- round magazines, 55 shots fired
- 2009 Binghamton, NY: 13 dead, 4 wounded, 30-round magazine , 99 rounds fired
- 2010 Connecticut Beer Distributor:  8 dead, 2 wounded, large capacity magazines

###

Citizens Crime Commission of New York City, Inc., 335 Madison Avenue, 9th Floor, New York, NY 10017
p: 212.608.4700 • f: 212.350.2701 • e: info@nycrimecommission.org
www.nycrimecommission.org

Gordon Declaration 02049

# Exhibit 64

Gordon Declaration 02050

**CALIFORNIA POLICE CHIEFS ASSOCIATION**
**POSITION PAPER**

May 31, 2013

**SUBJECT:**   GUN VIOLENCE AND THE REGULATION OF FIREARMS

**INTRODUCTION**

The California Police Chiefs Association has long recognized that gun violence is a threat to the safety and well-being of the communities we serve and the officers committed to the protection of those communities. The Association is dedicated to its leadership role in identifying and implementing strategies to reduce gun violence. The Association's position is that while the right to bear arms is clearly articulated under the Second Amendment, reasonable regulations of firearms protect those rights. It is entirely appropriate to take reasonable steps that ensure responsible ownership while removing firearms from those who are prohibited by law from possessing them or who are intent on threatening the safety of our communities.

California has some of the strictest firearms regulations in the nation. These regulations have served law-abiding Californians well and clearly have not interfered with firearms ownership by responsible Californians. However, regulations prove ineffective unless those who are intent on threatening the safety of our communities are arrested, prosecuted, and sentenced to the fullest extent possible. Additionally, California's regulations are undermined if the ability of our federal law enforcement partners to effectively perform their designed function is restricted.

We cannot escape the fact that many firearm-related deaths and injuries do not occur as a result of intentional criminal misconduct. Far too often, gun related deaths and injuries occur between family, friends, unintended victims, and children. Therefore, it is the Association's position that responsible ownership, which includes safe storage and handling of firearms, is imperative as a means of reducing these tragic incidents.

Gun violence is a complex issue with a multitude of causative factors that must be addressed if we are to be successful in reducing gun violence in our communities. These factors include:

- Examining mental health issues, including how to eliminate the ability of those who are mentally incompetent from purchasing or possessing a firearm.

- Straw Purchases: the purchase of a firearm by someone legally capable for an individual who is prohibited from purchasing or possessing a firearm.

1

Gordon Declaration 02051

- Armed and Prohibited Individuals:  prosecuting and proactively removing firearms and ammunition from individuals who are prohibited from owning and possessing them.

- Universal background checks:  It is estimated that over 40% of all firearm sales occur without background checks. Weapons acquired through such sales are finding their way into the hands of individuals who are prohibited from possessing them or who are intent on affecting the safety of our communities

- Ammunition –The Association recommends the addition of a registration component, similar to the Dealer Record of Sale (DROS), to track ammunition sales. This would assist in the investigation of crimes committed with a firearm, ammunition straw purchases, and purchases by those prohibited from owning or possessing firearms or ammunition.

  **Possession of armor piercing ammunition, which threatens the safety of police officers, should be made illegal.

- Concealed Weapons: the Association advocates that the ability to issue concealed weapons permits should remain at the discretion of the local chief or sheriff.

- High Capacity Magazines: Recognizing that justifiable reasons exist for limiting magazine capacity, we propose that no firearm magazine be lawfully possessed if it has a capacity of more than ten rounds of ammunition.

- The ability of the Federal Bureau of Alcohol, Tobacco, and Firearms (ATF) to track purchases and provide information to local law enforcement agencies across the country should be strengthened.

- Direct the Center for Disease Control (CDC) to conduct research for the purpose of determining the scope of the deaths and injuries which occur as a consequence of firearms.

**CONCLUSION**

The California Police Chiefs Association's position recognizes and supports the Second Amendment and the right of gun ownership provided to law abiding citizens. The Association also recognizes that delving into the mental health aspects of individuals associated with gun violence may conflict with currently enacted health and privacy laws, but if we are to have any impact on reducing gun violence, we must be a strong voice in addressing these issues that threaten the safety of our communities.

2

Gordon Declaration 02052