George M. Lee (SBN 172982)
Douglas A. Applegate (SBN 142000)
**Seiler Epstein Ziegler & Applegate LLP**
601 Montgomery Street, Suite 2000
San Francisco, California 94111
Phone:  (415) 979-0500
Fax:      (415) 979-0511

Raymond M. DiGuiseppe (SBN 228457)
**LAW OFFICES OF RAYMOND MARK DIGUISEPPE, PLLC**
4002 Executive Park Blvd., Suite 600
Southport, NC 28461
Phone: (910) 713-8804
Fax:      (910) 672-7705

Attorneys for Plaintiffs
WILLIAM WIESE, JEREMIAH MORRIS,
LANCE COWLEY, SHERMAN MACASTON,
ADAM RICHARDS, CLIFFORD FLORES,
L.Q. DANG, FRANK FEDEREAU, ALAN NORMANDY,
TODD NIELSEN, THE CALGUNS FOUNDATION,
FIREARMS POLICY COALITION,
FIREARMS POLICY FOUNDATION,
and SECOND AMENDMENT FOUNDATION

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM WIESE, et al.,<br><br>                    Plaintiffs,<br><br>        vs.<br><br>XAVIER BECERRA, in his official capacity as Attorney General of California, et al.,<br><br>                    Defendants. | Case No. 2:17-cv-00903-WBS-KJN<br><br>**Supplemental Memorandum in Support of Plaintiffs' Motion for Issuance of Preliminary Injunction**<br><br>**[FRCP 65; E.D. L.R. 231]**<br><br>Date:        June 29, 2017<br>Time:        9:00 a.m.<br>Courtroom 5<br>Judge:      Hon. William B. Shubb |

**Seiler Epstein Ziegler & Applegate LLP**
Attorneys at Law

– i –

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................................ 1

II.   ARGUMENT IN REPLY ............................................................................................ 1

    A.  PLAINTIFFS' SECOND AMENDMENT CLAIM ENTITLES THEM TO RELIEF AT
    THIS PRELIMINARY STAGE BECAUSE THE SIGNIFICANTLY BURDENSOME
    EFFECTS UNIQUE TO THIS BAN CANNOT BE JUSTIFIED BY THE STATE'S
    PURPORTED JUSTIFICATIONS. ......................................................................... 1

        1.  Large Capacity Magazines Are Certainly Protected and Not
        "Dangerous and Unusual" Under the Second Amendment; Nor Are
        They "Unusually Dangerous" Under the State's Purported
        Measurement of What is Protected. ....................................................... 3

        2.  The Burden Here Would Be Substantially Greater Than the Burdens of
        the Bans At Issue in the Cases the State Cites as Ostensible Evidence
        that Courts Have "Considered" and "Rejected" This Challenge Against
        This Ban. ............................................................................................... 4

        3.  The State's Justifications Fall Far Short of Saving This Law, Even
        Assuming the Burdens It Would Impose Invoke Only Intermediate
        Scrutiny. ............................................................................................... 5

    B.  PLAINTIFFS HAVE SHOWN A CLEAR LIKELIHOOD OF PREVAILING ON THE
    MERITS OF THEIR TAKINGS CLAIM. ................................................................ 9

        1.  Neither Physical Appropriation Nor Actual Public Use is Required to
        Constitute a Physical Taking Under the Fifth Amendment. ................... 9

        2.  The "Police Powers of the State" Cannot Be Invoked to Impose a
        Retroactive Ban on the Possession of Legally-Owned Property
        Without Violating the Takings Clause. ................................................ 12

        3.  Compelled Magazine Modifications – Whatever Those Might Mean
        According to the DOJ – Are Still a Physical Invasion, and Therefore, a
        Taking of Property. ............................................................................. 16

    C.  PLAINTIFFS ARE ENTITLED TO PRELIMINARY INJUNCTIVE RELIEF ON THE
    INDEPENDENT GROUNDS THAT THIS STATUTORY SCHEME IS
    UNCONSTITUTIONALLY VAGUE AND OVERBROAD, AND THE STATE HAS
    DONE NOTHING TO SHOW OTHERWISE. ....................................................... 19

        1.  The Statutes Are Vague and Overbroad Because They Fail to Give
        Adequate Notice, and Violate the Due Process Clause. ...................... 19

2. The State's Conclusion that Proposition 63 Controls Does Not Answer The Question of Why Two Versions of Pen. Code § 32406 are Chaptered and Active. ..................................................................... 21

3. Severe Vagueness Concerns Arise From the DOJ's Failure to Promulgate Clarifying Regulations. ...................................................... 23

III.   CONCLUSION ........................................................................................... 25

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

<u>TABLE OF AUTHORITIES</u>

**Cases**

*Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) ...............................8, 23

*Armstrong v. United States*, 364 U.S. 40, 80 S.Ct. 1563 (1960) ....................................................10

*Askins v. United States*, 82 Fed. Cl. 619 (2008) ..........................................................................12

*Austin v. United States*, 509 U.S. 602, 113 S.Ct. 2801 (1993) .....................................................15

*Babbitt v. Youpee*, 519 U.S. 234, 117 S.Ct. 727 (1997) ................................................................19

*Bair v. United States*, 515 F.3d 1323 (Fed. Cir. 2008) .................................................................15

*Brown v. Legal Found. of Washington*, 538 U.S. 216, 123 S.Ct. 1406 (2003) ..............................17

*Caetano v. Massachusetts*, __ U.S. ___, 136 S.Ct. 1027 (2016) ....................................................3

*Colorado Outfitters Ass'n v. Hickenlooper*, 24 F.Supp.3d 1050 (D. Colo. 2014) ...........................5

*County of Santa Clara v. Trump*, __ F.Supp.3d __,
    2017 U.S. Dist. LEXIS 62871 (N.D. Cal. 2017) ..................................................................21

*Cwynar v. City & Cty. of San Francisco*, 90 Cal.App.4th 637 (2001) ..........................................17

*District of Columbia v. Heller*, 554 U.S 570 (2008) ...............................................................passim

*Esplanade Properties, LLC v. City of Seattle*, 307 F.3d 978 (9th Cir. 2002) ................................15

*Fesjian v. Jefferson*, 399 A.2d 861 (D.C. Ct. App. 1979) ............................................................12

*Friedman v. City of Highland Park*, 784 U.S. 406 (7th Cir. 2015) ............................................5, 6

*Fyock v. City of Sunnyvale*, 25 F.Supp.3d 1267 (N.D. Cal. 2014) .........................................3, 5, 6

*Fyock v. Sunnyvale*, 779 F.3d 991 (9th Cir. 2015) ..........................................................3, 4, 8, 13

*Gun South, Inc. v. Brady*, 877 F.2d 858 (11th Cir. 1989)............................................................12

*Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 104 S.Ct. 2321 (1984)...............................10

*Hawaii v. Trump*, __ F.3d__, 2017 WL 2529640 (9th Cir. 2017)................................................22

*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011).....................................................4

*Horne v. Dept. of Agriculture*, __ U.S. __, 135 S.Ct. 2419 (2015) ..............................................11

*Hotel & Motel Assn. of Oakland v. City of Oakland*, 344 F.3d 959 (9th Cir. 2003) ....................20

*Kavanau v. Santa Monica Rent Control Bd.*, 16 Cal.4th 761 (1997) ...........................................17

*Kelo v. City of New London*, 545 U.S. 469, 125 S.Ct. 2655 (2005) ..............................................10

*Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) .......................................................................4, 20

<div style="writing-mode: vertical">**SEILER EPSTEIN ZIEGLER & APPLEGATE LLP**
Attorneys at Law</div>

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

*Kolender v. Lawson*, 461 U.S. 352 (1983) ................................................................21

*Leonard v. Texas*, __ U.S. __, 137 S.Ct. 847 (2017)................................................15

*Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S.Ct. 3164 (1982).......10, 17

*Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 112 S.Ct. 2886 (1992) ....................13, 14, 15, 17

*McDonald v. Chicago*, 561 U.S. 742 (2010) ..........................................................5, 6

