Neal A. Potischman (SBN 254862)
DAVIS POLK & WARDWELL LLP
1600 El Camino Real
Menlo Park, California 94025
Phone: (650) 752-2000
Fax: (650) 752-2156
neal.potischman@davispolk.com

*Attorneys for Amicus Curiae
Everytown for Gun Safety*

# UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM WIESE, et al., | No. 2:17-cv-00903-WBS-KJN |
| Plaintiffs, | |
| - v. - | **BRIEF OF AMICUS CURIAE EVERYTOWN FOR GUN SAFETY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT** |
| XAVIER BECERRA, ATTORNEY GENERAL, AND MARTHA SUPERNOR, ACTING CHIEF OF THE DEPARTMENT OF JUSTICE BUREAU OF FIREARMS, | |
| Defendants. | |

# CORPORATE DISCLOSURE STATEMENT

Everytown for Gun Safety has no parent corporations. It has no stock and hence no publicly held company owns 10% or more of its stock.

**TABLE OF CONTENTS**

PAGE

TABLE OF AUTHORITIES ........................................................................................................ ii

INTRODUCTION AND INTEREST OF AMICUS CURIAE ......................................................1

ARGUMENT ...................................................................................................................................3

    I.   California's Prohibition of Large-Capacity Magazines Is Part of a
Longstanding History of Analogous Prohibitions ................................................................3

        A.   There Is a Longstanding Tradition of Prohibiting Firearms Capable
of Quickly Firing Multiple Rounds Without Reloading ............................................4

        B.   Proposition 63 Is Consistent with Centuries of Laws Prohibiting
Weapons Deemed to Be Especially Dangerous..........................................................5

    II.  The Court Should Not Adopt Plaintiffs' Unprecedented and
Illogical "Common Use" Test.................................................................................................7

CONCLUSION ...............................................................................................................................10

# TABLE OF AUTHORITIES

CASES

PAGE(S)

*Aymette v. State*,
   21 Tenn. 154 (1840) .................................................................................................... 6

*Cockrum v. State*,
   24 Tex. 394 (1859) ...................................................................................................... 6

*District of Columbia v. Heller*,
   554 U.S. 570 (2008) ........................................................................................... 2, 3, 7, 8

*Duncan v. Becerra*,
   No. 3:17-cv-1017-BEN, 2017 WL 2813727 (S.D. Cal. June 29, 2017) .................... 2

*Friedman v. City of Highland Park*,
   784 F.3d 406 (7th Cir. 2015) .............................................................................. 2, 3, 8, 9

*Fyock v. City of Sunnyvale*,
   779 F.3d 991 (9th Cir. 2015) ................................................................................... 1, 3

*Heller v. District of Columbia*,
   670 F.3d 1244 (D.C. Cir. 2011) .................................................................................. 2

*Jackson v. City & County of San Francisco*
   746 F.3d 953 (9th Cir. 2014) ....................................................................................... 9

*Kolbe v. Hogan*,
   849 F.3d 114 (4th Cir. 2017) ........................................................................ 1, 2, 8, 9, 10

*N.Y. State Rifle & Pistol Association, Inc. v. Cuomo*,
   804 F.3d 242 (2d Cir. 2015) ................................................................................ 1, 3, 8

*City of Renton v. Playtime Theatres*,
   475 U.S. 41 (1986) ...................................................................................................... 9

*United States v. Chester*,
   628 F.3d 673 (4th Cir. 2010) ....................................................................................... 3

*United States v. Chovan*,
   735 F.3d 1127 (9th Cir. 2013) ..................................................................................... 2

*United States v. Marzzarella*,
   614 F.3d 85 (3d Cir. 2010) .......................................................................................... 3

*United States v. Miller*,
   307 U.S. 174 (1939) .................................................................................................... 7

*United States v. Skoien*,
   614 F.3d 638 (7th Cir. 2010) ................................................................................... 3, 4

*United States v. Stevens*,
   559 U.S. 460 (2010) .................................................................................................... 3

*Wiese v. Becerra*,
   Civ. No. 2:17-903 WBS KJN, 2017 WL 2813218 (E.D. Cal. June 29, 2017) ........... 2

