Neal A. Potischman (SBN 254862)
DAVIS POLK & WARDWELL LLP
1600 El Camino Real
Menlo Park, California 94025
Phone: (650) 752-2000
Fax: (650) 752-2156
neal.potischman@davispolk.com

*Attorneys for Amicus Curiae*
*Everytown for Gun Safety*

# UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

WILLIAM WIESE, et al.,

          Plaintiffs,

        - v. -

XAVIER BECERRA, et al.,

         Defendants.

No. 2:17-cv-00903-WBS-KJN

**BRIEF OF AMICUS CURIAE EVERYTOWN FOR GUN SAFETY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' THIRD AMENDED COMPLAINT**

1

**CORPORATE DISCLOSURE STATEMENT**

2      Everytown for Gun Safety has no parent corporations.  It has no stock and hence no

3  publicly held company owns 10% or more of its stock.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ............................................................................................. ii

INTEREST OF AMICUS CURIAE ................................................................................. 1

INTRODUCTION ........................................................................................................... 2

ARGUMENT ................................................................................................................... 4

   I.  California's Prohibition of Large-Capacity Magazines Is Part of a
      Longstanding History of Analogous Prohibitions ............................................... 4

      A.  There Is a Longstanding Tradition of Prohibiting Firearms Capable
          of Quickly Firing Multiple Rounds Without Reloading ............................ 5

      B.  Proposition 63 Is Consistent with Centuries of Laws Prohibiting
          Weapons Deemed to Be Especially Dangerous ........................................ 7

   II.  The "Common Use" Test Proposed by Plaintiffs Is Illogical and Should
      Not Be Followed. ................................................................................................. 8

   III. The Use of Large-Capacity Magazines Makes Mass Shootings and Other
       Gun Violence Incidents Deadlier ...................................................................... 11

      A.  Everytown's Analysis of Mass Shootings Shows That the Use of
          LCMs Results in More Deaths and More Injuries ................................... 12

      B.  Social Science Research Shows that Large-Capacity Magazines Pose
          a Serious Risk to Public Safety .............................................................. 14

CONCLUSION .............................................................................................................. 17

# TABLE OF AUTHORITIES

## CASES

PAGE(S)

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Attorney Gen. New Jersey*,
  910 F.3d 106 (3d Cir. 2018) ............................................................................... 2

*Aymette v. State*,
  21 Tenn. 154 (1840) ........................................................................................ 7-8

*City of Renton v. Playtime Theatres*,
  475 U.S. 41 (1986) ............................................................................................ 11

*Cockrum v. State*,
  24 Tex. 394 (1859) .......................................................................................... 7-8

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) .................................................................................. *passim*

*Drake v. Filko*,
  724 F.3d 426 (3d Cir. 2013) ............................................................................... 7

*Duncan v. Becerra*,
  742 F. App'x 218 (9th Cir. 2018) ....................................................................... 2

*Friedman v. City of Highland Park*,
  784 F.3d 406 (7th Cir. 2015), *cert. denied*, 136 S. Ct. 447 (2015) ............... *passim*

*Fyock v. City of Sunnyvale*,
  779 F.3d 991 (9th Cir. 2015) ........................................................................... 2, 4

*Gallinger v. Becerra*,
  898 F.3d 1012 (9th Cir. 2018) .......................................................................... 12

*Heller v. District of Columbia*,
  670 F.3d 1244 (D.C. Cir. 2011) .............................................................. 2, 11, 16

*Jackson v. City & County of San Francisco*
  746 F.3d 953 (9th Cir. 2014) ........................................................................... 11

*Kolbe v. Hogan*,
  849 F.3d 114 (4th Cir. 2017) (en banc), *cert. denied*, 138 S. Ct. 469 (2017) ................ *passim*

*Nat'l Rifle Ass'n of Am. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
  700 F.3d 185 (5th Cir. 2012) .............................................................................. 4

*N.Y. State Rifle & Pistol Association, Inc. v. Cuomo*,
  804 F.3d 242 (2d Cir. 2015), *cert. denied sub nom.*
  *Shew v. Malloy*, 136 S. Ct. 2486 (2016) ........................................................... 2

*Teixeira v. Cty. of Alameda*,
  873 F.3d 670, 673 (9th Cir. 2017) (en banc), *cert. denied*, 138 S. Ct. 1988 (2018) ................ 5

*United States v. Chester*,
   628 F.3d 673 (4th Cir. 2010) ............................................................. 4

*United States v. Marzzarella*,
   614 F.3d 85 (3d Cir. 2010) ............................................................. 4

*United States v. Skoien*,
   614 F.3d 638 (7th Cir. 2010) (en banc) ............................................. 4

*Worman v. Healey*,
   293 F. Supp. 3d 251 (D. Mass. 2018) ................................................. 9

S<small>TATUTES</small> & R<small>ULES</small>

1837 Ala. Acts 7, § 1 ....................................................................... 8

1907 Ala. Acts 80, § 1 ..................................................................... 8

1881 Ark. Laws § 1909 ..................................................................... 8

1933 Cal. Acts 1170, § 3 ................................................................... 6

1917 Cal. Stat. 221, ch. 145, § 1 ......................................................... 8

1927 Cal. Stat. 938, ch. 552, §§ 1-2 ..................................................... 6

1837 Ga. Acts 90 ............................................................................. 8

33 Hen. 8, ch. 6, § 1 (1541) ............................................................... 7

1931 Ill. Laws 452, § 1 ..................................................................... 7

1913 Iowa Acts 307, ch. 297, § 2 ........................................................ 8

1932 La. Acts 336, § 1 ..................................................................... 7

1926 Mass. Acts 256, ch. 261 ............................................................. 8

1909 Me. Laws 141 .......................................................................... 8

1927 Mich. Pub. Acts 887, No. 372, § 3 .............................................. 5, 8

1927 Mich. Pub. Acts 887-89, No. 372, § 3 ............................................ 8

1913 Minn. Laws 55 ......................................................................... 8

1917 Minn. Laws 614, ch. 243, § 1 ..................................................... 8

1933 Minn. Laws 231, § 1 ................................................................. 6

1763-1775 N.J. Laws 346 ................................................................... 7

1911 N.Y. Laws 442, ch. 195, § 1 ....................................................... 8

1916 N.Y. Laws 338-39, ch. 137, § 1 .................................................... 8

1933 Ohio Laws 189 ......................................................................... 6

7 Ric. 2, 35, ch. 13 (1383) ................................................................ 7

1927 R.I. Pub. Laws 256, § 1 ........................................................... 5, 8

1927 R.I. Pub. Laws 256, § 4 ............................................................. 5

47 Stat. 650 (1932), ch. 465, § 1 ........................................................ 6

47 Stat. 650 (1932), ch. 465, § 14 ....................................................... 6

1903 S.C. 127, § 1 ........................................................................... 8

1934 S.C. Acts 1288, § 1 ................................................................... 7

1933 S.D. Sess. Laws 245, § 1 ........................................................... 7

1879 Tenn. 135, ch. 96 § 1...........................................................................................8

1837-1838 Tenn. Pub. Acts 200 ..................................................................................8

