George M. Lee (SBN 172982)
Douglas A. Applegate (SBN 142000)
**SEILER EPSTEIN ZIEGLER & APPLEGATE LLP**
601 Montgomery Street, Suite 2000
San Francisco, California 94111
Phone:  (415) 979-0500
Fax:      (415) 979-0511

Raymond M. DiGuiseppe (SBN  228457)
**THE DIGUISEPPE LAW FIRM, P.C.**
2 North Front Street, Fifth Floor
Wilmington, NC 28401
Phone: (910) 713-8804
Fax:      (910) 672-7705

Attorneys for Plaintiffs
WILLIAM WIESE, JEREMIAH MORRIS,
LANCE COWLEY, SHERMAN MACASTON,
CLIFFORD FLORES, L.Q. DANG, FRANK FEDERAU,
ALAN NORMANDY, TODD NIELSEN,
THE CALGUNS FOUNDATION,
FIREARMS POLICY COALITION,
FIREARMS POLICY FOUNDATION,
and SECOND AMENDMENT FOUNDATION

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM WIESE, et al., | Case No. 2:17-cv-00903-WBS-KJN |
| Plaintiffs, | **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THIRD AMENDED COMPLAINT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(B)(6)** |
| vs. | |
| XAVIER BECERRA, in his official capacity as Attorney General of California, et al., | Date:      February 19, 2019<br>Time:      1:30 p.m.<br>Courtrm.  5<br>Judge:    Sr. Judge William B. Shubb |
| Defendants. | |

**SEILER EPSTEIN ZIEGLER & APPLEGATE LLP**
Attorneys at Law

**SEILER EPSTEIN ZIEGLER & APPLEGATE LLP**
Attorneys at Law

<u>TABLE OF CONTENTS</u>

I.   INTRODUCTION ..................................................................................................1

II.  STATEMENT OF FACTS ......................................................................................2

    A.   AMMUNITION MAGAZINES AND THE ORIGINAL CALIFORNIA MAGAZINE BAN .................3

    B.   SENATE BILL 1446 AND PROPOSITION 63 ................................................5

    C.   THE INSTANT ACTION ....................................................................7

III. ARGUMENT ......................................................................................................9

    A.   IN EVALUATING PLAINTIFFS' SECOND AMENDMENT CLAIMS, THIS COURT SHOULD REJECT ANY INTEREST-BALANCING APPROACH, WHICH WOULD CLEARLY BE INCONSISTENT WITH *HELLER*. ................................9

        1.   Because the LCM Ban is Tantamount to a Confiscation of a Widely-Used, Constitutionally-Protected Class of Arms, *Heller's* Categorical Approach Controls...........................................9

        2.   Any Application of Intermediate Scrutiny Cannot Involve the Interest-Balancing Prohibited by *Heller*. .........................16

        3.   Defendants Bear a True Evidentiary Burden Under *Actual* Intermediate Scrutiny, Which They Cannot Overcome in Their Motion to Dismiss. ..........................................22

        4.   Should There Be Any "Interest-Balancing," Strict Scrutiny is Actually the More Appropriate Test.................................25

    B.   PLAINTIFFS STATE A CAUSE OF ACTION FOR TAKINGS. ................................29

        1.   The Retroactive Magazine Possession Ban Constitutes a *Per Se* Taking. ........................................................31

            a.   Section 32310(d) is a Taking Because It Compels the Physical Appropriation of Property. ....................................32

            b.   The Effect of Section 32310(c) and (d) Constitutes a Taking Because the Statutory Scheme Completely Deprives the Owners of All Economically Beneficial Use of Their Property.................36

            c.   The Statute is Not a Valid Exercise of Police Power....................38

        2.   The Retroactive Magazine Possession Ban Constitutes a Burdensome Regulatory Taking.................................................43

– ii –

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

C.   PLAINTIFFS STATE CAUSES OF ACTION FOR VAGUENESS AND OVERBREADTH (COUNTS III & V). ...................................................................46

1.   The Vagueness Claims Stand On Their Own In Stating Colorable Claims For Relief That Easily Survive The State's Motion To Dismiss. ..............46

2.   The DOJ's Own Findings Poignantly Demonstrate the Serious Vagueness Problems that the State Seeks to Bypass in Ignoring This Evidence. ....................47

3.   The Legislative and Initiative History Inevitably Compel the Conclusion that the Two Conflicting Versions of the LCM Ban Both Remain in Effect. ...............................................................48

4.   The Resulting Conflicts and Confusion Within the LCM Ban Strongly Support Plaintiffs' Claim that the Scheme is Unconstitutionally Vague. ........................................................................51

5.   The State Fails in Its Attempt to Brush Off Plaintiffs' Viable Claims of Vagueness and Overbreadth in Count IV. ...............................................53

D.   PLAINTIFFS HAVE STATED A CLAIM THAT THIS STATUTORY SCHEME VIOLATES THE EQUAL PROTECTION CLAUSE. ............................................54

IV.   CONCLUSION ............................................................................57

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

1

<u>TABLE OF AUTHORITIES</u>

2

**Cases**

3

*Andrus v. Allard*, 44 U.S. 51, 100 S.Ct. 318 (1979) .........................................................36, 37, 38

4

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..............................................................................52, 54

5

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Attorney General N.J. (ANJRPC)*,
    910 F.3d 106 (3d Cir. 2018) ...............................................................................................25

6

7

*Babbitt v. Youpee*, 519 U.S. 234 (1997) ...............................................................................30

8

*Bair v. United States*, 515 F.3d 1323 (Fed. Cir. 2008) ...............................................................42

9

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).............................................................2, 8, 54

10

*Board of Trustees of State Univ. of New York v. Fox*, 492 U.S. 469 (1989) ...............................23

11

*Burns v. Mukasey*, 2009 WL 8756489 (E.D. Cal. 2009) .............................................................40

12

*Caetano v. Mass.*, __ U.S. __, 136 S.Ct. 1027 (2016)....................................................15, 16, 26, 28

13

*Carson v. Am. Brands, Inc.*, 450 U.S. 79 (1981) ........................................................................8

14

*Chicago, R. I. & P. R. Co. v. United States*, 284 U.S. 80, 52 S.Ct. 87 (1931) .............................36

15

*City of Cleburne, Texas v. Cleburne Living Ctr.*, 473 U.S. 432 (1985) .......................................55

16

17

*Colorado Outfitters Ass'n v. Hickenlooper*, 24 F.Supp.3d 1050 (D. Colo. 2014) .................13, 14

18

*Connally v. General Constr. Co.*, 269 U.S. 385 (1926) ............................................................48

19

*Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992 (9th Cir. 2010) ............................................2, 7

20

*District of Columbia v. Heller*, 554 U.S 570, 128 S.Ct. 2783 (2008) ................................. *passim*

21

*Dore v. United States*, 97 F. Supp. 239 (Ct. Cl. 1951) ............................................................34

22

*Drake v. Filco*, 724 F.3d 426 (3d Cir. 2010) ..........................................................................18

23

24

*Duncan v. Becerra*, 742 Fed.App'x 218 (9th Cir. 2018)..............................................................8

25

*Duncan v. Becerra*, 265 F.Supp.3d 1106 (S.D. Cal. 2017) .................................................24, 47

26

*Edenfield v. Fane*, 507 U.S. 761 (1993) ...............................................................................23

27

*Edward P. Stahel & Co. v. United States*, 78 F. Supp. 800 (Ct. Cl. 1948)....................................34

28

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ..............................................23, 24

*F.C.C. v. Beach Communications, Inc.*, 508 U.S. 307 (1993)....................................23

*Felton Water Co. v. Superior Court*, 82 Cal.App. 382 (1927) ....................................30

*Fesjian v. Jefferson*, 399 A.2d 861 (D.C. Ct. App. 1979) .................................38, 39, 40

*Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015) ...................11, 16, 26

*Fyock v. City of Sunnyvale*, 25 F.Supp.3d 1267 (N.D. Cal. 2014) ...................15, 16, 27

*Fyock v. City of Sunnyvale*, 779 F.3d 991 (9th Cir. 2015) ...................................*passim*

*Gerhart v. Lake County Montana*, 637 F.3d 1013 (9th Cir. 2011)................................56

*Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91 (1979) ......................................2

*Golden Gate Hotel Assn. v. City & County of San Francisco*,
    836 F.Supp. 707 (N.D. Cal. 1993)........................................................................30

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) .....................................................46

*Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173 (1999) .........23

*Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244 (D.C. Cir. 2011) .............13, 14, 19, 26

*Heller v. Doe by Doe*, 509 U.S. 312 (1993) .................................................................56

*Hill v. Colorado*, 530 U.S. 703 (2000) .......................................................................21

*Horne v. Department of Agriculture*, ___ U.S. ___, 135 S.Ct. 2419 (2015)...............36, 37, 38, 43

*Jackson v. City and County of San Francisco*, 135 S.Ct. 2799 (2015) .........................20

*Jackson v. City and County of San Francisco*, 746 F.3d 953 (9th Cir. 2014).................21

*Jefferson Street Industries, LLC v. City of Indio*, 236 Cal.App.4th 1175 (2015) .........30

*John Doe I v. Nestle USA*, 766 F.3d 1013 (9th Cir. 2014) .....................................52, 54

*Kachalsky v. County of Westchester*, 701 F.3d 81 (2d Cir. 2012)................................18

*Kaiser Aetna v. United States*, 444 U.S. 164, 100 S. Ct. 383 (1979) .....................31, 36

*Karlin v. Foust*, 188 F.3d 446 (9th Cir. 1999).......................................................46, 51

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

*Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 104 S.Ct. 2187 (1984) ..........................35

*Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) (en banc) ......................................19, 24

*Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356 (1973) ................................22

*Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 125 S. Ct. 2074 (2005) ...................30, 31, 36, 41

*Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S.Ct. 3164 (1982).......31, 38

*Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 112 S.Ct. 2886 (1992)............. *passim*

*Luis v. United States*, __ U.S. __, 136 S. Ct. 1083 (2016) ........................................21

*Mathews v. Lucas*, 427 U.S. 495 (1976) ........................................................56

*McDonald v. Chicago*, 561 U.S. 742 (2010) ...................................18, 20, 23, 26

*Mugler v. Kansas*, 123 U.S. 623 (1887) ......................................................41, 42

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2d Cir. 2015) ........................15, 26

*Nat'l Wildlife Fed'n v. I.C.C.*, 850 F.2d 694 (D.C. Cir. 1988)........................................31

*NRA v. BATFE*, 700 F.3d 185 (5th Cir. 2012) ...................................................19

*Palazzolo v. Rhode Island*, 533 U.S. 606, 121 S.Ct. 2448 (2001)....................................43

*Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007)......................................11

*Penn Central Transportation Co. v. City of New York*,
    438 U.S. 104, 98 S.Ct. 2646 (1978)....................................................42, 43

*Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 43 S.Ct. 158 (1922) ..............................43

*People v. Bustamante*, 57 Cal.App.4th 693 (1997)..........................................48, 49

*People v. Carter*, 131 Cal.App.3d 177 (1933)..................................................49

*People v. Dobbins*, 73 Cal. 257 (1887).......................................................48

*Powell v. Tompkins*, 783 F.3d 332 (1st Cir. 2015) .............................................10

*Powell's Books, Inc. v. Kroger*, 622 F.3d 1202 (9th Cir. 2010)....................................53

*Quilici v. Vill. of Morton Grove*, 532 F.Supp. 1169 (N.D. Ill. 1981) ..............................39, 44

*Reed v. Reed*, 404 U.S. 71 (1971)...........................................................55

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THIRD AMENDED COMPLAINT

*Residents of Beverly Glen, Inc. v. City of Los Angeles*, 34 Cal.App.3d 117 (1973)...............7, 31

*Richmond Elks Hall Ass'n v. Richmond Redevelopment Agency*,
   561 F.2d 1327 (9th Cir. 1977) ................................................................36

*Robinson v. Salazar*, 885 F.Supp.2d 1002 (E.D. Cal. 2012) ...........................54

*Romer v. Evans*, 517 U.S. 620 (1996) ..............................................................56

*Royster Guano Co. v. Virginia*, 253 U.S. 412 (1920)......................................55

*San Remo Hotel L.P. v. City and County of San Francisco*, 27 Cal.4th 643 (2002)...................30

*Shew v. Malloy*, 994 F. Supp. 2d 234 (D. Conn. 2014) ...................................15

*Silveira v. Lockyer*, 312 F.3d 1052 (9th Cir. 2002) .........................................56

*Silvester v. Harris*, 843 F.3d 816 (9th Cir. 2016) ...........................19, 26, 27, 28

*Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*,
   535 U.S. 302, 122 S.Ct. 1465 (2002)......................................................31

*Teixeira v. County of Alameda*, 873 F.3d 670 (9th Cir. 2017) (en banc) .................9, 19

*Tenants Assn. of Park Santa Anita v. Southers*, 222 Cal.App.3d 1293 (1990)...........................7

*Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622 (1994) ...........................21, 22

*Tyler v. Hillsdale County Sheriff's Department*, 837 F.3d 678 (6th Cir. 2016)..........................24

*U.S. v. Rodriguez-Deharo*, 192 F.Supp.2d 1031 (E.D. Cal. 2002)...................53

*United States v. Alvarez*, 617 F.3d 1198 (9th Cir. 2010) .................................29

*United States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013)..............................9, 19

*United States v. Decastro*, 682 F.3d 160 (2d Cir. 2012) .................................18

*United States v. Security Industrial Bank*, 459 U.S. 70 (1982) ......................42

*United States v. Vongxay*, 594 F.3d 1111 (9th Cir. 2010)................................14

*Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383 (1998)................................53

*Warth v. Seldin*, 422 U.S. 490 (1975)................................................................2

*Western Mobile Assn. v. County of San Diego*, 16 Cal.App.3d 941 (1971) ...........................49, 50

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**SEILER EPSTEIN ZIEGLER & APPLEGATE LLP**
Attorneys at Law

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THIRD AMENDED COMPLAINT

**SEILER EPSTEIN ZIEGLER & APPLEGATE LLP**
Attorneys at Law

*Worman v. Healey*, 293 F.Supp.3d 251 (D. Mass. 2018) ........................................25, 53

*Wrenn v. District of Columbia*, 864 F.3d 650 (D.C. Cir. 2017) ...............................10

*Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981 (9th Cir. 2009) ...................2, 8

**Statutes**

Cal. Govt. Code § 9605 ...............................................................................................48

Cal. Pen. Code § 16740 ................................................................................................4

Cal. Pen. Code § 16900 ................................................................................................27

Cal. Pen. Code § 26700 ................................................................................................29

Cal. Pen. Code § 26915 ................................................................................................29

Cal. Pen. Code § 29805 ...............................................................................................50, 51

Cal. Pen. Code § 31910 ................................................................................................27

Cal. Pen. Code § 32000 ................................................................................................27

Cal. Pen. Code § 32310 ............................................................................................... *passim*

Cal. Pen. Code § 32400 ................................................................................................5

Cal. Pen. Code § 32405 ................................................................................................5

Cal. Pen. Code § 32406 ...............................................................................................5, 49, 50

Cal. Pen. Code § 32410 ................................................................................................5

Cal. Pen. Code § 32425 ...............................................................................................5, 29

Cal. Pen. Code § 32435 ................................................................................................5

Cal. Pen. Code § 32445 ................................................................................................55

Cal. Pen. Code § 32450 ...............................................................................................5, 34, 55

Colo. Rev. Stat. § 18–12–301 ......................................................................................4

**Other Authorities**

Allen Rostron, *Justice Breyer's Triumph in the Third Battle Over the Second Amendment*,
    80 Geo. Wash. L. Rev. 703 (2012) ..........................................................................18

Clayton Cramer & Joseph Olson, *Pistols, Crime, and Public Safety in Early America*,
    44 Williamette L. Rev. 699 (2008) ..........................................................................12

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*,
78 Alb. L. Rev. 849 (2015)......................................................................12

Don B. Kates, Jr., *The Second Amendment: A Dialogue*,
49 Law & Contemp. Probs. 143 (1986)....................................................14

Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self–Defense:*
*An Analytical Framework and a Research Agenda*, 56 UCLA L. Rev. 1443 (2009) ..............10

Joseph Blocher, *Categoricalism and Balancing in First and Second Amendment Analysis*, 84
N.Y.U. L. Rev. 375 (2009) ......................................................................10

**Constitutional Provisions**

Cal. Const. Art. I, § 19..............................................................................30

Cal. Const., Art. II, § 10 ............................................................................6

U.S. Const., 14th Amend., § 1 ............................................................29, 55

U.S. Const., 5th Amend...........................................................................29

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THIRD AMENDED COMPLAINT

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

## I.   INTRODUCTION

California has generally banned the importation, manufacture, sale, or receipt of large-capacity firearm magazines since 2000.  And thus, for 18 years, California gun owners have been forced to live with a constitutionally unacceptable, but politically compelled compromise: that the further acquisition, importation, or manufacture of large-capacity magazines would be prohibited, but that gun owners – including the individual Plaintiffs herein – would be permitted to keep their existing lawfully acquired and possessed property as "grandfathered" items.

In 2016, the Legislature and the drafters of Proposition 63 reneged on that arrangement. Seventeen years after the fact, they required that virtually all owners of large-capacity magazines either remove them from the State, sell them to a licensed firearms dealer, or "surrender" them to the State.  None of these options allowed a "grandfathered" magazine possessor to keep his or her property, and therefore, they are being forcibly dispossessed of them.

