George M. Lee (SBN 172982)
    gml@seilerepstein.com
**SEILER EPSTEIN LLP**
4 Embarcadero Center, 14th Floor
San Francisco, CA 94111
Phone: (415) 979-0500
Fax:   (415) 979-0511

Raymond M. DiGuiseppe (SBN  228457)
    law.rmd@gmail.com
**THE DiGUISEPPE LAW FIRM, P.C.**
4320 Southport-Supply Road, Suite 300
Southport, North Carolina 28461
Phone: (910) 713-8804
Fax: (910) 672-7705

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM WIESE, et al., | Case No. 2:17-cv-00903-WBS-KJN |
| Plaintiffs, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| vs. | **[FRCP 56]** |
| ROB BONTA, in his official capacity as Attorney General of California, et al., | Date:  July 10, 2023 |
| Defendants. | Time: 1:30 p.m. |
| | Judge: Hon. William B. Shubb |
| | Courtroom 5, 14th Floor |

TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................ 1

II.  STATEMENT OF FACTS ................................................................................... 2

     A.   FIREARM AMMUNITION MAGAZINES AND THE ORIGINAL
          CALIFORNIA MAGAZINE BAN ............................................................... 2

     B.   SENATE BILL 1446 AND PROPOSITION 63 ............................................ 3

     C.   THE INSTANT ACTION ............................................................................ 4

     D.   SUBSEQUENT PROCEEDINGS IN *DUNCAN* ............................................ 6

III. ARGUMENT ..................................................................................................... 8

     A.   STANDARD ............................................................................................. 8

     B.   PLAINTIFFS ARE ENTITLED TO JUDGMENT ON THEIR SECOND
          AMENDMENT CLAIM. .............................................................................. 8

          1.   The Ban Prohibits Conduct Protected by the Text of the Second Amendment. ... 8

          2.   The Ban Prohibits Arms in Common Use for Lawful Purposes. ....................... 10

          3.   No Historical Basis Exists that Could Justify the Magazine Ban. ...................... 14

               a.   Magazines capable of holding more than 10 rounds predate the
                    Second Amendment and were known to and embraced by
                    the Founders. ................................................................................ 15

               b.   The State Cannot Identify Any Relevantly Similar Historical Analogue. . 19

     C.   PLAINTIFFS ARE ENTITLED TO JUDGMENT ON THEIR TAKINGS CLAIM. ........................ 23

          1.   The Retroactive Magazine Possession Ban Constitutes a *Per Se* Taking. .......... 24

               a.   Section 32310(d) is a Taking because It compels the physical
                    appropriation of property. ............................................................. 25

               b.   The Effect of Section 32310(c) and (d) Constitutes a Taking
                    Because the Statutory Scheme Completely Deprives the Owners
                    of All Economically Beneficial Use of Their Property. ............................ 28

          2.   The Retroactive Magazine Possession Ban Constitutes a Burdensome
               Regulatory Taking. .............................................................................. 30

     D.   PLAINTIFFS ARE ENTITLED TO JUDGMENT ON THEIR EQUAL PROTECTION CLAIM. ....... 32

IV.   CONCLUSION   ................................................................................................... 33

## TABLE OF AUTHORITIES

**Cases**

*Andrus v. Allard*, 44 U.S. 51 (1979)......................................................................... 29, 30

*Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey*, 910 F.3d 106 (3d Cir. 2018) ....................................................................... 10, 12

*Babbitt v. Youpee*, 519 U.S. 234 (1997).......................................................................... 23

*Chicago, R. I. & P. R. Co. v. United States*, 284 U.S. 80 (1931)................................... 28

*City of Cleburne, Tex. v. Cleburne Living Center*, 473 U.S. 432 (1985)........................ 33

*Crawford v. Washington*, 541 U.S. 36 (2004).................................................................. 20

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ............................................. *passim*

*Dore v. United States*, 97 F. Supp. 239 (Ct. Cl. 1951).................................................... 27

*Duncan v. Becerra*, 2019 WL 1510340 (S.D. Cal. Apr. 4, 2019)..................................... 7

*Duncan v. Becerra*, 742 F. App'x 218 (9th Cir. 2018) ...................................................... 6

*Duncan v. Becerra*, 970 F.3d. 1133 (9th Cir. 2020) .......................................................... 7

*Duncan v. Bonta*, 142 S.Ct. 2895 (Mem.) (June 30, 2022).............................................. 7

*Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021)......................................................... 7, 12

*Duncan v. Bonta*, 49 F.4th 1228 (Mem.) (9th Cir. Sept. 23, 2022) ................................. 7

*Edward P. Stahel & Co. v. United States*, 78 F. Supp. 800 (Ct. Cl. 1948) ...................... 27

*Felton Water Co. v. Superior Court*, 82 Cal.App. 382 (1927).......................................... 24

*Fyock v. Sunnyvale*, 779 F.3d 991 (9th Cir. 2015)................................................. 9, 12, 31

*Gamble v. United States*, __ U.S. __, 139 S.Ct. 1960 (2019) ......................................... 15

*Golden Gate Hotel Assn. v. City & County of San Francisco*, 836 F.Supp. 707 (N.D. Cal. 1993) .............................................................................. 23

*Heller v. Dist. of Columbia* ("*Heller II*"), 670 F.3d 1244 (D.C. Cir. 2011).................... 13

*Horne v. Department of Agriculture*, 576 U.S. 350 (2015) ................................. 29, 30, 31

*Jackson v. City of San Francisco*, 746 F.3d 953 (9th Cir. 2014) ...................................... 9

*Jefferson Street Industries, LLC v. City of Indio*, 236 Cal.App.4th 1175 (2015)............................ 23

*Kaiser Aetna v. United States*, 444 U.S. 164 (1979) ............................................................ 24, 28

*Khan v. State Oil Co.*, 93 F.3d 1358 (7th Cir. 1996)............................................................ 15

*Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1 (1984) ......................................... 27

*Kolbe v. Hogan*, 813 F.3d 160 (4th Cir. 2016),
on reh'g en banc, 849 F.3d 114 (4th Cir. 2017) (abrogated by *Bruen*, 142 S.Ct. at 2126)........... 10

*Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) (en banc)................................................... 12

*Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 528 (2005)................................... 23, 24, 28, 31

*Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982) ............................ 24

*Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992) ............................... 24, 28

*Luis v. United States*, 578 U.S. 5 (2016) .......................................................................... 9

*Lynch v. Donnelly*, 465 U.S. 668 (1984) .......................................................................... 20

*Mass. Bd. of Retirement v. Murgia*, 427 U.S. 307 (1976) ............................................... 32

*McDonald v. City of Chicago*, 561 U.S. 742 (2010)..................................... 1, 14, 15, 20

*Nat'l Wildlife Fed'n v. I.C.C.*, 850 F.2d 694 (D.C. Cir. 1988) ..................................... 25

*Nevada Comm'n on Gaming Ethics v. Carrigan*, 564 U.S. 117 (2011)............................ 20

*New York State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242 (2d Cir. 2015) ............... 10, 12

*New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S.Ct. 2111 (2022) ................. *passim*

*Nixon v. United States*, 978 F.2d 1269 (D.C. Cir. 1992)................................................... 26

*Or. Firearms Fed'n, Inc. v. Brown*, 2:22-cv-01815-IM, Doc. 39 (D. Or. Dec. 6, 2022)................. 9

*Palazzolo v. Rhode Island*, 533 U.S. 606 (2001) .......................................................... 31

*Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 (1922) ................................................. 30

*Residents of Beverly Glen, Inc. v. City of Los Angeles*, 34 Cal.App.3d 117 (1973) ................ 5, 24

*Richmond Elks Hall Ass'n v. Richmond Redevelopment Agency*, 561 F.2d 1327 (9th Cir. 1977).... 28

*Romer v. Evans*, 517 U.S. 620 (1996).......................................................................... 33

*San Remo Hotel L.P. v. City and County of San Francisco*, 27 Cal.4th 643 (2002)........................ 23

*Staples v. United States*, 511 U.S. 600 (1994) ................................................................. 13

*Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*,
    535 U.S. 302 (2002) ..................................................................................................... 24

*Tenants Assn. of Park Santa Anita v. Southers*, 222 Cal.App.3d 1293 (1990) ................... 5

*United States v. JP Morgan Chase Bank Account No. Ending 8215*,
    835 F.3d 1159 (9th Cir. 2016) ....................................................................................... 8

*Virginia v. Moore*, 553 U.S. 164 (2008) ............................................................................ 20

*Wiese v. Becerra*, 306 F.Supp.3d 1190 (E.D. Cal. Feb. 7, 2018) ....................................... 10

*Zetwick v. County of Yolo*, 850 F.3d 436 (9th Cir. 2017) ................................................... 8

**Statutes**

1927 Mich. Pub. Acts ch. 372, § 3 ..................................................................................... 21

1927 R.I. Pub. Laws 256, §§ 1, 4 ...................................................................................... 21

1933 Cal. Laws, ch. 450 .................................................................................................... 21

1933 Minn. Laws ch. 190 .................................................................................................. 21

1933 Ohio Laws 189 .......................................................................................................... 21

1934 Va. Acts ch. 96 s137, §§ 1(a), 4(d) .......................................................................... 21

Cal. Pen. Code § 1170 ....................................................................................................... 26

Cal. Pen. Code § 16900 ....................................................................................................... 9

Cal. Pen. Code § 31910 ....................................................................................................... 9

Cal. Pen. Code § 32000 ....................................................................................................... 9

Cal. Pen. Code § 32310 ................................................................................................. *passim*

Cal. Pen. Code § 32400 ....................................................................................................... 4

Cal. Pen. Code § 32405 ....................................................................................................... 4

Cal. Pen. Code § 32406 ....................................................................................................... 4

Cal. Pen. Code § 32410 ....................................................................................................... 4

Cal. Pen. Code § 32420 ....................................................................................................... 4

Cal. Pen. Code § 32425 ....................................................................................................... 4

Cal. Pen. Code § 32435 ....................................................................................................... 4

Cal. Pen. Code § 32450 ................................................................................. 4, 27

Ill. Comp. Stat. 5/24-1.10 ................................................................................ 12

Vt. Stat. Ann. tit. 13, § 4021 ........................................................................... 12

**Other Authorities**

*16-Shot Wheel Lock*, AMERICA'S 1ST FREEDOM, May 10, 2014 ......................... 16

4 THE DIARY OF SAMUEL PEPYS (Henry Wheatley ed., 1893 .......................... 16

7 JOURNALS OF THE CONTINENTAL CONGRESS 1774-1789 ............................. 18

Brown, M.L., FIREARMS IN COLONIAL AMERICA: THE IMPACT ON
     HISTORY AND TECHNOLOGY, 1492–1792 (1980) ................................ 15, 17

C. Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev. 741 (1993) ............ 14

