1  ROB BONTA
   Attorney General of California
2  MARK R. BECKINGTON
   Supervising Deputy Attorney General
3  JOHN D. ECHEVERRIA
   Deputy Attorney General
4  ROBERT L. MEYERHOFF
   Deputy Attorney General
5  State Bar No. 298196
    300 South Spring Street, Suite 1702
6   Los Angeles, CA  90013-1230
    Telephone:  (213) 269-6177
7   Fax:  (916) 731-2144
    E-mail: Robert.Meyerhoff@doj.ca.gov
8  *Attorneys for Defendants Rob Bonta in*
   *his official capacity as Attorney*
9  *General of the State of California and*
   *Allison Mendoza in her Official*
10 *Capacity as Director of the Bureau of*
   *Firearms*

11              IN THE UNITED STATES DISTRICT COURT

12            FOR THE EASTERN DISTRICT OF CALIFORNIA

13                     SACRAMENTO DIVISION

14

15

16 **WILLIAM WIESE, et al.,**          2:17-cv-00903-WBS-KJN

17                      Plaintiffs,

18        v.                          **DEFENDANTS' OPPOSITION TO**
                                      **PLAINTIFFS' MOTION FOR SUMMARY**
19                                    **JUDGMENT AND COUNTER-MOTION**
   **ROB BONTA, et al.,**             **FOR SUMMARY JUDGMENT**
20
                       Defendants.    Date:      July 10, 2023
21                                    Time:      1:30 p.m.
                                      Courtroom:5, 14ᵗʰ Floor
22                                    Judge:    Hon. William B. Shubb

23

24

25

26

27

28

_____
        Defendants' Opposition and Counter-Motion for Summary Judgment
                    (Case No. 2:17-cv-00903-WBS-KJN)

# TABLE OF CONTENTS

Page

Introduction.................................................... 1

Statutory Background............................................ 4

Procedural Background.......................................... 6

Legal Standard................................................. 9

Argument....................................................... 9

    I.    California's Restrictions on Large Capacity Magazines Do Not Burden Conduct Covered by the "Plain Text" of the Second Amendment................. 9

        A.    Bruen Requires that Plaintiffs Satisfy a Threshold, Textual Inquiry and Define a Specific Proposed Course of Conduct............ 9

        B.    Plaintiffs Cannot Demonstrate that LCMs Are "Arms," or that LCM Possession Is a "Closely Related Right."............................... 11

        C.    Large-Capacity Magazines Are Not Protected "Arms" Because They Are Not Commonly Used for Self-Defense.................................... 14

    II.    California's Restrictions on Large-Capacity Magazines Are Consistent with the Nation's Traditions of Weapons Regulation.................... 18

        A.    This Case Requires a "More Nuanced" Analogical Approach............................ 18

            1.    LCMs Represent a Dramatic Technological Change from the Firearms Technologies Widely Available During the Founding and Reconstruction Eras..................... 19

            2.    Section 32310 Addresses the Unprecedented Social Problem of Mass Shootings................................. 24

        B.    California's Restrictions on Large-Capacity Magazines Are Consistent with Historical Laws Regulating Other Dangerous Weapons............. 25

            1.    The Survey of Relevant Dangerous Weapons Laws.................................... 26

                 a.    Medieval to Early Modern England (1300—1776)......................... 27

                b.    Colonial and Early Republic (1600—1812).............................. 28

                 c.    Antebellum and Reconstruction Periods (1813—1877)................... 29

i

**TABLE OF CONTENTS**
(continued)

Page

       d.    Late 19th and Early 20th Centuries (1878—1930s)......................... 32

    2.    The Surveyed Weapons Restrictions Are Relevantly Similar to Section 32310....... 34

III.  The Takings Clause Claim Fails..................... 35

IV.   This Due Process Claim Fails....................... 38

V.    The Equal Protection Claim Fails.................... 38

VI.   If the Court Does Not Agree that Plaintiffs Have Failed to Satisfy the Summary Judgment Standard on Any of Their Claims, Defendants Require Discovery Pursuant to Rule 56(d)............................. 39

VII.  If the Court Finds that California's Restrictions on Large-Capacity Magazines Are Unconstitutional, the Court Should Stay Enforcement of the Judgment Pending Appeal...................................... 40

Conclusion.................................................. 42

**TABLE OF AUTHORITIES**

**Page**

CASES

*Accuracy Firearms, LLC v. Pritzker*
No. 5-23-0035, 2023 Ill. App. (5th) 230035 (Jan. 31, 2023) .................................................... 6

*Akins v. United States*
82 Fed. Cl. 619 (2008) ...................................... 36

*Anderson v. Liberty Lobby, Inc.*
477 U.S. 242 (1986) ......................................... 9

*Arnold v. Brown*
No. 22CV41008 (Haney Cnty. Cir. Ct. Dec. 15, 2022),
*appeal filed* (Jan. 23, 2023) ................................ 6

*Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey*
910 F.3d 106 (3d Cir. 2018) ................................ 37

*Barnett v. Raoul*
Case 3:23-cv-00209-SPM, Dkt. No. 99 ....................... 14

*Bevis v. City of Naperville, Illinois*
2023 WL 2077392 (N.D. Ill. Feb. 17, 2023) ............... 1, 9

*Boland v. Bonta*
Dkt. No. 7, Case No. 23-55276 (9th Cir. Apr. 3, 2023) .................................................... 42

*Bruen. Duncan v. Bonta*
142 S.Ct. 2895 (2022) ....................................... 8

*Bruen. Duncan v. Bonta*
49 F.4th 1228 (9th Cir. 2022) .............................. 8

*Burlington N. Santa Fe R. Co. v. Assiniboine & Sioux Tribes of Fort Peck Reservation*
323 F.3d 767 (9th Cir. 2003) .............................. 40

*Caetano v. Massachusetts*
577 U.S. 411 (2016) ......................................... 12

*Duncan v. Becerra*
265 F. Supp. 3d 1106 (S.D. Cal. 2017) ..................... 12

**TABLE OF AUTHORITIES**
(continued)

*Duncan v. Becerra*
    366 F. Supp. 3d 1131 (S.D. Cal. 2019) ....................... 7

*Duncan v. Becerra*
    742 F. App'x 218 (9th Cir. 2018) ....................... *passim*

*Duncan v. Becerra*
    970 F.3d 1133 (9th Cir. 2020) .............................. 8

*Duncan v. Bonta*
    19 F.4th 1087 (9th Cir. 2021) (en banc) ............... *passim*

*Duncan v. Bonta*
    No. 3:17-cv-01017-BEN-JLB, Dkt. No. 111 (S.D. Cal.
    Sept. 26, 2022) ............................................. 8

*Ezell v. City of Chicago*
    651 F.3d 684 (7th Cir. 2011) .............................. 31

*Fed. Trade Comm'n v. Qualcomm Inc.*
    935 F.3d 752 (9th Cir. 2019) .............................. 41

*Fesjian v. Jefferson*
    399 A.2d 861 (D.C. Ct. App. 1979) ......................... 37

*Frlekin v. Apple, Inc.*
    979 F.3d 639 (9th Cir. 2020) .............................. 9

*Fyock v. Sunnyvale*
    779 F.3d 991 (9th Cir. 2015) ......................... 4, 5, 7

*Hanson v. D.C.*
    2023 WL 3019777 (D.D.C. Apr. 20, 2023) ............... *passim*

*Herrera v. Raoul*
    2023 WL 3074799 (N.D. Ill. Apr. 25, 2023) ............... 1, 19

*Humane Soc'y of U.S. v. Gutierrez*
    558 F.3d 896 (9th Cir. 2009) .............................. 40

*Jackson v. City & Cnty. of San Francisco*
    746 F.3d 953 (9th Cir. 2014) .............................. 13

*Kolbe v. Hogan*
    849 F.3d 114 (4th Cir. 2017) (en banc) ................. 17, 35

**TABLE OF AUTHORITIES**
(continued)

Page

*Laurel Park Cmty., LLC v. City of Tumwater*
  698 F.3d 1180 (9th Cir. 2012) ............................... 36

*Levald, Inc. v. City of Palm Desert*
  998 F.2d 680 (9th Cir. 1993) ............................... 38

*Liebling v. Novartis Pharms. Corp.*
  2014 WL 12576619 (C.D. Cal. Mar. 24, 2014) ................ 19

*Luis v. United States*
  578 U.S. 5 (2016) ......................................... 13

*McDonald v. City of Chicago, Ill.*
  561 U.S. 742 (2010) ................................... 12, 28

*Nat'l Rifle Ass'n v. Bondi*
  61 F.4th 1317 (11th Cir. 2023) ............................ 31

*New York State Rifle & Pistol Association, Inc. v.*
  *Bruen*
  142 S.Ct. 2111 (2022) ................................. *passim*

*Oakland Tactical Supply, LLC v. Howell Twp.*
  2023 WL 2074298 (E.D. Mich. Feb. 17, 2023) ................ 10

*Ocean State Tactical, LLC v. State of Rhode Island*
  2022 WL 17721175 (D.R.I. Dec. 14, 2022) .............. *passim*

*Oregon Firearms Fed'n, Inc. v. Brown*
  2022 WL 17454829 (D. Or. Dec. 6, 2022) ............... *passim*

*Orr v. Bank of Am., NT & SA*
  285 F.3d 764 (9th Cir. 2002) ........................... 9, 19

*Presser v. People of State of Ill.*
  116 U.S. 252 (1886) ....................................... 31

*Renna v. Bonta*
  2023 WL 2756981 (S.D. Cal. Mar. 31, 2023) ................. 10

*Ridgel v. United States*
  2013 WL 2237884 (C.D. Cal. May 21, 2013) .............. 9, 19

*Teixeira v. Cnty. of Alameda*
  873 F.3d 670 (9th Cir. 2017) .............................. 13

Defendants' Opposition and Counter-Motion for Summary Judgment
(Case No. 2:17-cv-00903-WBS-KJN)

**TABLE OF AUTHORITIES**
(continued)

Page

*Texas Partners v. Conrock Co.*
  685 F.2d 1116 (9th Cir. 1982) ............................. 40

*United States ex rel. Kelly v. Serco, Inc.*
  846 F.3d 325 (9th Cir. 2017) ................................. 9

*United States v. Cox*
  906 F.3d 1170 (10th Cir. 2018) ............................ 12

*United States v. Kelly*
  2022 WL 17336578 (M.D. Tenn. Nov. 16, 2022) ................ 26

*United States v. Reyna*
  2022 WL 17714376 (N.D. Ind. Dec. 15, 2022) ............ 10, 15

*United States v. Trinidad*
  (D.P.R. Oct. 17, 2022) ................................. 10, 11

*Worman v. Healey*
  922 F.3d 26 (1st Cir. 2019) ................................. 16

**STATUTES**

18 U.S.C. § 922(w)(2) (repealed 2004)........................ 4

Cal. Penal Code § 16740................................... *passim*

Cal. Penal Code § 32310................................... *passim*

Cal. Stat. 938........................................... 33

Cal. Stat. 1549, § 1...................................... 5

Cal. Stat. 1781, §§ 3, 3.5................................ 4

Colo. Rev. Stat. § 18-12-301—303.......................... 6

Conn. Gen. Stat. §§ 53-202w............................... 6

D.C. Code Ann. §§ 7-2506.01(b), 7-2507.06(a)(4).............. 6

Del. Code Ann. Title 11, §§ 1468(2), 1469(a)................ 6

Haw. Rev. Stat. Ann. § 134-8(c)........................... 6

Ill. Comp. Stat. § 5/24-1.10.............................. 6

1804 Ind. Acts 108....................................... 29

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page**

3

1855 Ind. Acts 153, An Act To Provide For The
  Punishment Of Persons Interfering With Trains or
4
  Railroads, chap. 79, § 1 .................................. 30

5

1905 Ind. Acts 677............................................. 30

6

1798 Ky. Acts 106 ............................................. 29

7

Mass. Gen. Laws, Chapter 140, §§ 121, 131M.................... 6

8

Md. Code Ann., Crim. Law § 4-305............................. 6

9

1804 Miss. Laws 90, An Act Respecting Slaves, § 4............ 29

10

N.J. Stat. Ann. §§ 2C:39-1(y), 2C:39-3(j), 2C:39-9(h).......... 6

11

N.Y. Penal Law §§ 265.00(23), 265.02(8), 265.10,
12
  265.11, 265.37 ............................................ 6

13

National Firearms Act........................................ 33

14

Pub.L. 103—322, Sept. 13, 1994, 108 Stat. 1796, 1998—
15
  2000 (formerly codified at 18 U.S.C. § 922(w)) .............. 4

16

Pub. L. No. 275, 1932........................................ 33

17

R.I. Gen. Laws §§ 11-47.1-2, 11-47.1-3(a)..................... 6

18

Safety for All Act of 2016................................... 5

19

Vt. Stat. Ann. Title 13, § 4021.............................. 6

20

Wash. Rev. Code Title 9, §§ 9.41.010(16), 9.41.370.......... 6

21

**CONSTITUTIONAL PROVISIONS**

22

Second Amendment........................................... *passim*

23

Fourteenth Amendment....................................... *passim*

24

California Constitution...................................... 7

25

Idaho Constitution of 1896.................................. 31

26

Utah Constitution of 1896................................... 31

27

28

**TABLE OF AUTHORITIES**
(continued)

Page

**COURT RULES**

Federal Rule of Civil Procedure 12............................. 7

Federal Rule of Civil Procedure 56.................... 8, 39, 40

**OTHER AUTHORITIES**

Adam Winkler, *Racist Gun Laws and the Second Amendment*,
   135 Harv. L. Rev. .......................................... 27

William Baude & Stephen E. Sachs, *Originalism & the Law
   of the Past* 1. & .......................................... 27

Defendants' Opposition and Counter-Motion for Summary Judgment
(Case No. 2:17-cv-00903-WBS-KJN)

**INTRODUCTION**

Because California's restrictions on large capacity magazines (LCMs)—that is, ammunition-feeding devices that can accept more than ten rounds of ammunition—are constitutional under the "text and history" test set forth by the Supreme Court in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S.Ct. 2111 (2022), Plaintiffs' Motion for Summary Judgment should be denied and Defendants' Counter-Motion for Summary Judgment should be granted. Such a decision would accord with numerous district courts that have considered and rejected challenges to LCM restrictions under the *Bruen* framework. *See Herrera v. Raoul*, 2023 WL 3074799, at *4 (N.D. Ill. Apr. 25, 2023) (denying preliminary injunction of LCM and assault weapon restrictions); *Hanson v. D.C.*, 2023 WL 3019777, --- F. Supp. 3d --- (D.D.C. Apr. 20, 2023) (denying preliminary injunction of LCM restrictions); *Bevis v. City of Naperville, Illinois*, 2023 WL 2077392, at *16 (N.D. Ill. Feb. 17, 2023) (denying preliminary injunction of LCM and assault weapon restrictions); *Oregon Firearms Fed'n, Inc. v. Brown*, 2022 WL 17454829, at *8—11 (D. Or. Dec. 6, 2022), *appeal dismissed*, 2022 WL 18956023 (9th Cir. Dec. 12, 2022) (denying temporary restraining order preventing enforcement of LCM restriction); *Ocean State Tactical, LLC v. State of Rhode Island*, 2022 WL 17721175, at *25 (D.R.I. Dec. 14, 2022) (denying preliminary injunction of LCM restriction).

