George M. Lee (SBN 172982)
gml@seilerepstein.com
**SEILER EPSTEIN LLP**
4 Embarcadero Center, 14th Floor
San Francisco, CA 94111
Phone: (415) 979-0500
Fax:    (415) 979-0511

Raymond M. DiGuiseppe
(SBN  228457)
law.rmd@gmail.com
**THE DIGUISEPPE LAW FIRM, P.C.**
116 N. Howe Street, Suite A
Southport, North Carolina 28461
Phone: (910) 713-8804
Fax: (910) 672-7705

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM WIESE, et al.,<br><br>   Plaintiffs,<br><br> vs.<br><br>ROB BONTA, in his official capacity as Attorney General of California, et al.,<br><br>   Defendants. | Case No. 2:17-cv-00903-WBS-KJN<br><br>**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, AND OPPOSITION TO DEFENDANTS' COUNTER MOTION FOR SUMMARY JUDGMENT**<br><br>**[FRCP 56]**<br><br>Date:  July 10, 2023<br>Time:  1:30 p.m.<br>Courtroom: 5, 14th Floor<br>Judge:  Hon. William B. Shubb |

## TABLE OF CONTENTS

I.    INTRODUCTION ..................................................................................................... 1

II.   ARGUMENT IN REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFFS' MSJ AND ARGUMENT IN OPPOSITION TO DEFENDANTS' MSJ ...................................................................... 1

    A.  SECOND AMENDMENT CLAIM .................................................................... 1

       1.  The LCM Ban Clearly Prohibits Conduct Protected by the Text of the Second Amendment. ......................................................................... 1

       2.  The LCM Ban Prohibits "Arms" Protected by the Second Amendment ................... 5

       3.  The State's Argument That It Can Decide What is *Really Needed* by its Citizens Should be Rejected. ...................................................... 7

       4.  Defendants Have Failed to Meet Their Burden Under *Bruen* to Show "Relevantly Similar" Historical Analogues Justifying This Ban. ............................. 11

    B.  TAKINGS AND DUE PROCESS CLAIM .......................................................... 16

       1.  The Court Must Examine the Character of the Taking, in Relation to its Stated Public Purpose. ................................................................ 16

       2.  The State's Reliance Upon its Police Powers is Misplaced. ...................... 19

       3.  The Parallel Due Process Violation ....................................................... 21

    C.  EQUAL PROTECTION CLAIM ...................................................................... 22

III.  CONCLUSION ...................................................................................................... 22

– ii –

REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT; AND OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - CASE NO. 2:17-cv-00903-WBS-KJN

<u>TABLE OF AUTHORITIES</u>

**Cases**

*Akins v. United States*, 82 Fed. Cl. 619 (2008) ............................................................................. 20

*Armstrong v. United States*, 364 U.S. 40, 80 S.Ct. 1563 (1960) ................................................ 16, 19

*Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey*,
    910 F.3d 106 (3d Cir. 2018) ........................................................................................................ 5

*Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Grewal*, 2018 WL 4688345
    (D.N.J. Sept. 28, 2018), aff'd sub nom. *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y
    Gen. New Jersey*, 910 F.3d 106 (3d Cir. 2018) ........................................................................ 10

*Barnett v. Raoul*, 2023 WL 3160285 (S.D. Ill. Apr. 28, 2023) .......................................................... 5

*Caetano v. Massachusetts*, 577 U.S. 411 (2016) ...................................................................... 3, 11

*Cwynar v. City & County of San Francisco*, 90 Cal.App.4th 637 (2001) ........................................ 19

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ......................................................... *passim*

*Drummond v. Robinson Township*, 9 F.4th 217 (3d Cir. 2021) ........................................................ 4

*Duncan v. Becerra*, 265 F. Supp.3d 1106 (S.D. Cal. 2017) ........................................................ 10

*Duncan v. Becerra*, 970 F.3d 1133 (9th Cir. 2020), reh'g en banc granted, opinion vacated,
    988 F.3d 1209 (9th Cir. 2021), and on reh'g en banc sub nom. *Duncan v. Bonta*,
    19 F.4th 1087 (9th Cir. 2021), cert. granted, judgment vacated, 142 S.Ct. 2895 (2022),
    and vacated and remanded, 49 F.4th 1228 (9th Cir. 2022) ........................................................ 8

*Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021), cert. granted, judgment vacated,
    142 S.Ct. 2895 (2022), and vacated and remanded, 49 F.4th 1228 (9th Cir. 2022) ............... 16, 17

*Ezell v. City of Chicago*, 651 F.3d 684 (9th Cir. 2011) ..................................................................... 4

*Fesjian v. Jefferson*, 399 A.2d 861 (D.C. Ct. App. 1979) .......................................................... 20, 21

*Fyock v. City of Sunnyvale*, 25 F. Supp.3d 1267 (N.D. Cal. 2014),
    aff'd sub nom. *Fyock v. Sunnyvale*, 779 F.3d 991 (9th Cir. 2015) ........................................... 9, 11

*Fyock v. Sunnyvale*, 779 F.3d 991 (9th Cir. 2015) ......................................................................... 5

*Gamble v. United States*, 587 U.S. ___, 139 S.Ct. 1960 (2019) ................................................ 14, 15

*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) (*Heller II*) ................................. 8, 16

*Jackson v. City of San Francisco*, 746 F.3d 953 (9th Cir. 2014) ................................................ 4, 6

– iii –

REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT; AND OPPOSITION
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - CASE NO. 2:17-cv-00903-WBS-KJN

*Kelo v. City of New London, Conn.*, 545 U.S. 469 (2005) .......................................................... 17, 19

*Kolbe v. Hogan*, 813 F.3d 160 (4th Cir. 2016) ................................................................................ 5, 7

*Laurel Park Community, LLC v. City of Tumwater*, 698 F.3d 1180 (9th Cir. 2012) ................. 16, 19

*Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528 (2005) ............................................................ 16, 19, 20

*Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982) ..................................... 17, 19

*Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992) ............................................... 19, 20

*Luis v. United States*, 578 U.S. 5, 136 S. Ct. 1083 (2016) ................................................................. 3

*Mass. Bd. of Retirement v. Murgia*, 427 U.S. 307 (1976) ................................................................ 22

*McCulloch v. Maryland, 4 Wheat.* 316, 415, 4 L.Ed. 579 (1819) ..................................................... 12

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ......................................................................... 15

*Miller v. Bonta*, 542 F. Supp.3d 1009 (S.D. Cal. 2021) .................................................................. 10

*Monks v. City of Rancho Palos Verdes*, 167 Cal.App.4th 263 (2008) .............................................. 18

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) ........................................................................... 23

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S.Ct. 2111 (2022) .............................*passim*

*Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007),
   aff'd sub nom. *Heller*, 554 U.S. 570. ......................................................................................... 6

*Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 (1922) ................................................................. 17

*PruneYard Shopping Center v. Robins*, 447 U.S. 74 (1980) ............................................................ 17

*Richmond Elks Hall Ass'n v. Richmond Redevelopment Agency*, 561 F.2d 1327 (9th Cir. 1977) .... 17

*State Oil Co. v. Khan*, 522 U.S. 3 (1997) ........................................................................................ 15

*Teixeira v. County of Alameda*, 873 F.3d 670 (9th Cir. 2017) .......................................................... 3

*Texas Partners v. Conrock Co.*, 685 F.2d 1116 (9th Cir. 1982) ...................................................... 23

*United States v. Jones*, 565 U.S. 400, 132 S.Ct. 945, 181 L.Ed.2d 911 (2012) .............................. 12

*United States v. Security Industrial Bank*, 459 U.S. 70 (1982) ....................................................... 16

