1  ROB BONTA, State Bar No. 202668
   Attorney General of California
2  MARK R. BECKINGTON, State Bar No. 126009
   Supervising Deputy Attorney General
3  JOHN D. ECHEVERRIA, State Bar No. 268843
   Deputy Attorney General
4  ROBERT L. MEYERHOFF, State Bar No. 298196
   Deputy Attorney General
5    300 South Spring Street, Suite 1702
   Los Angeles, CA  90013-1230
6  Telephone:  (213) 269-6177
   Fax:  (916) 731-2144
7  E-mail:  Robert.Meyerhoff@doj.ca.gov
   *Attorneys for Defendants Rob Bonta in his official*
8  *capacity as Attorney General of the State of*
   *California and Allison Mendoza in her Official*
9  *Capacity as Director of the Bureau of Firearms*

10                 IN THE UNITED STATES DISTRICT COURT

11              FOR THE EASTERN DISTRICT OF CALIFORNIA

12                       SACRAMENTO DIVISION

13

14
   **WILLIAM WIESE, et al.,**                | Case No. 2:17-cv-00903-WBS-KJN
15
                              Plaintiffs,     | **DEFENDANTS' AMENDED**
16                                            | **OPPOSITION TO PLAINTIFFS'**
                                              | **MOTION FOR SUMMARY JUDGMENT**
17         v.                                 | **AND COUNTER-MOTION FOR**
                                              | **SUMMARY JUDGMENT**
18  **XAVIER BECERRA, et al.,**
                                              | Date:        October 30, 2023
19                             Defendants.    | Time:        1:30 p.m.
                                              | Courtroom:   5, 14th Floor
20                                            | Judge:       Hon. William B. Shubb

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

Statutory Background .................................................................................................. 4

Procedural Background .............................................................................................. 6

Legal Standard .......................................................................................................... 9

Argument .................................................................................................................. 9

I.    California's Restrictions on Large-Capacity Magazines Do Not Burden Conduct Covered by the "Plain Text" of the Second Amendment. ...................... 9

    A.    *Bruen* Requires that Plaintiffs Satisfy a Threshold, Textual Inquiry and Define a Specific Proposed Course of Conduct. ................................. 9

    B.    Plaintiffs Cannot Demonstrate that LCMs Are "Arms," or that LCM Possession Is a "Closely Related Right." ....................................... 11

    C.    Large-Capacity Magazines Are Not Protected "Arms" Because They Are Not Commonly Used for Self-Defense .................................... 15

II.    California's Restrictions on Large-Capacity Magazines Are Consistent with the Nation's Traditions of Weapons Regulation ........................................ 19

    A.    This Case Requires a "More Nuanced" Analogical Approach ................ 19

        1.    LCMs Represent a Dramatic Technological Change from the Firearms Technologies Widely Available During the Founding and Reconstruction Eras ................................................. 20

        2.    Section 32310 Addresses the Unprecedented Social Problem of Mass Shootings ............................................................................ 25

    B.    California's Restrictions on Large-Capacity Magazines Are Consistent with Historical Laws Regulating Other Dangerous Weapons ............................................................................................... 26

        1.    The Survey of Relevant Dangerous Weapons Laws .................... 27

            a.    Medieval to Early Modern England (1300–1776) ........... 28

            b.    Colonial and Early Republic (1600–1812) ...................... 29

            c.    Antebellum and Reconstruction Periods (1813–1877) ............................................................................... 30

            d.    Late 19th and Early 20th Centuries (1878–1930s) .......... 32

        2.    The Surveyed Weapons Restrictions Are Relevantly Similar to Section 32310 .................................................................... 33

III.    The Takings Clause Claim Fails. ............................................................ 35

IV.    The Due Process Claim Fails. ............................................................... 37

V.    The Equal Protection Claim Fails. ........................................................ 38

VI.    If the Court Finds that California's Restrictions on Large-Capacity Magazines Are Unconstitutional, the Court Should Stay Enforcement of the Judgment Pending Appeal. ................................................................. 39

Conclusion .............................................................................................................. 40

i

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Accuracy Firearms, LLC v. Pritzker*
No. 5-23-0035, 2023 Ill. App. (5th) 230035 (Jan. 31, 2023) ..................................... 6

*Akins v. United States*
82 Fed. Cl. 619 (2008) ......................................................................................... 36

*Anderson v. Liberty Lobby, Inc.*
477 U.S. 242 (1986) .............................................................................................. 9

*Arnold v. Brown*
No. 22CV41008 (Haney Cnty. Cir. Ct. Dec. 15, 2022) ........................................... 6

*Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey*
910 F.3d 106 (3d Cir. 2018)................................................................................. 37

*Barnett v. Raoul*
2023 WL 3160285 (S.D. Ill. Apr. 28, 2023) ......................................................... 15

*Bevis v. City of Naperville, Ill.*
__ F. Supp. 3d __ (N.D. Ill. Feb. 17, 2023) ...................................................... 1, 10

*Boland v. Bonta*
Dkt. No. 7, Case No. 23-55276 (9th Cir. Apr. 3, 2023) ......................................... 40

*Bruen. Duncan v. Bonta*
142 S.Ct. 2895 (2022)............................................................................................ 7

*Bruen. Duncan v. Bonta*
49 F.4th 1228 (9th Cir. 2022) ............................................................................... 8

*Caetano v. Massachusetts*
577 U.S. 411 (2016)............................................................................................. 13

*Cox v. United States*
2023 WL 4203261 (D. Alaska June 27, 2023) ............................................... 12, 16

*Defense Distributed v. Bonta*
2022 WL 15524977 (C.D. Cal. Oct. 21, 2022) ..................................................... 14

*DHX, Inc. v. Allianz AGF MAT, Ltd.*
425 F.3d 1169 (9th Cir. 2005).............................................................................. 11

ii

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Duncan v. Becerra*
  265 F. Supp. 3d 1106 (S.D. Cal. 2017) ............................................................... 13

*Duncan v. Becerra*
  366 F. Supp. 3d 1131 (S.D. Cal. 2019) ................................................................. 7

*Duncan v. Becerra*
  742 F. App'x 218 (9th Cir. 2018) ............................................................... *passim*

*Duncan v. Becerra*
  970 F.3d 1133 (9th Cir. 2020) ............................................................................. 7

*Duncan v. Bonta*
  19 F.4th 1087 (9th Cir. 2021) (en banc) ................................................... *passim*

*Duncan v. Bonta*
  No. 3:17-cv-01017-BEN-JLB, Dkt. No. 111 (S.D. Cal. Sept. 26, 2022) ................ 8

*Ezell v. City of Chicago*
  651 F.3d 684 (7th Cir. 2011) ............................................................................. 31

*Fed. Trade Comm'n v. Qualcomm Inc.*
  935 F.3d 752 (9th Cir. 2019) ............................................................................. 39

*Fesjian v. Jefferson*
  399 A.2d 861 (D.C. Ct. App. 1979) ................................................................... 36

*Frlekin v. Apple, Inc.*
  979 F.3d 639 (9th Cir. 2020) ............................................................................... 9

*Fyock v. Sunnyvale*
  779 F.3d 991 (9th Cir. 2015) .......................................................................... 4, 6

*Hanson v. D.C.*
  2023 WL 3019777 (D.D.C. Apr. 20, 2023) ................................................. *passim*

*Herrera v. Raoul*
  __ F. Supp. 3d __ (N.D. Ill. Apr. 25, 2023) ................................................. 1, 20

*Horne v. Dep't of Agriculture*
  135 S. Ct. 2419 (2015) ...................................................................................... 36

*Humane Soc'y of U.S. v. Gutierrez*
  558 F.3d 896 (9th Cir. 2009) ............................................................................. 39

iii

## TABLE OF AUTHORITIES
### (continued)

Page

*Jackson v. City & Cnty. of San Francisco*
   746 F.3d 953 (9th Cir. 2014).............................................................................. 14

*Kolbe v. Hogan*
   849 F.3d 114 (4th Cir. 2017) (en banc)........................................................ 18, 35

*Laurel Park Cmty., LLC v. City of Tumwater*
   698 F.3d 1180 (9th Cir. 2012)............................................................................ 35

*Levald, Inc. v. City of Palm Desert*
   998 F.2d 680 (9th Cir. 1993).............................................................................. 38

*Liebling v. Novartis Pharms. Corp.*
   2014 WL 12576619 (C.D. Cal. Mar. 24, 2014) .................................................. 20

*Loretto v. Teleprompter Manhattan CATV Corp.*
   458 U.S. 419 (1982) ........................................................................................... 36

*Luis v. United States*
   578 U.S. 5 (2016) (Thomas, J., concurring) ...................................................... 14

*McDonald v. City of Chicago, Ill.*
   561 U.S. 742 (2010) ..................................................................................... 13, 28

*Nat'l Ass'n of Gun Rights v. Lamont*
   __ F. Supp. 3d __ (D. Conn. Aug. 3, 2023) ................................................ *passim*

*Nat'l Rifle Ass'n v. Bondi*
   61 F.4th 1317 (11th Cir. 2023) .......................................................................... 31

*New York State Rifle & Pistol Association, Inc. v. Bruen*
   142 S.Ct. 2111 (2022) .................................................................................. *passim*

*Oakland Tactical Supply, LLC v. Howell Twp.*
   2023 WL 2074298 (E.D. Mich. Feb. 17, 2023) .................................................. 10

*Ocean State Tactical, LLC v. State of Rhode Island*
   2022 WL 17721175 (D.R.I. Dec. 14, 2022) ................................................. *passim*

*Oregon Firearms Fed'n v. Brown* (*Oregon Firearms I*)
   __ F. Supp. 3d __ (D. Or. Dec. 6, 2022) ............................................ 18, 19, 26, 31

*Oregon Firearms Fed'n v. Kotek* (*Oregon Firearms II*)
   __ F. Supp. 3d __ (D. Or. July 14, 2023).................................................... *passim*

1
2

# TABLE OF AUTHORITIES
### (continued)

**Page**

3
4

*Orr v. Bank of Am., NT & SA*
   285 F.3d 764 (9th Cir. 2002) ............................................................................. 9, 20

5

*Presser v. People of State of Ill.*
   116 U.S. 252 (1886) ......................................................................................... 31

6
7

*Renna v. Bonta*
   2023 WL 2756981 (S.D. Cal. Mar. 31, 2023) ..................................................... 10

8
9

*Ridgel v. United States*
   2013 WL 2237884 (C.D. Cal. May 21, 2013) ................................................... 9, 20

10

*Teixeira v. Cnty. of Alameda*
   873 F.3d 670 (9th Cir. 2017) .............................................................................. 13

11
12

*Teter v. Lopez*
   __ F. 4th __ (9th Cir. Aug. 7, 2023) .................................................................. 12

13
14

*United States ex rel. Kelly v. Serco, Inc.*
   846 F.3d 325 (9th Cir. 2017) .............................................................................. 9

15

*United States v. Alaniz*
   69 F.4th 1124 (9th Cir. 2023) .................................................................. 15, 26, 31

16
17

*United States v. Cox*
   906 F.3d 1170 (10th Cir. 2018) .......................................................................... 12

18
19

*United States v. Kelly*
   2022 WL 17336578 (M.D. Tenn. Nov. 16, 2022) ................................................ 26

20

*United States v. Reyna*
   2022 WL 17714376 (N.D. Ind. Dec. 15, 2022) .............................................. 10, 15

21
22

*United States v. Trinidad*
   2022 WL 10067519 (D.P.R. Oct. 17, 2022) ........................................................ 10

23
24

*Womack v. Cnty. of Amador*
   551 F. Supp. 2d 1017 (E.D. Cal. 2008) ............................................................... 11

25

*Worman v. Healey*
   922 F.3d 26 (1st Cir. 2019) ................................................................................ 17

26

**STATUTES**

27

18 U.S.C. § 922(w)(2) (repealed 2004) ................................................................... 4

28

## TABLE OF AUTHORITIES
**(continued)**

**Page**

Cal. Penal Code § 16740 ................................................................................................ *passim*

Cal. Penal Code § 32310 ............................................................................................... *passim*

Cal. Stat. 1549, § 1 ............................................................................................................. 5

Cal. Stat. 1781, §§ 3, 3.5 .................................................................................................... 4

Colo. Rev. Stat. § 18-12-301–303 ...................................................................................... 6

Conn. Gen. Stat. §§ 53-202w .............................................................................................. 6

D.C. Code Ann. §§ 7-2506.01(b), 7-2507.06(a)(4) ............................................................ 6

Del. Code Ann. Title 11, §§ 1468(2), 1469(a) .................................................................... 6

Haw. Rev. Stat. Ann. § 134-8(c) ........................................................................................ 6

Ill. Comp. Stat. § 5/24-1.10 ................................................................................................ 6

Mass. Gen. Laws, Chapter 140, §§ 121, 131M ................................................................... 6

Md. Code Ann., Crim. Law § 4-305 .................................................................................... 6

N.J. Stat. Ann. §§ 2C:39-1(y), 2C:39-3(j), 2C:39-9(h) ...................................................... 6

N.Y. Penal Law §§ 265.00(23), 265.02(8), 265.10, 265.11, 265.37.................................... 6

Pub. L. 103–322, Sept. 13, 1994, 108 Stat. 1796, 1998–2000 (formerly codified at
    18 U.S.C. § 922(w)) ..................................................................................................... 4

Pub. L. No. 275, 1932 ...................................................................................................... 33

R.I. Gen. Laws §§ 11-47.1-2, 11-47.1-3(a) ......................................................................... 6

Vt. Stat. Ann. Title 13, § 4021 ............................................................................................ 6

Wash. Rev. Code Title 9, §§ 9.41.010(16), 9.41.370 .......................................................... 6

**CONSTITUTIONAL PROVISIONS**

Second Amendment ...................................................................................................... *passim*

Idaho Constitution of 1896 ............................................................................................... 32

Utah Constitution of 1896 ................................................................................................ 32

# TABLE OF AUTHORITIES
**(continued)**

**Page**

**COURT RULES**

Federal Rule of Civil Procedure 12(b)(6) ........................................................ 7

Federal Rule of Civil Procedure 56(d) ............................................................ 8

**OTHER AUTHORITIES**

Adam Winkler, *Racist Gun Laws and the Second Amendment*, 135 Harv. L. Rev. .................... 27

William Baude & Stephen E. Sachs, *Originalism & the Law of the Past*, 37 L. &
   Hist. Rev. 809, 813 (2019) ......................................................................... 27

1    Because California's restrictions on large capacity magazines (LCMs)—that is,

2    ammunition-feeding devices that can accept more than ten rounds of ammunition—are

3    constitutional under the "text and history" test set forth by the Supreme Court in *New York State*

4    *Rifle & Pistol Association, Inc. v. Bruen*, 142 S.Ct. 2111 (2022), Plaintiffs' Motion for Summary

5    Judgment should be denied and Defendants' Counter-Motion for Summary Judgment should be

6    granted. Such a decision would accord with numerous district courts that have considered and

7    rejected challenges to LCM restrictions under the *Bruen* framework. *See Nat'l Ass'n of Gun*

8    *Rights v. Lamont*, ___ F. Supp. 3d ___, 2023 WL 4975979, at *21 (D. Conn. Aug. 3, 2023) (denying

9    preliminary injunction of LCM and assault weapons restrictions); *Oregon Firearms Fed'n v.*

10   *Kotek* (*Oregon Firearms II*), ___ F. Supp. 3d ___, 2023 WL 4541027, at *8 (D. Or. July 14, 2023)

11   (finding, after trial. that LCM restrictions did not violate the Second Amendment and entering

12   judgment for the state); *Herrera v. Raoul*, ___ F. Supp. 3d ___, 2023 WL 3074799, at *4 (N.D. Ill.

