1 | ROB BONTA
Attorney General of California
2 | MARK R. BECKINGTON
Supervising Deputy Attorney General
3 | JOHN D. ECHEVERRIA
Deputy Attorney General
4 | ROBERT L. MEYERHOFF
Deputy Attorney General
5 | State Bar No. 298196
  300 South Spring Street, Suite 1702
6 |   Los Angeles, CA  90013-1230
  Telephone:  (213) 269-6177
7 |   Fax:  (916) 731-2144
  E-mail: Robert.Meyerhoff@doj.ca.gov
8 | *Attorneys for Defendants Rob Bonta in his official capacity as Attorney General of the State of California and Allison Mendoza in her Official Capacity as Director of the Bureau of Firearms*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **WILLIAM WIESE, et al.,**<br><br>                      Plaintiffs,<br><br>v.<br><br>**ROB BONTA, et al.,**<br><br>                      Defendants. | Case No. 2:17-cv-00903-WBS-KJN<br><br>**DEFENDANTS' STATEMENT OF UNDISPUTED FACT IN SUPPORT OF THEIR OPPOSITION TO MOTION FOR SUMMARY JUDGMENT AND COUNTER-MOTION FOR SUMMARY JUDGMENT**<br><br>Date:        October 30, 2023<br>Time:       1:30 p.m.<br>Courtroom:5,  14th Floor<br>Judge:      Hon. William B. Shubb |

1

In accordance with Federal Rule of Civil Procedure 56 and Local Rule 260(a), Defendants Rob Bonta, Attorney General of the State of California, and Allison Mendoza, Director of the Bureau of Firearms, sued in their official capacities (Defendants), submit the following Statement of Undisputed Facts in support of their Amended Opposition to Plaintiffs' Motion for Summary Judgment and Counter-Motion for Summary Judgment, filed concurrently herewith (Defendants' Opposition and Counter-Motion).

| | **Undisputed Fact** | **Document Relied on to Establish that Fact** |
|---|---|---|
| 1. | LCMs are not weapons in and of themselves. | Busse Decl., ¶ 13; Lee Decl., Dkt. 123-4, at 5-6. |
| 2. | An LCM is not necessary to operate any firearm, much less any firearm commonly used for self-defense. | Busse Decl., ¶ 18. |
| 3. | Section 32310's restrictions on large capacity magazines do not restrict possession of any firearm and leave other magazines available for lawful self-defense. | Busse Decl., ¶¶ 17-18, 21. |
| 4. | An analysis of incidents reported in the NRA Armed Citizens database compiled from January 2011 through May 2017 reveals that it is rare for individuals to defend themselves using more than ten rounds; on average, only 2.2 shots were fired by defenders. | Allen Supp. Decl., ¶ 10. |
| 5. | An analysis of incidents from the NRA Armed Citizens database found that more than 10 bullets were fired in only 2 out of 736 self-defense incidents in the United States. | Allen Supp. Decl., ¶ 10. |
| 6. | An analysis of published news stories revealed a similar number of average shots per incident of self-defense (*i.e.*, 2.34). | Allen Supp. Decl., ¶ 18. |
| 7. | An analysis of published news stories found that in 97.3% of incidents the defender fired 5 or fewer shots, and that there were no incidents where the defender was reported to have fired more than 10 bullets. | Allen Supp. Decl., ¶ 19. |
| 8. | Detachable large-capacity magazines allow the combat rifleman to rapidly change magazines in combat, and thus to increase killing efficiency by significantly reducing reload time. Changing magazines during intense combat is the most important individual skill taught to Marines. During | Tucker Decl., ¶ 16. |

