1  Rob Bonta
   Attorney General of California
2  Mark R. Beckington
   Supervising Deputy Attorney General
3  Robert L. Meyerhoff
   Deputy Attorney General
4  State Bar No. 298196
    300 South Spring Street, Suite 1702
5   Los Angeles, CA  90013-1230
    Telephone:  (213) 269-6177
6   Fax:  (916) 731-2144
    E-mail:  Robert.Meyerhoff@doj.ca.gov
7  *Attorneys for Defendants Rob Bonta in*
   *his official capacity as Attorney*
8  *General of the State of California and*
   *Allison Mendoza in her Official*
9  *Capacity as Director of the Bureau of*
   *Firearms*
10
11
12             IN THE UNITED STATES DISTRICT COURT

13            FOR THE EASTERN DISTRICT OF CALIFORNIA

14                    SACRAMENTO DIVISION

15

16  **WILLIAM WIESE, et al.,**              Case No. 2:17-cv-00903-WBS-KJN

17                         Plaintiffs,

18                                          **DECLARATION OF SAUL CORNELL IN**
           **v.**                           **SUPPORT OF DEFENDANTS'**
19                                          **OPPOSITION TO MOTION FOR**
                                            **SUMMARY JUDGMENT AND COUNTER-**
20  **ROB BONTA, et al.,**                  **MOTION FOR SUMMARY JUDGMENT**

21                         Defendants.      Date:     July 10, 2023
22                                          Time:     1:30 p.m.
                                            Courtroom:5, 14th Floor
23                                          Judge:    Hon. William B. Shubb

24

25

26

27

28
                                    1

1      **DECLARATION OF SAUL CORNELL**

2          I, Saul Cornell, declare under penalty of perjury that the

3      following is true and correct:

4          1.    I have been asked by the Attorney General's Office of

5      the California Department of Justice to provide an expert opinion

6      on the history of firearms regulation in the Anglo-American legal

7      tradition, with a particular focus on how the Founding era

8      understood the right to bear arms, as well as the understanding

9      of the right to bear arms held at the time of the ratification of

10     the Fourteenth Amendment to the United States Constitution.  In

11     *New York State Rifle & Pistol Ass'n Inc. v. Bruen*, the U.S.

12     Supreme Court underscored that text, history, and tradition are

13     the foundation of modern Second Amendment jurisprudence.  This

14     modality of constitutional analysis requires that courts analyze

15     history and evaluate the connections between modern gun laws and

16     earlier approaches to firearms regulation in the American past.

17     My report explores these issues in some detail.  Finally, I have

18     been asked to evaluate the statute at issue in this case,

19     particularly regarding its connection to the tradition of

20     firearms regulation in American legal history.

21         2.    This declaration is based on my own personal knowledge

22     and experience, and if I am called to testify as a witness, I

23     could and would testify competently to the truth of the matters

24     discussed in this declaration.

25                    **BACKGROUND AND QUALIFICATIONS**

26         3.    I am the Paul and Diane Guenther Chair in American

27     History at Fordham University.  The Guenther Chair is one of

28     three endowed chairs in the history department at Fordham and the

1

only one in American history.  In addition to teaching constitutional history at Fordham University to undergraduates and graduate students, I teach constitutional law at Fordham Law School.  I have been a Senior Visiting research scholar on the faculty of Yale Law School, the University of Connecticut Law School, and Benjamin Cardozo Law School.  I have given invited lectures, presented papers at faculty workshops, and participated in conferences on the topic of the Second Amendment and the history of gun regulation at Yale Law School, Harvard Law School, Stanford Law School, UCLA Law School, the University of Pennsylvania Law School, Columbia Law School, Duke Law School, Pembroke College Oxford, Robinson College, Cambridge, Leiden University, and McGill University.[1]

4.   My writings on the Second Amendment and gun regulation have been widely cited by state and federal courts, including the majority and dissenting opinions in *Bruen*.[2] My scholarship on this topic has appeared in leading law reviews and top peer-reviewed legal history journals. I authored the chapter on the right to bear arms in *The Oxford Handbook of the U.S. Constitution* and co-authored the chapter in *The Cambridge History of Law in America* on the Founding era and the Marshall Court, the period that includes the adoption of the Constitution and the

---

[1] For a full *curriculum vitae* listing relevant invited and scholarly presentations, *see* Exhibit 1.

[2] *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022).

1  Second Amendment.[3]  Thus, my expertise not only includes the

2  history of gun regulation and the right to keep and bear arms,

3  but also extends to American legal and constitutional history

4  broadly defined.  I have provided expert witness testimony in

5  *Rocky Mountain Gun Owners, Nonprofit Corp. v. Hickenlooper*, No.

6  14-cv-02850 (D. Colo.); *Chambers, v. City of Boulder*, No. 2018 CV

7  30581 (Colo. D. Ct., Boulder Cnty.), *Zeleny v. Newsom*, No. 14-cv-

8  02850 (N.D. Cal.), and *Miller v. Smith*, No. 2018-cv-3085 (C.D.

9  Ill.); *Jones v. Bonta*, 3:19-cv-01226-L-AHG (S.D. Cal.), 34 F.4th

10 704 (9th Cir. 2022); *Baird v. Bonta*, No. 2:19-cv-00617 (E.D.

11 Cal.); *Worth v. Harrington,* No. 21-cv-1348 (D. Minn.); *Miller v.*

12 *Bonta*, No. 3:19-cv-01537-BEN-JLB (S.D. Cal.); *Duncan v. Bonta*,

13 No. 17-cv-1017-BEN-JLB (S.D. Cal.).

14                    **RETENTION AND COMPENSATION**

15      5.   I am being compensated for services performed in the

16 above-entitled case at an hourly rate of $500 for reviewing

17 materials, participating in meetings, and preparing reports; $750

18 per hour for depositions and court appearances; and an additional

19 $100 per hour for travel time.  My compensation is not contingent

20 on the results of my analysis or the substance of any testimony.

21              **BASIS FOR OPINION AND MATERIALS CONSIDERED**

22      6.   The opinion I provide in this report is based on my

23 review of the amended complaint filed in this lawsuit, my review

24

25      [3] Saul Cornell, *The Right to Bear Arms*, *in* THE OXFORD HANDBOOK OF
   THE U.S. CONSTITUTION 739–759 (Mark Tushnet, Sanford Levinson & Mark
26 Graber eds., 2015); Saul Cornell & Gerald Leonard, *Chapter 15:*
   *The Consolidation of the Early Federal System*, *in* 1 THE CAMBRIDGE
27 HISTORY OF LAW IN AMERICA 518–544 (Christopher Tomlins & Michael
   Grossberg eds., 2008).
28

Declaration of Saul Cornell (Case No. 2:17-cv-00903-WBS-KJN)

of the local ordinances at issue in this lawsuit, my education,
expertise, and research in the field of legal history.  The
opinions contained herein are made pursuant to a reasonable
degree of professional certainty.

### SUMMARY OF OPINIONS

7.    A sophisticated grasp of historical context is
essential to implementing the text, history, and tradition
framework mandated by *Bruen*.  One must canvass the relevant
primary sources, secondary literature, and jurisprudence to
arrive at an understanding of the scope of permissible regulation
consistent with the Second Amendment. One must analyze the range
of historical gun regulations in place at the Founding and the
era of the Fourteenth Amendment. Of equal importance one must
understand how to makes sense of silences in the historical
record, and the nature of the societal concerns that prompted we
the people to act through legislative bodies to guard the right
to keep and bear arms and mitigate any negative consequences
flowing form changes in firearms technology and gun culture.

8.    It is impossible to understand the meaning and scope of
Second Amendment protections without understanding the way
Americans in the Founding era approached legal questions and
rights claims.  In contrast to most modern lawyers, the members
of the First Congress who wrote the words of the Second Amendment
and the American people who enacted the text into law were well
schooled in English common law ideas.  Not every feature of
English common law survived the American Revolution, but there
were important continuities between English law and the common

Declaration of Saul Cornell (Case No. 2:17-cv-00903-WBS-KJN)

law in America.[4]  Each of the new states, either by statute or judicial decision, adopted multiple aspects of the common law, focusing primarily on those features of English law that had been in effect in the English colonies for generations.[5]  No legal principle was more important to the common law than the concept of the peace.[6]  As one early American justice of the peace manual noted:  "the term peace, denotes the condition of the body politic in which no person suffers, or has just cause to fear any injury."[7]  Blackstone, a leading source of early American views about English law, opined that the common law "hath ever had a special care and regard for the conservation of the peace; for peace is the very end and foundation of civil society."[8] Thus, at a minimum, any genuinely historical inquiry must explore how the peace was maintained and how firearms fit into the scheme of ordered liberty.

9.    In *Bruen*, Justice Kavanaugh reiterated *Heller*'s invocation of Blackstone's authority as a guide to how early

---

[4] William B. Stoebuck, *Reception of English Common Law in the American Colonies*, 10 Wm. & Mary L. Rev. 393 (1968); Md. Const. of 1776, Declaration of Rights, art. III, § 1; Lauren Benton & Kathryn Walker, *Law for the Empire: The Common Law in Colonial America and the Problem of Legal Diversity*, 89 Chi.-Kent L. Rev. 937 (2014).

[5] 9 Statutes at Large of Pennsylvania 29-30 (Mitchell & Flanders eds. 1903); Francois Xavier Martin, A Collection of Statutes of the Parliament of England in Force in the State of North-Carolina 60-61 (Newbern, 1792); *Commonwealth v. Leach*, 1 Mass. 59 (1804).

[6] Laura F. Edwards, The People and Their Peace: Legal Culture and the Transformation of Inequality in the Post-Revolutionary South 105-109, 227-228 (University of North Carolina Press, 2009).

[7] Joseph Backus, The Justice of the Peace 23 (1816).

[8] 1 William Blackstone, Commentaries *349.

5

Americans understood their inheritance from England.
Specifically, Justice Kavanaugh stated in unambiguous terms that
there was a "well established historical tradition of
prohibiting the carrying of dangerous and unusual weapons."[9]
The dominant understanding of the Second Amendment and its state
constitutional analogues at the time of their adoption in the
Founding period forged an indissoluble link between the right to
keep and bear arms with the goal of preserving the peace.[10]

10.   "Constitutional rights," Justice Scalia wrote in
*Heller*, "are enshrined with the scope they were thought to have

_____

[9] *District of Columbia v. Heller*, 554 U.S. 570, 626–627
(2008), and n. 26.  The formulation employed by Blackstone was
"dangerous or unusual," not "dangerous  and unusual." Blackstone
and Hawkins, two of the most influential English legal writers
consulted by the Founding generation, described these types of
limits in slightly different terms.  The two different
formulations related to weapons described as dangerous and
unusual in one case and sometimes as dangerous or unusual in the
other instance, see Saul Cornell, *The Right to Carry Firearms
Outside of the Home: Separating Historical Myths from Historical
Realities*, 39 FORDHAM URB. L.J. 1695, 1713 (2012).  The phrase
"dangerorous and unusual" was an example of an archaic
grammatical and rhetorical form hendiadys; see Samuel Bray,
*'Necessary AND Proper' and 'Cruel AND Unusual': Hendiadys in the
Constitution*, 102 VIRGINIA L. REV. 687 (2016). The best modern
rendering of this term, and the only reading that reconciles
Blackstone and Hawkins recognizes this fact. Thus, the best
translation of the phrase would be "unusually dangerous."

[10] On Founding-era conceptions of liberty, *see* JOHN J. ZUBLY,
THE LAW OF LIBERTY (1775).  The modern terminology to describe this
concept is "ordered liberty."  *See Palko v. Connecticut*, 302 U.S.
319, 325 (1937).  For a more recent elaboration of the concept,
JAMES E. FLEMING & LINDA C. MCCLAIN, ORDERED LIBERTY: RIGHTS,
RESPONSIBILITIES, AND VIRTUES (Harvard University Press, 2013), 44-45.
On Justice Cardozo and the ideal of ordered liberty, see *Palko v.
Connecticut*, 302 U.S, 319, 325 (1937); John T. Noonan, Jr.,
*Ordered Liberty: Cardozo and the Constitution*, 1 CARDOZO L. REV.
257 (1979); Jud Campbell, *Judicial Review, and the Enumeration of
Rights*, 15 GEO. J.L. & PUB. POL'Y 569, 576-77 (2017).

when the people adopted them."[11]  The most basic right of all in this scheme of ordered liberty was  the right of the people to regulate their own internal police.  Although modern lawyers and jurists are accustomed to thinking of state police power, the Founding generation viewed this concept as a right, not a power.[12] The first state constitutions clearly articulated such a right — including it alongside rights more familiar to modern Americans, most notably, the right to bear arms.[13]  Pennsylvania's Constitution framed this estimable right succinctly:  "That the people of this State have the sole, exclusive and inherent right of governing and regulating the internal police of the same."[14] Thus, if Justice Scalia's rule applies to the scope of the right to bear arms, it must also apply to the scope of the right of the people to regulate their internal police.  The history of gun

---

[11] *Heller*, 554 U.S. at 634–35; William J. Novak*, Common Regulation: Legal Origins of State Power in America,* 45 HASTINGS L.J. 1061, 1081–83 (1994); Christopher Tomlins, *Necessities of State: Police, Sovereignty, and the Constitution,* 20 J. POL'Y HIST. 47 (2008).

[12] On the transformation of the Founding era's ideas about a "police right" into the more familiar concept of "police power," see generally Aaron T. Knapp, *The Judicialization of Police*, 2 CRITICAL ANALYSIS OF L. 64 (2015)*.  See also* MARKUS DIRK DUBBER, THE POLICE POWER: PATRIARCHY AND THE FOUNDATIONS OF AMERICAN GOVERNMENT (2005), 82-87; Christopher Tomlins, *Necessities of State: Police, Sovereignty, and the Constitution*, 20 J. OF POL'Y HIST. 47 (2008).

[13] PA. CONST. of 1776, ch. I, art. III; MD. DECLARATION OF RIGHTS, art. IV (1776); N.C. DECLARATION OF RIGHTS, art. I, § 3 (1776); and VT. DECLARATION OF RIGHTS, art. V (1777).

[14] Modern style police forces did not emerge until the middle of the next century, and although these early police forces were modeled on military style organizations, they did not routinely carry firearms until after the Civil War, see Scott W.  Phillips, *A Historical Examination of Police Firearms* 94 THE POLICE JOURNAL 122 (2021).

7

1  regulation in the decades after the right to bear arms was
2  codified in both the first state constitutions and the federal
3  bill of rights underscores this important point.

