1   ROB BONTA
    Attorney General of California
2   MARK R. BECKINGTON
    Supervising Deputy Attorney General
3   ROBERT L. MEYERHOFF
    Deputy Attorney General
4   State Bar No. 298196
     300 South Spring Street, Suite 1702
5    Los Angeles, CA  90013-1230
     Telephone:  (213) 269-6177
6    Fax:  (916) 731-2144
     E-mail:  Robert.Meyerhoff@doj.ca.gov
7   *Attorneys for Defendants Rob Bonta in*
    *his official capacity as Attorney*
8   *General of the State of California*
    *and Allison Mendoza in her Official*
9   *Capacity as Director of the Bureau of*
    *Firearms*

10

                IN THE UNITED STATES DISTRICT COURT
11
                FOR THE EASTERN DISTRICT OF CALIFORNIA
12
                        SACRAMENTO DIVISION
13

14

15  **WILLIAM WIESE, et al.,**                Case No. 2:17-cv-00903-WBS-KJN

16                            Plaintiffs,

17          **v.**                            **SUPPLEMENTAL DECLARATION OF**
                                              **JOHN J. DONOHUE IN SUPPORT OF**
18                                            **DEFENDANTS' OPPOSITION TO**
    **ROB BONTA, et al.,**                    **MOTION FOR SUMMARY JUDGMENT**
19                                            **AND COUNTER-MOTION FOR SUMMARY**
                            Defendants.       **JUDGMENT**
20
                                              Date:        July 10, 2023
21                                            Time:        1:30 p.m.
                                              Courtroom:   5, 14th Floor
22                                            Judge:   Hon. William B. Shubb

23

24

25

26

27

28

---

1    **SUPPLEMENTAL DECLARATION OF JOHN J. DONOHUE**

2        I, John J. Donohue, declare under penalty of perjury that the

3    following is true and correct:

4        1.    This declaration is based on my own personal knowledge

5    and experience, and if I am called to testify as a witness, I

6    could and would testify competently to the truth of the matters

7    discussed in this declaration.

8        2.    I have been retained by the California Department of

9    Justice to render expert opinions in this case.  I am being

10   compensated at a rate of $850 per hour.

11                   **BACKGROUND AND QUALIFICATIONS**

12       3.    I am the C. Wendell and Edith M. Carlsmith Professor of

13   Law at Stanford Law School.  A true and correct copy of my

14   current curriculum vitae is attached as **Exhibit A** to this

15   declaration.

16       4.    I submitted an expert declaration in *Duncan v. Bonta*,

17   Case No. 3:17-cv-1017, in the Southern District of California in

18   June 2017, involving a challenge to California's restrictions on

19   large-capacity magazines. I submitted a supplemental declaration

20   in the same case in November 2022.

21       5.    I filed an expert declaration in *Chambers v. City of*

22   *Boulder*, Case No. 2018CV30581, in the District Court of Boulder

23   County in September 2020, involving a challenge to the City of

24   Boulder's restrictions on assault weapons.

25       6.    At the request of the United States Department of

26   Justice, I filed an expert declaration in July 2020 and testified

27   at trial in April 2021 in a case arising out of the Sutherland

28   Springs mass shooting that killed 26 in November 2017: *Holcombe,*

1

1   *et al. v. United States*, Case No. 5:18-CV-555-XR (W.D. Tex.).   On

2   December 9, 2020, I submitted an expert report on behalf of the

3   City of San Francisco in a wrongful conviction lawsuit, *Caldwell*

4   *v. City of San Francisco*, Case No. 12-cv-1892 DMR, United States

5   District Court, Northern District of California, Oakland

6   Division.

7        7.   I was the main author of the Brief of Amici Curiae

8   Social Scientists and Public Health Researchers in Support of

9   Respondents, which was submitted to the United States Supreme

10  Court on September 21, 2021 in *New York State Rifle & Pistol*

11  *Association v. Bruen*, Case No. 20-843.

12       8.   On January 24, 2022, I submitted an expert declaration

13  in *Worth v. Harrington,* a lawsuit in the District of Minnesota

14  (Case No. 21-cv-1348) challenging how Minnesota regulates the

15  concealed carry of firearms by individuals aged 18 to 20.   I was

16  deposed in this case on March 28, 2022.

17       9.   On May 31, 2022, I submitted an expert declaration in

18  *Meyer v. Raoul,* a lawsuit in the Southern District of Illinois

19  (Case No. 21-cv-518-SMY) challenging how Illinois regulates the

20  concealed carry of firearms by individuals aged 18 to 20.

21       10.  On September 14, 2022, I submitted an expert

22  declaration in *Viramontes v. The County of Cook*, a lawsuit in the

23  Northern District of Illinois (Case No. 1:21-cv-04595)

24  challenging the Blair Holt Assault Weapons Ban enacted by Cook

25  County, Illinois in 2006.

26       11.  On October 13, 2022, I submitted an expert declaration

27  in *Miller v. Bonta,* a lawsuit in the Southern District of

28

Declaration of John J. Donohue (Case No. 2:17-cv-00903-WBS-KJN)

1   *et al. v. United States*, Case No. 5:18-CV-555-XR (W.D. Tex.).   On

2   December 9, 2020, I submitted an expert report on behalf of the

3   City of San Francisco in a wrongful conviction lawsuit, *Caldwell*

4   *v. City of San Francisco*, Case No. 12-cv-1892 DMR, United States

5   District Court, Northern District of California, Oakland

6   Division.

7        7.   I was the main author of the Brief of Amici Curiae

8   Social Scientists and Public Health Researchers in Support of

9   Respondents, which was submitted to the United States Supreme

10  Court on September 21, 2021 in *New York State Rifle & Pistol*

11  *Association v. Bruen*, Case No. 20-843.

12       8.   On January 24, 2022, I submitted an expert declaration

13  in *Worth v. Harrington,* a lawsuit in the District of Minnesota

14  (Case No. 21-cv-1348) challenging how Minnesota regulates the

15  concealed carry of firearms by individuals aged 18 to 20.   I was

16  deposed in this case on March 28, 2022.

17       9.   On May 31, 2022, I submitted an expert declaration in

18  *Meyer v. Raoul,* a lawsuit in the Southern District of Illinois

19  (Case No. 21-cv-518-SMY) challenging how Illinois regulates the

20  concealed carry of firearms by individuals aged 18 to 20.

21       10.  On September 14, 2022, I submitted an expert

22  declaration in *Viramontes v. The County of Cook*, a lawsuit in the

23  Northern District of Illinois (Case No. 1:21-cv-04595)

24  challenging the Blair Holt Assault Weapons Ban enacted by Cook

25  County, Illinois in 2006.

26       11.  On October 13, 2022, I submitted an expert declaration

27  in *Miller v. Bonta,* a lawsuit in the Southern District of

28

Declaration of John J. Donohue (Case No. 2:17-cv-00903-WBS-KJN)

California (Case No. 3:19-cv-01537-BEN-JLB) challenging how California regulates the assault weapons.

12. On January 6, 2023, I submitted an expert declaration in *Rupp v. Bonta*, a lawsuit in the Central District of California (Case No. 8:17-cv-00746-JLS-JDE) challenging how California regulates assault weapons.

13. On January 6, 2023, I submitted an expert declaration in *State of Vermont v. Misch*, Criminal Division, Docket No. 173-2-19 Bncr in a case challenging magazine-size restrictions for handguns and long-guns.

14. On January 26, 2023, I submitted an expert declaration in *NAGR v. Campbell*, Civil Action No. 1:22-cv-11431-FDS, a case challenging Massachusetts' restrictions on assault weapons and limits on magazine size in the United States District Court for the District of Massachusetts.

15. On January 26, 2023, I submitted an expert declaration in *NAGR v. Lamont*, Civil Action No. 3:22-cv-01118, a case challenging Connecticut's restrictions on assault weapons and limits on magazine size.

16. On February 27, 2023, on behalf of Cook County, I submitted an expert declaration in *Herrera v. Raoul*, Case No. 1:23-cv-00532, a case challenging Illinois' restrictions on assault weapons and limits on magazine size in the Northern District of Illinois.

17. On February 28, 2023, I submitted an expert declaration in *LaFave v. County of Fairfax, et al.*, Case No. CL-2021-0001569 (Fairfax Co. Cir. Ct.), a case challenging County restrictions on firearms in sensitive places.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**OPINIONS**

**I.   THE GROWING PROBLEM OF PUBLIC MASS SHOOTING IN THE UNITED STATES**

18.   I have been asked by the California Department of Justice to update the opinions expressed in my 2017 Declaration with currently available information.   I continue to stand by the opinions and conclusions expressed in that 2017 Declaration.

19.   The FBI noted previously that the active shooter problem in the United States was growing ominously in 2017, as illustrated in Figure 1 below.[1]

---

[1] https://www.usatoday.com/story/news/2018/06/20/fbi-most-active-shooters-dont-have-mental-illness-get-guns-legally/718283002/.

Declaration of John J. Donohue (Case No. 2:17-cv-00903-WBS-KJN)

**Figure 1**



**Active shooter incidents on the rise, with 2017 topping all years since 2000.**

SOURCE FBI data and the FBI's report on active shooter incidents in the United States in 2016 and 2017

20.  In my 2017 Declaration, I stressed that the mass-shooter problem would only be getting worse if significant action was not taken to address it. Sadly, my predictions based on the growing lethality of weaponry in the United States have been fulfilled. As bad as the active shooter problem looked in 2017, it is considerably worse today, as seen in the same FBI active shooter data now extended through 2021 in Figure 2.  By 2021, the 61 active shooter incidents were more than double the previous high of 30 in 2017!

5

1        21.  The ominous and steep upward trend in the Figure 2 FBI

2    data charting the growth in active shooter incidents is

3    unmistakable.  Not surprisingly, the number of mass shootings

4    clearly is higher following the termination of the federal

5    assault weapons ban in 2004.  In that year, the FBI counted 4

6    active shooter incidents in which 14 died.  Since then, the

7    mayhem has accelerated so much that in 2021 the FBI counted 61

8    active shooter incidents killing 103.[2]

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27        [2]  FBI, "Active Shooter Incidents in the United States in
2021," https://www.fbi.gov/file-repository/active-shooter-
28    incidents-in-the-us-2021-052422.pdf/view.

Declaration of John J. Donohue (Case No. 2:17-cv-00903-WBS-KJN)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

Figure 2



Active Shooter Incidents, 2000-2021

17    22.  Since my 2017 Declaration, the United States has

18  experienced numerous, devastating mass shootings with firearms

19  equipped with high-capacity magazines, including the March 16,

20  2021 Atlanta spa shootings (8 killed), the March 22, 2021

21  shooting at King Soopers supermarket in Boulder, Colorado (10

22  killed); the April 15, 2021 shooting at an Indianapolis

23  FedEx warehouse (8 killed); the May 26, 2021 shooting at a

24  transportation authority facility in San Jose, California (9

25  killed);[3] the May 14, 2022 supermarket shooting in Buffalo, New

26  _____

27      [3] Woolfolk, John; Salonga, Robert; Savidge, Nico; Baron,
    Ethan (May 27, 2021). "San Jose shooting: VTA gunman was 'highly
    disgruntled,' had 32 illegal high-capacity magazines". *East Bay

28  Times*. Walnut Creek, California.

7

York (10 killed); the May 24, 2022 shooting at Robb Elementary
School in Uvalde, Texas (19 children and 2 adults killed); the
July 4, 2022 shooting at a Fourth of July parade in Highland
Park, Illinois (7 killed), the November 20, 2022 shooting in a
Colorado Springs nightclub in which five people were killed and
17 wounded, the November 22, 2022 shooting at a Virginia Walmart
that left 7 dead, the January 2023 shooting at a dance studio in
Monterey Park, California that killed 11 and wounded nine others,
the March 2023 shooting at the elementary school in Nashville
that killed six, including three 9-year-old children; and the
April 10, 2023 shooting at a Louisville bank that killed five
(with an assault weapon purchased six days earlier).

     23.   These figures do not reflect the countless people
injured, both physically and emotionally, and the devastation
inflicted on the communities in which they occurred. For example,
during the July 4, 2022 mass shooting in Highland Park, Illinois,
an 8-year-old boy was paralyzed and may never walk again after a
bullet severed his spinal cord.[4] Similarly, one 11 year old
victim in the Uvalde shooting who was shot seven times has
already had 60 surgeries to deal with her wounds and a 10 year
old classmate who was shot in the back has been going through
months and months of pain and physical therapy.[5]

_____

     [4] NBC Chicago, Cooper Roberts, Boy, 8, Paralyzed in Highland
Park Shooting, Continues to Push Forward, Mother Says, Dec. 19,
2022, https://www.nbcchicago.com/news/local/cooper-roberts-8-
year-old-paralyzed-in-highland-park-shooting-continues-to-push-
forward-mother-says/3026490/.
     [5] Edgar Sandoval, "Two Children, a Burst of Gunfire and the
Year That Came After," *The New York Times*, April 17, 2023,
https://www.nytimes.com/2023/04/17/us/uvalde-shooting-
survivors.html.

24.  The consequences for the shooters are also severe. Tellingly, the recent 18-year-old Buffalo shooter, who killed 10 using the same weapon as the Sandy Hook shooter—a Bushmaster XM-15 semiautomatic rifle with a high-capacity magazine—had written, "I am well aware that my actions will effectively ruin my life. If I'm not killed during the attack, I will go to prison for an inevitable life sentence."[6]

25.  Both the February 2018 mass killing at Parkland High School and the May 2022 mass killing in Uvalde, Texas — where police delayed entering the school during a shooting — vividly underscored how police responses to violence are impaired when the officers are confronted by a shooter armed with an assault rifle and high-capacity magazines.  A 26-year-old Louisville police officer took a bullet in the head in responding to the April 10, 2023 bank shooting there.[7] The ability to fire rapidly allows criminals to more effectively engage with responding police officers, even from a significant distance.[8] Many law enforcement officers and agencies report that the possibility of

---

[6] Ashley Parker, Tyler Pager, and Colby Itkowitz, "From Sandy Hook to Buffalo and Uvalde: Ten years of failure on gun control," *Washington Post*, May 22, 2022; Jesse McKinley, Jonah E. Bromwich, Andy Newman and Chelsia Rose Marcius, "Buffalo Suspect Planned Attack for Months, Online Posts Reveal," *The New York Times*, May 16, 2022; Craig Whitlock, David Willman, and Alex Horton, "Massacre Suspect Said He Modified Bushmaster Rifle to Hold More Ammunition," *Washington Post*, May 15, 2022.

[7] Emily Olson, "Nickolas Wilt was shot in the head on his fourth shift as a Louisville police officer," NPR, April 11, 2023, https://www.npr.org/2023/04/11/1169219029/nickolas-wilt-louisville-shooting-police-hero-cop.

[8]Kyes Decl. ¶ 15-17, *Worman v. Healy,* 293 F. Supp. 3d 251 (D. Mass. 2018).

9

1    encountering mass shooters necessitates that they spend a great

2    deal of time and resources preparing for such encounters.[9]

3    **The Importance of the Instrumentality Effect**

4      26.   Decades of research has shown that there is a

5    considerable variation in the survivability of assault depending

6    on the instrumentality employed.   A seminal 1972 study by UC

7    Berkeley Professor Frank Zimring found "that the outcome of gun

8    assaults had a large random element, and that the power of the

9    firearm was one systematic factor influencing the likelihood that

10    an individual with a gunshot injury would survive."[10]

11      27.   A meticulous study by Anthony Braga and Phil Cook in

12    2018 has powerfully confirmed this instrumentality effect.   Braga

13    and Cook examined the files of 511 gunshot victims kept by the

14    Boston Police Department and found that survivability from

15    gunshot wounds varied considerably based on attributes of the

16    weapon and ammunition that generated the wound.   Specifically,

17    the death rate from handgun assault injuries increased

18    substantially as the caliber of the firearm increased—even though

19    the caliber was not correlated with observable indicators of the

20    intent and determination to kill by the shooter.   The shooter's

21    use of a medium caliber handgun (.38, .380, and 9 mm) more than

22    doubled the odds that the wounded victim would die compared to

23    small caliber handguns (.22, .25, and .32).   Large caliber

24    handguns (.357 magnum, or greater) more than doubled the odds of

25    death compared to medium caliber handguns.

26

27   [9]Brady Center to Prevent Gun Violence 2008 at 4-6.

28      [10] The description of the Zimring study comes from Braga and Cook (2018), infra, note 5.

Declaration of John J. Donohue (Case No. 2:17-cv-00903-WBS-KJN)

28.  The authors conclude that:

> The results here support the view that the intrinsic power and lethality of the weapon had a direct effect on the likelihood that a victim of a criminal shooting died. For Boston, in the period studied here, simply replacing larger-caliber guns with small-caliber guns with no change in location or number of wounds would have reduced the gun homicide rate by 39.5 percent.  It is plausible that larger reductions would be associated with replacing all types of guns with knives or clubs (p.8, Braga and Cook 2018).[11]

29.  Of course, the conclusion of the Braga and Cook study—that switching to less deadly firearm options could reduce firearm deaths—applies directly to bans on assault weapons and high-capacity magazines.  The greater the lethality of the weapon, the more killed and injured in active shooter incidents. This was clearly illustrated in a study for the *Journal of the American Medical Association* that examined deaths and injuries documented in the FBI Active Shooter Database from 2000-2017.[12] The authors found that deaths and injuries were substantially higher for the 61 active shooter incidents using a semiautomatic rifle versus the 187 episodes using some other firearm. Specifically, in the incidents in which the shooter employed a semi-automatic rifle the average number killed or wounded was 9.72 versus only 5.47 killed or wounded when other firearms were

---

[11] Anthony A. Braga and Philip J. Cook, "The Association of Firearm Caliber with Likelihood of Death from Gunshot Injury in Criminal Assaults," *JAMA Network Open*. 2018; 1(3):e180833. doi:10.1001/jamanetworkopen.2018.0833, https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2688536.

[12] Elzerie de Jager, et al., "Lethality of Civilian Active Shooter Incidents With and Without Semiautomatic Rifles in the United States," *JAMA*. 2018;320(10):1034-1035. doi:10.1001/jama.2018.11009, https://jamanetwork.com/journals/jama/fullarticle/2702134.

1    used.  (Note that the authors excluded the horrific Las Vegas

2    shooting from the numbers above, since that case was so extreme,

3    with 60 killed and almost 500 wounded—all with semi-automatic

4    rifles.)

5         30.   Indeed, if one looks at the deadliest acts of

6    intentional mass violence in the United States since 9/11, they

7    all share one feature.  The killer in every case used a weapon

8    equipped with a high-capacity magazine. Table 1 provides a list

9    of these most deadly mass violence incidents, with the numbers

10   killed ranging from 13 — 60 in these mass shooting spasms of

11   violence aided by the greater lethality afforded by these weapons

12   and accessories formerly banned by the federal government and

13   currently banned under California law. (Eleven incidents are

14   listed because there were two killings tied for tenth with 13

15   killed.)

16

17

18

19

20

21

22

23

24

25

26

27

28

Declaration of John J. Donohue (Case No. 2:17-cv-00903-WBS-KJN)

**Table 1. The 11 Deadliest Acts of Intentional Violence in the U.S. since 9/11**

| Deaths | Date | Location | Used Firearms Equipped With High-Capacity Magazines |
|--------|------|----------|-----------------------------------------------------|
| 60 | October 1, 2017 | Las Vegas, NV | ✓ |
| 49 | June 12, 2016 | Orlando, FL | ✓ |
| 32 | April 16, 2007 | Virginia Tech, VA | ✓ |
| 27 | December 14, 2012 | Newtown, CT | ✓ |
| 25 | November 5, 2017 | Sutherland Springs, TX | ✓ |
| 23 | August 3, 2019 | El Paso, TX | ✓ |
| 21 | May 24, 2022 | Uvalde, TX | ✓ |
| 17 | February 14, 2018 | Parkland, FL | ✓ |
| 14 | December 2, 2015 | San Bernardino, CA | ✓ |
| 13 | April 3, 2009 | Binghamton, NY | ✓ |
| 13 | November 5, 2009 | Fort Hood, TX | ✓ |

31.  In addition to the well-documented increase in overall public mass shootings in the United States, there has been an equally dramatic rise of these events in school settings.[13] Indeed, the authors of a study on mass school shootings — written before the May 2022 shooting at Robb Elementary School in Uvalde,

---

[13] Antonis Katsiyannis, Denise K. Whitford, Robin Parks Ennis. Historical Examination of United States Intentional Mass School Shootings in the 20th and 21st Centuries: Implications for Students, Schools, and Society. *Journal of Child and Family Studies*, 2018; DOI: 10.1007/s10826-018-1096-2.

Texas left 21 dead — concluded in 2018 that "More people have died or been injured in mass school shootings in the US in the past 18 years than in the entire 20th century."[14] The impact of the elevated stress experienced by students and parents across the country as the reality of America's tragic mass shooting problem penetrates their consciousness is undeniable. While these horrendous gun massacres are relatively rare compared with the totality of gun homicides in the U.S, each one harms tens of millions, if not hundreds of millions, beyond those killed or wounded at the scene.

32.    Indeed, consider the impact of the following student response to a recent mass shooting at a Texas high school:

> "It's been happening everywhere," student Paige Curry said after a gunman's attack at Santa Fe High School … killed [ten and wounded ten]. Asked if there was a moment where she felt as though the shooting could not be real, could not be actually happening at her school, Paige shook her head. "No, there wasn't," she said with a small hitch in her voice. "I've always kind of felt like eventually it was going to happen here, too," she said. "So, I don't know. I wasn't surprised, I was just scared."[15]

This is the reality of modern America: fear over the prospect of mass shootings for millions of students and their parents throughout the U.S. The harm of mass shooting in the United States is measured in the millions, far beyond the narrow

---

[14] Springer, "Rapid rise in mass school shootings in the United States, study shows: Researchers call for action to address worrying increase in the number of mass school shootings in past two decades." *ScienceDaily*, 19 April 2018. <www.sciencedaily.com/releases/2018/04/180419131025.htm>.

[15] Adam Carlson, "'I've Always Felt Like Eventually It Was Going to Happen Here, Too,' Says Texas Shooting Survivor," People, May 18, 2018, https://www.yahoo.com/entertainment/apos-ve-always-felt-eventually-174424389.html.

Declaration of John J. Donohue (Case No. 2:17-cv-00903-WBS-KJN)

1  death count the plaintiff seeks to minimize.

2      33.   The FBI's analysis of active shooters over age 18 found

3  that 65 percent had no adult convictions prior to the active

4  shooting event.[16] Moreover, the FBI report found that only a tiny

5  fraction would have qualified as "adjudicated mental defectives"

6  that would have been barred from possessing weapons.[17] In other

7  words, the lack of a basis for prohibiting gun ownership under

8  current law for most active shooters means that tighter

9  background checks would not have likely blocked their homicidal

10 objectives.

