1  ROB BONTA
   Attorney General of California
2  MARK R. BECKINGTON
   Supervising Deputy Attorney General
3  ROBERT L. MEYERHOFF
   Deputy Attorney General
4  State Bar No. 298196
    300 South Spring Street, Suite 1702
5   Los Angeles, CA  90013-1230
    Telephone:  (213) 269-6177
6   Fax:  (916) 731-2144
    E-mail:  Robert.Meyerhoff@doj.ca.gov
7  *Attorneys for Defendants Rob Bonta in
   his official capacity as Attorney*
8  *General of the State of California
   and Allison Mendoza in her Official*
9  *Capacity as Director of the Bureau of
   Firearms*
10
                  IN THE UNITED STATES DISTRICT COURT
11
                 FOR THE EASTERN DISTRICT OF CALIFORNIA
12
                          SACRAMENTO DIVISION
13

14

15 **WILLIAM WIESE, et al.,**          Case No. 2:17-cv-00903-WBS-KJN

16                      Plaintiffs,

17         **v.**                     **DECLARATION OF BRENNAN RIVAS
                                      IN SUPPORT OF DEFENDANTS'
                                      OPPOSITION TO MOTION FOR**
18                                    **SUMMARY JUDGMENT AND COUNTER-**
   **ROB BONTA, et al.,**              **MOTION FOR SUMMARY JUDGMENT**
19
                      Defendants.     Date:     July 10, 2023
20                                    Time:     1:30 p.m.
                                      Courtroom:5, 14th Floor
21                                    Judge:    Hon. William B. Shubb

22

23

24

25

26

27

28
                                    1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**DECLARATION OF BRENNAN RIVAS**

I, Brennan Rivas, declare under penalty of perjury that the following is true and correct:

1.   I have been retained by the Office of the Attorney General of the California Department of Justice to provide expert opinion and testimony regarding historical regulations that prohibited the public carry and possession of certain weapons.  I am being compensated at a rate of $130 per hour.

2.   I have evaluated the historical justifications and purposes of laws restricting the carrying of certain weapons, in addition to their scope in restricting the use of certain weapons associated with urgent societal problems of the time while simultaneously protecting the right to use other weapons for constitutionally protected, lawful purposes.

**BACKGROUND AND QUALIFICATIONS**

3.   I have a Ph.D. in history from Texas Christian University, awarded in 2019.  My expertise includes historical weapon regulations in the United States.  I have several publications on this topic, including peer-reviewed articles in the *Southwestern Historical Quarterly*, and a chapter in an edited collection forthcoming by Oxford University Press; earlier this year, my article, "Enforcement of Public Carry Restrictions: Texas as a Case Study (June 2022), was published in the *UC Davis Law Review*.

4.   I am currently completing a book manuscript, based upon my dissertation research, which traces the development and implementation of weapon and firearm policies in Texas across a century-long period.

1

5.    I have provided expert witness testimony in *Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB (S.D. Cal.); *Duncan v. Bonta*, No. 17-1017-BEN-JLB (S.D. Cal.); *Angelo v. District of Columbia*, No. 1:22-cv-02256-RC (D. D.C.); *Christian v. Nigrelli*, No. 22-cv-00695 (JLS) (W.D. N.Y.); *Frey v. Nigrelli*, No. 21 Civ. 5334 (NSR) (S.D. N.Y.); *Brumback v. Ferguson*, No. 1:22-cv-03093-MKD (E.D. Wash.); *Sullivan v. Ferguson*, No. 3:22-cv-5403 (W.D. Wash.); *Siegel v. Platkin*, No. 22-CV-7463 (RMB) (AMD) (D. N.J.); *NAGR v. Campbell*, No. 1:22-cv-11431-FDS (D. Mass.); *Oregon Firearms Federation, Inc. v. Kotek*, No. 2:22-cv-01815-IM (D. Ore.); *NSSF v. Jennings*, No. 22-cv-01499-RGA (D. Del.).

6.    A true and correct copy of my current curriculum vitae is attached as **Exhibit A** to this declaration.

## OPINIONS

7.    My research, which represents some of the most in-depth work on nineteenth-century gun regulations, shows that there are historical firearm regulations similar to both California's restrictions on large-capacity magazines.  During the nineteenth century, several states prohibited the sale, gift, transfer, or importation of certain types of weapons, including bowie knives, revolvers, and other pistols which people of the time associated with criminal activity.

8.    Nineteenth-century firearm restrictions, including examples from Florida, Georgia, Tennessee, and Arkansas described in more detail in this declaration, demonstrate a robust governmental response to rising rates of violence, and particularly the wave of gun violence that swept the Nation following the Civil War.  Importantly, these restrictions did not

2

flatly ban the carry or possession of all arms, and instead targeted only those weapons that posed significant risk to public safety at that time.

I.  **BRIEF HISTORY OF THE COLT REVOLVER AND THE SPREAD OF HANDGUN VIOLENCE IN THE 19TH CENTURY**

9.  The revolver design that came to dominate American markets during the mid- and late nineteenth century was patented by Samuel Colt in 1836.  He was not the first inventor to produce a multi-shot pistol, but he was the first whose creation became technologically and socially significant.  Even though Colt had a working revolver by the mid-1830s, it took decades for his invention to become commercially successful.

10.  The Colt revolver diverged from pistols then widely available in two critical ways.  First, it was breech-loading, meaning that ammunition did not need to be inserted through the end of the barrel (muzzle-loading).  Second, it provided multiple shots without reloading; the standard design eventually settled at six rounds.  The earliest revolvers (those manufactured prior to and during the Civil War) were of the "cap and ball" type, which required a delicate and time-consuming reloading process.  By about the 1870s, technological developments in the design and functionality of ammunition meant that later models of Colt's could use individual cartridges; these could be inserted fairly quickly into the cylinder, which made the reloading process much more swift—a boon on the battlefield, but a new danger in other contexts.

11.  Though Colt's revolver was a revolutionary device that represented a paradigmatic shift in firearm technology, his

3

1  company struggled to reach its potential.  The expiration of

2  Colt's patent in 1857 opened the door for other manufacturers to

3  enter the market without having to endure the same decades-long

4  startup cost.  Meanwhile, the growing crisis over slavery and its

5  looming prospect of war gave Colt what he had always wanted—

6  substantial government patronage.  Southern states ordered as

7  many revolvers as they could in the lead-up to Fort Sumter, and

8  Colt's Patent Fire Arms Manufacturing Company was more than

9  willing to deliver.  But the far more important contracts came

10  from the United States military, whose orders for pistols like

11  Colt's revolver skyrocketed during the course of the Civil War.[1]

12  Wartime production by Colt, in addition to the new entrants into

13  the market (like Smith & Wesson), created an unprecedented

14  infrastructure to manufacture staggeringly large quantities of

15  pistols.  As production capacity increased and the U.S. military

16  demobilized, more of these weapons became available to and

17  affordable for American consumers; by the 1870s, the net result

18  was more and cheaper pistols spread throughout the country[2],

19

20  _____

    [1] On the life of Samuel Colt and the history of his firearm

21  manufacturing companies, see Jim Rasenberger, *Revolver: Sam Colt

    and the Six-Shooter that Changed America* (New York: Scribner,

22  2020).

23  [2] Colt's Army revolvers cost about $20 at the time of the
    Civil War, but subsequent entrants into the market sold small

24  pocket pistols for as little as a couple of dollars.  For
    example, see digitized Sears and Roebuck catalog (1898), pp. 365-

25  367.  Regardless of caliber, the pistols from Colt's ran about
    $12 to $13 in the catalog but retailed elsewhere for something

26  closer to $18 (see pp. 367).  Meanwhile, the smaller caliber
    pocket pistols from other brands could be ordered for as little

27  as $1.40 (see pp. 365).  For the 1898 Sears & Roebuck catalog
    online, see https://bit.ly/3VeUhHo.

28

Declaration of Brennan Rivas (Case No. 2:17-cv-00903-WBS-KJN)

introducing the United States to its first experience with rampant gun violence.

