George M. Lee (SBN 172982)
  gml@seilerepstein.com
**SEILER EPSTEIN LLP**
4 Embarcadero Center, 14th Floor
San Francisco, CA 94111
Phone: (415) 979-0500
Fax:    (415) 979-0511

Raymond M. DiGuiseppe (SBN  228457)
  law.rmd@gmail.com
**THE DIGUISEPPE LAW FIRM, P.C.**
116 N. Howe Street, Suite A
Southport, North Carolina 28461
Phone: (910) 713-8804
Fax: (910) 672-7705

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

WILLIAM WIESE, et al.,

              Plaintiffs,

    vs.

ROB BONTA, in his official capacity as Attorney General of California, et al.,

           Defendants.

Case No. 2:17-cv-00903-WBS-KJN

**PLAINTIFFS' AMENDED REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, AND OPPOSITION TO DEFENDANTS' COUNTER MOTION FOR SUMMARY JUDGMENT**

**[FRCP 56]**

Date:          October 30, 2023
Time:          1:30 p.m.
Courtroom: 5, 14th Floor
Judge:        Hon. William B. Shubb

## <u>TABLE OF CONTENTS</u>

I.   INTRODUCTION ...................................................................................................... 1

II.  ARGUMENT IN REPLY TO THE STATE'S OPPOSITION TO PLAINTIFFS' MSJ
     AND ARGUMENT IN OPPOSITION TO THE STATE'S MSJ ......................................... 1

     A.   SECOND AMENDMENT CLAIM ....................................................................... 1

          1.   The Second Amendment's Protections Extend to All Instruments
               Constituting Bearable Arms, Including Semiautomatic Firearm Magazines. ....... 2

          2.   The Magazines Targeted by the LCM Ban are Inherent Operating
               Parts of Semiautomatic Firearms. ...................................................... 4

          3.   LCMs are Protected as Being Indisputably in Common Use. ............................. 6

          4.   The State's Demand that Plaintiffs Demonstrate a Self-Defense *Need*
               for LCMs in Order to Secure Protection Under the Text of the Second
               Amendment Directly Contradicts the Settled Supreme Court Authority. ............. 9

          5.   The State Has Failed to Meet Its Burden Under *Bruen* to Show "Relevantly
               Similar" Historical Analogues Justifying This Ban. .................................. 13

     B.   TAKINGS AND DUE PROCESS CLAIM ............................................................. 19

          1.   The Court Must Examine the Character of the Taking, in Relation to
               its Stated Public Purpose. ................................................................... 19

          2.   The State's Reliance Upon its Police Powers is Misplaced. ........................... 22

          3.   The Parallel Due Process Violation ...................................................... 24

     C.   EQUAL PROTECTION CLAIM ......................................................................... 25

III. CONCLUSION ....................................................................................................... 25

<u>TABLE OF AUTHORITIES</u>

**Cases**

*Akins v. United States*, 82 Fed. Cl. 619 (2008) ................................................................. 22

*Armstrong v. United States*, 364 U.S. 40, 80 S.Ct. 1563 (1960) ................................... 19, 22

*Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey*,
    910 F.3d 106 (3d Cir. 2018) ......................................................................................... 3

*Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Grewal*, 2018 WL 4688345
    (D.N.J. Sept. 28, 2018), aff'd sub nom. *Ass'n of New Jersey Rifle & Pistol
    Clubs, Inc. v. Att'y Gen. New Jersey*, 910 F.3d 106 (3d Cir. 2018) ........................... 12

*Barnett v. Raoul*, 2023 WL 3160285 (S.D. Ill. Apr. 28, 2023) ......................................... 3

*Caetano v. Massachusetts*, 577 U.S. 411 (2016) ......................................................... 2, 12

*Cwynar v. City & County of San Francisco*, 90 Cal.App.4th 637 (2001) ......................... 21

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ............................................. *passim*

*Drummond v. Robinson Township*, 9 F.4th 217 (3d Cir. 2021) ......................................... 2

*Duncan v. Becerra*, 265 F. Supp.3d 1106 (S.D. Cal. 2017) ............................................. 12

*Duncan v. Becerra*, 970 F.3d 1133 (9th Cir. 2020), reh'g en banc granted, opinion vacated,
    988 F.3d 1209 (9th Cir. 2021), and on reh'g en banc sub nom. *Duncan v. Bonta*,
    19 F.4th 1087 (9th Cir. 2021), cert. granted, judgment vacated, 142 S.Ct. 2895 (2022),
    and vacated and remanded, 49 F.4th 1228 (9th Cir. 2022) ........................................... 7

*Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021), cert. granted, judgment vacated,
    142 S.Ct. 2895 (2022), and vacated and remanded, 49 F.4th 1228 (9th Cir. 2022) .......... 19, 20

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ..................................................... 2

*Fesjian v. Jefferson*, 399 A.2d 861 (D.C. Ct. App. 1979) ....................................... 22, 23, 24

*Fyock v. City of Sunnyvale*, 25 F.Supp.3d 1267 (N.D. Cal. 2014) ............................ 7, 10, 12

*Fyock v. Sunnyvale*, 779 F.3d 991 (9th Cir. 2015) ........................................................ 3, 6, 10

*Gamble v. United States*, 587 U.S. ___, 139 S.Ct. 1960 (2019) ................................. 17, 18

*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) (*Heller II*) ................. 6, 7

*Jackson v. City of San Francisco*, 746 F.3d 953 (9th Cir. 2014) ..................................... 2

*Kelo v. City of New London, Conn.*, 545 U.S. 469 (2005) ........................................... 20, 21

*Kolbe v. Hogan*, 813 F.3d 160 (4th Cir. 2016) ............................................................... 3

*Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526 (9th Cir. 2011) ................................... 8

*Laurel Park Community, LLC v. City of Tumwater*, 698 F.3d 1180 (9th Cir. 2012) ................ 19, 22

*Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528 (2005) ......................................... 19, 22, 23

*Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982).......................... 19, 21, 22

*Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992) ....................... 21, 22, 23

*Luis v. United States*, 578 U.S. 5, 136 S. Ct. 1083 (2016) ........................................ 2

*Mass. Bd. of Retirement v. Murgia*, 427 U.S. 307 (1976) .......................................... 25

*McCulloch v. Maryland, 4 Wheat.* 316, 415, 4 L.Ed. 579 (1819) ................................. 15

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ........................................... 10, 18

*Miller v. Bonta*, 542 F. Supp.3d 1009 (S.D. Cal. 2021) ............................................. 12

*Monks v. City of Rancho Palos Verdes*, 167 Cal.App.4th 263 (2008) ........................... 21

*National Association for Gun Rights v. Lamont*, 2023 WL 4975979 (D. Conn. Aug. 3, 2023) ......... 8

*New York State Rifle & Pistol Ass'n v. Bruen*, 142 S.Ct. 2111 (2022) ....................... *passim*

*New York State Rifle and Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2d Cir. 2015) .................. 7

*Orr v. Bank of America*, 285 F.3d 764 (9th Cir. 2022) .......................................... 8

*Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007),
    aff'd sub nom. *Heller*, 554 U.S. 570. ......................................................... 10

*Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 (1922) ............................................ 20

*PruneYard Shopping Center v. Robins*, 447 U.S. 74 (1980) ...................................... 19

*Richmond Elks Hall Ass'n v. Richmond Redevelopment Agency*, 561 F.2d 1327 (9th Cir. 1977)....20

*State Oil Co. v. Khan*, 522 U.S. 3 (1997) .................................................... 18

*Teixeira v. County of Alameda*, 873 F.3d 670 (9th Cir. 2017) ................................. 2

*Teter v. Lopez*, 76 F.4th 938 (9th Cir. 2023) ................................................ 6, 9, 13, 16

*United States v. Jones*, 565 U.S. 400, 132 S.Ct. 945, 181 L.Ed.2d 911 (2012) ............... 15

AMENDED REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT; AND OPPOSITION
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - CASE NO. 2:17-cv-00903-WBS-KJN

*United States v. Security Industrial Bank*, 459 U.S. 70 (1982) ........................................................ 19

*United States v. Sprague*, 282 U.S. 716 (1931) ........................................................................ 2

*Virginia v. Moore*, 553 U.S. 164 (2008) ................................................................................ 18

*Wiese v. Becerra*, 306 F.Supp.3d 1190 (E.D. Cal. Feb. 7, 2018) ........................................... 3

*Wiesmueller v. Kosobucki*, 547 F.3d 740 (7th Cir. 2008) ...................................................... 9

**Statutes**

Cal. Pen. Code § 31910 ...................................................................................................... 4

