1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VIRGINIA DUNCAN, et al.,<br><br>                    Plaintiffs,<br><br>v.<br><br>ROB BONTA, in his capacity as Attorney General of the State of California,<br><br>                    Defendant. | Case No.:  17-cv-1017-BEN (JLB)<br><br>**DECISION** |

    We begin at the end.  California's ban and mandatory dispossession of firearm magazines holding more than 10 rounds (California Penal Code § 32310(c) and (d)), as amended by Proposition 63, was preliminarily enjoined in 2017.[1]  That decision was affirmed on appeal.[2]  In 2019, summary judgment was granted in favor of Plaintiffs and § 32310 in its entirety was judged to be unconstitutional.[3]  Initially, that decision was also

---

[1] *Duncan v. Becerra*, 265 F. Supp. 3d 1106, 1138 (S.D. Cal. 2017).
[2] *Duncan v. Becerra*, 742 F. App'x 218, 221 (9th Cir. 2018).
[3] *Duncan v. Becerra*, 366 F. Supp. 3d 1131, 1133 (S.D. Cal. 2019).

affirmed on appeal.[4]  However, the decision was re-heard and reversed by the court of appeals *en banc*.[5]  In 2022, the United States Supreme Court granted certiorari, vacated the appellate *en banc* decision, and remanded the case.[6]  The court of appeals, in turn, remanded the case to this Court "for further proceedings consistent with *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022)."[7]  All relevant findings of fact and conclusions of law set forth in the prior decision concluding § 32310 is unconstitutional are incorporated herein.

## I.  **INTRODUCTION**

"There is a long tradition of widespread lawful gun ownership by private individuals in this country," according to the United States Supreme Court.[8]  Americans have an individual right to keep and bear firearms.[9]  The Second Amendment to the United States Constitution "guarantee[s] the individual right to possess and carry weapons in case of confrontation."[10]  This guarantee is fully binding on the States and limits their ability to devise solutions to social problems.[11]  And the guarantee protects "the possession of weapons that are 'in common use,'"[12] or arms that are "typically

---

[4] *Duncan v. Becerra*, 970 F.3d 1133, 1147 (9th Cir. 2020), *reh'g en banc granted, opinion vacated*, 988 F.3d 1209 (9th Cir. 2021).

[5] *Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021) (*en banc*).

[6] *Duncan v. Bonta*, 142 S. Ct. 2895 (2022).

[7] *Duncan v. Bonta*, 49 F.4th 1228, 1231 (9th Cir. 2022).

[8] *Staples v. United States*, 511 U.S. 600, 610 (1994).

[9] *District of Columbia v. Heller*, 554 U.S. 570, 630 (1980).

[10] *Id.* at 606 (quoting 2 Tucker's Blackstone 143) ("This may be considered as the true palladium of liberty …. The right to self defence is the first law of nature:  in most governments it has been the study of rulers to confine the right within the narrowest limits possible.").

[11] *McDonald v. City of Chicago, Illinois*, 561 U.S. 742, 785 (2010) (emphasis in original).

[12] *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2128 (2022).

possessed by law-abiding citizens for lawful purposes."[13] These are the decisions this Court is bound to apply.  "It's our duty as judges to interpret the Constitution based on the text and original understanding of the relevant provision—not on public policy considerations, or worse, fear of public opprobrium or criticism from the political branches."[14]

This case is about a California state law that makes it a crime to keep and bear common firearm magazines typically possessed for lawful purposes.  Based on the text, history, and tradition of the Second Amendment, this law is clearly unconstitutional.

The detachable firearm magazine solved a problem with historic firearms: running out of ammunition and having to slowly reload a gun.[15] When more ammunition is needed in case of confrontation, a larger the magazine is required.  Many gun owners want to have ready more than 10 rounds in their guns.  As a result, in the realm of firearms, magazines that hold more than 10 rounds are possibly the most commonly owned thing in America.  These larger magazines number over one hundred million.  For handguns, the most popular sizes range up to 17 rounds; the most popular size for rifles is

---

[13] *Caetano v. Massachusetts*, 577 U.S. 411, 416 (Alito and Thomas concurring) (quoting *Heller*, 554 U.S. at 625, in turn quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)) ("We therefore read *Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes."

[14] *United States v. Rahimi*, 61 F.4th 443, 462 (5th Cir. 2023) (Ho, J., concurring) (citations omitted).

[15] *United States v. Gonzalez*, 792 F. 3d. 534, 536–37 (5th Cir. 2015) ("The problem of limited ammunition capacity has plagued rifles since their invention centuries ago.  The earliest rifles fired a single shot, leaving the user vulnerable during reloading.  Numerous inventions have sought to eliminate this problem.  But from repeating rifles to clips, none has proved as effective as the magazine.") (citing David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 ALB. L. R. 849 (2015)).

30 rounds. Yet, regardless of the overwhelming popularity of larger magazines, California continues to prohibit any magazine capable of holding more than 10 rounds.[16]

There is no American tradition of limiting ammunition capacity and the 10-round limit has no historical pedigree and it is arbitrary and capricious. It is extreme. Our federal government and most states impose no limits[17] and in the states where limits are imposed, there is no consensus. Delaware landed on a 17-round magazine limit.[18] Illinois and Vermont picked limits of 15 rounds for handguns and 10 rounds for a rifles.[19] Colorado went with a 15-round limit for handguns and rifles, and a 28-inch tube limit for shotguns.[20] New York tried its luck at a 7-round limit; that did not work out.[21] New Jersey started with a 15-round limit and then reduced the limit to 10-rounds.[22] The fact

---

[16] *See* Cal. Penal Code § 32310 and § 16740. The term "large-capacity magazine" is defined in California Penal Code § 16740 as "any ammunition feeding device with the capacity to accept more than 10 rounds," but excludes: (a) a "feeding device that has been permanently altered so that it cannot accommodate more than 10 rounds," (b) a ".22 caliber tube ammunition feeding device," and (c) a "tubular magazine that is contained in a lever-action firearm."

[17] Federal law imposes only a sentencing enhancement. United States Sentencing Guideline § 2K2.1(a)(4)(B) increases the base offense level for a violation of 18 U.S.C. § 922(g)(1) (felon in possession) when the offense involves a firearm with an attached magazine larger than 15 rounds. *United States v. Lucas*, No. 22-50064, 2023 U.S. App. LEXIS 14768, at *7 (9th Cir. June 14, 2023).

[18] *Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*, Civil Action No. 22-951-RGA, 2023 U.S. Dist. LEXIS 51322, at *4 (D. Del. Mar. 27, 2023) ("'Large-capacity magazine[s]' are those 'capable of accepting, or that can readily be converted to hold, more than 17 rounds of ammunition.'").

[19] 720 ILCS 5/24-1.10(a); Vt. Stat. Ann. tit. 13, § 4021.

[20] Colo. Rev. Stat. Ann. § 18-12-301.

[21] The 7-round limit was found to be unconstitutional. *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 269 (2d Cir. 2015).

[22] "New Jersey once imposed a fifteen-round limit on magazine capacity. Now it claims a lower limit of ten is essential for public safety. The Second Amendment demands more than back-of-the-envelope math." *Ass'n of N.J. Rifle & Pistol Clubs Inc. v. AG N.J.*, 974 F.3d 237, 260 (3d Cir. 2020) (Matey, J. dissenting).

that there are so many different numerical limits demonstrates the arbitrary nature of magazine capacity limits.

In a stealth return to the interest balancing test rejected by *Heller* and *Bruen*, the State ostensibly justifies its magazine limits by deeming the smaller magazines "well-suited" for its citizens.[23]  Suitability, in turn, is based on concocted statistics about what a hypothetical average person needs to defend against an attacker or attackers in an average self-defense situation.  Based on this hypothetical statistically average case scenario, the State permits its citizen to have a gun, but the State decides the number of rounds in the gun that it finds suitable.[24]

_____

[23] At least a dozen times in its briefing before this Court, the State of California insists magazines larger than 10 rounds are unsuitable.  Here are some examples.  "[T]he Attorney General has demonstrated that LCMs are not necessary or even *suitable* to engage in private self-defense."  Dkt. 145, at 9.  "Nor are LCMs particularly *suitable* for self-defense."  Dkt. 142, at 8.  "[T]he accessory at issue here (an LCM) is not *well-suited* for lawful self-defense."  *Id.*

[24] And be grateful for 10 rounds.  *Duncan*, 19 F.4th at 1168 n.10, *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022), *and vacated and remanded*, 49 F.4th 1228 (9th Cir. 2022) (Bumatay, J., dissenting) ("California currently allows more than 2.2 rounds in a magazine, and does not prohibit carrying multiple magazines.  But don't be fooled.  Under the majority's Version 2.2 of the Second Amendment, there is no reason a state couldn't limit its citizens to carrying a (generous) 3 rounds total for self-defense.").

As this Court explained in its prior decision, "[a]rtificial limits will eventually lead to disarmament.  It is an insidious plan to disarm the populace and it depends on for its success a subjective standard of 'necessary' lethality.  It does not take the imagination of Jules Verne to predict that if all magazines over 10 rounds are somehow eliminated from California, the next mass shooting will be accomplished with guns holding only 10 rounds.  To reduce gun violence, the state will close the newly christened 10-round 'loophole' and use it as a justification to outlaw magazines holding more than 7 rounds.  The legislature will determine that no more than 7 rounds are 'necessary.'  Then the next mass shooting will be accomplished with guns holding 7 rounds.  To reduce the new gun violence, the state will close the 7-round 'loophole' and outlaw magazines holding more than 5 rounds determining that no more than 5 rounds are 'suitable.'  And so it goes, until the only lawful firearm law-abiding responsible citizens will be permitted to possess is a single-shot handgun.  Or perhaps, one gun, but no ammunition.  Or ammunition issued only to persons deemed trustworthy."  *Duncan*, 366 F. Supp. 3d at 1146 n.33.

In so doing, the State denies a citizen the federal constitutional right to use common weapons of their own choosing for self-defense. There have been, and there will be, times where many more than 10 rounds are needed to stop attackers.[25] Yet,

---

[25] Some have wishfully believed "there is no evidence that anyone ever has been unable to defend his or her home and family due to the lack of a large-capacity magazine," or that more than 10 rounds is ever needed. But there is actually the evidence to support this. In fact, the State's own expert reports otherwise.

*See Duncan*, 366 F. Supp. 3d at 1134 ("As two masked and armed men broke in, Susan Gonzalez was shot in the chest. She made it back to her bedroom and found her husband's .22 caliber pistol. Wasting the first rounds on warning shots, she then emptied the single pistol at one attacker. Unfortunately, now out of ammunition, she was shot again by the other armed attacker. She was not able to re-load or use a second gun. Both she and her husband were shot twice. Forty-two bullets in all were fired. The gunman fled from the house—but returned. He put his gun to Susan Gonzalez's head and demanded the keys to the couple's truck.

When three armed intruders carrying what look like semi-automatic pistols broke into the home of a single woman at 3:44 a.m., she dialed 911. No answer. Feng Zhu Chen, dressed in pajamas, held a phone in one hand and took up her pistol in the other and began shooting. She fired numerous shots. She had no place to carry an extra magazine and no way to reload because her left hand held the phone with which she was still trying to call 911. After the shooting was over and two of the armed suspects got away and one lay dead, she did get through to the police. The home security camera video is dramatic.

A mother, Melinda Herman, and her nine-year-old twins were at home when an intruder broke in. She and her twins retreated to an upstairs crawl space and hid. Fortunately, she had a .38 caliber revolver. She would need it. The intruder worked his way upstairs, broke through a locked bedroom door and a locked bathroom door, and opened the crawl space door. The family was cornered with no place to run. He stood staring at her and her two children. The mother shot six times, hitting the intruder five times, when she ran out of ammunition. Though injured, the intruder was not incapacitated. Fortunately, he decided to flee.") (Citations omitted).

More examples have been reported since those words were written. When four suspects in a stolen car with stolen guns and ammunition used stolen house keys to enter the victims' home in Tallahassee, Florida at 3:37 a.m., the victim fired 25 rounds before the suspects retreated out of the home. *Police: Tallahassee homeowner shot 2 out of 4 home invasion suspects, all 4 charged*, ABC27 WTXL (May 24, 2019) https://www.wtxl.com/news/local-news/tpd-investigating-home-invasion-robbery [https://perma.cc/AQ36-S2ZH].

under this statute, the State says "too bad."  It says, if you think you need more than 10 chances to defend yourself against criminal attackers, you must carry more magazines. Or carry more bullets to hand reload and fumble into your small magazine while the attackers take advantage of your pause.  On the other hand, you can become a criminal, too.  So, the previously law-abiding California citizen who buys and keeps at her bedside a nationally popular Glock 17 (with its standard 17-round magazine) becomes the criminal, because the State dictates that a gun with a 17-round magazine is not well-suited for home defense.[26]

---

In Kentucky, when a home intruder wearing a bulletproof vest shot and killed one daughter asleep in her bed, the father awoke and needed to fire 11 shots from one gun and 8 shots from a second gun, while suffering 3 gunshot wounds himself, to protect his other daughter, his wife, and himself.  Krista Johnson and Hayes Gardner, *Jordan Morgan's death: Suspect Shannon Gilday arrested in Madison County*, Louisville Courier J. (Feb. 28, 2022), https://www.courier-journal.com/story/news/local/2022/02/28/shannon-gilday-arrested-in-jordan-morgan-richmond-ky-shooting/6941351001/ [https://perma.cc/Q49M-ZFF9].

On a Chicago train this year, a citizen was robbed at gunpoint by a suspect who had been previously arrested 32 times.  The victim, a bank security guard, shot back 18 times (4 of the rounds jammed) before the suspect retreated off the train.  *Arrested 32 times since 2014, man allegedly engaged in a 'firefight' with a concealed carry holder on a CTA train*, CWBChicago (Jan. 22, 2023), https://cwbchicago.com/2023/01/arrested-32-times-since-2014-man-allegedly-engaged-in-a-firefight-with-a-concealed-carry-holder-on-a-cta-train.html [https://perma.cc/EAV2-8F2E].

[26] Criminals sometimes do not abide by gun regulations and pass around "gang guns" with magazines larger than 10 rounds.  *See, e.g.*, *People v. Cyrus*, No. E075271, 2023 Cal. App. Unpub. LEXIS 1301, at *5 (Mar. 3, 2023) (describing a Glock .40 cal. handgun and 29-round magazine and explaining, "[a] 'gang gun' is a gun that is passed around the gang and used by numerous gang members to commit crimes.).

Numbers vary, but some estimate that 81 million Americans own between 415[27] and 456[28] million firearms.  Further, millions of Americans across the country own large capacity magazines.  "One estimate . . . shows that . . .  civilians possessed about 115 million LCMs out of a total of 230 million magazines in circulation.  Put another way, half of all magazines in America hold more than 10 rounds."[29] A more recent large-scale survey estimates that Americans today own 542 million rifle and handgun magazines that hold more than 10 rounds.[30]  Home defense and target shooting are the two most common reasons for owning these larger magazines.[31]  Moreover, the survey reports 48% of gun owners have owned a handgun or rifle magazine that holds more than 10 rounds.[32] But California bans these typically possessed magazines kept and used for self-defense.

Why are larger magazines chosen for self-defense?  Crime happens a lot.  One recent estimate holds that guns are needed defensively approximately 1,670,000 times a year.[33]  Another report, originally commissioned and long cited by the Centers for Disease Control and Prevention estimated that there are between 500,000 and 3,000,000

---

[27] William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* 7 (Geo. McDonough Sch. of Bus. Rsch. Paper No. 4109494, 2022), available at https://ssrn.com/abstract=4109494 [https://perma.cc/83XT-75YG].

[28] *See* Suppl. Decl. of Louis Klarevas, Dkt. 137-5 ("Suppl. Klarevas Decl."), at ¶ 15 and n.13.

[29] *Duncan*, 970 F.3d at 1142, *reh'g en banc granted, opinion vacated*, 988 F.3d 1209 (9th Cir. 2021), *and on reh'g en banc sub nom. Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021), *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022), *and vacated and remanded*, 49 F.4th 1228 (9th Cir. 2022).

[30] English, *supra*, at 25 ("These estimates suggest that Americans have owned some 542 million rifle and handgun magazines that hold over 10 rounds.").  Plaintiff's expert, Stephen Helsley, a retired California Department of Justice Assistant Director of the Division of Law Enforcement, estimates there are between 500 million and one billion magazines able to hold more than 10 rounds.  *See* Declaration of Helsley in Support of Plfs.' Suppl. Br., Exh. 10, Dkt. 132-4, at ¶ 11.

[31] English, *supra*, at 23.

[32] *Id.* at 22.

[33] *Id.* at 35.

17-cv-1017-BEN (JLB)

defensive gun uses in the United States every year.[34]  Woe to the victim who runs out of ammunition before armed attackers do.  The police will mark the ground with chalk, count the number of shell casings, and file the report.

All of this was decided earlier.

What remains to be done?  California Penal Code § 32310 must be assessed in light of *Bruen*.  Now, on remand, the State has to justify this ban under *Bruen*, which makes clear that "[t]o justify its regulation, the government may not simply posit that the regulation promotes an important interest."[35]  After all, "'the very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is really worth insisting upon.'"[36]  So, the State must demonstrate that its extreme ban is consistent with this Nation's historical tradition of firearms regulation.  As explained below, there is no national tradition of prohibiting or regulating firearms based on firing capacity or ammunition capacity.

