ROB BONTA
Attorney General of California
MARK R. BECKINGTON
Supervising Deputy Attorney General
JOHN D. ECHEVERRIA
Deputy Attorney General
ROBERT L. MEYERHOFF
Deputy Attorney General
State Bar No. 298196
  300 South Spring Street, Suite 1702
  Los Angeles, CA  90013-1230
  Telephone:  (213) 269-6177
  Fax:  (916) 731-2144
  E-mail:  Robert.Meyerhoff@doj.ca.gov
*Attorneys for Defendants Rob Bonta in his official*
*capacity as Attorney General of the State of*
*California and Allison Mendoza in her Official*
*Capacity as Director of the Bureau of Firearms*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **WILLIAM WIESE, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**ROB BONTA, et al.,**<br><br>Defendants. | 2:17-cv-00903-WBS-KJN<br><br>**DEFENDANTS' REPLY IN SUPPORT OF AMENDED COUNTER-MOTION FOR SUMMARY JUDGMENT**<br><br>Date:          October 30, 2023<br>Time:         1:30 p.m.<br>Courtroom:  5, 14th Floor<br>Judge:        Honorable William B. Shubb |

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................................................. 1

Argument ..................................................................................................................... 3

    I.      Plaintiffs Mischaracterize the *Bruen* Test. ............................................. 3

    II.     Plaintiffs' Proposed Course of Conduct Is Not Protected by the Second Amendment's Plain Text. ....................................................................... 6

          A.     LCMs Are Accessories, Not Arms, and Are Not Essential to the Operation of Any Firearm for Self-Defense. .................................. 6

          B.     LCMs Are Not Commonly Used in Self-Defense. ................................. 10

    III.    LCM Restrictions Fall Within the Nation's History and Tradition of Firearm Regulation. .......................................................................... 15

          A.     A More Nuanced Approach at Stage Two Is Required in this Case........ 15

          B.     Defendants Have Identified Relevantly Similar Analogues as *Bruen* Requires ....................................................................................... 18

    IV.    Judgment Should Be Entered in Defendants' Favor on Plaintiffs' Takings, Due Process, and Equal Protection Claims. ...................................... 20

Conclusion ............................................................................................................. 23

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Akins v. United States*
   82 Fed. Cl. 619 (2008) ............................................................................................ 21

*Baird v. Bonta*
   2023 WL 5763345 (9th Cir. Sept. 7, 2023) ............................................................ 5

*Bevis v. City of Naperville, Illinois*
   2023 WL 2077392 (N.D. Ill. Feb. 17, 2023) ..................................................... 5, 20

*Brumback v. Ferguson*
   Case No. 1:22-cv-03093 (E.D. Wash.) .................................................................... 4

*Burch v. Regents of Univ. of Cal.*
   433 F. Supp. 2d 1110 (E.D. Cal. 2006) ............................................................ 14, 22

*Columbia Pictures Indus., Inc. v. Pro Real Est. Invs., Inc.*
   944 F.2d 1525 (9th Cir. 1991) ................................................................................ 9

*Defense Distributed v. Bonta*
   2022 WL 15524977 (C.D. Cal. Oct. 21, 2022) ....................................................... 8

*Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.* (*DSSA*)
   2023 WL 2655150 (D. Del. Mar. 27, 2023) ................................................... *passim*

*District of Columbia v. Heller*
   554 U.S. 570 (2008) ............................................................................. 6, 7, 12, 13

*Duncan v. Bonta*
   19 F.4th 1087 (2021) (en banc) .......................................................................... *passim*

*Duncan v. Bonta*
   Case No. 3:17-cv-01017-BEN-JLB (S.D. Cal.) ...................................................... 3

*Fesjian v. Jefferson*
   399 A.2d 861 (D.C. Ct. App. 1979) ....................................................................... 21

*Fried v. Garland*
   2022 WL 16731233 (N.D. Fla. Nov. 4, 2022) ....................................................... 17

*Friedman v. City of Highland Park, Ill.*
   784 F.3d 406 (7th Cir. 2015) ................................................................................. 13

1

<u>**TABLE OF AUTHORITIES**</u>
(continued)

2

<u>Page</u>

3

*Grant v. Lamont*

4

   2023 WL 5533522 (D. Conn. Aug. 28, 2023) ...................................................... 13

*Hanson v. District of Columbia*

5

   2023 WL 3019777 (D.D.C. Apr. 20, 2023) ............................................. 12, 18, 19

6

*Hartford v. Ferguson*

7

   2023 WL 3836230 (W.D. Wash. June 6, 2023).......................................... *passim*

8

*Herrera v. Raoul*

   2023 WL 3074799 (N.D. Ill. Apr. 25, 2023) ...................................................... 20

9

*Jackson v. City & Cnty. of San Francisco*

10

   746 F.3d 953 (9th Cir. 2014)................................................................................ 7

11

*Lingle v. Chevron U.S.A. Inc.*

12

   544 U.S. 528 (2005) .......................................................................................... 21

13

*Lucas v. S.C. Coastal Council*

   505 U.S. 1003 (1992) ........................................................................................ 21

14

*McGlinchy v. Shell Chem. Co.*

15

   845 F.2d 802 (9th Cir. 1988).............................................................................. 22

16

*Miller v. Garland*

17

   2023 WL 3692841 (E.D. Va. May 26, 2023) ...................................................... 7

18

*Nordyke v. King*

19

   681 F.3d 1041 (9th Cir. 2012)............................................................................ 23

*Ocean State Tactical, LLC v. State of Rhode Island*

20

   2022 WL 17721175 (D.R.I. Dec. 14, 2022) .................................................. 4, 7

21

*Or. Firearms Fed'n v. Kotek*

22

   __ F. Supp. 3d __ (D. Or. July 14, 2023).......................................... *passim*

23

*Teixeira v. Cnty. of Alameda*

   873 F.3d 670 (9th Cir. 2017).............................................................................. 7

24

*Teter v. Lopez*

25

   76 F.4th 938 (9th Cir. 2023) ................................................................. 3, 5, 6, 19

26

*United States v. Alaniz*

27

   69 F.4th 1124 (9th Cir. 2023) ........................................................................ *passim*

28

iii

# TABLE OF AUTHORITIES
### (continued)

**Page**

*United States v. Bartucci*
    2023 WL 2189530 (E.D. Cal. Feb. 23, 2023) ................................................ 4, 17

*United States v. Jackson*
    2023 WL 2499856 (D. Md. Mar. 13, 2023) ................................................ 17, 18

*United States v. Jackson*
    622 F. Supp. 3d 1063 (W.D. Okla. 2022) ................................................ 16

*United States v. Kelly*
    2022 WL 17336578 (M.D. Tenn. Nov. 16, 2022) ................................................ 16

*United States v. McAdory*
    935 F.3d 838 (9th Cir. 2019) ................................................ 3

*United States v. Ryno*
    2023 WL 3736420 (D. Alaska May 31, 2023) ................................................ 17

*United States v. Slye*
    2022 WL 9728732 (W.D. Pa. Oct. 6, 2022) ................................................ 17

*Weinberg v. Whatcom Cnty.*
    241 F.3d 746 (9th Cir. 2001) ................................................ 22

STATUTES

California Penal Code § 32310 ................................................ *passim*

1849 N.Y. Laws 403 ................................................ 19

1849 Vt. Acts & Resolves 26 ................................................ 19

CONSTITUTIONAL PROVISIONS

Second Amendment ................................................ *passim*

COURT RULES

Fed. R. Civ. P. 56(c)(4) ................................................ 9

Fed. R. Evid. 201 ................................................ 12

Local Rule 260 ................................................ 1

**INTRODUCTION**

In their Counter-Motion, Defendants presented a robust evidentiary record of undisputed material facts that are more than sufficient for this Court to grant summary judgment in their favor at either stage of the *Bruen* analysis. At the textual stage, Plaintiffs' proposed course of conduct (*i.e.*, the acquisition and possession of "large-capacity magazines" ("LCMs")) is not covered by the plain text of the Second Amendment because (a) LCMs are firearm accessories and thus not weapons protected as "Arms" by the Second Amendment, nor are they accessories necessary for the use of any such firearm for self-defense, and (b) regardless, they are not commonly used (or suitable) for self-defense. In their Opposition to Defendants' Counter-Motion for Summary Judgment ("Pls.' Opp'n"), Plaintiffs submit no evidence to meet their burden of proof or controvert Defendants' evidence, and thus judgment should be entered at *Bruen*'s threshold stage.[1]

Similarly, at the historical analysis stage of the analysis, Plaintiffs fail to counter Defendants' evidentiary showing that Section 32310 is consistent with the Nation's tradition of weapons regulation. Defendants have submitted declarations establishing that LCMs represent a dramatic technological change from the firearm technologies available during the Founding and Reconstruction eras, Counter-Mot. at 20-24, and that Section 32310 addresses the unprecedented social problem of mass shootings, *id*. at 25-26. Plaintiffs do not challenge either conclusion in their Opposition. As a result, this case calls for *Bruen*'s more "nuanced approach" to the historical analysis, which requires district courts to consider "comparable burdens" and "comparable justifications" in assessing whether historical analogues are relevantly similar to the challenged law. Consistent with the determinations of numerous other district courts evaluating the constitutionality of restrictions like Section 32310 on a historical record similar to the one presented here, the burdens imposed by Section 32310 are comparable to those imposed by the

---

[1] Along with their Opposition, Plaintiffs submitted a Reply to Defendants' Responses to Plaintiffs' Statement of Disputed Facts in Support of Plaintiffs' Motion for Summary Judgment [Dkt. No. 136-1]. Nothing in Local Rule 260 (governing motions for summary judgment) or the Court's Standard Information authorizes a party to file a reply in support of its separate statement of facts, and as such Plaintiffs' filing at Dkt. No. 136-1 should be stricken or otherwise not considered by this Court in ruling on either Plaintiffs' Motion or Defendants' Counter-Motion.