*Monks v. City of Rancho Palos Verdes*, 167 Cal.App.4th 263 (2008) .........................19

*N.Y.S. Rifle Ass'n v. Cuomo*, 804 F.3d 242 (2d Cir. 2015)......................................4, 20

*Nixon v. United States*, 978 F.2d 1269 (D.C. Cir. 1992) .........................................17

*Penn Central Transp. Co. v. City of N.Y.*, 438 U.S. 104 (1978).................................11

*Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 43 S.Ct. 158 (1922) .......................10

*Phelps v. U.S.*, 831 F.2d 897 (9th Cir. 1987)...........................................................21

*PruneYard Shopping Center v. Robins*, 447 U.S. 74, 100 S.Ct. 2035 (1980) ...............10

*S.F. Veteran Police Officers Ass'n v. City of S.F.*, 18 F.Supp.3d 97 (N.D. Cal. 2014)...................4

*Skilling v. U.S.*, 561 U.S. 358 (2010) .....................................................................21

*Stevens v. City of Cannon Beach*, 510 U.S. 1207, 114 S.Ct. 1332 (1994) ..................15

*U.S. v. JDT*, 762 F.3d 984 (9th Cir. 2014)...............................................................21

*U.S. v. Rodriguez-Deharo*, 192 F.Supp.2d 1031 (E.D. Cal. 2002).............................21

*United States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013).........................................5, 8

*United States v. Gen. Motors Corp.*, 323 U.S. 373, 65 S.Ct. 357 (1945) ....................11

*United States v. Security Industrial Bank*, 459 U.S. 70, 103 S. Ct. 407 (1982) .................9, 10, 14

*Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 101 S.Ct. 446 (1980) ...............15

**Statutes**

Cal. Fish & Game Code § 2021 ...............................................................................16

Cal. Pen. Code § 16740 ..........................................................................................21

Cal. Pen. Code § 32310 ...........................................................................9, 20, 22, 25

Cal. Pen. Code § 32406 ................................................................................21, 22, 23

Cal. Pen. Code § 32450 ..........................................................................................12

Colo. Rev. Stat. § 18-12-302 ................................................................................5

D.C. Code Ann. § 7-2506.01 ................................................................................4

D.C. Code Ann. § 7-502.03 ................................................................................4

**Constitutional Provisions**

Cal. Const., art. I, § 19 ...............................................................................19

**SEILER EPSTEIN ZIEGLER & APPLEGATE LLP**
Attorneys at Law

**I.    INTRODUCTION**

Pursuant to the court's directive at the hearing on Plaintiffs' application for issuance of a temporary restraining order on June 16, 2017, and in response to the Opposition of Defendants Xavier Becerra and Martha Supernor ("State"), Plaintiffs respectfully submit these supplemental/reply points and authorities in support of their request for preliminary injunctive relief.

**II.    ARGUMENT IN REPLY**

**A.    PLAINTIFFS' SECOND AMENDMENT CLAIM ENTITLES THEM TO RELIEF AT THIS PRELIMINARY STAGE BECAUSE THE SIGNIFICANTLY BURDENSOME EFFECTS UNIQUE TO THIS BAN CANNOT BE JUSTIFIED BY THE STATE'S JUSTIFICATIONS.**

Right out of the gate, the State proudly acknowledges the great breadth of its magazine ban, characterizing it as applying essentially without exception to all private citizens. (Opposition ("Opp.") at 1:13-14.)  This would include, without exception all of the individual plaintiffs, the organizational plaintiffs, and the countless members they represent.  (Opp. at 3:19, stating that this prohibition applies to "any person possessing an LCM, *with exemptions not relevant here . . .*") (emphasis added)).  The strategy is, apparently, to concede the extraordinarily significant sweep of the ban (Opp. at 14:15: section 32310 "is far more robust than the federal ban" on large capacity magazines previously in effect between 1994 and 2004), while crafting end-runs around it that ostensibly insulate it from constitutional challenge.

The State sets the stage here with the notion that all large capacity magazines, which are standard, preferred, and the most commonly purchased and used magazines for semi-automatic firearms, are entirely outside the purview of the Second Amendment, using its own yardstick to conclude they are "unusually dangerous" and therefore unworthy of constitutional protection. (Opp. at 9:4.)  The State weaves this idea throughout its Opposition to support a general theme that the burden this ban is to impose upon private citizens is of little concern because it merely implicates a "particularly dangerous" and "particularly lethal" "subset of magazines" for which there is really no any legitimate need since two to three rounds are good enough for exercising

**SEILER EPSTEIN ZIEGLER & APPLEGATE LLP**
Attorneys at Law

1   any self-defense rights.  (Opp. at 10:2, 12:28.)  This theme forms the backbone of the State's

2   claim that intermediate scrutiny applies, because the supposedly negligible burden of banning

3   these allegedly unprotected arms calls for nothing more.  (Opp. at 15:7.)  Under this test, the

4   State portrays its countervailing interests as narrowly focused and compelling aims, even though

5   they boil down to the broadest of general interests – "protecting citizens and law enforcement

6   from gun violence, protecting public safety, and preventing crime," (Opp. at 9:12-13; 12:25-26)

7   – which could justify a total disarmament of the citizenry if allowed to serve as the sole

8   justification for the banning of firearms and ammunition.  In a similar vein, the State attempts to

9   support its position with general hypotheses about how this ban could reduce the incidence or

10  impact of gun violence and how such a ban could make the current regulations on large-capacity

11  magazines less "difficult to enforce." (Opp. at 4:2, 13 n.11.) Of course, the same could be said of

12  anything subject to regulation because of its *potential* to inflict harm.

13          The State attempts to support its position with an assertion that *this same* Second

14  Amendment claim "has been rejected by every other court to consider it," (Opp. at 7:22), citing

15  as evidence a series of other cases involving substantially different large capacity magazine bans,

16  when, in fact, no court has previously considered – much less "rejected" – *this* claim or upheld

17  *this* ban against constitutional challenge.

18          In the end, the State is attempting to artificially hoist a mere potential for harm that could

19  be ascribed to innumerable other entirely lawful items with dangerous propensities, and that has

20  only ever been realized in an exceedingly small percentage of violent crimes, over the

21  constitutionally-protected rights of countless law-abiding citizens across California who seek to

22  simply continue keeping and using their firearms for the same lawful purposes that they have

23  possessed them for years now, including the core guarantee of "the individual right to possess

24  and carry weapons in case of confrontation." *District of Columbia v. Heller*, 554 U.S 570, 592

25  (2008) (*Heller*). The State's campaign to save the ban fails, as it cannot survive any degree of

26  honestly-applied heightened scrutiny.

27

28

**SEILER EPSTEIN ZIEGLER & APPLEGATE LLP**
*Attorneys at Law*

1  |  **1.      Large Capacity Magazines Are Certainly Protected and Not "Dangerous and**
2  |  **Unusual" Under the Second Amendment; Nor Are They "Unusually**
   |  **Dangerous" Under the State's Purported Measurement of What is Protected.**

3      The State's notion that large capacity magazines are unworthy of any protection as

4  merely "lethal" instrumentalities for criminals is drawn from its own standard, unheard of in this

5  context, that "unusually dangerous" instrumentalities fall outside the Second Amendment.  (Opp.

6  at 9:4.)  While the State may prefer this more sinister-sounding reformulation of the actual

7  standard, the fact remains that the standard is simply "dangerous *and unusual*." *Heller*, 554 U.S.