## STATUTES & RULES

1837 Ala. Acts 7, § 1 ..........................................................................................................6
1907 Ala. Acts 80, § 1 ........................................................................................................6
1881 Ark. Laws § 1909 ......................................................................................................6
1933 Cal. Acts 1170, § 3.....................................................................................................5
1917 Cal. Stat. 221, ch. 145, § 1 ........................................................................................6
1927 Cal. Stat. 938 ............................................................................................................. 4
1837 Ga. Acts 90.................................................................................................................6
33 Hen. 8, ch. 6, § 1 (1541) ................................................................................................6
1931 Ill. Laws 452, § 1 .......................................................................................................5
1913 Iowa Acts 307, ch. 297, § 2 .......................................................................................7
1932 La. Acts 336, § 1 .......................................................................................................5
1926 Mass. Acts 256, ch. 261 ............................................................................................6
1909 Me. Laws 141 ........................................................................................................... 6
1927 Mich. Pub. Acts 887-89, No. 372, § 3 ...............................................................4, 6, 7
1913 Minn. Laws 55 ......................................................................................................... 6
1917 Minn. Laws 614, ch. 243, § 1 ...................................................................................7
1933 Minn. Laws 231, § 1 .................................................................................................5
1763-1775 N.J. Laws 346 ..................................................................................................6
1911 N.Y. Laws 442, ch. 195, § 1 .....................................................................................7
1916 N.Y. Laws 338-39, ch. 137, § 1 ................................................................................6
1933 Ohio Laws 189 ..........................................................................................................5
7 Ric. 2, 35, ch. 13 (1383)...............................................................................................5, 6
1927 R.I. Pub. Laws 256, § 1.............................................................................................4
1927 R.I. Pub. Laws 256, § 4.............................................................................................4
47 Stat. 650 (1932), ch. 465, §§ 1, 14................................................................................4
48 Stat. 1236, 1246 (1934).................................................................................................7
1903 S.C. 127, § 1..............................................................................................................6
1934 S.C. Acts 1288, § 1 ...................................................................................................5
1933 S.D. Sess. Laws 245, § 1...........................................................................................5
1879 Tenn. 135, ch. 96 § 1.................................................................................................6
1837-1838 Tenn. Pub. Acts 200 .........................................................................................6
1933 Tex. Gen. Laws 219, § 1 ...........................................................................................5
1934 Va. Acts 137, § 1.......................................................................................................5
1912 Vt. Laws 310, § 1 ......................................................................................................6
Cal. Penal Code § 32310 ................................................................................................... 1

## OTHER AUTHORITIES

Cody J. Jacobs, *End the Popularity Contest: A Proposal for Second Amendment "Type of Weapon" Analysis*, 84 Tenn. L. Rev. 231 (2015) .................................................................... 9

H.R. Rep. 103-489 (1994).............................................................................................................8

Joseph Blocher & Darrell A.H. Miller, *Lethality, Public Carry, and Adequate Alternatives*, 53 Harv. J. on Legis. 279, 288 (2016) .................................................................................... 9

Mary Ellen Clark & Noreen O'Donnell, *Newtown school gunman fired 154 rounds in less than 5 minutes*, Reuters (Mar. 28, 2013, 8:55 AM), http://www.reuters.com/article/us-usa-shooting-connecticut/newtown-school-gunman-fired-154-rounds-in-less-than-5-minutes-idUSBRE92R0EM20130328....................................................................................................1

Records of the Colony of New Plymouth in New England (Boston 1861) ...................................6

*Report of Firearms Committee*, 38th Conference Handbook of the National Conference on Uniform State Laws and Proceedings of the Annual Meeting (1928) .......................................4

The Laws of Plymouth Colony ......................................................................................................6

# INTRODUCTION AND INTEREST OF AMICUS CURIAE

Everytown for Gun Safety ("Everytown") is the nation's largest gun violence prevention organization, with supporters in every state, including tens of thousands of California residents and the mayors of forty California cities. It was founded in 2014 as the combined effort of Mayors Against Illegal Guns, a national, bipartisan coalition of mayors combating illegal guns and gun trafficking, and Moms Demand Action for Gun Sense in America, an organization formed in the wake of the murder of twenty-six children and six adults in an elementary school in Newtown, Connecticut by an individual using a firearm with a large-capacity magazine. Everytown's mission includes defending laws regulating weapons deemed unreasonably dangerous though the use of amicus briefs providing historical context and doctrinal analysis that might otherwise be overlooked.[1]