1933 Tex. Gen. Laws 219, § 1 .....................................................................................7

1934 Va. Acts 137, § 1..............................................................................................6, 7

1912 Vt. Laws 310, § 1 ................................................................................................8

Cal. Penal Code § 32310  .............................................................................................2

## OTHER AUTHORITIES

Alana Abramson, *After Newtown, Schools Across the Country Crack Down on Security*,
    ABC News (Aug. 21. 2013). http://abcn.ws/1KwN9Ls ......................................14

Alex Yablon, *Most Californians Who Own 'Assault Rifles' Have 10+ Guns*,
    The Trace (Nov. 12, 2018), https://goo.gl/aKEtmi ...........................................10

Ali Tadayaon, *6-Year-Old Girl Struck by Stray Bullet in East Oakland Adults*  (Jan. 1, 2019),
    https://www.eastbaytimes.com/2019/01/01/6-year-old-girl-wounded-in-oakland-backyard-
    by-celebratory-gunfire-police-say/ ..........................................................16-17

Charles DiMaggio et al., *Changes in U.S. Mass Shooting Deaths Associated with the
    1994-2004 Federal Assault Weapons Ban: Analysis of Open-Source Data*,
    86 J. of Trauma and Acute Care Surgery 11, 13 (2018), https://bit.ly/2NKmLtC .................15

Christopher Ingraham, *It's time to bring back the assault weapons ban,
    gun violence experts say*, Wash. Post (Feb. 14, 2018), https://wapo.st/2JjFlSk .....................15

Christopher Koper et al., *An Updated Assessment of the Federal Assault Weapons Ban:
    Impacts on Gun Markets and Gun Violence, 1994-2003*, National Institute of Justice (2004),
    http://bit.ly/2vBTGTX / ......................................................................15, 16

Christopher S. Koper et al., *Criminal Use of Assault Weapons and High-Capacity Semiautomatic
    Firearms: An Updated Examination of Local and National Sources*, J. Urban Health
    (Oct. 2017), https://bit.ly/2MRVqkd ..........................................................15, 17

Cody J. Jacobs, *End the Popularity Contest: A Proposal for Second Amendment "Type of
    Weapon" Analysis*, 84 Tenn. L. Rev. 231 (2015)  ..................................................10

Daniel W. Webster et al., *Epidemiologic changes in gunshot wounds in Washington, D.C.
    1983-1990,* 127 Archives of Surgery 694 (1992) ..................................................16

David Fallis, *Data Indicate Drop in High Capacity Magazines During Federal Gun Ban*,
    Washington Post, Jan. 10, 2013, http://wapo.st/2wV9EMX ....................................15

Emily Shapiro, *New Details Emerge in Thousand Oaks Mass Shooting, Including Gunman's
    Possession of 7 High-Capacity Magazines*, ABC News (Nov. 27, 2018),
    https://abcnews.go.com/beta-story-container/US/thousand-oaks-gunman-high-capacity-
    magazines-illegal-california/story?id=59440205 ....................................................13

Everytown for Gun Safety, *Appendix to Mass Shootings in the United States:  2009-2016*
    (Mar. 2017). https://every.tw/2JPBIVz ..............................................................13

Everytown for Gun Safety, *Mass Shootings in the United States:  2009-2017*
    (Dec. 2018), https://everytownresearch.org/reports/mass-shootings-analysis/ .................12, 13

iv

Garen J. Wintemute et al., *Criminal Activity and Assault-Type Handguns: A Study of Young Adults*, 32 Annals Emer. Med. 44 (1998), http://bit.ly/2ymFodM ...........................................17

Garen J. Wintemute et al., *Epidemiology and Clinical Aspects of Stray Bullet Shootings in the United States*, 73 J. of Trauma and Acute Care Surgery 215 (2012) ......................................16

Jackie Valley et al., *No Clear Motive in Las Vegas Strip Shooting That Killed 59, Injured 527, Nevada Independent* (Oct. 2, 2017), http://bit.ly/2x4m4is .....................................................13

Jason Hanna & Holly Yan, *Sutherland Springs church shooting: What we know*, CNN.com (Nov. 7, 2017), https://cnn.it/2HlsfV6 ....................................................................13

Jeffrey Roth & Christopher Koper, *Impact Evaluation of the Public Safety and Recreational Firearms Use Protection Act of 1994: Final Report*, Urban Institute (1997), http://urbn.is/2wQKkrA ..........................................................................................................16

Justin George, *Shoot to Kill: Why Baltimore is One of The Most Lethal Cities in America*, Baltimore Sun (Sept. 30, 2016), https://bsun.md/2da4nci .......................................................16

Joseph Blocher & Darrell A.H. Miller, *Lethality, Public Carry, and Adequate Alternatives*, 53 Harv. J. on Legis. 279 (2016) ..............................................................................  9-10, 11

Lois Beckett, *Meet America's Gun Super-Owners—With An Average of 17 Firearms Each*, The Trace (Sept. 20, 2016), http://bit.ly/2d89dGH ..................................................................10

Louis Klarevas, *Rampage Nation: Securing America from Mass Shootings* 240-43 (2016) .......15

*Man Arrested in Death of Long Beach Woman Struck by Stray Bullet*, CBS L.A. (Dec. 9, 2018), https://losangeles.cbslocal.com/2018/12/09/arrest-long-beach-fatal-stray-bullet// .........................................................................................17

Marjory Stoneman Douglas High School Public Safety Commission, *Initial Report to the Governor, Speaker of the House of Representatives and Senate President*, at 262-63 (Jan. 2, 2019), http://www.fdle.state.fl.us/MSDHS/CommissionReport.pdf ..........................13

Mary Ellen Clark & Noreen O'Donnell, *Newtown school gunman fired 154 rounds in less than 5 minutes*, Reuters (Mar. 28, 2013, 8:55 AM), http://www.reuters.com/article/us-usa-shooting-connecticut/newtown-school-gunman-fired-154-rounds-in-less-than-5-minutes-idUSBRE92R0EM20130328..............................................................................................2

Mike McIntire, *Weapons in San Bernardino Shootings Were Legally Obtained*, N.Y. Times (Dec. 3, 2015), https://nyti.ms/2JPLR4F ..............................................................2

Rachael Rettner, *Gunshot Wounds Are Getting Deadlier, One Hospital Finds*, LiveScience.com (June 14, 2016), https://bit.ly/2HBnMO9 ..............................................................................16

Records of the Colony of New Plymouth in New England (Boston 1861) ...................................7

*Report of Firearms Committee*, 38th Conference Handbook of the National Conference on Uniform State Laws and Proceedings of the Annual Meeting (1928) ......................................6