As we have before, we say this was a bridge too far.  Plaintiffs are seeking declaratory and injunctive relief to challenge the *entire* confiscatory ban on large capacity magazines (the "LCM ban").  Here, we oppose the State's Motion to Dismiss the Third Amended Complaint ("TAC") ("MTD" or the "Motion") as follows:

First, the provisions at issue – which include a retroactive prohibition on lawfully-acquired parts of firearms, and parts intrinsic to them, constitute a categorical ban that violates the Second Amendment to the United States Constitution.  Plaintiffs will show at trial that the magazines themselves are integral firearm parts, which cannot be so readily and easily banned today under the Supreme Court's precedents.  Plaintiffs will be able to show that the subject magazines are arms, and/or parts of arms, *not both "dangerous and unusual,"* and that they are in widespread common use, for lawful purposes, including self-defense.  Therefore, they are protected from the State's categorical ban under the Supreme Court's mandate in *District of Columbia v. Heller*.  To the extent that any review of the LCM ban should be subject to some form of scrutiny, such review should not involve a balancing of interests that is clearly prohibited by *Heller*, and, in any event, the ban would fail to pass constitutional muster under any *proper*

application of constitutional scrutiny, even the "intermediate scrutiny" standard that the State seeks.

Second, this retroactive ban on lawfully-possessed private property would completely dispossess Plaintiffs and thousands of others like them of important, valuable, and Constitutionally-protected property.  Therefore, the retroactive LCM ban amounts to a violation of the Takings and Due Process Clauses of the Federal and state constitutions, as the State in no way provides or allows for just compensation to be paid to "grandfathered" magazine owners who will lose, in many instances, their right to keep and maintain their valuable, and in some cases irreplaceable, property, and will stand exposed to criminal sanctions should this ban be enforced.

Further, the retroactive LCM ban suffers from constitutionally unacceptable problems in vagueness and overbreadth, particularly as the enactment of two different versions of the LCM ban in 2016 resulted in the chaptering of two current, live, and inconsistent versions of the law, neither of which satisfies the fundamental due process requirements for adequate notice of what is and is not prohibited under the law.

For these reasons, and others as discussed at length below, the State's Motion should be denied.

## II.   STANDARD OF REVIEW

On a motion to dismiss, a court must accept as true all material allegations of the complaint, and construe the complaint in favor of the complaining party.  *Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91, 109 (1979) (citing *Warth v. Seldin*, 422 U.S. 490, 501 (1975)); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010) ("We accept as true all well-pleaded allegations of material fact, and construe them in the light most favorable to the non-moving party.").  The court "will hold a dismissal inappropriate unless the plaintiffs' complaint fails to 'state a claim to relief that is plausible on its face.'"  *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 989 (9th Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550

**SEILER EPSTEIN ZIEGLER & APPLEGATE LLP**
Attorneys at Law

U.S. 544, 570 (2007)).

### III. STATEMENT OF FACTS

The following facts are largely taken from Plaintiffs' Third Amended Complaint ("TAC"), filed February 26, 2018 (Dkt. #76).

**A.      FIREARM AMMUNITION MAGAZINES AND THE ORIGINAL CALIFORNIA MAGAZINE BAN**

Firearm ammunition magazines and feeding devices are intrinsic parts of all semi-automatic firearms, which were designed, developed, produced, and sold in large quantities starting in the early 20th Century.  Today, a vast majority of constitutionally-protected firearms in common use for lawful purposes – including handguns, "the quintessential self-defense weapon," *District of Columbia v. Heller*, 554 U.S. 570, 629 (2008) – are self-loading, semi-automatic firearms that require a magazine to feed each successive round of ammunition.

A magazine is simply "a receptacle for a firearm that holds a plurality of cartridges or shells under spring pressure preparatory for feeding into the chamber.  Magazines take many forms, such as box, drum, rotary, tubular, etc. and may be fixed or removable." (https://saami.org/saami-glossary/?letter=M.)  Plaintiffs here will easily prove that the vast majority of the firearms in common use for lawful purposes, particularly handguns, sold at retail to the non-military market (e.g., civilian and law enforcement purchasers) are semi-automatic, and contain removable magazines.  (TAC, ¶ 32.)  And moreover, Plaintiffs will show that ammunition feeding devices and magazines are therefore an inherent operating part of, and inseparable from, functioning semi-automatic firearms.  (*Id.*)  Plaintiffs will further show that all semi-automatic firearms are essentially inoperable without them.  (*Id.*)  Modern semi-automatic firearms of the kind in use for lawful purposes (including self-defense) sold at retail in the non-military market generally include at least one magazine intended to be used as a part of those firearms.  (*Id.*)

Although an exact number may never be known, over the past century, many millions of magazines certainly have existed, lawfully within the United States, as these inherent parts of

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

semi-automatic firearms commonly held and used by Americans for lawful purposes such as self-defense, competition, training, and sport. (TAC, ¶ 33.) At trial, Plaintiffs will demonstrate, through data supporting a study by the National Shooting Sports Foundation, that magazines capable of holding more than 10 rounds of ammunition accounted for approximately 115 million, or approximately half, of all magazines owned in the United States between 1990 and 2015. It can also be safely assumed that many more such magazines were manufactured within or imported into the United States (and California specifically) for sale, both prior to 1990 as well as after 2015.

Along with the rest of the nation, and up through 1999, millions of California citizens, including Plaintiffs herein, lawfully acquired and possessed semi-automatic firearms – many of which contained magazines capable of holding more than ten rounds of ammunition. However, in 1999, through passage of Senate Bill 23, California enacted legislation generally banning methods of *acquiring* magazines that hold more than ten rounds, legislatively branding them "large-capacity magazines" as currently defined in Penal Code § 16740.[1] And since that time, the Code has generally forbidden the manufacture, importation, sale, or receipt of any large-capacity magazine. *See* Cal. Pen. Code § 32310(a) (formerly § 12020(a)(2)).

However, and as part of the legislative arrangement in connection with Sen. Bill 23, as enacted, the continued possession of lawfully-acquired "large capacity magazines" up to that point (i.e., "grandfathered" magazines) was not prohibited and would still be lawful. Individual Plaintiffs Wiese, Morris, Cowley, Macaston, Flores, and Dang, and the members of the class of persons on whose behalf this action is brought, are law-abiding citizens, who are neither

---

[1]To be sure, the very term "large-capacity magazine" is an irksome and controversial label. In states where there are no limits on magazine capacity, the term "large capacity magazine" is generally not even used. Where it is used, the mere capability to hold more than 10 rounds is not necessarily enough for the label to apply. *See e.g.*, Colo. Rev. Stat. § 18–12–301(2)(a)(I) (defining "large capacity magazine" as those having capacity to accept more than 15 rounds). Indeed, consistent with their commonality and popularity among law-abiding gun owners, in most states, magazines that hold more than 10 rounds are considered "*standard* capacity magazines." We use the term "large-capacity magazine" in this opposition, as we must, solely because that is the codified definition at issue.

prohibited from the possession of firearms or ammunition nor exempt from California's restrictions upon firearms and ammunition, and who lawfully possessed and used such large-capacity magazines with their firearms up through and including December 31, 1999.

**B.   SENATE BILL 1446 AND PROPOSITION 63**

In 2016, gun control measures in California moved forward at a steady, and unprecedented pace.  Among these measures included additional laws pertaining to large-capacity magazines, contained in Senate Bill 1446 ("SB 1446") and Proposition 63.

Purportedly concerned about what they presumably viewed as a prevalence of mass shootings and the terrorist attacks in San Bernardino, California, on December 2, 2015 (*see* Req. for Jud. Notice, Exhibit B, p. 4), the Legislature passed SB 1446, which amended Penal Code § 32310(b) to make it a criminal offense to possess a large-capacity magazine, "regardless of the date the magazine was acquired[.]"  The law as signed would have required a person in lawful possession of any large-capacity magazines prior to July 1, 2017, to dispose of such magazine(s) by surrender, sale to a licensed firearms dealer, or removal from the State in the manner provided by the statute.  The provisions of SB 1446 were signed into law by then-Governor Brown on July 1, 2016, and became effective on January 1, 2017.

The author and proponents of SB 1446 never considered the actual value of the magazines subject to the ban, payment of "just compensation" to the owners of previously grandfathered magazines who would surrender their magazines to law enforcement, or the existence of any type of market that would be available to the owners who attempt to dispose of their LCMs through forced sales to licensed firearm dealers.  The bill's author and sponsors simply assumed that the State, via local law enforcement agencies, had the power to confiscate the magazines under the "police powers" of the State, and without providing the owners any compensation.  (*See* Req. for Jud. Notice, Exhibit B, pp. 4-6.)

Then, on November 8, 2016, California voters enacted Proposition 63 (titled the "Safety for All Act"), a measure that was sponsored and heavily promoted as a "gun safety" measure by Lt. Governor Gavin Newsom.  (*See* Req. for Jud. Notice, Exhibit E.)  Proposition 63 amended

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

Penal Code §§ 32310, 32400, 32405, 32410, 32425, 32435, 32450, added section 32406, and repealed section 32420 by initiative statute, which changed the law to totally prohibit and criminalize the possession of large-capacity magazines as of July 1, 2017.  Proposition 63 took effect the day after the election.  *See* Cal. Const., Art. II, § 10(a) ("An initiative statute or referendum approved by a majority of votes thereon takes effect the day after the election unless the measure provides otherwise.").

With regard to those provisions of Proposition 63 dealing with large-capacity magazines, the proponents and drafters likewise clearly had mass shootings in mind, a type of crime that has dominated our news during the past decade.  Specifically, contained within the "Findings and Declarations" (section 2) of Proposition 63, the measure stated:

> 11. Military–style large-capacity ammunition magazines—some capable of holding more than 100 rounds of ammunition—significantly increase a shooter's ability to kill a lot of people in a short amount of time. That is why these large capacity ammunition magazines are common in many of America's most horrific mass shootings, from the killings at 101 California Street in San Francisco in 1993 to Columbine High School in 1999 to the massacre at Sandy Hook Elementary School in Newtown, Connecticut in 2012.

> 12. Today, California law prohibits the manufacture, importation and sale of military-style, large capacity ammunition magazines, but does not prohibit the general public from possessing them. We should close that loophole. No one except trained law enforcement should be able to possess these dangerous ammunition magazines.

(Prop. 63, § 2; *see* Req. for Jud. Notice, Exhibit E.)

As defendants' motion admits, mass shootings were the stated *raison d'être* justifying these new magazine restrictions.  However, Plaintiffs will demonstrate at trial, through expert testimony, that *pre-ban* (i.e., lawfully-held, since before 2000) large-capacity magazines generally have *not* been used in mass shootings.  It is true that, in some of the incidents, large-capacity magazines were used, such as in the San Bernardino terrorist attack of December 2, 2015, which the Legislature specifically cited as a catalyst justifying passage of SB 1446.  (*See* Req. for Jud. Notice, Exh B at p. 4.)  But in that event, given the relatively young age of the shooters and that they obtained their weapons through straw purchases in close proximity to the

attacks, it is reasonably inferable that their large-capacity magazines were either illegally imported or manufactured.  And the State is greatly overstating the case in suggesting that such magazines are responsible for causing harm across the field of *all crime* with its sweepingly broad and entirely unsupportable assertions like LCMs "are disproportionately used in crime." (MTD at 3:5-6.) In short, Plaintiffs' evidence will show that the State's justification for this ban is illusory because there is no current evidence that legally-possessed large-capacity magazines have been involved in mass shooting incidents in California since the year 2000. And more to the point, Plaintiffs' clear and detailed allegations on these factually determinative points must be accepted as true in determining whether they have crossed the low threshold for overcoming the State's MTD and retaining their right to have these important claims heard. *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d at 998.

## C.    THE INSTANT ACTION

Plaintiffs commenced the instant action on April 28, 2017, and filed their First Amended Complaint on June 6, 2017.  (Dkt. No. 7.)  Plaintiffs Wiese, Morris, Cowley, Macaston, Flores, and Dang are individual and law-abiding California residents, who acquired, prior to 2000, large-capacity magazines, as intrinsic parts of their legally-possessed firearms.  Each of these individual plaintiffs wishes to keep these magazines in the State of California, and is naturally unwilling to destroy or "surrender" his property to the State.  Some of the Plaintiffs have "pre-ban" magazines of substantial value, either intrinsically or because they have historical value. (TAC, ¶ 12.)  Some of these magazines are the only magazines that the Plaintiffs may have for that particular firearm.  (*Id.*, ¶ 11, 12.)  And some of the magazines are the only magazines that were ever made for that particular firearm.  (*Id.*, ¶ 13.)

Plaintiffs, including the organizational plaintiffs, are bringing this matter individually, and as representatives on behalf of the class of individuals who are or would be affected by the ban; that is, those law-abiding residents, who are not otherwise exempt, and who lawfully possessed large-capacity magazines in this State before December 31, 1999.  (TAC, ¶ 7.)  *See*

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

*Residents of Beverly Glen, Inc. v. City of Los Angeles*, 34 Cal.App.3d 117 (1973); *Tenants Assn. of Park Santa Anita v. Southers*, 222 Cal.App.3d 1293, 1299-1300 (1990) (a right to sue in a representative capacity may be recognized where the question is one of public interest).

Plaintiffs filed a motion for a temporary restraining order and issuance of a preliminary injunction to enjoin enforcement of the law, on June 12, 2017 (Dkt. #9).  On June 29, 2017, this Court denied Plaintiffs' motion.[2]  (Dkt. #52).  By stipulation of the parties, and order of this Court (Dkt. #54), Plaintiffs filed their Second Amended Complaint on August 17, 2017 (Dkt. #59).  Defendants likewise moved to dismiss the Second Amended Complaint under FRCP 12(b)(6), and this Court granted the motion on February 7, 2018 (Dkt. #74), under the same reasoning as justified its prior dismissal.  This Court granted the Plaintiffs leave to amend consistent with the Court's Order.

On February 26, 2018, Plaintiffs filed the current and Operative Third Amended Complaint.  Plaintiffs' amendments directly allege, make it clear that they intend to prove and can prove, the ultimate fact that the LCM ban would not reduce the incidence or lethality of mass shootings.  Firstly, the TAC clarifies that the express and stated rationale for the new LCM ban lies in the supposed prevention of mass shootings, and in likewise calling the grandfathered possession exemption a "loophole."  (TAC, ¶ 41).  Moreover, we directly allege that which was stated and discussed at length in connection with our motion for preliminary injunction, i.e., that LCMs have not been used in mass shootings in California since the prohibition was enacted.

---

[2]As this Court is aware, on that same day, the District Court for the Southern District of California granted the plaintiffs' motion for a preliminary injunction there, enjoining substantially those same portions of the LCM ban that were the subject of Plaintiffs' motion in the instant case.  *Duncan v. Becerra*, Civ. No. 3:17-01017-BEN-JLB, Hon. Roger T. Benitez presiding.  Judge Benitez' order in that matter rendered the prospect of an appeal of this Court's order largely moot, since any interlocutory appeal of the denial of an injunction would have required the Plaintiffs to show continuing "serious, perhaps irreparable consequence" from this Court's order.  *See Carson v. Am. Brands, Inc.*, 450 U.S. 79, 84 (1981).  It also inevitably shows that Plaintiffs here have at least "'state[d] a claim to relief that is plausible on its face.'"  *Zucco Partners, LLC*, 552 F.3d at 989 (quoting *Twombly*, 550 U.S. at 570)).  The Ninth Circuit has since affirmed Judge Benitez' grant of the preliminary injunction against this ban. *Duncan v. Becerra*, 742 Fed.App'x 218 (9th Cir. 2018).

1   (Id., ¶ 42).  And moreover, Plaintiffs clarify their assertion that actual intermediate scrutiny, to

2   the extent that it must be applied, requires the State to prove a reasonable fit between the law and

3   the substantial objective that it ostensibly advances, and that the State has failed to carry this

4   burden.  (Id., ¶ 70).

5          In short, Plaintiffs have alleged and are here prepared to prove at trial that legally-owned

6   (grandfathered) LCMs have not been involved in California mass shootings since the original

7   ban was enacted in 2000 (*id.*, ¶ 42), and the lack of the State's evidence otherwise shows that the

8   wide breadth and confiscatory nature of the new LCM ban cannot be justified.

9

10                          **III.    ARGUMENT**

11  **A.    IN EVALUATING PLAINTIFFS' SECOND AMENDMENT CLAIMS, THIS COURT SHOULD**
     **REJECT ANY INTEREST-BALANCING APPROACH, WHICH WOULD CLEARLY BE**
12   **INCONSISTENT WITH *HELLER*.**

13         **1.    Because the LCM Ban is Tantamount to a Confiscation of a Widely-Used,**
                 **Constitutionally-Protected Class of Arms, *Heller's* Categorical Approach**
14               **Controls.**

15

16         Traditionally, in discussing Second Amendment claims, the parties at the outset routinely

17  recite standards of review leading to their preferred forms of scrutiny.  Indeed, the State,

18  following suit, cites *United States v. Chovan*, 735 F.3d 1127, 1136 (9th Cir. 2013) to shuttle us

19  toward the "two-step" approach in leading to what the State claims is "an appropriate level of

20  scrutiny."  (Def. Motion at 11:3-8).  *See also Teixeira v. County of Alameda*, 873 F.3d 670, 682

21  (9th Cir. 2017) (en banc) (quoting *Chovan* at 1136 ("We apply a two-step inquiry to examine

22  Teixeira's claim … and … we then determine the 'appropriate level of scrutiny.'")).  And the

23  State thus argues that even if a statewide, confiscatory magazine ban does implicate Second

24  Amendment interests – as if that is still somehow a debatable point[3] – the law meets and survives

25

26  ─────────────────────

27  [3]The Ninth Circuit has already settled this.  *Fyock v. City of Sunnyvale*, 779 F.3d 991, 999 (9th
     Cir. 2015) ("Because Measure C restricts the ability of law-abiding citizens to possess large-
28   capacity magazines within their homes for the purpose of self-defense, we agree … that Measure
     C may implicate the core of the Second Amendment.").