Chapel, Charles Edward, GUNS OF THE OLD WEST (1961) ............................. 17

Charles Winthrop Sawyer, 1 FIREARMS IN AMERICAN HISTORY 29 (1939) ....... 17

David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*,
     78 Alb. L. Rev. 849 (2015) ............................................... 2, 13, 20, 22

Flayderman, Norm, FLAYDERMAN'S GUIDE TO ANTIQUE AMERICAN FIREARMS
     AND THEIR VALUES (9th ed. 2007) ............................................... 20

Gallay, Alan, COLONIAL WARS OF NORTH AMERICA, 1512–1763 (2015) ......... 17

Garry, James B., WEAPONS OF THE LEWIS AND CLARK EXPEDITION (2012) ...... 18

Greener, W.W., THE GUN AND ITS DEVELOPMENT (9th ed. 1910) .................... 16

Harold Peterson, ARMS AND ARMOR IN COLONIAL AMERICA 215 (1956) ...... 16, 17

JOURNALS OF THE CONTINENTAL CONGRESS 1774–1789 (1907) ..................... 18

Mark W. Smith, *"Not all History is Created Equal": In the Post-*Bruen *World,*
     *the Critical Period for Historical Analogues is when the Second Amendment was*
     *Ratified in 1791, and not 1868* (Oct. 1, 2022),
     https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4248297 ................... 20

Mark W. Smith, *Attention Originalists: The Second Amendment was*
     *adopted in 1791, not 1868*, Harv. J. of L. & Pub. Pol'y Per Curiam (Dec. 7, 2022) ............ 15

McClure, Nancy, *Treasures from Our West: Lukens Air Rifle*,
     BUFFALO BILL CENTER FOR THE AMERICAN WEST, Aug. 3, 2014 ............... 19

*Newly Invented Muskets*, N.Y. EVENING POST, Apr. 10, 1822 .......................................................... 19

Niles, Samuel, *A Summary Historical Narrative of the Wars in New England*,
  *in* Massachusetts Historical Society Collections, 4th ser., vol. 5 (1837) ..................................... 17

Papers of the Continental Congress, Compiled 1774–1789 ............................................................. 18

Peterson, Harold L., THE TREASURY OF THE GUN (1962) ............................................................. 16

Plaster, John, THE HISTORY OF SNIPING AND SHARPSHOOTING (2008) ........................................... 18

Prenderghast, Gerald, REPEATING AND MULTI-FIRE WEAPONS (2018) ............................................. 18

Supica, Jim, et al., TREASURES OF THE NRA NATIONAL FIREARMS MUSEUM (2013) ................. 18, 20

*The Cookson Gun and the Mortimer Pistols*, Am. Rifleman, Sept. 29, 1917 ................................... 17

William English, *2021 National Firearms Survey: Updated Analysis Including
  Types of Firearms Owned* (May 18, 2022) ........................................................................ 11, 12

Winant, Lewis, FIREARMS CURIOSA (1955) ......................................................................... 16, 20

Winant, Lewis, PEPPERBOX FIREARMS (1952) ............................................................................. 20

**Rules**

Fed. R. Civ. Pro. 12(b)(6) ........................................................................................................ 6

**Constitutional Provisions**

Cal. Const., Art. I, § 19 ............................................................................................................ 23

Cal. Const., Art. II, § 10(a) ........................................................................................................ 4

U.S. Const., Amend. II ................................................................................................... *passim*

U.S. Const., Amend. V .................................................................................... 23, 24, 28, 29

U.S. Const., Amend. XIV, § 1 ................................................................................................. 23

# I.   INTRODUCTION

In *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S.Ct. 2111 (2022) ("*Bruen*"), the Supreme Court "reiterate[d] that the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id*. at 2129-30 (2022). And in further expressly rejecting and forbidding the two-step test applied by some lower courts since *District of Columbia v. Heller*, 554 U.S. 570 (2008), the *Bruen* Court made clear that the test it "set forth in *Heller* and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Id*. at 2131.

What the Supreme Court applied in *Bruen* is precisely the theory Plaintiffs here have advanced since this case was filed on April 28, 2017.[1] "Despite California's apparent legislative policy preferences and animus towards Second Amendment rights (and, by extension, those who would lawfully seek to assert and exercise them), [T]he enshrinement of constitutional rights necessarily takes certain policy choices off the table." Compl. at 43; Third Amended Compl. (TAC) at 49 (quoting *Heller*, 554 U.S., at 636, 128 S.Ct., at 2822) (cleaned up). "Indeed, the [Supreme] Court expressly rejected the argument that the scope of the Second Amendment right should be determined by judicial interest balancing." *Id*. (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 785 (2010) [quoting *Heller*, 554 U.S., at 634-636]).

The conduct that Plaintiffs wish to engage in—keeping and bearing arms—is covered by the plain text of the Second Amendment. Accordingly, it is the government's burden to demonstrate that

---

[1] As this Court is aware, a similar case, *Duncan v. Becerra* (S.D. Cal. Case No. 17-cv-1017-BEN-JLB) was filed in the Southern District of California District Court on May 17, 2017 (thus, this action was the first-filed case). The Plaintiffs in this nearly 6-year-old action appreciate the Court's consideration and leave to file this motion for dispositive adjudication.

its laws are "consistent with the Nation's historical tradition of firearm regulation." That it cannot do.

Estimates suggest there are over *half a billion* of the firearm magazines banned by California in circulation in the United States today—far more than necessary for blanket protection under any analysis of their commonality. Moreover, the firearm magazines banned by California are *integral* for the operation of common, constitutionally protected firearms, such as handguns, that individuals use for self-defense and other lawful purposes. And because these magazines are in common use for lawful purposes, they can neither be "dangerous" *nor* "unusual." Indeed, *unless* an arm is both "dangerous and unusual," it is protected under the very analysis the Supreme Court applied in *Heller* (and most recently in *Bruen*).

Because the State cannot justify its laws under the Supreme Court's test for Second Amendment challenges, Plaintiffs are entitled to summary judgment. The Court should declare the challenged laws unconstitutional and issue a permanent injunction against the Defendants.

## II.   STATEMENT OF FACTS

### A.   FIREARM AMMUNITION MAGAZINES AND THE ORIGINAL CALIFORNIA MAGAZINE BAN

A magazine is simply "a receptacle for a firearm that holds a plurality of cartridges or shells under spring pressure preparatory for feeding into the chamber. Magazines take many forms, such as box, drum, rotary, tubular, etc. and may be fixed or removable." SAAMI, Glossary of Terms (https://saami.org/saami-glossary/?letter=M.); Statement of Undisputed Material Facts (SOUMF") Nos. 11-14. Many of the most popular handguns in the country are manufactured with magazines holding more than 10 rounds. *See, e.g.,* Gun Digest 2018 (Jerry Lee and Chris Berens, ed. 2017) (Lee Decl., Ex. D); *id.* at 386-88 (Glocks); *id.* at 374 (Beretta); *id.* at 408 (Smith & Wesson); *id.* at 408 (Sig Sauer); SOUMF Nos. 16, 17, 21. The same is true of many of the most popular semi-automatic rifles. *See, e.g.*, David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849, 859 (2015) (Lee Decl., Ex. H) ("The most popular rifle in American history is the AR-15 platform, a semiautomatic rifle with standard magazines of twenty

1  or thirty rounds."); *see also Commonly Owned: NSSF Announces Over 24 Million MSRs in*

2  *Circulation*, The Firearm Indus. Trade Ass'n (July 20, 2020) (Lee Decl., Ex. F),

3  https://bit.ly/3QBXiyv (last accessed March 14, 2023); SOUMF Nos. 15, 18, 19. Data from the

4  Firearm Industry Trade Association indicates that over *three quarters* of modern sporting rifle

5  magazines in the country have a capacity of more than 10 rounds, and 52% have a capacity of 30

6  rounds. *See* NSSF, *Modern Sporting Rifle Comprehensive Consumer Report* (Lee Decl., Ex. G),

7  https://bit.ly/3GLmErS (last accessed March 14, 2023); SOUMF No. 20.

8      Along with the rest of the nation, up until 1999, millions of California citizens, including the

9  Plaintiffs in this case, lawfully acquired and possessed semi-automatic firearms, many of which

10 contained magazines capable of holding more than ten rounds of ammunition. Indeed, the State's

11 own legislative findings in connection with Proposition 63 declared, "[t]here are likely hundreds of

12 thousands of large-capacity magazines in California at this time," and "[t]he Department therefore

13 expects many gun owners to be affected by the new ban." Request for Judicial Notice ("RJN"), Ex.

14 A, p. 1.); SOUMF Nos. 30 & 31. However, in 1999, through Senate Bill 23, California enacted

15 legislation generally banning methods of acquiring magazines that hold more than ten rounds,

16 legislatively branding them "large-capacity magazines" as currently defined in Penal Code § 16740.

17 And since that time, the Code has generally forbidden the manufacture, importation, sale, or receipt

18 of any such "large-capacity magazine." *See* Cal. Pen. Code § 32310(a) (formerly § 12020(a)(2)).

19      As enacted under Senate Bill 23, the continued possession of lawfully-acquired "large

20 capacity magazines" up to that point (i.e., "grandfathered" magazines) was not prohibited. SOUMF

21 No. 5. Individual Plaintiffs and the class of persons on whose behalf this action is brought, are law-

22 abiding citizens, who are neither prohibited from the possession of firearms or ammunition nor

23 exempt from California's restrictions upon firearms and ammunition, and who lawfully possessed

24 and used such large-capacity magazines up through December 31, 1999.

25 **B.   SENATE BILL 1446 AND PROPOSITION 63**

26      In 2016, gun control measures in California moved forward at a steady and unprecedented

27 pace. Among these measures included additional laws pertaining to large-capacity magazines,

28

contained in Senate Bill 1446 ("SB 1446") and Proposition 63.

Purportedly concerned about what lawmakers presumably viewed as a prevalence of mass shootings and terrorist attacks in San Bernardino, California, the Legislature passed SB 1446 on December 2, 2015 (*see* RJN, Ex. A, p. 4), which amended Penal Code § 32310(b) to outlaw the mere possession of a "large-capacity magazine," "regardless of the date the magazine was acquired[.]" The law as signed would have required a person in lawful possession of any large-capacity magazines prior to July 1, 2017, to dispose of such magazine(s) by surrender, sale to a licensed firearms dealer, or removal from the State in the manner provided by the statute. SOUMF No. 6. SB 1446 was signed into law July 1, 2016, and became effective on January 1, 2017.