Under *Bruen*, Plaintiffs must first satisfy a threshold, plain text analysis, *i.e.*, that their proposed course of conduct is covered by the Second Amendment. If Plaintiffs can meet that burden, then Defendants must show that the challenged regulation

1  is consistent with the Nation's historical tradition of firearm

2  regulations. As explained herein, the voluminous evidence that

3  Defendants have submitted from leading historians and firearms

4  experts establishes that there is no genuine dispute of material

5  fact on either of the analyses *Bruen* requires. Plaintiffs'

6  proposed course of conduct of possessing firearm magazines

7  capable of holding more than ten rounds of ammunition is not

8  covered by the Second Amendment's plain text, and, even if it

9  were, California's law restricting such possession is consistent

10  with the historical tradition of firearms regulation in this

11  country.

12      First, as to the threshold inquiry, Plaintiffs' proposed

13  conduct, properly understood, is not "keeping and bearing arms,"

14  a characterization that would read this threshold inquiry of out

15  the *Bruen* analysis entirely, but rather the possession of LCMs.

16  The Second Amendment does not protect this conduct, however,

17  because LCMs are not "Arms" that fall within the Second

18  Amendment's plain text, but rather are accoutrements or

19  accessories. While regulation of an accessory could trigger

20  Second Amendment scrutiny under a "closely related right" or

21  "corollary" right theory if that accessory were necessary for the

22  operation in self-defense of a firearm that is itself protected

23  by the Second Amendment (*e.g.*, ammunition), that is not the case

24  here because the evidence establishes that LCMs are not necessary

25  for the operation of any firearm, much less the operation of such

26  a firearm for a constitutionally-protected purpose (*i.e.*, self-

27  defense).

28

1    Moreover, LCMs are not "Arms" within the meaning of Second

2   Amendment because the evidence establishes that they are not

3   commonly used for self-defense. To the contrary, the evidence

4   Defendants have submitted proves that LCMs are often, and

5   increasingly, used in the devastating mass shootings that have

6   come to plague this Nation. Indeed, the evidence in this case

7   shows that far from being commonly used for self-defense, LCMs

8   are accessories most suitable for military combat and as such

9   are, like M-16s, outside of the scope of the Second Amendment.

10    Second, even if the Court were to determine that Plaintiffs'

11  proposed course of conduct is protected by the Second Amendment's

12  plain text, Section 32310 is nonetheless constitutional because

13  it is consistent with the Nation's tradition of firearms

14  regulation. Defendants have identified, and provided evidence to

15  contextualize, numerous relevantly similar restrictions enacted

16  around 1791 (*i.e.*, the ratification of the Second Amendment) and

17  1868 (*i.e.*, the ratification of the Fourteenth Amendment). These

18  relevantly similar restrictions are more than sufficient in a

19  case such as this, where the evidence submitted shows that LCMs

20  represent a "dramatic technological change" and that Section

21  32310 addresses an "unprecedented societal concern." *Bruen*

22  commands that in cases implicating either such a change *or* such a

23  concern, courts must follow a "*more* nuanced approach" because

24  "[t]he regulatory challenges posed by firearms today are not

25  always the same as those that preoccupied the Founders in 1791 or

26  the Reconstruction generation in 1868." *Bruen*, 142 S.Ct. at 2132—

27  33. Applying this more nuanced approach and considering the

28

1    evidence in question, this Court should find that Section 32310

2    fits within the Nation's tradition of firearms regulations.

3        In the face of Defendants' evidence on all of these points,

4    Plaintiffs present no evidence that the Founders would have

5    considered magazines "Arms," no evidence (beyond non-academic

6    studies based on anecdotes and self-reporting) that LCMs are

7    commonly used in self-defense, no evidence that LCMs bear any

8    significant similarity to early repeating firearms, no evidence

9    that mass shootings facilitated by the recent phenomenon of

10   widely-available LCMs are not an "unprecedented societal

11   concern," and no evidence that Section 32310 does not impose

12   comparable burdens and does not have comparable justifications to

13   the numerous relevantly similar restrictions Defendants

14   identified.

15       Indeed, Plaintiffs appear to believe that the mere

16   incantation of *Bruen* is both sufficient to strike down any

17   firearms-related regulation and to relieve them of their

18   obligations under Rule 56 to submit evidence in support of their

19   claims. But *Bruen* directs courts to "follow the principle of

20   party presentation," as they should in every case, and "decide a

21   case based on the historical record compiled by the parties." 142

22   S. Ct. at 2130. In this case, based on the historical record

23   compiled by the parties, the Court should enter judgment for

24   Defendants on Plaintiffs' Second Amendment claim.

25       Similarly, there is no genuine dispute of material fact on

26   Plaintiffs' Takings and Equal Protections claims. This Court had

27   previously dismissed those claims based on well-established Ninth

28   Circuit precedent, and then had only allowed those claims to

1   survive in the Third Amended Complaint based on a Ninth Circuit

2   decision in another case, a decision that was subsequently

3   vacated. Nothing in *Bruen* suggests that this Court erred in

4   dismissing those claims at the pleadings stage on Defendants'

5   motion to dismiss the Second Amended Complaint, nor have

6   Plaintiffs presented any evidence to controvert this Court's

7   previous holding. Judgment should thus be entered for Defendants

8   on those claims.

9       For these reasons, Plaintiffs' motion for summary judgment

10  should be denied and Defendants' counter-motion for summary

11  judgment on all claims should be granted.

12                       **STATUTORY BACKGROUND**

13      California law defines an LCM as any ammunition-feeding

14  device with the capacity to accept more than ten rounds. Cal.

15  Penal Code § 16740.[1] LCMs have been extensively regulated in the

16  United States for decades. Federal law prohibited the possession

17  and transfer of any LCM (defined as a magazine capable of

18  accepting more than ten rounds of ammunition) from 1994 to 2004

19  as part of the federal assault weapons ban. Pub.L. 103—322, Sept.

20  13, 1994, 108 Stat. 1796, 1998—2000 (formerly codified at 18

21  U.S.C. §922(w)). The federal ban did not, however, apply to LCMs

22  that were lawfully possessed on the date of enactment. 18 U.S.C.

23  § 922(w)(2) (repealed 2004).

24

25  _____

26      [1] California's definition of an LCM excludes any "feeding
    device that has been permanently altered so that it cannot
    accommodate more than 10 rounds." Cal. Penal Code § 16740(a). It
27  also excludes a ".22 caliber tube ammunition feeding device" and
    a "tubular magazine that is contained in a lever-action firearm."
28  *Id.* at § 16740(b), (c).

In 2000, before the federal ban expired, "California criminalized the manufacture, sale, purchase, transfer, and receipt of large-capacity magazines within the state, but did not specifically criminalize the possession of large-capacity magazines, which was covered at the time by federal law." *Fyock v. Sunnyvale*, 779 F.3d 991, 994 (9th Cir. 2015); 1999 Cal. Stat. 1781, §§ 3, 3.5 (S.B. 23) (now codified at Cal. Penal Code § 32310(a)). Individuals in California who lawfully possessed LCMs on January 1, 2000 were permitted to keep them, though they were not authorized to sell or otherwise transfer their grandfathered LCMs, nor were they permitted to manufacture or acquire new LCMs. *See* Cal. Penal Code § 32310(a). The expiration, in 2004, of the federal prohibition on the possession of non-grandfathered LCMs, left "a 'loophole' permitting the possession of [LCMs] in California." *Fyock*, 779 F.3d at 994. As this Court has noted, the "loophole" enabled the continued proliferation of LCMs in the State because there was "no way for law enforcement to determine which magazines were 'grandfathered' and which were illegally transferred or modified to accept more than ten rounds after January 1, 2000." Dkt. No. 52 (Order re: Preliminary Injunction), at 9. As a result, California's original LCM restrictions on the manufacture and importation of LCMs were "very difficult to enforce." S. Rules Comm., Off. of S. Floor Analyses, 3d Reading Analysis of S.B. 1446 (2015–2016 Reg. Sess.) as amended Mar. 28, 2016, at 9 (noting comments in support of the bill that "[i]t is nearly impossible to prove when a[n LCM] was acquired or whether the magazine was illegally purchased [or transferred] after the

1  2000 ban" and that prohibiting the possession of LCMs "would

2  enable the enforcement of existing law regarding [LCMs]").

3       In 2016, California's LCM laws were amended to address this

4  difficulty with enforcement of those laws, by prohibiting the

5  possession of all LCMs—both new and previously grandfathered—

6  beginning on July 1, 2017. *See* 2016 Cal. Stat. 1549, § 1 (S.B.

7  1446); Prop. 63, "The Safety for All Act of 2016."

8       California's LCM restrictions are set forth in section 32310

9  of the California Penal Code. Subsection (a) provides that "any

10  person in this state who manufactures or causes to be

11  manufactured, imports into the state, keeps for sale, or offers

12  or exposes for sale, or who gives, lends, buys, or receives" an

13  LCM is guilty of a misdemeanor or a felony. Subsection (c), added

14  in 2016, provides that the possession of an LCM on or after July

15  1, 2017 is an infraction or a misdemeanor punishable by a fine

16  not to exceed $100 per LCM or imprisonment in a county jail not

17  to exceed one year, or both. Subsection (d), also added in 2016,

18  addresses previously grandfathered LCMs, providing that anyone

19  not authorized to possess LCMs must, before July 1, 2017, (1)

20  remove the LCM from the state, (2) sell the LCM to a licensed

21  firearms dealer, or (3) surrender the LCM to law enforcement for

22  destruction. Alternatively, an owner of an LCM may permanently

23  modify the magazine "so that it cannot accommodate more than 10

24  rounds." Cal. Penal Code § 16740(a); *see also id.* at § 32425

25  (exempting from section 32310 the "giving of any [LCM] to . . . a

26  gunsmith, for the purposes of . . . modification of that [LCM]").

27       California is not alone in imposing limits on magazine

28  capacity. Fourteen states, and the District of Columbia, have

1   done so to date.[2]  As of today, more than one-third of the

2   American population resides in a jurisdiction that has enacted

3   magazine-capacity limits.[3]

**PROCEDURAL BACKGROUND**

5        In 2017, Plaintiffs filed this challenge to Section 32310,

6   raising claims under the Second, Fifth, and Fourteenth

7

8        [2] *See* Cal. Penal Code §§ 16740, 32310 (10-round limit);
Colo. Rev. Stat. § 18-12-301—303 (15-round limit); Conn. Gen.
9   Stat. §§ 53-202w (10-round limit); Del. Code Ann. tit. 11,
§§ 1468(2), 1469(a) (17-round limit); D.C. Code Ann. §§ 7-
10  2506.01(b), 7-2507.06(a)(4) (10-round limit); Haw. Rev. Stat.
Ann. § 134-8(c) (10-round limit for handguns); 720 Ill. Comp.
11  Stats. 5/24-1.10 (10-round limit for long guns and 15-round limit
for handguns); Md. Code Ann., Crim. Law § 4-305 (10-round limit);
12  Mass. Gen. Laws, ch. 140, §§ 121, 131M (10-round limit); N.J.
Stat. Ann. §§ 2C:39-1(y), 2C:39-3(j), 2C:39-9(h) (10-round
13  limit); N.Y. Penal Law §§ 265.00(23), 265.02(8), 265.10, 265.11,
265.37 (10-round limit); 2022 Or. Ballot Measure 114, § 11(d)
14  (10-round limit); R.I. Gen. Laws §§ 11-47.1-2, 11-47.1-3(a) (10-
round limit); Vt. Stat. Ann. tit. 13, § 4021 (10-round limit for
15  long guns and 15-round limit for handguns); Wash. Rev. Code tit.
9, §§ 9.41.010(16), 9.41.370 (10-round limit). Illinois's LCM
16  laws (720 Ill. Comp. Stat. § 5/24-1.10) and Oregon's LCM law
(2022 Or. Ballot Measure 114, § 11) are currently subject to a
17  temporary restraining order and a preliminary injunction,
respectively, issued by state trial courts on state
18  constitutional grounds. *See Accuracy Firearms, LLC v. Pritzker*,
No. 5-23-0035, 2023 Ill. App. (5th) 230035, at *17, 35—38 (Jan.
19  31, 2023) (noting that no Second Amendment claims were alleged
but affirming temporary restraining order based on equal
20  protection guarantees in the Illinois Constitution); Opinion
Letter at 22—25, *Arnold v. Brown*, No. 22CV41008 (Haney Cnty. Cir.
21  Ct. Dec. 15, 2022) (granting injunction based on the Oregon
Constitution), *appeal filed* (Jan. 23, 2023).