*United States v. Sprague*, 282 U.S. 716 (1931) ................................................................................. 3

*Virginia v. Moore*, 553 U.S. 164 (2008) .......................................................................................... 15

*Wiese v. Becerra*, 306 F.Supp.3d 1190 (E.D. Cal. Feb. 7, 2018) .......................... 5

**Statutes**

Cal. Pen. Code § 16900 .................................................................... 2

Cal. Pen. Code § 31910 .................................................................... 2

Cal. Pen. Code § 32000 .................................................................... 2

Cal. Pen. Code § 32310 ........................................................ 16, 17, 19

Colo. Rev. Stat. § 18-12-301 .......................................................... 2

**Other Authorities**

Mark W. Smith, *Attention Originalists: The Second Amendment Was Adopted in 1791, Not 1868*, HARV. J. L. & PUB. POL'Y PER CURIAM, (Fall 2022) ........................... 14

William English, *2021 National Firearms Survey* (July 14, 2021) .................... 9

**Constitutional Provisions**

Cal. Const., Art. I, § 19 ................................................................. 18

U.S. Const., Amend. II ............................................................. *passim*

U.S. Const., Amend. V ...................................................... 16, 17, 20, 21

U.S. Const., Amend. XIV ....................................................... 14, 21

# I.    INTRODUCTION

Plaintiffs submit this brief in reply to Defendants' opposition to Plaintiffs' motion for summary judgment (Dkt. No. 123) ("Plaintiffs' MSJ" or "PMSJ"), and in opposition to Defendants' counter-motion for summary judgment (Dkt. No. 125) ("Defendants' MSJ" or "DMSJ"). Defendants' arguments in opposition to Plaintiffs' MSJ mirror their arguments in support of their counter-motion for summary judgment, which are combined into a single brief. Plaintiffs respond in like fashion through this single brief, as everything rises and falls together: if Plaintiffs are right that the LCM Ban targets activity protected under the Second Amendment without a historically-rooted justification as mandated under the *Bruen* framework, then the whole house that the defense has built around its defense of the Ban falls down, and the law must be invalidated as unconstitutional. And that is exactly what we have seen in this litigation: the defense put up by the State in these cross motions for summary judgment solidifies that California can point to no legitimate justification for its prohibitions against the fundamental liberty of ordinary law-abiding citizens to acquire, possess, and use LCMs in the exercise of their right to keep and bear arms under the Second Amendment. Therefore, this Court can quickly and confidently enter summary judgment in favor of Plaintiffs. We respectfully request that it do so now.

## II.    ARGUMENT IN REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFFS' MSJ AND ARGUMENT IN OPPOSITION TO DEFENDANTS' MSJ

### A.    SECOND AMENDMENT CLAIM

#### 1.    The LCM Ban Clearly Prohibits Conduct Protected by the Text of the Second Amendment.

The State first argues that Plaintiffs have failed to meet a "threshold inquiry" under *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S.Ct. 2111 (2022), because the plain text of the Second Amendment does not cover the possession of LCMs. (Opp. at 12-13.) But clearly, magazines, being inherent operating parts of a firearm—a fact which Defendants do not really dispute—are integral

parts of modern arms.[1] Pltf. SOUMF Nos. 11-15 (Dkt. No. 123-2). Of course, the only thing that distinguishes LCMs, as defined by the State, from any other magazines is their capacity. Indeed, even the declaration of Ryan Busse, offered by the State (Dkt. No. 125-6) states "all firearms that can accept a large-capacity magazine can also accept a magazine that holds fewer rounds and still function precisely as intended." *Id.*, at ¶ 18. Thus, putting the issue of a magazine's capacity aside, and sticking with this "threshold inquiry," it would be absurd for the State to concede that an inherent operating part of a firearm constitutes an "arm" as long as it only holds less than an arbitrarily-decided[2] number of rounds, but then to argue that as soon as a magazine crosses an 11-round threshold, it somehow mysteriously transforms into something that is *not* an arm.

Or to put it another way: Under the State's theory, it could simply prohibit the possession of *all* detachable magazines in California, thereby rendering *all* semi-automatic firearms to be "one-shot wonders," and still not run afoul of the text of the Second Amendment, under its novel theory that a firearm's capacity has *nothing to do* with its operability. There is no limiting principle under that rationale: because a State that can limit the capacity of a magazine based on its judgment about the number of rounds a magazine should be able to hold at any given time can limit that capacity to five or two—or even one. At that point, a semiautomatic firearm is not semiautomatic at all—it is a single-shot firearm that becomes a single-use hand projectile when its shot is spent. As this demonstrates,

---

[1] The State purports to dispute Plaintiffs' SOUMF No. 14 by citing to the Declaration of Ryan Busse. But nowhere in Mr. Busse's declaration does he deny that magazines are inherent parts of modern firearms. Further, both the State and Mr. Busse completely ignore the effect of Cal. Pen. Code §§ 31910(b)(4)-(6), 32000, and 16900, which require new semiautomatic pistols sold in California to have a magazine disconnect mechanism, thereby preventing those pistols from firing unless a detachable magazine is inserted. Mr. Busse also declares that "there is no known firearm that requires a large-capacity magazine to function as designed," and that "[t]here is no difficulty in obtaining lower capacity or standard capacity magazines for virtually any firearm." Busse Decl., ¶ 18, 17. Mr. Busse completely ignores the testimony of Plaintiffs Dang and Macaston, who have attested that their legally-acquired magazines were the only ones ever made for their particular firearms. Plaintiffs' SOUMF No. 39; Dang Decl., ¶ 5; Macaston Decl., ¶ 6.

[2] In Colorado, for example, a "large capacity magazine" is defined as one which is capable of accepting more than 15 rounds of ammunition. Colo. Rev. Stat. § 18-12-301(2)(a). So, under Defendants' interpretation of the Second Amendment, does a firearm equipped with a fifteen-round magazine constitute an "arm" in Colorado but then lose its status an "arm" as soon as it crosses the border into California?

by limiting magazine capacity, the State is in fact limiting the number of rounds a firearm can fire without reloading. That plainly is the restriction of a type of arm—one capable of firing more than the limit without reloading—and therefore covered by the Second Amendment's plain text.

The State's argument is not only absurd on its face, but it is foreclosed by *Heller*, which, as reaffirmed by *Bruen*, declares: "the Second Amendment extends, prima facie, to *all instruments* that constitute bearable arms." *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008) (emphasis added); *accord Bruen*, 142 S.Ct. at 2132. *Bruen* made further clear that "even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense." *Bruen* at 2132 (citing *Caetano v. Massachusetts*, 577 U.S. 411, 411–412 (2016) (per curiam) (stun guns)). In interpreting the text of the Second Amendment, the courts must be guided by the principle that "'[t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning.'" *Heller* at 576 (quoting *United States v. Sprague*, 282 U.S. 716, 731 (1931)). And the founders would doubtless have thought it absurd that some modern-day Americans would consider today's magazines to no longer be "Arms" that "facilitate armed self-defense" under the Second Amendment as soon as they crossed some arbitrary limit on ammunition capacity.