13   Apr. 25, 2023) (denying preliminary injunction of LCM and assault weapon restrictions); *Hanson*

14   *v. D.C.*, 2023 WL 3019777, ___ F. Supp. 3d ___, 2023, 2023 WL 3019777, at *17 (D.D.C. Apr. 20,

15   2023) (denying preliminary injunction of LCM restrictions); *Bevis v. City of Naperville, Ill.*, ___ F.

16   Supp. 3d ___, 2023 WL 2077392, at *16 (N.D. Ill. Feb. 17, 2023) (denying preliminary injunction

17   of LCM and assault weapon restrictions); *Ocean State Tactical, LLC v. State of Rhode Island*,

18   2022 WL 17721175, at *25 (D.R.I. Dec. 14, 2022) (denying preliminary injunction of LCM

19   restriction).

20   Under *Bruen*, Plaintiffs must first satisfy a threshold, plain text analysis by showing that

21   their proposed course of conduct is covered by the Second Amendment. If Plaintiffs can meet that

22   burden, then Defendants must show that the challenged regulation is consistent with the Nation's

23   historical tradition of firearms regulation. As explained herein, the voluminous evidence that

24   Defendants have submitted from leading historians and firearms experts establishes that there is

25   no genuine dispute of material fact on either of the analyses *Bruen* requires. Plaintiffs' proposed

26   course of conduct of the acquisition, importation, manufacture, possession, and use of firearm

27   magazines capable of holding more than ten rounds of ammunition is not covered by the Second

28   Amendment's plain text, and, even if it were, California's law restricting the manufacture,

1

1  importation, purchase, and possession of LCMs is consistent with the historical tradition of

2  firearms regulation in this country.

3      First, as to the threshold inquiry, Plaintiffs' proposed conduct, properly understood, is not

4  "keeping and bearing arms" generally—a characterization that would read this threshold inquiry

5  of out the *Bruen* analysis entirely--but rather is the possession of LCMs in particular. The Second

6  Amendment does not protect this conduct, however, because LCMs are not "Arms" that fall

7  within the Second Amendment's plain text, but rather are accoutrements or accessories. While

8  regulation of an accessory might trigger Second Amendment scrutiny under a "closely related

9  right" or "corollary" right theory if that accessory were necessary for the operation in self-defense

10  of a firearm that is itself protected by the Second Amendment (*e.g.*, ammunition), that is not the

11  case here because there is no genuine dispute that LCMs are not necessary for the operation of

12  any firearm, much less the operation of such a firearm for a constitutionally-protected purpose

13  (*i.e.*, self-defense).

14      Moreover, LCMs are not "Arms" within the meaning of Second Amendment because the

15  evidence establishes that they are not commonly used for self-defense. To the contrary, the

16  evidence Defendants have submitted proves that LCMs are often, and increasingly, used in the

17  devastating mass shootings that have come to plague this Nation. Indeed, the evidence in this case

18  shows that far from being commonly used for self-defense, LCMs are accessories most suitable

19  for military combat and as such are, like M-16s, outside of the scope of the Second Amendment.

20  Plaintiffs have adduced no evidence demonstrating that LCMs are commonly used in, or well-

21  suited to, lawful self-defense.

22      Second, even if the Court were to determine that Plaintiffs' proposed course of conduct is

23  protected by the Second Amendment's plain text, California Penal Code section 32310 ("Section

24  32310") is nonetheless constitutional because it is consistent with the Nation's tradition of

25  firearms regulation. Defendants have identified, and provided evidence to contextualize,

26  numerous relevantly similar restrictions enacted around 1791 (*i.e.*, the ratification of the Second

27  Amendment) and 1868 (*i.e.*, the ratification of the Fourteenth Amendment). These relevantly

28  similar restrictions are more than sufficient in a case such as this, where the evidence submitted

2

1    shows that LCMs represent a "dramatic technological change" and that Section 32310 addresses

2    the "unprecedented societal concern" of mass shootings. *Bruen* commands that in cases

3    implicating either such a change *or* such a concern, courts must follow a "*more* nuanced

4    approach" because "[t]he regulatory challenges posed by firearms today are not always the same

5    as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Bruen*,

6    142 S.Ct. at 2132–33. Applying this more nuanced approach and considering the evidence in

7    question, this Court should hold that Section 32310 fits within the Nation's tradition of firearms

8    regulation.

9        In the face of Defendants' evidence on all of these points, Plaintiffs present no evidence

10   that the Founders would have considered magazines "Arms," no evidence (beyond non-academic

11   studies based on anecdotes and self-reporting) that LCMs are commonly used in self-defense, no

12   evidence that LCMs bear any significant similarity to early repeating firearms, no evidence that

13   mass shootings facilitated by LCMs are not an "unprecedented societal concern," and no evidence

14   that Section 32310 does not impose comparable burdens and does not have comparable

15   justifications to the numerous relevantly similar restrictions Defendants identified.

16       Indeed, Plaintiffs appear to believe that the mere incantation of *Bruen* is both sufficient to

17   strike down any firearms-related regulation and to relieve them of their obligations under Rule 56

18   to submit admissible evidence in support of their claims. But *Bruen* directs courts to "follow the

19   principle of party presentation," as they should in every case, and "decide a case based on the

20   historical record compiled by the parties." 142 S. Ct. at 2130. In this case, based on the historical

21   record compiled by the parties, the Court should enter judgment for Defendants on Plaintiffs'

22   Second Amendment claim.

23       Similarly, there is no genuine dispute of material fact on Plaintiffs' Takings and Equal

24   Protections claims. This Court previously dismissed those claims based on well-established Ninth

25   Circuit precedent, but only allowed those claims to survive in the Third Amended Complaint

26   based on a Ninth Circuit decision in another case that was subsequently vacated. Nothing in

27   *Bruen* suggests that this Court erred in dismissing those claims at the pleadings stage on

28   Defendants' motion to dismiss the Second Amended Complaint, nor have Plaintiffs presented any

3

1   evidence to controvert this Court's previous holding. Judgment should thus be entered for

2   Defendants on Plaintiffs' non-Second Amendment claims.

3       For these reasons, Plaintiffs' motion for summary judgment should be denied and

4   Defendants' counter-motion for summary judgment on all claims should be granted.

5                                **STATUTORY BACKGROUND**

6       California law defines an LCM as any ammunition-feeding device with the capacity to

7   accept more than ten rounds. Cal. Penal Code § 16740.[1] LCMs have been extensively regulated in

8   the United States for decades. Federal law prohibited the possession of any LCM (defined as a

9   magazine capable of accepting more than ten rounds of ammunition) from 1994 to 2004 as part of

10  the federal assault weapons ban. Pub. L. 103–322, Sept. 13, 1994, 108 Stat. 1796, 1998–2000

11  (formerly codified at 18 U.S.C. §922(w)). The federal ban did not, however, apply to LCMs that

12  were lawfully possessed on the date of enactment, which could continue to be possessed and

13  transferred. 18 U.S.C. § 922(w)(2) (repealed 2004).

14      In 2000, before the federal ban expired, "California criminalized the manufacture, sale,

15  purchase, transfer, and receipt of large-capacity magazines within the state, but did not

16  specifically criminalize the possession of large-capacity magazines, which was covered at the

17  time by federal law." *Fyock v. Sunnyvale*, 779 F.3d 991, 994 (9th Cir. 2015); 1999 Cal. Stat.

18  1781, §§ 3, 3.5 (S.B. 23) (now codified at Cal. Penal Code § 32310(a)). Individuals in California

19  who lawfully possessed LCMs on January 1, 2000 were permitted to keep them, though they were

20  not authorized to sell or otherwise transfer their grandfathered LCMs, nor were they permitted to

21  manufacture or acquire new LCMs. *See* Cal. Penal Code § 32310(a). The expiration, in 2004, of

22  the federal prohibition on the possession of non-grandfathered LCMs left "a 'loophole' permitting

23  the possession of [LCMs] in California." *Fyock*, 779 F.3d at 994. As this Court has noted, the

24  "loophole" enabled the continued proliferation of LCMs in the State because there was "no way

25  for law enforcement to determine which magazines were 'grandfathered' and which were

26      _____

        [1] California's definition of an LCM excludes any "feeding device that has been
27  permanently altered so that it cannot accommodate more than 10 rounds." Cal. Penal Code
    § 16740(a). It also excludes a ".22 caliber tube ammunition feeding device" and a "tubular
28  magazine that is contained in a lever-action firearm." *Id.* § 16740(b), (c).

                                            4

illegally transferred or modified to accept more than ten rounds after January 1, 2000." Dkt. No. 52 (Order re: Preliminary Injunction), at 9. As a result, California's original restrictions on the manufacture and importation of LCMs were "very difficult to enforce." S. Rules Comm., Off. of S. Floor Analyses, 3d Reading Analysis of S.B. 1446 (2015-2016 Reg. Sess.) as amended Mar. 28, 2016, at 9 (noting comments in support of the bill that "[i]t is nearly impossible to prove when a[n LCM] was acquired or whether the magazine was illegally purchased [or transferred] after the 2000 ban" and that prohibiting the possession of LCMs "would enable the enforcement of existing law regarding [LCMs]").

In 2016, California's LCM laws were amended by ballot proposition to address this difficulty with enforcement of those laws, by prohibiting the possession of all LCMs—both new and previously grandfathered—beginning on July 1, 2017. *See* 2016 Cal. Stat. 1549, § 1 (S.B. 1446); Prop. 63, "The Safety for All Act of 2016."

California's LCM restrictions are set forth in Section 32310 of the California Penal Code. Subsection (a) provides that "any person in this state who manufactures or causes to be manufactured, imports into the state, keeps for sale, or offers or exposes for sale, or who gives, lends, buys, or receives" an LCM is guilty of a misdemeanor or a felony. Subsection (c), added in 2016, provides that the possession of an LCM on or after July 1, 2017 is an infraction or a misdemeanor punishable by a fine not to exceed $100 per LCM or imprisonment in a county jail not to exceed one year, or both. Subsection (d), also added in 2016, addresses previously grandfathered LCMs, providing that anyone not authorized to possess LCMs must, before July 1, 2017, remove the LCM from the state, sell the LCM to a licensed firearms dealer, or surrender the LCM to law enforcement for destruction. Alternatively, an owner of an LCM may permanently modify the magazine "so that it cannot accommodate more than 10 rounds." Cal. Penal Code § 16740(a); *see also id.* at § 32425 (exempting from section 32310 the "giving of any [LCM] to . . . a gunsmith, for the purposes of . . . modification of that [LCM]").

California is not alone in imposing limits on magazine capacity. Fourteen states, and the District of Columbia, have done so to date.[2] As of today, more than one-third of the American population resides in a jurisdiction that has enacted magazine-capacity limits.[3]

**PROCEDURAL BACKGROUND**

In 2017, Plaintiffs filed this challenge to Section 32310, raising claims under the Second, Fifth, and Fourteenth Amendments. Dkt. No. 1. After the Court denied Plaintiffs' request for a preliminary injunction (Dkt. No. 52), Plaintiffs filed their Second Amended Complaint, which expanded on their previously asserted claims and which added (1) an equal protection claim under the U.S. and California Constitutions; (2) an allegation that the ban operates as a taking under the California Constitution; and (3) additional allegations in support of their vagueness claims. Dkt. No. 59. The Court dismissed the Second Amended Complaint on in its entirety February 7, 2018. Dkt. No. 74. The Court dismissed the Second Amendment claim, relying in part on the two-step test set forth by the Ninth Circuit in *Fyock*, 779 F.3d 991. Dkt. No. 74 at 4-

---

[2] *See* Cal. Penal Code §§ 16740, 32310 (10-round limit); Colo. Rev. Stat. § 18-12-301–303 (15-round limit); Conn. Gen. Stat. §§ 53-202w (10-round limit); Del. Code Ann. tit. 11, §§ 1468(2), 1469(a) (17-round limit); D.C. Code Ann. §§ 7-2506.01(b), 7-2507.06(a)(4) (10-round limit); Haw. Rev. Stat. Ann. § 134-8(c) (10-round limit for handguns); 720 Ill. Comp. Stats. 5/24-1.10 (10-round limit for long guns and 15-round limit for handguns); Md. Code Ann., Crim. Law § 4-305 (10-round limit); Mass. Gen. Laws, ch. 140, §§ 121, 131M (10-round limit); N.J. Stat. Ann. §§ 2C:39-1(y), 2C:39-3(j), 2C:39-9(h) (10-round limit); N.Y. Penal Law §§ 265.00(23), 265.02(8), 265.10, 265.11, 265.37 (10-round limit); 2022 Or. Ballot Measure 114, § 11(d) (10-round limit); R.I. Gen. Laws §§ 11-47.1-2, 11-47.1-3(a) (10-round limit); Vt. Stat. Ann. tit. 13, § 4021 (10-round limit for long guns and 15-round limit for handguns); Wash. Rev. Code tit. 9, §§ 9.41.010(16), 9.41.370 (10-round limit). Illinois's LCM laws (720 Ill. Comp. Stat. § 5/24-1.10) and Oregon's LCM law (2022 Or. Ballot Measure 114, § 11) are currently subject to a temporary restraining order and a preliminary injunction, respectively, issued by state trial courts on state constitutional grounds. *See Accuracy Firearms, LLC v. Pritzker*, No. 5-23-0035, 2023 Ill. App. (5th) 230035, at *17, 35–38 (Jan. 31, 2023) (noting that no Second Amendment claims were alleged but affirming temporary restraining order based on equal protection guarantees in the Illinois Constitution); Opinion Letter at 22–25, *Arnold v. Brown*, No. 22CV41008 (Haney Cnty. Cir. Ct. Dec. 15, 2022) (granting injunction based on the Oregon Constitution), *appeal filed* (Jan. 23, 2023).