2

| | | |
|---|---|---|
| | intense combat, the detachable magazine provides a rifleman the capability to fire 180 rounds on semi-automatic in four minutes at a high-sustained rate of 45 rounds per minute.  In a civilian self-defense context, by contrast, an individual would not have a need for such a high rate of fire. | |
| 9. | LCMs enable an individual to have a sustained rate of 45 rounds per minute, and fire 180 rounds on semi-automatic in four minutes. | Tucker Decl., ¶ 16; Roth Decl., ¶ 49. |
| 10. | Many LCMs are detachable, which enables a sustained rate of fire over a period of minutes. | Tucker Decl., ¶ 16; Roth Decl., ¶ 49. |
| 11. | LCMs can be quickly and easily changed to maintain "a sustained or rapid sustained rate of fire." | Tucker Decl., ¶ 15. |
| 12. | When LCMs began to circulate more widely in the 1980s, they were regarded as military accessories. | Busse Decl., ¶ 36. |
| 13. | Today, a "new semiautomatic handgun can be purchased for less than $200 and equipped with a 33-round magazine for less than $15." | Roth Decl., ¶ 50. |
| 14. | Historically, the term "Arms" referred to "weapons such as swords, knives, rifles, and pistols," and did not include "accoutrements," like "ammunition containers, flints, scabbards, holsters, or 'parts' of weapons." | Baron Decl., ¶ 8. |
| 15. | Founding-era "magazines," which at the time were storehouses used for storing gunpowder. | Baron Decl. ¶ 23. |
| 16. | It was time-consuming to load a gun in the late 18th and early 19th century. | Cornell Decl., ¶ 29. |
| 17. | The early repeaters were "extraordinarily rare." | Sweeney Decl., ¶ 23; Cornell Decl., ¶ 26; DeLay Decl., ¶ 7. |
| 18. | There is no evidence that many early repeating firearms were commercially available. | Sweeney Decl., ¶¶ 24, 28, 29, 49; DeLay Decl., ¶ 36. |
| 19. | Early attempts at repeating firearms had a paltry rate of fire. | Sweeney Decl., ¶¶ 24, 34, 45. |
| 20. | It is difficult to even estimate the cost of these early repeaters, given their rarity. | Sweeney Decl., ¶ 47. |
| 21. | Reloading the early repeaters identified by Plaintiffs was an arduous process. | Cornell Decl., ¶¶ 29, 44; DeLay Decl., ¶ 31; Sweeney Decl. ¶ 24 n.48; Spitzer Decl., ¶28. |
| 22. | In 1800, it "was still not possible to manufacture with precision and in any quantity firearms with closely fitting parts that could contain the destructive explosive potential associated with the use of black powder gunpowder" that repeaters required. | Sweeney Decl., ¶ 50. |
| 23. | The early attempts at repeating rifles in some ways more closely resemble trap guns than LCMs. | Sweeney Decl., ¶¶ 31, 46. |

3

| | | | |
|---|---|---|---|
| | 24. | The historical record is replete with reference to faultiness of these repeaters. | Cornell Decl., ¶ 44; Sweeney Decl., ¶ 27, 37, 43; DeLay Decl., ¶¶ 15, 30. |
| | 25. | Similarly, "high-capacity firearms," like the Henry and Winchester rifles, were understood during the era of Reconstruction to be weapons of war or anti-insurrection, not weapons of individual self-defense. | Vorenberg Decl., ¶ 7. |
| | 26. | During Reconstruction, the only bearable, high-capacity firearms capable of firing more than 10 rounds were the lever-action Henry Rifle and the Winchester Repeating Rifle (the Winchester 66 and Winchester 73 models), which were capable of holding 15 rounds in a fixed chamber within the firearm. | Vorenberg Decl., ¶¶ 20-21. |
| | 27. | The Henry and Winchester repeaters were not adopted by the Union or Confederate militaries during the Civil War and were not commonly acquired by soldiers returning from the Civil War. | Vorenberg Decl., ¶¶ 24. |
| | 28. | Following the Civil War, the circulation of Henry and Winchester lever-action repeating rifles remained low, with few documented instances of possession by civilians. | Vorenberg Decl., ¶¶ 27. |
| | 29. | By the time the Fourteenth Amendment was ratified, the commercial viability of the Winchester Model 1866 was due "almost entirely to sales to foreign armies," not to Americans. | Vorenberg Decl., ¶ 50; DeLay Decl., ¶ 67. |
| | 30. | In 1868 these repeating rifles accounted for less than 0.002% of guns in the United States. | DeLay Decl., ¶ 7. |
| | 31. | There are no known shooting incidents involving ten or more fatalities before 1949, and the number of such double-digit mass shootings increased dramatically in the period before and after the federal assault weapons ban, mass shootings being defined as shootings resulting in four or more victims being shot (fatally or nonfatally), regardless of location or underlying motive. | Klarevas Decl., ¶¶ 16-19 & n.7, tbl. 4. |
| | 32. | From the colonial period to the early 20th century, mass killings were generally committed by groups of people because technological limitations constrained the ability of a single person to commit mass murder. | Roth Decl., ¶ 41. |
| | 33. | The development and proliferation of semiautomatic and automatic firearms technologies in the 1920s and 1930s substantially increased the amount of carnage an individual could inflict, which led to government regulation of those technologies. | Spitzer Decl., ¶¶ 50-51; Roth Decl., ¶ 47. |