4      11.  In the years following the adoption of the Second
5  Amendment and its state analogues, firearm regulation increased.
6  Indeed, the individual states exercised their police powers to
7  address longstanding issues and novel problems created by
8  firearms in American society.  In particular, the states
9  regulated and when appropriate prohibited categories of weapons
10 deemed to be unusually dangerous.

11 **I.   THE HISTORICAL INQUIRY REQUIRED BY *BRUEN*, *MCDONALD*, AND *HELLER***
12
13     12.  The United States Supreme Court's decisions in *Heller*,
14 *McDonald*[15]*,* and *Bruen* have directed courts to look to text and
15 history when evaluating the scope of permissible firearms
16 regulation under the Second Amendment.  In another case involving
17 historical determinations, Justice Thomas, the author of the
18 majority opinion in *Bruen*, has noted that judges must avoid
19 approaching history, text, and tradition with an "ahistorical
20 literalism."[16]  Legal texts must not be read in a decontextualized
21 fashion detached from the web of historical meaning that made
22 them comprehensible to Americans living in the past.  Instead,
23
24
25

26     [15] *McDonald v. City of Chicago*, 561 U.S. 742 (2010).
27     [16] *Franchise Tax Board of California v. Hyatt*, 139 S. Ct.
   1485, 1498 (2019) (Thomas, J.) (criticizing "ahistorical
28 literalism").

understanding the public meaning of constitutional texts requires a solid grasp of the relevant historical contexts.[17]

13.    Following the mandates set out in *Heller, McDonald* and more recently in *Bruen*, history provides essential guideposts in evaluating the scope of permissible regulation under the Second Amendment.[18]  Moreover, as *Bruen* makes clear, history neither imposes "a regulatory straightjacket nor a regulatory blank check."[19]  The Court acknowledged that when novel problems created by firearms are at issue the analysis must reflect this fact: "other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach."[20]  *Bruen* differentiates between cases in which contested regulations are responses to long standing problems and situations in which modern regulations address novel problems with no clear historical analogues from the Founding era or the era of the Fourteenth Amendment.

14.    In particular, *Bruen* suggests three key contextually dependent inquiries[21] courts must conduct to analyze the history of regulation and try and infer what the absence of a regulatory tradition means as a matter of law:

- When a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation

---

[17] *See* Jonathan Gienapp, *Historicism and Holism: Failures of Originalist Translation*, 84 FORDHAM L. REV. 935 (2015).

[18] *Bruen*, 142 S. Ct. at 2127.

[19] *Id*. at 2133.

[20] *Id*. at 2132.

[21] *Id*. at 2131.

9

addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment;

- Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional; and

- If some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality.

15. A mechanistic strategy of digital searching for historical gun laws would be incapable of answering those historical inquiries. Instead, a historian seeking to answer those inquires would need to holistically research and analyze how firearms technology has changed, how consumer demand has waxed and waned, and how the people, acting through their representatives, have responded to the societal ills created by these changes.[22]

16. In the years between *Heller* and *Bruen*, historical scholarship has expanded our understanding of the history of arms regulation in the Anglo-American legal tradition, but much more

---

[22] Jack M. Balkin, *Lawyers and Historians Argue about the Constitution*, 35 CONST. COMM. 345, 399-400 (2020);Elias Neibart, *Originalism As Intellectual History* 2022 HARV. J.L. & PUB. POL'Y PER CURIAM  28 (2022); Jonathan Gienapp, Historicism and Holism: Failures of Originalist Translation, 84 FORDHAM L. REV. 935, 935 (2015); Joseph Blocher & Eric Ruben, Originalism-by-Analogy and Second Amendment Adjudication, 133 YALE L.J. (forthcoming).

Declaration of Saul Cornell (Case No. 2:17-cv-00903-WBS-KJN)

work needs to be done to fill out this picture.[23]  Indeed, such research is still ongoing: new materials continue to emerge; and in the months since *Bruen* was decided, additional evidence about the history of regulation has surfaced and new scholarship interpreting it has appeared in leading law reviews and other scholarly venues.[24]

17.  Justice Kavanaugh underscored a key holding of *Heller* in his *Bruen* concurrence:  "Like most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."  Crucially, the Court further noted that "we do think that *Heller* and *McDonald* point toward at least two metrics:  how and why the regulations burden a law-abiding citizen's right to armed self-defense."[25]

18.  One overarching principle regarding firearms regulation does emerge from this period and it reflects not only the common law assumptions familiar to the Founding generation, but it is hard-wired into the Second Amendment itself.  As Justice Scalia noted in *Heller*, and Justice Thomas reiterated in

---

[23] Eric M. Ruben & Darrell A. H. Miller, *Preface: The Second Generation of Second Amendment Law & Policy*, 80 L. & CONTEMP. PROBS. 1 (2017).

[24] *Symposium — The 2nd Amendment at the Supreme Court: "700 Years Of History" and the Modern Effects of Guns in Public*, 55 U.C. DAVIS L. REV. 2495 (2022); NEW HISTORIES OF GUN RIGHTS AND REGULATION: ESSAYS ON THE PLACE OF GUNS IN AMERICAN LAW AND SOCIETY (Joseph Blocher, Jacob D. Charles & Darrell A.H. Miller eds., forthcoming 2023).

[25] *Bruen*, 142 S. Ct. at 2132-33.

1  *Bruen*, the original Second Amendment was a result of interest

2  balancing undertaken by the people themselves in framing the

3  federal Constitution and the Bill of Rights.  Thus, from its

4  outset the Second Amendment recognizes both the right to keep and

5  bear arms and the right of the people to regulate arms to promote

6  the goals of preserving a free state. An exclusive focus on

7  rights and a disparagement of regulation is thus antithetical to

8  the plain meaning of the text of the Second Amendment.  Although

9  rights and regulation are often cast as antithetical in the

10  modern gun debate, the Founding generation saw the two goals as

11  complimentary.  Comparing the language of the Constitution's

12  first two amendments and their different structures and word

13  choice makes this point crystal clear.  The First Amendment

14  prohibits "abridging" the rights it protects. In standard

15  American English in the Founding era, to "abridge" meant to

16  "reduce."  Thus, the First Amendment prohibits a diminishment of

17  the rights it protects.  The Second Amendment's language employs

18  a very different term, requiring that the right to bear arms not

19  be "infringed."[26]  In Founding-era American English, the word

20  "infringement" meant to "violate" or "destroy."  In short, when

21  read with the Founding era's interpretive assumptions and legal

---

[26] The distinction emerges clearly in a discussion of natural law and the law of nations in an influential treatise on international law much esteemed by the Founding generation: "Princes who infringe the law of nations, commit as great a crime as private people, who violate the law of nature,"  J.J. BURLAMAQUI, THE PRINCIPLES OF NATURAL LAW (Thomas Nugent trans., 1753) at 201.  This book was among those included in the list of important texts Congress needed to procure, *see* Report on Books for Congress, [23 January] 1783," *Founders Online,* National Archives, https://founders.archives.gov/documents/Madison/01-06-02-0031.

definitions in mind, the two Amendments set up radically different frameworks for evaluating the rights they enshrined in constitutional text.  Members of the Founding generation would have understood that the legislature could regulate the *conduct* protected by the Second Amendment and comparable state arms bearing provisions as long as such regulations did not destroy the underlying *right*.

19.  John Burn, author of an influential eighteenth-century legal dictionary, illustrated the concept of infringement in the context of his discussion of violations of rights protected by the common law.  Liberty, according to Burns, was not identical to that "wild and savage liberty" of the state of nature.  True liberty, by contrast, only existed when individuals created civil society and enacted laws and regulations that promoted *ordered liberty*.[27]

20.  Similarly, Nathan Bailey's *Dictionarium Britannicum* (1730) defined "abridge" as to "shorten," while "infringe" was defined as to "break a law."[28]  And his 1763 *New Universal Dictionary* repeats the definition of "abridge" as "shorten" and "infringe" as "to break a law, custom, or privilege."[29]  Samuel Johnson's *Dictionary of the English Language* (1755) defines "infringe" as "to violate; to break laws or contracts" or "to

---

[27] *Liberty,* A NEW LAW DICTIONARY (1792) *See  also,* Jud Campbell, *Natural Rights, Positive Rights, and the Right to Keep and Bear Arms*, 83 LAW & CONTEMP. PROBS. 31, 32–33 (2020)

[28] *Abridge*, DICTIONARIUM BRITANNICUM (1730).

[29] *Abridge*, NEW UNIVERSAL DICTIONARY (1763).

destroy; to hinder."[30]  Johnson's definition of "abridge" was "to

shorten" and "to diminish" or "to deprive of."[31]  And Noah

Webster's *An American Dictionary of the English Language* (1828)

largely repeats Johnson's definitions of "infringe" and

"abridge."[32]

21.  Regulation, including robust laws, were not understood

to be an "infringement" of the right to bear arms, but rather the

necessary foundation for the proper exercise of that right as

required by the concept of ordered liberty.[33]  As one patriotic

revolutionary era orator observed, almost a decade after the

adoption of the Constitution:  "True liberty consists, not in

having *no government*, not in a *destitution of all law*, but in our

having an equal voice in the formation and execution of the laws,

according as they effect [*sic*] our persons and property."[34]  By

allowing individuals to participate in politics and enact laws

---

[30] *Infringe*, DICTIONARY OF THE ENGLISH LANGUAGE (1755).

[31] *Abridge*, DICTIONARY OF THE ENGLISH LANGUAGE (1755).

[32] *Abridge*, *Infringe*, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828).

[33] Dan Edelstein, *Early-Modern Rights Regimes: A Genealogy of Revolutionary Rights*, 3 CRITICAL ANALYSIS L. 221, 233–34 (2016).  *See generally* GERALD LEONARD & SAUL CORNELL, THE PARTISAN REPUBLIC: DEMOCRACY, EXCLUSION, AND THE FALL OF THE FOUNDERS' CONSTITUTION, 1780s–1830s, at 2; Victoria Kahn, *Early Modern Rights Talk*, 13 YALE J.L. & HUMAN. 391 (2001) (discussing how the early modern language of rights incorporated aspects of natural rights and other philosophical traditions); Joseph Postell, *Regulation During the American Founding: Achieving Liberalism and Republicanism*, 5 AM. POL. THOUGHT 80 (2016) (examining the importance of regulation to Founding political and constitutional thought).

[34] Joseph Russell, *An Oration; Pronounced in Princeton, Massachusetts, on the Anniversary of American Independence, July 4, 1799*, at 7 (July 4, 1799), (text available in the Evans Early American Imprint Collection) (emphasis in original).

14

aimed at promoting the health, safety, and well-being of the people, liberty flourished.[35]

22.  The key insight derived from taking the Founding era conception of rights seriously and applying the original understanding of the Founding era's conception of liberty is the recognition that regulation and liberty were not antithetical to one another.  The inclusion of rights guarantees in constitutional texts was not meant to place them beyond the scope of legislative control.  "The point of retaining natural rights," originalist scholar Jud Campbell reminds us "was not to make certain aspects of natural liberty immune from governmental regulation.  Rather, retained natural rights were aspects of natural liberty that could be restricted only with just cause and only with consent of the body politic."[36]  Rather than limit rights, regulation was the essential means of preserving rights,

---

[35] *See* Quentin Skinner, Liberty Before Liberalism (1998), 17-36 (examining neo-Roman theories of free citizens and how it impacted the development of political theory in England); The Nature of Rights at the American Founding and Beyond (Barry Alan Shain ed., 2007), 125-27, 139-43 (discussing how the Founding generation approached rights, including the republican model of protecting rights by representation).

[36] Jud Campbell, *The Invention of First Amendment Federalism*, 97 Tex. L. Rev. 517, 527 (2019) (emphasis in original). *See generally* Saul Cornell, *Half Cocked: The Persistence of Anachronism and Presentism in the Academic Debate Over the Second Amendment*, 106 J. of Crim. L. and Criminology 203, 206 (2016) (noting that the Second Amendment was not understood in terms of the simple dichotomies that have shaped modern debate over the right to bear arms).

including self-defense.[37]  In fact, without robust regulation of arms, it would have been impossible to implement the Second Amendment and its state analogues.  Mustering the militia required keeping track of who had weapons and included the authority to inspect those weapons and fine individuals who failed to store them safely and keep them in good working order.[38] The individual states also  imposed loyalty oaths, disarming those who refused to take such oaths.  No state imposed a similar oath as pre-requisite to the exercise of First Amendment-type liberties.  Thus, some forms of prior restraint, impermissible in the case of expressive freedoms protected by the First Amendment or comparable state provisions, were understood by the Founding generation to be perfectly consistent with the constitutional right to keep and bear arms.[39]

---

[37] See Jud Campbell, *Judicial Review and the Enumeration of Rights,* 15 GEO. J.L. & PUB. POL'Y 569, 576–77 (2017).  Campbell's work is paradigm-shifting, and it renders Justice Scalia's unsubstantiated claim in *Heller* that the inclusion of the Second Amendment in the Bill of Rights placed certain forms of regulation out of bounds totally anachronistic.  This claim has no foundation in Founding-era constitutional thought, but reflects the contentious modern debate between Justice Black and Justice Frankfurter over judicial balancing, on Scalia's debt to this modern debate, *see generally* SAUL CORNELL, THE POLICE POWER AND THE AUTHORITY TO REGULATE FIREARMS IN EARLY AMERICA 1–2 (2021), https://www.brennancenter.org/sites/default/files/2021-06/Cornell_final.pdf [https://perma.cc/J6QD-4YXG] and Joseph Blocher, *Response: Rights as Trumps of What?*, 132 HARV. L. REV. 120, 123 (2019).

[38] H. RICHARD UVILLER & WILLIAM G. MERKEL, THE MILITIA AND THE RIGHT TO ARMS, OR, HOW THE SECOND AMENDMENT FELL SILENT 150 (2002).

[39] Saul Cornell,  *Commonplace or Anachronism: The Standard Model, the Second Amendment, and the Problem of History in Contemporary Constitutional Theory* 16 CONSTITUTIONAL COMMENTARY 988 (1999).

23.   In keeping with the clear public meaning of the Second Amendment's text and comparable state provisions, early American governments enacted laws to preserve the rights of law-abiding citizens to keep and bear arms and promote the equally vital goals of promoting public safety.  As long as such laws did not destroy the right of self-defense, the individual states enjoyed broad latitude to regulate arms. [40]

## II. From Muskets to Pistols: Change and Continuity in Early American Firearms Regulation

24.   Guns have been regulated from the dawn of American history.[41]  At the time *Heller* was decided, there was little scholarship on the history of gun regulation and a paucity of quality scholarship on early American gun culture.[42]  Fortunately, a burgeoning body of scholarship has illuminated both topics, deepening scholarly understanding of the relevant contexts needed to implement *Bruen*'s framework.[43]

25.   The common law that Americans inherited from England always acknowledged that the right of self-defense was not unlimited but existed within a well-delineated jurisprudential framework.  The entire body of the common law was designed to preserve the peace and the exercise of self-defense was no

---

[40] Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487 (2004).