11     34.   The *Wall Street Journal* analyzed data from the 32

12 school shootings since 1990 with at least three victims dead or

13 injured.[18] In 25 cases, the shooters were in their teens or

14 younger. Of the 20 cases in which information was available, 17

15 of the shooters obtained their guns from their home or a

16 relative.  In other words, law-abiding citizens who possess

17 weapons equipped with high-capacity magazines can and do

18 unwittingly assist their young children and relatives who take

19 their lethal weaponry to commit mass shootings.

20     35.   Nor can we hope to limit these horrific crimes by

21 elevating the probability of apprehending mass shooters once

22

23      [16] Silver, J., Simons, A., & Craun, S. (2018). A Study of the
24 Pre-Attack Behaviors of Active Shooters in the United States
   Between 2000 — 2013. Federal Bureau of Investigation, U.S.
25 Department of Justice, Washington, D.C. 20535.
     The Gun Control Act of 1968 prohibits gun possession by felons
26 and adjudicated "mental defectives" (18 U.S.C. §922 (d) (4)
   2016).
27      [18] Tawnell D. Hobbs, "Most Guns Used in School Shootings Come
   From Home," (April 5, 2018), https://www.wsj.com/articles/in-
28 school-shootings-most-guns-come-from-home-1522920600.

Declaration of John J. Donohue (Case No. 2:17-cv-00903-WBS-KJN)

1  their crime is completed since almost all mass killers are either

2  captured, commit suicide, or are killed at the scene.[19]

3     36.  Note the contrast of a school attack in China that

4  occurred only hours before Adam Lanza used an assault weapon

5  armed with 30-round magazines to kill 26 in Sandy Hook Elementary

6  School:  while 22 children and an adult were injured in the

7  attack in China, no one died — a likely result, at least in part,

8  of the attacker using a knife instead of an assault weapon.[20]

9     37.  Consider the assassination attempt on the life of

10 Ronald Reagan by John Hinckley on March 30, 1981. Hinckley fired

11 six shots with a six-shot .22 caliber revolver — striking Reagan

12 and three others (White House Press Secretary James Brady in the

13 head, Metropolitan Police Officer Thomas Delahanty in the neck,

14 and Special Agent Tim McCarthy in the abdomen as he turned to

15 shield the president).  Hinckley was tackled after he had emptied

16 his gun, and all four of the wounded victims survived the

17 attack.[21]

18

19

20    [19] According to the FBI, in 156 of the 160 episodes, the mass
   shooter was either captured, committed suicide (64 cases), or was
21 killed (30 cases). Blair, J. Pete, and Schweit, Katherine W.
   (2014). "A Study of Active Shooter Incidents, 2000 – 2013." Texas
22 State University and Federal Bureau of Investigation, U.S.
   Department of Justice, Washington D.C. 2014.  Of course, those
23 who are captured alive are already punished as severely as the
   law allows, and the abundant number of mass shootings in Texas
24 and Florida highlights the inefficacy of the death penalty in
   addressing this problem.
25    [20] Mallory Ortberg, "Man Arrested in China After Knife Attack
26 on Students," http://gawker.com/5968740/man-arrested-in-china-
   after-knife-attack-on-students.
27    [21] U.S Secret Service, Forty Years Since the Assassination
   Attempt on President Reagan,
28 https://www.secretservice.gov/reagan40thanniversary.

38.  A similar attempt today would likely by far more devastating — as a modern semi-automatic pistol with 15 or more bullets would have enabled the assassin to fire off many more rounds, hitting many more victims and delaying the opportunity to stop his attack.  Moreover, as careful research has demonstrated, a typical 9 mm pistol round would have been far more lethal than a .22 caliber round[22] and the likelihood that individual victims would suffer more bullet wounds — which occurs with high-capacity magazines — would also enhance the risk of death. We need only to look to another attempted assassination — Jared Loughner's 2011 assault on Congresswoman Gabby Giffords to see the greater damage inflicted when a Glock weapon with a high-capacity magazine is used.  Loughner was able to empty his 33-round magazine in about 19 seconds, killing six, including a federal judge and a 9-year-

[22] An inspired study by Anthony Braga and Phil Cook in 2018 that examined the files of 511 gunshot victims kept by the Boston Police Department found that survivability from gunshot wounds varied considerably based on attributes of the weapon and ammunition that generated the wound.  Specifically, the death rate from handgun assault injuries increased substantially as the caliber of the firearm increased — a victim was twice as likely to die from a wound from a 9 mm pistol than from a .22 caliber revolver.

Two studies have found that the fatality rates of those victims hit by more than 1 bullet were more than 60% higher than the fatality rates of gunshot wound victims who were hit by only a single bullet. Webster DW, Champion HR, Gainer PS, Sykes L. Epidemiologic changes in gunshot wounds in Washington, DC, 1983—1990. Arch Surg. 1992;127(6): 694—698;  Koper CS, Roth JA. A priori assertions versus empirical inquiry: a reply to Kleck. J Quant Criminology. 2001; 17(1):81—88.

Not surprisingly, analyses of gunshot wound victims at level I trauma centers suggest that high-capacity magazines are associated with higher rates of multiple bullet wounds per victim. Livingston DH, Lavery RF, Lopreiato MC, Lavery DF, Passannante MR. Unrelenting violence: an analysis of 6,322 gunshot wound patients at a level I trauma center. J Trauma Acute Care Surg. 2014;76(1):2—9; Manley NR, Fabian TC, Sharpe JP, Magnotti LJ, Croce MA. Good news, bad news: an analysis of 11,294 gunshot wounds (GSWs) over two decades in a single center. J Trauma Acute Care Surg. 2017;84(1):58—65.

1 old girl, and seriously wounding 13 others, including Ms.

2 Giffords, who was shot in the head at close range.[23] Indeed, the

3 only thing that limited the devastation to this unspeakable level

4 was that an unarmed citizen was able to tackle Loughner when he

5 was trying to reload another high-capacity magazine into his

6 Glock. Of course, with a more limited magazine, the deadly

7 rampage would have been stopped earlier, and fewer lives and

8 families would have been shattered and destroyed.

9     39.  This explains why the restrictions on assault weapons

10 and high-capacity magazines during the ten-year duration of the

11 federal assault weapons ban did suppress mass shootings.  To show

12 this, I chose to use the *Mother Jones* database, which limits the

13 gun crimes to killings occurring in a public place and omits

14 killings related to armed robbery, gang activity, or domestic

15 violence in accord with recent FBI practice.  I augmented the

16 Mother Jones data whenever I found it had missed relevant mass

17 shootings that appeared in other mass shooting databases.

18     40.  Figure 3 below shows the number of incidents of such

19 gun massacres and the deaths resulting therefrom based on these

20 criteria.[24] The figure illustrates clearly that the number and

21 ───────────────

22 [23] James Ball, "Loughner faces victims in being sentenced to life in prison without parole," The Washington Post, November 8, 2012, https://www.washingtonpost.com/world/national-security/gabrielle-giffords-confronts-shooter-jared-lee-loughner-in-court/2012/11/08/09968fe2-29c7-11e2-b4e0-346287b7e56c_story.html.

25 [24] Figures 1 and 2 are replicated from John Donohue and Theodora Boulouta, "The Assault Weapon Ban Saved Lives," *Stanford Law School Legal Aggregate*, October 15, 2019, https://stanford.io/2MWNsrV and discussed further in John Donohue, "The Swerve to 'Guns Everywhere:' A Legal and Empirical Analysis," *Law and Contemporary Problems*, (forthcoming, February 2020).  See also the earlier piece: John Donohue and Theodora

(continued...)

Declaration of John J. Donohue (Case No. 2:17-cv-00903-WBS-KJN)

deadliness of these mass shootings dropped during the ten years of the federal assault weapons ban from September 1994 through 2004 and rose sharply after the federal ban was lifted.[25] Although the number of incidents is too limited to highlight the 25 percent drop in gun massacres, the 40 percent drop in overall fatalities during the period of the federal ban is substantial and noteworthy.

41.  After the federal ban lapsed in 2004, the gun market was flooded with increasingly more powerful weaponry that allowed mass killers to kill ever more quickly with predictable results. The decade after the ban elapsed saw a 266 percent increase in mass shooting incidents and a 347 percent increase in fatalities, even as overall violent crime continued downward (reflected in the dotted line in Figure 3).  In other words, my independent assessment confirms the pattern first revealed by Louis Klarevas:[26] gun massacres fell during the assault weapons ban and rose sharply when it was removed in 2004.

42.  What has happened after 2014 is even more alarming. In the ensuing five years, the number of fatalities in these gun massacres already topped the previous high that occurred during the first decade after the federal assault weapon ban was

Boulouta, "That Assault Weapon Ban? It Really Did Work," *The New York Times*, September 5, 2019, (with Theodora Boulouta), https://www.nytimes.com/2019/09/04/opinion/assault-weapon-ban.html.
   [25] The Federal Assault Weapons Ban took effect September 13, 1994, and expired on September 13, 2004, due to a sunset provision that enabled the law to lapse after President George W. Bush reneged on his campaign promise to support retention of the federal ban.
   [26] Louis Klarevas, Rampage Nation: Securing America from Mass Shootings (Amherst, NY: Prometheus 2016).

1  removed. This murderous leap has occurred at the same time that

2  overall violent crime persisted on a downward trend, as the

3  dotted line in Figure 3 confirms.[27] If we continue at the post-

4  2014 pace until 2024, the last column of Figure 3 shows that we

5  will have an astonishing order of magnitude increase in gun

6  massacre deaths over a 20-year period.[28]

7      43.  The evident effectiveness of the ten-year federal ban

8  in reducing mass shooting deaths is exactly what we would expect,

9  since during that decade mass killers could not simply enter a

10  gun store and buy a weapon with a large capacity magazine, as

11  they can do in most of the U.S. today.[29]

---

[27] This downward trend in violent crime even as mass shootings rise after 2004 is important evidence of the harmful impact of ending the federal assault weapons ban.  Without that evidence one might mistakenly think that the overall violent crime drop of roughly 14 percent during the decade of the federal assault weapons ban was simply part of downward crime which itself explains the drop in mass shooting deaths. The experience after 2004 undermines that view.

[28] Note that the numbers of mass shootings would be substantially larger using alternative definitions, such as the Gun Violence Archive definition of *four individuals wounded by gunfire in a single incident*.  Using that more capacious definition, there have been 366 mass shootings in the first 318 days of 2019, killing 408 and injuring 1477. https://www.insider.com/number-of-mass-shootings-in-america-this-year-2019-8.

[29] Only 7 states and the District of Columbia ban assault weapons and all of those states plus Colorado and Vermont restrict the permissible size of the ammunition magazines.

1

2

**Figure 3**

3



Gun Massacres Were Less Frequent And Less Deadly During The Federal Assault Weapons Ban
(six or more killed, not including perpetrator)

Mass shooting data from Mother Jones; dates begin and end in September to reflect the period from 9/13/1994 to 9/12/2004 when the federal assault weapons ban was in place, except for the last column, which ends in 9/2/2019. Violent crime rate data from UCR; dots mark ten-year averages, except for the last dot, which ends in 6/2018.

17        44.   Figure 4 illustrates the average number of fatalities

18   in each mass shooting for the same four periods shown in Figure

19   3.  The pattern is the same:  fatalities per incident fell during

20   the federal assault weapon ban and have risen sharply thereafter.

21   With the weaponry available to citizens getting increasingly more

22   potent and plentiful, the average number of people who die in

23   every incident has increased by 90 percent since the decade after

24   elimination of the federal assault weapons ban.

25        45.   Assault weapons and/or high-capacity magazines were

26   used in all 15 gun massacres since 2014 in which at least six

27   were killed (other than the shooter) shown in Figure 3; all 272

28

Declaration of John J. Donohue (Case No. 2:17-cv-00903-WBS-KJN)

1  people who died in these 15 gun massacres were killed by weaponry

2  prohibited under the federal assault weapons ban.[30]

3      46.  Another horrific killing by a 19-year-old outside

4  Seattle in 2016 highlights the importance of restrictions on

5  magazine size.  In that case, the shooter became angry when he

6  showed up at his ex-girlfriend's house and saw her with another

7  man.  He then "went back to his car, and … read the instruction

8  manual for the AR-15 semiautomatic rifle that he had purchased

9  about a week [earlier].loaded the gun, went back to the home" and

10 kept shooting until he "realized that the rifle's magazine was

11 empty," at which point he went back to his car and drove away,

12 thus following the typical pattern of frenzied shooters to keep

13 firing until their magazine is spent.  The result was three 19-

14 year-olds were killed (including the ex-girlfriend), and an 18-

15 year-old was wounded.[31]

16

17

18

19

---

20  [30] After Figure 3 was created another victim of the Las Vegas
shooting died after two horrendous and agonizing years as a
21  quadriplegic, which elevates to 272 the number of deaths form
public gun massacres in the last five years.  The following
22  article highlights some of the devastating injuries that result
from being shot by an assault rifle, such as that used by the Las
23  Vegas shooter. https://www.kptv.com/news/vancouver-woman-says-
sister-injured-in-las-vegas-shooting-has/article af9198c6-099c-
24  11ea-87c1-37de7096726f.html.

25  [31] Also, typically, the shooter embraced the gun lobby
message that his weapon "was a symbol of power." Sarah Larimer,
26  "Man read AR-15 manual before fatally shooting three people,
according to documents," *Washington Post*, August 3, 2016,
27  https://www.washingtonpost.com/news/post-
nation/wp/2016/08/03/man-read-ar-15-manual-before-fatally-
28  shooting-three-people-according-to-documents/.

**Figure 4**



Gun Massacres: Deaths per Incident
(six or more killed, not including perpetrator)

Mass shooting data from Mother Jones; dates begin and end in September to reflect the period from 9/13/1994 to 9/12/2004 when the federal assault weapons ban was in place, except for the last column, which ends in 9/2/2019.

47.  The instrumentality effect was further demonstrated in an article I authored with Phil Cook since my 2017 Declaration, demonstrating that the federal assault weapons ban—which banned both new semi-automatic assault rifles with certain features that made them attractive to mass shooters *and* new ammunition magazines that could hold more than ten rounds—suppressed deaths in public mass shootings.[32]  Figure 5 below shows that the deaths

---

[32] Phil Cook and John Donohue, "Regulating Assault Weapons and Large-Capacity Magazines for Ammunition," *JAMA*. 2022; 328(12):1191–1192, https://jamanetwork.com/journals/jama/fullarticle/2796675.



that occurred fr...                                      ...eriod

from 1985-2019 i...                                      ...ghts

that by the seco...                                      ...ederal

assault weapons ...                                      ...ss

shootings using ...                                      ...half

(falling from 30...                                      ...cline

in public mass s...                                      ...anned

weaponry.

Figure 5

Victim Counts for Mass Public Shootings in the United States, 1985 - 2019
Using Assault Weapons and/or High-Capacity Magazines versus Other Firearms

in the last five
year period, the
18 incidents
with the more
lethal weapons
were far more
deadly than the
14 incidents
with the less
lethal firearms.

48. After the federal ban lapsed in 2004, the deaths from
public mass shootings using the previously banned weaponry rose
sharply: rising from 16 in the last five years of the federal
ban to 271 in the five-year span from 2015-2019—with the latter
figure 17 times as high as the former. Meanwhile, there was
relatively little movement in public mass shooting deaths using

24

the less-lethal weaponry (neither an assault weapon nor a high-capacity magazine).  Indeed, as the Figure 2 illustrates, there was roughly the same number of deaths from less lethal weaponry in the five-years prior to the federal assault weapons ban (1990-1994) as there was from 2015-2019—specifically 83 in the pre-ban period and 81 in the final period.

49.  Figure 5 also highlights that while there was a roughly comparable *number of incidents* of public mass shootings that used either the most lethal (previously federally banned) weaponry or less lethal firearms not subject to the federal ban, the incidents involving assault weapons and/or high-capacity magazines were far more lethal.  Specifically, the 18 public mass shootings conducted with the most lethal weapons killed 271 (roughly 15 deaths per episode), while the 14 public mass shootings with the less lethal firearms killed 81 (about 5.8 deaths per episode).

**Restrictions on Assault Weapons Reduce Mass Shooting Deaths and Casualties**

50.  Table 2 provides an original econometric analysis of Mother Jones mass shootings data from 1982-2019 to assess empirically whether assault weapons bans at the state and federal level have limited mass shootings deaths and overall casualties. This analysis reveals that such bans do generate statistically significant reductions in mass shooting deaths and casualties.

51.  This panel data analysis simultaneously examines data from all 50 states and the District of Columbia from 1982-2019 to ascertain what happens when federal or state bans on assault

weapons and/or high-capacity magazines go into effect or are eliminated.  The statistical model specifically controls for national influences on mass shootings that occur each year ("year effects") as well as the stable differences in mass shooting rates across states ("state effects").[33]  This panel data model also controls for a variety of criminal justice, socio-economic, and demographic factors that could also influence violent crime.[34]

52.  Table 2 indicates that having an assault weapon ban (whether at the state or federal level) and/or high-capacity magazine ban in place in a given state is associated with a statistically significant decrease in per capita rates of deaths and casualties due to mass shootings.[35]  Overall, this analysis serves to further reinforce and expand upon earlier findings that bans on assault weapons and high-capacity magazines save lives.

---

[33] This is a population-weighted, state-level two-way fixed effects regression.

[34] The controls include the lagged incarceration rate in each state for each year, the lagged police employee rate, real per capita personal income, the unemployment rate, poverty rate, beer consumption, the percentage of the population living in MSAs, and six demographic variables (based on different age-sex-race categories).  This statistical model is described in greater details in Donohue, John, Abhay Aneja, and Kyle Weber, "Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Control Analysis" *Journal of Empirical Legal Studies*, April 2019, https://onlinelibrary.wiley.com/doi/full/10.1111/jels.12219.

[35] The model also suggests that these gun safety restrictions suppress the rate of mass shooting incidents and injuries, although the evidence is statistically weaker for these dependent variables although the injury-alone effect is statistically significant at the .10 level.

**Table 2**

*The Effect of Assault Weapon and High-Capacity Magazine Bans on Mass Shootings,*

*1982–2019*

|  | Mass Shooting *Incidents* per 10,000,000[a] | Mass Shooting *Deaths* per 1,000,000 Population | Mass Shooting *Injuries* per 1,000,000 | Mass Shooting *Casualties* per 1,000,000[b] |
|---|---|---|---|---|
| Assault Weapon or High-Capacity Magazine Ban[c] | –.07 (0.05) | –.09** (0.04) | –.22* (0.12) | –.31** (0.15) |

Notes: Outcome variables are based on *Mother Jones'* database of mass shootings in the 50 states plus Washington DC from 1982 to 2019. The OLS regressions also included the socioeconomic control variables used in DAW 2019 as well as state and year fixed effects. The coefficients on these variables were omitted from this table to conserve space. Regressions are weighted by each state's 1999 population, and standard errors are clustered at the state level.

[a] Mass shootings are defined as attacks in public places in which four or more victims were killed.

[b] Casualties are defined as people who were either injured or killed during a mass shooting.

[c] The variable "Assault Weapon or High-Capacity Magazine Ban" is assigned a value of 1 for each state-year for which either an assault weapon ban or high-capacity magazine ban was active, and 0 for all other state-years.

* p<0.1; ** p<0.05; *** p<0.01

53.    One of the unfortunate consequences of the continuing advances in the lethality and power of modern firearms is that without appropriate government action the dangers posed by civilian weaponry will continue to outpace any legitimate crime-reducing benefit that firearms might provide.  The lesson of the November 2017 massacre at the Sutherland Springs Baptist Church in Texas highlights the growing dangers.  The killer in that case used an AR-15 that was modified to include features that could allow large capacity magazines to be more quickly reloaded to maintain a relentless barrage.  The killer stood outside the church and fired straight through the walls of the church as he strafed along at just above the top of the levels of the church pews, allowing him to shoot 254 shots from **outside** the church in a matter of minutes on his way to killing 26 men, women, and children.  No portable weapon in civilian hands at the time of the adoption of the Second Amendment could possibly generate this degree of destruction.  The evident social harms will only grow as gun technology increases firearm lethality.

54.    The tragedy that first brought mass shootings into the public consciousness is often thought to be the 1966 reign of death from the top of the University of Texas memorial tower when Charles Whitman used scoped hunting rifles to kill 14 and wound 32.  Whitman was an expert Marine marksman, perched in a very protected space to continue his barrage, and it took him 90 minutes to produce this level of mayhem.  Fast forward to November 5, 2009, and Nidal Hasan, an inexperienced shooter, was able to fire 214 times at Fort Hood in less than 10 minutes with a faster shooting handgun equipped with high-capacity magazines,

28

1  killing 13 and also wounding 32.[36]  The August 4, 2019 attack

2  targeting a Dayton, Ohio bar district lasted only 32 seconds, yet

3  armed with a 100 round drum magazine, the shooter was still able

4  to kill nine and shoot 17 others.[37]

5      55.  By 1981, as we saw with the Hinckley attempted

6  assassination of Reagan, the US had not moved into the era of

7  pervasive possession of modern weaponry, which was launched by

8  both the increased advertising of assault rifles and the move

9  towards modern pistols with high-capacity magazines that was

10  catalyzed by the advent of the Glock 9 mm semiautomatic pistol,

11  introduced into the U.S. market in 1986.  These developments were

12  accompanied by the U.S. gun market's fixation on ever bigger

13  magazines and growing military-style appearance and enhanced

14  lethality, turning mass shootings from once in a decade events in

15  the 1960s and 1970s into the growing menace that they have become

16  today. As the problem grew in the 1980s, government efforts at

17  the state and federal level began, with the only serious national

18  effort designed to address the problem coming in 1994 with the

19  passage of the federal prohibition of new assault weapons and

20  high-capacity magazines.  While the ten years in which this

21  federal ban was in place did restrict mass shootings, the lapsing

22

23      [36] Lee Hancock, The gun Nidal Hasan used to kill at Fort
24  Hood, Jun 17, 2011,
    https://www.dallasnews.com/opinion/commentary/2011/06/17/lee-
    hancock-the-gun-nidal-hasan-used-to-kill-at-fort-hood/.
25      [37] Although the shooter had previously been suspended from
    high school for making hit lists of students he wanted to rape
26  and kill, he met the gun industry definition of a responsible,
    law-abiding citizen who should be able to purchase the weaponry
27  he employed to commit mass murder. Biesecker, Michael; Carr
    Smyth, Julie, Associated Press, August 5, 2019, "Classmates: Ohio
28  shooter kept a 'hit list' and a 'rape list'".

Declaration of John J. Donohue (Case No. 2:17-cv-00903-WBS-KJN)

of the federal ban and the continued expansion of these weapons has correlated tightly with the growing menace of mass shootings.