12. The Civil War Era (1850-1870), marked a sharp departure for the United States in terms of violence and homicide in comparison to other Western nations. Distrust in governing institutions and tremendous economic change wrought by industrialization primed Americans for homicidal violence to a degree that was unprecedented in American history. In northern cities, rising population levels accompanied urbanization, labor agitation, and poverty, which caused an increase in homicide and crime. Though military victory and a renewed faith in American government reduced homicide in northern states after the 1860s, the rates for the 1870s and 1880s in the north remained higher than those from the more peaceful era prior to the 1840s, and by the close of the 1890s northern homicide rates began ratcheting upward yet again.[3] Broader crime rates for the late nineteenth century are harder to pin down than those for homicide, but the development of urban, industrial life produced abundant opportunities for the criminally inclined. That city governments enacted new criminal ordinances and increased funding for police strongly suggests that urban residents perceived themselves to be

---

[3] On homicide in American history, particularly as broken down into northern and southern regions, see Randolph Roth, *American Homicide* (Cambridge: Belknap Press of Harvard University Press, 2009), 297-326, 386-388 (for trends in northern areas); 185 (for data-supported charts showing trends in homicide for large cities across the entire nineteenth century); 184 (complicating data from pp. 185 by showing that some rural northern areas experienced sharp rise in crime after 1865 and therefore emulated what took place in the American South during that time).

5

more vulnerable to victimization than they had been in the past.
In the southern states, the revolutionary consequences of
emancipation and Reconstruction created an atmosphere of distrust
of government and one's neighbor, mutual hatred, and deeply
ideological partisanship that resulted in tremendous, gut-
wrenching violence suffered primarily by Black Americans and
their political allies.  The disruption of war, occupation, and
frequent changes in state government and constitutional structure
bred attitudes of vigilantism and disregard for the judicial
process.  Rates of violence and homicide remained quite high in
the southern states across the nineteenth century.[4]  The
proliferation of deadly weapons, and especially easily
concealable pistols, to a point of near ubiquity in American
communities rendered the interpersonal conflicts that erupted as
a result of urbanization, Reconstruction, economic hardship, and
social dislocation all the more deadly.

**II. GOVERNMENTAL RESPONSES TO THE RISE IN HANDGUN VIOLENCE**

13.   The response to this gun violence varied across the
United States.  The most popular approach was the enactment or
strengthening of public carry laws.  These statutes were enacted
throughout the nineteenth century by entities ranging from states
to municipalities and even institutions of learning.[5]
Jurisdictions that did not already have such laws were likely to
enact them, and those using the older mechanism of sureties to

---

[4] Roth, *American Homicide*, 411-434.

[5] Tenn. 1801 ch. 22 § 6; 1851 Pa. Laws 382, § 4 (pertaining
to "willfully and maliciously" carrying deadly weapons in the
borough of York); *Laws and Regulations of the College of William
and Mary*, V.276 (1830).

Declaration of Brennan Rivas (Case No. 2:17-cv-00903-WBS-KJN)

1    keep the peace were likely to transition toward the

2    implementation of criminal statutes mandating fines and/or jail

3    time for violators.[6] These public carry regulations targeted

4    concealable items like pistols, sword canes, and daggers that

5    were used in the commission of crimes and generally referred to

6    as deadly weapons.  The closing third of the nineteenth century

7    saw a flurry of this activity as states and municipalities tried

8    new penalties, added new weapons to the lists of prohibited

9    weapons, and generally attempted to eliminate small, easily

10   concealable weapons from the public sphere.[7]

11       14.   Another strategy employed by state governments to

12   reduce gun violence and gun crime was to place certain

13   requirements upon dealers in firearms. States and municipalities

14   prohibited the sale of deadly weapons to persons under a certain

15   age (generally twenty-one years)[8], required occupation taxes[9],

16   criminalized the sale of specific kinds of weapons[10], and some

17   _____

18   [6] The Repository of Historical Gun Laws, a database
     maintained by the Duke Center for Firearms Law, reflects that
     American state and local governments enacted statutes and
19   ordinances specifically relating to "carrying weapons" in large
     numbers during the period from the close of the Civil War in 1865
20   through the end of the nineteenth century.  See
     https://firearmslaw.duke.edu/repository/search-the-repository/.

21   [7] In the second half of the nineteenth century, items like
     metal knuckles and razor blades became targets for proscription
22   alongside bowie knives, pistols, and sword canes.

23   [8] For example, see Kent. 1859 ch. 33 p. 241.
     [9]  For example, see Acts of the General Assembly of the
24   State of Georgia (1894) available online from the Digital Library
     of Georgia; see
25   https://dlg.usg.edu/record/dlg_zlgl_75343012/fulltext.text and
     https://dlg.usg.edu/collection/dlg_zlgl?range%5Byear_facet%5D%5Bb
26   egin%5D=1880&range%5Byear_facet%5D%5Bend%5D=1899&sort=year+desc.

27   [10] For example, see Ga. 1837 ch. 90; Tenn. 1838 ch. 137; 1849
     Vermont ch.36, 26, §1;  Hiram Denio, et al, *Revised Statutes of*
28                                                      (continued…)

7

even required the registration of all purchases of pistols.[11]  In 1907, the Texas legislature placed a fifty-percent sales tax upon pistols; dealers had to report their sales and pay the required tax to the state comptroller's office on a quarterly basis.[12] Sales and occupation taxes tended to be less about generating revenue than regulating an activity that was frowned upon by society more generally.  Occupation tax laws applied to vendors who appealed to vices like smoking, gambling, and playing games as well as peddlers and itinerant salesmen.  When a Texas appellate court upheld the stringent sales tax (over loud complaints by dealers), the judge described the business of selling pistols as one "hurtful to the welfare of society" and among that class of occupations "detrimental to the health, morals, or good order of society."  As a result, the court reasoned that the legislature "would have the right, not only to levy an excessive tax, which would be prohibitory thereof, but could go further and absolutely prohibit any one from engaging therein."[13]

15.  Prohibiting or otherwise discouraging the sale of certain weapons had historically gone hand-in-hand with public carry regulations. During its territorial phase (1822-1845),

_the State of New York_ (Albany: Gould, Banks, & Co., 1852), Part IV, Title 6, "Misdemeanors," 880, §52. The code section cites 1849 New York ch. 278; Kentucky 1855 ch.636, 96, §1. This is not an exhaustive list.

[11] For example, see Ill. 1881 "Criminal Code" §3 p. 73.

[12]  An Act providing for the levy and collection of an occupation tax . . ., General Laws of Texas, §XVIII (1907).  See also Brennan Gardner Rivas, "The Deadly Weapon Laws of Texas: Regulating Guns, Knives, and Knuckles in the Lone Star State, 1836-1930, (PhD diss., Texas Christian University, 2019) 161-162.

[13] _Caswell & Smith v. State_, 148 SW 1159 (Tex. App. 1912).

8

Florida had enacted a concealed-carry law with a steep fine of $50-500 for violations.[14] When the law did not deliver the desired effect of reducing the preemptive carrying of deadly weapons, lawmakers turned to prohibitive taxes to further reduce the presence of deadly weapons in public. An 1838 statute held that anyone who chose "to vend dirks, pocket pistols, sword canes, or bowie knives" had to first pay an annual tax of $200, "and all persons carrying said weapons openly shall pay…a tax of ten dollars annually."[15] In 2023 dollars, the annual open-carry tax would amount to approximately $320.00, and the annual occupation tax to approximately $6,300.00.[16] Clearly these taxes were designed to discourage trade in and public carry of deadly weapons, and the architects of the taxation policy saw it as intrinsically connected to the previously enacted concealed-carry restriction.

    16.  In 1837, Georgia enacted a public carry law that also made it unlawful "for any merchant, or vender of wares or merchandize in this State, or any other person or persons whatsoever, to sell, or offer to sell, or to keep, or have about their person or elsewhere, any of the hereinafter described

---

[14] John P. Duval, Compilation of the Public Acts of the Legislative Council of the Territory of Florida, Passed Prior to 1840 Page 423, Image 425 (1839) available at The Making of Modern Law: Primary Sources.

[15] 1838 Fla., ch. 24, "An Act in addition to An Act, (approved January 30th, 1835,) entitled An Act to prevent any person in this Territory from carrying arms secretly.  This tax is not included within the Duke Repository, indicating that that database captures only a portion of the occupation and personal taxes in force, even at the state/territorial level, during the nineteenth century.  More research remains to be done on the subject.

[16] The amounts reach $319.14 and $6,382.73. See: $200 in 1838 → 2023 | Inflation Calculator (in2013dollars.com).