Cal. Pen. Code § 32000 ...................................................................................................... 4

Cal. Pen. Code § 32310 ...................................................................................................... 19, 20, 22

Colo. Rev. Stat. § 18-12-301 ............................................................................................. 5

**Constitutional Provisions**

Cal. Const., Art. I, § 19 ..................................................................................................... 21

U.S. Const., Amend. II ................................................................................................. *passim*

U.S. Const., Amend. V ................................................................................................ 19, 20, 23, 24

U.S. Const., Amend. XIV ............................................................................................... 17, 24

**Rules**

Fed. R. Evid. 201, advis. comm. note (1972 proposed rules)................................................ 9

Fed. R. Evid. 901(b)(4).................................................................................................... 8

**Other Authorities**

David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849 (2015) ...................................................................................................................... 8

Mark W. Smith, *Attention Originalists: The Second Amendment Was Adopted in 1791, Not 1868*, HARV. J. L. & PUB. POL'Y PER CURIAM, (Fall 2022) .......................................... 17

Mueller & Kirkpatrick, Fed. Evid. 2:12 (4th ed. Thomson Reuters/Westlaw 2013) ........................ 9

National Library of Medicine, Hemenway (2015), *The epidemiology of self-defense gun use: evidence from the National Crime Victimization Surveys 2007-2011* .......................................... 11

Stephen P. Halbrook, *America's Rifle: The Case for the AR-15* (Google Books ed. 2022) ................ 3

William English, *2021 National Firearms Survey* (July 14, 2021) .................................................... 11

## I.     INTRODUCTION

Pursuant to this Court's order of June 27, 2023 (Dkt. No. 132), Plaintiffs submit this combined brief in reply to the State's amended motion for summary judgment (Dkt. No. 135) ("Plaintiffs' MSJ or "PMSJ"), and in opposition to the State's counter-motion for summary judgment (Dkt. No. 135). The State's arguments in opposition to Plaintiffs' MSJ mirror its arguments in support of its counter-motion for summary judgment, which are combined into a single brief. Plaintiffs respond in like fashion through this single brief, as everything rises and falls together: if Plaintiffs are right that the LCM Ban targets activity protected under the Second Amendment without a historically-rooted justification as mandated under the *Bruen* framework, then the whole house that the defense has built around its defense of the Ban collapses, and the law must be invalidated as unconstitutional. And that is exactly what we have seen in this litigation: the State's defense in these cross motions for summary judgment solidifies that California can point to no legitimate justification for its prohibitions against the fundamental liberty of ordinary law-abiding citizens to acquire, possess, and use LCMs in the exercise of their right to keep and bear arms protected by the Second Amendment. Therefore, this Court can quickly and confidently enter summary judgment in favor of Plaintiffs. We respectfully request that it do so now.

## II.     ARGUMENT IN REPLY TO THE STATE'S OPPOSITION TO PLAINTIFFS' MSJ AND ARGUMENT IN OPPOSITION TO THE STATE'S MSJ

### A.     SECOND AMENDMENT CLAIM

Plaintiffs seek to possess, keep, use, and acquire *standard*-capacity magazines in common use for self-defense and lawful purposes around the country. Wiese Decl. (Dkt. No. 123-5), ¶¶ 5, 8; Morris Decl. (Dkt. No. 123-6), ¶¶ 5, 8; Macaston Decl. (Dkt. No. 123-7), ¶¶ 8-11; Flores Decl. (Dkt. No. 123-8), ¶¶ 9-11; Dang Decl. (Dkt. No. 123-9), ¶¶ 7-8, 10. Plaintiffs' conduct, which is banned under California's "large capacity" magazine ban ("LCM Ban"), is covered under the Second Amendment as interpreted and applied by the Supreme Court. The State's efforts to claim otherwise resoundingly fall flat and must be rejected as in contravention of this clear authority.

1.  **The Second Amendment's Protections Extend to All Instruments Constituting Bearable Arms, Including Semiautomatic Firearm Magazines.**

*Heller*, as reaffirmed by *Bruen*, declares: "the Second Amendment extends, prima facie, to *all instruments* that constitute bearable arms." *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008) (emphasis added); *accord New York State Rifle & Pistol Ass'n v. Bruen*, 142 S.Ct. 2111, 2132 (2022). *Bruen* further made clear that "even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense." *Bruen*, 142 S.Ct. at 2132 (citing *Caetano v. Massachusetts*, 577 U.S. 411, 411–412 (2016) (per curiam) (stun guns are protected under the Second Amendment). In interpreting the text of the Second Amendment, courts must be guided by the principle that "'[t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning.'" *Heller*, 554 U.S. at 576 (quoting *United States v. Sprague*, 282 U.S. 716, 731 (1931)). And the Founders and Framers doubtless would have thought it absurd that some modern-day governments would consider today's firearm magazines to no longer be "Arms" that "facilitate armed self-defense" under the Second Amendment as soon as those magazines crossed some arbitrary limit on ammunition capacity.

The Second Amendment protected right to "keep and bear Arms" necessarily extends to and covers the right to *acquire* new LCMs that the LCM Ban cuts off. The Ninth Circuit "and other federal courts of appeals have held that the Second Amendment protects ancillary rights necessary to the realization of the core right to possess a firearm for self-defense." *Teixeira v. County of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017). "Constitutional rights thus implicitly protect those closely related acts necessary to their exercise." *Luis v. United States*, 578 U.S. 5, 136 S. Ct. 1083, 1097 (2016) (Thomas, J., concurring). Thus, the right "'implies a corresponding right to acquire and maintain proficiency' with common weapons." *Drummond v. Robinson Township*, 9 F.4th 217, 227 (3d Cir. 2021) (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011). And the right necessarily "'implies a corresponding right to obtain the bullets necessary to use them.'" *Luis* at p. 1097 (quoting *Jackson v. City and County of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014)). It follows that

ammunition containers and loaders, i.e., "magazines," are no less protected than ammunition as necessary prerequisites for the normal and intended function of constitutionally protected semiautomatic firearms. By definition, such firearms fire and then rechamber a new round with each pull of the trigger and thus have exactly the same inherent rate of fire: "Once one pulls the trigger and fires a round, another round loads itself and may be fired by another pull of the trigger." Stephen P. Halbrook, *America's Rifle: The Case for the AR-15* at 206 (Google Books ed. 2022); *see also Barnett v. Raoul*, 2023 WL 3160285, at *8 (S.D. Ill. Apr. 28, 2023), appeal pending ("It is hard to imagine something more closely correlated to the right to use a firearm in self-defense than the ability to effectively load ammunition into the firearm.").

For these essential reasons, courts have deemed LCMs as "arms" both before and after *Bruen*. *See e.g., Fyock v. Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015) (recognizing a general right to possess magazines necessary to render firearms operable); *Kolbe v. Hogan*, 813 F.3d 160, 175 (4th Cir. 2016) ("To the extent the State can regulate these magazines, it is not because the magazines are not bearable 'arms' within the meaning of the Second Amendment"); *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey*, 910 F.3d 106, 116 (3d Cir. 2018) ("Because magazines feed ammunition into certain guns, and ammunition is necessary for such a gun to function as intended, magazines are 'arms' within the meaning of the Second Amendment."); *Wiese v. Becerra*, 306 F.Supp.3d 1190, 1195, n. 3 (E.D. Cal. Feb. 7, 2018)); *Barnett*, 2023 WL 3160285, at *8 (it is "not even a close call" that magazines are arms under the plain text of the Second Amendment). The conclusion that "magazines constitute 'arms' also finds strong historical support." *Kolbe*, 813 F.3d at 175. "*Heller* looked to early definitions of 'arms' to determine what weapons implicated the Second Amendment, and those definitions were broad, including 'weapons of offence, or armour of defence,' or anything 'that a man ... takes into his hands, or useth in wrath to cast at or strike another." *Id.* (quoting *Heller*, 554 U.S. at 581).

**2.** **The Magazines Targeted by the LCM Ban are Inherent Operating Parts of Semiautomatic Firearms.**

Magazines are inherent operating parts of a firearm and thus integral parts of modern constitutionally protected arms. Notably, the expert on which the State purportedly relies to claim otherwise, Ryan Busse, does not deny that magazines are inherent parts of modern firearms, and he ignores the State's own law under Cal. Pen. Code §§ 31910(b)(4)-(6), 32000, and 16900, which the State itself concedes have the effect of *mandating* the use of detachable magazines by requiring new semiautomatic pistols sold in California to have a magazine disconnect mechanism. Def. Resp. Pltf. SOUMF No. 15. And Busse's own declaration implicitly acknowledges that magazines are integral operating parts of all semiautomatic firearms, in saying, "all firearms that can accept a large-capacity magazine can also accept a magazine that holds fewer rounds *and still function* precisely as intended." Dkt. No. 135-9 at ¶ 18 (italics added). Magazines are either needed for a firearm's functionality or they are not, and they are, as Busse's statement admits.