## II.   **CONSTITUTIONAL STANDARDS**

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to *keep and bear* Arms, shall not be

---

[34] *See* Inst. of Med. & Nat'l Rsch. Council, *Priorities for Research to Reduce the Threat of Firearm-Related Violence* 15 (The Nat'l Acads. Press ed., 2013), https://doi.org/10.17226/18319 [https://perma.cc/K3N4-FEXQ].  For many years the CDC's "fast facts" webpage referred to this report.  The report itself had two different ranges.  The second rage estimated from 60,000 to 2,500,000 annual defensive gun uses in America.  *See* Internet Archive Wayback Machine, CDC Firearm Violence Prevention, captured July 26, 2021, https://web.archive.org/web/20210726233739/https://www.cdc.gov/violenceprevention/firearms/fastfact.html.  The Court notes that the CDC has changed its reporting to delete reference to this study and the Court will not comment on how or why that happened as the CDC website does not reflect why it was deleted.
[35] *Bruen*, 142 S. Ct. at 2126.
[36] *Id.* at 2129 (quoting *Heller*, 554 U.S. at 634).

17-cv-1017-BEN (JLB)

infringed."[37]  "[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding."[38]  According to *Heller*, "[t]he Second Amendment is naturally divided into two parts: its prefatory clause and its operative clause.  The former does not limit the latter grammatically, but rather announces a purpose.  The Amendment could be rephrased, 'Because a well regulated Militia is necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed.'"[39] "The first salient feature . . . is that it codifies a 'right of the people.'"[40]  *Heller* then examines the substance of the constitutional right, the verbs *to keep* and *to bear* and their object: *arms*.  So, what does it mean to keep and bear arms?

The Supreme Court concludes, "[t]he 18th-century meaning [of "arms"] is no different from the meaning today.  The 1773 edition of Samuel Johnson's dictionary defined 'arms' as 'weapons of offence, or armour of defence.'  Timothy Cunningham's important 1771 legal dictionary defined 'arms' as 'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another.'"[41]  In the past, the term "arms" included weapons that were not specifically designed for military use and were not employed in a military capacity.  "Although one founding-era thesaurus limited 'arms' . . . to 'instruments of offence generally made use of in war,' even that source stated that all firearms constituted 'arms,'" according to *Heller*.[42]  And it is now clear that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding."[43]

---

[37] U.S. Const. amend. II (emphasis added).
[38] *Caetano*, 577 U.S. 411 (quoting *Heller*, 554 U.S. at 581).
[39] *Heller*, 554 U.S. at 577 (citations omitted).
[40] *Heller*, 554 U.S. at 579.
[41] *Heller*, 554 U.S. at 581 (citations omitted).
[42] *Heller*, 554 U.S. at 581 (citations omitted).
[43] *Heller*, 554 U.S. at 582.

*Heller* later describes the types and kinds of arms that are guaranteed Second Amendment protection. But first, *Heller* describes the meanings of "to keep" and "to bear" arms.

"We turn to the phrases 'keep arms' and 'bear arms.' Johnson defined 'keep' as, most relevantly, 'to retain; not to lose,' and 'to have in custody.' Webster defined it as 'to hold; to retain in one's power or possession'. . . .Thus the most natural reading of 'keep Arms' in the Second Amendment is to 'have weapons.'"[44] "Keep arms," according to *Heller,* "was simply a common way of referring to possessing arms, for militiamen and everyone else."[45] "To bear" meant to carry for the purpose of being armed and ready in case of conflict with another person. *Heller* even cited with approval the meaning of the phrase "carries a firearm" proposed by Justice Ginsburg in *Muscarello v. United States*: "as the Constitution's Second Amendment indicates: 'wear, bear, or carry upon the person or in the clothing or in a pocket, for the purpose of being armed and ready for offensive or defensive action in a case of conflict with another person.'"[46] Providing our modern understanding of the Second Amendment's text, *Heller* concludes, "[p]utting all of these textual elements together, we find that they *guarantee the individual right to possess and carry weapons in case of confrontation*."[47]

Very important in the past, still important in the future, *Heller* describes the concept of America's militia. "In *Miller*, we explained that 'the Militia comprised all

---

[44] *Heller*, 554 U.S. at 582 (citations omitted).

[45] *Heller*, 554 U.S. at 583.

[46] *Heller*, 554 U.S. at 584 (quoting *Muscarello*, 524 U.S. 125, 143 (1998) (Ginsburg, J. dissenting).

[47] *Heller*, 554 U.S. at 592 (emphasis added). "As the most important early American edition of Blackstone's Commentaries (by the law professor and former Antifederalist St. George Tucker) made clear in the notes to the description of the arms right, Americans understood the 'right of self-preservation' as permitting a citizen to 'repel force by force' when 'the intervention of society in his behalf, may be too late to prevent an injury.'" *Id*. at 595 (quoting 1 Blackstone's Commentaries, 145-46, n.42 (1803)).

17-cv-1017-BEN (JLB)

males physically capable of acting in concert for the common defense.'"[48] And *Heller* explains why the militia was important.  Two of the three reasons remain important today.  "There are many reasons why the militia was thought to be 'necessary to the security of a free State.'  First, of course, it is useful in repelling invasions and suppressing insurrections. . . . Third, when the able-bodied men of a nation are trained in arms and organized, they are better able to resist tyranny."[49] Once one understands the history of tyrants resorting to taking away people's arms to suppress political opposition, *Heller* explains, one can see that the militia clause fits perfectly with the operative clause. *Heller* teaches,

> We reach the question, then: Does the preface fit with an operative clause that creates an individual right to keep and bear arms?  It fits perfectly, once one knows the history that the founding generation knew and that we have described above. That history showed that the way tyrants had eliminated a militia consisting of all the able-bodied men was not by banning the militia but simply by taking away the people's arms, enabling a select militia or standing army to suppress political opponents.  This is what had occurred in England that prompted codification of the right to have arms in the English Bill of Rights.[50]

While the protection of a citizen militia was important, most people regarded the Second Amendment as even more important for its protection of self-defense and hunting.  "The prefatory clause does not suggest that preserving the militia was the only reason Americans valued the ancient right; *most undoubtedly thought it even more important for self-defense and hunting*."[51] After all, "'[t]he right to self defence is the first law of nature: in most governments it has been the study of rulers to confine the right

---

[48] *Heller*, 554 U.S. at 595.
[49] *Heller*, 554 U.S. at 598 (citations omitted).
[50] *Heller*, 554 U.S. at 598.
[51] *Heller*, 554 U.S. at 599 (emphasis added).

17-cv-1017-BEN (JLB)

within the narrowest limits possible.  Wherever standing armies are kept up, and the right of the people to keep and bear arms is, under any colour or pretext whatsoever, prohibited, liberty, if not already annihilated, is on the brink of destruction.'"[52] As one commentator wrote at the time the Fourteenth Amendment was adopted in 1868, "[t]he purpose of the Second Amendment is to secure a well-armed militia. . . . But a militia would be useless unless the citizens were enabled to exercise themselves in the use of warlike weapons."[53]  In this way, a general public knowledge and skill with weapons of war is beneficial to the nation at large and is protected by the Second Amendment.  "No doubt, a citizen who keeps a gun or pistol under judicious precautions, practices in safe places the use of it, and in due time teaches his sons to do the same, exercises his individual right."[54] And "[t]he right to bear arms has always been the distinctive privilege of freemen."[55]  In the end, the Supreme Court deems the Second Amendment as valuable for both preserving the militia and for self-defense – which is the heart of the right. *McDonald* put it this way:

> In *Heller*, we recognized that the codification of this right was prompted by fear that the Federal Government would disarm and thus disable the militias, but we rejected the suggestion that the right was valued only as a means of preserving the militias. On the contrary, we stressed that the right was also valued because the possession of firearms was thought to be essential for self-defense.  As we put it, self-defense was "the central component of the right itself."[56]

---

[52] *Heller*, 554 U.S. at 606 (citation omitted).

[53] *Heller*, 554 U.S. at 618 (quoting J. Pomeroy, *An Introduction to the Constitutional Law of the United States* §239, pp. 152-153 (1868)).

[54] *Heller*, 554 U.S. at 619 (quoting B. Abbott, *Judge and Jury: A Popular Explanation of the Leading Topics in the Law of the Land* 333 (1880)).

[55] *Heller*, 554 U.S. at 619 (quoting J. Ordronaux, *Constitutional Legislation in the United States* 241-242 (1891)).

[56] *McDonald*, 561 U.S. at 926-27.

*Heller* specifically considered "whether a District of Columbia prohibition on the *possession* of *usable* handguns in the home violates the Second Amendment to the Constitution."[57] And "District of Columbia law also require[d] residents to keep their lawfully owned firearms, such as registered long guns, 'unloaded and dissembled or bound by a trigger lock or similar device' unless they are located in a place of business or are being used for lawful recreational activities."[58]  In the end, the Supreme Court struck down both parts of the statute.  "In sum, we hold that the District's ban on handgun possession in the home violates the Second Amendment, as does its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense."[59] While reaching its conclusion, the Supreme Court considered what types of firearms were, and were not, protected by the Constitution.  Highlighting the central tenant of the Second Amendment, the Supreme Court wrote,

> We may as well consider at this point (for we will have to consider eventually) what types of weapons *Miller* permits. Read in isolation, *Miller's* phrase "part of ordinary military equipment" could mean that only those weapons useful in warfare are protected.  That would be a startling reading of the opinion, since it would mean that the National Firearms Act's restrictions on machineguns (not challenged in *Miller*) might be unconstitutional, machineguns being useful in warfare in 1939. We think that *Miller's* "ordinary military equipment" language must be read in tandem with what comes after: "Ordinarily when called for militia service able-bodied men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time."  The traditional militia was formed from a pool of men bringing arms "in common use at the time" for lawful purposes like self-defense.  "In the colonial and revolutionary war era, small-arms weapons[60]  used by

---

[57] *Heller*, 554 U.S. at 573 (emphasis added).
[58] *Heller*, 554 U.S. at 575.  The Court declared both aspects of the statute to be in violation of the Second Amendment.
[59] *Heller*, 554 U.S. at 635.
[60] Not cannons or mortars.

17-cv-1017-BEN (JLB)

militiamen and weapons used in defense of person and home were one and the same." . . . We therefore read *Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes.[61]

Since it was "the conception of the militia at the time of the Second Amendment's ratification [that] the body of all citizens capable of military service, [citizens] would bring the sorts of lawful weapons that they possessed at home to militia duty,"[62] the right to keep and carry arms means "the sorts of weapons protected were those 'in common use at the time.'"[63]

### A. Magazines Are Protected "Arms"

The State argues that larger capacity magazines are not "arms."  First, the State argues that magazines are not essential to the use of firearms and consequently would have been thought of as accessories.  But magazines are "integral components to vast categories of guns."  *Fyock v. City of Sunnyvale*, 25 F.Supp.3d 1267, 1276 (N.D. Cal. 2014), *aff'd sub nom. Fyock v. Sunnyvale*, 779 F.3d 991 (9th Cir. 2015).  "Most pistols are manufactured with magazines holding ten to seventeen rounds, and many popular rifles are manufactured with magazines holding twenty or thirty rounds."  *Kolbe v. Hogan*, 849 F.3d 114, 129 (4th Cir. 2017) (*en banc*).  While the Second Amendment does not explicitly mention ammunition or magazines supplying ammunition, "without bullets, the right to bear arms would be meaningless."[64] This is because the right to keep firearms

---

[61] *Heller*, 554 U.S. at 624-25 (citations omitted).  If it existed at the time and were in common use, as it is today, would a militia member bring a firearm with a magazine that holds more than 10 rounds?  The answer is, yes, of course.
[62] *Heller*, 554 U.S. at 627.
[63] *Heller*, 554 U.S. at 627 citation omitted).
[64] *Jackson v. City & County of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014)

15

17-cv-1017-BEN (JLB)

for protection implies a corresponding right to obtain the bullets necessary to use them. "The possession of arms also implied the possession of ammunition."[65]

By extension, "arms" includes the magazine component necessary to supply the bullet into the chamber of the gun.  "[O]ur case law supports the conclusion that there must also be some corollary, albeit not unfettered, right to possess the magazines necessary to render those firearms operable."[66] "It is hard to imagine something more closely correlated to the right to use a firearm in self-defense than the ability to effectively load ammunition into the firearm."[67]

Put more broadly, "the Second Amendment protects ancillary rights necessary to the realization of the core right to possess a firearm for self-defense."[68]  Consequently, whether thought of as a firearm able to fire a certain number of rounds because of its inserted magazine, or as a separate ammunition feeding component, magazines are usable "arms" within the meaning of the Second Amendment.  As the Third Circuit Court of Appeals found, "[w]e therefore must first determine whether the regulated item is an arm under the Second Amendment.  The law challenged here regulates magazines, and so the question is whether a magazine is an arm under the Second Amendment.  The answer is yes." [69]

Proffering two subsidiary arguments, the State says: (1) a magazine of some size may be necessary, but a magazine larger than 10 rounds is not necessary to operate a firearm and thus a larger magazine is not a protected "arm"; and (2) statistically people rarely fire more than 10 rounds in self-defense so it can be said that a magazine larger

---

[65] *United States v. Miller*, 307 U.S. 174, 180 (1939).
[66] *Fyock v. Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015)
[67] *Barnett v. Raoul*, 2023 U.S. Dist. LEXIS 74756, *26 (S.D. Ill. Apr. 28, 2023).
[68] *Teixeira v. Cty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017).
[69] *Ass'n of N.J. Rifle & Pistol Clubs v. Att'y Gen. of N.J.*, 910 F/3d 106, 116 (3d Cir. 2018).

17-cv-1017-BEN (JLB)

than 10 rounds is rarely *used* for self-defense, and if a larger magazine is not commonly *used* for self-defense then it is not a protected "arm."

For the first argument, the State claims that if a standard 17-round magazine is detached from a standard Glock 17 pistol, the 17-round magazine is no longer a weapon (by itself) and because the Glock 17 pistol could still function with a substitute 10-round magazine, then the 17-round standard Glock magazine does not come within the definition of "arms" that the Second Amendment protects.[70] In contrast, according to the State, a magazine holding 10 or less may qualify as a protected "arm," but a magazine able to hold 11 or more is not a protected "arm." What the State seems to be really saying is that a magazine may be a protected arm, but only the State has the right to pick the number of rounds a citizen may have in his gun.

This Court disagrees. The Supreme Court has not described protected arms in subdivided categories. When *Heller* found handguns were protected, it did not distinguish between semiautomatic pistols and revolvers. *Heller* did not classify protected handguns according to the number of rounds one could hold or the caliber of the ammunition that could be fired. It did not suggest that typically possessed arms could be subcategorized and subjected to judicial ad hoc constitutional determinations. Whether thought of holistically as a "handgun" irrespective of magazine size as *Heller* does, or as an entirely separate attachment, both firearms and their magazines (of all typical sizes) are "arms" covered by the text of the Second Amendment. "This is not even a close call."[71] As this Court has said before, "[n]either magazines, nor rounds of

---

[70] Of course, the argument admits, *sub silentio*, that some magazines are necessary to operate a gun. The State says: "To be sure, some type of magazine is essential to the use of many handguns. But there is no evidence in this record . . . that a magazine capable of firing more than 10 rounds without reloading is necessary to the function of any modern firearm." Def's Suppl. Br., Dkt. 118 at n.10.

[71] *Barnett v. Raoul*, No. 3:23-cv-00209-SPM, 2023 U.S. Dist. LEXIS 74756, at *26–27 (S.D. Ill. Apr. 28, 2023); *Hanson v. District of Columbia*, Civil Action No. 22-2256 (RC), 2023 U.S. Dist. LEXIS 68782, at *17 (D.D.C. Apr. 20, 2023) ("At least three

ammunition, nor triggers, nor barrels are specifically mentioned in the Second
Amendment . . . But without a right to keep and bear triggers, or barrels, or ammunition
and the magazines that hold ammunition, the Second Amendment right would be
meaningless."[72]  Using reasoning that is still persuasive, the Ninth Circuit agreed,
explaining "[p]ut simply, a regulation cannot permissibly ban a protected firearm's
components critical to its operation."  More recently, counsel for California's Governor
in a related fee-shifting case agreed while pointing out that "[t]he large-capacity
magazines ban appears in the Penal Code's title on 'Firearms,'" and "a restriction on the
ammunition that may be used in a firearm is a restriction on firearms."[73] Leaving no
doubt, even the (vacated) Ninth Circuit's *en banc* decision assumed that § 32310
implicates the Second Amendment.[74]

Relatedly, the State argues that it is only restricting a firearm component or an
accessory.[75] "LCMs are not weapons in themselves," says the State, "nor are they

---

Courts of Appeals have concluded that LCMs are "arms" within the meaning of the
Second Amendment."); *Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety &
Homeland Sec.*, Civil Action No. 22-951-RGA, 2023 U.S. Dist. LEXIS 51322, at *19 (D.
Del. Mar. 27, 2023); *contra, Ocean State Tactical, LLC v. Rhode Island*, No. 22-cv-246
JJM-PAS, 2022 U.S. Dist. LEXIS 227097, at *33–34 (D.R.I. Dec. 14, 2022); *Or.
Firearms Fed'n, Inc. v. Brown*, No. 2:22-cv-01815-IM, 2022 U.S. Dist. LEXIS 219391,
at *23–25 (D. Or. Dec. 6, 2022).