1    historical analogues identified by Defendants, and those burdens are comparably justified; thus,

2    Section 32310 fits within the text, history, and tradition of the Second Amendment and is

3    constitutional under *Bruen*.

4        Plaintiffs argue in sweeping terms that all firearm magazines, no matter how large their

5    ammunition capacity, are an integral part of modern, semiautomatic firearms. According to

6    Plaintiffs, if the State is permitted to prohibit possession of any type of magazine, the Second

7    Amendment's right to bear arms would be "meaningless." Pls.' Opp'n at 5. If the Court were to

8    grant Defendants' Counter-Motion, Plaintiffs seem to say, then the State "could strip away

9    integral components of a firearm" until there was nothing left to the "Arms" protected by the

10   Second Amendment but an unusable piece of metal. *Ibid*. Plaintiffs are tilting at windmills.

11   California Penal Code section 32310 ("Section 32310"), the law they actually challenge, does not

12   ban all magazines. Instead, it restricts only those magazines capable of holding more than ten

13   rounds, which are *not* necessary to operate any firearm for self-defense.

14       Judgment should be entered for Defendants on Plaintiffs' other claims as well. The

15   Opposition provides no new argument or evidence for this Court to consider on the Takings

16   claim, and thus there is no reason for this Court to abandon its prior ruling, echoed in *Duncan v.*

17   *Bonta*, 19 F.4th 1087 (2021) (en banc), rejecting this claim. And Plaintiffs admit that their Due

18   Process claim rises (and thus should fall) with its Takings Claim. As for Plaintiffs' Equal

19   Protection claim, California's restrictions on LCMs do not violate the Second Amendment (or

20   any other constitutional provision) and easily pass rational basis review.

21       Far from establishing that they are entitled to summary judgment, Plaintiffs' Opposition

22   (along with their Motion) reveals that they have no evidence to support their claims, and none to

23   contradict the voluminous evidentiary submissions of Defendants meeting their burden on every

24   issue of material fact. As such, Plaintiffs' Motion should be denied, Defendants' Counter-Motion

25   should be granted, and judgment should be entered for Defendants.

26

27

28

Defendants' Reply ISO Amended Counter-Motion for Summary Judgment (Case No. 2:17-cv-00903-WBS-KJN)

1

**ARGUMENT**

2

**I.    PLAINTIFFS MISCHARACTERIZE THE *BRUEN* TEST.**

3      As explained in the Counter-Motion, *Bruen* sets forth a two-part test for evaluating Second

4 Amendment challenges: (1) Plaintiffs must first satisfy a threshold, plain text analysis, *i.e.*, that

5 their proposed course of conduct is covered by the text of the Second Amendment; and (2) if

6 Plaintiffs can meet that burden, then Defendants must show that the challenged regulation is

7 consistent with the Nation's historical tradition of firearm regulations. Counter-Mot. at 9-11

8 (citing *Bruen*, 142 S. Ct. at 2129-30).[2] Ignoring *Bruen*, Plaintiffs attempt to collapse the *Bruen*

9 test into a single issue: in their view, if the "the arms in question are in common use, for lawful

10 purposes," then "no further historical analysis is needed." Pls. Opp'n at 14. But Plaintiffs

11 incorrectly assume that if an item is in common use for any lawful purpose, then any regulation of

12 that item is necessarily prohibited by the Second Amendment. At the textual stage of the *Bruen*

13 analysis, however, Plaintiffs must demonstrate that the item they wish to possess "is in common

14 use today for self-defense." *United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023) ("*Bruen*

15 step one involves a threshold inquiry," including whether, *inter alia*, "the weapon at issue is in

16 common use for self-defense.").[3]

17 _____

18 [2] Plaintiffs argue that the State "bears the burden of proving LCMs are *not* in common use for
lawful purposes," citing the Ninth Circuit's recent decision in *Teter v. Lopez*, 76 F.4th 938, 950
19 (9th Cir. 2023). Pls. Opp'n at 9 n. 4. But *Teter* actually held that the State "bears the burden of
proof in the second," not first, "prong of the *Bruen* analysis." 76 F.4th at 950.  *Teter* did not—and
20 could not—overrule *Alaniz*'s instruction that the courts evaluate common use at the textual stage
and *Bruen*'s determination that the weapon regulated in that case was in common use for self-
21 defense at the textual stage. *Alaniz*'s explanation of *Bruen*'s stage-one elements (based on
*Bruen*'s own stage-one analysis) is entitled to precedential effect here. *See United States v.*
22 *McAdory*, 935 F.3d 838, 843 (9th Cir. 2019) (explaining that "well-reasoned dicta" by the Ninth
Circuit is binding if it is both "reasoned and deliberate").

23 [3] On September 22, 2023, the district court in *Duncan v. Bonta*, Case No. 3:17-cv-01017-BEN-
JLB (S.D. Cal.), *appeal filed* (Sept. 22, 2023), found that Section 32310 violated the Second
24 Amendment. *See* Plaintiffs' Notice of Supplemental Authority [Dkt. No. 137]. That decision
makes numerous incorrect conclusions, however, including, *inter alia*, (a) that magazines are
25 "Arms" protected under the Second Amendment, rather than accessories potentially entitled to
some "ancillary" protections (*id.* at 15-16), (b) that common ownership or possession, rather than
26 common use, is the relevant test (*id.* at 25, 35), (c) that a weapon's usefulness in militia service is
important to whether it is entitled to Second Amendment protection (*id.* at 35), (d) that
27 commonality is the State's burden to disprove, rather than the plaintiffs' burden to prove (*id.* at
20-34), and (e) that only firearms regulations, and not regulations on other weapons, can be
28 considered when the modern law in question regulates firearms (*id.* at 47-48), and thus the
(continued…)

3

1   And even if Plaintiffs can meet that burden, which they have not done, that would lead to

2   stage two of the *Bruen* analysis, where the burden would shift to "the Government to show that

3   [the challenged law] is consistent with the Nation's historical traditions of firearm regulation."

4   *United States v. Bartucci*, 2023 WL 2189530, at *6 (E.D. Cal. Feb. 23, 2023). As courts have

5   observed, even if a plaintiff can "demonstrate that their proposed conduct . . . is covered by the

6   Second Amendment," the Constitution only "*presumptively* protects that conduct," and this

7   "presumption can be overcome." *Hartford v. Ferguson*, 2023 WL 3836230, at *3 (W.D. Wash.

8   June 6, 2023); *see also Or. Firearms Fed'n v. Kotek*, __ F. Supp. 3d __, 2023 WL 4541027, at

9   *35 n.27 (D. Or. July 14, 2023) (rejecting argument that the court need not evaluate whether

10  LCM restrictions are consistent with the Nation's tradition of firearm regulation if the court were

11  to find, at the textual stage, that LCMs are in common use for self-defense); *Del. State*

12  *Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.* (*DSSA*), 2023 WL 2655150, at *8 (D.

13  Del. Mar. 27, 2023) (rejecting the argument that a finding of "common use" "is the end of the

14  matter"), *appeal docketed*, No. 23-1641 (3d Cir. Apr. 7, 2023).