8  at 627 (emphasis added). And, as the district court in *Fyock* itself cogently explained, the *Heller*

9  analysis "clearly illustrate[s]" that even less burdensome magazine bans like the Sunnyvale City

10 ordinance at issue there burdened conduct "within the scope of the Second Amendment right,"

11 *Fyock v. City of Sunnyvale*, 25 F.Supp.3d 1267, 1274 (N.D. Cal. 2014). The district court went

12 on to expressly hold that "magazines having a capacity to accept more than ten rounds are not

13 dangerous or unusual," but rather are "protected arms" under the Second Amendment. *Id.* at

14 1276. While the Ninth Circuit did not directly address these issues in affirming the District

15 Court, it did not depart from these conclusions; if anything, it implicitly approved them. *See*

16 *Fyock v. Sunnyvale*, 779 F.3d 991, 997-998 (9th Cir. 2015) ("to the extent that certain firearms

17 capable of use with a magazine – e.g., certain semiautomatic handguns – are commonly

18 possessed by law-abiding citizens for lawful purposes, our case law supports the conclusion that

19 there must also be some corollary, albeit not unfettered, right to possess the magazines necessary

20 to render those firearms operable"). And as Justice Alito recently reminded us in the Supreme

21 Court's reversal of a Massachusetts high court ruling that stun guns may be banned as

22 "dangerous and unusual weapons," *Heller*'s "dangerous and unusual" test "is a conjunctive" one,

23 underscoring the principle that a "weapon may not be banned unless it is *both* dangerous and

24 unusual."  *Caetano v. Massachusetts*, __ U.S. ___, 136 S.Ct. 1027, 1031 (2016) (Alito, J.,

25 concurring).  In our case, these "protected arms" are neither "dangerous and unusual" nor

26 "unusually dangerous," – nor are they "unusual" at all.

27

28

– 3 –

**SEILER EPSTEIN ZIEGLER & APPLEGATE LLP**
Attorneys at Law

**2.     The Burden Here Would Be Substantially Greater Than the Burdens of the Bans At Issue in the Cases the State Cites as Ostensible Evidence that Courts Have "Considered" and "Rejected" *This* Challenge Against *This* Ban.**

The cases which the State portrays as being on all fours with this case and supposedly rendering its desired outcome a forgone conclusion, are actually quite different. The State is simply disingenuous in brushing aside, as essentially meaningless, the difference between the *citywide* effect of the Sunnyvale ban in *Fyock* and the *statewide* effect of this ban.  (*See* Opp. at 10, n. 8.)  And, notably, it makes no attempt to address – much less refute – the key point that the license exemptions to the citywide Sunnyvale existed, leaving *some* opportunity for the average citizen, as opposed to the license exemptions under this statewide ban which would disqualify essentially everyone except the specially credentialed few. The case of *S.F. Veteran Police Officers Ass'n v. City of S.F.*, 18 F.Supp.3d 97 (N.D. Cal. 2014) is a misfit for similar reasons: as in *Fyock*, one need only step across city lines to be free of the ban because it applied only within the City of San Francisco, and the ban was subject to the broader form of licensing exemptions. *Id.* at 1000. As much as the State keeps trying to harness *Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) for support, that case is also of no real help: the fundamental difference the State fails to mention is that the ban at issue there did *not* ban mere possession and did *not* apply retroactively through a forced dispossession of legally-owned magazines from current owners, as this law would.  *Id.* at 121-23. Further, quite unlike the would-be ban here, the bans at issue in *N.Y.S. Rifle and Pistol Ass'n v. Cuomo*, 804 F.3d 242 (2d Cir. 2015) permitted Connecticut residents to *retain* pre-ban large capacity magazines so long as they were registered with the state, and permitted New York residents to possess fully loaded large-capacity magazines at firing ranges and official shooting competitions and to possess them partially loaded elsewhere. *Id.*, at 249-250.

*Heller II* and *Colorado Outfitters* also lack true analogous value: As already explained, in *Heller II*, the ban excepted essentially any responsible, able-bodied person with no history of violence or mental illness.  *Heller v. District of Columbia*, 670 F.3d 1244, 1260-64 (D.C. Cir. 2011); D.C. Code Ann. §§ 7-2506.01(a)(3), 7-502.03(a)-(b).  And in *Colorado Outfitters*, the ban

only applied to magazines of a greater capacity than 15 rounds, and excepted all such magazines owned before the ban's effective date. *Colorado Outfitters Ass'n v. Hickenlooper*, 24 F.Supp.3d 1050, 1068 (D. Colo. 2014); Colo. Rev. Stat. § 18-12-302(a). As for the *Friedman* case, while that did involve a retroactive ban, it was a citywide ordinance, and the decision did not come without significant dissension. *Friedman v. City of Highland Park*, 784 F.3d 406, 412-13 (7th Cir. 2015) (Manion, J., dissenting: "Both the ordinance and this court's opinion upholding it are directly at odds with the central holdings of *Heller* and *McDonald*: that the Second Amendment protects a personal right to keep arms for lawful purposes, most notably for self-defense within the home.").

If, on the "sliding scale" test for the appropriate level of scrutiny, intermediate scrutiny was appropriate for these other *less* burdensome bans, surely a greater degree of scrutiny is warranted here, where the law comes closer "to the core of the Second Amendment right" while imposing greater burdens. *United States v. Chovan*, 735 F.3d 1127, 1137 (9th Cir. 2013). The State does not even claim this would ban survive such higher scrutiny. In fact, it acknowledges that "a complete ban on an entire category of *firearms*" would certainly be unconstitutional under any standard. (Opp. at 9:22 (emphasis added.)) The distinction between "firearms" and large capacity magazines is one without a difference in this context, because this law would undeniably ban an entire category of "protected arms." *Fyock v. City of Sunnyvale*, 25 F.Supp.3d at 1276.[1]

### 3. The State's Justifications Fall Far Short of Saving This Law, Even Assuming the Burdens It Would Impose Invoke Only Intermediate Scrutiny.

In line with its general theme that the inherently "lethal" nature of large capacity magazines renders them of no real economic or social value when possessed by private citizens,

---

[1]The State cannot simply bypass the case-specific determination of the appropriate level of scrutiny by simply characterizing the Ninth Circuit's application of intermediate scrutiny in *Fyock* as a decision on a "pure issue of law" that is "binding" upon this court. (Opp. at 10:10.) This determination "depend[s] on the nature of the conduct being regulated and the degree to which the challenged law burdens the right," *Chovan*, 735 F.3d at 1137 (internal quotations

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

the State sets up its analysis of the relative interests with the notion that banishment would place "*no* appreciable burden on an individual's ability to defend himself at home or anywhere else" because such "lethal" weapons are neither necessary nor well-suited for self-defense. (Opp. at 1:18 – 11:3 (emphasis added.))  It then goes on to maintain that the magazines should be banned anyway because of their *potential* danger and the "difficulty" of enforcing current regulations. (Opp. at 13, n.11.)  The slippery slope underlying this rationale is troubling: *any* magazine capable of holding or gun capable of firing more rounds than what the State believes a person "would need" for self-defense could be banned.  (*See* Opp. at 11.)  The State thinks that number is somewhere between two and three rounds based on incidents where people have been fortunate enough to repel threats with that number of shots.  (Opp. at 11:4-23.)  So what, we must ask, is next? All magazines capable of holding or guns capable of firing six or more rounds, since people "need" only two or three?  For that matter, four or five rounds could be viewed as too many.  Such governmental bans are conceivable – but only *if* the State's rationale is endorsed as a justification for this ban. The Second Amendment right does not hinge upon evidence that people have been commonly required to empty their magazines or reload their guns in violent confrontations: any such instance where a significant number of shots was not necessary "should be celebrated," *Fyock v. City of Sunnyvale*, 25 F.Supp.3d at 1276, not harnessed as means to deprive people of the core "individual right to possess and carry weapons *in case of* confrontation," *Heller*, 554 U.S. at 592 (emphasis added).[2]

---

omitted), which therefore necessarily must be made on a case-by-case basis and is clearly not a "pure issue of law."

[2]Justice Manion's vehement dissent in *Friedman*, 784 F.3d at 413, cogently makes this point: "To be sure, assault rifles and large capacity magazines are dangerous. But their ability to project large amounts of force accurately is exactly why they are an attractive means of self-defense. While most persons do not require extraordinary means to defend their homes, the fact remains that some do. Ultimately, it is up to the lawful gun owner and not the government to decide these matters. To limit self-defense to only those methods acceptable to the government is to effect an enormous transfer of authority from the citizens of this country to the government – a result directly contrary to our constitution and to our political tradition. The rights contained in the Second Amendment are 'fundamental' and 'necessary to our system of ordered liberty.' *McDonald*, 561 U.S. at 778. The government recognizes these rights; it does not confer them."