Here, Plaintiffs challenge California Proposition 63 (hereinafter, "Proposition 63"), which amends the California Penal Code § 32310 to prohibit the sale or possession of large-capacity magazines of the type used in the Newtown murders.[2] The Ninth Circuit and every other Court of Appeals that has considered such challenges have found such prohibitions on large-capacity magazines to be permissible under the Second Amendment.[3] Everytown

---

[1] Everytown has filed such briefs in several recent cases. *See, e.g.*, Brief of Everytown for Gun Safety as Amicus Curiae in Support of Defendants, *Flanagan v. Becerra*, 2:16-cv-06164-JAK-AS (C.D. Cal. Sept. 18, 2017); Brief of Amicus Curiae Everytown for Gun Safety in Support of Appellees and Affirmance, *Wrenn v. District of Columbia*, No. 16-7025, 2016 WL 3928913 (D.C. Cir. July 20, 2016); Brief of Amicus Curiae Everytown for Gun Safety in Support of Appellee and Affirmance, *Peña v. Lindley*, No. 15-15449, 2015 WL 5706896 (9th Cir. Sept. 28, 2015); Brief of Everytown for Gun Safety as Amicus Curiae in Support of Appellees and Affirmance, *Peruta v. Cty. of San Diego*, Nos. 10-56971, 11-16255, 2015 WL 2064206 (9th Cir. Apr. 30, 2015); Brief of Amicus Curiae Everytown for Gun Safety in Support of Appellant and Reversal, *Silvester v. Harris,* No. 14-16840, 2015 WL 1606313 (9th Cir. Apr. 1, 2015).

[2] *See* Mary Ellen Clark & Noreen O'Donnell, *Newtown school gunman fired 154 rounds in less than 5 minutes*, Reuters (Mar. 28, 2013, 8:55 AM), http://www.reuters.com/article/us-usa-shooting-connecticut/newtown-school-gunman-fired-154-rounds-in-less-than-5-minutes-idUSBRE92R0EM20130328.

[3] *See Fyock v. City of Sunnyvale*, 779 F.3d 991, 1001 (9th Cir. 2015) (upholding denial of preliminary injunction of local ordinance restricting the possession of large-capacity magazines accepting more than ten rounds); *see also Kolbe v. Hogan*, 849 F.3d 114, 137-38 (4th Cir. 2017) (en banc) (affirming the finding that Maryland's ban on large-capacity magazines over ten rounds was constitutional and holding that such magazines were not protected by the Second Amendment); *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 247 (2d Cir. 2015)

respectfully submits that the Court should find similarly here and grant Defendants' Motion to Dismiss.

As the Court is well aware, courts in this Circuit analyze Second Amendment challenges through a two-step process: first by assessing "whether the challenged law burdens conduct protected by the Second Amendment" and then by "apply[ing] an appropriate level of scrutiny." *United States v. Chovan*, 735 F.3d 1127, 1136 (9th Cir. 2013); *Wiese v. Becerra*, Civ. No. 2:17-903 WBS KJN, 2017 WL 2813218, at *2 (E.D. Cal. June 29, 2017). Everytown submits this amicus brief in support of Defendants' Motion to Dismiss to inform the Court's first step in this analysis. Specifically, the Court should consider Proposition 63 as part of a long tradition of regulating or prohibiting weapons that legislatures have determined to be unacceptably dangerous—including a century of restrictions on firearms capable of firing a large number of rounds without reloading. Such a historical tradition alone is sufficient for this Court to find Proposition 63 constitutional under *Heller*. *See District of Columbia v. Heller*, 554 U.S. 570, 626-27 (2008) ("[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms . . . or laws imposing conditions and qualifications on the commercial sale of arms.").