Robert J. Spitzer, *Gun Law History in the United States & Second Amendment Rights*, 80 Law & Contemp. Probs. 55 (2017) .............................................................................. 4-5, 5

v

Robert Johnson & Geoffrey Ingersoll, *It's Incredible How Much Guns Have Advanced Since the Second Amendment*, Business Insider: Military & Defense (Dec. 17, 2012), http://read.bi/2x12PpU ...........................................................................................................5

S. Rep. No. 72-575 (1932) ..................................................................................................6

Sam Petulla, *Here is 1 Correlation Between State Gun Laws and Mass Shootings*, CNN.com (Oct. 5, 2017), https://www.cnn.com/2017/10/05/politics/ gun-laws-magazines-las-vegas/index.html ..............................................................14

The Laws of Plymouth Colony (1671) ...............................................................................7

Violence Policy Center, *High-Capacity Ammunition Magazines* (Dec. 17, 2018), https://bit.ly/2HnPC0k ...........................................................................................14

## INTEREST OF AMICUS CURIAE

Everytown for Gun Safety ("Everytown") is the nation's largest gun violence prevention organization, with supporters in every state, including tens of thousands in California.  It was founded in 2014 as the combined effort of Mayors Against Illegal Guns, a national, bipartisan coalition of mayors combating illegal guns and gun trafficking, and Moms Demand Action for Gun Sense in America, an organization formed in the wake of the murder of twenty children and six adults in an elementary school in Newtown, Connecticut by an individual using a firearm with a large-capacity magazine ("LCM").  Currently, the mayors of more than 50 California cities are members of Mayors Against Illegal Guns.  Everytown also includes a large network of gun-violence survivors who are empowered to share their stories and advocate for responsible gun laws.

Everytown has drawn on its expertise to file briefs in numerous Second Amendment cases, including challenges to LCM prohibitions like those at issue in this case, offering historical and doctrinal analysis that might otherwise be overlooked.  *See, e.g.*, Brief of *Amicus Curiae* Everytown for Gun Safety in Support of Appellees and Affirmance, *Worman v. Healey*, No. 18-1545 (1st Cir. Nov. 13, 2018); Brief of Everytown for Gun Safety as Amicus Curiae in Support of Defendants-Appellees, *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*, No. 18-3170, 2018 WL 5802625 (3d Cir. Nov. 2, 2018); Brief of Amicus Curiae Everytown for Gun Safety in Support of Defendant-Appellant, *Duncan v. Becerra*, No. 17-56081 (9th Cir. Nov. 22, 2017); Brief of Amicus Curiae Everytown for Gun Safety in Support of Defendant's Opposition to Plaintiffs' Motion for Summary Judgment or, Alternatively, Partial Summary Judgment, *Duncan v. Becerra*, No. 3:17-cv-01017-BEN-JLB, 2018 WL 2405910 (S.D. Cal. Apr. 18, 2018).[1]  It seeks to do the same here.[2]

---

[1] Everytown previously moved for leave to file an amicus brief in this case in support of Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint, which the Court denied as moot on February 6, 2018 (Dkt. No. 75) after granting Defendants' Motion (Dkt. No. 74).

[2] An addendum of historical gun laws accompanies this brief.

# INTRODUCTION

This case concerns California residents' right to be free from gun violence and their power to enact laws protecting that right. In light of the increasing toll of mass shootings, and in response to a massacre at a 2015 San Bernardino office party, the people of California sought legislation that would limit their risk of dying in one of these horrific crimes. Their efforts resulted in California Proposition 63 ("Proposition 63"), which amends California Penal Code § 32310 to prohibit the possession of LCMs of the type used in the Newtown and San Bernardino mass shootings—and many others.[3]

All five federal courts of appeals to have considered challenges to similar laws on the merits have upheld such laws as constitutional under the Supreme Court's decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008). *See Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Attorney Gen. New Jersey*, 910 F.3d 106, 123 (3d Cir. 2018); *Kolbe v. Hogan*, 849 F.3d 114, 137-38 (4th Cir. 2017) (en banc), *cert. denied*, 138 S. Ct. 469 (2017); *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 247 (2d Cir. 2015), *cert. denied sub nom. Shew v. Malloy*, 136 S. Ct. 2486 (2016); *Friedman v. City of Highland Park*, 784 F.3d 406, 412 (7th Cir. 2015), *cert. denied*, 136 S. Ct. 447 (2015); *Heller v. District of Columbia*, 670 F.3d 1244, 1264 (D.C. Cir. 2011) (*Heller II*). And while the Ninth Circuit has not yet definitively ruled on the merits of an LCM restriction, in its only published decision reviewing a Second Amendment challenge to an LCM law, it upheld the denial of a preliminary injunction of a local ordinance that, like the state law at issue here, prohibits the possession of LCMs that accept more than ten rounds. *See Fyock v. City of Sunnyvale*, 779 F.3d 991, 1001 (9th Cir. 2015).[4]

---

[3] *See* Mary Ellen Clark & Noreen O'Donnell, *Newtown school gunman fired 154 rounds in less than 5 minutes*, Reuters (Mar. 28, 2013), http://www.reuters.com/article/us-usa-shooting-connecticut/newtown-school-gunman-fired-154-rounds-in-less-than-5-minutes-idUSBRE92R0EM20130328; Mike McIntire, *Weapons in San Bernardino Shootings Were Legally Obtained*, N.Y. Times (Dec. 3, 2015), https://nyti.ms/2JPLR4F; *infra* notes 17-18.

[4] In *Duncan v. Becerra*, 742 F. App'x 218 (9th Cir. 2018), an unpublished decision, the Ninth Circuit affirmed, under an abuse-of-discretion standard, the district court's grant of a preliminary injunction of the same law at issue in this case. Other courts have placed little weight on *Duncan*, recognizing that the outcome was tethered to the specific evidentiary record before the district court and that the majority's opinion was "not a general pronouncement about whether LCM bans violate the Second Amendment." *Ass'n of N.J. Rifle & Pistol Clubs*, 910 F.3d at 123,

As the Defendants' brief shows, these courts got it right.  Everytown submits this amicus brief to urge this Court to similarly uphold the law here—and, in particular, to make three points.

*First*, California's LCM prohibition is part of a long tradition of regulating weapons that legislatures have determined to be unacceptably dangerous—including a century of restrictions on firearms capable of firing a large number of rounds without reloading.  This historical tradition alone—which the Court has yet to examine in this case, *see* Mem. & Order Re: Mot. to Dismiss ("MTD Order") (Dkt. No. 74), at 5 n.3—is sufficient for this Court to dismiss Plaintiffs' Second Amendment claims.

*Second*, this Court should also reject Plaintiffs' assertion in their Third Amended Complaint that the national prevalence of a firearm feature, like the LCMs at issue here, somehow gives that feature Second Amendment protection.  *See* Third Am. Compl. ¶¶ 6, 28, 45, 48, 52, 56 (Dkt. 76).  Such an approach cannot be reconciled with the Second Amendment exceptions articulated by the Supreme Court in *Heller* or by those circuits that have addressed this issue.  Put simply, the "common use" test advocated for by Plaintiffs would transform the constitutional analysis into a consumer referendum and render existing firearms and firearm features like LCMs effectively immune from regulation.  That is not the law.