1    "intermediate scrutiny" because it merely "eliminat[es] a particularly lethal subset of magazines"

2    (*id.*, at 11:24-25), as simply a matter of "common sense" (*id.*, at 3:16).

3            The State, however, completely glosses over what is perhaps the most salient point in

4    *Heller*: a means-end analysis is *not* to be used – and must be bypassed completely – when a

5    textual and historical analysis shows that the law at issue effectuates a ban against any category

6    of protected arms.  In other words, *Heller* commands that governments may only ban classes of

7    arms that have been banned in our "historical tradition," such as firearms that are *both*

8    "dangerous and unusual," and thus are not the sort of lawful weapons that citizens have

9    commonly possessed and used for self-defense. 554 U.S. at 627-628.  If the law amounts to an

10   impermissible ban on such a category of firearms, unless one of the narrow set of "longstanding"

11   exceptions happens to apply, it must be struck down without resort to or need for any "level of

12   scrutiny."  "[U]nder [*Heller*], 'complete prohibitions]' of Second Amendment rights are always

13   invalid.  […]  It's appropriate to strike down such 'total ban[s]' without bothering to apply tiers

14   of scrutiny because no such analysis could ever sanction obliterations of an enumerated

15   constitutional right.  [Citation.]  With this categorical approach to such bans, [*Heller*] ensured

16   that judicial tests for implementing gun rights would not be misused to swallow those rights

17   whole."  *Wrenn v. District of Columbia*, 864 F.3d 650, 665 (D.C. Cir. 2017) (citing *Heller*, 554

18   U.S. at 629); *Powell v. Tompkins*, 783 F.3d 332, 347 (1st Cir. 2015) ("Together, *Heller* and

19   *McDonald* establish that states may not impose legislation that works a complete ban on the

20   possession of operable handguns in the home by law-abiding, responsible citizens for use in

21   immediate self-defense."); *see also* Eugene Volokh, *Implementing the Right to Keep and Bear*

22   *Arms for Self–Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. Rev.

23   1443, 1463 (2009) ("Absent [from *Heller*] is any inquiry into whether the law is necessary to

24   serve a compelling government interest in preventing death and crime, though handgun ban

25   proponents did indeed argue that such bans are necessary to serve those interests and that no less

26   restrictive alternative would do the job"); Joseph Blocher, *Categoricalism and Balancing in First*

27   *and Second Amendment Analysis*, 84 N.Y.U. L. Rev. 375, 380 (2009) ("Rather than adopting one

28   of the First Amendment's many Frankfurter-inspired balancing approaches, the majority [in

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

*Heller*] endorsed a categorical test under which some types of 'Arms' and arms-usage are protected absolutely from bans and some types of 'Arms' and people are excluded entirely from constitutional coverage.").

In this regard, the *Heller* majority itself ultimately undertook this categorical approach, holding simply that the handgun ban at issue there "amounts to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for that lawful purpose.  The prohibition extends, moreover, to the home, where the need for defense of self, family, and property is most acute.  Under any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home 'the most preferred firearms in the nation to 'keep' and use for protection of one's home and family,' would fail constitutional muster." *Heller*, 554 U.S. at 628-629 (citing *Parker v. District of Columbia*, 478 F.3d 370, 400 (D.C. Cir. 2007)).

And therefore, the *proper* threshold inquiry here should not simply be whether a law merely "implicates" Second Amendment concerns, but whether the possession of certain weapons (such as handguns – or in this case, semi-automatic weapons containing *standard*-capacity magazines) is constitutionally protected because they have not traditionally been banned and are in common use by law-abiding citizens.  *See Friedman v. City of Highland Park*, 784 F.3d 406, 414 (7th Cir.2015) (Manion, J., dissenting) ("[W]here, as here, the activity is directly tied to specific classes of weapons, we are faced with an additional threshold matter: whether the classes of weapons regulated are commonly used by law-abiding citizens.").

In considering whether and how to apply this categorical approach, we look at the pillars of text, history, and tradition.  And in determining whether the magazine ban at issue survives this challenge, we look to the plain text of the Constitution, and history of these devices integral to semi-automatic firearms.  This look reveals that the LCM ban amounts to a prohibition on a significant category of firearms forbidden under *Heller* as a matter of law.

### i.   Text and History

First, with regard to the text, we start with the plain language of the Second Amendment itself, which states that "the right of the people *to keep* and bear arms, shall not be infringed"

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

1  (emphasis added).  The term "keep" simply means "'[t]o retain; not to lose,' and '[t]o have in

2  custody.'"  *Heller*, 554 U.S. at 582 ("The most natural reading of 'keep Arms' in the Second

3  Amendment is to 'have weapons.'").  And in this case, Plaintiffs Wiese, Morris, Cowley,

4  Macaston, Flores, and Dang, as individuals and representatives of the class of similarly-situated

5  individuals, have all legally possessed large-capacity magazines in this State, prior to December

6  31, 1999, without incident.  (TAC, ¶ 21.)  Naturally and rightfully, they desire to *keep* this valued

7  personal property, i.e., they "simply wish to continue to hold and otherwise exercise their Second

8  Amendment right to possess, keep, use and acquire firearms and standard-capacity magazines,

9  which are in common use, and for lawful purposes, but cannot do so should this total, categorical

10  Large-Capacity Magazine Ban be enforced."  (*Id.*, ¶ 45.)

11       Historically, "[r]epeating, magazine-fed firearms date back to at least the 1600s."

12  Clayton Cramer & Joseph Olson, *Pistols, Crime, and Public Safety in Early America*, 44

13  Williamette L. Rev. 699, 716 (2008).  Magazines holding more than ten rounds are older than the

14  Second Amendment itself.  "For example, in 1718 (seventy-one years before the drafting of the

15  American Bill of Rights) the 'Puckle Gun' was patented in England.  It was a repeating firearm

16  from which multiple individual shots could be discharged without physically reloading the gun."

17  This firearm held eleven pre-loaded charges.  *Id*. at 716-717.  Box magazines date from before

18  ratification of the Fourteenth Amendment, and handgun magazines containing more than ten

19  rounds became popular in the 1930s.  David B. Kopel, *The History of Firearm Magazines and*

20  *Magazine Prohibitions*, 78 Alb. L. Rev. 849, 851 (2015).

21       By the time California legislatively branded them "large-capacity magazines" ages later,

22  at the end of 1999 (SB 23, 1999-2000 Reg. Sess. (Cal. 1999); former § 32310), millions of such

23  magazines had been manufactured and sold into circulation here and around the county as

24  integral operating parts of semi-automatic firearms.  Kopel, *supra*, at 862 ("Long before 1979,

25  magazines of more than ten rounds had been well established in the mainstream of American gun

26  ownership.").  Indeed, with many of the most popular semi-automatic firearms, magazines of this

27  capacity or greater are the most prevalent type of magazine employed, or the only type

28  manufactured for those firearms.  Plaintiffs here will show at trial that magazines of this capacity

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

1   or greater are now "standard" in semi-automatic firearms.  And for this reason, virtually all such

2   firearms are sold at retail in the vast majority of jurisdictions throughout the United States with at

3   least one or more magazines of this capacity.

4            ii.       Tradition

5            As for the closely related matter of tradition, these items have always been accepted as

6   integral to semi-automatic firearms.  While California's 2000 legislative action generally banned

7   most forms of future acquisition and transfer of these magazines, it had never before banned the

8   mere possession of these items, and thus, countless law-abiding citizens of this State have relied

9   upon this longstanding status of the law in continuing to use and possess them for many

10  recognized lawful purposes, including self-defense, competition, training, and sport.  Again, the

11  numbers speak for themselves in proving tradition.  Large-capacity magazines in California

12  today number into the "hundreds of thousands," at least, as the DOJ's own recent findings

13  indicate. (Req. for Jud Notice, Ex. A).  And they number into the millions nationwide.  *See*

14  *Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244, 1261 (D.C. Cir. 2011) ("We think it

15  clear enough in the record that semi-automatic rifles and magazines holding more than ten

16  rounds are indeed in 'common use,' as the plaintiffs contend."); *Colorado Outfitters Ass'n v.*

17  *Hickenlooper*, 24 F.Supp.3d 1050, 1068 (D. Colo. 2014) (magazines with capacities of greater

18  than 15 rounds "number in the tens of millions").  The numbers irrefutably show that a majority

19  of Americans prefer semi-automatic handguns, and that roughly half of the magazines sold and

20  distributed have – *traditionally* – been those holding more than ten rounds. And, but for recent

21  (and certainly not longstanding) legislation, virtually all magazines manufactured and sold into

22  the American non-military market for full-sized pistols would be standard-capacity, holding

23  more than ten rounds of ammunition.

24            iii.      Commonality

25            Similarly, these historically and traditionally respected firearm instrumentalities are

26  indisputably in common use throughout California and beyond.  As Plaintiffs' Third Amended

27  complaint explains, "[s]uch [large-capacity] magazines are, in virtually every other state of the

28  Union, exactly the sorts of lawful weapons in common use that law-abiding people possess at

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

home for lawful purposes [.]"  (TAC, ¶ 48.)  "Millions of semi-automatic firearms in common use for lawful purposes are possessed by law-abiding people throughout the United States, including in California. Those firearms include, but are not limited to, highly-popular makes and models of handguns like the Glock models 17, 19, 22, and 23, the Smith & Wesson M&P series models, the Springfield Armory XD series models, and many others, including some pistols that have now been discontinued."  (*Id.*, ¶ 50.)  "Millions of such firearms, including those handguns, are commonly possessed by law-abiding people for lawful purposes including target shooting, training, sport shooting, competition, and self-defense."  (*Id.*, ¶ 51.)  And millions of such firearms, including those handguns, were designed and intended to be used with magazine capacities exceeding 10 rounds.  For example, one of the most popular handgun models commonly used and possessed for self-defense, the Glock model 17 9mm, was designed with a 17-round magazine.  (*Id.*, ¶ 52.)  And many of these handguns that were designed for factory-*standard* large-capacity magazines holding more than 10 rounds, including the Glock model 17 handgun, are available for sale in California to law-abiding people on the DOJ's Roster of Handguns Certified for Sale (Roster).  (*Id.*, ¶ 53.)

These key allegations of the operative complaint are not, as the State asserts or suggests, mere "arguments" or "conclusions of law."  These are matters of *fact* – facts that cannot reasonably be disputed.[4]  *Every* court to have considered this specific issue has recognized that such magazines are indeed in common use by a wide swath of ordinary Americans.  *See e.g.*, *Heller II*, 670 F.3d at 1261 ("[w]e think it clear enough in the record that semi-automatic rifles

---

[4]If the State actually does dispute this, then they should be required to prove this at trial. One need only travel to any other state in the Union where such magazines are not prohibited — indeed, the vast majority of states — and visit any gun store there, any shooting range, attend any shooting competition, any gun show, or talk to any other ordinary gun owners in those states, where it will be manifestly apparent that "standard-capacity" magazines (called "LCMs" by our Legislature since 2000), are indeed standard fare, widely and commonly kept, by good and decent people, for good and useful purposes. *See United States v. Vongxay*, 594 F.3d 1111, 1118 (9th Cir. 2010) ("most scholars of the Second Amendment agree that the right to bear arms was 'inextricably ... tied to' the concept of a "virtuous citizen[ry]" that would protect society through 'defensive use of arms against criminals, oppressive officials, and foreign enemies alike . . .'") (citing Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 Law & Contemp. Probs. 143, 146 (1986)).

1    and magazines holding more than ten rounds are indeed in 'common use,' as the plaintiffs

2    contend."); *Colorado Outfitters Ass'n v. Hickenlooper*, 24 F. Supp. 3d 1050, 1068 (D. Colo.

3    2014) ("lawfully owned semi-automatic firearms using a magazine with the capacity of greater

4    than 15 rounds number in the tens of millions"); *Shew v. Malloy*, 994 F. Supp. 2d 234, 246 (D.

5    Conn. 2014) (semi-automatic rifles such as the AR-15 as well as magazines with a capacity

6    greater than 10 rounds "are 'in common use' within the meaning of *Heller* and, presumably, used

7    for lawful purposes"); *Fyock v. City of Sunnyvale*, 25 F. Supp. 3d 1267, 1276-1277 (N.D. Cal.

8    2014) (such magazines are "typically possessed by law-abiding citizens for lawful purposes");

9    *N.Y. State Rifle & Pistol Ass'n*, 990 F. Supp. 2d at 365 (presuming use for lawful purposes). And

10   again, such clear *allegations* of *fact* are all Plaintiffs must plead in order to defeat the State's

11   MTD and proceed to trial on the merits of the claims these allegations support.

12           The indisputably widespread common and ordinary use of such magazines must further

13   be measured by what is commonly used and held in the rest of the country.  For example,

14   handguns were not in common use by ordinary, law-abiding citizens within the District of

15   Columbia when the Supreme Court struck down the District's thirty-year ban on their possession

16   and lawful use of handguns.  But *Heller* noted: "[i]t is no answer to say, as petitioners do, that it

17   is permissible to ban the possession of handguns so long as the possession of other firearms (i.e.,

18   long guns) is allowed.  It is enough to note, as we have observed, that *the American people* have

19   considered the handgun to be the quintessential self-defense weapon."  554 U.S. at 629

20   (emphasis added).  Plaintiffs here will easily demonstrate that a large swath of semi-automatic

21   handguns used by ordinary Americans around the country utilize magazines holding more than

22   10 rounds of ammunition as *standard*-capacity magazines.

23           Amicus Curiae Everytown for Gun Safety ("Everytown") argues that the common use

24   test is "illogical." (Proposed Amicus Brief at 8:15).  Hardly.  *See Heller*, 554 U.S. at 624;

25   *Caetano v. Mass.*, __ U.S. __, 136 S.Ct. 1027, 1032-33 (2016) (the "[h]undreds of thousands" of

26   stun guns, which are "less popular than handguns," makes them "a legitimate means of self-

27   defense across the country"); and citations above.  Everytown's lamentation that the ubiquity of

28   firearms "creates perverse incentives for the firearm industry" to give gun manufacturers " the

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

1    unilateral ability to insulate highly dangerous firearms or firearm features with Second

2    Amendment protection […]" (Proposed Amicus Brief, at 10:14-16), is entirely irrelevant.[5]

3    "[T]he court will not judge whether the public's firearm choices are often used for self-defense,

4    or even whether they are effective for self-defense – *the firearms must merely be preferred*."

5    *Fyock v. City of Sunnyvale*, 25 F.Supp.3d 1267, 1278 (N.D. Cal. 2014) (italics added); *see*

6    *Caetano*, 136 S.Ct. at 1028-29; *see also Friedman*, 784 F.3d at 416 n. 5 (Manion, J., dissenting)

7    ("The fact that a statistically significant number of Americans use AR-type rifles and large-size

8    magazines demonstrates *ipso facto* that they are used for lawful purposes. Our inquiry should

9    have ended here: the Second Amendment covers these weapons.").

10            Therefore, because the statewide LCM ban essentially amounts to a prohibition of an

11   entire class of arms, and/or a critical component thereof, which have been overwhelmingly

12   chosen by American society for lawful purposes, and implicates a core Second Amendment

13   right, it is a *categorical prohibition* that necessarily cannot survive any level of scrutiny

14   whatsoever. The inquiry should end there, and Defendants' motion to dismiss this claim should

15   be denied. While this is surely not a claim that could even be decided on a motion to dismiss in

16   any event, Plaintiffs' opposition demonstrates that such a categorical ban must be struck down.

17           **2.    Any Application of Intermediate Scrutiny Cannot Involve the Interest-
                      Balancing Prohibited by *Heller*.**
18

19           We recognize that this Court may feel bound by the law of this circuit, namely, *Fyock v.*

20   *City of Sunnyvale*, 779 F.3d 991 (9th Cir. 2015), to conclude that Plaintiffs' claims – to the

21   extent they should be subject to any standard of review at all – would be subject to "intermediate

22   scrutiny." Should this Court adhere to this position (as stated in its Order of June 29, 2017), as

23

24   ───────────────

25   [5]Everytown's view is also distorted by its hostility toward the Second Amendment generally,
     leading it to suggest that gun owners should just blithely submit to any assertion of police powers
26   in the name of combatting so-called "gun violence." In reality, state legislators – pandering to
     prohibitionist groups such as Everytown, and exploiting public fears over the perceived
     dangerousness of certain weapon types – have their own perverse incentives to enact firearm
27   prohibitions that would render ordinary, commonly-used firearms less prevalent or even non-
     existent, even among the virtuous. Indeed, the State *expressly admits* this is its ultimate goal in
28   its zeal to reduce the "continued proliferation" of such items. (MTD at 3:13.)

further articulated in the TAC, we must emphasize that a vast difference exists between *actual* intermediate scrutiny and how that test has been applied in recent Second Amendment cases. "Intermediate scrutiny" in Second Amendment cases has devolved into the very sort of interest-balancing expressly prohibited by *Heller*.  Assuming that this Court does not find the LCM ban is a categorical ban absolutely prohibited by *Heller*, it must take care to apply a proper level and form of scrutiny that does not involve the prohibited interest-balancing.