The author and proponents of SB 1446 never considered the actual value of the magazines subject to the ban, payment of "just compensation" to the owners of previously grandfathered magazines forced to dispossess themselves of their magazines, or whether a viable market actually existed for purposes of selling these magazines under legal compulsion. The bill's author and sponsors simply assumed that the State, via local law enforcement agencies, had the power to force the dispossession of the magazines under the "police powers" of the State regardless of whether any of the targeted owners could obtain any fair compensation for the loss. *See* RJN, Ex. B, p. 5; SOUMF Nos. 32, 34.

Then, on November 8, 2016, California voters enacted Proposition 63 (titled the "Safety for All Act"), sponsored and heavily promoted as a "gun safety" initiative. *See* RJN, Ex. A. Proposition 63 amended Penal Code sections 32310, 32400, 32405, 32410, 32425, 32435, 32450, added section 32406, and repealed section 32420 by initiative statute, which changed the law to totally prohibit and criminalize the possession of large-capacity magazines as of July 1, 2017. *See* RJN, Ex. C. Proposition 63 took effect the day after the election; Cal. Const., Art. II, § 10(a) ("An initiative statute or referendum approved by a majority of votes thereon takes effect the day after the election unless the measure provides otherwise."); SOUMF Nos. 7 & 8.

C.    THE INSTANT ACTION

Plaintiffs commenced the instant action on April 28, 2017. Plaintiffs Wiese, Morris,

Macaston, Flores, Dang, and Federau are individual and law-abiding California residents, who acquired, prior to 2000, large-capacity magazines, as intrinsic parts of their legally-possessed firearms. Wiese Decl., ¶ 4; Morris Decl., ¶ 4; Macaston Decl., ¶ 5; Flores, Decl.; ¶ 4, Dang Decl., ¶¶ 4-5; Federau Decl., ¶ 4; SOUMF No. 9. Each of them wishes to keep these magazines in the State of California, and is naturally unwilling to destroy or "surrender" his property to the State. Wiese Decl., ¶¶ 5-6; Morris Decl., ¶¶ 5-6; Macaston Decl., ¶ 8; Flores Decl., ¶ 9;  Dang Decl., ¶ 7; Federau Decl., ¶¶ 5-6; SOUMF Nos. 10, 35. Plaintiffs Normandy, Nielsen, and Cowley currently reside out of State, but California's magazine ban continues to adversely impact them because each of them maintains strong ties to the State through employment or familial connections, regularly travels back to and remains physically present in the State for extended periods of time, desires to keep and use these magazines for self-defense and other lawful purposes while in the State, and would do so were it not for California's ban. Normandy Decl., ¶¶ 6-9; Nielsen Decl., ¶¶ 6-9.

Some of the individual Plaintiffs have "pre-ban" magazines of substantial value, either intrinsically or because they have historical value. Dang Decl., ¶ 4; Third Amended Complaint ("TAC"), ¶ 12. Some of these magazines are the only magazines that the Plaintiffs may have for that particular firearm. Dang Decl. ¶ 5; Macaston Decl., ¶ 6; SOUMF Nos. 38. And some of the magazines are the only magazines that were ever made for that particular firearm. Dang Decl., ¶ 5; TAC, ¶ 13; SOUMF Nos. 39.

Plaintiffs are bringing this matter individually, and as representatives on behalf of the class of individuals who are or would be affected by the ban; that is, those law-abiding residents, who are not otherwise exempt, and who lawfully possessed large-capacity magazines in this State before December 31, 1999. *See Residents of Beverly Glen, Inc. v. City of Los Angeles*, 34 Cal.App.3d 117 (1973); *Tenants Assn. of Park Santa Anita v. Southers*, 222 Cal.App.3d 1293, 1299-1300 (1990) (a right to sue in a representative capacity may be recognized where the question is one of public interest). Further, organizational Plaintiffs California Gun Rights Foundation (formerly the Calguns Foundation), FPC Action Foundation (formerly Firearms Policy Foundation) Firearms Policy Coalition, and Second Amendment Foundation are bringing this action on behalf of their many

1   similarly situated California members. Hoffman Decl., ¶ 4 (CGR); Silvester Decl., ¶ 4 (FPCAF);

2   Normandy Decl., ¶ 11 (FPC); Gottlieb Decl., ¶ 3 (SAF).

3       After filing a First Amended Complaint (Dkt. No. 7), Plaintiffs sought a motion for a

4   temporary restraining order and issuance of a preliminary injunction to enjoin enforcement of the

5   law, on June 12, 2017 (Dkt. No. 9). On June 29, 2017, this Court denied Plaintiffs' motion. (Dkt.

6   No. 52). Before Defendants answered, by stipulation of the parties (Dkt. No. 53) and order of this

7   Court (Dkt. No. 54), Plaintiffs filed their Second Amended Complaint on August 17, 2017 (Dkt. No.

8   59). Defendants moved to dismiss the Second Amended Complaint under FRCP 12(b)(6), and this

9   Court granted that motion on February 7, 2018 (Dkt. No. 74). Plaintiffs then filed the current and

10  operative Third Amended Complaint on February 26, 2018. Meanwhile, in *Duncan v. Becerra*, S.D.

11  Cal. No. 17-56081, Judge Benitez had issued a preliminary injunction in another case challenging

12  the magazine ban as unconstitutional, and a panel of the Ninth Circuit affirmed that judgement in

13  July of 2018. *Duncan v. Becerra*, 742 F. App'x 218, 221–22 (9th Cir. 2018).

14      Thereafter, Defendants moved to dismiss the TAC (Dkt. No. 95), and the Court held a hearing

15  on Defendants' motion on February 19, 2019. Following the Ninth Circuit's affirmance of the

16  preliminary injunction in *Duncan*, this Court denied the motion to dismiss as to the Second

17  Amendment, Takings, and Equal Protection claims. (Dkt. No. 103, at pp. 5-6.) However, the Court

18  dismissed the claims that the law was unconstitutionally vague and overbroad. (*Id.* at p. 8.)

19  **D.   SUBSEQUENT PROCEEDINGS IN *DUNCAN***

20      On March 29, 2019, Judge Benitez issued a final judgment and memorandum decision in

21  *Duncan v. Becerra*, S.D. Cal. No. 3:17-cv-01017-BEN-JLB, declaring Penal Code § 32310

22  unconstitutional. On April 4, 2019, the Attorney General appealed the judgment to the Ninth Circuit,

23  and the district court stayed in part its judgment pending final resolution of the appeal.[2] The Attorney

24

25

26  ───────────────
    [2] Judge Benitez stayed the injunction as to subdivisions (a) and (b) of Penal Code section 32310,

27  which prohibits the manufacturing, importing into the State, offering for sale, giving, lending, buying,
    or receiving of large-capacity magazines, while he kept in place the injunction against subdivisions

28

General contemporaneously sought a stay of the proceedings in the present case pending the outcome of *Duncan*, which this Court granted on May 8, 2019. (Dkt. No. 110.)

Judge Benitez's judgment was again upheld by a Ninth Circuit panel, which affirmed that the large capacity magazine was unconstitutional. *Duncan v. Becerra*, 970 F.3d 1133 (9th Cir. 2020). Following this panel decision, Plaintiffs in the instant case requested this Court lift the stay. Defendants opposed that request, signaling they would seek further review. (Dkt. No. 112.) Given the possibility of en banc review, this Court declined to lift the stay. (Dkt. No. 113.)

Eventually, the panel decision was reversed en banc. *See Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021). However, the plaintiffs in *Duncan* petitioned for a writ of certiorari to the United States Supreme Court. The Court held *Duncan*, among several other Second Amendment cases, pending its decision in *Bruen*. On June 30, 2022, following the *Bruen* decision, the Supreme Court granted certiorari, vacated the en banc decision, and remanded to the Ninth Circuit for further consideration in light of *Bruen*. *Duncan v. Bonta*, 142 S.Ct. 2895 (Mem.) (June 30, 2022).

On September 23, 2022, the Ninth Circuit remanded to the district court for further proceedings "consistent with" *Bruen*. *Duncan v. Bonta*, 49 F.4th 1228 (Mem.) (9th Cir. Sept. 23, 2022). Shortly thereafter, on September 26, 2022, Judge Benitez issued an order "spreading the mandate and continuing the preliminary injunction," ordering that the "previously entered preliminary injunction enjoining enforcement of California Penal Code § 32310 (c) and (d) for magazines able to hold more than ten rounds *shall remain in effect* for all those who previously acquired and possessed magazines legally (including those persons and business entities who acquired magazines between March 29, 2019 and April 5, 2019), pending further Order of this Court." *Duncan v. Becerra*, S.D. Cal. No. 3:17-cv-01017-BEN-JLB (Dkt. No. 111). To date, the parties in *Duncan* are still briefing the case under the *Bruen* standards, and there has been no further order lifting or otherwise modifying this injunction against the possession ban.

---

(c) and (d) of section 32310, which prohibits "the simple possession" of such magazines. *Duncan v. Becerra*, 2019 WL 1510340, at *3 (S.D. Cal. Apr. 4, 2019).

On January 13, 2023, this Court lifted the stay in this case (Dkt. No. 116), and granted Plaintiffs leave to file the instant motion for summary judgment (Dkt. No. 120).

### III.   ARGUMENT

#### A.   STANDARD

"Summary judgment is appropriate when, viewing the evidence in the light most favorable to the nonmoving party, there is no genuine dispute as to any material fact." *Zetwick v. County of Yolo*, 850 F.3d 436, 440 (9th Cir. 2017) (citing *United States v. JP Morgan Chase Bank Account No. Ending 8215*, 835 F.3d 1159, 1162 (9th Cir. 2016)).

#### B.   PLAINTIFFS ARE ENTITLED TO JUDGMENT ON THEIR SECOND AMENDMENT CLAIM.

"When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.' " *Bruen*, 142 S.Ct. at 2129–30.

#### 1.   The Ban Prohibits Conduct Protected by the Text of the Second Amendment.

At the textual level, the Second Amendment protects the right to "keep and bear Arms." Interpreting "Arms," the Supreme Court in *Heller* explained that "[j]ust as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, to *all instruments that constitute bearable arms.*" *Heller*, 554 U.S. at 582 (citations omitted); *see also Bruen*, 142 S.Ct. at 2132. Therefore, at the level of the text the only question for this Court is whether the ban at issue impacts the rights to "keep and bear" any "instruments that constitute bearable arms."

This "large-capacity" magazine ban does impact that right. Magazines are integral for the operation of many common firearms. A firearm magazine is an inherent part of, and inseparable from, a functioning firearm. SOUMF No. 14. All modern, semiautomatic firearms are essentially inoperable without them. Youngman Decl., at ¶ 7 (Lee Decl., Ex. A; Dkt. No. 28-2); SOUMF No. 15. Modern semi-automatic firearms of the kind in use for lawful purposes, including self-defense,

1    sold at retail in the civilian and law enforcement markets include at least one magazine intended to

2    be used as part of that firearm. *Id.* California's own laws require a magazine to be inserted in the

3    firearm in order to be sold as an operable pistol, a so-called "safety" feature. Consequently, many

4    models of new pistols sold at retail in California must have "magazine disconnect mechanisms,"

5    meaning these firearms are incapable of being fired without a magazine. *See* Pen. Code §§

6    31910(b)(4)-(6), 32000, and 16900 (defining "magazine disconnect mechanism" as "a mechanism

7    that prevents a semiautomatic pistol that has a detachable magazine from operating to strike the

8    primer of ammunition in the firing chamber when a detachable magazine is not inserted in the

9    semiautomatic pistol").