22

23       [3] The total population in the fifteen jurisdictions with
magazine-capacity limits is estimated to be 120,060,105, and the
24  total U.S. population is 333,287,557. *See* U.S. Census, State
Population Totals and Components of Change: 2020—2022,
25  http://bit.ly/40yhFSK. All Americans lived with LCM restrictions
while the federal assault weapons ban was in effect from 1994 to
26  2004. *See* H.R. Rep. No. 103-489 (1994).

1   Amendments. Dkt. No. 1. After the Court denied plaintiffs'

2   request for a preliminary injunction (Dkt. No. 52), Plaintiffs

3   added equal protection and Takings Clause claims in their Second

4   Amended Complaint, which expanded on their previously asserted

5   claims and which added (1) an equal protection claim under the

6   U.S. and California Constitutions; (2) an allegation that the ban

7   operates as a taking under the California Constitution; and (3)

8   additional allegations in support of their vagueness claims. Dkt.

9   No. 59. The Court dismissed the Second Amended Complaint on in

10  its entirety February 7, 2018. Dkt. No. 74. The Court dismissed

11  the Second Amendment claim, relying in part on the two-step test

12  set forth by the Ninth Circuit in *Fyock v. City of Sunnyvale*, 779

13  F.3d 991 (9th Cir. 2015). Dkt. No. 74 at 4-10. The Court rejected

14  the Takings Clause claim, finding the physical taking allegations

15  to be insufficient, because magazine owners may sell the

16  magazines to licensed gun dealers, remove them from the state, or

17  permanently modify them so they no longer accept more than 10

18  rounds. *Id*. at 10-13. The Court also found that the regulatory

19  taking allegations fell short because the options for disposing

20  of LCMs left some beneficial use for that property. *Id*. Finally,

21  the Court rejected the claims that the LCM restrictions were void

22  for vagueness or overbroad, and that the exemption for magazines

23  used solely as props in movie, television, or video production

24  violated equal protection. *Id*. at 13-23.

25      After the dismissal of the Second Amended Complaint, a panel

26  of the Ninth Circuit upheld a preliminary injunction issued by

27  the district court in another case raising a Second Amendment and

28  Takings Clause challenge to California's LCM restrictions, *Duncan*

1  *v. Becerra*, 742 F. App'x 218 (9th Cir. 2018). This Court then

2  considered Defendants' motion to dismiss the Third Amended

3  Complaint. Dkt. No. 103. While noting that the "Third Amended

4  Complaint has only minor changes from the Second Amended

5  Complaint, which this court previously found insufficient under

6  Federal Rule of Civil Procedure 12(b)(6)," the Court determined

7  that the Ninth Circuit's affirmance of the preliminary injunction

8  in *Duncan* compelled the Court to deny the motion to dismiss the

9  Second Amendment and Takings Clause claims. *Id.* at 5-6.

10  After this Court denied the motion to dismiss, the district

11  court in *Duncan* issued a final judgment striking down

12  California's LCM restrictions, *Duncan v. Becerra*, 366 F. Supp. 3d

13  1131 (S.D. Cal. 2019), which the Attorney General appealed.  On

14  May 8, 2019, before discovery in this matter opened, this Court

15  stayed the case pending resolution of the appeal in *Duncan*. Dkt.

16  No. 110; *see also* Dkt. No. 113 (extending the stay until issuance

17  of the mandate by the Ninth Circuit in *Duncan*).

18  A three-judge panel from the Ninth Circuit affirmed the

19  *Duncan* district court's final judgment. *Duncan v. Becerra*, 970

20  F.3d 1133 (9th Cir. 2020). An en banc panel ultimately reversed

21  and remanded for entry of judgment in favor of the Attorney

22  General. *Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021) (en

23  banc). That en banc opinion was later vacated by the Supreme

24  Court and remanded to the Ninth Circuit for reconsideration in

25  light of *Bruen*. *Duncan v. Bonta*, 142 S.Ct. 2895 (2022). The Ninth

26  Circuit then remanded the case to the district court for further

27

28

1  proceedings consistent with *Bruen*. *Duncan v. Bonta*, 49 F.4th 1228

2  (9th Cir. 2022).[4]

3      On September 23, 2022, the mandate in *Duncan* issued, and the

4  parties in this matter filed a joint status report on October 7,

5  2022. Dkt. No. 115. In that report, Plaintiffs "request[ed] to

6  file a motion for summary judgment as to all claims in this

7  matter." *Id*. at 2. "Plaintiffs oppose[d] discovery in this case,"

8  because "[t]he only 'facts' relevant to resolution of this case

9  are 'legislative facts' regarding the history of magazine usage

10 and regulation in this country, and as such all facts can be

11 developed in briefing and argument without the need for expert or

12 other evidence adduced through traditional party discovery

13 methods." *Id*. at 3. Defendants requested "both fact and expert

14 discovery to develop a factual, legal, and historical record in

15 support of this analysis." *Id*. at 5.

16      On January 13, 2023, the Court issued an order permitting

17 plaintiffs to file their motion for summary judgment "forthwith."

18 Dkt. No. 119. The Court noted, however, that it would consider a

19 "request under Federal Rule of Civil Procedure 56(d) after

20 plaintiffs' motion for summary judgment has been filed, should

21 defendants feel discovery is necessary to respond to plaintiffs'

22 motion." *Id*. at 2. On March 31, 2023, Plaintiffs filed the

23 instant motion. Dkt. No. 123.

24

25  _____

26      [4] Following remand of *Duncan*, the district court issued an
order continuing the preliminary injunction of California Penal
Codes section 32310(c) and (d), *Duncan v. Bonta*, No. 3:17-cv-

27 01017-BEN-JLB, Dkt. No. 111 (S.D. Cal. Sept. 26, 2022).
Accordingly, at this time, enforcement of section 32310(c) and

28 (d) remains enjoined.

1      **LEGAL STANDARD**

2      "A grant of summary judgment is appropriate when there is no

3   genuine dispute as to any material fact and the movant is

4   entitled to judgment as a matter of law." *Frlekin v. Apple, Inc.*,

5   979 F.3d 639, 643 (9th Cir. 2020). "If the evidence is merely

6   colorable, or is not significantly probative, summary judgment

7   may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

8   249—50 (1986). Moreover, to survive summary judgment, a party

9   "must establish *evidence* on which a reasonable jury could find

10   for" that party. *United States ex rel. Kelly v. Serco, Inc.*, 846

11   F.3d 325, 330 (9th Cir. 2017).

12      "A trial court can only consider admissible evidence in

13   ruling on a motion for summary judgment." *See Orr v. Bank of Am.,*

14   *NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002). And a document that

15   "is not attached to any declaration and is unauthenticated and

16   unsworn" cannot be considered on a motion for summary judgment.

17   *Ridgel v. United States*, 2013 WL 2237884, at *2 (C.D. Cal. May

18   21, 2013).

19      **ARGUMENT**

20   I.   **CALIFORNIA'S RESTRICTIONS ON LARGE CAPACITY MAGAZINES DO NOT BURDEN**
        **CONDUCT COVERED BY THE "PLAIN TEXT" OF THE SECOND AMENDMENT.**

21
        A.   ***Bruen* Requires that Plaintiffs Satisfy a Threshold,**
22           **Textual Inquiry and Define a Specific Proposed Course**
             **of Conduct.**

23
24      Plaintiffs' challenge to Section 32310 fails at the

     threshold, textual stage of the *Bruen* analysis.  The Court does
25
     not proceed to the historical step of the text-and-history
26
     standard unless the party challenging the law first establishes
27
     that the "plain text" of the Second Amendment covers the conduct
28

1   in which the party wishes to engage. "When the Second Amendment's

2   plain text covers an individual's conduct, the . . . government

3   must *then* justify its regulation by demonstrating that it is

4   consistent with the Nation's historical tradition of firearm

5   regulation." *Bruen*, 142 S. Ct. at 2129—30 (emphasis added); *see*

6   *also Bevis*, 2023 WL 2077392, at *9 ("Courts must *first* determine

7   whether the Second Amendment's plain text covers an individual's

8   conduct," and only if it does, the "government must then justify

9   its regulation.") (emphasis added); *Ocean State*, 2022 WL

10  17721175, at *12 ("Although *it is their burden* to show that

11  large-capacity magazines fall within the purview of the Second

12  Amendment, *the plaintiffs* offer no expert opinion on the meaning

13  of the word 'Arms.'") (emphasis added).

14      Not only do Plaintiffs ignore the threshold inquiry *Bruen*

15  requires, Plaintiffs also describe their course of conduct in

16  such a generalized manner that this threshold inquiry would be

17  rendered a nullity. "To determine whether the plain text of the

18  Amendment covers the conduct regulated by the challenged law, it

19  is necessary to identify and delineate the *specific* course of

20  conduct at issue." *Renna v. Bonta*, 2023 WL 2756981, at *6 (S.D.

21  Cal. Mar. 31, 2023) (emphasis added).  Lower courts applying

22  *Bruen* have similarly described courses of conduct with reasonable

23  specificity. *See, e.g., United States v. Reyna*, 2022 WL 17714376,

24  at *4 (N.D. Ind. Dec. 15, 2022) (cautioning against defining the

25  proposed conduct generally as "mere possession," because "any

26  number of other challenged regulations would similarly boil down

27  to mere possession, then promptly and automatically proceed" to

28  the historical stage of the *Bruen* analysis); *Oakland Tactical*

*Supply, LLC v. Howell Twp.*, 2023 WL 2074298, at *3 (E.D. Mich. Feb. 17, 2023) (rejecting plaintiffs' effort to define their course of conduct as "training with firearms" and concluding that the course of conduct is "construction and use of an outdoor, open-air, 1,000-[yard] shooting range"). And in *Bruen* itself, the Supreme Court defined the course of conduct not as merely "keeping and bearing arms," but more specifically as "carrying handguns publicly for self-defense."  142 S. Ct. at 2119.

Contrary to *Bruen*, Plaintiffs define their proposed conduct simply as "keeping and bearing arms." MPA at 1. Such a broad definition would allow any litigant to "promptly and automatically proceed" to the historical stage of the *Bruen* analysis.  *See United States v. Reyna*, 2022 WL 17714376, at *4 (N.D. Ind. Dec. 15, 2022); *see also United States v. Trinidad* (D.P.R. Oct. 17, 2022) ("If step one merely required them to say that they wanted to bear arms, then *Bruen*'s analysis about who they were, what they wanted to do, and why they wanted to do it would be gratuitous.").

*Bruen* requires more. In this case, Plaintiffs' actual proposed course of conduct is the ownership, possession, and use of LCMs. *See, e.g.,* MPA at 10 (arguing that "firearms capable of firing more than ten rounds without reloading are unquestionably 'bearable arms' that are 'in common use' and therefore entitled to protection"); *id.* ("The Second Amendment certainly 'covers an individual's conduct' in owning, possessing, and using these magazines.").

As explained below, because Plaintiffs cannot show that Section 32310 burdens conduct covered by the Second Amendment,

1    the Court should uphold it at the textual stage of the *Bruen*

2    analysis.

3        **B.  Plaintiffs Cannot Demonstrate that LCMs Are "Arms,"**
         **or that LCM Possession Is a "Closely Related Right."**

4

5        As an initial matter, there is no dispute among the parties

6    that LCMs are not weapons in and of themselves. *See* Busse Decl.,

7    ¶ 13 (magazines are "containers which hold ammunition"); *see* Lee

8    Decl., Dkt. 123-4, at 5-6 (magazines are "ammunition feeding

9    devices" and are "simply a receptacle for a firearm that holds a

10   plurality of cartridges or shells under spring pressure

11   preparatory for feeding into the chamber") (quotation omitted).[5]

12       Courts both pre- and post-*Bruen* have similarly recognized

13   that magazines are not themselves weapons. As the *Duncan* en banc

14   panel correctly observed, Section 32310 "outlaws *no weapon*, but

15   only limits the size of the magazine that may be used with

16   firearms." 19 F.4th at 1096 (emphasis added);[6] *see also Ocean*

17   *State*, 2022 WL 17721175, at *12 (same conclusion). "LCMs, like

18   other accessories to weapons, are not used in a way that 'cast[s]

19   at or strike[s] another,'" *Ocean State*, 2022 WL 17721175, at *12,

20   but rather are more properly viewed like silencers and other

21   accessories that "'generally have no use independent of their

22   attachment to a gun.'"  *Id.* (quoting *United States v. Hasson*,

23   2019 WL 4573424, at *2 (D. Md. Sept. 20, 2019)); *see also United*

24   *States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018) ("A silencer

25       [5] Indeed, today, dealers list magazines under the
     "accessories" sections of their websites. *See, e.g.*, Guns.com,

26   Accessories, https://www.guns.com/accessories; *see* Busse Decl. ¶
     25 (noting that LCMs are "characterized as an accessory by the

27   [firearms] industry").

28       [6] Although this opinion was vacated, it is cited for its
     persuasive value.

1   is a firearm accessory; it's not a weapon in itself (nor is it

2   'armour of defence')."").