The State's ban on LCMs prohibits *conduct* covered by the Second Amendment because it prohibits Plaintiffs' right to *keep* and bear Arms. The term "keep" simply means "'[t]o retain; not to lose,' and '[t]o have in custody.'" *Heller*, 554 U.S. at 582 ("The most natural reading of 'keep Arms' in the Second Amendment is to 'have weapons.'"). This right clearly extends to and covers the right to *acquire* new LCMs that the LCM Ban cuts off. The Ninth Circuit "and other federal courts of appeals have held that the Second Amendment protects ancillary rights necessary to the realization of the core right to possess a firearm for self-defense." *Teixeira v. County of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017). "Constitutional rights thus implicitly protect those closely related acts necessary to their exercise." *Luis v. United States*, 578 U.S. 5, 136 S. Ct. 1083, 1097 (2016) (Thomas, J., concurring). Thus, the right "'implies a corresponding right to acquire and maintain proficiency' with

1    common weapons." *Drummond v. Robinson Township*, 9 F.4th 217, 227 (3d Cir. 2021) (quoting *Ezell*

2    *v. City of Chicago*, 651 F.3d 684, 704 (9th Cir. 2011); *Luis* at 1097 (quoting *Jackson v. City and*

3    *County of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) ("The right to keep and bear arms, for

4    example 'implies a corresponding right to obtain the bullets necessary to use them.'").

5          In this case, the individual Plaintiffs, as representatives of the class of similarly-situated

6    individuals, have all legally possessed large-capacity magazines in this State, prior to December 31,

7    1999, without incident. Naturally and rightfully, they desire to keep this valued personal property,

8    i.e., they simply wish to continue to hold and otherwise exercise their Second Amendment right to

9    possess, keep, use and acquire firearms and standard-capacity magazines, which are in common use,

10   and for lawful purposes, but cannot do so should this total, categorical Large-Capacity Magazine Ban

11   be enforced. Wiese Decl. (Dkt. No. 123-5), ¶¶ 5, 8; Morris Decl. (Dkt. No. 123-6), ¶¶ 5, 8); Macaston

12   (Dkt. No. 123-7), ¶¶ 8-11; Flores Decl. (Dkt. No. 123-8), ¶¶ 9-11; Dang Decl. (Dkt. No. 123-9), ¶¶

13   7-8, 10.

14         In any event, this Court has already and previously found, even in applying intermediate

15   scrutiny before *Bruen* foreclosed such interest-balancing tests, that the LCM Ban burdens conduct

16   protected by the Second Amendment. *See* Memorandum & Order Re Motion to Dismiss Second

17   Amended Complaint, Dkt. No. 74, at 5, fn.3. In applying the law before *Bruen* eliminated the circuit

18   courts' former "two-step" approach, this Court granted Defendants' motion to dismiss the Second

19   Amended Complaint only on the grounds that the law survived the now-invalidated intermediate

20   scrutiny test. It would be quite the reversal for the Court now to say that the Second Amendment is

21   somehow not implicated *at all* according to its plain text *after* the Supreme Court restored *Heller* as

22   the controlling framework. *Bruen*, 142 S.Ct. at 2131 ("The test that we set forth in *Heller* and *apply*

23   *today* requires courts to assess whether modern firearms regulations are consistent with the Second

24   Amendment's text and historical understanding.") (italics added). Yet, that is what Defendants urge

25   this Court to do in opposing Plaintiffs' MSJ and claiming that they are the ones entitled to summary

26   judgment here.

27

28

### 2. The LCM Ban Prohibits "Arms" Protected by the Second Amendment.

Even beyond the textual interpretation, the State has attempted to argue that LCMs themselves are not "Arms" within the meaning of the Second Amendment. As noted, most courts, including this Court, have found otherwise, even before *Bruen*. *See Fyock v. Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015) (recognizing a general right to possess magazines necessary to render firearms operable); *Kolbe v. Hogan*, 813 F.3d 160, 175 (4th Cir. 2016) ("[t]o the extent the State can regulate these magazines, it is not because the magazines are not bearable 'arms' within the meaning of the Second Amendment"); *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey*, 910 F.3d 106, 116 (3d Cir. 2018) ("[b]ecause magazines feed ammunition into certain guns, and ammunition is necessary for such a gun to function as intended, magazines are 'arms' within the meaning of the Second Amendment."); *Wiese v. Becerra*, 306 F.Supp.3d 1190, 1195, n. 3 (E.D. Cal. Feb. 7, 2018)); *Barnett v. Raoul*, 2023 WL 3160285, at *8 (S.D. Ill. Apr. 28, 2023) ("not even a close call" that magazines are arms under the plain text of the Second Amendment).

In their opening memorandum, Plaintiffs asserted that "Second Amendment protections would be meaningless if the State could strip away integral component parts of a firearm by claiming that prohibitions against individual components do not constitute a ban on 'arms.' This would be an absurd construction." (Memo. Dkt. No. 123-1, at 9:10-12). But that's exactly what the State is attempting to do, by first reducing a firearm to the sum of its parts, and then claiming that any integral or operating part thereof is not, in and of itself, an "arm." The State does not reasonably dispute that a firearm magazine is an inherent part of, and inseparable from, a functioning firearm. Its only response here is that "many functioning firearms do not have magazines." Def. Resp. to Pltf. SOUMF ("PSOUMF") No. 14 (Dkt. No. 125-3). It does not and cannot dispute the essential fact that such magazines are integral to all modern, *semiautomatic* firearms which are essentially inoperable without them. Youngman Decl., at ¶ 7 (Lee Decl., Ex. A; Dkt. No. 28-2); Def. Resp. to Pltf. SOUMF No. 15. Modern semiautomatic firearms of the kind in use for lawful purposes, including self-defense, sold at retail in the civilian and law enforcement markets include at least one magazine intended to be used as part of that firearm. *Id*.

The State argues that gun owners are not totally disarmed under the LCM Ban, as some firearms can operate with magazines holding ten or fewer rounds. *See* Def. Opp. to PMSJ at 18:8 ("Possession of an LCM is not necessary for such a purpose.") But nothing in the plain text of the Second Amendment would allow the State to prohibit a type of arm based on its ammunition capacity; and therefore, this argument must be supported by historical traditions, which—as argued throughout—the State cannot do. Moreover, the State's argument is tantamount to saying that it may otherwise ban firearms because gun owners can simply obtain or use a different kind of gun, even if it is markedly *inferior* to the ones that most Americans actually prefer to own and do own. Such an argument was explicitly rejected in *Heller* when the Court stated: "It is no answer to say […] that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed." *Heller*, 554 U.S. at 629; *see also Parker v. District of Columbia*, 478 F.3d 370, 400 (D.C. Cir. 2007) (rejecting as "frivolous," even before *Heller*, the District's argument that its ban on one type of firearm "does not implicate the Second Amendment because it does not threaten total disarmament" and "residents still have access to hundreds more," since "[i]t could be similarly contended that all firearms may be banned so long as sabers were permitted."), aff'd sub nom. *Heller*, 554 U.S. 570.

Ultimately, when *Heller* struck down the District of Columbia's then thirty-year-old ban on handguns, it did so noting that such a ban "amounts to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for that lawful purpose[,]" *Heller*, 554 U.S. at 628, which was constitutionally untenable, "[w]hatever  the reason" for this popularity, *id.* at 629. Likewise, given the ubiquity and overwhelming choice of millions of Americans to purchase, keep and bear arms with standard capacity magazines, as Plaintiffs have amply demonstrated, it is hardly sufficient for the State to say that law-abiding gun owners here must abide by arbitrary magazine capacity limitations that most Americans do not choose. Once again, the State's attempt to strip away component parts of a firearm, and claim—disingenuously—that the mere restriction of an integral part somehow does not constitute a ban on arms, should be rejected. The right to bear arms would be meaningless otherwise. *See Jackson v. City of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014);

(ammunition); *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) (training); *Kolbe*, 813 F.3d at 175. And the clear choice of Americans to possess these magazines for lawful purposes must be respected under this framework, "whatever the reason" for that choice.