[3] The total population in the fifteen jurisdictions with magazine-capacity limits is estimated to be 120,060,105, and the total U.S. population is 333,287,557. *See* U.S. Census, State Population Totals and Components of Change: 2020–2022, http://bit.ly/40yhFSK. All Americans lived with LCM restrictions while the federal assault weapons ban was in effect from 1994 to 2004. *See* H.R. Rep. No. 103-489 (1994).

6

1   10. The Court rejected the Takings Clause claim, finding the physical-taking allegations to be

2   insufficient, because magazine owners may sell the magazines to licensed gun dealers, remove

3   them from the state, or permanently modify them so they no longer accept more than 10 rounds.

4   *Id*. at 10-13. The Court also found that the regulatory-taking allegations fell short because the

5   options for disposing of LCMs left some beneficial use for that property. *Id*. Finally, the Court

6   rejected the claims that the LCM restrictions were void for vagueness or overbroad, and that the

7   exemption for magazines used solely as props in movie, television, or video production violated

8   equal protection. *Id*. at 13-23.

9       After the dismissal of the Second Amended Complaint, a panel of the Ninth Circuit upheld

10   a preliminary injunction issued by the district court in another case raising a Second Amendment

11   and Takings Clause challenge to California's LCM restrictions, *Duncan v. Becerra*, 742 F. App'x

12   218 (9th Cir. 2018). This Court then considered Defendants' motion to dismiss the Third

13   Amended Complaint. Dkt. No. 103. While noting that the "Third Amended Complaint has only

14   minor changes from the Second Amended Complaint, which this court previously found

15   insufficient under Federal Rule of Civil Procedure 12(b)(6)," the Court determined that the Ninth

16   Circuit's affirmance of the preliminary injunction in *Duncan* compelled the Court to deny the

17   motion to dismiss the Second Amendment and Takings Clause claims. *Id*. at 5-6.

18       After this Court denied the motion to dismiss, the district court in *Duncan* issued a final

19   judgment striking down California's LCM restrictions, *Duncan v. Becerra*, 366 F. Supp. 3d 1131

20   (S.D. Cal. 2019), which the Attorney General appealed. On May 8, 2019, before discovery in this

21   matter opened, this Court stayed the case pending resolution of the appeal in *Duncan*. Dkt. No.

22   110; *see also* Dkt. No. 113 (extending the stay until issuance of the mandate by the Ninth Circuit

23   in *Duncan*).

24       A three-judge panel from the Ninth Circuit affirmed the *Duncan* district court's final

25   judgment. *Duncan v. Becerra*, 970 F.3d 1133 (9th Cir. 2020). An en banc panel ultimately

26   reversed and remanded for entry of judgment in favor of the Attorney General. *Duncan v. Bonta*,

27   19 F.4th 1087 (9th Cir. 2021) (en banc). That en banc opinion was later vacated by the Supreme

28   Court and remanded to the Ninth Circuit for reconsideration in light of *Bruen*. *Duncan v. Bonta*,

1   142 S.Ct. 2895 (2022). The Ninth Circuit then remanded the case to the district court for further

2   proceedings consistent with *Bruen*. *Duncan v. Bonta*, 49 F.4th 1228 (9th Cir. 2022).[4]

3       On September 23, 2022, the mandate in *Duncan* issued, and the parties in this matter filed a

4   joint status report on October 7, 2022. Dkt. No. 115. In that report, Plaintiffs "request[ed] to file a

5   motion for summary judgment as to all claims in this matter." *Id*. at 2. "Plaintiffs oppose[d]

6   discovery in this case," because "[t]he only 'facts' relevant to resolution of this case are

7   'legislative facts' regarding the history of magazine usage and regulation in this country, and as

8   such all facts can be developed in briefing and argument without the need for expert or other

9   evidence adduced through traditional party discovery methods." *Id*. at 3. Defendants requested

10  "both fact and expert discovery to develop a factual, legal, and historical record in support of [the

11  *Bruen*] analysis." *Id*. at 5.

12      On January 13, 2023, the Court issued an order permitting Plaintiffs to file their motion for

13  summary judgment "forthwith." Dkt. No. 119. The Court noted, however, that it would consider a

14  "request under Federal Rule of Civil Procedure 56(d) after plaintiffs' motion for summary

15  judgment has been filed, should defendants feel discovery is necessary to respond to plaintiffs'

16  motion." *Id*. at 2. More than two months later, on March 31, 2023, Plaintiffs filed the instant

17  motion. Dkt. No. 123. On May 1, 2023, Defendants filed their Opposition and Counter-Motion

18  for Summary Judgment (Dkt. No. 125), in which they also requested discovery pursuant to

19  Federal Rule of Civil Procedure 56(d). *Id*. at 52-32. On May 31, 2023, Plaintiffs filed their Reply

20  in Support of their Motion for Summary Judgment and Opposition to the Counter-Motion for

21  Summary Judgment. Dkt. No. 127.

22      On June 9, 2023, the Court ordered Defendants to file a declaration setting forth the

23  discovery they sought to take. Dkt. No. 128. Defendants filed that declaration on June 16, 2023,

24  Dkt. No. 129, requesting leave to take the depositions of the thirteen individuals who signed

25  declarations that were filed in support of Plaintiffs' Motion for Summary Judgment. *Id*. at ¶ 15.

26      [4] Following remand of *Duncan*, the district court issued an order continuing the
27  preliminary injunction of Section 32310(c) and (d). *Duncan v. Bonta*, No. 3:17-cv-01017-BEN-
    JLB, Dkt. No. 111 (S.D. Cal. Sept. 26, 2022). Accordingly, at this time, enforcement of Section
28  32310(c) and (d) remains enjoined.

8

1   On July 21, 2023, Defendants filed their Reply in Support of the Counter-Motion for Summary

2   Judgment. Dkt. No. 129.

3       On June 27, 2023, the Court issued an order granting Defendants leave to depose the

4   thirteen individuals who submitted declarations on Plaintiffs' behalf. Dkt. No. 132 at 2. The Court

5   further ordered that Defendants file an amended Opposition to Plaintiffs' Motion for Summary

6   Judgment and Counter-Motion for Summary Judgment by August 18, 2023. *Id.*

7                               **LEGAL STANDARD**

8       "A grant of summary judgment is appropriate when there is no genuine dispute as to any

9   material fact and the movant is entitled to judgment as a matter of law." *Frlekin v. Apple, Inc.*,

10  979 F.3d 639, 643 (9th Cir. 2020). "If the evidence is merely colorable, or is not significantly

11  probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

12  249–50 (1986). Moreover, to survive summary judgment, a party "must establish *evidence* on

13  which a reasonable jury could find for" that party. *United States ex rel. Kelly v. Serco, Inc.*, 846

14  F.3d 325, 330 (9th Cir. 2017).

15      "A trial court can only consider admissible evidence in ruling on a motion for summary

16  judgment." *See Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002). And a document

17  that "is not attached to any declaration and is unauthenticated and unsworn" cannot be considered

18  on a motion for summary judgment. *Ridgel v. United States*, 2013 WL 2237884, at *2 (C.D. Cal.

19  May 21, 2013).

20                                 **ARGUMENT**

21  **I.   CALIFORNIA'S RESTRICTIONS ON LARGE-CAPACITY MAGAZINES DO NOT BURDEN
22        CONDUCT COVERED BY THE "PLAIN TEXT" OF THE SECOND AMENDMENT.**

23      **A.   *Bruen* Requires that Plaintiffs Satisfy a Threshold, Textual Inquiry and
            Define a Specific Proposed Course of Conduct.**

24      Plaintiffs' challenge to Section 32310 fails at the threshold, textual stage of the *Bruen*

25  analysis. The Court does not proceed to the historical step of the text-and-history standard unless

26  the party challenging the law first establishes that the "plain text" of the Second Amendment

27  covers the conduct in which the party wishes to engage. "When the Second Amendment's plain

28  text covers an individual's conduct, the . . . government must *then* justify its regulation by

                                          9

1  demonstrating that it is consistent with the Nation's historical tradition of firearm regulation."

2  *Bruen*, 142 S. Ct. at 2129–30 (emphasis added); *see also Bevis*, 2023 WL 2077392, at \*9 ("Courts

3  must *first* determine whether the Second Amendment's plain text covers an individual's conduct,"

4  and only if it does, the "government must then justify its regulation." (emphasis added)); *Ocean*

5  *State*, 2022 WL 17721175, at \*12 ("Although *it is their burden* to show that large-capacity

6  magazines fall within the purview of the Second Amendment, *the plaintiffs* offer no expert

7  opinion on the meaning of the word 'Arms.'" (emphasis added)).

8      Not only do Plaintiffs ignore the threshold inquiry *Bruen* requires, Plaintiffs also describe

9  their course of conduct in such a generalized manner that this threshold inquiry would be

10  rendered a nullity. "To determine whether the plain text of the Amendment covers the conduct

11  regulated by the challenged law, it is necessary to identify and delineate the *specific* course of

12  conduct at issue." *Renna v. Bonta*, 2023 WL 2756981, at \*6 (S.D. Cal. Mar. 31, 2023) (emphasis

13  added). Lower courts applying *Bruen* have similarly described courses of conduct with reasonable

14  specificity. *See, e.g.*, *United States v. Reyna*, 2022 WL 17714376, at \*4 (N.D. Ind. Dec. 15, 2022)

15  (cautioning against defining the proposed conduct generally as "mere possession," because "any

16  number of other challenged regulations would similarly boil down to mere possession, then

17  promptly and automatically proceed" to the historical stage of the *Bruen* analysis); *Oakland*

18  *Tactical Supply, LLC v. Howell Twp.*, 2023 WL 2074298, at \*3 (E.D. Mich. Feb. 17, 2023)

19  (rejecting plaintiffs' effort to define their course of conduct as "training with firearms" and

20  concluding that the course of conduct is "construction and use of an outdoor, open-air, 1,000-

21  [yard] shooting range"). And in *Bruen* itself, the Supreme Court defined the course of conduct not

22  as merely "keeping and bearing arms," but more specifically as "carrying handguns publicly for

23  self-defense." 142 S. Ct. at 2119.

24      Contrary to *Bruen*, Plaintiffs define their proposed conduct simply as "keeping and bearing

25  arms." Pls.' Mem. of P. & A. in Supp. of Mot. for Summ. J. ("MPA") at 1. Such a broad

26  definition would allow any litigant to "promptly and automatically proceed" to the historical stage

27  of the *Bruen* analysis. *See Reyna*, 2022 WL 17714376, at \*4; *see also United States v. Trinidad*,

28  2022 WL 10067519, at \*3 (D.P.R. Oct. 17, 2022) ("If step one merely required them to say that

10

1   they wanted to bear arms, then *Bruen*'s analysis about who they were, what they wanted to do,

2   and why they wanted to do it would be gratuitous.").

3       *Bruen* requires more. In this case, Plaintiffs' actual proposed course of conduct is the

4   acquisition, importation, manufacture, possession, and use of LCMs.  *See, e.g.*, MPA at 10

5   (arguing that "firearms capable of firing more than ten rounds without reloading are

6   unquestionably 'bearable arms' that are 'in common use' and therefore entitled to protection");

7   *id.* ("The Second Amendment certainly 'covers an individual's conduct' in owning, possessing,

8   and using these magazines.").

9       As explained below, because Plaintiffs cannot show that Section 32310 burdens conduct

10  covered by the Second Amendment, the Court should uphold it at the textual stage of the *Bruen*

11  analysis.

12      **B.    Plaintiffs Cannot Demonstrate that LCMs Are "Arms," or that LCM
               Possession Is a "Closely Related Right."**

13      As an initial matter, there is no dispute among the parties that LCMs are not weapons in and

14  of themselves. *See* Busse Decl., ¶ 13 (magazines are "containers which hold ammunition"); *see*

15  Lee Decl., Dkt. 123-4, at 5-6 (magazines are "ammunition feeding devices" and are "simply a

16  receptacle for a firearm that holds a plurality of cartridges or shells under spring pressure

17  preparatory for feeding into the chamber" (quotation omitted)).[5]

18      Courts both pre- and post-*Bruen* have similarly recognized that magazines are not

19  themselves weapons. As the *Duncan* en banc panel correctly observed, Section 32310 "outlaws

20  *no weapon*, but only limits the size of the magazine that may be used with firearms." 19 F.4th at

21  1096 (emphasis added);[6] *see also Ocean State*, 2022 WL 17721175, at *12 (same conclusion).