| | | | |
|---|---|---|---|
| | 34. | This increased lethality has only accelerated over the past several decades. | Donohue Decl., ¶ 54. |
| | 35. | LCMs in particular have greatly enhanced the lethality of mass shootings when they occur. | Supp. Allen Decl., ¶¶ 27-28; Roth Decl., ¶¶ 49-51; Klarevas Decl., ¶ 14. |
| | 36. | Of all the shootings in American history involving 14 or more fatalities, 100% involved the use of LCMs. | Klarevas Decl. ¶ 14 & tbl. 4. |
| | 37. | If one looks at the deadliest acts of intentional mass violence in the United States since 9/11, they all share one feature. The killer in every case used a weapon equipped with a high-capacity magazine. | Donohue Decl., ¶ 30. |
| | 38. | Just in the past two years, the United States has experienced numerous, devastating mass shootings with firearms equipped with large-capacity magazines, including the March 16, 2021 Atlanta spa shootings (8 killed), the March 22, 2021 shooting at King Soopers supermarket in Boulder, Colorado (10 killed); the April 15, 2021 shooting at an Indianapolis FedEx warehouse (8 killed); the May 26, 2021 shooting at a transportation authority facility in San Jose, California (9 killed); the May 14, 2022 supermarket shooting in Buffalo, New York (10 killed); the May 24, 2022 shooting at Robb Elementary School in Uvalde, Texas (19 children and 2 adults killed); the July 4, 2022 shooting at a Fourth of July parade in Highland Park, Illinois (7 killed), the November 20, 2022 shooting in a Colorado Springs nightclub in which five people were killed and 17 wounded, the November 22, 2022 shooting at a Virginia Walmart that left 7 dead, the January 2023 shooting at a dance studio in Monterey Park, California that killed 11 and wounded nine others, the March 2023 shooting at the elementary school in Nashville that killed six, including three 9-year-old children; and the April 10, 2023 shooting at a Louisville bank that killed five. | Donohue Decl., ¶ 22. |
| | 39. | In the 18th and 19th centuries, laws required gunpowder to be stored on the top floor of a building and permitted government officials to remove it when necessary to prevent explosions and to transfer the powder to the public magazine. | *See* Cornell Decl., ¶ 47. |
| | 40. | During the colonial period, states began to enact restrictions on "trap guns," laws that proliferated in the 19th century. | Spitzer Decl., ¶¶ 72-75, & Exs. B & F. |
| | 41. | A trap gun was a firearm that was configured in a way to fire remotely (without the user operating the | Spitzer Decl., ¶ 72. |