[41] Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & Contemp. Probs. 55 (2017).

[42] *Id.*

[43] Ruben & Miller, *supra* note 22, at 1.

17

exception to this overarching principle.[44]  Statutory law, both in England and America functioned to further secure the peace and public safety.  Given these indisputable facts, the Supreme Court correctly noted, the right to keep and bear arms was never understood to prevent government from enacting a broad range of regulations to promote the peace and maintain public safety.[45]  To deny such an authority would be to convert the Constitution into a suicide pact and not a charter of government and well-regulated liberty. In keeping with this principle, the Second Amendment and its state analogues were understood to enhance the concept of ordered liberty, not undermine it.[46]

26.  *Bruen*'s methodology requires judges to distinguish between the relevant history necessary to understand early American constitutional texts and a series of myths about guns and regulation that were created by later generations to sell novels, movies, and guns themselves.[47]  Unfortunately, many of these myths continue to cloud legal discussions of American gun policy and Second Amendment jurisprudence.[48]

[44] Saul Cornell, *The Right to Keep and Carry Arms in Anglo-American Law: Preserving Liberty and Keeping the Peace*, 80 L. & CONTEMP. PROBS. 11 (2017).

[45] *McDonald*, 561 U.S. at 785 (noting "'[s]tate and local experimentation with reasonable firearms regulations will continue under the Second Amendment'").

[46] *See generally* Saul Cornell, *The Long Arc Of Arms Regulation In Public: From Surety To Permitting*, 1328-1928, 55 U.C. DAVIS L. REV. 2547 (2022)

[47] PAMELA HAAG, THE GUNNING OF AMERICA: BUSINESS AND THE MAKING OF AMERICAN GUN CULTURE 198-201 (2016).

[48] RICHARD SLOTKIN, GUNFIGHTER NATION: THE MYTH OF THE FRONTIER IN TWENTIETH-CENTURY AMERICA 10-16 (1993); JOAN BURBICK, GUN SHOW NATION: GUN CULTURE AND AMERICAN DEMOCRACY xvi-xxii (2006).

27.  Although it is hard for many modern Americans to grasp, there was no comparable societal ill to the modern gun violence problem for Americans to solve in the era of the Second Amendment.  A combination of factors, including the nature of firearms technology and the realities of living life in small, face-to-face, and mostly homogenous rural communities that typified many parts of early America, militated against the development of such a problem.  In contrast to modern America, homicide was not the problem that government firearm policy needed to address at the time of the Second Amendment.[49]

28.  The surviving data from New England is particularly rich and has allowed scholars to formulate a much better understanding of the dynamics of early American gun policy and relate it to early American gun culture.[50]  Levels of gun violence among those of white European ancestry in the era of the Second Amendment were relatively low compared to modern America.  These low levels of violence among persons of European ancestry contrasted with the high levels of violence involving the tribal populations of the region.  The data presented in Figure 1 is based on the pioneering research of Ohio-State historian Randolph Roth. It captures one of the essential facts necessary to

---

[49] RANDOLPH ROTH, AMERICAN HOMICIDE 56, 315 (2009).

[50] It is important to recognize that there were profound regional differences in early America. See JACK P. GREENE, PURSUITS OF HAPPINESS: THE SOCIAL DEVELOPMENT OF EARLY MODERN BRITISH COLONIES AND THE FORMATION OF AMERICAN CULTURE 170–176 (1988).  These differences also had important consequences for the evolution of American law. *See generally* David Thomas Konig, *Regionalism in Early American Law*, *in* 1 THE CAMBRIDGE HISTORY OF LAW IN AMERICA 144 (Michael Grossberg & Christopher Tomlins eds., 2008).

understand what fears motivated American gun policy in the era of the Second Amendment.  The pressing problem Americans faced at the time of the Second Amendment was that citizens were reluctant to purchase military style weapons which were relatively expensive and had little utility in a rural society.  Americans were far better armed than their British ancestors, but the guns most Americans owned and desired were those most useful for life in an agrarian society: fowling pieces and light hunting muskets.[51]  Killing pests and hunting birds were the main concern of farmers, and their choice of firearm reflected these basic facts of life.  Nobody bayoneted turkeys, and pistols were of limited utility for anyone outside of a small elite group of wealthy, powerful, and influential men who needed these weapons if they were forced to face an opponent on the field of honor in a duel, as the tragic fate of Alexander Hamilton so vividly illustrates.[52]

29.  Limits in Founding-era firearms technology also militated against the use of guns as effective tools of interpersonal violence in this period.  Eighteenth-century muzzle-loading weapons, especially muskets, took too long to load and were therefore seldom used to commit crimes.  Nor was keeping guns loaded a viable option because the black powder used in

---

[51] Kevin M. Sweeney, *Firearms Ownership and Militias in Seventeenth and Eighteenth Century England and America*, *in* A RIGHT TO BEAR ARMS?: THE CONTESTED ROLE OF HISTORY IN CONTEMPORARY DEBATES ON THE SECOND AMENDMENT (Jennifer Tucker et al. eds., 2019).

[52] Joanne B. Freeman, AFFAIRS OF HONOR: NATIONAL POLITICS IN THE NEW REPUBLIC (2001).

Declaration of Saul Cornell (Case No. 2:17-cv-00903-WBS-KJN)

1  these weapons was not only corrosive, but it attracted moisture

2  like a sponge.  Indeed, the iconic image of rifles and muskets

3  hung over the mantle place in early American homes was not

4  primarily a function of aesthetics or the potent symbolism of the

5  hearth, as many today assume.  As historian Roth notes: "black

6  powder's hygroscopic, it absorbs water, it corrodes your barrel,

7  you can't keep it loaded.  Why do they always show the gun over

8  the fireplace?  Because that's the warmest, driest place in the

9  house."[53]  Similar problems also limited the utility of muzzle-

10  loading pistols as practical tools for self-defense or criminal

11  offenses.  Indeed, at the time of the Second Amendment, over 90%

12  of the weapons owned by Americans were long guns, not pistols.[54]

**Figure 1**



Figure 2.3  Unrelated-adult homicide rates in New England by race, 1677–
1797 (per 100,000 persons per year).

---

[53] Randolph Roth, Transcript: *Why is the United States the Most Homicidal in the Affluent World*, NATIONAL INSTITUTE OF JUSTICE (Dec. 1, 2013), https://nij.ojp.gov/media/video/24061#transcript-0.

[54] Sweeney, *supra* note 50.

30.  As Roth's data makes clear, there was not a serious homicide problem looming over debates about the Second Amendment. Nor were guns the primary weapon of choice for those with evil intent during this period.[55]  The problem the Founding generation faced was that Americans were reluctant to purchase the type of weapons needed to effectively arm their militias.  When the U.S. government surveyed the state of the militia's preparedness shortly after Jefferson took office in 1800, the problem had not been solved.  Although Massachusetts boasted above 80% of its militia armed with military quality weapons, many of the southern states lagged far behind, with Virginia and North Carolina hovering at about less than half the militia properly armed.[56]

31.  Government policy, both at the state and federal level, responded to these realities by requiring a subset of white citizens, those capable of bearing arms, to acquire at their own expense a military quality musket and participate in mandatory training and other martial activities.[57]  Gun policy in the Founding era reflected these realities, and accordingly, one must approach any analogies drawn from this period's regulations with some caution when applying them to a modern heterogeneous industrial society capable of producing a bewildering assortment of firearms whose lethality would have been almost unimaginable to the Founding generation.[58]  Put another way, laws created for

[55] HAAG, *supra* note 46.

[56] Sweeney, *supra* note 50.

[57] SAUL CORNELL, A WELL REGULATED MILITIA: THE FOUNDING FATHERS AND THE ORIGINS OF GUN CONTROL IN AMERICA (2006) at 68-70.

[58] Darrell A. H. Miller & Jennifer Tucker, *Common Use, Lineage, and Lethality*, 55 U.C. DAVIS L. REV. 2495 (2022).

1  a society without much of a gun violence problem enacted at a

2  time of relative gun scarcity, at least in terms of militia

3  weapons, have limited value in illuminating the challenges

4  Americans face today.

5      32.  The other aspect of gun policy that needs to be

6  acknowledged is the active role the federal government took in

7  encouraging the manufacturing of military arms.  The American

8  firearms industry in its infancy was largely dependent on

9  government contracts and subsidies.  Thus, government had a

10 vested interest in determining what types of weapons would be

11 produced. [59]  Government regulation of the firearms industry also

12 included the authority to inspect the manufactures of weapons and

13 impose safety standards on the industry.[60]  Some states opted to

14 tax some common weapons to discourage their proliferation.[61]

---

[59] Lindsay Schakenbach Regele, *A Different Constitutionality for Gun Regulation*, 46 HASTINGS CONST. L.Q. 523, 524 (2019); Andrew J. B. Fagal, *American Arms Manufacturing and the Onset of the War of 1812*, 87 NEW ENG. Q. 526, 526 (2014).

[60] 1814 Mass. Acts 464, An Act In Addition To An Act, Entitled "An Act To Provide For The Proof Of Fire Arms, Manufactured Within This Commonwealth," ch. 192, § 1 ("All musket barrels and pistol barrels, manufactured within this Commonwealth, shall, before the same shall be sold, and before the same shall be stocked, be proved by the person appointed according to the provisions of an act . . . . . ."); § 2 ("That if any person of persons, from and after the passing of this act, shall manufacture, within this Commonwealth, any musket or pistol, or shall sell and deliver, or shall knowingly purchase any musket or pistol, without having the barrels first proved according to the provisions of the first section of this act, marked and stamped according to the provisions of the first section of the act.")

[61] 1858-1859 N.C. Sess. Laws 34-36, Pub. Laws, An Act Entitled Revenue, chap. 25, § 27, pt. 15. ("The following subjects shall be annually listed, and be taxed the amounts specified: . . . Every dirk, bowie-knife, pistol, sword-cane,

(continued…)

1    33.  The calculus of individual self-defense changed

2  dramatically in the decades following the adoption of the Second

3  Amendment.[62]  The early decades of the nineteenth century

4  witnessed a revolution in the production and marketing of guns.[63]

5  The same technological changes and economic forces that made

6  wooden clocks and other consumer goods such as Currier and Ives

7  prints common items in many homes also transformed American gun

8  culture.[64]  These same changes also made handguns and a gruesome

9  assortment of deadly knives, including the dreaded Bowie knife,

10  more common.  The culmination of this gradual evolution in both

11  firearms and ammunition technology was the development of Samuel

12  Colt's pistols around the time of the Mexican-American War.[65]

13  Economic transformation was accompanied by a host of profound

14  social changes that gave rise to America's first gun violence

15  crisis.  As cheaper, more dependable, and easily concealable

16  handguns proliferated in large numbers, Americans, particularly

17

18

19

_____

20  dirk-cane and rifle cane, used or worn about the person of any
one at any time during the year, one dollar and twenty-five

21  cents. Arms used for mustering shall be exempt from taxation.");
*see also* 1866 Ga. Law 27, An Act to authorize the Justices of the

22  Inferior Courts of Camden, Glynn and Effingham counties to levy a
special tax for county purposes, and to regulate the same.

23      [62] Cornell, *supra* note 3 at 745.

24      [63] Lindsay Schakenbach Regele, *Industrial Manifest Destiny:
American Firearms Manufacturing and Antebellum Expansion*, 93 Bus.

25  Hist. Rev. 57 (2018).

26      [64] Sean Wilentz, *Society, Politics, and the Market
Revolution*, in The New American History (Eric Foner ed., 1990).

27      [65] William N. Hosley, Colt: The Making of an American Legend (1st ed.

28  1996) at 23.

1  southerners, began sporting them with alarming regularity.  The

2  change in behavior was most noticeable in the case of handguns. [66]

3       34.  The response of states to the emergence of new firearms

4  that threatened the peace was regulation. In short, when

5  confronted by changes in technology, consumer behavior, and faced

6  with novel threats to public safety, the individual states

7  enacted laws to address these problems.  In every instance apart

8  from a few outlier cases in the Slave South, courts upheld such

9  limits on the unfettered exercise ok the  right to keep and bear

10  arms.  The primary limit identified by courts in evaluating such

11  laws was the threshold question about abridgement: did the law

12  negate the ability to act in self-defense.[67]  In keeping with the

13  clear imperative hard-wired into the Second Amendment, states

14  singled out weapons that posed a particular danger for regulation

15  or prohibition.  Responding in this fashion was entirely

16  consistent with Founding-era conceptions of ordered liberty, the

17  Second Amendment and comparable state arms bearing provisions.

18       35.  Not all guns were treated equally by the law in early

19  America. Some guns were given heightened constitutional

20  protection and others were treated as ordinary property subject

21  to the full force of state police power authority.[68]  The fact

22  that some weapons were treated in the same fashion as other forms

---

23       [66] Cornell, *supra* note 9, at 1716.

24       [67] On southern gun rights exceptionalism, see Eric M. Ruben &

25  Saul Cornell, *Firearms Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 Yale L.J. F. 121, 128

26  (2015).

27       [68] Saul Cornell, *History and Tradition or Fantasy and Fiction: Which Version of the Past Will the Supreme Court Choose*

28  *in NYSRPA v. Bruen?*, 49 Hastings Const. L.Q. 145 (2022).

of property did not mean government authority over them was unlimited any more than it implied that people's homes, chattels, or other forms of property were somehow not protected by law. Property rights in early America were highly venerated, but they were always subject to forms of regulation by the people themselves acting through their legislatures.  Regulating guns and gun powder were basic exercises of the sovereignty of the people.  The decision of legislatures to determine which dangerous weapons were exempted from the full protection of the constitutional right to keep and bear arms flowed inexorably out of the police power enjoyed by states, localities, and in some limited situations the Federal government when regulating land or property under its jurisdiction.