56.  The dramatic increases in gun massacre incidents and fatalities closely tracks the growth in U.S. sales of previously federally banned weaponry that was ignited by the expiration of the federal assault-weapons ban in 2004, the removal of potential liability on the part of gun merchants, and intense advertising of the militarized upgrades, ranging from high-capacity magazines to flash suppressors, that stimulated the demand for this highly dangerous consumer product. Josh Sugarmann, executive director of the Violence Policy Center, notes that "The end of the assault-weapons ban allowed for the customization and modification of these weapons to make them look even more militaristic, even more grand in the eyes of their owners."[38]

57.  Research published following the mass shootings in Buffalo, New York and Uvalde, Texas killing a total of 31 in May 2022 further confirms these findings.[39] Specifically, an analysis of mass shooting data by a group of injury epidemiologists and trauma surgeons reached the following conclusion:

> We calculated that the risk of a person in the U.S. dying in a mass shooting was 70% lower during the period in which the assault weapons ban was active.

---

[38] Quoted in Tim Dickinson, "All-American Killer: How the AR-15 Became Mass Shooters' Weapon of Choice," *Rolling Stone*, February 22, 2018, https://www.rollingstone.com/politics/politics-features/all-american-killer-how-the-ar-15-became-mass-shooters-weapon-of-choice-107819/.

[39] Klein, Michael, 2022. Did the assault weapons ban of 1994 bring down mass shootings? Here's what the data tells us, *The Conversation*, June 8, 2022, https://theconversation.com/did-the-assault-weapons-ban-of-1994-bring-down-mass-shootings-heres-what-the-data-tells-us-184430.

Declaration of John J. Donohue (Case No. 2:17-cv-00903-WBS-KJN)

> The proportion of overall gun homicides resulting from mass shootings was also down, with nine fewer mass-shooting-related fatalities per 10,000 shooting deaths.[40]

58.  Another empirical study that examined high-fatality mass shootings killing at least six victims between 1990 and 2017 similarly concluded that "LCM bans have been effective at saving lives" by reducing the incidence of and deaths in these mass shootings.[41]  The authors found that:

59.  Attacks involving LCMs resulted in a 62% higher mean average death toll. The incidence of high-fatality mass shootings in non—LCM ban states was more than double the rate in LCM ban states; the annual number of deaths was more than 3 times higher. In multivariate analyses, states without an LCM ban experienced significantly more high-fatality mass shootings and a higher death rate from such incidents.

60.  My 2017 Declaration explained that the increase in gun massacre incidents and fatalities closely tracks the growth in the U.S. of assault weapons sales, the removal of potential liability on the part of gun merchants, and intense advertising of the militarized upgrades, from high-capacity magazines to flash suppressors and other tactical accessories, which has only continued since my declaration.

61.  Moreover, there is not the slightest evidence that the federal restrictions on high-capacity magazines that were enacted

---

[40] *Id.*

[41] Klarevas L, Conner A, Hemenway D. The effect of large-capacity magazine bans on high-fatality mass shootings, 1990-2017. *Am J Public Health*. 2019;109(12):1754-61. doi: 10.2105/ajph.2019.305311.

in 1994 (and lapsed ten years later) compromised the safety of law-abiding citizens.  Since these magazines are useful for those bent on mass killing, further limiting their availability should have a beneficial effect on the active shooter and mass shooting problems that are serious and worsening in the United States.

62.  Hundreds of law-abiding citizens have been killed in mass shootings and the problem of mass shootings is getting worse.  Since the value of high-capacity magazines for legitimate self-defense is so small, the primary impact of removing such lethal enhancers from circulation will be to decrease the prospect that a law-abiding citizen will be confronted by a criminal so equipped.

63.  "[L]aw-abiding citizens" whose guns are lost or stolen each year are one of the most important sources of weapons for criminals in the United States. The best current estimates are that roughly 400,000 guns move into the hands of criminals this way each year in the United States.[42]  In other words, it is

---

[42]According to Larry Keane, senior vice president of the National Shooting Sports Foundation (a trade group that represents firearms manufacturers), "There are more guns stolen every year than there are violent crimes committed with firearms." More than 237,000 guns were reported stolen in the United States in 2016, according to the FBI's National Crime Information Center. The actual number of thefts is obviously much higher since many gun thefts are never reported to police, and "many gun owners who report thefts do not know the serial numbers on their firearms, data required to input weapons into the NCIC." The best survey estimated 380,000 guns were stolen annually in recent years, but given the upward trend in reports to police, that figure likely understates the current level of gun thefts. See, Freskos, Brian. 2017c. "These Gun Owners Are at the Highest Risk of Having Their Firearms Stolen." *The Trace*. 4/11/2017. https://www.thetrace.org/2017/04/gun-owners-high-risk-firearm-theft/ and Freskos, Brian. 2017b. "Missing Pieces." *The Trace*. 11/20/2017. https://www.thetrace.org/features/stolen-guns-violent-crime-america/.

orders of magnitudes more likely that a criminal will steal a gun of a law-abiding citizen than a law-abiding citizen will fire a firearm equipped with a high-capacity magazine in lawful self-defense.  More such magazines in the hands of law-abiding citizens like Nancy Lanza means more lethal weaponry in the hands of criminals such as Adam Lanza.

64.  Further, many of the most horrific mass shootings in America were perpetrated by previously law-abiding citizens.  The list, which is too long to recite, includes Stephen Paddock, who killed 59 in Las Vegas; Omar Mateen, who killed 49 in the Pulse nightclub in Orlando; Adam Lanza, who killed 26 in Newtown, Connecticut; and the Batman killer in Aurora, Colorado, who killed 12, as well as the Buffalo and Uvalde, Texas shootings in May 2022, where 10 and 21 died, respectively, after being shot with assault weapons equipped with high-capacity magazines.

65.  The first line of defense to reducing mass shootings is clearly to try to keep guns out of the hands of those who may end up using them for criminal purposes, but this approach will never be fully effective since not all killers can be easily identified in advance.  Therefore, a critical element in trying to stop the death and injury from the growing problem of mass shootings is to limit the killing power of the weaponry available to prospective mass shooters.  The value of a ban on high-capacity magazines is that it is easily definable, hard to circumvent through cosmetic changes by gun merchants, and effective at reducing the lethality of mass shooters by limiting the number of bullets that can be fired without reloading.

66.   The empirical evidence supports the conclusion that if, rather than allowing the federal assault weapons ban to lapse in 2004, the country had moved to a more complete ban, many of the gun tragedies of recent years would have been far less deadly and damaging to countless individuals who have been maimed and injured throughout the United States.  It is also my opinion that California's bans on high-capacity magazines is one tool in the important governmental effort to reduce the likelihood that residents of the state will be killed in mass shootings by making it incrementally harder for prospective mass shooters to equip weapons with lethal accoutrements that are both uniquely appealing to their criminal aspirations as well as uniquely designed to aid in their homicidal rampages.

## II. INTERNATIONAL EFFORTS TO ADDRESS ASSAULT WEAPONS AND MASS SHOOTINGS

67.   In this regard, consider what happened in Australia after a gunman shot and killed 35 people in Port Arthur, Tasmania in 1996.  The Australian federal government persuaded all states and territories to implement tough new gun control laws. Under the National Firearms Agreement (NFA), firearms legislation was tightened throughout the country, national registration of guns was imposed, and it became illegal to hold certain long guns that might be used in mass shootings. The effect was that both while there were 7 public mass shootings in Australia during the seventeen-year period 1979—96 (a per capita rate that was higher than in the U.S. at the time), there have been none in the 23 years since (in contrast to the bleak trend in public mass

34

1  shootings in the United States[43]).  Adjusting for the relative

2  populations of the two countries, it would be as though there

3  were 103 separate mass shooting events in the 18 years prior to

4  the massive Australian gun buyback and none in the 23 years

5  since.[44]

6      68.  The important point of the Australian experience for

7  present purposes is that by depriving disturbed individuals of

8  the vehicle by which they imagined they would unleash their

9  murderous impulses, Australia showed that strong gun control

10  measures such as bans on semiautomatic rifles could dramatically

11  reduce the number of mass shootings — even if guns are still

12  widely available, as they remain in Australia.

13      69.  Although the ban was highly controversial when enacted

14  in 1996, the results have been so unambiguously positive for the

15  country that there is now overwhelming support for it throughout

16  Australia, as repeatedly shown in public opinion polls.  For

17  example, a survey by Essential Research in 2016 confirmed that 44

18  percent thought Australians gun restrictions were "about right"

19  and 45 percent thought the laws were "not strong enough."[45]

20  Against this 89 percent in support of gun restrictions, only 6

21  percent thought the laws were "too strong."  Significantly, the

22  poll specifically noted that these views were now consistent

---

23      [43] Dan Diamond, "Mass Shootings Are Rising. Here's How To
24  Stop Them," *Forbes*, June 18, 2015 (depicting the accelerating
    trend in the U.S. versus the benign trend in Australia),
25  https://www.forbes.com/sites/dandiamond/2015/06/18/charleston-
    deaths-are-an-american-tragedy-mass-shootings-are-
26  rising/#12bd32ef787b.
      [44] The population of Australia in 1996 was 18.3 million and
27  the population of the US in the same year was 269.4 million,
    according to data from the World Bank.
28      [45] Essential Research, "Gun laws", 1 November 2016.

1  regardless of political party voting tendency for Labor,
2  Coalition, or Greens voters.

3      70.  New Zealand followed the Australian lead after a
4  horrific mass murder with an assault rifle,[46] and Canada announced
5  in May 2022 its plans for a similar gun buyback for its current
6  stock of assault weapons after its own horrendous mass shooting
7  prompted the enactment of a ban on assault weapons in 2020.[47]
8  Tellingly, in announcing an array of stringent gun safety
9  measures, Canadian Prime Minister Justin Trudeau showed that he
10 has learned from the lamentable experience of mass killings in
11 the United States: "We need only look south of the border to know
12 that if we do not take action, firmly and rapidly, it gets worse
13 and worse and more difficult to counter."

14

15

16

17 _____

18     [46] Associated Press, "New Zealanders hand in 50,000 guns
   after assault weapon ban," Dec. 21, 2019,
19 https://www.nbcnews.com/news/world/new-zealanders-hand-50-000-
   guns-after-assault-weapon-ban-n1106081 ("The government banned
20 the most lethal types of semi-automatic weapons less than a month
   after a lone gunman in March [2019] killed 51 worshippers at two
21 Christchurch mosques. The police then launched a six-month
   program to buy the newly banned weapons from owners.")
22     [47] The Prime Minister also announced that magazine size would
   be restricted to five rounds in long guns. Justin Trudeau,
23 "Further strengthening our gun control laws,' (May 30, 2022),
   https://pm.gc.ca/en/news/news-releases/2022/05/30/further-
24 strengthening-our-gun-control-laws. Amanda Coletta, "Canada vows
   to 'freeze' handgun sales, buy back assault-style weapons," The
25 Washington Post (May 30, 2022)("[T]he government banned 1,500
   makes and models of "military-style assault weapons" in 2020,
26 after a gunman posing as a police officer charged across rural
   Nova Scotia, killing 22 people, including a Royal Canadian
27 Mounted Police officer, in the country's deadliest mass
   shooting.")
28

Declaration of John J. Donohue (Case No. 2:17-cv-00903-WBS-KJN)

### III. HIGH-CAPACITY MAGAZINES ENHANCE THE DANGER FROM FIREARMS, WHICH CAN BE CURTAILED BY REGULATION

71.  While defensive gun ownership is designed to prevent violence, the intent of the public mass shooter is to kill as many people as possible. Accordingly, the lethal capacity of the weapon will influence that toll of these homicidal events (as opposed to the defensive setting when brandishing typically achieves its goal).  As Klarevas, Koper, and courts have observed, assault weapons with large capacity magazines are disproportionately used in mass shootings.[48]  When such weapons are deployed in mass shootings, they "result in 'more shots fired, persons wounded, and wounds per victim than do other gun attacks.'"[49] Among the mass shootings identified in a 2016 study by Everytown for Gun Safety, use of a large capacity magazine, or assault weapon that likely included a large capacity magazine, was associated with more than twice as many people being shot and nearly 50 percent more people being killed.[50]

72.  The argument that the federal assault weapons ban could not be effective since it only limited acquisitions of newly acquired weapons, but did not by itself reduce the stock of assault weapons or high-capacity magazines turned out to be

---

[48] Christopher Ingraham, *It's Time to Bring Back the Assault Weapons Ban, Gun Violence Experts Say*, Washington Post, February 15, 2018, https://www.washingtonpost.com/news/wonk/wp/2018/02/15/its-time-to-bring-back-the-assault-weapons-ban-gun-violence-experts-say/; Koper 2004 Assessment at 14, 18.
[49] *N.Y.S. Rifle*, 804 F.3d at 264 (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1263 (D.C. Cir. 2011)).
[50] Mass Shootings in the United States: 2009 — 2016, Appendix of Shootings Profiled, https://everytownresearch.org/documents/2017/03/appendix-mass-shootings-united-states-2009-2016.pdf.

Declaration of John J. Donohue (Case No. 2:17-cv-00903-WBS-KJN)

incorrect.  Figure 6 shows data from Chris Koper's investigation in six cities of the percent of guns recovered at crime scenes that were assault weapons, documenting how this percentage changed after the federal assault weapons ban went into effect. The figure clearly shows that the prevalence of assault weapons found at crime scenes fell in all six cities when the ban went into effect.

**Figure 6**



**Assault weapons as a share of guns recovered by police at crime scenes**

Before assault weapons ban

After assault weapons ban

Milwaukee 5.9%  4.9% Milwaukee

Anchorage 3.6%

Miami 2.5%  2.1% Anchorage
Boston 2.2%  1.7% Miami
Baltimore 1.9%  1.3% Baltimore
St. Louis 1.3%  0.9% St. Louis
0.6% Boston

Time periods for data for each city vary based on when data was collected.

Source: Christopher Koper, 2004 National Institute of Justice study    THE WASHINGTON POST

73.  Subsequent research by Koper et al (2017: 319) further highlights both the increased danger from assault weapons (AWs) and firearms with large-capacity magazines (LCM firearms):

LCM firearms, which include AWs as well as other high-capacity semiautomatics, appear to account for 22 to 36% of crime guns in most places, with some estimates upwards of 40% for cases involving serious violence. These estimates are comparable to or higher than earlier estimates of LCM use. …

Consistent with prior research, this study also finds that AWs and LCM firearms are more heavily represented among guns used in murders of police and mass murders. AWs account for 13—16% of guns used in murders of police, while LCM weapons overall account for about 41% of these weapons. Estimates for firearm mass murders are very imprecise due to lack of data on the guns and magazines used in these cases, but available information suggests that AWs and other high-capacity semiautomatics are involved in as many as 57% of such incidents. Further, they are particularly prominent in public mass shootings and those resulting in the highest casualty counts.

Importantly, trend analyses suggest that LCM firearms have grown substantially as a share of crime guns since the expiration of the federal ban on AWs and LCMs.[51]

74.   In other words, the use of banned firearms and magazines by criminals fell during the federal AWB and rose when it lapsed.  These weapons also account for a major share of murders of police and overall crime, as well as for firearm mass murder.

_____

[51] Koper, Christopher et al. (2017), Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms: An Updated Examination of Local and National Sources, J Urban Health (2018) 95:313—321, DOI 10.1007/s11524-017-0205-7.  The authors summarized their findings based on crime data from Minneapolis from January – August 2014  as follows:This study has highlighted the potential value of LCM restrictions for reducing HVG cases, which pose clear public dangers (nearly all HVG cases in this study occurred in public or outdoor settings). The findings underscore the concern that criminal use of semiautomatic weapons with large ammunition magazines facilitates particularly dangerous and injurious HVG incidents that contribute to a notable share of gunshot victimisations. Koper, Christopher et al. (2018), "Gunshot victimisations resulting from high-volume gunfire incidents in Minneapolis: findings and policy implications,"

Declaration of John J. Donohue (Case No. 2:17-cv-00903-WBS-KJN)

75.  As the Fourth Circuit held in upholding Maryland's assault weapons ban in 2017: "the issue is whether the banned assault weapons and large-capacity magazines possess an amalgam of features that render those weapons and magazines like M16s and most useful in military service. The uncontroverted evidence … is that they do.[52] Indeed, the industry is constantly striving to find new ways to increase the lethality of their merchandise, so the notion that some threshold of "common use" erects a constitutional impediment that can obstruct governmental initiatives to promote citizen safety is wholly misguided. The ability and right of citizens to enact safety promoting measures designed to deal with the serious and growing problem of public mass shootings should not be affected by how quickly gun manufacturers can sell their products before regulations can be put into place.

76.  In 2016, fourteen-year old Jesse Osborne of South Carolina wanted to top the death toll of Adam Lanza, and he made numerous attempts to get his father's assault weapon from a gun safe as he planned a school shooting at a nearby elementary school.  When that failed, he took his father's loaded handgun from his bed dresser and killed his father before heading to the school where he opened fire on the playground, killing a 6-year-old boy before his gun jammed.  As the *Wall Street Journal* study referenced above found, a sizeable proportion of students aged 12-18 had access to firearms without adult permission.  For

---

[52] *Kolbe v. Hogan*, (4th Circuit Court of Appeals, February 21, 2017), https://cases.justia.com/federal/appellate-courts/ca4/14-1945/14-1945-2017-02-21.pdf?ts=1487707284.

40

students and others who harbor homicidal fantasies similar to Jesse Osborne, the most powerful and deadly weapons will be most helpful for their criminal designs.[53]

77.  As stated above, an enormous source of guns used by teens in school shootings come from the home and the ability to kill is greatly enhanced if the gun at home is an assault weapon with a high-capacity magazine (see footnote 18, above).  Adam Lanza could not have made this point any more powerfully when he used his mother's assault rifle to kill 26 (also killing himself as the police closed in).  Of course, this is part of the larger problem of the enormous rates of gun thefts in the United States each year — in the neighborhood of 400,000 stolen.  The more assault weapons lying around in the home of law-abiding citizens, the more will be made available to criminals via these enormous rates of theft.

78.  My empirical evaluation of data through 2019 has emphasized that restrictions on high-capacity magazines are essential if one wants to reduce the risk of Las Vegas style killings that enable hundreds of individuals to be shot.[54]  The evidence that the federal assault weapons bans reduced deaths from public mass shootings is powerful and unrefuted.

---

[53] Tawnell D. Hobbs, "Most Guns Used in School Shootings Come From Home," *The Wall Street Journal*, https://www.wsj.com/articles/in-school-shootings-most-guns-come-from-home-1522920600, April 5, 2018.

[54] John Donohue and Theodora Boulouta, "The Assault Weapon Ban Saved Lives," *Stanford Law School Legal Aggregate*, October 15, 2019, https://stanford.io/2MWNsrV.

1
2

**IV. Firing-Capacity Restrictions Have Historically Corresponded with Increased Use and Criminal Abuse**

3        79.  Restrictions on weaponry have historically followed

4   growing criminal abuse and social harm, rather than at the time

5   these weapons are first introduced.  This makes sense because it

6   is not always clear at the outset which inventions will lead to

7   adverse impacts on public safety.  Frequently, the dangers of

8   products and practices fly below the radar until their

9   proliferation generates sufficient social damage to enable the

10  public and the scientific community to become aware of the full

11  extent of their social harm.

12       80.  The first group of state restrictions on the number of

13  rounds that could be fired by a firearm without reloading were

14  adopted in the 1920s and 1930s after weapons like the Tommy gun

15  became a preferred weapon for gangsters.[55]  More recently, after

16  pistols replaced revolvers as the most commonly used handguns in

17  the United States in the 1980s, a second round of restrictions

18  addressing magazine capacity and assault weapons began to be

19  adopted, including the now expired 10 year federal ban on large

20  capacity magazines.[56]  State restrictions continued to be adopted

21  following the expiration of the federal ban, often in response to

22  public mass shootings.

23

24

25

26        [55] *See* Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 Law & Contemp. Probs. 55, 68 (2017).

27

28        [56] *See* 1990 N.J. Sess. Law Serv. 32 (West); Haw. Rev. Stat. Ann § 34—(8);  Pub. L. 103—322, § 110103 (Sep. 13, 1994).

1  **Limiting the Size of Ammunition Magazines Should Save Lives and**
2  **Reduce Injuries**

3      81.  No single gun control measure is likely to be as

4  effective in addressing the problem of public mass shootings as

5  the limitation on the size of the ammunition magazine, and the

6  evidence from the ten-year period when the federal assault

7  weapons ban was in effect from 1994-2004 indicates that this

8  federal law, which contained the limitation on the size of

9  ammunition magazines to ten bullets saved lives and reduced the

10 mayhem from mass shootings.

11     82.  A review of the resolution of mass shootings and other

12 public shootings unleashed with large-capacity magazines in the

13 U.S. suggests that bans on large-capacity magazines can help save

14 lives by forcing mass shooters to pause and reload ammunition.

15 Citizens have frequently taken advantage of a perpetrator

16 stopping to reload his weapon to tackle him or otherwise subdue

17 him in at least 20 separate shootings in the United States since

18 1991, notably including the December 7th, 1993 shooting of

19 passengers on a Long Island Railroad car,[57] the October 29th, 1994

20 shooting near the grounds of the White House,[58] the May 21, 1998

21 shooting at Thurston High School in Springfield, Oregon,[59] and the

22 [57] "DEATH ON THE L.I.R.R.: The Rampage; Gunman in a Train Aisle
23 Passes Out Death," *The New York Times*, December 9, 1993 -
   http://www.nytimes.com/1993/12/09/nyregion/death-on-the-lirr-the-
24 rampage-gunman-in-a-train-aisle-passes-out-death.html (9-
   millimeter pistol, 15 round magazine).
25     [58] "Public Report of the White House Security Review,"
   Department of the Treasury, 1995 -
26 http://www.fas.org/irp/agency/ustreas/usss/t1pubrpt.html
   (Chinese-made SKS semiautomatic rifle, 30 round magazine).
27     [59] When an already wounded student realized the shooter's 50
28 round magazine was empty, the student ran 10 to 15 feet and

(continued...)

43

1   January 8th, 2011 shooting in Tucson, AZ that targeted U.S.

2   Congresswoman Gabby Giffords.[60] In many other incidents, targeted

3   victims were able to escape while a shooter reloaded.  Perhaps

4   the most vivid illustration of this benefit was seen when at

5   least nine children at Sandy Hook Elementary School were able to

6   escape while Adam Lanza reloaded his 30 round LCM.[61]

7       83.  On April 22, 2018, a man walked into a Nashville Waffle

8   House and opened fire, killing four and wounding seven. The

9   police credited a customer with ending the slaughter when he saw

10  the shooter trying to reload his rifle. The 29-year-old customer

11  "burst out from behind a swinging door where he had been hiding,

12  wrested the weapon away and threw it over a countertop."[62] When

13  shooters stop to reload, they are overtaken by citizens, shot by

14  police, or provide opportunities for escape, all of which

15  tackled the shooter as he tried to reload his rifle. At that
    point, other boys helped subdue the gunman as he reached for a
16  handgun in his belt. Jere Longman, "SHOOTINGS IN A SCHOOLHOUSE:
    THE HERO; Wounded Teen-Ager Is Called a Hero," *The New York*
17  *Times*, May 23, 1998,
    https://www.nytimes.com/1998/05/23/us/shootings-in-a-schoolhouse-
18  the-hero-wounded-teen-ager-is-called-a-hero.html.