9

weapons, to wit: Bowie, or any other kind of knives, manufactured and sold for the purpose of wearing, or carrying the same as arms of offence or defence." The statute further held that "pistols, dirks, sword canes, spears, c., shall also be contemplated in this act, save such pistols as are known and used, as horseman's pistols."[17] The public carry portion of the Georgia statute was challenged and overturned in a case called *Nunn v. State* (1846); but the sales restriction within the statute was neither challenged by the plaintiff nor addressed by the Georgia Supreme Court.[18]

17.  The State of Tennessee, which had enacted a public carry law in 1801 and an updated version in 1821, adopted a yet newer public carry law in 1838—and this one included a section prohibiting "any merchant, pedlar, jeweller, confectioner, grocery keeper, or other person" to sell "any Bowie knife or knives, or Arkansas tooth picks, or any knife or weapon that shall in form, shape or size resemble a Bowie knife or knives, or Arkansas tooth pick."[19]

18.  After the Civil War, when their states were engulfed in political instability, racial strife, and rising rates of homicide, lawmakers in Arkansas and Tennessee pursued this two-pronged approach that combined public carry regulation with a sales ban for certain kinds of weapons.  The first prong was to

---

[17] Ga. 1837 ch. 90, cited at supra n. 10; HYPERLINK: Acts of the General Assembly of the state of Georgia, passed in Milledgeville at an annual session in November and December, 1837 [volume 1] - Digital Library of Georgia (usg.edu)
[18] *Nunn v. State*, 1 Ga. 243 (1846).
[19] Tenn. 1838 ch. 137, cited at supra, n.10. This law was temporarily suspended during part of the Civil War. See Tenn. 1862 ch. 23.

Declaration of Brennan Rivas (Case No. 2:17-cv-00903-WBS-KJN)

1  prohibit the public carrying of pistols with very limited

2  exceptions.[20]  Courts in both states struck down early versions of

3  the laws because they applied to all revolvers, including those

4  being issued to certain classes of soldiers by the United States

5  military.[21]  But the respective legislatures of Arkansas and

6  Tennessee quickly changed the rule to exclude "army and navy

7  pistols"—those types or models in use by the US military—when

8  carried openly in the hand.  By exempting these models, Arkansas

9  and Tennessee lawmakers made their gun policies comport with the

10  reigning Second Amendment jurisprudence of their day, which held

11  that militia arms enjoyed special protection from certain forms

12  of regulation.[22]  The revised Tennessee law held that "it shall

13  not be lawful for any person to publicly carry a dirk, sword

14  cane, Spanish stiletto, belt or pocket pistol, or revolver, other

15  than an army pistol, or such as are commonly carried and used in

16  the United States army, and in no case shall it be lawful for any

17  person to carry such army pistol publicly or privately about his

18

19     [20] See 1869-1870 Tenn. Pub. Acts, 2d. Sess., An Act to
      Preserve the Peace and Prevent Homicide, ch. 13, § 1; 1874-1875
20     Acts of Ark., An Act to Prohibit the Carrying of Side-Arms, and
      Other Deadly Weapons, at p. 155, § 1.

21     [21] *Andrews v. State*, 50 Tenn. 165 (1871); *Wilson v. State*, 33
      Ark. 557 (1878).

22     [22] Unlike today, where laws generally prevent the civilian
23     sale of military-grade weapons while carving out protections for
      self-defense weapons, Americans of the nineteenth century did
24     just the opposite; case law at that time held that a citizen's
      militia obligation conferred upon certain kinds of firearms,
25     especially muskets and rifles, a protected status under the law
      as "militia arms," while those smaller weapons which lent
26     themselves to concealability and were more conducive to
      interpersonal violence could be prohibited.  This view of arms
27     and their place in society changed in the twentieth century as a
      result of substantial alterations to the militia system (and the
28     development of the National Guard) as well as the advent of
      automatic and select-fire weapons for military use.

11

1  person in any other manner than openly in his hands."[23]

2  Arkansas's replacement statute was similar to that of Tennessee.[24]

3  The Tennessee Supreme Court upheld that state's replacement

4  statute against constitutional challenge, and the revised

5  Arkansas statute received no notable challenge.[25]

6      19.  The second prong which Arkansas and Tennessee employed

7  was a prohibition on the sale of certain pistols.  Tennessee

8  prohibited "any person to sell, or offer to sell, or bring into

9  the State for the purpose of selling, giving away, or otherwise

10  disposing of, belt or pocket pistols, or revolvers, or any other

11  kind of pistol, except army or navy pistols."[26]  Arkansas followed

12  suit but went even further by prohibiting the sale of pistol

13  ─────────────────

14      [23] 1871 Tenn. Pub. Acts 81, An Act to Preserve the Peace and
   to Prevent Homicide, ch. 90, § 1; *State v. Wilburn*, 66 Tenn. 57,
   61 (1872). It is worth noting that even the exempted army/navy
15   pistols could not be carried concealed, or even visible within a
   waistband or hip holster; the only way to carry legally exempted
16   pistols was to hold them in one's hand.  The purpose of this
   additional phrase was to curtail as much as possible the carrying
17   of these weapons in public spaces so that a person would only do
   so in the event of a real emergency.
18

19      [24] 1881 Ark. Acts 191, An Act to Preserve the Public Peace
   and Prevent Crime, chap. XCVI, § 1-2 ("That any person who shall
20   wear or carry, in any manner whatever, as a weapon, any dirk or
   bowie knife, or a sword, or a spear in a cane, brass or metal
21   knucks, razor, or any pistol of any kind whatever, except such
   pistols as are used in the army or navy of the United States,
22   shall be guilty of a misdemeanor. . . . Any person, excepting
   such officers or persons on a journey, and on his premises, as
23   are mentioned in section one of this act, who shall wear or carry
   any such pistol as i[s] used in the army or navy of the United
24   States, in any manner except uncovered, and in his hand, shall be
   guilty of a misdemeanor.").
25

26      [25] *State v. Wilburn*, 66 Tenn. 57, 61 (1872).

27      [26] 1879 Tenn. Pub. Act 135-36, An Act to Prevent the Sale of
   Pistols, chap. 96, § 1; *State v. Burgoyne*, 75 Tenn. 173, 173-74
28   (1881).

Declaration of Brennan Rivas (Case No. 2:17-cv-00903-WBS-KJN)

1  cartridges as well.  "Any person who shall sell, barter, or

2  exchange, or otherwise dispose of, or in any manner furnish to

3  any person any dirk or bowie knife, or a sword or a spear in a

4  cane, brass or metal knucks, or any pistol, of any kind of

5  whatever, except as are used in the army or navy of the United

6  States, and known as the navy pistol, or any kind of cartridge

7  for any pistol, or any person who shall keep such arms or

8  cartridges for sale, shall be guilty of a misdemeanor."[27]

9      20.  Throughout the nineteenth century, Americans voiced

10  their displeasure with the practice of carrying weapons in public

11  spaces.[28]  Condemnations of such behavior and calls for

12  regulations rang out across the country and became increasingly

13  common during the late nineteenth century when economic and

14  technological developments had made them easier to produce and

15  cheaper to purchase.  Arkansas and Tennessee were no exception to

16  this national rule, and commentators there engaged in the same

17  discourse of their counterparts elsewhere.  The "shocks and

18  violent convulsions which have been so fatal to law and order in

19  the South" were well known, as was the fact that "the pistol, the

20  knife, the shotgun and the bludgeon too often do their bloody

21

22

23      [27] Acts of the General Assembly of Arkansas, No. 96 § 3

24  (1881).

25      [28] For example, see Patrick Charles, Armed in America 152
    (2018) (noting the Georgia Supreme Court's view that it was "at a
    loss to follow the line of thought that extends the guarantee to

26  the right to carry pistols, dirks, Bowie-knives, and those other
    weapons of like character, which, as all admit, are the greatest

27  nuisances of our day." (quoting *Hill v. State*, 53 Ga. 472, 474

28  (1874))).

work."[29]  After the 1875 statute went into effect in Arkansas, news editors began praising it as "about the best law that has ever been enacted in this state," and one that, had it been in effect since statehood in 1836, "would have saved the lives of thousands of good men who have fallen victim to the vice of carrying deadly weapons, or from the results and natural consequences thereof."[30]  Some judges in Tennessee began handing down penalties of a fifty-dollar fine plus sixty days in jail, and "as a result few persons carry deadly weapons in [that] county."[31]  Reports of this rigid enforcement in Tennessee elicited praise among Arkansans, who viewed it as a social benefit that in Tennessee "men who for years converted themselves into walking arsenals discover that they can pursue their ordinary vocations without fear that they may at any moment be called upon to defend their persons against assault."[32]  From

---

[29] "Crime in the South" *Arkansas Democrat* (Little Rock, Arkansas), June 7, 1879, 2.

[30] *Newport News* (Newport, Arkansas), quoted in *Daily Arkansas Gazette* (Little Rock, Arkansas), April 27, 1875, 2.