The State does not and cannot dispute the essential fact that magazines are integral to all modern, semiautomatic firearms which cannot operate as designed and intended without them. Youngman Decl., at ¶ 7 (Lee Decl., Ex. A; Dkt. No. 28-2); Def. Resp. to Pltf. SOUMF No. 15. Modern semiautomatic firearms of the kind in use for lawful purposes, including self-defense, sold at retail in the civilian and law enforcement markets across the country, include at least one magazine intended to be used as part of that firearm. *Id*. The State admits this much as well. Def. Resp. to Pltf. SOUMF No. 13. In fact, Plaintiffs Dang and Macaston have attested that their legally-acquired "large capacity" magazines were the only ones ever made for their particular firearms. PSOUMF No. 39; Dang Decl., ¶ 5; Macaston Decl., ¶ 6. Although the State resists the implications here, Resp. to Pltf. SOUMF ("PSOUMF") No. 39, it does not dispute that "[s]ome of these magazines are the only magazines that these Individual Plaintiffs may have for that particular firearm," Resp. to PSOUMF No. 38, and it musters no evidence that directly counters the assertions of Plaintiff Dang or Macaston that the firearms at issue do not actually accommodate any lower capacity magazines.

Ultimately, all that distinguishes the "large capacity" magazines at issue from any other magazines is their capacity. This reveals the absurdity, arbitrariness, and untenably slippery slope underlying the State's rationale: under its theory, a firearm equipped with a magazine is an "arm" for purposes of the Second Amendment for so long as its magazine holds less the number of rounds to which the State has arbitrarily assigned the label of "large capacity," but then the same firearm somehow mysteriously transforms into something that is not an arm whenever its magazine crosses the arbitrarily established threshold.[1] Right now, that's 11, since 10 is the current limit. Hence the slippery slope: There is no limiting principle under this rationale because a state that can limit the capacity of a magazine based on its judgment about the number of rounds a magazine should be able to hold at any given time can limit that capacity to five or two—or even one.

That is, the State advocates for an interpretation of the Second Amendment under which it ultimately remains free to prohibit the possession of *all* detachable magazines in California, thereby rendering *all* semi-automatic firearms to be "one-shot wonders," and still would not run afoul of the text of the Second Amendment, under this absurd theory that a firearm's capacity has *nothing to do* with its operability except when that capacity falls below an arbitrarily defined number. At that point, a semiautomatic firearm is not semiautomatic at all—it is a single-shot firearm that becomes a single-use hand projectile when its shot is spent. The reality is, by limiting magazine capacity, the State is in fact limiting the number of rounds a firearm can fire without reloading and therefore placing restrictions on the operability and functionality of *the firearm itself*. That plainly is a restriction of a type of arm and therefore covered by the Second Amendment's plain text.

Again, the "Second Amendment protections would be meaningless if the State could strip away integral component parts of a firearm by claiming that prohibitions against individual components do not constitute a ban on 'arms.'" (Memo. Dkt. No. 123-1, at 9:10-12). But that's

---

[1] In Colorado, for example, a "large capacity magazine" is defined as one capable of accepting more than 15 rounds of ammunition. Colo. Rev. Stat. § 18-12-301(2)(a). So, under California's theory, a firearm equipped with a 15-round magazine constitutes an "arm" in Colorado but then loses this status as soon as it crosses the border into California.

1   exactly what the State is attempting to do, by reducing a firearm to the sum of its parts, claiming that

2   a particular integral or operating part thereof is not, by itself, an "arm," and then relying on this

3   rationale to ban all detachable magazines whose capacity exceeds the then-prevailing maximum

4   number of rounds that the State has set for the bar against "large capacity" magazines.

5   **3.    LCMs are Protected as Being Indisputably in Common Use.[2]**

6       In its previous order on the State's motion to dismiss the Second Amended Complaint, Dkt.

7   No. 74, this Court held that "California's large capacity magazine ban burdens conduct protected by

8   the Second Amendment because these magazines are commonly possessed by law-abiding citizens

9   for lawful purposes." *Id.* at 5 & n.3. In so holding, the Court cited established case law recognizing

10  the indisputable fact that the banned magazines—i.e., those capable of holding more than 10 rounds—

11  are otherwise widely available and in common use for lawful purposes around the country. *Id.* (citing

12  *Heller v. District of Columbia*, 670 F.3d 1244, 1261 (D.C. Cir. 2011) (*Heller II*) and *Fyock*, 779 F.3d

13  at 998, on this point. It would be quite the reversal for the Court to now find, as the State urges it to

14  do, that the Second Amendment is somehow not implicated *at all* according to its plain text *after* the

15  Supreme Court restored *Heller* as the controlling framework. *Bruen*, 142 S.Ct. at 2131 ("The test that

16  we set forth in *Heller* and *apply today* requires courts to assess whether modern firearms regulations

17  are consistent with the Second Amendment's text and historical understanding.") (emphasis added).

18      *Heller* already established the relevant contours of the historical tradition that a court must

19  examine, in declaring that "the Second Amendment extends, prima facie, to *all instruments* that

20  constitute bearable arms," *Heller*, 554 U.S. at 582 (emphasis added), and all such presumptively

21  protected instruments cannot be banned unless they are both "dangerous *and* unusual," *id.* at 627

22

23  _____

24  [2] As noted, because LCMs are in common use, they are necessarily not "dangerous and unusual," and the issue of whether an arm is "dangerous and unusual" is actually "a contention as to which [the State] bears the burden of proof in the second prong of the *Bruen* analysis," as the Ninth Circuit recently reiterated. *Teter v. Lopez*, 76 F.4th 938, 950 (9th Cir. 2023). Plaintiffs address the issue here not to in any way suggest they bear any burden on the point, as the State wrongly contends in ignoring *Teter*, Def. Amended Opp. & Cross-MSJ at 15, but simply to further illustrate how LCMs are presumptively protected under a proper textual analysis.

25

26

27

28

1    (emphasis added). It is simply beyond any reasonable dispute that the magazines at issue are

2    commonly owned, both here in California and throughout the United States. *See* Reply to Def. Resp.

3    to PSOUMF Nos. 16-31, Resp. to Def. SOUMF ("DSOUMF") Nos. 1, 4. In fact, the State's own

4    estimate from several years ago was that, as of December 16, 2016, "[t]here [we]re likely hundreds

5    of thousands of large capacity magazines in California at th[at] time." Def. Resp. to PSOUMF No.

6    30. The State further admitted at the time that it expected "many gun owners" to be affected by the

7    ban. Def. Resp. to PSOUMF No. 31. Moreover, in this litigation, the State does not dispute that

8    "[m]any semiautomatic firearms sold in other states are sold with magazines capable of holding more

9    than ten rounds." Def. Resp. to PSOUMF No. 16. The impact of the State's LCM Ban and the number

10   of those affected by it today is even greater than it was almost seven years ago.

11         By definition, LCMs are commonly possession, and therefore, not dangerous *and/or* unusual.

12   *See Duncan v. Becerra*, 970 F.3d 1133, 1147 (9th Cir. 2020) ("[N]early half of all magazines in the

13   United States today hold more than ten rounds of ammunition. And the record shows that such

14   magazines are overwhelmingly owned and used for lawful purposes. This is the antithesis of

15   unusual."), reh'g en banc granted, opinion vacated, 988 F.3d 1209 (9th Cir. 2021), and on reh'g en

16   banc sub nom. *Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021), cert. granted, judgment vacated, 142

17   S.Ct. 2895 (2022), and vacated and remanded, 49 F.4th 1228 (9th Cir. 2022); *New York State Rifle*

18   *and Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015) (finding "Americans own millions"

19   of the "large-capacity magazines" at issue (defined as those holding more than 10 rounds) and,

20   "[e]ven accepting the most conservative estimates cited by the parties and by amici, the assault

21   weapons and large-capacity magazines at issue are 'in common use' as that term was used in *Heller*"

22   and as the D.C. Circuit also found in *Heller II*); *Kolbe*, 813 F.3d at 174 ("Like a number of courts

23   that have previously considered this question, we have little difficulty in concluding that the banned

24   semi-automatic rifles are *in common use* by law-abiding citizens."); *id.* (quoting *Fyock v. City of*

25   *Sunnyvale*, 25 F.Supp.3d 1267, 1275 (N.D. Cal. 2014) ("Virtually every federal court to have

26   addressed this question has concluded that 'magazines having a capacity to accept more than ten

27   rounds are in common use.'").