[72] *Duncan*, 366 F. Supp. 3d at 1142–43 (citing *Fyock v. City of Sunnyvale*, 779 F.3d 991,
998 (9th Cir. 2015); *Teixeira v. Cty. Of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (en
banc); *Ass'n of N.J. Rifle & Pistol Clubs v. A.G. N.J.*, 910 F.3d 106, 116 (3d Cir. 2018).

[73] *Miller v. Bonta*, 22cv1446-BEN (JLB), Intervenor-Def's Suppl. Br., Dkt. 35, at 14.

[74] *Duncan*, 19 F.4th at 1103, *cert. granted, judgment vacated*, 213 L. Ed. 2d 1109, 142 S.
Ct. 2895 (2022).

[75] Instead of isolating the magazine from the gun, the better understanding is to consider
the magazine as part of the gun.  There is a federal law analogue leading to the
conclusion that a magazine is correctly regarded as a component part of a gun.  The Arms
Control Export Act criminalizes the unlicensed export of firearms and their components.
22 U.S.C. § 2778(b).   Firearm magazines come within the Act because "a magazine is
'useful' only when used in conjunction with that end-item [a rifle]: its sole purpose is to
load cartridges into the breech so that they can be fired . . . ."[75]  In this view, the

necessary to operate any firearm for self-defense." California residents who purchased new pistols in the last decade are probably surprised to hear that magazines are not necessary to operate a pistol. After all, another state law known as the Unsafe Handgun Act requires new semiautomatic pistols to have an integrated magazine-disconnect mechanism in order to be sold to the public.[76]

A magazine-disconnect mechanism prevents a pistol from firing at all, even if one round is left loaded in the chamber, if the magazine is not inserted into the pistol. The state-mandated magazine-disconnect mechanism thus prevents the operation of the firearm without its magazine.[77] While rifles are not required to have a magazine-disconnect mechanism, the State must concede that at least for semiautomatic handguns the State deems "not unsafe," firearms for self-defense will not function without a magazine.[78] Modern magazines, submits the State, are more like founding-era cartridge boxes or "ancillary equipment associated with soldiering" that were not strictly necessary to fire a gun. Today, however, as pointed out above, some semiautomatic firearms will not function at all without a magazine, while others can fire no more than one round. As

_____

magazine is a necessary component part of a gun which, in turn, would obviously fall under the text of the Second Amendment protection of "arms."

[76] "California's Unsafe Handgun Act (the 'UHA') seeks to prevent accidental discharges by requiring handguns to have particular safety features . . . [t]he UHA requires certain handguns to have a magazine disconnect mechanism ("MDM"), which prevents a handgun from being fired if the magazine is not fully inserted." *Boland v. Bonta*, No. SACV2201421CJCADSX, 2023 WL 2588565, at *1 (C.D. Cal. Mar. 20, 2023) (citing Cal. Penal Code §§ 16900, 31910(b)(5)).

[77] Semiautomatic pistols elsewhere in the nation usually do not have a magazine-disconnect mechanism so a pistol can still fire one chambered round without its magazine. Of course, one need not go too far out on a limb to say that a semi-automatic pistol that can fire only 1-round is not the sort of self-defense weapon most people would choose.

[78] To be precise, revolvers are handguns that do not require a magazine-disconnect mechanism, but that is because a revolver does not have a detachable magazine.

1   such, a magazine is an essential component without which a semiautomatic firearm is

2   useless for self-defense.  Therefore, a magazine falls within the meaning of "arms."[79]

3   ## B. **LCMs Are *Used* for Self-Defense**

4         Notwithstanding that the Second Amendment protects the right to "keep and bear,"

5   the State's more troubling argument is that magazines holding more than 10 rounds are

6   not being *used* for self-defense.  By "used," the State means actually fired.  The State

7   asserts, "there is no evidence that LCMs are frequently used in self-defense."

8   Continuing, the State asserts, "[t]o the contrary, the record reflects that it is exceedingly

9   rare for an individual, in a self-defense situation, to fire more than ten rounds."  But

10  without conceding the accuracy of the State's position, infrequent use or "exceedingly

11  rare" is not the same as *never*.  To support the State's argument, it relies on a

12  statistician's conclusion that an average of only 2.2 rounds are fired in an average self-

13  defense situation.  Because more than 10 rounds in the average situation are not being

14  fired for self-defense, the argument goes, magazines holding more than 10 rounds are not

15  *used* or needed for self-defense.  And because the Second Amendment protects

16  (according to the State) only those arms commonly "used" for self-defense, the State says

17

18

19  [79] *See e.g., Hanson v. D.C.*, No. CV 22-2256 (RC), 2023 WL 3019777, at *7 (D.D.C.

20  Apr. 20, 2023) ("The District's logic, by contrast, would allow it to ban *all* magazines
    (not just LCMs) — a result even the District does not endorse here — because a firearm

21  technically does not require *any* magazine to operate; one could simply fire the single
    bullet in the firearm's chamber.  The Court will therefore follow the persuasive reasoning

22  of *ANJRPC, Kolbe*, and *Duncan* in concluding that LCMs are "arms" within the meaning

23  of the Second Amendment."); *see also Barnett v. Raoul*, No. 3:23-CV-00141-SPM, 2023
    WL 3160285, at *8 (S.D. Ill. Apr. 28, 2023) ("Defendants' argument is not persuasive.

24  The Seventh Circuit has recognized the Second Amendment as extending to "corollaries

25  to the meaningful exercise of the core right to possess firearms for self-defense."  It is
    hard to imagine something more closely correlated to the right to use a firearm in self-

26  defense than the ability to effectively load ammunition into the firearm.").

27

28

17-cv-1017-BEN (JLB)

larger capacity magazines are not commonly "used," and therefore they are not protected arms.[80]

It is a remarkable reading of *Heller, McDonald, Caetano,* and *Bruen* to say that if a gun is not fired more than 10 times in self-defense then the gun's larger magazine is not being "used" in self-defense, and if not "used" in self-defense, then not protected by the Second Amendment. Yet, this is the State's theme.

In this Court's view, it is a crabbed reading of the Supreme Court's Second Amendment decisions and not relevant to the text, history and tradition test. The Supreme Court uses several descriptive phrases to describe the kinds of firearms that are protected by the Constitution. But common to all is the notion that to be protected, an arm needs only to be regarded as *typically* possessed or carried, or *commonly* kept, by citizens to be ready for use, if needed. The Supreme Court has not said that the actual firing of a gun is any part of the test. Indeed, the Second Amendment does not say that the right of the People to keep only such firearms as they actually shoot, shall not be infringed.

*McDonald* begins, "[t]wo years ago, in *District of Columbia v. Heller*, we held that the Second Amendment protects the right to keep and bear arms *for the purpose of self-defense*, and we struck down a District of Columbia law that banned the possession of handguns in the home."[81] What mattered is the purpose for which handguns were possessed, not necessarily the actual use.

_____

[80] A similar argument was made by the State in *N.A. for Gun Rights v. Lamont*, Case No. 22-1118 (JBA), 2023 U.S. Dist. LEXIS 134880, *40 (D. Conn. Aug. 3, 2023) ("Defendants maintain that after *Bruen*, Plaintiffs must show not only that the weapons and accoutrements are commonly owned, but they are commonly possessed and used *for self-defense* base on *Bruen*'s repeated use of the phrase 'common use' for self-defense.") (emphasis added), and in *Oregon Firearms Federation v. Kotek*, Case No. 22cv1815-IM, *67 (D. Ore. July 14, 2023) ("Defendants … argue for an interpretation of 'use' that includes some objective metric of an LCM's actual use in self-defense.").
[81] 561 U.S. at 749-50 (citation omitted) (emphasis added).

17-cv-1017-BEN (JLB)

The State puts its weight on the words "use," "uses," and "used."  One problem with the State's view is that it treats the Supreme Court's opinion language like the language of a statute.  That is a mistake.  "Because 'opinions, unlike statutes, are not usually written with the knowledge or expectation that each and every word may be the subject of searching analysis,' we do not follow statutory canons of construction with their focus on 'textual precision' when interpreting judicial opinions."[82]

Under the State's reading, a homeowner who displays a handgun with a 17-round magazine to scare away home invaders, has not "used" the 17-round magazine.  Under the State's reading, even a citizen who fires his semiautomatic firearm 10 times or less to defend himself, has not *used* his 17-round magazine in self-defense.  Admittedly, one can find different meanings of the term "use."  For example, in the context of a criminal statute, the Supreme Court acknowledged "use" offers different possible meanings. "[T]he word 'use' poses some interpretational difficulties because of the different meanings attributable to it.  Consider the paradoxical statement: 'I *use* a gun to protect my house, but I've never had to *use* it.'"[83]  Consequently, context is important, whether interpreting a statute or understanding an opinion.[84]

So, considering the words "use" or "used" in context, the State's notion is far removed from the meaning indicated by the Supreme Court.  *Heller* considered merely the simple possession of *usable* handguns in the home.  Focusing on the right to possess a usable arm, *Heller* said, "[w]e consider whether a District of Columbia prohibition on the possession of *usable* handguns in the home violates the Second Amendment to the

---

[82] *Upper Skagit Indian Tribe v. Sauk-Suiattle Indian Tribe*, 66 F.4th 766, 770 (9th Cir. 2023) (citations omitted).
[83] *Bailey v. United States*, 516 U.S. 137, 143 (1996) (emphasis in original).
[84] *Muscarello v. United States*, 524 U.S. 125, 144 (1998) ("Noting the paradoxical statement, 'I *use* a gun to protect my house, but I've never had to *use* it,' the Court in *Bailey* emphasized the importance of context.")

22

Constitution."[85] Actual firing of a handgun in the District was irrelevant.  Statistical surveys of shots fired in self-defense were not determinative – they were not even mentioned.  *Heller* used a simpler test.  Constitutional protection is afforded to weapons "typically possessed by law-abiding citizens for lawful purposes," focusing on typicality and possession rather than frequency of firing.[86]

*McDonald* says "the right was also valued because the possession of firearms was thought to be essential for self-defense."  *McDonald's* focus is on possession.[87]  And *McDonald* says the right applies "to handguns because they are 'the most preferred firearm in the nation to 'keep' and use for protection of one's home and family,'" focusing on a national subjective preference for handguns.[88]  There was no effort by the Supreme Court to condition the constitutional right upon some objective metric of actual handgun firing in self-defense.

*Bruen* says, "[t]he Second Amendment guaranteed to 'all Americans' the right to bear commonly used arms in public."  *Bruen* appears to focus on commonality.[89]  *Bruen* injects some ambiguity with the following phraseology, "the Second Amendment protects the possession and use of weapons that are 'in common use at the time.'"[90]  *Bruen* noted that in that case, no party disputed that handguns are weapons "in common use" today for self-defense, but did not say what it meant by "use."[91] So, what does the Supreme Court mean by its phrase "in common use?"  Is the focus placed on a weapon's commonality in society or the frequency of a weapon's firing?  *Bruen* answers the question elsewhere in its opinion.  Commonality is the focus.  Consider the following

---

[85] 554 U.S. at 573 (emphasis added).
[86] 554 U.S. at 625; *see also* at 720 (Breyer, J., dissenting) (describing the majority test in the same terms).
[87] 561 U.S. at 787.
[88] *Id.* at 767 (citations omitted).
[89] 142 S. Ct. at 2156 (citing *Heller*, 554 U.S. at 581).
[90] *Id.* at 2128 (citing *Heller*, 554 U.S. at 627).
[91] *Id.* at 2134.

17-cv-1017-BEN (JLB)

sentence from *Bruen*: "Drawing from this historical tradition, we explained there that the Second Amendment protects only the carrying of weapons that are those 'in common use at the time,' *as opposed to those that 'are highly unusual in society at large*.'"[92] Or consider this sentence from *Bruen's* footnote 13: "Even assuming that pocket pistols were, as East Jersey in 1686 deemed them, 'unusual or unlawful,' it appears that they were commonly used at least by the founding."[93] *Bruen* contrasts common pistols against unusual pistols. The focus remains on commonality, not the frequency of actual discharge in self-defense scenarios. Put simply, Second Amendment protection envelops weapons commonly or typically subjectively chosen by citizens to keep in case of confrontation.

From *Bruen*, it is evident that the Supreme Court's focus is on whether a weapon is common (or unusual) amongst the citizenry. This, in turn, requires some sort of generalized numerical estimation of citizen ownership or gauge of present popularity. In *Caetano*, the concurring Justices explained that, "[t]he more relevant statistic is that 'hundreds of thousands of Tasers and stun guns have been sold to private citizens,' who it appears may lawfully possess them in 45 States."[94] That Ms. Caetano did not actually energize and fire her stun gun made no difference to the Supreme Court. In her case, she did no more than display the weapon. "She stood her ground [and] displayed the stun gun."[95] Absent from the opinion is any discussion about the average number of times a stun gun is energized in an average self-defense scenario. Absent from the opinion is any objective metric counting the frequency with which stun guns have been fired. The

---

[92] *Id.* at 2143 (emphasis added).
[93] *Id.* at n.13 (citation omitted).
[94] 577 U.S. at 420 (citations omitted) ("While less popular than handguns, stun guns are widely owned and accepted as a legitimate means of self-defense across the country. Massachusetts' categorical ban of such weapons therefore violates the Second Amendment.").
[95] *Id.* at 413, (Alito, J., concurring).

17-cv-1017-BEN (JLB)

measure of constitutional protection was that the stun gun was "used" in the sense that stun guns are widely *owned* to satisfy a subjective need for protection and that the number in existence was in the hundreds of thousands.

Applying the same measure to magazines, because it is the case that magazines holding more than 10 rounds are owned and possessed by millions of Americans to meet a subjective need for self-defense, this fact alone entitles such magazines to Second Amendment protection.  When a magazine is commonly owned by Americans with the subjective intention of using it for self-defense, it is enough to say that it is in common use (or typically used) for self-defense, as the Supreme Court employs the phrase in its opinions.[96]

Probably the vast majority of Americans that own magazines of 11 rounds or more keep them and use them for self-defense in the same way that a driver puts on and uses a seat belt in the case of a collision.  Though collisions rarely happen, the seat belt is used for protection and to be ready for the unexpected collision.  A reserve canopy is being used on a parachute jump, although it is not deployed, in case the main parachute fails.  A cell phone in one's pocket is being used when waiting for a telephone call or in the event one needs to make a call.  In the same way, a firearm kept on one's nightstand is used for self-defense even when the night is quiet.  It is kept and used in case of confrontation.  A person may happily live a lifetime without needing to fire their gun in self-defense.  But that is not to say that such a person does not *use* their gun for self-defense when he or she keeps it under the bed with a hope and a prayer that it never has to be fired.

In 2016, an 81-year old Uniontown, Pennsylvania man and his elderly sister were at home when at night an intruder broke in.  In the ensuing struggle, the older man fired

---

[96] At the margin, there may be a weapon that is commonly owned that is not commonly used for self-defense.  One could imagine perhaps a reproduction of an 18th century flintlock or a World War II German Luger being commonly owned, but used only as curios or museum pieces.

one shot from his gun at his attacker. The victim said he had never before fired his gun and that it had been sitting on his nightstand for thirty years.[97] California would say that the victim did not *use* his gun for self-defense on any day of those preceding thirty years. And if his gun had a magazine with eleven or more rounds in it (the news report does not say), California would argue that the victim never did *use* his large capacity magazine in self-defense. This Court would say that the victim *used* his gun every night of the thirty years he subjectively kept it on his bedroom nightstand in case of confrontation, including the night of the burglary. And if his gun had been equipped with a large capacity magazine, it could correctly be said that he also *used* the large capacity magazine for self-defense every night of the thirty years he subjectively kept it on his bedroom nightstand in case of confrontation.

## C. <u>The Invention of the 2.2 Shot Average</u>

Without agreeing that when the Supreme Court discusses firearms "in common use" it means commonly fired, even if it did, the State's statistic is suspect. California relies entirely on the opinion of its statistician for the hypothesis that defenders fire an average of only 2.2 shots in cases of confrontation.

Where does the 2.2 shot average originate? There is no national or state government data report on shots fired in self-defense events. There is no public government database. One would expect to see investigatory police reports as the most likely source to accurately capture data on shots fired or number of shell casings found, although not every use of a gun in self-defense is reported to the police. As between the two sides, while in the better position to collect and produce such reports, the State's

---

[97] *81-year-old fatally shoots home invasion suspect, says gun had never been used in 30 years*, WXPI-TV 11 News (Nov. 4, 2016),  https://www.wpxi.com/news/81-year-old-fatally-shoots-home-invasion-suspect-says-gun-had-never-been-used-in-30-years/464100332/  [https://perma.cc/FRP6-MA9P].

Attorney General has not provided a single police report to the Court or to his own expert.[98]

Without investigatory reports, the State's expert turns to anecdotal statements, often from bystanders, reported in news media, and selectively studied. She indicates she conducted two studies.[99] Based on these two studies of newspaper stories, she opines that it is statistically rare for a person to fire more than 10 rounds in self-defense and that only 2.2 shots are fired on average.[100] Unfortunately, her opinion lacks classic indicia of reliability and her two studies cannot be reproduced and are not peer-reviewed. "Reliability and validity are two aspects of accuracy in measurement. In statistics, reliability refers to reproducibility of results."[101] Her studies cannot be tested because she

---

[98] Allen asked the State for police reports, but she did not receive them. *See* Transcript, Preliminary Injunction Hearing, 10/19/20, 153:1-16:

"THE COURT: Let me ask you a question. Did you ever ask, for example, [Deputy Attorney General] Mr. Echeverria if he would get you the law enforcement reports of home defense shootings that may have occurred where the homeowner or the person at home fired shots at someone that was intruding?