15  Plaintiffs also misunderstand both stages of the text and history analysis. With respect to

16  the textual inquiry, Plaintiffs further confuse the *Bruen* test when they argue that "the State has

17  failed to meet its burden to show" that LCMs are not in common use. Pls. Opp'n at 9. At stage

18  one, the plain text burden is one that Plaintiffs, not Defendants, must satisfy. *See* Counter-Mot. at

19  9-11 (citing *Bruen*, 142 S. Ct. at 2129-30); *see also Or. Firearms Fed'n*, 2023 WL 4541027, at

20  *34 ("Plaintiffs have not met their burden to show that LCMs are protected by the Second

21  Amendment."); *Ocean State Tactical, LLC v. State of Rhode Island*, 2022 WL 17721175, at *2

22  (D.R.I. Dec. 14, 2022). And it is Plaintiffs who must point to the plain text of the Second

23  Amendment to demonstrate that the text, as originally understood, protects their proposed course

24  of conduct, not Defendants who must identify language in the plain text that would authorize the

25  ───────────────

26  *Duncan* holding, and its underlying reasoning, should not be adopted by this Court. And three
    days later, on September 25, 2023, the district court in *Brumback v. Ferguson* joined the majority
    of courts that have examined restrictions on LCMs and denied a motion for preliminary

27  injunction, finding that the plaintiffs had "offered insufficient evidence suggesting that the text of
    the Second Amendment was meant to include large capacity magazines." 2023 WL 6221425, at

28  *8 (E.D. Wash. Sept. 25, 2023).

4

1  challenged restriction or must otherwise show that the plain text does not cover Plaintiffs'

2  proposed course of conduct. As explained in the Counter-Motion and below, Plaintiffs have not

3  met their burden.

4      Finally, Plaintiffs incorrectly describe the historical analysis that *Bruen* contemplates.

5  Plaintiffs contend that the Founding-era is the only relevant time period for identifying historical

6  analogues. *See, e.g.*, Pls. Opp'n at 15, 16. That is wrong. *See Bruen*, 142 S. Ct. at 2132 ("The

7  regulatory challenges posed by firearms today are not always the same as those that preoccupied

8  the Founders in 1791 *or the Reconstruction generation in 1868*." (emphasis added)); *id.* at 2133

9  (describing a review of the "historical record . . . [of] 18th- and *19th-century* 'sensitive places'"

10  (emphasis added)). And the Ninth Circuit has treated post-1791 evidence as relevant under *Bruen*.

11  *See Alaniz*, 69 F.4th at 1129 (finding that a "historical tradition is well-established" based on the

12  fact that "several States enacted [analogous] laws throughout the 1800s"); *Teter*, 76 F.4th at 951-

13  54 (evaluating 19th-century weapons restrictions at the historical stage of the *Bruen* analysis);

14  *Baird v. Bonta*, 2023 WL 5763345, at *5 (9th Cir. Sept. 7, 2023) (noting the relevance under

15  *Bruen* of Reconstruction-era regulations).

16      In fact, *Bruen* does not prohibit consideration of 20th century regulations, except where

17  those laws "are *inconsistent* with the original meaning of the constitutional text." *Bruen*, 142 S.

18  Ct. at 2137. Indeed, numerous courts across the Nation have considered laws from the 20th

19  century in analyzing historical analogues where those "arms restrictions, including bans and

20  restrictions on carrying, arose from the same historical pattern" as 18th- and 19th-century laws,

21  and thus are not inconsistent with the Second Amendment's original meaning. *Hartford*, 2023

22  WL 3836230, at *5 (relying in part on 20th century restrictions on "Tommy guns" in denying a

23  preliminary injunction of assault weapons restrictions); *see also Bevis v. City of Naperville,

24  Illinois*, 2023 WL 2077392, at *12 (N.D. Ill. Feb. 17, 2023), *injunction denied pending appeal*,

25  2023 WL 3190470 (9th Cir. Apr. 18, 2023), *injunction denied pending appeal*, 143 S. Ct. 2489

26  (2023) (finding that, "[n]otably, semiautomatic weapons themselves, which assault weapons fall

27  under, were directly controlled in the early 20th century," in refusing to enjoin assault weapons

28  and LCM restrictions); *DSSA*, 2023 WL 2655150, at *12 (declining to "disregard machine gun

regulations as irrelevant" because "these later regulations are consistent with the earlier

regulations that Defendants provide").

Thus, contrary to Plaintiffs' assertions, the *Bruen* analysis is bifurcated into two separate

inquiries—Plaintiffs bear the threshold burden of demonstrating that their proposed course of

conduct is presumptively protected by the plain text of the Second Amendment at stage one, and

at stage two, the government can show that a restriction on a weapon presumptively protected by

the Second Amendment is nonetheless constitutional if it fits within the Nation's tradition of

firearms regulation. With a proper understanding of *Bruen*, as explained below, judgment should

be entered for Defendants at either stage of the analysis.

## II.   PLAINTIFFS' PROPOSED COURSE OF CONDUCT IS NOT PROTECTED BY THE SECOND AMENDMENT'S PLAIN TEXT.

### A.   LCMs Are Accessories, Not Arms, and Are Not Essential to the Operation of Any Firearm for Self-Defense.

As to the threshold textual inquiry, to qualify as an "Arm" under the plain text of the

Second Amendment, a plaintiff must show that the regulated item is a "[w]eapon[] of offence, or

armour of defence" (*District of Columbia v. Heller*, 554 U.S. 570, 581 (2008) (quoting Samuel

Johnson's 1773 dictionary); *Teter*, 76 F.4th at 949 (same)), such that the item is a "thing that a

man wears for his defence, or takes into his hands, or uses in wrath to cast or strike another."

*Heller*, 554 U.S. at 581 (quoting Timothy Cunningham's 1771 legal dictionary). Defendants

explained in their Counter-Motion that the evidence submitted by both Defendants and Plaintiffs

establishes that LCMs are mere accessories, not "Arms" within the meaning of the Second

Amendment. *See* Counter-Mot. at 11 (citing Busse Decl. [Dkt. No. 135-9], ¶ 13 (magazines are

"containers which hold ammunition")); *see* Lee Decl. [Dkt. No. 123-4], Ex. A (Youngman Decl.),

¶¶ 5-6 (magazines are "ammunition feeding devices" and a magazine is "simply a receptacle for a

firearm that holds a plurality of cartridges or shells under spring pressure preparatory for feeding

into the chamber" (quotation omitted)). In their Opposition, Plaintiffs provide no evidence in

response to Mr. Busse's Declaration or that of Dennis Baron [Dkt. No. 135-8], a linguist who

provided testimony establishing that the original public meaning of the term "Arms" referred to

1   "weapons such as swords, knives, rifles, and pistols," and did not include "accoutrements," like

2   "ammunition containers, flints, scabbards, holsters, or 'parts' of weapons." Baron Decl., ¶ 8.

3        Though they neglected to argue that magazines are "Arms" in their Motion, Plaintiffs now

4   argue that Section 32310 prohibits "Arms" protected by the Second Amendment. *Compare* Pls.'

5   Mot. at 9 (describing magazines as "component parts"), *with* Pls. Opp'n at 2 (arguing that it

6   would be "absurd" to not "consider today's firearm magazines to be "Arms" (emphasis omitted)).

7   But characterizing LCMs as "Arms" would not comport with Supreme Court precedent. *See*

8   Counter-Mot. at 13 (quoting language from *Bruen*, *Heller*, *Caetano*, and *McDonald* to show that

9   "the Court has always equated 'Arms' with weapons, not accessories or other incidents necessary

10  to use them"). And Plaintiffs have put forward no evidence that LCMs are themselves "used in a

11  way that 'cast[s] at or strike[s] another,'" as weapons are. *Ocean State Tactical, LLC*, 2022 WL

12  17721175, at *12. As such, LCMs are not protected "Arms" under the Second Amendment.

13       A recent post-*Bruen* decision affirming the constitutionality of the federal ban on silencers

14  is instructive. In *United States v. Saleem*, the district court first noted that *Heller* and *Bruen* make

15  clear that the Second Amendment's right to keep and bear arms "protects an individual's right to

16  carry or possess a bearable weapon for self-defense." 2023 WL 2334417, at *9 (W.D.N.C. Mar.

17  2, 2023). Under that logic, the court easily determined that a silencer was not an "Arm" because,

18  in part, it "cannot, on its own, cause any harm, and it is not useful independent of its attachment

19  to a firearm." *Id*; *see also Miller v. Garland*, 2023 WL 3692841, at *10 (E.D. Va. May 26, 2023)

20  (holding that "laws that regulate the use of firearm accessories or attachments do not generally

21  implicate the Second Amendment"); Counter-Mot. at 11-12 (citing cases).