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

And the State's "difficulty of enforcement" justification rests on a similarly slippery surface, which it then tilts in the wrong direction. Difficulty of enforcement of an already-overbearing, constitutionally suspect law is not license for the State to "double down" in enacting an even more onerous ban. Obscenity laws, in their heyday, were extremely difficult to enforce because of variances in "temporary community standards" and such. But the answer to the difficulty in enforcing such laws was not simply to ban the possession of all obscene materials. *See*, *Stanley v. Georgia*, 394 U.S. 557, 89 S.Ct. 1243 (1969), wherein the Court stated: "[W]e are faced with the argument that prohibition of possession of obscene materials is a necessary incident to statutory schemes prohibiting distribution. That argument is based on alleged difficulties of proving an intent to distribute or in producing evidence of actual distribution. We are not convinced that such difficulties exist, but even if they did we do not think that they would justify infringement of the individual's right to read or observe what he pleases." 394 U.S. at 567-568, 89 S.Ct. at 1249. Likewise, the Volstead Act was notoriously difficult to enforce because, as this court observed, it did not ban the possession, but merely the sale of "intoxicating liquors." But the answer to the difficulties in enforcing the Prohibition laws would not have been to criminalize the possession of liquor – unless the government's true aim was simply to jail as many of its citizens as it could.

For that matter, the entire Fourth Amendment to the United State Constitution might be seen as one large impediment to the enforcement of all manner of laws. But we would naturally recoil against any suggestion that trampling upon those portions of the Constitution could be justified simply for the sake of facilitating law enforcement. And therefore, great vigilance against sweeping governmental bans is necessary when, as here, they involve *constitutionally-protected* property overwhelmingly used by citizens in most other states for entirely lawful purposes, including the core right of self-defense. The same is true of general claims that such bans advance the State's ability to "promote public safety" and protect the public against violence and crime (Opp. at 12:25), as such purposes are so broad-based and elastic that they could be stretched to serve as the basis for justifying the expansion of *all* criminal laws to extreme degrees. And whatever the State's interest in public safety may be in the context of

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

regulating firearms and its necessary parts, a statewide, total, confiscatory ban on lawfully-possessed personal property is not reasonably tailored, or tailored at all.  Such a scheme substitutes a lazy convenience, at the expense of thousands of law-abiding citizens' constitutional rights.

Here, the State has not even come close to carrying its burden of demonstrating a "reasonable fit" between this would-be ban and the achievement of a "significant, substantial, or important" objective *specific* to large capacity magazines, *Chovan*, 628 F.3d at 1139, as opposed to merely general postulations that could theoretically apply to virtually any "safety" regulation.  Thus, even granting the law review under intermediate scrutiny, it fails to pass muster.  On the other hand, for these same reasons, Plaintiffs have carried their burden of demonstrating that they are "more likely than not to prevail on the merits of the underlying claims," *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1133 (9th Cir. 2011), *or* that there are "serious questions going to the merits" and the balance of hardships tips sharply in [their] favor," *id.*[3]  The nebulousness of the State's stated justifications in support of this ban speak for themselves in refuting any claim that merely delaying implementation of this law while the important issues are adjudicated would lead to any sort of "considerable" harm to the State or the people. (Opp. at 3:5-6.)  It is quite the opposite: the State simply cannot show that the instances of "grievous injuries and deaths" involving large capacity magazines wielded by criminals – which, indisputably (and fortunately), are comparatively quite rare – could ever justify stamping out the Second Amendment rights of the innumerable law-abiding gun owners throughout California who happen to have possessed these magazines, lawfully and peacefully, for many years.  The balance of equities and interests in maintaining the status *quo* weighs heavily in Plaintiffs' favor.

---

[3]A note about the Ninth Circuit's opinion in *Fyock* is in order here, because the State relies heavily on the opinion without mentioning this: Fyock had *conceded* that a stay of the underlying merits action "would cause him no harm and in fact would benefit him," which naturally led the Ninth Circuit conclude that "it seems *unlikely* Fyock could make the requisite showing of irreparable harm to support the issuance of a preliminary injunction." *Fyock v. Sunnyvale*, 779 F.3d at 996, n. 2 (emphasis added). As such, the court's opinion is necessarily of limited value, if any, on the analysis or conclusion concerning the issue of irreparable harm here.

**B.      PLAINTIFFS HAVE SHOWN A CLEAR LIKELIHOOD OF PREVAILING ON THE MERITS OF THEIR TAKINGS CLAIM.**

With regard to the takings claim, we will address three primary arguments or suggestions raised in the State's Opposition: First, we address the State's contention that the regulation at issue does not constitute a physical taking because it is not literally being appropriated for use by the State itself.  Second – and perhaps the heart of this matter – we address the State's argument that the "police powers" of the State allow it unilaterally to declare previously-legally owned property to be contraband, and compel its surrender without compensation or due process.  Finally, we touch upon the State's suggestion that magazine modifications do not amount to takings or any other constitutional deprivation.  As we show, none of these contentions have merit, nor should they prevent the court from finding that Plaintiffs are likely to prevail on their takings claim.

### 1.      Neither Physical Appropriation Nor Actual Public Use is Required to Constitute a Physical Taking Under the Fifth Amendment.

The State first asserts in its opposition that section 32310, subdivs. (b) and (c) as amended, does not amount to a physical taking because the State is not literally taking the magazines for its own (and therefore, a public) use, i.e., that the statute "does not involve the government acquiring LCMs for public use or forcing the sale of property to a government designee to use for a public purpose."  (Opp. at 17:8-9.)  And the Attorney General argued at the TRO hearing that the State was not requisitioning plaintiffs' pre-ban magazines for use, for example, by the CHP.  However, direct requisitioning by the government, for its own use, or even use by the public, is not the test for a direct physical appropriation to be a taking, and this argument must be rejected out of hand.

The direct-appropriation requirement was, in fact, rejected by the Supreme Court in *United States v. Security Industrial Bank*, 459 U.S. 70, 103 S. Ct. 407 (1982), in which the Court considered the effect that a bankruptcy statute had which, retroactively applied, would have operated to avoid liens on the debtors' property that had attached before the statute was enacted. (This case is discussed further below).  In rejecting the government's claim, similar to the one

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

being advanced here regarding direct appropriations, the Court observed:

> The government seeks to distinguish [*Armstrong v. United States*, 364 U.S. 40, 80 S.Ct. 1563 (1960)] on the ground that it was a classical "taking" in the sense that the government acquired for itself the property in question, while in the instant case the government has simply imposed a general economic regulation which in effect transfers the property interest from a private creditor to a private debtor. While the classical taking is of the sort that the government describes, our cases show that takings analysis is not necessarily limited to outright acquisitions by the government for itself.

459 U.S. at 77-78 (citing *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S.Ct. 3164 (1982); *PruneYard Shopping Center v. Robins*, 447 U.S. 74, 100 S.Ct. 2035 (1980); *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S.Ct. 158, 160 (1922)).

The State's further argument, resting upon a literal requirement that a "public use" must be had in order to amount to a taking, is also relying upon an outdated concept.  The Supreme Court has steadily retreated from the view that a "public use" requires that the public have actual access to property once taken, and instead, it is enough that the law or regulation have a "public purpose."  This was reinforced in *Kelo v. City of New London*, 545 U.S. 469, 125 S.Ct. 2655 (2005), in which the Court observed that it had "long ago rejected any literal requirement that condemned property be put into use for the general public."  […]  Indeed, while many state courts in the mid-19th century endorsed 'use by the public' as the proper definition of public use, that narrow view steadily eroded over time."  545 U.S. at 479, 125 S.Ct. at 2662 (citing *Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 244, 104 S.Ct. 2321 (1984)).  The Court concluded: "We have repeatedly and consistently rejected that narrow test ever since."  *Kelo*, 545 U.S. at 480, 125 S.Ct. at 2663.  Accordingly, "public use" is now largely synonymous with "public purpose" for takings purposes.  *Id.* ("The disposition of this case therefore turns on the question whether the City's development plan serves a "public purpose.")