In addition, Everytown writes in opposition to Plaintiffs' suggestion that the Court should consider the national prevalence of a firearm feature as determinative in the first step of the Second Amendment analysis. This proposal cannot be reconciled with the Supreme Court's decision in *Heller*, or with the law of the circuits that have addressed this issue. *See, e.g.*, *Heller*, 570 U.S. at 627 (recognizing that weapons "most useful in military service—M-16 rifles and the like—may be banned"); *Kolbe v. Hogan*, 849 F.3d 114, 121 (4th Cir. 2017) (holding that large-capacity magazines "are among those arms . . . the *Heller* Court singled out as being beyond the

---

(holding that New York and Connecticut prohibitions on possessing large-capacity magazines holding over ten rounds did not violate the Second Amendment); *Friedman v. City of Highland Park*, 784 F.3d 406, 412 (7th Cir. 2015) (holding that local ordinance banning large-capacity magazines did not violate the Second Amendment); *Heller v. District of Columbia*, 670 F.3d 1244, 1264 (D.C. Cir. 2011) (upholding D.C. prohibition on large-capacity magazines over ten rounds); *but see Duncan v. Becerra*, No. 3:17-cv-1017-BEN, 2017 WL 2813727, at *25 (S.D. Cal. June 29, 2017) (preliminarily enjoining Proposition 63 and noting that Second Amendment rights are not eliminated "simply" because high-capacity magazine are "unpopular").

BRIEF OF AMICUS CURIAE EVERYTOWN FOR GUN SAFETY IN SUPPORT OF DEFENDANTS
NO. 2:17-CV-00903-WBS-KJN

Second Amendment's reach"); *Friedman v. City of Highland Park*, 784 F.3d 406, 407-08 (7th Cir. 2015) (noting that under *Heller*, the Second Amendment does not protect "military-grade weapons . . . and weapons especially attractive to criminals"). Moreover, such a "common use" test would transform the constitutional analysis into a consumer referendum and render existing firearms and firearm features like large-capacity magazines effectively immune from regulation.

## ARGUMENT

### I. California's Prohibition of Large-Capacity Magazines Is Part of a Longstanding History of Analogous Prohibitions

Considering the statute at issue here in historical perspective is critical to an appropriate analysis of whether it is constitutional, as "longstanding prohibitions [] fall outside of the Second Amendment's scope" and therefore merit only rational basis review. *Fyock v. Sunnyvale*, 779 F.3d 991, 997 (9th Cir. 2015).[4] Longstanding prohibitions need not "mirror limits that were on the books in 1791." *United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010) (en banc). Instead, courts have held that even early twentieth century regulations can qualify as longstanding. *See Fyock*, 779 F.3d at 996-97 ("[E]arly twentieth century regulations might nevertheless demonstrate a history of longstanding regulation if their historical prevalence and significance is properly developed in the record.").[5] As discussed below, California's

---

[4] *See also Heller*, 554 U.S. at 627, 635 (noting that "longstanding prohibitions" fall outside the scope of the Second Amendment as "exceptions" by virtue of their "historical justifications"); *United States v. Marzzarella*, 614 F.3d 85, 91 (3d Cir. 2010) (noting that "longstanding limitations are exceptions to the right to bear arms"); *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010) (noting that a law does not violate the Second Amendment if it does not infringe upon "conduct that was within the scope of the Second Amendment as historically understood"); *New York State Rifle and Pistol Association, Inc. v. Cuomo*, 804 F.3d 242, 258 n.76 (2nd Cir. 2015) (hereinafter "*NYSRPA*") ("[T]he *Heller* majority identified these . . . measures in an attempt to clarify the scope of the Second Amendment's reach in the first place."). Such exceptions to Constitutional protections are not unique to the Second Amendment context. *See United States v. Stevens*, 559 U.S. 460, 468-69 (2010) ("'From 1791 to the present,' . . . the First Amendment has 'permitted restrictions upon the content of speech in a few limited areas,' and has never 'include[d] a freedom to disregard these traditional limitations.' These 'historic and traditional categories long familiar to the bar'—including obscenity, defamation, fraud, incitement, and speech integral to criminal conduct—'are well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem.'" (internal citations omitted)).

[5] *See also Friedman*, 784 F.3d at 408 (noting that "*Heller* deemed a ban on private possession of machine guns to be obviously valid" despite the fact that "states didn't begin to regulate private

3

prohibition on large-capacity magazines is part of a longstanding history of laws prohibiting firearms capable of firing a large number of rounds in a short time period, and an even longer tradition of government regulation of weapons deemed to be unusually dangerous.