*Finally*, even if California's LCM prohibition were found or assumed to regulate conduct protected by the Second Amendment, the prohibition survives intermediate scrutiny.  Research conducted by Everytown, as well as other relevant social science and statistical evidence, demonstrates that LCMs make both mass shootings and day-to-day gun violence more deadly, which supports the conclusion that there is a reasonable fit between the LCM prohibition and the important objective of reducing gun violence.

---

n.29.  A decision on the merits in *Duncan* remains pending in the district court.  *See Duncan v. Becerra*, No. 3:17-cv-01017-BEN-JLB (S.D. Cal.).

# ARGUMENT

## I.  California's Prohibition of Large-Capacity Magazines Is Part of a Longstanding History of Analogous Prohibitions

Both the Supreme Court and the Ninth Circuit have emphasized that "longstanding prohibitions" on the possession of certain types of weapons are "traditionally understood to be outside the scope of the Second Amendment."  *Fyock*, 779 F.3d at 996; *Heller*, 554 U.S. at 626-27, 635 (noting that such "longstanding prohibitions" are treated as tradition-based "exceptions" by virtue of their "historical justifications").[5]  These longstanding prohibitions need not "mirror limits that were on the books in 1791."  *United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010) (en banc).  Instead, courts have found that even "early twentieth century regulations might nevertheless demonstrate a history of longstanding regulation if their historical prevalence and significance is properly developed in the record."  *Fyock*, 779 F.3d at 997 (citing *Nat'l Rifle Ass'n of Am. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185, 196 (5th Cir. 2012)).[6]

Proposition 63 is part of a long tradition of regulating or prohibiting weapons that lawmakers have determined to be unacceptably dangerous—including a century of restrictions enacted shortly after semi-automatic weapons capable of firing a large number of rounds without reloading became widely available in the commercial market.  *See* Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 Law & Contemp. Probs. 55, 68-69, 72 (2017) (explaining that "[firearm] laws were enacted not when these weapons were

---

[5] *See also United States v. Marzzarella*, 614 F.3d 85, 91 (3d Cir. 2010) (noting that "longstanding limitations are exceptions to the right to bear arms"); *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010) (noting that a law does not violate the Second Amendment if it does not infringe upon "conduct that was within the scope of the Second Amendment as historically understood").

[6] *See also Friedman*, 784 F.3d at 408 (noting that "*Heller* deemed a ban on private possession of machine guns to be obviously valid" despite the fact that "states didn't begin to regulate private use of machine guns until 1927," and that "regulating machine guns at the federal level" did not begin until 1934); *Skoien*, 614 F.3d at 639-40 (noting that "prohibitions on the possession of firearms by felons and the mentally ill" have been found to be sufficiently longstanding, despite the fact that "[t]he first federal statute disqualifying felons from possessing firearms was not enacted until 1938" and that "the ban on possession by *all* felons was not enacted until 1961" (internal quotations and citation omitted)).

invented, but when they began to circulate widely in society").  Many of these laws were passed around the same time as the prohibitions on sales to felons and the mentally ill and restrictions on the commercial sale of arms that *Heller* identified as longstanding and therefore presumptively valid.  *See id.* at 82 (discussing the passage of prohibitions on possession of firearms by felons and the mentally ill in the early 20th century and the possession of semi-automatic weapons with LCMs in the 1920s and 1930s).  As further described below, this historical tradition alone is sufficient for the Court to hold that Proposition 63 is constitutional under *Heller.  See Heller*, 554 U.S. at 626-27; *see also Teixeira v. Cty. of Alameda*, 873 F.3d 670, 673, 682-90 (9th Cir. 2017) (en banc) (applying "a textual and historical analysis" to conclude that "the Second Amendment . . . does not confer a freestanding right . . . to sell firearms"), *cert. denied*, 138 S. Ct. 1988 (2018).

### A.    There Is a Longstanding Tradition of Prohibiting Firearms Capable of Quickly Firing Multiple Rounds Without Reloading

States have regulated the ammunition capacity of semi-automatic firearms since these firearms first became widely commercially available at the turn of the twentieth century.  *See* Robert Johnson & Geoffrey Ingersoll, *It's Incredible How Much Guns Have Advanced Since the Second Amendment*, Business Insider: Military & Defense (Dec. 17, 2012), http://read.bi/2x12PpU (explaining that semi-automatic weapons became commercially available in the early 1900s).  Such laws often categorized large-capacity, semi-automatic firearms, along with fully automatic weapons, as "machine guns," and imposed restrictions that effectively amounted to outright prohibitions.  *See, e.g.*, 1927 R.I. Pub. Laws 256, §§ 1, 4 (prohibiting the "manufacture, s[ale], purchase or possess[ion]" of a "machine gun," which it defined as "any weapon which shoots more than twelve shots semi-automatically without reloading"); 1927 Mich. Pub. Acts 887, § 3 (prohibiting possession of "any machine gun or firearm which can be fired more than sixteen times without reloading").

In 1928, the National Conference on Uniform State Laws (now the Uniform Law Commission) adopted a model law prohibiting possession of "any firearm which shoots more than twelve shots semi-automatically without reloading," setting the national standard for laws

1   prohibiting possession of semi-automatic firearms with large magazine capacities.  *See Report of*

2   *Firearms Committee*, 38th Conference Handbook of the National Conference on Uniform State

3   Laws and Proceedings of the Annual Meeting 422-23 (1928).[7]  Shortly thereafter, the federal

4   government enacted a similar prohibition for the District of Columbia.  *See* 47 Stat. 650, ch. 465,

5   §§ 1, 14 (1932) (making it a crime to "possess any machine gun," which it defined as "any

6   firearm which shoots . . . semiautomatically more than twelve shots without loading").  Even the

7   National Rifle Association endorsed passage of the D.C. law, saying, "it is our desire [that] this

8   legislation be enacted for the District of Columbia, in which case it can then be used as a guide

9   throughout the states of the Union."  S. Rep. No. 72-575, at 5-6 (1932).

10          California first prohibited automatic weapons in 1927[8] and expanded this prohibition

11   with a 1933 statute that prohibited the sale or possession of not only "all firearms . . . capable of

12   discharging automatically," but also "all firearms which are automatically fed after each

13   discharge from or by means of clips, discs, drums, belts or other separable mechanical device

14   *having a capacity of greater than ten cartridges*."  1933 Cal. Acts 1170, § 3 (emphasis added).

15   These statutes were at least as restrictive as Proposition 63, and indeed appear more restrictive,

16   as the 1933 law prohibited *firearms* capable of receiving large-capacity magazines, rather than

17   only the LCMs at issue here.  *See id.*  Several other states, including Minnesota, Ohio, and

18   Virginia, also prohibited or regulated firearms based on magazine capacity.[9]  Still other states

19

20

21   _____

22   [7] This standard originated with a model law promulgated by the National Crime Commission in
    1927.  *Report of Firearms Committee*, at 422-23.