*Heller* did many great things to reaffirm basic civil liberties for law abiding citizens, but it left open the question of what specific level of scrutiny to apply in future cases involving firearms restrictions that fall short of categorical bans.  But the *Heller* Court did expressly and emphatically make clear that rational-basis review is an unacceptably deferential standard to apply in evaluating restrictions that impinge upon the fundamental rights enshrined in the Second Amendment.  *Heller*, 554 U.S. at 628, n. 27.  Thus, in evaluating such restrictions, the lower courts have generally avoided applying rational basis review (at least in name) and have instead applied some form of heightened scrutiny – either "strict" or "intermediate" scrutiny (though most commonly some variation of the latter).

But, whatever label is applied to this form of scrutiny, the fact is, *any* interest-balancing in resolving Second Amendment claims is forbidden under *Heller*.  The *Heller* court expressly *rejected* this methodology wholesale.  The majority directly confronted and then renunciated Justice Breyer's argument in his dissent for a "judge-empowering 'interest balancing inquiry,'" stating:

> We know of no other enumerated constitutional right whose core protection has been subjected to a freestanding "interest-balancing" approach. The very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon.  A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all. Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad.

*Heller*, 554 U.S. at 634-35.  Indeed, writing for the majority, Justice Scalia observed that the Second Amendment rights have already been subjected to all the "interest-balancing" that is

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

1   needed or warranted: "Like the First [Amendment], [the Second Amendment] is the very *product*

2   of an interest balancing by the people—which Justice Breyer would now conduct for them anew.

3   And whatever else it leaves to future evaluation, it surely elevates above all other interests the

4   right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.*, at 635.

5   Nevertheless, the circuit courts have been engaging in the very sort of interest-balancing

6   that the *Heller* court rejected and essentially applying what is the functional equivalent of the

7   *rational basis* review that the court flatly rejected as improper.  Legal scholars have recognized

8   this now for the last several years.  As Professor Roston observed in 2012, "the lower courts'

9   decisions strongly reflect the pragmatic spirit of the dissenting opinions that Justice Steven

10  Breyer wrote in *Heller* and *McDonald*."  Allen Rostron, *Justice Breyer's Triumph in the Third*

11  *Battle Over the Second Amendment*, 80 Geo. Wash. L. Rev. 703, 706-707 (2012).  In fact, even

12  back then, Professor Rostron suggested that Justice Breyer's dissenting view in *Heller* had

13  become the controlling law of the land, because the lower courts "have effectively embraced the

14  sort of interest-balancing approach that Justice Scalia condemned, adopting an intermediate

15  scrutiny test and applying it in a way that is highly deferential to legislative determinations and

16  that leads to all but the most drastic restrictions on guns being upheld." *Id.*, at 706-07.

17  During this period of the Supreme Court's general passivity since *McDonald* in 2010, the

18  circuit courts have become further emboldened in their application of this approach and improper

19  deference to state legislatures' "empirical judgment" in enacting laws that impinge upon Second

20  Amendment rights.  *Heller*, 554 U.S. at 690.  In other words, intermediate scrutiny has become,

21  to the circuit courts, not just a tool for conducting improper "balancing of interests" but a means

22  of effectively stacking the deck in favor of states seeking to restrict firearms rights.  *See e.g.*,

23  *United States v. Decastro*, 682 F.3d 160, 166 (2d Cir. 2012) (finding that the challenged law,

24  which restricts citizens' ability to transport firearms into New York from out of state, "only

25  minimally affects the ability to acquire a firearm," the court reasoned that it was not even

26  "subject to any form of heightened scrutiny"); *Kachalsky v. County of Westchester*, 701 F.3d 81,

27  98-99 (2d Cir. 2012) (giving "substantial deference" to the state legislature's "belief" that the

28  regulation would serve a public safety interest); *Drake v. Filco*, 724 F.3d 426, 435-37 (3d Cir.

2010) (applying "intermediate scrutiny" to uphold New York's "justifiable need" requirement for concealed carry licenses by essentially just deferring to the state's generic justification that the law helped ensure public safety); *Kolbe v. Hogan*, 849 F.3d 114, 141 (4th Cir. 2017) (readily acceding to the state's proffered "policy judgments" that the restrictions at issue were necessary to "protect[] public safety"); *Heller II*, 670 F.3d at 1258 (accepting as adequate to pass muster under intermediate scrutiny the District of Columbia's claim that the firearm registration requirement at issue advanced the general interests of "protect[ing] police officers and . . . aid[ing] in crime control," even while the court itself recognized that the District had presented this justification "incompletely" and "almost cursorily"); *NRA v. BATFE*, 700 F.3d 185 (5th Cir. 2012) (upholding a statute prohibiting the sale of handguns to people ages 18–20 under intermediate scrutiny, despite the indisputable severity of establishing an almost total handgun prohibition against an entire class of adults).

This is, of course, the prevailing methodology in the Ninth Circuit as well, where the test for the appropriate standard of review as applied to Second Amendment claims is currently drawn from *Chovan*, 735 F.3d at 1136. Under *Chovan*, the court is supposed to ask "whether the challenged law burdens conduct protected by the Second Amendment," and if it does, determine the "appropriate level of scrutiny." *Id*. The resulting analysis permits a court to conduct the prohibited balancing of interests, which in turn inevitably permits upholding the regulation so long as the burden could reasonably be perceived as relatively insubstantial in comparison to the proffered state interest.[6] And even where Second Amendment conduct is implicated, it is nevertheless routinely minimized and dismissed – since, as noted, the proffered justification for such restrictions is generally just a variation of the generic "public safety" theme, which this

---

[6]Dissenting in *Teixeira*, Judge Bea made the point that the majority had improperly evaluated the *degree* of the burden, and not simply whether the ordinance at issue burdened Second Amendment rights at all. "*Chovan* did not require the burden to be 'meaningful' or 'substantial' to proceed to the second step in the analysis, the 'severity' of the burden. It required only that the right be burdened. Second, *Chovan* explicitly required the 'severity' of the burden to be examined at its second step, as necessary to choose the level of judicial scrutiny to be applied." *Teixeira*, 873 F.3d at 695 (9th Cir. 2017) (Bea, J., dissenting) (quoting *Chovan*, 735 F.3d at 1138).

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

improper methodology encourages courts to readily accept. *See e.g.*, *Silvester v. Harris*, 843 F.3d 816, 827 (9th Cir. 2016) (where the Ninth Circuit, purporting to apply intermediate scrutiny, marginalized the actual burden on the plaintiffs, reasoning that "[t]he actual effect of the [waiting period laws] on Plaintiffs is very small," and minimized the government's burden by emphasizing that "the [reasonable fit] test is not a strict one … and scrutiny does not require the least restrictive means of furthering a given end" – regardless of the trial court's findings of fact and conclusions of law to the contrary).

While the Supreme Court has yet to denounce with one voice this judicial obstructionism against the Second Amendment currently prevailing in the lower courts, it has at least signaled recognition that the Ninth Circuit has gone awry in its use of supposed "intermediate scrutiny" to decide these cases. *See Jackson v. City and County of San Francisco*, 135 S.Ct. 2799, 2801 (2015) (Thomas, J., dissenting from denial of cert.) ("[N]othing in our decision in *Heller* suggested that a law must rise to the level of the absolute prohibition at issue in that case to constitute a 'substantial burden' on the core of the Second Amendment right. And when a law burdens a constitutionally protected right, we have generally required a higher showing than the Court of Appeals demanded here."). Indeed, the Ninth Circuit's opinion in *Jackson* is flawed for several reasons, the primary of which is that it applied intermediate scrutiny even though it found that the statute at issue burdened the Second Amendment's core right to possess firearms in the home, for self-defense purposes. Also, it found that firearm storage laws do not "severely burden" the core right – a proposition that Justice Thomas has specifically called into question. Cf. *McDonald*, 561 U.S. at 790–91 (2010) (noting that *Heller* and *McDonald* reject a quantitative "costs and benefits" approach). The Supreme Court's recent decision to review the case of *New York State Rile & Pistol Association v. City of New York*, 883 F.3d 5 (2d Cir. 2018), *cert. granted*, 2019 WL 271961 (U.S. Jan. 22, 2019) (No. 18-280) ("*NYSRPA*") – where the Second Circuit engaged in similarly constitutionally suspect analyses to uphold New York City's sweepingly broad ban on transporting a licensed, locked and unloaded handgun outside city limits – signals the high court is finally ready to reign in this judicial activism within the lower courts and ensure that laws restricting Second Amendment rights are properly and fairly

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

1   scrutinized in accordance with the core principles pronounced in *Heller* and *McDonald.*

2       Here, this Court's order denying Plaintiffs' motion for a preliminary injunction found that

3   intermediate scrutiny applies because Penal Code section 32310 "does not affect the ability of

4   law-abiding citizens to possess the 'quintessential self-defense weapon' – the handgun. Rather,

5   [it] restricts possession of only a subset of magazines that are over a certain capacity."

6   (MEMORANDUM AND ORDER RE: MOTION FOR PRELIMINARY INJUNCTION (Dkt. #52) ("Order") at

7   6:21-25 (citing *Heller*, 554 U.S. at 629).)  Irrefutably, however, the ban implicates the core of the

8   Second Amendment right.  *Fyock*, 779 F.3d at 999.  Further, "[c]onstitutional rights

9   [...]implicitly protect those closely related acts necessary to their exercise. 'There comes a point

10   ... at which the regulation of action intimately and unavoidably connected with [a right] is a

11   regulation of [the right] itself.'"  *Luis v. United States*, 136 S. Ct. 1083, 1097 (2016) (Thomas, J.,

12   concurring) (quoting *Hill v. Colorado*, 530 U.S. 703, 745 (2000) (Scalia, J., dissenting)).  "The

13   right to keep and bear arms, for example, 'implies a corresponding right to obtain the bullets

14   necessary to use them[.]'"  *Luis*, 136 S.Ct. at 1097 (quoting *Jackson v. City and County of San*

15   *Francisco*, 746 F.3d 953, 967 (9th Cir. 2014)).

16       But if a statute that implicates a core exercise of the Second Amendment right, or

17   prohibits activity essential to an exercise of the right such as the possession of large-capacity

18   magazines – which are not "only a subset" of magazines in general, but in Plaintiffs'

19   circumstances are integral to the functioning of their firearms – can nevertheless be upheld

20   merely because there is *some articulable* governmental justification for it, then true

21   "intermediate scrutiny" ceases to exist.  For when it comes to firearms, a government can always

22   at least articulate, on paper, some "reasonable"-sounding, generic public safety concern –

23   irrespective of the actual effects of the law. That is not the standard for intermediate scrutiny.

24   *See*, *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 664 (1994) ("[the government] must

25   demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in

26   fact alleviate these harms in a direct and material way").  *Actual* intermediate scrutiny – not just

27   that of the watered-down variety being improperly applied by too many courts in Second

28   Amendment cases – means the government bears a real burden, which it must meet with

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

1   *substantial* evidence. The State cannot carry that burden here.

2   **3.    Defendants Bear a True Evidentiary Burden Under *Actual* Intermediate Scrutiny, Which They Cannot Overcome in Their Motion to Dismiss.**

3

4   Consistent with the prevailing distortions of the Second Amendment jurisprudence, the

5   State's apparent position is that it bears no evidentiary burden to justify the existence of its LCM

6   ban – even as applied to owners of pre-ban, grandfathered magazines – and even while giving lip

7   service to an "intermediate scrutiny" standard. The State distorts the picture further by claiming

8   that Plaintiffs are alleging the State must show the ban will end "*all* gun violence" or "*would*

9   *have* prevented" the past incidents of gun violence. (MTD at 13:20-23 (italics added).) Of

10  course, no one is claiming that anyone must or could prove this. But the fact that the State cannot

11  prove *this* does not somehow mean it is relieved of the burden to substantiate the *actual*

12  *justification* it has proffered in support of the ban – that the ban will reduce the incidence or

13  lethality of mass shootings – as the State claims in attempting to shirk any burden-carrying

14  responsibility. (*Id.* at 13: 15-19.) *See Turner Broad. Sys., Inc.*, 520 U.S. 180, 195 (1997). For the

15  same essential reason, nor can the State hope to carry its actual burden with mere speculation

16  that access to such magazines "leads to more injuries and higher fatality rates than crimes

17  involving smaller, conventional magazines." (MTD at 3: 8-9.) Indeed, if such slippery-slope

18  justifications were sufficient to sustain magazine bans, States could (and *would*, in places like

19  California) eventually succeed in banning everything except *single* round capacity firearms.

20  This practice of wholly ignoring or minimizing the traditional governmental burdens

21  under purportedly legitimate forms of constitutional scrutiny demonstrates that "intermediate

22  scrutiny" in this context has devolved into something functionally and practically

23  indistinguishable from the *Heller*-prohibited rational basis review. One of the fundamental

24  differences between rational basis scrutiny and intermediate scrutiny of a challenged

25  governmental action is supposed to be the evidence required to reasonably justify the action.

26  Under rational basis review, the burden rests with the challenger to negate every conceivable

27  basis that might support a challenged law.  *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S.

28  356, 364 (1973).  And no evidence is required.  *F.C.C. v. Beach Communications, Inc.*, 508 U.S.

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

307, 313-315 (1993).

By contrast, when a heightened level of scrutiny is used, the requirements change, and rational speculation is no longer good enough.  Under *actual* intermediate scrutiny, the government bears the burden of proof to demonstrate a reasonable fit between the challenged regulation and a *substantial* governmental objective that the law ostensibly advances.  *Board of Trustees of State Univ. of New York v. Fox*, 492 U.S. 469, 480–81 (1989).  To carry this burden, the government must not only present evidence, but "*substantial* evidence" drawn from "*reasonable* inferences" that actually support its proffered justification.  *Turner Broad. Sys., Inc.*, 520 U.S. at 195 (emphasis added); *see also City of Renton*, 475 U.S. at 51–52 (the evidence that the lawmakers rely upon must be "reasonably believed to be relevant to the problem" the government is addressing).  And the regulation must often be more than merely "relevant" to the problem at hand.  Indeed, in the related First Amendment context, the government is typically put to the evidentiary test to show that the harms it recites are not only real, but "that [the speech] restriction will in fact alleviate them to a material degree."  *Italian Colors Rest. v. Becerra*, 878 F.3d 1165, 1177  (9th Cir. 2018) (citing *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 188 (1999) (quoting *Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993)).  This same evidentiary burden should apply with equal force to Second Amendment cases, where equally fundamental rights are similarly at stake. *See Ezell v. City of Chicago*, 651 F.3d 684, 706–07 (7th Cir. 2011) ("Both *Heller* and *McDonald* suggest that First Amendment analogues are more appropriate, […] and on the strength of that suggestion, we and other circuits have already begun to adapt First Amendment doctrine to the Second Amendment context[.]") (citing *Heller*, 554 U.S. at 582, 595, 635; *McDonald*, 130 S.Ct. at 3045).

In this case, however, the State essentially flips this evidentiary burden on its head, arguing that the government has no burden to prove anything in relation to its own proffered justifications. (MTD at 13:19-26.)   Not only does the State's motion suggest that *Plaintiffs* bear the evidentiary burden of showing that the law will *not* advance "public safety,"[7] but it treats its

---

[7]Indeed, what firearm law doesn't somehow *claim* to advance "public safety?"

own stated justifications as simply presumptively true.  If, as the State claims, laws can survive intermediate scrutiny by merely appealing to some people's idea of "common sense" (Motion at 3:16), then, again, true intermediate scrutiny does exist in Second Amendment cases, because it has devolved into nothing more than rational basis review masquerading as "heightened" constitutional scrutiny.

Frankly, these are simply not issues that can be resolved on a motion to dismiss under Rule 12.  The government may or may not eventually be able to clear the required hurdles to survive appropriately-applied, *real* heightened scrutiny, but still, it must do so with *real* evidence and not mere speculation. *See* e.g., *Ezell*, 651 F.3d at 709 (in analogous First Amendment contexts, "the government must supply actual, reliable evidence to justify restricting protected expression based upon secondary public-safety effects"); *City of Renton*, 475 U.S. at 51–52. As Judge Benitez observed looking at largely the same evidence that the State presented in *Duncan v. Becerra*, the State's evidence consists of "incomplete studies from unreliable sources upon which experts base speculative explanations and predictions," "a potpourri" of "amorphous harms to be avoided," and "a homogenous mass of horrible crimes in jurisdictions near and far for which large capacity magazines were not the cause." *Duncan v. Becerra*, 265 F.Supp.3d at 1120.