10        Second Amendment protections would be meaningless if the State could strip away integral

11   component parts of a firearm by claiming that prohibitions against individual component do not

12   constitute a ban on "arms." This would be an absurd construction. *See Jackson v. City of San*

13   *Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) ("The Second Amendment protects 'arms,' 'weapons,'

14   and 'firearms'; it does not explicitly protect ammunition. Nevertheless, without bullets, the right to

15   bear arms would be meaningless"). Just as the First Amendment would not allow the government to

16   ban the ink used to print newspapers, the Second Amendment does not permit it to ban triggers,

17   barrels, magazines, or any other component integral to the operation of a firearm. *See Or. Firearms*

18   *Fed'n, Inc. v. Brown*, 2:22-cv-01815-IM (D. Or.) Op. and Order 19, Doc. 39 (Dec. 6, 2022) ("TRO

19   Op.") ("The Second Amendment covers firearms and items 'necessary to use' those firearms.").

20   Constitutional rights "implicitly protect those closely related acts necessary to their exercise." *Luis*

21   *v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring in the judgment). The Ninth Circuit

22   itself has recognized "caselaw supports the conclusion that there must also be some corollary, albeit

23   not unfettered, right to possess the magazines necessary to render those firearms operable." *Fyock*

24   *v. Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015). As the Third Circuit held before *Bruen*, "[b]ecause

25   ammunition magazines feed ammunition into certain guns, and ammunition is necessary for such a

26   gun to function as intended, magazines are 'arms' within the meaning of the Second Amendment."

27   *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey*, 910 F.3d 106, 116 (3d Cir.

28

2018) ("*ANJRPC*"); *New York State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 257 (2d Cir. 2015) (assuming that laws banning assault weapons and large capacity magazines "ban weapons protected by the Second Amendment").

In *Kolbe v. Hogan*, the Fourth Circuit expressly extended this reasoning to large capacity magazines: "To the extent that firearms equipped with detachable magazines are commonly possessed by law-abiding citizens for lawful purposes, there must also be an ancillary right to possess the magazines necessary to render those firearms operable. To the extent the State can regulate these magazines, it is not because the magazines are not bearable 'arms' within the meaning of the Second Amendment." *Kolbe v. Hogan*, 813 F.3d 160, 175 (4th Cir. 2016), on reh'g en banc, 849 F.3d 114 (4th Cir. 2017) (abrogated by *Bruen*, 142 S.Ct. at 2126). Likewise, this Court, even in previously dismissing Plaintiffs' Second Amended Complaint under the now-rejected interest-balancing test, Dkt. No. 74, found that other courts had assumed these magazines are protected by the Second Amendment. *Wiese v. Becerra*, 306 F.Supp.3d 1190, 1196 (E.D. Cal. Feb. 7, 2018)

Looking at it another way, the clear purpose and effect of California's magazine ban provisions are to functionally ban firearms capable of firing more than ten rounds without reloading. And as discussed in more detail below, firearms capable of firing more than ten rounds without reloading are unquestionably "bearable arms" that are "in common use" and therefore entitled to protection. The Second Amendment certainly "covers an individual's conduct" in owning, possessing, and using these magazines. *Bruen*, 142 S.Ct. at 2126.

**2.      The Ban Prohibits Arms in Common Use for Lawful Purposes.**

Under *Bruen*, once the textual analysis is complete, if there exists an apparent conflict between the text and the challenged law, as in this case, that law should be treated as presumptively unconstitutional. 142 S.Ct. at 2126. In that event, the law is salvageable only if the government can "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* That means it is California's burden to demonstrate the existence of founding-era historical evidence banning certain types of arms and that its own ban *fits* that evidence. *Heller* establishes the test for whether a ban on possession fits with this historical evidence from the time

of the founding, and that is, are the arms in question "in common use" by law abiding citizens for lawful purposes or are they instead "dangerous and unusual" arms? It is up to the State to prove that the arms are not commonly used. As discussed below, the State cannot carry its burden.

The historical work has already been done here. In *Heller*, the Court held that the Second Amendment protects the right to "keep and bear" arms "'in common use at the time.'" *Heller*, 554 U.S. at 627. "That limitation is fairly supported by the *historical* tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.* (emphasis added). So, the Court's precedent makes clear that when firearms are "in common use at the [present] time," they necessarily cannot be deemed "dangerous and unusual" and thus cannot be banned. The only question here then is whether magazines holding more than ten rounds are in common use for lawful purposes. They unquestionably are and thus they cannot be subject to a ban like California's ban.

Forty-eight percent of gun owners have owned magazines that hold more than 10 rounds. William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* at 22 (May 18, 2022) (Lee Decl., Ex. C), https://bit.ly/3yPfoHw (last accessed March 14, 2023). Given the survey's estimate that 81.4 million Americans own firearms, approximately 39 million Americans have owned at least one magazine that holds more than 10 rounds. SOUMF No 26. And that is a conservative estimate since only current gun owners were polled. Those individuals frequently owned more than one such magazine. In fact, Professor English found that American gun owners have owned as many as 269 million handgun magazines that hold over 10 rounds and an additional 273 million rifle magazines over that threshold for a total of 542 million such magazines. *Id.* at 24; *see also* Curcuruto Decl. (Lee Decl., Ex. B) at ¶ 8 (estimating that 230 million pistol and rifle magazines were in the possession of United States consumers between 1990 and 2015, and that magazines capable of holding more than 10 rounds of ammunition accounted for approximately half (or 115 million) of those magazines altogether during that time period). SOUMF Nos. 23, 24, 27, 28.

There is nothing surprising about this result. As detailed above, many of the most popular handguns in the country are manufactured with magazines holding more than 10 rounds. The Ninth

Circuit itself has acknowledged the ubiquity and commonality of large capacity magazines: "Most, but not all, firearms use magazines. For those firearms that accept magazines, manufacturers often include large-capacity magazines as a standard part of a purchase of a firearm. 'Most pistols are manufactured with magazines holding ten to seventeen rounds, and many popular rifles are manufactured with magazines holding twenty or thirty rounds.' […] Although data on magazine ownership are imprecise, some experts estimate that approximately half of all privately owned magazines in the United States have a capacity greater than ten rounds." *Duncan v. Bonta*, 19 F.4th at 1097 (quoting *Kolbe v. Hogan*, 849 F.3d 114, 129 (4th Cir. 2017) (en banc)). And, according to the National Firearms Survey, the most common reasons cited for owning these magazines are target shooting (64.3% of owners), home defense (62.4%), hunting (47%), and defense outside the home (41.7%). English, *supra*, at 23; SOUMF No. 29. Such magazines are lawful to own in the vast majority of states; only nine other states and the District of Columbia have laws as strict as California's that limit magazine capacity to ten rounds for all firearms (Connecticut, Hawaii, Maryland, Massachusetts, New Jersey, New York, Oregon, Rhode Island, and Washington).[3]

These statistics conclusively demonstrate that the banned magazines are commonly owned and used overwhelmingly for lawful purposes. SOUMF No. 22. "[C]ourts throughout the country [including in this Circuit,] agree that large-capacity magazines are commonly used for lawful purposes." *Duncan*, 19 F.4th at 1155–56 (Bumatay, J., dissenting); *see also Fyock*, 779 F.3d at 998 ("[W]e cannot say that the district court abused its discretion by inferring from the evidence of record that, at a minimum, [large-capacity] magazines are in common use."); *ANJRPC*, 910 F.3d at 116–17 ("The record shows that millions of magazines are owned, often come factory standard with semi-automatic weapons, are typically possessed by law-abiding citizens for hunting, pest-control, and occasionally self-defense, and there is no longstanding history of [large capacity magazine] regulation.") (cleaned up); *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d at 255

---

[3] Illinois and Vermont have a 10-round magazine capacity restriction for long guns only, and a 15-round capacity restriction for handguns. 720 Ill. Comp. Stat. 5/24-1.10 (enacted January 10, 2023 by 2021 IL HB 5471); Vt. Stat. Ann. tit. 13, § 4021 (enacted by 2017 VT S 55, Sec. 8).

("Even accepting the most conservative estimates cited by the parties and by amici, the . . . large-capacity magazines at issue are 'in common use' as that term was used in *Heller*."); *Heller v. Dist. of Columbia* ("*Heller II*"), 670 F.3d 1244, 1261 (D.C. Cir. 2011) ("As for magazines, fully 18 percent of all firearms owned by civilians in 1994 were equipped with magazines holding more than ten rounds, and approximately 4.7 million more such magazines were imported into the United States between 1995 and 2000. There may well be some capacity above which magazines are not in common use, but, if so . . . that capacity surely is not ten."); *see also* Youngman Decl. (Lee Decl., Ex. A), at ¶ 7 ("In most other states, firearms, including many of the most popular pistols and rifles, are sold with" magazines that hold more than 10 rounds, as "*standard* capacity magazines.") (italics added).

Moreover, aside from this quantitative numerical data of the common use of these magazines themselves, the fact that they constitute integral parts of handguns and rifles indisputably in common use for lawful purposes across the country, like all those discussed above, Gun Digest 2018 at 374, 386-88, 408; David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. at 849, 859, is alone enough to establish the necessary commonality based on the prior judicial findings and pronouncements on the point. *See Heller*, 554 U.S. at 629 ("Whatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home . . ."); *Staples v. United States*, 511 U.S. 600, 603 (1994) ("[t]he AR-15 is the civilian version of the military's M-16 rifle, and is, unless modified, a semiautomatic weapon"). And, again, because the conduct at issue is covered under the plain text of the Second Amendment, it is the State's burden to prove these magazines are *not* in "common use" and are instead subject to a ban as "dangerous and unusual" weapons, which it cannot do in any event.

Because California's magazine ban prohibits arms within the meaning of the Second Amendment—arms unquestionably in common use, for lawful purposes—summary judgment should be granted in Plaintiffs' favor on their Second Amendment Claim.

//

//

### 3.    No Historical Basis Exists that Could Justify the Magazine Ban.

The Court need go no further to resolve this case. As explained above,  once it is determined that a type of arm is in "common use," it is protected by the Second Amendment and cannot be banned. The magazines banned by California are in common use, therefore there is no historical justification for banning them. *See Bruen*, 142 S.Ct. at 2143; *Heller*, 554 U.S. at 625. But even if the Court does go further, it should find the magazine ban cannot be supported by any historical tradition.