3       This conclusion is supported by corpus linguistics analysis;

4   historically, the term "Arms" referred to "weapons such as

5   swords, knives, rifles, and pistols," and did not include

6   "accoutrements," like "ammunition containers, flints, scabbards,

7   holsters, or 'parts' of weapons." *See* Baron Decl., ¶ 8; *Ocean*

8   *State*, 2022 WL 17721175, at *13 (discussing Professor Barron's

9   credentials and expertise and crediting his testimony). Even the

10  district court in *Duncan*, which concluded pre-*Bruen* that LCMs are

11  protected by the Second Amendment, suggested that LCMs were not

12  "Arms." *See, e.g., Duncan v. Becerra*, 265 F. Supp. 3d 1106, 1117

13  (S.D. Cal. 2017) (stating that "[o]f course, when a magazine is

14  detached the magazine is not a firearm," "is not dangerous,"

15  "cannot fire a single round of ammunition," and has as its "only

16  function . . . to hold ammunition").

17      This conclusion is also grounded in Supreme Court precedent.

18  From the *Heller* decision on, the Court has always equated "Arms"

19  with weapons, not accessories or other incidents necessary to use

20  them. *See Bruen*, 142 S. Ct. at 2134 ("[T]he 'textual elements' of

21  the Second Amendment's operative clause—'the right of the people

22  to keep and bear Arms, shall not be infringed'—'guarantee the

23  individual right to possess and carry *weapons* in case of

24  confrontation.'") (quoting *Heller*, 554 U.S. 570, 592 (2008))

25  (emphasis added); *id.* at 2128 (holding that the right secured by

26  the Second Amendment "was not a right to keep and carry any

27  *weapon* whatsoever in any manner whatsoever and for whatever

28  purpose") (quoting *Heller*, 554 U.S. at 626) (emphasis added);

1  *Caetano v. Massachusetts*, 577 U.S. 411, 416 (2016) (Alito, J.,

2  concurring) (rejecting the notion that "only *weapons* popular in

3  1789 are covered by the Second Amendment") (emphasis added);

4  *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 786 (2010)

5  (noting that "incorporation does not imperil every law regulating

6  *firearms*") (emphasis added). As the Court in *Heller* put it, "the

7  most natural reading of 'keep Arms' in the Second Amendment is to

8  'have *weapons*.'" 554 U.S. at 582 (emphasis added). Nothing in

9  *Bruen*, a case that involved a challenge to the manner of carry,

10  suggests that the Court expanded the definition of "Arms" beyond

11  its most natural reading: "weapons."

12       Plaintiffs argue that "Second Amendment protections would be

13  meaningless if the State could strip away integral component

14  parts of a firearm by claiming that prohibitions against

15  individual component do not constitute a ban on 'arms.'" MPA at

16  9. Plaintiffs' doomsday prediction is misplaced, however, because

17  the Ninth Circuit has recognized that "the Second Amendment

18  protects ancillary rights necessary to the realization of the

19  core right to possess a firearm for self-defense." *Teixeira v.*

20  *Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017); *see Jackson*

21  *v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir.

22  2014) (finding that "the right to possess firearms for protection

23  implies a corresponding right to obtain the bullets necessary to

24  use them"); *see also Luis v. United States*, 578 U.S. 5, 27 (2016)

25  (Thomas, J., concurring) (stating "[c]onstitutional rights thus

26

27

28

1   implicitly protect those closely related acts necessary to their

2   exercise").[7]

3       What can be gleaned from these cases, unchanged by *Bruen*, is

4   that the Second Amendment does not transform mere accessories

5   into "Arms." Instead, the Second Amendment's protection for

6   "Arms" sometimes provides protection for those accessories

7   necessary to operate an "Arm" for self-defense.

8       Possession of an LCM is not necessary for such a purpose. The

9   evidence submitted establishes that an LCM is not necessary to

10  operate any firearm, much less any firearm commonly used for

11  self-defense. *See* Busse Decl., ¶ 18; *Oregon Firearms*, 2022 WL

12  17454829, at *9 (crediting declaration of Ryan Busse). Plaintiffs

13  put forward no evidence or argument to the contrary. *See* MPA at 8

14  (arguing only that "[m]agazines are integral for the operation of

15  many common firearms"). As in *Oregon Firearms*, Plaintiffs' claim

16  fails because "Plaintiffs have not produced evidence that these

17  weapons can *only* operate with magazines that accept more than ten

18  rounds of ammunition and cannot operate with magazines that

19  contain ten or fewer rounds." 2022 WL 17454829, at *9 (cleaned

20  up, emphasis added).

21      Plaintiffs nonetheless contend "the clear purpose and effect

22  of California's magazine ban provisions are to functionally ban

23  firearms capable of firing more than ten rounds without

24  reloading." MPA at 10. This argument makes little sense, though,

25      [7] It is significant that Justice Thomas used the adjective
    "closely" to limit the related rights concept, as courts have
26  rejected efforts to expand the plain text of the Second
    Amendment. *See, e.g., Defense Distributed*, 2022 WL 15524977, at
27  *4 (rejecting plaintiffs' effort identify a "penumbra" of covered
    activities beyond keeping and bearing arms, including a right to
28  manufacture firearms).

because California law permits the manufacture, sale, and
possession of magazines holding ten or fewer rounds for use in
firearms for self-defense, and does not restrict the number of
such magazines that may be kept, the manner in which such
magazines are stored, or the amount of ammunition that may be
kept for use with such magazines.

Accordingly, because LCMs are neither "Arms" nor are they
necessary for the use of any firearm for self-defense, Plaintiffs
cannot show that their desired conduct falls within the "plain
text" of the Second Amendment.

### C.  Large-Capacity Magazines Are Not Protected "Arms" Because They Are Not Commonly Used for Self-Defense

Even if LCMs were considered "weapons" that could qualify as
bearable "Arms," Plaintiffs cannot establish that LCMs are "in
common use" for self-defense, such that their possession would be
protected by the plain text of the Second Amendment. *See Bruen*,
142 S. Ct. at 2134 (noting that no party disputed that handguns
are "in common use" at the textual stage of the analysis).

As an initial matter, Plaintiffs are incorrect that "[i]t is
up to the State to prove that the arms are not commonly used."
MPA at 11; *id.* (describing the "common use" inquiry as the
State's "burden").[8] Whether LCMs are in "common use" is part of

---

[8] On April 28, 2023, a district court in the Southern
District of Illinois granted a preliminary injunction of
Illinois' LCM restrictions. *Barnett v. Raoul*, Case 3:23-cv-00209-
SPM, Dkt. No. 99. In addition to being an outlier in finding that
Plaintiffs were likely to succeed on their Second Amendment
challenge to LCM restrictions, *see supra*, p. 1 (collecting cases
that refused to enjoin LCM restrictions on Second Amendment
grounds post-*Bruen*), the court in *Barnett* also departed from the
practice of other district courts applying *Bruen* by engaging in
the "common use" as part of the second step (*i.e.*, whether the
(continued...)

1    the threshold textual inquiry that Plaintiffs, not Defendants,

2    bear the burden of satisfying, because the Second Amendment

3    covers only weapons "'in common use' today for self-defense,"

4    such as "the quintessential self-defense weapon," the handgun.

5    *Bruen*, 142 S. Ct. at 2134 (citation omitted). But it does not

6    cover a weapon that is "uncommon or unusually dangerous or not

7    typically used by law-abiding people for lawful purposes." *Reyna*,

8    2022 WL 17714376, at *3 (citing *Bruen*, 142 S. Ct. at 2128).

9         In this case, the evidence put forth by Defendants

10   establishes that there is no genuine dispute of material fact on

11   the question of whether LCMs are frequently used in self-

12   defense.[9] To the contrary, the record reflects that their use for

13   self-defense is vanishingly rare, to the extent they are used for

14   that purpose at all.

15        As detailed in Lucy P. Allen's supplemental declaration, two

16   separate recent datasets establish large-capacity magazines are

17   not commonly used in self-defense. First, an analysis of

18   incidents reported in the NRA Armed Citizens database compiled

19   from January 2011 through May 2017 reveal that it is rare for

20   individuals to defend themselves using more than ten rounds; on

21   average, only 2.2 shots were fired by defenders. Allen Supp.

---

22   challenged regulation is consistent with the nation's tradition
     of firearms regulation). As explained herein, neither the holding
23   of the court in *Barnett* nor its "common use" analysis comport
24   with *Bruen*.

25        [9] A definition of "common use" based on industry-created
     production and ownership estimates, *see* MPA at 2-3, 11, would be
26   circular and inconsistent with *Heller*. *See Duncan*, 19 F.4th at
     1127 (Berzon, J., concurring) ("Notably, however, *Heller* focused
27   not just on the prevalence of a weapon, but on the primary use or
     purpose of that weapon.").
28

Decl., ¶ 10. Moreover, that same analysis of incidents from the NRA Armed Citizens database found that more than 10 bullets were fired in only 2 out of 736 self-defense incidents in the United States. *Id*. And in those two incidents, there is no evidence that the shooter used an LCM, rather than reloading or using another firearm. *See Duncan*, 19 F.4th at 1105 (finding that the record below did not disclose whether "the added benefit of a large-capacity magazine—being able to fire more than ten bullets in rapid succession—has ever been realized in self-defense in the home"). The second analysis involved published news stories. Allen Supp. Decl., ¶¶ 13-14. That analysis revealed a similar number of average shots per incident of self-defense (*i.e.*, 2.34). *Id*. at ¶ 18. And it further found that in 97.3% of incidents the defender fired 5 or fewer shots, and that there were no incidents where the defender was reported to have fired more than 10 bullets. *Id*. at ¶ 19.[10]

The fact that LCMs are not commonly used for self-defense is unsurprising. While any weapon (or accessory) could theoretically be used in self-defense, the accessory at issue here (an LCM) is not well-suited for lawful self-defense. *See Worman v. Healey*, 922 F.3d 26, 37 (1st Cir. 2019) ("[W]ielding the proscribed [assault weapons and LCMs] for self-defense within the home is tantamount to using a sledgehammer to crack open the shell of a peanut."), *abrogated on other grounds by Bruen*, 142 S. Ct. at 2127 n.4. Instead, LCMs were designed for military applications

---

[10] The court in *Oregon Firearms*, crediting a similar declaration from Ms. Allen, found it "exceedingly rare for an individual, in a self-defense situation, to fire more than ten rounds." *Oregon Firearms*, 2022 WL 2022 WL 17454829, at *10.

and are "particularly suited to military use," as they "'enable a shooter to hit multiple human targets very rapidly.'" *Oregon Firearms*, 2022 WL 17454829, at *11 (citation omitted). As explained in the declaration of Colonel (Ret.) Craig Tucker—a decorated Marine combat veteran who commanded soldiers in both Fallujah battles during the Iraq War—detachable magazines serve specific combat-related purposes:

> Detachable large-capacity magazines . . . allow the combat rifleman to rapidly change magazines in combat, and thus to increase killing efficiency by significantly reducing reload time.  Changing magazines during intense combat is the most important individual skill taught to Marines.  During intense combat, the detachable magazine provides a rifleman the capability to fire 180 rounds on semi-automatic in four minutes at a high-sustained rate of 45 rounds per minute.  In a civilian self-defense context, by contrast, an individual would not have a need for such a high rate of fire.

Tucker Decl., ¶ 16.

Though the Supreme Court's decision in *Heller* did not delineate "the full scope of the Second Amendment," 554 U.S. at 626, it did set at least one guidepost: "weapons that are most useful in military service—M16 rifles and the like—may be banned," *id.* at 627. As the Fourth Circuit held, LCMs are not protected by the Second Amendment because they are "like" "M-16 rifles," "weapons that are most useful in military service," and thus are "beyond the Second Amendment's reach." *Kolbe v. Hogan*, 849 F.3d 114, 121 (4th Cir. 2017) (en banc) (quoting *Heller*, 554 U.S. at 627), *abrogated on other grounds by Bruen*, 142 S. Ct at 2126; *see also Oregon Firearms*, 2022 WL 17454829, at *11 (same); *Hanson*, 2023 WL 3019777, at *9 (finding that "LCMs are most useful in military service," that "LCMs' lethality was popular in

1  military settings, and [that] indeed many of them were designed

2  specifically for military (and law enforcement) use"). And the

3  *Duncan* en banc panel observed that the analogy to the M16 has

4  "significant merit" because LCMs have limited "lawful, civilian

5  benefits" and "significant benefits in a military setting."

6  *Duncan*, 19 F.4th at 1102. Nothing in *Bruen* calls into question

7  *Heller*'s view that weapons most useful in military service, like

8  the M16 rifle or M4 carbine, may be banned.

9      Historically, at the founding, such high-capacity firearms

10  were extraordinarily rare, *see* infra, section II.A.1, and were

11  not part of a militiaman's "ordinary military equipment" that he

12  would be expected to bring to muster at that time, *Heller*, 554

13  U.S. at 624 (quoting *United States v. Miller*, 307 U.S. 174, 178

14  (1939)). Similarly, "high-capacity firearms," like the Henry and

15  Winchester rifles, were understood during the era of

16  Reconstruction to be "weapons of war or anti-insurrection, not

17  weapons of individual self-defense." Vorenberg Decl., ¶ 7; *Ocean*

18  *State*, 2022 WL 17721175, at *15 (same); *Hanson*, 2023 WL 3019777,

19  at *13 ("High-capacity firearms became more common in military

20  settings in the second half of the 19th century, but they were

21  still rare."); *see also* Vorenberg Decl., ¶ 9 (noting that

22  "efforts to create a market for high-capacity firearms in the

23  United States during Reconstruction failed miserably" and that

24  "Americans who were not part of legal law enforcement bodies

25  rarely bought high-capacity firearms"). When LCMs began to

26  circulate more widely in the 1980s, they were regarded as

27  military accessories. Busse Decl., ¶ 36. In 1989, the Bureau of

28  Alcohol, Tobacco, and Firearms found that "large-capacity

magazines are indicative of military firearms," and later in 1998, it determined that "detachable large-capacity magazine[s] [were] originally designed and produced for . . . military assault rifles." *Oregon Firearms*, 2022 WL 17454829, at *11 (quoting *Duncan*, 19 F.4th at 1105—06).