### 3. The State's Argument That It Can Decide What is *Really Needed* by its Citizens Should be Rejected.

The State next attempts to argue that possession of an LCM "is not necessary" for the purpose of self-defense. Def. Opp. to PMSJ at 18:8. This premise is then used to bootstrap its further argument that LCMs are not protected arms because they are not "commonly used" for self-defense—i.e., used to actually *fire upon* another person in repelling deadly force. *Id.* at 19-24.

There are a multitude of flaws in the State's argument. To begin with, the notion that Plaintiffs' claim is in any way dependent on the "*necessity*" of LCMs for purposes of self-defense harkens us back to the Court's warning in *Heller*, which stated: "The very enumeration of the [Second Amendment] right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Heller*, 554 U.S. at 634 (emphasis original). And now *Bruen* has confirmed that *Heller* was itself designed to eliminate such interest-balancing considerations altogether. *See Bruen*, 142 S.Ct. at 2129 ("Not only did *Heller* decline to engage in means-end scrutiny generally, but it also specifically ruled out the intermediate-scrutiny test that respondents and the United States now urge us to adopt."). The State is therefore foreclosed from elevating its judgments—and the judgments of its paid experts—as to what is "really needed" by ordinary citizens, above the judgments of the citizens themselves. *See Bruen* at 2129 (*Heller* rejected any framework that "'asks whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests'") (quoting *Heller* at 634).

As with handguns, the American people have spoken, overwhelmingly, in favor of higher capacity firearms and, just as with handguns, "[t]here are many reasons that a citizen may prefer" a LCM in equipping their semiautomatic firearms. *Heller*, 554 U.S. at 629. But *whatever* the reason for their popularity, they represent a choice of law-abiding citizens for purposes of engaging in the

1    exercise of their Second Amendment rights, "and a complete prohibition of their use is invalid." *Id.*

2    In fact, the Court's use of the phrase "whatever the reason" not only quite clearly signals the need for

3    judicial *deference* here, but also illustrates that self-defense is not the *only* lawful use or purpose

4    protected by the Second Amendment, even if self-defense is the "core" purpose. *See Heller v. District*

5    *of Columbia*, 670 F.3d 1244, 1260 (D.C. Cir. 2011) (*Heller II*) ("Of course, the [U.S. Supreme] Court

6    also said the Second Amendment protects the right to keep and bear arms for other lawful purposes,

7    such as hunting, but self-defense is the core lawful purpose protected.").

8            Therefore, the common use of an arm overrides any decrees or policy judgments of the State

9    as to what its citizens "really need" for purposes of exercising their constitutional right to keep and

10   bear protected arms for self-defense and other lawful purposes. And it is beyond any reasonable

11   dispute that the magazines at issue are commonly owned, both here in California and throughout the

12   United States. *See* Pltf. Reply to Def. Resp. to Pltf. SOUMF ("Reply to Resp. to PSOUMF") Nos.

13   16-31, Pltf. Resp. to Def. SOUMF Nos. 1, 4 ("Resp. to DSOUMF"), filed contemporaneously with

14   this brief. This, by definition, makes them commonly held, and therefore, not dangerous *and/or*

15   unusual. *See Duncan v. Becerra*, 970 F.3d 1133, 1147 (9th Cir. 2020) ("'[N]early half of all

16   magazines in the United States today hold more than ten rounds of ammunition. And the record shows

17   that such magazines are overwhelmingly owned and used for lawful purposes. This is the antithesis

18   of unusual."), reh'g en banc granted, opinion vacated, 988 F.3d 1209 (9th Cir. 2021), and on reh'g

19   en banc sub nom. *Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021), cert. granted, judgment vacated,

20   142 S.Ct. 2895 (2022), and vacated and remanded, 49 F.4th 1228 (9th Cir. 2022). Under the historical

21   test developed in *Heller* and confirmed in *Bruen*, because these magazines are commonly owned for

22   lawful purposes, they are protected as "modern instruments that facilitate armed self-defense." *Bruen*,

23   142 S.Ct. at 2132.

24           Indeed, a finding that the instruments in question pass the common-use test would obviate the

25   need for any further historical analysis. *Heller* already established the relevant contours of the

26   historical tradition that a court must examine, when it stated that bearable arms presumptively

27   protected by the Second Amendment cannot be banned unless they are both dangerous *and* unusual.

28

This was confirmed in *Bruen*, 142 S.Ct. at 2128, when it stated: "we found it 'fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons'' that the Second Amendment protects the possession and use of weapons that are 'in common use at the time'" (citing *Heller*, 554 U.S. at 627). An absolute ban of a widely and commonly held instrument that facilitates armed self-defense is categorically unconstitutional because there is, *ipso facto*, no historical tradition that would support it. Because Plaintiffs have shown that the banned arms are in common use, it is impossible for the State to meet its burden.

Unable to effectively refute the ubiquity of LCMs in American hands today, the State resorts to its discredited argument that LCMs are not needed based on evidence of the rate at which they are *actually used* in self-defense shootings in the United States, relying primarily upon the supplemental declaration of Lucy Allen. Dkt. No. 125-5; Def. Resp. to PSOUMF Nos. 4, 5, 6, 7. But once again, the common use of these magazines by the American people overrides the State's self-imposed decrees as to what is *really needed* for purposes of exercising the constitutional rights to keep and bear arms for self-defense. And moreover, this argument is simply yet another attempt to resurrect a now-dead means-ends debate, the type of which is foreclosed by *Heller* and *Bruen*.

The State's reported study of the "use" of LCMs in self-defense shootings is simply not relevant. "Use" for purposes of Ms. Allen's study seems to include only the firing of a shot from the magazine. As Plaintiff expound further in their response to Defendants' SOUMF Nos. 4, 5, 6, and 7, "Second Amendment rights do not depend on how often the magazines are used. Indeed, the standard is whether the prohibited magazines are 'typically *possessed* by law-abiding citizens for lawful purposes,' not whether the magazines are often *used* for self-defense." *Fyock v. City of Sunnyvale*, 25 F. Supp.3d 1267, 1276 (N.D. Cal. 2014) (emphasis original, citing *Heller*, 554 U.S. at 625), aff'd sub nom. *Fyock v. Sunnyvale*, 779 F.3d 991 (9th Cir. 2015). Further, as we know, millions of law-abiding American citizens *carry* firearms for self-defense every day, and very few self-defense shootings actually occur in proportion to the number of firearms actually carried.[3] Does this mean

---

[3] *See* English, William, *2021 National Firearms Survey* (July 14, 2021), Georgetown McDonough School of Business Research Paper No. 3887145, Available at SSRN:

that such firearms are not actually "used" for self-defense unless they are fired? The answer is no, of course, but it does not matter, because that is not the proper inquiry. When the Court decided *Heller* and focused on the fact that handguns are overwhelmingly *used* by the American people for lawful purposes, *such as* self-defense, it did not get into an analytical discussion of how many times they were actually fired in self-defense incidents. It was enough that the American people overwhelmingly chose to *keep* handguns in the home for self-defense, and in the overwhelming majority of cases, they were never actually fired—or even brandished—in a self-defense situation. *See* 2021 National Firearms Survey, *supra*. This principle was then restated in *Bruen*, which reaffirmed that the Second Amendment protects the right to "*possess and carry* weapons *in case of* confrontation." *Bruen*, 142 S.Ct. at 2127 (emphasis added) (citing *Heller*, 554 U.S. at 592). The right to keep and bear arms clearly protects *preparedness* not just *actuality*; to read it as Defendants do, the protections of the Second Amendment wouldn't kick in until the moment a person is compelled to fire upon another person as means of repelling deadly force.