---

23      [5] Indeed, today, dealers list magazines under the "accessories" sections of their websites.
24  *See, e.g.*, Guns.com, Accessories, https://www.guns.com/accessories; *see* Busse Decl. ¶ 25
    (noting that LCMs are "characterized as an accessory by the [firearms] industry").

25      [6] Defendants cite to cases abrogated on other grounds by *Bruen* or vacated after *Bruen* for
26  their persuasive value. *See DHX, Inc. v. Allianz AGF MAT, Ltd.*, 425 F.3d 1169, 1176 (9th Cir.
    2005) ("[A]t minimum, a vacated opinion still carries informational and perhaps even persuasive
27  or precedential value.") (Beezer, J., concurring); *Womack v. Cnty. of Amador*, 551 F. Supp. 2d
    1017, 1028 (E.D. Cal. 2008) (same).

28

                                                                     (continued…)

Defendants' Amended Opposition and Counter-Motion for Summary Judgment
(Case No. 2:17-cv-00903-WBS-KJN)

1    "LCMs, like other accessories to weapons, are not used in a way that 'cast[s] at or strike[s]

2    another.'" *Ocean State*, 2022 WL 17721175, at *12; *see also Teter v. Lopez*, __ F. 4th __, 2023

3    WL 5008203, at *8 (9th Cir. Aug. 7, 2023) (describing "Arms" as "[w]eapons of offence" that

4    may be "use[d] in wrath to cast at or strike another" (quoting *District of Columbia v. Heller*, 554

5    U.S. 570, 581, 628–29 (2008))). Rather, they are more properly viewed like silencers and other

6    accessories that "'generally have no use independent of their attachment to a gun.'" *Id.* (quoting

7    *United States v. Hasson*, 2019 WL 4573424, at *2 (D. Md. Sept. 20, 2019)); *see also United

8    States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018) ("A silencer is a firearm accessory; it's not a

9    weapon in itself (nor is it 'armour of defence')."); *Cox v. United States*, 2023 WL 4203261, at *7

10   (D. Alaska June 27, 2023) (holding that silencers are "firearms accessories" because they "serve[]

11   no purpose without a firearm and . . . [are] not necessary for the functioning of the firearm," and

12   thus they are "not 'arms' for purposes of Second Amendment Protection"). Even one of

13   Plaintiffs' own purported firearms experts acknowledged at his deposition that magazines are

14   properly categorized as "accessories." Meyerhoff Decl., Ex. H (Curcuruto Depo., 78:17–19) ("Q

15   In your opinion, would it be fair to describe magazines as a firearm accessory? A Yes.").

16          This conclusion is supported by corpus linguistics analysis; historically, the term "Arms"

17   referred to "weapons such as swords, knives, rifles, and pistols," and did not include

18   "accoutrements," like "ammunition containers, flints, scabbards, holsters, or 'parts' of weapons."

19   *See* Baron Decl., ¶ 8; *Ocean State*, 2022 WL 17721175, at *13 (discussing Professor Barron's

20   credentials and expertise and crediting his testimony). As Dr. Baron's declaration makes clear,

21   "magazines (including what we would call LCMs today) . . . and other ammunition storage

22   containers, were considered accoutrements or accessories and not arms during the Founding and

23   Reconstruction Eras." Baron Decl., ¶ 3. Post-*Bruen*, the Ninth Circuit has relied on

24   contemporaneous understandings of the Second Amendment's meaning in determining what

25   constitutes an "Arm." *Teter*, 2023 WL 5008203, at *8 (relying on "contemporaneous sources" to

26

27

28

1    "confirm that, at the time of the adoption of the Second Amendment, the term 'arms' was

2    understood" in a particular manner). Even the district court in *Duncan*, which concluded pre-

3    *Bruen* that LCMs are protected by the Second Amendment, observed that "when a magazine is

4    detached the magazine is not a firearm," "is not dangerous," "cannot fire a single round of

5    ammunition," and has as its "only function . . . to hold ammunition." *Duncan v. Becerra*, 265 F.

6    Supp. 3d 1106, 1117 (S.D. Cal. 2017).

7         This conclusion is also grounded in Supreme Court precedent. From the *Heller* decision on,

8    the Court has always equated "Arms" with weapons, not accessories or other implements

9    necessary to use them. *See Bruen*, 142 S. Ct. at 2134 ("[T]he 'textual elements' of the Second

10   Amendment's operative clause—'the right of the people to keep and bear Arms, shall not be

11   infringed'—'guarantee the individual right to possess and carry *weapons* in case of

12   confrontation.'" (quoting *Heller*, 554 U.S. at 592) (emphasis added)); *id.* at 2128 (holding that the

13   right secured by the Second Amendment "was not a right to keep and carry any *weapon*

14   whatsoever in any manner whatsoever and for whatever purpose" (quoting *Heller*, 554 U.S. at

15   626)); *Caetano v. Massachusetts*, 577 U.S. 411, 416 (2016) (Alito, J., concurring) (rejecting the

16   notion that "only *weapons* popular in 1789 are covered by the Second Amendment" (emphasis

17   added)); *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 786 (2010) (noting that "incorporation

18   does not imperil every law regulating *firearms*" (emphasis added)). As the Court in *Heller* put it,

19   "the most natural reading of 'keep Arms' in the Second Amendment is to 'have *weapons*.'" 554

20   U.S. at 582 (emphasis added). Nothing in *Bruen*, a case that involved a challenge to the manner of

21   carry, suggests that the Court expanded the definition of "Arms" beyond its most natural reading:

22   "weapons."

23        Plaintiffs argue that "Second Amendment protections would be meaningless if the State

24   could strip away integral component parts of a firearm by claiming that prohibitions against

25   individual component [sic] do not constitute a ban on 'arms.'" MPA at 9. Plaintiffs' doomsday

26   prediction is misplaced, however, because the Ninth Circuit has recognized that "the Second

27   Amendment protects ancillary rights necessary to the realization of the core right to possess a

28   firearm for self-defense." *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017); *see*

13

*Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) (finding that "the right to possess firearms for protection implies a corresponding right to obtain the bullets necessary to use them"); *see also Luis v. United States*, 578 U.S. 5, 27 (2016) (Thomas, J., concurring) (stating "[c]onstitutional rights thus implicitly protect those closely related acts necessary to their exercise").[7]

What can be gleaned from these cases, unchanged by *Bruen*, is that the Second Amendment does not transform mere accessories into "Arms." Instead, the Second Amendment's protection for "Arms" sometimes provides protection for those accessories necessary to operate an "Arm" for self-defense. Possession of an LCM is not necessary for such a purpose. The evidence submitted establishes that an LCM is not necessary to operate any firearm, much less any firearm commonly used for self-defense. *See* Busse Decl., ¶ 18; *see also Oregon Firearms II*, 2023 WL 4541027, at *26 ("LCMs, as a subset of magazines, are never necessary to render firearms operable."). Plaintiffs do not argue to the contrary. *See* MPA at 8 (arguing only that "[m]agazines are integral for the operation of many common firearms").

Plaintiffs nonetheless contend "the clear purpose and effect of California's magazine ban provisions are to functionally ban firearms capable of firing more than ten rounds without reloading." MPA at 10. This argument makes little sense, though, because California law permits the manufacture, sale, and possession of magazines holding ten or fewer rounds for use in firearms for self-defense, and does not restrict the number of such magazines that may be kept, the manner in which such magazines are stored, or the amount of ammunition that may be kept for use with such magazines.

Accordingly, because LCMs are neither "Arms" nor are they necessary for the use of any firearm for self-defense, Plaintiffs cannot show that their desired conduct falls within the "plain text" of the Second Amendment and their challenge to Section 32310 fails as a matter of law.

---

[7] It is significant that Justice Thomas used the adjective "closely" to limit the related rights concept, as courts have rejected efforts to expand the plain text of the Second Amendment. *See, e.g., Defense Distributed v. Bonta*, 2022 WL 15524977, at *4 (C.D. Cal. Oct. 21, 2022) (rejecting plaintiffs' effort identify a "penumbra" of covered activities beyond keeping and bearing arms, including a right to manufacture firearms).

14

**C.     Large-Capacity Magazines Are Not Protected "Arms" Because They Are Not Commonly Used for Self-Defense**

Even if LCMs could be considered "weapons" that could qualify as bearable "Arms," Plaintiffs cannot establish that LCMs are "in common use" for self-defense, such that their possession would be protected by the plain text of the Second Amendment. *See Bruen*, 142 S. Ct. at 2134 (noting that no party disputed that handguns are "in common use" at the textual stage of the analysis).

As an initial matter, Plaintiffs are incorrect that "[i]t is up to the State to prove that the arms are not commonly used." MPA at 11; *id*. (describing the "common use" inquiry as the State's "burden").[8] Whether LCMs are in "common use" is part of the threshold textual inquiry that Plaintiffs, not Defendants, bear the burden of satisfying, because the Second Amendment covers only weapons "'in common use' today for self-defense," such as "the quintessential self-defense weapon," the handgun. *Bruen*, 142 S. Ct. at 2134 (citation omitted); *United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023) ("*Bruen* step one involves a threshold inquiry," including whether, inter alia, "the weapon at issue is in common use for self-defense."). But it does not cover a weapon that is "uncommon or unusually dangerous or not typically used by law-abiding people for lawful purposes." *Reyna*, 2022 WL 17714376, at *3 (citing *Bruen*, 142 S. Ct. at 2128); *see. Lamont*, 2023 WL 4975979, at *21 (weapons that "are commonly used and typically possessed . . . for the purpose of causing unlawful or excessive harm or fatalities" are not protected by the Second Amendment).

In this case, based on the evidence presented by the parties, there is no genuine dispute of material fact that LCMs are not commonly used in self-defense.[9] To the contrary, the record

---

[8] Of the courts that have considered post-*Bruen* Second Amendment challenges to laws regulating LCMs, only *Barnett v. Raoul*, 2023 WL 3160285 (S.D. Ill. Apr. 28, 2023), has conducted the common use analysis at step two of the *Bruen* analysis (*i.e.*, whether the challenged regulation is consistent with the nation's tradition of firearms regulation). *Id*. at *9. *Barnett* is an outlier both in adopting that analytical framework, and its finding that Plaintiffs were likely to succeed on their Second Amendment challenge to LCM restrictions (*id*. at *11). As explained herein, neither the holding of the court in *Barnett* nor its "common use" analysis comport with *Bruen*.

[9] A definition of "common use" based on industry-created production and ownership

(continued…)

1  reflects that their use for self-defense is vanishingly rare, to the extent they are used for that

2  purpose at all.

3      As detailed in Lucy P. Allen's supplemental declaration, two separate datasets establish

4  large-capacity magazines are not commonly used in self-defense. First, an analysis of incidents

5  reported in the NRA Armed Citizens database compiled from January 2011 through May 2017

6  reveal that it is rare for individuals to defend themselves using more than ten rounds; on average,

7  only 2.2 shots were fired by defenders. Allen Supp. Decl., ¶ 10. Moreover, that same analysis of

8  incidents from the NRA Armed Citizens database found that more than 10 bullets were fired in

9  only 2 out of 736 self-defense incidents in the United States. *Id*. And in those two incidents, there

10  is no evidence that the shooter used an LCM, rather than reloading or using another firearm. *See*

11  *Duncan*, 19 F.4th at 1105 (finding that the record below did not disclose whether "the added

12  benefit of a large-capacity magazine—being able to fire more than ten bullets in rapid

13  succession—has ever been realized in self-defense in the home"). The second analysis involved

14  published news stories. Allen Supp. Decl., ¶¶ 13-14. That analysis revealed a similar number of

15  average shots per incident of self-defense (*i.e.*, 2.34). *Id*. at ¶ 18. And it further found that in

16  97.3% of incidents the defender fired 5 or fewer shots, and that there were no incidents where the

17  defender was reported to have fired more than 10 bullets. *Id*. at ¶ 19.[10]

18      The conclusions set forth in Ms. Allen's declaration are also reflected in depositions of

19  Plaintiffs' own witnesses. None of the Plaintiffs testified to having ever discharged a firearm in

20  _____

21  estimates, *see* MPA at 2-3, 11, would be circular and inconsistent with *Heller*. *See Duncan*, 19
   F.4th at 1127 (Berzon, J., concurring) ("Notably, however, *Heller* focused not just on the

22  prevalence of a weapon, but on the primary use or purpose of that weapon."); *see also Cox*, 2023
   WL 4203261, at *7 (rejecting defendant's contention that the "upwards of 741,146 machine

23  guns" allegedly possessed legally in the United States by itself is "enough to find that machine
   guns are 'in common use'" because, *inter alia*, defendant "fails to argue or point to any support

24  that machine guns are in common use for self defense").

25      [10] The court in *Oregon Firearms II*, crediting a similar declaration from Ms. Allen, found
   it "is exceedingly rare (far less than 1 percent) for an individual to fire more than ten shots in self-

26  defense." 2023 WL 4541027, at *12  (finding "Ms. Allen to be a highly qualified and credible
   witness and gives significant weight to her testimony and statistical conclusions"); *see also*

27  *Lamont*, 2023 WL 4975979, at *21  (citing a similar declaration from Ms. Allen and noting that
   she has "previously been qualified as an expert and testified in both federal and state courts").

28

16

self-defense, much less emptying an entire detachable magazine for such a purpose. *See, e.g.,* Meyerhoff Decl., Exs. B-E, G (Nielsen Depo., 49:22–24; Flores Depo., 36:5–10; Federau Depo., 28:4-6; Morris Depo., 47:3–18; Wiese Depo., 43:19–21). And some of the Plaintiffs testified that they possessed weapons capable of firing ten or fewer rounds without reloading for the very purpose of self-defense, belying any notion that their right to self-defense is infringed by Section 32310. *See, e.g.*, *id.*, Ex. A (Macaston Depo., 57:20–58:11) (describing his possession of firearms with maximum magazine capacity of eight rounds for the purpose of, *inter alia*, self-defense); *id.* at Ex. E (Morris Depo., 64:24-65:2, 67:19–68:1) (describing his possession of fixed magazine firearms capable of holding less than eleven rounds for the purpose of, *inter alia*, self-defense).