5

| | | |
|---|---|---|
| | firearm), typically by rigging the firearm to be fired by a string or wire when tripped. | |
| 42. | Trap guns were used to protect personal or commercial property. | Spitzer Decl., ¶ 73. |
| 43. | Just as Massachusetts prohibited the storage of loaded guns inside the home to prevent accidental harm, trap gun laws regulated the manner in which firearms could be kept and configured to protect the public from harm. | Spitzer Decl., 75 & Exs. B & F. |
| 44. | As homicide rates increased in the South in the early 1800s, states began restricting the carrying of certain concealable weapons. | Roth Decl., ¶ 23; Spitzer Decl., ¶ 55; Rivas Decl., ¶¶ 15-17. |
| 45. | These concealed weapons laws targeted the specific types of weapons that were commonly used in the murders and serious assaults that caused an alarming rise in homicides at the time. | Roth Decl., ¶ 23. |
| 46. | Throughout this period, states enacted a range of laws restricting the carrying of blunt weapons: 12 states restricted "bludgeons"; 14 states restricted "billies"; seven states restricted "clubs"; 43 states restricted "slungshots"; six states restricted "sandbags"; and 12 states broadly restricted any concealed weapon. | Spitzer Decl., ¶¶ 56-62 & Ex. C. |
| 47. | From 1813 to the Mexican War, numerous states and territories also restricted the concealed carrying of particular weapons. These concealed weapons laws were intended to specifically address the rise in murders and assaults throughout the South at that time. | Roth Decl., ¶ 23. |
| 48. | Class and racial tensions led to a dramatic increase in the number of deadly quarrels, property disputes, duels, and interracial killing during the period, and individuals turned to concealable weapons to ambush both ordinary citizens and political rivals, to bully or intimidate law-abiding citizens, and to seize the advantage in fist fights. | Roth Decl., ¶¶ 23-24. |
| 49. | In addition to prohibiting concealable, blunt weapons—which are dangerous weapons used mainly for criminal mischief—49 states (all except for New Hampshire) enacted restrictions on Bowie knives and other "fighting knives" in the 19th century, including around the time that the Fourteenth Amendment was ratified. | Spitzer Decl., ¶ 60 & Ex. C. |
| 50. | Many state laws enacted during the 19th century also included revolvers and pistols in their lists of proscribed weapons. | Roth Decl., ¶ 26 |

| | | |
|---|---|---|
| 51. | These laws aimed to curb the use of concealable weapons that exacerbated rising homicide rates in the South and its borderlands. | Roth Decl., ¶ 26 |
| 52. | State constitutions adopted during Reconstruction expressly linked the right to keep and bear arms to the state's authority to regulate arms: "Every person shall have the right to keep and bear arms, in the lawful defence of himself or the government, under such regulations as the Legislature may prescribe." | Cornell Decl., ¶ 22 n.73; *id.* at ¶ 49. |
| 53. | During this period, the federal government regulated access to particularly dangerous weapons, including the Henry and Winchester lever-action repeating rifles that began to circulate in the postbellum period, and along with state militias sought to prevent access to those weapons to insurrectionary groups and Native Americans. | Vorenberg Decl., ¶¶ 7-10, 21-22, 63-64. |
| 54. | Notably, when semiautomatic and automatic weapons began to circulate more widely in society and appear more frequently in crime in the 1920s, states began to regulate semiautomatic and automatic weapons capable of firing a certain number of rounds successively and weapons capable of receiving ammunition from feeding devices. | Spitzer Decl., ¶¶ 11, 13. |
| 55. | Thirteen states enacted restrictions on semiautomatic or fully automatic firearms capable of firing a certain number of rounds without reloading; eight states regulated fully automatic weapons, defined as a firearm capable of firing a certain number of rounds without reloading or accepting an ammunition feeding device; and four states restricted all guns that could receive any type of ammunition feeding mechanism or round feeding device and fire them continuously in a fully automatic manner, including a 1927 California law. | Spitzer Decl., ¶¶ 13–14. |
| 56. | These early 20th century firearm regulations followed the same regulatory pattern of state and federal restrictions on large-capacity magazines in the late 20th century after the rise in mass shootings. | Spitzer Decl., ¶¶ 9-10. |
| 57. | Section 32310 is justified because it regulates a weapon accessory that is used frequently in mass shootings and leads to greater numbers of casualties when that accessory is used. | Roth Decl., ¶ 23; Klarevas Decl., ¶¶ 13-14 & figs. 3-4. |

| | |
|---|---|
| Dated: August 18, 2023 | Respectfully submitted, |
| | ROB BONTA<br>Attorney General of California<br>MARK R. BECKINGTON<br>Supervising Deputy Attorney General<br>JOHN D. ECHEVERRIA<br>Deputy Attorney General |
| | /s/ Robert L. Meyerhoff<br>ROBERT L. MEYERHOFF<br>Deputy Attorney General<br>*Attorneys for Defendants Rob Bonta in his official capacity as Attorney General of the State of California and Allison Mendoza in her Official Capacity as Director of the Bureau of Firearms* |