### III. Technology, Marketing, Consumer Behavior, and Regulation:  The American Paradigm of Gun Regulation Emerges

36.  Political scientist Robert Spitzer's overview of the history of firearms regulation underscores the dynamic governing this important tradition: "The lesson of gun regulation history here is that new technologies bred new laws when circumstances warranted."[69]

37.  Virtually all firearms in common use in the era of the Second Amendment were single-shot, muzzle-loading black powder weapons.  Guns capable of firing more than a single round, repeaters, could best be described as exceedingly rare and exotic.  Thus, the claim that firearms capable of firing more than ten rounds without reloading "are nothing new" and the

---

[69]  *Supra* note 39.

related claim that such weapons were familiar to Americans in the Founding era is deceptive at best.  The existence of such weapons did not mean that they were common, nor did it mean that the average American would have understood that such weapons were generally understood to fall within the protection of the Second Amendment.  There is no evidence to support such a conclusion.

38.  Moreover, the claim that "repeaters" and other rare weapons were widely believed to be protected by the Second Amendment is not consistent with the originalist framework employed in *Bruen*.  An analysis of history, text, and tradition requires a contextually sensitive assessment of what types of weapons were in common use at the time and which weapons were singled out by governments for heighted forms of legal protection or treated simply as property subject to the normal range of regulation.[70]  Thus, the relevant historical question is not what firearms technology existed at the time of the Second Amendment. The constitutionally-pertinent question is: did the average reader of the Constitution and the first ten amendments understand repeaters to be among those weapons the Second Amendment was intended to protect?[71]

39.  Few if any Americans would have ever encountered these types of weapons and even fewer owned such weapons, an indisputable fact that makes the argument that these types of

---

[70] Kevin Sweeney and  Saul Cornell, All Guns Are Not  Created Equal CHRONICLE OF  HIGHER  EDUCATION.  January 28, 2013; Priya Satia, *What  Guns  Meant  in  Eighteenth-century  Britain*  5  PALGRAVE COMMUN 104 (2019)

[71] William Baude & Stephen E. Sachs, *Originalism and the Law of the Past*, 37 LAW AND HISTORY REVIEW 809-820 (2019).

weapons were encompassed by the Second Amendment highly
improbable.[72]

40. The best way to understand the historical importance
(or irrelevance) of these weapons is to analyze the discussion of
arms in the print culture of the period, paying close attention
to how repeating weapons were discussed in newspapers, books, and
to a lesser extent private correspondence.[73] If one consults the
standard sources associated with originalist scholarship and
jurisprudence, the silence is deafening. These types of weapons
were rarely mentioned and when they were discussed they were
described as rare and "curious."[74] Founding era newspapers often
contained advertisements for the sale of firearms. Although one
must approach data gained from this type of digital searching
with some historical sophistication and caution, the evidence
clearly shows that "repeating" weapons were neither common nor
readily available in the period between the American Revolution
and enactment of the Second Amendment. Given this fact it
strains credulity to claim that such weapons were originally
understood to be encompassed within the protections afforded by
the Second Amendment. During the almost two decade period
between the Declaration of Independence and the adoption of the
Second Amendment there were a total of five advertisements for

---

[72] See discussion below *infra* pp. ____.
[73] Saul Cornell, *Reading the Constitution, 1787–91: History, Originalism, and Constitutional Meaning Id.*, 821–45
[74]

the sale of air rifles in American newspapers.[75] In the same period there were over four thousand advertisements for the sale of guns of various types, most notably muskets of one type or another.  The advertisement reproduced in Figure Two below illustrates the exotic nature of these weapons, which were described as "singular" and "curious."[76]

Figure Two[77]



*To be Sold, at Private Sale,*
At No. 60, in Smith-Street, the following curious and singular Collection of Fire-Arms :
THREE Air Guns and a Cafe of Air Piftols,—a gun which can be fired twelve times from one fingle loading.
Ditto, thirty times in a minute, with Piftols, and many others on the lateft and moft curious conftruction, that is now extant in Europe.
Twelve fmall Brafs Pattararoes, proper for a Pleafure-Boat, or a Gentleman's country-feat.
*New-York, Sept. 27, 1783.*

41.   These guns were so rare and expensive that a New York Museum from the period decided to showcase an air gun alongside other curiosities such as mammoth bones and a full-size working guillotine.  For an additional fee beyond the price of admission one could purchase an opportunity to fire one these "singular" weapons.[78]

//

---

[75]  [New York] Royal Gazette October 1, 1783  at 3;  Pennsylvania Packet  July 21, 1789 at 3 ; *id.*  July 28, at 1;  *id.*, July 31 at 1; *id.*, August 13, at 1.

[76] " To be Sold at Private Sale," [New York] ROYAL GAZETTE October 1, 1783  at 3

[77] I*d.*

[78] Lawrence W. Levine  HIGHBROW/LOWBROW (2009) at 149.

29

1    //

2

3

4

5

6

7

8

9

10                          Figure Three[79]

11

12



To the Curious

AN AIR GUN, made by a young man, a native of Rhode-Island, but now resident in this city, and which has been purchased by the subscriber, at a very considerable price, with a view eventually to make it the property of the American museum, but wishes to reimburse himself in the following manner, viz.

He will exhibit it to the examination of all persons desirous of viewing it, and of discharging a shot, for which they shall pay six-pence.

This gun, when properly filled with air, will do execution twenty times, without renewing the charge, and for several times will send a ball thro' an inch board, at the distance of sixty yards, to be seen at the subscriber's, No. 13 Maiden lane, every day in the week, from 10 to 12 o'clock in the forenoon, and from three to five in the afternoon, Tuesday and Friday afternoons excepted, at which times it may be seen at the Museum.

GARDINER BAKER,
February 9.                    Keeper of the Museum.

25

26

27

28

---

[79] [" To the Curious," [New York] DAILY ADVERTISER  February 9, 1792]

42.  The notion that the Second Amendment was widely understood to protect weapons that were rarely advertised for sale and that generally recognized to be of a "singular" and "curious" nature is not credible; nor is such a claim consistent with *Bruen*'s originalist methodology which requires that texts be interpreted according to their ordinary meaning.  Weapons described as "singular and curious" are a poor choice for understanding the ordinary meaning of the term arms in the Founding era English.

43.  One of the best known repeaters to modern firearms enthusiasts is the Girondoni air gun.  A version of this weapon was carried by Lewis and Clark, but there is not much evidence that Americans at the time of the Corps of Discovery (*i.e.*, Lewis and Clark's expedition) were familiar with its features.  The primary use of the weapon was not for war, hunting, or self defense, but instead this exotic weapon was a show piece used to impress the different Indian nations that the expedition encountered with the superiority of American technology.[80] Few Americans at the time of the Lewis and Clark exhibition would

---

[80]  2 History of the Expedition Under the Command of Captains Lewis and Clark...in Two (ed., Paul Allen, 1814) at 136, 28,364.For a discussion of the Corps of Discovery's use of technology to over-awe Indian peoples and impress upon them the superiority of American technology, see James P. Rhonda, LEWIS AND CLARK AMONG THE INDIANS (1984) at 225.

have had the opportunity to ever see one of these weapons or any other repeating gun up close.

44.    Such weapons were totally impractical for use in hunting or self-defense. Even under ideal conditions, priming the Girardoni air gun required 1500 strokes of a pump.  The Austrian military, one of the few armed forces in the world to purchase any of these types of weapons for combat use, quickly abandoned them because they were difficult to maintain and operate.  In 1789, an Austrian officer complained that the weapons were of little military value because of the difficulty of using them and their tendency to malfunction: "Due to their construction, these guns were much more difficult to use effectively than normal, as one had to handle them much more cautiously and carefully. In addition, the soldiers using them had to be supervised extremely carefully, as they were unsure about the operation. The guns became inoperable after a very short time—so much so that after a while no more than one-third of them were still in a usable state. We needed the whole winter to repair and replace them."[81] William Duane's popular *Military Dictionary* (1810) devoted a

---

[81] Frederick J. Chiaventone, *The Girardoni Air Rifle: The Lewis and Clark Expedition's Secret Weapon* 14  MILITARY HERITAGE  (2015), 19.

short entry to air guns, noting that the gun's performance was so unreliable, "it has long been out of use among military men."[82]

## IV. THE POLICE POWER AND FIREARMS REGULATION

45.   The 1776 Pennsylvania Constitution, the first revolutionary constitution to assert a right to bear arms, preceded the assertion of this right by affirming a more basic rights claim:  "That the people of this State have the sole, exclusive and inherent right of governing and regulating the internal police of the same."[83]   The phrase "internal police" had already become common, particularly in laws establishing towns and defining the scope of their legislative authority enjoyed by representative bodies to craft laws to promote public health and safety.[84]   By the early nineteenth century, the term "police" was a fixture in American law.[85]   Thus, an 1832 American encyclopedia confidently asserted that police, "in the common acceptation of the word, in the U. States and England, is applied to the

---

[82] William Duane,  A MILITARY DICTIONARY (1810) at 5.
[83] PA. CONST. OF 1776, Ch. I, art iii.

[84] For other examples of constitutional language similar to Pennsylvania's provision, N.C. CONST. OF 1776, DECLARATION OF RIGHTS, art. II; VT. CONST. OF 1777, DECLARATION OF RIGHTS, art. IV.  For other examples of this usage, see An Act Incorporating the residents residing within limits therein mentioned, in 2 NEW YORK LAWS 158 (1785) (establishing the town of Hudson, NY); An Act to incorporate the Town of Marietta, in LAWS PASSED IN THE TERRITORY NORTHWEST OF THE RIVER OHIO 29 (1791).  For later examples, see 1 STATUTES OF THE STATE OF NEW JERSEY 561 (rev. ed. 1847); 1 SUPPLEMENTS TO THE REVISED STATUTES. LAWS OF THE COMMONWEALTH OF MASSACHUSETTS, PASSED SUBSEQUENTLY TO THE REVISED STATUTES: 1836 TO 1849, INCLUSIVE 413 (Theron Metcalf & Luther S. Cushing, eds. 1849).

[85] ERNST FREUND, THE POLICE POWER: PUBLIC POLICY AND CONSTITUTIONAL RIGHTS 2, n.2 (1904).

municipal rules, institutions and officers provided for
maintaining order, cleanliness &c."[86]  The Founding era's
conception of a basic police right located in legislatures was
transmuted during the Marshall Court's era into the judicial
doctrine of the police power and would become a fixture in
American law.

46.  The power to regulate firearms and gunpowder has always
been central to the police power and historically was shared
among states, municipalities, and the federal government when it
was legislating conduct on federal land and in buildings.[87]  The
adoption of the Constitution and the Bill of Rights did not
deprive states of their police powers.  Indeed, if it had, the
Constitution would not have been ratified and there would be no
Second Amendment today. Ratification was only possible because
Federalists offered Anti-Federalists strong assurances that
nothing about the new government threatened the traditional scope
of the individual state's police power authority, including the
authority to regulate guns and gun powder.[88]

47.  Federalists and Anti-Federalists bitterly disagreed
over many legal issues, but this one point of accord was
incontrovertible.  Brutus, a leading Anti-Federalist,
emphatically declared that "it ought to be left to the state
governments to provide for the protection and defence [sic]of the

---

[86] 10 ENCYCLOPEDIA AMERICANA 214 new edition (Francis Lieber ed.).

[87] Harry N. Scheiber, *State Police Power*, in 4 ENCYCLOPEDIA OF THE AMERICAN CONSTITUTION 1744 (Leonard W. Levy et al. eds., 1986).

[88] SAUL CORNELL, THE OTHER FOUNDERS: ANTIFEDERALISM AND THE DISSENTING TRADITION IN AMERICA, 1788-1828 139 (1999).

citizen against the hand of private violence, and the wrongs done
or attempted by individuals to each other."[89]  Federalist Tench
Coxe concurred, asserting that "[t]he states will regulate and
administer the criminal law, exclusively of Congress."  States,
he assured the American people during ratification, would
continue to legislate on all matters related to the police power
"such as unlicensed public houses, nuisances, and many other
things of the like nature."[90]  State police power authority was at
its pinnacle in matters relating to guns or gun powder.[91]  Thus,
Massachusetts enacted a law that prohibited storing a loaded
weapon in a home, a firearms safety law that recognized that the
unintended discharge of firearms posed a serious threat to life
and limb.[92]  New York City even granted broad power to the
government to search for gun powder and transfer powder to the
public magazine for safe storage:

> it shall and may be lawful for the mayor or
> recorder, or any two Alderman of the said city, upon
> application made by any inhabitant or inhabitants of
> the said city, and upon his or their making oath of
> reasonable cause of suspicion (of the sufficiency of
> which the said mayor or recorder, or Aldermen, is
> and are to be the judge or judges) to issue his or
> their warrant or warrants, under his or their hand
> and seal, or hands and seals for searching for such

---

[89] Brutus, *Essays of Brutus VII*, reprinted in 2 THE COMPLETE
ANTIFEDERALIST 358, 400-05 (Herbert J. Storing ed., 1981).

[90] Tench Coxe, A Freeman, *Pa. Gazette*, Jan. 23, 1788,
reprinted in FRIENDS OF THE CONSTITUTION: WRITINGS OF THE "OTHER" FEDERALISTS
82 (Colleen A. Sheehan & Gary L. McDowell eds., 1998).

[91] CORNELL, THE POLICE POWER, *supra* note 36.

[92] Act of Mar. 1, 1783, ch. XIII, 1783 Mass. Acts 37, An Act
in Addition to the Several Acts Already Made for the Prudent
Storage of Gun Powder within the Town of Boston, § 2.

1    gun powder, in the day time, in any building or

2    place whatsoever.[93]

3    48.  The power to regulate firearms and gunpowder was

4  therefore at the very core of the police power and inheres in

5  both states and local municipalities.  The application of the

6  police power to firearms and ammunition was singled out as the

7  quintessential example of state police power by Chief Justice

8  John Marshall in his 1827 discussion of laws regulating gun

9  powder in *Brown v. Maryland.*[94]  This was so even though gunpowder

10  was essential to the operation of firearms at that time and gun

11  powder regulations necessarily affected the ability of gun owners

12  to use firearms for self-defense, even inside the home.

13    49.  A slow process of judicializing this concept of police,

14  transforming the Founding era's idea of a "police right" into a

15  judicially enforceable concept of the "police power" occurred

16  beginning with the Marshall Court and continuing with the Taney

17  Court.[95]

18

19    [93] An Act to Prevent the Storing of Gun Powder, within in
Certain Parts of New York City, LAWS OF THE STATE OF NEW-YORK,

20  COMPRISING THE CONSTITUTION, AND THE ACTS OF THE LEGISLATURE, SINCE THE
REVOLUTION, FROM THE FIRST TO THE FIFTEENTH SESSION, INCLUSIVE 191-2 (Thomas

21  Greenleaf, ed., 1792).

22    [94] 25 U.S. (12 Wheat.) 419, 442-43 (1827) ("The power to
direct the removal of gunpowder is a branch of the police

23  power").