19      [60] "Crowd members took gunman down," *Los Angeles Times*,
    January 9, 2011 -
20  http://articles.latimes.com/2011/jan/09/nation/la-na-arizona-
    shooting-heroes-20110110 (9mm Glock handgun, 30-round extended
21  magazine).

22      [61] "Legislative Leaders Say Bipartisan Agreement Could Yield
    Nation's Strongest Gun-Control Bill," *The Hartford Courant*, April
23  1, 2013. http://www.courant.com/news/politics/hc-gun-deal-
    newtown-0413-20130401,0,7341094.story (Bushmaster .223 caliber
24  rifle, high-capacity 30 round magazine).  While some contend that
    11 children were saved in this fashion at Sandy Hook, Louis
25  Klarevas puts the number at 9 in his book, Rampage Nation:
    Securing America from Mass Shootings (Amherst, NY: Prometheus
26  2016). p. 22.

27      [62] Christopher Mele and Jacey Fortin, "Man Sought in Waffle
    House Shooting Had Been Arrested Near White House," *The New York*
28  *Times*, April 22, 2018,
    https://www.nytimes.com/2018/04/22/us/waffle-house-shooting.html.

44

1  government policy should seek to facilitate.  The lower the size

2  of the magazine, the more reloading must take place in mass

3  shooting situations.

4      84.  Indeed, an effective ban on high-capacity magazines

5  would likely have significantly reduced the number of deaths and

6  non-fatal gunshot victims at the Las Vegas concert. The *New York*

7  *Times* video of the 2017 Las Vegas shooting shows how the Las

8  Vegas concert attendees would use the pauses in firing when the

9  shooter's high-capacity magazines were spent to flee the deadly

10  venue before more shots were fired.[63]  If Stephen Paddock had been

11  limited to using only 10-round magazines during his deadly

12  rampage, potentially hundreds of victims at the concert could

13  have been spared.

14      85.  No one has a greater desire or use for a large-capacity

15  magazine than a determined mass killer, and governments have a

16  responsibility to thwart those desires and those uses. A ban on

17  such magazines is an important tool in the effort to stop the

18  most egregious homicidal rampages.

19      86.  As noted above, Adam Lanza was able to kill more (a

20  total of 20 children and six adults) because he was using

21  lawfully purchased weapons equipped with a 30-round LCM.  It may

22  well be that Lanza would have criminally abused the guns that his

23  mother had made available to him even if he had not had an LCM,

24  but there is every reason to believe that he would have killed

25

26      [63]Malachy Browne, et al., *10 Minutes. 12 Gunfire Bursts. 30*
*Videos. Mapping the Las Vegas Massacre*, N.Y. Times Video, Oct.
27  21, 2017, *available at*
https://www.nytimes.com/video/us/100000005473328/las-vegas-
28  shooting-timeline-12-bursts.html (last visited Nov. 1, 2017).

1    fewer individuals if he had to persistently reload during his

2    murderous rampage.  In other words, the LCM ban is designed

3    precisely to save lives and by raising the costs for killers, the

4    LCM ban would be expected to advance that goal.

5         87.  Further, most mass killings by Americans involve the

6    use of guns, and many of these killers — Adam Lanza (Newtown),

7    James Holmes (the Batman movie killer in Aurora, Colorado killed

8    12 and injured 70), Jared Loughner (shooting Congresswoman Gabby

9    Giffords), Stephen Paddock (who killed 58 and wounded roughly 500

10   in Las Vegas in October 2017) to name just a few — were drawn to

11   a vision of killing large number of individuals in a certain way

12   that included the use of LCM's.  On November 5, 2009, Nidal Hasan

13   killed 13 and injured more than 30 others at Fort Hood,

14   near Killeen, Texas.  When Hasan purchased his killing arsenal,

15   he asked for "the most technologically advanced weapon on the

16   market and the one with the highest standard magazine capacity."[64]

17   This is exactly what one would do if one wanted to simply kill as

18   many people as possible in the shortest amount of time. If one is

19   serious about stopping mass killings, a good first step is to

20   deprive such killers of their preferred killing approaches.[65]

21   _____

22        [64] Scott Huddleston, "Hasan Sought Gun with 'High Magazine
     Capacity,'" MySanAntonio.com, October 21, 2010,
23   http://blog.mysanantonio.com/military/2010/10/hasan-sought-gun-
     with-high-magazine-capacity/.

24        [65] Anders Breivik, who committed mass murder in Norway, was
     aided in his efforts because of lax rules concerning LCM's in the
25   United States. Breivik was very unhappy that he could not get the
     large-capacity magazines that he wanted to use since they were
26   banned in Europe.  In his manifesto, he wrote about his attempts
     to legally buy weapons, stating, "I envy our European American
27   brothers as the gun laws in Europe sucks ass in comparison."
     Under the section titled, "December and January - Rifle/gun

28                                              (continued...)

88.   Indeed, in October 2022, a 19-year-old "vying to be the deadliest school shooter in U.S. history" launched an attack at the St. Louis High School from which he had recently graduated. An extremely rapid police response by eight officers killed the shooter quickly, which was fortunate given the fact that he was armed with more than a dozen high-capacity 30-round magazines in order to achieve his demonic goal.[66] This extraordinarily rapid and effective police response limited the harm to "only" two killed -- a high school student and a teacher — with seven others wounded.[67]

**Uses of LCMs for Self-Defense are Extremely Rare**

89.   In the face of the clear evidence from around the United States and the world, Plaintiff fail to acknowledge the threat posed by weapons accessories, and features that California restricts. First, it is worth noting that the vast majority of the time that an individual in the United States is confronted by violent crime, they do *not* use a gun for self-defense. Specifically, over the period from 2007-2011 when roughly 6 million violent crimes occurred each year, data from the National

---

accessories purchased," Breivik wrote that he purchased ten 30-round ammunition magazines from a U.S. supplier who mailed the devices to him. Stephanie Condon, "Norway Massacre Spurs Calls For New U.S. Gun Laws," CBS News, July 28, 2011, http://www.cbsnews.com/news/norway-massacre-spurs-calls-for-new-us-gun-laws/.

[66] "St. Louis school shooter had kill list, aimed to become 'deadliest shooter in history,'"*Police 1*, October 31, 2022, https://www.police1.com/school-safety/articles/st-louis-school-shooter-had-kill-list-aimed-to-become-deadliest-shooter-in-history-EYlAM4LF3PCe8rvG/.

[67] The Counterterrorism Group, "Behavioral Threat Assessment Of Orlando Harris," Nov 6, 2022, https://www.counterterrorismgroup.com/post/behavioral-threat-assessment-of-orlando-harris.

47

Crime Victimization Survey shows that the victim did not defend with a gun in 99.2 percent of these incidents — this in a country with 300 million or more guns in civilian hands.

90.   Second, even if a gun were available for self-defense use, the need for an LCM is slight according to decades of statements by NRA-affiliated and pro-gun experts. For example, John Lott has repeatedly made the following claims:

- based on "about 15 national survey[s] … about 98 percent of [defensive gun uses] involve people brandishing a gun and not using them."[68]

- "When victims are attacked, 98 percent of the time merely brandishing a gun is enough to cause the criminal to stop his attack."[69]

- "Considerable evidence supports the notion that permitted handguns deter criminals. …. In 98% of the cases, people simply brandish weapons to stop attacks."[70]

91.   Gary Kleck has similarly stated: "Of the … times citizens use their guns to defend themselves every year, the overwhelming majority merely brandish their gun or fire a warning shot to scare off their attackers."[71]

[68] Statements by John R. Lott, Jr. on Defensive Gun Brandishing Posted by Tim Lambert on October 17, 2002 http://scienceblogs.com/deltoid/2002/10/17/lottbrandish/. Page 41, State of Nebraska, Committee on Judiciary LB465, February 6, 1997, statement of John Lott, Transcript prepared by the Clerk of the Legislature, Transcriber's Office.
[69] John R. Lott, Jr., Packing Protection, Letters, *Chicago Sun-Times*, April 30, 1997, Pg. 52.
[70] John R. Lott Jr., "Unraveling Some Brady Law Falsehoods," *Los Angeles Times*, July 2, 1997.
[71] Gary Kleck and Marc Gertz, "Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun," 86(1) *Journal of Criminal Law and Criminology* 150-187 (Fall 1995),

(continued…)

Declaration of John J. Donohue (Case No. 2:17-cv-00903-WBS-KJN)

92.  In other words, a gun is used in defense less than 1 percent of the time when someone is attacked in the United States.  In the "overwhelming majority" of the less than 1% of cases in which a gun *is* used, brandishing is all that is needed for defense.  One would imagine that the vast majority of the times that the gun is fired in this increasingly small subset, it will be fired no more than 10 times. All firearms that can accept high-capacity magazines can also accept magazines that hold fewer rounds. It cannot be seriously maintained that high-capacity magazines play any important role in furtherance of the goal of self-defense.

93.  Should there be a future case of a law-abiding citizen who 1) has a gun and 2) the need and opportunity to use it in self-defense, and 3) the desire to fire more than 10 rounds, the individual can either re-load the defensive weapon by inserting a new clip or by using a second weapon, which an increasingly large number of gun owners currently possess.  This implies that the challenged California restrictions, which are designed to limit the mayhem caused by criminals engaging in the most dangerous forms of violent criminal behavior, are likely to have little or no impact on the defensive capabilities of law-abiding citizens.

94.  Bullets fired by assault weapons or a modern weapon with an LCM will easily penetrate walls, threatening family members or occupants in attached dwellings.  This point was dramatically underscored when a concealed carry permit holder attending a gun safety class inadvertently fired his weapon,

https://pdfs.semanticscholar.org/91da/afbf92d021f06426764e800a4e639a1c1116.pdf.

49

1    which discharged a bullet that easily penetrated the classroom

2    wall, striking and killing the owner of the gun store who was

3    working in the next room.[72]  Encouraging untrained, stressed

4    individuals to spray bullets from a high-capacity magazine is a

5    recipe for generating similar unwelcome outcomes that will put

6    family members and neighbors at considerable risk.

7         95.  A wise December 2016 editorial in the *Las Vegas Sun*

8    noted the danger presented—and the lack of practical use for—

9    LCMs:

10        By overwhelmingly supporting universal background
          checks for firearms purchases, Clark County voters made
11        it abundantly clear last month that they were concerned
          about gun violence.

12        Now, it's time for Las Vegas-area lawmakers to go a
13        step further to protect Nevadans and push to ban the
          sale of high-capacity magazines in the state. Eight
14        states and the District of Columbia already have
          imposed such prohibitions, and with good reason.
15        There's simply no legitimate civilian use for magazines
          that hold dozens upon dozens of rounds of ammunition.
16
          Don't believe us? Fine, then listen to Clark County Sheriff
17        Joe Lombardo.

18    _____

19        [72] Peter Holley, *Ohio gun store owner accidentally killed by
      student during firearm-safety c*lass, *Washington Post*, June 19,
20    2016, *available at* https://www.washingtonpost.com/news/morning-
      mix/wp/2016/06/19/ohio-gun-store-owner-accidentally-killed-by-
21    student-during-firearm-safety-class/?utm_term=.ed4c232d20ad (last
      visited Nov. 1, 2017).

22        Another example of how doors and walls do not stop bullets
      from modern handguns occurred on September 13, 2015, when "39-
23    year-old Mike Lee Dickey was babysitting an 8-year-old Casa
      Grande, Arizona boy.  According to police, at about 2 a.m.,
24    Dickey was in the bathroom removing his .45-caliber handgun from
      the waistband of his pants when he unintentionally discharged the
25    gun. The bullet passed through two doors and struck the 8-year-
      old in his arm while he lay sleeping in a nearby bedroom. The boy
26    was flown to a hospital in Phoenix for treatment."  *8-year-old
      boy unintentionally shot by babysitter*, Ohh Shoot, Sept. 13,
27    2016, *available at* http://ohhshoot.blogspot.com/2015/09/8-year-
      old-boy-unintentionally-shot-by.html (last visited Nov. 1, 2017).

"I'm a very avid hunter, I was in the military myself, and there's no need to have a high-capacity magazine for any practical reason," Lombardo said during a recent interview with the Sun.

To the contrary, the dangers posed by such magazines are obvious. Lombardo says the time it takes for suspects to change magazines gives potential victims an opportunity to escape and law enforcement officials an opportunity to safely fire back. That being the case, the fewer times a shooter has to switch out magazines, the fewer the chances for people to get away and authorities to get a protected shot.[73]

The prescience of the editorial was powerfully underscored ten months later when On October 1, 2017, the deadliest mass shooting in U.S. history occurred in Las Vegas (60 killed and hundreds wounded) — only possible because of the use of high- capacity magazines.

96.    John F. Walsh, the United States Attorney for the District of Colorado from 2010 to 2016, testifying before the Senate Juficiary Committee in 2013 in favor of reinstating the federal ban on high-capacity magazines stated: [74]

One of the most disturbing aspects of the recent mass shootings our Nation has endured is the ability of a shooter to inflict massive numbers of fatalities in a matter of minutes due to the use of high-capacity magazines.  High-capacity magazines were defined in the 1994 ban as magazines capable of holding more than 10

---

[73] *High-capacity magazine ban a must for Nevadans' safety*, Las Vegas Sun, Dec. 11, 2016, *available at* https://lasvegassun.com/news/2016/dec/11/high-capacity-magazine-ban-a-must-for-nevadans-saf/(last visited Nov. 1, 2017).
[74] Statement of John F. Walsh before the United States Senate Committee on the Judiciary, https://www.judiciary.senate.gov/imo/media/doc/2-27-13WalshTestimony.pdf (last visited Nov. 1, 2017).

Declaration of John J. Donohue (Case No. 2:17-cv-00903-WBS-KJN)

rounds, and this is a definition the Department endorses. The devastating impact of such magazines is not limited to their use in military-style assault rifles; they have also been used with horrific results in recent mass shootings involving handguns.  The 2007 mass shooting at Virginia Tech involved a shooter using handguns with high-capacity magazines.  Similarly, recent mass shootings in Tucson, Arizona; Oak Creek, Wisconsin; and Fort Hood, Texas all involved handguns with magazines holding more than 10 rounds.  As evidenced by these events, a high-capacity magazine can turn any weapon into a tool of mass violence. Forcing an individual bent on inflicting large numbers of casualties to stop and reload creates the opportunity to reduce the possible death toll in two ways: first, by affording a chance for law enforcement or bystanders to intervene during a pause to reload; and second, by giving bystanders and potential victims an opportunity to seek cover or escape when there is an interruption in the firing.  This is not just theoretical:  In the mass shooting in Tucson, for example, 9-year old Christina-Taylor Green was killed by the 13th shot from a 30-round high-capacity magazine.  The shooter was later subdued as he was trying to reload his handgun after those 30 shots. The outcome might have been different if the perpetrator had been forced to reload after firing only 10 times.

Furthermore, high-capacity magazines are not required for defending one's home or deterring further action by a criminal.  The majority of shootings in self-defense occur at close range, within a distance of three yards.  In such a scenario, and at such close ranges, a 10-round magazine is sufficient to subdue a criminal or potential assailant. Nor are high-capacity magazines required for hunting or sport shooting.  Like military-style assault weapons, high-

52

capacity magazines should be reserved for war, and for law enforcement officers protecting the public.  The continued commercial sale of high-capacity magazines serves only to provide those determined to produce a high body count with the opportunity and the means to inflict maximum damage.  Indeed, there is evidence suggesting that when the previous ban was in effect, it reduced the number of high-capacity magazines seized by the police, as well as the lethality of incidents.[75]

## V. Threats to Civil Peace and to Democracy Itself

97.  There is also a larger issue at stake with the proliferation of assault weapons and high-capacity magazines: their capacity to facilitate political violence and threaten American democracy.  The concern is heightened by the sharp rise in the percentage of Americans who think that violence against the government could be appropriate, which doubled from 16 percent in 2010 to 34 percent in 2021 (over 40 percent of Republicans and independents and 23 percent of Democrats agreed).[76]

98.  The extent and severity of these concerns have been clarified by the events surrounding the "Stop the Steal" rally of January 6, 2021, which I have written elsewhere has provided new

---

[75] See, David S. Fallis and James V. Grimaldi, *In Virginia, high-yield clip seizures rise*, Washington Post, Jan. 23, 2011, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2011/01/22/AR2011012204046.html (last visited Nov. 1, 2017).

[76] Meryl Kornfield and Mariana Alfaro, "1 in 3 Americans say violence against government can be justified, citing fears of political schism, pandemic," *Washington Post*, January 1, 2022, https://www.washingtonpost.com/politics/2022/01/01/1-3-americans-say-violence-against-government-can-be-justified-citing-fears-political-schism-pandemic/.

Declaration of John J. Donohue (Case No. 2:17-cv-00903-WBS-KJN)

insight into the dangers of such weaponry and the utter folly of many of the claims of the gun lobby:

> Consider the gun lobby protestation that "Gun control simply doesn't work."  Imagine for a moment what that rally would have looked like in Houston, Texas, or some other "gun-friendly" jurisdiction.  Without Washington, DC's profoundly wise firearm restrictions [including its assault weapons ban], a very large number of the rioters would have been marching on the U.S. Capitol armed with assault rifles equipped with high-capacity magazines and other highly lethal weapons.  When the mob storming the Capitol spun out of control, guns would have been flashing everywhere, and it is not hard to imagine that bullets would have been cutting down scores or even hundreds of victims.  Those who remember the 1970 Kent State massacre understand that once the bullets start flying in a riotous atmosphere, the consequences quickly turn lethal and dire….

> The pernicious Proud Boys leader Enrique Tarrio [now under indictment for seditious conspiracy],[77] who had planned to address the crowd before the U.S. Capitol riot, was thankfully taken off the streets two days earlier when he was arrested for tearing down a Black Lives Matter banner on a Washington, DC, church and lighting it on fire.  At the time of his arrest, Tarrio was carrying two high-capacity magazines festooned with the Proud Boys logo.  Washington, DC's wise prohibition on such unnecessary accoutrements to lethal weaponry managed to keep one conspiring criminal away from the U.S. Capitol on January 6, and thousands of others, knowing of Washington, DC's strict gun laws, were dissuaded from carrying weapons because of these laws.

> [Moreover, the claim that assault weapons could protect American democracy is fanciful.]  First, the thought that private gun owners could stand up to the modern U.S. military if it backed a tyrannical federal government is absurd.  There is no circumstance in which private citizens in modern America could promote democracy by using assault weapons to kill government employees to show their disapproval of what they perceive to be a "tyrannical" government.  Second, the idea that gun owners can be expected to *oppose* rather than support the

---

[77] Spencer Hsu, "Proud Boys leader Tarrio, 4 top lieutenants charged with seditious conspiracy in widening Jan 6 case", *Washington Post*, June 6, 2022, https://www.washingtonpost.com/dc-md-va/2022/06/06/tarrio-proud-boys-seditious-conpiracy/.

Declaration of John J. Donohue (Case No. 2:17-cv-00903-WBS-KJN)

tyrant was dealt a fatal blow by the violence at the U.S. Capitol.[78]

## CONCLUSION

99.   As discussed in my 2017 Declaration, the problem of mass shootings in the United States is socially damaging, growing worse, and will be exacerbated if appropriate limitations on the lethality of weaponry, such as the restrictions on high-capacity magazines enacted by the federal government and by the state of California as this dire social harm first emerged, are not sustained as constitutionally permissible measures. These lethality-enhancing accoutrements are far more likely to be used for criminal purposes and to be employed in an effort to thwart American democracy than to protect the Republic. Additional information gathered since my declaration only serves to reinforce those opinions.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 24, 2023, at Stanford, California.



John J. Donohue III

---

[78] John Donohue, "Will the Supreme Court Avoid Further Self-Inflicted Second Amendment Wounds?" Brennan Center for Justice (June 2021), https://www.brennancenter.org/sites/default/files/2021-06/Donohue_final.pdf.

55

# EXHIBIT A

# JOHN J. DONOHUE III

Stanford Law School
Stanford, CA 94305
Phone: 650 721 6339
E-mail: jjd@stanford.edu
Web pages:
http://works.bepress.com/john_donohue/
https://law.stanford.edu/directory/john-j-donohue-iii/

**EMPLOYMENT**

**Full-time Positions**

- Stanford Law School, C. Wendell and Edith M. Carlsmith Professor of Law, September 2010 to the present.
- Yale Law School, Leighton Homer Surbeck Professor of Law, July 2004 to August 2010.
- Stanford Law School, Professor of Law, September 1995 to June 2004.
    - William H. Neukom Professor of Law, February 2002 – June 2004.
    - John A. Wilson Distinguished Faculty Scholar, March 1997 – January 2002.
    - Academic Associate Dean for Research, since July 2001 – July 2003.
    - Stanford University Fellow, September 2001 – May 2003.
- Northwestern University School of Law:
    - Class of 1967 James B. Haddad Professor of Law, September 1994-August 1995
    - Harry B. Reese Teaching Professor, 1994-1995
    - Professor of Law, May 1991-September 1994
    - Associate Professor, May 1989-May 1991
    - Assistant Professor, September 1986-May 1989.
- Research Fellow, American Bar Foundation, September 1986-August 1995.
- Associate Attorney, Covington & Burling, Washington, D.C., October 1978-July 1981 (including last six months as Attorney, Neighborhood Legal Services)
- Law Clerk to Chief Justice T. Emmet Clarie, U.S. District Court, Hartford, Connecticut, September 1977-August 1978.

**Temporary Appointments**

- Affiliated Research Professor, American Bar Foundation, September 2020 – August 2025.
- Visiting Professor, Tel Aviv University School of Law, May 2022.
- Lecturer on the Economics of Crime, Bogota Summer School in Economics, Universidad del Rosario, Bogota, Colombia, June 2020.
- Visiting Professor, Bocconi University, Milan, Italy, October- November 2012, April 2014, and June 2015.
- 2011 Faculty Scholar in Residence, University of Denver Sturm College of Law, April 21-22, 2011.