[31] The practice began with Judge Horrigan of Shelby County, the seat of which is Memphis, Tennessee.  Judge Quarles of Nashville declared his intention to follow suit.  *Daily Arkansas Gazette* (Little Rock, Arkansas), January 7, 1883, 4.  Judge Allen of Davidson County, Tennessee pledged to "impartially enforce the law" regarding weapons and "declared that 'it would make no difference of how high degree a man was, if he was convicted before him of carrying a pistol he would have to go to jail as well as pay a fine, and it simply came down to this: if he was bound to carry a pistol he was bound to go to jail.  That only ruffians carried pistols and it gave them an unfair advantage over other citizens.'" *Daily Arkansas Gazette* (Little Rock, Arkansas), May 13, 1883, 4.

[32] *Daily Arkansas Gazette* (Little Rock, Arkansas), January 7, 1883, 4.

Declaration of Brennan Rivas (Case No. 2:17-cv-00903-WBS-KJN)

1   their perspective, the distrust of one's fellow community members

2   that went along with habitual gun-toting was a burden of fear

3   that could only be lifted by prohibiting deadly weapons in the

4   public sphere.  Middle-class Americans, white southerners

5   included, held the view that carrying deadly weapons was not

6   honorable, and that such behavior should be stopped—and by

7   banning the sale of specific weapons if necessary.[33]

8       21.  To fully understand these regulations, it is necessary

9   to understand the different kinds of pistols and revolvers

10  available during this time period.  First, at the larger end of

11  the spectrum was the "army pistol" or "holster pistol," which was

12  originally fashioned after the "horse pistols" that had been

13  adopted by mounted units in Europe and the United States.  Such

14  pistols were typically designed to be carried in a saddle mounted

15  holster and could weigh four pounds or more when loaded.  Though

16  the firearm became slightly smaller and more conducive to being

17  worn on the person by officers beginning in the 1870s, they

18  remained the largest gun in Colt's pistol lineup and carried a

19  higher caliber; they were issued in large numbers by the United

20  States Army and Navy during the Civil War and postbellum eras.[34]

21

22      [33] For an example from Arkansas and Tennessee, see *Daily
      Arkansas Gazette* (Little Rock, Arkansas), May 13, 1883, 4

23  (reporting that a Tennessee district judge stated "that only
      ruffians carried pistols and it gave them an unfair advantage

24  over other citizens,").  See also Mark Anthony Frassetto, "The
      Myth of Open Carry," *UC Davis Law Review* 55 (June 2022), 2518-

25  2519.

26      [34] On size, variability, and manufacture of Colt pistols, see
      Jim Rasenberger, *Revolver: Sam Colt and the Six-Shooter that*

27  *Changed America* (New York: Simon and Schuster, 2021); Martin
      Rywell, *Colt Guns* 66-67, 84-93 (Harriman, TN: Pioneer Press,

28                                                      (continued...)

The Arkansas and Tennessee restrictions carved out an exception for these weapons, but only when carried openly in the hand.

22.  Second, "belt pistols" were midsized models and would have been worn in a hip holster attached to the belt.  These midsized pistols became popular among civilians and may have been the most common type of revolver in the country around the time of the Civil War.  The Colt navy pistol took on that moniker during the antebellum years when that model featured an engraving of a naval battle.  In the postbellum decades, "army" or "holster" models became smaller and the differences between them and Colt's "navy" pistols lessened[35]; during the period in which these statutes were written—about fifteen years after the Civil War—the "army/navy" description most likely reflected this technological evolution by referring to the larger, heavier, higher caliber pistols with longer barrels that were then issued by the United States military.  The sales bans under discussion here generally included "belt" pistols, so it remains unclear whether and to what extent the Colt's Navy pistol (which was technically a "belt" model) would have received exemption on the basis of its name and/or its use by the military forces.

23.  Finally, the third kind of pistol available was the "pocket pistol."  These were substantially smaller than the holster and belt models.  Pocket pistols ranged from single-shot, muzzle-loading derringers with barrels under two inches to

1953); R. L. Wilson, *The Colt Heritage: The Official History of Colt Firearms from 1836 to the Present* 173 (New York: Simon & Schuster, 1979).

[35] See note 34, above.

16

revolvers like Colt's "pocket navy" six-shooter with a three-inch barrel.  After the Civil War, military purchases slowed, which led gun manufacturers to pivot toward civilian sales.  They marketed pocket pistols heavily.  For instance, Colt's produced both a "ladies' model" as well as a "house" pistol—though the latter became more widely known as a "Fisk" for its use in the infamous murder of the robber baron Jim Fisk in 1872.[36]  The explosion in production was all the more pronounced by the entry of imitation brands that used lower quality metals with less sophisticated workmanship to sell pocket pistols at much lower prices than the competition.[37]  These cheap revolvers could be had for a few dollars, with used ones selling for even less.[38]

24.  It is in this context that the public carry regulations and associated sales bans and prohibitory taxes mentioned above must be understood.  A confluence of technical advancements and

---

[36] For example, see The Pistol as a Weapon of Defence in the House and on the Road: How to Choose It and How to Use It 23 (1875) (referring to pocket pistols, including "the house pistol brought out some years ago by the Colt Arms Company, and rendered famous by the fact that it was the pistol used by [Edward] Stokes in the murder of Fisk").

[37] See note 34, above.

[38] Colt's Army revolvers cost about $20 at the time of the Civil War, but subsequent entrants into the market sold small pocket pistols for as little as a couple of dollars.  For example, see digitized Sears and Roebuck catalog (1898), pp. 365-367.  Regardless of caliber, the pistols from Colt's ran about $12 to $13 in the catalog but retailed elsewhere for something closer to $18 (see pp. 367).  Meanwhile, the smaller caliber pocket pistols from other brands could be ordered for as little as $1.40 (see pp. 365).  For the 1898 Sears & Roebuck catalog online, see https://archive.org/details/consumersguideno00sear/page/365/mode/1up?q=pistol.

Declaration of Brennan Rivas (Case No. 2:17-cv-00903-WBS-KJN)

1   social changes resulted in the widespread adoption of new
2   weapons, causing new societal problems that increased levels of
3   interpersonal violence and ratcheted up public fear.  In
4   response, state legislatures enacted regulations targeting the
5   source of that problem.  In addition to other dangerous weapons,
6   Tennessee and Arkansas targeted "pocket pistols"—designed to be
7   concealed from public view and increasingly easy to obtain by
8   those wishing to cause harm, were a target of these laws.  The
9   legislatures of both Tennessee and Arkansas prohibited both the
10  public carrying of these weapons, as well as their sale to the
11  general public.  These regulations remained in force well into
12  the twentieth century.

13      25.  Previous scholarship addressing these Arkansas and
14  Tennessee statutes has cast them as racially motivated.[39]  Those
15  articles did not investigate deeply the primary sources of the
16  time.  My research shows that these accounts have misrepresented
17  these laws, which were enacted as a public safety measure rather
18  than an attempt to disarm Black residents.  The argument made by
19  other scholars, again based on little more than inference, has
20  been that most white men served in the Civil War or had the means
21  to purchase a "army/navy" pistol, and that the army/navy
22  exception was tantamount to a whites-only exception to this
23  policy.[40]  Civil War soldiers on both sides of the conflict were
24  unlikely to be issued a revolver unless they were officers,

25      [39] For example, Stefan B. Tahmassebi, "Gun Control and
26  Racism," *George Mason University Civil Rights Law Journal* 2, no.
    1 (Summer 1991), 74-75; Robert Leider, "Our Non-originalist Right
27  to Bear Arms," *Indiana Law Journal* 89, no. 4, 1619-1620.

28      [40] Tahmassebi, "Gun Control and Racism," 74-75.

18

1  cavalry, or artillery; a great number of enlisted soldiers who

2  possessed revolvers during the conflict had purchased them on

3  their own, and at times their carrying of the weapons caused

4  sufficient trouble within the ranks that officers confiscated

5  them.  Others discarded heavy and seemingly unnecessary pistols

6  on long, grueling marches.[41]  Confederate service did not

7  automatically correlate to white possession of an exempted

8  pistol.