28

The relevant studies[3] confirm what is already clear in the record. A study by the National Shooting Sports Foundation (NSSF) estimated that there were over 24 million modern semiautomatic rifles in circulation in the United States as of 2022. *NSSF Announces Over 24 Million MSRs in Circulation*, The Firearm Indus. Trade Ass'n (July 20, 2022 (Lee Decl., Exh. E, and available at: https://bit.ly/3QBXiyv). And "[t]he most popular rifle in American history is the AR-15 platform, a semiautomatic rifle with standard magazines of *twenty or thirty* rounds." David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849, 859 (2015) (emphasis added); https://davekopel.org/2A/LawRev/2015/History-of-firearms-magazines-and-magazine-prohibition.pdf. In fact, a 2022 NSSF survey of semi-automatic rifle owners showed that over half

_____

[3] The State takes issue in particular with the NSSF and English surveys on the ground that they have not been properly authenticated and contain inadmissible hearsay. Resp. to PSMOUF Nos. 19-25. Again, however, these are presented as legislative facts to which such concerns do not apply. Moreover, the authentication that the State claims must be met applies only when the party presenting the document attempts to meet the basic evidentiary burden—demonstrating that it is what it purports to be—"*through personal knowledge.*" *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532-33 (9th Cir. 2011). "Where documents are otherwise submitted to the court, and where personal knowledge is *not* relied upon to authenticate the document, the district court must consider alternative means of authentication under Federal Rules of Evidence 901(b)(4)." Such documents can be authenticated "'by review of their contents if they appear to be sufficiently genuine.'" *Id.* at 533 (quoting *Orr v. Bank of America*, 285 F.3d 764, 778 n. 24 (9th Cir. 2022)). Here, even assuming the normal evidentiary rules apply, Plaintiffs are not attempting to authenticate these documents through anyone's personal knowledge, and there can be no reasonable dispute that the documents are what they "purport to be," particularly given the frequency with which such sources are cited as authority. *See e.g., National Association for Gun Rights v. Lamont*, 2023 WL 4975979, *19 (D. Conn. Aug. 3, 2023); Brief of Amicus Curiae National Shooting Sports Foundation in Support of Applicants, *National Association for Gun Rights v. City of Naperville*, Supreme Court No. 22A948, filed May 5, 2023, at 10-13.

Moreover, Mr. Curcuruto stated that the NSSF industry reference report, containing firearms ownership and participation statistics, was updated every year. (Curcuruto Depo., 113:2-10). In deposition testimony that Mr. Curcuruto gave in 2018, in *Duncan v. Becerra*, Mr. Curcuruto testified that the NSSF reports are updated annually, using the ATF AFMER reports, and when the reports are finished, they are published by the NSSF. (Lee Supp. Decl., Exh. K (Curcuruto Depo. Testimony in *Duncan*, at p. 79:18 - 80: 12.) And Mr. Curcuruto testified that nothing has happened from 2017 to 2023 that would change his opinion that millions of firearm magazines are in Americans' hands; in fact, in the six years since he offered his declaration in this case, there have been additional firearms and magazines manufactured and purchased. (Curcuruto Depo. at 174:11-20.) In fact, Mr. Curcuruto would assume that given the increase in the number of firearms since 2017, "the number has probably grown substantially over the past seven years." (Id., at 177:8-17.) Most telling to this point, however, is that the State never actually disputes any of Plaintiffs' estimates that range in the tens of millions, nor does it even attempt to offer its own estimates, but simply resorts to a pithy response that "the current number is unknown."

(52%) of them reported they possessed magazines with a capacity of 30 rounds, followed by 17% who said they owned magazines with a capacity of 20 rounds. NSSF, *Modern Sporting Rifle Comprehensive Consumer Report* at p. 31 (Lee Decl., Exh. F, and available at https://bit.ly/3GLmErS). The NSSF estimated that between 1990 and 2015, 230 million pistol and rifle magazines were in the possession of United States consumers and that magazines capable of holding more than 10 rounds of ammunition accounted for about 115 million, or half of all magazines owned, during this time period. Decl. of James Curcuruto in Support of Plaintiffs' Motion for Preliminary Injunction (Lee Decl., Exh. B) ("Curcuruto Decl."), ¶ 8.

Under the historical test developed in *Heller* and confirmed in *Bruen*, because these magazines are commonly owned for lawful purposes, they are protected as "modern instruments that facilitate armed self-defense." *Bruen*, 142 S.Ct. at 2132. The State has failed to meet its burden to show otherwise.[4] And that should be the end of the analysis.

### 4. The State's Demand that Plaintiffs Demonstrate a Self-Defense *Need* for LCMs in Order to Secure Protection Under the Text of the Second Amendment Directly Contradicts the Settled Supreme Court Authority.

The State goes even farther afield in its skewed textual analysis by demanding that Plaintiffs and all other similarly situated law-abiding Californians show some sort of demonstrated self-defense *need* for LCMs before any court should interpret the Second Amendment to apply to their intended

---

[4] As noted, although the State bears the burden of proving LCMs are *not* in common use for lawful purposes, *Teter*, 76 F.4th at 950, they wrongly attempt to shift this burden to Plaintiffs and complain they have provided no admissible evidence proving LCMs are in common use under the textual prong. Def. Amended Opp. & Cross-MSJ at 2. However, in *Teter*, the Ninth Circuit affirmed what Plaintiffs have contended all along, in that "the historical research required under *Bruen* involves issues of so-called 'legislative facts'—those 'which have relevance to legal reasoning and the lawmaking process,' such as 'the formulation of a legal principle or ruling by a judge or court'—rather than adjudicative facts, which 'are simply the facts of the particular case.'" *Id.* at 76 F.4th at 946-47, quoting Fed. R. Evid. 201, advis. comm. note (1972 proposed rules). The rules of evidence do not apply to legislative facts. *See, e.g.*, *Wiesmueller v. Kosobucki*, 547 F.3d 740, 742 (7th Cir. 2008) (Posner, J., in chambers); *see also* 1 Mueller & Kirkpatrick, Fed. Evid. 2:12 (4th ed. Thomson Reuters/Westlaw 2013). The materials that Plaintiffs have supplied and cited as relevant sources, including the surveys by NSSF and William English, consist of such legislative facts. In any event, they merely confirm what is already clear in the body of cited case law, which are also based largely on legislative facts and independently establish the point beyond dispute.

course of conduct. Def. Amended Opp. & Cross-MSJ at 2, 15-17. The State ignores the whole point, and the clear instruction of *Heller*, in focusing on the potential availability of *lower* capacity magazines for use in self-defense. *Id.* This is tantamount to saying a state may ban an entire class of otherwise protected firearms simply because gun owners may obtain or use a different kind of gun, even if it is markedly *inferior* to the ones most Americans prefer to own and do own. Such an argument was explicitly rejected in *Heller*: "It is no answer to say […] that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed." *Heller*, 554 U.S. at 629; *see also Parker v. District of Columbia*, 478 F.3d 370, 400 (D.C. Cir. 2007) (rejecting as "frivolous," even before *Heller*, the District's argument that its ban on one type of firearm "does not implicate the Second Amendment because it does not threaten total disarmament" and "residents still have access to hundreds more," since "[i]t could be similarly contended that all firearms may be banned so long as sabers were permitted."), aff'd sub nom. *Heller*, 554 U.S. 570.

The State is similarly way off base in its spilling of considerable ink to highlight statistics and news reports about self-defense incidents in which people have been able to avoid or ward off danger without firing more than 10 rounds—another variation of the same misguided claim that Plaintiffs should be required to show a demonstrated self-defense *need* for LCMs. Simply put, Second Amendment rights do not depend on how often the magazines are used. Indeed, the standard is whether the prohibited magazines are "'typically *possessed* by law-abiding citizens for lawful purposes,' not whether the magazines are often *used* for self-defense." *Fyock v. City of Sunnyvale*, 25 F. Supp.3d at 1276 (emphasis original, citing *Heller*, 554 U.S. at 625), aff'd sub nom. *Fyock*, 779 F.3d 991. And, in establishing a *personal* right, the Supreme Court made clear that when it comes to the use of presumptively protected arms, the Second Amendment protects more than just the ability to use them in self-defense—albeit a core purpose—as it broadly protects "a personal right to keep and bear arms for lawful purposes." *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010).