THE WITNESS: Yes. So I did ask both from the State of California as well as from a number of other states that I have worked for, I have asked for data on incidents of exactly that, or whether there was a broader set of data that they had that I could then review.

THE COURT: And did you get that from the State of California?

THE WITNESS: I did not. It was my understanding that the State of California did not have that data or did not have that in a way that it could be reviewed. That is not -- that is not a type of data that is collected."

[99] Lucy Allen Supp. Decl. Dkt 118-1.

[100] Allen Supp. Decl. Dkt 118-1, at ¶10. Of course, though one may assume that "LCMs" are only used .3% of the time, for the unfortunate homeowner who makes up part of the .3%, it is 100% of his time.

[101] Federal Judicial Center, *Reference Manual on Scientific Evidence* (3d ed.), 211 Reference Guide on Statistics, 2011 WL 7724256, 10 and n.37 ("*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590 n.9 (1993), for example, distinguishes "evidentiary reliability" from reliability in the technical sense of giving consistent results. We use "reliability" to denote the latter.).

has not disclosed her data.  Her studies have not been replicated.  In fact, the formula used to select 200 news stories for the Factiva study is incomprehensible.

For one study, Allen says she conducted a search of stories published in the NRA Institute for Legislative Action magazine (known as the Armed Citizen Database) between 2011 and 2017.  There is no explanation for the choice to use 2011 for the beginning.  After all, the collection of news stories goes back to 1958.  Elsewhere in her declaration she studies mass shooting events but for that chooses a much longer time period reaching back to 1982.  Likewise, there is no explanation for not updating the study after 2017.

However it is that they were chosen, some 736 incidents in the Armed Citizen Database were said to be analyzed and the number of shots tabulated, but details are completely absent.  Allen does not list the 736 stories.  Nor does she reveal how she assigned the number of shots fired in self-defense when the news accounts use phrases like "the intruder was shot" but no number of shots was reported, or "there was an exchange of gunfire," or "multiple rounds were fired."  She includes in her 2.2 average of defensive shots fired, incidents where no shots were fired.[102]  One would expect the impact of Allen's choice to include a zero for a no-shot event to be significant because (even using her number) 32.1% of the events in the home in California were no-shot events.[103]  She also reported no incidents in California where more than 10 shots were fired in self-defense among the stories she reviewed.  It seems obvious that in a state where magazines holding more than 10 rounds have been illegal to buy or sell for twenty years, law-abiding citizens are using the smaller magazines that the law requires for self-defense.  Absent from the expert opinion is a statistic reporting the average number of

---

[102] Allen Supp. Decl. Dkt 118-1 n.10 ("[T]he average includes instances when no shots are fired.").
[103] Allen Supp. Decl. Dkt 118-1 at ¶ 12 (table).

shots fired by criminals.  Also absent is the number of intruders or whether the homeowner was able to escape unharmed.

In another example, it is not evident from the study how she counted the number of shots fired for one story in the collection where a homeowner "fired back" and three intruders suffered eight gunshot wounds.  Considering most victims miss some of their shots, one would expect in defending against three attackers that more than eight shots were fired in self-defense.  Instead, all that the Court is told is:

> When the exact number of shots fired was not specified, we used the average for the most relevant incidents with [a] known number of shots.  For example, if the story stated that "shots were fired" this would indicate that at least two shots were fired and thus we used the average number of shots fired in all incidents in which two or more shots were fired and the number of shots was specified.[104]

She does not reveal the imputed number substitute value that she used where the exact number of shots fired was not specified, so her result cannot be reproduced. Interestingly, substituting an imputed average value for all of the times the number of shots fired is unknown, tends to bring the overall average of shots fired down towards 2.2.  For example if there are ten incidents of self-defense where nine times the victim fired two shots and one time the victim fired thirteen shots, the average number of shots fired would be 3.1 but the percentage of times more than ten shots were needed for self-defense would be 10%.

For a second study, Allen says she conducted a word search of a news aggregator called Factiva.  Factiva is a commercial database behind a paywall to which the Court and the public have no access.  Even if one did have access to the Factiva database, one could not repeat her study.  Allen's methodology for the Factiva study is incomprehensible.  For the Factiva database of 70 million news stories, her word search

---

[104] Allen Supp. Decl. Dkt 118-1 n.8.

returned 35,000 stories.[105] From there she somehow selected 200 stories of defensive gun use in the home and set out to analyze the events.[106] As with the Armed Citizen study, Allen does not provide a list of the 200 stories she analyzed.  Compare that to the long, detailed list of 179 mass shooting stories she includes in the second part of her declaration.  For the Factiva study, there is no way to check her analysis or her math.  And once again she includes in the averages those events where no shots were fired, bringing the overall average down.[107]

Had a table of the stories she and her team analyzed been supplied, it would certainly reveal important information.  For example, this Court randomly selected two pages from Allen's mass shooting table: pages 10 and 14.  From looking at these two pages (assuming that the sources for the reports were accurate and unbiased) the Court is able to make statistical observations, including the observation that the number of shots fired were unknown 69.04% of the time.  Without a similar table for the NRA or Factiva studies, this Court cannot ascertain the number of shots fired in each incident, the number of times a homeowner possessed a LCM, the number of times the number of shots fired were unknown, whether the homeowner was unharmed, or the number of intruders.

Allen's 2.2 shot average is suspect for larger reasons.  The whole statistical exercise is based on hearsay (anecdotes) upon hearsay news reporting, rather than police investigatory reports.  A database of news articles lacks the usual indicia of accuracy and reliability of admissible evidence.  According to fifteen national polls conducted by non-law enforcement agencies, there may be from 760,000 defensive handgun uses to

---

[105] Exh. A at ¶18.

[106] *Id*. at ¶ 19.

[107] Allen Depo. Jan. 12, 2021 at 119:10-18 ("Q.  So numerically speaking, inclusion of incidents where the number is zero would tend to drag the average number of shots fired down; would you tend to agree with that?  A.  So it includes those with zero.  That's correct.  Q.  Okay.  And have you ever looked at the average number of shots fired when shots were fired?  A.  No.").

17-cv-1017-BEN (JLB)

3,600,000 defensive uses each year.[108] Compared to the comprehensive details given for her study on mass shooting events, the NRA and Factiva studies are curiously lacking in depth and breadth and causes the Court to deeply discount her opinion.

The Court is aware of its obligation to act as a gatekeeper to keep out junk science where it does not meet the reliability standard of *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993) and Federal Rule of Evidence 702.[109] In a bench trial, the relevancy bar is low and Rule 702 is to be applied with a liberal thrust favoring admission.[110] While opinions and evidence may have been deemed admissible, in some cases, the evidence has been given very little weight or no weight at all.  This is the fact finder's role.[111] "Challenges that go to the weight of the evidence are within the province of a fact finder . . . ."[112] So, while questionable expert testimony was admitted, it has now been weighed in light of all of the evidence.

In assessing expert witness opinion, a court looks to see whether the opinion given is newly made or whether it grew naturally out of research conducted outside of the litigation.[113] Bias may be evident, according to legal authorities, where the expert forms

---

[108] Plaintiffs' Exh. 10-10, John R. Lott, Jr., *More Guns, Less Crime* 3d. (2010), at 12.
[109] *See Estate of Barabin v. AstenJohnson, Inc.,* 740 F.3d 457, 463 (9th Cir.2014), *overruled on other grounds*, *United States v. Bacon*, 976 F.3d 766 (9th Cir. 2020) (en banc) (duty falls squarely upon the district court to act as gatekeeper to exclude junk science).
[110] *Messick v. Novartis Pharm. Corp.,* 747 F.3d 1193, 1196 (9th Cir. 2014).
[111] *Primiano v. Cook,* 598 F.3d 558, 568 (9th Cir. 2010) (though opinion of doctor is admitted, jury may reject the opinion); *see also, e.g., United States v. Vallejo,* 237 F.3d 1008, 1021 (9th Cir. 2001) (admissibility of expert opinion different than weight to be accorded).
[112] *City of Pomona v. SQM North Am. Corp.,* 750 F.3d 1036, 1044 (9th Cir. 2014).
[113] *Daubert v. Merrell Dow Pharm., Inc.,* 43 F.3d 1311, 1317 (9th Cir. 1995) (after remand) ("One very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying."); *Cabrera v. Cordis Corp.,* 134 F.3d 1418, 1422

17-cv-1017-BEN (JLB)

an opinion without peer-reviewed scientific support or before examining sufficient data.[114] Bias may also be evident where an expert opinion is formed solely for the purposes of litigation.  Here, the Court is mindful that, "[f]or scientific evidence to be admissible, the proponent must show the assertion is 'derived by a scientific method,'" and "[o]pinion based on 'unsubstantiated and undocumented information is the antithesis of scientifically reliable expert opinion.'  "The court must assess the expert's reasoning or methodology, using as appropriate criteria such as testability, publication in peer-reviewed literature, known or potential error rate, and general acceptance."[115] Methods and procedures must be followed and undisciplined speculation is not science.[116]

"To aid courts in exercising this gatekeeping role, the Supreme Court has suggested a non-exclusive and flexible list of factors that a court may consider when determining the reliability of expert testimony, including: (1) whether a theory or technique can be tested; (2) whether it has been subjected to peer review and publication; (3) the known or potential error rate of the theory or technique; and (4) whether the theory or technique enjoys general acceptance within the relevant scientific community."[117]  Allen's study relies on unverified, uncorroborated second or third hand anecdotal information.  Normally, "a witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the

---

(9th Cir.1998) (expert's development of opinion expressly for purposes of testifying is a significant consideration in evaluating opinion).

[114] B. Black & P. Lee, *Expert Evidence* (West 1997), Ch. 4(IV)(B), at 147.

[115] *Id.*

[116] *Daubert*, 509 U.S. at 589–90. ("The subject of an expert's testimony must be 'scientific . . .  knowledge.'  The adjective 'scientific' implies a grounding in the methods and procedures of science.  Similarly, the word 'knowledge' connotes more than subjective belief or unsupported speculation.").

[117] *Messick*, 747 F.3d at 1197 (quoting *Daubert,* 509 U.S. at 592–94).

matter."[118] Assuming its relevance in the first instance for *Bruen* purposes, the statistical analysis has minimal indicia of accuracy or reliability.

In the end, Allen opines that an average of 2.2 shots are fired in self-defense gun scenarios and only .3% of such incidents involve more than 10 shots fired. Yet, even .3% is a lot in terms of actual times a citizen needs to fire his gun in self-defense. Using the estimate from the Centers for Disease Control mentioned earlier of 500,000 to 3,000,000 times per year nationally, and extrapolating the .3% where more than 10 shots were fired (per Allen's report), would mean defensive gun uses of more than 10 shots happen between 1,500 and 9,000 times, every year (based on the CDC annual number of defensive gun uses cited on the website Allen cited and relied on[119]).

### D. Magazines Holding More Than 10 Rounds Are Not Dangerous and Unusual

Taking another tack, the State reframes the "dangerous and unusual" test as a "dangerous *or* unusual" test and then objects that magazines able to hold more than 10 rounds are unusually dangerous. As the Court has stated, all guns and ammunition are dangerous.[120] However, magazines holding more than 10 rounds are not both "dangerous and unusual," which is the Supreme Court's test. So-called large capacity magazines

---

[118] Federal Rule of Evidence 602.

[119] In her Supplemental Declaration, at footnote 4, Dkt. 118-1, Allen cites a Heritage Foundation online visual database: https://datavisualizations.heritage.org/firearms/defensive-gun-uses-inthe-us. If one looks at the Heritage Foundation description of its visual database research, one would see that it acknowledges the CDC report that Americans use their firearms defensively between 500,000 and 3,000,000 million times each year.

[120] *Staples*, 511 U.S. at 611 ("Despite their potential for harm, guns generally can be owned in perfect innocence.").

1  banned in California are commonly-owned by law-abiding citizens across the nation[121]

2  and number in the millions.[122]

3  **E.  The Most-Useful-for-Military-Service Nostrum**

4  The State argues, and some courts have reasoned, that magazines holding more

5  than 10 rounds are "most useful in military service" and therefore, can be banned.[123]  The

6  Supreme Court said no such thing.[124]  *Caetano* addresses this question and says, "*Heller*

7  rejected the proposition 'that only those weapons useful in warfare are protected.'"[125]

8  *Heller* was explaining *United States v. Miller*.[126]  In *Miller*, the Supreme Court applied a

9  reasonable-relationship-to-militia-use test to a short-barreled shotgun, asking whether the

10  shotgun would have a reasonable relationship to the preservation or efficiency of a well-

11  regulated militia.  Finding none, it decided the Second Amendment did not guarantee the

12  right to keep that particular firearm.[127]  *Miller*'s realm of Second Amendment protection

13  encircled a firearm if it was reasonably related to militia use.  This "reasonably-related"

14  construct received a nod again in *Lewis v. U.S.*,[128] where the Supreme Court sang *Miller*'s

15

16

17  [121] "It is indisputable in the modern United States that magazines of up to thirty rounds
18  for rifles and up to twenty rounds for handguns are standard equipment for many popular
19  firearms."  Kopel, *supra*, *The History of Firearm Magazines*, at 874, Declaration of Anna
M. Barvir in Support of Plfs.' Suppl. Br., Exh. 39, Dkt. 132-6, at 125.
20  [122] *See* nn. 28-31, *supra*, and accompanying text.
[123] *See, e.g., Hanson v. D.C.*, No. CV 22-2256-RC, 2023 WL 3019777, at *28–29
21  (D.D.C. Apr. 20, 2023) ("LCMs are not covered by the Second Amendment because they
are most useful in military service.").
22  [124]  *See, e.g., Bevis v. City of Naperville*, No. 22 C 4775, 2023 U.S. Dist. LEXIS 27308, at
23  *22 (N.D. Ill. Feb. 17, 2023) ("Relatedly, the Supreme Court has unequivocally
dismissed the argument that 'only those weapons useful in warfare are protected.' To the
24  extent that the Seventh Circuit classified the weapon as either 'civilian' or 'military,' the
25  classification has little relevance.") (citation omitted).
[125] *Caetano*, 577 U.S. at 412 (quoting *Heller*, 554 U.S. at 624–25).
26  [126] 307 U.S. 174 (1939)
27  [127] *Id*. ("Certainly it is not within judicial notice that this weapon is any part of the
ordinary military equipment or that its use could contribute to the common defense.").
28  [128] 445 U.S 55, 65 n.8 (1980).

refrain, "the Second Amendment guarantees no right to keep and bear a firearm that does not have 'some reasonable relationship to the preservation or efficiency of a well regulated militia.'"  There was no undercutting of *Miller* in the *Heller* or *Bruen* decisions. Rather, *Heller* embraced *Miller* and said "[w]e therefore read *Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns.  That accords with the historical understanding of the scope of the right."[129]  And *Bruen* "quoted, explained, re-affirmed, and then applied" *Miller*.[130]  *Heller* took the already expansive zone of protection for weapons that could be used by the militia and focused on the core use of firearms for self-defense.

In other words, *Heller* made the logical connection between weapons commonly possessed by law-abiding citizens for lawful purposes that would also be useful, if necessary, for military purposes, *i.e.*, in the militia.  Since *Miller*, the Supreme Court has enlarged the breadth of firearms protected by the Second Amendment to include commonly owned firearms useful for the core right of self-defense and other lawful purposes like hunting, sporting, and target shooting.  Until the Supreme Court clearly says otherwise, commonly owned weapons that are useful for war and are reasonably related to militia use are also fully protected, so long as they are not useful solely for military purposes.  Firearms with magazines holding more than 10 rounds are such reasonably-related arms.  Even *Miller* understood the Constitution to protect the possession of ammunition.  For the militia system to function, "[t]he possession of arms also implied the possession of ammunition, and the authorities paid quite as much attention to the latter as to the former."[131]  All considered, the best reading of "arms"

---

[129] *Heller*, 554 U.S. at 625.
[130] *United States v. Saleem*, No. 3:21-cr-00086-FDW-DSC, 2023 WL 2334417, at *7 (W.D.N.C. Mar. 2, 2023).
[131] *Miller*, 307 U.S. at 180 (quoting The American Colonies In The 17th Century, Osgood, Vol. 1, ch. XIII).

17-cv-1017-BEN (JLB)

includes magazines.[132]

## III.   *BRUEN* AND THE MAGAZINE CAPACITY LIMIT

Plaintiffs challenge § 32310, which prohibits manufacturing, importing, keeping for sale, offering for sale, giving, lending, buying, receiving or possessing a magazine able to hold more than 10 rounds.  For simple possession of a magazine holding more than 10 rounds, the crime is an infraction under § 32310(c).  It is a much more serious crime to acquire a magazine holding more than 10 rounds in California by importing, buying, borrowing, receiving, or manufacturing.  These acts may be punished as a misdemeanor or a felony under § 32310(a).  Under the subsection's provision, "or imprisonment pursuant to subdivision (h) of Section 1170," punishment may be either a misdemeanor or a felony.