22       Moreover, the Second Amendment protects "ancillary rights" only if they are "*necessary*

23  to the realization of the core right to possess a firearm for self-defense." *Teixeira v. Cnty. of*

24  *Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (emphasis added); *Jackson v. City & Cnty. of San*

25  *Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) (finding that "the right to possess firearms for

26  protection implies a corresponding right to obtain the bullets *necessary* to use them" (emphasis

27  added)). It thus only protects accessories that keep firearms "useful" and "functional," and which

28  prevent them from falling "into disrepair and inoperability, precluding their protected use for self-

7

1    defense." *Saleem*, 2023 WL 2334417, at *10. Were it otherwise, potential plaintiffs could seek to

2    expand the Second Amendment's protection to an unenumerated "penumbra" of covered

3    activities beyond "keep[ing] and bear[ing] Arms," U.S. Const. amend. II, as provided by the

4    Second Amendment's plain text, where no such penumbra exists. *Defense Distributed v. Bonta*,

5    2022 WL 15524977, at *4 (C.D. Cal. Oct. 21, 2022).

6          Applying that standard, "an LCM is not necessary to operate any firearm, much less any

7    firearm commonly used for self-defense." Counter-Mot. at 14 (citing Busse Decl., ¶ 18; *Or.*

8    *Firearm Fed'n*, 2022 WL 17454829, at *9). In an effort to create a dispute of material fact on that

9    point, Plaintiffs point not to a firearms expert with a conflicting opinion—nor could they, because

10   they submit no expert opinion or evidence on the topic—but to the declarations of two of the

11   named Plaintiffs who claim that "their legally-acquired 'large capacity' magazines were the only

12   ones ever made for their particular firearms." Pls. Opp'n at 4. But whether a magazine of a

13   particular capacity was originally made for a firearm is irrelevant. The question is whether an

14   LCM is necessary for that firearms' use in ordinary self-defense. *See* Macaston Decl., ¶ 6

15   (admitting that "subsequently-manufactured ten-round magazines may (I am told) be compatible

16   with" his firearm); *see also* Meyerhoff Suppl. Decl., Ex. A (Macaston Depo.), 31:16-32:11

17   (admitting that he had been told by members of his gun club that ten-round magazines may be

18   available for his firearm). And Plaintiff Dang's statement that he is "not aware of the existence of

19   any . . . ten-round magazines compatible with" his firearm, Dang Decl., ¶ 5,[4] is not evidence that

20   no such magazine exists, given that he has not been qualified as an expert in firearms (or any

21   relevant topic for that matter), and certainly does not controvert record evidence to the contrary.

22   *See* Busse Decl., ¶ 18; Tucker Decl., ¶ 17 (explaining that 10-round magazines are adequate for

23   home and personal self-defense) *see also Or. Firearms Fed'n*, 2023 WL 4541027, at *26 (holding

24   that, "while magazines may often be necessary to render a firearm operable, LCMs are not"). In

25   any event, both declarants made these statements on "information and belief," Dang Decl., ¶ 5;

26   _____

     [4] At his deposition, Plaintiff Dang admitted that he had never even contacted the original
27   manufacturer of the firearm in question to determine whether there were magazines compatible
     with his firearm and capable of holding ten rounds or less. Meyerhoff Suppl. Decl., Ex. B (Dang
28   Depo.), 29:13-18.

1   Macaston Decl., ¶ 6, and thus those statements are not entitled to any evidentiary weight. *See* Fed.

2   R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made

3   on personal knowledge . . . ."); *Columbia Pictures Indus., Inc. v. Pro. Real Est. Invs., Inc.*, 944

4   F.2d 1525, 1529 (9th Cir. 1991) (holding that a declaration based "on information and belief . . .

5   does not raise a triable issue of fact"), *aff'd*, 508 U.S. 49 (1993). Thus, Plaintiffs' assertion that

6   "limiting the number of rounds a firearm can fire without reloading . . . plac[es] restrictions on the

7   operability and functionality of the firearm itself," Pls. Opp'n at 5, lacks any evidentiary basis and

8   does not create any triable issue of fact.

9        Plaintiffs also contend that magazines generally are "integral parts of modern

10   constitutionally protected arms." Pls. Opp'n at 4, a statement which they later appear to cabin

11   only "to all modern, *semiautomatic* firearms." *Id*. at 4 (emphasis added). In any event, Section

12   32310 does not ban all magazines—only those that hold more than ten rounds of ammunition. As

13   such, Plaintiffs' argument that Section 32310 bans "integral component parts of a firearm," *id*. at

14   5, is not correct, nor can it be credited given their failure to produce any evidence controverting

15   Defendants' evidence establishing that LCMs are not necessary to use of any firearm.[5] Otherwise,

16   magazines capable of holding far more than 10 rounds—such as 100-round drum magazines—

17   could also be considered "integral" to semiautomatic firearms.

18        Plaintiffs wrongly contend that there is no "limiting principle" to Defendants' position—

19   and, by implication, the position of numerous district courts evaluating LCM restrictions—and

20   that, under Defendants' theory, "a state that can limit the capacity of a magazine based on its

21   judgment about the number of rounds a magazine should be able to hold at any given time can

22   limit that capacity to five or two—or even one." Pls. Opp'n at 5 (emphasis omitted). That is

23   untrue. Magazines capable of holding more than ten rounds (*i.e.*, LCMs) are not necessary to

24   operate a semiautomatic firearm for ordinary self-defense and thus are not protected by the

25   ─────────────

26   [5] Plaintiffs' assertion that "magazines are an inherent operating parts of a firearm," Pls. Opp'n at 4 (emphasis added), cannot be squared their own contention elsewhere in the Opposition that Section 32310 is an effort to prohibit the possession of "*detachable* magazines," *id*. at 5

27   (emphasis added). And, as Defendants' evidence establishes, it is in part the fact that most LCMs are detachable that renders them a dramatic technological change. *See* Counter-Mot. at 17 (citing

28   Tucker Decl., ¶ 16).

9

1    Second Amendment. *See* Counter-Mot. at 15-19. But magazines of smaller capacity (and other

2    firearm accessories) might be found to be necessary for that lawful purpose, depending on the

3    record compiled by the parties. Thus, the limiting principle is clear: only possession of

4    accessories necessary to operate "Arms" for the purposes of self-defense are protected by the

5    Second Amendment as an ancillary right. *Id*. at 17-18. In any event, the challenged statute does

6    not restrict any magazines capable of holding ten rounds or less. *See* Penal Code §§ 32310,

7    16740(a). It is Plaintiffs' theory, and indeed the position of many of the individual Plaintiffs

8    themselves, that has "no limiting principle" and is an "untenably slippery slope," Pls. Opp'n at 5;

9    in their view, manufacturers could produce magazines capable of holding 50, 100, or even 1,000

10   rounds and, assuming such magazines are produced in sufficient (and unspecified) quantifies, no

11   regulation of them would pass constitutional muster because those magazines would be, under

12   Plaintiffs' understanding of the Second Amendment, "Arms." *See, e.g.*, Meyerhoff Suppl. Decl.,

13   Ex. C (Flores Depo.), 38:17-21 (asserting that a 500-round magazine should be protected by the

14   Second Amendment); *id*. at Ex. D (Morris Depo.), 53:16-54:2 (asserting that the fully automatic

15   M240, a military weapon that utilizes a link-belt system capable of holding 200 rounds, should be

16   protected by the Second Amendment).

17        In sum, Plaintiffs have not shown that their proposed course of conduct—acquisition and

18   possession of LCMs—is within the protections guaranteed by the Second Amendment. To the

19   contrary, LCMs are not themselves "Arms" under the Second Amendment and are not necessary

20   to the operation of any protected firearm for self-defense. Under Federal Rule of Civil Procedure

21   56, the Court should thus find that there is no genuine dispute that Plaintiffs' proposed course of

22   conduct is not protected by the Second Amendment and enter judgment in Defendants' favor on

23   the Second Amendment claim.

24        **B.    LCMs Are Not Commonly Used in Self-Defense.**

25        Even if this Court were to determine that LCMs are arms themselves or could otherwise be

26   subject to protection under an ancillary right theory—which the undisputed facts show they are

27   not—judgment should be entered for Defendants on the Second Amendment claim at stage one of

28   the *Bruen* analysis for another reason: only firearms commonly used for self-defense are

1   protected by the Second Amendment, and LCMs are not commonly used (or even suitable) for

2   that purpose.[6]

3          Defendants have presented evidence that LCMs are rarely, if ever, used for self-defense.

4   Counter-Mot. at 16-17; *see, e.g.*, Suppl. Allen Decl., ¶¶ 10-19 (finding that an analysis of one

5   dataset revealed on average, only 2.2 shots were fired by defenders, and that analysis of another

6   dataset found no incidents where the defender was reported to have fired more than 10 bullets and

7   that in 97.3% of incidents the defender fired 5 or fewer shots). Defendants also presented

8   evidence that while not being well-suited to self-defense, LCMs were in fact designed, and are

9   most suited, for military use in combat situations, "increas[ing] killing efficiency by significantly

10  reducing reload time." Tucker Decl., ¶ 16.