In the present case, the State admits that "the purpose of the statute is to remove LCMs from circulation[.]"  (Opp. at 17:19.)  For takings purposes, the public purpose of the law does not have to be tied or even related to the actual or intended use for it to be a physical taking.  In a physical takings case, it simply does not matter what the government does with the appropriated

items, i.e., whether it uses the property or not.  For example, in *Horne v. Dept. of Agriculture*, __ U.S. __, 135 S.Ct. 2419 (2015), which settled any lingering question as to whether the Takings Clause applies to personal property, the government's appropriation of raisins was not itself tied to the particular purpose underlying the statute.  In fact, the government was free to decide how to "dispose of them in its discretion."  135 S.Ct. at 2424.  The government could sell the raisins in non-competitive markets, donate them to charitable causes, and presumably even destroy them if it wanted.  But the underlying purpose of this New Deal-era law was not to prop up non-competitive markets, nor to benefit charitable causes.  The stated purpose of the law was "to help maintain stable markets for particular agricultural products."  *Id*.  And the point here is, no particular use of the raisins by the government was required or anticipated, or needed at all.  It was enough that the government took the raisins in the first place – and their summary destruction would not have prevented the Court from finding that the statutory scheme amounted to a taking.  *See also*, *United States v. Gen. Motors Corp.*, 323 U.S. 373, 378, 65 S.Ct. 357, 359–60 (1945) ("The courts have held that the deprivation of the former owner rather than the accretion of a right or interest to the sovereign constitutes the taking. Governmental action short of acquisition of title or occupancy has been held, if its effects are so complete as to deprive the owner of all or most of his interest in the subject matter, to amount to a taking.")

Here, the State has already admitted that the purpose of the large-capacity magazine ban is "to remove LCMs from circulation[.]"  It therefore admits that the law purports to serve some public purpose.  And although we strongly disagree that the law serves any beneficial purpose whatsoever, or would have any measurable effect on public safety (Moody Decl., ¶¶ 10-13, 16-17), we find it difficult to reconcile the State's admission regarding the alleged public purpose with its twin admission that the very purpose of the Takings Clause "is to prohibit '[g]overnment from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'"  (Opp. at 15:15 – 16:2 (citing *Penn Central Transp. Co. v. City of N.Y.*, 438 U.S. 104, 123 (1978)).  Since the admitted public purpose is supposedly to benefit all of us – for our own good – at Plaintiffs' expense (and those similarly situated), the

– 11 –

1    public purpose test is satisfied, and on its face, this is a physical taking for which compensation

2    is required.

### 2. The "Police Powers of the State" Cannot Be Invoked to Impose a Retroactive Ban on the Possession of Legally-Owned Property Without Violating the Takings Clause.

As we indicated in our opening memorandum, the State's reliance upon its "police powers" in unilaterally banning the possession of the pre-ban magazines at issue is likely the heart of the takings matter. And as we predicted, the State's opposition has cited to pre-*Heller* authority, e.g., *Fesjian v. Jefferson*, 399 A.2d 861 (D.C. Ct. App. 1979), in asserting that prohibitions on "dangerous weapons" do not violate the Takings Clause. (Opp. at 17:1-6.) We have already discussed at length why *Heller* now requires more than simply acceding to a government's determination that it may unilaterally ban categories of "dangerous weapons" without anything further. Moreover, we would further point out that each of the cases which the State cites in support of this proposition involved the State's appropriation of *specific weapons*. *See, Askins v. United States*, 82 Fed. Cl. 619, 621 (2008) (ATF's seizure of device deemed to be a machine gun); *Fesjian*, 399 A.2d at 863 (D.C.'s denial of three permits involving weapons deemed to be machine guns); *Gun South, Inc. v. Brady*, 877 F.2d 858, 859-860 (11th Cir. 1989) (Customs Service's interdiction and impoundment of 800 assault rifles.) None of these cases, of course, involved magazines.

Here, in declaring for everyone[4] that the pre-ban magazines are dangerous items no longer worthy of keeping, the State has essentially taken the position that it is entitled to force dispossession of this property under its police powers. And therefore, the State contends, it does not implicate the Takings Clause. But we cautioned in our opening memorandum, and in the argument before this court, about reliance upon a bright-line distinction between takings on the one hand, and the exercise of police powers on the other. And moreover, the *Lucas* Court

---

[4]Except, apparently, *e.g.*, Hollywood movie stars using large-capacity magazines in film or television. *See*, Pen. Code § 32450(a).

– 12 –

expressly warned against such self-fulfilling determinations as a matter of course.  The Court stated: "[I]t becomes self-evident that noxious-use logic cannot serve as a touchstone to distinguish regulatory 'takings' — which require compensation — from regulatory deprivations that do not require compensation.  *A fortiori* the legislature's recitation of a noxious-use justification cannot be the basis for departing from our categorical rule that total regulatory takings must be compensated.  If it were, departure would virtually always be allowed."  *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1026, 112 S.Ct. 2886, 2899 (1992).

In other words, and in the firearms context, we cannot and will not simply defer to legislative determinations on allegedly noxious uses or nuisances.  And not for the least of reasons that in *Fyock*, the Ninth Circuit has already determined that there is a vested constitutional interest in the firearm magazines in question, i.e., that the ban on such items, at the very least, *burdens* Second Amendment interests.  *Fyock*, 779 F.3d at 998 ("The district court applied the appropriate legal principles and did not clearly err in finding, based on the record before it, that a regulation restricting possession of certain types of magazines burdens conduct falling within the scope of the Second Amendment.")  These "Second Amendment interests" are not merely an abstract theory on the individual right to self-defense in general, but an express affirmation of the right to *keep* and bear arms, and thus, implicates a possessory right to *keep* such property as well.  We therefore and easily conclude that a state cannot simply rest upon its assumed plenary authority to ban magazines without compensation, under its "police power to protect the safety, health, and general welfare of the public" in declaring an item to be a "public nuisance," and thereby assuming that it is "not a physical taking."  (Opp. at 16:19-21.)

∎ ∎ ∎

During the argument on Plaintiffs' application for a TRO, this court inquired as to whether it was within the power of the State simply to declare certain items as "contraband," and ban them, as a means of forcible dispossession without violating the Takings Clause.  We were skeptical about the State's ability unilaterally to declare it so, and again, caution extreme circumspection here.  With regard to drugs, to use the court's example, there may be a long-

standing prohibition on the possession of opium, and the forfeiture of such property that is *illegally held* might be justified.  However, to further this example, if Congress should someday ban the possession of poppy seeds (as some Asian countries have done), as a component of the opium trade, thereby forcing people to rid themselves of all lawfully-held poppy seed stocks by 2018, then many people (poppy seed growers, owners of existing stocks, bakers, bagel-makers, etc.) might have something to say about it vis-à-vis the Takings Clause.  The key distinction to be made in these examples, of course, is whether the property which a legislative body deems to be "contraband" is legal to possess at the time of the prohibitory enactment.

We contend that any law that retroactively seeks to destroy an existing, established property right *must* be considered in light of the Takings Clause.  In *United States v. Security Industrial Bank*, the Supreme Court considered the retroactive effect of certain bankruptcy statutes that certain debtors could use to avoid liens on personal property.  In those consolidated cases, the creditors had perfected liens on the debtors' personal property (furnishings and appliances) *before* the bankruptcy statutes were enacted.  The creditors claimed that retroactive application of the bankruptcy statute – which effectively destroyed their liens – constituted takings within the context of the Fifth Amendment, and the Court, in essence, agreed.  The Court first found that the statute effected a destruction of a vested property interest in pre-existing property rights, i.e., a secured creditor's interest in property, no matter how non-traditional, slight or insubstantial.  459 U.S. at 75-76, 103 S.Ct. at 411.  The Court concluded and held that there was "substantial doubt" whether the retroactive destruction of the creditors' liens would comport with the Takings Clause of the Fifth Amendment.  459 U.S. at 78, 103 S.Ct. at 412.[5]

*Lucas*, again, confirms as much where the majority opinion itself states: "Any limitation so severe cannot be *newly legislated or decreed* (without compensation), but must inhere in the title itself, in the restrictions that background principles of the State's law of property and

_____

[5]Ultimately, the Court in *Security Industrial Bank* decided the matter as one of statutory interpretation, avoiding a holding as a takings matter.  Nevertheless, the case is properly cited for the proposition that retroactive application of the law that results in destruction of a vested property right implicates the Takings Clause.