### A. There Is a Longstanding Tradition of Prohibiting Firearms Capable of Quickly Firing Multiple Rounds Without Reloading

Proposition 63 is hardly the first statute to regulate the ammunition capacity of firearms to prohibit a large number of rounds from being fired in a short period of time. In fact, states have regulated the ammunition capacity of semiautomatic firearms since these firearms were first developed at the turn of the twentieth century, often categorizing large-capacity firearms along with fully automatic weapons as "machine guns," and have imposed restrictions effectively prohibiting them entirely.[6] Both the 1927 National Crime Commission Firearm Act and the 1928 Uniform Firearms Act criminalized possession of "any firearm which shoots more than twelve shots semi-automatically without reloading." *Report of Firearms Committee*, 38th Conference Handbook of the National Conference on Uniform State Laws and Proceedings of the Annual Meeting 422-23 (1928). Shortly thereafter, the federal government enacted a similar prohibition applicable to the District of Columbia. 47 Stat. 650, ch. 465, §§ 1, 14 (1932) (making it a crime to "possess any machine gun," which it defined as "any firearm which shoots . . . semiautomatically more than twelve shots without loading").

California first passed a ban on automatic weapons in 1927[7] and expanded such legislation in 1933 through a statute prohibiting the sale or possession of "all firearms . . .

---

use of machine guns until 1927," and that "regulating machine guns at the federal level" did not begin until 1934); *Skoien*, 614 F.3d at 639-41 (noting that "prohibitions on the possession of firearms by felons and the mentally ill" have been found to be sufficiently longstanding, despite the fact that "[t]he first federal statute disqualifying felons from possessing firearms was not enacted until 1938" and that "the ban on possession by *all* felons was not enacted until 1961").
[6] *See, e.g.*, 1927 R.I. Pub. Laws 256, §§ 1, 4 (prohibiting the "manufacture, s[ale], purchase or possess[ion]" of a "machine gun," which it defined as "any weapon which shoots more than twelve shots semi-automatically without reloading"); 1927 Mich. Pub. Acts 887, § 3 (prohibiting possession of "any machine gun or firearm which can be fired more than sixteen times without reloading").
[7] *See* 1927 Cal. Stat. 938, An Act to Prohibit the Possession of Machine Rifles, Machine Guns and Submachine Guns Capable of Automatically and Continuously Discharging Loaded Ammunition of any Caliber in Which the Ammunition is Fed to Such Guns from or by Means of Clips, Disks, Drums, Belts or Other Separable Mechanical Device, and Providing a Penalty for

4

capable of discharging automatically" and "all firearms which are automatically fed after each discharge from or by means of clips, discs, drums, belts or other separable mechanical device having a capacity of greater than ten cartridges." 1933 Cal. Acts 1170, § 3. These statutes were more restrictive than Proposition 63, as the 1933 law prohibited *firearms* capable of receiving large-capacity magazines, rather than the large-capacity *magazines* at issue here. *See id.* Several other states, including Minnesota, Ohio, and Virginia, also prohibited or regulated firearms based on magazine capacity.[8] Other states passed laws limiting possession of automatic weapons based on the number of rounds that a firearm could discharge without reloading.[9] In light of this history, Proposition 63 should be properly seen as continuing nearly a century of prohibition of firearms or firearm features that enable large numbers of rounds to be fired in a short time without reloading.

### B. Proposition 63 Is Consistent with Centuries of Laws Prohibiting Weapons Deemed to Be Especially Dangerous

The statute at issue here is also part of a long history of government prohibition of weapons that threaten public safety, either because the weapons themselves are remarkably lethal or because they are especially suitable for criminal use. Such prohibitions date back to early English legal history, beginning with the 1383 prohibition of launcegays (a particularly lethal type of spear) and the 1541 prohibition of crossbows and firearms less than a yard long. *See*

---

Violation Thereof, ch. 552, §§ 1-2 (prohibiting "all firearms known as machine rifles, machine guns or submachine guns capable of discharging automatically and continuously loaded ammunition of any caliber in which the ammunition is fed to such gun from or by means of clips, disks, drums, belts or other separable mechanical device").