23   [8] *See* 1927 Cal. Stat. 938, ch. 552, §§ 1-2 (prohibiting "all firearms known as machine rifles,
    machine guns or submachine guns capable of discharging automatically and continuously loaded

24   ammunition of any caliber in which the ammunition is fed to such gun from or by means of clips,
    disks, drums, belts or other separable mechanical device").

25   [9] *See* 1933 Minn. Laws 231, § 1 (prohibiting "[a]ny firearm capable of automatically reloading
    after each shot is fired, whether firing singly by separate trigger pressure or firing continuously"

26   if the weapon was modified to allow for a larger magazine capacity); 1933 Ohio 189, § 1
    (requiring a $5000 bond to possess "any firearm which shoots more than eighteen shots semi-

27   automatically without reloading"); 1934 Va. Acts 137, § 1 (effectively prohibiting possession or
    use of weapons . . . from which more than sixteen shots or bullets may be rapidly, automatically,

28   semi-automatically or otherwise discharged without reloading").

passed laws limiting possession of automatic weapons based on the number of rounds that a firearm could discharge without reloading.[10]

As this historical record demonstrates, Proposition 63 is the continuation of nearly a century of valid restrictions based on the ability of a firearm to shoot large numbers of rounds in a short period of time without reloading.  As such, the statute qualifies as a longstanding prohibition and does not burden conduct that is protected by the Second Amendment.  *See, e.g.*, *Drake v. Filko*, 724 F.3d 426, 432 (3d Cir. 2013) (finding that a concealed-carry licensing standard that had been in effect "in some form for nearly 90 years" "qualifies as a longstanding, presumptively lawful regulation" (internal quotations and citation omitted)).

**B.     Proposition 63 Is Consistent with Centuries of Laws Prohibiting Weapons Deemed to Be Especially Dangerous**

Proposition 63 is also part of a long history of government prohibition of weapons that threaten public safety, either because the weapons themselves are especially dangerous or because they are particularly suitable for criminal use.  Such prohibitions date back to early English legal history, beginning with the 1383 prohibition of launcegays (a particularly lethal type of spear) and the 1541 prohibition of crossbows and firearms less than a yard long.  *See* 7 Ric. 2, 35, ch. 13 (1383); 33 Hen. 8, ch. 6, § 1 (1541).  The regulation of especially dangerous firearms continued as the American colonies and first states adapted the English tradition.  *See generally* 1763-1775 N.J. Laws 346 (prohibiting set or trap guns); The Laws of Plymouth Colony (1671) (same); Records of the Colony of New Plymouth in New England 230 (Boston 1861).

States continued to pass prohibitions or regulations on such weapons after the ratification of the Second Amendment.  For example, several states barred or prohibitively taxed Bowie knives,[11] which were determined to be "instrument[s] of almost certain death."  *See Cockrum v.*

---

[10] These limitations were more stringent than California's current magazine prohibition of ten rounds.  *See* 1933 S.D. Sess. Laws 245, § 1 (five rounds); 1933 Tex. Gen. Laws 219, § 1 (five rounds); 1934 Va. Acts 137, § 1 (seven rounds for automatics, 16 for semi-automatics); 1931 Ill. Laws 452, § 1 (eight rounds); 1932 La. Acts 336, § 1 (eight rounds); 1934 S.C. Acts 1288, § 1 (eight rounds).

[11] *See* 1837 Ala. Acts 7, § 1 (prohibitively taxing Bowie knives); 1837 Ga. Acts 90 (banning Bowie knives); 1837-1838 Tenn. Pub. Acts 200 (prohibiting the sale of Bowie knives); *Aymette*

1  *State*, 24 Tex. 394, 402 (1859) (finding Bowie knives are "differ[ent] from [guns, pistols, or

2  swords] in [their] device and design" and are therefore more accurate and lethal than other

3  contemporary weapons).  In addition, a number of states prohibited certain types of small and

4  easily concealable handguns, which were determined to be ideal for criminal use.[12]

5  Throughout the early twentieth century, many states passed laws prohibiting especially

6  dangerous weapons or weapon features, such as silencers, as the technology of firearms and

7  other dangerous weapons evolved.[13]  And, in the 1920s and 1930s, at least 28 states and the

8  federal government passed prohibitions or severe restrictions on automatic weapons, along with

9  the restrictions on large-capacity semi-automatic weapons discussed above.  *See supra* Part I.A.

10  Within this historical context, California's prohibition on LCMs should be understood as

11  a continuation of a longstanding tradition of government prohibition or regulation of especially

12  dangerous weapons.  This long history of analogous regulation further supports the conclusion

13  that Proposition 63 does not burden a "right secured by the Second Amendment."  *Heller*, 554

14  U.S. at 626-27.

15  **II.    The "Common Use" Test Proposed by Plaintiffs Is Illogical and Should Not Be Followed**

16

17  Plaintiffs assert that LCMs must be afforded constitutional protection because they are

18  used "in virtually every other state of the Union," Third Am. Compl. ¶ 48 (Dkt. 76), echoing

19  their previous argument that the Court should consider the "prevalence, popularity, and common

20

21  *v. State*, 21 Tenn. 154, 158 (1840) (justifying a prohibition on Bowie knives on the basis that they are "weapons which are usually employed in private broils, and which are efficient only in the hands of the robber and the assassin").

22  [12] *See* 1881 Ark. Laws § 1909 (pocket pistols and "any kind of cartridge for any pistol"); 1879

23  Tenn. 135, ch. 96, § 1 ("belt or pocket pistols, or revolvers, or any other kind of pistols, except army or navy pistol"); 1907 Ala. Acts 80, § 1 (similar); 1903 S.C. 127, § 1 (similar).

24  [13] *See, e.g.*, 1909 Me. Laws 141 (prohibiting silencers); 1912 Vt. Laws 310, § 1 (same); 1913

25  Minn. Laws 55 (same); 1916 N.Y. Laws 338-39, ch. 137, § 1 (same); 1926 Mass. Acts 256, ch. 261 (same); 1927 Mich. Pub. Acts 887-89, § 3 (same); 1927 R. I. Pub. Laws 256, § 1 (same).

26  States also banned a wide variety of unusually dangerous weapons, including blackjacks and billy clubs, slung-shots (a metal or stone weight tied to a string), brass knuckles, various kinds of

27  knives, and explosives.  *See e.g.*, 1917 Cal. Stat. 221, ch. 145, § 1 (blackjacks and billy clubs); 1911 N.Y. Laws 442, ch. 195, § 1 (slung-shots); 1917 Minn. Laws 614, ch. 243, § 1 (brass

28  knuckles); 1913 Iowa Acts 307, ch. 297, § 2 (daggers and similar-length knives); 1927 Mich. Pub. Acts 887, No. 372, § 3 (explosives).

8

use" of LCMs at the first step of its Second Amendment analysis, and that the ubiquity of such magazines requires the Court to subject Proposition 63 to strict scrutiny.  Pls.' Mem. in Support of Mot. for Prelim. Inj. at 12 (Dkt. 10).  There is neither firm legal footing—nor sound logic—in the "common use" test that Plaintiffs advance.