Finally, it is worth noting – as the Attorney General was fond of pointing out at the hearing on Plaintiffs' motion for a preliminary injunction – that, to date, apparently no circuit court has actually reviewed a Second Amendment case under strict scrutiny – at least not *en banc*.  The two opinions that actually deigned to apply strict scrutiny to Second Amendment claims were quickly reversed by *en banc* panels.  *See Kolbe v. Hogan*; *Tyler v. Hillsdale County Sheriff's Department*, 837 F.3d 678 (6th Cir. 2016).  What does this tell us?  Simply, that many of our circuit courts are hostile to the fundamental, individual right of private firearm ownership recognized in *Heller*, and that Second Amendment challenges to government restrictions, especially in this Circuit, virtually always resolve in favor of the government.  Therefore, we ruefully conclude that "heightened scrutiny" means only "intermediate scrutiny" in Second Amendment cases – and a watered-down version of it at that, resembling analytical devices

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

1   materially indistinguishable from the rational basis review that *Heller* forbade.  The danger of

2   such distorted analyses jeopardizing the core of the fundamental rights recognized in *Heller* is

3   particularly acute where (as here) the government believes it has no particular burden to

4   demonstrate Legislative propriety, aside from offering generic platitudes to "public safety."[8]

5   Thus, should this Court ultimately decide to apply intermediate scrutiny here, we implore the

6   Court to put the government to the test and hold it to the exacting standards of *actual*

7   intermediate scrutiny, which its amorphous justifications cannot survive Indeed, if a federal

8   district court judge could hold that the Plaintiffs in *Duncan* carried the exceptionally high burden

9   of demonstrating a likelihood of irreparable harm so as to warrant the extraordinary remedy of a

10  statewide preliminary injunction against the ban, surely, the Plaintiffs here must be deemed to

11  have at least crossed the low threshold for merely stating a "plausible" claim sufficient to permit

12  them the *opportunity* for an adjudication of the merits of their case.[9]

13      **4.**      **Should There Be Any "Interest-Balancing," Strict Scrutiny is Actually the More Appropriate Test.**

14

15      In actuality, strict scrutiny is the more appropriate standard should this Court engage in

16  any "interest-balancing."  Plaintiffs' claims undisputedly implicate the core of the Second

17  _____

18  [8] The State proceeds with an inflated sense of self-confidence here in light of the recent opinions
19  in *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Attorney General N.J. (ANJRPC)*, 910 F.3d 106 (3d
    Cir. 2018), and *Worman v. Healey*, 293 F.Supp.3d 251 (D. Mass. 2018), which rejected other
20  challenges to different LCM bans. (MTD at 4, 11, 12, 13.) But it overplays the situation right out
    of the gate, claiming that "*several* courts have joined the growing consensus that LCM
21  restrictions are constitutional," when it only cites these *two* extraterritorial cases, one of which is
    a district court case currently on appeal. Moreover, the cases are clearly distinguishable. The
22  *Worman* plaintiffs challenged merely an "enforcement notice" stating the Massachusetts
    Attorney General's Office interpretation of a law concerning "assault weapons," which "lack[ed]
23  the binding effect and force of law" and presented no demonstrable threat of actual enforcement.
    *Worman*, at 260. And in the *ANJPRC* case, as discussed further below, the New Jersey ban at
24  issue there is less burdensome than the ban at issue here, because it contains express exceptions
    permitting owners of LCMs to modify their LCMs to accept ten rounds or fewer and to register
25  and thereafter retain firearms with LCMs that cannot be so modified. *ANJRPC*, 910 F.3d at 111.

26  [9] As of the time this Opposition is filed, the parties in *Duncan* await the district court's ruling on
    the plaintiffs' motion for summary judgment (heard on May 10, 2018). Accordingly, the parties
27  in Duncan have jointly requested a continuation of the pretrial deadlines in that matter,
    contemplating and requesting a final pretrial conference on May 6, 2019. Joint Motion of the
28  Parties to Amend Scheduling Order, No. 3:17-cv-01017-BEN-JLB (ECF Doc. No. 84, filed
    February 1, 2019).

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

1  Amendment right.  *See Fyock*, 779 F.3d at 999; *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*,

2  804 F.3d 242, 255 (2d Cir. 2015); *Friedman*, 784 F.3d at 415; *Heller II*, 670 F.3d at 1261.  While

3  the Ninth Circuit applied intermediate scrutiny in upholding Sunnyvale's ban of large-capacity

4  magazines in *Fyock*, that decision does not preclude application of strict scrutiny here.  The

5  *Fyock* court found the burden of that ban was not substantial enough to invoke strict scrutiny,

6  *Fyock*, 779 F.3d at 999-1000, but the burden to be imposed by this ban is notably more

7  significant. That ban is merely a *citywide* restriction on the possession of large-capacity

8  magazines: one need only step across the border of Sunnyvale City limits to be entirely free of its

9  proscription. The ban here applies across California entirely; there is no escaping its proscription

10  anywhere within this state.  And moreover, as a simple matter of scale, this statewide ban would

11  affect far many more people, many of whom live in outlying counties who are unlikely to even

12  realize that the ban was enacted, and who may often have the greatest need for the LCMs that the

13  State seeks ban since their homes tend to be located relatively far from law enforcement agencies

14  and emergency responders.

15       "The core of the *Heller* analysis is its conclusion that the Second Amendment protects the

16  right to self-defense in the home.  The Court said that the home is 'where the need for defense of

17  self, family, and property is most acute,' and thus, the Second Amendment must protect private

18  firearms ownership." *Silvester v. Harris*, 843 F.3d 816, 820 (9th Cir. 2016) (*Silvester*) (quoting

19  *Heller*, 554 U.S at 628). This is why the Second Amendment protects "arms . . . of the kind in

20  common use . . . for lawful purposes like self-defense," *Heller*, 554 U.S. at 624, and "elevates

21  above all other interests the right of law-abiding, responsible citizens to use arms in defense of

22  hearth and home," *id.* at 624; *Caetano*, 136 S.Ct. at 1028 (quoting *McDonald v. Chicago*, 561

23  U.S. 742, 767 (2010) ("That right vindicates the 'basic right' of 'individual self-defense.'").

24       The LCM ban unquestionably places a substantial burden upon the right to self-defense

25  under the Second Amendment.  If nothing else, as Plaintiffs' complaint persuasively alleges with

26  no realistic possibility of refutation by the State, these magazines are integral operating parts of

27  the modern day semi-automatic firearms for which they are routinely produced, such that many,

28

if not most, firearms are essentially inoperable without them.[10]  This ban would therefore and necessarily impair "the right of law-abiding, responsible citizens to use arms in defense of hearth and home," *Heller*, 554 U.S. at 624, which is "the core of the Second Amendment right," *Silvester*, 843 F.3d. at 821. The countless Californians who have reasonably relied upon the continuing ability to possess these magazines for self-defense would be forced to acquire substitute magazines, and perhaps even substitute firearms if their current firearms only accommodate magazines holding more than ten rounds, in order to salvage some form of their constitutionally-protected right to possess and use firearms for defensive and other lawful means.

The expense of replacing these magazines with substitute magazines or firearms could be substantial in many cases, entirely cost-prohibitive in others, or even render the firearms completely useless in still others, such as where a person has multiple such magazines or simply cannot afford to make the new purchases necessary to replace his or her existing ammunition or firearms subject to the ban. And some such magazines are simply irreplaceable.  (TAC, ¶¶ 11, 12, 13.)  At best, potentially scores these individuals would be left with a lesser level of firearm protection; at worst, some would be left with no firearm protection at all.

In the real world, magazine capacity makes a difference. Whether or not documented instances of firearm self-defense (where the number of shots fired has actually been recorded) have involved more ten rounds of fire is beside the point. The fact that few people may actually require large-capacity magazine for self-defense "should be celebrated, and not seen as a reason to except magazines having a capacity to accept more than ten rounds from Second Amendment protection."  *Fyock v. City of Sunnyvale*, 25 F.Supp.3d 1267, 1276 (N.D. Cal. 2014). Again, "the court will not judge whether the public's firearm choices are often used for self-defense, or even

---

[10] In fact, California law *requires* many models of new pistols sold at retail to have "magazine disconnect mechanisms," which means that these firearms are literally incapable of being fired without a magazine.  *See* Pen. Code §§ 31910(b)(4)-(6), 32000, and 16900 (defining "magazine disconnect mechanism" as "a mechanism that prevents a semiautomatic pistol that has a detachable magazine from operating to strike the primer of ammunition in the firing chamber when a detachable magazine is not inserted in the semiautomatic pistol").

whether they are effective for self-defense – the firearms must merely be preferred." *Id.* at 1278; *see Caetano*, 136 S.Ct. at 1028-29 (Ms. Caetano's mere possession of a stun gun in an encounter with her violent ex-boyfriend "may have saved her life," even though she never deployed it[.]"). Unquestionably, having a large-capacity magazine at one's disposal certainly *could*, and likely *would*, provide a greater level of protection in a self-defense situation given the simple, yet significant fact that one has a greater number of rounds available to fire. Plaintiffs will show, through expert testimony, that this is particularly true for average citizens who, unlike many trained and highly-equipped law enforcement personnel, are generally not as ready to efficiently confront an armed criminal. Citizens faced with such peril are likely to have a single firearm and a single magazine at their disposal, and may be more susceptible to the psychological effects of fear, anxiety, and stress that naturally occur when faced with the threat of deadly violence and tend to deprive one of the focus and clarity of mind necessary to make accurate shots at the attacker. For example, the evidence will show that, in home invasion situations, while average citizens may be able to retrieve their loaded firearms, they typically struggle to properly equip themselves with any additional ammunition. Uniformed police, on the other hand, are usually armed against the very same criminals with two spare magazines, each containing seventeen rounds or more of 9mm, or fifteen rounds of .40 caliber cartridges. Plaintiffs will show that collective law enforcement experience has determined this to be critical to officer survival in confrontations with armed criminals. That is, the threat from the criminals is the same, and the constitutional right to armed self-defense – if it is to afford meaningful protection – must be construed to preserve for average citizens the ability to *defend* themselves just the same.

Especially when coupled with the reality that this ban would effectuate, essentially, a *confiscation* of valuable personal property intrinsic to countless protected firearms, "'it amounts to a destruction of the Second Amendment right . . . unconstitutional under any level of scrutiny.'" *Bauer v. Becerra*, 858 F.3d 1216, 1222 (9th Cir. 2017) (quoting *Silvester*, 843 F.3d at 821). At the very least, this confiscatory ban "'implicates the core of the Second Amendment right and severely burdens that right.'" *Id.* And for that reason, if this law is to be evaluated with

S EILER  E PSTEIN  Z IEGLER  &  A PPLEGATE  LLP
Attorneys at Law

an "interest-balancing" test, it should be subjected to strict scrutiny review. Because the government cannot demonstrate that the ban is *narrowly* tailored to achieve a *compelling* state interest and that no less restrictive alternative exists to achieve the same end, as it must show under this standard, *United States v. Alvarez*, 617 F.3d 1198, 1216 (9th Cir. 2010), it cannot carry its burden and the motion to dismiss this claim should be denied.

**B.     PLAINTIFFS STATE A CAUSE OF ACTION FOR TAKINGS.**

Penal Code § 32310(c) and (d), which as of July 1, 2017, would require individual plaintiffs, and a large class of similarly-affected individuals who lawfully own pre-ban magazines, to dispose of, destroy, or "surrender" their constitutionally-protected personal property, thereby resulting in a taking of such property for which no compensation has been or would be provided, in violation of both the Takings and Due Process Clauses of the United States Constitution and the California Constitution.

The Takings Clause of the United States Constitution guarantees property owners "just compensation" when their property is "taken for public use." U.S. Const., 5th Amend.  The Due Process Clause likewise guarantees property owners due process of law when the State "deprive[s] [them] of ... property."  U.S. Const., 14th Amend., § 1.  And the California Constitution also provides that "Private property may be taken *or damaged*[11] for a public use and

---

[11]The State attempts to dismiss the notion of any damage to personal property interests here by hypothesizing that the magazines may be permanently modified to render them incapable of accepting more than ten rounds of ammunition. (MTD, 16:12-17).  However, the sole basis for the State's claim here is an oblique reference Penal Code § 32425(a) which does not mention permanent modifications at all, Pen. Code, § 32425 (providing an exception to section 32310 for "[t]he lending or giving of any large-capacity magazine to, or possession of that magazine by, a person licensed pursuant to Sections 26700 to 26915, inclusive, or to a gunsmith, for the purposes of maintenance, repair, or modification of that large-capacity magazine").  And the DOJ has withdrawn its proposed "emergency regulations" that had specified permissible forms of permanent modifications to large-capacity magazines.  (RJN, Exhs. G and H.)  Thus, California citizens have no formal guidance whatsoever as to what sort of "modifications" suffice, if any, purportedly satisfy any such an exception. This contrasts with the New Jersey ban at issue in *ANJRPC*, 910 F.3d 106, which *expressly provides* for such an exception within the text of the ban itself, as well for registration of firearms with LCMs that cannot be so modified, *id.* at 111, and thus further highlights the especially onerous nature of California's ban.

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

*only* when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner."  Cal. Const., Art. I, § 19 (emphasis added).

As in this case, a plaintiff suffering an unconstitutional taking without compensation may seek declaratory and injunctive relief as a remedy.  *See e.g.*, *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 528 (2005) (plaintiffs brought suit seeking a declaration that a rent cap effected an unconstitutional taking of its property, and sought injunctive relief against application of the cap); *San Remo Hotel L.P. v. City and County of San Francisco*, 27 Cal.4th 643, 649 (2002) (plaintiffs challenged ordinance under California constitution by petition for writ of mandate); *Jefferson Street Industries, LLC v. City of Indio*, 236 Cal.App.4th 1175, 1195 (2015) (a facial challenge to an ordinance alleged to effect a regulatory taking may be brought through an action for declaratory relief).  In its Order, this Court denied Plaintiffs' motion for a preliminary injunction, in part, based on the proposition that preliminary injunctive relief is not generally available for a takings claim.  (Order at 16:12 – 17:18).  Having already cited to *Babbitt v. Youpee*, 519 U.S. 234 (1997) (affirming lower courts' grant of injunctive and declaratory relief, where statute violated the Takings Clause), we respectfully disagree with that determination, but find that this should have no bearing on the instant motion to dismiss.  *See also*, *Golden Gate Hotel Assn. v. City & County of San Francisco*, 836 F.Supp. 707, 709 (N.D. Cal. 1993) (granting injunction enjoining city from enforcing city hotel conversion ordinance constituting a taking) (reversed on other grounds, 18 F.3d 1482 (9th Cir. 1994)).  A court also has jurisdiction to enjoin the taking of private property before the amount of compensation has been determined.  *Felton Water Co. v. Superior Court*, 82 Cal.App. 382, 388 (1927).

This action is being brought by individual plaintiffs, all of whom are law-abiding owners of pre-ban (grandfathered) magazines, for themselves and on behalf of those in a class who are similarly situated, in a representative capacity pursuant to state law.  *See e.g.*, *Residents of Beverly Glen, Inc. v. City of Los Angeles*, 34 Cal.App.3d 117 (1973) (plaintiffs had standing to bring takings-type challenge to ordinance, in a representative capacity under state law).

1      **1.      The Retroactive Magazine Possession Ban Constitutes a *Per Se* Taking.**

2          A "classic taking" is well understood to be one in which "the government directly

3  appropriates private property for its own use." *Tahoe-Sierra Preservation Council, Inc. v. Tahoe*

4  *Regional Planning Agency*, 535 U.S. 302, 324 (2002).  And likewise, a "paradigmatic taking,"

5  has also been equally well understood to be "a direct government appropriation or physical

6  invasion of private property." *Lingle*, 544 U.S. at 537.  Such takings – where the government

7  directly appropriates the property itself – are *per se* takings for which just compensation must be

8  provided, without regard to factors regarding the economic impact of the regulation or the nature

9  or character of the government action.  *Loretto v. Teleprompter Manhattan CATV Corp.*, 458

10  U.S. 419, 426 (1982).

11          The law has further developed to recognize another type of *per se* taking, one in which

12  government regulation of private property may be so onerous that its effect *is tantamount* to a

13  direct appropriation or ouster.  These regulations are also compensable takings under the Fifth

14  Amendment, and occur when such regulations "completely deprive an owner of '*all*

15  economically beneficial us[e]' of her property." *Lingle*, 544 U.S. at 538 (citing *Lucas v. South*

16  *Carolina Coastal Council*, 505 U.S. 1003, 1019 (1992) (*Lucas*)).

17          Where there has been a *per se* taking, under either theory, compensation *must* be paid to

18  the property owner, *irrespective* of the perceived public good.  *See, e.g.*, *Loretto*, 458 U.S. at

19  426; *Kaiser Aetna v. United States*, 444 U.S. 164, 174 (1979) ("[T]here is no question but that

20  Congress could assure the public a free right of access [...] if it so chose. Whether a statute or

21  regulation that went so far amounted to a 'taking,' however, is an entirely separate question.");

22  *Nat'l Wildlife Fed'n v. I.C.C.*, 850 F.2d 694, 706 (D.C. Cir. 1988) ("government action that

23  causes a permanent physical occupation of real property amounts to a taking 'without regard to

24  whether the action achieves an important public benefit or has only minimal economic impact on

25  the owner'").

26

27          Here, Penal Code § 32310(c) and (d) as amended constitutes both a direct physical

28  appropriation of Plaintiffs' personal property and a scheme so onerous that it deprives Plaintiffs

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

of all economically beneficial use of their property.  It therefore amounts to a *per se* taking, for which compensation *must* be provided.

### a. Section 32310(d) is a Taking Because It Compels the Physical Appropriation of Property.

There can be no question that the statute itself *provides* for the direct physical appropriation of tangible property by the government through forced physical surrender.  The question is whether that is the only practical, viable (and intended) result.  Penal Code § 32310(d) as enacted, states:

> Any person who may not lawfully possess a large-capacity magazine commencing July 1, 2017 shall, prior to July 1, 2017:
>
> (1) Remove the large-capacity magazine from the state;
> (2) Sell the large-capacity magazine to a licensed firearms dealer; or
> (3) Surrender the large-capacity magazine to a law enforcement agency for destruction.

California's ban does *not* expressly provide for LCM owners to "modify their LCMs 'to accept ten rounds or less" or to "register their firearms with LCMs that cannot be 'modified to accommodate ten rounds or less," like the New Jersey ban at issue in the *ANJPRC* case which specifically carves out such exceptions within the text of the ban itself.  *ANJPRC*, 910 F.3d at 111. And, in fact, of California's three limited "options," the third option ("surrender"), we contend, is the true option which the State intends to compel, and to which its statutory scheme would effectively relegate most owners of pre-ban magazines who wish to comply with the law. As Plaintiffs will show, it is the only economically viable option for the vast majority of California pre-ban magazine holders to remain in compliance with the law.