To justify a regulation as "consistent with the Second Amendment's text and historical understanding," the government must demonstrate by "analogical reasoning" the existence of "a proper analogue." *Bruen*, 42 S.Ct. 2131-32. The analogue must be "'relevantly similar.'" *Id.* at 2132 (quoting C. Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev. 741, 773 (1993)). It "may be analogous enough to pass constitutional muster" even if it's not "a historical *twin*" or a "dead ringer" for the modern regulation, but it must be "well-established and representative." *Id.* at 2133. *Bruen* did not "provide an exhaustive survey of the features that render regulations relevantly similar" here, but "*Heller* and *McDonald* point toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132. "[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are '*central*' considerations when engaging in an analogical inquiry," because "individual self-defense is 'the *central component*' of the Second Amendment right." *Id.* at 2133 (quoting *McDonald*, 561 U.S. at 767).

As for what constitutes the relevant historical period, the high court explained, "when it comes to interpreting the Constitution, not all history is created equal." *Bruen*, 142 S.Ct. at 2136. Foremost, "'[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them.'" *Id.* at 2137 (quoting *Heller*, 554 U.S. at 634-35). While "[s]trictly speaking," the States are "bound to respect the right to keep and bear arms because of the Fourteenth Amendment," adopted in 1868, and not the Second, adopted in 1791, "we have generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public

understanding of the right when the Bill of Rights was adopted in 1791." *Id.* Indeed, as noted, the standard established in *Bruen* "requires judges to apply faithfully the balance struck *by the founding generation* to modern circumstances." *Id.* at 2132 n. 7 (italics added). While "there is an ongoing scholarly debate" over whether the understanding of the Second Amendment in 1791 or 1868 should be considered primary, that issue need not be resolved when "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to" the rights at stake. *Id.* at 2138.

What is more, while *Bruen* flagged this scholarly debate for possible future Supreme Court consideration, lower courts are bound to look to 1791 given the Court's repeated holdings (a) that 1791 is the key date for interpreting the Bill of Rights against the federal government, *see, e.g.*, *Gamble v. United States*, __ U.S. __, 139 S.Ct. 1960, 1976 (2019), and (b) that incorporated provisions of the Bill of Rights have the same meaning when applied against the states as applied against the federal government, *see, e.g.*, *McDonald*, 561 U.S. at 765. *See, e.g.*, *Khan v. State Oil Co.*, 93 F.3d 1358, 1363 (7th Cir. 1996) (lower courts must follow Supreme Court holdings even with "wobbly, moth-eaten foundation" until overruled by the Supreme court), *vacated by State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997) (overruling precedent but making clear that the "Court of Appeals was correct in applying [*stare decisis*] . . . for it is this Court's prerogative alone to overrule one of its precedents"); *see also* Mark W. Smith, *Attention Originalists: The Second Amendment was adopted in 1791, not 1868*, HARV. J. OF L. & PUB. POL'Y PER CURIAM (Dec. 7, 2022), https://bit.ly/42BmRX3.

    a.    **Magazines capable of holding more than 10 rounds predate the Second Amendment and were known to and embraced by the Founders.**

Magazines capable of holding more than 10 rounds of ammunition can trace their historical lineage back to the late-15th or early-16th century, with the advent of repeating firearms (or repeaters). The first known repeaters were invented between 1490 and 1530.[4] King Henry VIII

---

[4] M.L. Brown, FIREARMS IN COLONIAL AMERICA: THE IMPACT ON HISTORY AND TECHNOLOGY, 1492-1792 50 (1980).

(reigned 1509-1547) even owned one.[5] The first known repeater capable of firing more than 10 shots—a 16-round German wheellock rifle—was invented around 1580.[6]

By 1660, both the Kalthoff and Lorenzoni repeaters had gained popularity throughout Europe.[7] The capacity of Kalthoff "magazines ran all the way from six or seven to thirty" charges. Peterson, TREASURY, at 230. "[A]t least nineteen gunsmiths are known to have made [Kalthoffs] in an area stretching from London . . . to Moscow . . . and from Copenhagen . . . to Salzburg." *Id.* Kalthoffs saw "active service during the siege of Copenhagen in 1658, 1659, and again in the Scanian War of 1675-1679." *Id.* "The Lorenzoni also was developed during the first half of the Seventeenth Century." *Id.* The repeating mechanism of this magazine-fed Italian pistol was soon adopted in rifles and spread throughout Europe and the colonies. *Id.* at 232.

On July 3, 1662, famed London diarist Samuel Pepys observed "a gun to discharge seven times, the best of all devices that ever I saw, and very serviceable, and not a bawble; for it is much approved of, and many thereof made."[8] On March 4, 1664, Pepys wrote about "several people [] trying a new-fashion gun" that could "shoot off often, one after another, without trouble or danger, very pretty." 7 *id.* at 61. Pepys was referring to Lorenzoni-style firearms.

"Many . . . English gunsmiths . . . made guns with the Lorenzoni action during the next two or three decades." Peterson, TREASURY, at 232. So did "a host of others throughout the 18th century."[9] "[A]t least two New England gunsmiths actually manufactured such guns." *Id.* at 232. The advent and innovation of repeaters and proto magazines carried through the 17th century into our early history in the 18th century.

Innovation and proliferation of such arms continued through our nation's early history. Some

---

[5] W.W. Greener, THE GUN AND ITS DEVELOPMENT 81–82 (9th ed. 1910).

[6] Lewis Winant, FIREARMS CURIOSA 168–70 (1955); *16-Shot Wheel Lock*, AMERICA'S 1ST FREEDOM (May 10, 2014), http://bit.ly/2tngSDD.

[7] Harold Peterson, THE TREASURY OF THE GUN 229 (1962).

[8] 4 THE DIARY OF SAMUEL PEPYS 258 (Henry Wheatley ed., 1893)

[9] Harold Peterson, ARMS AND ARMOR IN COLONIAL AMERICA 215 (1956).

pre-American, colonial repeaters in the mid-1600s employed a revolving cylinder rotated by hand.[10]
"A few repeating arms were made use of in a military way in America," for example, "[Louis de Buade de] Frontenac[11] in 1690 astonished the Iroquois with his three and five shot repeaters."[12]

In 1722, John Pim, a Boston gunsmith, demonstrated a repeater he sold.[13] "[L]oaded but once," it "was discharged eleven times following, with bullets, in the space of two minutes, each which went through a double door at fifty yards' distance."[14]

The most common American repeaters of the early 18th century were probably Lorenzoni variants known as Cooksons—named after English gunsmith John Cookson. Peterson, TREASURY, at 230. A 10-round Cookson, later displayed at the National Museum, "found its way into Maryland with one of the early English colonists."[15]

A Boston gunsmith, also named John Cookson, manufactured repeaters in the 18th century. The American Cookson advertised a repeater in the *Boston Gazette* on April 12 and 26, 1756, explaining that the rifle was "to be sold at his house in Boston . . . the said gun will fire 9 Times distinctly, as quick, or as slow as you please." Peterson, ARMS AND ARMOR, at 215. "Thus this type of repeating flintlock popular in England from the third quarter of the 17th century, was known and manufactured in Massachusetts early in the 18th century." *Id.*

In the late-1700s, Joseph Belton created a rifle capable of firing "Sixteen Balls loaded at one

---

[10] *See, e.g.,* Charles Winthrop Sawyer, 2 FIREARMS IN AMERICAN HISTORY 5 (1939) (six-shot flintlock); Charles Edward Chapel, GUNS OF THE OLD WEST 202–03 (1961) (revolving snaphance).

[11] Frontenac was the governor of New France at the time. *See* Alan Gallay, COLONIAL WARS OF NORTH AMERICA, 1512–1763, at 240–42 (2015).

[12] Charles Winthrop Sawyer, 1 FIREARMS IN AMERICAN HISTORY 29 (1939).

[13] Pim produced other repeaters, including a "six-shot, .52 caliber snaphaunce revolver." Brown, FIREARMS IN COLONIAL AMERICA, at 257.

[14] Samuel Niles, *A Summary Historical Narrative of the Wars in New England*, *in* MASSACHUSETTS HISTORICAL SOCIETY COLLECTIONS, 4th ser., vol. 5, at 347 (1837).

[15] *The Cookson Gun and the Mortimer Pistols*, AM. RIFLEMAN, Sept. 29, 1917, at 3, 4.

time."[16] Belton demonstrated his rifle before leading military officers (including General Horatio Gates and Major General Benedict Arnold) and scientists (including David Rittenhouse), who verified its functionality. Belton, *Letter*, at 139. In 1777, the Continental Congress ordered one hundred of Joseph Belton's rifles,[17] which could "discharge sixteen, or twenty [rounds], in sixteen, ten, or five seconds." Belton, *Letter*, at 123. Although the deal fell through when Belton demanded "an extraordinary allowance,"[18] the exchange proves that the Founders embraced repeaters capable of firing more than 10 rounds.

The British similarly recognized the advantage of repeaters, employing the Ferguson Rifle during the Revolutionary War, which "fired six shots in one minute" during a government test on June 1, 1776.[19]

At the time of the Second Amendment's ratification, the state-of-the-art repeater was the Girandoni air rifle, which could shoot 21 or 22 rounds in .46 or .49 caliber.[20] The Girandoni was ballistically equal to a powder gun,[21] and powerful enough to take an elk.[22] At the time, "there were many gunsmiths in Europe producing compressed air weapons powerful enough to use for big game hunting or as military weapons." Garry, WEAPONS OF LEWIS AND CLARK, at 91. The Girandoni was invented for the Austrian army—1,500 were issued to sharpshooters and remained in service for 25 years, including in the Napoleonic Wars between 1796 and 1815.[23]  Isaiah Lukens of Pennsylvania

---

[16] Joseph Belton, *Letter to the Continental Congress*, Apr. 11, 1777, *in* PAPERS OF THE CONTINENTAL CONGRESS, COMPILED 1774-1789, vol. 1 A-B, at 139.

[17] 7 JOURNALS OF THE CONTINENTAL CONGRESS 1774-1789, at 324 (1907).

[18] 7 JOURNALS OF THE CONTINENTAL CONGRESS 1774-1789, at 361.

[19] Roger Lamb, AN ORIGINAL AND AUTHENTIC JOURNAL OF OCCURRENCES DURING THE LATE AMERICAN WAR 309 (1809).

[20] James Garry, WEAPONS OF THE LEWIS AND CLARK EXPEDITION 100–01 (2012).

[21] John Plaster, THE HISTORY OF SNIPING AND SHARPSHOOTING 69–70 (2008).

[22] Jim Supica, *et al.*, TREASURES OF THE NRA NATIONAL FIREARMS MUSEUM 31 (2013).