Plaintiffs cannot show that LCMs are commonly used in—let alone suitable for—lawful self-defense. Accordingly, these accessories are not protected by the Second Amendment, and Section 32310 should be upheld.

## II. CALIFORNIA'S RESTRICTIONS ON LARGE-CAPACITY MAGAZINES ARE CONSISTENT WITH THE NATION'S TRADITIONS OF WEAPONS REGULATION

Even if Plaintiffs could meet their initial burden of showing that the possession of LCMs is an activity covered by the "plain text" of the Second Amendment (they cannot), the uncontroverted evidence Defendants have put forward establishes that California's restrictions on LCMs are consistent with the Nation's traditions of weapons regulation. Defendants have assembled a survey of hundreds of relevant laws and authorities that show that, from pre-founding America through the 1930s, state and local governments regularly enacted restrictions on certain enumerated weapons viewed at the time to be particularly dangerous. *See* Appendix 1. These laws are relevantly similar to Section 32310 because they impose a comparably modest burden on the right to armed self-defense—by restricting weapons and devices that are not particularly useful for self-defense while ensuring access to other arms for effective self-defense—and those minimal burdens are comparably justified by public-safety concerns.

1

2

**A.   This Case Requires a "More Nuanced" Analogical Approach**

In a case that proceeds to the historical stage of the *Bruen* analysis, the government need not identify a "historical *twin*" or a "dead ringer"; it can justify a modern restriction by identifying a "relevantly similar" restriction enacted when the Second or Fourteenth Amendments were ratified. *Id.* at 2132—33. When the challenged law addresses "unprecedented societal concerns or dramatic technological changes," the courts should engage in a "*more* nuanced approach" because "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Bruen*, 142 S. Ct. at 2131—32 (emphasis added). Here, unlike the "fairly straightforward" analysis in *Bruen* and *Heller*, *id.* at 2131, a more nuanced approach is required because LCMs implicate dramatic technological change in firearms technology and an unprecedented societal concern (*i.e.*, mass shootings). *See Herrera*, 2023 WL 3074799, at *7 (concluding that a more nuanced approach is required in assessing large-capacity magazine restrictions); *Hanson*, 2023 WL 3019777, at *13 (same).

**1.   LCMs Represent a Dramatic Technological Change from the Firearms Technologies Widely Available During the Founding and Reconstruction Eras**

As an initial matter, Plaintiffs have provided no expert declarations or other evidence for their claims relating to the purportedly long-standing existence of magazines capable of holding more than ten rounds of ammunition. MPA at 19. Plaintiffs have introduced no experts *at all* on the historical pedigree (or

1  lack thereof) of LCMs, instead merely citing documents (which

2  themselves are largely secondary sources) on the topic. Without

3  expert testimony on the context, reliability, and veracity of

4  these sources, it is impossible for the Court to credit them

5  (much less any of the claims made therein). *See Orr v. Bank of*

6  *Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) ("A trial court

7  can only consider admissible evidence in ruling on a motion for

8  summary judgment."). To the extent Plaintiffs contend that the

9  authors of these sources are themselves experts, "it is well

10  established that unsworn expert reports are inadmissible and

11  cannot be used to create a triable issue of fact for purposes of

12  summary judgment." *See Liebling v. Novartis Pharms. Corp.*, 2014

13  WL 12576619, at *1 (C.D. Cal. Mar. 24, 2014); *see also Ridgel v.*

14  *United States*, 2013 WL 2237884, at *2 (C.D. Cal. May 21, 2013)

15  (not considering on summary judgment a document that "is not

16  attached to any declaration and is unauthenticated and unsworn").

17      As the evidence actually submitted in this case establishes,

18  LCMs represent a "dramatic technological change" requiring a more

19  nuanced approach under *Bruen*. Plaintiffs argue that "the Founders

20  and Framers were well aware of the advent, existence, and

21  popularity of magazines capable of holding more than ten rounds

22  of ammunition." MPA at 19. But Plaintiffs' argument fails for two

23  reasons: (1) the early repeaters identified by Plaintiffs were

24  prototypes and curios, to the extent they existed at all; and (2)

25  LCMs are not by any means the same technology as these early

26  repeating rifles.

27      First, the early repeaters were "extraordinarily rare."

28  Sweeney Decl., ¶ 23; *id.* at ¶ 47 ("[P]eriod probate inventories

and newspapers indicate that repeating firearms were

extraordinarily rare in eighteenth-century America."); *see also*

Cornell Decl., ¶ 26; DeLay Decl., ¶ 7. Indeed, while Plaintiffs

conclude that these weapons were "prevalen[t]" at the time of the

Founding (MPA at 19-20), their own briefing indicates that these

weapons were rare curiosities. *See id*. at 17 (recounting that

three and five-shot repeaters "astonished the Iroquois," a

reaction that would seem to be incompatible with the argument

that repeaters were common in pre-Revolutionary America); *id*. at

19 (recounting that the Girandoni rifle was "astonishing and

surprising" to those who saw its use); *id*. (noting that around

1660, "[a]t least 19 gunsmiths" in an area stretching from London

to Moscow (*i.e.*, effectively all of Continental Europe, Russia,

and England) made magazines that may have held more than ten

rounds,[11] indicating how rare such weapons, given that the

population of Europe (even excluding Russia) was more than 74

million people at that time[12]).

    While today a "new semiautomatic handgun can be purchased for

less than $200 and equipped with a 33-round magazine for less

than $15," Roth Decl., ¶ 50, there is no evidence that many early

repeating firearms were commercially available. Sweeney Decl., ¶

29 (no evidence that Belton produced any of the 1777 firearms

that he wrote to the Continental Congress about); *id*. at ¶ 28

(evidence suggests that to the extent English-born John Cookson

ever made repeaters, he "apparently did not produce repeating

---

[11] The text Plaintiffs cite describes the magazine in
question as having between six and thirty rounds. MPA at 16.
[12] https://www.britannica.com/topic/history-of-
Europe/Demographics.

1  firearms during his 60 years in Boston, and there are no
2  surviving eighteenth-century, American-made Cookson repeaters");
3  *id.* at ¶ 24 (the Pimm "gun was not being offered for sale; no
4  examples of a repeating long-arm by Pimm survive"). In other
5  words, in contrast to the ease and low cost with which an LCM
6  could be acquired today, in 1791 a repeating firearm (to the
7  extent it was available for purchase at all) would have been hard
8  to acquire and "expensive." Sweeney Decl., ¶ 49; *see also* DeLay
9  Decl., ¶ 36 (only "a paper-thin slice of Europe's political and
10 economic elite" would have access to these weapons; for "almost
11 everyone else at the time, these guns were unknown and
12 irrelevant").[13]

13     Second, the evidence establishes that LCMs are vastly
14 different from the repeating firearms identified by Plaintiffs.
15 The LCMs regulated by Section 32310 are detachable magazines
16 capable of holding more than ten rounds of ammunition. *Id.* at
17 (a). As Plaintiffs themselves assert, in other states where LCMs
18 are not regulated, many firearms are sold with 30-round
19 magazines. MPA at 3. Those magazines enable an individual to have
20 a sustained rate of 45 rounds per minute, and fire 180 rounds on
21 semi-automatic in four minutes. Tucker Decl., ¶ 16; *see also* Roth
22 Decl., ¶ 49 (noting that the AR-15 can fire 45 rounds per
23 minute); *id.* at ¶ 50 (noting that an entire 30-round clip from a
24 semi-automatic pistol can be fired in five seconds).

25     The ease of discharging dozens (if not hundreds) of rounds of
26 ammunition in minutes from LCMs regulated by Section 32310

27     [13] It is difficult to even estimate the cost of these early
repeaters, given their rarity (Sweeney Decl., ¶ 47) and thus the
28 absence of any real commercial market.

contrasts sharply with the paltry rate of fire from early attempts at repeating firearms. Sweeney Decl., ¶ 45 (noting that the Puckle "gun had a rate of fire of only 9 rounds per minute"); *id.* at ¶ 24 (noting that the Pimm gun fired 11 rounds in a two-minute period; *id.* at ¶ 34 (noting that the 1786 Belton firearm required the user to cock and prime each time before pulling the trigger and firing the gun).

The differential rate of discharge is only furthered by the fact that LCMs can be quickly and easily changed to maintain "a sustained or rapid sustained rate of fire" (Tucker Decl., ¶ 15), while reloading the early repeaters identified by Plaintiffs was an arduous process. *See* Cornell Decl., ¶ 44 (noting that the Girardoni air gun required 1500 strokes of a pump to prime for use); DeLay Decl., ¶ 31 (stating that the early air-rifles "were time-consuming and onerous to prime"); Sweeney Decl. ¶ 24 n.48 (recounting the 1715 Pimm revolver could deliver six shots after being loaded once, but it was not a rapid-fire weapon, and it took time to reload the individual chambers with powder and ball); Spitzer Decl., ¶28 (noting that "the guns of 1830 were essentially what they had been in 1430: single metal tubes or barrels stuffed with combustible powder and projectiles" where "after every shot, the shooter had to carry out a minimum of three steps: pour powder into the barrel; add a projectile. . .; then ignite the gunpowder and send the projectile on its way").[14]

---

[14] In fact, the early attempts at repeating rifles in some ways more closely resemble trap guns (*see* Cornell Decl., ¶¶ 72-75) than LCMs. *See* Sweeney Decl., ¶ 46 (the Puckle gun required a tripod to use); *id.* at ¶ 31 (once fired, the "the ensuing discharge of balls" from the Belton "uncontrolled").

And Defendants' evidence shows, to the extent they were produced at all, these early attempts at repeating firearms were far from reliable. As Professor Sweeney's declaration establishes, in 1800, it "was still not possible to manufacture with precision and in any quantity firearms with closely fitting parts that could contain the destructive explosive potential associated with the use of black powder gunpowder" that repeaters required. Sweeney Decl., ¶ 50; DeLay Decl., ¶ 15 ("Early magazine guns demanded an even higher level of craftsmanship in order to create a perfect seal between the rotating breechblock and the stored powder, lest the combustion in the chamber ignite the magazine."). As a result, the historical record is replete with reference to faultiness of these repeaters. *See, e.g.,* Cornell Decl., ¶ 44 (noting that the Austrian military abandoned the Girardoni air rifle due their tendency to malfunction and the fact that they "became inoperable after a very short time"); Sweeney Decl., ¶ 27 ("Catastrophic failures happened because the period's methods of fabrication were not reliably capable of producing the fitting precision parts needed to prevent such malfunctions caused by errant sparks."); *id.* at ¶ 37 (stating that the Chambers firearms could "produce devastating malfunctions" because they "were difficult to load correctly, and if the bullets did not fit tightly, flame could leak around them and set off all the charges at once"); *id.* at ¶ 43 (noting that imported Belgian or French-made Segales pistols which had four rifled barrels were "at risk from a dangerous chain reaction, in which firing one chamber could accidently set off all the others," and "[i]f this happened, the gun would explode in the

shooter's hand"); DeLay Decl., ¶¶ 15, 30 (even famed Italian gunmaker Bartolomo Girardoni, creator of eponymous air rifle, lost his left hand in a magazine explosion).

The repeating rifles available during the Reconstruction period were also materially different than the LCMs regulated today. At that time, the only bearable, high-capacity firearms capable of firing more than 10 rounds were the lever-action Henry Rifle and the Winchester Repeating Rifle (the Winchester 66 and Winchester 73 models), which were capable of holding 15 rounds in a fixed chamber within the firearm. Vorenberg Decl., ¶¶ 20–21. But as explained above, what makes the LCM a dramatic technological change is not merely the number of rounds that it holds but the fact that many such LCMs are detachable, which enables a sustained rate of fire over a period of minutes. *See* Tucker Decl., ¶ 16; Roth Decl., ¶ 49; *see also Hanson*, 2023 WL 3019777, at *13 (noting that "these rifles did not resemble the semiautomatic weapons of today," in part because of their "firing rate [of] . . . about one shot every three seconds"). In any event, those rifles were not widely owned by civilians during Reconstruction. As Professor Vorenberg explains, the Henry and Winchester repeaters were not adopted by the Union or Confederate militaries during the Civil War and were not commonly acquired by soldiers returning from the Civil War. Vorenberg Decl., ¶ 24 ("Production and sales numbers reveal that Henry Rifles and their successors, Winchester Repeating Rifles, were uncommon during the Civil War and Reconstruction compared to other rifles."). Following the Civil War, the circulation of Henry and Winchester lever-action repeating rifles remained low, with few documented

1  instances of possession by civilians. *Id.* ¶ 27. By the time the

2  Fourteenth Amendment was ratified, the commercial viability of

3  the Winchester Model 1866 was due "almost entirely to sales to

4  foreign armies," not to Americans. *Id.* at ¶ 50; DeLay Decl., ¶ 67

5  ("[T]he vast majority of these weapons were made to order for

6  foreign armies and shipped abroad."). Indeed, as Professor

7  Delay's declaration establishes, in 1868 these repeating rifles

8  accounted for less than 0.002% of guns in the United States.