     *Heller* spoke of common use in the context of possession, not as some quantitative measurement of the shots that are actually ever fired. Accordingly, the State's discredited study[4] is

---

https://ssrn.com/abstract=3887145 or http://dx.doi.org/10.2139/ssrn.3887145, Abstract ("Handguns are the most common firearm employed for self-defense (used in 65.9% of defensive incidents), and *in most defensive incidents (81.9%) no shot was fired.*") (italics added); National Library of Medicine, Hemenway (2015), *The epidemiology of self-defense gun use: evidence from the National Crime Victimization Surveys 2007-2011*, Abstract (https://pubmed.ncbi.nlm.nih.gov/25910555/) (studying "the epidemiology of self-defense gun use (SDGU) and the relative effectiveness of SDGU in preventing injury and property loss," in "over 14,000 incidents in which the victim was present, 127 (0.9%) involved a SDGU").

[4] Ms. Allen admits that her study, insofar as it relied upon anecdotal stories published in an NRA magazine feature called "Armed Citizen," has not been updated since 2017. (Allen Decl., ¶ 9, n.5). Her study was also presented and relied upon by the State in both *Duncan v. Bonta*, S.D. Cal. No. 3:17-cv-1017-BEN (JLB), and *Miller v. Bonta*, S.D. Cal. No. 19-cv-1537-BEN (JLB). However, she admitted in those cases and elsewhere that her study was not compiled scientifically. *See Duncan v. Becerra*, 265 F. Supp.3d 1106, 1129 (S.D. Cal. 2017); *Miller v. Bonta*, 542 F. Supp.3d 1009, 1044-45 (S.D. Cal. 2021) ("[a]s she acknowledged in her declaration submitted in *Duncan v. Becerra*, the NRA-ILA Armed Citizen Database is not compiled scientifically"), vacated and remanded, 2022 WL 3095986 (9th Cir. Aug. 1, 2022); *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Grewal*, No. 3:17-cv-10507-PGS-LHG, 2018 WL 4688345 ("*ANJRPC*"), at *5 (D.N.J. Sept. 28, 2018) ("Allen conceded that the NRA Armed Citizen Database is not a scientific study and is not representative of overall statistics on the use of arms in self-defense."), aff'd sub nom. *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey*, 910 F.3d 106 (3d Cir. 2018). Judge Benitez's fuller

simply not relevant. What matters is that these magazines are typically *possessed* by law-abiding citizens for lawful purposes, including *in case of confrontation. Fyock*, 25 F. Supp.3d at 1276 ("Second Amendment rights do not depend on how often the magazines are used."); *see also Caetano*, 577 U.S. at 420 ("The more relevant statistic is that '[h]undreds of thousands of Tasers and stun guns have been sold to private citizens,' who it appears may lawfully possess them in 45 States") (Alito, J., concurring).

### 4. Defendants Have Failed to Meet Their Burden Under *Bruen* to Show "Relevantly Similar" Historical Analogues Justifying This Ban.

Once again, *Heller* and *Bruen* have already done the historical work here by adopting and affirming that *Heller*'s common-use test stems from its analysis of the "historical traditions" prohibiting dangerous and unusual weapons. If this Court finds that the arms in question are in common use, for lawful purposes, which it must, no further historical analysis is needed.

And otherwise, the State has failed to meet its burden under *Bruen* to show through relevant historical analogues that its regulation "is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Bruen*, 142 S.Ct. at 2130. The State has failed to meet its burden under *Bruen* as none of the 348 laws it has offered as historical evidence contained within its Appendix[5] is on point. Dkt. No. 125-2.

_____

criticism of Ms. Allen's study and conclusions is found at *Miller v. Bonta*, 542 F. Supp.3d at 1042-45 ("Allen's opinion about the number of shots fired in self-defense is entitled to little weight and fails the scientific method."); *see also ANJRPC*, 2018 WL 4688345, at *12 ("The Court finds Allen [has not] provided a clear analysis based on the various studies. Allen's analysis, based on an NRA report, does not support with statistical reliability her claim that individuals only use an average of 2.2 or 2.3 bullets when using handguns in self-defense."); *see also* Resp. to DSOUMF No. 4.

[5] The State submitted this same survey in both *Duncan v. Bonta*, S.D. Cal. No. 3:17-cv-1017-BEN (JLB) (Dkt. No. 139) and in *Miller v. Bonta*, S.D. Cal. No. 3:19-cv-1537-BEN (JLB) (Dkt. No. 166). In a further brief that the State was requested to file in *Duncan* regarding "the best historical regulation that is a proper analogue and relevantly similar to a statewide prohibition on possession of an ammunition feeding device or a limit on the amount of ammunition," the State filed a supplemental brief in which it identified the gunpowder storage laws, historical restrictions on the carrying of concealable weapons, and prohibitions on the use of trap guns as the laws/regulations that it claimed to be most relevant to the State's modern-day LCM restrictions. (*Duncan*, Dkt. No. 143, at pp. 1-2). The State repeats its reliance on such laws here. *See* DSOUMF Nos. 39-53.

Instead, the State's compilation confirms what we already know, i.e., while there may be some tradition of regulation "dangerous and unusual weapons" under *Heller*, there are no constitutionally relevant historical analogues that are "relevantly similar" to a ban on arms that are typically possessed by ordinary citizens—particularly not any regulations, much less *bans*, on the *capacity* of magazines or rounds of firearms ammunition in general. *Bruen*, 142 S.Ct. at 2132.

Defendants' argument that the LCMs themselves represent a "dramatic technological change" which requires a "more nuanced analogical approach," Def. Opp. to PMSJ at 26:18-19, is misplaced, because the "more nuanced approach" that was discussed in *Bruen* concerns the determination of what constitutes a proper historical analogue. A "more nuanced analogical approach" is not a license to resurrect means-end interest balancing or to otherwise circumvent or lessen the burden the government must carry. The relevant passage from *Bruen* reads:

> While the historical analogies here and in *Heller* are relatively simple to draw, other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach. The regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868. Fortunately, the Founders created a Constitution—and a Second Amendment—"intended to endure for ages to come, and consequently, to be adapted to the various crises of human affairs." *McCulloch v. Maryland, 4 Wheat.* 316, 415, 4 L.Ed. 579 (1819) (emphasis deleted). Although its meaning is fixed according to the understandings of those who ratified it, the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated. See, e.g., *United States v. Jones*, 565 U.S. 400, 404–405, 132 S.Ct. 945, 181 L.Ed.2d 911 (2012) (holding that installation of a tracking device was "a physical intrusion [that] would have been considered a 'search' within the meaning of the Fourth Amendment when it was adopted").

*Bruen*, 142 S.Ct. at 2132. The Court then went on to explain that "[m]uch like we use history to determine which modern 'arms' are protected by the Second Amendment, so too does history guide our consideration of modern regulations that were unimaginable at the founding. When confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy—a commonplace task for any lawyer or judge." *Id*. Therefore, the "more nuanced approach" that may be required occurs within the context of determining what constitutes a proper historical analogue, not simply an updated justification as to why the law today

furthers an important governmental interest. To be clear, *Bruen* held that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct, and to justify its regulation, "*the government may not simply posit that the regulation promotes an important interest*. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." 142 S.Ct. at 2126 (emphasis added). Otherwise, the State's argument that its ban on LCMs addresses "dramatic technological changes" is simply interest-balancing by another name or a means of shirking its actual burden.