The fact that LCMs are not commonly used for self-defense is unsurprising. While any weapon (or accessory) could theoretically be used in self-defense, the accessory at issue here (an LCM) is not well-suited for lawful self-defense. *See Worman v. Healey*, 922 F.3d 26, 37 (1st Cir. 2019) ("[W]ielding the proscribed [assault weapons and LCMs] for self-defense within the home is tantamount to using a sledgehammer to crack open the shell of a peanut."), *abrogated on other grounds by Bruen*, 142 S. Ct. at 2127 n.4. Instead, LCMs were "initially developed for military use and allowed soldiers to fire without pausing to reload." *Oregon Firearms II*, 2023 WL 4541027, at *24; *Lamont*, 2023 WL 4975979, at *25 ("LCMs were originally designed for military use in World War I and did not become widely available for civilian use until the 1980s."). As explained in the declaration of Colonel (Ret.) Craig Tucker—a decorated Marine combat veteran who commanded soldiers in both Fallujah battles during the Iraq War—detachable magazines serve specific combat-related purposes:

> Detachable large-capacity magazines . . . allow the combat rifleman to rapidly change magazines in combat, and thus to increase killing efficiency by significantly reducing reload time. Changing magazines during intense combat is the most important individual skill taught to Marines. During intense combat, the detachable magazine provides a rifleman the capability to fire 180 rounds on semi-automatic in four minutes at a high-sustained rate of 45 rounds per minute. In a civilian self-defense context, by contrast, an individual would not have a need for such a high rate of fire.

Tucker Decl., ¶ 16. One of Plaintiffs' own purported experts echoed Colonel Tucker's conclusions. *See* Meyerhoff Decl., Ex. F (Youngman Depo., 36:20–24) (describing how, in a

17

1   military setting, 30-round magazines are "obviously advantageous to increase the number of

2   rounds that could be fired in a -- an engagement with enemy forces"); *id*. at 115:5–17 (noting that

3   the sustained rate of fire with a semi-automatic weapon is between 40 and 60 rounds per minute).

4          Though the Supreme Court's decision in *Heller* did not delineate "the full scope of the

5   Second Amendment," 554 U.S. at 626, it did set at least one guidepost: "weapons that are most

6   useful in military service—M16 rifles and the like—may be banned," *id.* at 627. As the Fourth

7   Circuit held, LCMs are not protected by the Second Amendment because they are "like" "M-16

8   rifles," "weapons that are most useful in military service," and thus are "beyond the Second

9   Amendment's reach." *Kolbe v. Hogan*, 849 F.3d 114, 121 (4th Cir. 2017) (en banc) (quoting

10  *Heller*, 554 U.S. at 627), *abrogated on other grounds by Bruen*, 142 S. Ct at 2126; *see also*

11  *Oregon Firearms Fed'n v. Brown* (*Oregon Firearms I*), __ F. Supp. 3d __. 2022 WL 17454829,

12  at *11 (D. Or. Dec. 6, 2022) (same); *Hanson*, 2023 WL 3019777, at *9 (finding that "LCMs are

13  most useful in military service," that "LCMs' lethality was popular in military settings, and [that]

14  indeed many of them were designed specifically for military (and law enforcement) use"). And

15  the *Duncan* en banc panel observed that the analogy to the M16 has "significant merit" because

16  LCMs have limited "lawful, civilian benefits" and "significant benefits in a military setting."

17  *Duncan*, 19 F.4th at 1102. Nothing in *Bruen* calls into question *Heller*'s view that weapons most

18  useful in military service, like the M16 rifle or M4 carbine, may be banned.

19          Historically, at the founding, such high-capacity firearms were extraordinarily rare, *see*

20  *infra*, section II.A.1, and were not part of a militiaman's "ordinary military equipment" that he

21  would be expected to bring to muster at that time, *Heller*, 554 U.S. at 624 (quoting *United States*

22  *v. Miller*, 307 U.S. 174, 178 (1939)). Similarly, "high-capacity firearms," like the Henry and

23  Winchester rifles, were understood during the era of Reconstruction to be "weapons of war or

24  anti-insurrection, not weapons of individual self-defense." Vorenberg Decl., ¶ 7; *Ocean State*,

25  2022 WL 17721175, at *15 (same); *Hanson*, 2023 WL 3019777, at *13 ("High-capacity firearms

26  became more common in military settings in the second half of the 19th century, but they were

27  still rare."); *see also* Vorenberg Decl., ¶ 9 (noting that "efforts to create a market for high-

28  capacity firearms in the United States during Reconstruction failed miserably" and that

18

"Americans who were not part of legal law enforcement bodies rarely bought high-capacity firearms"). When LCMs began to circulate more widely in the 1980s, they were regarded as military accessories. Busse Decl., ¶ 36. In 1989, the Bureau of Alcohol, Tobacco, and Firearms found that "large-capacity magazines are indicative of military firearms," and later in 1998, it determined that "detachable large-capacity magazine[s] [were] originally designed and produced for . . . military assault rifles." *Oregon Firearms I*, 2022 WL 17454829, at *11 (quoting *Duncan*, 19 F.4th at 1105–06).

Plaintiffs cannot show that LCMs are commonly used in—let alone suitable for—lawful self-defense. Accordingly, these accessories are not protected by the Second Amendment, and Section 32310 should be upheld at *Bruen*'s threshold inquiry.

## II. CALIFORNIA'S RESTRICTIONS ON LARGE-CAPACITY MAGAZINES ARE CONSISTENT WITH THE NATION'S TRADITIONS OF WEAPONS REGULATION

Even if Plaintiffs could meet their initial burden of showing that the possession of LCMs is an activity covered by the "plain text" of the Second Amendment (they cannot), the uncontroverted evidence Defendants have put forward establishes that California's restrictions on LCMs are consistent with the Nation's traditions of weapons regulation. Defendants have assembled a survey of hundreds of relevant laws and authorities that show that, from pre-founding America through the 1930s, state and local governments regularly enacted restrictions on certain enumerated weapons viewed at the time to be particularly dangerous. *See* Appendix 1. These laws are relevantly similar to Section 32310 because they impose a comparably modest burden on the right to armed self-defense—by restricting weapons and devices that are not particularly useful for self-defense while ensuring access to other arms for effective self-defense—and those minimal burdens are comparably justified by public-safety concerns.

### A. This Case Requires a "More Nuanced" Analogical Approach

In a case that proceeds to the historical stage of the *Bruen* analysis, the government need not identify a "historical *twin*" or a "dead ringer"; it can justify a modern restriction by identifying a "relevantly similar" restriction enacted when the Second or Fourteenth Amendments were ratified. *Id.* at 2132–33. When the challenged law addresses "unprecedented societal

19

1   concerns or dramatic technological changes," the courts should engage in a "*more* nuanced

2   approach" because "[t]he regulatory challenges posed by firearms today are not always the same

3   as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Bruen*,

4   142 S. Ct. at 2131–32 (emphasis added). Here, unlike the "fairly straightforward" analysis in

5   *Bruen* and *Heller*, *id.* at 2131, a more nuanced approach is required because LCMs implicate

6   dramatic technological change in firearms technology and an unprecedented societal concern (*i.e.*,

7   mass shootings). *See Lamont*, 2023 WL 4975979, at *29 (concluding that a more nuanced

8   approach is required in assessing large-capacity magazine restrictions); *Herrera*, 2023 WL

9   3074799, at *7 (same); *Hanson*, 2023 WL 3019777, at *13 (same).

> **1.    LCMs Represent a Dramatic Technological Change from the Firearms Technologies Widely Available During the Founding and Reconstruction Eras**

12        As an initial matter, Plaintiffs have provided no expert declarations or other evidence for

13   their claims relating to the purportedly long-standing existence of magazines capable of holding

14   more than ten rounds of ammunition. MPA at 19. Plaintiffs have introduced no experts *at all* on

15   the historical pedigree (or lack thereof) of LCMs, instead merely citing documents (which

16   themselves are largely secondary sources) on the topic. Without expert testimony on the context,

17   reliability, and veracity of these sources, it is impossible for the Court to credit them (much less

18   any of the claims made therein). *See Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir.

19   2002) ("A trial court can only consider admissible evidence in ruling on a motion for summary

20   judgment."). To the extent Plaintiffs contend that the authors of these sources are themselves

21   experts, "it is well established that unsworn expert reports are inadmissible and cannot be used to

22   create a triable issue of fact for purposes of summary judgment." *See Liebling v. Novartis*

23   *Pharms. Corp.*, 2014 WL 12576619, at *1 (C.D. Cal. Mar. 24, 2014); *see also Ridgel v. United*

24   *States*, 2013 WL 2237884, at *2 (C.D. Cal. May 21, 2013) (not considering on summary

25   judgment a document that "is not attached to any declaration and is unauthenticated and

26   unsworn").

27        As the evidence actually submitted in this case establishes, LCMs represent a "dramatic

28   technological change" requiring a more nuanced approach under *Bruen*. Plaintiffs argue that "the

20

Founders and Framers were well aware of the advent, existence, and popularity of magazines capable of holding more than ten rounds of ammunition." MPA at 19. But Plaintiffs' argument fails for two reasons: (1) the early repeaters identified by Plaintiffs were prototypes and curios, to the extent they existed at all; and (2) LCMs are not by any means the same technology as these early repeating rifles.

First, the early repeaters were "extraordinarily rare." Sweeney Decl., ¶ 23; *id.* ¶ 47 ("[P]eriod probate inventories and newspapers indicate that repeating firearms were extraordinarily rare in eighteenth-century America."); *see also* Cornell Decl., ¶ 26; DeLay Decl., ¶ 7. Indeed, while Plaintiffs conclude that these weapons were "prevalen[t]" at the time of the Founding, MPA at 19-20, their own briefing indicates that these weapons were rare curiosities. *See id.* at 17 (recounting that three and five-shot repeaters "astonished the Iroquois," a reaction that would seem to be incompatible with the argument that repeaters were common in pre-Revolutionary America); *id.* at 19 (recounting that the Girandoni rifle was "astonishing and surprising" to those who saw its use); *id.* (noting that around 1660, "[a]t least 19 gunsmiths" in an area stretching from London to Moscow (*i.e.*, effectively all of Continental Europe, Russia, and England) made magazines that may have held more than ten rounds,[11] indicating how rare such weapons, given that the population of Europe (even excluding Russia) was more than 74 million people at that time[12]).

While today a "new semiautomatic handgun can be purchased for less than $200 and equipped with a 33-round magazine for less than $15," Roth Decl., ¶ 50, there is no evidence that many early repeating firearms were commercially available. Sweeney Decl., ¶ 29 (no evidence that Belton produced any of the 1777 firearms that he wrote to the Continental Congress about); *id.* at ¶ 28 (evidence suggests that to the extent English-born John Cookson ever made repeaters, he "apparently did not produce repeating firearms during his 60 years in Boston, and there are no surviving eighteenth-century, American-made Cookson repeaters"); *id.* at ¶ 24 (the Pimm "gun

---

[11] The text Plaintiffs cite describes the magazine in question as having between six and thirty rounds. MPA at 16.

[12] https://www.britannica.com/topic/history-of-europe/Demographics.

1   was not being offered for sale; no examples of a repeating long-arm by Pimm survive"). In other

2   words, in contrast to the ease and low cost with which an LCM could be acquired today, in 1791 a

3   repeating firearm (to the extent it was available for purchase at all) would have been hard to

4   acquire and "expensive." Sweeney Decl., ¶ 49; *see also* DeLay Decl., ¶ 36 (only "a paper-thin

5   slice of Europe's political and economic elite" would have access to these weapons; for "almost

6   everyone else at the time, these guns were unknown and irrelevant").[13]

7       Second, the evidence establishes that LCMs are vastly different from the repeating firearms

8   identified by Plaintiffs. The LCMs regulated by Section 32310 are detachable magazines capable

9   of holding more than ten rounds of ammunition. *Id*. at (a). As Plaintiffs themselves assert, in other

10   states where LCMs are not regulated, many firearms are sold with 30-round magazines. MPA

11   at 3. Those magazines enable an individual to have a sustained rate of 45 rounds per minute, and

12   fire 180 rounds on semi-automatic in four minutes. Tucker Decl., ¶ 16; *see also* Roth Decl., ¶ 49

13   (noting that the AR-15 can fire 45 rounds per minute); *id*. at ¶ 50 (noting that an entire 30-round

14   clip from a semi-automatic pistol can be fired in five seconds); Meyerhoff Decl., Ex. F

15   (Youngman Depo., 115:3–116:1).

16       The ease of discharging dozens (if not hundreds) of rounds of ammunition in minutes from

17   LCMs regulated by Section 32310 contrasts sharply with the paltry rate of fire from early

18   attempts at repeating firearms. Sweeney Decl., ¶ 45 (noting that the Puckle "gun had a rate of fire

19   of only 9 rounds per minute"); *id*. at ¶ 24 (noting that the Pimm gun fired 11 rounds in a two-

20   minute period); *id*. at ¶ 34 (noting that the 1786 Belton firearm required the user to cock and

21   prime each time before pulling the trigger and firing the gun).

22       The differential rate of discharge is only furthered by the fact that LCMs can be quickly and

23   easily changed to maintain "a sustained or rapid sustained rate of fire," Tucker Decl., ¶ 15, while

24   reloading the early repeaters identified by Plaintiffs was an arduous process. *See* Cornell Decl., ¶

25   44 (noting that the Girardoni air gun required 1500 strokes of a pump to prime for use); DeLay

26   Decl., ¶ 31 (stating that the early air-rifles "were time-consuming and onerous to prime");

27   _____

28   [13] It is difficult to even estimate the cost of these early repeaters, given their rarity
    (Sweeney Decl., ¶ 47) and thus the absence of any real commercial market.