24    [95] Eras of Supreme Court history are typically defined by the
tenure of the Chief Justice. The Marshall Court Period covered

25  the years 1801-1835. For a brief overview, *see* "The Marshall
Court, 1801-1835", SUPREME COURT HISTORICAL SOCIETY (last visited Oct.

26  5, 2022), https://supremecourthistory.org/history-of-the-court-
history-of-the-courts/history-of-the-court-history-of-the-courts-

27  the-marshall-court-1801-1835/. The Taney Court period covered the
years 1836-1864. See "The Taney Court, 1836-1864", SUPREME COURT

28                                        (continued…)

1        50.  Nor was Chief Justice John Marshall unique in

2  highlighting the centrality of this idea to American law.[96] The

3  ubiquity of the police power framework for evaluating the

4  constitutionality of legislation regarding firearms reflected the

5  centrality of this approach to nearly every question of municipal

6  legislation touching health or public safety in early America.[97]

7  Massachusetts Judge Lemuel Shaw, one of the most celebrated state

8  jurists of the pre-Civil War era elaborated this point in his

9  influential 1851 opinion in *Commonwealth v. Alger,* a decision

10  that became a foundational text for lawyers, judges, and

11  legislators looking for guidance on the meaning and scope of the

12  police power.  Shaw described the police power in the following

13  manner:

> [T]he power vested in the legislature by the
> constitution, to make, ordain and establish all
> manner of wholesome and reasonable laws, statutes
> and ordinances, either with penalties or without,
> not repugnant to the constitution, as they shall
> judge to be for the good and welfare of the
> commonwealth, and of the subjects of the same.  It
> is much easier to perceive and realize the existence

HISTORICAL SOCIETY (last visited Oct. 5, 2022),
https://supremecourthistory.org/history-of-the-court-history-of-
the-courts/history-of-the-courts-history-of-the-courts-the-taney-
court-1836-1864/.

    [96] In the extensive notes he added as editor of the 12th
edition of James Kent's classic *Commentaries an American Law*,
Oliver Wendell Holmes, Jr., wrote that regulation of firearms was
the *locus classicus* of the police power. *See* 2 JAMES KENT
COMMENTARIES ON AMERICAN LAW (340) 464 n.2 (Oliver Wendell Holmes,
Jr., ed. 12 ed. 1873).

    [97] FREUND, *supra* note 72, at 2, n.2 (1904). WILLIAM J. NOVAK, THE
PEOPLE'S WELFARE: LAW AND REGULATION IN NINETEENTH-CENTURY AMERICA (1996) at
65-66; Christopher Tomlins, *To Improve the State and Condition of
Man: The Power to Police and the History of American Governance*,
53 BUFF. L. REV. 1215 (2005); DUBBER, *supra* note 12, at 82-87.

and sources of this power, than to mark its
boundaries, or prescribe limits to its exercise.
There are many cases in which such a power is
exercised by all well-ordered governments, and where
its fitness is so obvious, that all well regulated
minds will regard it as reasonable. Such are the
laws to prohibit the use of warehouses for the
storage of gunpowder.[98]

51.  In short, there was unanimous agreement among leading antebellum jurists, at both the federal and state level, that the regulation of arms and gun powder was at the core of the police power enjoyed by legislatures.  Indeed, the scope of government power to regulate, prohibit, and inspect gunpowder has been among the most far reaching of any exercise of the police power throughout American history.[99]  A Maine law enacted in 1821 authorized town officials to enter any building in town to search for gun powder:

Be it further enacted, That it shall, and may be
lawful for any one or more of the selectmen of any
town to enter any building, or other place, in such
town, to search for gun powder, which they may have
reason to suppose to be concealed or kept, contrary
to the rules and regulations which shall be
established in such town, according to the
provisions of this Act, first having obtained a
search warrant therefore according to law.[100]

52.  No jurisdiction enumerated the full contours of the police power they possessed in a single text or in a single

---

[98] *Commonwealth v. Alger*, 61 Mass. (7 Cush.) 53 (1851).  For another good discussion of how state jurisprudence treated the concept, *see Thorpe v. Rutland*, 27 Vt. 140, 149 (1855).

[99] CORNELL, THE POLICE POWER, *supra* note 36.

[100] 1821 Me. Laws 98, An Act for the Prevention of Damage by Fire, and the Safe Keeping of Gun Powder, chap. 25, § 5.

statute or ordinance.  Rather, it was well understood that the exercise of this power would need to adapt to changing circumstances and new challenges as they emerged.  This conception of law was familiar to most early American lawyers and judges who had been schooled in common law modes of thinking and analysis.[101]  Throughout the long sweep of Anglo-American legal history, government applications of the police power were marked by flexibility, allowing local communities to adapt to changing circumstances and craft appropriate legislation to deal with the shifting challenges they faced.[102]  This vision of the police power was articulated forcefully by the Supreme Court in the License Cases when Justice McClean wrote this about the scope of state police power:

> It is not susceptible of an exact limitation, but must be exercised under the changing exigencies of society. In the progress of population, of wealth, and of civilization, new and vicious indulgences spring up, which require restraints that can only be imposed by new legislative power. When this power shall be exerted, how far it shall be carried, and where it shall cease, must mainly depend upon the evil to be remedied.[103]

53.  One of the most important early American gun-related cases discussed in *Heller*, *State v. Reid*, offers an excellent illustration of the way police power jurisprudence was used by

---

[101] KUNAL M. PARKER, COMMON LAW HISTORY, AND DEMOCRACY IN AMERICA, 1790-1900: LEGAL THOUGHT BEFORE MODERNISM 147-148 (2013).

[102] William J. Novak, *A State of Legislatures*, 40 POLITY 340 (2008).

[103] *License Cases (Thurlow v. Massachusetts; Fletcher v. Rhode Island; Peirce v. New Hampshire),* 5 How. (46 U.S.) 504, 592 (1847).

antebellum judges to adjudicate claims about gun rights and the right of the people to regulate.[104]  The case is a classic example of antebellum police power jurisprudence.  The Supreme Court of Alabama evaluated the statute by focusing on the scope of state police power authority over guns.  "The terms in which this provision is phrased," the court noted, "leave with the Legislature the authority to adopt such regulations of police, as may be dictated by the safety of the people and the advancement of public morals."[105]  In the court's view, the regulation of arms was at the very core of state police power.[106]  The judicial determination was straight forward:  was the challenged law a legitimate exercise of the police power or not?

## V.   RECONSTRUCTION AND THE EXPANSION OF STATE POLICE POWER TO REGULATE FIREARMS (1863-1877)

54.  Founding-era constitutions treated the right of the people to regulate their internal police separately from the equally important right of the people to bear arms.  These two rights were separate in the Founding era but were mutually reinforcing: both rights were exercised in a manner that furthered the goal of ordered liberty.  Reconstruction-era constitutions adopted a new textual formulation of the connection between these two formerly distinct rights, fusing the two

---

[104] *See State* v. *Reid,* 1 Ala. 612, 612 (1840).

[105] *Id.* at 616.

[106] Apart from rare outlier decisions, such as *Bliss v. Commonwealth*, 12 Ky. (2 Litt.) 90, 92 (1822) courts employed a police power framework to adjudicate claims about the scope of state power to regulate arms.  For a useful discussion of *Bliss* in terms of the police power, *see* FREUND, *supra* note 72, at 91.

Declaration of Saul Cornell (Case No. 2:17-cv-00903-WBS-KJN)

together as one single constitutional principle.  This change
reflected two profound transformations in American politics and
law between 1776 and 1868.  First, the judicial concept of police
power gradually usurped the older notion of a police right
grounded in the idea of popular sovereignty.  As a result, state
constitutions no longer included positive affirmations of a
police right.  Secondly, the constitutional "mischief to be
remedied" had changed as well.[107]  Constitution writers in the era
of the American Revolution feared powerful standing armies and
sought to entrench civilian control of the military.  By
contrast, constitution writers in the era of the Fourteenth
Amendment were no longer haunted by the specter of tyrannical
Stuart Kings using their standing army to oppress American
colonists.  In place of these ancient fears, a new apprehension
stalked Americans:  the proliferation of especially dangerous
weapons and the societal harms they caused.[108]

---

[107] The mischief rule was first advanced in *Heydon's Case*,
(1584) 76 Eng. Rep. 637 (KB) — the legal principle that the
meaning of a legal text was shaped by an understanding of the
state of the common law prior to its enactment and the mischief
that the common law had failed to address and that new
legislation had intended to remedy — continued to shape Anglo-
American views of statutory construction, and legal
interpretation more generally, well into the nineteenth century.
For Blackstone's articulation of the rule, see 1 BLACKSTONE, *supra*
note 8, at *61.  The relevance of common law modes of statutory
construction to interpreting antebellum law, including the
mischief rule, is clearly articulated in 1 ZEPHANIAH SWIFT, A DIGEST
OF THE LAWS OF THE STATE OF CONNECTICUT 11 (New Haven, S. Converse
1822).  For a modern scholarly discussion of the rule, *see* Samuel
L. Bray, *The Mischief Rule*, 109 GEO. L.J. 967, 970 (2021).

[108] *See McDonald*, 561 U.S. at 767-68

41

55.  The new language state constitutions employed to describe the right to bear arms enacted during Reconstruction responded to these changed circumstances by adopting a new formulation of the venerable right codified in 1776, linking the right to bear arms inextricably with the states broad police power to regulate conduct to promote health and public safety.[109] For example, the 1868 Texas Constitution included new language that underscored the indissoluble connection that Anglo-American law had long recognized between the right to keep and bear arms and regulation of guns.  "Every person shall have the right to keep and bear arms, in the lawful defence of himself or the government, under such regulations as the Legislature may prescribe."[110]  Nor was Texas an outlier in this regard.  Sixteen state constitutions adopted during this period employed similarly expansive language.[111]  Millions of Americans living in the newly organized western states and newly reconstructed states of the former confederacy adopted constitutional provisions that reflected this new formulation of the right to bear arms.  Thus, millions of Americans were living under constitutional regimes

---

[109] Saul Cornell, *The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America*, 55 U.C. DAVIS L. REV. 65 (2022).

[110] TEX. CONST. OF 1868, Art. I, § 13; for similarly expansive constitutional provision enacted after the Civil War, *see* IDAHO CONST. OF 1889, art. I, § 11 ("The people have the right to bear arms for their security and defense; but the legislature shall regulate the exercise of this right by law."); UTAH CONST OF 1896, art. I, § 6 ("[T]he people have the right to bear arms for their security and defense, but the legislature may regulate the exercise of this right by law.").

[111] Cornell, *supra* note 96, at 75–76.

42

that acknowledged that the individual states' police power authority was at its apogee when regulating guns.[112]

56.  This expansion of regulation was entirely consistent with the Fourteenth Amendment's emphasis on the protection of rights and the need to regulate conduct that threatened the hard-won freedoms of recently free people of the South and their Republican allies.  The goals of Reconstruction were therefore intimately tied to the passage and enforcement of racially neutral gun regulations.[113]

57.  Reconstruction ushered in profound changes in American law, but it did not fundamentally alter the antebellum legal view that a states' police powers were rooted in the people's right to make laws to protect the peace and promote public safety.  Nor did Reconstruction challenge the notion that these powers were at their zenith when dealing with guns and gun powder.  In fact, the Republicans who wrote the Fourteenth Amendment were among the most ardent champions of an expansive view of state police power. As heirs to the antebellum Whig vision of a well-regulated society, Reconstruction-era Republicans used government power aggressively to protect the rights of recently freed slaves and promote their vision of ordered liberty.[114]

---

[112] *Id.*

[113] Brennan Gardner Rivas, *Enforcement of Public Carry Restrictions: Texas as a Case Study*, 55 U.C. DAVIS L. REV. 2603 (2022).

[114] Robert J. Kaczorowski*, Congress's Power to Enforce Fourteenth Amendment Rights: Lessons from Federal Remedies the Framers Enacted*, 42 HARV. J. ON LEGIS. 187, 205 (2005); Christopher Tomlins, *To Improve the State and Condition of Man: The Power to Police and the History of American Governance* 53 BUFFALO L. REV. 1215 (2005-2006).

58.  Indeed, the passage of the Fourteenth Amendment was premised on the notion that the individual states would not cede their police power authority to the federal government.  The author of Section One of the Fourteenth Amendment, John Bingham, reassured voters that the states would continue to bear the primary responsibility for "local administration and personal security."[115]  As long as state and local laws were racially neutral and favored no person over any other, the people themselves, acting through their representatives, were free to enact reasonable measures necessary to promote public safety and further the common good. [116]

59.  It would be difficult to understate the impact of this new paradigm for gun regulation on post-Civil War legislation. Across the nation legislatures took advantage of the new formulation of the right to bear arms included in state constitutions and enacted a staggering range of new laws to regulate arms.  Indeed, the number of laws enacted skyrocketed, increasing by over four hundred percent from antebellum levels.[117] Not only did the number of laws increase, but the number of states and localities passing such laws also expanded.[118]

---

[115] John Bingham, *Speech*, CINCINNATI DAILY GAZETTE (Sept. 2, 1867), as quoted in Saul Cornell and Justin Florence, *The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation*, 50 SANTA CLARA L. REV. 1043, 1058 (2010).

[116] For a discussion of how the courts wrestled with the meaning of the Amendment, *see* WILLIAM E. NELSON, THE FOURTEENTH AMENDMENT: FROM POLITICAL PRINCIPLE TO JUDICIAL DOCTRINE 173-4 (1998).

[117] *See* Spitzer, *supra* note 40, at 59-61 tbl. 1.

[118] *Id.*

1    60.  Henry Campbell Black, the author of *Black's Law*

2  *Dictionary*, described the police power as "inalienable" and

3  echoed the view of a long line of jurists who noted that the

4  scope of the power was not easily defined and the determination

5  of its limits was best left to courts on a case-by-case basis.[119]

6  Indeed, even the most ardent critics of the police power, such as

7  conservative legal scholar Christopher G. Tiedeman, acknowledged

8  that "police power of the State extends to the protection of the

9  lives, limbs, health, comfort and quiet of all persons, and the

10 protection of all property within the State."[120]

11   61.  In keeping with the larger goals of Reconstruction,

12 Republicans sought to protect the rights of African Americans to

13 bear arms but were equally insistent on enacting strong racially

14 neutral regulations aimed at public safety.  Violence directed

15 against African Americans, particularly the campaign of terror

16 orchestrated by white supremacist para-military groups prompted

17 Republican dominated legislatures in the Reconstruction South to

18 pass a range of racially neutral gun regulations.[121]  The racially

19 neutral gun laws enacted by Republicans were in part a reaction

20 to the discriminatory black codes passed by neo-confederate

21 legislatures earlier in Reconstruction.  The Black Codes violated

22      [119] HENRY CAMPBELL BLACK, HANDBOOK OF CONSTITUTIONAL LAW, 334–344 (2d

23 ed., 1897).