Exhibit A_Donohue
Page 1

- Visiting Fellow, The Milton Friedman Institute for Research in Economics, University of Chicago, October 2009.
- Schmidheiny Visiting Professor of Law and Economics, St. Gallen University, November – December, 2007.
- Visiting Lecturer in Law and Economics, Gerzensee Study Center, Switzerland, June 2007.
- Visiting Professor, Tel Aviv University School of Law, May 2007.
- Herbert Smith Visitor to the Law Faculty, University of Cambridge, England, February 2006.
- Visiting Professor, Harvard Law School, January 2003.
- Fellow, Center for Advanced Studies in the Behavioral Sciences, Stanford, California, Academic year 2000-01.
- Visiting Professor, Yale Law School, Fall, 1999.
- Professor, Center for the Study of American Law in China, Renmin University Law School, Beijing, July 1998.
- Visiting Professor of Law and Economics, University of Virginia, January 1997.
- Lecturer, Toin University School of Law, Yokohama, Japan, May-June 1996.
- Cornell Law School, Distinguished Visiting Fellow in Law and Economics, April 8-12, 1996 and September 25-29, 2000
- Visiting Professor, University of Chicago Law School, January 1992-June 1992.
- Visiting Professor of Law and Economics, University of Virginia Law School, January 1990-May 1990.
- Fellow, Yale Law School Program in Civil Liability, July 1985-August 1986.
- Private Practice (part-time), New Haven, Connecticut, September 1981-August 1986.
- Instructor in Economics, Yale College, September 1983-August 1985.
- Summer Associate, Donovan Leisure Newton & Irvine, New York, Summer 1982.
- Summer Associate, Perkins, Coie, Stone, Olsen & Williams, Seattle, Washington, Summer 1976.
- Research Assistant, Prof. Laurence Lynn, Kennedy School of Government, Harvard University, Summer 1975.
- LSAT Tutor, Stanley Kaplan Education Center, Boston, Massachusetts; Research Assistant, Prof. Philip Heymann, Harvard Law School; Research Assistant, Prof. Gordon Chase, Harvard School of Public Health. (During Law School).

**EDUCATION**

**Yale University, 1981-1986**

- University Fellow in Economics; M.A. 1982, M. Phil. 1984, Ph.D. 1986.
  - Dissertation: "A Continuous-Time Stochastic Model of Job Mobility:  A Comparison of Male-Female Hazard Rates of Young Workers."  Awarded with Distinction by Yale.

  - Winner of the Michael E. Borus Award for best social science dissertation in the last three years making substantial use of the National Longitudinal Surveys--awarded by the Center for Human Research at Ohio State University on October 24, 1988.

- National Research Service Award, National Institute of Health.
- Member, Graduate Executive Committee; Graduate Affiliate, Jonathan Edwards College.

**Harvard Law School, 1974-1977 (J.D.)**

- Graduated Cum Laude.

- Activities: Law Clerk (Volunteer) for Judge John Forte, Appellate Division of the District Court of Central Middlesex; Civil Rights, Civil Liberties Law Review; Intra-mural Athletics; Clinical Placement (Third Year): (a) First Semester: Massachusetts Advocacy Center; (b) Second Semester: Massachusetts Attorney General's Office--Civil Rights and Consumer Protection Divisions. Drafted comments for the Massachusetts Attorney General on the proposed U.S. Department of Justice settlement of its case against BechtelCorporation's adherence to the Arab Boycott of Israeli companies.

## Hamilton College, 1970-1974 (B.A.)
- Departmental Honors in both Economics and Mathematics
  - Phi Beta Kappa (Junior Year)
- Graduated fourth in class with the following academic awards:

  - Brockway Prize (Highest GPA Freshman Year)
  - Edwin Huntington Memorial Mathematical Scholarship
  - Fayerweather Prize Scholarship
  - Oren Root Prize Scholarship in Mathematics

- President, Root-Jessup Public Affairs Council.


**PUBLICATIONS**

## Books and Edited Volumes:

- Law and Economics of Discrimination, Edward Elgar Publishing, 2013.

- Employment Discrimination: Law and Theory, Foundation Press, 2005, 2021 (5th edition) (with George Rutherglen).

- Economics of Labor and Employment Law: Volumes I and II, Edward Elgar Publishing, 2007. http://www.e-elgar.co.uk/bookentry_main.lasso?id=4070

- Foundations of Employment Discrimination Law, Foundation Press, 2003 (2d edition).

- Foundations of Employment Discrimination Law, Oxford University Press, 1997 (Initial edition).

## Book Chapters:

- "Drug Prohibitions and Its Alternatives." Chapter 2 in Cook, Philip J., Stephen Machin, Olivier Marie, and Giovanni Mastrobuoni, eds, *Lessons from the Economics of Crime: What Reduces Offending?* MIT Press. 45-66 (2013).

- "The Death Penalty" Chapter in Encyclopedia of Law and Economics, Spring (2013) and in Alain Marciano & Giovanni Battista Ramello eds., Encyclopedia of Law and Economics (2019).

- "Rethinking America's Illegal Drug Policy," in Philip J. Cook, Jens Ludwig, and Justin McCrary, eds, Controlling Crime: Strategies and Tradeoffs (2011), pp.215-289 (with Benjamin Ewing and David Peloquin).

- "Assessing the Relative Benefits of Incarceration: The Overall Change Over the Previous Decades and the Benefits on the Margin" in Steven Raphael and Michael Stoll, eds., "Do Prisons Make Us Safer? The Benefits and Costs of the Prison Boom," pp. 269-341 (2009).

3

- "Does Greater Managerial Freedom to Sacrifice Profits Lead to Higher Social Welfare" In Bruce Hay, Robert Stavins, and Richard Vietor, eds., Environmental Protection and the Social Responsibility of Firms: Perspectives from Law, Economics, and Business (2005).

- "The Evolution of Employment Discrimination Law in the 1990s:  A Preliminary Empirical Evaluation" (with Peter Siegelman), in Laura Beth Nielsen and Robert L. Nelson, eds., Handbook of Employment Discrimination Research (2005).

- "The Impact of Concealed Carry Laws" in Jens Ludwig and Philip Cook, Evaluating Gun Policy:  Effects on Crime and Violence (Washington D.C.:  Brookings, 2003).

**Articles:**

- Phil Cook and John Donohue, "Regulating Assault Weapons and Large-Capacity Magazines for Ammunition," JAMA. 2022;328(12):1191-1192. https://jamanetwork.com/journals/jama/fullarticle/2796675.

- John J. Donohue, Samuel V. Cai, Matthew V. Bondy, and Philip J. Cook, (2022) "More Guns, More Unintended Consequences: The Effects of Right-to-Carry on Criminal Behavior and Policing in US Cities," https://www.nber.org/papers/w30190.
  - Featured in August 2022 Issue of NBER Digest.
  - Featured in August 11, 2022 issue of The Economist: "A Supreme Court ruling could spell even more gun crime: Right-to-carry laws are associated with increases in violence."
- "The Supreme Court's gun decision will lead to more violent crime," Washington Post, July 8, 2022, https://www.washingtonpost.com/outlook/2022/07/08/guns-crime-bruen-supreme-court/.
- Daniel Cerqueira, Danilo Coelho, John J. Donohue III, Marcelo Fernandes, & Jony Pinto Junior, "A panel-based proxy for gun prevalence in US and Mexico" International Review of Law & Economics (2022). https://www.sciencedirect.com/science/article/abs/pii/S0144818822000369.

- "Increasing murders but overall lower crime suggests a growing gun problem," Am J Public Health. (2022).

- "An expert draws 7 lessons about US gun laws from the murder of Ahmaud Arbery and the Rittenhouse verdict," The Conversation (December 6, 2021), https://theconversation.com/an-expert-draws-7-lessons-about-us-gun-laws-from-the-murder-of-ahmaud-arbery-and-the-rittenhouse-verdict-172741.

- Lisa Vicen, Samuel Levander, & John J. Donohue III, 'NYSRPA v. Bruen': Studies Show Direct Link Between Right-to-Carry and Violent Crime Increase, The National Law Journal, November 4, 2021. https://www.law.com/nationallawjournal/2021/11/04/nysrpa-v-bruen-studies-show-direct-link-between-right-to-carry-and-violent-crime-increase/.

- "Will the Supreme Court Avoid Further Self-Inflicted Second Amendment Wounds?" Brennan Center for Justice (June 2021), https://www.brennancenter.org/sites/default/files/2021-06/Donohue_final.pdf. This is part of the Brennan Center for Justice Protests, Insurrection, and the Second Amendment series.

- "We Must Confront the Threats to America's Democracy" 56 Idaho Law Review 119 (2020)."

- The Impact of Legalized Abortion on Crime over the Last Two Decades" American Law and Economics Review (Fall 2020)(with Steven Levitt), Volume 22, Issue 2, Pages 241–302.

4

https://academic.oup.com/aler/article/22/2/241/5973959?guestAccessKey=917acf36-918d-4310-9d22-73c713757238

- ◼ NBER Working Paper No. 25863, May 2019, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3391510.

  - ○ Featured on Freakonomics Radio, "Abortion and Crime, Revisited." https://podcasts.apple.com/us/podcast/freakonomics-radio/id354668519?i=1000444184627."

- "The Swerve to 'Guns Everywhere:' A Legal and Empirical Evaluation" 83 *Law and Contemporary Problems* 117-136 (2020). https://scholarship.law.duke.edu/lcp/vol83/iss3/7.

- Daniel Cerqueira, Danilo Santa Cruz Coelho, John J. Donohue, Marcelo Fernandes & Jony Arrais Pinto, A Panel-Based Proxy for Gun Prevalence in the US (Nat'l Bureau of Econ. Research, Working Paper No. 25530, 2019), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3332277.

- "That Assault Weapon Ban? It Really Did Work" *The New York Times*, September 5, 2019, (with Theodora Boulouta), https://www.nytimes.com/2019/09/04/opinion/assault-weapon-ban.html?action=click&module=Opinion&pgtype=Homepage.

- "Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Control Analysis" *Journal of Empirical Legal Studies*, April 2019 (with Abhay Aneja and Kyle Weber), https://onlinelibrary.wiley.com/doi/full/10.1111/jels.12219.

- "RTC Laws Increase Violent Crime: Moody and Marvell Have Missed the Target," *Econ Journal Watch*, Vol. 16, No. 1, 97-113, March 2019 (with Abhay Aneja and Kyle Weber), https://econjwatch.org/File+download/1103/DonohueAnejaWeberMar2019.pdf?mimetype=pdf

- "It's Going to Take More Than Background Checks and AR-15 Bans to Stop Mass Shootings," *Time.com*, November 16, 2018. http://time.com/5456015/gun-control-background-checks-ar15-mass-shootings/

- "What's in a denial? Bayesian Analysis that Kavanaugh lied about denials under oath and Trump was foolish to believe MBS," November 2, 2018 (with Aaron Edlin). https://works.bepress.com/john_donohue/176/

- "Brett Kavanaugh won't keep Americans safe," CNN.com, September 5, 2018. https://www.cnn.com/2018/09/05/opinions/kavanaugh-wont-keep-america-safe-donohue/

- "More Gun Carrying, More Violent Crime," *Econ Journal Watch*, Vol. 15, No. 1, 67-82, January 2018. https://econjwatch.org/articles/more-gun-carrying-more-violent-crime

- "Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Controls Analysis" NBER Working Paper w23510, www.nber.org/papers/w23510, January 2018 (with Abhay Aneja, and Kyle Weber).

- "Saving lives by regulating guns: Evidence for policy," *Science*  Dec. 8, 2017, Vol. 358, Issue 6368, pp. 1259-1261, http://science.sciencemag.org/content/358/6368/1259.full (with Phil Cook).

- "Laws Facilitating Gun Carrying and Homicide," American Journal of Public Health, Vol 107, No. 12, 1864-1865, December 2017, http://ajph.aphapublications.org/doi/10.2105/AJPH.2017.304144.

- "Comey, Trump, and the Puzzling Pattern of Crime in 2015 and Beyond," 117 Columbia Law Review 1297 (2017). http://columbialawreview.org/content/comey-trump-and-the-puzzling-pattern-of-crime-in-2015-and-beyond/.

- "Did Jeff Sessions forget wanting to execute pot dealers?" The Conversation, January 23, 2017 (with Max Schoening), https://theconversation.com/did-jeff-sessions-forget-wanting-to-execute-pot-dealers-71694

    - Reprinted in Huffington Post, http://www.huffingtonpost.com/the-conversation-us/did-jeff-sessions-forget_b_14344218.html

    - Reprinted in Salon, http://www.salon.com/2017/01/30/jeff-sessions-forgetting-he-once-wanted-to-execute-pot-dealers/#comments

- "Jeff Sessions, The Grim Reaper of Alabama," The New York Times, January 9, 2017 (with Max Schoening), http://www.nytimes.com/2017/01/08/opinion/jeff-sessions-the-grim-reaper-of-alabama.html

- "Testing the Immunity of the Firearm Industry to Tort Litigation," JAMA Intern Med. Published online November 14, 2016. http://jamanetwork.com/journals/jamainternalmedicine/fullarticle/2582991 (with David Studdert and Michelle Mello).

- "Empirical Analysis and the Fate of Capital Punishment," 11 Duke Journal of Constitutional Law and Public Policy 51-106 (2016). Available at: http://scholarship.law.duke.edu/djclpp/vol11/iss1/3

- "Firearms on College Campuses: Research Evidence and Policy Implications," Johns Hopkins Bloomberg School of Public Health, (October 15, 2016)(with Daniel Webster et al). http://www.jhsph.edu/research/centers-and-institutes/johns-hopkins-center-for-gun-policy-and-research/_pdfs/GunsOnCampus.pdf

- "Be skeptical about claims of benefits of concealed carry permits." Sacramento Bee, (October 6, 2016), http://www.sacbee.com/opinion/op-ed/soapbox/article106329677.html

- "The Death Penalty Does Not Add Up to Smart Justice," California State Treasurer Intersections (September 2016), http://treasurer.ca.gov/newsletter/2016/201609/conversation.asp

- "Reducing civilian firepower would boost police and community safety, Stanford expert says," Stanford News (July 2016), http://news.stanford.edu/2016/07/15/reducing-civilian-firepower-boost-police-community-safety/review/

- "Domestic Violence and Effectively Terminating the Gun Rights of the Dangerous," Legal Aggregate – Stanford Law School (June 2016), https://law.stanford.edu/2016/06/28/domestic-violence-and-effectively-terminating-the-gun-rights-of-the-dangerous/

- "4 Gun Control Steps U.S. Needs Now," CNN.com (June 2016), http://www.cnn.com/2016/06/23/opinions/gun-control-donohue/index.html

- "The Demise of the Death Penalty in Connecticut," Legal Aggregate - Stanford Law School (June 2016),

  https://law.stanford.edu/2016/06/07/the-demise-of-the-death-penalty-in-connecticut/

- "On Justice Scalia's Legacy," Legal Aggregate - Stanford Law School (February 14, 2016) https://law.stanford.edu/2016/02/15/stanford-law-faculty-on-justice-scalia/

- "Empirical Evaluation of Law:  The Dream and the Nightmare," 17 American Law and Economics Review 313 2015.

- "Capital Punishment Does not Deter Homicides," Casetext, August 30, 2015, https://casetext.com/posts/capital-punishment-does-not-deter-homicides

- "There's no evidence that death penalty is a deterrent against crime," The Conversation, August 8, 2015. http://theconversation.com/theres-no-evidence-that-death-penalty-is-a-deterrent-against-crime-43227

    - Reprinted under the title "Does the Death Penalty Deter Killers?" Newsweek, August 19, 2015.

6

https://www.newsweek.com/does-death-penalty-deter-killers-364164

- "Glossip v. Gross: Examining Death Penalty Data for Clarity," Stanford Lawyer, June 29, 2015. http://stanfordlawyer.law.stanford.edu/2015/06/glossip-v-gross-examining-death-penalty-data-for-clarity/

- "How US Gun Control Compares to the Rest of the World," The Conversation, June 24, 2015. http://theconversation.com/how-us-gun-control-compares-to-the-rest-of-the-world-43590

  - Reprinted in slightly modified form under the title "Ban guns, end shootings? How evidence stacks up around the world," in CNN.com on August 27, 2015 http://www.cnn.com/2015/08/27/opinions/us-guns-evidence/

- "The 10 day period is reasonable," San Francisco Daily Journal, September 3, 2014.

- "An Empirical Evaluation of the Connecticut Death Penalty System Since 1973:  Are There Unlawful Racial, Gender, and Geographic Disparities?" 11 Journal of Empirical Legal Studies 637 (2014).

- "The Impact of Right to Carry Laws and the NRC Report:  The Latest Lessons for the Empirical Evaluation of Law and Policy," NBER Working Paper 18294. Revised November 2014 (with Abhay Aneja and Alexandria Zhang), http://www.nber.org/papers/w18294

- "Do Police Reduce Crime? A Reexamination of a Natural Experiment," in Yun-Chien Chang, ed., Empirical Legal Analysis: Assessing the Performance of Legal Institutions, London: Routledge, Chapt. 5, pp. 125-143, 2014 (with Daniel E. Ho & Patrick Leahy)

- "Reflections on the Newtown Shooting One Year Later," Stanford Lawyer, December 5, 2013. http://stanfordlawyer.law.stanford.edu/2013/12/reflections-on-the-newtown-shooting-one-year-later/

- Outlier Nation:  Homicides, Incarceration, Guns and Gun Culture, TAR 9 (Verona, Italy: 2013).

- "Gun lunacy rides high in America," Special to CNN, September 13, 2013. http://www.cnn.com/2013/09/13/opinion/donohue-gun-control/index.html?iref=allsearch

- "Why the NRA fights background checks," Special to CNN, Wed April 10, 2013. http://www.cnn.com/2013/04/10/opinion/donohue-background-checks/index.html

- "Substance vs. Sideshows in the More Guns, Less Crime Debate: A Comment on Moody, Lott, and Marvell" (with Abhay Aneja, and Alexandria Zhang) ECON JOURNAL WATCH 10(1) January 2013: 32-39

- "More Guns, Less Crime Thesis," Guns in American Society: An Encyclopedia of History, Politics, Culture, and the Law (volume 2:G-Q, at page 585) (2012).

- "Jury Nullification in Modified Comparative Negligence Regimes," 79 The University of Chicago Law Review 945 (2012)(with Eli K. Best).

- "What Can Be Done to Stem Gun Violence?"  San Francisco Chronicle, December 21, 2012.   http://www.sfgate.com/opinion/article/What-can-be-done-to-stem-gun-violence-4139575.php#ixzz2G4qIkJJ2

- "When Will America Wake Up to Gun Violence?" CNN opinion, July 21, 2012. Posted to: http://www.cnn.com/2012/07/20/opinion/donohue-gun-control/.

- "Time To Kill the Death Penalty?" The California Progress Report, June 28, 2012.

- "Assessing Post-ADA Employment: Some Econometric Evidence and Policy Considerations." Journal of Empirical Legal Studies Vol. 8: No. 3, September 2011, pp. 477-503 (with Michael Ashley Stein, Christopher L. Griffin, Jr. and Sascha Becker).

7

- "The Impact of Right-to-Carry Laws and the NRC Report: Lessons for the Empirical Evaluation of Law and Policy," American Law and Economics Review (Fall 2011) 13 (2): 565-631 (with Abhay Aneja and Alex Zhang). See January 2014 Revision released as an NBER working paper above.

- "Punishment is a Cost, Not a Benefit," Review of Mark A. R. Kleiman's "When Brute Force Fails: How to Have Less Crime and Less Punishment," XLVII Journal of Economic Literature (March 2010), 168-172.

- "The Politics of Judicial Opposition: Comment," Journal of Institutional and Theoretical Economics, 166(1), 108—114 (2010).

- "Introduction to the Death Penalty Symposium," 11 American Law and Economics Review. (Fall 2009) (with Steve Shavell).

- "Estimating the Impact of the Death Penalty on Murder," 11 American Law and Economics Review 249 (Fall 2009) (with Justin Wolfers).

- "The Impact of the Death Penalty on Murder," Criminology & Public Policy (November 2009, Volume 8, Issue 4) at pp. 795-801.

- "The Impact of Legalized Abortion on Teen Childbearing," 11 American Law and Economics Review 24 (2009) (with Jeff Grogger and Steven Levitt).

- "More Guns, Less Crime Fails Again:  The Latest Evidence from 1977-2006," 6 Econ Journal Watch 218-233 (May 2009)(with Ian Ayres).

- "Yet Another Refutation of the More Guns, Less Crime Hypothesis – With Some Help From Moody and Marvell," 6 Econ Journal Watch 35-59 (January 2009)(with Ian Ayres).

- "Measurement Error, Legalized Abortion, and the Decline in Crime: A Response to Foote and Goetz," The Quarterly Journal of Economics (2008) 123 (1): 425-440 (with Steven Levitt). http://qje.oxfordjournals.org/content/123/1/425.abstract

- "AntiDiscrimination Law," in Steven Durlauf and Lawrence Bloom, eds., The New Palgrave Dictionary of Economics, 2d Edition, 2008.

- "Murder in Decline in the 1990s: Why the U.S. and N.Y.C. Were Not That Special," Punishment and Society  10: 333 (2008) at http://pun.sagepub.com

- "Understanding the 1990s Crime Drops in the U.S. and Canada," Canadian Journal of Criminology and Criminal Justice, Vol 49, No. 4, p. 552 (October 2007).

- "The Law and Economics of Antidiscrimination Law," A. M. Polinsky and Steven Shavell, eds., Handbook of Law and Economics, Volume 2 (2007), Pages 1387-1472.

- "Economic Models of Crime and Punishment," Social Research, Vol. 74: No. 2, Summer 2007, pp. 379-412.

- "Rethink the War on Drugs," Yale Law Reports, Summer 2007, pp. 46-47.

- "More Cops," Brookings Policy Brief #158, March 2007 (with Jens Ludwig), http://www.brookings.edu/papers/2007/03crime_john-j--donohue-iii.aspx.

- "Studying Labor Market Institutions in the Lab: Minimum Wages, Employment Protection, and Workfare: Comment," Journal of Theoretical and Institutional Economics, 163(1), 46—51 (March 2007).

- "The Impact of Damage Caps on Malpractice Claims:  Randomization Inference with Difference-in-Differences," (with Daniel Ho), 4 Journal of Empirical Legal Studies 69 (2007).

8

- "The Discretion of Judges and Corporate Executives:  An Insider's View of the Disney Case," The Economists' Voice: Vol. 3: No. 8, Article 4.  Available at: http://www.bepress.com/ev/vol3/iss8/art4

- "The Knicks Boldly Go Where Companies Have Not," The New York Times, July 2, 2006 Sunday (with Ian Ayres).

- "The Death Penalty:  No Evidence of Deterrence," The Economists' Voice, (with Justin Wolfers) (April 2006), http://bpp.wharton.upenn.edu/jwolfers/Press/DeathPenalty(BEPress).pdf.