9       26.  Rather than impute racism to these laws simply because

10  of their occurrence during Reconstruction, we should embed them

11  within their appropriate political and cultural context.  The

12  fact that Tennessee's legislature amended the public carry law so

13  swiftly to add the army/navy exception could indicate to the

14  casual observer that white residents were dissatisfied with the

15  original statute; however, when the statutes and their

16  constitutional challenges are placed in chronological order and

17  interpreted in light of the other primary sources of the era

18  (particularly newspapers and the widespread social contempt for

19  publicly carrying deadly weapons), it is clear that racism was

20  not behind the army/navy exemption.  Instead, it represented the

21  best effort of Tennessee lawmakers to emulate the kind of

22

23       [41] On pistols and other arms issued during the Civil War, see
    Katelyn Brown, "Armed to the Teeth," *Military Images* 33, no. 4

24  (Autumn 2015), 32-36; Joseph G. Bilby, *Civil War Firearms: Their
    Historical Background and Tactical Use* (Conshohcken, PA: Combined

25  Books, 1996); Graham Smith, *Civil War Weapons* (New York:
    Chartwell, 2011); Jack Coggins, *Arms and Equipment of the Civil

26  War* (New York: Fairfax Press, 1982); *Arms and Equipment of the
    Union* (Alexandria, VA: Time-Life Books, 1999); Ken Bauman, *Arming

27  the Suckers: A Compilation of Illinois Civil War Weapons* (Dayton,
    OH: Morningside House, 1989).

28

comprehensive public carry prohibition that was in force in Texas[42] while also respecting the parameters set forth by the state supreme court in *Andrews v. State*.  The amendatory statute did not simply provide an exemption for army/navy pistols—it specified that even those pistols could not be carried in public unless openly in the hand.  Just like today, it was not common at that time to see a person walking along a public street carrying a gun in hand; such behavior would have been understood as an emergency requiring the intervention of local officers of the law.

### III.  THE RECENT EMERGENCE OF LARGE-CAPACITY MAGAZINES

27.  As explained below, the modern large-capacity magazine as we know it today was not widely distributed in the United States until quite recently. The semi-automatic weapons with which twenty-first century Americans associate large capacity magazines were either not in existence or not manufactured in large numbers until the twentieth century. Nineteenth-century

---

[42] Texas featured a comprehensive deadly weapon law that prohibited the open or concealed carrying of "any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie knife, or any other kind of knife manufactured or sold for the purposes of offense or defense."  There were a few exceptions, such as for travelers, peace officers, and anyone who "has reasonable grounds for fearing an unlawful attack on his person, and that such ground of attack shall be immediate and pressing." *General Laws of Texas*, ch. XXXIV, §1 (1871).  The original statutes in Arkansas and Tennessee indicate legislative intent to enact a comprehensive law like this one, but the decisions from their state courts in *Wilson* and *Andrews*, respectively, prevented them from doing so; in Texas, on the other hand, cases *English* and *Duke* upheld the constitutionality of the deadly weapon law without requiring an army/navy exception.  See *English v. State of Texas*, 35 Tex. 473 (1872); *State of Texas v. Duke* 42 Tex. 455 (1874).

magazines capable of storing more than ten rounds of ammunition at a time were not usually detachable (which made for slower reloading time) or were designed for large, military-grade firearms that were not capable of being used or carried for personal use.

**A.   Rare and Unusual High-Capacity Firearms**

28.   Repeating rifles became available for military and civilian use during the Civil War Era (1850-1870), though prior to that time there were a few novelty firearms that featured firing capacities greater than ten rounds. At no point were these firearms widely available or produced in sufficient numbers to make them accessible to American consumers. The examples of high-capacity nineteenth-century firearms cited by plaintiffs fall into this category.[43]

29.   Plaintiffs refer to a 24-barreled pepperbox pistol and a 21-shot revolver which appear in the book *Pepperbox Firearms* by Lewis Winant (1952).[44] The citations provided do not direct the researcher to either of those weapons.[45] A specific pepperbox pistol type discussed on p.118 was produced "with as many as twenty-four barrels," but was of a European design and appeared in a chapter titled "European Percussion Pepperboxes."[46] No 21-

---

[43] Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Summary Judgment, Dkt. 123-1 ("MPA"), at 20.

[44] Lewis Winant, *Pepperbox Firearms* (New York: Greenberg, 1952).

[45] Plaintiff's citation to the 24-barreled pistol is Winant, *Pepperbox Firearms*, 7, but there is no mention or depiction of such a gun on that page. The only mention of a 24-barreled pistol is on p.118. One of two citations for a 21-shot, pinfire revolver is Winant, *Pepperbox Firearms*, 67-70. There is no mention or depiction of such a firearm on those pages that I could find.

[46] Lewis Winant, *Pepperbox Firearms* (1952), 9, 118 ("Mariettes with as many as twenty-four barrels were made.").

21

1    shot revolver was mentioned in the book that I was able to find
2    through a scan and keyword search. Images on p.9 show 18- and 19-
3    shot pistols. The 21-shot revolver referred to was of a pinfire
4    design, which was quite uncommon in the United States. The author
5    of the cited work stated unequivocally that "the use of pin-fire
6    ignition is completely foreign to American pepperboxes."[47] The
7    vast majority of the pepperbox pistols pictured and described in
8    Winant's work—including those available to Americans—held between
9    four and six shots. A second source for the 21-shot revolver,
10   Supica et al, *Treasures of the NRA National Firearms Museum*
11   (2013) is a book which has fewer than 60 copies in circulation at
12   lending institutions nationwide. I was not able to consult this
13   work within the time constraints for this declaration.

14        30.  Another source cited by plaintiffs is *Firearms Curiosa*
15   (1957) by Lewis Winant.[48] The title of the book clearly indicates
16   that its contents were curiosities and novelties rather than
17   widely produced weapons with which regular nineteenth-century
18   Americans would have been familiar. Winant described a 20-round,
19   belt-fed chain-pistol, patented in 1866, as "odder and scarcer"
20   than the bit of curiosa he had discussed immediately prior. The
21   inventor of the weapon, Harry S. Josselyn, has left scant
22   records.[49] The Smithsonian Institution holds the patent model of

---

23        [47] Winant, *Pepperbox Firearms*, 26.
24        [48] Lewis Winant, *Firearms Curiosa* (New York: Bonanza Books, 1955).
25        [49] In a high-level, keyword-search review of *Chronicling America* and the American Periodicals Series (ProQuest), I was not
26   able to find a written record of Harry S. Josselyn or a Josselyn chain-pistol. A European designer of chain-fed guns mentioned in
27   *Firearms Curiosa*, Thomas Treeby, was similarly difficult find. He has neither an entry nor a mention in the Oxford History of
28   National Biography. One reference to Treeby's chain gun was made

(continued…)

1  the Josselyn Chain Revolver in its collections and categorizes it

2  as an item related to Armed Forces History and Military History,

3  meaning that the firearm may very well have been designed for

4  military use.[50] A 42-shot Ferris Wheel pistol pictured in *Firearms*

5  *Curiosa* also appears to be a rare item with which few Americans

6  would have been familiar. Its inventor, a British man named

7  Joseph Enouy, has also left few records.[51]

8      *31.*  A final example of a high-capacity, historical firearm

9  provided by plaintiff is the 12-shot Bennett and Haviland Rifle

10  patented in 1838. *Flayderman's Guide* describes this weapon in

11  these terms: "Quantity unknown; likely less than ten," and "very

12  rare."[52] It was not a common weapon which Americans would have

13  seen or been familiar with.

14      *32.*  The repeating pistols that had some commercial success

15  in the antebellum nineteenth century carried between four and six

16  shots. The repeating rifles that experienced some commercial

17  ─────────────

18  in a 1914 newspaper article, which described the weapon as "a
   most extraordinary repeating arm" that was among the collection
   of firearms held by a collector named H. H. Harrod. See
   "Evolution of Modern Rifle," *New York Tribune* (New York, New

19  York), September 20, 1914, 6.

20      [50] Patent Model, Josselyn Chain Revolver, Smithsonian
   Institution, National Museum of American History, ID No.

21  AF.251103. HYPERLINK
   https://collections.si.edu/search/detail/edanmdm:nmah_417116?q=jo

22  sselyn+pistol&record=1&hlterm=josselyn%2Bpistol

       [51] Like Treeby, Joseph Enouy has neither an entry nor a

23  mention in the Oxford Dictionary of National Biography, and a
   cursory keyword search of *Chronicling America* and the American

24  Periodicals Series (ProQuest) returns no results. An online
   gallery of "Unusual Revolvers," which is an informal source,

25  asserts that most photographs of this gun depict only one
   manufactured product—one which was held in an English collection

26  before being sent to Egypt. It may be that there is no more than
   this one example of the Enouy Ferris Wheel Revolver.