In fact, in striking down the handgun ban at issue in *Heller*, the Supreme Court also made clear that a ban on "an entire class of 'arms' that is overwhelmingly chosen by American society" is constitutionally untenable "whatever the reason" may be for that choice. *Heller*, 554 U.S. at 629.

Likewise, given the ubiquity and overwhelming choice of millions of Americans to purchase, keep, and bear arms with standard capacity magazines, it is hardly sufficient for the State to say that law-abiding gun owners must abide by arbitrary magazine capacity limitations that most Americans do not choose. The clear, indisputable choice of Americans to possess these magazines for lawful purposes must be respected under this framework, "whatever the reason" for that choice. Indeed, as we know, millions of law-abiding American citizens *carry* firearms for self-defense every day, and very few self-defense shootings actually occur in proportion to the number of firearms actually carried. *See* English, William, *2021 National Firearms Survey* (July 14, 2021), Georgetown McDonough School of Business Research Paper No. 3887145, Available at SSRN: https://ssrn.com/abstract=3887145 or http://dx.doi.org/10.2139/ssrn.3887145, Abstract ("Handguns are the most common firearm employed for self-defense (used in 65.9% of defensive incidents), and *in most defensive incidents (81.9%) no shot was fired.*") (italics added); National Library of Medicine, Hemenway (2015), *The epidemiology of self-defense gun use: evidence from the National Crime Victimization Surveys 2007-2011*, Abstract (https://pubmed.ncbi.nlm.nih.gov/25910555/) (studying "the epidemiology of self-defense gun use (SDGU) and the relative effectiveness of SDGU in preventing injury and property loss," in "over 14,000 incidents in which the victim was present, 127 (0.9%) involved a SDGU").

Do the State's statistics mean that semiautomatic firearms equipped with LCMs are not actually "used" for self-defense unless they are fired? The answer is no, of course, but it does not matter, because that is not the proper inquiry. When the Court decided *Heller* and focused on the fact that handguns are overwhelmingly *used* by the American people for lawful purposes, *such as* self-defense, it did not get into an analytical discussion of how many times they were actually fired in self-defense incidents. It was enough that the American people overwhelmingly chose to *keep* handguns in the home for self-defense, and in the overwhelming majority of cases, they were never actually fired—or even brandished—in a self-defense situation. *See* 2021 National Firearms Survey, *supra*. This principle was then restated in *Bruen*, when it reaffirmed that the Second Amendment protects the right to "*possess and carry* weapons *in case of* confrontation." *Bruen*, 142 S.Ct. at 2127

1    (emphasis added) (citing *Heller*, 554 U.S. at 592). The right to keep and bear arms clearly protects

2    *preparedness* for self-defense not just the *actuality* of self-defense; to read it as the State does, the

3    protections of the Second Amendment wouldn't kick in until the moment a person is compelled to

4    fire upon another person as means of repelling deadly force.

5         *Heller* spoke of common use in the context of possession, not as a quantitative measurement

6    of the shots that are actually fired. Accordingly, the State's discredited study is not relevant.[5]

7    Furthermore, as detailed in Plaintiffs' responses to the State's SOUMF, magazines of the kind the

8    State bans are particularly useful when one is confronted by multiple assailants, Resp. to Def.

9    SOUMF No. 4,  and studies show that high-stress situations, such as self-defense encounters, affect

10   the ability of even well-trained shooters to fully hit their mark, such that LCMs can indeed provide

11   important additional protection for the average citizen who lacks specialized training in accuracy and

12   reloading magazines while under stress, *id.*

13        Again, what matters is that these magazines are typically *possessed* by law-abiding citizens

14   for lawful purposes. *Fyock*, 25 F. Supp.3d at 1276; *see also Caetano*, 577 U.S. at 420 ("The more

15   relevant statistic is that '[h]undreds of thousands of Tasers and stun guns have been sold to private

16   citizens,' who it appears may lawfully possess them in 45 States") (Alito, J., concurring). The test is

---

18   [5] Ms. Allen admits that her study, insofar as it relied upon anecdotal stories published in an NRA
19   magazine feature called "Armed Citizen," has not been updated since 2017. (Allen Decl., ¶ 9, n.5).
     Her study was also presented and relied upon by the State in both *Duncan v. Bonta*, S.D. Cal. No.
20   3:17-cv-1017-BEN (JLB), and *Miller v. Bonta*, S.D. Cal. No. 19-cv-1537-BEN (JLB). However, she
     admitted in those cases and elsewhere that her study was not compiled scientifically. *See Duncan v.*
21   *Becerra*, 265 F. Supp.3d 1106, 1129 (S.D. Cal. 2017); *Miller v. Bonta*, 542 F. Supp.3d 1009, 1044-
     45 (S.D. Cal. 2021) ("[a]s she acknowledged in her declaration submitted in *Duncan v. Becerra*, the
22   NRA-ILA Armed Citizen Database is not compiled scientifically"), vacated and remanded, 2022 WL
     3095986 (9th Cir. Aug. 1, 2022); *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Grewal*, No. 3:17-
23   cv-10507-PGS-LHG, 2018 WL 4688345 ("*ANJRPC*"), at *5 (D.N.J. Sept. 28, 2018) ("Allen
     conceded that the NRA Armed Citizen Database is not a scientific study and is not representative of
24   overall statistics on the use of arms in self-defense."), aff'd sub nom. *Ass'n of New Jersey Rifle &*
     *Pistol Clubs, Inc. v. Att'y Gen. New Jersey*, 910 F.3d 106 (3d Cir. 2018). Judge Benitez's fuller
25   criticism of Ms. Allen's study and conclusions is found at *Miller v. Bonta*, 542 F. Supp.3d at 1042-
     45 ("Allen's opinion about the number of shots fired in self-defense is entitled to little weight and
26   fails the scientific method."); *see also ANJRPC*, 2018 WL 4688345, at *12 ("The Court finds Allen
     [has not] provided a clear analysis based on the various studies. Allen's analysis, based on an NRA
27   report, does not support with statistical reliability her claim that individuals only use an average of
     2.2 or 2.3 bullets when using handguns in self-defense."); *see also* Resp. to DSOUMF No. 4.

28

1  possession and not use, and that is an issue on which the State bears the burden as part of the historical

2  analysis. *Teter*, 76 F.4th at 950.

3        The State's *necessity* arguments fundamentally harken back to the Supreme Court's warning

4  in *Heller*: "The very enumeration of the [Second Amendment] right takes out of the hands of

5  government—even the Third Branch of Government—the power to decide on a case-by-case basis

6  whether the right is *really worth* insisting upon." *Heller*, 554 U.S. at 634. Indeed, laws and policies

7  based on demonstration of a "need" apart from the mere intention to engage in the lawful exercise of

8  one's Second Amendment rights are cut from the same cloth as the "special need" requirement of

9  New York's carry licensing scheme that was struck down in *Bruen* as unconstitutional. And now

10  *Bruen* has confirmed that *Heller* was itself designed to eliminate such interest-balancing

11  considerations altogether. *See Bruen*, 142 S.Ct. at 2129 ("Not only did *Heller* decline to engage in

12  means-end scrutiny generally, but it also specifically ruled out the intermediate-scrutiny test that

13  respondents and the United States now urge us to adopt."). The State is therefore foreclosed from

14  elevating its judgments—and the judgments of its paid experts—as to what is "really needed" by

15  ordinary citizens, above the judgments of the citizens themselves. *See Bruen*, 142 S.Ct. at 2129

16  (*Heller* rejected any framework that "'asks whether the statute burdens a protected interest in a way

17  or to an extent that is out of proportion to the statute's salutary effects upon other important

18  governmental interests'") (quoting *Heller*, 554 U.S. at 634). As with handguns, the American people

19  have spoken, overwhelmingly, in favor of higher capacity firearms and, as with handguns, "[t]here

20  are many reasons that a citizen may prefer" a LCM in equipping their semiautomatic firearms. *Heller*,

21  554 U.S. at 629. But *whatever* the reason for their popularity, they represent a choice of law-abiding

22  citizens for engaging in the exercise of their Second Amendment rights, "and a complete prohibition

23  of their use is invalid." *Id.*

24      **5.**    **The State Has Failed to Meet Its Burden Under *Bruen* to Show "Relevantly**
                **Similar" Historical Analogues Justifying This Ban.**
25

26        Once again, *Heller* and *Bruen* have already done the historical work here by adopting and

27  affirming that *Heller*'s common-use test stems from its analysis of the "historical traditions"

28

prohibiting dangerous and unusual weapons. If this Court finds that the arms in question are in common use, for lawful purposes—which it must—no further historical analysis is needed, because the Supreme Court has already determined which "arms" may be banned consistent with an "historical tradition," that is, those that are not "in common use today," but rather are "highly unusual in society at large." *Bruen*, 142 S.Ct. at 2143 (citing *Heller*, 554 U.S. at 627).