This Court concludes, once again, that manufacturing, importing, selling, giving, loaning buying, receiving, acquiring,[133] possessing, storing, or using commonly-owned magazines capable of holding more than 10 rounds for self-defense at home or in public is protected by the Second Amendment.  Whether 50-round, 75-round, or 100-round drum magazines are constitutionally protected is a different question because they may be much less common and may be unusual.

### A.   Remand for *Bruen* Review

This case was remanded from the United States Court of Appeals for the Ninth Circuit in order to consider the challenged laws under the recent Supreme Court decision

---

[132] *Jackson v. City & Cty. of San Francisco*, 746 F.3d 953, 968 (9th Cir. 2014) ("Because restrictions on ammunition may burden the core Second Amendment right of self-defense and the record contains no persuasive historical evidence suggesting otherwise, section 613.10(g) regulates conduct within the scope of the Second Amendment.").

[133] "This acquisition right is protected as an 'ancillary right' necessary to the realization of the core right to possess a firearm for self-defense."  *Renna v. Becerra*, No. 20-cv-02190-DMS (DEB), 2021 WL 1597933, at *6 (S.D. Cal. Apr. 23, 2021) (quoting *Teixeira v. County of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017)) (*en banc*) (core Second Amendment right "wouldn't mean much" without ability to acquire arms).

in *Bruen*.  Under *Bruen*, the government must affirmatively prove that its firearm regulation is part of a constitutional historical tradition.  It is the same text, history, and tradition standard the Court used in *Heller* and *McDonald*.  What is different is that the old means-end, interest balancing, tiers-of-scrutiny test is no longer viable.[134]  The State now has a second chance to defend its large capacity magazine ban and must do so applying the *Bruen* test.

     *Bruen* says,

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.  *The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.*  Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."[135]

And *Bruen* confirms, once again, that the Second Amendment applies to modern arms.  "Thus, even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense," like magazines able to hold more than 10 rounds.[136]

### i.  <u>Already Determined: No Historical Pedigree</u>

     This Court previously determined that a ban on magazines able to hold more than 10 rounds has no historical pedigree.  Detachable magazines were invented in the late 19th Century.[137]  In 1990, New Jersey introduced the first ban on detachable magazines,

---

[134] *Baird v. Bonta*, 2023 WL 5763345, *5 (9th Cir. Sept. 7, 2023) ("In *Bruen*, the Supreme Court expressly rejected the use of such 'means-end scrutiny in the Second Amendment context' and described the two-step approach as 'one step too many.'").

[135] 142 S. Ct. at 2129–30 (emphasis added).

[136] *Id.* at 2132.

[137] "In 1879, Remington introduced the first 'modern' detachable rifle magazine.  In the 1890s, semiautomatic pistols with detachable magazines followed.  During WWI, detachable magazines with capacities of 25 to 32-rounds were introduced."  Plaintiff's Exh. 2 (Stephen Helsley Report), at 4.

17-cv-1017-BEN (JLB)

1    initially imposing a 15-round limit and later a 10-round limit.  California put its ban in
2    place in the year 2000.  A historical tradition of magazine bans, this is not.

3         Before *Bruen*, the State unpersuasively argued that its magazine capacity
4    restriction was analogous to a handful of state machinegun firing-capacity regulations
5    from the 1920's and 1930's and one District of Columbia law from 1932—a law the
6    Supreme Court ignored while dismantling the District of Columbia's handgun ban in
7    *Heller*.  That argument remains unpersuasive today.  That was pre-*Bruen*.  *Bruen* invites
8    a look farther back into the Nation's history.

9              ii.    **The State Asked for Time for Discovery**

10        Because the *Bruen* approach places the burden upon the government to justify its
11   firearm restrictions by demonstrating that they are consistent with the Nation's historical
12   tradition of firearm regulation as understood at the founding, and because judicial review
13   under the *Bruen* standard is in its infancy, the State has been given generous time and
14   leeway to satisfy its new burden.  The State's experts have been studying historic firearm
15   regulations for more than 20 years.[138] This Court has reviewed all of the declarations of
16   the State's experts and historians as well as many of their cited sources, and finds no
17   support for the State's ban.

18

19

---

20   [138] The State's expert, professor Robert Spitzer, has studied gun policy for 30 years.  *See*
21   Decl. of Robert Spitzer, Dkt. 137-8 ("Spitzer Decl."), at ¶ 5.  The State's expert,
     professor Saul Cornell, said that he has been studying gun regulations for 20 years.  That
22   was in 2017.  *See* Saul Cornell, Five Types of Gun Laws the Founding Fathers Loved,
23   Salon (Oct. 22, 2017, 7:29 a.m.), https://www.salon.com/2017/10/22/five-types-of-gun-
     laws-the-founding-fathers-loved_partner/ [https://perma.cc/73SL-VAKV].  Ten years
24   ago, Mark Anthony Frasetto compiled a list of over 1,000 historical gun laws spanning
25   the years 1607 to 1934 and available on the Social Science Research Network.
     [https://perma.cc/Q2L8-SW6U].  His law collection was not unknown.  It was described
26   in detail in 2017 by professor Spitzer in his article *Gun Law History in the United States
27   and Second Amendment Rights*, 80 L. & Contemp. Probs. 55 (2017), and included in
     professor Cornell's Compendium of Works cited in his Declaration, Dkt. 154-3, at 1707–
28   33.

### iii.  <u>Some Text, History, and Tradition Analysis is Already Done</u>

Some of the time spent analyzing text, history, and tradition, has already been done by the Supreme Court.  To begin, "the 'textual elements' of the Second Amendment's operative clause—'the right of the people to keep and bear Arms, shall not be infringed'—'guarantee the individual right to possess and carry weapons in case of confrontation.'"[139] Further, "the right to 'bear arms' refers to the right to 'wear, bear, or carry ... upon the person or in the clothing or in a pocket, for the purpose ... of being armed and ready for offensive or defensive action in a case of conflict with another person.'"[140] The Supreme Court explains that the terms "keep" and "bear" mean that the Second Amendment's text protects a citizen's right to "'keep' firearms in their home, at the ready for self-defense," and to carry arms on one's person in and outside the home in case of confrontation.[141]  As to the types of weapons the Second Amendment protects, *Bruen* echoes *Heller*, *McDonald*, *Caetano*, *Miller*, and Blackstone, pronouncing that it "protects the possession and use of weapons that are 'in common use at the time.'"[142]

In this case, Plaintiffs are law-abiding citizens who want to possess (or keep) and carry (or bear), magazines able to hold more than 10 rounds commonly-owned for lawful purposes.  Plaintiffs' proposed conduct is covered by the plain text of the Second Amendment.  Under the plain text, the State's statute infringes on the constitutional rights of American citizens.  Therefore, Plaintiffs have met their burden of showing that the prohibited magazines fall within the Second Amendment's text.

*Bruen* next instructs courts to assess whether the initial conclusion is confirmed by the historical understanding of the Second Amendment.  *Bruen* has already confirmed that the Second Amendment protects an individual right to armed self-defense.  It repeats

---

[139] *Bruen*, 142 S. Ct. at 2134 (quoting *Heller*, 554 U.S. at 592).
[140] *Bruen*, 142 S. Ct. at 2134 (quoting *Heller*, 554 U.S. at 584).
[141] *Id.*
[142] *Id.* at 2128 (citations omitted).

17-cv-1017-BEN (JLB)

*Heller*'s lesson to not engage in means-end scrutiny, because, "[a] constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all."[143] After all, "[t]he Second Amendment 'is the very product of an interest balancing by the people' and it 'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense.  It is this balance—struck by the traditions of the American people—that demands our unqualified deference."[144]

## B. *Bruen*'s Guidelines for Historical Inquiry

For conducting a historical inquiry, *Bruen* identifies a number of guidelines.  First, "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment."[145]  Second, "if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional."[146]  Third, "if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality."[147]  Fourth, "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach."[148] Fifth, "[w]hen confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy."[149] "Determining whether a historical

---

[143] *Id.* at 2129 (quoting *Heller*, 554 U.S. at 634).
[144] *Bruen*, 142 S. Ct. at 2131 (quoting *Heller*, 554 U.S. at 635).
[145] *Bruen*, 142 S. Ct. at 2131.
[146] *Id.*
[147] *Id.*
[148] *Id.* at 2132.
[149] *Id.*

17-cv-1017-BEN (JLB)

regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar.'"[150]  *Bruen* notes,

> analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check.  On the one hand, courts should not "uphold every modern law that remotely resembles a historical analogue," because doing so "risks endorsing outliers that our ancestors would never have accepted."  On the other hand, analogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin.  So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster.[151]

In surveying American history, the task is to stay within *Bruen*'s guardrails.  As to the road ahead, it is a road back to 1791.

### i.   <u>The Significant Time Period—1791 to 1868</u>

*Bruen* teaches the most significant historical evidence comes from 1791, and secondarily 1868.  For the Second Amendment (and other protections in the Bill of Rights), "Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*."[152]  The Second Amendment was adopted in 1791. "[W]e have generally assumed that the scope of the [Second Amendment] protection applicable to the Federal Government and States is pegged to the public understanding of

---

[150] *Id.*

[151] *Id.* at 2133.

[152] *Id.* at 2136 (quoting *Heller*, 554 U.S. at 634–35); *cf. Kennedy v. Bremerton*, 142 S. Ct. 2407, 2428 (2022) ("[T]his Court has instructed that the Establishment Clause must be interpreted by reference to historical practices and understandings.  The line . . . has to accord with history and faithfully reflect the understanding of the Founding Fathers.") (cleaned up); *Riley v. California*, 573 U.S. 373, 403 (2014) ("Our cases have recognized that the Fourth Amendment was the founding generation's response to the reviled 'general warrants' and 'writs of assistance' of the colonial era.").

the right when the Bill of Rights was adopted in 1791."[153]  Consequently, whatever evolving standards of gun regulation the state legislature thought was good policy in the year 2000 (when it decided 11 rounds is not well-suited for a person to have in a gun) or the year 2016 (when it was amended by Proposition 63), or today, is not the test for constitutional scrutiny.

Courts are to "afford greater weight to historical analogues more contemporaneous to the Second Amendment's ratification."[154]  British sources pre-dating the Constitution are not particularly instructive because the American Revolution was a rejection of British rule.  Sources post-enactment are also less helpful.[155]  "[T]o the extent later history contradicts what the text says, the text controls . . . .  Thus, post-ratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text."[156]  Late 19th century evidence is not particularly instructive, "because post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources.'"[157]  Even so, evidence from the time period enforces the claim that the right to

---

[153] *Bruen*, 142 S. Ct. at 2137.

[154] *Rahimi*, 61 F.4th at 456; *contra Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1323 (11th Cir. 2023) ("For most cases, the Fourteenth Amendment Ratification Era understanding of the right to keep and bear arms will differ from the 1789 understanding.  And in those cases, the more appropriate barometer is the public understanding of the right when the States ratified the Fourteenth Amendment and made the Second Amendment applicable to the States.").

[155] *Bruen*, 142 S. Ct. at 2136 ("Similarly, we must also guard against giving postenactment history more weight than it can rightly bear.").

[156] *Id.* at 2137 (citations omitted) (cleaned up).

[157] *Id.* (quoting *Heller*, 554 U.S. at 614).  There is little reason to rely on laws from the later part of the 1800's or the 1900's rather than ones put into effect at the time of the founding in view of *Bruen*'s central question about the meaning of the Second Amendment as understood by the people who adopted it.  *See Worth v. Harrington*, No. 21-cv-01348-KMM-LIB, 2023 WL 2745673, at *12 (D. Minn. Mar. 31, 2023) ("But the

keep and bear arms continued to be regarded as a fundamental right.  The Supreme Court gauged the most explicit evidence appeared in the Freedmen's Bureau Act of 1866.  "The most explicit evidence of Congress' aim," according to *McDonald,* "appears in § 14 of the Freedmen's Bureau Act of 1866, which provided that 'the right . . . to have full and equal benefit of all laws and proceedings concerning personal liberty, personal security [and] . . . including the constitutional right to bear arms, shall be secured to and enjoyed by all the citizens.'"[158]  *McDonald* points to one senator's description of the right to bear arms for one's defense as an "indispensable safeguard of liberty."  *McDonald* writes,

> "Every man . . . should have the right to bear arms
> for the defense of himself and family and his
> homestead.  And if the cabin door of the freedman
> is broken open and the intruder enters for purposes
> as vile as were known to slavery, then should a
> well-loaded musket be in the hand of the occupant
> to send the polluted wretch to another world,
> where his wretchedness will forever remain
> complete."[159]

Thus, it can be said that, even at the time of the Fourteenth Amendment, the right to keep and bear guns was a necessary right to preserve.  "In sum, it is clear that the Framers and

---

Commissioner offers no persuasive reason why this Court should rely upon laws from the second half of the nineteenth century to the exclusion of those in effect at the time of the founding in light of *Bruen*'s warnings not to give post-Civil War history more weight than it can rightly bear."); *Firearms Pol'y Coalition, Inc. v. McCraw*, No. 4:21-cv-01245-P, 2022 WL 3656996, at *11 (N.D. Tex. Aug. 25, 2022); *United States v. Harrison*, No. CR 22-00328-PRW, 2023 WL 1771138, at *8 (W.D. Okla. Feb. 3, 2023) (quoting *Bruen*, 142 S. Ct. at 2136 (Barrett, J., concurring) ("[T]oday's decision should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights.")); *contra Hanson*, No. CV 22-2256-RC, 2023 WL 3019777, at *16 ("In this case, it is appropriate to apply 20th century history to the regulation at issue.").

[158] *McDonald*, 561 U.S. at 773.

[159] *McDonald*, 561 U.S. at 775-76 (citation omitted).

ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty."[160]

*Bruen* and *Heller* have already considered some of the historical firearm statutes. Consequently, we know that colonial laws restricting handguns that were dangerous and unusual in the 1690's do not justify modern laws restricting handguns. The Court explains that even if handguns were considered "dangerous and unusual" in the 1690's, it would not matter because handguns are common today. As *Bruen* puts it,

> Whatever the likelihood that handguns were considered "dangerous and unusual" during the colonial period, they are indisputably in "common use" for self-defense today. They are, in fact, "the quintessential self-defense weapon." Thus, even if these colonial laws prohibited the carrying of handguns because they were considered "dangerous and unusual weapons" in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use.

## C.    The State's List of Relevant Laws

To aid in the task of looking for a national "historical tradition of firearm regulation," the State was directed to create a list of relevant laws regulating arms dating from the time of the Second Amendment (1791) to 20 years after the Fourteenth Amendment (1868 + 20). This was not an acknowledgement that 20 years after the Fourteenth Amendment is a relevant period. Twenty years after the Fourteenth Amendment is an admittedly arbitrary limit and probably includes laws too late to shed much light.

In any event, the State went far beyond. The State produced a list of 316 laws covering 550 years—from 1383 to 1933.[161] Many of the entries are not relevant because

---

[160] *McDonald*, 561 U.S. at 778.

[161] *See* Def's Survey of Relevant Statutes, Dkt. 139-1 to 3 (citations to the individual law entries herein are indicated by brackets [--]).

17-cv-1017-BEN (JLB)

they came much earlier or later than the most significant time period of 1791–1868.  The first fourteen listed laws pre-date the Second Amendment.[162]  On the other end, the last 225 laws post-date the adoption of the Fourteenth Amendment.  Also, two-thirds of the State's list (199 laws) are restrictions on *use*—not on possession or acquisition.  Here, the magazine ban prohibits possession, manufacturing, giving, lending, offering for sale, etc., rather than regulating the *use* or *manner* of carrying ammunition or its magazines.  Twenty-two tax laws are included in the State's historical list, yet the law challenged here imposes no tax on magazines.  The State's historical list also includes, surprisingly, 38 laws that applied only to particular groups, such as slaves, Blacks, or Mulattos.  Those laws are not relevant to the magazine prohibition challenged in this case.  "And Founding-era statutes that disarmed groups of persons who governments thought might be dangerous because of their race or religion were not considered analogous to modern carry prohibitions on released felons also thought to be dangerous: 'any such analogy would be far too broad.'"[163]  Even if they were, this Court would give such discriminatory laws little or no weight.

---

[162] The State includes in its list a concealed carry statute in East New Jersey from 1686 which treated pocket pistols as "unusual" weapons.  [6].  *Bruen* bulldozed that citation.  The East New Jersey statute was too old and too different.  *Bruen* found little there to commend a present-day ban on carrying pistols.  The statute prohibited only the concealed carrying of pocket pistols; it did not prohibit possession or public carrying.  *Bruen*, 142 S. Ct. at 2143.  The statute did not apply to all pistols, much less all firearms.  Moreover, even if pocket pistols were uncommon in 1686 in East New Jersey, they were commonly used by the time of the founding.  *Id.* at 2144 and n.13.  The statute did not survive the merger of East and West New Jersey in 1702.  Consequently, the Court made short work of the history summing it up, "[a]t most eight years of history in half a Colony roughly a century before the founding sheds little light on how to properly interpret the Second Amendment."  *Id.* at 2144.
[163] *Baird*, 2023 WL 5763345 at *8 (citations omitted).