11         In their Opposition, Plaintiffs put forward no expert testimony or any other evidence to

12  counter Defendants' evidence. Instead, they cite studies from individuals who, unlike Defendants'

13  experts, have not provided sworn testimony regarding their conclusions. Pls.' Opp'n at 8-9.[7] Far

14  from showing, as Plaintiffs claim, that LCMs are commonly used in self-defense, these studies

15  establish that it is exceedingly rare for individuals who have firearms to discharge them at all in

16  self-defense. *Id*. at 11 (claiming that only 0.9% of self-defense gun use even involved a discharge

17  of a firearm).[8] Perhaps given the weakness of these studies, Plaintiffs revert to arguing that

18  [6] Plaintiffs contend that the burden on them to establish common use is in fact a requirement to
    "show some sort of demonstrated self-defense *need* for LCMs." Pls. Opp'n at 9. But the common
19  use analysis does not require Plaintiffs to show they need LCMs for self-defense, only that LCMs
    are commonly used for that purpose. *See* Counter-Mot at 15-19. And Plaintiffs' subjective
20  "needs" are insufficient to extend constitutional protection to the firearm accessories they wish to
    acquire and possess. Consistent with other constitutional claims, an objective standard of
21  common use applies here, *see Or. Firearms Fed'n*, 2023 WL 4541027, at *30-32, and Plaintiffs
    must show that LCMs are appropriate for "*ordinary* self-defense needs," not just any subjective
22  self-defense need, *id.* at 31 (quoting *Bruen*, 142 S. Ct. at 2156) (emphasis added). Because
    Plaintiffs have failed to controvert Defendants' evidence showing LCMs are not commonly used
23  or well-suited for ordinary self-defense, their Second Amendment claim fails at the textual stage.

24  [7] In moving for summary judgment, Plaintiffs attached a document as exhibit to an attorney
    declaration entitled "NSSF Consumer Study." Lee Decl. (Dkt. No. 123-4), Ex. F. Plaintiffs argue
25  that Mr. Curcuruto's deposition testimony supports the reliability and veracity of the study, Pls.
    Opp'n at 8 n.3, but Mr. Curcuruto testified at his deposition that he left NSSF in January of 2021,
26  Meyerhoff Decl., Ex. E (Curcuruto Depo.), 50:22-24, eighteen months before the study was
    published, and that he lacked access to documents and information at NSSF after that time, *id*. at
27  180:18-25.

28  [8] Plaintiffs attempt to relieve themselves of the need to present actual evidence in support of their
    (continued…)

1  "Second Amendment rights do not depend on how often" LCMs "are used" (*id*. at 10), ignoring

2  the applicable test for common *use*. *See Bruen*, 142 S. Ct. at 2143 ("[T]he Second Amendment

3  protects only the carrying of weapons that are those 'in *common use* at the time.'" (emphasis

4  added) (quoting *Heller*, 554 U.S. at 627)).

5      Plaintiffs also claim that Ms. Allen's work has been "discredited" and has not been updated

6  since 2017, *id*. at 12 & fn. 5, but that ignores the fact that, unlike Plaintiffs' purported experts,

7  Ms. Allen submitted a supplemental declaration this year with updated data on the relationship

8  between LCMs and mass shootings. Suppl. Allen Decl. [Dkt. No. 135-7]. Courts continue to rely

9  on her analysis post-*Bruen* in answering the "common use" question. *See, e.g.*, *Hanson v. District

10  of Columbia*, 2023 WL 3019777, at \*10 (D.D.C. Apr. 20, 2023) (citing approvingly one of the

11  same studies that Ms. Allen's declaration relies on in this case); *Or. Firearms Fed'n*, 2023 WL

12  4541027, at \*12 (crediting Ms. Allen's expert testimony showing that "it is exceedingly rare (far

13  less than 1 percent) for an individual to fire more than ten shots in self-defense"). In any event,

14  Ms. Allen's supplemental declaration in this case contains an analysis of a second dataset using

15  "Factiva, an online news reporting service and archive owned by Dow Jones, Inc. that aggregates

16  news content from nearly 33,000 sources," Suppl. Allen Decl., ¶¶ 13-14—the accuracy of which

17  Plaintiffs do not contest.

18      Importantly, the applicable test is common use for self-defense, not merely common

19  ownership. *Alaniz*, 69 F.4th at 1128 (holding that one of the threshold inquiries at step one is

20  whether "the weapon at issue is 'in *common use*' today for self-defense" (emphasis added)); *see

21  also Bruen*, 142 S. Ct. at 2156 (describing the Second Amendment's "right to bear *commonly

22  used* arms" (emphasis added)). Plaintiffs nonetheless contend that "*Heller* spoke of common use

23  in the context of possession." Pls. Opp'n at 12; *see also id*. at 7 (arguing that "LCMs are

24  commonly possessed"). But it was *Heller* itself that established that "common use," rather than

25

26  claims by arguing that the studies are presented as "legislative facts." Pls. Opp'n at 8 & n. 3. But
even if Plaintiffs were correct, the Court can and should nevertheless apply the Federal Rules of
27  Evidence to Plaintiffs' evidence and interrogate these studies. *See Or. Firearms Fed'n* , 2023 WL
4541027, at \*3 n.2 ("Without subjecting Plaintiffs' legislative facts to the adversarial process, this
28  Court cannot adequately assess issues of credibility or bias."); *see also* Fed. R. Evid. 201.

1  common ownership, was the relevant test, 554 U.S. at 627, and found that the challenged

2  regulation in that case was unconstitutional because the law made it impossible for "citizens to

3  *use* them," *i.e.*, firearms, "for the core lawful purpose of self-defense." *Id*. at 630 (emphasis

4  added). And when evaluating the possession of LCMs, the actual use of them (or lack thereof)

5  would be relevant to determining *why* people purportedly own them.

6      Adopting Plaintiffs' proposed test of common ownership, untethered from the suitability of

7  the weapon for ordinary self-defense, would permit mere popularity to control the meaning of the

8  Second Amendment. *See* Pls. Opp'n at 13 (arguing that LCMs are protected by the Second

9  Amendment because, supposedly, the "American people have spoken"). This Court should reject

10  Plaintiffs' proposed "popularity test," as other courts have both before and after *Bruen*. *See Or.*

11  *Firearms Fed'n*, 2022 WL 17454829, at *10 n.13 ("The Second Amendment . . . requires a court

12  to not only consider the prevalence of a particular firearm, but also the nature of that firearm's use

13  among civilians."); *Friedman v. City of Highland Park, Ill.*, 784 F.3d 406, 409 (7th Cir. 2015)

14  (noting that "relying on how common a weapon is at the time of litigation would be circular");

15  *Duncan*, 19 F.4th at 1127 (Berzon, J., concurring) ("*Heller* focused not just on the prevalence of a

16  weapon, but on the primary use or purpose of that weapon."); *Grant v. Lamont*, 2023 WL

17  5533522, at *5 (D. Conn. Aug. 28, 2023) (finding that "showing mere statistical numerosity is

18  insufficient to show that a weapon is in 'common use for self-defense'").

19      Equally problematic for Plaintiffs is their failure to put forth sufficient evidence that LCMs

20  are commonly owned, much less used, for ordinary self-defense.[9] Plaintiffs cite the previously

21  filed declarations of D. Allen Youngman and James Curcuruto in support of that conclusion, but

22  General Youngman's declaration merely concludes that it "is generally well-known, well-

23  accepted, and generally indisputable that so-call 'large capacity magazines' are commonly owned

24  by millions of person in the United States, for a variety of lawful purposes." Youngman Decl., ¶

25

26  [9] Thus, Plaintiffs' argument that LCMs are not "dangerous and unusual" weapons not subject to
    Second Amendment protection under *Heller*, 554 U.S. at 627, because they are in "common use,"
    Pls. Opp'n at 6 n.2, fails because the uncontroverted evidence shows that LCMs are not in

27  "common use" for self-defense (or, for that matter, any other lawful purpose). In any event, the
    record here demonstrates that LCMs are "dangerous and unusual" and thus fall outside the scope

28  of the Second Amendment. *See Or. Firearms Fed'n*, 2023 WL 4541027, at *34.