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

1    nuisance already place upon land ownership[,]" and remanded the matter for further

2    determination of whether those "background principles" under existing state law would have

3    prevented the proposed use of the plaintiff's property. *Lucas*, 505 U.S. at 1029, 112 S.Ct. at

4    2900 (emphasis added); *Esplanade Properties, LLC v. City of Seattle*, 307 F.3d 978, 985 (9th

5    Cir. 2002). This same principle applies to takings of personal property as well. *See*, e.g., *Bair v.*

6    *United States*, 515 F.3d 1323, 1328 (Fed. Cir. 2008) ("In cases of personal property, the

7    background principles are defined by the law existing at the time that the property came into

8    existence. Any lawful regulation defining the scope of the property interest that predates the

9    creation of that interest will 'inhere in the title' to the property.")

10       And therefore, a legislature may not, merely by unilateral declaration, command that

11   certain legally-owned property must simply be surrendered for the supposed public good without

12   compensation. *See e.g.*, *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 164, 101

13   S.Ct. 446, 452 (1980) ("a State, by *ipse dixit*, may not transform private property into public

14   property without compensation[.]"); *Stevens v. City of Cannon Beach*, 510 U.S. 1207, 114 S.Ct.

15   1332, 1334 (1994) ("Our opinion in *Lucas*, […] would be a nullity if anything that a state court

16   chooses to denominate 'background law' – regardless of whether it is really such – could

17   eliminate property rights.") (Scalia, J., dissenting from denial of certiorari).

18       Even with regard to those statutes and cases which allow for civil forfeiture of property

19   as a *penalty* – a discussion taking us far afield from the takings inquiry before this court – there

20   must be a reasonable relationship to an actual underlying crime or offense. *See*, *Leonard v.*

21   *Texas*, __ U.S. __, 137 S.Ct. 847 (2017) ("Modern civil forfeiture statutes are plainly designed,

22   at least in part, to punish the owner of property used for criminal purposes.") (Thomas, J.,

23   statement respecting the denial of certiorari) (citing *Austin v. United States*, 509 U.S. 602, 618–

24   619, 113 S.Ct. 2801 (1993)). And moreover, within those instances, it is fair to generalize that at

25   least some semblance of due process exists (e.g., in rem proceedings, varying burdens of proof)

26   wherever such seizures may occur. In contrast, the State here intends to enforce a categorical

27   ban upon the continued possession by *all* pre-ban magazine holders – irrespective of whether

28

*their* property was used in commission of a crime, and even in the face of evidence that such pre-ban magazines are not used in crime generally.  (See, Moody Decl., ¶¶ 18-25.)

Finally, in oral argument before this court, the Attorney General made brief reference to a state trial court ruling regarding the regulation of shark fins as not violative of the Takings Clause.  We think the distinctions are obvious and warrant little response.  In the first place, that apparent case, *Asian Amer. Rights Comm. of Calif. v. Brown*, San Francisco Superior Court No. CGC 12-517723, was decided on a demurrer, did not result in a reported appellate decision, and the takings aspect was therefore never tested on appeal.  Moreover, the case apparently was one primarily brought on Commerce Clause grounds, where the parties apparently devoted secondary consideration to the takings aspect of the case.  But more to the point, a statewide ban on a perishable commodity, particularly where existing owners of that commodity were given sufficient time to sell/consume it,[6] is far removed from the dispossession of constitutionally-protected parts of firearms, which have been lawfully possessed for many years.

In the present case, the State has enacted a unilateral, retroactive ban on the possession of items that were previously – and at all times before then – legal to own.  Aside from the Second Amendment interests at stake, their right to continuing ownership of *any* personal property that they value very highly cannot simply be steamrolled over by legislative decree.  The magazine ban violates the Takings Clause, and its enforcement should be enjoined.

### 3. Compelled Magazine Modifications – Whatever Those Might Mean According to the DOJ – Are Still a Physical Invasion, and Therefore, a Taking of Property.

Finally, we address the State's contention (more like a suggestion), briefly raised in its Opposition that "[i]t is also possible and relatively easy to modify an LCM so it can only accept

---

[6]Cal. Fish & Game Code § 2021, enacted in 2011 and which became effective in January 2012, allowed for such consumption: "Before January 1, 2013, any restaurant may possess, sell, offer for sale, trade, or distribute a shark fin possessed by that restaurant, as of January 1, 2012, that is prepared for consumption."

– 16 –

1  a maximum of ten rounds."  (Opp. at 18:3-4, citing Gordon Decl., Ex. 7 at 5-6.)[7]  This point was

2  raised by the Attorney General at argument as well.

3         By now, it is well established that if a physical invasion of property occurs, it constitutes

4  a taking of property requiring compensation, no matter how slight the invasion may be

5  characterized.  *Loretto*, 458 U.S. at 421, 102 S.Ct. at 3168 ("This case presents the question

6  whether a minor but permanent physical occupation of an owner's property authorized by

7  government constitutes a "taking" of property for which just compensation is due under the Fifth

8  and Fourteenth Amendments of the Constitution.")  *Lucas*, 505 U.S. at 1015, 112 S.Ct. at 2893

9  ("In general (at least with regard to permanent invasions), no matter how minute the intrusion,

10  and no matter how weighty the public purpose behind it, we have required compensation.")

11  *Kavanau v. Santa Monica Rent Control Bd.*, 16 Cal.4th 761, 774 (1997) ("Thus, the court has

12  held that a permanent physical invasion of property, no matter how slight, effects a taking

13  requiring compensation."); *Cwynar v. City & Cty. of San Francisco*, 90 Cal.App.4th 637, 652

14  (2001) ("[G]overnment action that effectuates a permanent physical invasion of property, no

15  matter how slight, constitutes a per se taking.")  And *Loretto*-type takings involving invasions of

16  property are not limited to real property – personal property may physically be taken in this

17  regard as well.  *See, e.g.*, *Brown v. Legal Found. of Washington*, 538 U.S. 216, 235, 123 S.Ct.

18  1406, 1419 (2003) (transfer of interest on attorney trust accounts to pay for state legal services

19  programs "seems more akin to the [*per se*] occupation of a small amount of rooftop space in

20  *Loretto*."); *Nixon v. United States*, 978 F.2d 1269, 1284 (D.C. Cir. 1992) ("the actual holding of

21  *Loretto* makes no mention of a distinction between real and personal property, nor was any

22  rationale given in the opinion that might justify such a distinction.")

23

24  _____

25  [7]The exhibit which the State refers in support of this proposition that a large capacity magazine is
26  "relatively easy" to modify is a letter from an adversarial third party attorney.  (Gordon Decl.,
   Ex. 7, pp. 5-6.)  Mr. Silvoso's letter in no way stands for such a proposition, even if it could be
27  relied upon at all to prove such a thing.  Mr. Silvoso was correctly pointing out that many
   Californians have had to resort to articles and videos to figure out how to modify magazines –
28  without any settled consensus on the matter.  The State's suggestion that anything here is
   possible and "relatively easy" is simply not persuasive.

– 17 –

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

1    We do not concede for one moment that compelling the physical destruction or alteration

2    of firearm magazines – inherent parts of firearms – in any way can be characterized as "minor"

3    or of little consequence.  But the cases cited above show that it simply does not matter.  If a

4    physical invasion is being compelled or otherwise occurs, it constitutes a *per se* taking for which

5    compensation must be provided.