[8] *See* 1933 Minn. Laws 231, § 1 (banning "[a]ny firearm capable of automatically reloading after each shot is fired, whether firing singly by separate trigger pressure or firing continuously" if the weapon was modified to allow for a larger magazine capacity); 1933 Ohio 189, § 1 (banning "any firearm which shoots more than eighteen shots semi-automatically without reloading"); 1934 Va. Acts 137, § 1 (effectively prohibiting possession or use of weapons . . . from which more than sixteen shots or bullets may be rapidly, automatically, semi-automatically or otherwise discharged without reloading").

[9] These limitations were more stringent than California's current magazine prohibition of ten rounds. *See* 1933 S.D. Sess. Laws 245, § 1 (five rounds); 1933 Tex. Gen. Laws 219, § 1 (five rounds); 1934 Va. Acts 137, § 1 (seven rounds for automatics, 16 for semi-automatics); 1931 Ill. Laws 452, § 1 (eight rounds); 1932 La. Acts 336, § 1 (eight rounds); 1934 S.C. Acts 1288, § 1 (eight rounds).

5

7 Ric. 2, 35, ch. 13 (1383); 33 Hen. 8, ch. 6, § 1 (1541).  The regulation of unusually dangerous firearms continued as the American colonies and first states adapted the English tradition.  *See generally* 1763-1775 N.J. Laws 346 (prohibiting set or trap guns); The Laws of Plymouth Colony (1671) (same); Records of the Colony of New Plymouth in New England 230 (Boston 1861).

States continued to pass prohibitions or regulations on unreasonably dangerous weapons after ratification of the Second Amendment.  For example, several states banned or placed prohibitively high taxes on Bowie knives,[10] which were determined to be "instrument[s] of almost certain death."  *See Cockrum v. State*, 24 Tex. 394, 402 (1859) (finding Bowie knives are "differ[ent] from [guns, pistols, or swords] in [their] device and design" and are therefore more accurate and lethal than other contemporary weapons).  In addition, a number of states prohibited certain types of small and easily concealable handguns, which were determined to be ideal for criminal use.[11]

Throughout the early twentieth century, many states passed laws prohibiting unusually dangerous weapons or weapon features, such as silencers.[12]  Prohibitions on weapons with large ammunition capacities were also passed in the 1930s.  The federal government embraced such regulations in 1934, when Congress enacted the National Firearms Act.  *See* 48 Stat. 1236, 1246 (1934) (requiring the registration of automatic weapons, short-barreled rifles and shotguns,

---

[10] *See* 1837 Ala. Acts 7, § 1 (prohibitively taxing Bowie knives); 1837 Ga. Acts 90 (banning Bowie knives); 1837-1838 Tenn. Pub. Acts 200 (prohibiting the sale of Bowie knives); *Aymette v. State*, 21 Tenn. 154, 158 (1840) (justifying a prohibition on Bowie knives on the basis that they are "weapons which are usually employed in private broils, and which are efficient only in the hands of the robber and the assassin").

[11] *See* 1881 Ark. Laws § 1909 (pocket pistols and "any kind of cartridge for any pistol"); 1879 Tenn. 135, ch. 96, § 1 ("belt or pocket pistols, or revolvers, or any other kind of pistols, except army or navy pistol"); 1907 Ala. Acts 80, § 1 (similar); 1903 S.C. 127, § 1 (similar).

[12] *See, e.g.*, 1909 Me. Laws 141 (prohibiting silencers); 1912 Vt. Laws 310, § 1 (same); 1913 Minn. Laws 55 (same); 1916 N.Y. Laws 338-39, ch. 137, § 1 (same); 1926 Mass. Acts 256, ch. 261 (same); 1927 Mich. Pub. Acts 887-89, § 3 (same); 1927 R. I. Pub. Laws 256, § 1 (same). States also banned a wide variety of unusually dangerous weapons, including blackjacks and billy clubs, slung-shots (a metal or stone weight tied to a string), brass knuckles, various kinds of knives, and explosives.  *See e.g.*, 1917 Cal. Stat. 221, ch. 145, § 1 (blackjacks and billy clubs); 1911 N.Y. Laws 442, ch. 195, § 1 (slung-shots); 1917 Minn. Laws 614, ch. 243, § 1 (brass knuckles); 1913 Iowa Acts 307, ch. 297, § 2 (daggers and similar-length knives); 1927 Mich. Pub. Acts 887, No. 372, § 3 (explosives).

certain explosives, and a variety of concealable and disguised firearms, and imposing a significant transfer tax on the regulated weapons). The Supreme Court unanimously upheld the National Firearms Act in one of its few pre-*Heller* Second Amendment cases. *See United States v. Miller*, 307 U.S. 174, 178 (1939) (holding that short-barreled shotguns are not "part of the ordinary military equipment [n]or . . . [can they] contribute to the common defense" and therefore "we cannot say that the Second Amendment guarantees the right to keep and bear such [] instrument[s]").