The argument that LCMs must be afforded Second Amendment protection because they are widely available misconstrues the Supreme Court's decision in *Heller* to suggest that a product's significant presence in the national market triggers Second Amendment protection. *Heller* held that the Second Amendment "does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns."  554 U.S. at 625. But it does not logically follow—and neither the Supreme Court nor other courts have held—that the Second Amendment somehow protects *all* weapons that have achieved a degree of commercial success.  *See Kolbe*, 849 F.3d at 142 ("[T]he *Heller* majority said nothing to confirm that it was sponsoring the popularity test."); *Worman v. Healey*, 293 F. Supp. 3d 251, 266 (D. Mass. 2018), *appeal docketed*, No. 18-1545 (1st Cir. June 19, 2018) ("[P]resent day popularity is not constitutionally material.").

In addition to lacking a firm jurisprudential foundation, the "common use" test is hopelessly circular.  This approach would permit the constitutionality of weapons prohibitions to be decided not by how dangerous a weapon is, but rather by "how widely it is circulated to law-abiding citizens by the time a bar on its private possession has been enacted and challenged." *Kolbe*, 849 F.3d at 141.  Just as "[i]t would be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning it, so that it isn't commonly owned," *Friedman*, 784 F.3d at 409, it would be similarly absurd to allow the fact that a law previously did not exist to stand as a constitutional bar to its enactment.  *See* Joseph Blocher & Darrell A.H. Miller, *Lethality, Public Carry, and Adequate Alternatives*, 53 Harv. J. on Legis. 279, 288 (2016) (discussing the "central circularity" that plagues the "common use" test:  "[W]hat is common depends largely on what is, and has been, subject to regulation").  Yet this is precisely what the "common use" test advocated by Plaintiffs would dictate, both here and elsewhere.

1    Plaintiffs' approach also fails to provide workable standards—or any guidance, for that

2    matter—as to whether "common use" is determined by considering the number of weapons or

3    weapons features produced or sold, or by the number of law-abiding owners.  *See Kolbe*, 849

4    F.3d at 135-36.  This distinction is critical because firearm ownership is extremely concentrated,

5    with just 3% of American adults possessing half of the total stock of civilian-owned guns.  *See*

6    Lois Beckett, *Meet America's Gun Super-Owners—With An Average of 17 Firearms Each*, The

7    Trace (Sept. 20, 2016), http://bit.ly/2d89dGH; *see also* Alex Yablon, *Most Californians Who*

8    *Own 'Assault Rifles' Have 10+ Guns*, The Trace (Nov. 12, 2018), https://goo.gl/aKEtmi

9    (reporting research finding that "four out of five assault rifles in [California] are owned by

10   people who own 10 or more guns").  If production or sales numbers form the basis of the

11   common use analysis, this small group of gun owners would effectively control the scope of the

12   Second Amendment.  This tyranny by a tiny minority cannot be what the *Heller* Court intended.

13   Indeed, a constitutional analysis driven by the prevalence of a firearm in the market

14   would create perverse incentives for the firearms industry, giving gun makers the unilateral

15   ability to insulate highly dangerous firearms or firearm features with Second Amendment

16   protection "simply by manufacturing and heavily marketing them" before a government could

17   assess their danger, determine whether to regulate them, and build the political momentum to

18   actually do so.  *See* Cody J. Jacobs, *End the Popularity Contest: A Proposal for Second*

19   *Amendment "Type of Weapon" Analysis*, 83 Tenn. L. Rev. 231, 265 (2015).  These corporate

20   profit-driven choices cannot and should not define the meaning of the Second Amendment.  *See*

21   *Kolbe*, 849 F.3d at 141-42 (rejecting such a test).

22   Such an approach also raises federalism concerns, as states that fail to immediately

23   regulate new firearms or firearm features could lose the ability to do so if such products are

24   quickly adopted by consumers anywhere in the country.[14]  Thus, firearm safety decisions made

25

26   _____

[14] A counterfactual further demonstrates why the "common use" test is inappropriate:  If
27   Congress had renewed the federal prohibition on large-capacity magazines rather than permitting
     it to lapse in 2004, the weapons prohibited by Proposition 63 would not be in widespread use
28   today and would therefore not be subject to Second Amendment protection under Plaintiffs'
     "common use" theory.

in some states would render the laws of other states "more or less open to challenge under the

Second Amendment," and "would imply that no jurisdiction other than the United States as a

whole can regulate firearms." *Friedman*, 784 F.3d at 408, 412.  But *Heller* "does not foreclose

*all* possibility of experimentation" by state and local governments.  *Id.* at 412.  To the contrary, it

permits states and localities to do what they have long done in the realm of firearm legislation:

to "experiment with solutions to admittedly serious problems." *Jackson v. City & Cty. of San

Francisco*, 746 F.3d 953, 966 (9th Cir. 2014) (quoting *City of Renton v. Playtime Theatres*, 475

U.S. 41, 52 (1986)).

To the extent that "common use" should play any role in the constitutional analysis

outside the context of a total prohibition on a class of arms (like the handgun prohibition at issue

in *Heller*), it should be tied to "the purpose of the right to keep and bear arms."  Blocher &

Miller, *Lethality*, at 291.  The test should focus, in other words, on whether the regulated

weapons are commonly used or are reasonably necessary for *self-defense* or, in particular, *self-

defense in the home*, which *Heller* holds is the core of the right.  *See* 554 U.S. at 635.  The D.C.

Circuit adopted that approach in upholding a similar law, and implicitly rejected Plaintiffs'

market-share "common-use" test.  *See Heller II*, 670 F.3d at 1261.  This Court should follow the

D.C. Circuit's lead and, if it considers "common use" at all, ask whether LCMs "are commonly

used or are used specifically for self-defense."  *Id.*  The allegations in the Third Amended

Complaint—which nowhere assert that Plaintiffs or anyone else have ever actually needed to use

more than ten rounds for self-defense—do not, and cannot, meet such a test.[15]

**III.    The Use of Large-Capacity Magazines Makes Mass Shootings and Other Gun
Violence Incidents Deadlier**

The use of LCMs, whether in mass shootings or in daily gun violence, results in more

people being shot, more injuries per victim, and more deaths.  Both Everytown's analysis and the

relevant social science research indicate that the use of LCMs makes shootings more dangerous

---

[15] The Court has recognized as much in its prior rulings in this case.  *See* MTD Order at 6 (noting that "the prohibition of . . . large capacity magazines does not effectively disarm individuals or substantially affect their ability to defend themselves" (quoting *Heller II*, 670 F.3d at 1262) (internal quotation marks omitted)); Mem. & Order Re: Mot. for Prelim. Inj. ("PI Order") at 6 (Dkt. 52) (same).

and more deadly.  By prohibiting the possession and use of LCMs throughout California, Proposition 63 is a reasonably tailored attempt to address this serious public safety concern. Thus, as this Court has already concluded in this case, even if the LCM prohibition burdens constitutionally protected conduct, it nevertheless survives intermediate scrutiny.  *See* MTD Order at 5-10 (following the lead of "virtually every other court to examine large capacity magazine bans" in applying intermediate scrutiny and upholding the law); PI Order at 6-10 (applying intermediate scrutiny in concluding that Plaintiffs failed to demonstrate a likelihood of success of their Second Amendment claim).