To illustrate, the first purported "option" under subdivision (d), which is to "remove the large-capacity magazine from the state," is simply not viable for the vast majority of the class, i.e., lawful pre-ban magazine holders.  In the first place, the State has taken great pains to prevent or prohibit the sale of such items to others within the confines of this State.  Subdivision (a) of section 32310 specifically states: "[A]ny person in this state who […] *offers or exposes for sale*, […] any large-capacity magazine is punishable by imprisonment in a county jail not exceeding

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

one year or imprisonment pursuant to subdivision (h) of Section 1170."  (Emphasis added.)

Therefore, conscientious California pre-ban large capacity magazine holders who wish to dispose

of their property using the first "option" apparently may not go on the Internet, offer it for sale,

or even call a prospective purchaser in another state to arrange for the sale.  They must, by

statute, physically drive to a border state before they may even begin to offer or expose it for

sale, or even begin to *look* for a willing buyer or receiver.  This is simply, economically and

practically, untenable.  Indeed, the notion that an actual market exists for 18+ year-old firearms

parts is, in itself, highly doubtful.

It is apparent that the Legislature and drafters of Proposition 63 simply and callously

assumed (or were simply indifferent to the fact) that any lawful pre-ban large-capacity magazine

holder wishing to take the magazine out of state to preserve his or her constitutionally-protected

right to *keep* and bear arms has a friend, relative, or other recipient willing to take or bear the

costs of storing firearms or firearms parts on the holder's behalf.  This is simply unrealistic.  Yet,

this is the only option available to the class of pre-ban magazine holders who actually wish to

*keep* their firearms, intact or otherwise.[12]  If such owners wish to keep their firearms intact, they

must essentially lose access to them – a substantial deprivation of their rights and interests in the

property that in itself constitutes a taking.  *See Nixon v. United States*, 978 F.2d 1269, 1285 (D.C.

Cir. 1992) ("The retention of some access rights by the former owner of property does not

preclude the finding of a *per se* taking.").

The second purported "option" under § 32310(d) –  to sell to a "licensed firearms dealer"

– is equally illusory and (from a takings perspective) suffers from the same defect as the first

option, i.e., it simply presupposes that there is an actual market for such items.  That is not only a

callous assumption, but it is a false one.  There is no guarantee (or reason to assume) that

licensed firearms dealers would even be willing to participate in this state-endorsed confiscation

---

[12]Again, and as will be proven at trial, ammunition magazines are not separate artifacts, but are considered to be and are inherent operating parts of functioning firearms; semi-automatic firearms are essentially inoperable without them. (TAC, ¶ 32).

scheme, forcing upon California gun owners the gross indignity of disassembling and selling away valuable firearms parts they have lawfully held for years.  And moreover, from a purely economic point of view, there is no reason to assume that licensed firearms dealers would even be willing to buy such items, at cost, or even at all.  Indeed, there are very few people within the State to whom licensed firearms dealers could resell such items, except for the small class of exempt people such as law enforcement officers.  *See* Pen. Code § 32450(c).

But in the bigger picture, of course, the government's dispossession of personal property, by *forcing* its sale to third parties, must itself be considered no less than a taking in the first place.  At one time, during a *bona fide* national emergency/World War, the government routinely did just this, forcing property owners to relinquish valuable materiel in forcing its sale to third parties for wartime use.  And in such instances, the courts routinely held these commandments to be takings, whether or not the property was directly appropriated by the government.  *See Dore v. United States*, 97 F. Supp. 239, 242 (Ct. Cl. 1951) ("When, as here, the United States exercises its authority to order delivery and in its sovereign capacity forces the 'sale' of property to it for public use there is, in our opinion, a 'taking' and just compensation must be made."); *Edward P. Stahel & Co. v. United States*, 78 F. Supp. 800, 804 (Ct. Cl. 1948) ("But to say that when the Government forbids an owner of property to make any other use of it, and requires him to sell it, upon request, to the Government, or its designee who will use it for a Government purpose, is not a taking of the property for public use, would be to make the constitutional right contingent upon the form by which the Government chose to acquire the use of the property.").

And therefore, the State cannot simply defer, deflect, or "outsource" its duty to provide just compensation under the Takings Clause, by just *assuming* that a market for such forced sales exist.  "A 'sale' implies willing consent to the bargain.  A transaction although in the form of a sale, but under compulsion or duress, is not a sale."  *Dore*, 97 F. Supp. at 242.  "'Just compensation,'" we have held, means in most cases the fair market value of the property on the date it is appropriated. [...] 'Under this standard, the owner is entitled to receive 'what a willing buyer would pay in cash to a willing seller' at the time of the taking.'"  *Kirby Forest Indus., Inc.*

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

1  *v. United States*, 467 U.S. 1, 10, 104 S.Ct. 2187, 2194 (1984) (citation omitted).  A true market

2  for these old pre-ban magazines – comprised of *voluntary* buyers and sellers – simply does not

3  exist.

4  　There being no viable, true market for these pre-ban magazines, (again, which essentially

5  cannot be offered for sale while within this State), that leaves only one plausible, practical option

6  for a conscientious pre-ban magazine holder to comply with the law: to "surrender" it to a law

7  enforcement agency for destruction.  And let us make no mistake: this is the option which the

8  State wants, for (a) it is the only viable option as discussed above, and (b) it is hard to imagine

9  that such large-capacity magazines which the State believes "are disproportionately used in

10  crime, and feature prominently in some of the most serious crime, including homicides, mass

11  shootings, and killings of law enforcement officers," (MTD at 3), are somehow acceptable to

12  export to other parts of the country.  And the destruction option is, for purposes of this

13  discussion, a direct physical appropriation of previously lawfully-held property, whether the

14  government takes title to it or not.  It is therefore a taking, for which compensation has not even

15  been considered, or would be provided.[13]

16  　Therefore, by enactment of this confiscatory statutory scheme, the State has or will have

17  engaged in a taking.  "[T]o constitute a taking under the Fifth Amendment it is not necessary that

18  property be absolutely 'taken' in the narrow sense of that word to come within the protection of

19  this constitutional provision; it is sufficient if the action by the government involves a direct

20  interference with or disturbance of property rights.  […]  Nor need the government directly

21  appropriate the title, possession or use of the properties[.]"  *Richmond Elks Hall Ass'n v.*

22  

23  _____

24  

25  [13] The Legislature, in enacting SB 1446, never even considered the question of compensation at all, nor did it consider the question of a viable market for the forced sale of these items.  We

26  know this because the Legislative analysis simply assumed, as discussed below, that the retroactive magazine ban was not a taking in the first place, but was a valid exercise of its police

27  power.  (*See* Senate Rules Committee Analysis dated 5/19/16 regarding SB 1446, at pp. 4-5, Plaintiffs' Req. for Jud. Notice, Exhibit B.)  Moreover, there is nothing in the legislative history

28  of SB 1446, or Proposition 63, that indicates that the drafters/proponents ever even considered a study of compensation, or a viable market for the forced sale of these items.

1  *Richmond Redevelopment Agency*, 561 F.2d 1327, 1330 (9th Cir. 1977) (citations omitted);

2  *Kaiser Aetna*, 444 U.S. at 175 ("[T]his Court has observed that '[c]onfiscation may result from a

3  taking of the use of property without compensation quite as well as from the taking of the

4  title[.]") (quoting *Chicago, R. I. & P. R. Co. v. United States*, 284 U.S. 80, 96 (1931)).

5           **b.    The Effect of Section 32310(c) and (d) Constitutes a Taking Because
                the Statutory Scheme Completely Deprives the Owners of All
6                Economically Beneficial Use of Their Property.**

7           Irrespective of whether the statute as amended will substantially result in direct physical

8  appropriation of the pre-ban magazines, one thing is clear: it is, in any event, compelling

9  *dispossession* of this property.  And thus, it amounts to a compensable taking, which, as noted,

10  even goes beyond the New Jersey ban, because the law will have completely deprived the

11  owners of *all* economically beneficial use of their property. *Lucas*, 505 U.S. at 1019; *Lingle*, 544

12  U.S. at 538.  In doing so, the State has deprived plaintiffs and those similarly situated of "the

13  entire 'bundle' of property rights," i.e., their rights to possess, use, and dispose of these items as

14  they see fit.  *Horne v. Department of Agriculture*, ___ U.S. ___, 135 S.Ct. 2419, 2428 (2015).

15

16           In *Horne*, the Supreme Court confirmed that the Takings Clause applies to direct

17  appropriations of personal property, included within its description of a "paradigmatic" taking.

18  That this was the first time that the Supreme Court squarely addressed the issue of whether

19  personal property was subject to the Takings Clause is somewhat remarkable because it is self-

20  evident.  However, it has long been established that laws or regulations which essentially destroy

21  the value of personal property, or require its surrender, may and often do constitute a taking,

22  thereby entitling the property owner to compensation or other relief.

23           In fact, some 40 years ago, in *Andrus v. Allard*, 44 U.S. 51 (1979) (*Allard*), the Supreme

24  Court considered the question of whether a law that affected the value of personal property could

25  be challenged, among other grounds, for the reason that it constituted a taking without

26  compensation – or more precisely, whether it violated the plaintiffs' property rights under the

27

28

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

Fifth Amendment.[14]  The specific question presented to the court was whether federal

conservation statutes designed to prevent the destruction of certain species of birds violated the

Fifth Amendment rights of the plaintiffs.  The conservation statutes in question prohibited

generally the sale of protected bird parts, but not the possession thereof.  The plaintiffs were

engaged in the trade of Indian artifacts, and in fact, had been prosecuted and fined for *selling*

such artifacts which contained the feathers of protected birds.  444 U.S. at 54-55.  Ultimately, the

court, considering the merits of the claim, concluded that the conservation statutes did not

amount to a taking, the primary reasons for which had to do with the enduring economic value of

the property, and that the laws did not completely destroy that bundle of property rights to

deprive the owners of any use whatsoever.  But in this regard, the court stated:

> The regulations challenged here do not compel the surrender of the artifacts, and
> there is no physical invasion or restraint upon them. Rather, a significant
> restriction has been imposed on one means of disposing of the artifacts. But the
> denial of one traditional property right does not always amount to a taking. At
> least where an owner possesses a full "bundle" of property rights, the destruction
> of one "strand" of the bundle is not a taking, because the aggregate must be
> viewed in its entirety. [. . .]  In this case, it is crucial that appellees retain the
> rights to possess and transport their property, and to donate or devise the protected
> birds.

444 U.S. at 65–66 (internal citations omitted).

Unlike the regulations in *Allard*, the relevant portions of the LCM Ban, specifically §

32310(c) and (d) as amended, *do indeed* compel the surrender of lawfully-held personal

property.  The magazine ban as enacted is a complete and retroactive ban on the *possession* of

previously lawfully-held, and constitutionally-protected, personal property.  Unlike the plaintiffs

in *Allard*, but like the plaintiffs in *Horne*, the retroactive ban on the possession of pre-ban

magazines in fact causes Plaintiffs here to "lose the entire 'bundle' of property rights in these

items.  The distinction from *Allard* that Chief Justice Roberts drew in *Horne* directly applies

---

[14]The court noted that although the argument was cast in terms of "economic substantive due process," the language used by the district court was consistent with the terminology of the Takings Clause.  444 U.S. at 64, n. 21.

here: "*Allard* is a very different case.  […] [T]he owners in that case retained the rights to possess, donate, and devise their property.  In finding no taking, the Court emphasized that the Government did not 'compel the surrender of the artifacts, and there [was] no physical invasion or restraint upon them.' […]  Here of course the raisin program requires physical surrender of the raisins and transfer of title, and the growers lose any right to control their disposition."  *Horne*, 135 S.Ct. at 2429 (citing *Allard*, 444 U.S. at 65-66).

Again, this statutory scheme is built upon the assumption that all "pre-ban" large-capacity magazine holders in this State simply have the means and the ability to store their personal property out of State, or could simply sell the magazines to a licensed firearm dealer – with no supporting analysis of the likely burdens or costs for such out-of-state storage or the existence of a market for such forced sales. This reveals the State's true motive here: to force law-abiding gun owners to surrender these valuable and integral components of their firearms. In other words, the State's ultimate goal is simply confiscation and destruction of Plaintiffs' lawfully-held personal property.

### c.    The Statute is Not a Valid Exercise of Police Power.

Much of the authority upon which the State relies in claiming this confiscatory ban is a valid exercise of its "police power" is entirely inapposite because it pre-dates the paradigmatic shifts in *Heller* and *Lucas*. (MTD at 18, n. 13.) Second, the State's call to "police power" is largely irrelevant if this Court finds this statutory scheme to be a *per se* taking.  Again, *per se* takings require compensation – irrespective of any "public good" that is asserted or achieved. *See Loretto*, 458 U.S. at 425 (Assuming a valid exercise of the state's police power, the court stated: "It is a separate question, however, whether an otherwise valid regulation so frustrates property rights that compensation must be paid.").

On the first point, regarding the purported police power to regulate "dangerous weapons," the case upon which the Legislature primarily relied in determining that it had the unilateral authority to enact this ban without running afoul of the Takings Clause is *Fesjian v. Jefferson*, 399 A.2d 861 (D.C. Ct. App. 1979).  (*See* Plaintiffs' Req. for Jud. Notice, Exhibit B, at p. 6.)

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

1  This pre-*Heller* decision applied a simple rational basis test to an important fundamental right,

2  albeit on equal protection grounds.  399 A.2d at 864.  After *Heller*, the proper inquiry would be

3  whether the firearms themselves are in common use, for lawful purposes, and are not dangerous

4  and unusual.  *Heller*, 554 U.S. at 627.  And as to the specific takings argument, it could fairly be

5  said that in *Fesjian* the D.C. Court of Appeals simply gave short shrift to the takings argument

6  based on the assumption that *all* firearms could be summarily banned in a pre-*Heller* District of

7  Columbia.  In one paragraph, where the court assumed *arguendo* that the D.C. statute prohibiting

8  the plaintiffs (representing themselves in pro per) from registering their weapons was a taking,

9  the court simply concluded that "a taking for the public benefit under a power of eminent domain

10  is, however, to be distinguished from a proper exercise of police power to prevent a perceived

11  public harm, which does not require compensation. […]  That the statute in question is an

12  exercise of legislative police power and not of eminent domain is beyond dispute."  *Fesjian*, 399

13  A.2d at 866.  There was no discussion or analysis whatsoever as to whether the D.C. statute

14  amounted to forced dispossession, or deprived plaintiffs of the economically beneficial use of

15  their property, constituting a *per se* taking.  Those Supreme Court takings cases, of course, came

16  later.

17       Indeed, *Heller* completely changes the landscape as to takings cases involving firearms

18  since courts may no longer simply assume that *all* firearms could be banned within any given

19  jurisdiction.  For example, in *Quilici v. Vill. of Morton Grove*, 532 F.Supp. 1169 (N.D. Ill. 1981),

20  the district court ruled that a village ordinance which completely banned possession of handguns

21  except by peace officers, members of armed forces, and licensed gun collectors, but which

22  allowed continued recreational use of handguns at licensed gun clubs, was a reasonable exercise

23  of police power.  As in *Fesjian* (and in fact, citing to it), the district court made short work of the

24  takings argument, summarily reasoning: "It is well established that a Fifth Amendment taking

25  can occur through the exercise of the police power regulating property rights. In order for a

26  regulatory taking to require compensation, however, the exercise of the police power must result

27  in the destruction of the use and enjoyment of a legitimate private property right."  *Quilici*, 532

1   F.Supp. at 1183-84, aff'd, 695 F.2d 261 (7th Cir. 1982).  If a court believes it can simply uphold

2   a ban *all* firearms without regard to the Second Amendment, it is a short step to dismiss a related

3   takings claim as being a valid exercise of police power.  All pre-*Heller* takings cases involving

4   firearms, including *Fesjian*, are inherently suspect for this very reason alone.  Understanding this

5   to be the argument, the State has cited one post-*Heller* case which upheld a firearm seizure and

6   dismissed the plaintiff's takings claim, *Burns v. Mukasey*, 2009 WL 8756489 at *5 (E.D. Cal.

7   2009) (MTD at 18, n. 13.)  But in *Burns*, the district court did not believe at the time that the

8   Second Amendment was applicable to the states (as the decision pre-dated *McDonald*), *id.*, at *4.

9   Furthermore, the district court in *Burns* similarly gave short shrift to the plaintiff's takings claim,

10  limited to a discussion of whether his firearm constituted a taking for "public use," and there was

11  no discussion regarding the alleged police power of the state.  *Id.*, at *5.  *Burns* therefore has no

12  applicability here.

13        The second point of significance is, while we do not concede that the retroactive LCM

14  ban involves an exercise of "police power," *it simply does not matter* if it does.  Any reliance

15  upon older, pre-*Lucas* cases in adopting some type of bright-line rule regarding the payment of

16  compensation is, today, a fools' errand, just as any reliance upon hoary cases that attempted to

17  draw such lines is insufficient to uphold this ban.  Notably, *Lucas*, the very case that gives us its

18  eponymous test regarding deprivation of all economically beneficial use of a claimant's property,

19  also involved the alleged exercise of a state's "police power."  In *Lucas*, the owner of two

20  beachfront lots intended to build houses there, but was prohibited by a statute forbidding any

21  permanent inhabitable structures on the land in question.  505 U.S. at 1008.  The plaintiff sued in

22  state court, and the South Carolina Supreme Court ultimately rejected his challenge under the

23  Takings Clause, holding that in the legitimate exercise of its police power, the state could restrict

24  his ability to use the land in order "to mitigate the harm to the public interest that [such a] use of

25  his land might occasion." *Id.*, at 1020–21.  The *Lucas* Court disagreed.  It held that, when "the

26  State seeks to sustain regulation that deprives land of all economically beneficial use, ... it may

27  resist compensation only if the logically antecedent inquiry into the nature of the owner's estate

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

shows that the proscribed use interests were not part of his title to begin with." *Id.*, at 1027.  And thus, the high court remanded the case for the state courts to determine, under state law, whether "background principles of ... property law" prohibited the future uses that the owner intended. *Id.*, at 1031.