[23] Gerald Prenderghast, REPEATING AND MULTI-FIRE WEAPONS 100–01 (2018); Garry, WEAPONS OF LEWIS AND CLARK, at 91–94.

manufactured such rifles,[24] along with "many makers in Austria, Russia, Switzerland, England, and various German principalities." Garry, WEAPONS OF LEWIS AND CLARK, at 99. Meriwether Lewis seemingly acquired the Girandoni rifle he famously carried on the Lewis and Clark Expedition from Isaiah Lukens. *Id.* Lewis mentioned it in his journal 39 times, always demonstrating the rifle to impress various Native American tribes encountered on the expedition—often "astonishing" or "surprising" them and making the point that although the expedition was usually outnumbered, the smaller group could defend itself.[25]

It is therefore clear that the Founders and Framers were well aware of the advent, existence, and popularity of magazines capable of holding more than ten rounds of ammunition, as well as repeating arms that were capable of firing more than ten rounds without reloading.[26]

**b.      The State Cannot Identify Any Relevantly Similar Historical Analogue.**

Defendants cannot identify any on-point or analogous historical prohibition on firearms capable of firing more than ten rounds without reloading or magazines capable of holding more than ten rounds.

As demonstrated above, when the Second Amendment was ratified in 1791, repeating arms were already three centuries old. The state-of-the-art as of 1791 was a 22-shot rifle. Yet, despite the

---

[24] Nancy McClure, *Treasures from Our West: Lukens Air Rifle*, BUFFALO BILL CENTER FOR THE AMERICAN WEST (Aug. 3, 2014), https://centerofthewest.org/2014/08/03/treasures-west-lukens-air-rifle/.

[25] *See, e.g.*, Meriwether Lewis and William Clark, 6 THE JOURNALS OF THE LEWIS & CLARK EXPEDITION 233 (Gary Moulton ed., 1983) (Jan. 24, 1806 entry: "My Air-gun also astonishes them very much, they cannot comprehend it's [*sic*] shooting so often and without powder; and think that it is *great medicine* which comprehends every thing that is to them incomprehensible.").

[26] Additionally, the innovation surrounding these magazines and the historical analogues continued through the 19th century and became some of the most popular Arms. *See, e.g.*, *Newly Invented Muskets*, N.Y. EVENING POST (Apr. 10, 1822), *in* 59 Alexander Tilloch, THE PHILOSOPHICAL MAGAZINE AND JOURNAL 467–68 (1822) (In 1821, the *New York Evening Post* lauded Isaiah Jennings for inventing a repeater, "importan[t], both for public and private use," whose "number of charges may be extended to fifteen or even twenty . . . and may be fired in the space of two seconds to a charge."); R.L. Wilson, WINCHESTER: AN AMERICAN LEGEND 11–12 (1991) (recounting the testing of the popular Henry Rifle at the Washington Navy Yard in 1862 and noting that "one full fifteen-shot magazine was fired in only 10.8 seconds").

prevalence of repeaters and magazines that allowed operators to fire more than ten rounds without reloading and to quickly reload their arms, there are no Founding Era prohibitions on magazine capacity.

Moreover, should this Court look to the period surrounding the ratification of the Fourteenth Amendment, it will come to the same result.[27] By the Fourteenth Amendment's ratification in 1868, Americans had seen 24-barreled pistols,[28] 12-barreled rifles,[29] 21-shot revolvers,[30] 20-round belt-fed chain pistols,[31] 42-shot Ferris Wheel pistols,[32] and rifles capable of firing 60 shots in 60 seconds.[33] The 16-shot Henry Rifle and 18-shot Winchester Model 1866 were becoming American legends. And yet, there were also no 19th century prohibitions on firearm or magazine capacity.

"The first laws that restricted magazine capacity were enacted during the prohibition era, nearly a century and a half after the Second Amendment was adopted, and over half a century after the adoption of the Fourteenth Amendment." David B. Kopel, *The History of Firearm Magazines*

---

[27] Importantly, the Founding Era, and not the time surrounding the ratification of the Fourteenth Amendment, is the key historical guide when engaging in this inquiry. *See* Mark W. Smith, *"Not all History is Created Equal": In the Post-Bruen World, the Critical Period for Historical Analogues is when the Second Amendment was Ratified in 1791, and not 1868* (Oct. 1, 2022), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4248297 (working draft). This is evident for, at minimum, two reasons. First, in *McDonald v. Chicago*, the Supreme Court held that the Second Amendment bears the *same meaning* as applied against the federal government as it does against the states. 561 U.S. 742, 765 (2010). Second, the Supreme Court has always treated ratification of the Bill of Rights as the key historical period for understanding the scope of those rights—regardless of whether the Court is applying the Amendments against the federal government or against the states. *See, e.g.*, *Crawford v. Washington*, 541 U.S. 36, 42–50 (2004); *Virginia v. Moore*, 553 U.S. 164, 168–69 (2008); *Nevada Comm'n on Gaming Ethics v. Carrigan*, 564 U.S. 117, 122–25 (2011); *Lynch v. Donnelly*, 465 U.S. 668, 674 (1984). Regardless, even if this Court considers the 1868 historical period in this case, the result is the same.

[28] Lewis Winant, PEPPERBOX FIREARMS 7 (1952).

[29] Norm Flayderman, FLAYDERMAN'S GUIDE TO ANTIQUE AMERICAN FIREARMS AND THEIR VALUES 711 (9th ed. 2007) (Bennett and Haviland Rifle).

[30] Supica, TREASURES, at 48–49; Winant, PEPPERBOX FIREARMS, at 67–70 (pin-fire revolvers).

[31] Winant, FIREARMS CURIOSA, at 204, 206.

[32] Winant, FIREARMS CURIOSA, at 208.

[33] Sawyer, 2 FIREARMS IN AMERICAN HISTORY, at 147 (Porter Rifle).

1  *and Magazine Prohibitions*, 88 ALBANY L. REV. 849, 864 (2015) (Lee Decl., Ex. H). Even then,

2  those laws were quickly repealed. During a seven-year period between 1927–1934, six states enacted

3  restrictions involving ammunition capacity. *See* 1927 R.I. Pub. Laws 256, §§ 1, 4 (banning sales of

4  guns that fire more than 12 shots semiautomatically without reloading); 1927 Mich. Pub. Acts ch.

5  372, § 3 (banning sales of firearms "which can be fired more than sixteen times without reloading");

6  1933 Minn. Laws ch. 190 (banning "machine gun[s]" and including in the definition semiautomatics

7  "which have been changed, altered or modified to increase the magazine capacity from the original

8  design as manufactured by the manufacturers"); 1933 Ohio Laws 189 (license needed for

9  semiautomatics with capacity of more than 18 rounds); 1933 Cal. Laws, ch. 450 (licensing system

10  for machine guns, defined to include semiautomatics with detachable magazines of more than 10

11  rounds); 1934 Va. Acts ch. 96 s137, §§ 1(a), 4(d) (defining machine guns as anything able to fire

12  more than 16 times without reloading, and prohibiting possession for an "offensive or aggressive

13  purpose"; presumption of such purpose when possessed outside one's residence or place of business,

14  or possessed by an alien; registration required for "machine gun" pistols of calibers larger than .30

15  or 7.62mm).

16       All these statues were repealed, with all but one being fully repealed by 1975. See 1959 Mich.

17  Pub. Acts 249, 250 (sales ban applies to only actual machine guns); 1959 R.I. Acts & Resolves 260,

18  263 (exempting .22 caliber and raising limit for other calibers to 14); 1975 R.I Pub. Laws 738, 738–

19  39, 742 (sales ban applies only to actual machine guns); 1963 Minn. Sess. L. ch. 753, at 1229

20  (following federal law by defining "machine gun" as automatics only); 1965 Stats. of Calif., ch. 33,

21  at 913 (defining a "machine gun" as firing more than one shot "by a single function of the trigger");

22  1972 Ohio Laws 1866 (exempting .22 caliber; for other calibers, license required for more rounds);

23  H.R. 234, 2013-2014 Leg., 130th Sess. § 2 (Ohio 2014) (full repeal); 1975 Va. Acts, ch. 14, at 67

24  (defining "machine gun" as automatics only).

25       Importantly, even though these statutes would themselves have been constitutionally suspect

26  under a *Bruen* analysis, no state law actually prohibited possession of standard firearms and their

27  magazines. California was the only state to limit magazine capacity to 10 rounds, but even then, at

28

that time, it had established a licensing system, not an outright prohibition. Ohio did not require a license to purchase any firearm or magazine but did require a license for only the simultaneous purchase of the magazine and the relevant firearm.[34] Rhode Island and Michigan limited sales, but not possession. Minnesota had no capacity limit and forbade only altering firearms from how they had been manufactured. Virginia's law forbade carry of some arms in public places and registered some handguns.

Historically, only the District of Columbia banned outright possession. A 1932 law banned any firearm that "shoots automatically or semiautomatically more than twelve shots without reloading." Pub. L. No. 72-275, §§ 1, 8, 47 Stat. 650, 650, 652. In 1975, the District broadened its law and prohibited functional firearms in the home, and handguns altogether. When the *Heller* Court ruled these prohibitions unconstitutional in 2008, the District of Columbia enacted a new ban on magazines capable of holding more than 10 rounds. 2008 District of Columbia Laws 17-372 (Act 17-708). Thus, only the District of Columbia banned possession entirely, and even then, not until the 20th century.

First and foremost, none of these laws can be said to provide a historical antecedent to California's current prohibition. Defendants cannot point to a single Founding Era law that limited magazine capacity or banned the sale of magazines or their historical predecessors. And the Supreme Court specifically disclaimed consideration of 20th century law in conducting the Second Amendment analysis when it contradicts the earlier Founding Era evidence, as is the case here. *See Bruen*, 142 S.Ct. at 2154 n.28 ("We will not address any of the 20th-century historical evidence brought to bear by respondents or their *amici*. As with their late-19th-century evidence, the 20th-century evidence presented by respondents and their *amici* does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence.").

Accordingly, under both *Heller* and *Bruen*, the State can point to no appropriate historical antecedent, and its law thus cannot survive constitutional scrutiny.

---

[34] *See* Kopel, *History of Firearm Magazines*, 78 ALBANY L. REV. at 865.