9  DeLay Decl., ¶ 7.

10     Thus, the evidence establishes that the LCMs regulated by

11 Section 32310 represent the type of dramatic technological change

12 recognized in *Bruen* as requiring a more nuanced approach.

### 2. Section 32310 Addresses the Unprecedented Social Problem of Mass Shootings

15     Section 32310 also addresses a societal concern that did not

16 exist at the Founding or during Reconstruction: mass shootings.

17 There are no known shooting incidents involving ten or more

18 fatalities before 1949, and the number of such double-digit mass

19 shootings increased dramatically in the period before and after

20 the federal assault weapons ban. *See* Klarevas Decl., ¶¶ 18–19 &

21 tbl. 4; *see Oregon Firearms*, 2022 WL 17454829, at *13 (crediting

22 Professor Klarevas's findings). And as Professor Roth has

23 explained, from the colonial period to the early 20th century,

24 mass killings were generally committed by groups of people

25 because technological limitations constrained the ability of a

26 single person to commit mass murder. *See* Roth Decl., ¶ 41.

27     The development and proliferation of semiautomatic and

28 automatic firearms technologies in the 1920s and 1930s

substantially increased the amount of carnage an individual could inflict, which led to government regulation of those technologies. *See* Spitzer Decl., ¶¶ 50-51; Roth Decl., ¶ 47. This increased lethality has only accelerated over the past several decades. *See* Donohue Decl., ¶ 54 (contrasting that the 1966 University of Texas memorial tower shootings, in which 14 people were killed, took the shooter, an expert marksman, 90 minutes with the 2009 Fort Hood shooting, in which an inexperienced shooter fired 214 times and killed 13 people at Fort Hood in less than 10 minutes).

LCMs in particular have greatly enhanced the lethality of mass shootings when they occur. *See* Supp. Allen Decl., ¶¶ 27-28; Roth Decl., ¶¶ 49-51; Klarevas Decl., ¶ 14. Of all the shootings in American history involving 14 or more fatalities, 100% involved the use of LCMs. *See* Klarevas Decl. ¶ 14 & tbl. 4; Donohue Decl., ¶ 30 ("[I]f one looks at the deadliest acts of intentional mass violence in the United States since 9/11, they all share one feature. The killer in every case used a weapon equipped with a high-capacity magazine.").[15]

_____

[15] Just in the past two years, the United States has experienced numerous, devastating mass shootings with firearms equipped with large-capacity magazines, including the March 16, 2021 Atlanta spa shootings (8 killed), the March 22, 2021 shooting at King Soopers supermarket in Boulder, Colorado (10 killed); the April 15, 2021 shooting at an Indianapolis FedEx warehouse (8 killed); the May 26, 2021 shooting at a transportation authority facility in San Jose, California (9 killed); the May 14, 2022 supermarket shooting in Buffalo, New York (10 killed); the May 24, 2022 shooting at Robb Elementary School in Uvalde, Texas (19 children and 2 adults killed); the July 4, 2022 shooting at a Fourth of July parade in Highland Park, Illinois (7 killed), the November 20, 2022 shooting in a Colorado Springs nightclub in which five people were killed and 17 wounded, the November 22, 2022 shooting at a Virginia Walmart that left 7 dead, the January 2023 shooting at a dance studio in

(continued...)

1   Therefore, one of the primary concerns addressed by Section

2   32310—mass shootings—is a modern problem that did not exist in

3   1791 or 1868. For this additional reason, a more nuanced approach

4   is required.

5       **B.   California's Restrictions on Large-Capacity Magazines**
        **Are Consistent with Historical Laws Regulating Other**
6       **Dangerous Weapons**

7   The Attorney General has identified hundreds of laws from

8   pre-founding England and colonial America through the 1930s,

9   including clusters of similar laws enacted around the time that

10  the Second and Fourteenth Amendments were ratified. *See* Appendix

11  1. Even if Section 32310 were viewed to burden conduct covered by

12  the plain text of the Second Amendment, Defendants have provided

13  "significant historical evidence to overcome the presumption of

14  unconstitutionality of a measure that infringes upon conduct

15  covered by the Second Amendment." *Oregon Firearms*, 2022 WL

16  17454829, at *12.

17      In evaluating the relevant similarities of these laws to

18  modern firearm regulations, the identification of relevant laws

19  is the first step. The laws must then be contextualized

20  historically and compared to modern laws within an appropriate

21  analytical framework. The *Bruen* standard focuses "not on a

22  minutely precise analogy to historical prohibitions, but rather

23  an evaluation of the challenged law in light of the broader

24  attitudes and assumptions demonstrated by those historical

25  prohibitions." *United States v. Kelly*, 2022 WL 17336578, at *5

26  _____

    Monterey Park, California that killed 11 and wounded nine others,
    the March 2023 shooting at the elementary school in Nashville
27  that killed six, including three 9-year-old children; and the
    April 10, 2023 shooting at a Louisville bank that killed five.
28  See Donohue Decl., ¶ 22.

n.7 (M.D. Tenn. Nov. 16, 2022). The absence of a precise twin in the historical record would not necessarily mean that a modern firearm restriction is inconsistent with the Second Amendment. Under *Bruen*, the Second Amendment does not "forbid all laws other than those that *actually existed* at or around the time of the [Second Amendment's] adoption," but rather "the Second Amendment must, at most, forbid laws that *could not have existed* under the understanding of the right to bear arms that prevailed at the time." *Id.* The laws identified by Defendants are relevantly similar to Section 32310 by the two metrics identified in *Bruen*: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." 142 S. Ct. at 2133.

### 1. The Survey of Relevant Dangerous Weapons Laws

Defendants have prepared and filed a survey of relevant laws— one from the pre-founding era through the 1930s. *See* Appendix 1.

This survey identifies over 300 state and local laws, including laws enacted by the District of Columbia, and six additional laws and authorities from pre-founding England, which regulated, or authorized the regulation, of certain enumerated weapons and items.[16] This history shows that governments have been

---

[16] The vast majority of these laws were generally applicable, but some restrictions applied only to certain groups. Twelve of the surveyed laws were based on race, nationality, or enslaved status and were enacted before ratification of the Thirteenth and Fourteenth Amendments [5, 14, 15, 16, 17, 20, 21, 28, 31, 53, 75, 79]. These laws are morally repugnant and would obviously be unconstitutional today. They are provided only as additional examples of laws identifying certain weapons for heightened regulation, and they are consistent in this respect with the other generally applicable laws. Defendants in no way condone laws that target certain groups on the basis of race, gender, nationality, or other protected characteristics, but these laws
(continued...)

free to adopt laws like Section 32310, consistent with the Second Amendment—restricting particular weapons and weapons configurations that pose a danger to society and are especially likely to be used by criminals, so long as the restriction leaves available other weapons for constitutionally protected uses. The enactments identified by Defendants show that Section 32310 is a constitutionally permissible exercise of California's police powers.

### a.   Medieval to Early Modern England (1300—1776)

In pre-founding England, the right to keep and bear arms was limited to arms "allowed by law" [7, 9], and the Crown prohibited the possession of certain enumerated weapons, like launcegays [1, 2], crossbows, handguns, hagbutts, and demy hakes [3, 4]. These laws are part of the tradition inherited from England when the Second Amendment was ratified. *See Bruen*, 142 S. Ct. at 2127 (noting that the Second amendment "codified a right inherited from our English ancestors") (quoting *Heller*, 554 U.S. at 599).

---

are part of the history of the Second Amendment and may be relevant to determining the traditions that define its scope, even if they are inconsistent with other constitutional guarantees. *See Bruen*, 142 S. Ct. at 2150—51 (citing *Dred Scott v. Sandford*, 19 How. 393 (1857) (enslaved party)). Reference to a particular historical analogue does not endorse the analogue's *application* in the past. Rather, it can confirm the *existence* of the doctrine and corresponding limitation on the Second Amendment right. *See* William Baude & Stephen E. Sachs, *Originalism & the Law of the Past*, 37 L. & Hist. Rev. 809, 813 (2019) ("Present law typically gives force to past *doctrine*, not to that doctrine's role in past society."); *see also* Adam Winkler, *Racist Gun Laws and the Second Amendment*, 135 Harv. L. Rev. F. 537, 539 (2022) ("Yet there will arise situations in which even a racially discriminatory gun law of the past might provide *some* basis for recognizing that lawmakers have a degree of regulatory authority over guns.").

The 1689 English Bill of Rights was the "predecessor to our Second Amendment," *id.* at 2141 (quoting *Heller*, 554 U.S. at 593), and although it was "initially limited" to Protestants and "matured" by the founding, *id.* at 2142, there is no indication that the "as allowed by law" qualification was written out of the right when the Second Amendment was ratified.

Pre-ratification English law is relevant, especially where it is consistent with laws that existed when the Second or Fourteenth Amendments were ratified. *Id.* at 2136 (suggesting that it is permissible for "courts to 'reach back to the 14th century' for English practices that 'prevailed up to the 'period immediately before and after the framing of the Constitution'")") (cleaned up); *id.* ("A long, unbroken line of common-law precedent stretching from Bracton to Blackstone is far more likely to be part of our law than a short-lived, 14th-century English practice."). Pre-founding English law was evaluated in *Bruen*, *McDonald*, and *Heller*, and it remains relevant here. *See Bruen*, 142 S. Ct. at 2138-39; *McDonald*, 561 U.S. at 768; *Heller*, 554 U.S. at 593.

### b. Colonial and Early Republic (1600—1812)

During the colonial period and the early Republic, several jurisdictions enacted restrictions on the possession of certain weapons and devices, including (a) limitations on the keeping and storing of gunpowder, (b) trap guns, and (c) other enumerated weapons.

First, during the colonial period and at the Founding, governments heavily regulated guns and gunpowder, both to ensure the readiness of the militia, and to protect the public from harm

1   [339, 340][17]. In particular, governments regulated the storage of

2   gunpowder inside the home. Laws required gunpowder to be stored

3   on the top floor of a building and permitted government officials

4   to remove it when necessary to prevent explosions and to transfer

5   the powder to the public magazine. *See* Cornell Decl., ¶ 47. Under

6   these gun powder storage laws, individuals were not free to

7   stockpile as much gunpowder as they may have wished—or felt

8   necessary for self-protection—nor could they keep the gunpowder

9   in the home in any manner that they wished.[18]

10      Second, during the colonial period, states began to enact

11   restrictions on "trap guns," laws that proliferated in the 19th

12   century. *See* Spitzer Decl., ¶¶ 72-75, & Exs. B & F. A trap gun

13   was a firearm that was configured in a way to fire remotely

14   (without the user operating the firearm), typically by rigging

15   the firearm to be fired by a string or wire when tripped. Spitzer

16   Decl., ¶ 72. Trap guns were used to protect personal or

17   commercial property. *Id*. at ¶ 73. Just as Massachusetts

18   prohibited the storage of loaded guns inside the home to prevent

19   accidental harm, trap gun laws regulated the manner in which

20   firearms could be kept and configured to protect the public from

21   harm. *Id*. at ¶ 75 & Exs. B & F.

22      Third, some jurisdictions prohibited the carrying of certain

23   listed weapons, including a 1686 New Jersey law prohibiting the

24   _____

25   [17] These references and those bracketed references that
     follow refer to relevant laws compiled in Appendix 1 and which
     are identified by number in the left-hand column of Appendix 1.

26   [18] Maine also enacted a law in 1821, authorizing town
     officials to enter any building to search for gun powder. Cornell

27   Decl., ¶ 51 (citing 1821 Me. Laws 98, An Act for the Prevention
     of Damage by Fire, and the Safe Keeping of Gun Powder, chap. 25,

28   § 5).

1   carrying of any pocket pistol, skein, stiletto, dagger, or dirk

2   [6] and other laws prohibiting the carry of certain weapons in

3   certain circumstances [8, 12, 13, 18, 19, 23]. Such pre-

4   ratification restrictions should "guide [this Court's]

5   interpretation" of the Second Amendment. *Bruen*, 142 S. Ct. at

6   2137. And laws enacted after ratification of the Second Amendment

7   during this period are relevant in showing the continuing

8   tradition of regulating certain enumerated weapons. Moreover,

9   post-ratification practice can "liquidate" indeterminacies in the

10   meaning of constitutional provisions. *Id.* at 2136 (citation

11   omitted).

> **c.  Antebellum and Reconstruction Periods (1813–1877)**

12
13       During the antebellum and postbellum period, including around

14   the time that the Fourteenth Amendment was ratified, numerous

15   states restricted weapons deemed to be particularly dangerous or

16   susceptible to criminal misuse.

17       As homicide rates increased in the South in the early 1800s,

18   states began restricting the carrying of certain concealable

19   weapons. *See* Roth Decl., ¶ 23; Spitzer Decl., ¶ 55; Rivas Decl.,

20   ¶¶ 15–17. Throughout this period, states enacted a range of laws

21   restricting the carrying of blunt weapons: 12 states restricted

22   "bludgeons"; 14 states restricted "billies"; seven states

23   restricted "clubs"[19]; 43 states restricted "slungshots"; six

24   _____

25       [19] These 19th century laws generally prohibited slaves from
     carrying clubs, *see* Slaves, in Laws of the Arkansas Territory 521
26   (J. Steele & J. M'Campbell, Eds., 1835); 1804 Ind. Acts 108, A
     Law Entitled a Law Respecting Slaves, § 4; 1798 Ky. Acts 106;
27   1804 Miss. Laws 90, An Act Respecting Slaves, § 4; Collection of
     All Such Acts of the General Assembly of Virginia, of a Public
28   and Permanent Nature, as Are Now in Force; with a New and
     (continued...)

states restricted "sandbags"; and 12 states broadly restricted any concealed weapon. *See* Spitzer Decl., ¶¶ 56–62 & Ex. C. Many of these laws were enacted shortly before and after the ratification of the Fourteenth Amendment. *Id*.