The State has submitted a survey of 348 purported laws (previously submitted in both *Duncan* and *Miller*, as noted *supra*), but fails to identify any analogue from the relevant (founding) era that restricted firearm capacity. The State cites no founding-era regulations on firing capacity restrictions, or even restrictions on the types of weapons that people could own at all. Instead, it cites only gunpowder storage laws, historical restrictions on the *manner* of carrying (e.g., prohibitions on the carry of certain weapons in a concealed manner), and historical restrictions on "trap guns." It's clear that such regulations are neither analogous nor relevant to the LCM Ban so as to show this ban is "part of an enduring American tradition of state regulation." *Bruen*, 142 S.Ct. at 2155. *See* Pltf. Resp. to DSOUMF Nos. 39-53 (detailing the lack of relevant similarity of these laws under the *Bruen* framework). Moreover, those analogues were not enough to carry the day for the state of New York in *Bruen*, where carry in public was the Second Amendment conduct being prohibited.

The State tries to fill this evidentiary void with the assertion that today's weapons represent a "dramatic technological change," LCMs are "not by any means the same technology as [...] early repeating rifles," and thus the legislatures of the day would not have seen any need to enact such restrictions during the relevant historical period. Def. Opp. to PMSJ at 26:25. But again, the State must meet its burden under *Bruen* by showing relevantly similar *regulations*, not by manufacturing theories or explanations as to why there was no need for such regulations during the founding era. In considering history, courts are to engage in "reasoning by analogy." *Bruen*, 142 S.Ct. at 2132. This "analogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin" to the challenged regulation. *Id.* at 2133. But to be a genuine

"analogue," the historical tradition of regulation identified by the government must be "relevantly similar" to the restriction before the court today. *Id.* at 2132. Two "metrics" are particularly salient in determining if a historical regulation is "relevantly similar": "[1] how and [2] why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133. By considering these two metrics, a court can determine if the government has demonstrated that a "modern-day regulation" is "analogous enough" to "historical precursors" that the regulation may be upheld as consistent with the Second Amendment's text and history. *Id.* And importantly, the burden rests on the government to identify a sufficiently close historical analogue to justify the challenged restriction. *Id.* at 2135. Here, the State has not identified any relevant historical regulations, the "how" *or* "why" of which would justify the LCM Ban. *See* Pltf. Resp. to DSOUMF Nos. 39-53.

The relevant era is our Nation's founding era. *See* Mark W. Smith, *Attention Originalists: The Second Amendment Was Adopted in 1791, Not 1868*, HARV. J. L. & PUB. POL'Y PER CURIAM, (Fall 2022), available at https://bit.ly/41OFQND. In *Bruen*, the Court emphasized that "not all history is created equal. 'Constitutional rights are enshrined with the scope they were understood to have when the people adopted them.' […] The Second Amendment was adopted in 1791; the Fourteenth in 1868." 142 S.Ct. at 2136 (citing *Heller*, 554 U.S. at 634-35 (emphasis original). And thus, the Court cautioned against "giving postenactment history more weight than it can rightly bear." 142 S.Ct. at 2136. And "to the extent later history contradicts what the text says, the text controls." *Bruen* at 2137 (citing *Gamble v. United States*, 587 U.S. ___, 139 S.Ct. 1960, 1987 (2019) (Thomas, J., concurring)).

Further, in examining the relevant history that was offered, the Court noted that "[a]s we recognized in *Heller* itself, because post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources.'" *Bruen*, 142 S.Ct at 2137 (citing *Heller*, 554 U.S. at 614). While there exists an "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)," *id.*

1    *Bruen* at 2138, the Court has "generally assumed that the scope of the protection applicable to the

2    Federal Government and States is pegged to the public understanding of the right when the Bill of

3    Rights was adopted in 1791," *id.* at 2137 (citations omitted). Perhaps the Court was signaling that

4    parties in future cases should address the issue for the Court, but it was certainly not overruling cases

5    in which it had, dispositively, "look[ed] to the statutes and common law of the founding era to

6    determine the norms that the [Bill of Rights] was meant to preserve." *See, e.g.*, *Virginia v. Moore*,

7    553 U.S. 164, 168 (2008) (Fourth Amendment). And while the Court in *Heller* itself had reviewed

8    materials published after adoption of the Bill of Rights, it did so to shed light on the public

9    understanding in 1791 of the right codified by the Second Amendment, and only after surveying what

10   it regarded as a wealth of authority for its reading—including the text of the Second Amendment and

11   state constitutions. "The 19th-century treatises were treated as mere confirmation of what the Court

12   had already been established." *Bruen* at 2137 (citing *Gamble*, 139 S.Ct. at 1976).

13          Therefore, 1791 must be the controlling time for the constitutional meaning of Bill of Rights

14   provisions incorporated against the States by the Fourteenth Amendment because, as in *Heller*, the

15   Court has looked to 1791 when construing the Bill of Rights against the federal government and, as

16   in *McDonald*, the Court has established that incorporated Bill of Rights provisions mean the same

17   thing when applied to the States as when applied to the federal government. *See McDonald v. City of*

18   *Chicago*, 561 U.S. 742, 765 (2010). *Bruen* did not disturb these precedents, and they are therefore

19   binding on lower courts. *See State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997). This seals the fate of the

20   LCM Ban. Beyond the historical misfits that Defendants cite, the only thing else they proffer in

21   support of the Ban is a bevy of 20th century firearms regulations, *see* DSOUMF Nos. 54-56, which

22   need not and should not even be considered given that they could provide nothing relevant to the

23   analysis under *Bruen*. 142 S.Ct. at 2154, n.28 ("We will not address any of the 20th-century historical

24   evidence brought to bear by respondents or their amici. As with their late-19th-century evidence, the

25   20th-century evidence presented by respondents and their amici does not provide insight into the

26   meaning of the Second Amendment when it contradicts earlier evidence."). Therefore, under *Bruen*,

27   some things cannot be appropriate historical analogues: 20th-century restrictions, laws that are rooted

28

1  in racism, laws that have been subsequently overturned (such as total handgun bans), and as noted,

2  laws that are clearly inconsistent with the original meaning of the constitutional text. *Bruen* at 2137

3  ("post-ratification adoption or acceptance of laws that are inconsistent with the original meaning of

4  the constitutional text obviously cannot overcome or alter that text.") (citing *Heller II*, 670 F.3d at

5  1274 n.6 (Kavanaugh, J., dissenting)). These sources of evidence must be disregarded.

6         In short, the State offers no relevant, "well established and representative" historical

7  analogues that would support its ban on LCMs, the "how and why" of which could in any way justify

8  this ban. *Bruen*, 142 S. Ct. at 2133.

9

10  **B.     TAKINGS AND DUE PROCESS CLAIM**

11         **1.     The Court Must Examine the Character of the Taking, in Relation to its Stated
                Public Purpose.**

12

13         The individual plaintiffs who legally acquired pre-ban magazines that the law now requires

14  them to surrender, have shown the law constitutes a taking. Tracking the reasoning of the en banc

15  panel in *Duncan*, 19 F.4th 1087, 1113, the State argues that section 32310 does not effect a taking

16  because it does not compel a physical invasion of the individual Plaintiffs' property. Def. Opp. to

17  PMSJ at 48:1-6, citing *Laurel Park Community, LLC v. City of Tumwater*, 698 F.3d 1180, 1188 (9th

18  Cir. 2012)). But in the first instance, as already explained, a direct physical appropriation of property

19  is not required to constitute a taking. *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538 (2005)

20  (compensable takings under the Fifth Amendment occur when such regulations "completely deprive

21  an owner of 'all economically beneficial us[e]' of her property.")