1    Sweeney Decl. ¶ 24 n.48 (recounting the 1715 Pimm revolver could deliver six shots after being

2    loaded once, but it was not a rapid-fire weapon, and it took time to reload the individual chambers

3    with powder and ball); Spitzer Decl., ¶ 28 (noting that "the guns of 1830 were essentially what

4    they had been in 1430: single metal tubes or barrels stuffed with combustible powder and

5    projectiles" where "after every shot, the shooter had to carry out a minimum of three steps: pour

6    powder into the barrel; add a projectile . . .; then ignite the gunpowder and send the projectile on

7    its way").[14]

8         And Defendants' evidence shows, to the extent they were produced at all, these early

9    attempts at repeating firearms were far from reliable. In 1800, it "was still not possible to

10   manufacture with precision and in any quantity firearms with closely fitting parts that could

11   contain the destructive explosive potential associated with the use of black powder gunpowder"

12   that repeaters required. Sweeney Decl., ¶ 50; DeLay Decl., ¶ 15 ("Early magazine guns demanded

13   an even higher level of craftsmanship in order to create a perfect seal between the rotating

14   breechblock and the stored powder, lest the combustion in the chamber ignite the magazine."). As

15   a result, the historical record is replete with reference to faultiness of these repeaters. *See, e.g.,*

16   Cornell Decl., ¶ 44 (noting that the Austrian military abandoned the Girardoni air rifle due their

17   tendency to malfunction and the fact that they "became inoperable after a very short time");

18   Sweeney Decl., ¶ 27 ("Catastrophic failures happened because the period's methods of

19   fabrication were not reliably capable of producing the fitting precision parts needed to prevent

20   such malfunctions caused by errant sparks."); *id*. ¶ 37 (stating that the Chambers firearms could

21   "produce devastating malfunctions" because they "were difficult to load correctly, and if the

22   bullets did not fit tightly, flame could leak around them and set off all the charges at once"); *id*. ¶

23   43 (noting that imported Belgian or French-made Segales pistols which had four rifled barrels

24   were "at risk from a dangerous chain reaction, in which firing one chamber could accidently set

25   off all the others," and "[i]f this happened, the gun would explode in the shooter's hand"); DeLay

26        [14] In fact, the early attempts at repeating rifles in some ways more closely resemble trap
     guns, *see* Cornell Decl., ¶¶ 72-75, than LCMs. *See* Sweeney Decl., ¶ 46 (the Puckle gun required
27   a tripod to use); *id*. at ¶ 31 (once fired, the "the ensuing discharge of balls" from the Belton
     "uncontrolled").

28

23

1   Decl., ¶¶ 15, 30 (even famed Italian gunmaker Bartolomo Girardoni, creator of eponymous air

2   rifle, lost his left hand in a magazine explosion).

3        The repeating rifles available during the Reconstruction period were also materially

4   different than the LCMs regulated today. At that time, the only bearable, high-capacity firearms

5   capable of firing more than 10 rounds were the lever-action Henry Rifle and the Winchester

6   Repeating Rifle (the Winchester 66 and Winchester 73 models), which were capable of holding

7   15 rounds in a fixed chamber within the firearm. Vorenberg Decl., ¶¶ 20-21. But as explained

8   above, what makes the LCM a dramatic technological change is not merely the number of rounds

9   that it holds but the fact that many such LCMs are detachable, which enables a sustained rate of

10  fire over a period of minutes. *See* Tucker Decl., ¶ 16; Roth Decl., ¶ 49; *see also Hanson*, 2023

11  WL 3019777, at *13 (noting that "these rifles did not resemble the semiautomatic weapons of

12  today," in part because of their "firing rate [of] . . . about one shot every three seconds"). In any

13  event, those rifles were not widely owned by civilians during Reconstruction. As Professor

14  Vorenberg explains, the Henry and Winchester repeaters were not adopted by the Union or

15  Confederate militaries during the Civil War and were not commonly acquired by soldiers

16  returning from the Civil War. Vorenberg Decl., ¶ 24 ("Production and sales numbers reveal that

17  Henry Rifles and their successors, Winchester Repeating Rifles, were uncommon during the Civil

18  War and Reconstruction compared to other rifles."). Following the Civil War, the circulation of

19  Henry and Winchester lever-action repeating rifles remained low, with few documented instances

20  of possession by civilians. *Id.* ¶ 27. By the time the Fourteenth Amendment was ratified, the

21  commercial viability of the Winchester Model 1866 was due "almost entirely to sales to foreign

22  armies," not to Americans. *Id.* ¶ 50; DeLay Decl., ¶ 67 ("[T]he vast majority of these weapons

23  were made to order for foreign armies and shipped abroad."). Indeed, as Professor Delay's

24  declaration establishes, in 1868 these repeating rifles accounted for less than 0.002% of guns in

25  the United States. DeLay Decl., ¶ 7.

26       Thus, the evidence establishes that the LCMs regulated by Section 32310 represent the type

27  of dramatic technological change recognized in *Bruen* as requiring a more nuanced approach.

28

### 2.   Section 32310 Addresses the Unprecedented Social Problem of Mass Shootings

Section 32310 also addresses a societal concern that did not exist at the Founding or during Reconstruction: mass shootings. There are no known shooting incidents involving ten or more fatalities before 1949, and the number of such double-digit mass shootings increased dramatically in the period before and after the federal assault weapons ban. *See* Klarevas Decl., ¶¶ 18-19 & tbl. 4; *see also Oregon Firearms II*, 2023 WL 4541027, at *36 (crediting Professor Klarevas's findings on that point); *Lamont*, 2023 WL 4975979, at *28 (same). And as Professor Roth has explained, from the colonial period to the early 20th century, mass killings were generally committed by groups of people because technological limitations constrained the ability of a single person to commit mass murder. *See* Roth Decl., ¶ 41.

The development and proliferation of semiautomatic and automatic firearms technologies in the 1920s and 1930s substantially increased the amount of carnage an individual could inflict, which led to government regulation of those technologies. *See* Spitzer Decl., ¶¶ 50-51; Roth Decl., ¶ 47. This increased lethality has only accelerated over the past several decades. *See* Donohue Decl., ¶ 54 (contrasting that the 1966 University of Texas memorial tower shootings, in which 14 people were killed, took the shooter, an expert marksman, 90 minutes with the 2009 Fort Hood shooting, in which an inexperienced shooter fired 214 times and killed 13 people at Fort Hood in less than 10 minutes).

LCMs in particular have greatly enhanced the lethality of mass shootings when they occur. *See* Supp. Allen Decl., ¶¶ 27-28; Roth Decl., ¶¶ 49-51; Klarevas Decl., ¶ 14. Of all the shootings in American history involving 15 or more fatalities, 100% involved the use of LCMs. *See* Klarevas Decl. ¶ 14 & tbl. 4; Donohue Decl., ¶ 30 ("[I]f one looks at the deadliest acts of intentional mass violence in the United States since 9/11, they all share one feature. The killer in every case used a weapon equipped with a high-capacity magazine."); *Lamont*, 2023 WL 4975979, at *21 (finding that the use of LCMs in mass shootings demonstrates that they "are commonly used for reasons other than lawful self-defense").[15]

---

[15] Just in the past two years, the United States has experienced numerous, devastating

(continued…)

Therefore, one of the primary concerns addressed by Section 32310—mass shootings—is a modern problem that did not exist in 1791 or 1868. For this additional reason, a more nuanced approach is required.

### B. California's Restrictions on Large-Capacity Magazines Are Consistent with Historical Laws Regulating Other Dangerous Weapons

The Attorney General has identified hundreds of laws from pre-founding England and colonial America through the 1930s, including clusters of similar laws enacted around the time that the Second and Fourteenth Amendments were ratified. *See* Appendix 1. Even if Section 32310 were viewed to burden conduct covered by the plain text of the Second Amendment (and it does not), Defendants have provided "significant historical evidence to overcome the presumption of unconstitutionality of a measure that infringes upon conduct covered by the Second Amendment." *Oregon Firearms I*, 2022 WL 17454829, at *12.

In evaluating the relevant similarities of these laws to modern firearm regulations, the identification of relevant laws is the first step. The laws must then be contextualized historically and compared to modern laws within an appropriate analytical framework. The *Bruen* standard focuses "not on a minutely precise analogy to historical prohibitions, but rather an evaluation of the challenged law in light of the broader attitudes and assumptions demonstrated by those historical prohibitions." *United States v. Kelly*, 2022 WL 17336578, at *5 n.7 (M.D. Tenn. Nov. 16, 2022). The absence of a precise twin in the historical record would not necessarily mean that a modern firearm restriction is inconsistent with the Second Amendment. *Alaniz,* 69 F.4th at 1128

---

mass shootings with firearms equipped with large-capacity magazines, including the March 16, 2021 Atlanta spa shootings (8 killed); the March 22, 2021 shooting at King Soopers supermarket in Boulder, Colorado (10 killed); the April 15, 2021 shooting at an Indianapolis FedEx warehouse (8 killed); the May 26, 2021 shooting at a transportation authority facility in San Jose, California (9 killed); the May 14, 2022 supermarket shooting in Buffalo, New York (10 killed); the May 24, 2022 shooting at Robb Elementary School in Uvalde, Texas (19 children and 2 adults killed); the July 4, 2022 shooting at a Fourth of July parade in Highland Park, Illinois (7 killed); the November 20, 2022 shooting in a Colorado Springs nightclub in which five people were killed and 17 wounded; the November 22, 2022 shooting at a Virginia Walmart that left 7 dead; the January 2023 shooting at a dance studio in Monterey Park, California that killed 11 and wounded nine others; the March 2023 shooting at the elementary school in Nashville that killed six, including three 9-year-old children; and the April 10, 2023 shooting at a Louisville bank that killed five. *See* Donohue Decl., ¶ 22.

26

("Notably, the analogue required at step two need not be a 'historical twin.'") Under *Bruen*, the Second Amendment does not "forbid all laws other than those that *actually existed* at or around the time of the [Second Amendment's] adoption," but rather "the Second Amendment must, at most, forbid laws that *could not have existed* under the understanding of the right to bear arms that prevailed at the time." *Id.* The laws identified by Defendants are relevantly similar to Section 32310 by the two metrics identified in *Bruen*: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." 142 S. Ct. at 2133.

### 1.   The Survey of Relevant Dangerous Weapons Laws

Defendants have prepared and filed a survey of relevant laws and authorities from the pre-founding era through the 1930s. *See* Appendix 1.

This survey identifies over 300 state and local laws, including laws enacted by the District of Columbia, and six additional laws and authorities from pre-founding England, which regulated, or authorized the regulation, of certain enumerated weapons and items.[16] This history shows that governments have been free to adopt laws like Section 32310, consistent with the Second Amendment—restricting particular weapons and weapons configurations that pose a danger to society and are especially likely to be used by criminals, so long as the restriction leaves available

---

[16] The vast majority of these laws were generally applicable, but some restrictions applied only to certain groups. Twelve of the surveyed laws were based on race, nationality, or enslaved status and were enacted before ratification of the Thirteenth and Fourteenth Amendments [5, 14, 15, 16, 17, 20, 21, 28, 31, 53, 75, 79]. These laws would be morally repugnant and would obviously be unconstitutional today. They are provided only as additional examples of laws identifying certain weapons for heightened regulation, and they are consistent in this respect with the other generally applicable laws. Defendants in no way condone laws that target certain groups on the basis of race, gender, nationality, or other protected characteristics, but these laws are part of the history of the Second Amendment and may be relevant to determining the traditions that define its scope, even if they are inconsistent with other constitutional guarantees. *See Bruen*, 142 S. Ct. at 2150–51 (citing *Dred Scott v. Sandford*, 19 How. 393 (1857) (enslaved party)). Reference to a particular historical analogue does not endorse the analogue's *application* in the past. Rather, it can confirm the *existence* of the doctrine and corresponding limitation on the Second Amendment right. *See* William Baude & Stephen E. Sachs, *Originalism & the Law of the Past*, 37 L. & Hist. Rev. 809, 813 (2019) ("Present law typically gives force to past *doctrine*, not to that doctrine's role in past society."); *see also* Adam Winkler, *Racist Gun Laws and the Second Amendment*, 135 Harv. L. Rev. F. 537, 539 (2022) ("Yet there will arise situations in which even a racially discriminatory gun law of the past might provide *some* basis for recognizing that lawmakers have a degree of regulatory authority over guns.").

1  other weapons for constitutionally protected uses. The enactments identified by Defendants show

2  that Section 32310 is a constitutionally permissible exercise of California's police powers.

3                    **a.      Medieval to Early Modern England (1300–1776)**

4          In pre-founding England, the right to keep and bear arms was limited to arms "allowed by

5  law" [7, 9],[17] and the Crown prohibited the possession of certain enumerated weapons, like

6  launcegays [1, 2], crossbows, handguns, hagbutts, and demy hakes [3, 4]. These laws are part of

7  the tradition inherited from England when the Second Amendment was ratified. *See Bruen*, 142 S.

8  Ct. at 2127 (noting that the Second amendment "codified a right inherited from our English

9  ancestors" (quoting *Heller*, 554 U.S. at 599)). The 1689 English Bill of Rights was the

10  "predecessor to our Second Amendment," *id.* at 2141 (quoting *Heller*, 554 U.S. at 593), and

11  although it was "initially limited" to Protestants and "matured" by the Founding, *id.* at 2142, there

12  is no indication that the "as allowed by law" qualification was written out of the right when the

13  Second Amendment was ratified.

14          Pre-ratification English law is relevant, especially where it is consistent with laws that

15  existed when the Second or Fourteenth Amendments were ratified. *Id.* at 2136 (suggesting that it

16  is permissible for "courts to 'reach back to the 14th century' for English practices that 'prevailed

17  up to the 'period immediately before and after the framing of the Constitution'" (cleaned up)); *id.*

18  ("A long, unbroken line of common-law precedent stretching from Bracton to Blackstone is far

19  more likely to be part of our law than a short-lived, 14th-century English practice."). Pre-

20  founding English law was evaluated in *Bruen*, *McDonald*, and *Heller*, and it remains relevant

21  here. *See Bruen*, 142 S. Ct. at 2138-39; *McDonald*, 561 U.S. at 768; *Heller*, 554 U.S. at 593.