24      [120] CHRISTOPHER G. TIEDEMAN, A TREATISE ON THE LIMITATIONS OF THE POLICE
POWER IN THE UNITED STATES 4–5 (1886) (citing *Thorpe v. Rutland R.R.*,

25 27 Vt. 140, 149-50 (1854)).

26      [121] Mark Anthony Frassetto, *The Law and Politics of Firearms
Regulation in Reconstruction Texas*, 4 TEX. A&M L. REV. 95, 113–17

27 (2016); Brennan G. Rivas, *An Unequal Right to Bear Arms: State
Weapons Laws and White Supremacy in Texas, 1836-1900*, 121

28 SOUTHWESTERN QUARTERLY 284 (2020).

1 the Second Amendment, but the wave of firearms legislation passed
2 by Republican controlled state legislatures in the South were
3 consciously crafted to honor the Second Amendment and protect
4 individuals from gun violence.[122]

5    62.  The laws enacted during Reconstruction underscore the
6 fact that robust regulation of firearms during Reconstruction was
7 not a novel application of the police power, but an expansion and
8 continuation of antebellum practices.  Moreover, these efforts
9 illustrated a point beyond dispute: the flexibility inherent in
10 police power regulations of guns.  American states had regulated
11 arms since the dawn of the republic and Reconstruction simply
12 renewed America's commitment to the idea of well-regulated
13 liberty.

14 **VI.  LARGE-CAPACITY MAGAZINES, THE POLICE POWER, AND THE LATEST FACE OF**
15     **TERROR**

16    63.  Another major inflection point in the history of
17 firearms regulation emerged in the context of the debate on
18 assault weapons and large-capacity magazines, which were closely
19 connected to the rise of mass shootings in the last decades of
20 the twentieth century.[123]  California began restricting large-

---

21    [122] *See* Darrell A. H. Miller, *Peruta, The Home-Bound Second*
22 *Amendment, and Fractal Originalism,* 127 HARV. L. REV. 238, 241
(2014); *see also* Robert J. Kaczorowski, *Congress's Power to*
23 *Enforce Fourteenth Amendment Rights: Lessons from Federal*
*Remedies the Framers Enacted*, 42 HARV. J. ON LEGIS. 187, 205 (2005)
24 (discussing Republican use of federal power to further their
25 aims, including to enforce the Fourteenth Amendment).

26    [123] Allen Rostron, *Style, Substance, and the Right to Keep*
*and Bear Assault Weapons*, 40 CAMPBELL L. REV. 301 (2018); Jaclyn
27 Schildkraut et.al., *Mass Shootings, Legislative Responses, and*
*Public Policy: An Endless Cycle of Inaction*, 68 EMORY L.J. 1043
28 (2020).

capacity magazines in 2000.[124]   Proposals to ban large-capacity

magazines are part of a larger national movement to deal with the

carnage caused by high capacity, high velocity weapons. The

effort to ban such weapons and accessories parallels earlier

efforts to deal with machine guns and semi-automatic weapons

during the 1920s.[125]

   64.  Legislative efforts to ban these weapons fit squarely

within the long Anglo-American tradition of limiting public

access to weapons capable of provoking terror.  During America's

first gun violence crisis in the Jacksonian era, states targeted

pistols that were easily concealed, and in the New Deal era,

states singled out gangster weapons such as the notorious

Thompson sub-machine gun (or "Tommy Gun"), treating these weapons

as sufficiently dangerous or unusual to warrant extensive

regulation, or prohibition.  The same imperatives and

constitutional logic guided both regulatory regimes.[126]

   65.  Regulation of firearms follows a well-worn path.

Technological innovation is only part of this equation.  In

addition, weapons must also achieve sufficient market penetration

to create a potential for criminal abuse.  Once a weapon enters

the marketplace it typically takes some time for the public and

legislative bodies to recognize the potential societal harm

arising from a new type of weapon. At this point legislatures

attempt to find a means to address the problem posed by these

---

[124] 1999 Cal. Stat. 1781, §§ 3, 3.5 (S.B. 23) (now codified
at Cal. Penal Code § 32310(a)).

[125] Spitzer, *supra* note 40.

[126] *Id.*

weapons without trenching on constitutionally protected liberties.[127]

66.  In short, there are time lags between the invention of a particular type of gun, the creation of a marketing strategy to sell the weapon, and the recognition that such weapons have produced societal harms that require regulation.

**VII.  BRUEN'S FRAMEWORK AND MODERN LARGE-CAPACITY MAGAZINES**

67.  The power to regulate and in some cases prohibit dangerous or unusual weapons has always been central to the police power authority of states and localities.  States and localities have regulated gunpowder and arms since the earliest days of the American Republic.  The statutes at issue in this case fit squarely within this long-established tradition of firearms regulation in America, beginning in the colonial period and stretching across time to the present.[128]  The adaptability of state and local police power provided the flexibility governments needed to deal with the problems created by changes in firearms technology and gun culture.

68.  At different moments in American history communities have deemed categories of weapons to be especially dangerous and have regulated them, and when it appeared necessary enacted bans on some types of weapons.  Such determinations were not made based on technological features in isolation but reflected the ancient common law tradition of singling out weapons capable of

---

[127]  *Id.*

[128]  *Supra* note 40.

1    producing terror.  Such weapons undermined the peace and the

2    constitutional imperative embedded in the text of the Second

3    Amendment to protect the security of a free state.  Defining

4    exactly which category of weapons fall outside of the scope of

5    constitutional protection has shifted over time as society has

6    addressed new developments in firearms technology, evolving

7    societal norms, and  the negative consequences from the spread of

8    new technologies. In short, in the history of firearms

9    regulation, social, and economic transformation were always

10   accompanied by legal transformation, as government adapted to new

11   realities and new problems.  Put another way, as times change,

12   the law changes with them.

13       Pursuant to 28 U.S.C. §1746, I declare under penalty of

14   perjury under the laws of the United States of America that the

15   foregoing is true and correct.

16       Executed on April 27, 2023, at Redding, Connecticut.

17

18

19                        _Saul Cornell_

20                        Saul Cornell

21

22

23

24

25

26

27

28

**EXHIBIT 1**

# Saul Cornell

Paul and Diane Guenther Chair in American History
Department of History
Fordham University
441 East Fordham Road ✳ Bronx, NY 10458 ✳ 203 826-6608 (c) ✳ scornell1@fordham.edu

| Education | | | |
|---|---|---|---|
| 1989 | University of Pennsylvania | Ph.D. | Dissertation: "The Political Thought and Culture of the Anti-Federalists" |
| 1985 | University of Pennsylvania | MA | History |
| 1982 | Amherst College | BA | History - Magna Cum Laude |
| 1980-81 | University of Sussex, Brighton, England | | |

| Teaching Experience | | |
|---|---|---|
| 2009-2020 | Guenther Chair in American History | Fordham University |
| 2011-2022 | Adjunct Professor of Law | Fordham Law School |
| 2005-2008 | Professor of History | The Ohio State University |
| 1997-2005 | Associate Professor, History | The Ohio State University |
| 1995 | Thomas Jefferson Chair | University of Leiden, The Netherlands |
| 1991-1997 | Assistant Professor, History | The Ohio State University |
| 1989-1991 | Assistant Professor, History | College of William and Mary |

## Fellowships and Grants

- 2019-2020 The Gilder Lehrman Center for the Study of Slavery, Resistance, and Abolition, Yale University
- 2018-2019 Senior Research Scholar in Residence, Floersheimer Center for Constitutional Democracy, Cardozo Law School
- 2014 Senior Research Scholar in Residence, University of Connecticut Law School
- 2011 Senior Research Scholar in Residence, Yale Law School
- 2003-2008 Joyce Foundation, Second Amendment Center Grant, $575,000
- 2003-2004 NEH Fellowship
- 2002-2005 Department of Education, Teaching American History Grant, Historyworks, $2,000,000
- 2002 Gilder-Lehrman Fellowship
- 2001-2002 Joyce Foundation Planning Grant, $40,000
- 2001 American Council of Learned Societies (ACLS)
- 1999-2000 Betha Grant, Batelle Memorial Endowment, Ohio Teaching Institute, $100,000
- 1998 Thomas Jefferson Memorial Foundation, Research Fellowship
- 1995 Thomas Jefferson Chair in American Studies, Fulbright Lecturing Award
- 1994 Ohio State University Seed Grant
- 1993 Ohio State University Special Research Assignment
- 1992 Ohio State University Grant-In-Aid
- 1989-1991 NEH Post-Doctoral Fellow, Institute of Early American History and Culture

| **Prizes and Awards** |
|---|

- 2006 Langum Prize in Legal History 2006
- 2006 History News Network, Book of the Month
- 2006 History News Network, Top Young Historian
- 2001 Society of the Cincinnati, History Book Prize, a Triennial Award for the Best Book on the American Revolutionary Era
- 2000 Choice Outstanding Academic Book

| **Book Publications** |
|---|

The Partisan Republic:  Democracy, Exclusion, and the Fall of the Founders Constitution
*New Histories of American Law*, series eds., Michael Grossberg and Christopher Tomlins (Cambridge University Press, 2019)  [With Gerald Leonard]

The Second Amendment On Trial:  Critical Essays on District of Columbia v. Heller
(University of Massachusetts Press,  2013) [with Nathan Kozuskanich]

Visions of America: A History of the United States [co-authored with  Jennifer Keene and Ed O'Donnell]
 (First edition, 2009),( second edition 2013) (third edition, 2016)

"A Well Regulated Militia": The Founding Fathers and the Origins of Gun Control (Oxford University Press, 2006) (paperback edition  2008)

Whose Right to Bear Arms Did the Second Amendment Protect?  (Bedford/St. Martins Press, 2000)
 (Paperback 2000)

The Other Founders:  Anti-Federalism and the Dissenting Tradition in America, 1788-1828  (Institute of Early American History and Culture, University of North Carolina Press, 1999)  (paperback edition 2001)

Editor, Retrieving the American Past:  Documents and Essays on American History, (Pearson, 1994-2008)

**Scholarly Articles, Book Chapters, and  Essays:**

"History and Tradition or Fantasy and Fiction: Which Version of the Past  Will the Supreme Court Choose in NYSRPA  v. Bruen?," 49 *Hastings Constitutional  Law Quarterly* (2022): 145-177.

"The Long Arc of Arms Regulation in Public: From Surety to Permitting,1328–1928," 55  University  of California, Davis Law Review  (2022): 2545-2602

"'Infants' and Arms Bearing in the Era of the Second Amendment:  Making Sense of the Historical Record," 40 Yale Law & Policy Review Inter Alia 1 (2021)

"The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America" *55*  University of California, Davis Law Review Online (2021): 65-90.

Exhibit 1_Cornell
Page 2

"President Madison's Living Constitution: Fixation, Liquidation, and Constitutional Politics in the Jeffersonian Era", 89 Fordham Law Review (2021): 1761-1781.

"History, Text, Tradition, and the Future of Second Amendment Jurisprudence: Limits on Armed Travel Under Anglo-American Law, 1688–1868," 83 Law and Contemporary Problems (2020): 73-95

"Reading the Constitution, 1787–91: History, Originalism, and Constitutional Meaning." Law and History Review 37 (2019): 821–45

"Constitutional Mythology and the Future of Second Amendment Jurisprudence after Heller," in Firearms and Freedom: The Second Amendment in the Twenty-First Century Controversies in American Constitutional Law Series (Routledge, 2017): 8-24

"The Right to Keep and Carry Arms in Anglo-American Law, Preserving Liberty and

Keeping the Peace," 80 Law and Contemporary Problems (2017): 11-54

"Half Cocked': The Persistence of Anachronism and Presentism in the Academic Debate over the Second Amendment," 107 Northwestern Journal of Criminal Law 107 (2017): 203-218

"The 1790 Naturalization Act and the Original Meaning of the Natural Born Citizen Clause: A Short Primer on Historical Method and the Limits of Originalism," Wisconsin Law Review Forward 92 (2016)

"Constitutional Meaning and Semantic Instability: Federalists and Anti-Federalists on the Nature of Constitutional Language," in special issue on "The Future of Legal History," American Journal of Legal History 56 (2016): 21-29

"Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context," Yale Law Journal Forum 125(2015-16):121-135 [with Eric Ruben]

"Originalism As Thin Description: An Interdisciplinary Critique" Fordham Law Review Res Gestae 84 (2015): 1-10

"The Right to Bear Arms," The Oxford Handbook of the US Constitution, eds., Mark Tushnet, Sanford Levinson, and Mark Graber (2015): 739-759

"Conflict, Consensus & Constitutional Meaning: The Enduring Legacy of Charles Beard" Constitutional Commentary 29 (2014): 383-409

"Meaning and Understanding in the History of Constitutional Ideas: the Intellectual History Alternative to Originalism" Fordham Law Review 82 (2013): 721-755

"The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities" Fordham Urban Law Journal 39 (2012): 1695-1726

"Evidence, Explanation, and the Ghost of Charles Beard" William & Mary Quarterly 69 (2012): 393-4

"Idiocy, Illiteracy, and the Forgotten Voices of Popular Constitutionalism: Ratification and the Ideology of Originalism" William & Mary Quarterly 69 (2012): 365-368

"The People's Constitution v. The Lawyer's Constitution: Popular Constitutionalism and the Original Debate Over Originalism," Yale Journal of Law and the Humanities 23 (2011): 295-337

"St. George Tucker's Lecture Notes, The Second Amendment, and Originalist Methodology: A Critical Comment," Northwestern University Law Review 103 (2009): 406-416

Exhibit 1_Cornell
Page 3

"Heller, New Originalism, and Law Office History: 'Meet the New Boss, Same as the Old Boss'" UCLA Law Journal 56 (2009): 1095 -1125

"Originalism on Trial: The Use and Abuse of History in District of Columbia v. Heller" Ohio-State Law Journal 69 (2008): 625-640

"Consolidation of the Early Federal System," Chapter 10 of the Cambridge History of A merican Law (Cambridge University Press, 2008) [With Gerry Leonard]

"The Ironic Second Amendment" Albany Government Law Review 2 (2008): 292-311.