  - Reprinted in Stiglitz, Edlin, and DeLong (eds), The Economists' Voice:  Top Economists Take on Today's Problems (2008).

- "The Costs of Wrongful-Discharge Laws," 88 Review of Economics and Statistics (with David Autor and Stewart Schwab)(2006), pp. 211-31.

- "Security, Democracy, and Restraint," 1 Opening Argument 4 (February 2006).

  - Reprinted in Loch Johnson and James Wirtz, Intelligence and National Security: An Anthology  406-407 (2d ed. 2008).

- "Uses and Abuses of Empirical Evidence in the Death Penalty Debate," 58 Stanford Law Review 791 (2005) (with Justin Wolfers).

  - Reprinted in Steven Levitt and Thomas Miles, eds., The Economics of Criminal Law, Edward Elgar Publishing (2008).

  - Reprinted in Robert Cooter and Francesco Parisi, eds., Foundations of Law and Economics, Edward Elgar Publishing (2010)

- "Does Terrorism Increase Crime?  A Cautionary Tale," (with Daniel Ho), 2005.

- "Fighting Crime:  An Economist's View," 7 The Milken Institute Review 46 (2005).

  - Reprinted in Kurt Finsterbusch, ed., Social Problems (McGraw-Hill, 2006).

- "Guns, Crime, and the Impact of State Right-to-Carry Laws," 73 Fordham Law Review 623 (2004).

- "Clinton and Bush's Report Cards on Crime Reduction: The Data Show Bush Policies Are Undermining Clinton Gains", The Economists' Voice: Vol. 1: No. 1, Article 4. 2004, http://www.bepress.com/ev/vol1/iss1/art4

- "The Employment Consequences of Wrongful-Discharge Laws:  Large, Small, or None at All?" American Economic Review:  Papers and Proceedings May, 2004 (with David Autor and Stewart Schwab).

- "Further Evidence that Legalized Abortion Lowered Crime:  A Reply To Joyce," 39 Journal of Human Resources 29 (Winter 2004)(with Steven Levitt).

- "A Clarification on Data Availability," Science: Vol. 301: No. 5641. (September 26, 2003), p. 1849, http://www.jstor.org/stable/3835157.

- "The Final Bullet in the Body of the More Guns, Less Crime Hypothesis," Criminology & Public Policy (July 2003, Volume 2, Issue 3) at pp. 397-410.

- "Shooting Down the 'More Guns, Less Crime' Hypothesis," 55 Stanford Law Review 1193 (2003)(with Ian Ayres).

- "The Latest Misfires in Support of the 'More Guns, Less Crime' Hypothesis," 55 Stanford Law Review 1371 (2003)(with Ian Ayres).

9

- "Can Guns, Or Gun Violence, Be Controlled?" (Reviewing James Jacobs, Can Gun Control Work?), The American Prospect (December 16, 2002), p. 35, http://prospect.org/article/books-review-4.

- "The Search for Truth: In Appreciation of James J. Heckman," 27 Law and Social Inquiry 23 (2002).

- "The Schooling of Southern Blacks: The Roles of Social Activism and Private Philanthropy, 1910-1960," Quarterly Journal of Economics (Feb. 2002), (with James Heckman and Petra Todd), pp. 225 – 268.

  - Reprinted in Legal Decisionmaking section of the American Bar Foundation Anthology, ABF Press (2007).

  - Reprinted in American Bar Foundation, Anaylzing Law's Reach: Empirical Research on Law and Society (2008)

- "The Impact of Race on Policing and Arrests," Journal of Law and Economics, vol. XLIV October 2001)(with Steven Levitt), pp. 367 – 394.

- "The Impact of Legalized Abortion on Crime," Quarterly Journal of Economics (Vol. CXVI, Issue 2, May 2001)(with Steven Levitt) pp. 379-420.

  - Reprinted in Steven Levitt and Thomas Miles, eds., The Economics of Criminal Law, Edward Elgar Publishing (2008).

  - Reprinted in Robert Cooter and Francesco Parisi, eds., Recent Developments In Law And Economics, Edward Elgar Publishing (2010).

- "Understanding the Reasons for and Impact of Legislatively Mandated Benefits for Selected Workers," 53 Stanford Law Review 897 (2001).

  - Reprinted in Michael Zimmer, Charles Sullivan et al, Cases and Materials on Employment Discrimination (6th edition)(2003).

- "Nondiscretionary Concealed Weapons Law: A Case Study of Statistics, Standards of Proof, and Public Policy," American Law and Economics Review 436 (1999)(with Ian Ayres).

  - Reprinted in Steven Levitt and Thomas Miles, eds., The Economics of Criminal Law, Edward Elgar Publishing (2008).

- "Why We Should Discount the Views of Those Who Discount Discounting," 108 Yale Law Journal 1901 (1999).

- "Understanding the Time Path of Crime," 88 Journal of Criminal Law and Criminology 1423 (1998).

- "Discrimination in Employment," The New Palgrave Dictionary of Law and Economics (1998).

  - Excerpted in Lynne Dallas, Law and Public Policy: A Socio-Economic Approach at page 261 (2003).

- "The Legal Response to Discrimination: Does Law Matter?" in Bryant Garth, Austin Sarat, eds., How Does Law Matter? Pp. 45 – 75 (Northwestern University Press, 1998).

- "Some Thoughts on Law and Economics and the Theory of the Second Best," 73 Chicago-Kent Law Review 257 (1998).

- "Allocating Resources Among Prisons and Social Programs in the Battle Against Crime," 27 Journal of Legal Studies 1 (1998) (with Peter Siegelman).

  - Excerpted in Sanford Kadish & Stephen Schulhofer, Criminal Law and Its Processes (8th ed. 2007),

- "Guns, Violence, and the Efficiency of Illegal Markets," 88 American Economic Review 463 (May 1998)(with Steve Levitt).

- "Did Miranda Diminish Police Effectiveness?" 50 Stanford Law Review 1147 (1998).

10

- "Some Thoughts on Affirmative Action," 75 Washington University Law Quarterly 1590 (1997).

- "Executive Compensation," 3 Stanford Journal of Law, Business & Finance 1 (1997).

- "Some Perspective on Crime and Criminal Justice Policy," Lawrence Friedman and George Fisher, eds., The Crime Conundrum: Essays on Criminal Justice 45 (1997). Reissued by Routledge eBooks 2019.

- "The Selection of Employment Discrimination Disputes for Litigation: Using Business Cycle Effects to Test the Priest/Klein Hypothesis," 24 Journal of Legal Studies 427 (1995) (with Peter Siegelman).

- "Employment Discrimination Law in Perspective: Three Concepts of Equality," 92 Michigan Law Review 2583 (1994).

- Reprinted in Frank Ravitch, Janis McDonald, and Pamela Sumners, Employment Discrimination Law (2004).

  - Translated into Chinese and published in Peking University Law Review (2007).

- "The Effects of Joint and Several Liability on Settlement Rates: Mathematical Symmetries and Meta-Issues in the Analysis of Rational Litigant Behavior," 23 Journal of Legal Studies 543 (1994).

- "Liberal Law and Economics," (reviewing Rethinking the Progressive Agenda by Susan Rose-Ackerman), 13 Journal of Policy Analysis and Management 192 (1994).

- Review of Richard Epstein's Forbidden Grounds: The Case Against Employment Discrimination Laws, 31 Journal of Economic Literature 1477 (1994).

- "Law and Macroeconomics: Employment Discrimination Over the Business Cycle," 66 University of S. Calif. L. Rev. 709 (1993) (with Peter Siegelman).

- "Advocacy Versus Analysis In Assessing Employment Discrimination Law," 44 Stanford Law Review 1583 (1992).

  - Reprinted in Christopher McCrudden, Anti-Discrimination Law (2003).

- Excerpted in Professors Michael J. Zimmer, Charles A. Sullivan, & Rebecca Hanner White, Cases and Materials on Employment Discrimination (Seventh Edition 2008).

- "The Changing Nature of Employment Discrimination Litigation," 43 Stanford Law Review 983 (1991) (with Peter Siegelman).

- "The Effects of Fee Shifting on the Settlement Rate: Theoretical Observations on Costs, Conflicts, and Contingency Fees," 54 Law and Contemporary Problems 195 (1991).

- "Re-Evaluating Federal Civil Rights Policy," 79 Georgetown Law Journal 1713 (1991) (with James Heckman).

- "Opting for the British Rule; Or, If Posner and Shavell Can't Remember the Coase Theorem, Who Will?" 104 Harvard Law Review 1093 (1991).

  - Reprinted in Saul Levmore, Foundations of Tort Law 160 (1994).

- "Continuous versus Episodic Change: The Impact of Civil Rights Policy on the Economic Status of Blacks," 29 Journal of Economic Literature 1603 (December 1991) (with James Heckman).

  - Reprinted in Paul Burstein, ed., Equal Employment Opportunity, Aldine De Gruyter, New York (1994).

- "The Impact of Federal Civil Rights Policy on the Economic Status of Blacks," 14 Harvard Journal of Law and Public Policy 41 (1991).

- "Studying the Iceberg From Its Tip: A Comparison of Published and Unpublished Employment Discrimination Cases," 24 Law and Society Review 1133 (1990) (with Peter Siegelman).

11

- "Prohibiting Sex Discrimination in the Workplace: An Economic Perspective," 56 University of Chicago Law Review 1337 (1989).

- "The Law & Economics of Tort Law: The Profound Revolution," 102 Harvard Law Review 1047 (1989).

- "Using Market Incentives to Promote Auto Occupant Safety," 7 Yale Law and Policy Review 449 (1989).

- "Diverting the Coasean River: Incentive Schemes to Reduce Unemployment Spells," 99 Yale Law Journal 549 (1989).

  - Winner of the 1989 Scholarly Paper Competition, Association of American Law Schools.

- "Reply to Professors Ellickson and Stigler," 99 Yale Law Journal 635 (1989).

- "Law and Economics: The Road Not Taken," 22 Law and Society Review 903 (1988).

- "Further Thoughts on Employment Discrimination Legislation: A Reply to Judge Posner," 136 U. Pa. L. Rev. 523 (1987).

- "Judge Bork, Anti-Trust Law, and the Bending of 'Original Intent'," Chicago Tribune, sec.1, pg. 15, July 22, 1987.

- "Posner's Third Symphony: Thinking about the Unthinkable," 39 Stanford Law Review 791 (1987)(with Ian Ayres).

- "Determinants of Job Turnover of Young Men and Women in the U.S.--A Hazard Rate Analysis," in Schultz, T.P., ed., Research in Population Economics, vol.6, Greenwich, Conn.: JAI Press (1987).

- "A Comparison of Male-Female Hazard Rates of Young Workers, 1968-1971," Working Paper #48, Center for Studies in Law, Economics and Public Policy; Yale Law School (1986).

- "Hazard Rates of Young Male and Female Workers--Recent Developments," Working Paper #51, Center for Studies in Law, Economics and Public Policy; Yale Law School (1986).

- "Is Title VII Efficient?" 134 U. Pa. L. Rev. 1411 (1986).

  - Reprinted in Paul Burstein, ed., Equal Employment Opportunity, Aldine De Gruyter, New York (1994).

- "Section I Cases," Sherman's Summations, Vol.3, No.2, Sherman Act Committee of the A.B.A. Antitrust Section, Fall, 1982, at 49.

- "An Evaluation of the Constitutionality of S. 114, The Proposed Federal Death Penalty Statute," Hearings before the U.S. Senate Judiciary Committee, April 27, 1981, at 151.

- "Godfrey v. Georgia: Creative Federalism, the Eighth Amendment, and the Evolving Law of Death," 30 Catholic University Law Review 13 (1980).

- "Criminal Code Revision--Contempt of Court and Related Offenses," Hearings before the Subcommittee on Criminal Justice of the House Judiciary Committee, July 18, 1979, at 1087.

**Blog Posts:**

- "Packed and Loaded: Stanford's John Donohue on Supreme Court's Guns Decision," *Stanford Law School Legal Aggregate Blog* (Jun. 24, 2022), https://law.stanford.edu/2022/06/24/packed-and-loaded-stanfords-john-donohue-on-supreme-courts-guns-decision/?utm_source=june302022&utm_medium=mc&utm_campaign=law%40stanford&utm_content=Stanford-law-news.

- "Guns, Mass Shootings, and the Law in the U.S.," *Stanford Law School Legal Aggregate Blog* (Dec. 10, 2021), https://law.stanford.edu/2021/12/10/stanfords-john-donohue-on-guns-mass-shootings-and-the-law-in-the-u-s/.

- "Stanford's John Donohue on One Tragic Week, Two Mass Shootings, and the Uniquely American Gun Problem," *Stanford Law School Legal Aggregate Blog* (March 25, 2021), https://law.stanford.edu/2021/03/25/stanfords-john-donohue-on-one-tragic-week-with-two-mass-shootings-and-the-uniquely-american-gun-problem.

- "Open Carry Laws, Guns on Capitol Hill, and a Police Force Outgunned by Militias," *Stanford Law School Legal Aggregate Blog* (January 19, 2021), https://law.stanford.edu/2021/01/19/open-carry-laws-guns-on-capitol-hill-and-a-police-force-outgunned-by-militias/.

- "Remembering Justice Ginsburg," *Stanford Law School Legal Aggregate Blog* (September 19, 2020), https://law.stanford.edu/2020/09/19/stanford-laws-john-donohue-remembers-justice-ginsburg/.

- "The Assault Weapon Ban Saved Lives," (with Theodora Boulouta), *Stanford Law School Legal Aggregate Blog*, October 15, 2019, https://stanford.io/2MWNsrV.

- "Stanford Law's John Donohue on Mass Shootings and Gun Regulation in the U.S.," *Stanford Law School Legal Aggregate Blog*, August 6, 2019, https://law.stanford.edu/2019/08/06/stanford-laws-john-donohue-on-mass-shootings-and-gun-regulation-in-the-u-s/.

- "Stanford Law Faculty Remember Justice Stevens." *Stanford Law School Legal Aggregate Blog*, July 18, 2019, https://law.stanford.edu/2019/07/18/stanford-law-faculty-remember-justice-stevens/.

- "Arming Teachers Is Not a Good Option," *Scientific American*, February 28, 2018, https://blogs.scientificamerican.com/observations/arming-teachers-is-not-a-good-option/.

- "Another Mass Shooting: An Update on U.S. Gun Laws," *Stanford Law School Legal Aggregate Blog*, February 18, 2018, https://law.stanford.edu/2018/02/18/another-mass-shooting-qa-us-gun-laws/.

- "Orlando to Las Vegas: Guns, Law, and Mass Shootings in the U.S.," Stanford Law School Legal Aggregate Blog, October 3, 2017, https://law.stanford.edu/2017/10/03/orlando-to-las-vegas-guns-and-law/.

- *"Moore v. Texas* and the Pathologies that Still Mar Capital Punishment in the U.S.," *Stanford Law School Legal Aggregate Blog*, March 29, 2017, https://law.stanford.edu/2017/03/29/moore-v-texas-and-the-pathologies-that-mar-capital-punishment-in-the-u-s/.

- "Trump and Gun Policy," *Stanford Law School Legal Aggregate Blog*, November 12, 2016, http://stanford.io/2eoWnna.

- "Facts Do Not Support Claim That Guns Make Us Safer" *Stanford Law School Legal Aggregate Blog*, October 12, 2015, https://law.stanford.edu/2015/10/12/professor-john-donohue-facts-do-not-support-claim-that-guns-make-us-safer/.

- "When will America wake up to gun violence?" *CNN.com*, July 20, 2012, http://www.cnn.com/2012/07/20/opinion/donohue-gun-control/index.html.

- "It Takes Laws to Control the Bad Guys," The New York Times -- Room For Debate: http://www.nytimes.com/roomfordebate/2011/01/11/more-guns-less-crime (January 11, 2011).

- "Have "Woman-Protective" Studies Resolved the Abortion Debate?  Don't Bet on It," http://balkin.blogspot.com/2008/09/have-woman-protective-studies-resolved.html (September 2008).

- "Dodging the Death Penalty Bullet On Child Rape," http://balkin.blogspot.com/2008/07/dodging-death-penalty-bullet-on-child.html (July 2008).

13

- "Why I'd Stick With Yale Clerks-- Some Econometric Ruminations," http://balkin.blogspot.com/2008/04/why-id-stick-with-yale-clerks-some.html (April 2008).

## WORKSHOPS AND ADDRESSES:

- "Can We Get Strong Gun Safety Legislation Passed?" Vi Seminar, **Palo Alto, CA**, July 18, 2022.

- Panelist, "Inside the Brain of the Mass Shooter and the Impact of Their Criminal Behavior," Symposium on "The Law and Neuroscience of Mass Shootings," held virtually at Fordham Law School, November 1, 2022.

- "*Bruen*, Permissive Gun Carrying, Constitutional Law, and Violent Crime," Faculty Workshop, **Stanford Law School**, July 13, 2022.

- "Effectiveness of Permissive Gun Laws: Carry Laws, Stand Your Ground," Annals Authors' Conference, **University of Connecticut**, Hartford, April 7, 2022.

- "Permissive Gun Carrying Laws and Violent Crime," ETH, Zurich, April 6, 2022; Law and Economics Workshop, **Tel Aviv University School of Law**, May 11, 2022.

- "Guns and Crime in American Life and Law," **University of Zurich**, April 5, 2022.

- "Do Permissive Gun Carrying Laws Increase Violent Crime?" Applied Webinar at the **Sao Paulo School of Economics**, November 17, 2021.

- "Mass Shootings, Gun Laws and the Evolution of the Second Amendment – Where Do We Go from Here?" Minnesota Continuing Legal Education Webcast, November 2, 2021.

- Discussant of Richard Berk, "Firearm Sales in California Through the Myopic Vision of an Interrupted Time Series Causal Analysis," Online Causal Inference Seminar, **Stanford University**, April 6, 2021.

- "The Impact of Legalized Abortion on Crime over the Last Two Decades," American Law and Economics Association Meetings, **NYU School of Law**, May 18, 2019; Department of Economics, **University of California, Irvine**, October 13, 2020; **Harvard Kennedy School** Program in Inequality and Social Policy, March 22, 2021; Crime Seminar, **Northwestern Law School**, March 3, 2022.

- Discussant of Chika Okafor, "Prosecutor Politics: The Impact of Election Cycles on Criminal Sentencing in the Era of Rising Incarceration," **Harvard Kennedy School** Program in Inequality and Social Policy, March 22, 2021.

- "Guns and Crime," Economic Analysis of Crime course, **Bocconi University**, Dept. of Social and Political Sciences, March 8, 2021.

- Discussant, "How the Massachusetts assault weapons ban enforcement notice changed firearm sales," Firearms and Policy session, **Assoc. for Public Policy Analysis and Management (APPAM) Virtual Fall Research Conference**, November 12, 2020.

- "We Must Confront the Threats to America's Democracy," Idaho Law Review Election Law Symposium, **University of Idaho College of Law**, October 20, 2020.

- "The Impact of Legalized Abortion on Crime over the Last Two Decades," Department of Economics, **University of California, Irvine**, October 13, 2020.

- "The Death Penalty: Informing Policy Through Empirical Research," Program in Criminal Law and Policy, **University of Arizona College of Law**, October 6, 2020.

- Discussant, "Mandatory Retirement Improved Performance on State Supreme Courts," Law and Economics Session, **NBER Summer Institute**, July 22, 2020.

14

- Discussant, "Measuring Racial Discrimination in Bail Decisions," Crime Session, **NBER Summer Institute**, July 15, 2020.

- "Guns and Empirical Evidence in Second Amendment Litigation," **Columbia Law School**, March 24, 2020; **Yale Law School**, March 25, 2020 (Zoom Presentation).

- Panelist, "Guns, Schools, and Adolescents: A Disaster Waiting to Happen," Psychiatry Grand Rounds,

- Sapp Center for Science Teaching and Learning, **Stanford University School of Medicine**, February 20, 2020.

- "The Power of Data to Change Hearts, Minds, and Public Policy," Law and Policy Lab, **Stanford Law School**, February 13, 2020.

- "The Move to 'Guns Everywhere'," Inaugural Cooter-Rubinfeld Lecture, **University of California, Berkeley, Law School**, February 6, 2020.

- "The Swerve:  A Legal and Empirical Evaluation of the Move to 'Guns Everywhere,'" Law and Economic Studies Workshop, **Columbia Law School**, September 23, 2019; Conference on Gun Rights and Regulations Outside the Home, **Duke Law School**, September 27, 2019.

- "Evidence to Guide Gun-related Public Policy," Conference on Gun Violence Epidemic, **Stanford Medical School**, September 16, 2019; Lecturer, Physicians and Social Responsibility Course, **Stanford Medical School**, October 7, 2019; Lecturer, Data Science Course, **Department of Statistics, Stanford University**, November 1, 2019.

- "The Legal and Political Battle over Gun Policy in America," **Hamilton College**, June 7, 2019.

- "Impact of Right to Carry Laws on Violent Crime," Public Policy colloquium, **Stanford Economics Department**, January 22, 2018; SPILS Methods Workshop, **Stanford Law School**, January 25, 2018; Quantlaw, **University of Arizona Law School**, March 2, 2018; Stanford/Berkeley Causal Inference Conference, **Stanford Graduate School of Business**, April 23, 2019; **Baldy Center/Law School Distinguished Speaker Series**, University at Buffalo School of Law, May 3, 2019; Conference on "Synthetic Controls and Related Methods," **Institute for Data, Systems, and Society, MIT**, May 21, 2019.

- "Guns, Abortion, and the Death Penalty: Informing Policy Through Empirical Research," Politics and Public Policy Lecture Series, **Stanford University**, April 1, 2019.

- "Dangers of Guns Carried Outside the Home for Protection," **GVPedia Conference**, Denver, Colorado, April 6, 2019.

- "Understanding California's Red Flag Law: How to Remove Guns from People Who Are a Threat to Themselves or Others," **Stanford Law School**, February 12, 2019.

- "Guns and Crime: Current Empirical and Legal Debates," **Fellowship Forum**, January 22, 2019.

- "Gun Policy in America at a Critical Juncture," SAFE, **Stanford Medical School**, September 17, 2018.

- "Empirical Evaluation of Law and Policy: The Battle for Truth," **Woodside Rotary Club**, September 12, 2018.

- "Discussing America's Second Amendment," **San Jose Museum of Quilts & Textiles**, July 15, 2018.

- "The Legal Battle to End the Death Penalty in Connecticut," **Law School of the University of Reggio Calabria,** Italy, June 15, 2018.

- Panelist, "Newtown and Gun Violence in the US, Humanity is Indivisible Series, **Stanford University**, May 31, 2018.

- "Gun Policy In California and the US," Human Rights Seminar; **Stanford Medical School**, May 29, 2018.