27  http://www.douglas-self.com/MUSEUM/COMMS/revolver/revolver.htm

       [52] Norm Flayderman, *Flayderman's Guide to Antique Firearms*

28  *and Their Values*, 9th ed. (Iola, WI: Krause Publications, 2007),
   711.

success had varied firing capacities. The Colt repeating rifle (a revolving design) carried five or six rounds, while the early Spencer lever-action rifles carried seven rounds. The Henry rifle and Winchester rifles of the 1860s and 1870s were the first repeating rifles with a magazine capacity greater than ten which were produced in sufficient numbers to be readily available for purchase by Americans.

**B.  High-Capacity Level-Action Rifles, a Nineteenth Century Outlier**

33.   The lever-action design usually featured a fixed, tubular magazine that was loaded through a loading port on the side of the firearm. While there are a handful of examples of these fixed tubular magazines capable of holding more than ten cartridges during that time period, such as the famous Winchester Model 1873 Repeating Rifle,[53] between each shot the user had to engage the lever action to discharge the spent shell and load a fresh cartridge from the magazine into the chamber. And when all rounds had been expended, the user had to individually load cartridges back into the magazine by inserting them through the loading port.

34.   In fact, as the nineteenth century drew to a close, newly designed lever-action rifles tended to be chambered for larger center-fire cartridges—which had the effect of reducing magazine capacity. Where the Henry and Winchester 1866 had been designed for 44-caliber rimfire cartridges, the Winchester 1873

---

[53] Thomas Henshaw, *The History of Winchester Firearms, 1866-1992* (Clinton, NJ: Winchester Press, 1993), 13-19.

1  was chambered for the 44-40 Winchester center-fire round.[54] It was

2  slightly longer than the 44 Henry and 44 Rim Fire that the

3  preceding models had used, but it was the beginning of a trend on

4  Winchester's part to develop and produce rifles capable of firing

5  stronger, larger center-fire cartridges.[55] The company was

6  competing for sportsmen as consumers, and sportsmen were drawn to

7  the single-shot rifles designed for large, heavy center-fire

8  cartridges that were capable of taking down a large target (like

9  deer, grizzlies, and buffalo) with one well-placed shot. For this

10 reason, Winchester developed lever-action rifles for use with

11 larger cartridges and even manufactured its first single-shot

12 rifle in 1885.[56]

13     35.  Around the turn of the twentieth century, John M.

14 Browning began working on the design of semi-automatic firearms,

15 which functioned through a "blowback" method in which "The recoil

16 from the exploded cartridge ejects the empty shell, cocks the

17 hammer, and throws a fresh cartridge into the chamber."[57] This

18 design was sometimes referred to as "automatic," though its

19         [54] On these rifles, their magazines, and the associated
   cartridges, see Henshaw, *Winchester Firearms*, 6-8, 10-17; and
20 Frank C. Barnes and Stan Skinner, *Cartridges of the World: A
   Complete and Illustrated Reference for over 1500 Cartridges* 11th
21 ed. (Iola, WI: Gun Digest Books, 2009), 485, 96.
         [55] Subsequent Winchester models, including the Winchester
22 1883 Hotchkiss Repeater, chambered for the newer 45-70 US
   Government cartridge, had a magazine in the butt stock that held
23 6 rounds; and the Winchester Model 1894 Repeating Rifle,
   chambered for various center-fire cartridges, had a maximum
24 magazine capacity was only 8 rounds. See Henshaw, *Winchester
   Firearms*, 23-24, 41; and Barnes and Skinner, *Cartridges of the
25 World*, 96-97
         [56] On Winchester Repeating Arms Co. designing guns in
26 competition with other manufacturers' single-shot rifles, see
   Henshaw, *Winchester Firearms*, 25-29.
27         [57] "Model 1903," Catalogue No. 71 (June 1904), 60. Winchester
   Repeating Arms Company Catalogs 1904-1908, Rare Books, McCracken
28 Research Library, Buffalo Bill Center of the West, Cody, Wyoming.

1  function aligns with our current definition of "semi-automatic";

2  it was also referred to as "auto-loading" or "self-loading."

3  Winchester released its Model 1903 Automatic Rifle, which

4  employed this method, and featured a 10-round, fixed, tubular

5  magazine for .22 caliber cartridges. According to its product

6  description, "…all that is necessary to do to shoot the ten

7  cartridges that the magazine holds is to pull the trigger for

8  each shot."[58] Winchester did not release a semi-automatic sporting

9  rifle featuring a detachable magazine until its Model 1905 Self-

10  Loading Rifle, and that detachable box magazine held only five

11  cartridges in a single column.[59] The subsequent semi-automatic

12  model, called the Model 1907 Self-Loading Rifle, featured a 5-

13  round detachable box magazine.

14      36.  A major rival of Winchester was Marlin Firearms, a

15  company that became a highly popular producer of lever-action

16  rifles. Marlin did not begin manufacturing semi-automatic rifles

17  until 1931 when the company (under new leadership) released the

18  22 Caliber Autoloading Rifle, also called the Model 50 / 50E.[60] It

19  came with a six-round detachable clip magazine.[61]

20      37.  As the twentieth century wore on, both Marlin and

21  Winchester featured semi-automatic rifles as a part of their

22  regular lineup of hunting firearms, though lever-action, pump

23

24  _____

25  [58] "Model 1903," Catalogue No. 71 (June 1904), 60. Winchester
Repeating Arms Company Catalogs 1904-1908, Rare Books, McCracken
26  Research Library, Buffalo Bill Center of the West, Cody, Wyoming.
   [59] Henshaw, *Winchester Firearms*, 61-61.
27  [60] William S. Brophy, *Marlin Firearms: A History of the Guns
and the Company that Made Them* (Harrisburg, PA: Stackpole Books,
1989), 300-301.
28  [61] Brophy, *Marlin Firearms*, 301.

26

1  action, and bolt action designs tended to be more popular.[62] The

2  magazine capacities of their semi-automatic models with

3  detachable magazines remained at or below 10 rounds with very few

4  exceptions. One of those few outliers was the Marlin Model 89C,

5  released in 1948 and chambered for .22 caliber long rifle rounds.

6  It was originally sold with a standard 7-shot clip magazine, but

7  beginning in 1953, new models were sold with two 5-shot clip

8  magazines. In 1957, that changed once again when standard

9  magazines for new manufactures was a 12-shot clip magazine.[63]

10 Marlin ceased production of the Model 89C in 1961, and for the

11 next two decades or more, the company's standard magazine sizes

12 tended to max out at 7 rounds.[64] The Model 89C and its short-lived

13 magazine capacity of twelve rounds was an outlier in Marlin's

14 sales and production catalog.

15     38.  Even though Winchester produced semi-automatic rifles

16 before Marlin, the company did not sell rifles with a standard

17 clip magazine capacity over 10 rounds to civilians through at

18 least 1996.[65] For a brief period in the 1970s (1974-1978), the

19 company produced the Model 490 Repeating (Autoloading) 22 Rim

20 Fire Rifle. These firearms came with a standard 5-round clip

21 magazine and were shown with that magazine in Winchester

22

23     [62] See the catalogs of Marlin Firearms and Winchester
    Repeating Arms Company for the 1950s through the 1990s.
    Winchester Catalogs, Rare Books; and Winchester and Marlin
24  Catalogs and Literature, MS 162, McCracken Research Library,
    Buffalo Bill Center of the West, Cody, Wyoming.
25     [63] Brophy, *Marlin Firearms*, 306-307.
       [64] Marlin Catalogs, Folders 1/13-1/16, MS 162, Winchester and
26  Marlin Catalogs and Literature, McCracken Research Library,
    Buffalo Bill Center of the West, Cody, Wyoming.
27     [65] Marlin Catalogs, Folders 1/13-1/16, MS 162, Winchester and
    Marlin Catalogs and Literature, McCracken Research Library,
28  Buffalo Bill Center of the West, Cody, Wyoming.

catalogs; customers who wish to purchase magazines holding 10 or 15 rounds had to do so as accessories.[66] The dearth of Winchester company records makes it impossible to estimate how many of these accessory magazines were purchased, but it stands to reason that, had a standard capacity at or above ten been popular with consumers, Winchester likely would have sold at lease some of their semiautomatic rifles that way.

39.  Records relating to the production and advertisement of rifles manufactured by two of the most popular brands shows that even though detachable clip/box magazines have been in existence since the early twentieth century, they were not generally sold with a capacity of more than 10 rounds until recently. In fact, these records show that during most of the twentieth century standard clip/box magazine sizes usually ranged from 3 to 7 rounds.[67]

**C.  Early Semi-Automatic Pistols Had a Magazine Capacity of Less than Ten Rounds**

40.  The technological developments that produced automatic and semi-automatic rifles and shotguns also made possible the automatic and semi-automatic pistol. In the 1890s, a German engineer designed the first fully functional semi-automatic pistol, but its unusual size and shape prevented it from being

---

[66] Henshaw, *Winchester Firearms*, 174. Winchester Catalogs 1970-1975, Folder 1/3, MS 162, Winchester and Marlin Catalogs and Literature, McCracken Research Library, Buffalo Bill Center of the West, Cody, Wyoming.