Here, the State has also failed to meet its burden under *Bruen* to show through relevant historical analogues that its regulation "is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Bruen*, 142 S.Ct. at 2130. The State has failed to meet its burden under *Bruen* as none of the 348 laws it has offered as historical evidence contained within its Appendix[6] is on point. Dkt. No. 125-2.

Instead, the State's compilation confirms what we already know, i.e., while there may be some tradition of regulating "dangerous and unusual weapons" under *Heller*, there are no constitutionally relevant historical analogues that are "relevantly similar" to a ban on arms commonly possessed by ordinary citizens. And there are specifically no regulations, much less *bans*, on the *capacity* of magazines or rounds of firearms ammunition in general. *Bruen*, 142 S.Ct. at 2132.

The State's argument that the LCMs themselves represent a "dramatic technological change" which requires a "more nuanced analogical approach," Def. Amended Opp. & Cross-MSJ at 3, is misplaced, because the "more nuanced approach" that was discussed in *Bruen* concerns the determination of what constitutes a proper historical analogue. A "more nuanced analogical approach" is not a license to resurrect means-end interest balancing or to otherwise circumvent or

---

[6] The State submitted this same survey in both *Duncan v. Bonta*, S.D. Cal. No. 3:17-cv-1017-BEN (JLB) (Dkt. No. 139) and in *Miller v. Bonta*, S.D. Cal. No. 3:19-cv-1537-BEN (JLB) (Dkt. No. 166). In a further brief that the State was requested to file in *Duncan* regarding "the best historical regulation that is a proper analogue and relevantly similar to a statewide prohibition on possession of an ammunition feeding device or a limit on the amount of ammunition," the State filed a supplemental brief in which it identified the gunpowder storage laws, historical restrictions on the carrying of concealable weapons, and prohibitions on the use of trap guns as the laws/regulations that it claimed to be most relevant to the State's modern-day LCM restrictions. (*Duncan*, Dkt. No. 143, at pp. 1-2). The State repeats its reliance on such laws here. *See* DSOUMF Nos. 39-53.

lessen the burden the government must carry. The relevant passage from *Bruen* reads:

> While the historical analogies here and in *Heller* are relatively simple to draw, other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach. The regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868. Fortunately, the Founders created a Constitution—and a Second Amendment—"intended to endure for ages to come, and consequently, to be adapted to the various crises of human affairs." *McCulloch v. Maryland, 4 Wheat.* 316, 415, 4 L.Ed. 579 (1819) (emphasis deleted). Although its meaning is fixed according to the understandings of those who ratified it, the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated. See, e.g., *United States v. Jones*, 565 U.S. 400, 404–405, 132 S.Ct. 945, 181 L.Ed.2d 911 (2012) (holding that installation of a tracking device was "a physical intrusion [that] would have been considered a 'search' within the meaning of the Fourth Amendment when it was adopted").

*Bruen*, 142 S.Ct. at 2132. The Court went on to explain that "[m]uch like we use history to determine which modern 'arms' are protected by the Second Amendment, so too does history guide our consideration of modern regulations that were unimaginable at the founding. When confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy—a commonplace task for any lawyer or judge." *Id*. Therefore, the "more nuanced approach" that may be required occurs within the context of determining what constitutes a proper historical analogue, not simply an updated justification as to why the law today furthers an important governmental interest. To be clear, *Bruen* held that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct, and to justify its regulation, "*the government may not simply posit that the regulation promotes an important interest*. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." 142 S.Ct. at 2126 (emphasis added). Otherwise, the State's argument that its ban on LCMs addresses "dramatic technological changes" is simply interest-balancing by another name or a means of shirking its actual burden.

The State has submitted a survey of 348 purported laws (previously submitted in both *Duncan* and *Miller*, as noted *supra*), but fails to identify any analogue from the relevant (Founding) era that restricted firearm capacity. The State cites no Founding-era regulations on firing capacity restrictions,

or even restrictions on the types of weapons that people could own at all. Instead, it cites only gunpowder storage laws, historical restrictions on the *manner* of carrying (e.g., prohibitions on the carry of certain weapons in a concealed manner), and historical restrictions on "trap guns." These regulations are neither analogous nor relevant to show that the State's LCM Ban is "part of an enduring American tradition of state regulation." *Bruen*, 142 S.Ct. at 2155; *see* Pltf. Resp. to DSOUMF Nos. 39-53 (detailing the lack of relevant similarity of these laws under the *Bruen* framework). Moreover, those analogues were not enough to carry the day for the state of New York in *Bruen*, where carry in public was the Second Amendment conduct being prohibited. And as the Ninth Circuit recently recognized, laws that prohibited the manner of carrying a particular arm are not relevant to show any historical tradition of banning the arm itself. *Teter*, 76 F.4th at 951 ("As *Bruen* put it, the 'how' of the proffered state statutes is different—they regulate different conduct. [...] the vast majority of the statutes cited by Hawaii did not ban the possession of knives; they regulated on their *carry*.") (citing *Bruen*, 142 S.Ct. at 2133).

The State tries to fill its evidentiary void with the assertion that today's weapons represent a "dramatic technological change," LCMs are "not by any means the same technology as [...] early repeating rifles," and thus the legislatures of the day would not have seen any need to enact such restrictions during the relevant historical period. Amended Opp. & Cross-MSJ at 21. But again, the State must meet its burden under *Bruen* by showing relevantly similar *regulations*, not by manufacturing theories or explanations as to why there was no need for such regulations during the founding era. In considering history, courts are to engage in "reasoning by analogy." *Bruen*, 142 S.Ct. at 2132. This "analogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin" to the challenged regulation. *Id.* at 2133. But to be a genuine "analogue," the historical tradition of regulation identified by the government must be "relevantly similar" to the restriction before this Court. *Id.* at 2132. Two "metrics" are particularly salient in determining if a historical regulation is "relevantly similar": "[1] how and [2] why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133. By considering these two metrics, a court can determine if the government has demonstrated that a "modern-day

regulation" is "analogous enough" to "historical precursors" that the regulation may be upheld as consistent with the Second Amendment's text and history. *Id.* And importantly, the burden rests on the government to identify a sufficiently close historical analogue to justify the challenged restriction. *Id.* at 2135. Here, the State has not identified any relevant historical regulations, the "how" *or* "why" of which would justify the LCM Ban. *See* Pltf. Resp. to DSOUMF Nos. 39-53.

The relevant era is our Nation's Founding era. *See* Mark W. Smith, *Attention Originalists: The Second Amendment Was Adopted in 1791, Not 1868*, HARV. J. L. & PUB. POL'Y PER CURIAM, (Fall 2022), available at https://bit.ly/4893EyY. In *Bruen*, the Court emphasized that "not all history is created equal. 'Constitutional rights are enshrined with the scope they were understood to have when the people adopted them.' […] The Second Amendment was adopted in 1791; the Fourteenth in 1868." 142 S.Ct. at 2136 (citing *Heller*, 554 U.S. at 634-35. And thus, the Court cautioned against "giving postenactment history more weight than it can rightly bear." *Bruen*, 142 S.Ct. at 2136. And "to the extent later history contradicts what the text says, the text controls." *Bruen*, 142 S.Ct. at 2137 (citing *Gamble v. United States*, 587 U.S. ___, 139 S.Ct. 1960, 1987 (2019) (Thomas, J., concurring)).

Further, in examining the relevant history that was offered, the Court noted that "[a]s we recognized in *Heller* itself, because post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources.'" *Bruen*, 142 S.Ct at 2137 (citing *Heller*, 554 U.S. at 614). While there exists an "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)," *id. Bruen* at 2138, the Court has "generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791," *id.* at 2137 (citations omitted). Perhaps the Court was signaling that parties in future cases should address the issue for the Court, but it was certainly not overruling cases in which it had, dispositively, "look[ed] to the statutes and common law of the founding era to determine the norms that the [Bill of Rights] was meant to preserve." *See, e.g.*, *Virginia v. Moore*,

553 U.S. 164, 168 (2008) (Fourth Amendment). And while the Court in *Heller* itself had reviewed materials published after adoption of the Bill of Rights, it did so to shed light on the public understanding in 1791 of the right protected by the Second Amendment, and only after surveying what it regarded as a wealth of authority for its reading—including the text of the Second Amendment and state constitutions. "The 19th-century treatises were treated as mere confirmation of what the Court had already been established." *Bruen*, 142 S.Ct. at 2137 (citing *Gamble*, 139 S.Ct. at 1976).