## IV.   IN AMERICA PEOPLE WERE GENERALLY FREE TO CARRY FIREARMS PUBLICLY AND PEACEABLY FROM 1791 to 1868

### A.   Traditions

The history and tradition of the United States is a tradition of widespread gun ownership and expertise.  *Bruen* says, "those who sought to carry firearms publicly and peaceably in antebellum America were generally free to do so."[164] Thomas Jefferson pointed out that our soldiers were good shots because they had practiced with guns since they were children.  Jefferson wrote,

> I inclose you a list of the killed, wounded, and captives of the enemy from the Commencement of hostilities at Lexington in April 1775, until November 1777.  since which there has been no event of any consequence ... I think that upon the whole it has been about one half the number lost by them.  In some instances more, but in others less. *This difference is ascribed to our superiority in taking aim when we fire; every soldier in our army having been intimate with his gun from his infancy.*[165]

Then, having firearms was commonplace.  Carrying firearms was accepted.  Proficiency with firearms was encouraged.  Readiness with firearms was required.  Then, as now, terrorizing with a firearm or carrying a firearm with the intent to assault another was punishable.  But, "[n]one of the [] historical limitations on the right to bear arms . . . operated to prevent law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose."[166]

Notwithstanding having significant time to do so, the State has identified no

---

[164] 142 S. Ct. at 2146.

[165] Letter from Thomas Jefferson, to Giovanni Fabbroni, *Founders Online*, National Archives (June 8, 1778), https://founders.archives.gov/documents/Jefferson/01-02-02-0066 [https://perma.cc/8VTV-K9HB]; [Original source: *The Papers of Thomas Jefferson*, vol. 2, *1777–18 June 1779*, ed. Julian P. Boyd. Princeton: Princeton University Press, 1950, pp. 195–98] (emphasis added).

[166] *Bruen*, 142 S. Ct. at 2150.

historical statute or national tradition of firearm regulation so broad in its coverage or so far reaching in its effect as its large capacity magazine ban.  So, what are the traditions of firearm regulation evidenced by the State's law list?

Historical regulations are considered chronologically, "mindful that greater weight attaches to laws nearer in time to the Second Amendment's ratification."[167]  The Court has reviewed every law cited in the State's list.  It has sometimes searched for the actual text of a cited law rather than the parties' summary in order to understand any legal nuance.  It has reviewed the laws with a view to understanding the tradition of all the states and their contexts.  For example, as the nation expanded old states became interior states and new states became frontier states.  Frontier states often had different social and security concerns than did the interior of the new nation.  The Court sought to understand how states responded to new technological developments in ammunition, revolvers, repeaters, and high-capacity, fast-shooting, lever-action rifles.

The State's experts opine that gun laws were plentiful and widespread and firearm regulation was the norm.  But, if the test were to look at gun laws with that level of generality, no gun law would ever fail scrutiny and *Heller*, *McDonald* and *Bruen* could not have been decided as they were.  Furthermore, as will be shown, it is an exaggeration. The State also says regulations on dangerous or unusual *weapons* existed throughout American history.  By "weapons," the State means non-firearms.

Relevantly similar regulations are *firearm* prohibitions—not bladed or melee weapon regulations.  And neither "dangerous or unusual" nor "unusually dangerous" is the test, although the State cannot point to an outright prohibition on even unusual or unusually dangerous *firearms* until Alabama's 1868 prohibition on the dangerous and unusual rifle-walking cane.  [87]

Because the State cannot find a historic regulation of *firearms*, it turns to the

---

[167] *Rahimi*, 61 F.4th at 456.

historic regulations of *weapons*, whether bladed weapons, melee weapons, blunt weapons, or leaded weapons.  Yet, the Supreme Court does not look to knife laws when reviewing a restriction about guns.  *Bruen* teaches that a state's burden is to identify a historical tradition of *firearm* regulation, not a tradition of knife regulation.  Underscoring the importance of its words, three different times *Bruen* repeats the specific phrase "firearm regulation," as in the following instances: (1) "Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of *firearm regulation*;[168] (2) "The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of *firearm regulation*;"[169] and (3) "[T]he burden falls on respondents to show that New York's proper-cause requirement is consistent with this Nation's historical tradition of *firearm regulation*."[170]  In contrast, the *Bruen* majority opinion did not mention bowie knives at all.  The Supreme Court was not interested in traditions of knife regulation or melee regulation.  Even in the dissent, bowie knife laws were hardly mentioned.  Consequently, when the State asserts, "weapons restrictions proliferated," it misses the mark by referring to non-firearm weapon restrictions or concealed carrying restrictions.[171]

During the most important period of history, there were relatively few firearm regulations.[172]  This conclusion can be drawn from inspecting the State's historic law list, and is confirmed by at least one historian: "Between 1607 and 1815 . . . the colonial and

---

[168] *Bruen*, 142 S. Ct. at 2126 (emphasis added).
[169] *Id.* at 2130 (emphasis added).
[170] *Id.* at 2135 (emphasis added).
[171] Def's Br. in Resp., Dkt. 142, at 20.
[172] It is true that there were laws criminalizing the *use* of guns for criminal acts such as carrying a gun with intent to assault another, or displaying a gun in a threatening manner. These were crimes of violence, not crimes of possession.  California, as it should, has similar laws today, such as California Penal Code § 245(a)(2) & (3) (assault with a deadly weapon - firearm) and § 417(a)(2) (exhibition of a firearm in a rude, angry, or threatening manner).

state governments of what would become the first fourteen states neglected to exercise any police power over the ownership of guns by members of the body politic . . . . These limits on colonial and early state regulation of arms ownership outlined a significant zone of immunity around the private arms of the individual citizen."[173]  It is a conclusion confirmed by the Supreme Court.  "Apart from a few late 19th-century outlier jurisdictions, American governments simply have not broadly prohibited the public carry of commonly used firearms for personal defense."[174]

There were regional differences, no doubt.[175]  As the nation aged, northern states had virtually no restrictions on guns and none on ammunition while southern states tended to mainly prohibit concealed carrying.[176]  In short, the State argues that because some states have regulated in some ways the use of some *weapons* (primarily knives and melee devices), that translates into the State being able to regulate any magazine in any way.  That is a *non sequitur* and in this particular case—a bridge too far.

### i.   <u>No Prohibitions on Possessing Guns</u>

It is remarkable to discover that there were no outright prohibitions on keeping or possessing guns.  No laws of any kind.[177]  Based on a close review of the State's law list

---

[173] Robert H. Churchill, *Forum: Rethinking the Second Amendment*, 25 L. & Hist. Rev. 139, 161 (2007).

[174] *Bruen*, 142 S. Ct. at 2156.

[175] "[T]here were profound regional differences in early America."  Decl. of Saul Cornell, Dkt. 118-4 ("Cornell Decl.") at n.49.

[176] Don B. Kates, Jr., *Restricting Handguns* 12 (North River Press ed., 1979), found in Compendium Works Cited in Decl. of Randolph Roth, Dkt. 118-8, at n.53 and 0349 ("By 1850, every Western state barred the carrying of concealed weapons.  In contrast, none of the Northeastern states adopted even that mild a restriction until nearly the turn of the twentieth century.  Until 1924, for instance, the only gun law in New Jersey was the prohibition of dueling.").

[177] According to one scholar, the first prohibition on simple ownership of a gun came in 1911.  Churchill, *supra*, at 139 n.61 ("The first law restraining gun ownership by citizens mentioned in the secondary literature is New York's 1911 Sullivan Law, which prohibited the ownership of concealable arms without a police permit."); *see also* David

and the Court's own analysis, Plaintiffs are correct in asserting that there are no Founding-era categorical bans on firearms in this nation's history.  Though it is the State's burden, even after having been offered plenty of opportunity to do so, the State has not identified any law, anywhere, at any time, between 1791 and 1868 that prohibited simple possession of a gun or its magazine or any container of ammunition (unless the possessor was an African-American or a slave or a mulatto).[178]

Surely, with 315 other entries in the State's law list, there must be many other laws in the relevant time period of demonstrating a tradition of firearm regulation analogous to the large capacity magazine ban.  What else is there?

### ii.   No Gun Laws In The Northern States For 50 Years

From the adoption of the Second Amendment through the next 50 years, there were no firearm restrictions in any states north of the Mason-Dixon Line.[179]  One could

---

B. Kopel and Joseph G.S. Greenlee, *This History of Bans on Types of Arms Before 1900* 50 J. of Legis., Apr. 25, 2023, at 45–46 (2024), https://ssrn.com/abstract=4393197 [https://perma.cc/P85U-ASTZ] ("Before, during, and after the Revolution, no state banned any type of arm, ammunition, or accessory.  Nor did the Continental Congress, the Articles of Confederation Congress, or the federal government created by the U.S. Constitution in 1787 . . . .  There is no evidence that any of the Founders were concerned about individuals having too much firepower.  After a long, grueling war against the world's strongest military, limiting individuals' capabilities was not a concern.").

[178] Even before *Bruen* was decided, at least one other judge has applied the text, history, and tradition test with analogical reasoning for a 10-round magazine ban, and came to the same conclusion.  *See Ass'n of N.J. Rifle & Pistol Clubs Inc. v. AG N.J.*, 974 F.3d 237, 258 (3d Cir. 2020) (Matey, J. dissenting) ("This history reveals a long gap between the development and commercial distribution of magazines, on the one hand, and limiting regulations, on the other hand. . . . Some will argue there must be an outer boundary to this analysis that, when crossed, renders a magazine dangerous and unusual.  If so, it does not appear in the history and traditions of our Nation. . . . As a result, and limited to this record, I would hold that magazines are arms protected by the Second Amendment and an act limiting magazine capacity to 10 rounds burdens the Appellants' Second Amendment rights.").

[179] The Mason-Dixon Line established the boundary line between Pennsylvania and Maryland.  Beyond its importance as a literal boundary between states, "the Mason-

live in any of the northern states without restrictions of almost any kind.[180]  A gun owner enjoyed freedom with no infringing prohibitions from 1789 to 1845 in Pennsylvania, New York, Connecticut, Massachusetts, New Hampshire, Rhode Island, Vermont, Maine, Ohio, Illinois, Michigan, or Indiana.  One might never be subject to a later surety statute in Massachusetts (1836) [29] and Maine (1841) [46].[181]  If anything, regulations were not about what kind of firearm one was *not* allowed to keep, but about the kind of firearm one was *required* to buy and have ready for militia duties.

The same was largely true south of the Mason-Dixon Line (disregarding laws targeting slaves and Indians, neither of which were considered to be citizens by lawmakers).  A citizen could reside in any of the northern states and half of the southern states for the first fifty years free from state government firearm restrictions.  This

---

Dixon Line has become known as the boundary between the North and the South.  It took on that association on March 1, 1790, when the Pennsylvania Assembly passed legislation ending slavery in the state.  Thus, the Mason-Dixon Line became the legal and the philosophical boundary between slave territory and free land, since slavery was still allowed in Maryland.  That was especially true after the Missouri Compromise was passed in 1820, which prohibited slavery north of the Mason-Dixon Line.  To the many slaves who used whatever means necessary to reach free land, the Mason-Dixon Line became important to their freedom.  For the slaves located in Maryland, they only needed to get to the state line to secure their freedom, although many continued traveling north in an attempt to get as far away from their former masters as possible."  Kathryn DeVan, *Our Most Famous Border: The Mason-Dixon Line*, Pa. St. Univ. (fall 2008), https://pabook.libraries.psu.edu/literary-cultural-heritage-map-pa/feature-articles/our-most-famous-border-mason-dixon-line [https://perma.cc/B6WN-DHAC].

[180] The State lists one New Jersey statute from 1799 as a law purportedly prohibiting the carrying of a pistol with the intent to assault [19], but this appears to be a sentencing enhancement statute applicable only if one was apprehended for burglary.  *See* An Act to Describe, Apprehend and Punish Disorderly Persons (1799), Duke Ctr. For Firearms L., *Charles Nettleton, Laws of the State of New-Jersey Page 474, Image 501 (1821) available at The Making of Modern Law: Primary Sources*, https://firearmslaw.duke.edu/laws/charles-nettleton-laws-of-the-state-of-new-jersey-page-474-image-501-1821-available-at-the-making-of-modern-law-primary-sources/.

[181] That the two states would share similar laws makes sense since Maine was part of the larger Commonwealth of Massachusetts prior to achieving statehood in 1820.

understanding is based on a methodical reading and assessment of the laws set out in the State's survey.  While the parties' experts express some disagreements, their contrary opinions are unpersuasive.

In the northern states there were hardly any firearm laws at all, let alone a tradition of criminalizing the act of keeping or carrying any firearm.  For the District of Columbia, governed by Congress, there were no firearm laws for the first 80 years until a concealed carry prohibition was enacted in 1871.  [97].   Maine enacted its first law, a gunpowder storage regulation to prevent fires, in 1821.  [27].  Massachusetts enacted its first firearm statute in 1836 as a surety law [29] with Maine following suit in 1841.  [46].  *Bruen* already notes that under the surety laws everyone started out with robust carrying rights and *Bruen* saw little evidence that the laws were enforced.

Illinois was admitted to the Union in 1818.  In 1845, Illinois enacted its first firearm statute criminalizing carrying a gun *with the intent to assault another person*. [49].  Indiana became a state in 1816.  In 1855, Indiana criminalized shooting a gun, or throwing stones or sticks, at a train.  [62].  The law did not concern keeping any gun whatsoever, or carrying a gun anywhere, in any manner whatsoever.[182]  Ohio became a state in 1808. The State's law list shows no Ohio state laws respecting firearms until 1859.  [70].  Ohioans did not have a gun law until nearly 70 years after the adoption of the Second Amendment.  Its first gun law was one that prohibited carrying a pistol, bowie knife, dirk, or other dangerous weapon *concealed*.  California enacted its first gun regulation in 1853, which criminalized the act of having "upon him any pistol, gun, knife,

---

[182] The State's law list erroneously describes the 1855 Indiana law as one prohibiting the carrying of a pistol with the intent to injure another.  This appears to be a scrivener's error.  Although the State does not include it in its law list, Indiana may have enacted an earlier statute prohibiting carrying a pistol concealed, with an exception made for travelers.  "In *State v. Mitchell*, 3 Blackf. 229, 1833 WL 2617 (Ind. 1833), the Supreme Court of Indiana, in a one-sentence opinion, upheld a state statute prohibiting the general public from carrying concealed weapons."  *Peruta v. Cnty. of San Diego*, 824 F.3d 919, 933 (9th Cir. 2016).

17-cv-1017-BEN (JLB)

dirk, bludgeon, or other offensive weapon, with intent to assault any person." [57].

In short, the history and tradition of the northern states, states north of the Mason-Dixon Line, was to leave firearm ownership and use completely unregulated.  From the time of the adoption of the Second Amendment to the time of the adoption of the Fourteenth Amendment, there were no state gun laws in Pennsylvania, New York, Connecticut, Rhode Island, Vermont, New Hampshire, Michigan, Wisconsin, Minnesota, Iowa, Nebraska, Kansas, Missouri, or the District of Columbia.  In Massachusetts and Maine there were only surety statutes.  In New Jersey there was a sentencing enhancement for carrying a pistol while committing a burglary.  In this half of the nation, keeping and bearing firearms was done freely without government interference.

### iii.   No Gun Laws In The Southern States For 50 Years

South of the Mason-Dixon Line, where slavery was practiced, there were many laws restricting firearms for slaves, African-Americans, and Indians.  Setting aside that obviously unconstitutional tradition, among the southern states firearm ownership was largely unregulated for at least the first 50 years after 1791.  Like the northern states, from 1791 to 1868 there were no state gun laws in Delaware, North Carolina, South Carolina, Mississippi, Florida, West Virginia, and Texas, according to the State's law list.

The few laws in other southern states that did exist concerned mainly: (1) carrying a pistol *with the intent to assault another*; and (2) carrying a pistol in a *concealed* manner.  Tennessee enacted the first firearm regulation in the southern states in 1801 in the form of a surety law— it was a law dismissed by *Bruen*.  [20].  A decade later in 1811, Maryland passed the second firearm regulation in the south. [23].  The Maryland law was, not a prohibition, but a sentencing enhancement for carrying a pistol *with the intent to assault another*.

In 1813, Louisiana passed the first law prohibiting the carrying of a *concealed* gun.

17-cv-1017-BEN (JLB)

[24].[183]  *Bruen* noticed that a Louisiana court found the prohibition on concealed carrying constitutional only because it permitted open carrying of a firearm.[184]  Kentucky passed a prohibition on carrying a *concealed* pistol that year, although it is omitted from the State's law list.  Perhaps it is omitted because Kentucky's concealed carry law was struck down as unconstitutional a short time later.  The only other firearm regulation in the south during this time period was Georgia's 1816 law prohibiting the carrying of a pistol *with intent to assault* another person.  [25].

Around 50 years after the Second Amendment, four southern states passed their own first firearm regulations, also in the form of *concealed* carry prohibitions.  In 1837, Arkansas banned carrying a pistol concealed unless on a journey.  [32].  In 1837, Georgia added its own prohibition on carrying a pistol concealed.  [33].  The constitutionality of the Georgia law was upheld because open carry was unregulated.[185]  In 1838, Virginia prohibited carrying a pistol concealed.  [40].  In 1839, Alabama prohibited carrying a firearm concealed [41], later adding exceptions for self-defense and for travelers.  [45].[186]

Three more regulations were enacted in the south in the years leading up to the Fourteenth Amendment's adoption.  In 1856, Tennessee passed a law affecting only minors.  [65].  In 1868, Florida prohibited carrying secretly "arms of any kind whatever"

---

[183] Louisiana reenacted similar, if not the same, statutes two more times, in 1842 and again in 1855.  [63].
[184] 142 S. Ct. at 2146 and n.19 (quoting *State v. Chandler*, 5 La. 489, 490 (1850) ("Louisiana concealed-carry prohibition 'interfered with no man's right to carry arms (to use its words) "in full open view," which places men upon an equality'")).
[185] *Nunn v. State*, 1 Ga. 243, 251 (1846) ("We are of the opinion, then, that so far as the act of 1837 seeks to suppress the practice of carrying certain weapons secretly, that is valid, inasmuch as it does not deprive the citizen of his natural right of self-defence, or of his constitutional right to keep and bear arms.  But that so much of it, as contains a prohibition against bearing arms openly, is in conflict with the Constitution, and void.").
[186] *Lockett v. State*, 47 Ala. 42, 45–46 (1872) ("Nor is it required that he should have any necessity for the use of his pistols.  It is enough if he was traveling on a journey, long or short.").