13

9. Putting aside that "common use," not "common ownership," is the relevant analysis at stage one of *Bruen*, *see supra* Section I, General Youngman points to no sources of information that support his unsubstantiated conclusion in his declaration, and he admitted at his deposition that he has no real evidence to support that conclusion. Meyerhoff Suppl. Decl., Ex. F (Youngman Depo.), 86:3-17 (admitting that he reviewed no documents and spoke to no specific person in reaching that conclusion). Thus, that statement should not be given any weight at summary judgment. *See Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006) ("[L]egal conclusions, or argumentative statements, are not *facts* and likewise will not be considered on a motion for summary judgment" (Shubb, J.)).

Like General Youngman's declaration, the declaration of James Curcuruto was first filed in 2017 and was reattached to an attorney declaration in support of Plaintiffs' Motion. Dkt. No. 28-3; Lee Decl. [Dkt. No. 123-4], Ex. B (Curcuruto Decl.).[10] Like General Youngman, Mr. Curcuruto does not even address the relevant inquiry of "common use," instead merely discussing production and ownership statistics. *See, e.g.*, Curcuruto Decl., ¶ 13 (discussing the "number of such [large-capacity] magazines in United States consumers' hands"). Further, Mr. Curcuruto's conclusions are based on speculation, not supporting evidence. *See id*. (describing his conclusion on the number of LCMs in the United States to be "an estimation based on extrapolation from indirect sources" that "cannot be confirmed as unequivocally correct").[11]

---

[10] Defendants rely on two of the declarants whose declarations they relied in 2017 in opposing Plaintiffs' motion for a temporary restraining order and preliminary injunction: Lucy Allen [Dkt. No. 42] and John Donohue [Dkt. No. 36]. Unlike Plaintiffs, however, Defendants have provided supplemental declarations from both Ms. Allen [Dkt. 135-7] and Professor Donohue [Dkt. No. 135-12], which include updated facts and conclusions.

[11] Mr. Curcuruto's deposition testimony revealed numerous methodological flaws that undermine his conclusions. For example, while his declaration states that "firearm industry professionals with knowledge of the pistol and rifle magazine market" estimated the number of magazines that were sold with firearms available for purchase in the United States during the relevant time period (Lee Decl., Dkt. No. 123-4, Ex. B, ¶ 11), Mr. Curcuruto admitted that the only "firearm industry professional" who he could actually recall providing input to Mr. Curcuruto in creating that estimate was his superior at National Shooting Sports Foundation ("NSSF"), Steve Sanetti. Meyerhoff Suppl. Decl., Ex. E (Curcuruto Depo.), 133:4-15, 134:14-19. And Mr. Curcuruto admitted that his magazine estimate was based on data (a) concerning firearms, not magazines, (b) concerning manufacture, not sale, and (c) not excluding sales to law enforcement agencies, private security organizations, firearms wholesalers, and firearms that are illegally trafficked out of the United States. *Id*. at 125:23-129:17.

14

In sum, Defendants have made a detailed showing establishing that LCMs are not commonly used in self-defense, and Plaintiffs have put forward no admissible evidence to the contrary. As such, this Court should enter judgment in Defendants' favor because Plaintiffs' proposed course of conduct is not covered by the Second Amendment's plain text.

### III.   LCM RESTRICTIONS FALL WITHIN THE NATION'S HISTORY AND TRADITION OF FIREARM REGULATION.

#### A.   A More Nuanced Approach at Stage Two Is Required in this Case.

*Bruen* discusses modern firearms regulations for which "historical analogies . . . are relatively simple to draw," as well as those "implicating unprecedented societal concerns or dramatic technological changes" and requiring a "more nuanced approach." 142 S. Ct. at 2132. The evidence submitted here establishes that this case requires a more nuanced historical analysis. *Hartford*, 2023 WL 3836230, at *5-6 (rapid firing capacity and accompanying mass shootings are a dramatic technological change and an unprecedented societal concern, respectively); *Or. Firearms Fed'n*, 2023 WL 4541027, at *36-39; *DSSA*, 2023 WL 2655150, at *10-11 (same). Under that more nuanced approached, Defendants have more than met their stage-two burden of showing that Section 32310 fits within the Nation's tradition of weapons regulation.

First, LCMs represent dramatic technological change. In their Counter-Motion, Defendants put forward abundant evidence in the form of declarations from some of the Nation's leading historians establishing that LCMs do indeed represent a dramatic technological change from the firearms technology that existed in 1791 and 1868. *See* Counter-Mot. at 20-24 (citing Cornell Decl. [Dkt. No. 135-10], ¶¶ 37-44; DeLay Decl. [Dkt. No. 135-11], ¶¶ 8-37, 55-69; Rivas Decl. [Dkt. No. 135-14], ¶¶ 27-32; Sweeney Decl. [Dkt. No. 135-17], ¶¶ 8-50; Vorenberg Decl. [Dkt. No. 135-19], ¶¶ 7, 16-22).[12] Second, mass shootings represent an "unprecedented societal

---

[12] In support of their Counter-Motion, Defendants submitted a declaration from Professor Brian DeLay [Dkt. No. 135-11]. In his declaration, Professor DeLay states that high-capacity firearms constituted "less than 0.002% of all firearms" in the early 1870s. *Id*. at ¶¶ 7, 68. The correct percentage is 0.2%, as the underlying data included in Professor DeLay's declaration makes clear. *Id*. ¶¶ 67-68 (noting that "[b]ased on the Winchester's production figures, that would have left only 9,294 high-capacity firearms for domestic consumption in the United States before 1872," and using that number as the denominator, and that "there were certainly more than five million firearms in the U.S. by the early 1870s—probably far more," and using that five million figure as
(continued…)

1    problem," as the voluminous evidence submitted by Defendants establishes. *See* Counter-Mot. at

2    25 (noting that there are "no known shooting incidents involving ten or more fatalities before

3    1949"); *see also* Klarevas Decl. [Dkt. No. 135-13], ¶¶ 16-18 & tbl. 4 & figs. 6-7; Roth Decl. [Dkt.

4    No. 135-15], ¶¶ 54-58 & fg. 1). In Plaintiffs' Opposition, they do not dispute either point. Thus,

5    there is no genuine dispute that a more nuanced analogical approach is appropriate here.

6         While Plaintiffs suggest that the "more nuanced approach" is little more than "license to

7    resurrect means-end interesting balancing" or "otherwise circumvent or lessen the burden the

8    government must carry," Pls. Opp'n at 14-15, it is an approach that *Bruen* expressly

9    countenances, enabling Defendants to draw analogies between Section 32310 and laws that are

10   not firing capacity restrictions or that may regulate conduct other than possession. Indeed, the

11   *Bruen* framework expressly contemplates that "regulatory challenges posed by firearms today are

12   not always the same as those that preoccupied the Founders in 1791 or the Reconstruction

13   generation in 1868." 142 S. Ct. at 2132. Thus, governments are not limited to utilizing regulations

14   of the past in addressing modern problems.

15        Thus, Plaintiffs' argument that Section 32310 cannot stand because Defendants "cite[] no

16   founding-era regulations on firing capacity restrictions" or "restrictions on types of weapons that

17   people could own," Pls. Opp'n at 15-16, fails for two reasons. First, as explained above, nothing

18   in *Bruen* restricts the period in which courts may look for relevant analogues to 1791. 142 S. Ct.

19   2111, 2132. Second, and more to the point, *Bruen* does not require that Defendants, in defending

20   a hardware ban (*i.e.*, a ban on LCMs), identify another restriction on a similar or the same type of

21   hardware. *Bruen* does not endorse a "wholly abstract game of spot-the-analogy-across-the-ages."

22   *United States v. Kelly*, 2022 WL 17336578, at *6 (M.D. Tenn. Nov. 16, 2022) (finding that *Bruen*

23   permits courts to reason that "heavy restrictions are typically more problematic than light ones . . .

24   in order to bridge historical gaps"); *United States v. Jackson*, 622 F. Supp. 3d 1063, 1067 (W.D.

25

26   the numerator to be conservative in his conclusions). Defendants became aware of this
     inadvertent mistake after filing their Counter-Motion, Dkt. No. 135, and bring it to the Court's

27   attention here. Even with the corrected percentage, the evidence in this case nonetheless
     conclusively establishes LCMs represent a dramatic technological change from firearms

28   technology available at the founding and Reconstruction. *See* Counter-Mot. at 20-24.

1    Okla. 2022) (finding that a mere "desire for greater specificity" in the analogy between the

2    modern and historical regulations is not dispositive for the *Bruen* analysis); *United States v. Slye*,

3    2022 WL 9728732, at *2 (W.D. Pa. Oct. 6, 2022) ("In *Bruen*, the Court acknowledged that

4    determining whether a regulation comports with the Nation's historical tradition can be difficult

5    in some cases and requires flexibility . . . .").