6    Moreover, the State has left many gun owners in the dark as to what constitutes

7    permanent modifications, by failing to provide regulations or any other guidance in this regard.

8    In December 2016, the DOJ did initially promulgate proposed "emergency" regulations by

9    which, the Department claimed, it would "provide guidance to California's gun owners so that

10   by July 1, 2017, they will be in compliance with the law."  (Plaintiffs' Req. for Jud. Notice, Exh.

11   A, p. 5.)  The DOJ further asserted that "[t]he proposed regulations provide options for disposal

12   of large-capacity magazines, as well as instructions for reducing the capacity of a large-capacity

13   magazine, and need to be formalized and provided to California residents as soon as possible."

14   *Id*.  And in furtherance of such guidance, the Department promulgated regulations touching on

15   those subjects, among others.  *See*, Text of [Proposed] Regulations, Cal. Code of Regulations,

16   Title 11, Div. 5, submitted December 16, 2016 (Plaintiffs' Supplemental Req. for Jud. Notice,

17   Exh. G, at pp. 3-5.)  These regulations, for example, would have provided guidance as to what

18   constitutes "permanent alterations" to standard box magazines, how to deal with drum or tubular-

19   type magazines, or firearms with integrated magazines, and for shotgun owners whose firearms

20   may accommodate different size shells.  However, possibly given the large number of objections

21   to the manner in which DOJ was seeking to bypass the regular notice and comment periods for

22   these proposed regulations (*See*, Supp. Req. for Jud. Notice, Exh. F), or for whatever reason, the

23   DOJ withdrew its proposed regulations on December 29, 2016.  (Supp. Req. for Jud. Notice,

24   Exh. H.)  And no proposed regulations of any kind have replaced them or even been proposed.

25   Thus, owners of these types of firearms are completely in the dark as to what the DOJ expects of

26   its fellow citizens in order to comply with the law – leading to substantial vagueness issues as

27   discussed below.  But to return us to takings – the State could surely not contend, with a straight

28

– 18 –

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

face, that it is "relatively easy to modify an LCM so it can only accept a maximum of ten rounds" as claimed in its Opposition.  The Department's own botched handling of proposed regulations, and failure to replace them with further regulations or guidance, undermines its conclusion that this is a "relatively easy" or simple operation – particularly for the unique and fact-specific firearm magazines that would be described in the regulations.

Finally, to the extent that the State might be claiming that permanent modifications to the subject magazines only results in damage, but not their total destruction, we would point out that the California Constitution, art. I, § 19, specifically prohibits takings *or damage* to property without compensation.  "Because the California Constitution requires compensation for damage as well as a taking, the California clause ''protects a somewhat broader range of property values' than does the corresponding federal provision[.]'" *Monks v. City of Rancho Palos Verdes*, 167 Cal.App.4th 263, 294 (2008), as modified on denial of reh'g (Oct. 22, 2008).  The Takings Clauses of both constitutions are construed congruently.  S*ee id*.  Thus, should this court find that compelled "permanent modifications" (whatever that might mean in the eyes of the DOJ) are physical invasions – no matter how slight – they are physical takings under both constitutions, and the payment of just compensation is required.

Plaintiffs have shown a likelihood of prevailing on the merits of their takings claim.  Injunctive relief is therefore appropriate.  See *Babbitt v. Youpee*, 519 U.S. 234, 117 S.Ct. 727 (1997) (affirming lower courts' grant of injunctive and declaratory relief, where statute violated the Takings Clause.)

C.   **PLAINTIFFS ARE ENTITLED TO PRELIMINARY INJUNCTIVE RELIEF ON THE INDEPENDENT GROUNDS THAT THIS STATUTORY SCHEME IS UNCONSTITUTIONALLY VAGUE AND OVERBROAD, AND THE STATE HAS DONE NOTHING TO SHOW OTHERWISE.**

1.   **The Statutes Are Vague and Overbroad Because They Fail to Give Adequate Notice, and Violate the Due Process Clause.**

The State's primary strategy in dealing with the vagueness and overbreadth problems is to portray the underlying claims as inextricably tied to the Second Amendment and Takings

claims, as if their success or failure rises and falls with those other claims and, of course, since the State concludes that those claims fail, it insists these claims fail too. (Opp. at 2:27 – 3:2 (the statutory scheme is not vague or overbroad because it "does not impair any constitutional rights"); 20:21 (the overbreadth doctrine should not be "import[ed] . . . into the Second Amendment context"); 21:8-12 (the vagueness and overbreadth claims fail because they are "contingent upon the unconstitutionality of Section 32310" and Plaintiffs have failed to establish "any constitutional violation" because (the State claims) there is no constitutional right to possess large capacity magazines).  Its secondary strategy is to portray such claims as necessarily contingent upon a right derived from the First Amendment only, such that no one has any business challenging a statute on the grounds of vagueness or overbreadth unless the statute restricts free speech. (Opp. at 18:10-13; 20:14-26.)  Both strategies completely miss the mark. The vagueness and overbreadth doctrines rest, at bottom, on Fifth Amendment due process concerns: independent of whether a statute does or does not satisfy the mandates of the First or Second Amendment, or any other constitutional guarantee, when it comes to *any* criminal law, a person is entitled to *fair notice* of what conduct is prohibited and not prohibited by the statute with language sufficiently "definite" to afford such notice and not encourage "discriminatory and arbitrary enforcement." *Hotel & Motel Assn. of Oakland v. City of Oakland*, 344 F.3d 959, 971 (9th Cir. 2003).  "A law that does not reach constitutionally protected conduct and therefore satisfies the overbreadth test may nevertheless be challenged on its face as unduly vague, in violation of due process." *Id.*, at 963.

Naturally then, the annals of case law are replete with both vagueness and overbreadth challenges, facial and as-applied, to all manner of criminal statutes based solely upon general due process grounds and having nothing to do with free speech rights – notably including two of the cases on which the State itself relies (in arguing other points, of course): *Kolbe*, 849 F.3d 148 (the plaintiffs in that case challenged the firearm regulation at issue as "unconstitutionally vague on its face, in contravention of the Due Process Clause"); *NY. State Rifle & Pistol Ass'n*, 804 F.3d at 265 (the plaintiffs challenged the firearm and magazine regulations as "unconstitutionally

1   vague," a challenge "[g]rounded in due process principles" of fair notice regarding the

2   definiteness of the conduct proscribed); *see e.g.*, *Kolender v. Lawson*, 461 U.S. 352, 353-54

3   (1983) (vagueness challenge to a "loitering" and "wandering" criminal statute); *Skilling v. U.S.*,

4   561 U.S. 358, 408-09 (2010) (vagueness challenge to a bribing and "kickbacks" criminal

5   statute); *Rose v. Locke*, 423 U.S. 48, 49-50 (vagueness challenge to a sex offense statute); *U.S. v.*

6   *JDT*, 762 F.3d 984, 998-99 (9th Cir. 2014) (same); *Phelps v. U.S.*, 831 F.2d 897, 898 (9th Cir.

7   1987) (vagueness and overbreadth challenge to a statute governing the release of persons

8   adjudged not guilty of a crime by reason of insanity); *U.S. v. Rodriguez-Deharo*, 192 F.Supp.2d

9   1031, 1038-39 (E.D. Cal. 2002) (vagueness and overbreadth challenge to a domestic violence

10  statute); *see also County of Santa Clara v. Trump*, __ F.Supp.3d __, 2017 U.S. Dist. LEXIS

11  62871, *11, 38-39 (N.D. Cal. 2017) (in considering the plaintiffs' challenges to the President's

12  Executive Orders concerning entry into the United States of people from certain other countries,

13  the court raised the general concern that "applying a narrow construction to an unconstitutionally

14  overbroad statute does not address the confusion and potential deterrent effect caused by the

15  language of the law itself").