When viewed with appropriate historical context, California's prohibition on large-capacity magazines can be understood as merely the latest part of a longstanding tradition of government prohibition or regulation of unusually dangerous weapons. Accordingly, this Court should find that Proposition 63, like other longstanding prohibitions, does not burden a "right secured by the Second Amendment." *Heller*, 554 U.S. at 626 (referencing prohibitions on firearm possession by felons and the mentally ill).

## II. The Court Should Not Adopt Plaintiffs' Unprecedented and Illogical "Common Use" Test

Plaintiffs have argued that the Court should consider the "prevalence, popularity, and common use" of large-capacity magazines as part of the first step of its Second Amendment analysis and that the ubiquity of such magazines requires the Court to subject Proposition 63 to strict scrutiny. Pls.' Mem. in Support of Mot. for Prelim. Inj. at 12 (Dkt. 10). However, there is neither firm legal footing—nor sound logic—in the "common use" test that Plaintiffs advance.

Plaintiffs maintain that large-capacity magazines must be afforded Second Amendment protection because they are in use "in virtually every other state of the Union." Second Am. Compl. ¶ 46 (Dkt. 59). Yet this argument misconstrues the Supreme Court's decision in *Heller* to suggest that a sufficiently large presence in the national market triggers Second Amendment protection. The Court in *Heller* held that the Second Amendment "does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns," 554 U.S. at 625, but it *did not* hold the converse to be true—that the Second Amendment necessarily protects weapons typically possessed by law-abiding citizens for lawful

7

BRIEF OF AMICUS CURIAE EVERYTOWN FOR GUN SAFETY IN SUPPORT OF DEFENDANTS
NO. 2:17-CV-00903-WBS-KJN

purposes. *See Kolbe*, 849 F.3d at 142 ("The *Heller* majority said nothing to confirm that it was sponsoring the popularity test.").[13]

Instead of focusing on a weapon's ubiquity, the Court in *Heller* found that "the Second Amendment right, whatever its nature, extends only to certain types of weapons," and noted that "weapons that are most useful in military service . . . may be banned." *Heller*, 554 U.S. at 623, 627.[14] Here, the California legislature joins the 1994 House of Representatives in finding large-capacity magazines to be "virtually indistinguishable in practical effect" from the military service weapons that *Heller* determined were not protected by the Second Amendment. *See* H.R. Rep. 103-489 at 18 (1994) (stating that large-capacity magazine features are not just "'cosmetic' in effect" but are "semiautomatic versions of military machineguns" (internal citation omitted)). Thus, Plaintiffs err in insisting that *Heller* requires the Court to consider whether the weapon in question is in "common use" rather than focusing on the nature of the weapon itself.

In addition to lacking a legal foundation, the "common use" test that Plaintiffs suggest invokes circular logic. Following this approach would allow the constitutionality of weapons prohibitions to be decided not by how dangerous a weapon is, but rather by "how widely it is circulated to law-abiding citizens by the time a bar on its private possession has been enacted and challenged." *Kolbe*, 849 F.3d at 141. But "[a] law's existence can't be the source of its own constitutional validity . . . ." *Id.* at n.15 (quoting *Friedman,* 748 F.3d at 409). Just as "it would be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning it, so that it isn't commonly owned," i*d.*, so too would it be absurd to allow the fact that a law previously did not exist to stand as a constitutional bar to its enactment. *See* Joseph Blocher & Darrell A.H. Miller, *Lethality, Public Carry, and Adequate Alternatives*, 53 Harv. J.

---

[13] Plaintiffs also fail to clarify how the Court should determine "common use," whether by considering the number of large-capacity magazines produced or sold, or the number of law-abiding owners of the same.