### A.   Everytown's Analysis of Mass Shootings Shows That the Use of LCMs Results in More Deaths and More Injuries

Relying largely on press coverage, police reports, and FBI data, Everytown has tracked and documented mass shootings since 2013 and has released several reports summarizing this data.[16]  While Everytown cannot present a comprehensive dataset of the magazines used in every mass shooting (the reality of gun violence is that mass shootings are so frequent that this information is not available in every instance), the information that is available indicates that LCMs make shootings significantly more deadly.

Data compiled by Everytown and its predecessor organization consistently indicate that mass shooting incidents involving LCMs or assault weapons, which are typically equipped with LCMs, result in significantly more shooting victims and significantly more deaths.  A report that Everytown issued just last month, which analyzed mass shooting data from 2009 to 2017, shows that 58% of mass shootings where magazine size can be verified involved LCMs, and those incidents led to 14 times as many injuries and twice as many deaths.  Everytown for Gun Safety, *Mass Shootings in the United States: 2009-2017* (Dec. 2018), https://everytownresearch.org/ reports/mass-shootings-analysis/; *see also Gallinger v. Becerra*, 898 F.3d 1012, 1019 (9th Cir. 2018) (noting that where assault weapons and LCMs are used, "more shots are fired and more fatalities and injuries result than when shooters use other firearms and magazines" (quoting

---

[16] Everytown published its most recent mass shootings report in December 2018.  *See* Everytown for Gun Safety, *Mass Shootings in the United States: 2009-2017* (Dec. 2018), https://everytownresearch.org/reports/mass-shootings-analysis/.

*Kolbe*, 849 F.3d at 127)); *Friedman*, 784 F.3d at 409 (noting that "guns with large-capacity magazines enable shooters to fire bullets faster than handguns equipped with smaller magazines").

Everytown's research also demonstrates that LCMs are almost always used in the most deadly and injurious shooting events—including, for example:

- The attack at an office party in San Bernardino, California, that resulted in 14 deaths and 22 injuries;

- The shooting at a country-western bar in Thousand Oaks, California, that left 12 dead and at least ten injured;

- The shooting at a movie theater in Aurora, Colorado that killed 12 and injured 70;

- The attack on a school in Newtown, Connecticut that killed 26 people;

- The massacre of 49 people and wounding of 53 more in a nightclub in Orlando, Florida;

- The attack in Las Vegas, Nevada in which the shooter used dozens of assault weapons and LCMs to fire hundreds of rounds into a concert crowd resulting in the death of 59 people and the injury of over 500 more;

- The attack on a church in Sutherland Springs, Texas that resulted in 26 deaths and 20 injuries; and

- The attack on a high school in Parkland, Florida that resulted in the death of 17 people and wounding of 17 more.[17]

Indeed, in each of the ten deadliest mass shootings in modern American history, an LCM was used to perpetrate the crime.[18]

---

[17] *See* Everytown, *Appendix to Mass Shootings*, at 3, 6; Marjory Stoneman Douglas High School Public Safety Commission, *Initial Report to the Governor, Speaker of the House of Representatives and Senate President*, at 262-63 (Jan. 2, 2019), http://www.fdle.state.fl.us/MSDHS/CommissionReport.pdf; Jackie Valley et al., *No Clear Motive in Las Vegas Strip Shooting That Killed 59, Injured 527, Nevada Independent* (Oct. 2, 2017), http://bit.ly/2x4m4is; Jason Hanna & Holly Yan, *Sutherland Springs church shooting: What we know*, CNN.com (Nov. 7, 2017), https://cnn.it/2HlsfV6; Emily Shapiro, *New Details Emerge in Thousand Oaks Mass Shooting, Including Gunman's Possession of 7 High-Capacity Magazines*, ABC News (Nov. 27, 2018), https://abcnews.go.com/beta-story-container/US/thousand-oaks-gunman-high-capacity-magazines-illegal-california/story?id=59440205; Marjory Stoneman Douglas High School Public Safety Commission, Initial Report, at 262-63.

13

In addition to the sheer magnitude of death and injury, mass shootings like those that occurred at San Bernardino, Thousand Oaks, Virginia Tech, Aurora, Newtown, Tucson, Orlando, Las Vegas, Sutherland Springs, Parkland, and elsewhere sear themselves into the national consciousness and affect the way people live their everyday lives.  *See* Alana Abramson, *After Newtown, Schools Across the Country Crack Down on Security*, ABC News (Aug. 21, 2013), http://abcn.ws/1KwN9Ls (comparing the impact of the Sandy Hook shooting on school security to that of 9/11 on airport security and noting that school districts have spent tens of millions of dollars on security improvements); *see also Friedman*, 784 F.3d at 412 (noting that mass shootings are "highly salient"). While shootings on the scale of these tragedies remain statistically rare compared to the plague of daily gun violence, their enormous impacts reinforce the significant and compelling justifications behind California's prohibition on LCMs.

**B.      Social Science Research Shows that Large-Capacity Magazines Pose a Serious Risk to Public Safety**

Additional research supports the conclusion reached by both the people of California and the State Legislature: that LCMs pose a significant danger to public safety.

Whether a state prohibits LCMs is the single best predictor of mass shooting rates.  Sam Petulla, *Here is 1 Correlation Between State Gun Laws and Mass Shootings*, CNN.com (Oct. 5, 2017), https://cnn.it/2J4sWCC (noting that, according to analysis by Boston University Professor Michael Siegel, state prohibitions on LCMs are associated with a 63% lower rate of mass shootings).  Indeed, during the period between 1994 and 2004, when the federal prohibition on LCMs and assault weapons was in effect, mass shootings were 70% less likely to occur.  Charles DiMaggio et al., *Changes in U.S. Mass Shooting Deaths Associated with the 1994-2004 Federal Assault Weapons Ban: Analysis of Open-Source Data*, 86 J. of Trauma and Acute Care Surgery 11, 13 (2018), https://bit.ly/2NKmLtC; *see also* Louis Klarevas, *Rampage Nation: Securing*

---

[18] Las Vegas, Nev. (58 fatalities); Orlando, Fla. (49); Blacksburg, Va. (32); Newtown, Conn. (26); Sutherland Springs, Tex. (26); Killeen, Tex. (23); San Ysidro, Cal. (21); Austin, Tex. (17); Parkland, Fla. (17); San Bernardino, Cal. (14).  *See* Violence Policy Center, *High-Capacity Ammunition Magazines* (Dec. 17, 2018), http://vpc.org/fact_sht/VPCshootinglist.pdf; Tom Dart, *As Campus Carry Becomes Texas law, Memories of UT Tower Massacre Linger*, The Guardian (July 31, 2016), https://www.theguardian.com/us-news/2016/jul/31/campus-carry-texas-law-ut-tower-massacre-anniversary.