The rule post-*Lucas* now and simply boils down to this: Does the regulation result in the complete elimination of the property's value or beneficial use?  If so, it amounts to the equivalent of a physical appropriation, *see Lucas*, 505 U.S. at 1017; *Lingle*, 544 U.S. at 539–40, and compensation must be paid.  The *Lucas* court itself strongly implied that "many of [its] prior opinions" which wrestled with the concept of "'harmful or noxious uses' of property" were simply "early attempt[s] to describe in theoretical terms why government may, consistent with the Takings Clause, affect property values by regulation without incurring an obligation to compensate—a reality we nowadays acknowledge explicitly with respect to the full scope of the State's police power." *Lucas*, 505 U.S. at 1022–23.  With regard to these early cases, the court stated:

> When it is understood that "prevention of harmful use" was merely our early formulation of the police power justification necessary to sustain (without compensation) any regulatory diminution in value; and that the distinction between regulation that "prevents harmful use" and that which "confers benefits" is difficult, if not impossible, to discern on an objective, value-free basis; *it becomes self-evident that noxious-use logic cannot serve as a touchstone to distinguish regulatory "takings"—which require compensation—from regulatory deprivations that do not require compensation.*

505 U.S. at 1026 (emphasis added.)  Accordingly, the older line of cases, starting with *Mugler v. Kansas*, 123 U.S. 623 (1887), which attempted to distinguish between valid exercises of "police powers" and takings, simply does not result in a bright-line rule today.  In fact, it is quite likely that *Mugler* – decided under today's standards – would have a different result, and it certainly would be subject to a different analysis.  The dispositive fact upon which the court relied in *Mugler* was that the plaintiff had not been deprived of his property.  "He still has possession of it. He still has the right to sell it. Nor is it claimed that he is deprived of its use generally. The only claim is that he is deprived of the privilege to use it for the manufacture of liquors for sale

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

1   as a beverage." *Mugler*, 123 U.S. 623, 8 S.Ct. at 285–86.  So it was easy for the court simply to

2   conclude, as a binary matter, that "[t]he law was within the police power of the state." *Id.*, at

3   286.  Today, of course, the analysis would hinge not upon physical possession, but whether the

4   plaintiff was deprived of all economically beneficial use thereof.  *Lucas*, 505 U.S. at 1019.[15]

5       The State's Motion suggests that *Lucas* is limited to land use cases, and "it is not clear

6   that it is applicable here."  (MTD at 17:16-19).  But that is not correct.  *See*, *Bair v. United*

7   *States*, 515 F.3d 1323, 1328 (Fed. Cir. 2008) ("In cases of personal property, the background

8   principles are defined by the law existing at the time that the property came into existence. Any

9   lawful regulation defining the scope of the property interest that predates the creation of that

10  interest will 'inhere in the title' to the property.").  Moreover, *Lucas* merely restated a preexisting

11  general principle that any limitation on the use of any property so severe could not be *newly*

12  *legislated or decreed* without providing compensation.  *See*, *United States v. Security Industrial*

13  *Bank*, 459 U.S. 70, 78 (1982) (there was "substantial doubt" as to whether the retroactive

14  destruction of creditors' liens could comport with the Takings Clause).

15      Here, there is no question – and the State cannot legitimately dispute – that Plaintiffs and

16  similarly-situated, pre-ban magazine holders (of whom there may be hundreds of thousands – *see*

17  Req. for Jud. Notice Exhibit A), have and have had a valid possessory interest in their personal

18  property, lawfully and legally held, without controversy for many years – 17 years or more.

19  *Their* property was not a nuisance 17 years ago, and it is not today.  There is no evidence that

20  *any* legal "pre-ban" magazine holders are using or ever have used their property in noxious or

21  dangerous ways.  Instead, the statute is a categorical ban on possession itself, designed to punish

22  Plaintiffs and others similarly situated, as a supposed remedy to the tragedies of mass shootings

23  and other incidents of "gun violence" – when there is no evidence that any of these "pre-ban"

---

[15]And even if the prohibitory liquor law were found not to deprive the plaintiff of *all* economically beneficial use of the distillery, that would not end the story either.  The law's effect would still be subject to the regulatory takings analysis required by *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978), as discussed below.

1   magazines, especially those owned by Plaintiffs, are or have been used in such incidents.

2   Plaintiffs are being completely dispossessed of this lawfully-held, and Constitutionally-protected

3   property either as a forced physical surrender or its equivalent by the destruction of all beneficial

4   use thereof.  It is, quite simply, a *per se* taking for which compensation must be provided,

5   irrespective of the purported public good or the police power of the State.

6       **2.    The Retroactive Magazine Possession Ban Constitutes a Burdensome**
            **Regulatory Taking.**
7

8       The same analysis alternatively supports a conclusion that the retroactive ban on the

9   prohibition of these grandfathered, pre-ban magazines constitutes an unreasonably burdensome

10  regulatory taking, which also requires compensation.  Aside from the direct appropriations of

11  and interference with property constituting *per se* takings, discussed above, the Supreme Court

12  has held, starting with *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 (1922), that compensation

13  is also required for a "regulatory taking" – a restriction on the use of property that goes "too far."

14  260 U.S. at 415; *Horne*, 135 S.Ct. at 2427.  "And in *Penn Central Transp. Co. v. New York City*,

15  [...], the Court clarified that the test for how far was 'too far' required an 'ad hoc' factual

16  inquiry."  *Horne*, 135 S.Ct. at 2427.  "Primary among those factors [in *Penn Central*] are '[t]he

17  economic impact of the regulation on the claimant and, particularly, the extent to which the

18  regulation has interfered with distinct investment-backed expectations.' [...]  In addition, the

19  'character of the governmental action – for instance whether it amounts to a physical invasion or

20  instead merely affects property interests through 'some public program adjusting the benefits and

21  burdens of economic life to promote the common good' – may be relevant in discerning whether

22  a taking has occurred.'"  *Lingle*, 544 U.S. at 539; *Palazzolo v. Rhode Island*, 533 U.S. 606, 617

23  (2001).

24      In essence, the "principal guidelines" under *Penn Central* are the economic impact on the

25  regulation and the character of the government action.  Each test focuses on the severity of the

26  burden that the government imposes upon these private property rights.  Here, the economic

27  burden on the Plaintiffs, and upon the class of similarly-situated individuals they represent, is

28

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

substantial.  As discussed above, to the extent that the forced dispossession of the magazines is not a taking *per se*, there is no viable market for the "forced sale" of these items.  In some cases, the value of these "pre-ban," "grandfathered" magazines is substantial.  (TAC, ¶ 11-13.)  Some of these magazines are substantial in value because they are the only type of magazine that was ever made for that particular firearm (*id.*, ¶ 13) or the manufacturer never made original ten-round or fewer magazines for that firearm (*id.*, ¶ 11, 13).  Ironically, the very thing that makes all of these magazines so valuable and essentially irreplaceable is the fact that their further acquisition and importation into the State is illegal under § 32310(a).

And again, even generously assuming that some semblance of a market exists, the law does not permit the offering for sale of these items while within the confines of this State.  Pen. Code § 32310(a).  Unlike the plaintiffs in *Fyock*, this is not simply a matter of taking items of personal property to a neighboring township a few miles away in order to escape the prohibition. The statewide scale, combined with a restrictive law preventing the interstate or extra-state sale of these items, makes the burden of compliance far more substantial.  Contrast the case of *Quilici v. Vill. of Morton Grove*, 532 F. Supp. 1169 (N.D. Ill. 1981), where, in rejecting the takings challenge to a village-wide ban on handguns, the district court concluded: "The Morton Grove ordinance does not go that far. The geographic reach of the ordinance is limited; gun owners who wish to may sell or otherwise dispose of their handguns outside of Morton Grove."  532 F.Supp at 1184.  Such is clearly not the case here.

We measure these severe burdens upon the Plaintiffs, of course, against the character of the government's action.  Here, there can be no substantial or legitimate justification for the retroactive confiscation of large-capacity magazines that are now at least 17 years old, and in many cases, even older.  The stated, express justification for this massive retroactive ban is to prevent the incidence of horrific mass shootings that have occurred over the past few years, most notably culminating in the terrorist attacks in San Bernardino in 2015.  But an objective and careful examination of the data shows that to the extent mass shootings occur in California, pre-ban, large-capacity magazines lawfully held in California since well before 2000 have not been

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

1    and are not the instrumentality.  Plaintiffs will indeed show at trial that there is little or no data to

2    support any conclusion that pre-SB 23 "grandfathered" large-capacity magazines have been

3    involved in such incidents.  And when large-capacity magazines have been used (e.g., in San

4    Bernardino), they were imported illegally in contravention of existing law prohibiting their

5    importation.  The data indicate an extremely low probability that any of the large-capacity

6    magazines used in mass shootings since 2000 were grandfathered magazines.  Thus, there is

7    virtually no benefit to be gained in (or legitimate justification for) banning possession of large-

8    capacity magazines that have been legally and peaceably owned since 2000.  There is indeed no

9    evidence that large-capacity magazine bans in general have anything to do with reducing murder

10   rates, or gun homicides in particular.

11        In sum, whether the retroactive ban on the continued possession of personal property,

12   legally held for at least 17 years and more, constitutes direct appropriation, completely

13   eliminates their value, or substantially interferes with Plaintiffs' property rights rising to the level

14   of a regulatory taking, compensation must be provided.  In this case, the State never even

15   considered that it might need to provide compensation as a taking, instead presumptively

16   assuming that it could simply dispossess Plaintiffs of long-held, lawfully-owned, and integral

17   parts of firearms under its "police powers."  It was wrong in so assuming, and should therefore

18   be prevented from enforcing this retroactive ban, unless and until it provides for such

19   compensation or amends the law to keep grandfathered magazines legal within this State. In

20   response to Plaintiffs' legitimate concerns about the failure of the State to provide any sort of

21   claims process through which LCM owners could seek compensation, the State says this Court

22   can and should ignore these concerns because they amount to nothing more than a "legal

23   conclusion." (MTD at 17:26-28.) But, of course, this is a purely *factual* point: the State either did

24   or did not provide such a process, and the State does not claim it did. Thus, these concerns

25   cannot be swept aside and, instead, must be accepted as true along with the rest of Plaintiffs'

26   well-pleaded facts that the State has not even attempted to refute in its motion.

27

28

**SEILER EPSTEIN ZIEGLER & APPLEGATE LLP**
Attorneys at Law

C.   **PLAINTIFFS STATE CAUSES OF ACTION FOR VAGUENESS AND OVERBREADTH (COUNTS III & V).**

    1.   **The Vagueness Claims Stand On Their Own In Stating Colorable Claims For Relief That Easily Survive The State's Motion To Dismiss.**

In contesting Plaintiffs' vagueness concerns, the State overlooks the irony of its reliance upon *Karlin v. Foust*, 188 F.3d 446 (9th Cir. 1999). Drawing directly from the high court's opinion in *Grayned v. City of Rockford*, 408 U.S. 104 (1972), the *Karlin* court emphasized in no uncertain terms  the key constitutional principle at the bottom of this claim – that "a law is unconstitutional 'if its prohibitions are not clearly defined.'"  *Id*. at 458 (quoting *Grayned*, at 108).  Harnessing the high court's commanding analysis, the Ninth Circuit emphasized the core concerns underlying Plaintiffs' void-for-vagueness claim:

> Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application.

*Karlin* at 458 (quoting *Grayned* at 108-09).

Thus, "there are two means by which a statute can operate in an unconstitutionally vague manner." *Karlin*, 188 F.3d at 458.  "First, a statute is void for vagueness if it fails to provide 'fair warning' as to what conduct will subject a person to liability." *Id*.  "Second, a statute must contain an explicit and ascertainable standard to prevent those charged with enforcing the statute's provisions from engaging in 'arbitrary and discriminatory' enforcement." *Id*. at 458-59.  The statutory scheme at issue here woefully fails these fundamental requirements of due process, and there is no basis for the State's setting aside of those concerns simply because the claims implicate fundamental rights other than free speech.

## 2. The DOJ's Own Findings Poignantly Demonstrate the Serious Vagueness Problems that the State Seeks to Bypass in Ignoring This Evidence.

Significantly, the DOJ itself – the very arm of the State charged with the crucial task of enforcing the LCM ban against California citizens – has publicly acknowledged that the ban as written failed to satisfy either requirement of due process.  The DOJ went on record to declare that "emergency regulations" were necessary to "provide guidance to California residents" on the most basic and fundamental enforcement issue – "how to comply with the ban" – and that without such guidance, citizens would not understand the core provisions delineating the "options for disposal of large-capacity magazines" or the option of "reducing the capacity of a large-capacity magazine."  (TAC, Exh. A at 1-2, 3, 5).  In the DOJ's own words, this clarification was necessary to "avert serious harm to public peace, health, safety, or general welfare" that would ensue should the LCM ban be enforced without such emergency regulations. *Id*. at 2.

But after issuing such "emergency regulations," it later retracted them after receiving criticism that it had failed to comply with the ordinary notice and comment process.  And, crucially, the DOJ has never publicly retracted any of its pronouncements that effectively declared the LCM ban unconstitutionally vague and ambiguous because, in its own schooled opinion, it was not possible to enforce this law in a clear, consistent, and non-discriminatory manner based upon the face of the LCM ban alone.  This is compelling evidence of inherent vagueness, coming directly from the DOJ, and starkly exposes the reality the State seeks to avoid in blithely claiming that "[t]here can be no question that section 32310 reasonably apprises the public as to what conduct is prohibited from under the statute."  (MTD at 20:17-18.)  Indeed, how could there be "*no* question" here when a federal district court judge has painstakingly detailed the vagueness concerns subsisting throughout this very statutory scheme? *See Duncan v. Becerra*, 265 F.Supp.3d 1106, 1111 (S.D. Cal. 2017) (where Judge Benitez illustrated in detail realistic concerns about how California's increasingly "burdensome web of restrictions on the rights of law-abiding responsible gun owners to buy, borrow, acquire, modify, use, or possess

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

1    ammunition magazines able to hold more than 10 rounds" is "so vague that men of common

2    intelligence must necessarily guess at its meaning") (quoting *Connally v. General Constr. Co.*,

3    269 U.S. 385, 391 (1926).

4        **3.    The Legislative and Initiative History Inevitably Compel the Conclusion that the Two Conflicting Versions of the LCM Ban Both Remain in Effect.**

5

6        The DOJ had much reason for the urgent concerns that spurred its "emergency" response

7    to the "serious harms" posed by the LCM ban's lack of clarity in enforcement.   Material

8    uncertainties and inconsistencies abound within the statutory scheme.   The starting point is

9    inevitably the two parallel versions of the scheme under SB 1446 and Proposition 63, which have

10   become a major subject of debate in this litigation.   The State continues to insist that the

11   significant substantive differences between the two versions may be swept aside with the general

12   principle that a later enacted law typically prevails over an earlier law on the same subject.

13   (MTD 19:19-23.) But no such simplistic solution exists for this problem.   In fact, the primary

14   authority the State cites in support of its proposition is the opinion in *People v. Bustamante*, 57

15   Cal.App.4th 693 (1997), which drew its analysis from decisional and statutory law that can only

16   undermine the State's position.

17       The *Bustamante* court relied upon the California Supreme Court case of *People v.*

18   *Dobbins*, 73 Cal. 257 (1887) and Government Code § 9605, to conclude that a later-enacted

19   criminal statute prevailed over an earlier criminal statute defining the same general criminal

20   offense.   *Bustamante*, 57 Cal.App.4th at 701.   Both of these authorities make clear this general

21   rule about later-enacted statutes is actually a rebuttable presumption that dissolves in the face of

22   evidence that the later-enacted law is not intended to prevail over earlier laws on the same

23   subject. *Dobbins*, at 259 (explaining that this rule creates a "presumption" that "when two laws

24   upon the same subject, passed at different times, are inconsistent with each other, the one passed

25   last must prevail," rebuttable with evidence of contrary legislative intent regarding which

26   prevails); Govt. Code, § 9605 ("In the absence of any express provision to the contrary in the

27   statute which is enacted last, it shall be conclusively presumed that the statute which is enacted

28

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

1   last is intended to prevail over statutes which are enacted earlier at the same session . . .").

2       Something else the *Bustamante* decision does not mention is the closely related

3   presumption of statutory interpretation that, absent clear evidence to the contrary, the later

4   enactment of a law is not intended to repeal or supplant earlier laws on the same subject and

5   instead both statutes are intended to be enforced.  *People v. Carter*, 131 Cal.App.3d 177, 181

6   (1933); *Western Mobile Assn. v. County of San Diego*, 16 Cal.App.3d 941, 948 (1971).  Unless it

7   is clear that a repeal was intended, no such intent will be implied, and "the courts are bound to

8   maintain the integrity of both statutes" insofar as they may reasonably be read to stand together.