1    **C.**    **PLAINTIFFS ARE ENTITLED TO JUDGMENT ON THEIR TAKINGS CLAIM.**

2    Penal Code § 32310(c) and (d), as of July 1, 2017, requires individual Plaintiffs, and a large

3    class of similarly-affected individuals who lawfully own pre-ban magazines, to dispose of, destroy,

4    or "surrender" their constitutionally-protected personal property, thereby resulting in a taking of

5    such property for which no compensation has been or would be provided, in violation of both the

6    Takings and Due Process Clauses of the United States Constitution and the California Constitution.

7    The Takings Clause of the United States Constitution guarantees property owners "just

8    compensation" when their property is "taken for public use." U.S. Const., 5th Amend. The Due

9    Process Clause likewise guarantees property owners due process of law when the State "deprive[s]

10    [them] of ... property." U.S. Const., 14th Amend., § 1. And the California Constitution also provides

11    that "Private property may be taken *or damaged* for a public use and only when just compensation,

12    ascertained by a jury unless waived, has first been paid to, or into court for, the owner." Cal. Const.,

13    Art. I, § 19 (emphasis added).

14    As in this case, a plaintiff suffering an unconstitutional taking without compensation may seek

15    declaratory and injunctive relief as a remedy. *See e.g.*, *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528,

16    528 (2005) (plaintiffs brought suit seeking a declaration that a rent cap effected an unconstitutional

17    taking of their property, and sought injunctive relief against application of the cap); *San Remo Hotel*

18    *L.P. v. City and County of San Francisco*, 27 Cal.4th 643, 649 (2002) (plaintiffs challenged

19    ordinance under California constitution by petition for writ of mandate); *Jefferson Street Industries,*

20    *LLC v. City of Indio*, 236 Cal.App.4th 1175, 1195 (2015) (a facial challenge to an ordinance alleged

21    to effect a regulatory taking may be brought through an action for declaratory relief).

22    Injunctive relief is available to enjoin enforcement of a statute violating the Takings Clause.

23    *See Babbitt v. Youpee*, 519 U.S. 234 (1997) (affirming lower courts' grant of injunctive and

24    declaratory relief, where statute violated the Takings Clause); *Golden Gate Hotel Assn. v. City &*

25    *County of San Francisco*, 836 F.Supp. 707, 709 (N.D. Cal. 1993) (granting injunction enjoining city

26    from enforcing city hotel conversion ordinance constituting a taking) (reversed on other grounds, 18

27    F.3d 1482 (9th Cir. 1994)). A court also has jurisdiction to enjoin the taking of private property

28

1    before the amount of compensation has been determined. *Felton Water Co. v. Superior Court*, 82

2    Cal.App. 382, 388 (1927).

3        Individual plaintiffs, all of whom are law-abiding owners of pre-ban (grandfathered)

4    magazines, are suing for themselves and on behalf of those in a class who are similarly situated, in

5    a representative capacity pursuant to state law. *See e.g.*, *Residents of Beverly Glen, Inc. v. City of*

6    *Los Angeles*, 34 Cal.App.3d 117 (1973) (plaintiffs had standing to bring takings-type challenge to

7    ordinance, in a representative capacity under state law).

8        **1.      The Retroactive Magazine Possession Ban Constitutes a *Per Se* Taking.**

9        A "classic taking" is well understood to be one in which "the government directly appropriates

10   private property for its own use." *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional*

11   *Planning Agency*, 535 U.S. 302, 324 (2002). And likewise, a "paradigmatic taking" has also been

12   equally well understood to be "a direct government appropriation or physical invasion of private

13   property." *Lingle*, 544 U.S. at 537. Such takings–where the government directly appropriates the

14   property itself–are *per se* takings for which just compensation must be provided, without regard to

15   factors regarding the economic impact of the regulation or the nature or character of the government

16   action. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426 (1982).

17       The law has further developed to recognize another type of *per se* taking, one in which

18   government regulation of private property may be so onerous that its effect is tantamount to a direct

19   appropriation or ouster. These regulations are also compensable takings under the Fifth Amendment,

20   and occur when such regulations "completely deprive an owner of '*all* economically beneficial

21   us[e]' of her property." *Lingle*, 544 U.S. at 538 (citing *Lucas v. South Carolina Coastal Council*,

22   505 U.S. 1003, 1019 (1992) (*Lucas*)).

23       Where there has been a *per se* taking, under either theory, compensation must be paid to the

24   property owner, irrespective of the perceived public good. *See, e.g.*, *Loretto*, 458 U.S. at 426; *Kaiser*

25   *Aetna v. United States*, 444 U.S. 164, 174 (1979) ("[T]here is no question but that Congress could

26   assure the public a free right of access [...] if it so chose. Whether a statute or regulation that went

27   so far amounted to a 'taking,' however, is an entirely separate question."); *Nat'l Wildlife Fed'n v.*

28

*I.C.C.*, 850 F.2d 694, 706 (D.C. Cir. 1988) ("government action that causes a permanent physical occupation of real property amounts to a taking 'without regard to whether the action achieves an important public benefit or has only minimal economic impact on the owner'").

Here, Penal Code § 32310(c) and (d) as amended constitute both a direct physical appropriation of Plaintiffs' personal property and a scheme so onerous that it deprives Plaintiffs of all economically beneficial use of their property. It therefore amounts to a *per se* taking, for which compensation must be provided.

### a. Section 32310(d) is a Taking because It compels the physical appropriation of property.

There can be no question that the statute itself provides for the direct physical appropriation of tangible property by the government through forced physical surrender. The question is whether that is the only practical, viable (and intended) result. Penal Code § 32310(d) as enacted, states:

> Any person who may not lawfully possess a large-capacity magazine commencing July 1, 2017 shall, prior to July 1, 2017:
>
> (1) Remove the large-capacity magazine from the state;
> (2) Sell the large-capacity magazine to a licensed firearms dealer; or
> (3) Surrender the large-capacity magazine to a law enforcement agency for destruction.

Of these three purported "options," the third option ("surrender"), we contend, is the true option which the State intends to compel, and to which its statutory scheme would effectively relegate most owners of pre-ban magazines who wish to comply with the law. It is the only viable option for the vast majority of California pre-ban magazine holders to remain in compliance with the law.

To illustrate, the first purported "option" under subdivision (d), which is to "remove the large-capacity magazine from the state," is simply not viable for the vast majority of the class, i.e., lawful pre-ban magazine holders. In the first place, the State has taken great pains to prevent or prohibit the sale of such items to others within the confines of this State. Subdivision (a) of section 32310 specifically states: "[A]ny person in this state who […] offers or exposes for sale, […] any large-capacity magazine is punishable by imprisonment in a county jail not exceeding one year or

imprisonment pursuant to subdivision (h) of Section 1170." (Emphasis added.) Therefore, conscientious California pre-ban large capacity magazine holders who wish to dispose of their property using the first "option" apparently may not go on the Internet, offer it for sale, or even call a prospective purchaser in another state to arrange for the sale. They must, by statute, physically drive to a border state before they may even begin to offer or expose it for sale, or even begin to look for a willing buyer or receiver. This is simply, economically and practically, untenable. Indeed, the notion that an actual market exists for 23+ year-old firearms parts is, in itself, highly doubtful.

It is apparent that the Legislature and drafters of Proposition 63 simply and callously assumed (or were simply indifferent to the fact) that any lawful pre-ban large-capacity magazine holder wishing to take the magazine out of state to preserve his or her constitutionally-protected right to keep and bear arms has a friend, relative, or other recipient willing and able to take or bear the costs of storing firearms or firearms parts on the holder's behalf. This is simply unrealistic. Yet, this is the only option available to the class of pre-ban magazine holders who actually wish to keep their firearms, intact or otherwise. If such owners wish to keep their firearms intact, they must essentially lose access to them—a substantial deprivation of their rights and interests in the property that in itself constitutes a taking. *See Nixon v. United States*, 978 F.2d 1269, 1285 (D.C. Cir. 1992) ("The retention of some access rights by the former owner of property does not preclude the finding of a per se taking.").

The second purported "option" under § 32310(d) – to sell to a "licensed firearms dealer" – is equally illusory and (from a takings perspective) suffers from the same defect as the first option, i.e., it simply presupposes that there is an actual market for such items. That is not only a callous assumption, but it is a false one. There is no guarantee (or reason to assume) that licensed firearms dealers would even be willing to participate in this state-endorsed confiscation scheme, forcing upon California gun owners the gross indignity of disassembling and selling away valuable firearms parts they have lawfully held for years. And moreover, from a purely economic point of view, there is no reason to assume that licensed firearms dealers would even be willing to buy such items, at cost, or even at all. Indeed, there are very few people within the State to whom licensed firearms dealers

could resell such items, except for the small class of exempt people such as law enforcement officers. *See* Pen. Code § 32450(c).

But in the bigger picture, of course, the government's mandate of dispossession of personal property, by forcing its sale to third parties, must itself be considered no less than a taking in the first place. At one time, during a *bona fide* national emergency/World War, the government routinely did just this, forcing property owners to relinquish valuable materiel in forcing its sale to third parties for wartime use. And in such instances, the courts routinely held these commandments to be takings, whether or not the property was directly appropriated by the government. *See Dore v. United States*, 97 F. Supp. 239, 242 (Ct. Cl. 1951) ("When, as here, the United States exercises its authority to order delivery and in its sovereign capacity forces the 'sale' of property to it for public use there is, in our opinion, a 'taking' and just compensation must be made."); *Edward P. Stahel & Co. v. United States*, 78 F. Supp. 800, 804 (Ct. Cl. 1948) ("But to say that when the Government forbids an owner of property to make any other use of it, and requires him to sell it, upon request, to the Government, or its designee who will use it for a Government purpose, is not a taking of the property for public use, would be to make the constitutional right contingent upon the form by which the Government chose to acquire the use of the property.").

And therefore, the State cannot simply defer, deflect, or "outsource" its duty to provide just compensation under the Takings Clause, by just assuming that a market for such forced sales exists. "A 'sale' implies willing consent to the bargain. A transaction although in the form of a sale, but under compulsion or duress, is not a sale." *Dore*, 97 F. Supp. at 242. "'Just compensation,'" we have held, means in most cases the fair market value of the property on the date it is appropriated. […] 'Under this standard, the owner is entitled to receive 'what a willing buyer would pay in cash to a willing seller' at the time of the taking.'" *Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 10 (1984) (citation omitted). A true market for these pre-ban magazines – comprised of voluntary buyers and sellers – simply does not exist.

There being no viable, true market for these pre-ban magazines, (again, which essentially cannot be offered for sale while within this State), that leaves only one plausible, practical option

for a conscientious pre-ban magazine holder to comply with the law: to "surrender" it to a law enforcement agency for destruction. And let us make no mistake: this is the option which the State wants, for (a) it is the only viable option as discussed above, and (b) it is hard to imagine that such large-capacity magazines which the State believes "are disproportionately used in crime, and feature prominently in some of the most serious crime, including homicides, mass shootings, and killings of law enforcement officers," as it has argued elsewhere, are somehow acceptable to export to other parts of the country. And the destruction option is, for purposes of this discussion, a direct physical appropriation of previously lawfully-held property, whether the government takes title to it or not. It is therefore a taking, for which compensation has not even been considered, or would be provided.