From 1813 to the Mexican War, numerous states and territories [25, 34, 36, 39, 43, 44] also restricted the concealed carrying of particular weapons. These concealed weapons laws were intended to specifically address the rise in murders and assaults throughout the South at that time. Roth Decl., ¶ 23. Class and racial tensions in the region led to the region saw a dramatic increase in the number of deadly quarrels, property disputes, duels, and interracial killing during the period, and individuals turned to concealable weapons to ambush both ordinary citizens and political rivals, to bully or intimidate law-abiding citizens, and to seize the advantage in fist fights. *Id.* at ¶¶ 23–24. In addition, several laws regulated the possession of gunpowder [343, 345, 346] and the setting of any trap gun [87].

In addition to prohibiting concealable, blunt weapons—which are dangerous weapons used mainly for criminal mischief—49 states (all except for New Hampshire) enacted restrictions on Bowie knives and other "fighting knives" in the 19th century, including around the time that the Fourteenth Amendment was ratified. *See* Spitzer Decl., ¶ 60 & Ex. C. Many state laws enacted during this

---

Complete Index. To Which are Prefixed the Declaration of Rights, and Constitution, or Form of Government Page 187, Image 195 (1803), or prohibited the throwing of clubs at trains or railroad, *see* 1855 Ind. Acts 153, An Act To Provide For The Punishment Of Persons Interfering With Trains or Railroads, chap. 79, § 1; the Revised Statutes of Indiana: Containing, Also, the United States and Indiana Constitutions and an Appendix of Historical Documents (1881); 1905 Ind. Acts 677.

time also included revolvers and pistols in their lists of proscribed weapons. *See* Roth Decl., ¶ 26 (discussing restrictions on the carrying of certain concealable weapons in Kentucky, Louisiana, Indiana, Georgia, and Virginia between 1813 and 1838). These laws aimed to curb the use of concealable weapons that exacerbated rising homicide rates in the South and its borderlands. *Id.*

Regulations from around the time of ratification of the Fourteenth Amendment further demonstrate that states restricted weapons deemed to be particularly dangerous or susceptible to criminal misuse. These regulations bear particular importance, because as noted in *Bruen*, the Second Amendment was made applicable to the states not in 1791, but in 1868, with the ratification of the Fourteenth Amendment. *See* 143 S. Ct. at 2138; *see also Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) ("*McDonald* confirms that when state- or local-government action is challenged, the focus of the original-meaning inquiry is carried forward in time; the Second Amendment's scope as a limitation on the States depends on how the right was understood *when the Fourteenth Amendment was ratified*." (emphasis added)); *Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1321 (11th Cir. 2023) (concluding that "Reconstruction Era historical sources are the most relevant to our inquiry on the scope of the right to keep and bear arms").

Just two years before the ratification of the Fourteenth Amendment, New York prohibited "furtively possess[ing]" and carrying any slungshot, billy, sandclub, metal knuckles, or dirk

1    [88].[20] And after 1868, governments continued to regulate

2    enumerated, unusually dangerous weapons, including trap guns

3    [104], restricting the carrying and use of certain specified

4    weapons [98-143], and taxing certain weapons, like Bowie knives

5    [108, 122, 125, 126, 127].

6        Further, state constitutions adopted during Reconstruction

7    expressly linked the right to keep and bear arms to the state's

8    authority to regulate arms: "Every person shall have the right to

9    keep and bear arms, in the lawful defence of himself or the

10   government, under such regulations as the Legislature may

11   prescribe." Cornell Decl., ¶ 49 (quoting Tex. Const. of 1868,

12   art. I, § 13); *see also id.* at ¶ 22 n.73 (describing similar

13   constitutional provisions in the Idaho Constitution of 1896 and

14   the Utah Constitution of 1896). Additionally, during this period,

15   the federal government regulated access to particularly dangerous

16   weapons, including the Henry and Winchester lever-action

17   repeating rifles that began to circulate in the postbellum

18   period, and along with state militias sought to prevent access to

19   those weapons to insurrectionary groups and Native Americans. *See*

20   Vorenberg Decl., ¶¶ 7-10, 21-22, 63-64.

21       Thus, the dangerous weapons laws that proliferated before and

22   after the ratification of the Fourteenth Amendment provide

23   substantial historical support for Section 32310's restrictions

24        [20] Additionally, laws restricting unauthorized militias
25   "demonstrate[] the government's concern with the danger
     associated with assembling the amount of firepower capable of
26   threatening public safety—which, given firearm technology in the
     1800s, could only arise collectively." *Oregon Firearms*, 2022 WL
27   17454829, at *14 (discussing *Presser v. People of State of Ill.*,
28   116 U.S. 252, 253 (1886)).

on large capacity magazines, which do not restrict possession of any firearm and leave other magazines available for lawful self-defense (Busse Decl., ¶¶ 17–18, 21) and thus do not destroy the right protected by the Second Amendment.

### d. Late 19th and Early 20th Centuries (1878–1930s)

From the end of Reconstruction to the end of the 19th century, states and localities continued to enact restrictions on certain enumerated weapons deemed to be uniquely dangerous, like slungshots and Bowie knives [145, 153, 154, 171, 206, 210, 211, 214, 217, 221, 222, 224, 236, 243, 250, 252, 269, 273–275]. In 1881, Illinois enacted a prohibition on the possession of a slungshot or metallic knuckles [158]. And in 1885, the Territory of Montana prohibited possession of certain weapons, including dirks and sword canes [183].

During the early 20th century, dangerous weapons laws continued to be enacted, including more prohibitions on the possession of certain weapons. [248, 249, 253, 257, 264–265, 269, 275, 294, 295, 304, 321]. Notably, when semiautomatic and automatic weapons began to circulate more widely in society and appear more frequently in crime in the 1920s, *see* Spitzer Decl., ¶ 11 (describing the St. Valentine's Day Massacre), states began to regulate semiautomatic and automatic weapons capable of firing a certain number of rounds successively and weapons capable of receiving ammunition from feeding devices.

Indeed, thirteen states enacted restrictions on semiautomatic or fully automatic firearms capable of firing a certain number of rounds without reloading; eight states regulated fully automatic

1  weapons, defined as a firearm capable of firing a certain number

2  of rounds without reloading or accepting an ammunition feeding

3  device; and four states restricted all guns that could receive

4  any type of ammunition feeding mechanism or round feeding device

5  and fire them continuously in a fully automatic manner, including

6  a 1927 California law. *See* Spitzer Decl., ¶¶ 13–14; 1927 Cal.

7  Stat. 938. Additionally, in 1932, Congress enacted a twelve-shot

8  restriction on semiautomatic weapons in the District of Columbia.

9  Pub. L. No. 275, 1932 — 72d Cong., Sess. I, chs. 465, 466. And in

10  1934, Congress passed the National Firearms Act, significantly

11  restricting fully automatic weapons. Spitzer Decl., ¶ 16.

12      These early 20th century firearm regulations followed the

13  same regulatory pattern of state and federal restrictions on

14  large-capacity magazines in the late 20th century after the rise

15  in mass shootings. *See* Spitzer Decl., ¶¶ 9–10. These laws were

16  also similar to the regulatory approaches to addressing the

17  prevalence of concealable weapons in crime and homicide before

18  the 20th century and even before the founding, and thus are

19  relevant to the *Bruen* analysis because they are consistent with

20  earlier enacted laws which identified certain types of weapons

21  for heightened regulation. *Cf. Bruen*, 142 S. Ct. at 2154 n.28

22  (discounting probative value of 20th century laws that

23  "contradict[ed] earlier evidence"). These 20th century laws are

24  uniquely relevant to this case because they were enacted around

25  the time in which comparable firearms technology appeared and

26  began to circulate widely in society. *See Hanson*, WL 3019777, at

27  *16 (finding that "the 1920s and 1930s regulations do not

28  contradict any earlier evidence . . . because semiautomatic and

high-capacity weapons were not technologically feasible and commercially available in meaningful quantities until the early 1900s").

### 2. The Surveyed Weapons Restrictions Are Relevantly Similar to Section 32310

The surveyed dangerous weapons laws enacted from the pre-founding era through the early 20th century are relevantly similar to Section 32310 in light of their comparable burdens and justifications in at least three significant ways.

*First*, the gunpowder and loaded-weapon restrictions enacted since the founding-era [339, 340, 343, 344-347] are relevantly similar to the magazine-capacity limit challenged here. The gunpowder restrictions regulated possession, including inside the home. Cornell Decl., ¶ 47. Just as a 10-round magazine capacity limits the amount of firepower that can be used in self-defense (without reloading), historical gunpowder storage requirements limited the firepower that could be exerted for self-defense. But the gunpowder storage laws were far more burdensome than limits on detachable magazines, particularly Massachusetts' 1783 prohibition on the possession of a loaded firearm [339], because the time-consuming nature of having to load a gun (Cornell Decl., ¶ 29) meant that this prohibition imposed a significant burden on one's ability to have a functional firearm available for self-defense in the home. And in a direct parallel to modern magazine-capacity limits, gunpowder storage requirements limited the amount of gunpowder that could be kept in the functional equivalent of founding-era "magazines," which at the time were storehouses used for storing gunpowder. Baron Decl. ¶ 23. By

1   preventing explosions or fires, these laws sought to protect the

2   public from mass-casualty incidents and minimize the threat of

3   harm.

4       **Second**, the dangerous weapons laws [1-4, 6], including the

5   restrictions on concealable weapons enacted during the 1800s are

6   also relevantly similar to the law challenged here. Those

7   restrictions on certain unusually dangerous weapons imposed a

8   comparably modest burden on Second Amendment rights because like

9   the LCM restrictions here, those laws did not restrict weapons

10  that are well suited to self-defense, and they left available

11  alternative weapons to be used for effective and lawful self-

12  defense. *See Oregon Firearms*, 2022 WL 17454829, at *13

13  (determining that the ban on possession of large-capacity

14  magazines imposed a comparable burden on "the right to self-

15  defense" as laws regulating "certain types of weapons, such as

16  Bowie knives, blunt weapons, slungshots, and trap guns because

17  they were dangerous weapons commonly used for criminal behavior

18  and not for self-defense"); *id.* at n.19 (crediting a

19  substantially similar declaration of Professor Spitzer as the one

20  filed in this case). And these concealed weapons laws targeted

21  the specific types of weapons that were commonly used in the

22  murders and serious assaults that caused an alarming rise in

23  homicides at the time, Roth Decl., ¶ 23, just as Section 32310 is

24  justified because it regulates a weapon accessory that is used

25  frequently in mass shootings and leads to greater numbers of

26  casualties when that accessory is used, Klarevas Decl., ¶¶ 13-14

27  & figs. 3-4.

28

*Third*, the prohibitions on the setting of trap guns are also relevantly similar to LCM restrictions. They regulate possession of firearms, even inside the home, and the manner in which they could be configured [10, 80, 109, 121, 168]. Spitzer Decl. ¶¶ 72-75. But the burden on the right to armed self-defense was minimal because the firearms themselves could still be operated for self-defense without being configured in a way to fire remotely, just as Section 32310 does not prohibit the use of firearms with magazines capable of holding ten or fewer rounds for lawful self-defense. These laws sought to prevent unnecessary gunshot injuries and death, as well as unintended harm. *See Kolbe*, 849 F.3d at 127.

In sum, even assuming that Plaintiffs' proposed course of conduct—the possession and use of LCMS—is covered by the Second Amendment, Section 32310 is consistent with the nation's tradition of firearm regulation. As such, judgment should be entered in Defendants' favor on the Second Amendment claim.

### III. THE TAKINGS CLAUSE CLAIM FAILS.

The Ninth Circuit en banc panel in *Duncan* reversed the *Duncan* district court's holding that California's LCM restrictions violated the Takings Clause. 19 F.4th at 1111. In doing so, the en banc panel held that Section 32310 reflects neither a *per se* nor a regulatory taking. *Bruen* did nothing to undermine that holding (which itself was based on long-standing Ninth Circuit precedent), and thus the result here should be the same: Defendants should be granted judgment on Plaintiffs' Takings Claim.

1    Section 32310 does not effect a *per se* taking. There are two

2    types of "per se" takings: (1) permanent physical invasion of the

3    property; and (2) a deprivation of all economically beneficial

4    use of the property. *Laurel Park Cmty., LLC v. City of Tumwater*,

5    698 F.3d 1180, 1188 (9th Cir. 2012). First, Section 32310 plainly

6    does not cause the permanent physical invasion of any property.

7    As the Ninth Circuit en banc panel in *Duncan* noted, "the

8    government here in no meaningful sense takes title to, or

9    possession of, the item, even if the owner of a magazine chooses

10   not to modify the magazine, remove it from the state, or sell

11   it." 19 F.4th at 1113. "That California opted to assist owners in

12   the safe disposal of large-capacity magazines by empowering law

13   enforcement agencies to accept magazines voluntarily tendered for

14   destruction does not convert the law into a categorical physical

15   taking." *Id.* (quotation omitted). *Bruen* did not address the

16   Takings Clause, and thus does not undermine the reasoning of the

17   Ninth Circuit's en banc opinion finding that Section 32310 does

18   not affect a physical taking. *See Oregon Firearms*, 2022 WL

19   17454829, at *16 (relying on the Ninth Circuit's en banc opinion

20   in *Duncan* and finding on a preliminary injunction that Oregon's

21   LCM ban does not give rise to a takings claim).

22   Even if Section 32310 caused the permanent physical invasion

23   of any property (which it does not), Plaintiffs' per se Takings

24   Clause claim would still fail because, as this Court has

25   previously recognized, "[a] long line of federal cases has

26   authorized the taking or destruction of private property in the

27   exercise of the state's police power without compensation." Dkt.