22         The Supreme Court rejected the direct-appropriation requirement in *United States v. Security

23  Industrial Bank*, 459 U.S. 70 (1982), in which the Court considered the effect that a bankruptcy statute

24  had which, retroactively applied, would have operated to avoid liens on the debtors' property that had

25  attached before the statute was enacted. In rejecting the government's claim, similar to the one being

26  advanced here regarding direct appropriations, the Court observed: "The government seeks to

27  distinguish [*Armstrong v. United States*, 364 U.S. 40, 80 S.Ct. 1563 (1960)] on the ground that it was

28

a classical 'taking' in the sense that the government acquired for itself the property in question, while in the instant case the government has simply imposed a general economic regulation which in effect transfers the property interest from a private creditor to a private debtor. While the classical taking is of the sort that the government describes, our cases show that takings analysis is not necessarily limited to outright acquisitions by the government for itself." 459 U.S. at 77-78 (citing *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982); *PruneYard Shopping Center v. Robins*, 447 U.S. 74 (1980); *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922)).

There can be no doubt that the LCM Ban is confiscatory in effect, and is therefore a *per se* taking. The State attempts to disguise the confiscatory nature of its ban by relying upon the purported "options" reflected in Pen. Code § 32310(d). But these "options" are merely illusory, for the reasons discussed in Plaintiffs' opening memorandum, at pp. 25-27. The State's opposition/motion, relying upon the dystopian language in the en banc decision in *Duncan*, 19 F.4th at 1113, which characterized the State's efforts as simply "opt[ing] to assist owners in the safe disposal of large-capacity magazines by empowering law enforcement agencies to accept magazines voluntarily tendered for destruction," is Orwellian Newspeak at its best, and reveals the true motive. The State is no more "assisting" gun owners in the voluntary surrender of their property than the City of New London, Connecticut was simply "assisting" Mrs. Kelo in transferring her property to a land developer. *See Kelo v. City of New London, Conn.*, 545 U.S. 469 (2005). And on that note, it is no answer for the State to claim that compelling the sale of valuable property to a third party somehow insulates its actions from being characterized as a taking—particularly in the absence of a viable sales market affording the opportunity to garner *fair market* value for this now-blacklisted property. ""(T)o constitute a taking under the Fifth Amendment it is not necessary that property be absolutely 'taken' in the narrow sense of that word to come within the protection of this constitutional provision; it is sufficient if the action by the government involves a direct interference with or disturbance of property rights. […] Nor need the government directly appropriate the title, possession or use of the properties[.]" *Richmond Elks Hall Ass'n v. Richmond Redevelopment Agency*, 561 F.2d 1327, 1330 (9th Cir. 1977) (citations omitted).

The State argues that there is a purported fourth "option" found at Pen. Code § 16470(a) which supposedly gives LCM owners the option of "modifying their LCMs permanently to hold no more than ten rounds." Def. Opp. to PMSJ at 50:1-3. The statute says no such thing, but merely states the obvious: by definition, a magazine which does not hold more than 10 rounds is not an LCM. Otherwise, the State provides no guidance or choices as to what constitutes or effects such an alteration. It should be recalled that in December 2016, the DOJ initially promulgated proposed "emergency" regulations by which, the Department claimed, it would "provide guidance to California's gun owners so that by July 1, 2017, they will be in compliance with the law." Pltf. Req. for Jud. Notice, Exh. A, p. 5, in support of PMSJ.  The DOJ further asserted that "[t]he proposed regulations provide options for disposal of large-capacity magazines, as well as instructions for reducing the capacity of a large-capacity magazine, and need to be formalized and provided to California residents as soon as possible." *Id.*  And in furtherance of such guidance, the Department promulgated regulations touching on those subjects, among others. *See* Text of [Proposed] Regulations, Cal. Code of Regulations, Title 11, Div. 5, submitted December 16, 2016. These regulations, for example, would have provided guidance as to what constitutes "permanent alterations" to standard box magazines, how to deal with drum or tubular-type magazines, or firearms with integrated magazines, and for shotgun owners whose firearms may accommodate different size shells. However, the DOJ withdrew its proposed regulations on December 29, 2016. No proposed regulations of any kind have replaced them or even been proposed.

To the extent that the State claims that such permanent modifications to the subject magazines only result in damage, but not their total destruction, again, art. I, § 19 of the California Constitution specifically prohibits takings *or damage* to property without compensation. "Because the California Constitution requires compensation for damage as well as a taking, the California clause ''protects a somewhat broader range of property values' than does the corresponding federal provision[.]'" *Monks v. City of Rancho Palos Verdes*, 167 Cal.App.4th 263, 294 (2008), as modified on denial of reh'g (Oct. 22, 2008). Government action that effectuates a permanent physical invasion of property, *no matter how slight*, constitutes a *per se* taking. *Cwynar v. City & County of San Francisco*, 90

1  Cal.App.4th 637, 652 (2001) (citing *Loretto*, 458 U.S. at 426; *Lucas v. South Carolina Coastal*

2  *Council*, 505 U.S. 1003, 1015 (1992)).

3    In looking at whether the regulations are indeed confiscatory, the courts should not look

4  strictly to the form of the taking, but at the character of the government's action in relation to its

5  intended purpose. "'[I]t is only the taking's purpose, and not its mechanics,' [the Supreme Court]

6  explained, that matters in determining public use." *Kelo*, 545 U.S. at 482 (citing *Hawaii Housing*

7  *Authority v. Midkiff*, 467 U.S. 229, 244 (1984)). As *Laurel Park Community*, cited by the State and

8  cited in *Duncan*, states: "'[T]he character of the governmental action—for instance whether it

9  amounts to a physical invasion or instead merely affects property interests through some public

10  program adjusting the benefits and burdens of economic life to promote the common good—may be

11  relevant in discerning whether a taking has occurred." [...] The government generally cannot

12  "'forc[e] some people alone to bear public burdens which, in all fairness and justice, should be borne

13  by the public as a whole.'" *Laurel Park Community*, 698 F.3d at 1190 (citing *Lingle*, 544 U.S. at 539,

14  and *Armstrong*, 364 U.S. at 49). Here, the State readily admits that the purpose of the large-capacity

15  magazine ban is "to remove LCMs from circulation[.]" Def. Opp. to PMSJ at 49:15-16. It therefore

16  admits that the law purports to serve a claimed public purpose and is not simply forcing dispossession

17  of LCMs against individual gun owners to remedy some specific harm inflicted *by them*.

18    **2. The State's Reliance Upon its Police Powers is Misplaced.**

19    In effectuating this claimed public purpose, the State resorts to its standby argument: that

20  "Section 32310 is a valid exercise of the State's police powers to protect the public by eliminating

21  the dangers posed by LCMs." Def. Opp. to PMSJ at 49:13-15. But even if so, the State's reliance

22  upon its police powers is misplaced as to whether the action constitutes a taking. *See Loretto*, 458

23  U.S. at 425 (Assuming a valid exercise of the state's police power, the court stated: "It is a separate

24  question, however, whether an otherwise valid regulation so frustrates property rights that

25  compensation must be paid.").

26    Here, it doesn't matter if the confiscation was under the auspices of the State's police powers.

27  Compensation must still be paid. The State's reliance upon *Akins v. United States*, 82 Fed. Cl. 619

28

1   (2008), and *Fesjian v. Jefferson*, 399 A.2d 861 (D.C. Ct. App. 1979), two cases that were submitted

2   or decided before *Heller*, and the older police-power cases upon which they were grounded, is

3   misplaced.