22                    **b.      Colonial and Early Republic (1600–1812)**

23          During the colonial period and the early Republic, several jurisdictions enacted restrictions

24  on the possession of certain weapons and devices, including (a) limitations on the keeping and

25  storing of gunpowder, (b) trap guns, and (c) other enumerated weapons.

26  _____

27          [17] These references and those bracketed references that follow refer to relevant laws
compiled in Appendix 1 and which are identified by number in the left-hand column of Appendix

28  1.

1    First, during the colonial period and at the Founding, governments heavily regulated guns

2  and gunpowder, both to ensure the readiness of the militia, and to protect the public from harm

3  [339, 340]. In particular, governments regulated the storage of gunpowder inside the home. Laws

4  required gunpowder to be stored on the top floor of a building and permitted government officials

5  to remove it when necessary to prevent explosions and to transfer the powder to the public

6  magazine. *See* Cornell Decl., ¶ 47. Under these gun powder storage laws, individuals were not

7  free to stockpile as much gunpowder as they may have wished—or felt necessary for self-

8  protection—nor could they keep the gunpowder in the home in any manner that they wished.[18]

9    Second, during the colonial period, states began to enact restrictions on "trap guns," laws

10  that proliferated in the 19th century. *See* Spitzer Decl., ¶¶ 72–75, & Exs. B & F. A trap gun was a

11  firearm that was configured in a way to fire remotely (without the user operating the firearm),

12  typically by rigging the firearm to be fired by a string or wire when tripped. Spitzer Decl., ¶ 72.

13  Trap guns were used to protect personal or commercial property. *Id*. at ¶ 73. Just as

14  Massachusetts prohibited the storage of loaded guns inside the home to prevent accidental harm,

15  trap gun laws regulated the manner in which firearms could be kept and configured to protect the

16  public from harm. *Id*. at ¶ 75 & Exs. B & F.

17    Third, some jurisdictions prohibited the carrying of certain listed weapons, including a 1686

18  New Jersey law prohibiting the carrying of any pocket pistol, skein, stiletto, dagger, or dirk [6]

19  and other laws prohibiting the carry of certain weapons in certain circumstances [8, 12, 13, 18,

20  19, 23]. Such pre-ratification restrictions should "guide [this Court's] interpretation" of the

21  Second Amendment. *Bruen*, 142 S. Ct. at 2137. And laws enacted after ratification of the Second

22  Amendment during this period are relevant in showing the continuing tradition of regulating

23  certain enumerated weapons. Moreover, post-ratification practice can "liquidate" indeterminacies

24  in the meaning of constitutional provisions. *Id.* at 2136 (citation omitted).

25

26

_____

27    [18] Maine also enacted a law in 1821, authorizing town officials to enter any building to
search for gun powder. Cornell Decl., ¶ 51 (citing 1821 Me. Laws 98, An Act for the Prevention

28  of Damage by Fire, and the Safe Keeping of Gun Powder, chap. 25, § 5).

### c. Antebellum and Reconstruction Periods (1813–1877)

During the antebellum and postbellum period, including around the time that the Fourteenth Amendment was ratified, numerous states restricted weapons deemed to be particularly dangerous or susceptible to criminal misuse.

As homicide rates increased in the South in the early 1800s, states began restricting the carrying of certain concealable weapons. *See* Roth Decl., ¶ 23; Spitzer Decl., ¶ 55; Rivas Decl., ¶¶ 15-17. Throughout this period, states enacted a range of laws restricting the carrying of blunt weapons: 12 states restricted "bludgeons"; 14 states restricted "billies"; seven states restricted "clubs"; 43 states restricted "slungshots"; six states restricted "sandbags"; and 12 states broadly restricted any concealed weapon. *See* Spitzer Decl., ¶¶ 56-62 & Ex. C. Many of these laws were enacted shortly before and after the ratification of the Fourteenth Amendment. *Id*.

From 1813 to the Mexican War, numerous states and territories [25, 34, 36, 39, 43, 44] also restricted the concealed carrying of particular weapons. These concealed weapons laws were intended to specifically address the rise in murders and assaults throughout the South at that time. Roth Decl., ¶ 23. Class and racial tensions in the region led to a dramatic increase in the number of deadly quarrels, property disputes, duels, and interracial killing during the period, and individuals turned to concealable weapons to ambush both ordinary citizens and political rivals, to bully or intimidate law-abiding citizens, and to seize the advantage in fist fights. *Id.* ¶¶ 23-24. In addition, several laws regulated the possession of gunpowder [343, 345, 346] and the setting of any trap gun [87].

In addition to prohibiting concealable, blunt weapons—which are dangerous weapons used mainly for criminal mischief—49 states (all except for New Hampshire) enacted restrictions on Bowie knives and other "fighting knives" in the 19th century, including around the time that the Fourteenth Amendment was ratified. *See* Spitzer Decl., ¶ 60 & Ex. C. Many state laws enacted during this time also included revolvers and pistols in their lists of proscribed weapons. *See* Roth Decl., ¶ 26 (discussing restrictions on the carrying of certain concealable weapons in Kentucky, Louisiana, Indiana, Georgia, and Virginia between 1813 and 1838). These laws aimed to curb the

1    use of concealable weapons that exacerbated rising homicide rates in the South and its

2    borderlands. *Id.*

3         Regulations from around the time of ratification of the Fourteenth Amendment further

4    demonstrate that states restricted weapons deemed to be particularly dangerous or susceptible to

5    criminal misuse. These regulations bear particular importance, because as noted in *Bruen*, the

6    Second Amendment was made applicable to the states not in 1791, but in 1868, with the

7    ratification of the Fourteenth Amendment. *See* 143 S. Ct. at 2138; *see also Alaniz*, 69 F.4th at

8    1129 (finding that a "historical tradition is well-established" based on the fact that "several States

9    enacted [analogous] laws throughout the 1800s"); *Ezell v. City of Chicago*, 651 F.3d 684, 704

10   (7th Cir. 2011) ("*McDonald* confirms that when state- or local-government action is challenged,

11   the focus of the original-meaning inquiry is carried forward in time; the Second Amendment's

12   scope as a limitation on the States depends on how the right was understood *when the Fourteenth*

13   *Amendment was ratified*." (emphasis added)); *Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1321

14   (11th Cir. 2023) (concluding that "Reconstruction Era historical sources are the most relevant to

15   our inquiry on the scope of the right to keep and bear arms").

16        Just two years before the ratification of the Fourteenth Amendment, New York prohibited

17   "furtively possess[ing]" and carrying any slungshot, billy, sandclub, metal knuckles, or dirk

18   [88].[19] And after 1868, governments continued to regulate enumerated, unusually dangerous

19   weapons, including trap guns [104], restricting the carrying and use of certain specified weapons

20   [98-143], and taxing certain weapons, like Bowie knives [108, 122, 125, 126, 127].

21        Further, state constitutions adopted during Reconstruction expressly linked the right to keep

22   and bear arms to the state's authority to regulate arms: "Every person shall have the right to keep

23   and bear arms, in the lawful defence of himself or the government, under such regulations as the

24   Legislature may prescribe." Cornell Decl., ¶ 49 (quoting Tex. Const. of 1868, art. I, § 13); *see*

25   _____

26        [19] Additionally, laws restricting unauthorized militias "demonstrate[] the government's
     concern with the danger associated with assembling the amount of firepower capable of
27   threatening public safety—which, given firearm technology in the 1800s, could only arise
     collectively." *Oregon Firearms*, 2022 WL 17454829, at *14 (discussing *Presser v. People of*
28   *State of Ill.*, 116 U.S. 252, 253 (1886)).

*also id.* ¶ 22 n.73 (describing similar constitutional provisions in the Idaho Constitution of 1896

and the Utah Constitution of 1896). Additionally, during this period, the federal government

regulated access to particularly dangerous weapons, including the Henry and Winchester lever-

action repeating rifles that began to circulate in the postbellum period, and along with state

militias sought to prevent access to those weapons to insurrectionary groups and Native

Americans. *See* Vorenberg Decl., ¶¶ 7-10, 21-22, 63–64.

Thus, the dangerous weapons laws that proliferated before and after the ratification of the

Fourteenth Amendment provide substantial historical support for Section 32310's restrictions on

large-capacity magazines, which do not restrict possession of any firearm and leave other

magazines available for lawful self-defense (Busse Decl., ¶¶ 17-18, 21) and thus do not destroy

the right protected by the Second Amendment.

### d.   Late 19th and Early 20th Centuries (1878–1930s)

From the end of Reconstruction to the end of the 19th century, states and localities

continued to enact restrictions on certain enumerated weapons deemed to be uniquely dangerous,

like slungshots and Bowie knives [145, 153, 154, 171, 206, 210, 211, 214, 217, 221, 222, 224,

236, 243, 250, 252, 269, 273-275]. In 1881, Illinois enacted a prohibition on the possession of a

slungshot or metallic knuckles [158]. And in 1885, the Territory of Montana prohibited

possession of certain weapons, including dirks and sword canes [183].

During the early 20th century, dangerous weapons laws continued to be enacted, including

more prohibitions on the possession of certain weapons. [248, 249, 253, 257, 264-265, 269, 275,

294, 295, 304, 321]. Notably, when semiautomatic and automatic weapons began to circulate

more widely in society and appear more frequently in crime in the 1920s, *see* Spitzer Decl., ¶ 11

(describing the St. Valentine's Day Massacre), states began to regulate semiautomatic and

automatic weapons capable of firing a certain number of rounds successively and weapons

capable of receiving ammunition from feeding devices.

Indeed, thirteen states enacted restrictions on semiautomatic or fully automatic firearms

capable of firing a certain number of rounds without reloading; eight states regulated fully

automatic weapons, defined as a firearm capable of firing a certain number of rounds without

1  reloading or accepting an ammunition feeding device; and four states restricted all guns that could

2  receive any type of ammunition feeding mechanism or round feeding device and fire them

3  continuously in a fully automatic manner, including a 1927 California law. *See* Spitzer Decl.,

4  ¶¶ 13–14; 1927 Cal. Stat. 938. Additionally, in 1932, Congress enacted a twelve-shot restriction

5  on semiautomatic weapons in the District of Columbia. Pub. L. No. 275, 1932 – 72d Cong., Sess.

6  I, chs. 465, 466. And in 1934, Congress passed the National Firearms Act, significantly restricting

7  fully automatic weapons. Spitzer Decl., ¶ 16.

8       These early 20th century firearm regulations followed the same regulatory pattern of state

9  and federal restrictions on large-capacity magazines in the late 20th century after the rise in mass

10  shootings. *See* Spitzer Decl., ¶¶ 9–10. These laws were also similar to the regulatory approaches

11  to addressing the prevalence of concealable weapons in crime and homicide before the 20th

12  century and even before the Founding, and thus are relevant to the *Bruen* analysis because they

13  are consistent with earlier enacted laws which identified certain types of weapons for heightened

14  regulation. *Cf. Bruen*, 142 S. Ct. at 2154 n.28 (discounting probative value of 20th century laws

15  that "contradict[ed] earlier evidence"). These 20th century laws are uniquely relevant to this case

16  because they were enacted around the time in which comparable firearms technology appeared

17  and began to circulate widely in society. *See Hanson*, 2023 WL 3019777, at *16 (finding that "the

18  1920s and 1930s regulations do not contradict any earlier evidence . . . because semiautomatic

19  and high-capacity weapons were not technologically feasible and commercially available in

20  meaningful quantities until the early 1900s").

21       **2.    The Surveyed Weapons Restrictions Are Relevantly Similar to
            Section 32310**

22
       The surveyed dangerous weapons laws enacted from the pre-founding era through the early
23
24  20th century are relevantly similar to Section 32310 in light of their comparable burdens and

25  justifications in at least three significant ways.

26       ***First***, the gunpowder and loaded-weapon restrictions enacted since the founding-era [339,

27  340, 343, 344–347] are relevantly similar to the magazine-capacity limit challenged here. The

28  gunpowder restrictions regulated possession, including inside the home. Cornell Decl., ¶ 47. Just

1   as a 10-round magazine capacity limits the amount of firepower that can be used in self-defense

2   (without reloading), historical gunpowder storage requirements limited the firepower that could

3   be exerted for self-defense. But the gunpowder storage laws were far more burdensome than

4   limits on detachable magazines, particularly Massachusetts' 1783 prohibition on the possession of

5   a loaded firearm [339], because the time-consuming nature of having to load a gun, Cornell Decl.,

6   ¶ 29, meant that this prohibition imposed a significant burden on one's ability to have a functional

7   firearm available for self-defense in the home. And in a direct parallel to modern magazine-

8   capacity limits, gunpowder storage requirements limited the amount of gunpowder that could be

9   kept in the functional equivalent of founding-era "magazines," which at the time were

10   storehouses used for storing gunpowder. Baron Decl. ¶ 23. By preventing explosions or fires,

11   these laws sought to protect the public from mass-casualty incidents and minimize the threat of

12   harm.

13       ***Second***, the dangerous weapons laws [1–4, 6], including the restrictions on concealable

14   weapons enacted during the 1800s are also relevantly similar to the law challenged here. Those

15   restrictions on certain unusually dangerous weapons imposed a comparably modest burden on

16   Second Amendment rights because like the LCM restrictions here, those laws did not restrict

17   weapons that are well suited to self-defense, and they left available alternative weapons to be

18   used for effective and lawful self-defense. *See Oregon Firearms II,* 2023 WL 4541027, at *39

19   (determining that the ban on possession of large-capacity magazines imposed a comparable

20   burden on "the right to self-defense" as laws regulating "certain types of weapons, such as Bowie

21   knives, blunt weapons, slingshots, and trap guns because they were dangerous weapons

22   commonly used for criminal behavior and not for self-defense"); *id.* at [page] n.19 (crediting a

23   substantially similar declaration of Professor Spitzer as the one filed in this case). And these

24   concealed weapons laws targeted the specific types of weapons that were commonly used in the

25   murders and serious assaults that caused an alarming rise in homicides at the time, Roth Decl., ¶

26   23, just as Section 32310 is justified because it regulates a weapon accessory that is used

27   frequently in mass shootings and leads to greater numbers of casualties when that accessory is

28   used, Klarevas Decl., ¶¶ 13-14 & figs. 3-4.