"The Original Meaning of Original Understanding: A Neo-Blackstonian Critique," Maryland Law Review (2008): 101-115

"Mobs, Militias, and Magistrates: Popular Constitutionalism During the Whiskey Rebellion," Chicago-Kent Law Review (2007): 883-903

"The Second Amendment and Early American Gun Regulation: a Closer Look at the Evidence," Law and History Review (2007): 197-204

"St. George Tucker and the Second Amendment: Original Understandings and Modern Misunderstandings," William and Mary Law Review 47 (2006): 1123-55

"The Early American Origins of the Modern Gun Control Debate: The Right to Bear Arms, Firearms Regulation, the Lessons of History," Stanford Law and Policy Review (2006): 571-596

"Well Regulated: The Early American Origins of Gun Control," Fordham Law Review 73 (2004): 487-528 [With Nathan DeDino]

"Beyond the Myth of Consensus: The Struggle to Define the Right to Bear Arms in the Early Republic," in Beyond the Founders: New Essays on the Political History of the Early Republic (UNC Press, 2005)

"A New Paradigm for the Second Amendment," Law and History Review 22 (2004): 161-7

"Gun Laws and Policies: A Dialogue," Focus on Law Studies: Teaching about Law in the Liberal Arts (American Bar Association, 2003)

"The Militia Movement," Oxford Companion to American Law (Oxford University Press, 2002)

"Don't Know Much About History: The Current Crisis in Second Amendment Scholarship," Northern Kentucky Law Review (2003)

"A Right to Bear Quills or Kill Bears? A Critical Commentary on the Linkage between the 1st and 2nd Amendment in Recent Constitutional Theory," in The Limits of Freedom in A Democratic Society (Kent State University Press, 2001)

"The Irony of Progressive Historiography: The Revival of Anti-Federalism in Contemporary Constitutional History," in American Law Ways and Folkways (Odense University Press, Denmark 2001)

"Commonplace or Anachronism: The Standard Model, The Second Amendment, and the Problem of History in Contemporary Constitutional Theory," Constitutional Commentary (1999): 221-246

"Mere Parchment Barriers? Anti-Federalists, the Bill of Rights, and the Question of Rights Consciousness," in Government Proscribed: The Bill of Rights (University of Virginia Press, 1998): 175-208

Exhibit 1_Cornell
Page 4

"Moving Beyond the Great Story: Post-Modern Prospects, Post-Modern Problems, A Forum on Robert Berkhofer, Jr. Beyond the Great Story" American Quarterly (1998): 349-357

"The Anti-Federalists," in The Blackwell Companion to American Thought, eds., James Kloppenberg (London, 1995)

"The Bill of Rights," in The Blackwell Companion to American Thought, eds., James Kloppenberg (London, 1995)

"Splitting the Difference: Textualism, Contexualism, and Post-Modern History," American Studies (1995): 57-80

"Canon Wars II: The Return of the Founders," Reviews in American History 22 (1994): 413-417

"Moving Beyond the Canon of Traditional Constitutional History: Anti-Federalists, the Bill of Rights and the Promise of Post-Modern Historiography," Law and History Review (1994): 1-28

"Early American History in a Post-Modern Age," William and Mary Quarterly 50 (1993): 329-341

"Liberal Republicans, Republican Liberals?: The Political Thought of the Founders Reconsidered," Reviews in American History 21 (1993): 26-30

"Politics of the Middling Sort: The Bourgeois Radicalism of Abraham Yates, Melancton Smith, and the New York Anti-Federalists," in New York in the Age of the Constitution (New York Historical Society, 1992): 151-175

"Aristocracy Assailed: Back-Country Opposition to the Constitution and the Problem of Anti-Federalist Ideology," Journal of American History (1990): 1148-1172

"The Changing Historical Fortunes of the Anti-Federalists," Northwestern University Law Review (1989): 39-73

"Reflections on the `Late Remarkable Revolution in Government,' Aedanus Burke and Samuel Bryan's Unpublished History of the Ratification of the Federal Constitution," The Pennsylvania Magazine of History and Biography (1988): 103-130

## Book Reviews:

- Journal of American History
- William and Mary Quarterly
- American Studies  Journal of the Early Republic
- Pennsylvania Magazine of History and Biography
- American Quarterly
- American Journal of Legal History
- Law and History Review

## Journal Manuscript Referee:

- Journal of American History
- William and Mary Quarterly
- Diplomatic History
- Pennsylvania Magazine of History and Biography
- Law and History Review
- Harvard Law Review

- <u>Stanford Law Review</u>
- <u>Yale Law Journal</u>

**Book Manuscript Reviewer:**

- University Press of Virginia
- University of North Carolina Press
- Stanford University Press
- University of Massachusetts Press
- Oxford University Press
- Cambridge University Press
- University of Michigan Press
- Harvard University Press

**<u>Invited Lectures:</u>**

"Race, Regulation, and Guns: The Battleground in the Debate Over the Second Amendment," Haber/Edelman Lecture:  University of Vermont,  Fall 2021

"Second Amendment Myths and Realities," University of Tampa, Honors College Symposium, November 30, 2018.

"The Common Law and Gun Regulation: Neglected Aspects of the Second Amendment Debate,"  Guns in Law, Amherst College, Law Justice and Society (2016)

"The New Movement to End Gun Violence." UCLA Hammer Museum (2016)

"No Person May Go Armed": A Forgotten Chapter in the History of Gun Regulation" The Elizabeth Battelle Clark Legal History Series, Boston University College of Law, 2016

Legacy Speaker Series:  "Guns in the United States," University of Connecticut (2016) "How does the Second Amendment Apply to Today?"

American Constitution Society/ Federalist Society Debate, Tulane Law School, New Orleans (2016)

"The Second Amendment and The Future of Gun Regulation: Forgotten Lessons From U.S. History," Constitution Day Lecture, Goucher College, (2015)

Keynote Lecture: "The Second Amendment and American Cultural Anxieties:  From Standing Armies to the Zombie Apocalypse" Firearms and Freedom: The Relevance of the Second Amendment in the Twenty First Century, Eccles Center, British Library (Spring 2015)

"Narratives of Fear and Narratives of Freedom:  A Short Cultural History of the Second Amendment," Comparing Civil Gun Cultures: Do Emotions Make a Difference? Max Plank Institute, Berlin (2014)

"History and Mythology in the Second Amendment Debate," Kollman Memorial Lecture, Cornell College, Iowa (Spring, 2013)

"Will the Real Founding Fathers Please Stand Up or Why are so few Historians Originalists" Constitution Day Lecture, Lehman College, Fall 2011

"Lawyers, Guns, and Historians: The Second Amendment Goes to Court," SHEAR/HSP Public Lecture, Philadelphia, July, 2008

Exhibit 1_Cornell
Page 6

The Robert H. and Alma J. Wade Endowment Lecture, Kentucky Wesleyan University, "The Early American Origins of Gun Control" (2006)

"Jefferson, Mason, and Beccaria:  Three Visions of the Right to Bear Arms in the Founding Era," Bill of Rights Lecture, Gunston Hall Plantation, Fairfax, VA   (2003)

"A New Paradigm for the Second Amendment," Finlay Memorial Lecture, George Mason University, (2001)

"Academic Gunsmoke:  The Use and Abuse of History in the Second Amendment Debate," Cadenhead Memorial Lecture, University of Tulsa, (2000)

"Why the Losers Won: The Rediscovery of Anti-Federalism in the Reagan Years," Thomas Jefferson Inaugural Lecture, University of Leiden, Netherlands, (1995)

### **Presentations:**

"From Ideology to Empiricism: Second Amendment Scholarship After Heller, " Hastings Constitutional Law Quarterly Symposium, Heller at Ten, January 18, 2019

"Firearms and the Common Law Tradition,"  Aspen Institute, Washington, DC (2016)

"The Original Debate over Original Meaning Revisited, " British Group in EarlyAmerican History, Annual Meeting,  Cambridge, England (2016)

"Second Amendment Historicism and Philosophy"  The Second Generation of Second Amendment Scholarship" Brennan Center, NYU 2016

"The Reception of the Statute of Northampton in Early America:  Regionalism and the Evolution of Common Law Constitutionalism" OIEAHC and the USC/Huntington Library Early Modern Studies Institute May 29–30, 2015

"The Right to Travel Armed in Early America: From English Restrictions to Southern Rights," British Group in Early American History, Annual Conference Edinburgh, Scotland (2014)

"Progressives, Originalists, and Pragmatists:  The New Constitutional Historicism and the Enduring Legacy of Charles Beard," Charles Beard, Economic Interpretation and History, Rothmere Center, Oxford University (2012)

CUNY Early American Seminar, "The People's Constitution v. the Lawyer's Constitution," 2011

Roundtable : "The Work of J.R. Pole," SHEAR , Philadelphia, Pennsylvania 2011)

"The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation?" Bearing Arms, Policy, Policing, and Incorporation After Heller, Santa Clara Law School (2010)

"Re-envisioning Early American History,"  American Historical Association Annual Meeting, San Diego (2010)

"The Ironic Second Amendment"  Firearms, the Militia, and Safe Cities: Merging History, Constitutional Law and Public Policy,  Albany Law School ( 2007)

"*District of Columbia* v. *Heller*  and the Problem of Originalism,"  University of Pennsylvania Constitutional Law Workshop, Philadelphia ( 2007)

"Progressives and the Gun Control Debate,"  American Constitution Society, Harvard Law School, (2006)

"The Problem of Popular Constitutionalism in Early American Constitutional Theory," American Association of Law Schools, Annual Conference (2006)

"Popular Constitutionalism and the Whiskey Rebellion," Symposium on Larry Kramer's The People Themselves, Chicago-Kent Law School  (2005)

Roundtable Discussion on the Second Amendment and Gun Regulation,  NRA/ GMU Student's For the Second Amendment Symposium  (2005)

"The Early American Origins of the Modern Gun Control Debate: The Right to Bear Arms, Firearms Regulation, and the Lessons of History,"  Gun Control: Old Problems, New Problems, Joint Conference Sponsored by the John Glenn Institute and Stanford Law School (2005)

"Original Rules for Originalists?"  University of Minnesota Law School (2005)

"The Fourteenth Amendment and the Origins of the Modern Gun Debate," UCLA, Legal History Workshop (2004)

"Beyond Consensus, Beyond Embarrassment: The Use and Abuse of History in the Second Amendment Debate," American Society of Legal History, Austin, TX  (2004)

"Armed in the Holy Cause of Liberty: Guns and the American Constitution," NYU Legal History Colloquium (2004)

"Digital Searches and  Early American History,"  SHEAR  Brown University  (2004)

"Well Regulated: The Early American Origins of Gun Control," The Second Amendment and the Future of Gun Regulation," Joint Conference Sponsored by the John Glenn Institute and Fordham Law School, New York (2004)

"Minuteman, Mobs, and Murder: Forgotten Contexts of the Second Amendment," Department of History, University of California Berkeley (2003)

"History vs. Originalism in the Second Amendment Debate,"  Federalist Society/ American Constitution Society, George Washington University Law School, Washington D.C.  (2003)

"Self-defense, Public Defense, and the Politics of Honor in the Early Republic," Lake Champlain Early American Seminar, Montreal (2003)

"The Ironic Second Amendment"  "Gun Control:  Controversy, Social Values, and Policy," University of Delaware Legal Studies Conference, Newark, Delaware (2003)

"Individuals, Militias, and the Right to Bear Arms:  The Antebellum Debate Over Guns," Institute for Legal Studies, University of Wisconsin School of Law (2004)

"Guns in the British Atlantic World: New Research, New Directions" Society for the Historians of the Early American Republic, Ohio State University (2003)

"Neither Individual nor Collective:  A New Paradigm for the Second Amendment," American Bar Foundation, Chicago (2003)

"The Changing Meaning of the Armed Citizen in American History," "Americanism Conference," Georgetown University  (2003)

"A New Paradigm for the Second Amendment?"  Supreme Court Historical Society, Washington, D.C. (2002)

"Constitutional History as Cultural History: The Case of the Second Amendment" European American Studies Association, Bordeaux,  France (2002)

"Don't Know Much About History: The Current Crises in Second Amendment Scholarship," Salmon P. Chase College of Law, Symposium, "The Second Amendment Today," (2002)

"History, Public Policy, and the Cyber-Age: Gun Control Policy after the Emerson Decision," Sanford Institute of Public Policy, Duke University (2002)

"Constitutional History After the New Cultural History: The Curious Case of the Second Amendment," Society of the Historians of the Early American Republic, Baltimore (2001)

Roundtable Discussion, "The State of Second Amendment Scholarship," American Historical Association (2001)

"Armed in the Holy Cause of Liberty: Critical Reflections on the Second Amendment Debate," Vanderbilt University Law School (2001)

"Neither Individual nor Collective:  A New Paradigm for the Second Amendment,"  Boston University Law School, (2000)

"The Current State of Second Amendment Scholarship," National Press Club Washington, D.C. American Bar Association,  (2000)

"Taking the Hype out of Hyper-Text, Or What Should Textbook Companies Being Doing for us on the Web," OAH  St. Louis, Missouri (1999)

"The Ironies of Progressive Historiography: The Revival of Anti-Federalism in Contemporary Constitutional Theory," European American Studies Association, Lisbon, Portugal (1998)

"Deconstructing the Canon of American Constitutional History" American Society of Legal History, Seattle, Washington (1998)

"Beyond Meta-narrative: The Promise of Hypertext," American Studies Association, Seattle, Washington (1998)

"Text, Context, Hypertext," American Historical Association, Washington D.C. (1998)

"Jefferson and Enlightenment," International Center for Jefferson Studies, Charlottesville, VA, (1998)

"Copley's Watson and the Shark: Interpreting Visual Texts with Multi-media Technology," American Studies Association, Washington, D.C. (1997)

"Multi-Media and Post-Modernism," H-Net Conference, Technology and the Future of History, East Lansing, Michigan (1997)

Comment on Jack Rakove's Original Meanings, Society of the Historians of the Early Republic, State College, PA (1997)

"Teaching with Multi-Media Technology," Indiana University, spring 1997 "Constitutional History from the Bottom Up:  The Second Amendment as a Test Case," McGill University, Montreal, Canada (1996)

"Just Because You Are Paranoid, Does Not Mean the Federalists Are Not Out to Get You:  Freedom of the Press in Pennsylvania," University of Pennsylvania (1995)

"Multi-Media and Post-Modernism: The Future of American Studies?" Lecture, Erasmus University, Rotterdam, Netherlands (1995)

"Post-Modern American History?  Ratification as a Test Case," St. Cross College, Oxford University, Oxford, England (1994)

"The Other Founders,"  NYU Legal History Seminar," NYU Law School (1994)