15

- "Gun Policy in the Wake of Parkland," Sigma Alpha Epsilon Leadership Speaker Series, **Stanford Law School**, March 13, 2018; Stanford in Government event, Haas Center, **Stanford University**, April 20, 2018.

- Panelist, Town Hall Meeting on Gun Violence with Congresswoman Jackie Speier, **Burlingame High School**, April 14, 2018.

- Moderator, In Studio Conversation with Berkeley Law School Dean Erwin Chemerinsky: "Defining the Limits of Free Speech," **Palo Alto League of Women's Voters**, March 27, 2018. https://youtu.be/cqHEIAVoTLY

- "More than Thoughts & Prayers," **American Constitution Society** and the **Federalist Society, U.C. Hastings School of Law**, March 14, 2018.

- Panelist, "Addressing Gun Violence," **American Constitution Society**, Stanford Law School, March 8, 2018.

- Panelist, "Public Carry: Defending Against Efforts to Expand Carry Laws," **National Gun Violence Prevention Meeting**, Washington, D.C., October 18, 2017.

- "Keynote Presentation: Right-to-Carry Laws and Violent Crime," Second Amendment Litigation & Jurisprudence Conference, **The Law Center to Prevent Gun Violence**, October 16, 2017.

- "The Latest Evidence on Abortion Legalization and Crime," Conference on Empirical Legal Studies, **Cornell University**, October 13, 2017.

- "Comey, Trump, and the Puzzling Pattern of Crime in 2015 and Beyond," **University of Texas School of Law and Economics Seminar,** April 24, 2017, Faculty Workshop, **UC Davis School of Law**, April 10, 2017; Law and Social Science Seminar, **Texas A&M University School of Law**, March 6, 2017; Quantlaw, **University of Arizona Law School**, February 17, 2017.

- Debate with Kent Scheidegger on Capital Punishment, Philosophy of Punishment Seminar, **JFK University School of Law,** March 18, 2017.

- "The Evidence on Guns and Gun Laws," **Federal Bar Council Program on Guns and Gun Laws** -- Rancho Mirage, California, February 23, 2017.

- "Guns, Crime and Race in America," Stanford's Center for Population Health Sciences, **Stanford Medical School**, October 17, 2016.

- "Evaluating the Death Penalty," Forum on California Propositions 62 and 66, **Stanford Law School**, September 14, 2016.

- "Empirical Analysis and the Fate of Capital Punishment," Colloquium, Presley Center for Crime and Justice Studies; **University of California, Riverside**, October 24, 2016.

- "Gun Violence and Mental Illness," Department of Psychiatry, **Stanford University**, August 25, 2016.

- "The Battle Over Gun Policy In America," Physicians and Social Responsibility" seminar; **Stanford Medical School**, October 3, 2016; **Bioethics Committee of the San Mateo County Medical Association**, April 27, 2016; **The League of Women Voters of Palo Alto**, April 19, 2016; Human Rights and Health Seminar, **Stanford University**, April 12, 2016; Bechtel International Center, **Stanford University**, February 23, 2016; Stanford in Government Seminar, Haas Center, **Stanford University**, February 2, 2016.

- American Economic Association Continuing Education Course "The Economics of Crime" (with Jens Ludwig), **AEA Annual Meeting**, San Francisco, January 5-7, 2016.

- "Race and Arbitrariness in the Connecticut Death Penalty," **University of Connecticut School of Law**, Nov. 20, 2015.

16

- *"Connecticut v. Santiago* and the Demise of the Connecticut Death Penalty," Faculty Workshop, **Stanford Law School**, August 19, 2015.

- "Do Handguns Make Us Safer? A State-Level Synthetic Controls Analysis of Right-to-Carry Laws," Second Amendment Conference, **Covington and Burling, New York**, May 14,  2015; **NBER Summer Institute**, Cambridge, MA, July 23, 2015; Faculty Workshop, **Stanford Law School**, November 11, 2015.

- "U.S. Criminal Justice Under Siege : Will Becker or Beccaria Prevail?" Faculty Seminar, **Bocconi University School of Law, Milan, Italy**, June 18, 2015.

- "Can You Believe Econometric Evaluations of Law, Policy, and Medicine?" **Stanford Law School**, Legal Theory Workshop, March 1, 2007; Faculty Workshop, **Tel Aviv University School of Law**, May 14, 2007; Faculty Workshop, **University of Haifa Law School**, May 16, 2007; Law and Economics Workshop, **Georgetown Law School**, September 19, 2007; Law and Economics Workshop, **St. Gallen Law School**, Switzerland, November 29, 2007; and Yale Law School, February 25, 2008; Law and Economics Workshop, **Swiss Institute of Technology**, Zurich, Switzerland, May 21, 2008; Faculty Workshop, **University of Virginia Law School,** October 24, 2008; Plenary Session, Latin American and Caribbean Law and Economics Association, **Universitat Pompeu Fabra (Barcelona),** June 15, 2009; **Google, Milan**, Italy, June 8, 2015.

- Commentator: ""Throw Away the Jail or Throw Away The Key? The Effect of Punishment on Recidivism and Social Cost,"" by Miguel F. P. de Figueiredo, American Law and Economics Association Meetings, **Columbia Law School**, May 15, 2015.

- "Broken Windows, Stop and Frisk, and Ferguson," 2015 Justice Collaboratory Conference: Policing Post-Ferguson, **Yale Law School**, April 17, 2015.

- "Assessing the Development and Future of Empirical Legal Studies," **Stanford Law School** course on Modern American Legal Thought, February 25, 2015.

- Commentator:  "Payday Lending Restrictions and Crimes in the Neighborhood," by Yilan Xu, 9th Annual Conference on Empirical Legal Studies, **Boalt Hall**, Berkeley, CA, November 7,  2014.

- "An Empirical Evaluation of the Connecticut Death Penalty Since 1973:  Are There Unconstitutional Race, Gender and Geographic Disparities?" Faculty Workshop, **Economics Department, Rice University**, Houston, TX, Feb. 18, 2014; Law and Economics Workshop, **University of Virginia Law School**, September 11, 2014; Faculty Colloquium, **University of San Diego School of Law**, October 3, 2014.

- "What's Happening to the Death Penalty?  A Look at the Battle in Connecticut," **Hamilton College**, Clinton, New York, June 6, 2014.

- Panel Member, Research Methods Workshop, Conference for Junior Researchers on Law and Society, **Stanford Law School,** May 15, 2014.

- "Logit v. OLS: A Matter of Life and Death," Annual Meeting of the American Law and Economics Association, **University of Chicago**, May 9, 2014.

- "Guns: Law, Policy, Econometrics," Second Amendment Litigation and Jurisprudence Conference, **Jenner & Block**, Chicago, May 8, 2014.

-  "The Impact of Antidiscrimination Law:  The View 50 Years after the Civil Rights Act of 1964," **Renaissance Weekend**, Liguna Niguel, CA, Feb. 15, 2014.

- "Concealed Carry and Stand Your Ground Law," **Renaissance Weekend**, Liguna Niguel, CA, Feb. 15, 2014.

- "Reducing Gun Violence," Forum on Gun Violence Reduction, **Mountainview City Hall**, Mountainview, CA, Feb. 8, 2014.

17

- "Gun Policy Debate," **C-SPAN**. National Cable Satellite Corporation, Jan. 16, 2014. <http://www.c-span.org/video/?317256-1/GunPoli>.

- "Trial and Decision in the Connecticut Death Penalty Litigation," Faculty Workshop, **Stanford Law School**, November 20, 2013.

- "Rethinking America's Illegal Drug Policy," Law and Economics Workshop, **Harvard Law School**, April 20, 2010; NBER Conference, "Economical Crime Control," **Boalt Hall**, Berkeley, CA, January 16, 2010; **NBER Summer Institute** Pre-Conference "Economical Crime Control," July 23, 2009; **Whitney Center** Lecture Series, Hamden, CT, October 5, 2009; Law and Economics Workshop, **University of Chicago Law School**, October 13, 2009; Seminar for Spanish Law Professors, **Harvard Law School**, October 23, 2009; The Criminal Law Society, **Stanford Law School**, March 31, 2011, **University of Denver Sturm College of Law**, April 21, 2011; Law and Economics Workshop, **Boalt Hall**, Berkeley, CA, October 17, 2011; Shaking the Foundations Conference, **Stanford Law School**, November 2, 2013.

- "The Challenge to the Connecticut Death Penalty," **Yale Law School**, Death Penalty Clinic, November 5, 2007; Graduate Student Seminar, November 11, 2009; Stanford Program in International Legal Studies Seminar, **Stanford Law School**, Nov. 11, 2010; Faculty Workshop, **Stanford Law School**, June 8, 2011; Faculty workshop, **Duke Law School**, April 13, 2012; Program on Public Policy, **Stanford University**, May 2, 2012; Annual Meeting of the American Law and Economics Association, **Vanderbilt Law School**, Nashville, TN, May 18, 2013; Faculty Workshop, **University of Arizona Law School**, October 17, 2013;  8th Annual Conference on Empirical Legal Studies, **University of Pennsylvania Law School**, October 26, 2013.

- Commentator: "How to Lie with Rape Statistics" by Corey Rayburn Yung, 8th Annual Conference on Empirical Legal Studies, **University of Pennsylvania Law School**, October 2013.

- "An Empirical Look at Gun Violence in the U.S." **University of Arizona Law School**, October 17, 2013

- Discussant, "Sex Offender Registration and Plea Bargaining," **NBER Labor Summer Institute**, Cambridge, MA, July 25, 2013.

- "What Works in the War Against Crime?"  **Renaissance Weekend**, Jackson Hole, Wyoming, July 5, 2013.

- Seminar Presentation, "Statistics and the Streets – Curbing Crime, Realities of the Death Penalty, and Successes in Public Safety," **Renaissance Weekend**, Jackson Hole, Wyoming, July 5, 2013.

- Flashes of Genius (Glimpses of Extra-ordinarily Novel Thinking) -- "Stemming Gun Violence," **Renaissance Weekend**, Jackson Hole, Wyoming, July 5, 2013.

- "Can Laws Reduce Crime?" Safe Oakland Speakers Series, Holy Names University, Oakland, CA, May 1, 2013, http://www.ustream.tv/channel/safe-oakland-speaker-series

- Presentation on "The Death Penalty in America" on a panel on "human rights and criminal justice systems in the world," Science for Peace conference at Bocconi University in Milan, Italy, November 15, 2012. http://www.fondazioneveronesi.it/scienceforpeace2012/

- Seminar Presentation, "America's Criminal Justice System," **Renaissance Weekend**, Santa Monica, CA., Feb. 19, 2012.

- "Statistical Inference, Regression Analysis and Common Mistakes in Empirical Research," SPILLS Fellow's Workshop, **Stanford Law School**, February 2, 2012.

- "New Evidence in the 'More Guns, Less Crime' Debate:  A Synthetic Controls Approach," Conference on Empirical Legal Studies, **Northwestern Law School**, November 4, 2011.

18

- "Drug Legalization and its Alternatives," *Lessons from the Economics of Crime: What Works in Reducing Offending?* **CESifo Venice Summer Institute Workshop,** July 22 , 2011.

- "Incapacitating Addictions: Drug Policy and American Criminal Justice," in Rethinking the War on Drugs through the US-Mexico Prism," **Yale Center for the Study of Globalization**, May 12, 2011.

- Plenary Session:  Flashes of Genius (Glimpses of <u>Extra</u>-ordinarily Novel Thinking) -- "Has Legalized Abortion Reduced Crime?" **Renaissance Weekend**, Liguna Niguel, CA., Feb. 18, 2011.

- "An Evidence-Based Look at the More Guns, Less Crime Theory (after Tucson)" The American Constitution Society for Law and Policy (ACS), **Stanford Law School**, January 25, 2011; **Renaissance Weekend**, Liguna Niguel, CA., Feb. 19, 2011; "Faculty Forum" at the External Relations Office, **Stanford Law School**, April 5, 2011.

- "Empirical Evaluation of Law:  The Dream and the Nightmare," SPILS Fellows Lecture, **Stanford Law School**, January 15, 2015; Legal Studies Workshop, **Stanford Law School**, Feb. 7, 2011; **Renaissance Weekend**, Liguna Niguel, CA., Feb. 20, 2011; **University of Denver Sturm College of Law**, April 22, 2011; Presidential Address, Annual Meeting of the American Law and Economics Association, **Columbia University**, May 20, 2011.

- Death Sentencing in Connecticut," **American Society of Criminology Annual Meeting**, San Francisco, Nov. 17, 2010.

- "The Impact of Right to Carry Laws and the NRC Report:  Lessons for the Empirical Evaluation of Law and Policy," Conference on Empirical Legal Studies, **Yale Law School**, Nov. 6, 2010.

- Comment on Bushway and Gelbach, "Testing for Racial Discrimination in Bail Setting Using Nonparametric Estimation of a Parametric Model," Conference on Empirical Legal Studies, **Yale Law School**, Nov. 6, 2010.

- Commentator, "A Test of Racial Bias in Capital Sentencing," **NBER Political Economy Program Meeting**, April 23, 2010.

- "The (Lack of a) Deterrent Effect of Capital Punishment," Faculty Workshop, **University of Chicago Economics Department**, October 21, 2009.

- Keynote Address, "The Evolution of Econometric Evaluation of Crime and Deterrence,"1st Paris& Bonn Workshop on Law and Economics:  The Empirics of Crime and Deterrence, **University of Paris Ouest Nanterre,** September 24, 2009.

- Comment on Cook, Ludwig, and Samaha, "Gun Control after *Heller*: Litigating Against Regulation," NBER Regulation and Litigation Conference, **The Boulders**, Carefree, Arizona, September 11, 2009.

- "Impact of the Death Penalty on Murder in the US," Faculty Workshop, Law School, **Universitat Pompeu Fabra (Barcelona),** June 18, 2009.

- Comment on Joanna Shepherd's "The Politics of Judicial Opposition," Journal of Institutional and Theoretical Economics Conference, **Kloster Eberbach, Germany**, June 12, 2009.

- "The Great American Crime Drop of the '90s:  Some Thoughts on Abortion Legalization, Guns, Prisons, and the Death Penalty," **Hamilton College**, Clinton, NY, June 5, 2009.

- "The Impact of the ADA on the Employment and Earnings of the Disabled," **American Law and Economics Association Meetings**, University of San Diego, May 15, 2009.

- "Crime and Punishment in the United States," **Eastern State Penitentiary, Yale Alumni Event**, Philadelphia, PA, April 26, 2009.

19

- "Measuring Culpability in Death Penalty Cases," Conference on Applications of Economic Analysis in Law, **Fuqua School of Business, Duke University,** April 18, 2009.

- "Autopsy of a Financial Crisis," Workshop on New International Rules and Bodies for Regulating Financial Markets, **State University of Milan**, March 23, 2009.

- "Yet Another Refutation of the More Guns, Less Crime Hypothesis – With Some Help From Moody and Marvell, Law and Economics Workshop**, NYU Law School**, March 10, 2009.

- Intelligence-Squared Debate:  "Guns Reduce Crime," **Rockefeller University**, New York, October 28, 2008.

- "The D.C. Handgun Controls: Did the Supreme Court's Decision Make the City Safer?" Debate, **The Contemporary Club of Albemarle**, Charlottesville, VA, October 23, 2008.

- "Evaluating the Empirical Claims of the Woman-Protective Anti-Abortion Movement,"  Panel on The Facts of the Matter: Science, Public Health, and Counseling, Yale Conference on the Future of Sexual and Reproductive Rights, **Yale Law School**, October 11, 2008.

-  "Empirical Evaluation of Gun Policy," **Harvard Law School**, October 9, 2008.

- "Assessing the Relative Benefits of Incarceration:  The Overall Change Over the Previous  Decades and the Benefits on the Margin," **Russell Sage Foundation**, New York, May 3, 2007; Law and Economics Workshop, **Tel Aviv University School of Law**, May 28, 2008.

- Death Penalty Debate with Orin Kerr, Bloggingheads, April 11, 2008.

- "Evaluating Connecticut's Death Penalty Regime," Faculty Public Interest Conversation, **Yale Law School**, April 9, 2008.

- "The Death Penalty in Connecticut and the United States," **The Whitney Center**, Hamden, CT, November 5, 2007; Seminar on Advanced Criminal Law:  Criminal Sentencing and the Death Penalty, **Fordham Law School**, April 8, 2008; Law and Economics Workshop, **Swiss Institute of Technology**, Zurich, Switzerland, May 20, 2008.

- Radio Interview, "The Death of Capital Punishment?" Morning Edition: Where We Live. WNPR. Connecticut, March 10, 2008.

- Comment on Thomas Dee's "Born to Be Mild: Motorcycle Helmets and Traffic Safety," **American Economics Association Meetings**, New Orleans, Louisiana, January 4, 2008.

- "The Empirical Revolution in Law and Policy:  Jubilation and Tribulation," **Keynote Address, Conference on Empirical Legal Studies, NYU Law School,** Novermber 9, 2007.

- "The Optimal Rate of Incarceration," **Harvard Law School**, October 26, 2007.

- "Empirical Evaluation of Law:  The Impact on U.S Crime Rates of Incarceration, the Death Penalty, Guns, and Abortion," Law and Economics Workshop, **St. Gallen Law School, Switzerland**, June 25, 2007.

- Comment on Eric Baumer's "A Comprehensive Assessment of the Contemporary Crime Trends Puzzle," Committee on Law and Justice Workshop on Understanding Crime Trends, **National Academy of Sciences**, Washington, D.C., April 25, 2007.

- Comment on Bernard Harcourt, Third Annual Criminal Justice Roundtable Conferemce, **Yale Law School, "**Rethinking the Incarceration Revolution Part II:  State Level Analysis," April 14, 2006.

- "Corporate Governance in America:  The Disney Case," **Catholic University Law School**, Milan, Italy, March 19, 2007.

20

- "The U.S Tort System," (Latin American) Linkages Program, **Yale Law School**, February 13, 2007.

- Panel Member, "Guns and Violence in the U.S.," **Yale University, International Center**, January 24, 2007.

- **"**Economic Models of Crime and Punishment," Punishment: The U.S. Record: A Social    Research Conference at **The New School**, New York City, Nov. 30, 2006

- Comment on Baldus et al, "Equal Justice and the Death Penalty: The Experience fo the United States Armed Forces, Conference on Empirical Legal Studies, **University of   Texas Law, School**, Austin, Texas, October 27, 2006.

- "Empirical Evaluation of Law: The Promise and the Peril," **Harvard Law School**, October  26, 2006.

- "Estimating the Impact of the Death Penalty on Murder," Law and Economics Workshop, **Harvard Law School**, September 12, 2006; Conference on Empirical Legal Studies, **University of Texas Law School**, October 28, 2006; Joint Workshop, Maryland Population Research Center and School of Public Policy, **University of Maryland,** March 9, 2007.

- "Why Are Auto Fatalities Dropping so Sharply?" **Faculty Workshop, Wharton**, Philadelphia, PA, April 19, 2006.

- "The Law of Racial Profiling," Law and Economic Perspectives on Profiling Workshop, **Northwestern University Department of Economics**, April 7, 2006.

- "Landmines and Goldmines: Why It's Hard to Find Truth and Easy To Peddle Falsehood in Empirical Evaluation of Law and Policy," **Rosenthal Lectures, Northwestern University School of Law**, April 4-6, 2006.

- "The Impact of Legalized Abortion on Crime," **American Enterprise Institute**, March 28, 2006.

- "The Impact of Damage Caps on Malpractice Claims: Randomization Inference with Difference-in-Differences,"**Conference on Medical Malpractice, The Rand Corporation**, March 11, 2006.

- "Powerful Evidence the Death Penalty Deters?" **Leighton Homer Surbeck Chair Lecture, Yale Law School**, March 7, 2006.

- "Uses and Abuses of Empirical Evidence in the Death Penalty Debate," Faculty Workshop, **University of Connecticut Law School,** October 18, 2005; Faculty Workshop, **UCLA Law School**, February 3, 2006; Law and Economics Workshop, **Stanford Law School**, February 16, 2006; ; Law Faculty, **University of Cambridge, Cambridge, England**, February 28, 2006; **University of Illinois College of Law,** Law and Economics Workshop, March 2, 2006; Faculty Workshop, **Florida State University Law School**, March 30, 2006; **ALEA**, Berkeley, CA May 6, 2006; **University of Chicago Law School,** Law and Economics Workshop, May 9, 2006.

- "Is Gun Control Illiberal?" Federalist Society Debate with Dan Kahan at Yale Law School,  January 31, 2006.

- "Witness to Deception: An Insider's Look at the Disney Trial," **2005-2006 Distinguished Lecture, Boston University School of Law**, November 10, 2005; Center for the Study of Corporate Law, **Yale Law School**, November 3, 2005; **Law Offices of Herbert Smith, London, England**, February 23, 2006; Law Faculty, **University of Cambridge, Cambridge, England**, February 27, 2006.

- "Understanding the Surprising Fall in Crime in the 1990s," **Rotary Club**, Orange, CT, August 5, 2005; Faculty Workshop, **Yale School of Management**, September 21, 2005.

- Panel Member, "The Board's Role in Corporate Strategy," The Yale Global Governance Forum, **Yale School of Management**, September 8, 2005.

- "Crime and Abortion," **Museo de la Cuidad de Mexico**, Mexico City, October 20, 2003.

21

- "Allocating Resources towards Social Problems and Away From Incarceration as a Means of Reducing Crime," **MacArthur Foundation Research Network on Adolescent Development and Juvenile Justice**, San Francisco, CA, February 28, 2003.

- "Shooting Down the More Guns, Less Crime Hypothesis," **Stanford Law School**, Law and Economics Seminar, January 28, 2003; Faculty Workshop, Center for the Study of Law and Society, **Boalt Hall**, University of California, Berkeley, Feb. 24, 2003; Development Workshop, **Stanford Law School**, April 25, 2003; Faculty Workshop, **Stanford Law School**, July 2, 2003; Law and Public Affairs Program Workshop, **Princeton University,** September 29, 2003; Stanford Alumni Weekend, **Stanford University**, October 17, 2003; Faculty Workshop, **CIDE**, Mexico City, October 20, 2003.

- **"**The Impact of Legalized Abortion on Teen Childbearing," **NBER Labor Summer Institute**, Cambridge, MA, July 30, 2002.

- "Do Concealed Handgun Laws Reduce Crime?" Faculty Workshop, **Stanford Law School**, October 4, 2000; First-Year Orientation, **Stanford Law School**, September 5, 2001; Faculty Workshop, **Harvard Law School**, April 26, 2002; Faculty Workshop, **Columbia Law School**, April 29, 2002.

- "The Evolution of Employment Discrimination Law in the 1990s: An Empirical Investigation," Fellows Workshop, American Bar Foundation, February 11, 2002.