[67] See the catalogs of Marlin Firearms and Winchester Repeating Arms Company for the 1950s through the 1990s. Winchester Catalogs, Rare Books; and Winchester and Marlin Catalogs and Literature, MS 162, McCracken Research Library, Buffalo Bill Center of the West, Cody, Wyoming.

1  the financial success its manufacturers wanted.[68] The company

2  commissioned Georg Luger to redesign it, which he did over the

3  course of the 1890s.[69]  Meanwhile, the American gun designer, John

4  Moses Browning, developed various semi-automatic pistol designs.

5  One of his designs, which seemed poised to receive US military

6  contracts, was purchased by Colt's.[70] The company's developments

7  began with a series of handguns chambered for .38 Auto, then .45

8  caliber rounds, each of which had a magazine capacity of less

9  than ten rounds.[71] Efforts culminated in the development of the

10 Colt Government Model .45 1911 Automatic—the standard-issue

11 sidearm for American armed forces until the 1980s, which featured

12 a magazine capacity of seven rounds.

13     41.  Browning's other semi-automatic pistol design was

14 purchased by Fabrique Nationale d'Armes de Guerre (FN), a Belgian

15 arms manufacturer.  The FN Browning M1900 was released at the

16 turn of the twentieth century and sold quite successfully in

17 Europe. It was chambered for .32 caliber cartridges and had a

18 magazine in the hand-grip which held seven rounds. In Continental

19 Europe, these "Browning pistols" were associated with a

20 tremendous rise in crimes, accidents, and deaths related to

21

22

---

[68] Nathan Gorenstein, *The Guns of John Moses Browning: The Remarkable Story of the Inventor Whose Firearms Changed the World* (New York: Scribner, 2021), 119-120.

[69] The company was Deutsche Waffen- und Munitionsfabriken (DWM), which owned a controlling interest in the Belgian armsmaker Fabrique Nationale d'Armes de Guerre (FN).  See Gorenstein, *The Guns of John Moses Browning*, 128.

[70] Gorenstein, *The Guns of John Moses Browning*, 123-125.

[71] Charles T. Haven and Frank A. Belden, *A History of the Colt Revolver, and the Other Arms Made by Colt's Patent Fire Arms Manufacturing Company from 1836 to 1940* (New York: Bonanza Books, 1940), 205-207, 209, 210-213.

Declaration of Brennan Rivas (Case No. 2:17-cv-00903-WBS-KJN)

firearms, and particularly the anarchist movement that carried out numerous assassinations there.[72]

42.  FN subsequently approached Browning to design another semi-automatic handgun that might be purchased in large numbers by the French army. One of the requirements for consideration was that the firearm have a magazine capacity greater than ten rounds. Browning was initially reluctant to participate in the endeavor but soon changed his mind. An engineer from FN, Dieudonne Saive, developed a functional "double-stacked" magazine prototype, which offset cartridges in two separate columns to double the capacity.[73] The resulting hand-grip was significantly wider than those of previous models, but it held thirteen 9mm cartridges.[74] The FN Browning M35 Hi-Power pistol went into production after John M. Browning passed away in the 1930s, but FN produced the weapon (even though it was not initially selected by the French military) until 2018. When the Nazis occupied Belgium, they took over the FN factory and produced some of these pistols for their own use during World War II.[75]

43.  Even though American companies and designers proved to be trailblazers in the development of semi-automatic handguns, American consumers were not quickly won over by them. Through at least the World War II era, Americans seem to have preferred revolvers to semi-automatic designs; this was in sharp contrast to Europe, where semi-automatic pistols were favored over

---

[72] Gorenstein, *The Guns of John Moses Browning*, 130-133.
[73] Gorenstein, *The Guns of John Moses Browning*, 209-210.
[74] Henry M. Stebbins, Albert J. E. Shay, and Oscar R. Hammond, *Pistols: A Modern Encyclopedia* (Harrisburg, PA: The Stackpole Company, 1961), 140.
[75] Stebbins, Shay, and Hammond, *Pistols*, 139-140.

revolvers.[76] Browning M35 Hi-Power pistols were sold in the United States and some Americans purchased them with magazine capacities greater than ten rounds, but by far most semi-automatic firearms on the American market maxed out at ten.[77] Brands like Colt's and Smith & Wesson produced several semi-automatic models for target shooting, police, military, and personal defense, and these firearms generally had a capacity of six to ten rounds.

44. By 1940, Colt's still had not produced a handgun with a magazine capacity greater than ten,[78] and by 1944 the inaugural issue of *Gun Digest* (which published advertisements for the best-selling American handguns) did not feature one.[79] By 1951*, Gun Digest* included the Browning Hi-Power in its lineup of "military small arms," but it was an outlier among the other sixteen semi-automatic handguns with magazine capacities of ten or less.[80] The section featuring foreign handguns included two models with magazine capacities over ten out of a total of nine semi-automatic models.[81] By 1969, the selection of handguns featured in

---

[76] Gorenstein, *The Guns of John Moses Browning*, 130-133.
[77] My examination of firearms books, catalogs, archival records, and digitized copies of magazines like Gun Digest supports the assertion that most American semiautomatic firearms models produced between 1900 and 1990 had a standard magazine capacity of ten rounds or less.
[78] Haven and Belden, *A History of the Colt Revolver*, 219-225.
[79] *The Gun Digest: Complete Guide to American Rifles, Shotguns, Handguns and Accessories, The Encyclopedia for Shooters, 1944 First Annual Edition* (Chicago: Follett Publishing Company, 1944, repr. 1963), 155-127.
[80] John T. Amber, ed., *The Gun Digest: 5th Edition—1951* (Northfield, IL: DBI Books, Inc., 1950, repr. 1977), 131-132.
[81] These were the Ranger .22 Automatic with a magazine capacity of 11 shots and the Starr Automatic Target Pistol with a magazine capacity of 11 shots. See Amber, ed., *The Gun Digest: 5th Edition*, 146-147.

31

1  *Gun Digest* had grown substantially, but only two models had a

2  capacity of more than ten rounds.[82]

3  **IV. CONCLUSIONS**

4      45.  An important lesson that the study of history shows us

5  is that nineteenth-century Americans confronted a gun violence

6  problem, and their solution was the enactment of state and local

7  regulations that might limit the number of pistols in

8  circulation. These took the form of public carry laws,

9  prohibitive taxes, and other sales restrictions.  These states

10  targeted pocket pistols and other types of weapons that, due to

11  their concealability, were associated with forms of criminal

12  activity that were threatening the public at that time.

13      46.  These restrictions on pocket pistols provide historical

14  precedent for California's restrictions on large-capacity

15  magazines. As explained above, large-capacity magazines as we

16  understand them today only became commercially available for the

17  first time in the later parts of the twentieth and earlier parts

18  of the twenty-first.  Thus, like with pocket pistols in the

19  latter half of the nineteenth century, these large-capacity

20  magazines are associated with new social problems and criminal

21  _____

22  [82] The two models with magazine capacities greater than ten were the Browning M35 Hi-Power (13 rounds) and the Universal Enforcer Auto Carbine (30 shot magazine).  All other handguns maxed

23  out at 10 round magazine capacities.  See John T. Amber, ed., *Gun Digest: World's Greatest Gun Book, The Shooter's Encyclopedia of Handguns, Rifles, Shotguns and Accessories, Twenty-Third*

24  *Anniversary DeLuxe Edition, 1969* (Chicago: The Gun Digest Company,

25  1968), 294-306.  That year's selection of foreign-made handguns featured only two models that could come with a standard magazine

26  capacity greater than ten rounds.  The Luger .22 Auto Pistol had

27  "a 12-shot capacity with one round in the chamber," and the MAB Autoloading Pistol could be purchased with a magazine capacity of

28  either 8 or 15 rounds.  See Amber, ed., *Gun Digest 1969*, 345, 344-351.

Declaration of Brennan Rivas (Case No. 2:17-cv-00903-WBS-KJN)

1  use (*e.g.,* the rise of high-casualty mass shootings).