Therefore, 1791 must be the controlling time for the constitutional meaning of Bill of Rights provisions incorporated against the States by the Fourteenth Amendment because, as in *Heller*, the Court has looked to 1791 when construing the Bill of Rights against the federal government and, as in *McDonald*, the Court has established that incorporated Bill of Rights provisions mean the same thing when applied to the States as when applied to the federal government. *See McDonald v. City of Chicago*, 561 U.S. at 765. *Bruen* did not disturb these precedents, and they are therefore binding on lower courts. *See State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997). This seals the fate of the LCM Ban. Beyond the historical misfits that the State cites, the only thing else it proffers in support of the Ban is a bevy of *20th century* firearms regulations, *see* DSOUMF Nos. 54-56, which need not and should not even be considered given that they could provide nothing relevant to the analysis under *Bruen*. 142 S.Ct. at 2154, n.28 ("We will not address any of the 20th-century historical evidence brought to bear by respondents or their amici. As with their late-19th-century evidence, the 20th-century evidence presented by respondents and their amici does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence."). Therefore, under *Bruen*, some things cannot be appropriate historical analogues: 20th-century restrictions, laws that are rooted in racism, laws that have been subsequently overturned (such as total handgun bans), and as noted, laws that are clearly inconsistent with the original meaning of the constitutional text. *Bruen* at 2137 ("[P]ost-ratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text") (citing *Heller II*, 670 F.3d at 1274 n.6 (Kavanaugh, J., dissenting)). These sources of evidence must be disregarded.

In short, the State offers no relevant, "well established and representative" historical

analogues that would support its ban on LCMs, the "how and why" of which could in any way justify this ban. *Bruen*, 142 S.Ct. at 2133.

**B.   TAKINGS AND DUE PROCESS CLAIM**

    **1.    The Court Must Examine the Character of the Taking, in Relation to its Stated Public Purpose.**

The Individual Plaintiffs who legally acquired pre-ban magazines that the LCM Ban now requires them to surrender have shown the law constitutes a taking. Tracking the reasoning of the en banc panel in *Duncan*, 19 F.4th 1087, 1113, the State argues that section 32310 does not effect a taking because it does not compel a physical invasion of the individual Plaintiffs' property. Def. Amended Opp. & Cross-MSJ at 35, citing *Laurel Park Community, LLC v. City of Tumwater*, 698 F.3d 1180, 1188 (9th Cir. 2012)). But in the first instance, as already explained, a direct physical appropriation of property is not required to constitute a taking. *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538 (2005) (compensable takings under the Fifth Amendment occur when such regulations "completely deprive an owner of 'all economically beneficial us[e]' of her property.")

The Supreme Court rejected the direct-appropriation requirement in *United States v. Security Industrial Bank*, 459 U.S. 70 (1982), in which the Court considered the effect that a bankruptcy statute had which, retroactively applied, would have operated to avoid liens on the debtors' property that had attached before the statute was enacted. In rejecting the government's claim, similar to the one being advanced here regarding direct appropriations, the Court observed:

> The government seeks to distinguish [*Armstrong v. United States*, 364 U.S. 40, 80 S.Ct. 1563 (1960)] on the ground that it was a classical 'taking' in the sense that the government acquired for itself the property in question, while in the instant case the government has simply imposed a general economic regulation which in effect transfers the property interest from a private creditor to a private debtor. While the classical taking is of the sort that the government describes, our cases show that takings analysis is not necessarily limited to outright acquisitions by the government for itself.

*Security Industrial Bank*, 459 U.S. at 77-78 (citing *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982); *PruneYard Shopping Center v. Robins*, 447 U.S. 74 (1980); *Pennsylvania Coal*

*Co. v. Mahon*, 260 U.S. 393, 415 (1922)).

There can be no doubt that the LCM Ban is confiscatory in effect, and is therefore a *per se* taking. The State attempts to disguise the confiscatory nature of its ban by relying upon the purported "options" reflected in Pen. Code § 32310(d). But these "options" are merely illusory, for the reasons discussed in Plaintiffs' opening memorandum, at pp. 25-27. The State's opposition/motion, relying upon the dystopian language in the en banc decision in *Duncan*, 19 F.4th at 1113, which characterized the State's efforts as simply "opt[ing] to assist owners in the safe disposal of large-capacity magazines by empowering law enforcement agencies to accept magazines voluntarily tendered for destruction," is Orwellian Newspeak at its best, and reveals the true motive. The State is no more "assisting" gun owners in the voluntary surrender of their property than the City of New London, Connecticut was simply "assisting" Mrs. Kelo in transferring her property to a land developer. *See Kelo v. City of New London, Conn.*, 545 U.S. 469 (2005). And on that note, it is no answer for the State to claim that compelling the sale of valuable property to a third party somehow insulates its actions from being characterized as a taking—particularly in the absence of a viable sales market affording the opportunity to garner *fair market* value for this now-blacklisted property. ""(T)o constitute a taking under the Fifth Amendment it is not necessary that property be absolutely 'taken' in the narrow sense of that word to come within the protection of this constitutional provision; it is sufficient if the action by the government involves a direct interference with or disturbance of property rights. […] Nor need the government directly appropriate the title, possession or use of the properties[.]" *Richmond Elks Hall Ass'n v. Richmond Redevelopment Agency*, 561 F.2d 1327, 1330 (9th Cir. 1977) (citations omitted).

The State argues that there is a purported fourth "option" found in Pen. Code § 16470(a) which supposedly gives LCM owners the option of "modifying their LCMs permanently to hold no more than ten rounds." Amended Opp. & Cross-MSJ at 37. The statute says no such thing, but merely states the obvious: by definition, a magazine which does not hold more than 10 rounds is not an LCM. Otherwise, the State provides no guidance or choices as to what constitutes or effects such an alteration. It should be recalled that in December 2016, the DOJ initially promulgated proposed

1   "emergency" regulations by which, the Department claimed, it would "provide guidance to

2   California's gun owners so that by July 1, 2017, they will be in compliance with the law." Pltf. Req.

3   for Jud. Notice, Exh. A, p. 5, in support of PMSJ. The DOJ further asserted that "[t]he proposed

4   regulations provide options for disposal of large-capacity magazines, as well as instructions for

5   reducing the capacity of a large-capacity magazine, and need to be formalized and provided to

6   California residents as soon as possible." *Id.*  And in furtherance of such guidance, the Department

7   promulgated regulations touching on those subjects, among others. *See* Text of [Proposed]

8   Regulations, Cal. Code of Regulations, Title 11, Div. 5, submitted December 16, 2016. These

9   regulations, for example, would have provided guidance as to what constitutes "permanent

10  alterations" to standard box magazines, how to deal with drum or tubular-type magazines, or firearms

11  with integrated magazines, and for shotgun owners whose firearms may accommodate different size

12  shells. However, the DOJ withdrew its proposed regulations on December 29, 2016. No proposed

13  regulations of any kind have replaced them or even been proposed.

14         To the extent that the State claims that such permanent modifications to the subject magazines

15  only result in damage, but not their total destruction, again, art. I, § 19 of the California Constitution

16  specifically prohibits takings *or damage* to property without compensation. "Because the California

17  Constitution requires compensation for damage as well as a taking, the California clause ''protects a

18  somewhat broader range of property values' than does the corresponding federal provision[.]'" *Monks*

19  *v. City of Rancho Palos Verdes*, 167 Cal.App.4th 263, 294 (2008), as modified on denial of reh'g

20  (Oct. 22, 2008). Government action that effectuates a permanent physical invasion of property, *no*

21  *matter how slight*, constitutes a *per se* taking. *Cwynar v. City & County of San Francisco*, 90

22  Cal.App.4th 637, 652 (2001) (citing *Loretto*, 458 U.S. at 426; *Lucas v. South Carolina Coastal*

23  *Council*, 505 U.S. 1003, 1015 (1992)).