54

17-cv-1017-BEN (JLB)

and the outright carrying of a pistol or other arm or weapon.  [90].  The Florida law was not scrutinized in a published court decision.[187]

Significantly, the first restriction on a *dangerous and unusual* firearm did not occur until 1868, the year the Fourteenth Amendment was adopted.  That year, Alabama prohibited carrying a rifle walking cane.  [87].  A rifle walking cane was a single shot rifle disguised to appear as a walking cane with a variety of handles.  When fired, one bullet would exit through the bottom of the cane.  It was patented in 1858 and manufactured by the E. Remington & Sons company until approximately 1888, with less than 2,000 produced.[188]  Remington was the only major gun maker to produce a rifle walking cane gun.  California currently has a law prohibiting possession of a "cane gun." *See* Cal. Penal Code § 24410.

In short, the history and tradition of the states south of the Mason-Dixon Line, was to leave firearm ownership and use mostly unregulated.  At least for the first half of the century, in this half of the nation, keeping and bearing firearms was done freely, with a handful of states enacting prohibitions on carrying pistols in public in a concealed manner, and Maryland and Georgia making it a crime to carry a firearm with the intent to assault another person.

---

[187] However, an 1867 court decision considered an earlier law where only *concealed* carrying was prohibited.  *See Sutton v. State*, 12 Fla. 135, 136 (1867) ("The statute under which this indictment was found provides, 'that hereafter it shall not be lawful for any person in this State to carry arms of any kind secretly on or about their person, &c.: Provided, that this law shall not be so construed as to prevent any person from carrying arms openly outside of all their clothes' . . . . The statute was not intended to infringe upon the rights of any citizen to bear arms for the 'common defense.'  It merely directs how they shall be carried, and prevents individuals from carrying concealed weapons of a dangerous and deadly character, on or about the person, for the purpose of committing some malicious crime, or of taking some undue advantage over an unsuspecting adversary.").

[188] *See* Remington Soc'y of Am., *Remington Cane Guns*, https://www.remingtonsociety.org/remington-cane-guns/ [https://perma.cc/A74W-EHPT] (last visited May 26, 2023).

### iv. <u>Territories</u>

Among the State's law list is a number of regulations from 19th century territories. *Bruen* has already considered such laws and decided they are not particularly helpful for several reasons. "First, the bare existence of these localized restrictions cannot overcome the overwhelming evidence of an otherwise enduring American tradition . . . ."[189] "These territorial 'legislative improvisations,' which conflict with the Nation's earlier approach to firearm regulation, are most unlikely to reflect 'the origins and continuing significance of the Second Amendment' and we do not consider them 'instructive.'"[190] "Second, because these territorial laws were rarely subject to judicial scrutiny, we do not know the basis of their perceived legality . . . . we fail to see how they inform 'the origins and continuing significance of the Amendment.'"[191] "Finally, these territorial restrictions deserve little weight because they were—consistent with the transitory nature of territorial government—short lived . . . . Thus, they appear more as passing regulatory efforts by not-yet-mature jurisdictions on the way to statehood, rather than part of an enduring American tradition of state regulation."[192] One commentator disagrees.[193] Even so, the territorial regulations suggest an absence of gun bans during the most important historical period.

None of the territorial regulations from 1791 to 1868 prohibited a firearm. There were no prohibitions on owning firearms of any type. There were no prohibitions on keeping a firearm of any type for self-defense, whether in the home or in public. The first territorial regulation came approximately 47 years after the Second Amendment (in 1839) and prohibited the carrying of a firearm in a *concealed* manner in the Florida

---

[189] *Bruen*, 142 S. Ct. at 2154.
[190] *Id.* (quoting *Heller*, 554 U.S. at 614).
[191] *Bruen*, 142 S. Ct. at 2155 (quoting *Heller*, 554 U.S. at 592).
[192] *Id*. (citations omitted).
[193] *See* Andrew Willinger, *The Territories Under Text, History, and Tradition*, 101 Wash. Univ. L. Rev. (2023), https://ssrn.com/abstract=4372185.

Territory.  [42].  In other words, for the first 40 years of the nation's history, the only territorial restriction on firearms, was in the Florida territory taken from Spain in 1819.

In 1853, the New Mexico Territory also adopted a *concealed* carrying prohibition. [58].  In 1854, the Washington Territory prohibited *exhibiting* a pistol in a rude, angry, or threatening manner, reenacting a similar law in 1859.  [60, 71].  The Nebraska Territory made it a crime to carry a pistol *with the intent to assault* another person in 1858.  [68] The Colorado Territory (in 1862 and again in 1867) and the Montana Territory (in 1864) restricted the *concealed* carrying of a pistol in a city, town, or village.  [75, 79, 84]. While these territorial laws do evidence some later restrictions on the manner of carrying firearms in some public places, they do not not evidence a history or tradition of prohibiting any firearms of any type.

### v.   California's First Concealed Carry Law Was a Failure

In 1863, California's homicide rate reached "catastrophic levels."[194]  With no Second Amendment analogue in the state constitution, California's solution was to ban carrying concealed weapons.  The experiment failed.  In 1870, the legislature repealed the law, because it disarmed the good citizen, but the law was not followed by "the vast majority of roughs, fighting men, and predatory characters,"[195] and the police were "apt to arrest any quiet citizen" with a concealed weapon.[196]

### B.   Historical Twins

*Bruen* concluded that "[n]one of these historical limitations on the right to bear arms approach New York's proper-cause requirement because none operated to prevent

---

[194] Decl. of Randolph Roth, Dkt. 118-8 ("Roth Decl."), at ¶ 36.
[195] *Id.* at ¶ 37 and n.84 (citing Clayton E. Cramer and Joseph E. Olson, *The Racist Origins of California's Concealed Weapon Permit Law*, SSRN (Aug. 12, 2016) (quoting *The Carrying of Concealed Weapons*, Daily Alta (San Francisco) California, March 13, 1869, at 2, and *Concealed Deadly Weapons*, Sacramento Daily Union, December 16, 1870, at 2.)).
[196] *Id.*

law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose."[197]  The same can be said about California's magazine ban.  To paraphrase the Supreme Court, none of these historical limitations on the right to bear arms approach California's complete ban on magazines able to hold more than 10 rounds.  None operated to prevent law-abiding citizens from possessing as much ammunition as they thought best.

A historical twin is not unimaginable.  It could have been the case that the early states prohibited having large capacity gunpowder sacks, or, they might have prohibited carrying more than 10 lead bullets.  There were no such restrictions.   There are no Founding-era dead ringers or historical twins.  Of course, the State does not need to find a historical twin, but a second cousin twice-removed, is not enough.

## V.    **ANALOGUES**

Although the State does not identify any historical twins of its restrictions on magazines, it may not have to.  A history and tradition of a relevantly similar firearm regulation could suffice.  After all, it can be argued that removable magazines represent a dramatic change in technology and the State is attempting to address a modern societal concern.  In such cases, *Bruen* allows a more nuanced approach.  On one hand, compared to muskets of the colonial era, a Glock 17 with its 17-round magazine clearly represents a dramatic technological advancement.  On the other hand, the lever-action repeating Henry and Winchester rifles popular at the time of the Fourteenth Amendment were already dramatic technological advancements in firearms.  These popular lever-action rifles had large tubular magazines that held a lot of ammunition and could be fired multiple times in succession, accurately and quickly.  Yet, there are no state prohibitions on possession or manufacture of these lever-action rifles in the State's law list.

In any event, while California does not need to identify a dead ringer for its

---

[197] 142 S. Ct. at 2150.

magazine ban, "California cannot satisfy the requirement for a closely analogous historical regulation by reference to any general firearm regulation California might unearth."[198]

### A.   The State's Best Historic Analogue? A New York City Gunpowder Storage Law Following the Worst City Fire in Colonial America

Asked to identify the best historic analogue to its sweeping prohibition on large capacity magazines, the State identified a New York City gunpowder storage law following the worst city fire in Colonial America.  With the assistance of scholars who have studied historic laws for years the State identified a 1784 statute regulating the amount of gunpowder that could be stored inside a New York City building.[199] Because the State has identified this as its best analogue, it deserves closer consideration.

The gunpowder storage law has nothing to do with gun violence.  It was *a fire safety regulation*.  Unsurprisingly, the law was enacted after New York City suffered two great fires, one of which is described as, "The most destructive fire in colonial North America."[200]  The first fire, in the year 1776, burned much of Manhattan to the ground and destroyed 493 houses in its path.  In 1778, a second fire swept through the city and destroyed 54 more houses and several warehouses.[201]  After these two terrible fires the New York State legislature responded with a law for New York City limiting the quantity of gunpowder that a person could store in any one building to 28 pounds.  It applied only

---

[198] *Baird*, 2023 WL 5763345, at *8.
[199] *See* Defendant's Response Brief in Response to the Court's Order Entered on February 7, 2023, Dkt. 143, at 1, identifying 1784 Laws of N.Y. 627, chapter 28.
[200] New York City Fire Museum, *The Great New York Fire of 1776* (Mar. 21, 2023), https://www.nycfiremuseum.org/greatfire1776 [https://perma.cc/A3BW-TQRP].
[201] Richard Howe, *Notes on the Great Fires of 1776 and 1778* (2014), The Gotham Center for New York City History, https://www.gothamcenter.org/blog/notes-on-the-great-fires-of-1776-and-1778 [https://perma.cc/WJ4V-3QKP].

17-cv-1017-BEN (JLB)

to that part of Manhattan from city hall on the south end to one mile north.[202] Gunpowder was to be stored in fireproof stone jugs or tin canisters holding no more than 7 pounds each. Reinforcing that the law was enacted to prevent fires, it also required gunpowder be contained to prevent spills during transport through the streets.[203]

There was much the law did not do. It did not limit the total amount of gunpowder a person could own or use, as long as quantities over 28 pounds were kept in the public magazine or in additional buildings. It placed no limit on the number of lead bullets a person could keep or possess. It did not restrict a person from keeping his firearms loaded with gunpowder and bullets in his home, business, or when in public. Beyond the one mile stretch of lower Manhattan island, the law had no application anywhere else in the state. And 28 pounds is a lot of gunpowder. One New York militia soldier was required to bring ¼ pound of gunpowder when called to muster.[204] So, 28 pounds of gunpowder could outfit 112 militia men. As the State's expert Professor Cornell notes, "Twenty to thirty pounds of gunpowder is certainly not an inconsiderable amount."[205]

---

[202] "[I]t shall not be lawful . . . to have or keep any quantity of gun powder exceeding twenty-eight pounds weight, in any one place, less than one mile to the northward of the city hall . . . except in the public magazine at the Fresh-water . . . ."

[203] The law specified, "[a]nd in order to prevent any fatal consequences which may arise, from the carriage of gun powder, in and through the streets of the city of new York, by carts, carriages, or by hand, or otherways [sic], it shall be in a tight cask, well headed and hooped, and shall be put into bags or leather-cases, and intirely [sic] covered therewith, so as that none be spilt or scattered in the passage thereof . . . ."  1784 Laws of N.Y at 628.

[204] *See* Stats. at Large, New York 1867, Chapter X, Title VII, Article 1, §6, at 287 (eff. 1835) (penalties for militia men ill-equipped) ("[F]or want of two spare flints and a knapsack, twenty four cartridges, shot-pouch, powder-horn, twenty balls, and *a quarter of a pound of powder*, twenty five cents each . . . ."), https://books.google.com/books/content?id=RkkwAQAAMAAJ&pg=PA287&img=1&zoom=3&hl=en&bul=1&sig=ACfU3U3ooEDz2oBmZb_g3qythhk8S6UJOg&ci=99%2C102%2C820%2C820&edge=0 [https://perma.cc/KS72-L87G].

[205] Saul Cornell & Nathan DeNiro, *A Well Regulated Right*, 73 Fordham L. Rev. 487 n.173 (2004).

For nuanced analogues, the New York City gunpowder storage law fails the why and how tests.[206]  The "why" of the large capacity magazine ban is to introduce a "critical pause" into a mass shooter's unrelenting attack.  The "why" of the historic gunpowder storage law is to reduce the risk of building fires.  The "how" of the large capacity magazine ban is limiting the number of ammunition rounds that can be loaded in a gun for self-defense.  The "how" of the historic gunpowder storage law burden was generously limiting the storage (and not the amount loaded into guns for self-defense) of gunpowder for a geographic area smaller than one square mile.  In the end, the State's proposed analogue is not relevantly similar.

One other gunpowder storage law mentioned by the State which applied only in the city of Boston, Massachusetts, fares no better.  This was also a *fire* safety regulation—nothing more.[207]  "The ordinance did not prohibit *carrying* loaded firearms within the City of Boston—only leaving them unattended in a building—and . . . this law was for the protection of those fighting fires."[208]  In fact, one scholar mused, "Strictly speaking, the law did not forbid bringing an unloaded gun into a building, and then loading it when inside.  So, occupants of homes or businesses remained free to keep loaded guns."[209]  Moreover, the State offers no evidence that the Massachusetts law was enforced.  A search of *Thacher's Reports*, a collection of reports of criminal cases tried in the City of Boston Municipal Court from 1823–1843 reveals no such prosecutions.[210]

---

[206] Courts should examine "how and why the regulations burden a law-abiding citizens' right to armed self-defense."  *Bruen*, 142 S. Ct. at 2132-33.

[207] *See Renna*, 20-cv-2190-DMS-DEB, 2023 WL 2846937, *12–13 (citing *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 963 (9th Cir. 2014) (stating "Boston's firearm-and-gunpowder storage law is historically distinct from the challenged firearm regulation in light of *Heller*").

[208] Clayton E. Cramer and Joseph Edward Olson, *Pistols, Crime, and Public: Safety in Early America*, 44 Willamette L. Rev. 699, 705 (2008) (emphasis in original).

[209] *Id.*

[210] *Thacher's Reports* may be found at https://www.mass.gov/info-details/historical-massachusetts-cases#1800-1899-.

This whole gunpowder storage argument has been raised before and it has been rejected before.  It was raised a dissent in *Heller* and relied on the same laws of New York and Massachusetts, and the same writings of Cornell.[211]  The *Heller* majority was unimpressed.  *Heller* says,

> The other laws Justice Breyer cites are gunpowder-storage laws that he concedes did not clearly prohibit loaded weapons, but required only that excess gunpowder be kept in a special container or on the top floor of the home.  Nothing about those fire-safety laws undermines our analysis; they do not remotely burden the right of self-defense as much as an absolute ban on handguns.[212]

Applying the same reasoning to this case, the early fire-safety gunpowder storage laws do not remotely burden the self-defense right as much as an absolute ban on magazines holding more than 10 rounds.

### B.   The State's Historic Analogue No. 2: Concealed Carry Laws

Next, the State turns to historic laws regulating the *concealed* carrying of bowie knives, dirks, sword canes, and some pistols, as analogues.

#### i.   Pocket Pistols

Some historic laws prohibited carrying a pocket pistol in a concealed manner.  By 1868, about a dozen states had laws prohibiting carrying concealed pistols.  Importantly, the concealed carry laws did not prohibit either keeping pistols for all lawful purposes or carrying all guns openly.  And none included long guns or ammunition containers in their restrictions.  Pocket pistols were entirely lawful to keep and use at home for self-defense.

Prohibiting the concealed carrying of a pistol was constitutionally permissible only when a citizen could freely keep and carry the same gun openly.   The statutes were often tested in court, suggesting that any broad carrying restriction ran close to the

---

[211] *Heller*, 554 U.S. at 684–86 (Breyer, J., dissenting).
[212] *Id.* at 631–32.

17-cv-1017-BEN (JLB)

constitutional line.  Today's large capacity magazine ban prohibits carrying magazines in any manner -- and even more restrictively prohibits simple possession.

Historic concealed carry laws for pistols have a different "why" and "how" than do the State's large capacity magazine ban.  The "why" of a concealed carry law was to prevent unfair surprise attacks by a person who appeared to be unarmed.  The "how" of the historic concealed carry prohibitions was to proscribe the manner of carrying a pocket pistol and only when in public.  The substantial burden imposed by the large capacity magazine ban is not analogous to the burden created by a concealed carry restriction for public carrying of a pocket pistol.  Such a history and tradition of concealed carry prohibitions are not nuanced analogues for California's magazine ban as they are not relevantly similar.