6        This is particularly true in cases involving dramatic technological change and

7    unprecedented societal concerns (which Plaintiffs do not dispute this case presents). Indeed, in

8    similar circumstances, numerous courts have pushed back against the "historical twin" or "dead

9    ringer" requirement that *Bruen* rejected. *See Alaniz*, 69 F.4th at 1129 (rejecting the contention that

10   the government's "analogues are not sufficiently similar" because the modern restriction

11   challenged was "animated by unprecedented contemporary concerns"); *United States v. Ryno*,

12   2023 WL 3736420, at *2 (D. Alaska May 31, 2023) (upholding challenged regulation despite "the

13   lack of a distinctly similar firearm regulation" because "American legal history and tradition

14   indicates that lawmakers, both at the time of ratification and well into the 20th century, simply

15   did not recognize" the regulated conduct as a "societal problem" at the time); *Bartucci*, 2023 WL

16   2189530, at *10 (holding that although the challenged regulation "may not be a 'dead ringer for

17   historical precursors,' this Court finds that it is sufficiently analogous to pass constitutional

18   muster"); *Fried v. Garland*, 2022 WL 16731233, at *5 (N.D. Fla. Nov. 4, 2022) (holding that "if

19   there is a tradition of regulation that is relevantly similar to the challenged laws, Plaintiffs have

20   not stated a plausible Second Amendment claim," and rejecting plaintiffs' arguments as

21   "demand[ing] too much specificity in the historical tradition"). Indeed, "*Bruen*'s guidance

22   forecloses simply comparing the modern law under review with the laws of a couple of centuries

23   ago, like a redline comparison in a word processing application." *United States v. Jackson*, 2023

24   WL 2499856, at *12 (D. Md. Mar. 13, 2023). "That is because a list of the laws that happened to

25   exist in the founding era is, as a matter of basic logic, not the same thing as an exhaustive account

26   of what laws would have been theoretically believed to be permissible by an individual sharing

27   the original public understanding of the Constitution." *Id*.

28

**B.    Defendants Have Identified Relevantly Similar Analogues as *Bruen* Requires**

In *Bruen*, the Court pointed to the "how" and "why" a regulation burdens the right to bear arms as the central inquiry at stage two. 142 S. Ct. at 2133. In other words, *Bruen* asks "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id*. Despite acknowledging that the *Bruen* test turns on the "how" and "why" of the modern regulation and historical regulations, Pls. Opp'n at 17, nowhere in their Opposition do Plaintiffs even mention "comparable burden" or "comparable justification."

But that analysis of comparable burdens and justifications is the very core of stage two of the *Bruen* analysis. *Alaniz*, 69 F.4th at 1129 (affirming challenged statute because the statute "imposes a 'comparable burden' to the historical analogues and is 'comparably justified'" (quoting *Bruen*, at 2133)). Applying the "relevantly similar" analysis required under *Bruen*, district courts have concluded that LCM restrictions are consistent with the Nation's history of firearms regulation. *See Or Firearms Fed'n, Inc.*, 2023 WL 4541027, at *39-46 (finding that Oregon's restrictions on LCMs imposed a comparable burden to and had a comparable justification as analogous historical restrictions, including "regulations on the use of trap guns, the storage of gun powder, the possession and carrying of blunt objects like clubs, the possession and carrying of certain fighting knives, the concealed carrying of pistols, the concealed carrying of revolvers, and the use and possession of fully-automatic and semi-automatic firearms"); *Hanson*, 2023 WL 3019777, at *15 (finding that the challenged modern regulation is relevantly similar to the identified historical regulations "in that the burden it places on an individual's right of self-defense is relatively light"); *DSSA*, 2023 WL 2655150, at *12 (finding that historical restrictions and Delaware's modern LCM restrictions imposed a comparable burden because LCM restrictions imposed a "slight" burden while the historical restrictions cited "were blanket restrictions on the carry of entire categories of weapons" and that both the modern and historical regulations were enacted "in response to pressing public safety concerns regarding weapons determined to be dangerous"). Plaintiffs offer no basis to reach a different conclusion in this case.

1    In the Counter-Motion, Defendants identified three types of historical regulations that are

2    sufficiently analogous to Section 32310: (1) gunpowder and loaded-weapons restrictions; (2)

3    dangerous weapons laws; and (3) prohibitions on trap guns.[13] Counter-Mot. at 29. For each,

4    Defendants explained how the burdens and justifications of those laws were comparable to those

5    of Section 32310. *See, e.g.*, *id*. at 35 (explaining that the burden imposed by trap gun restrictions

6    and Section 32310 are comparably minimal because neither prohibited any firearm, only their

7    manner of use, and that the justifications for trap gun restrictions and Section 32310 were

8    comparable because both sought to prevent unnecessary gunshot injuries and death).[14]

9    In their Opposition, Plaintiffs do not dispute the existence of any of the laws (or categories

10    of laws) identified by Defendants, but nevertheless argue that these regulations are "neither

11    analogous nor relevant to" Section 32310. Pls. Opp'n at 16. Plaintiffs' only explanation for why

12    these regulations are not "relevantly similar" under *Bruen* is that they do not restrict firing

13    capacity. *Id*. at 15 (contending that Defendants "fail[] to identify any analogue from the relevant

14    (founding) era that restricted firearm capacity"). But there is no "dead ringer" requirement. And

15    [13] Defendants submitted a list of relevant statutes with the Counter-Motion. *See* Appendix 1 [Dkt.
16    No. 135-2]. After submission of those laws, Defendants became aware of two additional laws that
     prohibited the possession of slungshots: 1849 N.Y. Laws 403 and 1849 Vt. Acts & Resolves 26.
17    A slungshot is a weapon "composed of a rope tied into a large, dense knot covering a heavy
     weight," *Teter*, 76 F.4th at 951 n.11, and slungshots have been subject to a variety of restrictions
18    throughout the Nation's history, *see, e.g.*, Appendix 1 [61-63, 107, 114].

19    [14] The declaration of Robert Spitzer [Dkt. No. 135-16] explains that the "pattern of criminal
     violence and concerns for public safety leading to weapons restrictions is not new; in fact, it can
20    be traced back to the Nation's beginnings" because "[w]hile the particular weapons technologies
     and public safety threats have changed over time, governmental responses to the dangers posed
21    by certain weapons have remained constant." *Id*. ¶ 47. Thus, "[c]urrent restrictions on assault
     weapons and detachable ammunition magazines are historically grounded" because they are "part
22    of a pattern in America's history of legislative restrictions on particular weapons stretching back
     centuries." *Id*. Professor Spitzer's conclusions and the underlying basis for them have been
23    credited by numerous post-*Bruen* courts. *See, e.g.*, *Or. Firearms Fed'n*, 2023 WL 4541027, at
     *40-42, 46 (crediting Professor Spitzer explanation of the historical pattern of weapons regulation
24    and concluding that, "[t]hroughout this Nation's history, new technologies have led to the
     creation of particularly dangerous weapons" and, "[a]s those weapons became more common,
25    they became tied with violence and criminality" and "governments [then] passed laws that sought
     to address the features of those weapons that made them particularly dangerous to public safety");
26    *Hartford*, 2023 WL 3836230, at *4 (citing Professor Spitzer, and another of Defendants' experts
     in this case, Dr. Brennan Rivas, approvingly for the proposition that "when new weapons
27    proliferated and resulted in a rise in criminal violence that terrorized the public . . . [,] it was then
     that States historically stepped in and regulated those dangerous weapons"); *Hanson*, 2023 WL
28    3019777, at *15 (citing a declaration from Professor Spitzer in that case to show that "the states
     confronted the public safety issues of their time with vigor").

numerous courts have properly concluded that these restrictions are sufficiently analogous to modern regulations on LCMs. *See Or. Firearms Fed'n*, 2023 WL 4541027, at \*39-46 (finding that 19th century restrictions on Bowie knives, blunt weapons, slungshots, and trap guns were analogous to modern LCM restrictions because those early weapons were dangerous weapons commonly used for criminal behavior and not for self-defense); *Herrera v. Raoul*, 2023 WL 3074799, at \*6 (N.D. Ill. Apr. 25, 2023) (finding that "the regulatory history of Bowie knives, clubs, [and] trap guns" was analogous to that of modern restrictions on LCMs); *Bevis*, 2023 WL 2077392, at \*11-14 (holding that restrictions on Bowie knives, slug shots, billies, and other melee weapons "establish[] that governments enjoy the ability to regulate highly dangerous arms (and related dangerous accessories)," including LCMs); *Hartford*, 2023 WL 3836230, at \*4 (W.D. Wash. June 6, 2023) (holding that "regulations on trap guns, bowie knives, clubs, [and] slungshots," among others, are sufficiently analogous to modern restrictions on assault weapons).