16      **2.      The State's Conclusion that Proposition 63 Controls Does Not Answer The
17              Question of Why Two Versions of Pen. Code § 32406 are Chaptered and
18              Active.**

19      Aside from concluding that overbreadth concerns have no place outside of the First

20  Amendment generally, the State has little to add to the actual merits of these issues, simply

21  reciting the definition of a large capacity magazine (section 16740) and flatly asserting that

22  "there can be no confusion as to what is required of Plaintiffs on July 1, 2017" under section

23  32406, as if the meaning and application of these two, *live* sections of the Penal Code are entirely

24  self-evident in informing persons of ordinary intelligence what exceptions do and do not apply.

25  (Opp. at 20:9-10.)  However, that Proposition 63 came into effect after the enactment date of SB

26  1446 does not neatly resolve the matter or mean that Proposition 63 "supersedes" SB 1446, at

27  least as to *section 32406*, as the State contends.  (*Id.*)  Indeed, the general principle the State cites

28  in support of this notion is that "[a] later enacted, *more specific* statute generally governs over an

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

– 21 –

1   earlier, *more general one*." (Opp. at 19, quoting *Hawaii v. Trump*, __ F.3d__, 2017 WL

2   2529640, *20 (9th Cir. 2017) (italics added).  But in this case, SB 1446 (the "earlier" version) is

3   not "more general" than Proposition 63 – it is, in fact, the "more specific" one of the two, since

4   Proposition 63's version of section 32406 (Req. for Jud. Notice Exh. D) provides for only *one*

5   stated exemption to the ban, while the SB 1446 version (Req. for Jud. Notice Exh. C) contains

6   that exemption plus *four* more.  More to the point: *It is undisputed that SB 1446 was not*

7   *repealed, and became effective on January 1, 2017 – after the passage of Proposition 63*!  If

8   anything, the State's cited principle simply adds further confusion, because the result appears to

9   be the *opposite* of what would normally occur in the context of a "later enacted" statute.

10      And thus, there is a bona fide dispute as to which law became "effective" first.  While

11   Proposition 63 was formally enacted in November 2016, the final version of that law had been

12   established in December 2015.[8]  The "final" version of SB 1446 was not established until March

13   28, 2016.[9]  Therefore, when it finalized the content of SB 1446, the Legislature was *fully aware*

14   of Proposition 63's final content, including the quite different version of section 32406.  This

15   evidences a legislative intent for the "more specific" version of section 32406 to become

16   effective.  Moreover, the enactment language in the statutory history of the two versions suggests

17   that Proposition 63 was *not* intended to "chapter over" the SB 1446 version of section 32406,

18   because it reflected that the voters simply "adopted" this section independently, not that they

19   intended to *amend* the then-existing law under SB 1446.  As a contrasting example, the statutory

20   history in the Proposition 63 version of section 32310 expressly provides that the voters

21   approved an "*amendment*" of the then-existing version of the law.  A person of ordinary

22   intelligence attempting to decipher which of the two very different versions applies would

23   simply be left confounded since it is apparent that *both* versions of these crucial exemption

24   provisions are currently effective.

25

26   _____

27   [8]*See*, https://www.oag.ca.gov/system/files/initiatives/pdfs/15-0098%20(Firearms)_0.pdf

28   [9]*See*, http://leginfo.legislature.ca.gov/faces/billStatusClient.xhtml?bill_id=201520160SB1446

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

This is not simply nit-picking a minor or insignificant point.  Plaintiffs Adam Richards and Clifford Flores are suing in their capacities, in part, as trustees of trusts which hold large-capacity magazines as trust assets (FAC ¶¶ 12, 13, 86, 87) and therefore, are entitled to know whether section 32406(e) applies or is active.  Plaintiff L.Q. Dang has large-capacity magazines for a firearm for which no ten-round magazines were ever made (FAC ¶¶ 14, 85), and is similarly entitled to know whether section 32406(f) applies or is active.  The State's simple proposition that "Prop. 63 is controlling because it came later" is particularly unhelpful when it also must concede that *both* versions of section 32406 are live and active.  (*See* Plaintiffs' Req. for Jud. Notice, Exs. C and D.)

This naturally leads to more questions – undoubtedly to be determined through discovery – as to why the Prop. 63 version of section 32310 (providing for misdemeanor penalties) was chaptered, as opposed to the SB 1446 version (providing for infraction).  For purposes of this motion, it suffices to say that Plaintiffs have raised "serious questions going to the merits," and that the balance of hardships tips sharply in their favor under *Cottrell*.  For there is no harm to the State to enforce a vague and ambiguous law which its own Attorney General cannot adequately explain – while the potential criminal consequences to Plaintiffs, and those similarly situated, may be substantial.

### 3. Severe Vagueness Concerns Arise From the DOJ's Failure to Promulgate Clarifying Regulations.

Finally, as discussed above in connection with the takings claim, we mention that any vagueness and overbreadth concerns must be weighed against the state for its simple failure to issue clarifying regulations.  Again, the DOJ's proposed "emergency" regulations were supposed to have "provide[d] guidance to California's gun owners so that by July 1, 2017, they will be in compliance with the law."  (Plaintiffs' Req. for Jud. Notice, Exh. A, p. 5.)  The DOJ further assured us that "[t]he proposed regulations provide options for disposal of large-capacity magazines, as well as instructions for reducing the capacity of a large-capacity magazine, and need to be formalized and provided to California residents as soon as possible."  *Id*.  But upon

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

withdrawing those regulations after it attempted to bypass the ordinary notice and comment period for regulation (Supp. Req. for Jud. Notice, Exh. H), the Department never re-issued any subsequent proposed regulations.

In addition to the "permanent alterations" issue discussed above, the Department was supposed to have provided guidance as to how to deal with drum or tubular-type magazines, firearms with integrated magazines, and to shotgun owners whose firearms may accommodate different size shells.

These are not theoretical concerns.  Plaintiff Frank Federau legally owns an AR-15 platform rifle that is chambered in .458 SOCOM, and for which its magazine holds 10 rounds of such ammunition.  (FAC, ¶ 15.)  However, that magazine also could hold 30 rounds of 5.56 x 45mm ammunition, though Mr. Federau's firearm does not accept that round.  (*Id*.)  Therefore, Federau has sued for declaratory and injunctive relief, among other reasons, because many other persons are in a similar situation regarding the use of firearm magazines that may be capable of accepting more than 10 rounds of ammunition of a different caliber.  (*Id*.)  Plaintiffs will show, in fact, that this is not an uncommon situation.  Some handguns, for example, are designed to hold 10 rounds of .40 S&W, but could theoretically accept 11 rounds of 9mm ammunition.  Any questions regarding the treatment of these firearms, among others, might have been made and answered had the DOJ followed the usual public comment period required by the Administrative Procedures Act.  But it did not, nor did it issue any regulations at all, and these questions linger.

Because the State has treated all overbreadth concerns as somehow subsumed in the supposedly "failed" Second Amendment and Takings claims, it has offered nothing at all of substance to these and other legitimate questions, leaving them essentially unanswered.  Suffice it to say, the overbreadth is another matter of real concern in considering the severe impact this ban would have upon Plaintiffs and the countless similarly situated law-abiding citizens who have heretofore lawfully exercised their fundamental right to bear these protected arms.  For these reasons, Plaintiffs are entitled to relief on the independent grounds that the large capacity magazine ban is unconstitutionally vague and overbroad as a matter of fundamental due process.

### III.   CONCLUSION

For these reasons, and those set forth in Plaintiffs' points and authorities submitted in support of their opening memorandum, Plaintiffs respectfully request that this court maintain the *status quo*, and issue preliminary injunctive relief to enjoin enforcement of Pen. Code § 32310, subdivs. (b) and (c) as enacted, to prevent irreparable injury to their well-established, cherished liberty and property interests, through the pendency of this action.

Dated: June 23, 2017                    SEILER EPSTEIN ZIEGLER & APPLEGATE LLP


                                        /s/ George M. Lee
                                        George M. Lee

                                        **LAW OFFICES OF RAYMOND MARK DIGUISEPPE, PLLC**

                                        /s/ Raymond M. DiGuiseppe
                                        Raymond M. DiGuiseppe

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

– 25 –