[14] Several Courts of Appeal have subsequently applied this understanding. *See Kolbe,* 849 F.3d at 121 (noting that "large-capacity magazines are among those arms that . . . the *Heller* Court singled out as being beyond the Second Amendment's reach"); *NYSRPA*, 804 F.3d at 256 (noting that *Heller* permitted the prohibition of military-grade weapons "without implicating the Second Amendment"); *Friedman*, 784 F.3d at 408 (noting that, under *Heller*, the Second Amendment does not protect "military-grade weapons" or "weapons especially attractive to criminals").

on Legis. 279, 288 (2016) (discussing the "central circularity" that plagues the "common use" test: "what is common depends largely on what is, and has been, subject to regulation"). Yet this is what Plaintiffs are advocating here. *See, e.g.*, Second Am. Compl. ¶ 43 (Dkt. 59).

A constitutional analysis driven by the ubiquity of the prohibited firearm also creates perverse incentives for the firearm industry, giving it the unilateral ability to bestow highly dangerous firearms, and firearm features, with Second Amendment protection "simply by manufacturing and heavily marketing them" before the government has had the chance to assess their danger and determine whether to regulate them. Cody J. Jacobs, *End the Popularity Contest: A Proposal for Second Amendment "Type of Weapon" Analysis*, 83 Tenn. L. Rev. 231, 265 (2015). Such an analysis also raises federalism concerns, as states that fail to immediately regulate new and potentially dangerous firearms or firearm features would risk forgoing the ability to do so as they are adopted into common use in other states.[15] Thus, firearm safety decisions made in some states would render the laws of other states "more or less open to challenge under the Second Amendment," and "would imply that no jurisdiction other than the United States as a whole can regulate firearms." *Friedman*, 784 F.3d at 408, 412. But as the Supreme Court stated, *Heller* "does not foreclose *all* possibility of experimentation" by state and local governments, *id.*, but rather permits them to do what they have long done in the realm of firearm legislation: "experiment with solutions to admittedly serious problems," *Jackson v. City & Cty. of San Francisco*, 746 F.3d 953, 966 (9th Cir. 2014) (quoting *City of Renton v. Playtime Theatres*, 475 U.S. 41, 52).

Rather than following Plaintiffs' "common use" test, the Court should be guided by the Fourth Circuit sitting en banc in *Kolbe* and consider whether the firearm, or firearm component, at issue is appropriate for self-defense or is a weapon designed to produce mass casualties. *See* 849 F.3d at 121. In *Kolbe*, the Court of Appeals found that "large-capacity magazines . . . [that]

---

[15] A counterfactual further demonstrates why the "common use" test is inappropriate: If Congress had renewed the federal prohibition on large-capacity magazines rather than permitting it to lapse in 2004, the weapons prohibited by Proposition 63 would not be in widespread use today and would therefore not be subject to Second Amendment protection under Plaintiffs' "common use" theory.

9

allow a shooter to fire more than ten rounds without having to pause to reload . . . 'are particularly designed and most suitable for military and law enforcement applications' [as they] enhance a shooter's capacity to shoot multiple human targets very rapidly." *Id.* at 125 (internal citations omitted). Balancing the danger of large-capacity magazines against their limited usefulness in self-defense, the *Kolbe* court held that "large-capacity magazines are clearly most useful in military service, [and so] we are compelled by *Heller* to recognize that those weapons and magazines are not constitutionally protected." *Id.* at 137. Everytown submits that the same reasoning applies to the first step of the Court's analysis here.

## CONCLUSION

For the foregoing reasons, Everytown respectfully requests that the Court reject Plaintiffs' invitation to use the "common use" test and, in light of the long history of similar prohibitions, find Proposition 63 to be permissible under the Second Amendment and grant Defendants' Motion to Dismiss.

Dated: October 4, 2017

Respectfully submitted,

DAVIS POLK & WARDWELL LLP

By: /s/ Neal A. Potischman
Neal A. Potischman (SBN 254862)
1600 El Camino Real
Menlo Park, California 94025
Phone: (650) 752-2000
Fax: (650) 752-2156
neal.potischman@davispolk.com

*Attorneys for Amicus Curiae*
*Everytown for Gun Safety*