*America from Mass Shootings* 240-43 (2016) (finding that the number of gun massacres in which six or more people were killed fell by 37% during the period in which the federal prohibition was in effect; and that, after it lapsed, gun massacres increased by 183% and deaths increased by 239%); Christopher Ingraham, *It's time to bring back the assault weapons ban, gun violence experts say*, Wash. Post (Feb. 14, 2018), https://wapo.st/2JjFlSk (discussing Klarevas's research).

Studies also indicate that criminals increasingly use LCMs in daily gun violence, as evidenced by the number of LCMs recovered by police. *See, e.g.*, David Fallis, *Data Indicate Drop in High Capacity Magazines During Federal Gun Ban*, Washington Post, Jan. 10, 2013, http://wapo.st/2wV9EMX (noting that the number of LCMs recovered by Virginia police more than doubled between 2004, when the federal LCM prohibition expired, and 2013). Indeed, a recent study found that "LCM firearms . . . appear to account for 22 to 36% of crime guns in most places, with some estimates upwards of 40% for cases involving serious violence." Christopher S. Koper et al., *Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms: An Updated Examination of Local and National Sources*, J. Urban Health (Oct. 2017), https://bit.ly/2MRVqkd.

Furthermore, when criminals use LCMs, they generally fire more shots and cause more injuries.[19]  For example, a study of Milwaukee homicides found that those killed with guns containing LCMs had on average one additional gunshot injury than when a gun without an LCM was used, and the Maryland medical examiner's office reported that the number of cadavers with ten or more bullets more than doubled between 2006 and 2016. *See, e.g.*, Jeffrey Roth & Christopher Koper, *Impact Evaluation of the Public Safety and Recreational Firearms Use Protection Act of 1994: Final Report*, Urban Institute (1997), http://urbn.is/2wQKkrA; Justin George, *Shoot to Kill: Why Baltimore is One of The Most Lethal Cities in America*, Baltimore Sun (Sept. 30, 2016), https://bsun.md/2da4nci.  Shootings with more injuries also

---

[19] Christopher Koper et al., *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003*, National Institute of Justice (2004), http://bit.ly/2vBTGTX (finding that handguns associated with gunshot injuries are up to 50% more likely to have LCMs than handguns used in other crimes and that guns used in shootings resulting in injuries are nearly 26% more likely to have LCMs).

1   invariably lead to more deaths.  One study found that gunshot victims shot twice are 60% more

2   likely to die than those shot once.  *See* Koper, *An Updated Assessment*, *supra* note 19, at 87; *see*

3   *also* Daniel W. Webster et al., *Epidemiologic changes in gunshot wounds in Washington, D.C.*

4   *1983-1990,* 127 Archives of Surgery 694 (1992) (finding that the fatality rate for multiple chest

5   wounds is 61% higher than the fatality rate for a single chest wound).  This finding is supported

6   by the correlation between the prevalence of LCMs and increases in lethal shootings reported in

7   several American cities.  *See* Rachael Rettner, *Gunshot Wounds Are Getting Deadlier, One*

8   *Hospital Finds*, LiveScience.com (June 14, 2016), https://bit.ly/2HBnMO9 (asserting that

9   increases in gunshot death rates could be connected to the use of LCMs).[20]

10          As courts have recognized, because they result in more shots being fired, LCMs also

11   create the opportunity for a dramatic increase in the number of errant shots.  *See Kolbe*, 849 F.3d

12   at 127 ("[W]hen inadequately trained civilians fire weapons equipped with large-capacity

13   magazines, they tend to fire more rounds than necessary and thus endanger more bystanders.");

14   *Heller II*, 670 F.3d at 1263-64.  One recent study tracking stray-bullet shooting events concluded

15   that, during a one-year period alone, there were 284 stray-bullet shooting events, during which

16   65 people died and an additional 252 people were injured.  Garen J. Wintemute, et al.,

17   *Epidemiology and Clinical Aspects of Stray Bullet Shootings in the United States*, 73 J. of

18   Trauma and Acute Care Surgery 215 (2012). This is not a small concern in California—the most

19   densely populated state in the western United States, with several of the most densely populated

20   metropolitan areas in the nation—where the victims of shootings are often not the intended

21   targets.  *See, e.g.*, Ali Tadayon, *6-Year-Old Girl Struck by Stray Bullet in East Oakland* (Jan. 1,

22   2019), https://bayareane.ws/2R83GhK; *Man Arrested in Death of Long Beach Woman Struck by*

23   *Stray Bullet*, CBS L.A. (Dec. 9, 2018), https://losangeles.cbslocal.com/2018/12/09/arrest-long-

24   beach-fatal-stray-bullet/; *3-Year-Old Boy Injured by Stray Bullet in Oakland Shooting*, CBS S.F.

25   (Oct. 29, 2018), https://sanfrancisco.cbslocal.com/2018/10/29/oakland-police-investigate-

26   shooting-that-injured-child/.

27

28   ---

[20] *See also* George, *supra*, p. 17 (attributing increased shooting lethality, in part, to increasingly lethal tactics enabled by LCMs).

Another study, conducted in California, indicates that assault pistols equipped with LCMs are more likely to be purchased by individuals with a criminal background.  See Garen J. Wintemute et al., *Criminal Activity and Assault-Type Handguns: A Study of Young Adults*, 32 Annals Emer. Med. 44 (1998), http://bit.ly/2ymFodM (finding that assault pistols were selected by 2% of purchasers with no criminal record, 6.6% of purchasers with a prior gun charge, and 10.2% of purchasers with two or more previous violent felonies).  LCMs also pose a threat to California's law enforcement community.  A recent analysis found that "LCM weapons overall account for 41% of the guns used to kill [police] officers."  *See* Koper et al., *Criminal Use of Assault Weapons*, at 7.

In sum, Everytown's research makes clear that mass shootings involving LCMs are substantially more dangerous than those in which LCMs are not involved; and additional social science research demonstrates that LCMs exacerbate the dangers of gun crime, even outside the particularly tragic context of mass shootings.

## CONCLUSION

For the foregoing reasons, Everytown respectfully requests that the Court grant Defendants' Motion to Dismiss Plaintiffs' Third Amended Complaint.

Dated: January 28, 2019                              Respectfully submitted,

                                                     DAVIS POLK & WARDWELL LLP


                                                     By:  /s/ Neal A. Potischman
                                                          Neal A. Potischman (SBN 254862)
                                                          1600 El Camino Real
                                                          Menlo Park, California 94025
                                                          Phone: (650) 752-2000
                                                          Fax: (650) 752-2156
                                                          neal.potischman@davispolk.com

                                                          *Attorneys for Amicus Curiae*
                                                          *Everytown for Gun Safety*