9   *Western Mobile,* at 948. The State has made no effort to refute or address any of these factors

10  that sideline the *Bustamante* opinion as not controlling. And here, there is no suggestion in the

11  relevant history that Proposition 63 was intended to repeal or prevail over SB 1446 in

12  establishing the LCM ban.  If anything, the history indicates to the contrary, that SB 1446 was

13  intended to modify Proposition 63 or at least remain simultaneously in effect.  The DOJ made its

14  own assessment of this issue, publicly declaring in its Finding of Emergency, issued on

15  December 15, 2016, after Proposition 63 had become effective, that "[i]n anticipation of

16  [Proposition 63's] passages [sic], *the Legislature pre-amended Proposition 63* with the passage

17  of Senate Bill 1446 . . . and [t]he clarifying amendments take effect on January 1, 2017." (Req.

18  for Jud. Notice, Exh. A at p. 1 (italics added)).

19      Indeed, the Legislature was fully aware of the initiative's final content in drafting SB

20  1446, since that version had been established since December 2015 – several months before SB

21  1446 was enacted into law – and yet nothing in the history indicates any intent to repeal that law

22  or render its effectiveness subject to the fate of Proposition 63.  The content of SB 1446 itself

23  evinces an intent for that law to remain in effect.  For instance, the version of § 32406 under SB

24  1446 establishes five exemptions to the ban that are absent from the version enacted under

25  Proposition 63.  These protect: historical societies that keep large-capacities magazines

26  "unloaded, properly housed within secured premises, and secured from authorized handling;"

27  one who "finds a large-capacity magazine, if the person is not prohibited from possessing

28

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

firearms or ammunition, and possessed it no longer than necessary to deliver or transport it to the nearest law enforcement agency;" forensic laboratories, and their agents or employees, "in the course and scope of [their] authorized activities;" "[t]he receipt or disposition of a large-capacity magazine by a trustee of a trust, or an executor or administrator of an estate, including an estate that is subject to probate, that includes a large-capacity magazine;" and "[a] person lawfully in possession of a firearm that the person obtained prior to January 1, 2000, if no magazine that holds 10 or fewer rounds of ammunition is compatible with that firearm and the person possesses the large-capacity magazine solely for use with that firearm."  § 32406(b)-(f) (S.B. 1446).  One could scarcely argue that these exemptions should not exist and that people in possession of LCMs under such circumstances *should* be subject to criminal sanction for that possession.

The Legislature's careful crafting of these eminently reasonable exemptions when fully aware of the more limited scope of exemptions under the Proposition 63 version – coupled with the evident lack of an intent to repeal SB 1446 – can only evince an intent for the SB 1446 version to remain in effect despite the enactment of Proposition 63.  Thus, the timing of Proposition 63 as the "later-enacted" of the two laws cannot support the State's contention that Proposition 63 supplanted SB 1446 in to-to.  Rather, we must presume that both laws were intended to remain in effect, *Western Mobile Assn.*, 16 Cal.App.3d at 948 – either as separate schemes or as one collective scheme in which the Proposition 63 version was "pre-amended" by SB 1446, such that the SB 1446 version prevails to the extent of any inconsistency, unless and until the Legislature takes the affirmative step of repealing the SB 1446 version in order to install the Proposition 63 version as solely controlling.

In fact, when the Legislature has intended to effect a repeal of a statute that runs parallel to a different version of the same statute enacted under Proposition 63, it has done so affirmatively. Last year, through Assembly Bill 103, the Legislature expressly recognized that two parallel versions of Penal Code § 29805 (generally concerning firearm restrictions for certain misdemeanants) existed "as a result of Proposition 63" (AB 103, Leg. Counsel Digest, § 21), and it went on to retain both versions as operative in making individual amendments to both

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

(effectively mirroring each section's language with the other) (*id.* ¶¶ 45-46).  Then, a few months

later, the Legislature decided to actually repeal the version of section 29805 that pre-dated the

one enacted under Proposition 63 (Stats 2017 ch 784 § 1 (AB 785)), expressly stating its intent to

render the old version "obsolete" (AB 785, Leg. Counsel Digest). This additional compelling

evidence showing the Legislature does and will take affirmative action to repeal a law that runs

parallel to the version of the same law enacted under Proposition 63 solidifies Plaintiffs' position

that, unless and until the Legislature takes such action, both versions must be considered to

remain in effect and meanwhile, to the extent of any inconsistency between the two versions, the

later-*effective* version (SB 1446) controls.[16]

### 4. The Resulting Conflicts and Confusion Within the LCM Ban Strongly Support Plaintiffs' Claim that the Scheme is Unconstitutionally Vague.

Naturally, whether the two versions of the LCM ban exist as separate schemes or as one

collective scheme in which the Proposition 63 version was "pre-amended" by SB 1446, the

resulting scheme fails to ensure "'fair warning' as to what conduct will subject a person to

liability" with "an explicit and ascertainable standard."  *Karlin v. Foust*, 188 F.3d at 458.  Either

there are two parallel statutory schemes purporting to establish the same LCM ban under quite

different terms and conditions, or only one is in operation and we have a contentious debate

about which prevails over the other in whole or in part.  In the meantime, those who fall within

the legislatively-crafted exemptions specific to the SB 1446 version are left with uncertainty as

to whether the ban actually applies to them, and those charged with enforcing the ban are left

---

[16]The State's reference to the Proposition 63 Voter Information Guide does not change this analysis.  (MTD at 19-20.)  The single brief statement that the State extracts from the lengthy Guide reads: "Beginning July 2017, recently enacted law [SB 1446] will prohibit most of these individuals [who acquired their LCMs before 2000] from possessing these magazines. Individuals who do not comply are guilty of an infraction.  However, there are various individuals who will be exempt from this requirement – such as an individual who owns a firearm (obtained before 2000) that can only be used with a large capacity magazine. Proposition 63 eliminates several of these exemptions, as well as increases the maximum penalty for possessing large-capacity magazines."  (Exh. C. to Motion at p. 87).  If anything, the description of the SB 1446 version in terms of its *future* application – i.e., the effect the law *will* have beginning July 2017 and who *will* be exempt under it – indicates that the initiative backers also contemplated a simultaneous operation of these laws.

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

with the power to enforce it "on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application."  *Id*. at 458.  And even more generally, with the lack of the "guidance" that the DOJ itself deemed urgently necessary to avert "the serious harm" inevitably flowing from the ban's intrinsic vagueness, the average citizen will not only not know "how to comply with the ban," but also will not understand the core provisions establishing the "options for disposal" of LCMs or how to reduce the capacity of LCMs to "the acceptable minimum level of permanence."  (RJN, Exh. A at 1-2, 3, 5.)  In fact, many citizens will be left not even knowing whether their particular magazines fall within the LCM ban in the first place, like those in the position of Plaintiff Federau who has one or more magazines for use with his lawfully-possessed AR-15 platform model rifle. (TAC ¶ 14.) That rifle is only chambered for .458 SOCOM ammunition, and the magazines at issue can hold no more than 10 rounds of *that* ammunition. (*Id.*) However, the magazines *could* hold more than 10 rounds of a *different* caliber ammunition (e.g., 30 rounds of 5.56 x 45 mm). (*Id.*) So Federau and potentially countless other similarly situated citizens are stuck in the position of having no certainty about whether their magazines are or would be considered "large-capacity" magazines simply because they could hold more than 10 rounds of some *other* ammunition for which their firearms are not calibrated or which they have no intention of using.

The allegations in support of this claim are "well-pleaded factual allegations," specifically delineating both the nature of the vagueness at issue and how it affects the parties and all those similarly situated.  Thus, the Court "should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  This standard is met so long as the allegations and reasonable inferences therefrom "are plausibly suggestive of a claim entitling the plaintiff to relief."  *John Doe I v. Nestle USA*, 766 F.3d 1013, 1025 (9th Cir. 2014). Given the serious conflicts and confusion subsisting in the LCM ban that the State's own law enforcement arm has recognized as dangerous to the public welfare in its current state – the scope of which far exceed the narrow concerns about the potential vagueness of the single phase ("copies or duplicates") at issue with

**SEILER EPSTEIN ZIEGLER & APPLEGATE LLP**
Attorneys at Law

the pre-enforcement notice in *Worman v. Healey*, 293 F.Supp.3d at 269-270– the allegations are not just "plausibly suggestive of a claim," they are palpable.

### 5. The State Fails in Its Attempt to Brush Off Plaintiffs' Viable Claims of Vagueness and Overbreadth in Count IV.

The State also attempts to brush off the related vagueness and overbreadth claims in Count IV, asserting that "the overbreadth doctrine does not apply outside of the First Amendment context and thus, is inapplicable in this case[,]" and that because the Plaintiffs have not alleged a First Amendment challenge to the law, "overbreadth doctrine does not apply, and plaintiffs cannot state a claim that the LCM ban is unconstitutionally overbroad." (MTD at 21:6-13).. But again, this is not how it works. These challenges are neither dependent upon Plaintiffs' alleging a First Amendment free speech claim nor prevailing on their Second Amendment claim. Such claims are properly grounded in the independent, fundamental due process protections designed to ensure fair warning, consistent and non-arbitrary application, and to prevent the enforcement of laws that improperly sweep up "'a substantial amount of constitutionally protected conduct'" under the guise of a legislative goal that "'does not match the text of the statutes.'" *Powell's Books, Inc. v. Kroger*, 622 F.3d 1202, 1207 (9th Cir. 2010) (quoting *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 397 (1998)); see e.g., *Phelps v. U.S.*, 831 F.2d at 898 (vagueness and overbreadth challenge to a statute governing the release of persons adjudged not guilty of a crime by reason of insanity); *U.S. v. Rodriguez-Deharo*, 192 F.Supp.2d 1031, 1038-39 (E.D. Cal. 2002) (vagueness and overbreadth challenge to a domestic violence statute).

Given the nature of the State's conclusory, surface-level assertions here, it has failed to present any reasoned analysis or argument to refute or even contest any of the Plaintiffs' allegations in support of Count IV. That is a problem for the State, as the moving party who bears the general burden here: "In considering a motion to dismiss for failure to state a claim, the court generally accepts as true the factual allegations of the complaint in question, construes the pleading in the light most favorable to the party opposing the motion, and resolves all doubts in

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

the pleader's favor."  *Robinson v. Salazar*, 885 F.Supp.2d 1002, 1014 (E.D. Cal. 2012).  Having made no effort to meet any of the specific allegations in this count, the State motion's necessarily fails under this standard.

Moreover, even if the State had offered some sort of argument in support of its conclusory contention that the allegations fail to state a claim, this count would survive under the general standards designed to test for such adequacy.  As with Count III, the allegations in support of this count comprise "more than an unadorned, the-defendant-unlawfully-harmed-me accusation," *Iqbal*, 556 U.S. at 678, and instead contain more than "sufficient factual matter" that, "accepted as true," "'state claim to relief that is plausible on its face,'" *Iqbal* at 678 (quoting *Twombly*, 550 U.S. at 570).  The TAC specifically alleges, in detail, that: the purported disposal options of selling the prohibited LCMs to a firearms dealer and removing them from the state are illusory and utterly impractical options that could trap the unwary by exposing them to criminal liability in attempting to comply with the LCM ban through these purported disposal options (¶¶ 99-101); the purported exceptions for "honorably retired police officers," trustees of a trust, and administrators of an estate are of similarly illusory protection given how they also invite arbitrary and discriminatory enforcement by their terms (¶¶ 102-104); and the ban is unconstitutionally overbroad because, as Plaintiffs will demonstrate at trial, the retroactive application of the LCM ban to current, legal owners of such magazines in no way advances the stated objectives of the law (¶ 106).  These allegations are, at the very least, "plausibly suggestive of a claim entitling the plaintiff to relief." *John Doe I*, 766 F.3d at 1025.  And again, notably, the State does not claim otherwise. The State has failed to carry its burden in this motion to dismiss Counts III and IV, and therefore they must proceed to trial on the merits with the rest of Plaintiffs' colorable claims.

**D.     PLAINTIFFS HAVE STATED A CLAIM THAT THIS STATUTORY SCHEME VIOLATES THE EQUAL PROTECTION CLAUSE.**

Under the Equal Protection Clause of the Fourteenth Amendment, no state shall "deny to any person within its jurisdiction the equal protection of the laws," U.S. Const. amend. XIV, § 1,

which is "essentially a directive that all persons similarly situated should be treated alike," *City of Cleburne, Texas v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985).  "The Equal Protection Clause . . . den[ies] to States the power to legislate that different treatment be accorded to persons placed by a statute into different classes on the basis of criteria wholly unrelated to the objective of that statute. A classification 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.'" *Reed v. Reed*, 404 U.S. 71, 75–76 (1971) (quoting *Royster Guano Co. v. Virginia*, 253 U.S. 412, 415 (1920)).

Here, the State rotely recites standards applicable to the evaluation of equal protection claims while blithely assuming that no fundamental right is at stake, and in the end, never even gets around to justifying or explaining why exactly one class of ordinary citizens should be allowed to receive and possess large-capacity magazines as some kind of special privilege when other ordinary law-abiding citizens should be denied the same right – especially for lawful purposes like self-defense.  Indeed, under this "Hollywood exception," even honorably retired peace officers such as Plaintiffs Alan Normandy (TAC, ¶ 15) and Todd Nielsen (*id.*, ¶ 16), who reside out of state, and who often participate in firearms training programs, are precluded from simply *bringing* their LCMs into California for entirely lawful purposes.  (*Id.*, ¶ 102.)  As Plaintiffs' TAC alleges, Penal Code § 32445 provides for an exception to possession of an LCM "for use solely as a prop for a motion picture, television, or video production."  (TAC, ¶ 113.)  And, in order to use an LCM as a movie or television prop "an exempted holder of a special weapons permit (under § 32450(a)) would necessarily need to give possession of a proscribed magazine to a non-exempted actor or actress (under section 32445) – in order words, someone just like the average law-abiding California gun owner or visitor."  (*Id.*, ¶ 114.)  "However, under this section, the receiver of the large-capacity magazine may even be a prohibited person since there is no requirement of a background check through the Department of Justice, or even any other form of evidencing the statutorily-exempted receiver's eligibility to possess or acquire firearms or firearm parts – indeed, placing everyone on the same footing."  (*Id.*)

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

1   But the State's presumption that rational basis review should apply in the first place is

2   questionable.  "When a state statute burdens a fundamental right or targets a suspect class, that

3   statute receives heightened scrutiny under the Fourteenth Amendment's Equal Protection

4   Clause." *Silveira v. Lockyer*, 312 F.3d 1052, 1087 (9th Cir. 2002) (citing *Romer v. Evans*, 517

5   U.S. 620, 631 (1996). "Statutes infringing on fundamental rights are subject to the same

6   searching review." *Silveira*, 312 F.3d at 1088.  And here, it has already been established that a

7   law that restricts the ability of law-abiding citizens to possess large-capacity magazines within

8   their homes for the purpose of self-defense implicates the core of the Second Amendment.

9   *Fyock*, 779 F.3d at 999.  Thus, a fundamental right is at stake, and the law requires heightened

10   review.

11   Furthermore, even under rational basis review, that standard, although deferential, "is not

12   a toothless one," *Mathews v. Lucas*, 427 U.S. 495, 510 (1976), and "even the standard of

13   rationality . . . must find some footing in the realities of the subject addressed by the legislation."

14   *Heller v. Doe by Doe*, 509 U.S. 312, 321 (1993). When conducting rational-basis review, it is

15   this Court's "duty to scrutinize the connection, if any, between the goal of a legislative act and

16   the way in which individuals are classified in order to achieve that goal." *Silveira*, 312 F.3d at

17   1088. And because "[t]he search for the link between classification and objective gives substance

18   to the Equal Protection Clause," *Romer*, 517 U.S. at 632, courts "insist on knowing the relation

19   between the classification adopted and the object to be attained." *Id.* at 633.  To that end, the

20   question is focused "whether there is a rational basis for the *distinction*, rather than the

21   underlying government action." *Gerhart v. Lake County Montana*, 637 F.3d 1013, 1023 (9th Cir.

22   2011), *cert. denied*, 132 S. Ct. 249 (2011) (italics added).

23   Under any standard, however, the State offers absolutely no justification whatsoever for

24   the differential treatment under the Hollywood exception.  So what, exactly, is or could be the

25   supposed governmental interest advanced in allowing television and movie actors to receive and

26   possess LCMs while denying ordinary citizens the same?  Perhaps the State indeed simply

27   desires to "cater[] to its privileged, rich elite, concentrating in film and television hubs in

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

Hollywood and the Los Angeles Area," as Plaintiffs have alleged (TAC, ¶ 115).  And the State could have also simply admitted that its legislators *want* Hollywood entertainment producers to have access to large-capacity magazines (in addition to any other form of weaponry they want), to give or lend to people as they wish for whatever entertainment purpose, so that Hollywood actors such as Matt Damon can continue to make violent movies glorifying illegal gunplay, while at the same time, the State *distrusts* its ordinary citizens to have the same privileges (which is quite obvious from its Motion).  There appears to be no other conceivable justification for this classification.

Because the State has not offered any justification – or even suggested that a legitimate justification exists, and because no conceivably *rational* basis could justify this disparate treatment as somehow advancing the claimed governmental objective, its motion to dismiss Plaintiffs' fifth cause of action must be denied.

## IV.   CONCLUSION

For the foregoing reasons, plaintiffs respectfully request that defendants' motion to dismiss be denied.

Dated: February 5, 2019

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP

/s/ George M. Lee
George M. Lee

THE DIGUISEPPE LAW FIRM, P.C.

/s/ Raymond M. DiGuiseppe
Raymond M. DiGuiseppe
Attorneys for Plaintiffs

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law