Therefore, by enactment of this confiscatory statutory scheme, the State has or will have engaged in a taking. "[T]o constitute a taking under the Fifth Amendment it is not necessary that property be absolutely 'taken' in the narrow sense of that word to come within the protection of this constitutional provision; it is sufficient if the action by the government involves a direct interference with or disturbance of property rights. […] Nor need the government directly appropriate the title, possession or use of the properties[.]" *Richmond Elks Hall Ass'n v. Richmond Redevelopment Agency*, 561 F.2d 1327, 1330 (9th Cir. 1977) (citations omitted); *Kaiser Aetna*, 444 U.S. at 175 ("[T]his Court has observed that '[c]onfiscation may result from a taking of the use of property without compensation quite as well as from the taking of the title[.]") (quoting *Chicago, R. I. & P. R. Co. v. United States*, 284 U.S. 80, 96 (1931)).

b.   **The Effect of Section 32310(c) and (d) Constitutes a Taking Because the Statutory Scheme Completely Deprives the Owners of All Economically Beneficial Use of Their Property.**

Irrespective of whether the statute as amended will substantially result in direct physical appropriation of the pre-ban magazines, one thing is clear: it is, in any event, compelling dispossession of this property.  And thus, it amounts to a compensable taking because the law will have completely deprived the owners of all economically beneficial use of their property. *Lucas*, 505 U.S. at 1019; *Lingle*, 544 U.S. at 538.  In doing so, the State has deprived plaintiffs and those similarly situated of "the entire 'bundle' of property rights," i.e., their rights to possess, use, and

1   dispose of these items as they see fit. *Horne v. Department of Agriculture*, 576 U.S. 350, 361 (2015).

2   In *Horne*, the Supreme Court confirmed that the Takings Clause applies to direct

3   appropriations of personal property, included within its description of a "paradigmatic" taking.  That

4   this was the first time that the Supreme Court squarely addressed the issue of whether personal

5   property was subject to the Takings Clause is somewhat remarkable because it is self-evident.

6   However, it has long been established that laws or regulations which essentially destroy the value of

7   personal property, or require its surrender, may and often do constitute a taking, thereby entitling

8   the property owner to compensation or other relief.

9   In fact, some 40 years ago, in *Andrus v. Allard*, 44 U.S. 51 (1979) (*Allard*), the Supreme Court

10  considered the question of whether a law that affected the value of personal property could be

11  challenged, among other grounds, for the reason that it constituted a taking without compensation –

12  or more precisely, whether it violated the plaintiffs' property rights under the Fifth Amendment. The

13  specific question presented to the court was whether federal conservation statutes designed to

14  prevent the destruction of certain species of birds violated the Fifth Amendment rights of the

15  plaintiffs. The conservation statutes in question prohibited generally the sale of protected bird parts,

16  but not the possession thereof. The plaintiffs were engaged in the trade of Indian artifacts, and in

17  fact, had been prosecuted and fined for selling such artifacts which contained the feathers of

18  protected birds. 444 U.S. at 54-55. Ultimately, the court, considering the merits of the claim,

19  concluded that the conservation statutes did not amount to a taking, the primary reasons for which

20  had to do with the enduring economic value of the property, and that the laws did not completely

21  destroy that bundle of property rights to deprive the owners of any use whatsoever. But in this regard,

22  the Court stated:

> The regulations challenged here do not compel the surrender of the artifacts, and there
> is no physical invasion or restraint upon them. Rather, a significant restriction has been
> imposed on one means of disposing of the artifacts. But the denial of one traditional
> property right does not always amount to a taking. At least where an owner possesses
> a full "bundle" of property rights, the destruction of one "strand" of the bundle is not
> a taking, because the aggregate must be viewed in its entirety. [. . .]  In this case, it is
> crucial that appellees retain the rights to possess and transport their property, and to
> donate or devise the protected birds.

23

24

25

26

27

28

444 U.S. at 65–66 (internal citations omitted).

Unlike the regulations in *Allard*, the relevant portions of the LCM Ban, specifically § 32310(c) and (d) as amended, do indeed compel the surrender of lawfully-held personal property. The magazine ban as enacted is a complete and retroactive ban on the possession of previously lawfully-held, and constitutionally-protected, personal property. Unlike the plaintiffs in *Allard*, but like the plaintiffs in *Horne*, the retroactive ban on the possession of pre-ban magazines in fact causes Plaintiffs here to "lose the entire 'bundle' of property rights in these items. The distinction from *Allard* that Chief Justice Roberts drew in *Horne* directly applies here: "*Allard* is a very different case. […] [T]he owners in that case retained the rights to possess, donate, and devise their property. In finding no taking, the Court emphasized that the Government did not 'compel the surrender of the artifacts, and there [was] no physical invasion or restraint upon them.' […] Here of course the raisin program requires physical surrender of the raisins and transfer of title, and the growers lose any right to control their disposition." *Horne*, 576 U.S. at 364 (citing *Allard*, 444 U.S. at 65-66).

Again, this statutory scheme is built upon the assumption that all "pre-ban" large-capacity magazine holders in this State simply have the means and the ability to store their personal property out of State, or could simply sell the magazines to a licensed firearm dealer – with no supporting analysis of the likely burdens or costs for such out-of-state storage or the existence of a market for such forced sales. This reveals the State's true motive here: to force law-abiding gun owners to surrender these valuable and integral components of their firearms.   In other words, the State's ultimate goal is simply confiscation and destruction of Plaintiffs' lawfully-held personal property.

**2.     The Retroactive Magazine Possession Ban Constitutes a Burdensome Regulatory Taking.**

The same analysis alternatively supports a conclusion that the retroactive ban on the prohibition of these grandfathered, pre-ban magazines constitutes an unreasonably burdensome regulatory taking, which also requires compensation. Aside from the direct appropriations of and interference with property constituting per se takings, discussed above, the Supreme Court has held, starting with *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 (1922), that compensation is also

required for a "regulatory taking" – a restriction on the use of property that goes "too far."  260 U.S. at 415; *Horne*, 576 U.S. at 360. "And in *Penn Central Transp. Co. v. New York City*, […], the Court clarified that the test for how far was 'too far' required an 'ad hoc' factual inquiry." *Horne* at 360. "Primary among those factors [in *Penn Central*] are '[t]he economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations.' […]  In addition, the 'character of the governmental action – for instance whether it amounts to a physical invasion or instead merely affects property interests through 'some public program adjusting the benefits and burdens of economic life to promote the common good' – may be relevant in discerning whether a taking has occurred.'" *Lingle*, 544 U.S. at 539; *Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001).

In essence, the "principal guidelines" under *Penn Central* are the economic impact on the regulation and the character of the government action. Each test focuses on the severity of the burden that the government imposes upon these private property rights. Here, the economic burden on the Plaintiffs, and upon the class of similarly-situated individuals they represent, is substantial. As discussed above, to the extent that the forced dispossession of the magazines is not a taking *per se*, there is no viable market for the "forced sale" of these items. As noted, in some cases, the value of these "pre-ban," "grandfathered" magazines is substantial, and some of these magazines are substantial in value because they are the only type of magazine ever made for that particular firearm or the manufacturer never made original ten-round or fewer magazines for that firearm. Ironically, the very thing that makes all these magazines so valuable and essentially irreplaceable is the fact that their further acquisition and importation into the State is illegal under § 32310(a).

And again, even generously assuming that some semblance of a market exists, the law does not permit the offering for sale of these items while within the confines of this State. Pen. Code § 32310(a). And unlike the plaintiffs in *Fyock*, this is not simply a matter of taking items of personal property to a neighboring township a few miles away in order to escape the prohibition.  The statewide scale, combined with a restrictive law preventing the interstate or extra-state sale of these items, makes the burden of compliance far more substantial.

In sum, whether the retroactive ban on the continued possession of personal property, legally held for at least 23 years and more, constitutes direct appropriation, completely eliminates its value, or substantially interferes with Plaintiffs' property rights rising to the level of a regulatory taking, compensation must be provided. In this case, the State never even considered that it might need to provide compensation as a taking, instead presumptively assuming that it could simply dispossess Plaintiffs of long-held, lawfully-owned, and integral parts of firearms under its "police powers." In fact, the basis of the State's claim to the exercise of such power here is that the targeted magazines constitute "dangerous weapons" that the State is free to prohibit without any compensation. RJN, Ex. B, p. 5. Again, these are neither "dangerous" *nor* "unusual," when they must be "dangerous *and* unusual" to be constitutionally banned, and the State has made no effort or even any argument in support of the notion that these arms fall within the narrow purview of such weapons. They clearly do not, as there widespread common use for lawful purposes demonstrates beyond cavil. The State was wrong in baselessly pursuing this ban in a claimed exercise of its "police power," and it should therefore be prevented from enforcing this retroactive ban, unless and until it provides for such compensation or amends the law to keep grandfathered magazines legal within this State.

**D.    PLAINTIFFS ARE ENTITLED TO JUDGMENT ON THEIR EQUAL PROTECTION CLAIM.**

Not much else need be said about the equal protection claim, except that the law's abject failure under the *Bruen* framework underscores that it indeed "impermissibly interferes with the exercise of a fundamental right," subjecting it to strict scrutiny. *Mass. Bd. of Retirement v. Murgia*, 427 U.S. 307, 312 (1976). Defendants haven't even attempted to claim the law would survive such scrutiny. They just seek refuge under the "rational basis" standard—the lowest conceivably applicable form of scrutiny—for their special exemption classifications. The only argument Defendants have made in support of jettisoning strict scrutiny for rational basis is that the Legislature and the electorate "could have rationally believed that [LCMs] used solely as props were not at risk of being used in mass shootings and that such an exception would benefit an important sector of the California economy." Dkt. No. 95. But the "mass shootings" rationale is part of the State's false narrative, as discussed above, and protecting the *business* interests of the movie industry certainly

cannot justify an otherwise entirely impermissible infringement of the fundamental rights of California's law-abiding gunowners.

The classifications the State has drawn here are so "arbitrary or irrational" as to defeat the law even under "rational basis" scrutiny. *City of Cleburne, Tex. v. Cleburne Living Center*, 473 U.S. 432, 446 (1985), as there is no demonstrated "relation between the classification adopted and the object to be attained," *Romer v. Evans*, 517 U.S. 620, 632 (1996). Therefore, summary judgment for Plaintiffs must follow here too.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully submit that summary judgment should be entered in their favor on their claims. In the alternative, partial summary judgment should be entered in their favor on each count respectively.

Dated: March 31, 2023

**SEILER EPSTEIN LLP**


/s/ George M. Lee
George M. Lee

**THE DIGUISEPPE LAW FIRM, P.C.**


/s/ Raymond M. DiGuiseppe
Raymond M. DiGuiseppe

*Attorneys for Plaintiffs*