28   52 (Order re: PI), at 14 ("Plaintiffs have not cited, and the

1   court is unaware of, any case holding that a complete ban on

2   personal property deemed harmful to the public by the state is a

3   taking for public use which requires compensation."); *see also*

4   *Akins v. United States*, 82 Fed. Cl. 619, 623-24 (2008) (holding

5   that restrictions on sale and possession of device deemed to be a

6   machine gun is not a taking (collecting cases)); *Fesjian v.*

7   *Jefferson*, 399 A.2d 861, 865-66 (D.C. Ct. App. 1979) (holding

8   that a ban on machine guns with various disposal options is not a

9   taking).

10   Unlike cases in which the government has permanently and

11   physically occupied or appropriated private property for its own

12   use, *see Horne*, 135 S. Ct. at 2427-29; *Loretto*, 458 U.S. at 432,

13   434-35, Section 32310 is a valid exercise of the State's police

14   powers to protect the public by eliminating the dangers posed by

15   LCMs. *See* supra, pp. II.A.2. The purpose of the statute is to

16   remove LCMs from circulation in the State, not to transfer title

17   to the government or an agent of the government for use in

18   service of the public good. Cal. Penal Code § 32310(d). The Third

19   Circuit rejected a similar takings challenge to New Jersey's law

20   prohibiting previously legal LCMs, observing that the state's

21   "LCM ban seeks to protect public safety and therefore it is not a

22   taking at all." *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v.*

23   *Att'y Gen. New Jersey*, 910 F.3d 106, 124 n. 32 (3d Cir. 2018),

24   *abrogated by Bruen*, 142 S. Ct. 2111 (2022).

25   Moreover, only one of the disposal options listed in section

26   32310(d) would result in the transfer of grandfathered LCMs to

27   the government—for destruction and not for use by law

28   enforcement. Owners of grandfathered LCMs have other options to

1  comply with the statute, including modifying their LCMs

2  permanently to hold no more than ten rounds. Cal. Penal Code

3  § 16740(a). [21] Because LCM owners can keep their property and

4  comply with Section 32310, "[t]here is no actual taking." *ANJRPC*,

5  910 F.3d at 124. And while Plaintiffs argue that sale or removal

6  are "economically and practically, untenable" (MPA at 26), this

7  Court has already found that the "impracticality of any

8  particular option . . . does not transform the regulation into a

9  physical taking." Dkt No. 74 (Order re: MTD), at 11.

10      In addition, Section 32310 does not affect a regulatory

11  taking, because LCM owners are permitted to sell the LCMs they

12  possess or remove them from the State. In *Duncan* decision, the en

13  banc panel of the Ninth Circuit held that Section 32310 "plainly

14  does not deprive an owner of all economically beneficial use of

15  the property," 19 F.4th at 1112, given that California law gives

16  LCM's owners the right to sell it to a firearms dealer or remove

17  the magazine to another state.

18      Because Section 32310 effects neither a per se nor a

19  regulatory taking, this Court should enter judgment for

20  Defendants on the Takings Clause claim.

21  **IV. THIS DUE PROCESS CLAIM FAILS.**

22      Judgment should be entered for Defendants on the due process

23  claim because Section 32310 is not retroactive and does not

24  criminalize past LCM possession. And consistent with the Second

25  ────────────────────

[21] Plaintiffs attempt to read the modification option out of
26  Section 17460 by arguing that there are only three options (*i.e.*,
    removal, sale, or surrender) under the statute (MPA at 4), but
27  the Ninth Circuit has already recognized that modification is one
    of the four options available to LCM possessors under the law.
28  *Duncan*, 19 F.4th at 1113.

1   Amendment and Takings Clause analysis, the possession ban was

2   enacted under the State's police powers in pursuit of plainly

3   legitimate government objectives.

4       Plaintiffs contend that the "ban as enacted is a complete and

5   retroactive ban." MPA at 30. Not so. Instead, the law applies

6   prospectively and would penalize individuals who fail to comply

7   with section 32310(d) in the future; the statute does not

8   penalize anyone for past conduct. Cal. Penal Code § 32310(c).

9       Contrary to Plaintiffs' assertion that "the State was wrong

10  in baselessly pursuing this ban in a claimed exercise of its

11  'police power,'" MPA at 32, Section 32310 also serves compelling

12  public safety goals. A regulation that fails to serve any

13  legitimate governmental objective may be so arbitrary that it

14  violates the Due Process Clause, but regulations "survive a

15  substantive due process challenge if they were designed to

16  accomplish an objective within the government's police power, and

17  if a rational relationship existed between the provisions and

18  purpose" of the regulations. *Levald, Inc. v. City of Palm Desert*,

19  998 F.2d 680, 690 (9th Cir. 1993) (quotation omitted).

20

21  **V.  THE EQUAL PROTECTION CLAIM FAILS.**

        In addition, the Court should enter judgment for Defendants

22  on the equal protection claim. This Court had initially ruled in

23  Defendants' favor in dismissing this claim when it was raised in

24  the Second Amended Complaint, finding that rational basis review

25  applied to the equal protection claim, and that the "California

26  electorate could have rationally believed that large capacity

27  magazines used solely as props were not at risk of being used in

28

1   mass shootings and that such an exception would benefit an

2   important sector of the California economy." Dkt. No. 74 at 22–

3   23. This Court declined to dismiss the equal protection claim

4   raised in the Third Amended Complaint only because the decision

5   of the three-judge panel in *Duncan* affirming the granting of the

6   preliminary injunction in that case "compel[led] this court to

7   deny defendants' motion to dismiss the Third Amended Complaint's

8   equal protection claim." Dkt. No. 103 at 6. Given that the

9   panel's decision has been vacated (and, in any event, the *Duncan*

10  plaintiffs did not raise an equal protection claim), this Court

11  should adopt its prior holding dismissing this claim (*see* Dkt.

12  No. 74 at 20–23).

13  **VI.  If the Court Does Not Agree that Plaintiffs Have Failed to Satisfy the
14      Summary Judgment Standard on Any of Their Claims, Defendants Require
       Discovery Pursuant to Rule 56(d).**

15      As explained above, the evidence establishes there is no

16  genuine dispute of material fact in this case, and the Court

17  should enter judgment for Defendants. If this Court is inclined

18  to grant judgment to Plaintiffs based on the current record,

19  however, it should first grant Defendants the opportunity to

20  conduct discovery in accordance with Rule 56(d).

21      No discovery has occurred in this case. After the stay in

22  this case was lifted in October of 2022, Defendants sought

23  discovery "both fact and expert discovery to develop a factual,

24  legal, and historical record" prior to summary judgment, because

25  such an approach would allow "a full and fair opportunity to

26  address the new emphasis on historical analogues and to prepare a

27  record responsive to the text-and-history standard." Dkt. No. 115

28  (Joint Status Report) at 5. The Court granted Plaintiffs' request

1  to file a motion for summary judgment prior to discovery, but

2  stated that after filing, "[t]he court will then consider request

3  under Federal Rule of Civil Procedure 56(d) after plaintiffs'

4  motion for summary judgment has been filed, should defendants

5  feel discovery is necessary to respond to plaintiffs' motion."

6  Dkt. No. 120 at 2.

7      In their Separate Statement of Disputed Facts filed herewith,

8  Defendants identify numerous facts that Plaintiffs identify as

9  material but about which Defendants have had no opportunity to

10  take discovery. For example, Defendants have not been able to

11  conduct discovery as to the standing of the individual and

12  organizational plaintiffs (*see, e.g.,* Dkt. Nos. 123-6, 123-15),

13  or as to the methodology and reliability of the NSSF study which

14  Plaintiffs cite (*see id.* at 4-7). The Ninth Circuit has made

15  clear that where, as here, discovery has yet to commence, Rule

16  56(d) requests are to be granted as a matter of course. *See*

17  *Burlington N. Santa Fe R. Co. v. Assiniboine & Sioux Tribes of*

18  *Fort Peck Reservation*, 323 F.3d 767, 773 (9th Cir. 2003) ("before

19  a party has had any realistic opportunity to pursue discovery

20  relating to its theory of the case," Rule 56(d) requests should

21  be granted "fairly freely"). If the Court is not inclined to deny

22  Plaintiffs summary judgment, Defendants should be permitted to

23  engage in discovery. *See Texas Partners v. Conrock Co.*, 685 F.2d

24  1116, 1119 (9th Cir. 1982) (finding that the "district court

25  erred in granting summary judgment for appellees without

26  affording plaintiffs-appellants the opportunity to proceed with

27  discovery").

28

**VII. IF THE COURT FINDS THAT CALIFORNIA'S RESTRICTIONS ON LARGE-CAPACITY MAGAZINES ARE UNCONSTITUTIONAL, THE COURT SHOULD STAY ENFORCEMENT OF THE JUDGMENT PENDING APPEAL.**

If the Court is inclined to enter judgment holding that Section 32310 violates the Second Amendment (or another constitutional provision), Defendants respectfully request that the Court stay enforcement of any such judgment pending appeal. All four factors that courts consider in evaluating a request to stay pending appeal weigh in favor of the Defendants' request for a stay. *See Humane Soc'y of U.S. v. Gutierrez*, 558 F.3d 896, 896 (9th Cir. 2009) ("A party seeking a stay must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of relief, [3] that the balance of equities tip in his favor, and [4] that a stay is in the public interest.") (citing *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). On the first factor, the party seeking the stay "need not demonstrate that it is more likely than not they will win on the merits," but rather must show only "a reasonable probability" or "fair prospect" of success. *Fed. Trade Comm'n v. Qualcomm Inc.*, 935 F.3d 752, 755 (9th Cir. 2019) (granting partial stay of injunction pending appeal where the party seeking a stay showed "the presence of serious questions on the merits of the district court's determination").

*First*, Defendants meet the serious questions going to the merits standard for the Second Amendment claim. Regardless of the outcome, this case will be among the first opportunities for the Ninth Circuit (or any other Circuit) to address the constitutionality of LCM restrictions post-*Bruen*. At a minimum, this case presents a serious and novel question in the Ninth

1   Circuit, and thus satisfies the first factor for a stay pending
2   appeal where, as here, the equities tip strongly in favor of
3   granting a stay.

4       *Second*, absent a stay, Defendants and the State of California
5   will be irreparably injured as a matter of law. LCMs have been
6   illegal to manufacture, import, keep or offer for sale, give, or
7   lend in California since 2000; if the Court were to enter
8   judgment in Plaintiffs' favor, individuals who have been
9   prevented from acquiring large-capacity magazines for nearly
10   twenty years will be able to lawfully acquire them. And
11   significant numbers of LCMs could come into the State,
12   effectively defeating the purpose of the law even if it were
13   later upheld on appeal. *See* Matthew Green, *Gun Groups: More Than*
14   *a Million High-Capacity Magazines Flooded California During*
15   *Weeklong Ban Suspension*, KQED.org, Apr. 12, 2019, *available at*
16   https://bit.ly/3wfinEU. Additionally, Defendants suffer
17   irreparable harm when a duly enacted law is enjoined from
18   enforcement during an appeal if the law is ultimately sustained.

19       *Third*, the balance of harms favors Defendants. While a stay
20   will delay the relief that Plaintiffs seek in this action,
21   acquisition of LCMs has been unlawful for nearly two decades; any
22   additional delay pending appeal would be comparatively minor and
23   would preserve the status quo until this matter is finally
24   resolved. While any delay in the enjoyment of a constitutional
25   right will involve a burden to those who wish to exercise it, if
26   a judgment issued by this Court in Plaintiffs' favor is affirmed
27   on appeal, any such burden would be relatively modest in
28   comparison to the substantial burden that will be imposed on the

1    State if the acquisition of new LCMs is permitted during the

2    appeal.

3        *Fourth*, the public interest strongly favors staying any

4    judgment pending appeal. A stay pending appeal will preserve the

5    status quo involving an important public-safety law that has been

6    in effect for nearly two decades while the Ninth Circuit

7    considers this complex Second Amendment challenge. *See Boland v.*

8    *Bonta,* Dkt. No. 7, Case No. 23-55276 (9th Cir. Apr. 3, 2023)

9    (granting the Attorney General's motion for an emergency stay

10   where the district court had granted a preliminary injunction

11   enjoining enforcement of certain requirements in the Unsafe

12   Handgun Act but had not stayed its ruling pending appeal (instead

13   only staying the case to allow time for the State to seek a stay

14   from the Ninth Circuit)).

15                              **CONCLUSION**

16       For the foregoing reasons, the Court should deny Plaintiffs'

17   summary judgment motion on all claims and grant judgment in

18   Defendants' favor; or grant Defendants' application under Federal

19   Rule of Civil Procedure 56(d) to defer consideration of

20   Plaintiffs' motion for summary judgment or deny it, or to allow

21   time for Defendants engage in discovery.

22   //

23   //

24

25

26

27

28

1    Dated:   May 1, 2023                        Respectfully submitted,

2                                                Rob Bonta
                                                 Attorney General of California
3                                                Mark R. Beckington
                                                 Supervising Deputy Attorney
4                                                General
                                                 John D. Echeverria
5                                                Deputy Attorney General

6

7
                                                 /s/ Robert L. Meyerhoff
8                                                Robert L. Meyerhoff
                                                 Deputy Attorney General
9                                                *Attorneys for Defendants Rob
                                                 Bonta in his official capacity
10                                               as Attorney General of the
                                                 State of California and
11                                               Allison Mendoza in her
                                                 Official Capacity as Director
12                                               of the Bureau of Firearms*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28