4          It should be noted that *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992) also

5   involved the alleged exercise of a state's "police power." In *Lucas*, the owner of two beachfront lots

6   intended to build houses there, but was prohibited by a statute forbidding any permanent inhabitable

7   structures on the land in question. 505 U.S. at 1008. The plaintiff sued in state court, and the South

8   Carolina Supreme Court ultimately rejected his challenge under the Takings Clause, holding that in

9   the legitimate exercise of its police power, the state could restrict his ability to use the land in order

10  "to mitigate the harm to the public interest that [such a] use of his land might occasion." *Id.*, at 1020–

11  21. The *Lucas* Court disagreed. It held that, when "the State seeks to sustain regulation that deprives

12  land of all economically beneficial use, ... it may resist compensation only if the logically antecedent

13  inquiry into the nature of the owner's estate shows that the proscribed use interests were not part of

14  his title to begin with." *Id.*, at 1027. And thus, the high court remanded the case for the state courts

15  to determine, under state law, whether "background principles of ... property law" prohibited the

16  future uses that the owner intended. *Id.*, at 1031. Post-*Lucas*, the rule is simply this: Does the

17  regulation in question result in the complete elimination of the property's value or beneficial use? If

18  so, it amounts to the equivalent of a physical appropriation. *Lucas*, 505 U.S. at 1017; *Lingle*, 544 U.S.

19  at 539–40. Compensation must therefore be paid.

20         The *Lucas* court itself strongly implied that "many of [its] prior opinions" which wrestled

21  with the concept of "'harmful or noxious uses' of property" were simply "early attempt[s] to describe

22  in theoretical terms why government may, consistent with the Takings Clause, affect property values

23  by regulation without incurring an obligation to compensate—a reality we nowadays acknowledge

24  explicitly with respect to the full scope of the State's police power." *Lucas*, 505 U.S. at 1022–23.

25  With regard to these early cases, the court stated: "When it is understood that "prevention of harmful

26  use" was merely our early formulation of the police power justification necessary to sustain (without

27  compensation) any regulatory diminution in value; and that the distinction between regulation that

28

– 20 –

REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT; AND OPPOSITION
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - CASE NO. 2:17-cv-00903-WBS-KJN

"prevents harmful use" and that which "confers benefits" is difficult, if not impossible, to discern on an objective, value-free basis; *it becomes self-evident that noxious-use logic cannot serve as a touchstone to distinguish regulatory "takings"—which require compensation—from regulatory deprivations that do not require compensation*." 505 U.S. at 1026 (emphasis added.)

The State's reliance on *Fesjian* is also misplaced. *Fesjian* was a pre-*Heller* decision, applying a simple rational basis test to an important fundamental right, albeit on equal protection grounds. 399 A.2d at 864. After *Heller*, the proper inquiry on a Second Amendment claim would be whether the firearms themselves are in common use, for lawful purposes, and are not dangerous and unusual. *Heller*, 554 U.S. at 627. And as to the specific takings argument, it could fairly be said that in *Fesjian* the D.C. Court of Appeals simply assumed that all firearms could be summarily banned without compensation, in a pre-*Heller* District of Columbia. In one paragraph, where the court assumed arguendo that the D.C. statute prohibiting the plaintiffs (representing themselves in pro per) from registering their weapons was a taking, the court simply concluded that "a taking for the public benefit under a power of eminent domain is, however, to be distinguished from a proper exercise of police power to prevent a perceived public harm, which does not require compensation. […] That the statute in question is an exercise of legislative police power and not of eminent domain is beyond dispute." *Fesjian*, 399 A.2d at 866. There was no discussion or analysis whatsoever as to whether the D.C. statute amounted to forced dispossession, or deprived plaintiffs of the economically beneficial use of their property, constituting a per se taking. Those Supreme Court takings cases came later. All pre-*Heller* takings cases involving firearms, including *Fesjian*, are inherently suspect.

### 3.     The Parallel Due Process Violation

Plaintiffs' takings claim also gives rise to a due process claim under the Fourteenth Amendment, and for all the same essential reasons: just as the Fifth Amendment to the United States Constitution provides that private property shall not "be taken for public use, without just compensation," the Fourteenth Amendment provides that "no person shall "be deprived of any person of life, liberty, or property, without due process of law." Despite the confiscatory nature of the LMC Ban, the State has not created, established, or otherwise provided for any process, remedy, or

administrative body through which one whose LCM(s) have been targeted under the ban could seek compensation for the surrender/takings, compelled destruction, or significant diminution in value to their otherwise legally-owned firearm magazines. The State simply assumed that it could do so, under the auspices of its so-called "police powers," as it has freely admitted in this case. *See* Def. Resp. to PSOUMF No. 34. Thus, just as Plaintiffs are entitled to judgment in their favor on the Takings claim, Defendants must be adjudged to have violated the proscription against deprivations of property without due process of law.

## C.    EQUAL PROTECTION CLAIM

Regarding the equal protection claim, Defendants purportedly make short work of it by quickly reverting back to the notion that the claim is subject to no more than rational basis scrutiny. So, they say, it's enough to simply rest on the speculative notion that the Hollywood exception "would benefit an important sector of the California economy"—i.e., the movie business—while disregarding entirely the impact on all the ordinary law-abiding citizens of California who don't fall within this elitist class. Def. Opp. to PMSJ at 51-52.  But we can't just ignore that impact, because we can't ignore the overarching problem that this disparate treatment under the law "impermissibly interferes with the exercise of a fundamental right," *Mass. Bd. of Retirement v. Murgia*, 427 U.S. 307, 312 (1976), for all the reasons discussed above. And that requires strict scrutiny of the law. *Id.* Again, Defendants have not even argued, much less shown, that the law survives such scrutiny. Thus, under a proper analysis, summary judgment must be entered in favor of Plaintiffs on this claim.

## III.    CONCLUSION

For these reasons, Plaintiffs respectfully request entry of summary judgment in their favor. This Court should reject Defendants' alternative request to conduct further discovery before entering such judgment. Def. Opp. to PMSJ 52-53. The only facts relevant to resolution of this case are "legislative facts" regarding the history of magazine regulation in this country, and as such all facts and history are subject to historical citations and judicial notice as set forth in the parties'

– 22 –

REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT; AND OPPOSITION
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - CASE NO. 2:17-cv-00903-WBS-KJN

briefing and argument, without the need for expert or other evidence adduced through traditional party discovery methods. *See Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) (ordering entry of judgment for plaintiffs on review of order granting motion to dismiss because "[t]he constitutionality of the challenged statutory provisions does not present factual questions for determination in a trial . . . . Only adjudicative facts are determined in trials, and only legislative facts are relevant to the constitutionality of the Illinois gun law."). Also, this case is not like *Texas Partners v. Conrock Co.*, 685 F.2d 1116, 1119 (9th Cir. 1982), Def. Opp. to MSJ at 53, where there remained genuine issues of material fact on which discovery was warranted in order to ensure proper resolution of the case. The proper outcome here is clear based on the existing record: summary judgment for the Plaintiffs.

This Court should also reject any request to impose a stay on the enforcement of a judgment in favor of Plaintiffs. Defendants' arguments in support of such a preemptive strike against the judgment all center around their thesis that this is an otherwise valid law aimed at achieving "important public-safety" purposes. Def. Opp. to PMSJ at 54-56. But scrutiny of the law under *Bruen* strips away this facade, exposing what is at base an unconstitutional restriction against the exercise of fundamental civil liberties, devoid of any legitimate justification another the controlling law. While Defendants lament the idea of people "be[ing] able to lawfully acquire" LCM after a 20-year prohibition, Def. Opp. to PMSJ at 55, that is exactly what *Bruen* demands, and the law-abiding citizens of California should not be forced to endure this prohibition even one more day.

Dated: May 31, 2023

**THE DIGUISEPPE LAW FIRM, P.C.**


/s/ Raymond M. DiGuiseppe
Raymond M. DiGuiseppe

**SEILER EPSTEIN LLP**


/s/ George M. Lee
George M. Lee

*Attorneys for Plaintiffs*