34

1     ***Third***, the prohibitions on the setting of trap guns are also relevantly similar to LCM

2     restrictions. They regulate possession of firearms, even inside the home, and the manner in which

3     they could be configured [10, 80, 109, 121, 168]. Spitzer Decl. ¶¶ 72-75. But the burden on the

4     right to armed self-defense was minimal because the firearms themselves could still be operated

5     for self-defense without being configured in a way to fire remotely, just as Section 32310 does

6     not prohibit the use of firearms with magazines capable of holding ten or fewer rounds for lawful

7     self-defense. These laws sought to prevent unnecessary gunshot injuries and death, as well as

8     unintended harm. *See Kolbe*, 849 F.3d at 127.

9     In sum, even assuming that Plaintiffs' proposed course of conduct—the possession and use

10    of LCMs—is covered by the Second Amendment, Section 32310 is consistent with the nation's

11    tradition of firearm regulation. As such, judgment should be entered in Defendants' favor on the

12    Second Amendment claim.

13    **III.   THE TAKINGS CLAUSE CLAIM FAILS.**

14    The Ninth Circuit en banc panel in *Duncan* reversed the *Duncan* district court's holding

15    that California's LCM restrictions violated the Takings Clause. 19 F.4th at 1111. In doing so, the

16    en banc panel held that Section 32310 reflects neither a *per se* nor a regulatory taking. *Bruen* did

17    nothing to undermine that holding (which itself was based on long-standing Ninth Circuit

18    precedent), and thus the result here should be the same: Defendants should be granted judgment

19    on Plaintiffs' Takings claim.

20    Section 32310 does not effect a *per se* taking. There are two types of "per se" takings:

21    (1) permanent physical invasion of the property; and (2) a deprivation of all economically

22    beneficial use of the property. *Laurel Park Cmty., LLC v. City of Tumwater*, 698 F.3d 1180, 1188

23    (9th Cir. 2012). First, Section 32310 plainly does not cause the permanent physical invasion of

24    any property. As the Ninth Circuit en banc panel in *Duncan* noted, "the government here in no

25    meaningful sense takes title to, or possession of, the item, even if the owner of a magazine

26    chooses not to modify the magazine, remove it from the state, or sell it." 19 F.4th at 1113. "That

27    California opted to assist owners in the safe disposal of large-capacity magazines by empowering

28    law enforcement agencies to accept magazines voluntarily tendered for destruction does not

35

1  convert the law into a categorical physical taking." *Id*. (quotation omitted). *Bruen* did not address

2  the Takings Clause, and thus does not undermine the reasoning of the Ninth Circuit's en banc

3  opinion finding that Section 32310 does not affect a physical taking. *See Oregon Firearms II*,

4  2023 WL 4541027, at *49-50 (relying on the Ninth Circuit's en banc opinion in *Duncan* and

5  finding that Oregon's LCM ban does not give rise to a takings claim).

6        Even if Section 32310 caused the permanent physical invasion of any property (which it

7  does not), Plaintiffs' per se Takings Clause claim would still fail because, as this Court has

8  previously recognized, "[a] long line of federal cases has authorized the taking or destruction of

9  private property in the exercise of the state's police power without compensation." Dkt. 52 (Order

10  Denying Mot. for Prelim. Injunction), at 14 ("Plaintiffs have not cited, and the court is unaware

11  of, any case holding that a complete ban on personal property deemed harmful to the public by

12  the state is a taking for public use which requires compensation."); *see also Akins v. United*

13  *States*, 82 Fed. Cl. 619, 623–24 (2008) (holding that restrictions on sale and possession of device

14  deemed to be a machine gun is not a taking (collecting cases)); *Fesjian v. Jefferson*, 399 A.2d

15  861, 865-66 (D.C. Ct. App. 1979) (holding that a ban on machine guns with various disposal

16  options is not a taking).

17        Unlike cases in which the government has permanently and physically occupied or

18  appropriated private property for its own use, *see Horne v. Dep't of Agriculture*, 135 S. Ct. 2419,

19  2427–29 (2015); *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 432, 434–35

20  (1982), Section 32310 is a valid exercise of the State's police powers to protect the public by

21  eliminating the dangers posed by LCMs. *See supra*, p. 25. The purpose of the statute is to remove

22  LCMs from circulation in the State, not to transfer title to the government or an agent of the

23  government for use in service of the public good. Cal. Penal Code § 32310(d). The Third Circuit

24  rejected a similar takings challenge to New Jersey's law prohibiting previously legal LCMs,

25  observing that the state's "LCM ban seeks to protect public safety and therefore it is not a taking

26  at all." *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey*, 910 F.3d 106, 124

27  n. 32 (3d Cir. 2018), *abrogated by Bruen*, 142 S. Ct. 2111 (2022).

28

Moreover, only one of the disposal options listed in section 32310(d) would result in the transfer of grandfathered LCMs to the government—for destruction and not for use by law enforcement. Owners of grandfathered LCMs have other options to comply with the statute, including modifying their LCMs permanently to hold no more than ten rounds. Cal. Penal Code § 16740(a).[20] Because LCM owners can keep their property and comply with Section 32310, "[t]here is no actual taking." *ANJRPC v. New Jersey*, 910 F.3d 106, 124 (3d. Cir. 2018). And while Plaintiffs argue that sale or removal are "economically and practically, untenable," MPA at 26, this Court has already found that the "impracticality of any particular option . . . does not transform the regulation into a physical taking." Dkt No. 74 (Order Granting Mot. to Dismiss 2d Am. Compl.), at 11.

In addition, Section 32310 does not affect a regulatory taking, because LCM owners are permitted to sell the LCMs they possess or remove them from the State. In *Duncan* decision, the en banc panel of the Ninth Circuit held that Section 32310 "plainly does not deprive an owner of all economically beneficial use of the property," 19 F.4th at 1112, given that California law gives LCM owners the right to sell it to a firearms dealer or remove the magazine to another state.

Because Section 32310 effects neither a per se nor a regulatory taking, this Court should enter judgment for Defendants on the Takings Clause claim.

## IV.   THE DUE PROCESS CLAIM FAILS.

Judgment should be entered for Defendants on the due process claim because Section 32310 is not retroactive and does not criminalize past LCM possession. And consistent with the Second Amendment and Takings Clause analysis, the possession ban was enacted under the State's police powers in pursuit of plainly legitimate government objectives.

Plaintiffs contend that the "ban as enacted is a complete and retroactive ban." MPA at 30. Not so. Instead, the law applies prospectively and would penalize individuals who fail to comply

---

[20] Plaintiffs attempt to read the modification option out of Penal Code section 16740 by arguing that there are only three options (*i.e.*, removal, sale, or surrender) under the statute (MPA at 4), but the Ninth Circuit has already recognized that modification is one of the four options available to LCM possessors under the law. *Duncan*, 19 F.4th at 1113.

1   with section 32310(d) in the future; the statute does not penalize anyone for past conduct. Cal.

2   Penal Code § 32310(c).

3        Contrary to Plaintiffs' assertion that "the State was wrong in baselessly pursuing this ban in

4   a claimed exercise of its 'police power,'" MPA at 32, Section 32310 also serves compelling

5   public safety goals. A regulation that fails to serve any legitimate governmental objective may be

6   so arbitrary that it violates the Due Process Clause, but regulations "survive a substantive due

7   process challenge if they were designed to accomplish an objective within the government's

8   police power, and if a rational relationship existed between the provisions and purpose" of the

9   regulations. *Levald, Inc. v. City of Palm Desert*, 998 F.2d 680, 690 (9th Cir. 1993) (quotation

10   omitted).

11   **V.    THE EQUAL PROTECTION CLAIM FAILS.**

12        In addition, the Court should enter judgment for Defendants on the equal protection claim.

13   This Court had initially ruled in Defendants' favor in dismissing this claim when it was raised in

14   the Second Amended Complaint, finding that rational basis review applied to the equal protection

15   claim, and that the "California electorate could have rationally believed that large capacity

16   magazines used solely as props were not at risk of being used in mass shootings and that such an

17   exception would benefit an important sector of the California economy." Dkt. No. 74 at 22–23.

18   This Court declined to dismiss the equal protection claim raised in the Third Amended Complaint

19   only because the decision of the three-judge panel in *Duncan* affirming the granting of the

20   preliminary injunction in that case "compel[led] this court to deny defendants' motion to dismiss

21   the Third Amended Complaint's equal protection claim." Dkt. No. 103 at 6. Given that the

22   panel's decision has been vacated (and, in any event, the *Duncan* plaintiffs did not raise an equal

23   protection claim), this Court should adopt its prior holding dismissing this claim, *see* Dkt. No. 74

24   at 20–23.

25

26

27

28

38

1   **VI.   IF THE COURT FINDS THAT CALIFORNIA'S RESTRICTIONS ON LARGE-CAPACITY**
    **MAGAZINES ARE UNCONSTITUTIONAL, THE COURT SHOULD STAY ENFORCEMENT**
2   **OF THE JUDGMENT PENDING APPEAL.**

3         As discussed, the uncontroverted evidence demonstrates that Section 32310 is

4   constitutional as a matter of law. Nevertheless, if the Court were inclined to enter judgment

5   holding that Section 32310 violates the Second Amendment (or another constitutional provision),

6   Defendants respectfully request that the Court stay enforcement of any such judgment pending

7   appeal. All four factors that courts consider in evaluating a request to stay pending appeal weigh

8   in favor of the Defendants' request for a stay. *See Humane Soc'y of U.S. v. Gutierrez*, 558 F.3d

9   896, 896 (9th Cir. 2009) ("A party seeking a stay must establish [1] that he is likely to succeed on

10  the merits, [2] that he is likely to suffer irreparable harm in the absence of relief, [3] that the

11  balance of equities tip in his favor, and [4] that a stay is in the public interest." (citing *Winter v.*

12  *Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008))). On the first factor, the party seeking the

13  stay "need not demonstrate that it is more likely than not they will win on the merits," but rather

14  must show only "a reasonable probability" or "fair prospect" of success. *Fed. Trade Comm'n v.*

15  *Qualcomm Inc.*, 935 F.3d 752, 755 (9th Cir. 2019) (granting partial stay of injunction pending

16  appeal where the party seeking a stay showed "the presence of serious questions on the merits of

17  the district court's determination").

18        **First**, Defendants meet the serious questions going to the merits standard for the Second

19  Amendment claim. Regardless of the outcome, this case will be among the first opportunities for

20  the Ninth Circuit (or any other Circuit) to address the constitutionality of LCM restrictions post-

21  *Bruen*. At a minimum, this case presents a serious and novel question in the Ninth Circuit, and

22  thus satisfies the first factor for a stay pending appeal where, as here, the equities tip strongly in

23  favor of granting a stay.

24        **Second**, absent a stay, Defendants and the State of California will be irreparably injured as

25  a matter of law. LCMs have been illegal to manufacture, import, keep or offer for sale, give, or

26  lend in California since 2000; if the Court were to enter judgment in Plaintiffs' favor, individuals

27  who have been prevented from acquiring large-capacity magazines for nearly twenty years will be

28  able to lawfully acquire them. And significant numbers of LCMs could come into the State,

39

1  effectively defeating the purpose of the law even if it were later upheld on appeal. *See* Matthew

2  Green, *Gun Groups: More Than a Million High-Capacity Magazines Flooded California During*

3  *Weeklong Ban Suspension*, KQED.org, Apr. 12, 2019, *available at* https://bit.ly/3wfinEU.

4  Additionally, Defendants suffer irreparable harm when a duly enacted law is enjoined from

5  enforcement during an appeal if the law is ultimately sustained.

6      **Third**, the balance of harms favors Defendants. While a stay will delay the relief that

7  Plaintiffs seek in this action, acquisition of LCMs has been unlawful for nearly two decades; any

8  additional delay pending appeal would be comparatively minor and would preserve the status quo

9  until this matter is finally resolved. While any delay in the enjoyment of a constitutional right will

10  involve a burden to those who wish to exercise it, if a judgment issued by this Court in Plaintiffs'

11  favor is affirmed on appeal, any such burden would be relatively modest in comparison to the

12  substantial burden that will be imposed on the State if the acquisition of new LCMs is permitted

13  during the appeal.

14      **Fourth**, the public interest strongly favors staying any judgment pending appeal. A stay

15  pending appeal will preserve the status quo involving an important public-safety law that has

16  been in effect for nearly two decades while the Ninth Circuit considers this complex Second

17  Amendment challenge. *See Boland v. Bonta,* Dkt. No. 7, Case No. 23-55276 (9th Cir. Apr. 3,

18  2023) (granting the Attorney General's motion for an emergency stay where the district court had

19  granted a preliminary injunction enjoining enforcement of certain requirements in the Unsafe

20  Handgun Act but had not stayed its ruling pending appeal (instead only staying the case to allow

21  time for the State to seek a stay from the Ninth Circuit)).

22                                   **CONCLUSION**

23      For the foregoing reasons, the Court should deny Plaintiffs' summary judgment motion on

24  all claims, grant Defendants' counter-motion for summary judgment, and enter judgment in

25  Defendants' favor.

26  //

27  //

28

Dated:  August 18, 2023

Respectfully submitted,

ROB BONTA
Attorney General of California
MARK R. BECKINGTON
Supervising Deputy Attorney General
JOHN D. ECHEVERRIA
Deputy Attorney General


/s/ Robert L. Meyerhoff
ROBERT L. MEYERHOFF
Deputy Attorney General
*Attorneys for Defendants Rob Bonta in his
official capacity as Attorney General of the
State of California and Allison Mendoza in
her Official Capacity as Director of the
Bureau of Firearms*

Defendants' Amended Opposition and Counter-Motion for Summary Judgment
(Case No. 2:17-cv-00903-WBS-KJN)