"Reading the Rhetoric of Ratification,"  paper presented at "Possible Pasts:  Critical Encounters in Early America," Philadelphia Center for Early American Studies, Philadelphia, PA (1994)

"American Historiography and Post-Modernism," Organization of  American Historians, Atlanta, GA (1994)

"The Anti-Federalist Origins of Jeffersonianism,"  Columbia  Seminar on Early American History (1994)

"American History in a Post-Modern Age?" American Historical Association, San Francisco, CA (1994)

"Post-Modern Constitutional History?"  Indiana University School of Law,  Bloomington, IN (1993)

Participant, Institute of Early American History and Culture, planning conference, "New Approaches to Early American History," Williamsburg, VA (1992)

"Mere Parchment Barriers?  Federalists, Anti-Federalists and the Problem of Rights Consciousness," American Studies Association, Baltimore, MD (1991)

"James Madison and the Bill of Rights:  a comment on papers by Jack Rakove, Ralph Ketcham and Max Mintz," Organization of American Historians and Center for the Study of the Presidency Conference, "America's Bill of Rights at 200 Years,"  Richmond, VA, (1991)

Symposium participant, "Algernon Sidney and John Locke:  Brothers in Liberty?" Liberty  Fund Conference, Houston, TX  (1991)

"Mere Parchment Barriers?  Antifederalists, the Bill of Rights and the Question of Rights Consciousness," Capitol Historical Society, Washington, D.C. (1991)

"Anti-Federalism and the American Political Tradition," Institute of Early American History and Culture Symposium, Williamsburg, VA  (1989)

---

**Interviews, Editorials, Essays, Podcasts:**

---

- "Clarence Thomas' Latest Guns Decision Is Ahistorical and Anti-Originalist" SLATE June 24, 2022

- Cherry-picked history and ideology-driven outcomes: Bruen's originalist distortions*," SCOTUSblog (Jun. 27, 2022, 5:05 PM),

- "The Right Found a New Way to Not Talk About a School Shooting," SLATE May 25, 2022
- "The Horror in New York Shows the Madness of the Supreme Court's Looming Gun Decision," *Slate* May 19, 2022
- "Guns, Guns Everywhere: Last week's subway Shooting was Horrifying. If the Supreme Court Creates a National Right to Carry, the Future will be Worse," New York Daily News Apr 17, 2022
- "The Supreme Court's Latest Gun Case Made a Mockery of Originalism" *Slate* November 10, 2021
- "'Originalism' Only Gives the Conservative Justices One Option On a Key Gun Case," *Washington Post,* November 3, 2021
- "Neither British Nor Early American History Support the Nearly Unfettered Right to Carry Arms," *Slate* November 02, 2021
- "Will the Supreme Court Create Universal Concealed Carry Based on Fantasy Originalism?" *Slate* November 1, 2021
- "Biden was Wrong About Cannons, but Right About the Second Amendment," *Slate* June 29, 2021
- "Barrett and Gorsuch Have to Choose Between Originalism and Expanding Gun Rights," *Slate* April 29, 2021 Slate
- "What Today's Second Amendment Gun Activists Forget: The Right Not to Bear Arms," *Washington Post*, January 18, 2021
- "Could America's Founders Have Imagined This?" *The New Republic*, December 20, 2019
- "Don't Embrace Originalism to Defend Trump's Impeachment" *The New Republic*, December 5, 2019
- "The Second-Amendment Case for Gun Control" *The New Republic*, August 4, 2019
- "The Lessons of a School Shooting—in 1853" *Politico*, March 24, 2018.
- "Originalism and the Second Amendment in *District of Columbia v. Heller*," *University of Chicago Law Review*, Podcast, Briefly 1.9, Wed, 04/11/2018
- "Sandy Hook and the Original Meaning of the Second Amendment," *Time* December, 2017
- "The State of the Second Amendment," National Constitution Center, Podcast October, 2017
- "Gun Anarchy and the Unfree State: The Real History of the Second Amendment," *The Baffler On-line* October 2017
- "Five Types of Gun Laws the Founding Fathers Loved*" Salon* October 22, 2017
- "Half Cocked," *Book Forum* April 2016
- "Let's Make an Honest Man of Ted Cruz. Here's how we Resolve his "Birther" Dilemma with Integrity" *Salon* January 23, 2016
- "Guns Have Always Been Regulated," *The Atlantic Online* December 17, 2015
- "The Slave-State Origins of Modern Gun Rights" *The Atlantic Online* 30, 2015 [with Eric Ruben]
- PBS, "Need to Know: 'Debating the Second Amendment: Roundtable'" April 26, 2013
- "All Guns are not Created Equal" Jan 28, 2013 *Chronicle of Higher Education* [with Kevin Sweeney]

Exhibit 1_Cornell
Page 11

- "What the 'Right to Bear Arms' Really Means" *Salon* January 15, 2011 "Elena Kagan and the Case for an Elitist Supreme Court," *Christian Science Monitor* May 20, 2010
- "Gun Points," *Slate*, March 8, 2010 (With Justin Florence, and Matt Shors)
- "What's Happening to Gun Control,"  To the Point, NPR. March 11, 2010
- "Getting History Right," *National Law Journal*, March 1, 2010
- "History and the Second Amendment," *The Kojo Nnamdi Show* , WAMU (NPR) March 17, 2008
- "The Court and the Second Amendment,"  *On Point* with Tom Ashbrook, WBUR (NPR)  March 17, 2008
- "Aim for Sensible Improvements to Gun Regulations," *Detroit Free Press,* April 29, 2007
- "A Well Regulated Militia," *The Diane Rehm Show*, WAMU (NPR)  Broadcast on Book TV ( 2006)
- "Taking a Bite out of the Second Amendment," *History News Network*, January 30, 2005
- "Gun Control," Odyssey, Chicago NPR September 8, 2004
- "Loaded Questions," *Washington Post Book World*  February 2, 2003
- "The Right to Bear Arms," Interview *The Newshour,* PBS  May 8, 2002
- "Real and Imagined," *New York Times*, June 24, 1999

## Other Professional Activities

- Editorial Board, <u>Constitutional Study</u>, University of Wisconsin Press (2014-present)
- Advisory Council,  Society of Historians of the Early American Republic  (SHEAR) (2007-2009)
- Program Committee, Annual Conference, Society of the Historians of the Early American Republic,  Philadelphia, PA 2008
- Editorial Board, <u>American Quarterly</u> (2004-2007)
- Director, Second Amendment Research Center, John Glenn Institute for Public Service and Public Policy, 2002- 2007
- Fellow, Center for Law, Policy, and Social Science,  Moritz College of Law, Ohio State University 2001- 2004
- Local Arrangements Committee, Annual Conference, Society of the Historians of the Early American Republic, Columbus, OH 2003
- Project Gutenberg Prize Committee, American Historical Association, 2004,  2002
- Program Committee, Annual Conference, Society of the Historians of the Early Republic, 2001
- Co-Founder Ohio Early American Studies Seminar
- NEH Fellowship Evaluator, New Media Projects, Television Projects
- Multi-media Consultant and Evaluator, National Endowment for the Humanities, Special, Projects, Division of Public Programs, Grants Review Committee (1999)

## Court Citations, Amicus Briefs and Expert Witness Reports

### US Supreme Court:

<u>N.Y. State Rifle & Pistol Ass'n v. Bruen,</u> 597 U.S. __, 50 2022 U.S. Lexis 3055 (2022)

N.Y. State Rifle & Pistol Ass'n v. Bruen, 597 U.S. __, 26, 28, 45, 47 2022 U.S. Lexis 3055 (2022) (Breyer, J. dissenting)

McDonald v. City of Chicago, Ill., 561 U.S. 742, 900, 901 n.44  (2010) (Stevens, J., dissenting).

McDonald v. City of Chicago, Ill., 561 U.S. 742, 914, 933 (2010) (Breyer, J., dissenting).

D.C. v. Heller, 554 U.S. 570, 666 n.32, 671, 685 (2008) (Stevens, J., dissenting).

**Federal Courts:**

Jones v. Bonta, United States Court of Appeals, Ninth Circuit. May 11, 2022 --- F.4th ---- 2022 WL 1485187.

Duncan v. Bonta, United States Court of Appeals, Ninth Circuit. November 30, 2021 19 F.4th 1087 2021

Young v. Hawaii, 992 F.3d 765, 785-86 (9th Cir. 2021) (en banc).

Kanter v. Barr, 919 F.3d 437, 446 n.6, 457, 462, 464 (7th Cir. 2019) (Barrett, J., dissenting).

Medina v. Whitaker, 913 F.3d 152, 159 (D.C. Cir.), cert. denied sub nom. Medina v. Barr, 140 S. Ct. 645 (2019).

Young v. Hawaii, 896 F.3d 1044, 1066 (9th Cir. 2018), reh'g en banc granted, 915 F.3d 681 (9th Cir. 2019).

Young v. Hawaii, 896 F.3d 1044, 1077 (9th Cir. 2018) (Clifton, J., dissenting), reh'g en banc granted, 915 F.3d 681 (9th Cir. 2019).

Teixeira v. Cty. of Alameda, 873 F.3d 670, 684–85 (9th Cir. 2017).

Kolbe v. Hogan, 813 F.3d 160, 175 (4th Cir. 2016), on reh'g en banc, 849 F.3d 114 (4th Cir. 2017).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 348 (3d Cir. 2016).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 370–71, 371 n.17, 372 n.19 (3d Cir. 2016) (Hardiman, J., concurring).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 389 n.85, 405 n.187 (3d Cir. 2016) (Fuentes, J., concurring).

Peruta v. Cty. of San Diego, 824 F.3d 919, 935 (9th Cir. 2016).

Peruta v. Cty. of San Diego, 742 F.3d 1144, 1185, 1188 (9th Cir. 2014) (Thomas, J., dissenting).

Nat'l Rifle Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 714 F.3d 334, 342 n.19, 343 n.23 (5th Cir. 2013) (Jones, J., dissenting).

Kachalsky v. Cty. of Westchester, 701 F.3d 81, 95 & n.21 (2d Cir. 2012).

Moore v. Madigan, 702 F.3d 933, 935 (7th Cir. 2012).

Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 700 F.3d 185, 200, 202–03 (5th Cir. 2012).

United States v. Carpio-Leon, 701 F.3d 974, 980 (4th Cir. 2012).

United States v. Greeno, 679 F.3d 510, 519 (6th Cir. 2012).

United States v. Yancey, 621 F.3d 681, 684 (7th Cir. 2010).

United States v. Rene E., 583 F.3d 8, 12, 15–16 (1st Cir. 2009).

Miller v. Sessions, 356 F. Supp. 3d 472, 481 (E.D. Pa. 2019).

Grace v. D.C., 187 F. Supp. 3d 124, 138 n.11 (D.D.C. 2016).

Powell v. Tompkins, 926 F. Supp. 2d 367, 386 (D. Mass. 2013), aff'd, 783 F.3d 332 (1st Cir. 2015).

United States v. Tooley, 717 F. Supp. 2d 580, 589–591 (S.D.W. Va. 2010), aff'd, 468 F. App'x 357 (4th Cir. 2012).

United States v. Boffil-Rivera, No. 08-20437-CR, 2008 WL 8853354, 6 (S.D. Fla. Aug. 12, 2008), report and recommendation adopted sub nom.

United States v. Gonzales-Rodriguez, No. 08-20437-CR, 2008 WL 11409410 (S.D. Fla. Sept. 22, 2008), aff'd sub nom.

United States v. Boffil-Rivera, 607 F.3d 736 (11th Cir. 2010).

## **State Courts:**

Norman v. State, 215 So. 3d 18, 30 & nn.11–12 (Fla. 2017).

Posey v. Com., 185 S.W.3d 170, 179–180 (Ky. 2006).

Posey v. Com., 185 S.W.3d 170, 185 n.3 (Ky. 2006) (Scott, J., concurring).

State v. Craig, 826 N.W.2d 789, 796 (Minn. 2013).

People v. Handsome, 846 N.Y.S.2d 852, 858 (N.Y. Crim. Ct. 2007).

Zaatari v. City of Austin, No. 03-17-00812-CV, 2019 WL 6336186, 22 (Tex. App. Nov. 27, 2019) (Kelly, J., dissenting).

State v. Roundtree, 2021 WI 1, 395 Wis. 2d 94, 952 N.W.2d 765

State v. Christen, 2021 WI 39, 958 N.W.2d 746

## **Amicus Briefs:**

Amicus Brief, *NYSRPA v. Bruen*, No. 20-843 (U.S. Supreme Court, 2021) [2nd Amendment]

Amicus Brief, *Young v. State of Hawaii* N O . 12-17808 (9th Cir. 2020) [2nd Amendment]
Amicus Brief, *Gould v. Morgan*, No. 17-2202 (1st Cir. 2018) [2nd Amendment]
Amicus Brief, *Flanagan vs. Becerra*, Central District of California Case (2018) [2nd Amendment]
Amicus Brief, *Gill* v. *Whitford* (US Supreme Court, 2017) [Partisan Gerrymandering]
Amicus Brief, *Woollard v Gallagher*, (4th Cir. 2013) [Second Amendment]
Amicus Brief *Heller v. District of Columbia* [Heller II] (US Court of Appeals for D.C.) (2010) [2nd Amendment]
Amicus Brief, *McDonald* v. *City of Chicago* (US Supreme Court,2010) [14th Amendment]
Amicus Brief, *District of Columbia* v. *Heller* (US Supreme Court 2008) [2nd Amendment]

Amicus Brief, *Silvera* v. *Lockyer*, case on appeal( 9th Circuit 2003) [2nd Amendment]

Amicus Brief, *Emerson* v. *U.S.* case on appeal (5th Circuit 1999) [2nd Amendment]

Pro-bono Historical Consultant State of Ohio, *McIntyre* v. *Ohio*, (U.S. Supreme Court, 1995) [1st Amendment]

### **Expert Witness Reports**

*Rocky Mountain Gun Owners, Nonprofit Corp. v. Hickenlooper*, 14-cv-02850 (D. Colo.).

*Chambers, et al., v. City of Boulder*, 2018 CV 30581 (Colo. D. Ct. City of Boulder, filed June 14, 2018).

*Zeleny v. Newsom*, 14-cv-02850 (N.D. Cal.).

*Miller, et al v. Smith, et al.*, 2018 cv 3085 (C.D. Ill.).

*Jones v. Bonta United States* Court of Appeals, --- F.4th ---- , 2022 WL 1485187 (9th Cir., May 11, 2022).

*Baird v. Bonta*, No. 2:19-cv-00617 (E.D. Cal.).

*Worth v. Harrington,* 21-cv-1348 (D. Minn.).