- "The Role of Discounting in Evaluating Social Programs Impacting on Future Generations:  Comment on Arrow and Revesz," Colloquium on Distributive Justice, **Stanford Law School**, Oct. 18, 2001.

- "The Impact of Wrongful Discharge Laws," **NBER Labor Summer Institute**, Cambridge, MA, July 30, 2001; Labor and Employment Seminar, **NYU Law School**, October 16, 2001; Faculty Workshop, **Stanford Law School**, September 18, 2002;  **Yale Law School**, January, 2004.

- "Racial Profiling:  Defining the Problem, Understanding the Cause, Finding the Solution," **American Society of Criminology Conference**, San Francisco, CA, November 15, 2000.

- "Institutional Architecture for Building Private Markets," Conference on "Latin America and The New Economy" at **Diego Portales University** in Santiago, Chile, October 26, 2000.

- "The History and Current Status of Employment Discrimination Law in the United States," Unicapital School of Law, (Centro Universitario Capital), Sao Paulo, Brazil, March 10, 2000.

- "Corporate Governance in Developing Countries:  Opportunities and Dangers," Conference on Neoliberal Policies for Development:  Analysis and Criticism," University of Sao Paulo Law School, March 13, 2000

- "Legalized Abortion and Crime," Law and Economics Workshop, **University of Pennsylvania Law School**, September 21, 1999; Faculty Workshop, **Yale Law School**, September 27, 1999; **John Jay College of Criminal Justice**, October 7, 1999; Faculty Workshop, **Quinnipiac Law School**, October 13, 1999; Faculty Workshop, **University of Connecticut Law School**, October 19, 1999; **University of Virginia Law School**, October 25, 1999; Faculty Workshop, **Baruch College**, November 9, 1999; MacArthur Foundation Social  Interactions and Economic Inequality Network Meeting, **Brookings Institution**, December 4, 1999; Faculty Workshop, **NYU Law School**, January 21, 2000; Faculty Workshop, **University of San Diego Law School**, February 18, 2000; Public Economics Workshop, Department of Economics, **Stanford University**, April 28, 2000; Law and Economics Workshop, **University of California at Berkeley Law School**, September 18, 2000; Faculty Workshop, **Cornell Law School**, September 26, 2000; OB-GYN Grand Rounds, **Stanford Medical School**, October 2, 2000; **Center for Advanced Studies in the Behavioral Sciences,** October 11, 2000; Faculty Workshop, **Graduate School of Business**, February 5, 2002.

- Panel member, Session on Executive Compensation, Director's College, **Stanford Law School**, March 23, 1999.

- "Exploring the Link Between Legalization of Abortion in the 1970s and Falling Crime in the 1990s," Law and Economics Workshop, **Harvard Law School**, March 16, 1999; Law and Economics Workshop, **University of Chicago Law School**, April 27, 1999; Faculty Workshop, **Stanford Law School**, June 30, 1999.

- "Is the Increasing Reliance on Incarceration a Cost-Effective Strategy of Fighting Crime?" Faculty Workshop**, University of Wisconsin School of Social Science**, February 19, 1999.

- "What Do We Know About Options Compensation?" Institutional Investors Forum**, Stanford Law School**, May 29, 1998.

- Commentator on Orlando Patterson's presentation on "The Ordeal of Integration," **Stanford Economics Department**, May 20, 1998.

- "Understanding The Time Path of Crime," Presentation at Conference on Why is Crime Decreasing? **Northwestern University School of Law**, March 28, 1998; Faculty Workshop, **Stanford Law School**, September 16, 1998; Faculty Workshop, **University of Michigan School of Law**, February 18, 1999.

- Commentator, Conference on Public and Private Penalties, the **University of Chicago Law School**, Dec. 13-14, 1997.

- "Some Thoughts on Affirmative Action," Presentation at a conference on Rethinking Equality in the Global Society, **Washington University School of Law**, November 10, 1997.

- Commentator on Chris Jencks' Presentation on Welfare Policy, **Stanford Economics Department**, October 8, 1997.

- "The Impact of Race on Policing, Arrest Patterns, and Crime," Faculty Workshop, **Stanford Law School**, September 10, 1997; Law and Economics Workshop, **University of Southern California Law School**, October 23, 1997; Law and Economics Workshop, **Columbia University Law School**, November 24, 1997; Law and Economics Workshop, Haas School of Business**, University of California at Berkeley**, February 19, 1998; Annual Meeting of the American Law and Economics Association, **University of California at Berkeley**, May 8, 1998; Conference on the Economics of Law Enforcement, **Harvard Law School**, October 17, 1998.

- "Crime in America:  Understanding Trends, Evaluating Policy," **Stanford Sierra Camp**, August 1997.

- "Executive Compensation: What Do We Know?"  TIAA-CREF Committees on Corporate Governance and Social Responsibility, Center for Economic Policy Research, **Stanford University**, June 27, 1997; NASDAQ Director's Day, **Stanford University**, June 30, 1997.

- Panel Chair, Criminal Law (Theory), Criminal Law (Empirical), and Labor/Discrimination/Family Law, American Law and Economics Association, **University of Toronto Law School**, May 9-10, 1997.

- Commentator, "Diversity in Law School Hiring," **Stanford Law School**, February 25, 1997.

- Keynote Speaker, "The Optimal Rate of Crime," 11th Annual Conference, **The Oklahoma Academy for State Goals**, Tulsa, Oklahoma, May 7, 1996.

- Panel member, Session on Executive Compensation, Director's College, **Stanford Law School**, March 28-29, 1996.

- "The Power of Law:  Can Law Make a Difference in Improving the Position of Women and Minorities in the Labor Market?"  The Fellows of the **American Bar Foundation**, Baltimore, Maryland, February 3, 1996.

- "Public Action, Private Choice and Philanthropy:  Understanding the Sources of Improvement in Black Schooling Quality in Georgia, 1911-1960," **Stanford Faculty Workshop**, January 24, 1996; Faculty Workshop, **University of Virginia Law School**, January 22, 1997; **National Bureau of Economic Research**, Cambridge, Massachusetts, Labor Studies Conference, April 3, 1998.

23

- Commentator, "The Effect of Increased Incarceration on Crime," Meetings of the **American Economics Association**, San Francisco, January 6, 1996.

- Commentator, Symposium on Labor Law, **University of Texas Law School**, November 10-11, 1995.

- Panel Member, Symposium on Criminal Justice, **Stanford Law School**, October 6-7, 1995.

- Commentator, "The Litigious Plaintiff Hypothesis," Industrial and Labor Relations Conference, **Cornell University**, May 19, 1995.

- Commentator on Keith Hylton's, "Fee Shifting and Predictability of Law," Faculty Workshop, **Northwestern University School of Law**, February 27, 1995.

- "The Selection of Employment Discrimination Disputes for Litigation: Using Business Cycle Effects to Test the Priest/Klein Hypothesis," **Stanford University**, Law and Economics Seminars, October 31, 1994.

- "Is the United States at the Optimal Rate of Crime?" Faculty Workshop, **Indiana University School of Law**, Indianapolis, November 18, 1993; Faculty Workshop, **Northwestern University School of Law**, April 18, 1994; Law and Economics Workshop, **Stanford Law School**, April 28, 1994; Meetings of the American Law and Economics Association, **Stanford Law School**, May 13, 1994; **American Bar Foundation**, September 7, 1994; Faculty Workshop, **DePaul Law School**, September 21, 1994; Law and Economics Workshop, **University of Chicago Law School**, October 11, 1994; Faculty Seminar, **Stanford Law School**, October 31, 1994; Law and Economics Luncheon, **Stanford Law School**, November 1, 1994; Faculty Seminar Workshop, **University of Illinois College of Law**, Champaign, November 22, 1994; Law and Economics Workshop, **Harvard Law School**, November 29, 1994; School Alumni Luncheon, Chicago Club, December 13, 1994; **Northwestern Law School**; Law and Economics Workshop, **Yale Law School**, February 1, 1996; Faculty Workshop, **Cornell Law School**, April 10, 1996; Faculty Workshop, **Tokyo University Law School**, June 4, 1996; Panel on "The Economics of Crime," **Western Economics Association** Meeting, San Francisco, July 1, 1996.

- "The Broad Path of Law and Economics," Chair Ceremony, **Northwestern University School of Law**, September 30, 1994.

- Commentator on Paul Robinson's "A Failure of Moral Conviction," **Northwestern University School of Law**, September 20, 1994.

- "The Do's of Diversity, The Don'ts of Discrimination," Kellogg School of Business, **Northwestern University**, May 17, 1994.

- "Does Law Matter in the Realm of Discrimination?" **Law and Society Summer Institute**, Pala Mesa Lodge, Fallbrook, California, June 25, 1993.

- Commentator, "The Double Minority: Race and Sex Interactions in the Job Market," Society for the Advancement of Socio-Economics, **New School for Social Research**, March 28, 1993.

- "The Effects of Joint and Several Liability on Settlement Rates: Mathematical Symmetries and Meta-Issues in the Analysis of Rational Litigant Behavior," Economic Analysis of Civil Procedure, **University of Virginia School of Law**, March 26, 1993.

- Debate with Richard Epstein on Employment Discrimination Law, **Chicago Federalist Society**, February 23, 1993.

- Panel Chair, "Optimal Sanctions and Legal Rules in Tort and Criminal Law," Meetings of Annual Association of Law and Economics, **Yale Law School**, May 15, 1992.

- Panel Member, "The Law and Economics of Employment at Will," **The Institute For Humane Studies**, Fairfax, Virginia, March 27, 1992.

24

- "The Efficacy of Title VII," Debate with Professor Richard Epstein, **University of Chicago Law School**, February 26, 1992.

- Moderator, "Using Testers to Demonstrate Racial Discrimination," **University of Chicago Law School**, February 13, 1992.

- "Law & Macroeconomics:  The Effect of the Business Cycle on Employment Discrimination Litigation," Law and Society Workshop, **Indiana University**, November 6, 1991; Faculty Workshop, **University of North Carolina Law School**, Chapel Hill, November 8, 1991; Faculty Workshop, **Northwestern University School of Law**, December 11, 1991; Law and

- Economics Conference, **Duquesne Law School**, March 14, 1992; **University of Chicago Law School**, April 2, 1992.

- Panel Chair and Commentator, "New Perspectives on Law and Economics," **Society for the Advancement of Socioeconomics**, Stockholm, June 17, 1991; **Law and Society Meetings**, Amsterdam, June 29, 1991.

- Panel Chair, "Regulation of International Capital Markets," **Law and Society Meetings**, Amsterdam, June 27, 1991.

- Panel Chair, "The Law and Economics of Discrimination," American Association of Law and Economics, **University of Illinois Law School**, May 24, 1991.

- "The Economics of Employment Discrimination Law," **Industrial Relations Research Association**, Chicago, Illinois, March 4, 1991.

- "Does Current Employment Discrimination Law Help or Hinder Minority Economic Empowerment?"  Debate with Professor Richard Epstein, The Federalist Society, **Northwestern Law School**, February 26, 1991.

- Panel Member, "The Law and Economics of Employment Discrimination," **AALS Annual Meeting**, Washington, D.C., January 6, 1991.

- "Re-Evaluating Federal Civil Rights Policy," Conference on the Law and Economics of Racial Discrimination in Employment, **Georgetown University Law Center**, November 30, 1990.

- "Opting for the British Rule," Faculty Seminar, **Northwestern Law School**, September 11, 1990; Faculty Seminar, **University of Virginia Law School**, September 14, 1990; Law and Economics Seminar, **University of Michigan Law School**, October 18, 1990; Faculty Workshop, **NYU Law School**, November 14, 1990; Faculty Workshop, **University of Florida Law School**, March 18, 1991.

- "The Effects of Fee Shifting on the Settlement Rate:  Theoretical Observations on Costs, Conflicts, and Contingency Fees," at the **Yale Law School Conference** "Modern Civil Procedure:  Issues in Controversy," June 16, 1990.

- "Studying the Iceberg From Its Tip?:  An Analysis of the Differences Between Published and Unpublished Employment Discrimination Cases," **Law and Society Meetings**, Berkeley, California, May 31, 1990.

- Panel Discussion on Tort Reform, **University of Pennsylvania Law School**, April 27, 1990.

- Panel Discussion of "The Role of Government in Closing the Socio-Economic Gap for Minorities," at the Federalist Society National Symposium on "The Future of Civil Rights Law," **Stanford Law School**, March 16, 1990.

- "Continuous versus Episodic Change:  The Impact of Affirmative Action and Civil Rights Policy on the Economic Status of Blacks," **University of Virginia Economics Department**, February 15, 1990; **Princeton University Department of Economics**, February 21, 1990 (with James Heckman); Law & Economics Workshop, **University of Toronto Law School**, October 8, 1991.

- "Sex Discrimination in the Workplace:  An Economic Perspective," Fellows Seminar, **American Bar Foundation**, October 16, 1989.

- "The Changing Nature of Employment Discrimination Litigation," Law and Economics Workshop, **Columbia Law School**, March 23, 1989; Faculty Seminar, **University of Virginia Law School**, March 24, 1989; Law and Economics Workshop, **University of Chicago**, April 25, 1989; **Law & Society Meeting**; Madison, Wisconsin, June 8, 1989; Labor Economics Workshop, **University of Illinois**, Chicago, November 1, 1989; Law & Economics Workshop, **University of Pennsylvania Law School**, November 9, 1989; Law and Economics Seminar, **University of California at Berkeley**, October 4, 1990; Law and Social Science Workshop, **Northwestern University**, February 3, 1991; Law and Economics Seminar, **Stanford Law School**, March 21, 1991; Faculty Workshop, **Cornell Law School**, April 3, 1991; Visiting Committee, **Northwestern Law School**, April 5, 1991.

- "Law & Economics:  The Third Phase," The Association of General Counsel, **Northwestern University School of Law**, October 14, 1988.

- "Employment Discrimination Litigation," **Northwestern Law School** Alumni Monthly Loop Luncheon.  **Chicago Bar Association**, May 31, 1988.

- "The Morality of the Death Penalty."  A debate with Ernest Van Den Haag. **Northwestern University School of Law**, April 19, 1988.

- "Models of Deregulation of International Capital Markets."  A presentation with David Van Zandt, Faculty Seminar, **Northwestern University School of Law**, April 1, 1988; Visiting Committee, May 5, 1988.

- "Is Title VII Efficient?"  A debate with Judge Richard Posner, Faculty Seminar, **Northwestern University School of Law**, November 20, 1987.

- "The Senate's Role in Confirming Supreme Court Nominees:  The Historical Record," **Northwestern University School of Law**, September 22, 1987.

- "Diverting the Coasean River:  Incentive Schemes to Reduce Unemployment Spells," **Yale Law School** Civil Liability Workshop, March 30, 1987; Faculty Seminar, **Northwestern University School of Law**, March 18, 1987; **University of Southern California Law Center**, May 1, 1987; and Seminar in Law and Politics, Department of Political Science, **Northwestern University**, May 8, 1987; Labor Workshop, Department of Economics, **Northwestern University**, October 27, 1987; **AALS Annual Meeting**, New Orleans, January 7, 1989.

- "Women in the Labor Market--Are Things Getting Better or Worse?"  **Hamilton College**, February 23, 1987.

- "The Changing Relative Quit Rates of Young Male and Female Workers," **Hamilton-Colgate Joint Faculty Economics Seminar**, February 23, 1987.

- "Living on Borrowed Money and Time--U.S. Fiscal Policy and the Prospect of Explosive Public Debt," **Orange Rotary Club**, February 22, 1985.

- "Capital Punishment in the Eighties," **Hamilton College**, April 6, 1981.

- "Terms and Conditions of Sale Under the Uniform Commercial Code," Executive Sales Conference, **National Machine Tool Builders' Association**, May 12, 1980.

## AWARDS

- **47th Tikkun Olam Award**, The Haiti Jewish Refugee Legacy Project, February 2014, "Awarded for incredibly significant work that explores and inspires the search for justice and taking serious, correct and timely action." Tikkun Olam is a Hebrew phrase that means 'repairing the world.' https://haitiholocaustsurvivors.wordpress.com/guest-posts/47th-tikkun-olam-award-to-professor-john-j-donohue-iii/

**PROFESSIONAL ACTIVITIES**

- Member, Stanford Law School academic reading group evaluating the criminal law opinions of U.S. Supreme Court nominee Judge Ketanji Brown Jackson for the ABA Standing Committee on the Federal Judiciary, March 2022.
- Member, USF Institute for Nonviolence and Social Justice Leadership Council, University of San Francisco, June 2021 – present.
- Member, Criminal Justice Expert Panel, @CJExpertPanel, providing information on the relevance of criminal justice research to current events, beginning April 2021.
- Statistical Consultant to the Fairness Committee of the 9th Circuit Court of Appeals investigating issues of sentencing disparities by race, ethnicity, and gender in federal criminal sentencing, March 2018 – March 2020.
- Legal Scholarship Network Advisory Board Member, SSRN.
- Member, Committee on Law and Justice, National Research Council, October 2011 – December 2018.
- Fellow of the Society for Empirical Legal Studies, 2015 - present.
- Member, International Advisory Council, Economic Order Study Center, Federal University of San Paolo, Brazil.
- Co-Editor (with Steven Shavell), American Law and Economics Review, May 2006 – August 2012.
- President, American Law and Economics Association, May 2011 – May 2012.
- Co-President, Society for Empirical Legal Studies, November 2011 - August 2012.  Member, Board of Directors from November 2011 - November 2014.
- Testified before the Connecticut Legislature in Support of Senate Bill 1035 and House Bill 6425 (A Bill to Eliminate the Death Penalty), March 7, 2011; Testified again before the Connecticut Judiciary Committee on March 14, 2012.
- Member of the Special Committee on ALI Young Scholars Medal, October 2009 – February 2011.
- Vice-President/President Elect, American Law and Economics Association, June 2010 – May 2011.
- Secretary-Treasurer, American Law and Economics Association, June 2009 – May 2010.
- Board of Advisors, Yale Law School Center for the Study of Corporate Law, July 2004 – August 2010.
- Evaluated the Connecticut death penalty system: "Capital Punishment in Connecticut, 1973-2007: A Comprehensive Evaluation from 4600 murders to One Execution," http://works.bepress.com/john_donohue/137/.
- Member, Panel on Methods for Assessing Discrimination, National Academy of Sciences, September 2001 – June 2004.  Resulting Publication:  National Research Council, Measuring Racial Discrimination (2004), http://www.nap.edu/catalog/10887.html.
- Member, National Science Foundation Review Panel, Law and Social Sciences, September, 1999 – April 2001.
- Editorial Board, Journal of Empirical Legal Studies, July 2003 – present.
- Editorial Board, International Review of Law and Economics, October 1999 – present.
- Editorial Board, Law and Social Inquiry, February 2000 – present.

- Board of Editors, <u>American Law and Economics Review</u>, August 1998 – April 2013.

- Consultant, Planning Meeting on Measuring the Crime Control Effectiveness of Criminal Justice Sanctions, National Academy of Sciences, Washington, D.C., June 11, 1998.

- Member, Board of Directors, American Law and Economics Association, June 1994-May 1997. Member, ALEA Nominating Committee, July 1995-May 1996.  Member, Program Committee, July 1996-May 1998 and July 2000 – May 2002.

- Statistical Consultant, 7th Circuit Court of Appeals Settlement Conference Project (December, 1994).

- Testified before U.S. Senate Labor Committee on evaluating the Job Corps, October 4, 1994.

- Assisted the American Bar Association Standing Committee on the Federal Judiciary in evaluating the qualifications of Ruth Bader Ginsburg (June 1993) and David Souter (June, 1990).

- Chair, AALS Section on Law and Economics, January 1990-January 1991.

- Economic Consultant to Federal Courts Study Committee.  Analyzing the role of the federal courts and projected caseload for Judge Richard Posner's subcommittee.  February 1989-March 1990.

- Member, 1990 AALS Scholarly Papers Committee.

- Member, Advisory Board, Corporate Counsel Center, Northwestern University School of Law.  Since December 1987.

- Associate Editor, <u>Law and Social Inquiry</u>.  Summer 1987-December 1989.

- Interviewed Administrative Law Judge candidates for U.S. Office of Personnel Management.  Chicago, Illinois. May 23, 1988.

- Member, Congressman Bruce Morrison's Military Academy Selection Committee.  Fall 1983.

- 1982 Candidate for Democratic Nomination, Connecticut State Senate, 14th District (Milford, Orange, West Haven).

## PRO BONO LEGAL WORK

- Co-wrote <u>amicus brief</u> for the United States Supreme Court for "Social Scientists and Public Health Researchers in Support of Respondents" in *New York State Rifle & Pistol Association v. Bruen*, which discusses the evidence that right-to-carry laws increase violent crime in the brief, September 21, 2021.

- Co-wrote amicus brief for the United States Supreme Court for "Public Health Researchers and Social Scientists in Support of Respondents" in *New York State Rifle & Pistol Association v. City of New York*, which quotes my article *Right-to-Carry Laws and Violent Crime* in the brief, August 12, 2019.

- Co-wrote <u>amicus brief</u> for the 9th Circuit Court of Appeals for "Empirical Scholars Concerning Deterrence and the Death Penalty In Support of Petitioner/Appellee," *Jones v. Davis*, No. 09 Cv. 2158 CJC, which discusses the lack of deterrence of the death penalty, March 6, 2015.

- Death Penalty case:  <u>Heath v. Alabama</u>.  Fall 1986-Fall 1989.

- Wrote brief opposing death sentence in Navy spy case.  Court ruled in favor of defendant John A. Walker on September 13, 1985.

- Staff Attorney, Neighborhood Legal Services, January-July 1981.

- Appealed sentence of death for Georgia defendant to the United States Supreme Court.  Sentence vacated on May 27, 1980.  <u>Baker v. Georgia</u>.

- Court-appointed representation of indigent criminal defendant in District of Columbia Superior Court, February-July 1980.

## RESEARCH GRANTS

- Stanford University Research Fund, January 1997 and January 1998.

- The National Science Foundation (project with James Heckman), December 1992; (project with Steve Levitt), July 1997.

- Fund for Labor Relations Studies, University of Michigan Law School, March 1988.

## BAR ADMISSIONS
- Connecticut - October 1977; District of Columbia - March 1978 (Currently Inactive Status); United States Supreme Court - November 3, 1980; U.S. District Court for the District of Connecticut – February 14, 1978.

## PROFESSIONAL and HONORARY ASSOCIATIONS

- American Academy of Arts and Sciences (since April 2009).

- Research Associate, National Bureau of Economic Research (since October 1996) – in Law and Economics and Labor Studies.

- Stanford Center for Racial Justice – August 2020 to present.

- American Law Institute (since September 29, 2010).

- Member, Fellows of the Society for Empirical Legal Studies (since October 2015).

- American Bar Association

- American Economic Association

- American Law and Economics Association

## PERSONAL
- Born:  January 30, 1953.