2  California's regulation, being a prohibition on the sale,

3  transfer, and manufacture of such magazines, is thus quite

4  similar to the sale restrictions in states such as Tennessee and

5  Arkansas.

6      47.  As stated above, and as with any historical research

7  project, my work in this area is still ongoing.  There is

8  significant research and analysis to be done on the drafting and

9  enforcement of state-level statutes in Arkansas, Tennessee, and

10 elsewhere. Very little research that is based upon primary

11 sources—other than the review of case law and historical

12 statutes—has yet been conducted.  Still, this brief account of

13 deadly weapon regulations from nineteenth-century Tennessee,

14 Arkansas, Florida, and Georgia demonstrates an important theme in

15 the history of firearms and weapons regulations in the United

16 States: that states enacted restrictions upon certain types of

17 weapons, like pocket pistols and bowie knives, that were uniquely

18 adaptable to and associated with certain types of crime that

19 threatened public safety at the time, while also ensuring that

20 the right of individuals to arm themselves for self-defense in an

21 emergency or upon their private property was not destroyed.

22     I declare under penalty of perjury under the laws of the

23 United States of America that the foregoing is true and correct.

24     Executed on April  26 , 2023, at Fort Worth, TX.

25

26

27 *Brennan Rivas*
   Brennan Rivas

28

33

Declaration of Brennan Rivas (Case No. 2:17-cv-00903-WBS-KJN)

# EXHIBIT A

# Brennan Gardner Rivas
Curriculum Vitae  ·  Oct 2022

## Employment
Lloyd Lewis Fellow in American History, The Newberry Library, 2021-2022
Bill & Rita Clements Fellow for the Study of Southwestern America, Southern Methodist
    University, Clements Center for Southwest Studies, 2020-2021
Lecturer in American History (full-time), Texas Christian University, Department of History,
    2019-2020

## Education
Ph.D., History, Texas Christian University, 2019
    Thesis: "The Deadly Weapon Laws of Texas: Regulating Guns, Knives, & Knuckles in
    the Lone Star State, 1836-1930"
    Advisor: Gregg Cantrell
M.A., History, Texas Christian University, 2013
    Thesis: "Texas Antitrust Law: Formulation and Enforcement, 1889-1903"
B.A. with Honors, History, Oklahoma State University, 2010

## Publications
*Refereed Journal Articles*
"An Unequal Right to Bear Arms: State Weapons Laws and White Supremacy in Texas, 1836-
    1900," *Southwestern Historical Quarterly* 121 (Jan 2018): 284-303.

*Law Articles*
"Strange Bedfellows: Racism and Gun Rights in American History and Current Scholarship"
in Joseph Blocher and Jake Charles, eds., *New Histories of Gun Rights and Regulation: Essays
    on the Place of Guns in American Law and Society* (New York: Oxford University Press,
    forthcoming)
"Enforcement of Public Carry Restrictions: Texas as a Case Study," *U.C. Davis Law Review*
    (May 2022)
"The Problem with Assumptions: Reassessing the Historical Gun Policies of Arkansas and
    Tennessee," *Second Thoughts*, Duke Center for Firearms Law (Jan 2022)

*Short Pieces*
"Charles F. Cooley," in *Wanted in America: Posters Collected by the Fort Worth Police
    Department, 1898-1903*, edited by LeAnna Schooley and Tom Kellam. Fort Worth: TCU
    Press, 2019.
Review of David R. Berman, *George Hunt: Arizona's Crusading Seven-Term Governor*, in
    *Southwestern Historical Quarterly* 114, no. 3 (January 2016): 327-329.

## Public History
"In the Past, Americans Confronted Gun Violence by Taking Action," *Washington Post: Made
    by History Blog* (Jun 2022)

1

~ Op-ed showcasing open-mindedness of 19th century Americans about experimenting with new gun control measures

"The Origin of Public Carry Laws in Texas," *Texas Gun Sense Blog* (Feb 2021)

"Texas Gun Laws," Online Primary Source Collection, hosted by Omeka
~ Online collection featuring primary sources from my research; feature exhibit titled "Crafting a Public Carry Law"

"The Deadly Weapon Laws of Texas," Preserving Our Past: Community History Workshop, Center for Texas Studies at TCU (Nov 2020)
~ Public lecture featuring special insights for genealogical researchers

"The Deadly Weapon Laws of Texas," Graduate/Undergraduate Public History Seminar, Tarleton State University (Sept 2020)
~ Research presentation focusing on interpretation of county court records

"When Texas Was the National Leader in Gun Control: How the Land of Gunslinger Mythology Regulated Weapons to Reduce Violence," *Washington Post: Made by History Blog* (Sept 2019)
~ Op-ed highlighting long history of weapon regulation in Texas

## Fellowships and Awards

Lloyd Lewis Fellowship in American History, 2021-2022
~ Awarded by the Newberry Library to scholars using its collection to research topics in American history

Bill & Rita Clements Fellowship for the Study of Southwestern America, 2020-2021
~ Awarded by the SMU Clements Center for Southwest Studies to two scholars of Texas, the Southwest, or the U.S.-Mexico borderlands who are developing first books

The Benjamin W. Schmidt Memorial Scholarship, 2018-2019
~ Awarded by the TCU Department of History to a PhD candidate who shows exceptional professional promise; highest departmental prize for graduate students

Texas Christian University Department of History, Shinko and Thomas McDonald Research Prize in Texas History, 2019, 2017
~ Awarded by the TCU Department of History to a graduate student with the best research on antebellum Texas history

## Works in Progress

*The Revolver Must Go: The Rise and Fall of a Gun Control Movement in Texas*

Aim: Scholarly monograph exploring the rise of a gun control movement in nineteenth-century Texas and the regulatory strategies which it embraced. Widespread acceptance of strict, ambitious gun control laws in the "Wild West" belies current assumptions about Texas and challenges the reigning interpretation of the Second Amendment as a guarantor of expansive gun rights

Status: Editing manuscript

"The Texas Anti-Trust Movement: Antimonopoly, Populism, and Reform in the Long Progressive Era"

Aim: Scholarly article interpreting Texas antitrust policy an example of innovative reform in the Great Plains and trans-Mississippi West

Status: Research and writing in progress

## University Teaching Experience

*Instructor of Record*
Lecturer in American History, Texas Christian University                    2019-2020
    "American History to 1877: Social Movements & the Politics of Slavery" (HIST 10603)
    "American History since 1877: The Quest for Equality" (HIST 10613)
    "History of Texas: A Transnational Look at the American Southwest" (HIST 40743)

*Graduate Student Instructor*
Teaching Assistant, Texas Christian University                    2017-2018
    American History to 1877 (HIST 10603)
    American History since 1877 (HIST 10613)

*Teaching Interests*
American History, Legal History, Southwestern Borderlands, Civil War Era, American West, Gilded Age & Progressive Era, Women's History

## Conference Presentations & Invited Talks

"Reassessing Assumptions about Historical Arkansas and Tennessee Handgun Regulations," Race and Guns Roundtable, Duke Center for Firearms Law, Durham, North Carolina, November 2021

"Enforcement of Public Carry Restrictions: Texas as a Case Study," The Second Amendment at the Supreme Court: 700 Years of History and the Modern Effects of Guns in Public, Davis, California, October 2021

"Race & Guns," Newberry Library Colloquium, Chicago, Illinois, October 2021

"Unlawful Carrying: Enforcing the Pistol Law in Texas, 1870-1920," Texas State Historical Association Annual Meeting, Corpus Christi, Texas, February 2019

"Regulating Deadly Weapons in Nineteenth-Century Texas," Invited Lecturer, Los Bexareños Hispanic Genealogical and Historical Conference, San Antonio, Texas, September 2018

"Impregnable Citadels of Capital: American Monopolies in the British Radical Press," Southern Conference on British Studies Annual Meeting, St. Pete Beach, Florida, November 2016

"Dating Violence in Texas: Why the State Family Code Obstructs Accurate Reporting about Sexual Assault," TCU Women & Gender Studies Research Symposium, 2015

## Service

Invited Guest, "How to Make the Most of Your Time in Graduate School," Dept. of History Orientation Day, 2020
    ~ Advise incoming graduate students on strategies for success in the PhD program, emphasizing importance of intellectual development
Panelist, "Everything You Wanted to Know about TCU but Were Too Afraid to Ask," Dept. of History Orientation Day, 2016
    ~ Provide honest and confidential information to prospective graduate students
Graduate Student Mentor, 2015
    ~ Informal departmental program designed to ease the transition for incoming graduate students

**Professional Memberships**
Society for Historians of the Gilded Age and Progressive Era
Texas State Historical Association
Southern Historical Association
American Historical Association

**Languages**
Spanish (Proficient)
Latin (Proficient)