24         In looking at whether the regulations are indeed confiscatory, courts should not look strictly

25  to the form of the taking, but at the character of the government's action in relation to its intended

26  purpose. "'[I]t is only the taking's purpose, and not its mechanics,' [the Supreme Court] explained,

27  that matters in determining public use." *Kelo*, 545 U.S. at 482 (citing *Hawaii Housing Authority v.*

28

*Midkiff*, 467 U.S. 229, 244 (1984)). As *Laurel Park Community*, cited by the State and cited in *Duncan*, states: "'[T]he character of the governmental action—for instance whether it amounts to a physical invasion or instead merely affects property interests through some public program adjusting the benefits and burdens of economic life to promote the common good—may be relevant in discerning whether a taking has occurred. […] The government generally cannot 'forc[e] some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" *Laurel Park Community*, 698 F.3d at 1190 (citing *Lingle*, 544 U.S. at 539, and *Armstrong*, 364 U.S. at 49). Here, the State readily admits that the purpose of the large-capacity magazine ban is "to remove LCMs from circulation[.]" Def. Opp. to PMSJ at 49:15-16. It therefore admits that the law purports to serve a claimed public purpose and is not simply forcing dispossession of LCMs against individual gun owners to remedy some specific harm inflicted *by them*.

### 2. The State's Reliance Upon its Police Powers is Misplaced.

In effectuating this claimed public purpose, the State resorts to its standby argument: that "Section 32310 is a valid exercise of the State's police powers to protect the public by eliminating the dangers posed by LCMs." Amended Opp. & Cross-MSJ at 36. But even if so, the State's reliance upon its police powers is misplaced as to whether the action constitutes a taking. *See Loretto*, 458 U.S. at 425 (Assuming a valid exercise of the state's police power, the court stated: "It is a separate question, however, whether an otherwise valid regulation so frustrates property rights that compensation must be paid.").

Here, it doesn't matter if the confiscation was under the auspices of the State's police powers. Compensation must still be paid. The State's reliance upon *Akins v. United States*, 82 Fed. Cl. 619 (2008), and *Fesjian v. Jefferson*, 399 A.2d 861 (D.C. Ct. App. 1979), two cases that were submitted or decided before *Heller*, and the older police-power cases upon which they were grounded, is misplaced.

It should be noted that *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992) also involved the alleged exercise of a state's "police power." In *Lucas*, the owner of two beachfront lots intended to build houses there, but was prohibited by a statute forbidding any permanent inhabitable

structures on the land in question. 505 U.S. at 1008. The plaintiff sued in state court, and the South Carolina Supreme Court ultimately rejected his challenge under the Takings Clause, holding that in the legitimate exercise of its police power, the state could restrict his ability to use the land in order "to mitigate the harm to the public interest that [such a] use of his land might occasion." *Id.*, at 1020–21. The *Lucas* Court disagreed. It held that, when "the State seeks to sustain regulation that deprives land of all economically beneficial use, ... it may resist compensation only if the logically antecedent inquiry into the nature of the owner's estate shows that the proscribed use interests were not part of his title to begin with." *Id.*, at 1027. And thus, the high court remanded the case for the state courts to determine, under state law, whether "background principles of ... property law" prohibited the future uses that the owner intended. *Id.*, at 1031. Post-*Lucas*, the rule is simply this: Does the regulation in question result in the complete elimination of the property's value or beneficial use? If so, it amounts to the equivalent of a physical appropriation. *Lucas*, 505 U.S. at 1017; *Lingle*, 544 U.S. at 539–40. Compensation must therefore be paid.

The *Lucas* court itself strongly implied that "many of [its] prior opinions" which wrestled with the concept of "'harmful or noxious uses' of property" were simply "early attempt[s] to describe in theoretical terms why government may, consistent with the Takings Clause, affect property values by regulation without incurring an obligation to compensate—a reality we nowadays acknowledge explicitly with respect to the full scope of the State's police power." *Lucas*, 505 U.S. at 1022–23. With regard to these early cases, the court stated: "When it is understood that "prevention of harmful use" was merely our early formulation of the police power justification necessary to sustain (without compensation) any regulatory diminution in value; and that the distinction between regulation that "prevents harmful use" and that which "confers benefits" is difficult, if not impossible, to discern on an objective, value-free basis; *it becomes self-evident that noxious-use logic cannot serve as a touchstone to distinguish regulatory "takings"—which require compensation—from regulatory deprivations that do not require compensation.*" 505 U.S. at 1026 (emphasis added).

The State's reliance on *Fesjian* is also misplaced. *Fesjian* was a pre-*Heller* decision, applying a simple rational basis test to an important fundamental right, albeit on equal protection grounds. 399

A.2d at 864. After *Heller*, the proper inquiry on a Second Amendment claim would be whether the firearms themselves are in common use, for lawful purposes, and are not dangerous and unusual. *Heller*, 554 U.S. at 627. And as to the specific takings argument, it could fairly be said that in *Fesjian* the D.C. Court of Appeals simply assumed that all firearms could be summarily banned without compensation, in a pre-*Heller* District of Columbia. In one paragraph, where the court assumed arguendo that the D.C. statute prohibiting the plaintiffs (representing themselves in pro per) from registering their weapons was a taking, the court simply concluded that "a taking for the public benefit under a power of eminent domain is, however, to be distinguished from a proper exercise of police power to prevent a perceived public harm, which does not require compensation. [...] That the statute in question is an exercise of legislative police power and not of eminent domain is beyond dispute." *Fesjian*, 399 A.2d at 866. There was no discussion or analysis whatsoever as to whether the D.C. statute amounted to forced dispossession, or deprived plaintiffs of the economically beneficial use of their property, constituting a per se taking. Those Supreme Court takings cases came later. All pre-*Heller* takings cases involving firearms, including *Fesjian*, are inherently suspect.

### 3.    The Parallel Due Process Violation

Plaintiffs' takings claim also gives rise to a due process claim under the Fourteenth Amendment, and for all the same essential reasons: just as the Fifth Amendment to the United States Constitution provides that private property shall not "be taken for public use, without just compensation," the Fourteenth Amendment provides that "no person shall "be deprived of any person of life, liberty, or property, without due process of law." Despite the confiscatory nature of the LMC Ban, the State has not created, established, or otherwise provided for any process, remedy, or administrative body through which one whose LCM(s) have been targeted under the ban could seek compensation for the surrender/takings, compelled destruction, or significant diminution in value to their otherwise legally-owned firearm magazines. The State simply assumed that it could do so, under the auspices of its so-called "police powers," as it has freely admitted in this case. *See* Def. Resp. to PSOUMF No. 34. Thus, just as Plaintiffs are entitled to judgment in their favor on the Takings claim, the State must be adjudged to have violated the proscription against deprivations of property without

due process of law.

### C.  EQUAL PROTECTION CLAIM

Regarding the equal protection claim, the State purportedly makes short work of it by quickly reverting back to the notion that the claim is subject to no more than rational basis scrutiny. So, the State says, it's enough to simply rest on the speculative notion that the Hollywood exception "would benefit an important sector of the California economy"—i.e., the movie business—while disregarding entirely the impact on all the ordinary law-abiding citizens of California who don't fall within this elitist class. Def. Opp. to PMSJ at 51-52.  But this Court cannot simply ignore that impact, because the overarching problem that this disparate treatment under the law "impermissibly interferes with the exercise of a fundamental right," *Mass. Bd. of Retirement v. Murgia*, 427 U.S. 307, 312 (1976), for all the reasons discussed above. And that requires strict scrutiny of the law. *Id.* Again, the State has not even argued, much less shown, that the law survives such scrutiny. Thus, under a proper analysis, summary judgment must be entered in favor of Plaintiffs on this claim.

—◆—

This Court should also reject any request to impose a stay on the enforcement of a judgment in favor of Plaintiffs. The State's arguments in support of such a preemptive strike against the judgment all center around their thesis that this is an otherwise valid law aimed at achieving "important public-safety" purposes. Def. Opp. to PMSJ at 54-56. But scrutiny of the law under *Bruen* strips away this facade, exposing what is at base an unconstitutional restriction against the exercise of fundamental civil liberties, devoid of any legitimate justification another the controlling law. While the State laments the idea of people "be[ing] able to lawfully acquire" LCM after a 20-year prohibition, Def. Opp. to PMSJ at 55, that is exactly what *Bruen* demands, and the law-abiding citizens of California should not be forced to endure this prohibition even one more day.

### III.  CONCLUSION

For these reasons, Plaintiffs respectfully request entry of summary judgment in their favor.

Dated: September 8, 2023                    THE DIGUISEPPE LAW FIRM, P.C.


                                           /s/ Raymond M. DiGuiseppe
                                           Raymond M. DiGuiseppe

                                           SEILER EPSTEIN LLP


                                           /s/ George M. Lee
                                           George M. Lee

                                           *Attorneys for Plaintiffs*