### ii.   Dirks, Daggers, Sword Canes, and Bowie Knives

The State now asks the Court to compare firearms equipped with large capacity magazines to knives.  Undoubtedly, dirks, daggers, and bowie knives are dangerous.  But dirks, daggers, sword canes, and bowie knives were not firearms; they were bladed instruments.  *Bruen* says the state's burden is to identify a historical *firearm* regulation, not a knife regulation.  In the dissent, knives were cited only where territorial laws also affected the carrying of pistols, presumably because of the pistols.[213]  *Heller* did not mention knife laws at all in evaluating the District of Columbia's handgun ban.  And the Supreme Court's plurality did not mention bowie knives in evaluating Chicago's handgun ban, except as an example of Reconstruction-era efforts to disarm African-Americans.[214] This is not to say that bowie knives are not "arms" imbued with Second

---

[213] *Id.* at 2186 (Breyer, J. dissenting) ("For example, Georgia made it unlawful to carry, 'unless in an open manner and fully exposed to view, any pistol, (except horseman's pistols,) dirk, sword in a cane, spear, bowie-knife, or any other kind of knives, manufactured and sold for the purpose of offence and defence.' Ga. Code § 4413 (1861).").
[214] *McDonald*, 561 U.S. at 771.

Amendment protection.[215] Historical knife laws would be relevant in evaluating a modern prohibition on knives.  It is simply to say that historical *firearm* regulations are obviously more likely to be relevant analogues for modern *firearm* restrictions.

Even if knife regulations were relevant, they would not help the State much.[216] There were laws restricting bowie knives in some states in the 1800's, but not the vast majority of states.  There is also little evidence of actual prosecutions for simply

---

[215] *See, e.g.*, David B. Kopel, Clayton E. Cramer and Joseph E. Olson, *Knives and the Second Amendment*, 47 U. Mich. J. L. Reform 167, 168 (2013); Defs.' Compendium of Works, Dkt. 158-2, at 65, 67 ("This Article analyzes Second Amendment protection for the most common 'arm' in the United States – the knife.").

[216] This opinion is shared by two historians.  *See* David B. Kopel and Joseph G.S. Greenlee, *The History of Bans on Types of Arms Before 1900*, 50 J. of Legis., Apr. 25, 2023, at 168–69 (2024), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4393197 [https://perma.cc/P85U-ASTZ] ("Bans on modern rifles and magazines cannot be rescued by diverting attention away from the legal history of firearms law, and instead pointing to laws about other arms.  Dozens of state and territorial legislatures enacted laws about Bowie knives, as well as dirks and daggers.  Prohibitory laws for these blades are fewer than the number of bans on carrying handguns, and *Bruen* found the handgun laws insufficient to establish a tradition constricting the Second Amendment.

As for other non-blade impact weapons, the sales and manufacture bans in a minority of states for slungshots and knuckles could be considered as involving arms "not typically possessed by law-abiding citizens for lawful purposes."

Other flexible impact arms, most notably blackjacks, were "typically possessed by law-abiding citizens for lawful purposes," especially by law enforcement officers.  Likewise, modern semiautomatic rifles and standard magazines are also highly preferred by today's law enforcement officers.

For blackjacks and sand clubs, only one state, New York, enacted a sales and manufacture ban. That came at a time when the legislature was unencumbered by a Second Amendment enforceable against the states or by a state constitution right to arms.  As *Bruen* teaches, a lone eccentric state does not create a national legal tradition.

For every arm surveyed in this article, the mainstream American legal tradition was to limit the mode of carry (no concealed carry), to limit sales to minors (either with bans or requirements for parental permission), and/or to impose extra punishment for use in a crime.

The fact that most states banned concealed carry of Bowie knives is not a precedent to criminalize the mere possession of modern rifles and magazines.").

1  possessing a bowie knife, much less a judicial opinion on constitutionality.  One court

2  observed that a Tennessee bowie knife law was generally disregarded.[217]

3      The argument that a cluster of laws prohibiting the carrying of dangerous knives

4  could justify a gun ban, lost its wind in *McDonald*.  If the regulation of knives was not a

5  sufficient analogue for restricting handguns in Chicago, neither are regulations of dirks,

6  daggers, sword canes, and bowie knives useful analogues for prohibiting modern

7  magazines.

8      **C.   The State's Historic Analogue No. 3: Guns Set as Traps**

9      Historic laws prohibiting trap guns are proposed as a third analogue by the State.

10  What the State does not admit or seem to recognize is that "trap guns" are not guns at all.

11  They are a method by which a gun, any gun, can be set up to fire indiscriminately

12  through the use of springs, strings, or other atypical triggering mechanism without

13  needing an operator.  Nonetheless, absent from our history is a tradition of trap gun

14  restrictions in the important years between the 1791 and 1868.  The 1771 New Jersey trap

15  gun law, upon which the State relies, predates the Declaration of Independence, New

16  Jersey statehood,[218] and the Second Amendment.  Ninety-five years passed before a

17  second restriction on trap gun was enacted and that one applied only to the Utah Territory

18  (1865).  [80].  Within the states, the first regulation on setting a trap gun, was enacted in

19  Minnesota in 1873.  [109].  Two states followed later in 1875 (Michigan) and 1884

20

21

22  [217] *See, e.g.*, *Day v. State*, 37 Tenn. 496, 499 (Tenn. 1858) ("It is a matter of surprise that
23  these sections of this act, so severe in their penalties, *are so generally disregarded* in our
    cities and towns.") (describing state law prohibiting the concealed carrying of bowie
24  knives) (emphasis added).

25  [218] New Jersey was one of the few states that did not have in its state constitution a
26  provision like the Second Amendment.  (Six states do not have provisions protecting a
    right to arms in their state constitutions:  California, New Jersey, New York, Maryland,
27  Minnesota, and Iowa.)  *See* David B. Kopel and Clayton E. Cramer, *State Court
    Standards of Review for the Right to Keep and Bear Arms*, 50 Santa Clara L. Rev 1113,
28  1145 n.51 (2010).

(Vermont).  In other words, trap guns were not prohibited by law in the District of Columbia or 36 of the 37 states (then existing), until 1873.  California did not enact its own trap gun law until 1957.[219]  Court decisions between 1791 and 1868 recognized that it was entirely lawful to use trap guns (or spring guns, as they were sometimes called) to defend one's property.[220]  If this is what a national tradition of trap gun regulation looks like, it is a strange look, indeed.

Claiming trap guns were "dangerous weapons commonly used for criminal behavior and not for self-defense,"[221] the State has a problem with the facts.  There is little historical evidence that trap guns were used for criminal behavior.  Rather, guns

---

[219] *See* Cal. Fish & Game Code § 2007.

[220] *See, e.g.*, *Gray v. Combs*, 7 J. J. Marsh, 478 (Ky. 1832) (one who sets traps or spring guns to protect valuable property by means of which another is killed while attempting to enter the premises is guilty of no crime); *Loomis v. Terry*, 1837 WL 2808 (N.Y. Sup. Ct. 1837) ("It is not like setting spring guns with public notice of the fact; for even that has been held warrantable as being necessary (*Ilott v. Wilkes*, 3 Barn. & Ald. 304)."); *State v. Moore*, 31 Conn. 479, 479–80 (Conn. 1863) ("Breaking and entering a shop in the night season with intent to steal, is by our law burglary, and the placing of spring guns in such a shop for its defense, would be justified if a burglar should be killed by them."); *Maenner v. Carroll*, 46 Md. 193, 208 (Md. Ct. App. 1877) ("While it is decided that traps, spring-guns, and other dangerous instruments, may be lawfully placed on private grounds, for the purpose of deterring trespassers or catching strange animals doing damage . . . ."); *see also Simpson*, 59 Ala. at 18 (citing *Moore*, 31 Conn. at 479) ("The setting a spring-gun on his premises, by the owner, is culpable only because of the intent with which it is done.  Unless the public safety is thereby endangered, it is not indictable. If dangerous to the public, it is indictable as a nuisance."); *United States v. Gilliam*, 25 F. Cas. 1319, 1320 and n.2 (D.C. Crim. Ct. 1882) ("The setting of a spring-gun as a protection for property, though not in itself unlawful and indictable, is certainly undeserving of encouragement. . . .") (citing English common law and the court of King's Bench, *Ilott v. Wilkes*, 3 Barn. & Ald. 304 ('A trespasser, having knowledge that there are spring-guns in a wood, although he may be ignorant of the particular spots where they are placed, cannot maintain an action for an injury received in consequence of his accidental treading on the latent wire connecting with the gun, and thereby letting it off.')).

[221] Defs' Br. in Resp., Dkt. 145, at 10 (quoting *Oregon Firearms Fed'n, Inc. v. Brown*, No. 2:22-cv-01815-IM, 2022 WL 17454829, at *13 (D. Or. Dec. 6, 2022), *appeal dismissed*, No. 22-36011, 2022 WL 18956023 (9th Cir. Dec. 12, 2022)).

were set as traps by common people to protect their property from thieves and sometimes for self-defense against burglars. Perhaps just as often trap guns were used to hunt game. Historian and expert witness for the State, Robert Spitzer opines about trap guns: (1) "[t]hose who set gun traps typically did so to defend their places of business, properties, or possessions;" and (2) "opinion was more divided . . . with some arguing that thieves or criminals hurt or killed by the devices had it coming."[222]  So, when the State claims trap guns were used by criminals and not for self-defense, it gets the facts backwards. The how and why of the two types of regulations are not relevantly similar, thus trap gun laws are not useful analogues for prohibiting modern magazines.

> **D.**  **The Best Analogue: Laws Requiring Citizens to Keep and Carry Sufficient Bullets and Gunpowder for Service in the Militia**

California ignores Founding-era laws that present the best analogue to its present-day magazine law. These are the manifold early militia laws requiring each citizen, not to limit the amount of ammunition he could keep, but to arm himself with *enough* ammunition: at least 20 rounds.[223]

Government remains fixed on the notion that it alone can decide that anything larger than a 10-round magazine is not "suitable" for a citizen to have. But, there are no analogous cases in our history. There are no cases where American government dictated that lever-action rifles were unsuitable because single shot rifles were good enough, or

---

[222] (U.S.D.C. Oregon Dkt. 17-2 at ¶¶ 34–53) (first filed in the instant case).
[223] *See, e.g.*, 1784 Mass. Acts 142; 1786 N. Y. Laws 228; 1785 Va. Statutes at Large 12 (12 Hening c. 1); 1 Stat. 271 (1792) (Militia Act); Herbert L. Osgood, *The American Colonies in the Seventeenth Century*, 499–500 (1904) (explaining that states often required citizens to equip themselves with adequate firearms and ammunition, including between 20 and 24 cartridges at minimum); *Silveira v. Lockyer*, 328 F.3d 567, 586 (9th Cir. 2003) ("Much as building codes today require smoke detectors in the home, a man had to have a bullet mould, a pound of powder, four pounds of lead, and twenty bull<sup>et</sup>s, to be produced when called for by a militia officer.") (Kleinfeld, J., dissenting).

1    revolvers were unsuitable because derringers were good enough.[224] These choices have
2    always belonged to the People to decide for themselves how much firepower they need.

3        The right to have firearms for social security was important at the time the
4    Constitution was adopted.  There were many enemies of the young nation.  An armed
5    citizenry provided a much-needed deterrent effect.  Early citizens remembered how the
6    Minutemen of Lexington and Concord, Massachusetts, by assembling as a militia, fought
7    back against the hostile British march to take away guns and gunpowder in April 1776.

8        During the Nation's founding-era, federal and state governments enacted laws for
9    the formation and maintenance of citizen militias.  Three such statutes are described in
10   *Miller*.[225]  Rather than restricting too much firing capacity, the laws mandated a
11   minimum firing capacity.  These statutes required citizens to arm themselves with arms
12   and a minimum quantity of bullets and gunpowder, not to disarm themselves.  When
13   Congress passed the Militia Act in 1792,[226]  the law required a citizen to be equipped to
14   fire at least 20 to 24 shots.[227] A 1786 New York law required "no less than Twenty-four
15   Cartridges," and a 1785 Virginia law required a cartridge box and "four pounds of lead,

---

[224] "I surveyed the gun regulations in the Duke Historical Database from the early medieval period through 1885 to see what terminology was used.  None of the laws that prohibit weapons, aside from the Maryland statute above, specifies a gun part or ammunition case or accoutrements of any kind.  Although many present a list of banned or prohibited weapons – usually without defining them [the assumption is that the reader knows what they refer to], none of the laws mention cartridge boxes, bullets, barrels, or other parts of any weapons."  Declaration of Dennis Baron, Dkt. 118-2, at ¶ 56.
[225] 307 U.S. 174 (1939)
[226] 1 Stat. 271, 2 Cong. Ch. 33.
[227] "That every citizen so enrolled and notified, shall, within six months thereafter, provide himself with a good musket or firelock, a sufficient bayonet and belt, two spare flints, and a knapsack, a pouch with a box therein to contain not less than *twenty-four cartridges*, suited to the bore of his musket or firelock, each cartridge to contain a proper quantity of powder and ball: or with a good rifle, knapsack, shot-pouch and powder-horn, *twenty balls* suited to the bore of his rifle and a quarter of a pound of powder." (Emphasis added).

including twenty blind cartridges." In 1776, Paul Revere's Minutemen were required to have 30 bullets and gunpowder.

These and other citizen militia laws demonstrate that, contrary to the idea of a firing-capacity upper limit on the number of rounds permitted, there was a legal obligation for the average citizen to have at least 20 rounds available for immediate use.[228] There were no upper limits like § 32310; there were floors and the floors were well above 10 rounds.[229] California's large capacity magazine ban is a diametrically opposed analogue.

As one court explained, "[u]nder *Bruen*, the Second Amendment does not 'forbid all laws other than those that *actually existed* at or around the time of the Second Amendment's adoption,' but rather 'the Second Amendment must, at most, forbid laws that could not have existed under the understanding of the right to bear arms that prevailed at the time.'"[230] California's large capacity magazine ban did not exist and could not have existed under the understanding of the Second Amendment at the time of the Founding. This is clear because militia laws of the federal and state governments required citizens to keep and carry more ammunition supplies than 10 rounds. A prohibition like § 32310 would have been impossible to enforce and runs contrary to legal commands for militia readiness.

## VI.   **CONCLUSION**

Removable firearm magazines of all sizes are necessary components of semiautomatic firearms. Therefore, magazines come within the text of the constitutional

---

[228] *Teixeira v. Cty. Of Alameda*, 873 F.3d 670, 685 (9th Cir. 2017) (citing Joyce Lee Malcolm, *To Keep and Bear Arms* 139 (1994)) ("the colonial militia played a primarily defensive role . . . . The dangers all the colonies faced . . . were so great that not only militia members but all householders were ordered to be armed.").

[229] *Duncan*, 366 F. Supp. at 1150.

[230] Def's Br. in Resp., Dkt. 142 at 16 (quoting *United States v. Kelly*, No. 3:22-cr-00037, 2022 U.S. Dist. LEXIS 215189, at *14 n.7 (M.D. Tenn. Nov. 16, 2022)).

declaration that the right to keep and bear arms shall not be infringed.  Because millions of removable firearm magazines able to hold between 10 and 30 rounds are commonly owned by law-abiding citizens for lawful purposes, including self-defense, and because they are reasonably related to service in the militia, the magazines are presumptively within the protection of the Second Amendment.  There is no American history or tradition of regulating firearms based on the number of rounds they can shoot, or of regulating the amount of ammunition that can be kept and carried.  The best analogue that can be drawn from historical gun laws are the early militia equipment regulations that required all able-bodied citizens to equip themselves with a gun and a minimum amount of ammunition in excess of 10 rounds.

Because the State did not succeed in justifying its sweeping ban and dispossession mandate with a relevantly similar historical analogue, California Penal Code § 32310, as amended by Proposition 63, is hereby declared to be unconstitutional in its entirety and shall be enjoined.  At this time, the Court's declaration does not reach the definition of a large capacity magazine in California Penal Code § 16740 where it is used in other parts of the Penal Code to define other gun-related crimes or enhance criminal penalties.

One government solution to a few mad men with guns is a law that makes into criminals responsible, law-abiding people wanting larger magazines simply to protect themselves.  The history and tradition of the Second Amendment clearly supports state laws against the use or misuse of firearms with unlawful intent, but not the disarmament of the law-abiding citizen.  That kind of a solution is an infringement on the Constitutional right of citizens to keep and bear arms.  The adoption of the Second Amendment was a freedom calculus decided long ago by our first citizens who cherished individual freedom with its risks more than the subservient security of a British ruler or the smothering safety of domestic lawmakers.  The freedom they fought for was worth fighting for then, and that freedom is entitled to be preserved still.

The Attorney General respectfully requests a stay of any judgment in Plaintiffs' favor for a sufficient period to seek a stay from the Court of Appeals.  Dkt. 118 at 61–63;

17-cv-1017-BEN (JLB)

Dkt. 142 at 25.  That request is granted.  Therefore, the enforcement of the injunction is hereby stayed for ten days.

**IT IS HEREBY ORDERED** that:

    1. Defendant Attorney General Rob Bonta, and his officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with him, and those duly sworn state peace officers and federal law enforcement officers who gain knowledge of this injunction order, or know of the existence of this injunction order, are enjoined from enforcing California Penal Code § 32310.

    2. Defendant Rob Bonta shall provide, by personal service or otherwise, actual notice of this order to all law enforcement personnel who are responsible for implementing or enforcing the enjoined statute.

    3. This injunction is stayed for ten (10) days from the date of this Order.

**IT IS SO ORDERED.**

    Date: September 22, 2023

HON. ROGER T. BENITEZ
United States District Judge

71

17-cv-1017-BEN (JLB)