In sum, Defendants have put forward uncontroverted historical evidence establishing the following material facts: (1) this case involves dramatic technological change and unprecedented societal concerns, either of which is sufficient to implicate the "more nuanced approach" outlined in *Bruen*; and (2) gunpowder and loaded-weapon restrictions, dangerous weapons laws, and restrictions on trap guns imposed comparable burdens and had comparable justifications as Section 32310. In light of that evidence, this Court should hold, consistent with the growing weight of authority evaluating a similar historical record, that restrictions on LCMs such as Section 32310 are consistent with the Nation's tradition of firearm regulation.

## IV.   JUDGMENT SHOULD BE ENTERED IN DEFENDANTS' FAVOR ON PLAINTIFFS' TAKINGS, DUE PROCESS, AND EQUAL PROTECTION CLAIMS.

In their Counter-Motion, Defendants explain that Section 32310 effects neither a *per se* taking nor a regulatory taking. Counter-Mot. at 35-37 (citing *Laurel Park Cmty., LLC v. City of Tumwater*, 698 F.3d 1180, 1188 (9th Cir. 2012)). Defendants point out that the en banc opinion in *Duncan*, which was vacated on Second Amendment grounds as a result of the *Bruen* decision, rejected the argument that Section 32310 violated the Takings Clause, and nothing in *Bruen* undermines that conclusion. Counter-Mot. at 35-36. Defendants have also identified numerous

20

1   cases rejecting Takings Clause challenges to firearms restrictions specifically. Counter-Mot. at 36

2   (citing *Ass'n of New Jersey Rifle & Pistol Clubs, Inc.*, 910 F.3d 106, 124 n. 32 (3rd Cir. 2018));

3   *Akins v. United States*, 82 Fed. Cl. 619, 623-24 (2008); *Fesjian v. Jefferson*, 399 A.2d 861, 865-

4   66 (D.C. Ct. App. 1979)); *see also Or. Firearms Fed'n*, 2023 WL 4541027, at *50-51 (relying on

5   the Ninth Circuit's en banc opinion in *Duncan* and finding on the merits that Oregon's LCM ban

6   does not give rise to a takings claim).

7       Although Plaintiffs criticize purported "dystopian language in the en banc decision in

8   *Duncan*," Pls. Opp'n at 17, they do not explain how *Bruen* would alter that analysis or what

9   subsequent case law exists which challenges the conclusions therein. Nor do Plaintiffs identify

10  anything that would alter the conclusion this Court previously reached that Section 32310 does

11  not effect a taking. Order re: MTD [Dkt No. 74] at 10-13.[15] Indeed, in holding that Plaintiffs had

12  failed to state a takings claim, this Court cited two cases, *Lingle v. Chevron U.S.A. Inc.*, 544 U.S.

13  528 (2005), *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1019 (1992), that Plaintiffs

14  nonetheless cite in the Opposition as support for their takings claim. *Compare* Order re: MTD at

15  10-13 *with* Pls. Opp'n at 19, 21-23.

16      Moreover, even if there was a possible legal basis for bringing a takings claim under the

17  facts alleged in this case, Plaintiffs have put forward no admissible evidence in support of that

18  claim. The declarations of the named Plaintiffs contain the legally conclusory statement that

19  Section 32310 would cause "a physical deprivation of property that is . . . independently

20  valuable." *See, e.g.*, Morris Decl. [Dkt. No. 123-6], ¶ 8; Dang Decl. [Dkt. No. 123-9], ¶ 8

21  (contending that the LCMs "in my possession have substantial value, as irreplaceable items"). But

22  "statements in declarations based on speculation or improper legal conclusions, or argumentative

23  _____

24  [15] This Court dismissed Plaintiffs' takings claim on Defendants' motion to dismiss the second
    amended complaint. Dkt. No. 74 at 10-13. The *Duncan* panel, in a decision subsequently reversed
    by the Ninth Circuit en banc, affirmed the district court's injunction against Section 32310. *See*

25  Counter-Mot. at 7. Before the en banc decision, this Court then ruled on Defendants' motion to
    dismiss the third amended complaint, Dkt. No. 103, and found that the panel decision in *Duncan*

26  was "hard to reconcile" with existing Ninth Circuit precedent but nonetheless held that that
    decision "compels this court to deny the motion to dismiss" as to the Takings claim. But given

27  that this Court is now not compelled by the subsequently-reversed *Duncan* panel decision, its
    thorough analysis of Plaintiffs' Takings claim, Dkt. No. 74, should apply with renewed force on

28  this Counter-Motion.

1    statements, are not *facts* and likewise will not be considered on a motion for summary judgment."

2    *Burch*, 433 F. Supp. 2d at 1119 (E.D. Cal. 2006).

3        Plaintiffs do not put forward any evidence on the actual value, even approximate, of the

4    LCMs they possess. In fact, their own purported expert, General Youngman, states in his

5    declaration that there is "no market, or would be no market," for the sale of used magazines that

6    pre-date 2000. Lee Decl., Ex. B, ¶ 10; *id*. (declaring that "there is or would be very little demand"

7    for such magazines). That conclusion would likely apply with similar force to used magazines

8    that post-date 2000 as well, given General Youngman's statement that "new magazines are

9    relatively inexpensive, and are inherently reliable," while "used magazines, from unknown

10   sources, may suffer from defects such as worn springs, followers and feed lips, which may greatly

11   impair their reliability." *Id*.

12       Plaintiffs' failure to produce "competent evidence of damage" on their takings claim is

13   independently fatal to that claim because, at summary judgment, a takings claim requires "proof

14   that the regulatory action caused deprivation of all economic use." *Weinberg v. Whatcom Cnty.*,

15   241 F.3d 746, 752 (9th Cir. 2001); *see also McGlinchy v. Shell Chem. Co.,* 845 F.2d 802, 808

16   (9th Cir. 1988) ("Summary judgment is appropriate where appellants have no expert witnesses or

17   designated documents providing competent evidence from which a jury could fairly estimate

18   damages.").

19       As to their due process claim, Plaintiffs claim that it is based on "all the same essential

20   reasons" as their takings claim. Pls. Opp'n at 24. For all the same reasons outlined in the Counter-

21   Motion and herein, judgment should be entered for Defendants on that claim.[16] And as to their

22   equal protection claim, Plaintiffs merely repeat that Section 32310 should be subject to strict

23   scrutiny because it "interferes with the exercise of a fundamental right." Pls. Opp'n at 25

24   (quotation omitted). But because Section 32310 does not interfere with the exercise of the Second

25

26   [16] Similar to the procedural history of Plaintiffs' takings claim, this Court dismissed the equal protection claim on the motion to dismiss the second amended complaint and denied the motion

27   to dismiss the third amended complaint because the *Duncan* panel decision "compel[led]" it to. Dkt. 103 at 6. Just as with the takings claim, *see supra* n.5, the Court should readopt its analysis

28   in its order on the motion to dismiss the second amended complaint on the equal protection claim.

Amendment, *see supra* Sections II-III, rational basis review applies and is easily satisfied here.

*See Nordyke v. King*, 681 F.3d 1041, 1043 (9th Cir. 2012). Thus, judgment should be entered for

Defendants on Plaintiffs' equal protection claim.[17]

**CONCLUSION**

For the reasons stated herein and in the Counter-Motion, this Court should grant

Defendants' Counter-Motion and enter judgment in Defendants' favor on all of Plaintiffs' claims.

Dated:  September 29, 2023                              Respectfully submitted,

                                                       ROB BONTA
                                                       Attorney General of California
                                                       MARK R. BECKINGTON
                                                       Supervising Deputy Attorney General
                                                       JOHN D. ECHEVERRIA
                                                       Deputy Attorney General


                                                       /s/ Robert L. Meyerhoff
                                                       ROBERT L. MEYERHOFF
                                                       Deputy Attorney General
                                                       *Attorneys for Defendants Rob Bonta in his
                                                       official capacity as Attorney General of the
                                                       State of California and Allison Mendoza in
                                                       her Official Capacity as Director of the
                                                       Bureau of Firearms*

---

[17] In the Counter-Motion, Defendants requested that, if the Court were inclined to enter judgment in Plaintiffs' favor, it stay any such judgment pending appeal. Counter-Mot. at 39-40. In their Opposition, Plaintiffs merely accuse Defendants of "a preemptive strike against the judgment" based on the "'important public-safety' purposes" of Section 32310, but do not conduct any analysis under the applicable factors. Pls. Opp'n at 25. Given that Plaintiffs do not actually refute Defendants' contention that Defendants would be likely to succeed on appeal, that they will likely suffer irreparable harm in the absence of a stay, and that the balance of equities and the public interest favor a stay, Counter-Mot. at 39-40, this Court should stay any judgment against Defendants pending appeal.